UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK REESE, FRANCES ELAINE PIDDE,
JAMES CICHANOFSKY, ROGER
MILLER, GEORGE NOWLIN, and
RONALD HITT, on behalf of themselves
and a similarly situated class,

      Plaintiffs,                     Case No. 04-70592

v.                                     Honorable Patrick J. Duggan

CNH GLOBAL N.V. and
CNH AMERICA LLC,

      Defendants.
_____/


## OPINION AND ORDER (1) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT CNH AMERICA LLC'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on August 29,2007.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

Plaintiffs filed this lawsuit on February 18, 2004, pursuant to Section 301 of the

Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, and Section 502(a)(1)(B)

of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §

1132(a)(1)(B).  Plaintiffs, on behalf of themselves and a Class of similarly situated

persons,[1] seek a declaratory judgment that they and their surviving spouses have a vested right to lifetime health care benefits from Defendants CNH America LLC ("CNH") and CNH Global N.V. ("CNH Global").  Plaintiffs also seek damages and injunctive relief.

Presently before the Court are Plaintiffs' motion for summary judgment as to liability and CNH's motion for summary judgment.[2]  In their motions, both parties argue that there is no genuine issue of material fact with regard to whether Plaintiffs are entitled to vested retiree health insurance benefits.  Plaintiffs contend that there is no genuine issue that retiree health care benefits are vested benefits and that, therefore, they should prevail on their claims.  CNH contends that there is no genuine issue that retiree health care benefits are not vested benefits and that Plaintiffs' claims, therefore, should be dismissed.  In its motion, CNH also seeks summary judgment with respect to Plaintiffs' claim for mental distress damages.  Both motions have been fully briefed and, on June 13,

---

[1]Pursuant to an opinion and order entered today, the Class is defined as follows:

> All former bargaining unit employees who retired under the Case Corporation Pension Plan for Hourly Paid Employees after July 1, 1994, and who retired or were eligible to retire on or before November 1, 2004 (other than former employees eligible for or receiving retirement benefits under the deferred vested provisions of the Pension Plan and former employees hired after May 18, 1998), and all surviving spouses of those former bargaining unit employees.

[2]CNH Global joins in CNH's motion, although it filed a separate motion for summary judgment focusing on whether it is a proper defendant to this action.  (Doc. 127 at 2.)

2007, this Court heard oral argument with respect to the motions.[3]

## I.    Factual Background

Plaintiffs are retirees of a company formerly known as Case[4] or the retirees'

surviving spouses.  The International Union, United Automobile, Aerospace and

Agricultural Workers of America ("UAW") represented Case employees in collective

bargaining over the years.  Since 1967, the UAW and Case have negotiated a number of

collective bargaining agreements, referred to as Central Agreements, including Central

Agreements in 1971, 1974, 1980, 1983, 1987, 1990, 1995, 1998, and 2005.  In 1993, the

UAW and Case negotiated an Extension agreement which extended the Central

Agreement through February 5, 1995.  Beginning with the 1971 Central Agreement,

collectively bargained group insurance benefits were contained in a separate document,

the Group Insurance Plan.

With respect to that Plan, the Central Agreements between Case and the UAW

from 1971 forward contain the following language in Article XIV, Section 4A: "The

---

[3]The parties filed post-hearing briefs as well.  Defendants filed a post-hearing brief on July 19, 2007; Plaintiffs filed a response on July 31, 2007; and Defendants filed a reply on August 3, 2007.

[4]For purposes of resolving Plaintiffs' and CNH's motions for summary judgment, it is not necessary to set forth the history of the business for whom the retirees worked. This history is set forth, at least in part, in opinions and orders addressing other pending motions; it also is set forth in the Sixth Circuit's decision in a companion matter, *Yolton v. El Paso Tennessee Pipeline Co.,* 435 F.3d 571, 574 (6th Cir. 2006).  While the business changed its name several times, for ease of reference the Court will refer to it as "Case" or "CNH America."

group insurance agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this Agreement. (CNH's Mot. Exs. A-1, A-6, A-9); *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 575 (6th Cir. 2006). The language of the Group Benefit Plans from 1971 through 1998 remained substantially unchanged. (CNH's Mot. Ex. A-7 [1995 Group Insurance Plan] at CNHA032451; Ex. A-10 Part III [1998 Group Insurance Plan] at CNHA032544); *Yolton v. El Paso Tennessee Pipeline Co.*, 318 F. Supp. 2d 455, 460 (E.D. Mich. 2003)(evaluating plans from 1971 through 1990.) With respect to eligibility, the Plans provide that "[e]mployees who retire under the Case Corporation Pension Plan for Hourly Paid Employees, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for the Group benefits described in the following paragraphs."[5] *Id.* Beginning in 1974, Case agreed to pay the full cost of health care benefits for retirees and eligible surviving spouses, regardless of age. *Id.*; *Yolton*, 435 F.3d at 575. Therefore, from that year forward, under a section entitled "Contribution for Coverage," the Plans provide that "the company shall pay the full premium cost of the above coverages." *Id.* In 1998, the language was altered to read: "No contributions are required for the Health Care Plans,

_____

[5]In the 1998 Group Benefit Plan, the paragraph was slightly modified to add the italicized language: "Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees *after 7/1/94*, . . ." (CNH's Mot. Ex. A-10, Part III at CNHA032542.) The clause was otherwise unchanged. The 1998 Group Benefit Plan further provided that "[E]mployees hired after May 18, 1998, are not eligible for [retiree] health care coverage." (*Id*. at CNHA032543.) This limitations does not apply to any member of the Class.

Dental Plan, Vision Plan and Hearing Plan." (CNH's Mot. Ex. A-10 Part III at CNHA032544.)

In the current Group Benefit Plan, made effective with the 2005 negotiations between the UAW and now CNH America and developed through the 2005 Central Agreement, retirees and surviving spouses of retirees who retired on or after December 1, 2004, are required to contribute towards their medical plans per a contribution schedule. (CNH's Mot. Ex. A-13 at CNHA053617 & CNHA053705.)

As indicated previously, in 1993, the UAW and Case negotiated an Extension Agreement which extended the 1990 Central Agreement and Group Benefit Plan through February 4, 1995. In Section 9 of the 1993 Extension Agreement, under the heading "FAS 106 Out-Year Cost Limiters,"[6] the parties adopted a Letter of Agreement, effective October 3, 1993. (CNH's Mot. Ex. A-3.) This letter ("the 1993 Cap Letter") reads:

> This will confirm our understanding that the average per capita annual cost to the Company of providing medical and related benefits under the Case Group Benefit Plan to retired employees and surviving spouses of deceased employees shall not exceed $2,750 for Medicare eligible individuals and $8,500 for those individuals who are not eligible for Medicare. Notwithstanding the foregoing, no covered person shall be required to pay a portion of any excess amount prior

---

[6]"FAS-106" refers to an accounting standard promulgated by the Financial Accounting Standards Board, which took effect on December 15, 1992. This rule requires companies to report as costs on their financial statements, the present value of their estimated future post-retirement health care obligations. *See Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 932 & n.3 (5th Cir. 1993). In other words, the accounting standard requires companies to report their estimated future post-retirement health care costs on an accrual basis, rather than on a "pay-as-you-go" basis.

to April 1, 1998.

(CNH's Mot. Ex. A-3 at UAW3310.) The 1995 Tentative Agreement between the UAW and Case extended the 1993 Cap Letter, as per a February 5, 1995 letter from Case to the UAW which was attached to the agreement as an exhibit ("1995 Cap Letter"). (CNH's Mot. Ex. A-5 at UAWR081001 & UAWR081006.) The 1995 Cap Letter was identical to the 1993 Cap Letter, except the date when retired employees or their surviving spouses could be required to pay a portion of their health care benefits was extended to January 1, 1999. (*Id*. at UAWR081006.)

Case and the UAW agreed to eliminate the Cap Letters in a Tentative Agreement dated April 23, 1998. (CNH's Mot. Ex. A-8 at CASELLC17166 & CASELLC17237.) In this Tentative Agreement, Case and the UAW further agreed that medical plan "changes/improvements" for active employees will be applicable to non-Medicare eligible retirees who retired after July 1, 1994. (*Id*. at CASELLC17166.) One of these changes was the extension of a Managed Health Care Network Plan ("Network Plan"), a Preferred Provider Organization ("PPO"), to current active employees and non-Medicare retirees. (*Id*. at CASELLC17228.) Pursuant to the agreement, active employees and retirees still had the option of selecting a Health Maintenance Organization ("HMO") and, in some areas, other types of medical plans. The 1998 Tentative Agreement contained a Letter of Understanding regarding the cost of healthcare coverage ("1998 Letter of Understanding"), wherein the UAW and Case "agreed that over the term of the 1998 labor agreement employees and retirees who are enrolled in a Company offered

6

HMO, PPO or other plan will not have to pay any additional employee contributions above those which may be required for enrollment in the Case Managed Network Plan (if any)." (*Id.* at CASELLC17241.) The 1998 Letter of Understanding subsequently was included in the 1998 Group Benefit Plan which, as indicated previously, also provided that no contributions are required for retiree health care coverage. (CNH's Mot. Ex. A-10 Part II at CNHA032544 & CNHA032556.)

Some Case or CNH employees retired when Case or CNH decided to close the facilities at which they worked. Prior to these plant closings, the UAW and the company entered into Plant Shutdown Agreements. For example, the UAW and Case entered a Shutdown Agreement in 1993 prior to Case's termination of all activities at its Memphis Depot and Wausau Plant and of most covered operations at its Hinsdale Engineering Center. (Doc. 172 Ex. 7.) CNH Global and the UAW entered into another Shutdown Agreement in 2002 when the East Moline facility was closed.[7] (Pl.'s Mot. Ex. 47.) Pursuant to these Shutdown Agreements, eligible employees had the option to choose one of the following three options when their positions were terminated: (A) layoff/master recall, (B) Special Plant Shutdown Retirement (also referred to as Special Early Retirement), or (C) severance pay. (*Id.* at CNHA030587); *Yolton*, 318 F. Supp. 2d at 461.

_____

[7]CNH Global has filed a motion for summary judgment in which it claims that CNH was the entity that negotiated and entered the 2002 East Moline Shutdown Agreement with the UAW. (Doc. 127 at ¶ 25.) According to CNH Global, its name was listed on the agreement in error. (*Id.*) Whether CNH America or CNH Global was a party to the agreement is not relevant for purposes of deciding the present cross-motions for summary judgment.

Employees electing Option B, including employees who grew into special early retirement, received, among other entitlements, special early retirement pension benefits and the post-retirement medical coverage that applies generally to retired employees pursuant to the current Central Agreement and Group Benefit Plan. *Id.*

Over the years, Summary Plan Descriptions ("SPDs") describing insurance benefits under the Group Benefit Plans were prepared. The SPDs between 1974 and 1980 included the following provision in which Case reserved the right to change the terms of the Group Insurance Plan:

> It is hoped that the Group Policies will be continued indefinitely through the years, but your employer necessarily reserves the right, subject to the applicable provisions of the Labor Agreement between the Union and the Company, to terminate or change the Plan in the future.

*Yolton*, 435 F.3d at 575; *Yolton*, 318 F. Supp. 2d at 467-68. The SPD effective June 1990 through June 1993 stated that "[i]f there is any variance between the contents of this booklet and the above documents [the actual contracts, plan documents, and labor agreements on which the benefits are based], those documents will govern." (Doc. 127, Ex. A-3.) In 1999, a SPD was prepared for Case employees at the company's East Moline and Burlington facilities. The 1999 SPD contained the following reservation of rights language: "*Your employer or group sponsor has the authority to terminate, amend or modify the coverage described in this certificate at any time. (Changes may be subject to any Bargained Contracts.) . . . If your contract is terminated, you may not receive benefits.*" (CNH's Mot. Ex. A-14 at UAWR107881 (emphasis in original).) CNH

8

America prepared a 2000 SPD, effective May 1998 through May 2004, containing the

following language: "An amendment or termination of the Case Corporation benefit plans

may affect not only the coverages of active employees (and their covered dependents) but

also of COBRA participants and former employees who retired, died, or otherwise

terminated employment." (CNH's Mot. Ex. A-15 at EMR00005.) Above this statement,

under the title "Official Plan Documents," the 2000 SPD provides: "The official plan

documents and labor agreements govern your rights and benefits. If there is any variance

between the contents of this handbook and the official plan documents and labor

agreements, those documents or agreements will govern." (*Id.*)

After July 1, 1994, members of the Class or deceased spouses of Class members

retired from Case or CNH America and began receiving retiree medical insurance

coverage. The Class members paid no money toward the premium cost of their coverage.

On February 11, 2004, CNH filed a complaint against the UAW in the United States

District Court for the Eastern District of Wisconsin, seeking a declaration that it has the

right under ERISA and the LMRA to modify or terminate retiree health care benefits

upon the expiration of the 1998 Central Agreement (i.e. May 2, 2004) for all employees

represented by the UAW who retired on or after July 1, 1994. In response, Plaintiffs filed

the present action in this Court on February 18, 2004.[8]

---

[8]The District Court for the Eastern District of Wisconsin dismissed CNH's
declaratory judgment action on August 3, 2004, concluding that the matter should be
pursued in this Court.

## II.     Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323.  Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255.  The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant."  *See id.*

### III. Plaintiffs' Claim to Vested Retiree Health Insurance Benefits

Plaintiffs seek summary judgment and oppose CNH's motion for summary judgment, arguing that the relevant language in the negotiated Group Benefit Plans which confers health care benefits on retirees and their surviving spouses is essentially identical to the language in the Group Benefit Plans that this Court and the Sixth Circuit construed in *Yolton*. To the extent this Court previously was unsure of the impact of the FAS-106 Letter adopted in 1993, *see Yolton* 318 F. Supp. 2d at 473, Plaintiffs argue that the elimination of the letter by the UAW and Case during their 1998 negotiations compels a finding that retiree health care benefits are vested. Finally, Plaintiffs point to extrinsic evidence to demonstrate that the 1993 and 1995 Cap Letters were adopted for accounting purposes only and that even during the period when the letters were in effect, Case regarded the health care benefits of retirees and their surviving spouses as vested benefits.

CNH argues in its motion for summary judgment and in opposition to Plaintiffs' motion, that the 1993 and 1995 Cap Letters contain express limitations on the duration of fully-funded retiree heath care benefits and thus demonstrate that the UAW and Case did not intend for those benefits to vest. CNH further points out that the 2005 labor agreements require retirees and their surviving spouses to contribute to the costs of their health care benefits. CNH also refers to reservation of rights language in the Summary Plan Descriptions over the years, which CNH argues gave the employer the unilateral right to change or terminate retiree health care benefits. Finally, CNH relies on the deposition testimony of Case and/or CNH employees who worked in the company's

11

benefits department and benefit summaries those representatives provided to retiring employees, in which they indicate that retiree health insurance benefits are not vested benefits.

### A.    Governing Principles

A retiree health insurance benefit plan is a welfare benefit plan under ERISA and, as such, unlike pension plans, are not subject to mandatory vesting requirements under the statute.  *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000) (citing *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993)).  "If lifetime health care benefits exist for the plaintiffs, it is because the UAW and the defendants agreed to vest a welfare benefit plan."  *Yolton*, 435 F.3d at 578 (citing *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996)).  If the parties intended the benefits to vest for the lifetime of the retirees, the employer's unilateral modification or reduction of those benefits will constitute an LMRA violation.  *Id.* (citing *Maurer*, 212 F.3d at 914).  "If a welfare benefit has not vested, 'after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA.'"  *Id.* (quoting *Bittinger v. Tecumseh Prod. Co.*, 83 F. Supp. 2d 851, 857 (E.D. Mich. 1998)).

The Sixth Circuit's decision in *UAW v. Yard-Man, Inc.*, 716 F. 2d 1476, 1479 (1983), sets forth the guiding principles for determining whether the parties to a collective bargaining agreement intended for retiree insurance benefits to vest.  Pursuant to these principles, courts must apply basic rules of contract interpretation to discern the intent of the parties:

> [T]he court should first look to the explicit language of the
> collective bargaining agreement for clear manifestations of
> intent. The intended meaning of even the most explicit
> language can, of course, only be understood in light of the
> context which gave rise to its inclusion. The court should also
> interpret each provision in question as part of the integrated
> whole. If possible, each provision should be construed
> consistently with the entire document and the relative
> positions and purposes of the parties. As in all contracts, the
> collective bargaining agreement's terms must be construed so
> as to render none nugatory and avoid illusory promises.
> Where ambiguities exist, the court may look to other words
> and phrases in the collective bargaining agreement for
> guidance. Variations in language used in other durational
> provisions of the agreement may, for example, provide
> inferences of intent useful in clarifying a provision whose
> intended duration is ambiguous. Finally, the court should
> review the interpretation ultimately derived from its
> examination of the language, context and other indicia of
> intent for consistency with federal labor policy.

*Id*. at 1479-80 (internal citations omitted). Where the above analysis fails to resolve any

ambiguities, courts may look to extrinsic evidence to determine the parties' intent.

*Yolton*, 435 F.3d at 579 (citations omitted).

## B.    Application

Setting aside for a moment the 1993 and 1995 Cap Letters and the 1998 Letter of

Understanding, the relevant provisions in the Central Agreements and Group Benefit

Plans at issue in this case are substantially identical to the provisions this Court and the

Sixth Circuit evaluated in *Yolton*.[9]  In that case, both courts interpreted the labor

---

[9]At the motion hearing, Defendants' counsel attempted to distinguish the language
of the labor agreements at issue in this case and the language the Sixth Circuit considered
in cases other than *Yolton*, which the appellate court interpreted as granting retirees

agreements as conferring vested lifetime retiree health insurance benefits on retirees and surviving spouses. The defendants in *Yolton* raised the same arguments to support their claim that the UAW and Case did not intend retiree health insurance benefits to vest that CNH presents now. For the same reason this Court rejected those arguments in *Yolton*, it rejects them in this case.

While CNH refers to different SPDs than those considered in *Yolton*, there is no significant difference in the language of these documents. Like the SPDs in *Yolton*, 318 F. Supp. 2d at 468, the reservation of rights language in the present SPDs expressly provide that the employer's right to unilaterally modify or terminate the plan is subject to the applicable labor agreements.[10] (CNH's Mot. Ex. A-14 [1998 Alliance Select Care

_____

lifetime, free health insurance benefits. This Court finds no distinction. The Group Benefit Plans in this case state that retired employees or their surviving spouses, eligible for benefits under the pension plan "shall be eligible for the Group benefits as described in the following paragraphs" and that "no contributions" for coverage are required– meaning that the employer is responsible for the full premium or subscription charge. *See supra*. Contrary to Defendants' assertion, this language speaks directly to duration: as long as the employee or surviving spouse is eligible to receive a pension (which is presumed to be a lifetime benefit). As discussed *infra*, the Court does not read the 1998 Group Benefit Plan as limiting the duration of retiree health care benefits to the term of the 1998 Central Agreement. The above quoted language also addresses what benefits retirees and their surviving spouses are eligible to receive– that is, "the Group benefits as described [therein]."

[10]Interpreting the SPDs as barring Plaintiffs' claim to vested retiree health insurance benefits, CNH suggests in its motion for summary judgment that it may be appropriate for the Court to certify two subclasses of retirees: those who retired before the SPDs were distributed and those who retired after their distribution. (CNH Br. in Supp. of Mot. at 2.) Because the Court disagrees with CNH's interpretation, if finds it unnecessary to create such subclasses.

Certificate] at UAWR107881; Ex. A-15 ["2000 SPD"] at EMR00005; Ex. R [2000 SPD];

CNH's Resp. Ex. C ["1995 SPD"] at 3.)  For example, the 2000 SPD provides:

> This handbook describes the main provisions of your benefit
> plans.  However, not every detail is included.  The official
> plan documents and labor agreements govern your rights and
> benefits.  If there is any variance between the contents of this
> handbook and the official plan documents and labor
> agreements, those documents and agreements will govern.

(CNH Mot. Ex. A-15 at EMR00005.)  Further, as was also the case with the SPDs

considered in *Yolton*, 318 F. Supp. 2d at 468, the 2000 SPD on which CNH relies ties

eligibility for retiree group benefit plans, including group health coverage, to the retiree's

or surviving spouse's eligibility for pension benefits.  (*See, e.g., id.* at EMR00139.)  The

2000 SPD further provides that "[e]xcept where noted, the benefits and maximums under

these continued coverages *will be the same as those that were in effect on the day*

*preceding your retirement*."  (*Id.* (emphasis added).)  Thus the SPDs on which CNH

relies do not negate the Group Benefit Plans' vesting language.

A factor not present in *Yolton*, which CNH argues demonstrates the UAW's and

Case's mutual understanding that retiree health insurance benefits were not vested, was

the imposition of a Network Plan on already retired individuals and their surviving

spouses pursuant to the 1998 Group Benefit Plan.  This was a change negotiated between

Case and the UAW, which Plaintiffs note was an improvement to retiree health insurance

coverage.  (Pls.' Reply Br. at 3 n. 2.)  Plaintiffs' toleration of previous changes to their

health insurance benefits that were negotiated by the UAW does not bar them from

claiming that those benefits are vested. *Cole v. ArvinMeritor, Inc.*, Nos. 03-73872, 04-73656, 2005 WL 3502182, at *23 (E.D. Mich. Dec. 22, 2005) (citing *Helwig v. Kelsey-Hayes Co.*, 857 F. Supp. 1168, 1174 n. 2 (E.D. Mich. 1994) and *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1266-67 (W.D. Mich. 1990)).  "[M]erely because plaintiffs chose not to bring suit on earlier changes does not mean that they have tacitly admitted that their benefits are limited and terminable.  Instead, it merely indicates that the substance of the more recent changes have prompted them to seek relief." *Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034, 1042 (E.D. Mich. 1994).

The Seventh Circuit did not hold otherwise in *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 442 (7th Cir. 1998), a case on which CNH relies.  As an initial matter, the *Carrao* court first interpreted the relevant language of the governing labor agreement as not granting retirees vested health insurance benefits.  *Id*. at 440-41.  As the agreement only granted retirees benefits "for the term of this Agreement," the employer was free to make unilateral changes to those benefits once the agreement expired.  Moreover, the Seventh Circuit specifically noted that in prior opinions it had "suggested that an employer might be able to make minor changes in a retiree's health plan, perhaps even going so far as to impose a PPO or an HMO on retirees, without violating a promise to give lifetime benefits."  *Id*. at 442 (citing *Diehl v. Twin Disc, Inc.*, 102 F.3d 301 (7th Cir. 1996)).

CNH primarily relies on the 1993 and 1995 Cap Letters and the 1998 Letter of Understanding to support its claim that the parties to the relevant labor agreements did not

intend retiree health care benefits to vest.  The Court will quickly dispose of the 1998

Letter of Understanding's significance, as it finds that the letter has no bearing on

whether the UAW and Case intended retiree health insurance benefits to vest.

The plain language of the 1998 Letter of Understanding simply provides that,

during the term of the 1998 Central Agreement, the cost for health insurance coverage for

retirees electing a non-Network option (i.e. an "HMO, PPO, or other plan")[11] will not be

greater than the cost (if any) for the Network option.  (CNH's Mot. Ex. A-10 Part III at

CNHA032556.)  It does not provide that contributions can be sought from retirees and

surviving spouses for Network coverage once the 1998 Central Agreement expires.  This

interpretation is supported by the fact that, where the UAW and Case/CNH intended to

impose future costs on retirees and their surviving spouses for their continued health

insurance coverage, they knew how to expressly do so.  Specifically, in the 2005 Group

Benefit Plan, the UAW and CNH provide that, "*[e]ffective April 1, 2005* retirees and

surviving spouses of retirees who retired from the Company *on or after December 1,

2004* as well as any current and future LTD participants, will be required to contribute

towards the medical plan per [a contribution schedule."  (CNH's Mot. Ex. A-13 at

CNHA053617.)  Moreover, it seem implausible that CNH would agree to impose the

increased contributions only on those retirees and surviving spouses of retirees who

---

[11]At the motion hearing, Defendants' counsel suggested that "other plan"
encompasses all of the plans the company was providing at the time.  Clearly, however,
"other plan" does not refer to the Network plan or the letter would be rendered
meaningless.

retired on or after December 1, 2004– as it did during the 2005 negotiations– if it viewed the language of the 1998 Letter of Understanding as rendering retiree health insurance benefits not vested.  Finally, as indicated earlier in this opinion, the 1998 Group Benefit Plan contains vesting language in that it ties eligibility for retiree health care benefits to eligibility for a pension and it expressly provides that, for eligible retirees and surviving spouses, "[n]o contributions are required for the Health Care Plans . . ."  (*Id*. at CNHA032542 & CNHA032544.)  Thus the Court will focus on the 1993 and 1995 Cap Letters.

As an initial matter, this Court did not hold in *Yolton* that individuals who retired after October 3, 1993 (the date the first Cap Letter was adopted) "are *unlikely to succeed on the merits of their claims for 'vested' retiree health care benefits . . .*"  (CNH's Br. in Supp. of Mot. at 1 & 12; CNH's Resp. Br. at 2 & 8.)  Instead, the Court simply held that "[a]t this time"– notably the preliminary injunction stage– it "is not convinced that the FAS-106 Letter [1993 Cap Letter] was merely for accounting purposes and that the UAW and Case therefore did not intend for it to limit Case's obligations to provide future retirees' [sic] health care benefits."  *Yolton*, 318 F. Supp. 2d at 473.  At this stage in the present proceedings– aided by documents obtained by the parties through discovery and the parties' more expansive arguments– the Court now concludes that the 1993 and 1995 Cap Letters *do not* defeat Plaintiffs' claim for vested retiree health insurance benefits.

The 1993 and 1995 Cap Letters do not contain any language evidencing an intent by the UAW and Case to limit the *duration* of retiree health insurance benefits.  Instead,

18

they only set forth caps on Case's future costs for those benefits. Pursuant to the express terms of the Cap Letters, those cost-controlling caps were to take effect only after the expiration of the then current Central Agreements. This supports Plaintiffs' claim that retiree health insurance benefits were intended to continue after the termination date of the Central Agreements and Group Benefit Plans.

Moreover, the language of the 1993 and 1995 Cap Letters does not unambiguously demonstrate Case's and the UAW's intent to impose contribution costs on retirees and their surviving spouses to maintain their health insurance coverage.[12] The Cap Letters do not provide that individuals *will* be required to pay anything as of a subsequent date. Instead, they only state that "no covered person shall be required to pay a portion of any excess amount prior to [a specified future date]." Because the future dates selected in the Cap Letters are beyond the negotiation period for the subsequent Central Agreement, it is not clear whether the UAW and Case intended and/or otherwise agreed to take actions during future negotiations to prevent the cap from taking effect. Extrinsic evidence indicates that Case and the UAW in fact did not intend for the cap to ever have a substantive affect on retirees and their surviving spouses and that the cap was imposed solely for accounting purposes.

For example, the following statement is contained in an internal Case memo prepared in advance of the 1993 negotiations between the company and the UAW, under

---

[12]Compare the language of the 2005 Group Benefit Plan. (CNH's Mot. Ex. A-13 at CNHAO53617.)

the heading "Lower caps in FAS 106 letter from 9000/3000 to 8500/2500": "No practical

effect; Won't hurt anyone; Two contracts between now and any effect; Would save us

approximately $2.1 million in expense each year unless and until caps are adjusted."

(Pls.' Mot. Ex. 14, Att. 88.)  In order to have "no practical effect" and "[not] hurt

anyone," Case could not have intended for the caps to be imposed on any retiree or

surviving spouse.  Moreover, as the caps would not have taken effect when Case realized

the $2.1 million savings noted in the memo, those savings cannot refer to a decrease in

Case's actual costs for its retiree health insurance contributions.  More likely, the savings

referred to in the memo are the result of its reporting lower future estimated costs for its

post-retirement health obligations on its balance sheets.  This is consistent with Plaintiffs'

contention that, in light of the FAS-106 accounting standard, the UAW and Case intended

the 1993 and 1995 Cap Letters to serve only as an accommodation whereby the UAW

agreed to allow Case to temporarily reduce the figure for its estimated future costs for

retiree medical benefits on its financial records.

According to UAW representatives who were involved in the 1993 negotiations,

this is precisely what Case's representatives told them to convince them to agree to the

1993 Cap Letter.  (Pls.' Mot. Ex. 4 at 57; Ex. 28 at 146-153.)  As Phillip Cabreros

testified during his deposition:

> Again, from day one, when this was brought to my attention
> in collective bargaining, it was never intended to affect any
> healthcare benefits for current or future retirees.  The sole
> purpose of this was to deal with FAS, the new FAS
> accounting standards, and to help the company.  That was it.

That was it.

(*Id.* Ex. 4 at 57.) Jack Reese testified that the understanding of Case and the UAW was that the cap never would be reached because its effective date would be moved and therefore retirees and their surviving spouses never would be required to contribute to the cost of their health care benefits.[13] (*Id.* Ex. 28 at 147-48.) Further, in a summary of the 1993 extension agreement reached between the UAW and Case, Case reported that the agreement "[s]ubstantially reduces *FAS 106* retiree medical costs." (Pls.' Mot. Ex. 63 (italics added).)

Importantly, for almost a decade after the adoption of the 1993 Cap Letter, employees within Case's benefits department neither understood nor informed employees retiring from Case that their future retiree medical benefits would be subject to a cap. (*Id.* Ex. 19 at 139 & Att. 40; Ex. 30 at 135.) To the contrary, Case's representatives understood that retirees and their surviving spouses were entitled to lifetime medical insurance benefits and they conveyed this understanding to retirees and surviving

---

[13]Notably, as Mr. Reese discussed during his deposition, there were two bargaining opportunities from the time the 1993 Cap Letter was adopted until the date in that letter when retirees or surviving spouses of retirees could be required to pay a portion of any amount above the cap (i.e. April 1, 1998). (Pls.' Mot. Ex. 28 at 149-50.) Thus the parties had two opportunities to move the date before the cap took effect. Additionally, the Court expects that the UAW negotiating representatives knew that if Case showed any reluctance to extend the dates, they would have the terms of two Central Agreements with which to bargain for the change.

spouses.[14]  (*See, e.g., id.* Ex. 1, Att. 5, 8, 9, 11-21, 24, 25, & 27; Ex. 10, Att. 1; Ex. 12, Att. 22-27; Ex. 30 at 135 & Att. 40; Ex. 64; Ex. 65.)  CNH presents contradictory extrinsic evidence in the form of deposition testimony and letters its benefits representatives wrote to retirees or their surviving spouses providing that, for example, "[r]etiree life benefit amounts are negotiated and, therefore, subject to change with subsequent UAW contracts."  (CNH Resp. Br. at 18.)  CNH's evidence, however, post-dates the plaintiffs' complaint in *Yolton* and, in some cases, the date CNH filed its declaratory judgment action in Wisconsin.  The Court also does not find the self-serving deposition testimony of Case's benefit representatives persuasive where it is contradicted by documents the representatives prepared prior to this litigation.

In light of the above, the Court finds no genuine issue of material fact with respect to whether Plaintiffs are entitled to vested retiree health insurance benefits.  The Court concludes that the plain language of the relevant agreements, as further supported by extrinsic evidence, demonstrates Case's and the UAW's intent to grant lifetime retiree health insurance coverage to retirees and surviving spouses of retirees who are eligible for

---

[14]It is of no significance that some of Plaintiffs' evidence relates to retirees who retired before October 3, 1993.  While the Court held in *Yolton* in December 2003 that the cap letter could have no effect on individuals who retired before it was adopted or their surviving spouses, Case's position in *Yolton* and the present case has been that it could impose the cap on all retirees and surviving spouses, regardless of retirement date.  Thus, the fact that Case's benefits representatives were informing retirees and surviving spouses of retirees, after the 1993 Cap Letter was adopted, that they were entitled to vested retiree health insurance benefits, supports Plaintiffs' argument that the UAW and Case did not intend for the letter to have a substantive impact on those benefits.

or are receiving a pension.

## IV. Plaintiffs' Claim for Emotional Distress Damages

In their complaint, Plaintiffs seek damages "for mental distress and anguish suffered by the Class Representatives and Class members resulting from [Defendants] breach of contractual obligations under Section 301 of the LMRA to provide them with health care benefits." (Pls.' Am. Compl. at 7.) CNH seeks summary judgment with respect to Plaintiffs' claim for extra-contractual damages, arguing that the standard for awarding such damages is not satisfied in the present matter. Defendants assume that Plaintiffs concede this point, as Plaintiffs failed to respond to Defendants' arguments in their pleadings. At the motion hearing, Plaintiffs' counsel attempted to clarify Plaintiffs' position on this issue.

According to Plaintiffs' counsel, Plaintiffs believe that they can recover emotional distress damages if Defendants terminate or modify their health care benefits. Plaintiffs' counsel acknowledged, however, that Defendants have not yet taken such action and that Plaintiffs therefore have not suffered emotional distress. According to Plaintiffs' counsel, so long as Defendants do not modify or terminate their benefits, Plaintiffs are not seeking emotional distress damages.

In light of the above, the Court concludes that Plaintiffs' claim for emotional distress damages is not ripe. Courts lack subject matter jurisdiction to decide unripe claims. *See, e.g., Arnett v. Myers*, 281 F.3d 552, 562 (6th Cir. 2002) (citations omitted). Any ruling on Defendants' motion for summary judgment with respect to Plaintiffs'

23

emotional distress claim would constitute an advisory opinion.  For these reasons, the Court dismisses the claim, but without prejudice.

**V.     Conclusion**

Based on the foregoing analysis, the Court concludes that Plaintiffs are entitled to vested lifetime retiree health care benefits as provided for in the labor agreements in effect at the time of their or their deceased spouses' retirement.  With respect to Plaintiffs' claim for mental distress damages, the Court grants CNH's motion to dismiss that claim, but does so without prejudice.

Accordingly,

**IT IS ORDERED**, that Plaintiffs' motion for summary judgment as to liability is **GRANTED**;

**IT IS FURTHER ORDERED**, that CNH's motion for summary judgment is **GRANTED IN PART** with respect to Plaintiffs' request for mental distress damages and **DENIED IN PART** with respect to Plaintiffs' claim to vested retiree health insurance benefits.


s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Counsel of Record