UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK REESE, FRANCES ELAINE PIDDE,
JAMES CICHANOFSKY, ROGER
MILLER, GEORGE NOWLIN, and
RONALD HITT, on behalf of themselves
and a similarly situated class,

      Plaintiffs,

                                      Case No. 04-70592

v.

                                      Honorable Patrick J. Duggan

CNH GLOBAL N.V. and
CNH AMERICA LLC,

      Defendants.

_____/

## <u>OPINION AND ORDER</u>

      This matter is back before the Court, on remand from the Sixth Circuit Court of

Appeals, following this Court's decision granting summary judgment to Plaintiffs on their

claim that they are entitled to vested lifetime retiree health care benefits from Defendants.

*Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir.), *reh'g denied* 583 F.3d 995 (6th Cir.

2009).  The Sixth Circuit affirmed this Court's holding that Plaintiffs are entitled to

vested health care benefits, but reversed and remanded on the issue of what types of

changes, if any, are permitted to those benefits.  574 F.3d at 318.  This Court also had

awarded Plaintiffs attorneys' fees which Defendants challenged on appeal.  The Sixth

Circuit vacated the fee award and remanded the attorneys' fees issue to this Court,

reasoning that because the appellate court concluded that Plaintiffs "have not shown that

they are entitled to unchangeable benefits"– an issue this Court previously concluded

Plaintiffs prevailed upon– "the rationale for the fee award . . . may no longer be sound." *Id*. at 328.

On remand, the parties have filed several motions: (1) Plaintiffs' Motion for Summary Judgment Relating to All Class Matters pursuant to Federal Rule of Civil Procedure 56(c), filed July 16, 2010 (Doc. 273); (2) Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b), filed August 9, 2010 (Doc. 280); (3) CNH America LLC's Motion for Approval of Reasonable Changes to Plaintiffs' Health-Care Benefits, filed June 30, 2010 (Doc. 271); (4) Plaintiffs' Second Motion for Summary Judgment Regarding the East Moline Shutdown Agreement pursuant to Federal Rule of Civil Procedure 56(c), filed September 7, 2010 (Doc. 290); and (5) Defendants' Motion for Summary Judgment Related to the East Moline Shutdown Agreement pursuant to Rule 56(b), filed October 1, 2010 (Doc. 293).  The motions have been fully briefed.  On January 18, 2011, this Court held a hearing with respect to the motions.

## I.    Factual and Procedural Background

Plaintiffs filed this lawsuit on February 18, 2004, pursuant to Section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, and Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  Plaintiffs, on behalf of themselves and a Class of similarly situated persons,[1] sought a declaratory judgment that they and their surviving spouses have a

---

[1]The Class is defined as follows:

vested right to lifetime health care benefits from Defendants CNH America LLC

("CNH") and CNH Global N.V. ("CNH Global").  Plaintiffs also sought damages and

injunctive relief.

Plaintiffs are retirees of a company formerly known as Case[2] or the surviving

spouses of those retirees.  The International Union, United Automobile, Aerospace and

Agricultural Workers of America ("UAW") represented Case employees in collective

bargaining over the years.  Since 1967, the UAW and Case have negotiated a number of

collective bargaining agreements, referred to as Central Agreements, including Central

Agreements in 1971, 1974, 1980, 1983, 1987, 1990, 1995, 1998, 2005, and 2010.  In

1993, the UAW and Case negotiated an agreement which extended the 1990 Central

Agreement through February 5, 1995.  Beginning with the 1971 Central Agreement,

collectively bargained group insurance benefits were contained in a separate document,

---

All former bargaining unit employees who retired under the
Case Corporation Pension Plan for Hourly Paid Employees
after July 1, 1994, and who retired or were eligible to retire on
or before November 1, 2004 (other than former employees
eligible for or receiving retirement benefits under the deferred
vested provisions of the Pension Plan and former employees
hired after May 18, 1998), and all surviving spouses of those
former bargaining unit employees.

[2]The business for whom the retirees worked changed names over the years.  That
history has been set forth in earlier opinions of this Court; it also is set forth in the Sixth
Circuit's decision in a companion matter, *Yolton v. El Paso Tennessee Pipeline Co.*, 435
F.3d 571, 574 (6th Cir. 2006).  While the business changed its name several times, for
ease of reference the Court will refer to it as "Case" or "CNH America."

the Group Insurance Plan.

With respect to the Group Insurance Plans, the Central Agreements between Case and the UAW from 1971 forward contain the following language in Article XIV, Section 4A: "The group insurance agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this Agreement."  *Reese*, 2007 WL 2484989, at *1 (E.D. Mich. Aug. 29, 2007); *see also Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 575 (6th Cir. 2006).  The language of the Group Benefit Plans from 1971 through 1998 remained substantially unchanged.  *Id.*; *Yolton v. El Paso Tennessee Pipeline Co.*, 318 F. Supp. 2d 455, 460 (E.D. Mich. 2003) (evaluating plans from 1971 through 1990.)  With respect to eligibility, the Plans provide that "[e]mployees who retire under the Case Corporation Pension Plan for Hourly Paid Employees, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for the Group benefits described in the following paragraphs."[3]  *Id.*  Beginning in 1974, Case agreed to pay the full cost of health care benefits for retirees and eligible surviving spouses, regardless of age.  *Id.*; *Yolton*, 435 F.3d at 575.  Therefore, from that year forward, under a section entitled "Contribution for Coverage," the Plans provide that

---

[3]In the 1998 Group Benefit Plan, the paragraph was slightly modified to add the italicized language: "Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees *after 7/1/94*, . . ."  (Doc. 273 Ex. A-50, Part III at CNHA032542.)  The clause was otherwise unchanged.  The 1998 Group Benefit Plan further provided that "[E]mployees hired after May 18, 1998, are not eligible for [retiree] health care coverage."  (*Id.* at CNHA032543.)  This limitations does not apply to any member of the Class.

4

"the company shall pay the full premium cost of the above coverages." *Id*. In 1998, the language was altered to read: "No contributions are required for the Health Care Plans, Dental Plan, Vision Plan and Hearing Plan." *Id*.

As indicated previously, in 1993, the UAW and Case negotiated an Extension Agreement which extended the 1990 Central Agreement and Group Benefit Plan through February 4, 1995. In Section 9 of the 1993 Extension Agreement, under the heading "FAS 106 Out-Year Cost Limiters," the parties adopted a Letter of Agreement, effective October 3, 1993. *Id*. This Court has referred to that letter as "the 1993 Cap Letter." The 1995 Tentative Agreement between the UAW and Case extended the 1993 Cap Letter, as per a February 5, 1995 letter from Case to the UAW which was attached to the agreement as an exhibit ("the 1995 Cap Letter"). *Id*. The 1995 Cap Letter was substantially identical to the 1993 Cap Letter. *Id*. This Court has ruled that Case and the UAW agreed to both letters for accounting purposes only, with no intent to substantively impact retirees' cost of their health care benefits. *See, e.g., Reese*, 2007 WL 2484989, at *8-9.

Case and the UAW agreed to eliminate the Cap Letters in a Tentative Agreement dated April 23, 1998. *Id*. In this Tentative Agreement, Case and the UAW further agreed that medical plan "changes/improvements" for active employees will be applicable to non-Medicare eligible retirees who retire after July 1, 1994. *Id*. One of these changes was the extension of a Managed Health Care Network Plan ("Network Plan"), a Preferred

Provider Organization ("PPO"), to current active employees and non-Medicare retirees.[4]
The 1998 Group Benefit Plan provided a network of benefits for people in Racine, Burr
Ridge, and St. Paul, a separate network of benefits for people in East Moline and
Burlington, and a non-network medical plan for individuals in other locations.  (Doc. 273
Ex. A-50 §§ II(B), (C), (I).)

The 1998 Tentative Agreement contained a Letter of Understanding regarding the
cost of healthcare coverage for those individuals receiving health care outside a network
plan ("1998 Letter of Understanding").  In the 1998 Letter of Understanding, the UAW
and Case "agreed that over the term of the 1998 labor agreement employees and retirees
who are enrolled in a Company offered HMO, PPO or other plan will not have to pay any
additional employee contributions above those which may be required for enrollment in
the Case Managed Network Plan (if any)."  *Reese*, 2007 WL 2384989, at *2.  The 1998
Letter of Understanding subsequently was included in the 1998 Group Benefit Plan
which, as indicated previously, also provided that no contributions are required for retiree
health care coverage.  *Id*.

Some Case or CNH employees retired when Case or CNH decided to close the
facilities at which they worked.  Prior to these plant closings, the UAW and the company
entered into plant shutdown agreements.  For example, CNH Global and the UAW

---

[4]Pursuant to the previous 1995 Central Agreement, the Managed Health Care
Network Plan was mandatory for newly hired employees and optional for existing
employees and current retirees.  (Doc. 273 Ex. 11.)

entered into such an agreement in 2002 when the East Moline facility was closed ("East Moline Plant Shutdown Agreement").  *Id*. at *3.  Pursuant to Article III of the East Moline Plant Shutdown Agreement, entitled "Closing Benefits and Options," eligible employees could choose one of the following three options when their positions were terminated: (A) layoff/master recall, (B) Special Plant Shutdown Retirement (also referred to as Special Early Retirement), or (C) severance pay.  (Doc. 290 Ex. 1 at 14); *see also Reese*, 2007 WL 2484989, at *2; *Yolton*, 318 F. Supp. 2d at 461.  Employees electing Option B, including employees who grew into special early retirement, received, among other entitlements, special early retirement pension benefits and the post-retirement medical coverage that applies generally to retired employees pursuant to the Central Agreement and Group Benefit Plan in effect at the time.  *Id*.

Article IV, Section 1, of the East Moline Shutdown Agreement is entitled "Finality of this Agreement" and provides in part: "The economic closedown benefits and the eligibility rules established and set forth in this Shutdown Agreement shall not be altered by any subsequent agreements in any future negotiations."  (Doc. 290 Ex. 1 at 19.) Article IV, Section 3, entitled "Termination of Agreement" states in part: "Effective upon the final closing date of the East Moline facility, the 1998-2004 Central Agreement . . . and any negotiated successor Agreements, including all applicable plans, addenda, side letters, agreements or settlements . . . shall terminate and be of no further effect . . ." (*Id*. at 20.)

Over the years, Summary Plan Descriptions ("SPDs") describing insurance

7

benefits under the Group Benefit Plans were prepared.  CNH America prepared a 2000

SPD, effective May 1998 through May 2004 ("2000 SPD").  With respect to retirement

health insurance benefits, the 2000 SPD provides for employees with ten (10) or more

years of service: "Except where noted, the benefits and maximums under these continued

coverages will be the same as those that were in effect on the day preceding your

retirement."  *Reese*, 2007 WL 2484989, at *6 (citing Doc. 125 Ex. A-15).)

      In 2005, CNH and the UAW reached a new six-year Central Agreement effective

from March 21, 2005 through April 30, 2011 ("2005 Central Agreement").  The 2005

Central Agreement specifically provides that "[t]he provisions of this agreement are not

applicable to . . . any retiree who has retired from the Company prior to December 1,

2004."  (Doc. 273 Ex. N at 78.)  On March 25, 2010, Case and the UAW reached a mid-

term agreement under which the 2005 Central Agreement was terminated effective May

9, 2010 ("2010 Central Agreement").  (*Id*. Ex. O.)  The Medical Insurance provisions of

the 2010 Central Agreement provide that the plan agreed to will be effective "for all

employees and retirees (*who retire after November 1, 2004*)."  (*Id*. Ex. P at 42 (emphasis

added).)

      After July 1, 1994, and up to November 1, 2004, members of the Class or spouses

of Class members retired from Case or CNH America and began receiving retiree medical

insurance coverage.  The Class members paid no money toward the premium cost of their

coverage.  On February 11, 2004, CNH filed a complaint against the UAW in the United

States District Court for the Eastern District of Wisconsin, seeking a declaration that it

8

has the right under ERISA and the LMRA to modify or terminate retiree health care benefits upon the expiration of the 1998 Central Agreement (i.e. May 2, 2004) for all employees represented by the UAW who retired on or after July 1, 1994.  In response, Plaintiffs filed the present action in this Court on February 18, 2004.  The Wisconsin district court dismissed CNH's declaratory judgment action on August 3, 2004, concluding that the matter should be pursued in this Court.

As referenced earlier, on August 29, 2007, this Court granted summary judgment to Plaintiffs, concluding "that [they] are entitled to vested lifetime retiree health care benefits as provided for in the labor agreements in effect at the time of their or their deceased spouses' retirement."  2007 WL 2484989, at *10.  The parties filed cross-appeals.[5]  On July 27, 2009, the Sixth Circuit, in an opinion written by the Honorable Jeffrey S. Sutton, affirmed in part, reversed in part, and remanded the matter for further proceedings.

_____

[5]In addition to appealing the Court's decision to grant summary judgment to Plaintiffs, Defendants challenged the Court's attorneys' fees award.  Plaintiffs appealed a separate decision by this Court granting CNH's motion to strike Plaintiffs' demand for a jury trial, which the Sixth Circuit affirmed.  574 F.3d at 327.

With respect to the issue of whether Plaintiffs' right to lifetime health care benefits vested upon retirement, the panel wrote:

> Past is prologue in answering this question, because one of our cases– *Yolton*– arose from a nearly identical CBA.
>
> Promise for promise, the two sets of commitments are effectively identical. That is not surprising: the Yolton CBA involved retirees who worked at the same plant as today's retirees and concerned an employer that was different in name . . . but in few other meaningful ways.

574 F.3d at 322.  After analyzing the CBA at issue in the case before it, the panel concluded that Plaintiffs– as had been found for the *Yolton* plaintiffs– are entitled to vested retiree health care benefits.  *Id*. at 322-23.  The Court concluded its vesting discussion, however, by asking "what does vesting mean in this setting?"  *Id*. at 324.  As the Court had stated in the beginning of its opinion:

> At stake in this appeal is whether a collective bargaining agreement (CBA) grants retirees *lifetime* health-care benefits upon retirement.  Consistent with out precedents in this area, we hold that it does so.  That conclusion, however, does not resolve the *scope* of those benefits.

*Id*. at 318 (emphasis in original).

With respect to the scope of Plaintiffs' benefits, the panel concluded that retiree health insurance benefits, even those that have vested, are not necessarily "fixed and irreducible."  *Id*. at 325.  The panel provided the following rationale for this conclusion. First, comparing pension benefits and welfare benefits (the latter which includes health insurance), the panel wrote:

> The value of a pension benefit, whether defined or undefined, is clear cut– a matter of concrete dollars and cents, fairly measurable as a matter of

10

principal or income stream before retirement, at retirement or after retirement.  Vested health-care benefits are another matter.  Employers do not send their active or retired employees a monthly account itemizing the value of their health-care benefits.  And with good reason: What would it say?  What could it say?

The language of health-care provisions, as the 1998 CBA illustrates, generally does not contain the kind of precision that characterizes a pension plan.  "Employees," it says, "who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for" health-care benefits. It is one thing to say that this kind of language, when tied to eligibility for a pension plan, prevents an employer from *terminating* the benefits– which we have held here.  It is quite another to say that an employer may not *alter* the benefits in any way, particularly when the parties have a history of doing just that and when common experience suggests that health-care plans invariably change over time, if not from year to year.  *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 309 (7th Cir. 1996) (distinguishing a promise to provide "lifetime insurance benefits" from "decid[ing] precisely what those benefits are").

Which takes us to the nub of this case: Whatever these words mean, the parties' actions and a common understanding of welfare benefits confirm that the company's healthcare benefits are not akin to black-and-white pension benefits that cannot be diminished by one cent once they have vested.

574 F.3d at 324 (emphasis in original).

The panel seems to conclude that absent an express provision prohibiting future modifications to vested welfare benefits, such benefits are not necessarily vested in scope. Modifications to vested welfare benefits are permissible, the panel provides, if they satisfy the test developed by the Seventh Circuit in *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615 (7th Cir. 2006):

. . . the CBA– unless it says otherwise– should be construed to permit modifications to benefits plans that are "reasonably commensurate" with the

> benefits provided in the 1998 CBA, "reasonable in light of changes in
> health care" and roughly consistent with the kinds of benefits provided to
> current employees.[6]

*Id*. at 326 (quoting *Zielinski*, 463 F.3d at 620).  The panel concludes its discussion of the

scope issue with the following direction to this Court: "With this guidance, we leave it to

the district court to decide how and *in what circumstances* CNH may alter such benefits–

*and to decide whether it is a matter amenable to judgment as a matter of law or not*."  *Id*.

at 327 (emphasis added).

Following the Sixth Circuit's ruling, Plaintiffs filed a motion for rehearing arguing

that the panel resolved an issue "'that CNH did not raise or litigate before the trial [court];

that the trial court did not decide; and that CNH did not raise or argue on appeal.'" 583

F.3d 955 (6th Cir. 2009).  The panel denied Plaintiffs' motion.  *Id*.  In a separate

concurring opinion, Judge Sutton responded to Plaintiffs' specific "protest" of the panel's

"assessment of the factual record" by stating: "But this argument overlooks the posture of

this case– summary judgment– in which the inferences run in favor of the party that lost

below: CNH."  *Id*. (citation omitted).  Judge Sutton concluded:

> On remand, the parties are free to develop evidence on this point.[7]  That

---

[6]In this Court's opinion, if Case and the UAW believed that changes could be made to the retirees' vested benefits, they simply could have provided in the CBA that the benefits shall be the same as or commensurate with those benefits provided to *current active* employees.  This would assure retirees that their benefits would not be changed unilaterally by the company.

[7]On remand, neither party contends that it is necessary to develop additional evidence. In fact, neither party in the motions filed with this Court following the Sixth Circuit's mandate has suggested that there is an issue of fact to be resolved.  Each party contends that the relevant facts upon which this Court should rely are not in dispute and those "undisputed facts" warrant a

evidence may show that plaintiffs should win as a matter of law because the prior retirees either approved the changes or they did not diminish the nature of the benefits packages that existed upon retirement.  Or it may show that CNH should be allowed to make reasonable modifications to the health-care benefits of retirees, *consistent with the way the parties have interpreted and implemented prior CBAs containing similar language*.

*Id*. (emphasis added).

On October 6, 2009, the Sixth Circuit issued its mandate and remanded the matter to this Court.  Plaintiffs and CNH then filed their first motions for summary judgment. In their motion (Doc. 273), Plaintiffs contend that they are entitled to a judgment as a matter of law establishing that the vested level of benefits are those set forth in the 1998 Group Benefit Plan.  CNH contends in its motion (Doc. 280) that it is entitled to summary judgment because the Sixth Circuit held *as a matter of law* that Plaintiffs' benefits are not fixed in scope.  CNH therefore filed a separate motion in which it seeks approval to change Plaintiffs' health insurance benefits by moving Plaintiffs to the benefits package described in the 2005 Group Benefit Plan.  (Doc. 271.)  CNH argues that the changes from the 1998 to the 2005 Group Benefit Plans are reasonable when the criteria set forth by the panel are applied.  Plaintiffs and CNH filed second motions for summary judgment addressing the East Moline Plant Shutdown Agreement (Docs. 290, 293.)  Plaintiffs argue that language in this agreement expressly precludes any modifications to the health insurance benefits of Plaintiffs who retired under the agreement, or their surviving spouses.

───────────────

summary judgment in its favor.

## II.     Issues Presented on Remand

### A.     Has the Sixth Circuit ruled that Plaintiffs' healthcare benefits are alterable or did it remand the matter for this Court to review the relevant agreements and, if necessary, extrinsic evidence to determine whether they are modifiable in the context of this case?

Language in the panel's opinion suggests that it was analyzing in the first instance the facts relevant to the scope of Plaintiffs' benefits and ruling, based on its determination of those facts, that Plaintiffs' healthcare benefits are alterable.  Appellate courts, however, do not consider factual issues *de novo*.  As the Supreme Court has explained, when a court of appeals rules that the district court failed to consider relevant evidence or committed a legal error, a remand is the proper course:

> [F]actfinding is the basic responsibility of district courts, rather than appellate courts, and . . . the Court of Appeals should not have resolved in the first instance this factual dispute which had not been considered by the District Court.

*Pullman-Standard v. Swint*, 456 U.S. 273, 291-92, 102 S. Ct. 1781, 1791-92 (1982) (internal quotation marks and citation omitted).

Judge Sutton's concurring opinion, denying Plaintiffs' motion for rehearing, removes any doubt as to what the panel intended this Court to do on remand, particularly as he authored the original decision.[8]  As Judge Sutton clarifies in this opinion, on

---

[8]This Court believes that it may consider Judge Sutton's concurring opinion denying Plaintiff's motion for rehearing– particularly because he authored the original decision– to clarify the original decision.  Defendants cite cases indicating that concurring opinions are not binding authority.  (Doc. 282 at 12 (citing *Fed. Express Corp. v. Tenn. Pub. Serv. Comm'n*, 925 F.2d 962, 966 n. 2 (6th Cir. 1991) and *United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009).)  These cases do not stand for the

14

remand, the parties "are free to develop evidence" and from the evidence this Court may

decide whether, in the context of this case, the parties intended to allow CNH to make

reasonable modifications to retiree health care benefits and if, so what modifications are

reasonable.  583 F.3d at 955.

### B.     Are changes permissible in the context of this case.

This Court believes that the rules for determining whether the parties to a CBA

intended to permit modifications to vested welfare benefits and, if so, the extent of the

changes permitted, are no different than the rules for deciding in the first instance whether

the parties intended those benefits to vest.  As this Court previously set forth in making

the determination of whether the parties intended those benefits to vest: "'If lifetime

health care benefits exist for the plaintiffs, it is because the UAW and the defendants

*agreed* to vest a welfare benefit plan.'"  *Reese*, 2007 WL 2484989, at *5 (E.D. Mich.

Aug. 9, 2007) (emphasis added) (quoting *Yolton*, 435 F.3d at 578).

The panel concluded that the 1998 CBA provides no precision with respect to the

health care benefits promised retirees.  It is unclear to this Court why and how the panel

reached this conclusion.  The Group Insurance Plan over forty-one pages sets forth in

extensive detail the types of benefits and levels of coverage that the UAW and Case

agreed to through collective bargaining.  (*See* Doc. 273 Ex. A-50 at 18-59.)  This is what

---

proposition, however, that a court may not consider a concurring opinion on a motion for
rehearing, written by the author of the original opinion, for the purpose of clarifying the
panel's original decision.

distinguishes this case from *Diehl* and *Zielinski*.[9]  Moreover, CNH prepared a 2000

Summary Plan Description ("SPD")[10] which specifically promises retirees with ten or

more years of service the same medical benefits, *at the same levels*, that they were

receiving when they retired: "Except where noted, the benefits and maximums under

these continued coverages *will be the same as those that were in effect on the day*

*preceding your retirement*."  *Reese*, 2007 WL 2484989, at *6 (citing Doc. 125 Ex. A-15

at EMR00139).

With respect to the 1998 Letter of Understanding, based on its plain language and

the evidence presented, this Court previously interpreted  the document as "simply

provid[ing] that, during the term of the 1998 Central Agreement, the cost for health

insurance coverage for retirees electing a non-network option . . . will not be greater than

the cost (if any) for the Network option."  2007 WL 2484989, at *7.  As set forth in the

factual background section, while the 1998 Group Benefit Plan established two networks

---

[9]In *Diehl* and *Zielinski*, the specific details of the retiree health insurance benefits
agreed to could not be discerned.  Thus the Seventh Circuit developed those factors that
the panel in this case adopted for determining what benefits would be reasonable.  In the
present case, however, the parties and this Court know the precise details of the retirees'
health insurance benefits, as they are set forth in black and white in the 1998 Group
Benefit Plan.

[10]A summary plan description is a publication explaining the benefits of a
particular welfare benefit plan and ERISA requires employers to distribute the
descriptions to employees.  29 U.S.C. § 1022.  The Sixth Circuit has held that "statements
in a summary plan are binding and if the statements conflict with those in the plan itself,
the summary shall govern."  *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134,
136 (6th Cir. 1988).

covering most employees and retirees, individuals in some locations were not covered by either network and were covered by a non-network medical plan. The 1998 Letter of Understanding simply provided that those individuals would not have to pay more for coverage than everyone else.

If "the [1998] CBA and related documents do not say anything about subsequent modifications to [vested retiree health insurance] benefits," *Reese*, 574 F.3d at 318, the next step to evaluate the parties' intent would be to consider the extrinsic evidence. *See Yolton*, 435 F.3d at 579 (citations omitted).

The extrinsic evidence on which the panel focused was the UAW's and company's agreement in 1998 to move retirees to a managed care network. Importantly, however, this change was not unilaterally imposed by the employer but was based upon an *agreement* between the employer and the UAW reached through collective bargaining. Moreover, while the panel assumed that managed care provides reduced benefits to participants, Plaintiffs demonstrate in the pending pleadings that the 1998 Group Benefit

Plan provided significant improvements and no real reductions to the health care benefits for retirees.

To demonstrate that the adoption of the managed care plan in 1998 reduced retiree health care benefits, CNH cites to evidence reflecting the Union's opposition to the company's managed care proposals prior to 1998. CNH's earlier proposals, however, did not simply include a network plan. Those proposals which were rejected by the UAW included premium contributions and increased costs for coverage. (Doc. 273 Ex. A-9 at 7.) The UAW's responses to those proposals reflect only its objection to those elements of the proposals. (*See, e.g.*, Doc. 289 Ex. U at 5 (UAW representative's response that the company's proposal "was the most ambitious takeaway package that he had ever seen" because "[t]he premium for the average worker would be a 28 cent pay cut and a $1 per hour cut for his $2000 co-pay deductible.")

CNH also relies upon the panel's finding that "the UAW had rebelled" against managed health care "when negotiating earlier CBAs." The only evidence the panel cited for its finding was a portion of the transcript from Plaintiff Jack Reese's deposition in January 2007. In his deposition, Mr. Reese acknowledged that the UAW rejected the company's *prior* managed care proposals. (Doc. 282 Ex. 3 at 266-68.) But as indicated above, the company's earlier proposals did not simply include a shift to managed care but included increased premiums and costs for retirees. In describing the shift to managed

18

care pursuant to the 1998 Central Agreement, Mr. Reese specifically testified that "it wasn't considered [a] reduction."[11] (Doc. 289 Ex. T at 279.)

Aside from the alleged increased costs that would be imposed if participants went out-of-network to obtain health care and the alleged impingement on their freedom to choose their health care providers, CNH points to no decrease in benefits for retirees under the 1998 Group Benefit Plan that was accepted by the retirees or the union, and argues only that Plaintiffs "overstate" the improvements. Plaintiffs, however, set forth several reasons why there in fact were neither increased costs as a result of the shift from the indemnity plan to managed care nor restrictions on their freedom of choice.

The indemnity plan did cover "100% *of the reasonable and customary charges*" of Type A and B benefits ("Covered Hospital Expenses" and "Physicians' Charges for Surgery, In-Patient and Select Medical Care Procedures"); but it only covered 80% of the

---

[11]It is clear that the UAW and the retirees did not consent to the earlier proposed changes because they considered them to be unfavorable to the retirees. While retired workers are not members of the bargaining unit and their benefits are not a mandatory subject of collective bargaining, the union and company may agree to bargain for retirees benefits. *Allied Chem. and Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166-82, 92 S. Ct. 383 (1971). Nevertheless, "[u]nder established contract principles, vested retirement rights [i.e. pension *and* insurance benefits] *may not be altered* without the pensioner's consent." *Id.* at 181 n.20, 92 S. Ct. 383, 399 n.20 (emphasis added). As the Sixth Circuit stated in addressing an employer's alteration of health benefits in *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 918 (2000): "If benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees." Case and the UAW did make changes to retiree health insurance benefits over the years to which the retirees neither expressly consented nor objected. Those changes, however, did not reduce those benefits and thus it is not surprising that the retirees did not object to the union's bargaining on their behalf.

more frequent medical care that individuals receive, that being Type C benefits ("Other Covered Medical Expenses" which includes out-of-hospital doctor visits) and there was a $50,000 lifetime maximum per person. Under the managed care plan, most network services were covered at 100% with no deductible, no coinsurance payments, no "reasonable and customary charge" provision (i.e. participants were not required to pay costs above the "reasonable and customary charge"), and no lifetime maximum benefit. Thus Plaintiffs obtaining care "in-network" under the managed care plan received better coverage than they did under the indemnity plan; those obtaining care for routine services "out-of-network" were responsible for the same 20% of costs that they were paying under the indemnity plan.

Even if it is true that the managed care network imposed increased costs for individuals obtaining health care services out-of-network, before agreeing to the plan, the UAW was presented with information from Case reflecting that, in 1997, close to 100% of the providers who had treated Case employees were participants in the network and 100% of the hospitals in the area were within the network. (Doc. 273 Exs. 33-35, 42-43.) Promises also were made that doctors not in the network would be approached to join. (*Id*.) As a result, Plaintiffs in reality had the same freedom to choose their health care provider and hospital under the managed care plan that they did under the indemnity plan. For all of these reasons and more (such as an expansion of the services covered), Case touted the health care benefits agreed to in 1998 as "improvements" for employees and retirees. (Doc. 273 Exs. F, G, H.)

Defendants vigorously argue that the Sixth Circuit in this case and in *Winnett v. Caterpillar, Inc.*, 609 F.3d 404 (2010), rejected the notion that the introduction of managed care can ever be considered anything but a material reduction in health care benefits. This Court cannot conclude that this is correct *in every instance* where a managed care plan is adopted. A court considering the issue must look at the facts of the particular case before it, comparing the specifics of the managed care plan imposed and the plan it is replacing. This is what the *Winnett* panel did and what Judge Sutton directed this Court to do on remand. *Reese*, 535 F.3d at 956 (Sutton, J., concurring).

Perhaps more important than the fact that the managed care plan did not impose a material reduction in Plaintiffs' benefits, is that the changes to retiree health care benefits in 1998 were the result of an agreement between the UAW and Case. What the 1998 Central Agreement demonstrates is that, even if changes can be made to retiree vested health care benefits, those changes must be reached through negotiation and agreement between the union and the employer. Further evidence supports this conclusion. In the subsequent Central Agreement negotiated in 2005, CNH and the UAW *agreed* that the health care provisions set forth therein would not be applicable to pre-December 1, 2004 retirees. (Doc. 273 Ex. N at 78.) The CNH and the UAW reached the same *agreement* in 2010. (Id. Ex. P at 42.) In other words, even if CNH and the UAW viewed retiree health insurance benefits as mutable or capable of being "reset", the only circumstance that they allowed this to occur was through a collectively bargained agreement.

This point is further illustrated in CNH's arguments in support of its motion for

21

approval of the changes it seeks to impose upon Plaintiffs.  To demonstrate that the changes it seeks to make are "reasonable," CNH points out that the UAW *has agreed to* the same changes in other cases.  (*See, e.g.*, Doc. 271 at 10.)  Here, however, CNH is seeking to unilaterally impose these changes.  In fact, CNH is seeking to move Plaintiffs to a new package of benefits equivalent to those described in the 2005 Group Benefit Plan– a move that it was unable to accomplish through collective bargaining with the union for the 2005 Central Agreement.

The Sixth Circuit instructed this Court on remand to decide how and in what circumstances CNH may alter health-care benefits for retirees. 574 F.3d at 327. For the reasons discussed above, this Court finds that to the extent CNH can do so, it is only through an agreement with the UAW.

The 2002 East Moline Shutdown Agreement requires additional comment.  The panel presumably did not address the language of this agreement in finding that "the CBA and related documents do not say anything about subsequent modifications to [retiree health insurance] benefits . . ."  574 F.3d at 318.  The panel considered only the 1998 CBA.  A portion of the Class, however, retired under the East Moline Shutdown Agreement.

This agreement contains explicit language prohibiting the alteration of the benefits awarded under the agreement: "the economic closedown benefits and the eligibility rules established and set forth in this Shutdown Agreement *shall not be altered by any subsequent agreements in future negotiations*."  (Doc. 290 Ex. 1A at 19 (emphasis

22

added).)  Retiree healthcare benefits are undoubtedly one of the "economic closedown benefits" provided for in this agreement.  (*Id*. at 14, 41.)  The Shutdown Agreement also explicitly provides that, upon the closing of the plant, the 1998 Central Agreement terminates and has no further effect.  (*Id*. at 20.)  The parties to this agreement therefore included express language addressing subsequent modifications of retiree health insurance benefits (as well as other welfare benefits)– i.e. that such modifications are prohibited.  The Court accordingly finds for this additional reason that health care benefits *and the scope of those benefits* for Plaintiffs who retired under the East Moline Shutdown Agreement are vested and unalterable and irreducible.

C.     **Does the Court's decision change its attorneys' fees award**

Based on the conclusions reached above, the Court finds no reason to disturb its previous determination with respect to Plaintiffs' request for attorneys' fees.  The Court continues to find that Plaintiffs have prevailed on the dispositive issues in this case.

## III.    Conclusion

Having viewed the evidence presented by the parties in a light most favorable to Defendants, the Court concludes that Plaintiffs' vested retiree health insurance benefits may not be modified as CNH proposes.  This Court finds no evidence that the UAW and CNH (or Case previously) ever negotiated a *reduction* of those benefits.  In addition, with respect to the 2002 East Moline Shutdown Agreement, the agreement expressly precludes modifications to retirees' vested welfare benefits based on future negotiations between the union and employer.  The Court finds it unnecessary to decide whether a union even

23

has the authority to reduce retiree welfare benefits without the retirees' consent, although Supreme Court and Sixth Circuit precedent prior to the panel's decision lead this Court to believe that the answer is "No."  CNH, however, is seeking to unilaterally impose modification to those benefits and this Court holds that this cannot be done under the circumstances of this case, even with a court's determination that the proposed changes appear "reasonable in light of changes in health care" and when compared to "the kinds of benefits provided to current employees."

In summary, this conclusion is based upon the following facts: (1) the 1998 changes were not unilaterally made by Case but were agreed to by the company and the UAW; (2) the retirees did not expressly consent to the 1998 changes; (3) the managed health care plan adopted in the 1998 CBA did not diminish the benefits retirees were receiving and thus their failure to object to the changes cannot be deemed "consent" by the parties to changes that would reduce their benefits; and (4) there is no evidence of the UAW and CNH or Case ever agreeing to a reduction in retiree health care benefits.

Accordingly,

**IT IS ORDERED**, that CNH America LLC's Motion for Approval of Reasonable Changes to Plaintiffs' Health-Care Benefits (Doc. 271) is **DENIED**;

**IT IS FURTHER ORDERED**, that Plaintiffs' Motion for Summary Judgment Relating to All Class Members (Doc. 273) is **GRANTED**;

**IT IS FURTHER ORDERED**, that Defendants' Motion for Summary Judgment (Doc. 282) is **DENIED**;

24

**IT IS FURTHER ORDERED**, that Plaintiffs' Second Motion for Summary Judgment Regarding the East Moline Shutdown Agreement (Doc. 290) is **GRANTED**;

**IT IS FURTHER ORDERED**, that Defendants' Motion for Summary Judgment Related to the East Moline Shutdown Agreement (Doc. 293) is **DENIED**;

**IT IS FURTHER ORDERED**, that the Court's previous ruling with respect to Plaintiffs' request for attorneys' fees (Doc. 242) is **REINSTATED**.


Dated: March 3, 2011                          s/PATRICK J. DUGGAN
                                              UNITED STATES DISTRICT JUDGE


Copies to:
Roger J. McClow, Esq.
Bobby R. Burchfield, Esq.
Norman C. Ankers, Esq.