EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JACK REESE, FRANCES ELAINE PIDDE, JAMES CICHANOFSKY, ROGER MILLER, and GEORGE NOWLIN, | |
| Plaintiffs, | |
| v. | Case 2:04-cv-70592-PJD-PJK |
| CNH GLOBAL N.V. and CNH AMERICA LLC, | Hon. Patrick J. Duggan, U.S.D.J. |
| | Hon. Paul J. Komives, U.S. Mag. J. |
| Defendants. | |

**EXPERT REPORT OF SCOTT J. MACEY**

**Scott J. Macey**
**The ERISA Industry Committee**
1400 L Street, Northwest, Suite 350
Washington, D.C. 20005
202.789.1400

# TABLE OF CONTENTS

OPINIONS ...................................................................................................1

BASES FOR THE OPINIONS .....................................................................3

I.    Background...........................................................................................3

    A.    Contextual Information. ......................................................3

    B.    Company Perspectives Regarding Retiree Healthcare Costs and Vesting.......................................................................7

    C.    Union Perspectives. ............................................................9

    D.    Union–Company Agreements and Implementation...........12

        1.    AT&T and Lucent...................................................13

        2.    Goodyear. ...............................................................16

        3.    U.S. Steel................................................................17

        4.    CNH America. .........................................................17

        5.    General Motors and Ford. .......................................17

II.    CNH America's Proposed Changes to the Plan.............................18

    A.    The Proposed Benefits Are Reasonably Commensurate with Those Provided Under the Current Plan. .............................21

    B.    CNH America's Proposed Changes Are Reasonable in Light of Changes to Healthcare Benefits. .......................................22

        1.    Health Benefits Are Dynamic and Advances in Healthcare Drive Up the Costs of the Benefits........................22

        2.    Health Plans Respond to the Increased Costs by Changing the Benefits Offered. .................................24

3. The Increased Cost Sharing Is Not Likely To Adversely Affect Plaintiffs' Health Benefits. ...............................................25

C. CNH America's Proposed Benefits Are Roughly Consistent With Those Provided to Other Employees and Retirees.....................32

1. The Proposed Plan for the Plaintiff Class *Is* the Plan Agreed to by the UAW and the Plan Providing Benefits to More Recent CNH America Retirees. ..................................32

2. Other UAW-Bargained Benefit Plans Have Made Similar Changes. .......................................................................33

3. Other Retiree Health Plans Also Have Made Changes To Account for the Changing Economic Environment.................38

4. Statistical Comparisons Demonstrate the Reasonableness of CNH America's Proposed Benefits in This Case.................39

ATTACHMENT A: Compensation...........................................................46

ATTACHMENT B: Qualifications ...........................................................47

ATTACHMENT C: Articles......................................................................50

ATTACHMENT D: Testimonies...............................................................54

ATTACHMENT E: Documents Reviewed or Relied Upon to Develop Opinions......................................................................55

ATTACHMENT F: Other Expert Testimony...........................................69

## OPINIONS

1. Labor unions, including the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), have been aware for thirty years that employers with whom such unions bargain have resisted the notion that the provisions negotiated, from time to time, regarding health benefits for existing and future retired employees are vested for any period beyond the duration of an existing collective bargaining agreement.

2. Companies have bargained on a mandatory basis for future retirees and on a permissive basis for current retired employees with the understanding that only clear and direct vesting language in the collective bargaining agreement or plan would result in the vested right of participants to guaranteed, unchangeable retiree health benefits. Cost of living provisions that result in pension benefit increases for existing retirees are the result of specific agreements between companies and unions on such matters. Unions sometimes assert that similar cost increases to existing retiree health benefits or expansion of coverages due to changing technologies, treatments, and drugs, however, should be covered automatically without bargaining or reaching any agreement.

3.     As such, changes to retirees' health benefits are neither unexpected nor
unusual. Indeed, although understandably resistant to cost-reduction or cost-
shifting measures applicable to future or existing retirees, unions have
agreed on numerous occasions to such cost-reduction and cost-shifting
measures in recent years. Such agreements have resulted in a variety of cost-
restrictive and related measures applicable to both existing and future
retirees. Some of these measures include company premium caps; retiree
premium sharing; reduction or elimination of dental and vision benefits;
implementing managed care plans, mail order and other separately managed
prescription drug plans; and increases to plan deductibles and co-payments.
Further, companies have implemented, both with and without bargaining,
the various cost-limiting, cost-cutting, and other plan-restrictive measures
mentioned above, for existing retirees.

4.     The changes to current benefits and premiums proposed by CNH America
LLC to the health plan for UAW employees that retired between August
1994 and April 2005 (the "Plan") are a reasonable response to increasing
cost escalation of the Plan in light of the general market and economic
conditions, the specific provisions of and changes to the Plan, the experience
of union and other retirees in other situations, and the history of bargaining
and dealing with retiree health issues between CNH America and the UAW.

2

The proposed changes create benefits that are reasonably commensurate with those provided currently by the Plan; the changes are reasonable in light of changes in healthcare; and the revised benefits are roughly consistent with those provided to CNH America's current UAW-represented employees and benefits provided by other employers.

## BASES FOR THE OPINIONS[1]

**I.    Background.**

**A.    Contextual Information.**

Companies and unions began bargaining over health benefits after World War II. Until the 1950s and 1960s, company programs and company–union negotiations were typically limited to health plans for active employees. In the 1960s and thereafter, however, there was an increase in the number of negotiated health plans for retired employees. This early period of bargaining over retiree health benefits reflected an environment of relatively low, stable costs and a relatively small ratio of retirees to active employees. Eligibility for and coverage under these plans expanded during much of the 1970s and early 1980s.

---

[1] I have already provided two statements of my expert opinion in this matter: a report dated March 13, 2006, and a declaration dated June 30, 2010. The opinions expressed in this updated report are materially identical to those in the report and declaration. The bases for the opinions, however, have been updated.

3

In the 1980s, the Financial Accounting Standards Board (FASB) announced that it was evaluating the development of a new financial disclosure standard requiring the disclosure of liabilities and costs related to current and future retiree health benefits. The standard (FASB 106) was issued in 1990. The tentative and final FASB standards highlighted for companies the significant and growing liability for existing and future retiree health benefits. Coupled with the growing escalation of health costs, the new accounting standards caused companies to take additional steps to limit or reduce the current and future costs of retiree health plans. Thereafter, the topic of retiree healthcare and its costs was a constant subject of discussions and negotiations between companies and unions.

The Government Accountability Office (GAO) reported in 2006 that—between 1991 and 2005—health insurance costs exceeded general inflationary cost increases by 28%. This GAO study reported that the real hourly costs of health benefits for union employees increased 50% during the same period. More recent studies have shown that this trend has been accelerating until very recently. An analysis by the Kaiser Family Foundation found that between 1999 and 2010, health insurance premiums rose more than four times as quickly (138%) as overall inflation (31%). The analysis also found that employers were shifting an increasing portion of the cost of health insurance to employees as employee-paid premiums rose even more quickly—159%—over the same period. The GAO study also

4

indicated that employers were generally engaged in significant cost-reduction and cost-shifting policies, including increased deductibles and co-payments during the 1990s and up to the present in order to limit their overall long-term liabilities. The report also indicated that union employees are assuming a greater proportion of their health plan expenses. Even with these changes, employers with union retirees continued to shoulder the majority of retiree healthcare costs and to incur year-to-year increases in their costs.

In a 2005 presentation, the American Academy of Actuaries explained the significant escalation of healthcare costs as a function of increasing usage, greater medical provider cost escalation than general inflation, and new technologies and treatments. My experience and personal knowledge indicate that companies typically did not agree to provide vested retiree health benefits, as such an agreement would preclude them from responding to the benefits' ever-changing nature. Similarly, companies neither acted nor intended to waive their rights to make future changes to existing retiree benefits as business and financial circumstances evolved. In this sense, employers understood the critical distinction under ERISA between pension benefits, which were a fixed, defined benefit, and health benefits, which changed inherently over time.

During this same time, many companies in traditional manufacturing and other industries that provided retiree health benefits were encountering significant

competition from existing global and new, emerging domestic industries, which resulted in significant layoffs and financial difficulties. Although unions did not easily acknowledge these growing business and financial difficulties, they ultimately did so and negotiated numerous restrictive and cost-saving measures applicable to existing and future retiree benefits (as well as other unrelated cost-saving measures). Although the UAW was perhaps among the most resistant of the unions, it encountered significant pressure from a number of companies to limit health benefit costs and restrict the growth of fully-subsidized retiree health programs. Ultimately, its positions became more flexible, as evidenced by its agreements with, among others, the auto companies.

All of these factors have caused a dramatic decline in the prevalence of retiree health benefits. According to a 2010 Kaiser Family Foundation report, the percentage of large employers (200 or more employees) offering retiree health coverage has fallen from 66% in 1988 to 28% in 2010. Kaiser Family Foundation, *Employer Health Benefits 2010 Annual Survey*, (Sept. 2010). As of 2012, that figure has fallen even further, such that only a quarter of firms like CNH America provide retiree health benefits. Kaiser Family Foundation, *Employer Health Benefits 2012 Annual Survey* (Sept. 2012).

**B.    Company Perspectives Regarding Retiree Healthcare Costs and Vesting.**

As noted, companies faced increasing domestic and global competition from the late 1980s onward. The general response to these competitive pressures was to pursue cost reductions aggressively throughout all aspects of the business. The competitive pressures and responses to them became particularly relevant with respect to retiree health benefits. The literature, the history of various bargaining negotiations, and the evidence discussed in an array of court cases, suggest that companies did not believe that they were agreeing to ever-increasing lifetime health benefits when they negotiated and provided those benefits.

From the mid to late 1980s onward, escalation of health costs, demographic shifts, and downsizing increased both the number of retirees and the ratio of retirees to active employees, and financial rules changed to require specific broad-based corporate disclosures. The costs and liabilities of retiree health benefits became a paramount matter for businesses to address because they did not have the luxury of incurring and tolerating endless escalating expenses. This series of developments led companies to indicate their wariness about continuing to provide unchanged lifetime retiree health benefits by proposing or demanding restrictions and cost re-allocations for both existing and future retirees in union negotiations, and by implementing significant cost-saving measures. Suggested cost sharing measures included premium caps, new or increased premium sharing, increased

7

co-payments and deductibles, separately-managed and more restrictive drug plans, managed care plan design changes, cuts to and elimination of dental and vision care plans, and other similarly restrictive and cost-cutting measures. Companies and unions addressed these matters in their negotiations, both on a mandatory basis for future retirees and a permissive basis for existing retirees. In fact, the periodic permissive bargaining over health benefits for existing retirees actually underscored the view of companies that these benefits were not vested, but rather were subject to change either through subsequent union bargaining or unilaterally if there was not a governing contract in place that applied to existing retirees.

From the early 1990s onward, many unions began to work more closely with employers to try to find ways to limit the health cost escalation both for active and retired employees. Some of these efforts resulted in plan design and administrative changes that, in some cases, delayed the implementation of previously agreed upon premium caps or premium sharing. Nonetheless, throughout the many years during which companies and unions have addressed the retiree health issue, the evidence suggests that companies were serious in their efforts to limit future costs and unions were well aware of this seriousness.

Many companies that provided bargained-for retiree health benefits never believed that the benefits were in any way vested or not subject to change either in design or with respect to the allocation of costs. This belief is evidenced by the fact

that many, if not most, plans contained, especially from the mid-1980s and later, language reserving to the company the right to make plan changes or even terminate the plans. Moreover, most bargaining agreements between companies in various industries and unions, such as the CWA, the IBEW, the UAW, and the Steelworkers, did not contain any specific or general vesting language or any other language indicating that the plans or cost allocation could not be changed, especially after the expiration of a particular agreement.

In recent years, a number of companies have announced changes to existing retirees' benefits because of Medicare. Essentially, employers are demanding that retirees coordinate their medical benefits with Parts A and B and their drug benefits with Part D. These policies reflect companies' positions that plan changes for existing retirees can be made.

### C.   Union Perspectives.

Many unions were initially resistant to company proposals and pressure to restrict or reduce existing and future retiree health benefits. Despite the fact that bargaining for existing retirees is permissive and not mandatory, unions did discuss and address various employer proposals for cost re-allocation. Moreover, unions well understood the difference in the vesting principle as it applied to pension plans and retiree health programs. *See, e.g.*, *Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983).

9

The UAW's response to *Yard-Man*—which announced the existence of a purported "status benefit" inference that retiree health benefits lasted for the lifetime of a retiree—illustrates the union's understanding of the vesting issue. Shortly after the court's decision in *Yard-Man*, in a memorandum dated April 23, 1984, Owen Bieber, the UAW's president, recommended that union representatives not address specifically the vesting issue in negotiations, because ambiguity from silence would trigger the *Yard-Man* inference.[2]

The history reflects that major unions generally followed Mr. Bieber's advice and avoided any specific negotiation of the vesting issue despite their actual discussions and negotiations regarding proposed employer cost-cutting and plan-restrictive measures. It should also be noted that unions encountered the impact of the health cost-escalation not just with plans maintained by employers, but also with respect to jointly-administered multi-employer health plans. In fact, retired employees have been subjected to significant cutbacks under those plans as costs escalated and funding diminished. Indeed, to preserve the funds in VEBA trusts it manages for some of its retired members, the UAW has trimmed prescription drug

---

[2] Indeed, the Sixth Circuit's law in this area—including the *Yard-Man* inference—is very different from the law of the Seventh and Eighth Circuits, where many of the plaintiff class worked for CNH. To the extent that class members thought about it at all, because they did not work for their retirement benefit in the Sixth Circuit, class members certainly could not reasonably rely on Sixth Circuit law to apply to their benefits.

benefits and increased co-payment obligations, deductibles, and other out-of-expenses for participants. For example, according to the UAW VEBA's website, retired auto workers now have copayments for mail-order prescription drugs that range from $22 to $176.[3]

Unions have long been interested in or responsive to company proposals for bargaining (as opposed to companies making unilateral changes), on a permissive basis, regarding existing retiree health benefits. I understand that unions have generally pursued this bargaining to assure active employees that the union will continue to look out for their interests once retired. This continued union interest in bargaining over existing retiree health benefits is an attempt to balance the interests of all those directly or indirectly represented by the union and is effectively an intergenerational transfer of value from current active to current retired employees so as to enhance the perceived security of current active employees.

Companies and unions have continued to discuss and address existing retiree health issues generally to maintain labor peace even though it is only a permissive subject of bargaining. This desire and willingness to address these matters is an indication that the existing benefits were subject to change rather than that prior discussions and agreements had created vested rights in participants. Some

---

[3] *See* Benefit summary information at www.uawtrust.org.

11

agreements to limit existing retiree benefits have been followed by union lawsuits (that are almost immediately settled) to protect the agreements against challenges by the unions' membership.

     **D.**    **Union–Company Agreements and Implementation.**

Companies and unions in many industries, including telecommunications and manufacturing, have agreed to numerous cost-limiting and plan-restrictive measures and subsequently implemented these provisions. Such companies as AT&T, General Motors, Chrysler, Goodyear, United States Steel, Lucent, and others have implemented various measures to limit current and future costs both during relatively good times and in situations involving significant financial distress. For example, 2012 bargaining between the United Steelworkers and United States Steel resulted in increased costs for existing retirees and recent 2013 bargaining between AT&T and the CWA for employees and retirees covered by a contract for Connecticut telecommunication workers resulted in increased participant premiums, among other changes. In recent years, unions have faced numerous situations involving companies proposing greater cost sharing by existing retirees. The unions have agreed to a number of these or similar requested changes, which undercuts claims that benefits are vested. Regardless of the approach taken, the net result has been an increase in the costs for retirees and reductions in coverage. These changes, which result from bargained agreements,

indicate that both companies and unions do not view existing retiree health benefits as vested.[4]

Companies have suggested and bargained various cost-reduction measures to existing retiree health benefits over the years. Several examples of these proposals are company premium caps and retiree premium-sharing measures. Many companies and unions also took other approaches to limit employer costs, such as plan design and cost-sharing changes.

### 1.     AT&T and Lucent.

AT&T bargained prospective caps for future retirees with the Communications Workers of America (CWA) and the International Brotherhood of Electrical Workers (IBEW) in 1989. During 1995 bargaining, the company and the unions agreed to implement, for all future and pre-existing retirees subject to the cap (i.e., all retirees who retired on or after March 1, 1990), a portion of the previously negotiated premium cost-sharing. This new cost-sharing was administered for existing retirees by allowing them to pay for the monthly premium charge through a debit to monthly pension benefits. This new premium charge was accompanied by a new health spending account funded by the company under the plan, which permitted participants a flexible means to seek

---

[4] Because retirees' health benefits often change after retirement, union employees—including members of the plaintiff class—cannot reasonably expect their health benefits to remain frozen after they retire.

reimbursement of numerous types of out-of-pocket health costs. In 1995, the company and the CWA and IBEW agreed to implement revised prescription drug and mental health programs for existing retirees (including those retirees not subject to the company premium cap), which resulted in increased costs to numerous retirees depending upon plan usage. Additionally, pursuant to the 1995 bargaining agreement, those retirees under the age of 65 who retired on or after March 1, 1990, became covered by a managed care program effective January 1, 1996 (subject to geographic availability of the network). That program significantly changed the administration and coverages of the plan as well as the costs to various retirees based upon their usage. Subsequently, in 1998, AT&T delayed further implementation of premium sharing through the bargaining of more cost sharing under the plan (e.g., increased out-of-network medical deductibles and retail brand prescription drug co-payments). In 1998, AT&T and the unions agreed to cap retiree dental benefits and combine the dental caps with the medical caps (the effect of which was to delay the onset of additional cost-sharing by retirees). In 2005, AT&T and the CWA and IBEW also agreed to increase plan deductibles and prescription drug co-payments for the retirees who were not subject to the company premium cap.

Lucent has agreed with the CWA and IBEW to implement a variety of plan restrictions and cost-sharing features for existing retirees and has implemented

14

those provisions. (When Lucent was spun off from AT&T in 1996, Lucent inherited from AT&T the existing cap provisions, which AT&T and the CWA and the IBEW previously negotiated.) For example, in 2003, Lucent bargained with the CWA and IBEW and obtained an agreement to increase medical deductibles, co-payments, out-of-pocket maximums, and prescription drug co-payments. These plan changes applied to all existing and future union retirees. In 2004, Lucent and the CWA and IBEW agreed to a number of plan changes that applied to existing retirees. Some of these changes included increased physician and emergency room co-payments, increased deductibles and out-of-pocket maximums under the managed care plan, and increased deductibles and co-insurances under the indemnity plan for non-capped retirees. Lucent's 2004 agreement with the CWA and IBEW was notable for several other reasons. That agreement included several key provisions reflecting significant company flexibility regarding the design of existing retiree benefits. One provision cancelled a prior commitment to future bargaining regarding existing retirees and another provision acknowledged the company's right to change benefits in the future for existing retirees if a proposed legislative change relating to health trust funding was not enacted. Furthermore, the parties agreed that premiums based on health claims above the bargained cap would be collected commencing in 2005. These premiums, which are being collected by Lucent, apply to a group of existing retirees.

15

Since the 2004 contract was adopted, Lucent (now Alcatel-Lucent) and the CWA have agreed to numerous changes in the provision of retiree medical benefits. A joint committee of union representatives and company officials reviews retiree healthcare costs that exceed the caps negotiated in 2004. The committee makes recommendations to reduce the excess costs. For example, for the 2010 plan year, the committee reduced the excess expenditures, in part, by increasing plan coordination with Medicare Part B and expanded the number of prescription drugs requiring prior authorization and with restricted quantity and duration of treatment. For the 2011 plan year, the committee recommended further reductions in retiree health coverage including increased costs for brand-name drugs, increased coverage authorization requirements for prescriptions, a new deductible for prescriptions filled at retail pharmacy, exclusion of prescription drugs with over-the-counter equivalents, increases in retiree premiums, and a new deductible for the medical plan based on a percentage of the retiree's pension.

### 2. Goodyear.

In 2003, Goodyear and the United Steelworkers of America (Steelworkers) agreed to premium-sharing for existing retirees, which the company implemented in 2005. The company and the union also agreed to, and the company implemented in 2005, a number of plan design changes, including deductible, co-insurance, and prescription drug changes.

16

### 3. U.S. Steel.

In 2003, United States Steel agreed with the Steelworkers to implement

participant premiums and a company premium cap for existing retirees and has

since charged existing retirees premiums in accordance with a complex "profit-

sharing" formula.

### 4. CNH America.

In 1998, CNH America (then known as Case Corporation) and the UAW

agreed to implement an entirely new and less expensive managed care program

(the Case Managed Health Care Network Plan) for all existing and future non-

Medicare retirees. *See Reese v. CNH Am. LLC*, 574 F.3d 315, 324–26 (6th Cir.

2009).

### 5. General Motors and Ford.

In recent years, the UAW reached separate agreements with both General

Motors and Ford (as well as other agreements with Chrysler) to implement

numerous cost-reduction and premium-sharing measures for existing retirees. For

example, although accompanied by a company contribution to a new health fund to

be established by the company, the GM–UAW agreement provides for new

monthly retiree premiums, increased participant co-insurance and deductibles,

increased prescription drug co-payments, and elimination of dental plan benefits.

The modified plan for existing retirees reflects significant changes to existing

retiree health benefits as a result of formal negotiations between the company and the UAW. The UAW's agreement to these changes to existing retiree health benefits seems to indicate that the benefits are not vested and that the UAW does not consider them to be vested.

## II.    CNH America's Proposed Changes to the Plan.

The plaintiff class in this case—which consists of individuals that retired from CNH America after July 1, 1994, and before May 1, 2005, and their surviving spouses—currently receive retiree health benefits (medical and prescription drug) under the Plan. The Plan utilizes a network model, in which participants can receive treatment from any provider but they pay larger out-of-pocket costs if they use a provider that is not part of CNH America's network. If participants do not have access to the network, then the company provides a non-network plan. Both plans have deductibles, co-insurance requirements, and out-of-pocket maximums. Currently, participants do not pay monthly premiums for their coverage.[5]

CNH America has proposed three basic changes to the Plan. *First*, CNH America proposes to increase the usage-based costs borne by participants, such as deductibles and co-insurance. *Second*, CNH America proposes to charge monthly

---

[5] In 1998, the current network-style plan replaced an indemnity-style plan for all participants, including existing retirees. As a result, participants were faced with increased costs if they chose a non-network provider. That loss of free choice is considered a significant value under plans, especially to those participants whose usage patterns are restricted or whose costs have risen significantly.

premiums that would increase over time to reflect some (but not all) of the ever-increasing cost of the Plan. *Finally*, CNH America would use the existing non-network plan for all Medicare-eligible participants' medical benefits and require such participants to obtain prescription drug coverage through Medicare Part D. The material terms of the current Plan as well as the proposed changes to the Plan are summarized in the following table:

| Health Benefit | Existing Plan | Proposed Plan Pre-Medicare-Eligible Participants | Proposed Plan Medicare-Eligible Participants |
|---|---|---|---|
| Monthly contribution, retirees[6] | $0 (promised for duration of the CBA) | $0 in 2013 $57.25 in 2014 (increasing annually to reflect 60% of increased cost of benefits) | $0 in 2013 $5 in 2014 (increasing annually to reflect 60% of increased cost of benefits) |

---

[6] The proposed plan document provided to Plaintiffs in January 2013 said that the premium for 2013 would be $91 per month for non-Medicare-eligible participants and $10 per month for Medicare-eligible participants. It is obvious, however, that the proposed plan will not become effective in 2013. In developing its projections, CNH America's benefits consultant, Towers Watson, assumed *no* premiums in 2013 and projected 2014 premiums of $57.25 per month for pre-Medicare-eligible participants and $5 per month for Medicare-eligible participants. I am using the Towers Watson figures.

19

| Health Benefit | Existing Plan | Proposed Plan Pre-Medicare-Eligible Participants | Proposed Plan Medicare-Eligible Participants |
|---|---|---|---|
| Annual deductibles | *in network* $0<br><br>*out of network* $100 ind./$300 fam. | *in network* $200 ind./$400 fam.<br><br>*out of network* $500 ind./$1,000 fam. | $250 ind./$500 fam. |
| Post-deductible coverage | *in-network* 100%<br><br>*out-of-network* 80% | *in network* 85%<br><br>*out-of-network* 65% | 80% |
| Annual out-of-pocket maximums | *in-network* N.A.<br><br>*out-of-network* $1,000 ind./$2,000 fam. | *in-network* $1,000 ind./$2,000 fam.<br><br>*out-of-network* $2,000 ind. | $1,500 ind./$3,000 fam. |
| Copayments | $5 | $20 | $20 |
| Prescription drug benefits | *Generic* short-term $5 long-term $0<br><br>*Branded* short-term: $5 long-term $0 | *Generic* short-term $10 long-term $20<br><br>*Branded (Formulary)* short-term $40 long-term $80<br><br>*Branded (Non-Formulary)* short-term $60 long-term $120 | N.A. (Medicare Part D) |

The current Plan requires participants to take advantage of Medicare Part B when they become eligible for it. CNH America does not propose to change that requirement; rather the company proposes that Medicare-eligible participants look to Part D for their prescription drug coverage, which is consistent with the principles set forth in the 1998 plan and its "Cost of Healthcare Coverage" letter.

The proposed changes to the Plan will undoubtedly increase the costs paid by participants for their health benefits. But the changes are still reasonable, because the revised benefits are reasonably commensurate with the current ones, the changes are reasonable responses to the changes that have occurred in healthcare since members of the plaintiff class retired, and the changed benefits (although less generous than the current ones) compare very favorably to those available to other retirees. *See Reese v. CNH Am. LLC*, 574 F.3d 315, 326–27 (6th Cir. 2009).

### A.  The Proposed Benefits Are Reasonably Commensurate with Those Provided Under the Current Plan.

The treatments and services provided under CNH America's proposed plan are essentially the same as those the class receives under their current plan. Pre-Medicare-eligible participants will continue to receive the same care under a network-based model as currently, albeit with increased cost sharing. Medicare-eligible participants will also experience increased cost sharing for their medical

benefits, but they will move to a non-network-based model, restoring the freedom of choice eliminated in 1998. Medicare-eligible participants will no longer receive company-provided prescription drug coverage, but asking these participants to utilize government-provided benefits is not unusual. Effective January 1, 2008, EMBARQ, a large telecommunications company, eliminated medical coverage and Medicare premium subsidies for Medicare-eligible retirees and Medicare-eligible dependents. Further, CNH America has always asked its retirees to participate in Medicare programs, including those that come into existence after commencement of a CBA: the shift from company-provided drug benefits to Part D is an extension of this policy.

### B. CNH America's Proposed Changes Are Reasonable in Light of Changes to Healthcare Benefits.

#### 1. Health Benefits Are Dynamic and Advances in Healthcare Drive Up the Costs of the Benefits.

Unlike pension benefits, health benefits change over time. As noted by the Sixth Circuit, retiree health benefits differ from pension benefits, because retiree health benefits are not fixed and irreducible. *Reese*, 574 F.3d at 326–27. It is well understood that the American health care system changes over time. New services and treatments become available, and the costs of providing health benefits have increased largely because of these changes. Employer health plans for both active

and retired employees have responded by changing the benefits they provide to account for the systemic changes and related cost increases.

The costs of health care have risen significantly and continue to increase as new drugs, technologies, and protocols emerge; usage patterns change; general health inflation escalates; the covered population ages; and the productivity improvements found in many other sectors of the economy do not make their way comparably to the healthcare industry. According to the Congressional Budget Office, most of the per capita increased healthcare costs are attributable to new technologies and treatments, many of which are both very costly and stimulate significant increased usage. *See* Cong. Budget Office, *Technological Change and the Growth of Health Care Spending* (Jan. 2008).

The advances in medical care in the last decade have had a significant impact on the costs of the Plan. Towers Watson looked at the Plan's payments for procedures and prescription drugs that appear to be new since the current plan commenced in 1998. Between 2008 and 2012, almost thirty percent (28.9%) of medical procedures paid for by the Plan used procedure codes that did not exist in 1998, when the current Plan was enacted. The relationship between medical developments and increased costs can be seen even more with respect to prescription drugs. In 2009, the twenty-five drugs most used by the plaintiff class accounted for almost forty percent (39.8%) of the total drug claims paid by the

Plan. A staggering sixty percent of those costs were associated with drugs that did not exist in 1998. The sixty percent figure climbed to over eighty percent (82.3%) in 2012.

Unlike other sectors of the economy, technological advances in health care generally increase rather than decrease costs. Although new technologies improve clinical outcomes, very few plans have performed cost-benefit analyses to ascertain the real effectiveness of such technological advances. Regardless, it is clear that the plaintiff class is receiving the benefits of new medical procedures and prescription drugs and those advancements are driving the costs of the Plan.

### 2.      Health Plans Respond to the Increased Costs by Changing the Benefits Offered.

Plans have responded to these changes by changing the nature of the benefits they provide, the premiums they charge participants, or the usage costs imposed on participants when they use the plan. These changes include limits on treatments and choices, as well as increased cost sharing. The dynamic nature of health care and health-benefit plans can be seen in the addition to plans of new drugs, technologies, and treatments as eligible for coverage. These changes include new plan design and administrative provisions known as network/managed care plans. They also include increased co-payments, increased deductibles, and various limitations on the eligibility for, use of, and costs for various treatments, services, and products provided under a plan.

24

Plans are redesigned for two reasons. *First*, the plans wish to account for the new drugs, technologies, and treatments. *Second*, the plans want to arrest the escalating costs of health care in general and health benefit plans in particular. As discussed below, plans—including those covering UAW and other union retirees—have also implemented premium sharing arrangements with participants.

Plans have also tried to control costs by (1) establishing utilization and disease-management protocols, (2) using formulary drug lists, (3) mandating the uses of generic and mail-order prescription drugs, and (4) identifying preferred centers of excellence for serious and costly conditions. These internal plan design, administrative mechanisms, and cost-allocation arrangements attempt to manage costs and provide quality health care. The plans seek to balance healthcare advances with plan cost control and additional cost sharing.

CNH America's proposed changes are reasonable responses to the increased cost of the Plan. Importantly, CNH America is not trying to shift all new costs to the plaintiff class. For example, the calculation of future premiums allocates forty percent of cost increases to CNH America.

### 3.   The Increased Cost Sharing Is Not Likely To Adversely Affect Plaintiffs' Health Benefits.

I understand that the plaintiff class and one of its experts have taken the view that the increased costs CNH America is asking it to bear will reduce their use of the Plan and its benefits. The research findings are not this simplistic,

however. In December 2010, the Robert Wood Johnson Foundation published a synthesis of what we know (and do not know) about the effects of cost-sharing on spending and outcomes. It focused on how different groups respond differently to changes in costs. *See* Katherine Swartz, *Cost-sharing: Effects on spending and outcomes*, The Robert Wood Johnson Foundation, Dec. 2010, pp. 7–11 ("Since people's responsiveness to changes in cost-sharing depends on the amount of medical care they generally consume, a change in cost-sharing can produce different responses from different people."). In fact, one finding was that patient-initiated reductions of usage in response to increases in cost sharing were likely to come predominantly from low users of the plan, individuals with very little ongoing health costs. Further, the effects of increased cost-sharing on health outcomes are also not as clear-cut as the plaintiff class's expert suggests. *See id.* at 11–16 (noting that there has not been a study of the effects of increased cost-sharing on the health of the general population since the RAND Health Insurance Experiment, which found that "for the average person under the age of 62, there were no adverse health effects due to reductions in use of health care caused by cost-sharing").[7]

---

[7] *See also* Melinda Beeuwkes Buntin et al., *Healthcare Spending and Preventative Care in High-Deductible and Consumer-Directed Health Plans*, Am. J. Managed Care, vol. 17, no. 3, at 222 (Mar. 2011); Melinda Beeuwkes Buntin et al., *Consumer-Directed Health Care: Early Evidence About Effects On Cost And*

(continued . . .)

Indeed, although costs of participants for the plan will increase, one would not expect patient outcomes to be materially impacted by the increased costs. As long as participants make their premium payments, they will have access to the same care they have access to currently. And, as I understand, only two post-*Reese* participants have lost their benefits for premium non-payment. Further, the proposed plan employs an out-of-pocket maximum to protect participants against catastrophic outcomes.

In fact, the historical data for the plaintiff class's usage of the current Plan and the usage of post-2004 CNH retirees of the proposed plan demonstrate that usage is not likely to drop off precipitously.

---

*Quality*, Health Affairs, vol. 25, no. 6, at w516 (2006); RAND, *Consumers May Have More Control Over Health Care Costs Than Previously Thought* (press rel.) (Sept. 29, 2011).

## COMPARISON OF ALLOWED COSTS FOR
## PRE-MEDICARE-ELIGIBLE PARTICIPANTS UNDER
## CURRENT AND PROPOSED PLAN

| Year | Pre-Medicare Med.[8] | | Pre-Medicare Rx | |
|---|---|---|---|---|
| | Plaintiff Class (Current Plan) | Post-2004 Retirees (Prop. Plan) | Plaintiff Class (Current Plan) | Post-2004 Retirees (Prop. Plan) |
| 2008 | $7,984 | $7,786 | N.A. | N.A. |
| 2009 | $8,699 | $5,058 | $3,413 | $1,504 |
| 2010 | $9,414 | $8,888 | $3,662 | $2,133 |
| 2011 | $9,340 | $9,525 | $3,762 | $2,149 |
| 2012 | $9,128 | $13,521 | $3,388 | $2,280 |

If the plaintiff class's argument was correct, one would expect the per-capita claim values for the 2005 plan to be lower than those for the current Plan (reflecting the purported decrease in the usage of plan benefits). But they are not universally lower. In fact, in some instances the per-capita claim values are higher under the

---

[8] I am using the historical data for the pre-Medicare-eligible population, because it provides a better comparison between plans. For pre-Medicare-eligible participants, the difference between the current and proposed plans is only the increased costs. A comparison for the Medicare-eligible population would require looking at the current network plan and the proposed non-network plan for medical benefits and the current drug plan and Medicare Part D for prescription drug benefits.

2005 plan.[9] Further, at least some of the decreased costs may reflect not a reduction of care but a shifting of care from more expensive to less expensive treatments. For example, under the proposed plan, participants will likely shift their usage from branded prescription drugs to generic prescription drugs. That shift in behavior—which is illustrated by the prescription drug usage of the plaintiff class in the Plan and of the post-April 2005 retirees with benefits similar to what is in the proposed plan—lowers plan costs but does not lower plan usage.

Perhaps more importantly, despite the opinions in the expert reports submitted by Plaintiffs, it is probably not possible to accurately predict the cost of health benefits beyond the next several years given all of the variables and upcoming changes that will be caused by the implementation of the Affordable Care Act. In fact, recent reports indicate that there may be a developing trend reflecting a significant reduction in the cost escalation of the nation's health costs. *See* PricewaterhouseCoopers LLP, *Medical Cost Trend: Behind the Numbers 2014*, at 3 (June 2013). And, in reality, the cost trends of the last several decades cannot

---

[9] In addition, I note that the plaintiff class focuses its analysis on the highest users of the Plan's benefits. This approach makes little statistical sense, as CNH America could just as easily focus on the participants that use the benefits least. Neither approach gives a sense of how CNH America's proposed changes will affect the average participant.

continue without significant risk to the financial well-being of the country, which leads me to believe that the trends are unlikely to continue.

More fundamentally, Plaintiffs' experts' views appear based on a static model that assumes what has happened in the recent past (i.e., the last ten to twenty years) will continue indefinitely. In the abstract, that is of course unlikely, but more importantly it is inconsistent with more recent events and trends. First, recent reports indicate health cost escalation is scaling down. Second, it fails to reflect the near and long term effects of the Affordable Care Act, both regarding costs and the practice of medicine. Significant efforts are under way to transition health care delivery to a patient care model (meaning an overall cost for providers to attend to an individual's full health needs) rather than a pay for service or episodic model. If this is successful, it should help to arrest cost escalation further. Additionally, there are new tools being developed to assist health care consumers to make better and more effective treatment decisions. Finally, the Affordable Care Act includes provisions to encourage more preventive care that is also likely to reduce more serious diseases (or at least help diagnose them at an earlier stage) and attendant costs.

I also understand that one of Plaintiffs' experts has compared pension information for class members to projected costs under the proposed plan. Of course, the pensions received by class members from CNH do not present a

30

complete financial picture of class members. I understand that CNH asked

Plaintiffs for such a picture for the class members but were provided it only for the

Plaintiffs themselves. And their financial picture is not as bleak as Plaintiffs'

expert would have one believe.

- Jack Reese received in 2012 pension payments from CNH and Pactiv totaling $17,560. In addition, Mr. Reese received pension payments from the UAW totaling $25,255; social security benefits totaling $30.490; and annuities totaling $15,684. Mr. Reese estimates his net worth to be approximately $300,000.

- James Cichanofsky received in 2012 pension payments from CNH and Pactiv totaling $28,560. In addition, Mr. Cichanofsky had $7,700 of employment-related income.

- Roger Miller received in 2012 pension payments from CNH and Pactiv totaling $14,057. In addition, Mr. Miller received social security benefits totaling $24,466. Mr. Miller also has accounts (savings, investments, IRA) with $240,000 in assets.

- George Nowlin received in 2012 pension payments from CNH and Pactiv totaling $4,404. In addition, Mr. Nowlin received pension payments from other employers totaling $3,072; social security benefits totaling $23,196; employment income of $29,500; and $2,800 from a family trust. Mr. Nowlin estimates his net worth to be $830,000.

If one is to look at a participant's purported ability to pay for health benefits, the

analysis must look beyond the CNH pension benefit.

Moreover, the Affordable Care Act will offer members of the plaintiff class

an alternative to the Plan if it becomes too expensive because of rising health costs.

Indeed, the ACA will provide retirees with substantial government subsidies to

31

acquire alternative comprehensive health coverage through publicly available exchanges, thus neutralizing the claim that CNH's proposed changes will block the class's access to health benefits. Based on data from Plaintiffs' tax returns and information from the Kaiser Family Foundation,[10] non-Medicare-eligible class members would be eligible for subsidies to purchase insurance from the new exchanges. For example, James Cichanofsky, who has a "modified AGI" in 2012 of $36,266 would be eligible for a subsidy of $10,199 toward a total annual premium of $12,913. Of course, individuals like Messrs. Reese, Miller, and Nowlin are eligible for (and are required to participate in) Medicare.

### C.   CNH America's Proposed Benefits Are Roughly Consistent With Those Provided to Other Employees and Retirees.

If CNH America's changes are approved, the plaintiff class will still enjoy a generous package of benefits. Indeed, the rough consistency between the new benefits and what is available to other retirees can be demonstrated in several ways.

### 1.   The Proposed Plan for the Plaintiff Class *Is* the Plan Agreed to by the UAW and the Plan Providing Benefits to More Recent CNH America Retirees.

CNH America's proposed changes to the Plan are based upon and designed to bring the plaintiff class's benefits into alignment with the benefits provided to

---

[10] *See* Subsidy calculator at kff.org.

32

the UAW-represented retirees that retired after April 2005. The usage-based costs as well as the terms of the proposed plan are those of the plan enacted in 2005. There are few (if any) differences except those mandated by the passage of the Patient Protection and Affordable Care Act (and which improved the benefits).

Those benefits were agreed to by the UAW in 2005 (and continued in 2010), presumably demonstrating that the UAW accepted the reasonableness of the proposed plan. In fact, the plaintiff class has even more generous coverage than the more recent retirees, because the premiums for the plaintiff class will always be less than those paid by post-April 2005 retirees, who have been paying premiums since shortly after the 2005 plan commenced and whose premiums have escalated in accordance with the 60–40 split set forth in the plan. Moreover, I understand that only two participants have lost their coverage under the 2005 plan for failure to pay premiums and that neither lost coverage immediately and were given opportunities to catch up his or her payments.

## 2. Other UAW-Bargained Benefit Plans Have Made Similar Changes.

Most retiree health plans resulting from collective bargaining have not been bargained, established, or administered in a vacuum. Rather, the parties typically contemplate that healthcare will change and plan provisions and administration of plans will also change as healthcare services, treatments, technologies, and drugs evolve and the attendant costs of each increase. In fact, plan changes to existing

33

retiree-health programs for both union and nonunion retirees are the rule, not the exception. Many companies with both union and non-union workforces have announced changes to their retiree health plans for their existing retirees. The UAW has agreed with companies other than CNH America to periodic plan changes for both existing and future retirees (although the UAW sometimes seeks court approval of cutbacks and cost increases to which it had already agreed for existing retirees).

The UAW and the auto companies have agreed to participant premium sharing (as well as increasing participant costs for plan usage). For example, in 2005, the UAW and General Motors and other auto companies agreed to eliminate retiree dental benefits and impose new cost sharing provisions—including premiums, co-payments, and higher deductibles—for UAW retirees. The American Association of Retired People (AARP) Public Policy Institute estimates that the new plan for GM retirees imposes annual costs for UAW retirees of approximately $750. (Some of those costs would be temporarily offset for several years by cost reimbursement from a voluntary employee benefit association trust and other financial arrangements agreed to between the companies and the UAW.) *See* Ellen O'Brien, AARP Pub. Policy Inst., Pub. 14, *What Do the New Auto Industry VEBAs Mean for Current and Future Retirees?* (Mar. 2008).

In 2007, the auto companies and the UAW agreed to substantially alter further their retiree health program by transferring the entire benefit sponsorship, delivery, and financial underwriting from the companies to a new VEBA established by the UAW. The companies would no longer be involved in the provision of or funding of retiree health benefits (although they would make substantial initial, and in some cases subsequent, contributions to the VEBAs). The AARP Public Policy Institute estimates that the 2007 agreements between each of the auto companies and the UAW provided funding sufficient for only approximately 60% to 70% of the expected future costs of providing benefits in accordance with the existing plan terms. Accordingly, future plan cutbacks for existing retirees are anticipated. *See id.*; *see also* Sharon Terlep & Matthew Dolan, *Pension Trusts Strapped*, Wall St. J., Nov. 7, 2011, at B1.

The changes continued in 2009 when, against the backdrop of the deteriorating financial and business positions of GM and Chrysler, the UAW and the auto companies agreed that the companies could make a significant portion of their contributions to the VEBAs in company stock rather than cash, further increasing the uncertainty of participant benefit security. Although the UAW's contracts with the automakers set limits on the amount of annual cost increases participants bear, those limitations became subject to unilateral modification by the VEBA trustees in 2011 and thereafter. Time/CNN reported in 2009 that in less

than four years, GM and other auto company blue-collar retirees had gone from modest co-pays to footing 25% of total plan costs. *See* Joseph R. Szczesny, *Why Detroit Retirees Have Health Care Anxiety*, Time, May 31, 2009.

After agreeing to change benefits for existing and future retirees, the companies and the UAW sought and received federal district-court approval of these various design and funding changes.

And it is not just the automotive companies. The UAW has agreed that companies such as Caterpillar and Deere may transfer some or all of a plan's funding and other requirements from the company to a VEBA. In each of those situations—similar to the one involving the auto companies—the security of the benefit was altered for retirees irrevocably or for specified time periods in which the change applied because retirees could no longer look to the companies to "guarantee" benefits or funding. Indeed, in the VEBA created by Dana and the UAW, it was agreed that the VEBA could make future changes—including cutbacks—to existing retiree benefits.

The UAW has also agreed with Caterpillar and Deere—competitors to and similarly situated to CNH America—to retiree health benefits similar to those proposed in this case by CNH America. Although there is a long history of animosity between the UAW and Caterpillar in their collective-bargaining negotiations and related matters, the company and the UAW agreed to resolve

36

many of those difficulties in 1998 by implementing a cap on the amount of costs that the company would be liable for under the retiree health plan. And, in 2004, Caterpillar and the UAW agreed to share the allocation of costs above that cap in a ratio of 60% by the company and 40% by participants, including some pre-existing retirees.

The current Caterpillar–UAW agreement calls for retiree premium contributions of $241 per month for pre-Medicare-eligible retirees and $162 for Medicare-eligible retirees. In 2014 and beyond, the premiums will increase in accordance with the 40–60 schedule. Further, the deductibles under the Caterpillar plan are $600 per person and $1,200 per family and are scheduled to increase in 2014 and 2015. The co-insurance rate is 80% for in-network services and 50% for out-of-network services, and the out-of-pocket maximums are $1,750 per person and $3,500 per family (both figures increase until 2015). Under the Caterpillar plan, out-of-network services always require a 50% co-insurance payment by participants, even if the out-of-pocket maximum has been reached.

The current Deere–UAW agreement also requires retiree contributions. It also requires satisfaction of a deductible for "point-of-service" treatment (i.e., not preventative care, durable medical equipment, prosthetics, hospice, or organ transplants) of $250 per person and $500 per family. The plan imposes an out-of-pocket maximum for such services of $1,000 per person and $2,000 per family.

### 3.   Other Retiree Health Plans Also Have Made Changes To Account for the Changing Economic Environment.

It is not just UAW-related plans like the CNH America Plan that have felt economic pressures and responded with benefit changes. In October 2010, 3M announced dramatic changes in how it provides existing union and non-union retirees health insurance in response to both increasing costs and changes in the law. In 2011, 3M announced it will terminate its health plan for Medicare-eligible retirees in 2013 and will instead provide only a fixed annual contribution to an HRA that retirees can use to pay the premiums for an individual Medicare supplement policy. Effective in 2015, 3M will terminate its health plan for non-Medicare-eligible retirees and provide HRA credits that retirees can use to pay the premium for health insurance in the individual market.

Also in October 2010, Honeywell announced plans to stop providing health insurance to Medicare-eligible retirees who retired after July 1992. The change followed Honeywell's announcement in February 2010 that it was eliminating a retiree medical plan subsidy for certain union employees who retire after February 1, 2013. Unilever also announced that it would terminate its company plans for Medicare-eligible retirees and instead provide contributions toward covering the cost of individual Medicare supplement policies. Finally, both U.S. Steel and Goodyear "negotiated" premiums or capped company contributions for existing retirees with the Steelworkers, and Goodyear and the Steelworkers agreed

38

to transfer the retiree health plan sponsorship, funding, and administration from the company to a union VEBA.

### 4. Statistical Comparisons Demonstrate the Reasonableness of CNH America's Proposed Benefits in This Case.

Increased cost sharing in health plans is the trend in the marketplace. The Bureau of Labor Statistics reported that in March 2010, private-sector employers paid approximately 80% (on average) of premiums or costs of coverage for single coverage and 70% of premiums or costs of coverage for family coverage for participants. The BLS also reported that in March 2010, union employees in private industry paid approximately 11% of premiums for single coverage and 18% of premiums for family coverage. *See* Bureau of Labor Statistics, U.S. Dep't of Labor, USDL-10-1044, *Employee Benefits in the United States—March 2010* (July 27, 2010). Several years later, there is even more cost sharing. Non-union employers covered 78% of premium costs for single coverage and 66% for family coverage; union employees covered 12% of premium costs for single coverage and 17% for family coverage. *See* Bureau of Labor Statistics, U.S. Dep't of Labor, Bulletin 2773, *Employee Benefits in the United State, March 2012* (Sept. 2012).

A study released by the BLS and Department of Labor last year reported the following median figures for fee-for-service plans surveyed:

- for in-network deductibles for union employees, $400 for individuals and $900 for families;

- for company coinsurance, 80% for in-network services under union plans and 60% for out-of-network services; and

- for out-of-pocket maximums, $1,750 for single coverage under plans with union members, and $3,400 for family coverage for plans with union members.

*See* Bureau of Labor Statistics, U.S. Dep't of Labor, Bull. 2775, *National Compensation Survey: Health Plan Provisions in Private Industry in the United States, 2011* (Dec. 2012). Compared to the same figures in the 2009 data, these numbers reflect the trend of increased cost sharing.

The BLS reported in 1999 that approximately 50% of union participants were required to contribute towards coverage and the average monthly amount was approximately $50 for individual coverage and approximately $130 for family coverage. The BLS reported in 2005 that union workers paid approximately 10% of premiums or costs of coverage for individuals and 14% for families. *See* Bureau of Labor Statistics, U.S. Dep't of Labor, Bull. 2589, *National Compensation Survey: Employee Benefits in Private Industry in the United States, 2005* (May 2007). The BLS reported very similar percentages in 2010 and 2012, but the absolute dollar amounts had increased significantly. *See* Bureau of Labor Statistics, U.S. Dep't of Labor, USDL-10-1044, *Employee Benefits in the United States—March 2010* (July 27, 2010); Bureau of Labor Statistics, U.S. Dep't of Labor, Bulletin 2773, *Employee Benefits in the United State, March 2012* (Sept. 2012).

Various surveys over the years reflect that retirees have been impacted by this trend as well. One such survey indicated that employees pay on average $1,890 towards premiums or costs of coverage and $1,766 on average towards usage (although perhaps somewhat more than the typical union active employee or retiree plan, these figures are representative of the general cost sharing trend for plans). *See* Hewitt Assocs. LLC, *Challenges for Health Care in Uncertain Times, 2009: Hewitt's 10th Annual Health Care Report* (Feb. 2009), *updated*, Hewitt, *Guide to 2009 Economic, Health, Retirement, and Employment Trends* (Feb. 2010). Hewitt Associates and the Kaiser Family Foundation reported in 2006 that new pre-Medicare retirees paid, on average, monthly premiums for individual coverage somewhere between $168 and $229. *See* The Henry J. Kaiser Family Found. & Hewitt Assocs., *Retiree Health Benefits Examined: Findings from the Kaiser/Hewitt 2006 Survey on Retiree Health Benefits* (Dec. 2006). The U.S. Government Accountability Office reported in 2007 an increasing level of participant premiums, deductibles, and co-payments for retiree health plans in general. *See* U.S. Gov't Accountability Office, GAO-07-335, *Employer-Sponsored Health and Retirement Benefits: Efforts to Control Employer Costs and the Implications for Workers* (Mar. 2007).

Unsurprisingly, CNH America's proposed plan design compares favorably with plans provided by similar companies. Towers Watson provided CNH America

with a comparison of the proposed plan with data aggregated from nearly nine

hundred employers in Towers Watson's database. Benchmarked against the

aggregate data, the proposed plan compares favorably. The annual deductibles are

in the first quartile (i.e., the propose plan is better than at least seventy-five percent

of those Towers Watson surveyed). The out-of-pocket maximums are well within

the first quartile of data. The co-insurance rate is also in the first quartile of plans.

The copayment requirements are around the average of plans surveyed.

The proposed plan also compares favorably with Medicare,[11] in which,

according to CMS, 42.2 million people ages 65 and older participated in 2012.[12]

Medicare consists of four parts, each covering different benefits: Part A Hospital

Insurance, Part B Medical Insurance, Part C Medicare Advantage Program, and

Part D Prescription Drug Coverage.

- Under CNH's proposed plan, pre-Medicare-eligible participants would pay initial monthly premiums of $57.25, and Medicare-eligible participants would pay $5; most Medicare Part B participants pay monthly premiums of $104.90.[13]

---

[11] I looked at publicly available information about Medicare available at https://www.medicare.gov/your-medicare-costs/costs-at-a-glance/costs-at-glance.html#1288.

[12] *See* CMS Fast Facts available at http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMS-Fast-Facts/index.html.

[13] Like its current plan, CNH's proposed plan requires participants to take advantage of Medicare Part B when they become eligible for it. CNH's plan would sit above Part B and coordinate with those benefits.

- CNH's proposed plan has annual deductibles of $200 for in-network services and $500 for out-of-network services for pre-Medicare-eligible participants, and $250 for Medicare-eligible participants. Medicare Part B has an annual deductible of $147 and Part A has a deductible of $1,184 for the first sixty days of inpatient hospital care. Under Part A, after the deductible, there is no cost sharing for inpatient hospital care for the first 60 days, $296 per day for the next thirty days, and $592 per lifetime reserve day after 90 days.

- Part B's post-deductible coverage is generally 80%. CNH's proposed plan covers 85% of in-network services and 65% of out-of-network services for pre-Medicare-eligible participants, and 80% for Medicare-eligible participants.

- The out-of-pocket maximums under CNH's proposed plan ($1,000 for in-network services and $2,000 for out-of-network services) protect participants much more than Medicare, which does not have a limit on how much beneficiaries are required to spend out-of-pocket for inpatient and outpatient services.

- Finally, prescription drug coverage will be the same for Medicare-eligible participants under the proposed plan as Medicare-eligible participants will look to Medicare Part D for coverage.

The proposed plan also compares favorably with the network-based plans available to federal employees and retirees in this judicial district for pre-Medicare-eligible participants.[14]

- Under CNH's proposed plan, pre-Medicare-eligible participants would pay initial monthly premiums of $57.25; federal employees in Detroit pay monthly premiums of $97.36 to $197.51 each month.

---

[14] I looked at publicly available information about the Blue Cross and Blue Shield Service Benefit Plan Nationwide, the GEHA Benefit Plan Nationwide, the GEHA High Deductible Health Plan Nationwide, and the Michigan Aetna HealthFund. *See* Plan brochures available at http://www.opm.gov/healthcare-insurance/healthcare/plan-information/plan-codes/2013/states/mi.asp.

43

- Some plans open to Detroit federal employees have no deductibles, but those with deductibles (and that do not employ a health savings account) require participants to pay the first $350 to $1,500 of the cost of their health services; for the plan with an out-of-network deductible, it is $2,500. CNH's proposed plan has lower deductibles: $200 for in-network services and $500 for out-of-network services.

- Under Detroit-area federal plans, coinsurance ranges from 80% to 95% plan coverage for in-network services and from 60% to 75% for out-of-network services. CNH's proposed plan covers 85% of in-network services and 65% of out-of-network services.

- The out-of-pocket maximums under CNH's proposed plan ($1,000 for in-network services and $2,000 for out-of-network services) protect participants much more than those in the Detroit-area plans (which range from $4,000 to $7,000 for in-network services and $5,000 to $10,000 for out-of-network services).

- Finally, the proposed drug benefit under CNH's pre-Medicare-eligible plan is comparable to the ones in plans for Detroit-area federal employees. CNH would use flat copayments of $10 to $60 for short-term (i.e., retail) prescriptions and $20 to $120 for long-term (i.e., mail-order) ones. The Detroit plans can charge as high as 50% of the prescription for the highest tier of prescriptions under either short- or long-term.

These factors indicate that participants in other situations bear an increasing allocation of plan coverage and usage costs. Although there is no single means to modify basic cost allocations under a plan, revised cost allocation provisions are being implemented frequently. The relevant literature reports that participants covered by retiree plans—including plans covering union retirees—are bearing additional costs through premiums, deductibles, co-payments, more arduous plan administrative mechanisms, and elimination or limitations of benefits. After the

Plan is changed as CNH proposes, the plaintiff class will still have benefits generally comparable to those provided currently to retirees, including union retirees, in the marketplace.

Dated: October 17, 2013

Scott J. Macey
The ERISA Industry Committee
1400 L Street, Northwest, Suite 350
Washington, D.C. 20005
202.789.1400

## ATTACHMENT A:
### Compensation

My name is Scott Macey. I am currently President and CEO of the ERISA

Industry Committee (ERIC). Prior to June 1, 2012, I was Of Counsel to Covington

& Burling LLP (from April 1, 2010). The fee for my services and others within

Covington who assisted me is based on our hourly billing rates. My hourly rate

was $800. As of February 29, 2012, I spent approximately 59 hours on this matter.

Michael Chittenden assisted me in the preparation of this report. As of

February 29, 2012, Mr. Chittenden spent approximately 37 hours on this matter.

His hourly rate was $355. As of February 29, 2012, the total amount of

compensation received by Covington & Burling LLP on this matter was

approximately $60,000.

Since June 1, 2012, any work I have performed on this matter has been

under my own auspices and is totally independent of my work and responsibilities

for the ERISA Industry Committee. My personal billing rate is $625 per hour. As

of the date of this report, I have approximately 30 hours of time accorded to this

matter since June 1, 2012.

46

## ATTACHMENT B:
## Qualifications

I am currently the president of the ERISA Industry Committee.

I am a graduate of the University of San Francisco, *magna cum laude*, in 1969 and received a law degree (Juris Doctor), *summa cum laude*, from the University of Santa Clara School of Law in 1975. I also attended classes towards an MBA at the University of Santa Clara (without completing requirements for such) and a Masters in history from California State University at San Jose (also without completing requirements for such). I have been a practicing lawyer and an employee benefit consultant for more than 35 years. Since 1976, my area of professional concentration has been all aspects of employee benefits and compensation matters and related issues under the Employee Retirement Income Security Act (ERISA) and related laws. I have practiced law in a law firm (1975–1977, Parker Milliken, Clark & O'Hara—Los Angeles and, from April 2010 to 2012, Covington & Burling in Washington, D.C.) and with a large company (AT&T and its subsidiaries and affiliates, 1977–1998) as well as a consulting firm (Actuarial Sciences Associates (AT&T subsidiary) from 1986 to 1998). I have served as a senior member of AT&T's law department and was the primary attorney responsible for benefit and related legal compliance matters for the Bell System from 1977 through 1983 and for AT&T from 1984 through 1998. I also served as the Executive Vice President & General Counsel of Actuarial Sciences

47

Associates (ASA) from 1985 until 1998 and was Director of Government Affairs for Aon Consulting from 2000 to November 2009.

I have participated as an active member in a number of trade and professional associations involved in employee benefit and related matters including the American Benefit Council, the United States Chamber of Commerce, the American Bar Association, the New Jersey Bar Association, and The ERISA Industry Committee (ERIC). I have served on the Board of Directors of the latter organization for approximately 30 years and was its Chairman from 1995 to 1998 and continue to assist ERIC currently as one of its outside counsel. ERIC is the primary Washington based employer trade association for major Fortune 200 companies concerned about ERISA, retirement and health issues, and other employee benefit related matters. I am a charter member of the American College of Employee Benefit Counsel.

I have been actively involved in consulting with numerous companies regarding a wide range of employee benefit matters for the last 25 years in addition to my direct responsibilities for AT&T and Aon during most of that time period. From 1977 to 2005, I was actively involved and had direct legal or consulting responsibility for AT&T's benefit related union bargaining, including matters pertaining to the design, funding and legal compliance of retiree health plans. Such engagement and responsibilities have included direct onsite assistance for more

than 10 national bargaining sessions over that nearly 30 year period. I have also assisted other companies and entities with their union negotiations regarding employee benefit and specifically retiree health matters. Such other entities include Lucent Technologies, the Pacific Maritime Association, Southern New England Telephone Company, and other entities. I have engaged in the public and consultant evaluation of all aspects of retiree health issues with representatives of companies, unions, and government agencies throughout my career.

Over the years, I have written a number of articles and provided a number of interviews to various publications regarding retiree health and other employee benefit matters. I have also testified before various U.S. House and Senate committees and federal agencies regarding various employee benefit matters. I have attached a listing of those articles and testimony from the last 10 years plus.

## ATTACHMENT C:
## Articles

| Name of Publication | Name of Article | Date of Article | Author(s) |
|---|---|---|---|
| New York University on Federal Taxation - Employee Benefits and Executive Compensation | Retiree Health Benefits - The Divergent Paths | 2003 | Scott Macey, George O'Donnell |
| Journal of Compensation & Benefits | Retiree Health Benefits at the Crossroads | Sept./Oct. 2003 | Scott Macey, George O'Donnell |
| Financial Executive Magazine | Retiree Health - Crossroads of Benefits and Burdens | (Nov/Dec 2003) | Scott Macey |
| NYU Review of Employee Benefits and Executive Compensation 2004 | The Changing Landscape of Fiduciary Responsibility Under ERISA | 2004 | Scott Macey, Thomas Meagher, Pamela Reid |
| Journal of Compensation & Benefits | New Paradigms for 40l(k) Fiduciaries | Sept./Oct. 2004 | Scott Macey, Thomas Meagher, Pamela Reid |
| Business Insurance | Legal and Regulatory Uncertainty in the Retirement Benefits Market | Sept. 1, 2004 | Scott Macey |
| Pension & Benefits Reporter | Legal and Regulatory Uncertainty in the Retirement Benefits Market | Sept. 14, 2004 | Scott Macey |

| Name of Publication | Name of Article | Date of Article | Author(s) |
|---|---|---|---|
| NYU Review of Employee Benefits and Executive Compensation 2005 | Deferred Compensation - New Planning Opportunities Under Code Section 409A | Fall 2005 | Scott Macey, Thomas Meagher |
| Journal of Compensation and Benefits | Who's Killing DB Pension Plan | Mar./Apr. 2006 | Scott Macey |
| Journal of Compensation and Benefits | Health and Taxes: A Volatile Mix | May/Jun. 2006 | Scott Macey |
| Journal of Compensation and Benefits | Building a New Benefit Structure | Jul./Aug. 2006 | Scott Macey |
| Journal of Compensation and Benefits | A New Direction in ERISA Remedies? | Nov./Dec. 2006 | Scott Macey |
| Journal of Compensation and Benefits | Pension Protection Act – A Preliminary View | Nov./Dec. 2006 | Scott Macey |
| NYU Review of Employee Benefits and Executive Compensation 2007 | Solving the Conundrum of Frozen Pension Plans | 2007 | Scott Macey |
| Journal of Compensation and Benefits | Fiduciary Responsibilities | Jan./Feb. 2007 | Scott Macey |

| Name of Publication | Name of Article | Date of Article | Author(s) |
|---|---|---|---|
| Journal of Compensation and Benefits | Benefits and ERISA 2006 | Mar./Apr. 2007 | Scott Macey |
| Benefits & Compensation International | Enhancing Security for Frozen Pension Plans | Apr. 2007 | Scott Macey |
| Journal of Compensation and Benefits | Enhancing Security for Frozen Pension Plans | May/Jun. 2007 | Scott Macey |
| Journal of Compensation and Benefits | Pension Protection Act: Some Emerging Issues | Jul./Aug. 2007 | Scott Macey |
| Journal of Compensation and Benefits | The Dilemma of Healthcare Reform | Sept./Oct. 2007 | Scott Macey |
| Journal of Compensation and Benefits | 401(k) Plans: The Emerging Fee Disclosure Debate | Nov./Dec. 2007 | Scott Macey |
| Journal of Compensation and Benefits | Benefits and ERISA 2007: Hope or Despair? | Jan./Feb. 2008 | Scott Macey |
| Journal of Compensation and Benefits | Benefit Risk Evaluation and Management | Mar./Apr. 2008 | Scott Macey |
| Journal of Compensation and Benefits | The Supreme Court Addresses ERISA Procedures and Remedies | May/Jun. 2008 | Scott Macey |

| Name of Publication | Name of Article | Date of Article | Author(s) |
|---|---|---|---|
| Journal of Compensation and Benefits | ERISA Preemption: Boon or Bust | July/Aug. 2008 | Scott Macey |
| Journal of Compensation and Benefits | Benefits and Business Transactions | Sept./Oct. 2008 | Scott Macey |
| NYU Review of Employee Benefits and Executive Compensation 2008 | Benefit Planning: Strategies and Risks in Business Transactions | 2009 | Scott Macey |
| Journal of Compensation and Benefits | 2008: The Year of Living Dangerously | Jan./Feb. 2009 | Scott Macey |
| Journal of Compensation and Benefits | Pension Protection Act: An Emerging Assessment | Mar./Apr. 2009 | Scott Macey |
| Journal of Compensation and Benefits | Plan and Claims Administration Post-Larue and Metlife | May/Jun. 2009 | Scott Macey |
| Journal of Compensation and Benefits | Whither Goest 401(k) Plans | Jul./Aug. 2009 | Scott Macey |
| Aon Ready | Health Reform | Sept. 2009 | Scott Macey |
| Journal of Compensation and Benefits | Health Reform and Employers | Sept./Oct. 2009 | Scott Macey |
| Journal of Compensation and Benefits | What Next: Retirement Reform? | Nov./Dec. 2009 | Scott Macey |

**ATTACHMENT D:**
**Testimonies**

| Testimony Given Before the: | Subject Matter | Date of Testimony |
|---|---|---|
| Senate Special Committee on Aging | America's Pension System | October, 2003 |
| Treasury and IRS | Phased Retirement | March, 2005 |
| HELP Subcommittee of the US House of Representatives | Retirement Security (PPA) | May, 2007 |
| House Education and Labor Committee | Tierney Retiree Health Legislation | September 25, 2008 |
| Various regulatory testimony before the U.S. Treasury and Department of Labor and IRS | Various pension and health benefit issues/matters | Various dates |

**ATTACHMENT E:**
**Documents Reviewed or Relied Upon to Develop Opinions**

**Judicial Opinions**

*Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, No. 92-CV-0828E(M), 1996 WL 378175, at *1 (W.D.N.Y. June 26, 1996), *aff'd*, 116 F.3d 976 (2d Cir. 1997)

*Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir. 1993)

*Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir. 1993)

*Bower v. Bunker Hill Co.*, 725 F.2d 1221 (9th Cir. 1984)

*Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995)

*Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76 (2d Cir. 2001), *cert. denied*, 123 S. Ct. 1015 (2003)

*Devlin v. Transp. Commc'ns Int'l Union*, Nos. 95 Civ. 0742(JFK), 95 Civ. 10838(JFK), 2002 WL 413919, at *1 (S.D.N.Y. Mar. 14, 2002)

*Eardman v. Bethlehem Steel Corp. Employee Welfare Benefit Plans*, 607 F. Supp. 196 (W.D.N.Y. 1985)

*Golden v. Kelsey-Hayes Co. (In re Golden)*, 73 F.3d 648 (6th Cir. 1996)

*Groover v. Michelin N. Am., Inc.*, 90 F. Supp. 2d 1236 (M.D. Ala. 2000)

*Int'l Union, UAW v. Aluminum Co. of Am.*, 932 F. Supp. 997 (N.D. Ohio 1996)

*Int'l Union, UAW v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir. 1999)

*Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), *cert. denied*, 465 U.S. 1007 (1984)

*Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130 (2d Cir. 1999)

*Maurer v. Joy Techs., Inc.*, 212 F.3d 907 (6th Cir. 2000)

*Moore v. Metro. Life Ins. Co.*, 856 F.2d 488 (2d Cir. 1988)

*Reese v. CNH Am. LLC*, 574 F.3d 315 (6th Cir. 2009)

55

*Reese v. CNH Am. LLC*, 694 F.3d 681 (6th Cir. 2012)

*Senn v. United Dominion Indus., Inc.*, 951 F.2d 806 (7th Cir. 1992)

*Shy v. Navistar Int'l Corp.*, No. C-3-92-333, 1993 WL 1318607, at *1 (S.D. Ohio May 27, 1993)

**Federal Government Reports**

Patricia H. Born, Cal. St. Univ. & Alice M. Zawacki, U.S. Bureau of the Census, CES 03-14, *Manufacturing Firms' Decisions Regarding Retiree Health Insurance* (June 2003)

Bureau of Labor Statistics, U.S. Dep't of Labor, USDL 01-473, *Employee Benefits in Private Industry, 1999* (Dec. 19, 2001)

Bureau of Labor Statistics, U.S. Dep't of Labor, Bull. 2589, *National Compensation Survey: Employee Benefits in Private Industry in the United States, 2005* (May 2007)

Bureau of Labor Statistics, U.S. Dep't of Labor, Bull. 2749, *National Compensation Survey: Health and Retirement Plan Provisions in Private Industry in the United States, 2009* (July 2010)

Bureau of Labor Statistics, U.S. Dep't of Labor, Bull. 2773, *Employee Benefits in the United States, March 2012* (Sept. 2012)

Bureau of Labor Statistics, U.S. Dep't of Labor, Bull. 2775, *National Compensation Survey: Health and Retirement Plan Provisions in Private Industry in the United States, 2011* (Dec. 2012)

Bureau of Labor Statistics, U.S. Dep't of Labor, USDL-10-1044, *Employee Benefits in the United States—March 2010* (July 27, 2010)

Cong. Budget Office, *The Long-Term Outlook for Health Care Spending* (Nov. 2007)

Cong. Budget Office, *Technological Change and the Growth of Health Care Spending* (Jan. 2008)

U.S. Gov't Accountability Office, GAO-01-374, *Retiree Health Benefits: Employer-Sponsored Benefits May Be Vulnerable to Further Erosion* (May 2001)

U.S. Gov't Accountability Office, GAO-06-285, *Employee Compensation: Employer Spending on Benefits Has Grown Faster Than Wages, Due Largely to Rising Costs for Health Insurance and Retirement Benefits* (Feb. 2006)

U.S. Gov't Accountability Office, GAO-07-335, *Employer-Sponsored Health and Retirement Benefits: Efforts to Control Employer Costs and the Implications for Workers* (Mar. 2007)

U.S. Gov't Accountability Office, GAO/HRD-93-125, *Retiree Health Plans: Health Benefits Not Secure Under Employer-Based System* (July 1993)

**State Government Documents**

Employees Retirement System of Texas, *Changes on the Horizon for State Employee and Retiree Health Benefits* (eff. June 1, 2010)

State of Rhode Island, OEB052908, *Changes to Retiree Medical Subsidies: Frequently Asked Questions*, State of Rhode Island (May 29, 2008)

**Articles** (in addition to those cited in the report)

*2011 Retiree health Care Plan Changes Detailed*, GantDaily.com, October 18, 2010

*3M to end retirees' health plan*, StarTribune.com, October 4, 2010

*AFSCME sues state over changes to retiree insurance*, AFSCME Council 31

Michael Alaimo, Guest Column: *Retiree Health Benefits—An Ongoing Problem*, Original Equipment Suppliers Association (2002), available at http://www.oesa.org/publications/articledetail.php?articleId=2002

*The American Auto Industry in Crisis: The Threat to Middle-Class Jobs, Wages, Health Care and Pensions*, UAW News, December 8, 2005, available at http://uaw.org/news/newsarticle.cfm? ArtId=3 71

Nathanael R. Berneking, *Don't Mow Over the* Yard-Man *Inference: Guarding Against Improper Modification of Welfare Benefits Provided in a Collective Bargaining Agreement*, 45 St. Louis L.J. 261 (2001)

Janilyn S. Brouwer, *Current Issues in Insurance Law: The Promise of a Lifetime*, 51 Ohio St. L.J. 985 (1990)

Melinda Beeuwkes Buntin et al., *Consumer-Directed Health Care: Early Evidence About Effects On Cost And Quality*, vol. 25, no. 6, at w516 (2006)

Melinda Beeuwkes Buntin et al., *Healthcare spending and Preventative Care in High-Deductible and Consumer-Directed Health Plans*, Am. J. Managed Care, vol. 17, no. 3, at 222 (Mar. 2011)

Stuart Butler, Transcending Employer-Based Health Insurance, prepared for the Council on the Economic Impact of Health System Change Conference, *Using Tax Policy to Reduce the Number of Uninsured*, December 17, 1999 available at http://sihp.brandeis.edu/council/pubs/Butlertx.pdf

*Challenges and Opportunities: Issues Facing the Us. Health Care System*, An EBRI Special Report, September 1991

Brett Clanton, *Retirees Fight Ford, UAW Deal*, The Detroit News, January 29, 2006

*Company News: Navistar Seeks to Slash Retirees' Health Benefits*, New York Times, July 29, 1992

*Company News: Navistar to Give UAW a Seat on its Board*, New York Times, December 19, 1992

Martha Lynn Craver, *Big Cuts Coming in Health Benefits for Many Retirees*, Kiplinger Business Forecasts, November 7, 2005

Doug Cunningham, *GM UAW Retiree Challenges Union Suit on Pensions*, Workers Independent News, January 11, 2006, available at http://www.laborradio.org/node/2347

William S. Custer, *Employer Health Care Plan Design, Plan Costs, and Health Care Delivery*, An EBRI Special Report, SR-4, November 1989

William S. Custer, *Health Insurance Coverage for the Near Elderly*, An EBRI Special Report, SR-9, October 1990

*CWA Contracts and Retirees*, available at http://www.users.gwest.net/~cwa7019/retireeother.htm (last viewed February 20, 2006)

Dee-Ann Durbin, *GM-UAW Health Care Deal Gets Preliminary OK*, Forbes, December 22, 2005

Toby Eckert, *Cat v. UAW: Pattern Bargaining at Issue*, Illinois Periodicals Online (IPO) available at http://www.lib.niu.edu/ipo/1992/ii920315.html

*Embarq Slashes Health Care for Retirees*, Telecom News, Oct./Nov. 2007

*Employer Response to Medicare Part D—2005 Survey*, available at http://www.deloitte.com/dtt/article/0,1002,sid=26554&cid=71788,00.html, last updated December 28, 2005

*Ford retirees want health info*, The Detroit News (www.detnews.com), February 9, 2011

Milt Freudenheim, *Companies Limit Health Coverage of Many Retirees*, New York Times, February 3, 2004

Milt Freudenheim, *Employers Seek to Shift Costs of Drugs to U.S.*, New York Times, July 2, 2003

Paul Fronstin, *The Impact of the Erosion of Retiree Health Benefits on Workers and Retirees*, EBRI Issue Brief No. 279, March 2005

Paul Fronstin, *Retiree Health Benefits: Trends and Outlook*, EBRI Issue Brief No. 236, August 2001

*GIC Benefits to Change for Employees and non-Medicare Retirees and Survivors Effective February 1, 2010*, For Your Benefit, Winter of 2010

*GM labor deal would cut retiree health benefits immediately*, USA Today, February 9, 2011

Jay Greene, *Healthy Retirees, Healthy Fund*, Crain's Detroit Bus., Jan. 9, 2012, at 13

*Health Care Marketplace: GM, UAW Agreement on Changes to Health Benefits Could Prompt Similar Action by Other Automakers*, Kaiser Network, October 18, 2005

*Health Insurance*, Wikipedia Foundation, February 14, 2011, available at http://en.wikipedia.org/wiki/Health_Insurance

*Health Insurance History of the Connecticut Teachers' Retirement System—Past to Present*, State of Connecticut Teachers' Retirement Board, available at

http://www.ct.gov/trb/lib/trb/forrnsandpubs/HEALTHHISTORY.pdf (last visited March 3, 2006)

The Henry J. Kaiser Family Found. & Hewitt Assocs., *The Current State of Retiree Health Benefits: Findings from the Kaiser/Hewitt 2002 Retiree Health Survey* (Dec. 2002)

The Henry J. Kaiser Family Found. & Hewitt Assocs., *Retiree Health Benefits Examined: Findings from the Kaiser/Hewitt 2006 Survey on Retiree Health Benefits* (Dec. 2006)

Tom Herman, *New Definition of a "Child" causes Outcry—Congress's Move to Simplify; The Tax Code Creates Loophole for Some Wealthy Families*, The Wall Street Journal, March 1, 2006

Hewitt Assocs. LLC, *Challenges for Health Care in Uncertain Times, 2009: Hewitt's 10th Annual Health Care Report* (Feb. 2009)

Hewitt, *Guide to 2009 Economic, Health, Retirement, and Employment Trends* (Feb. 2010)

Bryce G. Hoffman, *UAW Wins Fight Over Benefits*, The Detroit News, December 28, 2005

*Honeywell limiters retiree medical benefits*, azcentral.com, August 23, 2009

*Honeywell Stops Offering Some Retirees Group Coverage*, Bloomberg, October 22, 2010

Gary Clyde Hutbauer and Ben Goodrich, *Steel: Big Problems, Better Solutions*, Institute for International Economics, No. 01-9 (2001)

Jim Jaffe and Paul Fronstin, *Controlling Health Costs and Improving Health Care Quality for Retirees*, EBRI Issue Brief No. 278, February 2005

Kaiser Family Found., *Employer Health Benefits 2010 Annual Survey* (Sept. 2010)

Kaiser Family Found., *Employer Health Benefits 2012 Annual Survey* (Sept. 2012)

*Kaiser Slides (Cumulative Changes in Health Premiums . . .)*, prepared for The Henry J. Kaiser Foundation, February 15, 2011

Helen M. Kemp, *The Employer Giveth and Taketh Away: Retiree Health Benefits under ERISA-Governed Health Plans*, American Bar Association, Volume 34, No.3, Spring 2005

*Kick Retirees Off Their Health Plans*, June 12,2005, available at http://www.unbossed.comlindex. php?itemid=204

Susan Martin, *An Overview of Retiree Welfare Benefits Litigation*, American Bar Association, 1998 Mid-Winter Meeting, March 20, 1998

*Maytag retiree lawsuit over health care benefit changes voluntarily dismissed*, Newton Independent, December 11, 2009

Jeffrey McCracken, *Idle Hands—Detroit's Symbol of Dysfunction: Paying Employees Not to Work*, The Wall Street Journal, March 1,2006

Mark Merlis, *Health Benefits in Retirement: Set for Extinction*, National Health Policy Forum, February 8, 2006

Joann Muller, *Surviving Globalism*, Forbes, February 27, 2006

*National Collective Bargaining Departments*, available at http://www.uaw.org/about/barg.html

*New York Times Examines Effect of New Medicare Drug Benefit on Employer Sponsored Retiree Health Benefits*, Kaiser Daily Health Policy Report, November 4, 2005

Ellen O'Brien, AARP Pub. Policy Inst., Pub. 14, *What Do the New Auto Industry VEBAs Mean for Current and Future Retirees?* (Mar. 2008)

James B. Parks, *Forging a Common Vision*, Labour Review, Issue No. 101 (February 2003)

William T. Payne, *Lawsuits Challenging Termination or Modification of Retiree Welfare Benefits*, American Bar Association (1998), available at http://www.bna.com/bnabooks/ababna/annual/98/ebc898.pdf (last visited March 3, 2006)

PricewaterhouseCoopers LLP, *Medical Cost Trends: Behind the Numbers 2014* (June 2013)

Jill Quadagno, *Health Savings Accounts & the State of the Union*, available at http://blog.oup.com/oupblog/health/index.html (last visited February 14, 2006)

RAND, *Consumers May Have More Control Over Health Care Costs Than Previously Thought* (press rel.) (Sept. 29, 2011)

*Retiree Health Care: A Level Playing Field for American Steel Begins with Legacy Cost Relief*, available at http://www.steelworkers-usw.org/usw/program/content/221.php (last visited March 3, 2006)

*Retiree Health VEBAs: A New Twist On An Old Paradigm Implications for Retirees, Unions and Employers*, prepared for The Henry J. Kaiser Foundation, March 2009

*Retirees watch benefits fade*, Pittsburgh Tribune-Review, December 12, 2010

*Retirement Liabilities Mid-Year Update: Reforms and Interest Rates Are Still the Focus, but Health Care is Gaining Attention*, Goldman Sachs, July 15,2005 available at http://www.gs.com/insight/research/reports/ docs/retirement

*Retirement Security in a Post-FASB Environment*, An EBRI Special Report, EBRI Issue Brief No. 124, March 1992

*RIP: Retiree Health Plans*, Kiplinger's Personal Finance Magazine, available at http://moneycentral.msn.com/content/Insurance/InsureyourhealthiP 13923 3 .asp (last visited March 3, 2006)

*Rising Costs Lead Companies to Cut Retiree Health Benefits*, January 11, 2004, available at http://www.desmoinesregister.com

Carolyn Said, *In Critical Condition Health Care in America*, San Francisco Chronicle, October 12, 2004

Sylvester S. Schieber, The Future of Retiree Health Benefits in Higher Education in the United States, Prepared for the TIAA-CREF Institute Conference, *Recruitment, Retention, and Retirement: The Three R's of Higher Education in the 21st Century*, April 2004

John B. Schnapp, *Auto Workers of the World Unite*, The Wall Street Journal, January 25, 2006

Ellen Schultz, *Companies Transform Retiree—Medical Plans into Source of Profits*, The Wall Street Journal, October 26, 2000

*Seventh Circuit Says Retirees Can't Get Trial on Claim Their Health Benefits Are 'Lifetime'*, BNA Pension & Benefits Reporter, Volume 33, No. 07, February 14,2006

Joanna Short, *Economic History of Retirement in the United States*, available at http://www.eh.net/encyc1opedia/article/short.retirement.history.us (last visited March 3, 2006)

*Some Big Corporations Will Drop Coverage for Retirees Joining Part D*, available at http://www.unionvoice.org (last visited March 3, 2006)

Douglas Sonderoth, *High Hopes: Why Courts Should Fulfill Expectations of Lifetime Retiree Health Benefits In Ambiguous Collective Bargaining Agreements*, 42 B.C. L. Rev. 1215 (2001)

*State retiree health premiums 'totally unaffordable', AFSCME says*, (Ill.) State J. Register, March 13, 2010

*States Aim Ax at Health Cost of Retirement*, The New York Times Reports, February 13, 2011

Bradley C. Strunk and Paul B. Ginsburg, *Tracking Health Care Costs: Spending Growth Slowdown Stalls in First Half of 2004*, Center for Studying Health System Change, Issue Brief No. 91, December, 2004

Rich Stuart and Caroline Bellamy, *UAW Strikes Over Wages, Health Plan at Tennessee Truck Plant*, The Militant Vol. 621N0. 21, June 1, 1998

Lee Sustar, *CWA Gives Ground at SBC*, Socialist Worker Online, June 4, 2004

Lee Sustar, *They Want to Break Our Unions*, December 17, 2004, available at http://www.socialistworker.org/2004-2/524/524 12 CNH.shtml

Katherine Swartz, *Cost-sharing: Effects on Spending and outcomes*, The Robert Wood Johnson Found., Dec. 2010

Joseph R. Szczesny, *Why Detroit Retirees Have Health-Care Anxiety*, Time, May 31, 2009

Melissa Thomasson, Miami University, *Health Insurance in the United States*,
    available at
    http://www.eh.net/encyclopedia/article/thomasson.insurance.health.us

Sharon Terlep & Matthew Dolan, *Pension Trusts Strapped*, Wall St. J., Nov. 7,
    2011, at B1

*TI Retiree Health Benefits Bulletin*, Texas Instruments, February 4, 2005, available
    at http://tialumni.org/assets/benef_bulletin/TI_retiree bulletin_2005Feb.pdf

*UAW, Navistar Agree to Trim Retiree Benefits - United Auto Workers, Navistar
    International Corp*, available at http://findarticles.comlp/articles/mi
    m3165/is nl/ai 13531189/print (last visited February 14,2006)

*UAW Seeking Legal Protection Against Unilateral Health Care Cuts for Retired
    Workers, Spouses*, Dependents, February 9, 2006, available at
    http://www.kaisemetwork.org/daily reports/rep index.cfm?DR ED=33200

*Unilever making changes to retiree health insurance*, NorthJersey.com;
    February 10, 2011

Edward J. Wasilewski, Jr., *A Look Back at the Kaiser Aluminum and United
    Steelworkers Dispute*, Compensation and Working Conditions Online,
    January 30, 2003

Marcia Weuve, *High Cost of Health Care Robbing Retirement*, available at
    http://hffo.cuna.org/story.html?doc id=953&sub id=tpempty, (last visited
    March 3, 2006)

*Why Health Care Costs Too Much*, CATO Institute, June 23, 1994

*Workers Get Deal as Tough as a Mack Truck*, January/February 2005, available at
    http://www.uaw.org/solidarity/05/0205/ufD2.cfm

**Documents Received From McDermott Will & Emery LLP**

Memorandum from Owen Bieber to the UAW International Executive Board
    (Apr. 23, 1984) [Ex. 17 to El Paso Tennessee Pipeline Co.'s Motion for
    Summary Judgment in *Yolton v. El Paso Tenn. Pipeline Co.*, No. 02-75164
    (E.D. Mich. June 1, 2007)]

CNH's Responses to Plaintiffs' Interrogatories

Case/UAW Group Benefit Plans: 1998 Negotiations (CNHA032476–CNHA032564)

Employee Insurance Plan for Hourly Employees of Case Corporation—United Auto Workers—Summary Plan Description: May 1998–May 2004 (EMR00001–EMR00144)

CNH/UAW Group Benefit Plans: 2005 Negotiations (CNHA053613–CNHA053712)

Employee Group Insurance Plan for Hourly Employees of CNH America LLC Who Retired After July 1, 1994, and Before May 1, 2005—United Auto Workers—Summary Plan Description (i.e., the summary plan description of the plan proposed by CNH for Plaintiffs)

UAW–Caterpillar 2001 Central Agreement Benefit Plans (UAW2013 000013–UAW2013 000393)

UAW Caterpillar Summary of Proposed 2011–2017 Tentative Agreement (UAW2013 000394–UAW2013 000403)

Benefit Plans Deere & Company (UAW2013 000404–UAW2013 000647)

UAW–Deere & Company Highlights of Proposed New Agreement 2009–2015 (UAW2013 000648–UAW2013 000659)

Plaintiff Reese's Responses to CNH's Second Set of Interrogatories to Plaintiffs

Plaintiff Cichanofsky's Responses to CNH's Second Set of Interrogatories to Plaintiffs

Plaintiff Miller's Responses to CNH's Second Set of Interrogatories to Plaintiffs

Plaintiff Nowlin's Responses to CNH's Second Set of Interrogatories to Plaintiffs

2010, 2011, and 2012 tax returns and related documents for Jack Reese and Nancy Reese

2010, 2011, and 2012 tax returns and related documents for James M. Cichanofsky and Cynthia L. Cichanofsky

2010, 2011, and 2012 tax returns and related documents for Roger L. Miller and Rosalie A. Miller

Investment and real estate records produced by Roger Miller

2010, 2011, and 2012 tax returns and related documents for George W. Nowlin and Brenda D. Nowlin

Expert Report of John Stahl

**Other Documents**

Agreements between USS and the USWA, April 29, 2003

American Academy of Actuaries (Cori Uccello, John Cookson and Lisa Tourville), *Rising Health Care Costs: What's the Diagnosis?* November 10, 2005

AT&T Active & Retiree Medical Benefits, 2005 Bargaining Proposal, December 10, 2005

AT&T Active & Retired Employee—Medical & Dental Benefits (2005 final health care language)

AT&T/CWA/IBEW 1989 National Memorandum of Understanding

AT&T/CWA/IBEW 1992 National Memorandum of Understanding

AT &T/CWA/IBEW 1995 National Memorandum of Understanding

AT&T/CWA/IBEW 1998 National Memorandum of Understanding

AT&T Medical Plan for Occupational Employees, 1993

Benefit summary information at www.uawtrust.org

*Changes to Your 2003 Healthcare Plans* (Employee communication from Lucent Technologies)

CMS Fast Facts available at http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMS-Fast-Facts/index.html

Communication from The Goodyear Tire & Rubber Company to Retiree or Surviving Spouse, April 2005

CWA/IBEW/Lucent 1998 National Memorandum of Understanding

CWA/IBEW/Lucent 2003 National Memorandum of Understanding Highlights

CWA/IBEW/Lucent 2004 National Memorandum of Understanding

Financial Accounting Series, Statement of Financial Accounting Standards No. 106, Employers' Accounting for Postretirement Benefits Other Than Pensions, December 1990

*Fulghum v. EMBARQ Corp.*, Class Action Complaint, Case 2:07-cv-02602-EFM (D. Kan. Dec. 28, 2007)

Goodyear Retiree VEBA (Aug. 2009)

*International Union, UAW v. General Motors Corporation*, Class Action Notice, Case No. 05-73991 (E.D. Mich. 2005)

Labor HHS Subcommittee Hearing: Statement of Leo Gerard, United States Senate Committee on Appropriations, Subcommittee News, May 14,2003

Letter from Mertroe B. Hornbuckle, Vice Pres., Human Res., Deere & Co., to All U.S. Employees with Company-Subsidized Salaried Health Care Benefits in Retirement (Sept. 17, 2007)

Lucent Technologies, Inc. Summary Plan Description, Medical Plan for Retired Occupational Employees, Effective 01/01/02

Medicare information available at https://www.medicare.gov/your-medicare-costs/costs-at-a-glance/costs-at-glance.html#1288

*Testimony of Ms. Louise Novotny, available* at http://house.gov/edworkforce/hearings/107thleer/retirees51602/novotny.htm, May 16, 2002

Memorandum from Communications Workers of America Local 3317 to District 3 Presidents with Members in AT&T re Retiree Benefits Package (Aug. 15, 2009)

Memorandum from Martha Flagge, CWA Rep., C&T, to Alcatel-Lucent Local Presidents re Results of 2010 Retiree Healthcare Negotiations for Plan Year 2011 (n.d.)

NOW on PBS Transcript, *available* at http://www.pbs.org/now/transcriptitranscriptNOW_full.html, April 1, 2005

Pfizer Inc., Pfizer Retiree Benefits and Health Information Fairs: Frequently Asked Questions and Answers, http://www.pfizerplus.com/kb/healthfair_faqs.aspx (visited Feb. 9, 2011)

Plan brochures for the Blue Cross and Blue Shield Service Benefit Plan Nationwide, the GEHA Benefit Plan Nationwide, the GEHA High Deductible Health Plan Nationwide, and the Michigan Aetna HealthFund. *See* Plan brochures available at http://www.opm.gov/healthcare-insurance/healthcare/plan-information/plan-codes/2013/states/mi.asp

Report of Subcommittee on Collective Bargaining and Employee Benefits, American Bar Association, Section of Labor and Employment Law, Committee on Employee Benefits (2000)

Settlement Agreement between GM and the UAW, December 16, 2005

Richard Shoemaker, *Text of the Letter From the UAW to its Retirees*, December 22, 2005, *available* at http://detnews.com

*Statement of Union Leaders, available* at http://edworkforce.house.gov/democrats/autounionleaders.html (last visited February 14, 2006)

Subsidy calculator at kff.org

*TIAA-CREF Retirees Health Care*, Board of Control Presentation, November 22, 1996

**ATTACHMENT F:**
**Other Expert Testimony**

I provided deposition testimony as an expert witness in *Sloan v. BorgWarner Inc.*,

Case 2:09-cv-10918-PDB-MKM (E.D. Mich. filed Mar. 11, 2009).