# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK REESE, JAMES CICHANOFSKY,
ROGER MILLER and GEORGE NOWLIN
on behalf of themselves and
a similarly situated class,

        Plaintiffs,

Vs.               Case No. 04-70592


CNH GLOBAL N.V., formerly
known as Case Corporation,
and CNH AMERICA LLC,

        Defendants.


THE DEPOSITION OF SHARON SCHAEFFER

NOVEMBER 15, 2013





KEMPFER COURT REPORTING
SARA R. ROGAN
P.O. Box 510196
Milwaukee, WI  53203
(414) 272-2844
1-800-725-9307

1    today?

2    A.        No.

3    Q.        I'm going to show you what's been

4    marked as Exhibit 1.

5              MS. BRAULT:  I did not shlep

6    extra copies to the deposition so if you can

7    share with her, Laura, that would be great.

8    Q.        (BY MS. BRAULT) Exhibit 1 is a notice

9    of deposition, and I'm just going to ask you

10   if you've seen this document before?

11   A.        Yes.

12   Q.        A signed copy?

13   A.        Yes.

14   Q.        And it's indicated in Exhibit 1 that

15   you should bring any and all documents used

16   to calculate pension benefits for the Reese

17   class, including but not limited to formulas,

18   demographic data, contracts and plan

19   documents.  And it's my understanding that

20   you have not brought those documents today?

21   A.        Correct.

22   Q.        Did you bring any documents with you

23   today?

24   A.        No.

25   Q.        Do you have documents in your

1    possession that are described in the notice?

2    A.      Well, we have plan documents.  I

3    personally don't have contracts.  We have

4    demographic data in employment and benefit

5    files.  We have formulas, but they're not

6    documented formulas in a specific place where

7    we could bring them.

8    Q.      And the plans, do you still keep

9    those in a file in your office like you did

10   in 2005?

11   A.      I don't have all the documents right

12   in my office because of space, but we have

13   them in our benefit area.

14   Q.      In terms of finding the plan

15   documents, I mean that would have been a

16   matter of going to a file and getting them?

17   A.      Pulling them together, yes.

18   Q.      Could you just roughly estimate how

19   long it would take you to find the plan

20   documents?

21   A.      Maybe a couple hours.

22   Q.      Really?  Couple of hours to find the

23   plans in an office in your building?

24   A.      Yes.

25   Q.      Do you have those plans scanned and

1    which year?

2    A.      Yes.

3    Q.      And those would be things that you

4    would use to formulate what the pension is

5    going to be, correct?

6    A.      Yes.

7    Q.      And that's all information that would

8    be readily available to you in your office?

9    A.      Yes.

10          MS. BRAULT:  Laura, do you want

11   to put your objection on the record regarding

12   the duces tecum request because we did

13   request that she bring those documents with

14   her.  I know you have an objection, if you

15   want to state it.

16          MS. CAPOTOSTO:  We do have an

17   objection that you cannot check by the 30-day

18   rule by putting a request for documents in a

19   notice of subpoena for a party, which

20   Ms. Schaeffer is.  Any documents that we have

21   not already provided to plaintiffs, we have

22   agreed, if they would like, to provide within

23   the 30-day period.

24          MS. BRAULT:  And my response to

25   the objection is that explaining that two

1    days before the deposition was late since we

2    sent the original notice on October 28th and

3    the amended notice on November 8th, which

4    incorporates the same duces tecum notice.

5    Q.      (BY MS. BRAULT) I'm going to show you

6    what's been marked as Exhibit 2,

7    Ms. Schaeffer.  Did you see the re-notice for

8    the deposition?

9    A.      I'm not sure.

10             MS. BRAULT:  And that was served

11   on November 8th.  Both of the deposition

12   notices have a duces tecum request.  I think

13   given the fact that Ms. Schaeffer could have

14   easily complied with the request in a matter

15   of hours, at most, or we could have had the

16   deposition at Ms. Schaeffer's office, as I

17   offered, that the reliant upon the 30-day

18   rule is inefficient and not in keeping with

19   the efficiencies of the rules of civil

20   procedure.

21   Q.      (BY MS. BRAULT) Having said that, I'm

22   going to have you take a look at Exhibit 3,

23   which is an email from myself to your

24   counsel.  I'm just going to ask you if you've

25   ever seen that email before?

1    was.

2    Q.      Okay.  Was there some special formula

3    that you had to put in for that or would it

4    still have come up under the group in the

5    retirees the way that you described?

6    A.      I don't recall how we pulled them in.

7    Q.      What's the significance of lower case

8    versus upper case type?

9    A.      I'm not sure you.

10   Q.      You don't know?

11   A.      I don't remember.

12   Q.      But did you check it to make sure

13   that it was correct?

14   A.      We checked for reasonableness.  We

15   didn't go through and check each and every

16   person.

17   Q.      What do you mean you checked for

18   reasonableness?  What did you do to check for

19   reasonableness?

20   A.      We would have picked a few at random

21   to make sure that information was what we

22   expected it to be.

23          MS. CAPOTOSTO:  I'm going to

24   object on privilege.  This was done at our

25   direction.  This is work product.

1           MS. BRAULT:  I think I'm allowed

2    to ask her if she checked to determine

3    whether or not the information that was

4    provided to us was accurate.

5           MS. CAPOTOSTO:  Okay.  Go ahead.

6    Q.      (BY MS. BRAULT) And the few that you

7    picked at random, were they all correct?

8    A.      Yes.

9    Q.      Let's look at Mr. Abbott against this

10   chart.  So can you find Mr. Abbott on your

11   chart?

12   A.      Yes.

13   Q.      And what is his credited service?

14   A.      29.5.

15   Q.      Now, if you look at the pension

16   application, it's CNHA015613, what does that

17   show for pension service date?

18   A.      30.5.

19   Q.      And on the pension calculation chart,

20   which is I think the next page, it shows him

21   with 30.5 years of credited service?

22   A.      Yes.

23   Q.      With 23.1 as of 6-30-94?

24   A.      Yes.

25   Q.      And 7.4 of credited Case service?

1    A.        Yes.

2    Q.        And on the pension checklist, it

3    shows that he had 30.5 years of credited

4    service?

5    A.        Yes.

6    Q.        And there's some handwritten note

7    that says T 23.1 and C 7.4?

8    A.        Yes.

9    Q.        What do those figures mean to you?

10   A.        Tenneco is the pre-IPO service.

11   Q.        So T is 23.1?

12   A.        Yes.

13   Q.        That's Tenneco?

14   A.        Yes.

15   Q.        And C is Case?

16   A.        Yes.

17   Q.        And that's 7.4?

18   A.        Yes.

19   Q.        Do you have an explanation for the

20   discrepancy that's between his credited

21   service that's shown in the file and the one

22   that's indicated in the spreadsheet?

23   A.        No.

24   Q.        So one of them is wrong, right?

25   A.        Yes.

1    Q.       Which one do you think is wrong?

2    A.       The one on the spreadsheet.

3    Q.       Okay.  So going back to the

4    calculation sheet, Mr. Abbott retired on

5    August 1st, 2001?

6    A.       Yes.

7    Q.       Was there any reduction in his base

8    benefit that he would receive after age

9    sixty-two, either for age, credit of service,

10   or an election of a spouse benefit?

11   A.       No.

12   Q.       And the pension rate at the time was

13   39.45 per year of credited service, correct?

14   A.       Yes.

15   Q.       And so his basic pension benefit that

16   he would receive after the supplemental

17   benefit terminated at age sixty-two would be

18   calculated by multiplying his years of

19   credited service by the pension rate of

20   39.45, right?

21   A.       Yes.

22   Q.       And the calculation shown on the

23   upper right-hand corner of the sheet totals

24   1,203.23?

25   A.       Yes.

Page 143

1    Q.      Mr. Foxcroft -- keep that.  You're

2    going to want that and the spreadsheet.  You

3    can put Mr. Abbott back.  I'm going to show

4    you what's been marked as Exhibit Number 11,

5    and this is for Mr. Foxcroft, and he is -- I

6    don't know why I did that.  If you look at

7    his file, I'd like you to focus on the

8    application for the pension benefits and the

9    UAW pension calculations.  And once you're

10   oriented, let me know.

11   A.      Okay.

12   Q.      When did he retire?

13   A.      March 1st, 2004.

14   Q.      And he retired after the last annual

15   increase to $42 so he retired at the $42

16   rate?

17   A.      Yes.

18   Q.      And the calculations then shown on

19   that page would not be adjusted upward after

20   that based upon an increase in rate?

21   A.      Well --

22   Q.      So --

23   A.      Hold on a second.  Let's see.  It

24   looks like he retired March 1st, but this has

25   April 1st as $42.

1    Q.        Do you know if he received the lower

2    rate for any period of time?

3    A.        It looks like it was calculated at

4    42.  I don't know.   I'd have to go back and

5    look.

6    Q.        After the 42, it would stay at that

7    level though for life, correct?

8    A.        Yes.

9    Q.        And the pension calculation sheet

10   shows 35.7 years of credited service?

11   A.        Yes.

12   Q.        And a base benefit at age sixty-two

13   of 1,499.40?

14   A.        Yes.

15   Q.        And I want you to look at the

16   application, which is Bates stamp CNHA019559,

17   and that shows a post-sixty-two benefit at

18   1,306.20?

19   A.        Yes.

20   Q.        And the Excel spreadsheet shows

21   Mr. Foxcroft with 31.1 years of credited

22   service?

23   A.        Yes.

24   Q.        And if you multiply 31.1 times 42,

25   you get 1,306.20?

1    A.       What was it again?  42 times --

2    Q.       42 times 31.10.

3    A.       1,306.20.  Yes.

4    Q.       So it appears that the credited

5    service number on the calculation sheet is

6    not accurate, correct?

7    A.       Yes.

8    Q.       On the pension calculation chart, it

9    shows 14.1 years of credited Case service?

10   A.       Yes.

11   Q.       So that was service after 6-30-94?

12   A.       Yes.

13   Q.       And there aren't 14.1 years between

14   6-30-94 and the date Mr. Foxcroft retired,

15   correct?

16   A.       Correct.

17   Q.       Would there be a document somewhere

18   that would show what the actual credited

19   service would be for Mr. Foxcroft?

20   A.       There could be a file document.

21   Q.       What kind of file document could

22   there be that isn't included in that file

23   that we have for Mr. Foxcroft?

24   A.       I don't know without looking.

25   Q.       Now, it looks like he's deceased,

1    A.      Well, the spreadsheet matches the

2    application here.

3    Q.      And it matches the spouse benefit at

4    55 percent, right?

5    A.      Yes.

6    Q.      How many discrepancies would you

7    expect to see in the calculation sheets

8    versus the spreadsheet that was provided to

9    us?

10   A.      I don't know.

11   Q.      If you were reviewing this for

12   acceptable amounts of error, what would you

13   think would be an acceptable amount of error

14   in a group of 2900 people, 2500 people?

15   A.      I don't know.

16   Q.      Would you expect to see as many as

17   500 discrepancies like these that I've been

18   showing you?

19   A.      No.

20   Q.      If it was more than 500, would that

21   be a concern that we maybe don't have correct

22   information?

23   A.      I don't know.

24   Q.      Okay.  I also want to show you -- and

25   looking back at that Excel spreadsheet, if

1    Q.      So it's possible that you reported

2    them directly to them?

3    A.      It's possible.  I don't recall.

4    Q.      How would you have done that?  Like

5    in what form?

6    A.      I don't recall.  Probably a

7    spreadsheet.

8    Q.      Would you have kept those

9    spreadsheets?

10    A.      I don't know.

11    Q.      Let's say if you did retain them,

12    where would you have retained them?

13    A.      If we had them, they would probably

14    be in our office.

15    Q.      And did you look for them?

16    A.      No.

17    Q.      On these N/As, I just want to clarify

18    so I make sure that I understand this.  This

19    Excel spreadsheet was given to us as a way of

20    coming up with or doing the calculations to

21    get pension benefit information for these

22    folks, and I'm trying to understand if you

23    know of any way that for any of these people

24    who are marked hash tag N slash A you can

25    figure out what their pension -- what the

1    total pension benefit that they're receiving

2    is?

3    A.      From this spreadsheet?

4    Q.      Yeah.

5    A.      No.

6    Q.      Because you don't have the Pactiv

7    service to figure out what they received

8    from -- or we don't have the total service

9    basically?

10   A.      Well, do we have -- I don't know if

11   we have the other pieces of information

12   either; for example, the date of retirement.

13   Q.      Well, let me give you -- I'm going to

14   have you look at the full sheet because I did

15   take some columns out to try to understand

16   the -- I think it was only addresses and

17   things like that, but I'm going to give you

18   what was given to us or at least I'm going to

19   give you the first page of what was given to

20   us.

21           MS. CAPOTOSTO:  Should we mark

22   that?

23           MS. BRAULT:  I wasn't going to

24   mark it, but we can.

25           MS. CAPOTOSTO:  Yeah, let's mark

1    it.

2              MS. BRAULT:  I don't have an

3    extra copy though.  We'll just use the first

4    sheet and mark it.

5              (Whereupon, the above-mentioned

6    document was marked as Exhibit 13.)

7              MS. BRAULT:  I don't know if the

8    date of retirement is on there.  Maybe you

9    can tell me.

10             MS. CAPOTOSTO:  This is a full

11   sheet of, what, Exhibit 10?

12             MS. BRAULT:  This is the full

13   sheet of the spreadsheet that was provided to

14   us by your firm in response to our request

15   for the pension benefit.

16             MS. CAPOTOSTO:  Okay.

17   Q.    (BY MS. BRAULT) Now, looking at --

18   maybe if you can look at just one of the

19   people who have a credited service of hash

20   tag N back slash A.  There should be somebody

21   on the first page I think.

22   A.    Okay.

23   Q.    So can you tell me is there any

24   way -- from the information that's contained

25   on this spreadsheet, is there any way to

1    figure out what that person is receiving in

2    terms of a pension benefit?

3    A.      No.

4    Q.      What other information would you need

5    in order to get that information?

6    A.      I would need the participant's date

7    of retirement.

8    Q.      What else?

9    A.      The service and the pre-IPO service.

10   Q.      Now, for people who don't have the

11   hash tag N/A next to their name, can you tell

12   from the information that you have for those

13   folks what their total benefit is?

14   A.      Are you asking if I can tell if it's

15   correct?

16   Q.      No.  Can you tell what the total

17   benefit is from the spreadsheet?

18   A.      There's a benefit listed here.

19   Q.      What is the benefit that's listed?

20   Is that just the CNH portion or is it the

21   full portion?

22   A.      It's just the CNH portion.

23   Q.      But if we have the Pactiv date of

24   service, we could figure out what the Pactiv

25   portion was, right?

1    guys gave us that supposedly has the correct

2    information on it.

3                MS. CAPOTOSTO:  It has the

4    information from our system on it.  Exhibit

5    10?

6                MS. BRAULT:  Looks like it, yep.

7    Q.      (BY MS. BRAULT) Can you look up

8    Judith Fisher?  I had everything turned

9    around when I copied these and hole-punched

10   them on the wrong side.

11              So Judith Fisher is the retiree, not

12   the spouse, correct?

13   A.      Yes.

14   Q.      And what is her credited service date

15   there?

16   A.      Her date of retirement?  10-1-2001.

17   Q.      And what are you showing in the

18   file -- let's go to the file first for her

19   total years of credited service.

20   A.      22.7.

21   Q.      And what's in the spreadsheet?

22   A.      24.6.

23   Q.      I want you to look next at Bernard

24   Godfrey.  He's the next person in that last

25   exhibit.  What does Mr. Godfrey's file show

1    in terms of his years of service?

2    A.      25.8.

3    Q.      And what's in the Excel spreadsheet

4    for him?

5    A.      21.7.

6    Q.      So these are discrepancies clearly,

7    correct?

8    A.      Yes.

9    Q.      Do you have any explanation for why

10   what was given us in the Excel spreadsheet is

11   different from what's in the pension benefit

12   file?

13   A.      Well, I can only guess that the data

14   that was loaded into the pension calculator

15   was just loaded from our HR system.  It

16   doesn't have the most accurate up-to-date

17   information because these people were already

18   retired and receiving benefits.

19   Q.      So you think -- which one do you

20   think is more accurate?

21   A.      These pages from the file.

22   Q.      Okay.  So you think that the

23   information that was given to us in this

24   spreadsheet is not good?

25   A.      The information in our pension

1   calculator system for these people who had

2   their benefits commence prior to us loading

3   all the information into the pension

4   calculator is not as up to date as these

5   spreadsheets, as these calculation sheets.

6   Q.      The ones that are in their benefits

7   files?

8   A.      Right.

9   Q.      Well, just so you understand, this

10  spreadsheet was given to us last month -- or

11  September?

12  A.      Correct.

13  Q.      And it's only the people in our

14  class, right?

15  A.      That spreadsheet is only the people

16  in the class.

17  Q.      So it would have been only people who

18  retired after -- or nobody in this group

19  would have retired after -- was it November

20  of 2004?  I can find the date.

21  A.      Right.

22  Q.      April 1st, 2005.  So nobody on that

23  sheet retired before April 1st or everybody

24  on that sheet retired before April 1st, 2005?

25  A.      Yes.

1   Q.     And it was printed in 2013?

2   A.     Yes.

3   Q.     And your explanation for why the

4   service dates might be wrong is because that

5   data that that was pulled from isn't as

6   reliable as the data in the printouts?

7   A.     Correct.

8   Q.     So on the instance where I showed you

9   that the data in the pension file was what

10   was incorrect and that Excel spreadsheet

11   would have been an outlier, normally you

12   think it would go the other way?

13   A.     I would have to look at more

14   examples.

15   Q.     Okay.  So Johnston, Shirley.  Well,

16   let's look at these two that we just looked

17   at.  Which do you think is the correct one?

18   Do you think the correct service for Judith

19   Fisher is in her pension file and not in the

20   Excel spreadsheet?

21   A.     Yes.

22   Q.     Why is that?

23   A.     Because this is what we would have

24   calculated the benefit on.

25   Q.     Well, isn't that also true of the one

1    that we looked at earlier for Mr.  -- not

2    Mr. Hendrickson, not Mr. Abbott, but the

3    other one.  Mr. Foxcroft.

4    A.      Okay.  What was the question again?

5    Q.      Didn't we determine that

6    Mr. Foxcroft's personnel data was wrong and

7    that the spreadsheet was right?

8               MS. CAPOTOSTO:  Object to form.

9    Q.      Remember him?  We talked about him a

10   couple hours ago?

11   A.      I remember him.

12   Q.      Okay.

13   A.      I don't remember the circumstances.

14   I would have to go back and check it.

15   Q.      Okay.  You can do that with

16   Mr. Foxcroft.  It's one of these exhibits

17   here.

18   A.      Well, I can't really tell from this

19   spreadsheet which one is correct without

20   doing an actual calculation for him.

21   Q.      Yeah, that's kind of our problem

22   too.  We have both and we've had

23   discrepancies and we don't have any way of

24   figuring out which is right.  You may have

25   other resources to figure that out.  What

1   would you look for?

2   A.    I would go through a recalculation to

3   see what we actually -- how we came up with

4   the numbers and I would verify the service.

5   I don't know if this is a complete file

6   here.

7   Q.    I'm sorry.  Did you want to add

8   something, Laura, because you're nodding your

9   head and that's really not --

10          MS. CAPOTOSTO:  My objection

11   was --

12          MS. BRAULT:  -- appropriate in a

13   deposition.

14          MS. CAPOTOSTO:  -- to form.

15   Sorry for talking over you.  My objection was

16   to form and misstating -- you asked me why

17   and to explain.  You're misstating what the

18   witness said because she said earlier that

19   this may not be a complete file and it may be

20   missing --

21          MS. BRAULT:  No, I didn't say

22   that.

23          MS. CAPOTOSTO:  I think that's

24   what she said earlier.

25          MS. BRAULT:  That's what we were

1  service because his service looks peculiar.

2  Q.      How would you do that?

3  A.      I'd have to get an employment file or

4  something and see when he actually worked

5  there and verify what's correct here.

6  Q.      And by employment file, you mean

7  something different than what would in fact

8  be in his benefits file?

9  A.      It's hard to tell because I can't --

10 I don't know if this is a complete file or

11 not.

12 Q.      And the reason you don't know that is

13 because you don't have any access to your

14 files right now?

15 A.      Well, I don't have his file.

16 Q.      If we were at your office, would you

17 have access to look at his file?

18 A.      I'm not sure because he left the

19 company quite a long time ago, right?  2004.

20 Q.      Yeah.  So it might be hard to know

21 where it is?

22 A.      Yes.

23 Q.      Okay.  So you would clearly need some

24 more information to know whether or not the

25 information contained in the benefits file is

1    wrong versus whether or not the spreadsheet

2    information is wrong?

3    A.        In this particular case, yes.

4    Q.        And what about for Fisher, Judith

5    Fisher?  She was one of the first -- she was

6    the first person in the compilation exhibit

7    that's got a black -- or it had at least been

8    put together with a binder clip.  The one

9    with all the pink tabbies on them.  You might

10   want to keep that clipped in order.

11   A.        Okay.  The information on this sheet

12   is the most accurate.

13   Q.        The pension calculation?

14   A.        Yes.

15   Q.        And that's from the pension file --

16   or the benefits file?

17   A.        Yes.

18   Q.        And why are you saying that that's

19   the most accurate?

20   A.        Because this is the one that we used

21   to do the calculation, etcetera, for payment.

22   Q.        And so why would you think that the

23   document that was provided to us in the Excel

24   spreadsheet was inaccurate?

25   A.        Because the information that was

1   you're saying that there's no other way to

2   determine what is being paid to retirees in

3   our class as pension benefits through CNH and

4   Pactiv other than to go through each one of

5   those benefits files?

6              MS. CAPOTOSTO:   Object to form.

7   A.      Yes.

8   Q.      And that's how you'd do it if you had

9   to do it, correct?

10  A.      Yes.

11  Q.      Now, a number of these -- if you go

12  back to the spreadsheet that was provided by

13  counsel.   I think it's --

14  A.      This one?

15  Q.      Yeah, the one you've got your hand on

16  right now.   Look down the column for Pactiv

17  service.   Do you see that there are a number

18  of people who have no Pactiv service listed?

19  A.      I don't see that column on here.

20  Q.      I'm sorry.

21             MS. BRAULT:   Go ahead and mark

22  this.

23             (Whereupon, the above-mentioned

24  document was marked as Exhibit 17.)

25             MS. BRAULT:   You know what, I

1   think I've got this marked in error.

2        (Whereupon, Exhibit 17 was remarked.)

3   Q.        (BY MS. BRAULT) This is the Abington,

4   Donald W. Abington file.  Can you look and

5   tell me what his Pactiv service is from

6   looking at his file?

7   A.        I can't tell from these documents.

8   Q.        Do you have a pension calculation

9   sheet for him?

10  A.        No.

11  Q.        Do you think there's something more

12  in his file that would show what the Pactiv

13  service was?

14  A.        I don't know without looking.

15              MS. BRAULT:  Let's mark this one

16  as 18.

17              (Whereupon, the above-mentioned

18  document was marked as Exhibit 18.)

19  Q.        So this is the file for Kenneth

20  Adams.  Can you tell me how many years of

21  service he has with Pactiv?

22  A.        It's not in this document either.

23  Q.        Is it on the spreadsheets?

24  A.        The Pactiv service isn't on here.

25  Q.        Oh, right, it's not in that part.

1   Any explanation for why the benefits files

2   would not contain the Pactiv service date for

3   an employee or retiree?

4           MS. CAPOTOSTO:   Object to form.

5   A.      I didn't copy these files.  I don't

6   know if this is all that is in the file that

7   we have in our office.

8   Q.      Do you know why there would be no

9   printout for the pension benefit calculation

10  that we were looking at in some of the other

11  files in a benefit file?

12  A.      Well, both of these people were at

13  the East Moline plant when it closed.

14  Q.      Okay.

15  A.      So it's possible that these

16  calculations were done a little bit

17  differently because neither of these two

18  people were eligible to retire under the

19  normal plan provisions.  It looks like these

20  folks were under the plant closing

21  agreement.

22  Q.      So does that mean that you would not

23  have had a benefit calculation sheet for

24  them?

25  A.      Well, it means that when East Moline

1   closed, we had 500-some people all retiring

2   all at the same time and the calculations

3   were done a little bit differently.

4   Q.     How were they done?

5   A.     They were done by the pension

6   calculator system as some sort of batch

7   process.

8   Q.     By whom?

9   A.     By the Xerox system.

10   Q.     Wouldn't the Xerox system then have

11   to have their Pactiv service date?

12   A.     It may have the Pactiv service for

13   these people who had service after the

14   calculator system was loaded in there.

15   Q.     Well, wouldn't they need it for

16   everybody who retired at that point in time?

17   A.     For these 2004 retirees?

18   Q.     Yeah.  You said there were about

19   500-plus people who retired at that time.

20   A.     Yes.

21   Q.     So Xerox would have had to have had

22   their Pactiv service date?

23   A.     They needed the Pactiv service

24   amount, not necessarily the Pactiv service

25   date.

1    Q.      What do you mean by service amount?

2    A.      The Pactiv service.

3    Q.      So the years to credit towards

4    Pactiv, right?

5    A.      Yes.

6    Q.      Okay.  Do you know how they received

7    that, how Xerox received it?

8    A.      No.

9    Q.      Would you agree with me that it

10   wouldn't really be possible to figure out

11   what their pension benefit was without

12   knowing what the Pactiv years were?

13   A.      Yes.

14   Q.      So it may be that for some 500-plus

15   people that we didn't get a Pactiv service

16   number for them when we looked at their

17   benefit files because it wasn't in there, it

18   was done in a batch?

19   A.      Okay.

20   Q.      I mean is that possible?

21   A.      I'm not sure what information you

22   have.

23   Q.      Okay.  Well, the only information

24   that we have about this group was what was

25   provided in the Excel spreadsheet --