# EXHIBIT A

# REESE, ET AL v. CNH GLOBAL N.V., ET AL

## SCOTT MACEY

January 15, 2014

*Prepared for you by*



# BIENENSTOCK
### NATIONWIDE COURT REPORTING & VIDEO

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

```
 1      Q    In the Re-Notice of Deposition there is a
 2   request for documents.
 3           Have you brought any documents today?
 4      A    I have not.
 5           MR. RADTKE:  Joshua, are you going to
 6   provide any documents responsive to this?
 7           MR. ROGACZEWSKI:  I'll represent that there
 8   are no documents responsive.  We have not received an
 9   additional bill from Mr. Macey in addition to the ones
10   that have been produced, and as well as there are
11   no -- Mr. Macey has no additional documents responsive
12   to the Subpoena that he has not already produced.
13           MR. RADTKE:  Okay.
14           MR. ROGACZEWSKI:  I mean, that's --
15   there's -- that's why nothing is being produced.
16           MR. RADTKE: All right.  Okay.  Thank you.
17           And just before we get started, I just want
18   to put something on the record, which is -- and I'm
19   not sure if you're aware of this.  But there are some
20   documents that were requested by the Plaintiffs in
21   this case that are the subject of a Motion to Compel
22   Production of Documents; that Motion is pending in the
23   United States District Court for the Eastern District
24   of Michigan.  And if the Motion to Compel is granted
25   and additional documents are required to be produced,
```



SCOTT MACEY
January 15, 2014

Page 241

```
 1   we would reserve the right to take your deposition as
 2   it relates to additional documents that are being
 3   produced.  Okay?
 4           MR. ROGACZEWSKI:  And that compels me to say
 5   that of course we reserve the right to oppose those
 6   attempts, and depending on what happens, we -- you
 7   know, we'll do what is within our power under the
 8   Rules as well.
 9   BY MR. RADTKE:
10       Q   Mr. Macey, what is your home address?
11       A   11 Sugar Mill Road, that's three words
12   counting "Road," Hillsborough,
13   H-I-L-L-S-B-O-R-O-U-G-H, New Jersey, 08844.
14       Q   And how long have you lived at that address?
15       A   Oh, 25 years or more.
16       Q   Are you currently employed?
17       A   I am.
18       Q   And by whom are you employed?
19       A   The ERISA Industry Committee, otherwise
20   known as ERIC.
21       Q   What is you job title at ERIC?
22       A   I'm President and Chief Executive Officer.
23       Q   How long have you held that position?
24       A   Approximately 18 months -- 19 months.
25   Approximately 19 months.
```



SCOTT MACEY
January 15, 2014

Page 242

```
 1      Q    Where did you work prior to ERIC?
 2      A    My immediate prior employer was the law firm
 3  of Covington & Burling here in Washington, D.C.
 4      Q    And how long did you work for Covington &
 5  Burling?
 6      A    A little over two years.
 7      Q    My recollection is when I took your
 8  deposition in another retiree health care case called
 9  Sloan V. BorgWarner, you were working at Covington
10  Burling; is that correct?
11      A    Yeah.  Do you recall what -- I forget when
12  you took -- when that other deposition was.  But...
13      Q    I believe it was in 2012.
14      A    Okay.  I worked at Covington & Burling until
15  the end of May 2012.
16      Q    It was before May of 2012?
17      A    Okay.  So that would be correct.
18      Q    You recall that deposition from the Sloan
19  case?
20      A    Well, none of the details at this point.
21      Q    Did you -- prior to coming in here today,
22  did you review the transcript in that case of your
23  deposition?
24      A    No.
25      Q    During that case we spent some time going
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

```
 1    interesting as your educational background is --
 2        A    Boring.
 3        Q    -- and your employment background is, I'd
 4    like to not -- I'd like to skip over that, and based
 5    on those assurances that you reviewed the transcript
 6    and if you would have seen an error you would have
 7    corrected it, then I'm going to skip over that so that
 8    we can get to maybe more relevant information as it
 9    relates to this, since you already had that in the
10    record at a deposition under oath at least once as it
11    relates to your background.
12             Okay.  As the President and CEO of ERIC,
13    what are your job responsibilities?
14        A    I'm charged with managing and overseeing the
15    general activities of the organization.  I'm
16    responsible for its budget and finances and managing
17    the staff.  I, you know, have communications and
18    interactions with the member representatives,
19    different employees from different companies that
20    are -- that are members, and, you know, at least
21    playing a role in the overall policy directions of the
22    organization.  It's ultimately controlled by a Board
23    of Directors.
24        Q    And what is ERIC?
25             MR. ROGACZEWSKI:  Objection to form.
```



1      A     ERIC is a nonprofit trade association
2   focused on benefit and ERISA matters, primarily on
3   behalf of major plan sponsors.
4      Q     Is that major employers?  Or is it beyond
5   employers?
6             MR. ROGACZEWSKI:  Objection to form.
7      A     Major employers.
8      Q     Do you have -- are there any labor unions
9   that are members of ERIC?
10     A     No.
11     Q     On behalf of ERIC, what are its general
12  activities?
13     A     Keeping members well informed of issues and
14  developments regarding ERISA and employee benefits;
15  interacting with the Federal agencies that regulate
16  employee benefits on matters of importance, things
17  that they ask us about, and on their proposals
18  regarding regulations and guidance and things like
19  that; from time to time developing and filing amicus
20  briefs in cases of importance to the -- to the
21  members; monitoring interacting with Congress on major
22  or sometimes technical, substantive legislative
23  developments regarding benefits, ERISA, in some cases
24  the tax code and related laws.
25              I think that's probably at a high level what



```
 1   we do.
 2         Q     And with respect to -- I think you used the
 3   word "members."  Could you describe what a member is,
 4   how that's defined?
 5         A     Yeah.  A member is a -- is a plan sponsor
 6   that has a significant number of employees that
 7   sponsors benefit programs, retirement programs,
 8   pensions, 401(k) plans, health plans, life insurance
 9   and things like that, that has determined to join our
10   organization and assigns one or more people to be --
11   to interact with the organization, either to receive
12   our communications, to be on our conference calls, and
13   to come to meetings.
14         Q     And do they pay a fee to become a member?
15         A     They pay annual dues.
16         Q     With respect to policy direction, who sets
17   the policy for ERIC?
18         A     Ultimately the members, either directly
19   if -- if they're asked, or sometimes we will go out
20   with a mailing to members in general, should we be
21   concerned, are you concerned about this or not; if so,
22   let us know how.  Sometimes the Board of Directors.
23   You know, rarely would staff, including me, alone
24   enunciate some policy position.
25         Q     Who's on the Board of Directors?
```



```
 1        Q    I'm going to just backtrack a little bit.
 2             With respect to the lobbying activity that
 3   you've engaged in during your career, have you ever
 4   lobbied on behalf of a labor union?
 5        A    No.
 6        Q    Okay.  And I think -- and I know you said
 7   previously that ERIC doesn't have any labor union
 8   members, correct?
 9        A    Correct.
10        Q    With respect to the members, that's a
11   voluntary membership group for ERIC?
12        A    Yes.
13        Q    And they pay voluntary dues?
14        A    Yes.
15        Q    Okay.  And your pay is out of the dues that
16   are received by ERIC?
17        A    Well, out of the total budget, and the
18   budget is primarily dues.
19        Q    Okay.  Are there -- what other methods of --
20        A    Oh, there might be a few payments for events
21   or, you know, monies collected on events.  You know,
22   we collect money for amicus briefs and then, you know,
23   pay a law firm to prepare the brief, and it might not
24   match total exactly, dollar for dollar, of what we
25   collect, you know.  But there's a lot of internal
```



```
 1   staff time put into all of that, so part of it will go
 2   to defer those expenses.  But the bulk of the
 3   revenues, I'd say 95 percent, probably come from dues.
 4       Q    With respect to the positions that ERIC
 5   takes, it's advocating on behalf of its members'
 6   interests; is that accurate?
 7       A    I would -- yeah, I think that's a good
 8   characterization.
 9       Q    And in advocating on behalf of its members'
10   interests, who are mostly large corporations,
11   sometimes those interests are in opposition to the
12   interests of retirees; is that accurate?
13            MR. ROGACZEWSKI:  Object to the form.
14       A    I guess that's just how -- it depends on how
15   you look at it.  I think, you know, that -- I could
16   see there might be situations where either a union
17   representing employees or some employees or former
18   employees/retirees would consider that, but I don't --
19   you know, I don't inherently see that tension.  A lot
20   of the -- an awful lot of what ERIC does is technical
21   stuff, technical substantive stuff, you know:  How --
22   what does the Internal Revenue Code or ERISA require
23   regarding the design of plan; does state law or
24   Federal law apply to a -- a particular issue;
25   should -- should the Government mandate the provision
```



 1    of some type of requirement benefit.
 2            And the reason I can say that that wouldn't
 3    have an effect on our members' employees is because
 4    they -- our members might take a position on that
 5    because they don't like -- generally, they don't like
 6    mandates from the Government on the design of
 7    particular aspects of plans or the maintenance of
 8    those plans.  But they all have plans.
 9            So if there was a mandate put in, they
10    wouldn't be affected by it.  There are some bills over
11    the last few years that have been in there that looks
12    like, oh, every plan, every sponsor, every company has
13    to either have a plan or provide payroll withholding
14    to send money to some outside agency or a financial
15    company on behalf of employees.  Our members wouldn't
16    be affected by that.  That's our determination.  But
17    they might say, well, you know, if we're asked, we
18    don't like that because we don't believe in mandates.
19    It might not be that we do a lot of lobbying on it,
20    but we're doing some lobbying on something else and
21    asked about that.
22            So, you know, I don't think -- is it
23    possible to have some tension between the ERIC
24    position and what the common sense says may be what
25    the union or employees might feel?  Yeah, I guess it's



SCOTT MACEY
January 15, 2014

```
 1   possible.  I don't think that's the -- just the normal
 2   issue.  I don't think there's an inherent tension.
 3        Q    If there is a tension, ERIC is going to
 4   advocate on behalf of its members over the interests
 5   of anyone who isn't a member, correct?
 6        A    Oh, that's true.  There are times where we
 7   stand down, where we say, well, let's -- you know,
 8   let's stand by, let's not get involved in this issue.
 9        Q    Well, what I'm asking is a little different
10   than that.
11             What I'm asking is, if there is an issue
12   that could negatively impact employees or retirees
13   that ERIC's members want to see happen, that ERIC will
14   advocate on behalf of what its members want?
15        A    Not --
16             MR. ROGACZEWSKI:  Object to form.
17        A    Not automatically.  If -- you know, we have
18   a -- an Executive Committee, we have a Board of
19   Directors, we have influential members, and, you know,
20   there could be situations where, you know, we don't
21   want to do something on behalf of some members that
22   might aggravate another set of members, either because
23   of sensitivity to the issues or, even though it might
24   benefit some companies, they don't think it's a good
25   position to take, or something like that.  So
```



BIENENSTOCK NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com