# EXHIBIT B

# In The Matter of:

JAN 1 6 2014

*REESE, ET AL.*
*vs.*
*CNH GLOBAL N.V. and CNH AMERICA,LLC*

---

## SUZANNE DANIELS, PH.D.
### *January 10, 2014*

---

**M E R R I L L   L A D**
1325 G Street NW, Suite 200, Washington, DC
Phone: 800.292.4789   Fax:202.861.3425

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JACK REESE, FRANCES ELAINE

PIDDE, JAMES CICHANOFSKY,

ROGER MILLER, and GEORGE

NOWLIN,

                    Plaintiffs,

        vs.                 Case No. 2:04-cv-70592-PJD-PJK

                            Hon. Patrick J. Duggan, U.S.D.J.

                            Hon. Paul J. Komives, U.S. Mag. J.

CNH GLOBAL N.V. and CNH

AMERICA LLC,

                    Defendants.

_____


        The Deposition of SUZANNE MARIE DANIELS, Ph.D.

        Taken at 400 Galleria Officentre, Suite 117

        Southfield, Michigan

        Commencing at 9:28 a.m.

        Friday, January 10, 2014

        Before Mary Jo Power, CSR-1404, RPR, RMR, CRR

SUZANNE DANIELS, PH.D. – 1/10/2014

Page 2

1  APPEARANCES:
2
3  JOHN R. CANZANO
4  McKnight, McClow, Canzano, Smith & Radtke, P.C.
5  400 Galleria Officentre
6  Suite 117
7  Southfield, Michigan 48034
8  248.354.9650
9  jcanzano@michworklaw.com
10     Appearing on behalf of the Plaintiffs
11
12  BOBBY R. BURCHFIELD
13  WILLIAM HOCHUL
14  McDermott Will & Emery
15  500 North Capitol Street N.W.
16  Washington, D.C. 20001
17  202.756.8003
18  bburchfield@mwe.com
19     Appearing on behalf of the Defendants
20
21
22
23
24
25

Page 3

1          TABLE OF CONTENTS
2
3  WITNESS                      PAGE
4  SUZANNE MARIE DANIELS, Ph.D.
5
6  EXAMINATION BY MR. BURCHFIELD:............... 6
7
8
9  EXHIBITS                     PAGE
10  (Exhibits attached to transcript.)
11  DEPOSITION EXHIBIT 1......................   7
12  (12-13-13 Subpoena)
13  DEPOSITION EXHIBIT 2......................   7
14  (12-30-13 Subpoena)
15  DEPOSITION EXHIBIT 3......................  10
16  (SNG Consulting Agreement)
17  DEPOSITION EXHIBIT 4......................  11
18  (Declaration of Suzanne M. Daniels)
19  DEPOSITION EXHIBIT 5......................  12
20  (6-3-13 Preliminary expert report of Daniels)
21  DEPOSITION EXHIBIT 6......................  12
22  (9-27-13 Preliminary expert report of Daniels)
23  DEPOSITION EXHIBIT 7......................  12
24  (12-20-13 Cover letter and addenda to preliminary
25    expert report of Daniels)

Page 4

1  DEPOSITION EXHIBIT 8......................  25
2  (3-18-11 Motion Re: Mack Truck v International
3    Union, et al)
4  DEPOSITION EXHIBIT 9......................  26
5  (Summary plan description for Mack Trucks, Inc.
6    restructured plan)
7  DEPOSITION EXHIBIT 10......................  37
8  (UAW St. Joseph Health & Welfare Trust)
9  DEPOSITION EXHIBIT 11......................  45
10  (UAW Retirees of the Dana Corp Health & Welfare
11    Trust)
12  DEPOSITION EXHIBIT 12......................  52
13  (11-5-13 Detroit Free Press Article)
14  DEPOSITION EXHIBIT 13......................  65
15  (4-23-84 letter)
16  DEPOSITION EXHIBIT 14......................  66
17  (August 2009 document entitled Examining Sources
18    of Supplemental Insurance and Prescription Drug
19    Coverage Among Medicare Beneficiaries)
20  DEPOSITION EXHIBIT 15......................  73
21  (10-11-13 Invoice from Daniels)
22  DEPOSITION EXHIBIT 16......................  94
23  (9-13-11 Decision of the United States Court of
24    Appeals in Reese v CNH America)
25

Page 5

1  DEPOSITION EXHIBIT 17......................  97
2  (Pages 19 and 20 from Macey's report)
3  DEPOSITION EXHIBIT 18......................  99
4  (Interrogatory responses of Jack Reese)
5  DEPOSITION EXHIBIT 19......................  99
6  (Interrogatory responses of George Nowlin)
7  DEPOSITION EXHIBIT 20...................... 106
8  (Two pages from Federal Register)
9  DEPOSITION EXHIBIT 21...................... 110
10  (Letter of understanding)
11  DEPOSITION EXHIBIT 22...................... 113
12  (January 2013 EBRI survey)
13  DEPOSITION EXHIBIT 23...................... 124
14  (6-27-11 Preliminary report of Daniels RE:
15    Temme, et al, v Bemis)
16  DEPOSITION EXHIBIT 24...................... 126
17  (11-30-12 Paranjpe opinion)
18  DEPOSITION EXHIBIT 25...................... 126
19  (2-15-13 Paranjpe opinion)
20  DEPOSITION EXHIBIT 26...................... 129
21  (Katherine Swartz paper)
22
23
24
25

2 (Pages 2 to 5)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 6

1  Southfield, Michigan
2  Friday, January 10, 2014
3  9:28 a.m.
4
5          SUZANNE MARIE DANIELS, Ph.D.,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10          EXAMINATION
11 BY MR. BURCHFIELD:
12 Q.  Would you please state your full name for the record.
13 A.  Suzanne Marie Daniels.
14 Q.  And you're a Ph.D. in economics; is that correct?
15 A.  Yes.
16 Q.  And could you give us just an overview of your
17     educational background: undergraduate degree, and
18     graduate degrees, please.
19 A.  My undergraduate degree is in economics, bachelors;
20     and I have a Ph.D. in economics.
21 Q.  From what institutions?
22 A.  From Wayne State University, both degrees.
23 Q.  And what were the dates of those degrees?
24 A.  They are stated on my bio with my report.
25 Q.  Okay.  We'll get to that in short order.

Page 7

1          Ms. Daniels, let me ask the reporter to
2  mark as Daniels Exhibits 1 and 2 a -- two subpoenas
3  that I believe were served on you.
4          This will be number 1, copy for Counsel;
5  and this will be number 2.
6          MARKED BY THE REPORTER:
7          DEPOSITION EXHIBITS 1 and 2
8          9:29 a.m.
9  BY MR. BURCHFIELD:
10 Q.  Dr. Daniels, I'm handing to you Daniels Exhibit 1,
11     which is a subpoena duces tecum dated December 13,
12     2013, and would you take a moment and let me know if
13     you've seen that document before.
14 A.  Yes, I have seen this document before.
15 Q.  You have.  Okay.
16          And Daniels Exhibit 2 is a subpoena duces
17     tecum dated December 30, 2013, which has a
18     supplemental document request at the end.  And take a
19     moment, let me know if you've seen that one before.
20 A.  Yes, I've seen this document.
21 Q.  Now, do you have any -- you're obviously appearing for
22     the deposition here in person today, and we'll ask
23     questions about these subpoenas to produce today?
24
25          MR. CANZANO:  I'm going to interject or

Page 8

1  object here in that the time for the return of these
2  subpoenas has not yet occurred.  We will be filing
3  a -- and I believe we either have or will be today
4  serving an objection to the December 30 subpoena.
5          The other one I don't want to say for
6  certain, because Darcie was handling this part of it,
7  but I believe that the response to that is essentially
8  that there are no further documents, you have the
9  rebuttal report, and the only other things that would
10 be -- that she relied on would be the documents
11 mentioned in there which came from you and are in your
12 expert's report.
13          MR. BURCHFIELD:  Okay.
14          MR. CANZANO:  But the December 30 one
15 regarding the mission -- I'll call that the mission
16 subpoena -- we are objecting to that.
17          MR. BURCHFIELD:  Okay.  Well, let me just
18 ask you:  Do you intend -- do the plaintiffs intend to
19 withdraw the like subpoena that has been served on
20 Mr. Macey?
21          MR. CANZANO:  I don't believe so.
22 BY MR. BURCHFIELD:
23 Q.  Okay.  Ms. Daniels, let's set aside Exhibit — well,
24     Exhibit 2, let's look at the document request on that,
25     and this is the document request that Counsel referred

Page 9

1  to as the mission request.  I think that's as fair a
2  consideration, without reading the whole thing, as
3  any.
4          You, just to be clear, you are not today
5  producing and have not produced any documents in
6  response to the document request at the end of Exhibit
7  2; is that correct?
8 A.  They're not due yet till the 15th.
9 Q.  But do you intend to produce any documents in response
10    to it?
11          MR. CANZANO:  We're objecting, so there
12 won't be any documents produced.
13 BY MR. BURCHFIELD:
14 Q.  All right.  And that's your understanding as well?
15 A.  That's my understanding.
16 Q.  That's all I wanted to confirm for the record.
17          Now with regard to Exhibit 1, the document
18    request appended to the December 13 subpoena which
19    begins with the document request your rebuttal expert
20    report, is it your understanding, Dr. Daniels, that
21    all documents responsive to this request have been
22    already produced to us?
23 A.  That is correct, because the documents were those that
24    were provided by the defense.  Mr. Macey's report and
25    the references in his report is what I relied on.

3 (Pages 6 to 9)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 10

1  Q.  Okay.  Thank you.
2       MR. BURCHFIELD:  Let me ask the reporter to
3  mark as Daniels Exhibit 3 a document entitled SNG
4  Consulting, LLC, Consulting Agreement.
5       MARKED BY THE REPORTER:
6       DEPOSITION EXHIBIT 3
7       9:34 a.m.
8       MR. BURCHFIELD:  Thank you.
9  BY MR. BURCHFIELD:
10 Q.  Dr. Daniels, I'm handing you Exhibit 3.  Do you
11     recognize this document?
12 A.  I do, yes.
13 Q.  Is this the -- is this the consulting agreement that
14     relates to the services you have provided in this case
15     of Reese versus CNH?
16 A.  Yes, it does.  Yes.
17 Q.  And just to confirm, under the heading Charges and
18     Payments, your rate for consulting services is $200 an
19     hour?
20 A.  Yes.
21 Q.  And your rate is $350 an hour for depositions, that
22     would be today; deposition preparation and travel
23     time; court, arbitration, mediation appearances; and
24     court, arbitration, mediation appearances,
25     preparation, and travel time; is that correct?

Page 11

1  A.  Yes.
2  Q.  Okay.  And this document was signed by you on page 3,
3      it looks like on May 29, 2013, correct?
4  A.  Yes.
5  Q.  And is this agreement -- does this follow a form that
6      you use in your consulting business, or was this a
7      form that was provided to you by the McKnight Law
8      Firm?
9  A.  This is my standard consulting agreement.
10 Q.  Okay.  And I notice, by the way, Dr. Daniels, in your
11     consulting agreement on page 3 there's a waiver of
12     jury trial; do you see that?
13 A.  Yes.
14 Q.  And what's the -- what, if you know, is the reason
15     that you have a waiver of jury trial in your standard
16     consulting agreement?
17 A.  I'd have to discuss that with Counsel.
18      MR. BURCHFIELD:  Let me ask the reporter to
19 mark three documents -- actually, there may be four
20 documents here, the first of which would be Daniels
21 Exhibit 4 is entitled Declaration of Suzanne M.
22 Daniels.
23      Let me go ahead and mark all these.
24      MARKED BY THE REPORTER:
25      DEPOSITION EXHIBIT 4

Page 12

1       9:38 a.m.
2       MR. BURCHFIELD:  Daniels Exhibit 5 is a
3  preliminary expert report of Suzanne Daniels dated
4  June 3, 2013.
5       MARKED BY THE REPORTER:
6       DEPOSITION EXHIBIT 5
7       9:38 a.m.
8       MR. BURCHFIELD:  Daniels Exhibit 6 is a
9  preliminary expert report by Dr. Daniels dated
10 September 27, 2013.
11      MARKED BY THE REPORTER:
12      DEPOSITION EXHIBIT 6
13      9:39 a.m.
14      MR. BURCHFIELD:  And Daniels Exhibit 7 is a
15 cover letter from Ms. Brault dated December 20, 2013,
16 attaching addenda to preliminary expert report of
17 Suzanne M. Daniels dated December 16, 2013.
18      MARKED BY THE REPORTER:
19      DEPOSITION EXHIBIT 7
20      9:39 a.m.
21 BY MR. BURCHFIELD:
22 Q.  Okay.  Dr. Daniels, let's start with Daniels Exhibit 4
23     and Daniels Exhibit 5.  I'll hand those to you.
24      My first question is for Daniels Exhibit 4
25     entitled Declaration of Suzanne M. Daniels.  Is that

Page 13

1  in fact a declaration that you executed on or about
2  June 3, 2013?
3  A.  Yes.
4  Q.  And was that declaration executed in conjunction with
5      Daniels Exhibit 5, which is your June 3, 2013,
6      preliminary expert report?
7  A.  Yes.
8  Q.  The -- and then Daniels Exhibit 5 is your preliminary
9      expert report dated June 3, 2013, correct?
10 A.  Yes.
11 Q.  I don't intend to spend much time on this today, but
12     let me just ask you:  Daniels Exhibit 5, as I read it,
13     seems consistent with but not as -- but doesn't -- but
14     not as inclusive as Daniels Exhibit 6, which is your
15     September 27, 2013, report; would you agree?
16 A.  Would you repeat that, please?
17 Q.  Sure.  And it wasn't a very good question.  Let me --
18     Daniels Exhibit 5 -- let me start from a different
19     perspective.
20      Daniels Exhibit 6 contains everything that
21     Daniels Exhibit 5 contains, but Daniels Exhibit 6 also
22     adds some material that is not in Daniels Exhibit 5;
23     would you agree with that?
24 A.  With the exception that there may be some words that
25     have been deleted that were typographical errors

4  (Pages 10 to 13)

SUZANNE DANIELS, PH.D. – 1/10/2014

| Page 14 | Page 16 |
|---|---|

**Page 14**

1   between the two.
2   Q.  But you -- you would still stand by all the opinions
3     expressed in Daniels Exhibit 5?
4   A.  That is -- yes.
5   Q.  And the opinions that you expressed in Daniels Exhibit
6     5 you would -- it would be your view that those are
7     consistent with the views expressed in Daniels Exhibit
8     6?
9   A.  Yes.
10   Q.  So that will allow us to focus on Daniels Exhibit 6
11     today. And Daniels Exhibit 6 -- let me give that to
12     you -- is your September 27, 2013, report, and just
13     take a moment, confirm that what you have before you
14     is, in fact, a copy of your September 27, 2013,
15     report.
16   A.  Yes.
17   Q.  Okay. Daniels Exhibit 7 is your -- is an addendum to
18     that preliminary report, and can you confirm that
19     Exhibit 7 is a correct copy of that addenda?
20   A.  Yes.
21   Q.  Dr. Daniels, I note that Daniels Exhibit 6 deems -- is
22     deemed a preliminary expert report. Other than
23     Daniels Exhibit 7, have you made any changes to the
24     preliminary report dated September 27, 2013?
25   A.  No.

**Page 16**

1     Ph.D. was received in 1984 and your BA in 1980. Are
2     those dates correct, so far as you know?
3   A.  Yes. Right.
4   Q.  At the present time you serve as the president of
5     AECP. What is AECP?
6         MR. CANZANO: I believe it's --
7         THE WITNESS: AEPC.
8   BY MR. BURCHFIELD:
9   Q.  AEPC. Sorry.
10   A.  AEPC is a not-for-profit labor management purchase --
11     health care purchasing coalition.
12   Q.  And can you describe what you mean by "health care
13     purchasing coalition"?
14   A.  On behalf of our -- AEPC's member organizations, we
15     undertake bidding on the selection of preferred
16     service providers and negotiate contracts with those
17     preferred service providers that result in value to
18     our members, both -- value being improved pricing and
19     improved quality.
20   Q.  And who are the members of AEPC?
21   A.  Any entity that provides health care to at least one
22     employee subject to under the terms of the collective
23     bargaining agreement is eligible to be a member of
24     AEPC.
25   Q.  How many members do you have?

| Page 15 | Page 17 |
|---|---|

**Page 15**

1   Q.  At this moment do you intend to?
2   A.  No.
3   Q.  And as of -- as of today, do you intend to make any
4     changes in the addenda that you submitted on December
5     16 which we've marked as Daniels Exhibit 7?
6   A.  Not as of today.
7   Q.  Okay. Are you continuing to do analysis in this case
8     or, with the possible exception of preparation of
9     additional documents for motions practice or
10     potentially appearing to testify, is your work -- is
11     your analytical work here done?
12   A.  At this point I have not -- I'm not actively doing any
13     other additional research.
14   Q.  You don't have any further assignments from
15     Plaintiffs' counsel?
16   A.  I do not, that is correct.
17   Q.  And as of this moment, you are not conducting any
18     analysis that would reasonably lead to changes in
19     either Daniels Exhibit 6 or Daniels Exhibit 7?
20   A.  Correct. Yes.
21   Q.  Okay. Let's look at your resume, which is at page 16
22     of Daniels Exhibit 6. And you had earlier indicated
23     that the dates of your degrees would be in this
24     document.
25       If you look at page 21, it indicates your

**Page 17**

1   A.  Approximately 34.
2   Q.  Forty-four?
3   A.  Thirty-four.
4   Q.  Thirty-four.
5   A.  Approximately.
6   Q.  And are they regionally based or nationwide?
7   A.  They are regionally based.
8   Q.  Can you describe the region?
9   A.  Predominantly Michigan. We have one member
10     organization in Kentucky and one in Ohio.
11   Q.  And how many people work with you at AEPC?
12   A.  I am the sole part-time employee.
13   Q.  Okay. And if I'm understanding you correctly, and
14     please feel free to correct me if I get this wrong,
15     but AEPC, on behalf of its members, seeks favorable
16     health insurance programs for those members to offer
17     to their employees?
18   A.  No, that's not correct.
19   Q.  Okay. Can you tell me how I'm wrong and maybe
20     rephrase it in a way that will be --
21   A.  Sure.
22   Q.  -- that I can understand?
23   A.  Certainly.
24       The members of AEPC largely are self-funded
25     employers or -- and/or Taft-Hartley Trusts, other

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 18

1    trusts. They're largely self-funded.
2  Q.  Yep.
3  A.  So they, for example, would be providing a
4    prescription drug benefit through a pharmacy benefit
5    manager, Express Scripts, CVS Caremark. We, working
6    with a consultant, go out to bid for a pharmacy
7    benefit manager, because 180,000-plus lives will be
8    covered if we add up all the members, the employees
9    and retirees, of the various AEPC members. They
10   receive more favorable pricing from a pharmacy benefit
11   manager than if any one of them went out to the
12   marketplace on their own. Similarly for vision, a
13   self-funded PPO network, and the like.
14       But it's not insurance.
15 Q.  Is the -- thanks for that clarification.
16       Do all the members of AEPC offer the same
17   plan?
18 A.  No. A coalition would never be successful if we
19   required each one of those 30-plus entities to have
20   the same plan design.
21 Q.  And about how many different plans are there among the
22   AEPC members?
23 A.  Oh, you can multiply the 34 by, like, two and a half,
24   three times, because some of the trusts have multiple
25   plan designs.

Page 19

1  Q.  Is it typical within the group of AEPC for an employer
2    to have a -- one plan for its employees and a separate
3    plan for its retirees?
4  A.  Sometimes, yes. It's not -- I wouldn't say it's
5    typical. It happens, yes.
6  Q.  Is it typical for members of AEPC to have a separate
7    plan for their unionized work force and a different
8    plan for their salary work force, nonunionized work
9    force?
10 A.  It's not an area that we spend a lot of time on,
11   because the focus of AEPC is only on those employees
12   that have health care through a collective bargaining
13   agreement. So what they're doing for other workers is
14   not something that we discuss at any level of detail.
15 Q.  Do the plans that AEPC members offer typically have
16   deductibles for prescription drugs?
17 A.  Plan design is left up to the employ -- to the
18   participating AEPC member organization.
19       As far as deductibles for prescription
20   drugs, it would be atypical to see that among the
21   group right now.
22 Q.  How about -- how about copays for prescription drugs?
23 A.  Yes, there are copays for prescription drugs.
24 Q.  And that would be typical?
25 A.  Yes.

Page 20

1  Q.  How about --
2        MR. CANZANO:  Could I just stop, just
3    because I didn't get the previous question? What was
4    the prior question?
5        MR. BURCHFIELD:  Do you want to read it
6    back?
7        (The following portion of the record was
8        read by the reporter at 9:53 a.m.:
9        Question: "Do the plans that AEPC members
10       offer typically have deductibles for
11       prescription drugs?".)
12       MR. CANZANO:  Okay.  You can go ahead.
13       MR. BURCHFIELD:  Thank you.
14 BY MR. BURCHFIELD:
15 Q.  Do some of the AEPC plan -- member plans have
16   deductibles for prescription drugs, to your knowledge?
17 A.  Not that I'm aware of.
18 Q.  How about coinsurance for prescription drugs; do the
19   plans offered by AEPC typically have coinsurance for
20   prescription drugs?
21 A.  There are some that have coinsurance.
22 Q.  Do you know if that would be a majority of the plans
23   or less than a majority of the plans?
24 A.  Far less than a majority of the plans.
25 Q.  How about for medical services; do the AEPC members

Page 21

1    typically have deductibles for the medical services in
2    their plans?
3  A.  AEPC has not gone to bid or done anything on the
4    medical side for the last seven years, so any -- I
5    don't have current knowledge of their medical plan
6    designs.
7  Q.  You've been at AEPC since 2006, according to --
8    actually, you were at AEPC as executive director going
9    back to 2004, it looks like; is that correct?
10 A.  That's correct.
11 Q.  And so was there a period of time during which you
12   were at AEPC that AEPC did become involved in
13   negotiating medical plans for its members?
14 A.  Yes.
15 Q.  And at that point in time did those medical plans have
16   deductibles?
17 A.  Some did.
18 Q.  Did most?
19 A.  I can't say. I don't recall.
20 Q.  At that time when AEPC was negotiating medical plans
21   for its members, did those medical plans have copays?
22 A.  Yes.
23 Q.  All?
24 A.  I can't say all, no.
25 Q.  But you're confident that most did?

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 22

1  A.  Many did.
2  Q.  And how about -- how about coinsurance for the medical
3      plans that you were familiar with?
4  A.  I don't recall specifically if there was a coinsurance
5      plan.
6  Q.  Why did AEPC cease its involvement with medical plans
7      for its members?
8  A.  It's the market dynamics of Michigan. With a
9      prominent -- with a dominant carrier, there's very
10     little that one can do to influence pricing in the
11     marketplace.
12 Q.  Is that Anthem Blue Cross Blue Shield?
13 A.  No, it's Blue Cross and Blue Shield of Michigan.
14 Q.  Okay. How do you see the Patient Protection and
15     Affordable Care Act affecting the mission of AEPC, if
16     at all?
17 A.  We're continuing, certainly, to -- it has impacted our
18     mission. We're focusing on -- we have greater focus
19     on educating our member organizations on certain
20     pieces of the ACA. We're monitoring the pieces that
21     are still kind of up in the air.
22         So we don't have a definitive, you know,
23     this is the game plan because of ACA, because ACA is a
24     work in progress.
25 Q.  What's the educational component of the plan -- of

Page 23

1      AEPC with regard to the AFA (sic)?
2  A.  We've been bringing in speakers to our meetings to
3      discuss various aspects of the Affordable Care Act, as
4      well as speakers on other topics, such as new products
5      and -- for the marketplace.
6  Q.  Who are the audience -- who are the audiences for
7      those speakers? Are they the individual insured
8      lives, or are they the administrators or managers of
9      the programs?
10 A.  They're the administrators or HR staff.
11 Q.  Okay. In the market as you see it at the present
12     time, do the members of AEPC offer, from member to
13     member, do they offer plans that vary in the levels of
14     coverage provided to the insureds?
15 A.  The members of AEPC are very diverse, ranging from
16     universities to heat and frost insulators. So yes,
17     there's variation in plan design somewhat reflective
18     of the type of organization and their historical
19     starting points.
20 Q.  Do the members of AEPC uniformly offer employee-funded
21     coverage for their retirees?
22 A.  Not --
23         MR. CANZANO: Employee funded?
24         THE WITNESS: Yeah, I don't understand the
25     question.

Page 24

1  BY MR. BURCHFIELD:
2  Q.  Okay. Let me ask it again.
3         If you ever don't understand a question,
4      let me know. I often misspeak, as my wife reminds me
5      more than daily.
6         Do the members -- do the members of AEPC
7      uniformly offer retiree health coverage to their
8      employees, to their former employees?
9  A.  Could you clarify what you mean by "uniformly"?
10 Q.  Do they all?
11 A.  No, they do not all.
12 Q.  What percentage do and what percentage don't?
13 A.  Can't tell you. I don't know.
14 Q.  With regard to those that do provide retiree health
15     coverage, have you had occasion to compare the retiree
16     health coverage that is provided by the AEPC members
17     to the proposed plan in this case?
18 A.  No.
19 Q.  Have you had occasion to compare the retiree health
20     coverage that is provided by the AEPC members, for
21     those that provide it, to the retiree health plan that
22     the plaintiffs in this case currently are under?
23 A.  No. That would be outside the scope of work.
24 Q.  You weren't asked to do that?
25 A.  No. It's outside of what I was asked to do.

Page 25

1  Q.  So you don't have an opinion on whether the proposed
2      plan is as good as, better than, or not as good as the
3      plans offered by the -- to retirees by the members of
4      your organization?
5  A.  I do not have an opinion as that was not part of the
6      scope of work.
7  Q.  Okay. Your resume also indicates that you currently
8      are the committee chair of four VEBAs, voluntary
9      employee benefit associations. Does that remain true?
10 A.  Yes. They're beneficiary associations, not benefit
11     associations.
12 Q.  Okay.
13         MR. BURCHFIELD: Ask the reporter to mark
14     as Daniels Exhibit 8 a motion filed in the United
15     States District Court for the Eastern District of
16     Pennsylvania in the case of Mack Truck versus
17     International Union, United Automobile Aerospace &
18     Agricultural Implement Workers of America, and it
19     looks like it's dated March 18, 2011.
20         MARKED BY THE REPORTER:
21         DEPOSITION EXHIBIT 8
22         10:03 a.m.
23 BY MR. BURCHFIELD:
24 Q.  Dr. Daniels, I'm handing you what's been just marked
25     as Daniels Exhibit 8. Would you please take a moment

7 (Pages 22 to 25)

Page 26

1   to look at that.
2       MR. CANZANO: Do you have a copy of that
3   for me?
4       MR. BURCHFIELD: Oh, I do. I'm sorry,
5   John.
6   BY MR. BURCHFIELD:
7   Q.   And while you're looking at that, let's mark as
8       Daniels Exhibit 9 a document with a cover page that
9       has summary plan description for the Mack Trucks,
10      Inc., restructured plan.
11          MARKED BY THE REPORTER:
12          DEPOSITION EXHIBIT 9
13          10:04 a.m.
14  BY MR. BURCHFIELD:
15  Q.   Dr. Daniels, as you go through that my question for
16      you, which you can think about as you're going
17      through, is: Does Daniels Exhibit 8 relate to the --
18      to the VEBA plan for which you serve as committee
19      chair?
20  A.   Yes.
21  Q.   Let me -- let's stay on Exhibit 8 for a minute, and
22      then we'll turn to Exhibit 9. Let me ask you to turn
23      to page 8 of Daniels Exhibit 8. Let me back up for a
24      second.
25          How long have you been the committee chair

Page 27

1   of the Mack Truck VEBA?
2   A.   Oh, it would be beginning after the -- let me just
3       look. I can tell by when the funding began and the
4       VEBA was started, which should be in here. So not
5       until the VEBA was actually up and running. There's a
6       date in here, I'm sure. Payments.
7           So it was, like, 2011 or 2012, based on
8       page 9.
9   Q.   Okay. So, but you -- taking your comment, were you on
10      the VEBA committee for the Mack Truck plan from the
11      time the VEBA was initially started?
12  A.   Yes.
13  Q.   Okay. And did that VEBA result as part of a
14      settlement of a dispute between the UAW and Mack
15      Trucks regarding, at least in part, retiree health
16      benefits?
17          MR. CANZANO: I'm going to object to
18      foundation.
19  BY MR. BURCHFIELD:
20  Q.   You may answer.
21  A.   I don't know the complete history behind what
22      precipitated the formation of the VEBA.
23  Q.   Let me ask you to look at -- well, let me back up for
24      a second.
25          Do you have any understanding of the

Page 28

1   historical prelude to the VEBA?
2   A.   Only that it was a settlement agreement that came
3       about that formed the VEBA.
4   Q.   Let me ask you to look at Daniels Exhibit 8 on page 8,
5       at the last paragraph there, and I'll read this into
6       the record. And I'm just -- I'm interested in whether
7       this is consistent with your understanding.
8           It says, quote, The benefits under the
9       restructured plan are reduced from the retiree medical
10      benefits in effect prior to the restructured plan's
11      October 1, 2009, effective date. The restructured
12      plan requires some cost-sharing by participants,
13      including annual deductibles and copayments. For
14      example, non-Medicare-eligible participants in the
15      Highmark PPO network must pay a larger share of their
16      medical expenses depending on whether they use a PPO
17      network provider, 20 percent in-network as compared to
18      40 percent out-of-network. The restructured plan also
19      requires monthly contributions by participants in
20      order to maintain coverage. The amount of the monthly
21      contribution depends on the retiree's date of
22      retirement, or the date of an employee's death for a
23      surviving spouse of a retirement-eligible employee, as
24      well as whether single or family coverage is selected,
25      and whether the participant is medical --

Page 29

1   Medicare-eligible. For example, the current monthly
2   contribution for family coverage, two or more persons,
3   for a retiree who retired between December 2, 2004,
4   and July 1, 2009, is $320 for a non-Medicare-eligible
5   family and $160 for a Medicare-eligible family?
6       Do you see that?
7   A.   Yes.
8   Q.   Does the statement that I've just read into the record
9       comport with your understanding of the terms of the
10      Mack Truck VEBA plan?
11  A.   I believe so, yes.
12  Q.   So it would be fair to say --
13  A.   Excuse me. Let me --
14          MR. CANZANO: Go ahead.
15          THE WITNESS: The Mack Truck VEBA plan?
16          Let me -- what you read is the restructured
17      plan that went into effect in 2009.
18  BY MR. BURCHFIELD:
19  Q.   And does the plan -- does the VEBA provide benefits
20      that are different from this restructured plan?
21  A.   Yes.
22  Q.   How does the VEBA differ at all from the, quote,
23      Restructured plan, unquote, if at all?
24  A.   There are changes in the benefits as well as changes
25      in the carriers.

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 30

1  Q.  Under the VEBA?
2  A.  Correct.  Yes.
3  Q.  Does the VEBA discontinue copays, deductibles, or
4      premiums for the participants in the plan?
5  A.  I cannot say that.  There are not -- let me say that
6      differently.  Let me rephrase that.
7          There have been changes, so in some cases
8      it is possible that a copay has been modified and --
9      and/or eliminated.
10 Q.  Deductibles?
11 A.  I don't believe those have been modified.
12 Q.  Premiums?
13 A.  I don't -- there are premiums.
14 Q.  And have those premiums been increasing?
15 A.  To the best of my recollection, no.
16 Q.  When was the last time they increased?
17 A.  I don't recall.
18 Q.  Just to make sure the record is clear, is there a
19     separate Mack Truck Restructured Plan that is a
20     different plan than the one administered through the
21     VEBA?
22 A.  Yes.
23 Q.  Okay.  And what is the difference between the Mack
24     Truck Restructured Plan and the benefits administered
25     through the VEBA?

Page 31

1  A.  As I stated earlier, there's a change in the carrier.
2      Under the Mack restructured plan, benefits were
3      provided in part through Highmark Blue Cross and Blue
4      Shield, prescription drugs were provided through
5      Catalyst, and that is no longer the case.
6  Q.  Well, and I apologize, this is -- these questions are
7      a little bit difficult for me to ask -- to phrase.
8          Is there -- do the terms of the VEBA and
9      the carriers used by the VEBA supersede the Mack Truck
10     Restructured Plan?
11 A.  The VEBA is responsible for determining plan design.
12 Q.  Determining what?
13 A.  The plan design, the carriers --
14 Q.  Right.
15 A.  -- everything going forward.
16         So yes, if supersedes means does it replace
17     what was the restructured plan for those participants
18     covered through the VEBA, it is the VEBA plan they are
19     covered by.
20 Q.  You mentioned that some copayments may have been
21     reduced or eliminated.  Are there currently any
22     copayments in the Mack Truck VEBA plan?
23 A.  There are copayments.
24 Q.  And what's the highest of those copayments, as best
25     you recall?

Page 32

1  A.  They're very -- I don't -- perhaps for prescription
2      drugs there could be a $30 for the middle tier drugs.
3  Q.  How about coinsurance; is there -- is there still
4      coinsurance under the Mack Truck VEBA plan?
5  A.  I'd have to look at the summary plan description to be
6      certain.
7          With four VEBAs -- with four very different
8      approaches covering both pre -- non-Medicare eligible,
9      Medicare eligible, quite candidly at the committee we
10     have to have in front of us the grid of all the
11     benefit designs.  It's not something you want to
12     commit to memory.
13 Q.  Do you -- well, do you have an opinion on whether --
14     and, well, let me -- I'll get to that in a second.
15         Let's look at Daniels Exhibit 9 for a
16     minute, which is the summary plan description for the
17     Mack Trucks, Inc., restructured plan, and it says,
18     This booklet describes the plan as in effect on and
19     after January 1, 2011.
20         Do you see that?  It's the second page of
21     Daniels Exhibit 9.
22         Oh, I'm sorry.  It's this one.
23 A.  Okay.  I wasn't handed it, so -- yes, I see.
24 Q.  Is there a more current summary plan description for
25     the Mack Truck Restructured Plan than Defendants'

Page 33

1      Exhibit 9 dated January 1, 2011?
2  A.  Yes.
3  Q.  And what's the date of the most recent restructured
4      plan, SPD?
5  A.  2012.
6  Q.  Is it --
7  A.  Is my understanding.
8  Q.  Is -- how frequently is the SPD revised?
9  A.  Based on the need to revise it as determined by legal
10     counsel.
11 Q.  When it was revised -- if you recall, when it was
12     revised from the 2011 SPD to the 2012 SPD, did the
13     program become more or less generous to those covered
14     by it?
15 A.  I struggle with the word generous.
16 Q.  All right.  You may use whatever term you want.
17         Is there any way -- how would you compare
18     the 2012 revised SPD to the 2011 SPD that's marked as
19     Daniels Exhibit 9?
20 A.  The benefits did not markedly change.
21 Q.  Did deductibles go up or down?
22 A.  I don't believe they changed.
23 Q.  How about copays?
24 A.  Again, I do not believe they changed.
25         We restructured part of the prescription

9 (Pages 30 to 33)

Page 34

1   drug benefit on the third tier, so it's a little
2   confusing, but they did not diminish the benefits.
3   Q.  And what do you mean, restructured the prescription
4       drug benefits on the third tier?
5   A.  Because of a coinsurance provision and an
6       out-of-pocket max, it was tweaked on the Medicare
7       side, is my recollection, just to be more logical, and
8       because of the way it was designed before was not --
9       is kind of not the standard way you would do it.
10  Q.  Can you be more specific?  None of this is
11      particularly logical to me, but --
12              MR. CANZANO:  I'm just going to --
13              THE WITNESS:  Oh, boy, I'd have to go back
14      and look at this.
15              MR. CANZANO:  At this point I'm going to
16      place an objection on the record.  I'm not sure where
17      you're going with this or how far you're going with
18      this, but the scope of this witness's report and
19      opinion here is not to compare --
20              THE WITNESS:  Yeah.
21              MR. CANZANO:  Let me speak.
22              THE WITNESS:  Okay.
23              MR. CANZANO:  -- is not to compare
24      different plans or different plan designs all over the
25      country that she may or may not have knowledge of.

Page 35

1           I'm reluctant to obstruct, because I want
2       to let you have your ability to get into her opinion,
3       but if we're going to go down that road, I will be
4       objecting more, and we may have to take a different
5       approach here.
6               MR. BURCHFIELD:  Okay.  That's noted.
7           Is there a question pending?  Would you
8       read it back, please?
9           (The following portion of the record was
10          read by the reporter at 10:18 a.m.:
11          Question:  "Can you be more specific?  None
12          of this is particularly logical to me,
13          but --".)
14  BY MR. BURCHFIELD:
15  Q.  Yeah, the question is:  You were talking about the
16      third tier prescription drug benefit was changed to
17      make it more rational, and I'm just interested --
18      those weren't exactly the terms you used, but I'm just
19      interested if you could be a little bit more specific
20      about what you meant by that.
21  A.  We made a change that addressed the specialty being a
22      forth tier and not -- rather than being considered, as
23      I recall, a nonpreferred.  So rather than have a
24      four-tier plan, it was moved to be a more typical,
25      three-tier plan.  That's my recollection.

Page 36

1   Q.  And you're obviously the expert on this.  In a
2       typical, three-tier plan, could you just briefly
3       indicate what each of those three tiers -- how you
4       would describe each of those three tiers?
5   A.  First tier, tier 1, the lowest copays would be generic
6       drugs, the second tier would be formulary brand, and
7       the third tier would be non-formulary brand.
8   Q.  Okay.  That's helpful.  Thank you.
9           Let me ask you a question on page -- if you
10      turn to page 26 of Daniels Exhibit 9, I see about the
11      middle of the page there it says, Lifestyle drugs not
12      covered.
13          Do you see where that is?
14  A.  I do.
15  Q.  And says, The plan does not cover any prescription
16      drugs that are used solely for cosmetic purposes or
17      that are used on a discretionary or medically-
18      unnecessary basis.
19          Do you see that?
20  A.  I do.
21  Q.  And is -- under this plan is a drug like Viagra
22      considered to be a lifestyle drug?
23  A.  Lifestyle drug is not a defined term in the industry,
24      and as such it's one that we, as a committee, tend not
25      to use.  So without looking at the summary plan

Page 37

1       description, I would have to refresh my memory as to
2       whether or not Viagra is included or excluded.
3   Q.  Okay.  Let me ask you, Dr. Daniels, if you have an
4       opinion, if you have formed an opinion, on whether the
5       benefits provided to retirees who participate in the
6       Mack Truck VEBA Program are more, less, or about the
7       same in terms of the coverages than the plan proposed
8       by CNH in this case.
9               MR. CANZANO:  I'm going to object to the
10      question on the basis that it goes beyond the scope of
11      the opinion and the scope of the report that she's
12      been asked to give in this case.
13              THE WITNESS:  I have no such opinion as it
14      is beyond the scope of the work that I was given to
15      do, asked to do.
16  BY MR. BURCHFIELD:
17  Q.  Okay.  You were also the chair of a committee on the
18      St. Joseph UAW Health & Welfare Trust; is that
19      correct?
20  A.  Yes, it is correct.
21              MR. BURCHFIELD:  Let me mark as Exhibit 10
22      a document with the legend The UAW St. Joseph Health &
23      Welfare Trust, Summary of Benefits.
24              MARKED BY THE REPORTER:
25              DEPOSITION EXHIBIT 10

SUZANNE DANIELS, PH.D. - 1/10/2014

### Page 38

1    10:23 a.m.
2 BY MR. BURCHFIELD:
3 Q. Dr. Daniels, do you have in front of you Daniels
4    Exhibit 10?
5 A. Yes.
6 Q. Am I correct that this is -- this document is a
7    summary of benefits for the UAW St. Joseph Health &
8    Welfare Trust for the period January 1, 2011, through
9    December 31, 2011?
10 A. Yes.
11 Q. And is this, at least during that period of time, was
12    this the plan that was provided pursuant to the St.
13    Joseph UAW Health & Welfare Trust of which you are the
14    committee chair?
15 A. This is the plan that was in effect for the period of
16    January 2011 through December 31, 2011, for the VEBA,
17    St. Joseph.
18 Q. And under this plan are the Medicare-eligible retirees
19    expected to participate in Medicare Part B?
20 A. Yes.
21 Q. And are the Medicare-eligible retirees expected to
22    participate in Medicare Part D?
23 A. Medicare Part D would not -- is not relevant to this
24    group.
25 Q. Why is that?

### Page 39

1 A. This is a Medicare Advantage product which includes
2    prescription drugs.
3 Q. Is there any -- does it in any way deem Medicare Part
4    D as primary coverage and then layer on top of that
5    additional -- additional coverage?
6 A. I don't understand your question.
7 Q. Let me ask you to look at page 19 of the plan.
8 A. Yes.
9 Q. You got it?
10 A. Um-hum.
11 Q. It says in the right-hand column there, it says, Part
12    D prescription drugs, and --
13    MR. CANZANO: What page?
14    THE WITNESS: Nineteen.
15    MR. BURCHFIELD: Page 19.
16 BY MR. BURCHFIELD:
17 Q. And I guess my question is: What's the relevance of
18    the reference to part D prescription drugs there if
19    Medicare Part D is not relevant to these retirees?
20    MR. CANZANO: Hang on a second, because the
21    copy that I have is about seven -- many page 20s and
22    21s, and I haven't found page 19 yet.
23    MR. BURCHFIELD: Okay.
24    MR. CANZANO: Nor does it appear to have a
25    page 19.

### Page 40

1    MR. BURCHFIELD: Dr. Daniels, you have a
2    page 19, right?
3    Maybe you can look over her shoulder as
4    we --
5    MR. CANZANO: Found it.
6    MR. BURCHFIELD: Okay.
7 BY MR. BURCHFIELD:
8 Q. The question is: What's the relevance of the
9    reference to part D prescription drugs there if
10    Medicare Part D is irrelevant to this plan?
11 A. The reference is relevant because it's defining what
12    drugs are covered through the plan. But it's not a
13    separate part D program, it's all one in the Medicare
14    Advantage.
15 Q. So does -- if a participant in the UAW St. Joseph
16    Health & Welfare Trust receives prescription drugs,
17    does Medicare pay anything for those prescription
18    drugs?
19 A. This is a Medicare Advantage program, so there is
20    funding for Medicare Advantage programs through CMS.
21    So are you -- I don't understand what you're asking.
22    Medicare doesn't cover prescription drugs.
23 Q. Part D doesn't cover prescription drugs?
24 A. But you asked about Medicare.
25 Q. I'm sorry. My question was imprecise. Let me

### Page 41

1    rephrase it.
2    When a participant in the UAW St. Joseph
3    Health & Welfare Trust receives prescription drugs,
4    does Medicare Part D pay any amount in support of that
5    prescription?
6 A. That -- what you're asking doesn't fit with how these
7    programs are designed or how Medicare is set up.
8    This is a group Medicare Advantage product.
9    It has the part D benefit all inside of that. An
10    individual covered under this plan is not mean to have
11    their own separate part D product -- program that they
12    bought in the marketplace or something, if that's
13    where you're going with this.
14 Q. That's not where I'm going with this.
15 A. I'm very confused.
16 Q. Well, let me see if I can clarify. Let me see if I
17    can help clarify.
18    You understand the concept of primary
19    coverage versus secondary coverage, right?
20 A. Yes, I do.
21 Q. Okay. Now, is it the case that in effect a
22    participant in the St. Joseph UAW Health & Welfare
23    Trust is expected to take full advantage of any
24    benefits through the Medicare Advantage program before
25    the St. Joseph UAW Trust pays anything?

11 (Pages 38 to 41)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 42

1   A.  The trust is paying a premium to Blue Cross for this
2       plan.  This is their sole coverage.
3   Q.  Right.
4   A.  It's not like there's a supplemental plan or a wrap
5       plan.  This is where they get all of their benefits
6       through.
7   Q.  And the government does not pay a penny in support of
8       those prescription drugs; is that what you're saying?
9   A.  No, that's not what I'm saying.
10  Q.  Okay.  I thought that was my question.
11          Let me ask the question a little bit more
12      directly, or let me reask the question I think I
13      already asked you directly, but let me reask the
14      question so we're clear.
15          A prescription recipient under the UAW
16      St. Joseph Health & Welfare Trust would receive
17      funding through Medicare Part D for the prescription
18      drugs as part of the Medicare Advantage Plan; is that
19      correct?
20          MR. CANZANO:  The recipient receive
21      funding?  Was that the question?
22          THE WITNESS:  Restate the question.
23  BY MR. BURCHFIELD:
24  Q.  Would part of the funding for a participant's
25      prescription drugs come from Medicare Part D?

Page 43

1   A.  Blue Cross and Blue Shield of Michigan, in offering a
2       Medicare Advantage product to the market, does receive
3       a subsidy from CMS.
4   Q.  And that is -- and that -- and the UAW St. Joseph
5       Health & Welfare Trust benefits from that subsidy?
6   A.  The -- yes.
7   Q.  Okay.
8   A.  Indirectly, yes.
9   Q.  Am I correct that the UAW St. Joseph Health & Welfare
10      Trust has deductibles for the services provided?
11          MR. CANZANO:  Can we just go off the record
12      for a second before we continue on?
13          MR. BURCHFIELD:  Let's finish this line of
14      questioning first.
15          MR. CANZANO:  Okay.
16          THE WITNESS:  There is no deductible for
17      in-network services, and there is no coinsurance for
18      in-network services.
19  BY MR. BURCHFIELD:
20  Q.  But there is for out-of-network deductible and
21      coinsurance; is that correct?
22  A.  The document states that there is cost-sharing
23      provisions for out-of-network services.
24  Q.  And on page 2 it indicates that under Medicare --
25      under the two right-hand columns, under the heading

Page 44

1   Medicare Plus Blue -- Plus Blue Group PPO, under
2   in-network it says, In addition to your Medicare Part
3   B premium, you may also be required to pay premium
4   contribution as defined by your employer or union
5   group.
6       Do you see that?
7   A.  I do see that.
8   Q.  Do you know if the St. Joseph -- if the participants
9       in the UAW St. Joseph Health & Welfare Trust are
10      required to pay such a premium?
11  A.  My recollection is that they do not have a premium
12      contribution that's required.
13  Q.  Do they pay the Medicare Part B premium?
14  A.  Medicare Part B premium is paid, but it may be through
15      their pension as a negotiated benefit that was in
16      place at the time of their retirement.
17  Q.  Okay.  Have you formed an opinion as to whether the
18      benefits proposed by CNH for the class plaintiffs in
19      this case are as good as, better, or not as good as
20      the benefits provided through the UAW St. Joseph
21      Health & Welfare Trust?
22          MR. CANZANO:  Objection, beyond the scope
23      of the opinion that she's been asked to give.
24          THE WITNESS:  I have no such opinion as
25      that's beyond the scope of the work I was asked to

Page 45

1   perform.
2           MR. BURCHFIELD:  Okay.  Let me ask the
3   reporter to mark as Daniels Exhibit 11 --
4           MR. CANZANO:  Before we move on, if we
5       could go off the record.
6           (Off the record at 10:35 a.m.)
7           (Back on the record at 10:36 a.m.)
8           MR. BURCHFIELD:  Let me ask the reporter to
9       mark as Daniels Exhibit 11 a document entitled UAW
10      Retirees of the Dana Corp Health & Welfare Trust for
11      the period January 1, 2011, through December 31, 2011.
12
13          MARKED BY THE REPORTER:
14          DEPOSITION EXHIBIT 11
15          10:37 a.m.
16  BY MR. BURCHFIELD:
17  Q.  Dr. Daniels, I'm handing you Daniels Exhibit 11, and
18      take whatever time you'd like to review that, but my
19      question for you is:  Does this appear to be the
20      summary of benefits for the UAW Retirees of the Dana
21      Corporation Health & Welfare Trust of which you served
22      as cochair -- of committee chair from the period
23      January through December 2011?
24  A.  That reflects the benefits for the Medicare-eligible
25      plan participants of the trust.

12 (Pages 42 to 45)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 46

1  Q. Okay. Could you look, please, at page 6 of the
2     document, under section 2, summary of benefits, and
3     under the heading Medicare Plus Blue Group PPO
4     In-Network? Are you with me?
5  A. Um-hum.
6  Q. Yes?
7  A. Yes.
8  Q. Thank you.
9        You see about halfway down the page there
10    it says, For many coverage services described below,
11    the following cost-share applies: Services are
12    subject to the annual deductible of $300. Services
13    are subject to a coinsurance of 20 percent. There is
14    an in-network annual out-of-pocket maximum of $1500.
15       Do you see that?
16 A. I do.
17 Q. And do you know if the current version of the UAW
18    Retirees of the Dana Corp Health & Welfare Trust
19    continue to have the deductible and coinsurance
20    provisions?
21 A. For the Medicare-eligible population in the trust
22    there are deductibles and coinsurance provisions.
23 Q. How about for the non-Medicare eligible, do they also
24    have deductibles and copays -- coinsurance? I'm
25    sorry.

Page 47

1  A. There are cost-sharing provisions for the non-Medicare
2     eligibles.
3  Q. Do you recall whether the cost-sharing provisions for
4     the non-Medicare-eligible retirees are higher; in
5     other words, whether they impose higher costs on the
6     non-Medicare-eligible retirees than the ones we see
7     here for the Medicare-eligible retirees?
8  A. Can't -- I don't know with certainty, but there -- the
9     work -- we do work to align them so that -- to the
10    extent possible. We don't have a lot of flexibility
11    with the Medicare Advantage product, however, so
12    that's why you see differences.
13 Q. And you say you don't have a lot of flexibility. What
14    is the -- what is the reason for the lack of
15    flexibility?
16 A. Because Medicare Advantage is overseen and regulated
17    by CMS under some Medicaid and Medicare services, and
18    they have guidelines for what the plan designs have to
19    be and what's covered and the like. So the carriers
20    have to file those plans.
21 Q. And I just -- I want to make sure I understand your
22    answer. On Daniels Exhibit 10, which is the UAW
23    St. Joseph Health & Welfare Trust, we saw and you
24    testified that there were no in-network deductibles or
25    coinsurance, yet for a contemporaneous Medicare Plus

Page 48

1     plan for the same period of time for the Dana
2     Corporation retirees, we do see deductibles and
3     coinsurance. I don't understand how one could be
4     consistent with inflexible CMS policies and the other
5     also consistent with those policies.
6  A. As I noted, CMS has standard plan designs that they
7     will accept, so there's a menu of plan designs, such
8     as reflected here. So there is some flexibility, but
9     not endless flexibility. So I couldn't say I want an
10    ER co -- emergency department copay of $13.50 for
11    Medicare Advantage. That's not permitted.
12       So there's permitted benefit levels, and
13    each of these have different permitted, permissible
14    benefit packages.
15 Q. But it is consistent with CMS policy for plans to
16    contain deductibles?
17 A. Yes.
18 Q. And coinsurance?
19 A. CMS permits that.
20 Q. And copays?
21 A. I believe so, yes. We see that on the prescription
22    drug side.
23 Q. And CMS also permits differentiation between patients
24    who receive their benefits in-network versus patients
25    who receive their benefits out-of-network?

Page 49

1  A. Under the Medicare Advantage programs there are --
2     differentials between in-network and out-of-network
3     services are permitted, although very few services are
4     ever rendered outside network.
5  Q. And in your view is that because the incentives to
6     stay in the network are so strong?
7  A. It's a multifaceted -- there's multi reasons, multiple
8     reasons, why people stay in-network, but usually the
9     breadth of the network is sufficient that people
10    continue to stay in network.
11 Q. But the financial incentives are significant to stay
12    in the network, right?
13 A. Depending upon ones income, the incentives may or may
14    not be significant.
15 Q. And is there a -- do you have an amount of income
16    threshold at which they become insignificant?
17 A. No, but one could imagine, certainly, if you were
18    someone that was a multimillionaire --
19 Q. Warren Buffett wouldn't care.
20 A. He wouldn't care. Exactly. That's my point.
21 Q. But for purposes of the class of plaintiffs we're
22    dealing with here, it would be true, wouldn't it, that
23    the incentives to stay in the network, the financial
24    incentives to say in the network, are significant to
25    stay in the network to the class of plaintiffs here?

13 (Pages 46 to 49)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 50

1  A. That's not what I was asked to look at.
2  Q. So you don't have an opinion on that?
3  A. I don't.
4  Q. Okay. This -- we've been going for about -- how long?
5     Let's go for a little bit longer. We can get a little
6     bit more done, I think. I'm eager to get you out of
7     here with appropriate dispatch.
8         And as with the other benefit plans, you
9     weren't asked to form an opinion as to whether the
10    Dana Corp plan was more generous, less generous, or
11    about the same as the CNH proposal here, were you?
12 A. I was not asked to form an opinion.
13 Q. And you don't have an opinion?
14 A. I was not asked to form an opinion.
15 Q. I take it --
16 A. Beyond the scope of my work.
17 Q. And so I take it that means you don't have an opinion.
18 A. That is correct.
19 Q. Thank you.
20        Dr. Daniels, your work in the health care
21    area has -- I assume that you have followed the issues
22    of some of the major entities in the Detroit area with
23    regard to their retiree health care liabilities; is
24    that right?
25 A. Could you be more specific?

Page 51

1  Q. Sure.
2  A. -- as to the entities?
3  Q. Sure.
4        You know that both business and
5     governmental entities in the greater Detroit area have
6     had -- have struggled with their retiree health care
7     liabilities in recent years, right?
8  A. There are some entities that have struggled in recent
9     years.
10 Q. In fact, the former treasurer of the state of Michigan
11    opined in court just a couple of weeks ago that the
12    principal reason Detroit went into bankruptcy was
13    retiree health care benefits.
14        Didn't you -- did you read that?
15 A. I read that.
16 Q. And do you disagree with that assessment?
17 A. Detroit is far more complex than just retiree health
18    care as it relates to the bankruptcy.
19 Q. But you would agree that the retiree health care
20    obligations of Detroit are at least a material
21    contributing factor to Detroit's decision to go into
22    bankruptcy?
23 A. They are a factor. I have not personally reviewed the
24    numbers to say whether or not they are material --
25    it's a material reason.

Page 52

1  MR. BURCHFIELD: Let me ask the reporter to
2  mark as Daniels Exhibit 12 an article from the Detroit
3  Free Press dated November 5, 2013, entitled Dillon:
4  Retiree Health Care, Not Pension Shortfall, a Core
5  Reason for Detroit Bankruptcy.
6         MARKED BY THE REPORTER:
7         DEPOSITION EXHIBIT 12
8         10:48 a.m.
9  BY MR. BURCHFIELD:
10 Q. Dr. Daniels, do you have in front of you Daniels
11    Exhibit 12?
12 A. I do.
13 Q. And do you see there in the first paragraph it says,
14    Former Michigan Treasurer Andy Dillon said Tuesday
15    that Detroit's retiree health care commitment was a
16    core reason why the city filed for bankruptcy and that
17    the city's pension shortfall wasn't the driving
18    factor, unquote?
19 A. I see that language.
20 Q. And that -- and you saw the news reports of that
21    testimony, I assume?
22 A. I did not see this one.
23 Q. Dr. Daniels, would you agree with me that every day
24    CNH's ability to implement the changes that it's
25    proposing in retiree health care benefits are delayed,

Page 53

1  the retirees receive a financial benefit?
2  A. I don't think I can answer with a simple yes or no.
3  Q. And what about the question do you find difficult?
4  A. "Every day."
5  Q. Well, let's say every month. Would you agree that
6     every month the changes that CNH is proposing are
7     delayed that the class of retirees in this case
8     receive a financial benefit?
9         MR. CANZANO: I --
10        THE WITNESS: No.
11        MR. CANZANO: I'm going to object because
12    it assumes -- it assumes that there is a right to make
13    that change.
14        MR. BURCHFIELD: I don't -- I don't -- if
15    that's the way you understood the question, let me
16    make sure that that assumption is not reflected in the
17    question.
18 BY MR. BURCHFIELD:
19 Q. In the event CNH were to have a right to make the
20    changes, every month that those changes are delayed
21    the retirees receive a financial benefit, correct?
22 A. Retirees who access services will pay less than under
23    the proposed plan.
24 Q. And that's a benefit to them?
25 A. Correct.

14 (Pages 50 to 53)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 54

1   Q.  And similarly, for every month that the changes are
2     delayed, assuming that CNH ultimately is allowed to
3     make them, CNH suffers a financial detriment?
4   A.  They incur a cost.
5   Q.  And that's a financial detriment?
6   A.  Dependent -- whatever you want to -- however you're
7     defining detriment.  Those are not my words.
8   Q.  Well, you're an economist.  Do you not consider
9     incurring cost to be a detriment to a business?
10  A.  No, I don't, because oftentimes you incur costs as
11     part of, like, research and development.  So it's an
12     investment.
13  Q.  And is there any -- do you see any return to CNH from
14     the cost of providing more generous benefits to this
15     group of retirees than not -- than providing less
16     generous benefits to this group of retirees?
17  A.  There can be.  It's --
18  Q.  And what would that be --
19  A.  -- perception.
20  Q.  -- Dr. Daniels?
21  A.  Perception in the marketplace.
22  Q.  And how would one go about valuing it?
23  A.  I don't know how one would value it, but certainly, if
24     you look at companies that are attractive to work for
25     and that are ranked high, it's because of the benefit

Page 55

1     packages that they provide both to current and retired
2     workers.
3   Q.  So is there any other benefit that you could
4     potentially conceive of to the continuing cost to CNH
5     for providing these benefits other than a potential
6     public perception?
7   A.  The other benefit is that retirees will have --
8     long-term health care costs can be contained by
9     providing a population access to care without barriers
10     that discourage them from getting care on a timely
11     basis and getting preventive care, taking their
12     medications and the like.  So there is a financial
13     upside to all of this.
14  Q.  Um-hum.  And you're familiar -- you're aware that
15     under the Affordable Care Act there are four
16     categories of preventive care that are not -- that
17     cannot be restricted, right?
18  A.  Correct.
19  Q.  And taking that into account, have you seen any
20     quantification of the long-term financial benefit to a
21     company of offering benefits without cost-sharing
22     versus benefits with cost-sharing, assuming --
23  A.  Yes.
24  Q.  -- those four categories of preventive services are
25     covered?

Page 56

1   A.  Yes.
2   Q.  And what study?
3   A.  There are employers -- most notable is probably Pitney
4     Bowes -- who went forth, and eliminated, reduced --
5     and others have followed -- and have zero copays on
6     generic drugs often, for certain classes of drugs,
7     because the data and the research that they conducted
8     showed that it lowered health care costs overall,
9     because the members -- their employees were able --
10     took their medications and were compliant.
11  Q.  I don't see Pitney Bowes referred to anywhere in your
12     report.
13  A.  That's right, because that's active workers, and...
14  Q.  Okay.  Am I correct, Dr. Daniels, that the UAW agreed
15     to all the changes in the 2005 plan for its current --
16     for the current unionized employees and for subsequent
17     retirees?
18        MR. CANZANO: Objection to foundation.
19        THE WITNESS: I don't know.  I was given
20     the documents with the plans that are cited in my
21     report.
22  BY MR. BURCHFIELD:
23  Q.  You would agree with me, as a health care economist,
24     that cost savings are not necessarily equivalent to
25     cost shifting?

Page 57

1   A.  Repeat the question, please.
2   Q.  You would agree with me that cost savings are not
3     necessarily equivalent to cost shifting?
4   A.  Savings can be achieved without a cost shift.
5   Q.  By, for example, moving from branded to generic drugs?
6   A.  That is an example.
7   Q.  Or mail-order prescription drugs?
8   A.  Correct.
9   Q.  Or requirements that drugs be purchased in quantities
10     such as 90 days rather than in shorter allotments?
11  A.  That actually works the opposite way oftentimes.
12  Q.  It works the opposite way, meaning that if you order
13     more from the drug distributor they will charge you
14     more for a 90-day supply than for a 30-day supply?
15  A.  Your question, as I interpreted it, was about savings,
16     and I'm looking at savings in a macro way.
17  Q.  Um-hum.
18  A.  So it would be not -- you would not save by having
19     individuals immediately fill a prescription for 90
20     days.  You only start 90-day scripts to be for
21     maintenance medications, medications they have been on
22     for a while.
23  Q.  Um-hum.
24  A.  So to say that the 90-day supply -- the way that
25     you've phrased it is not correct.  In fact, you want

15 (Pages 54 to 57)

Page 58

1  them to have had -- like, been on it for a month to
2  two months before you have them do a 90-day supply.
3  Q.  My question may have assumed that a doctor would not
4  write a prescription for 90 days or more unless the
5  patient needed the drugs for 90 days or more, so let's
6  work that into our assumption.
7         You would agree with me that, if a patient
8  has a prescription for maintenance medications and
9  buys them in 90-day allotments versus 30-day
10  allotments, that that can be a cost saving that does
11  not result in a cost shift to the patient?
12  A.  Agree with that for maintenance drugs.
13  Q.  And you would also agree with me, wouldn't you, that
14  moving patients from out-of-network where the payments
15  are at the usual and customary rate, into a network
16  with negotiated, discounted rates, would be a cost
17  saving that would not shift cost to the patients?
18  A.  If the network -- in-network -- if the provider
19  network that is considered in-network is broad, then
20  it is not a cost shift.  Because there are sufficient
21  providers, hopefully that were selected based not just
22  that they would take a discount, but based on clinical
23  outcomes, then it would not be a cost shift.
24  Q.  So -- but with a broad network the payment of
25  negotiated charges in-network could result in cost

Page 59

1  savings versus out-of-network care without shifting
2  any of the costs to the patients?
3  A.  Again with the caveat with respect to the breadth of
4  the network and the access that individuals have to
5  those network providers must be reasonable.
6  Q.  And you would also agree with me, wouldn't you, that
7  at least in theory a shift by a company of costs to
8  the government through existing government programs
9  would not necessarily -- let me start again.
10         Would you agree with me that a company
11  could save costs by shifting part of its cost to the
12  government through government programs, and that
13  doesn't necessarily lead to cost increases for the
14  patient?
15  A.  It is possible for, in a company, an employer to take
16  advantage of current government-funded programs that
17  will help contain their costs and not adversely impact
18  and cost their retirees, active workers -- retirees in
19  this case -- additional expenses.
20  Q.  Dr. Daniels, how do you define managed care?
21  A.  Managed care.  A managed care plan product has
22  programs and protocols that are focused on ensure --
23  on deliver -- ensuring that providers deliver care
24  based on evidence-based, clinical guidelines, that
25  members have timely access to care, that providers and

Page 60

1  plan members follow treatment protocols and those
2  evidence-based guidelines.
3  Q.  Is it a component of managed care, in your experience,
4  that it typically works in conjunction with a network
5  program?
6  A.  Yes.
7  Q.  And is it your experience that managed care typically
8  works in conjunction with negotiated rates for --
9  with -- between the provider and the network
10  providers?
11  A.  Yes.
12  Q.  Is it typically your experience that as part of
13  managed care that participating providers in the
14  network agree to, as you -- I think your term was
15  evidenced-based treatment protocols?
16  A.  Yes.
17  Q.  And is it typical in managed care that
18  precertification is required for certain services?
19  A.  Historically managed care precertification was very --
20  was a core feature.  It's waned in recent years.
21  Q.  And why -- I'm sorry.  Go ahead.
22  A.  As -- well, again, that there's not always the need
23  for it, that there were things that they used to do
24  precert for all the time that they realized it cost
25  more to do -- administratively to do the precert,

Page 61

1  because they were going to certify it anyhow.  So
2  there's less of that.
3         There's still some, but there's less than
4  in the old days.
5  Q.  Are you saying that precertification has declined for
6  certain services or it's declined --
7  A.  It's become more targeted.
8  Q.  Okay.  So it hasn't been -- it's not on the road to
9  distinction across the board?
10  A.  That is correct.
11  Q.  Now, does -- is managed care, as you understand it,
12  also consistent with the notion that patients get
13  financial incentives to participate in the network as
14  opposed to going out-of-network?
15  A.  Yes.
16  Q.  And the participating providers in a network can
17  change year to year, right?
18  A.  They can.
19  Q.  And hospitals participating in a network can change
20  year to year, too, can't they?
21  A.  They can.
22  Q.  Is it your understanding that managed care also has
23  protocols -- sometimes has protocols for the use of
24  generic or formulary drugs rather than branded drugs?
25  A.  Yes.

16 (Pages 58 to 61)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 62

1  Q.  I note from your resume that from 1987 to 1991 you
2     were a staff consultant at the United Auto Workers, a
3     senior staff consultant; is that correct?
4  A.  Yes, it is.
5  Q.  And during that time am I correct that the UAW had a
6     policy of rejecting managed care proposals in the
7     collective bargaining realm?
8  A.  There was no such policy that I recall.
9  Q.  Do you recall any situation in which the UAW entered a
10    collective bargaining agreement with the sorts of
11    managed care provisions that we've just talked about?
12  A.  Yes.
13  Q.  During the time you were there?
14  A.  Yes.  Towards the latter part of my tenure I was
15    responsible for evaluating what are true managed care
16    plans, HMOs, prior to them being offered to UAW
17    members across the country.  So managed care plans
18    were prevalent.
19  Q.  During the time that you were at the UAW did the UAW
20    have managed care or HMO programs with material
21    incentives for their use with GM?
22  A.  I don't understand what you mean by, Material
23    provisions for their use.
24  Q.  Well, you can set up — you can set up a program, but
25    if there are no incentives for the employees to use

Page 63

1    it, it might not be used.
2       Do you recall whether — do you recall
3    whether the UAW, in its collective bargaining
4    relations with GM during the time you were at the UAW,
5    had a managed care or HMO program for UAW employees
6    that incentivized them in a material way to
7    participate in the managed care program as opposed to
8    the indemnity program?
9  A.  The UAW-represented employees at GM were offered a
10    choice, and HMO benefits were significantly richer
11    than under an indemnity plan.
12  Q.  Was there any in-network incentives for the employees
13    to use the HMO plan?
14  A.  Under an HMO most -- if you want to use the
15    terminology -- restrictive forms of managed care,
16    there is no coverage if you go out-of-network.
17  Q.  Well, there can be out-of-network coverage.  We've
18    seen that in some of the plans that your VEBA's
19    administered.
20  A.  Not in an HMO.
21  Q.  What was the participation rate in the HMOs at GM
22    during the time you were at the UAW in 1987 to '91?
23  A.  I have no recollection.
24  Q.  Do you recall if it was more than half?
25  A.  I don't recall.

Page 64

1  Q.  Okay.  Were there any contracts -- were there any
2    contracts that you're aware of that the UAW entered
3    during your tenure there in which -- in which the
4    beneficiaries, the employees, were -- had to pay
5    out-of-pocket charges to go to a provider other than
6    the HMO?
7  A.  Your question doesn't make sense.
8  Q.  What doesn't make sense about it?
9  A.  Well, you asked would an employee have to pay out of
10    pocket if they went to a provider other than the HMO.
11    I either signed up for the HMO or I signed up for
12    whatever other plan was offered, the indemnity plan or
13    whatever.  So I'm a little -- I'm confused by your
14    question.
15  Q.  Okay.  Let me reask it then.
16       If an employee didn't sign up for the HMO,
17    how did the out-of-pocket charges that the employee
18    had to pay to take advantage of the non-HMO care
19    compare to the out-of-pocket charges that the employee
20    had to pay to go to the HMO during the time you were
21    at the UAW?
22  A.  As I stated, the benefits under the HMO were more
23    generous than the other plan offerings.
24  Q.  Yes.  My question focuses on out-of-pocket costs to
25    the employee.

Page 65

1  A.  That's generous, I mean, in terms of dollars.  The
2    copays were lower under an HMO than under the
3    indemnity plan.
4  Q.  Do you recall by how much?
5  A.  No, but I can say that there were many in HMO that had
6    a zero drug copay, whereas in another plan it's 5/10,
7    perhaps.
8       MR. BURCHFIELD:  Let me ask the reporter to
9    mark as Daniels Exhibit 13 a document dated April 23,
10    1984.
11       MARKED BY THE REPORTER:
12       DEPOSITION EXHIBIT 13
13       11:12 a.m.
14  BY MR. BURCHFIELD:
15  Q.  Dr. Daniels, if you could take a moment and look at
16    Daniels Exhibit 13, and my question for you is whether
17    you saw that during the time you were a senior staff
18    consultant at the UAW from 1987 to 1991.
19  A.  I do not recall seeing this letter.
20       MR. BURCHFIELD:  Okay.  Why don't we
21    take -- what do you think?  Ten minutes?
22       MR. CANZANO:  Fine.
23       MR. BURCHFIELD:  Okay.  Great.
24       (Recess taken at 11:13 a.m.)
25       (Back on the record at 11:29 a.m.)

17  (Pages 62 to 65)

Page 66

1    MR. BURCHFIELD: Let's go back on the
2  record.
3  BY MR. BURCHFIELD:
4  Q.  Dr. Daniels, do you know or have you done any
5     investigation about the percentage of retired
6     Americans who rely exclusively on Medicare as their
7     source of health insurance?
8  A.  I have not.
9     MR. BURCHFIELD: I ask the reporter to mark
10  as Daniels Exhibit 14 a document entitled Examining
11  Sources of Supplemental Insurance and Prescription
12  Drug Coverage Among Medicare Beneficiaries, dated
13  August 2009, by the Henry J. Kaiser Family Foundation.
14     MARKED BY THE REPORTER:
15     DEPOSITION EXHIBIT 14
16     11:30 a.m.
17  BY MR. BURCHFIELD:
18  Q.  Dr. Daniels, do you have in front of you Exhibit 14?
19  A.  I do.
20  Q.  You have heard of the Henry J. Kaiser Family
21     Foundation, I assume?
22  A.  I am familiar with the Henry J. Kaiser Family
23     Foundation.
24  Q.  Okay. And do you consider the Henry J. Kaiser Family
25     Foundation a credible source of information in the

Page 67

1     health care arena?
2  A.  Yes.
3  Q.  Let me ask you to look, if you would, at page 4 of
4     Daniels Exhibit 14, and you'll see at the top a pie
5     chart. And this is Exhibit 1.1 of the report, and
6     it's entitled Sources of Supplemental Coverage Among
7     Medicare Beneficiaries, 2007.
8     Are you with me?
9  A.  Yes, I am.
10  Q.  And it shows there none, Medicare fee-for-service
11     only, 11 percent; do you see that?
12  A.  I do.
13  Q.  And then self-purchased only, 17 percent; do you see
14     that?
15  A.  I do.
16  Q.  Twenty-two percent Medicare Advantage; do you see
17     that?
18  A.  Yes.
19  Q.  And then Medicaid, 15 percent?
20  A.  Yes.
21  Q.  And then total number of beneficiaries, 40.8 million.
22     Do you have reason to question any of those
23     percentages or numbers?
24  A.  No. I would -- no.
25  Q.  Now, Medicare Advantage we talked about a little bit

Page 68

1     before. Medicare is -- and let me just ask: Is
2     Medicare Advantage always an employer-provided or
3     -funded option for retirees?
4  A.  No.
5  Q.  Can private individuals, out of their own pockets,
6     obtain Medicare Advantage plans?
7  A.  Yes, they can now.
8  Q.  Do you have any notion, Dr. Daniels, of whether it is
9     more commonly employer funded or individually funded?
10  A.  I don't know those numbers, no.
11  Q.  Would it be fair to say, Dr. Daniels, that many
12     millions of Americans rely exclusively on Medicare
13     coverage for their health care coverage in retirement?
14  A.  Based on this chart, 11 percent of Medicare
15     beneficiaries rely solely on Medicare fee-for-service
16     in retirement.
17  Q.  And there are an additional complement of retirees who
18     have no employer-funded component to their health care
19     coverage; is that your understanding?
20  A.  Based on this chart in 2007, from 17 percent that
21     self-purchased additional coverage, 15 percent on
22     Medicaid.
23  Q.  And perhaps some portion of the 22 percent Medicare
24     Advantage?
25  A.  It's possible, but likely small, given the year.

Page 69

1  Q.  Now, you've reviewed the proposed plan that CNH is
2     advocating in this case; is that right?
3  A.  Yes.
4  Q.  And would you agree with me that the plan CNH is
5     proposing for the Medicare-eligible retirees is more
6     generous than Medicare standing alone?
7  A.  I believe so, to the best of my recollection of what
8     the plan design was.
9  Q.  Okay.
10  A.  Noting that it's Medicare standing alone.
11  Q.  Correct.
12     Have you reviewed the reports of -- the
13     report of Scott Macey in this case?
14  A.  I was given the report of Scott Macey. I was asked to
15     focus on a section of Scott Macey's report that
16     related to my expert report.
17  Q.  Did you review Mr. Stahl's report in this case?
18  A.  I'm not sure.
19  Q.  John Stahl, does that ring a bell?
20  A.  No, it doesn't.
21  Q.  Well, with regard to Mr. Macey's report, did you
22     review the portion where he states that, Of the top 25
23     drugs used by Plaintiffs in recent years, a very large
24     percentage of them didn't exist in 1998?
25  A.  I was not asked to review that section.

18  (Pages 66 to 69)

SUZANNE DANIELS, PH.D. - 1/10/2014

---

Page 70

1  Q.  Okay.  You don't have any opinion on whether that's
2      accurate or not?
3  A.  I don't have an opinion to offer.
4  Q.  Okay.
5  A.  I wasn't asked to look at that.
6  Q.  And Mr. Macey also addressed medical procedures on the
7      basis of procedure codes, opined that a large
8      percentage of the procedures that Plaintiffs are using
9      now, the medical procedures that they're using now,
10     did not exist is 1998.
11         Did you review that portion of his report?
12 A.  I was not asked to review that portion of the report.
13 Q.  So you don't have an opinion on that, either?
14 A.  No, I'm -- no.
15 Q.  All things being equal, Dr. Daniels, if the retirees
16     are receiving drugs and medical procedures today that
17     were not in existence in 1998, at no greater cost to
18     themselves, is that an advantage to the plaintiffs, in
19     your view?
20 A.  They're receiving health care, and health care has
21     changed over time, so there are things that were done
22     in 1998 that we probably don't do today or do in the
23     same way.
24 Q.  Okay.  My --
25 A.  So they're receiving current health care.

---

Page 71

1  Q.  Which is better than the health care standard in 1998?
2  A.  It's certainly different.  There's been progress,
3      medical -- in the medical field.
4  Q.  Okay.  And do you -- you say, "progress."  Is that a
5      good thing or a not-a-good thing?
6  A.  Actually it's a mixed bag.
7  Q.  So you think --
8  A.  Generally good, but like anything in this world, there
9      can be a downside.  There are providers that over
10     prescribe, do excessive surgeries and the like, so
11     there is a downside.  Nothing is black and white.
12 Q.  And over-prescriptions and excessive surgery you think
13     have detrimental health effects?
14 A.  That has been demonstrated, yes, in the research.
15 Q.  Have you seen statistics on the extent of that?
16 A.  I have not reviewed this document recently that I can
17     cite the numbers, but the Dartmouth Atlas --
18 Q.  Dartmouth?
19 A.  Dartmouth Atlas.
20 Q.  Atlas.
21 A.  -- does and continues to do extensive research that
22     focuses on the overutilization of services, in
23     particular surgeries such as hip replacements, knee
24     replacements.  So it's variation in care after you've
25     adjusted for differences in the population.  It's

---

Page 72

1      regional variations.
2          Sorry.
3  Q.  Oh, I'm sorry.  I thought we had a water leak.
4          Now, under the proposed plan do you
5      understand that the Medicare-eligible retirees would
6      be entitled to use any provider that accepts Medicare?
7  A.  Yes.
8  Q.  And I thought I read something, Dr. Daniels, you know
9      -- you may know whether this is accurate or not --
10     that the Patient Protection and Affordable Care Act
11     has eliminated or closed the so-called doughnut hole?
12 A.  It has made -- it has decreased the size of the
13     doughnut hole; however, one will enter the doughnut
14     hole earlier.
15 Q.  Okay.
16 A.  All right?  I know, this is...
17 Q.  It's arcane stuff, I know, but I'm with you so far.
18         So a lower -- the entry level for the
19     doughnut hole has been lowered, but the ceiling for
20     the doughnut hole has also been lowered?
21 A.  Correct.
22 Q.  And the net effect of that is to lessen the size of
23     the doughnut hole, if I'm understanding you correctly?
24 A.  That is the intent.
25 Q.  And do you know what the intended -- do you know what

---

Page 73

1      the intended ultimate size of the doughnut hole is,
2      taking into account the lower entry level and the
3      lowered ceiling?
4  A.  It's in the low $4,000 range --
5  Q.  Versus --
6  A.  -- for 2014.  The difference is less than $200 in
7      2013.
8  Q.  And is the --
9  A.  My recollection.
10 Q.  Is the expectation that the doughnut hole will
11     continue to shrink?
12 A.  Ultimately, and go away in, like, 2020.
13 Q.  Okay.  Let's turn back to your report the -- for a
14     couple minutes.  And this is Daniels Exhibit 6, your
15     September 27, 2013, report.  And let me just ask you
16     some questions about your -- about your approach.
17         On page 25 -- actually, on page 25 of your
18     report you set forth the fees you had charged, as I
19     read it, as of September 27, 2013, of $8,000; is that
20     right?
21 A.  That's correct.
22         MR. BURCHFIELD:  And let me ask the
23     reporter to mark as Exhibit 15 an invoice from SNG
24     Consulting to Darcie Brault.
25         MARKED BY THE REPORTER:

---

19  (Pages 70 to 73)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 74

1    DEPOSITION EXHIBIT 15
2         11:45 a.m.
3  BY MR. BURCHFIELD:
4  Q.  And is Exhibit 15 your invoice for services rendered
5      in connection with the June and September versions of
6      your report here?
7  A.  That is the invoice as of October 11 -- as October 1,
8      yes.
9  Q.  Okay.  So that would include the June version and the
10     September version?
11 A.  Yes, it does.
12 Q.  And the total number of hours you spent as of that
13     time was?
14 A.  31.5.
15 Q.  Okay.  And do you recall, Dr. Daniels, how many more
16     hours you have spent in connection with your addenda,
17     which is Exhibit 7?
18 A.  My recollection is less than ten.
19 Q.  So all in for your reports in this matter you spent
20     roughly 40 hours?
21 A.  I think that's a good estimate.
22 Q.  Have you -- have you invoiced Ms. Brault for your
23     rebuttal report as of yet?
24 A.  Not as of yet, no.
25 Q.  And has the $8,000 fee been paid as of yet?

Page 75

1  A.  It was -- yeah, 4300, because they had paid the
2      retainer.
3  Q.  Okay.  I'm looking at the $8,000 figure in your
4      report, but they're current on the invoices you've
5      tendered?
6  A.  Yes, they are.
7  Q.  All right.  Now let me look at -- let's look at
8      attachment 2, which is on page 22 of Daniels Exhibit
9      6, and can you just confirm for the record that this
10     is the list of materials that you have relied upon in
11     connection -- in preparing your report, plus any
12     additional materials cited in the footnotes of your
13     report?
14 A.  Yes, I believe this encompasses everything.
15 Q.  Okay.  Did you -- could you describe what if any
16     literature search you did in preparing your report?
17 A.  I did an extensive literature review in order to
18     address the focus that I was asked to look at, and
19     that would be the impact of changes in plan on the
20     retirees.  So I researched the current literature
21     that's published and peer reviewed to find information
22     in that area.
23 Q.  And about how many hours did you spend on that
24     extensive review?
25 A.  It's listed in here.  Three, four, five, roughly.

Page 76

1  Q.  So March 31 and June 1 I see literature review entries
2      totaling four hours.  Is that it?
3  A.  That's about right, yep.
4  Q.  Okay.  And you were satisfied that your literature
5      review in that four hours was sufficient to render the
6      opinions that you've rendered in this case?
7  A.  Yes.
8  Q.  Okay.
9  A.  I have reviewed the literature in this area before.
10 Q.  So obviously you relied upon your extensive experience
11     as an economist in the health care area, you relied on
12     your literature review you just described, you relied
13     on the documents that are listed in attachment 2 of
14     your report, and you relied upon letters submitted by
15     the individual retirees.
16         Is there anything else that you have relied
17     upon to form your opinions in this case?
18 A.  I did not rely upon the letters from the retirees in
19     the formation of my opinion.
20 Q.  Okay.  You cite them in your report.  What -- how
21     would you describe what you did with them, if you
22     don't call that reliance?
23 A.  Earlier on we talked about the report that was
24     submitted in June --
25 Q.  Um-hum.

Page 77

1  A.  -- that mirrors this report.  The difference really
2      between the two is -- are the citations from the
3      retiree letters, which served to provide real world
4      examples of the cited research and my opinion.
5  Q.  Okay.  You wouldn't say that your report rises and
6      falls on those retiree letters, would you?
7  A.  As I just said, they were to provide real world
8      examples, but my opinion was based on my experience
9      and the literature.
10 Q.  Did you find the retiree letters credible?
11 A.  Found that the retiree letters were consistent with
12     the literature, in my opinion.
13 Q.  Yeah.  We'll look at some of that in a minute.
14         Okay.  So in terms of what you relied on
15     for your opinion, your experience, the review of the
16     literature, the review of the documents listed in
17     attachment 2 to your report, anything else that you
18     relied upon for purposes of forming your opinions in
19     this case?
20 A.  I do not believe so.
21 Q.  Okay.  You did not do any field work, I assume?
22 A.  What do you mean by, "field work"?
23 Q.  You didn't go out and personally interview any of the
24     retirees?
25 A.  No.

20  (Pages 74 to 77)

SUZANNE DANIELS, PH.D. – 1/10/2014

| Page 78 | Page 80 |

**Page 78**

1  Q.  You did not do a formal survey of the retirees?
2  A.  Clarify.  Retirees meaning this group, or retirees --
3  Q.  Fair point.
4         The plaintiff retirees.  You did not do a
5     survey of the plaintiff retirees?
6  A.  No.
7  Q.  You didn't do any econometric analysis on your own?
8  A.  No.  That would not fit within the scope of what I was
9     asked to do.
10  Q.  You didn't do any one-on-one interviews with retirees?
11  A.  No.
12  Q.  You didn't review any retiree financial information?
13  A.  No.
14  Q.  And you didn't do any comparison of the proposed CNH
15     plan to any other health plans that are currently
16     available in the marketplace?
17  A.  I did not do any such comparisons.
18  Q.  In your report on page 13 -- let's start on page --
19     yeah, on page 13.  In the first -- in the second
20     paragraph there you write, Based on my experience,
21     industrial workers who for three to four decades were
22     covered by an employer-sponsored, collectively-
23     bargained group benefit plan, first as an active
24     worker and then in retirement, generally have lower
25     levels of health insurance literacy than nonindustrial

**Page 79**

1     retired workers who were not covered by a collective
2     bargaining agreement.
3         Do you see that?
4  A.  I do see that.
5  Q.  And you stand by that statement?
6  A.  That is my opinion.
7  Q.  And what is that opinion based on, Dr. Daniels?
8  A.  Based on my experience.
9  Q.  And describe that experience for me.
10         Have you -- is it experience borne of
11     talking to those retirees?  Literature search?  What
12     is it based on?
13  A.  It's based on my experience working with the plan
14     sponsors who oftentimes have both workers -- employees
15     that are covered by a collective bargaining agreement
16     and those that are not.
17  Q.  How do you make an assessment of the health insurance
18     literacy of the covered individuals without having
19     discussions with those covered individuals?
20  A.  There's research and such, as I've noted later on when
21     we talk about the Consumers Union study, where they
22     have done that testing of health literacy.
23         Also worked on health literacy as part of a
24     Robert Wood Johnson Foundation project that's listed
25     on my resume.

**Page 80**

1  Q.  And that's the Consumers Union study that's cited in
2     footnote -- is it footnote 23 of your report on -- 22
3     of your report on page 12?
4  A.  That is correct.
5  Q.  Okay.  And you say in paragraph F there, Retirees,
6     when faced with numerous choices of Medicare Part D
7     prescription drug plans, often make suboptimal
8     selections.  Medicare-eligible participants have a
9     choice of over 30 Medicare Part D prescription drug
10     plans in most states or CMS regions.
11         Do you see that?
12  A.  Yes, I see that.
13  Q.  And you stand by that statement?
14  A.  Yes.  There's literature that supports that.
15  Q.  How many Medicare Part D plans are there available in
16     the Wisconsin area?
17  A.  I don't know specifically today.
18  Q.  And when you say, Over 30 Medicare Part D prescription
19     drug plans in most states, does that mean 30 per
20     state, or does it mean 30 in aggregate?
21  A.  Thirty per state.
22         The number's dropped a little recently, but
23     I have not looked at Wisconsin currently.
24  Q.  Have you looked at -- have you looked at Illinois?
25  A.  No.

**Page 81**

1  Q.  Or Iowa?
2  A.  No.  It's not relevant in my work.
3  Q.  I'm sorry?
4  A.  It's not an area of focus for me.  This is individual
5     products.
6  Q.  You understand, don't you, that the manufacturing
7     facilities at which these retirees worked were in
8     those three states?
9  A.  I -- yes, from the documents I reviewed.
10  Q.  The next paragraph you wrote, A study published by the
11     National Bureau of Economic Research of Medicare
12     enrollees' selection of a Part D plan found that less
13     than 10 percent of Medicare beneficiaries enrolled in
14     what for them would be the most cost-effective plan,
15     costing the retirees hundreds of dollars per year in
16     avoidable, out-of-pocket expenses.  This is
17     significant for retirees on a fixed income as it
18     limits what they have to spend on other necessities,
19     such as health care, household expenses, et cetera.
20         Do you see that?
21  A.  I see that.
22  Q.  And you stand by that?
23  A.  I do.
24  Q.  And it sounds to me, Dr. Daniels, that you don't have
25     a lot of confidence in the ability of

21 (Pages 78 to 81)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 82

1       union-represented, industrial retirees generally, or
2   in this group of retirees, to make -- to make prudent,
3   careful economic decisions on their own about their
4   health care.
5  A.  Based on the -- on the research I've cited and in my
6   experience, it is my opinion that they are not
7   well-equipped to make such decisions.
8  Q.  You understand, don't you, that now, under the
9   Affordable Care Act, the uninsured population is being
10  asked to do exactly that by the Federal Government,
11  right?
12 A.  The under-64 uninsur -- population is being asked.
13 Q.  Are you suggesting that people get a lot dumber when
14  they turn 65?
15 A.  I'm not suggesting that.
16 Q.  Okay.  Well, let me --
17 A.  But certainly if you are 80 it would be more of a
18  challenge.
19 Q.  Well, is it -- are you -- do you draw material
20  distinction between people under 65 and people over 65
21  in terms of their health care literacy?
22 A.  There's some research that would support that there is
23  a difference.
24 Q.  And what research is that?
25 A.  I can locate it for you, but it's been again through

Page 83

1   the Robert Wood Johnson Foundation work.  We did look
2   at some differences in health literacy, and it did
3   vary by age.
4       And it's not because of intelligence; it's
5   how long you've been used to a certain type of
6   delivery mechanism for health care.
7  Q.  Would you turn to page 15 of your report?  And that's
8   your signature there, right?
9  A.  Yes.
10 Q.  And there's no footnote on that page, but the last
11  footnote in the report is on page 14, footnote 25.  Do
12  you see that?
13 A.  I see that.
14 Q.  And, Dr. Daniels, if we go through the report of those
15  25 footnotes, by my count 15 out of the 25 references
16  in your report, cited references, are to the retiree
17  letters.  Does that sound right?
18 A.  I did not count them.
19 Q.  It is footnotes 3, 4, 5, 9, 10, 11, 14, 15, 16, 17,
20  18, 19, 21, 24, and 25.  Does that sound right?
21 A.  I believe so.
22 Q.  Now, having just testified that the level of health
23  care literacy among this very group of retirees is
24  low, what weight are you putting on these retiree
25  letters?

Page 84

1  A.  None.
2  Q.  None.  Okay.
3       Do you know what information about the
4   plans -- do you know what information about the
5   proposed plan the retirees were given before they
6   wrote those letters?
7  A.  No.
8  Q.  Did you ask?
9       MR. CANZANO:  I'm going to object to the
10  extent that involves communication with Counsel.
11 BY MR. BURCHFIELD:
12 Q.  Well, would you agree with me, Dr. Daniels, that a
13  letter written by a person who has no understanding of
14  the proposed plan should carry no weight in this
15  proceeding?
16      MR. CANZANO:  I'm going to object to the
17  extent it assumes facts not in evidence.
18      THE WITNESS:  They have an understanding.
19  There's a difference between understanding and being
20  able to make the best decision.
21 BY MR. BURCHFIELD:
22 Q.  And my question for you is:  Before you cited 15 of
23  those letters in your report, did you make any inquiry
24  about what information the retirees were provided
25  about the proposed plan?

Page 85

1  A.  I don't recall specifically discussing that with
2   Counsel.
3  Q.  Do you, as you sit here right now, recall finding out
4   any information they were given?
5  A.  I don't recall.
6  Q.  Do you know if they were given something -- given
7   information in writing?
8  A.  Based on reading the letters, it was apparent -- it
9   seemed apparent that they were given something.  They
10  had knowledge of the proposed plan.
11 Q.  Well, obviously feel free to disagree with this,
12  Dr. Daniels, but having read the letters myself, it
13  seemed to me that the retirees were told little more
14  than that the health benefits they were going to get
15  were going to be worse than the ones that they have.
16      Did you see anything in the letters that
17  led you to believe that they had more specific
18  information than that?
19 A.  I would need to go back and look at them again, but I
20  do seem to recall that they -- there were some that
21  had a more -- had greater specificity.
22 Q.  About the plan?
23 A.  Correct.
24 Q.  Do you recall a number of them -- well, do you know
25  what the -- do you know how these letters originated?

22 (Pages 82 to 85)

SUZANNE DANIELS, PH.D. – 1/10/2014

Page 86

1   In other words, were they a spontaneous outcry by the
2   retiree class, or were they requested in some way?
3   A.  I assume that they were requested, given that they
4   were addressed to Counsel.
5   Q.  And do you know what -- do you know -- we have in the
6   law what we refer to as leading questions.  I've been
7   known to ask some of those myself.  But do you know if
8   the request for information was done in such a way
9   that might have prompted particular responses?
10  A.  I have no knowledge.
11  Q.  Would that matter to you as an expert in terms of
12  whether to credit these letters or not?
13  A.  I'd have to know more about it.
14  Q.  But you didn't make any inquiry?
15  A.  Again, I didn't rely on these letters.
16  Q.  Do you find them reliable?
17  A.  I find them consistent with the literature that I
18  cited and my opinion.
19  Q.  Well, standing alone do you find these letters
20  supportive -- would you be comfortable relying on
21  these letters as supportive of any conclusion?
22  A.  Of any conclusion?
23  Q.  Yeah, any conclusion.  And I'm going to ask you what
24  conclusion.
25  A.  Yes.

Page 87

1   Q.  What conclusion?
2   A.  That retired -- the retiree letters expressed a
3   concern that, if plan benefits were changed, that it
4   would negatively impact them.
5   Q.  Do you, Dr. Daniels, know how many -- there were --
6   let me start again.
7       We received in connection with your report,
8   I believe the number was, 58 unique letters.  Does
9   that sound about right to you?
10  A.  Sounds about right.
11  Q.  And you relied on 15 of those letters?
12  A.  I chose 15.
13  Q.  You cited 15 of those letters?
14  A.  I included 15.
15  Q.  And how did you choose the 15 you decided to cite?
16  A.  I chose them based on the ones that fit with the
17  original draft report that I did and the topics that I
18  had already laid out.  There were some that were not
19  as on topic or whatever.
20  Q.  So you just --
21  A.  I chose -- I selected a subset.
22  Q.  You chose the ones that supported your opinion?
23  A.  No.
24      Yes, they supported my opinion.  There were
25  others.

Page 88

1   Q.  Were there some that didn't support your opinion?
2   A.  Not that I recall.
3   Q.  Do you know how -- you say in your report that there
4   are --
5   A.  What page?
6   Q.  I'm on page 2.
7       You say that there are currently 2,037
8   non-Medicare-eligible participants and 1,982
9   Medicare-eligible participants.
10      Do you see that?
11  A.  I do.
12  Q.  And that's about 4,019 total participants in the plan,
13  right?
14  A.  That is correct.
15  Q.  As a -- you've had training in econometrics, right?
16  A.  A long time ago, yes.
17  Q.  And statistics?
18  A.  Yes.
19  Q.  Would you consider the 58 letters that you've included
20  to be a random sample?
21  A.  I don't know enough about how the letters -- they
22  requested the letters.  I know from a sample size
23  perspective it's valid.
24  Q.  So 58 -- 58 observations out of 4,000 would be, in
25  your estimation, if randomized, a sufficient sample?

Page 89

1   A.  My past recollection of training and statistics is a
2   sample size of 30 was good to go, was sufficient.
3   Q.  And the margin of error varies significantly for a
4   small sample size of that nature; is that correct?
5   A.  The smaller the sample size, the lower the level of
6   reliability.
7   Q.  Did you find -- did you find it of any concern,
8   Dr. Daniels, that you were provided only 58, if that
9   is the number, but certainly less than a hundred
10  letters, out of the 4,000 retirees?
11  A.  I didn't have any reason to question the number of
12  letters.
13  Q.  Did you attend any of the meetings that the plaintiffs
14  counsel had with the plaintiffs in East Moline,
15  Burlington, or Kenosha?
16      MR. CANZANO:  Object to assumes facts not
17  in evidence and foundation.
18      THE WITNESS:  No, I did not.
19  BY MR. BURCHFIELD:
20  Q.  As I reviewed the letters, Dr. Daniels, none of them
21  were under oath.  Is that consistent with your
22  recollection?
23  A.  They're just retiree letters.  I...
24  Q.  Do you know if the -- if Plaintiffs' counsel received
25  any letters from retirees that were not provided to

23  (Pages 86 to 89)

Page 90

1    you?
2    A.  I'm not aware of any.
3    Q.  Did you ask?
4    A.  I asked for the letters.  This is what I was given.
5    Q.  As a professional economist what do you expect people
6        to say if they're told they're going to have to pay
7        more for something?
8    A.  Generally they will not be happy about it.
9            MR. CANZANO:  Is that question pay more for
10       the same thing?
11           THE WITNESS:  I assumed that.
12   BY MR. BURCHFIELD:
13   Q.  Let me ask you to look at footnote 14, and you'll see
14       reference in there to a letter from, I think,
15       Ms. Blondell.  The note 14 would be on page 9, and
16       it's -- refers to the last quotation there on the
17       page.  Do you see that?
18           And the quotation is -- are you with me?
19   A.  I'm just double-checking the comment.
20   Q.  You see there the quotation is:  Simply put, the
21       financial impact of the extra cost would be
22       overwhelming.  I would just stop taking all
23       medications and let nature take its course, unquote.
24           Do you see that?
25   A.  I do see that.

Page 91

1    Q.  Did you find that credible?
2    A.  Yes.
3    Q.  Okay.  Let's look at footnote 21, which cites to a
4        letter from a, I think, Mr. Michael Darin.  Davis, you
5        had.  It appears to me like it might be Darin, but it
6        does say Davis.
7            Are you on page 12, footnote 21?
8    A.  I am.
9    Q.  And the quotation is in the second paragraph.
10       It says, A plan participant writes, Any new expense
11       will completely ruin me.  If it comes down to that
12       point, I plan to stop taking my medications and let
13       nature take its course, unquote.
14           Do you see that?
15   A.  I do.
16   Q.  Does it sound to you a little suspicious that two
17       independent retirees used that same terminology?
18   A.  It's a -- no.  It's a common term of saying, I'll just
19       let nature take its course.
20   Q.  I'll stop taking my medications and let nature take
21       its course.  That didn't strike you as a suspicious
22       turn of phrase?
23   A.  No, it didn't.  It's not that atypical for people to
24       say those types of things.
25   Q.  Would you entertain a hypothesis that use of that

Page 92

1    terminology was as a result of a leading question or a
2    comment that they might have heard?
3    A.  I wouldn't know.
4    Q.  Would it surprise you, or did you notice as you went
5        through these letters, that there were a number of
6        repetitive uses of particular phraseology in the 58
7        letters?
8    A.  It did not strike me.  I did not notice similar
9        phraseology going through them, no.
10   Q.  Would that be a concern to you, if it turned out to be
11       the case, and if you had noticed it?
12   A.  Not -- it would not be a concern if it's commonly-used
13       phraseology.
14   Q.  Do you recall any of the 58 letters providing complete
15       financial information on the retiree's family?
16   A.  Would you explain a little what -- you mean, like,
17       their total income and assets and --
18   Q.  Total pension income, total social security income,
19       other income, assets.
20   A.  I don't recall letters containing that type of
21       information.
22   Q.  Would that be relevant in evaluating the credibility
23       of a retiree who is claiming that the increased cost
24       would have a devastating impact and might lead them to
25       discontinue all their prescriptions?

Page 93

1    A.  I wasn't asked to evaluate.  I didn't have income
2        data.
3    Q.  Well, but my question -- but I'm asking you now, and
4        that is:  Would you find it -- and maybe you wouldn't.
5        Would you not find total income and total asset
6        information about a person claiming that a particular
7        event was going to have a devastating financial impact
8        relevant to evaluating the credibility of that person?
9    A.  In order to -- the information that would be required
10       would be extensive; not just assets, liabilities.  It
11       also would be subjective, because what is devastating
12       to that individual might not be devastating to you or
13       I.
14   Q.  But it would at least be relevant data to determine if
15       someone's claim of complete ruin as a result of an
16       increased health care cost was credible or not?
17   A.  I don't think that it's totally true, because again,
18       it's subjective.  We may say it's not complete ruin;
19       but if they view it that way, and they're not willing
20       to continue to take their meds because they feel it's
21       financially ruinsome (sic), and they may have
22       obligations that don't show up on their own personal
23       financial statements, they're either taking care of
24       their -- like, a disabled child or grandchild or
25       something -- I don't know that we can pass that

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 94

1    judgment.
2    Q.  We need more information than we've got from these
3    letters to pass that judgment, don't we?
4    A.  I don't know why you would want to pass that judgment.
5    Q.  Well, to the degree it is relevant that the financial
6        impact of these changes is devastating, don't we have
7        to address that judgment?
8    A.  Demonstrate it with the report prior to the letters
9        that the retirees would be adversely impacted a number
10       of different ways by the proposed changes.
11           MR. BURCHFIELD:  I ask the reporter to mark
12       as Daniels Exhibit 16 a copy of the decision of the
13       United States Court of Appeals for the Sixth Circuit
14       in Reese versus CNH America dated June 5 -- well,
15       actually dated September 13, 2011.
16           MARKED BY THE REPORTER:
17           DEPOSITION EXHIBIT 16
18           12:19 p.m.
19   BY MR. BURCHFIELD:
20   Q.  Dr. Daniels, have you read this -- have you read this
21       decision before?
22   A.  Yes.
23   Q.  And it's listed as one of the documents you rely upon
24       in attachment 2 of your expert report, item number 4,
25       correct?

Page 95

1    A.  Yes.
2    Q.  Let me ask you to look at page 6 of this document, and
3        beginning in the first full paragraph there over to
4        the last bullet point on page 7, would you please look
5        at those, please, and just read into the record the
6        aspect of that decision, the question in that
7        decision, that your report is most directly
8        addressing?
9    A.  My report addresses the following --
10   Q.  Okay.  Go ahead.  Shoot.
11   A.  -- it provides a summary of what premiums,
12       deductibles, and copayments most retirees pay under
13       the old plan, question mark, under the new plan; as
14       well as what differences, if any, is there between the
15       quality of care available under the old and new plans;
16       as well as what differences, if any, is there between
17       the new plan and the plan CNH makes available to
18       current employees and people retiring today.
19   Q.  Okay.  Anything else?
20   A.  No.
21   Q.  Can you -- let's look back at Exhibit 6, your report,
22       and perhaps you can point me to the pages which
23       address what premiums, deductibles, and copayments
24       most retirees pay under the old plan, what about under
25       the new plan.

Page 96

1    A.  Refer to page 3.
2    Q.  Yep.
3    A.  In number 6, and they're outlined in A, B; continuing
4        onto page 4, C, D, E; continuing onto page 5, we have
5        F, G, which continues onto page 6.
6    Q.  Okay.
7    A.  And I stand corrected that what difference between the
8        new plan -- plan makes available to current employees,
9        doesn't quite do that directly.
10   Q.  I'm sorry, say that again?
11   A.  The third item I had cited, what differences are there
12       between the new plan and the plan CNH makes available
13       to current employees and people retiring today, it's
14       not stated -- it's not written that way in my report,
15       so...
16   Q.  And then you also mention what difference is there in
17       the quality of care available under the old and new
18       plans.
19   A.  I would say my entire -- from then on my report
20       addresses quality of care, because a key element of
21       quality of care is access to care, and that means
22       affordable access.  But specifically beginning on page
23       13, I do have a section that's just devoted to health
24       care quality impacts of the proposed plan.
25   Q.  We'll talk about that momentarily.

Page 97

1            All right.  Anything else?
2    A.  No.
3            MR. BURCHFIELD:  Okay.  Let me ask the
4        reporter to mark -- ask the reporter to mark as
5        Daniels Exhibit 17 an excerpt from Mr. Macey's report,
6        pages 19 and 20 of Mr. Macey's report.
7            MARKED BY THE REPORTER:
8            DEPOSITION EXHIBIT 17
9            12:26 p.m.
10   BY MR. BURCHFIELD:
11   Q.  Dr. Daniels, I have provided you --
12           MR. CANZANO:  I have pages 20 and 20.
13           MR. BURCHFIELD:  Excuse me?
14           MR. CANZANO:  I have pages 20 and 20.
15           MR. BURCHFIELD:  Oh.
16           MR. HOCHUL:  I'm sorry.  This came out
17       wrong.
18   BY MR. BURCHFIELD:
19   Q.  Dr. Daniels, do you have pages 19 and 20?
20   A.  I do indeed.
21   Q.  Okay.  Let's get our colleagues straightened out, and
22       then we'll go forward.
23           Okay.  This is pages 19 and 20 of Scott
24       Macey's expert report in which he has, in chart form,
25       made a comparison between the health care plan that

25  (Pages 94 to 97)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 98

1    retirees currently have and the proposed pre and --
2    pre-Medicare and Medicare-eligible participants, and
3    my question for you on this is:  Reviewing this chart,
4    do you see anything on this chart that you disagree
5    with as a mere recitation of what the prior plan --
6    what the existing plan and the proposed plan would do?
7         (Off the record at 12:29 p.m.)
8         (Back on the record at 12:29 p.m.)
9         THE WITNESS:  Other than the premium
10   numbers, contribution numbers, which vary from what --
11   the documents I relied on.
12   BY MR. BURCHFIELD:
13   Q.  Can you be specific about what your -- what issues you
14   were having?
15   A.  Page 19.
16   Q.  Right.
17   A.  Proposed plan, pre-Medicare-eligible participants'
18   monthly contributions.  My report reflects -- and I'd
19   have to go back to my documents to recall where, but
20   $91 per month contribution beginning in 2013.
21   Q.  And we know that didn't happen, right?
22   A.  That's correct.  And so that is not consistent.
23   And $10 per month for Medicare-eligible
24   participants.
25   Q.  Okay.  Other than those two, is it consistent?

Page 99

1    A.  With a bit of hesitation that by lumping copayments
2    into one category when some things might have changed
3    through coinsurance, at a high level this is
4    consistent.
5    Q.  Okay.
6    A.  But not detailed enough to say that it's exact.
7         MR. BURCHFIELD:  Let me ask the reporter to
8    mark as Daniels Exhibit 18 the interrogatory responses
9    of Jack Reese, and as Exhibit 19 the interrogatory
10   responses of George Nowlin.
11        MARKED BY THE REPORTER:
12        DEPOSITION EXHIBITS 18 and 19
13        12:32 p.m.
14   BY MR. BURCHFIELD:
15   Q.  Dr. Daniels, you have in front of you Exhibits 18 and
16   19, the interrogatory responses by Mr. Reese and
17   Mr. Nowlin respectively; is that correct?
18   A.  Yes.
19   Q.  It's at the top of the second page who's answering
20   them.
21   A.  Yes.
22   Q.  Okay.  Have you seen these before?
23   A.  No.  I don't believe so.
24   Q.  Let me ask you to look at page 3 of Exhibit 18, and
25   under interrogatory number 14, if you skip down to the

Page 100

1    answer, it lists Mr. Reese's income.  Do you see that
2    under part B?
3    A.  Yes.  I'm reading that, yes.
4    Q.  Pension from CNH America in 2010 $21,684, pension from
5    UAW Staff Retirement Plan $30,000 declining down to
6    25,000; social security disability in D 20,000,
7    29,000, 30,000; annuities $7,800, 7,250, 15,000 in
8    2010, 2011, and 2012 respectively.
9         Do you see that?
10   A.  I see that.
11   Q.  These numbers add up to something north of $80,000 a
12   year of income for Mr. Reese.  I'll ask you just to
13   assume that.
14        In your -- in your opinion is Mr. Reese
15   devastated by the changes that CNH is proposing?
16   A.  I don't know based on this.
17   Q.  You didn't see a letter from Mr. Reese, did you?
18   A.  I don't recall.
19   Q.  Okay.  What would you need to know?
20   A.  This is one side of ones balance sheet.  There's also
21   liabilities, health status.
22   Q.  Let me ask you to look at the -- at page 6 under
23   interrogatory number 18, and it says, If your answer
24   to interrogatory number 12 is not an unqualified no,
25   then provide the information demanded by

Page 101

1    interrogatories 13 through 17 for each member of the
2    plaintiff class that you have been certified to
3    represent.
4         And just for your information,
5    interrogatory number 12 simply asks if the -- Do you
6    contend that your financial condition is relevant to
7    whether CNH America's proposed changes to your health
8    benefits are permitted under the standard articulated
9    in Reese -- in the Reese decisions.
10        And then back to page 6, it says, If your
11   answer to interrogatory 12 is not an unqualified no,
12   then provide the information demanded by
13   interrogatories 13 through 17 for each member of the
14   plaintiff class that you have been certified to
15   represent.
16        You with me so far?
17   A.  Um-hum.
18   Q.  And it says, Answer:  Plaintiff objects to this
19   interrogatory as unduly burdensome, unnecessarily
20   invasive of the class members' privacy, and not likely
21   to lead to admissible evidence.  Notwithstanding the
22   objection, Plaintiff Reese responds:  I do not have
23   this information.
24        Do you see that?
25   A.  I see that.

26 (Pages 98 to 101)

Page 102

1   Q.  If one were to make a serious conclusion about whether
2       the class members individually are being devastated,
3       ruined, I think one of the other terms used was wiped
4       out by these changes, wouldn't one need -- wouldn't it
5       be prudent for one to look at the financial
6       information, assets, liabilities, and income, for the
7       retirees on a one-by-one basis?
8   A.  It would still be subjective to look at it one-on-one
9       basis, because you and I may differ as to what would
10      be devastating.
11  Q.  Um-hum.  But it would be a more informed decision even
12      if subjective; would you agree?
13  A.  Not over the whole population.
14          Over the whole group, is that what you're
15      saying?
16  Q.  I don't understand that answer.
17  A.  Well, I'm trying to understand why you would do it
18      individual by individual.  This was a benefit that
19      they were all entitled to.
20  Q.  Wouldn't you agree that some of the retirees could be
21      impacted differently than others?
22  A.  Certainly, yes.
23  Q.  And wouldn't it be important in that circumstance to
24      evaluate them and their financial circumstances
25      individually to see whether they're individually

Page 103

1       impacted differently?
2   A.  But they're going to be impacted regardless of their
3       means.  But the extent of that impact is a
4       point-in-time observation.  You could look today and
5       say someone looks like they're all set, they're in
6       good shape.  That could change tomorrow for them.
7   Q.  So would you or would you not agree that a prudent
8       person making a determination of whether the
9       plaintiffs individually are being -- are being
10      seriously impacted by the proposed changes would look
11      at their financial background?
12          Or if you don't think that would be
13      pertinent information for a prudent person to look at,
14      you may say so.
15  A.  I don't -- there are impacts beyond just looking at
16      cost of the change in the plan.  If the network
17      changes, providers change.  So you could look at it
18      from a financial point of view, yes, that's one piece
19      of it, but there's other pieces to the change.
20  Q.  Let's focus on the financial impact, because as I read
21      the 56 letters -- 58 letters -- that's what they were
22      focusing on, and that's what your report focuses on to
23      a large degree, financial --
24  A.  I disagree.
25  Q.  Let's focus on financial impact.  We'll talk about

Page 104

1       health care outcomes after lunch.
2           Wouldn't you agree that, in order to
3       evaluate the financial impact on the individuals of
4       the class, it would be prudent to look at their
5       financial situations?
6   A.  If one felt that the financial aspect was critical,
7       you could look at their financial status at a point in
8       time, but knowing that is only a point-in-time
9       assessment.
10  Q.  We may all die tomorrow.
11  A.  That's right.
12  Q.  But you would consider -- you would consider it
13      prudent to look at the financial information?
14  A.  No.  I said that you could look at it if what your
15      focus is -- if your focus is on assessing a potential
16      financial impact.
17  Q.  That's the question.  If we're interested in assessing
18      the financial impact on the retirees, shouldn't we
19      look at their financial information?
20  A.  If you want to look at it individually, then yes.
21  Q.  Okay.  That's all I wanted to know.  Thank you.
22          MR. BURCHFIELD:  I tell you what, why don't
23      we -- we're at probably a pretty good breaking point.
24      Let me just ask -- let me just ask a couple questions,
25      then we'll take a break for lunch, if that's okay.

Page 105

1   BY MR. BURCHFIELD:
2   Q.  On Daniels Exhibit 19 -- do you see that?  This is the
3       interrogatory responses by George Nowlin.  And do you
4       see, Dr. Daniels, his income information on page 3,
5       down at the bottom of the page?
6   A.  Yes.
7   Q.  Okay.  And just so you know, if you look at the first
8       page of Exhibit 19, the caption of the case, just to
9       confirm, Jack Reese is the lead plaintiff in this
10      case.  Do you see that?
11  A.  I see that.
12  Q.  And you see George Nowlin is also one of the named
13      class representatives in the case?
14  A.  I see that.
15          MR. BURCHFIELD:  Okay.  All right.  Let's
16      take -- let's take, you know -- do you want to take --
17      I'll take as much as you want, but I could probably do
18      30 minutes if we can get through the cafeteria in that
19      period of time.
20          MR. CANZANO:  Actually, 30 minutes is fine.
21          MR. BURCHFIELD:  Okay.  We'll do our best
22      to get through the line in the cafeteria in that
23      period of time and be back, you know, quarter after
24      one or so.
25          MR. CANZANO:  Okay.

27 (Pages 102 to 105)

## Page 106

1    MR. BURCHFIELD: If we're a little bit
2  late, I apologize in advance, but it's only because
3  we've gone through the line several times.
4    MR. CANZANO: The line gets kind of sparse
5  on Fridays, though, actually.
6    (Recess taken at 12:43 p.m.)
7    (Back on the record at 1:27 p.m.)
8  BY MR. BURCHFIELD:
9  Q. Good afternoon, Dr. Daniels.
10    Do you find it credible that a retiree
11  faced with a $10 copay would cease taking all
12  medications?
13  A. It is possible, depending upon the financial status
14  and other factors pertaining to that individual.
15  Q. Well, anything is possible.
16    What is -- what do you think the likelihood
17  is that a $10 copay would cause an individual to stop
18  taking essential medications?
19  A. Again, it depends on the individual.
20    MR. BURCHFIELD: Let me ask the reporter to
21  mark as Daniels Exhibit 20 two pages from the Federal
22  Register of January 24, 2013.
23    MARKED BY THE REPORTER:
24    DEPOSITION EXHIBIT 20
25    1:29 p.m.

## Page 107

1    MR. BURCHFIELD: And I'm one short on that
2  one. May turn up eventually.
3  BY MR. BURCHFIELD:
4  Q. Dr. Daniels, this -- I've given you Daniels Exhibit
5  20. Do you have that in front of you?
6  A. Yes.
7  Q. If you'd look on Federal Register page -- volume 78,
8  page 5183, which is the second page of this excerpt,
9  you will see in the middle of the second page a chart
10  entitled 2013 Poverty Guidelines for the 48 Contiguous
11  States and the District of Columbia.
12    Do you see that?
13  A. I do.
14  Q. And as an economist do you have some familiarity with
15  the federal guidelines to define poverty?
16  A. At a high level.
17  Q. You see here, do you not, for the 48 contiguous states
18  and the District of Columbia the poverty level for a
19  one-person household as of the most recent date is
20  $11,490? Do you see that?
21  A. I do.
22  Q. And for a family of two the poverty guideline is
23  $15,510. Do you see that?
24  A. I do.
25  Q. Do you know how those numbers compare to the pensions

## Page 108

1  received by the class plaintiffs in this case?
2  A. I do not.
3  Q. Is it your -- do you have any understanding as to
4  whether the pension payments received by the class
5  plaintiffs here, plus whatever social security
6  payments that they are getting from the government,
7  exceed those figures?
8  A. I have no knowledge of their pension amounts.
9  Q. Okay.
10  A. Or their social security, for that matter.
11  Q. You are aware that -- you're familiar with the
12  literature -- you're somewhat familiar, I assume, with
13  the literature on the effect of cost-sharing on -- on
14  the willingness of individuals to seek health care?
15  A. Yes.
16  Q. And you are aware that much, if not all, of that
17  literature says that the effect is more acute on the
18  poor than it is on people who are more -- who are in
19  financially better shape than the poor?
20  A. There is an income effect.
21  Q. And if it were the case that the retiree and -- that
22  the pension and social security incomes of the
23  retirees in this class were above, and maybe
24  substantially above, the poverty level, would that
25  factor into whether they are likely to forego

## Page 109

1  necessary medications, in your view?
2  A. Based on the literature, it's not just those at the
3  poverty level that will --
4  Q. But that's one factor?
5  A. -- that will reduce. It's also -- depend upon income,
6  as well as other factors. So you can be above the
7  poverty level, have a low income, and still will be
8  adversely impacted by increases in copays and other
9  changes in the plan.
10  Q. But relative income is certainly a relevant factor,
11  right?
12  A. At the individual level, yes.
13  Q. And we saw earlier that 11 percent, I think was the
14  figure, of post-65 individuals are solely reliant upon
15  Medicare for their health insurance.
16    Do you remember that?
17  A. The Kaiser report, although dated, stated that
18  information that you shared, yes.
19  Q. Okay. It was 2007, so not that dated.
20  A. Well, yeah.
21  Q. Do you have an opinion on whether the retirees in this
22  case, as a class, are poor?
23  A. I don't -- I was not asked to review pension data or
24  income data, so I don't have knowledge of their
25  financial status. I looked at this as a group.

28 (Pages 106 to 109)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 110

1  Q. As a group do you consider them poor?
2  A. As a group we know from the literature and my
3     experience that there'll be a distribution. Some will
4     be wealthier than others, some will be poorer than
5     others.
6  Q. You've worked with the UAW in some capacity, I take
7     it, for 25 or 30 years. You're familiar with the UAW?
8  A. There were years which I -- my work did not intersect
9     at all with the UAW.
10 Q. But you're familiar with the UAW as an organization?
11 A. Yes.
12 Q. And you would agree with me, wouldn't you, that the
13    UAW certainly tries to negotiate pension benefits for
14    its retirees that keep them substantially above the
15    poverty level?
16 A. They try. That does not mean they're always
17    successful.
18 Q. Do you know if they were successful with regard to
19    CNH?
20 A. I have no knowledge of their pension benefits.
21    MR. BURCHFIELD: Ask the reporter to mark
22    as Daniels Exhibit 21 a document entitled Letter of
23    Understanding.
24    MARKED BY THE REPORTER:
25    DEPOSITION EXHIBIT 21

Page 111

1  1:35 p.m.
2  BY MR. BURCHFIELD:
3  Q. Dr. Daniels, do you have in front of you Exhibit 21?
4  A. Yes.
5  Q. This is a letter with the heading Letter of
6     Understanding Re: National and State Health Insurance
7     Initiatives.
8     It is, although I haven't copied the entire
9     collective bargaining agreement, an attachment to the
10    1998 group insurance plan, as you see indicated in the
11    upper, left-hand corner.
12    Have you seen this letter before?
13 A. I have not. It's kind of difficult to read on this
14    paper, but...
15 Q. My eyesight was better in 1998 also.
16    Once you've had a chance to read it, would
17    you let me know?
18    MR. BURCHFIELD: Here's another copy of
19    that. It just turned up.
20    THE WITNESS: Okay. I've completed reading
21    it.
22 BY MR. BURCHFIELD:
23 Q. Recognizing that you haven't seen this before, does
24    this have any -- well, let me step back.
25    Since 1998 you would agree with me,

Page 112

1     wouldn't you, that there have been at least two
2     noteworthy changes in federal health care programs,
3     Medicare Part D and the Affordable Care Act?
4  A. Could you repeat the beginning of your sentence?
5  Q. Sure. You would agree with me that since 1998 there
6     have been two noteworthy changes in federal health
7     programs, Medicare Part D, and the Affordable Care
8     Act?
9  A. I would agree that those are two of -- noteworthy
10    changes.
11 Q. Any others you can think of?
12 A. Those are the most major ones.
13 Q. Any minor ones you can think of?
14 A. No, because they're mainly tweaks. We had Medicare
15    part C for a while if you go back, things that didn't
16    work out so well.
17 Q. Having now looked at this letter, does it have any
18    effect one way or the other on the opinions you have
19    ventured in this case?
20 A. No, it does not.
21 Q. I'm going to ask you to look at -- would you look at
22    your report, Daniels Exhibit 6, note 2?
23 A. Page?
24 Q. And the text -- the text begins on paragraph 6,
25    carries over to paragraph 7.

Page 113

1  A. What page are you at?
2  Q. Page 6 of your report, Exhibit 6, the September
3     report. And let me just read it into the record.
4     Access to health insurance plays a key role
5     in retirement decisions. A study found that 54
6     percent of those surveyed indicated that access to
7     retiree health insurance was, quote, extremely
8     important, unquote, and another 28 percent reported
9     that it was, quote, very important, unquote. And then
10    footnote 2.
11    Do you see that?
12 A. Yes, I do.
13 Q. And in footnote 2 you cited -- there you go -- high
14    employment cite -- you cited a document from the
15    Employee Benefits Research Institute in January 2013;
16    is that correct?
17 A. That's correct.
18    MR. BURCHFIELD: Let me ask the reporter to
19    mark that document as Daniels Exhibit 22.
20    MARKED BY THE REPORTER:
21    DEPOSITION EXHIBIT 22
22    1:41 p.m.
23 BY MR. BURCHFIELD:
24 Q. Dr. Daniels, after you've had a chance to look at
25    this, would you please let me know if this is, in

29 (Pages 110 to 113)

Page 114

1    fact, the survey that you cited in footnote 2 of your
2    report?
3  A.  Yes, this is the document.
4  Q.  Now, this is a -- this is a survey, correct?
5  A.  That is correct.
6  Q.  They asked a number of people about what -- about, in
7    figure 5, the impact of health insurance on their
8    decision to retire.
9        Do you see that?
10 A.  Correct, I see that.
11 Q.  In looking at this document I did not see the actual
12    questions that were asked.  Did you happen to notice
13    those?
14 A.  No.  This is a survey, though, that they routinely do
15    on an annual basis, EBRI, and the methodology is
16    telephone based.  It's described on page 4.
17 Q.  It says at the bottom of page 4, The HCS, the health
18    confidence survey, was conducted between June 28 and
19    July 20, 2012, through telephone interviews with 800
20    individuals ages 21 and older.
21        Do you see that?
22 A.  Yes, I do.
23 Q.  And given that we are -- given that the survey is
24    asking questions about the relevance of various
25    factors to a retirement decision, would it be

Page 115

1    pertinent to you to know what portion of the survey
2    respondents were in their 20s as opposed to in their
3    50s?
4  A.  Well, it's a statistically-valid survey with results,
5    so they don't -- they're not asking -- it's not a
6    survey of just those nearing retirement age.
7  Q.  So it wouldn't be relevant to you to know that?
8        MR. CANZANO:  Could you repeat the
9    question?
10       THE WITNESS:  Yeah, repeat the question.
11 BY MR. BURCHFIELD:
12 Q.  It wouldn't be relevant to you, I take it, to know
13    what percentage of the survey respondents were in
14    their 20s as opposed to their 50s?
15 A.  It would be.
16       And the survey, though, the document -- and
17    without rereading the entire study, though -- they are
18    people that have worked a number of years, as
19    indicated by they've worked longer than they had
20    expected.  So this isn't someone in their 20s, if
21    you're -- referring back to the tables.
22 Q.  I'm not sure -- I'm not sure we're -- maybe we're
23    talking past each other.
24       My question for you is:  If there were an
25    even distribution of people in their 20s, 30s, 40s,

Page 116

1    50s, and 60s, and the questions related to factors
2    going into a retirement decision, would it bear on the
3    credibility you've placed on the study to know that
4    close to half of the survey respondents were 20 or
5    more years away from retirement?
6  A.  Well, if we refer back, this is focused on people that
7    are closer to retirement, in my interpretation of this
8    quickly, without going back.
9  Q.  Where are you reading?
10 A.  If we go back to figure 1.
11 Q.  Right.
12 A.  Let's see.
13 Q.  Figure 1 is --
14 A.  I'm sorry.  I'm sorry.
15 Q.  Figure 1 is sourced to something other than the survey
16    on which you've relied.
17 A.  I need to go back and refresh my memory, but the HCS
18    is a survey that's focused on older workers and
19    savings for retirement in general as well as this
20    health care section.  So it's not 20-year-olds.
21 Q.  Well, you would agree that's not what it says.  It
22    says, The HCS was conducted between June 28 and July
23    20, 2012, through telephone interviews with 800
24    individuals, ages 21 and older.
25       MR. CANZANO:  He's reading from right

Page 117

1    there.
2        THE WITNESS:  Yeah.  But you're correct.
3  BY MR. BURCHFIELD:
4  Q.  And it doesn't give a margin of error for the survey
5    that I saw.
6  A.  No, it doesn't report that out.
7  Q.  And it doesn't give a breakdown of what the
8    demographic distribution of the survey respondents is
9    that I saw.
10       MR. CANZANO:  I'm going to object to that
11    as mischaracterizing the document.
12 BY MR. BURCHFIELD:
13 Q.  Do you see a demographic distribution of the survey
14    respondents?
15 A.  They didn't do a survey that was aimed at identifying
16    differences by demographics.
17 Q.  So I take it the answer to my question is:  No, there
18    is no demographic distribution of the 800 survey
19    respondents here?
20 A.  I can't assume that.
21       MR. CANZANO:  I'm going to object to that.
22    Mischaracterizing the document.
23 BY MR. BURCHFIELD:
24 Q.  Okay.  Let me ask you that.
25       Can you point me anywhere in this document

SUZANNE DANIELS, PH.D. – 1/10/2014

Page 118

1  that you cited in your report where it provides a
2  demographic breakdown of the 800 people, ages 21 and
3  older, that it surveyed from June 28 through July 20,
4  2012?
5  A.  I do not see it in this document.
6  Q.  So no margin of error stated, right?
7  A.  Not in this report --
8  Q.  Okay.  No --
9  A.  -- paper.
10  Q.  No demographic breakdown, right?
11  A.  Correct.
12  Q.  No --
13  A.  Based on this -- this is in a notes document and not
14  necessarily the entire research brief.
15  Q.  And no reiteration of the questions that were asked,
16  right?
17  A.  They are not contained in this document.
18  Q.  Okay.  You say, Not in this document.
19      Did you look at something other than this
20  document?
21  A.  No, I did not.
22  Q.  So as you sit here today, you don't know whether that
23  information is publicly available or not, right?
24  A.  Which information?
25  Q.  Margin of error, demographic distribution of the

Page 119

1  sample, or -- or the questions?
2  A.  The information is likely available.  Whether it's
3  publicly available depends, because some of EBRI's
4  work, the more detailed work, is provided to their
5  member organizations and not all of it to the public.
6  Q.  But you haven't seen it?
7  A.  No.  I did not review it as part of this work.
8  Q.  Now, you know that there are empirical behavioral
9  studies that try to address the issue of health
10  insurance benefits and their effect on retirement.
11  You know that, don't you?
12  A.  I'm not familiar with behavioral studies.
13  Q.  You haven't -- are you not aware of studies that --
14  A.  I don't know what you mean by "behavioral."
15  Q.  That -- let me rephrase the question.
16      Are you aware of any studies that, using
17  actual human behavior reacting to changes in health
18  care structures, evaluate the greater or lesser
19  likelihood of retirement?
20  A.  Not that come to mind.  It's the ones I've cited in
21  this paper.
22  Q.  You're not familiar with the Gustman and Steinmeier
23  study with the National Bureau of Economics Research
24  in March 1993?
25  A.  Quite candidly, when I did my literature review,

Page 120

1  documents, studies going back that far, are very
2  dated.
3  Q.  Okay.  How about --
4  A.  I try to find things more relev -- more current.
5  Q.  How about David Blau and Donna Gilleskie, December of
6  2005, Health Insurance and Retirement of Married
7  Couples, University of North Carolina Chapel Hill?
8  A.  I don't believe that's one that I reviewed you were
9  provided.
10  Q.  How about Coe, Khan, and Rutledge, May 2013, Center
11  for Retirement Research at Boston College?
12  A.  I don't even know if these documents -- these are
13  relevant to my work.
14  Q.  But in any event, you didn't consider any of them?
15  A.  No.
16  Q.  The only source that you relied upon for your
17  conclusion that health insurance -- that access to
18  health insurance plays a key role in retirement
19  decisions, the only external source you cite for that
20  paragraph, is the EBRI survey that we talked about?
21  A.  That and my experience.
22  Q.  Okay.  Let's talk about your experience.
23      What -- have you done any empirical
24  analysis -- let me start more basically.
25      Have you done any published work on the

Page 121

1  effect of health care -- of access to health care
2  insurance on retirement outcomes?
3  A.  No.
4  Q.  Have you done any -- have you done any empirical
5  research on that, which is to say, comparison of the
6  actual retirement decisions of people under one health
7  care regime versus another health care regime?
8  A.  I have not.
9  Q.  Have you done any methodical surveys of persons within
10  the range of retirement decision-making on that issue?
11  A.  No.
12  Q.  Have you conducted methodical meetings with potential
13  retirees who are considering retirement?
14  A.  From a research perspective?
15  Q.  Yes.
16  A.  No.
17  Q.  What is your experience in this area, Dr. Daniels?
18  A.  It ranges from work at the UAW, attending retiree
19  meetings, pre-retiree meetings, continued work after
20  the UAW at the Greater Detroit Area Health Council,
21  which also then involved trust funds and others, and
22  as health care costs continue to rise, there's much
23  written about individuals wanting to continue to work
24  because of the health care benefits, as well as to
25  date we see it.

31  (Pages 118 to 121)

SUZANNE DANIELS, PH.D. – 1/10/2014

Page 122

1  Q.  And others have studied those issues, but you haven't
2     in a methodical way?
3  A.  That's correct.
4  Q.  Okay.  By the way, Dr. Daniels, with regard to Daniels
5     Exhibit 22, the EBRI survey, looking back at figure 5
6     on page 6, you would agree with me, wouldn't you,
7     that, as that chart is constructed, it doesn't shed
8     much light on whether the survey respondents were
9     addressing a binary system, full health insurance, or
10    no health insurance; or whether they were addressing
11    the gradations of health insurance?
12 A.  This uses the term health insurance as a single term.
13 Q.  So that could be retire with health insurance or
14    retire without health insurance, right?
15 A.  That is correct.
16 Q.  And here we know that the changes that are being made
17    in the health program are not eliminating health
18    insurance; they are simply increasing the
19    cost-sharing, correct?
20 A.  I disagree.
21 Q.  How do you disagree?
22 A.  You're eliminate -- the prescription drug benefit is
23    eliminated under the proposed plan for the Medicare
24    eligibles.
25 Q.  But Medicare eligibles do have prescription drug

Page 123

1     coverage available to them through Medicare Part D,
2     don't they?
3  A.  Only if they elect to purchase such coverage.
4  Q.  But it's available, right?
5  A.  Well, certainly it's available, but it's eliminated.
6  Q.  And you would agree with me that this survey, the
7     survey results reported in table 5 of Exhibit 22,
8     don't distinguish as to whether it's -- whether the
9     retirees would pay for the program themselves or
10    whether they would have it provided to them?
11 A.  I don't think I'd go to that conclusion.  I disagree.
12 Q.  What --
13 A.  It says they worked longer because they wanted to
14    continue to have health care insurance through their
15    employer.
16 Q.  Based on that chart, do you draw conclusions about
17    whether the persons being surveyed there were taking
18    into account the potential availability of Medicare
19    Part D?
20 A.  I can't draw a conclusion such as that.  There's not
21    sufficient detail.
22       MR. BURCHFIELD:  Let me ask the reporter to
23    mark as Daniels Exhibit 23 a document entitled A
24    Preliminary Expert Report of Suzanne Paran --
25       THE WITNESS:  Paranjpe.

Page 124

1        MR. BURCHFIELD:  -- Paranjpe, dated June
2  27, 2011.
3        MARKED BY THE REPORTER:
4        DEPOSITION EXHIBIT 23
5        2:00 p.m.
6  BY MR. BURCHFIELD:
7  Q.  Dr. Daniels, do you recognize Exhibit 23 as an expert
8     report that you submitted in the case of Thomas Temme
9     and Shirley Temme, individually and as representative
10    of a class, versus Bemis Company, on or about June 27,
11    2011?
12 A.  Yes.
13 Q.  And is the -- is that your signature on the last page,
14    page 4 of the document?
15 A.  Yes.
16 Q.  And at that point this -- the Suzanne Par --
17 A.  Paranjpe.
18 Q.  -- Paranjpe, Ph.D., is the person we now know as
19    Dr. Suzanne M. Daniels, Ph.D., correct?
20 A.  That is correct.
21 Q.  Okay.  Great.  Just to be clear.
22       Let me ask you to look, please, on page 3
23    of that document.  Just above The Facts Considered
24    there's a paragraph that says, It is my opinion that
25    an appropriate, alternative approach is to adjust the

Page 125

1     1985 annual $50 individual and $100 family deductibles
2     by the consumer price index medical care for the
3     period 1982 to 2011.  This adjustment results in 2011
4     annual deductibles of $175.94 for an individual and
5     $351.88 for a family.
6        Do you see that?
7  A.  Yes.
8  Q.  And that was your opinion in the Bemis case?
9  A.  Yes.
10 Q.  The --
11       MR. CANZANO:  Just for the record, it's
12    1985, not 1982.
13       MR. BURCHFIELD:  Okay.  If I said '82, I
14    misspoke.  Should be '85.
15 BY MR. BURCHFIELD:
16 Q.  Would you consider the difference in the family and
17    individual deductibles -- or I should say:  Would you
18    consider the difference between the individual and the
19    family deductibles that you thought appropriate in
20    that case, of $175.95 for an individual and $351.88
21    for a family, to be materially different than the $200
22    deductible and the -- individual and the $400 family
23    deductible proposed by CNH in this case?
24 A.  Numerically they're similar amounts.
25 Q.  Okay.  And is it your view that the -- that a $200

32 (Pages 122 to 125)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 126

1   individual deductible and a $400 family deductible are
2   oppressive or inappropriate in some way in relation to
3   the deductible stated in -- that you advocated in the
4   Bemis case?
5   A.  The Bemis case was focused, my work, on a reasonable,
6       commensurate deductible.  It's not the focus -- the
7       question I was asked, for this work that I've done.
8   Q.  Would you agree that a $200 individual deductible and
9       a $400 family deductible is reasonably commensurate?
10          MR. CANZANO:  I'm going to object, because
11      that's not the scope of her report, in that she wasn't
12      asked to give an opinion on that.
13  BY MR. BURCHFIELD:
14  Q.  If you don't have an opinion, you don't have an
15      opinion, but I'm asking.
16  A.  I don't have an opinion in this case.
17  Q.  Okay.
18          MR. BURCHFIELD:  Let me ask the reporter to
19      mark as Daniels Exhibit 24 an opinion dated November
20      30, 2012, by Suzanne Paranjpe -- and I'm probably
21      mispronouncing it, and I apologize -- and another
22      opinion dated February 15, 2013.
23          MARKED BY THE REPORTER:
24          DEPOSITION EXHIBITS 24 and 25
25          2:06 p.m.

Page 127

1   BY MR. BURCHFIELD:
2   Q.  Dr. Daniels, my only question for you about Exhibit 24
3       is:  Do you recognize this as an expert declaration
4       that you provided on or about November 30, 2012, in a
5       case involving TRW Automotive?
6   A.  Yes.
7   Q.  And similarly with regard to Daniels Exhibit 25, do
8       you recognize that as an opinion you gave in a case
9       involving TRW Automotive on or about February 15,
10      2013?
11  A.  Yes.
12  Q.  Can you briefly describe the dispute in the UAW TRW
13      case that you addressed in these two opinions?
14  A.  I can address the change in plan design.
15  Q.  What was that?
16  A.  That the group retiree benefit coverage plan was
17      terminated, and the retirees were given contributions
18      into a health reimbursement account that varied just
19      depending on the case of it.  They could then use
20      those funds to purchase individual Medicare coverage
21      if they went through Extend Health, a broker that
22      would help them select a plan.  In some cases
23      out-of-pocket expenses could also be reimbursed, if
24      eligible, through the health reimbursement account.
25  Q.  And did that case involve only retirees 65 and older

Page 128

1   who were Medicare eligible?
2   A.  That is my recollection.
3   Q.  Okay.
4   A.  Yes, for Daniels 25, yes for both.
5   Q.  And are these -- both of these -- are both of these
6       opinions, 24 and 25, from the same case, or are they
7       different cases?
8   A.  Just think for one second.
9           They're separate legal actions against TRW.
10      They're different groups.
11  Q.  Okay.  And if you don't recall, just say so, but do
12      you remember what the distinguishing characteristics
13      of the two groups are in one case versus the other?
14  A.  I don't -- there's some var -- I don't exactly
15      remember, but there was some variation in benefits and
16      contributions.  But I don't recall with this one.
17  Q.  Okay.  Let's now turn back to Daniels Exhibit 7, which
18      is your rebuttal report or your addendum, if we could.
19          Do you have that in front of you?
20  A.  I do.
21  Q.  And in that report you are responding to Mr. Macey's
22      report to the degree it relies upon a Robert Wood
23      Johnson report by Katherine Swartz entitled
24      Cost-sharing: Effects on Spending and Outcomes; is
25      that correct?

Page 129

1   A.  I -- this is in response to his section 2B3 of his
2       report.
3   Q.  Okay.  And you discuss in here, don't you, Dr. Swartz'
4       paper?
5   A.  I do.
6   Q.  Well, I see it, I just can't get it out of the box.
7           MR. BURCHFIELD:  Let me ask the reporter to
8       mark that paper as Daniels Exhibit 26.
9           MARKED BY THE REPORTER:
10          DEPOSITION EXHIBIT 26
11          2:13 p.m.
12  BY MR. BURCHFIELD:
13  Q.  Dr. Daniels, do you recognize Daniels Exhibit 26 as
14      the -- as the Cost-sharing: Effects on Spending and
15      Outcomes paper by Dr. Katherine Swartz that you
16      discussed in your rebuttal report, Daniels Exhibit 7?
17  A.  Yes.
18  Q.  And did you -- I take it that the only source that you
19      have relied upon -- or let me start again.
20          The only source you have cited in your
21      December 16, 2013, report, Daniels Exhibit 7, is the
22      Swartz paper.
23  A.  That is correct.
24  Q.  Okay.  Now, am I correct that Dr. Swartz relied in
25      some measure on the Rand Health Insurance Experiment,

33 (Pages 126 to 129)

SUZANNE DANIELS, PH.D. - 1/10/2014

| Page 130 |
| --- |

1    which was designed between 1970 and 1974, and
2    conducted between 1975 and 1978?
3  A.  This work by Swartz is a survey of the literature, in
4    essence, and not a study that would you cite something
5    to rely on, but rather to really summarize the
6    landscape of work that's been done in the field.
7  Q.  Okay. I'll try to find it.
8        Let me ask you to look at the page of
9    Daniels Exhibit 26 which has the last three digits at
10    the bottom, right-hand corner 923 — oh, I'm sorry,
11    it's the page with the heading Methodology Overview.
12        Are you with me?
13  A.  I am.
14  Q.  And it says — it is page 7. I see that now. It's —
15    in the first paragraph there it says, The rapid
16    changes in medical care, along with changes in health
17    insurance cost-sharing provisions, make studies done
18    before 1990 less relevant for this review. Because it
19    is so expensive to conduct a large, randomized
20    experiment such as the Rand — that's R-a-n-d —
21    Health Insurance Experiment, no experiments with
22    variations in health insurance design have been
23    conducted since the HIE, the health insurance
24    experiment.
25        Do you agree with that statement?

| Page 131 |
| --- |

1  A.  That — I agree that experiments have not been
2    conducted, and the key word is experiments.
3  Q.  Okay. And then she goes on to talk about some of the
4    studies and says, in the second paragraph,
5    Unfortunately, many of the empirical studies of the
6    effects of patient cost-sharing are based on
7    cross-sectional data, which are collected at only one
8    point in time. The problem with using cross-sectional
9    data to analyze the effects of cost-sharing is that
10    individuals often have some choice about the type of
11    health insurance they have, and the choice of
12    cost-sharing requirements could be driven in part by
13    how healthy a person is or how much care the person
14    expects to use. In this case, it is hard to
15    disentangle the effect of cost-sharing from the effect
16    of, say, the individual's health.
17        Do you see that?
18  A.  Yes.
19  Q.  And do you agree with her statement there?
20  A.  It's difficult. Does not mean impossible.
21  Q.  Okay. Would you look at page 10, please, under the
22    heading Findings? And in the first bolded finding
23    there it says, Reductions in patient-initiated care in
24    response to increases in cost-sharing are likely to
25    come predominantly from the half of the population who

| Page 132 |
| --- |

1    have low medical expenses, people who most likely are
2    healthy.
3        Do you see that?
4  A.  Yes.
5  Q.  And do you agree with that?
6  A.  Yes. In the context of the population that she's
7    looking at for this report, yes.
8  Q.  And what is your understanding of the population she's
9    looking at here?
10  A.  Her focus of this work is on the -- those under -- the
11    non-Medicare eligibles that are covered under Health
12    Care Reform under the ACA. That's her stated purpose
13    in the introduction.
14  Q.  Let me ask you to look at the bottom of page 11, and
15    the bolded heading says, What of the effects of
16    increased cost-sharing on health outcomes.
17        And it says, There has not been a study on
18    the effects of increased cost-sharing on the health of
19    a general population since the Rand HIE.
20        Do you agree with that?
21  A.  Yes.
22  Q.  And then she goes on to say — at the end of that
23    paragraph she says, As noted above, however, the HIE
24    found that people with higher cost-sharing reduced
25    their use of both appropriate and inappropriate health

| Page 133 |
| --- |

1    care services about equally. One hypothesis from this
2    finding is that any negative effects due to reducing
3    appropriate health care were matched by reducing
4    inappropriate care that sometimes causes adverse
5    health effects leading to hospitalizations.
6        Do you see that?
7  A.  Yes.
8  Q.  And I take it you mention -- you mentioned earlier the
9    Dartmouth Atlas study which talked about
10    overprescription and overutilization. Do you remember
11    that?
12  A.  Variations in care.
13  Q.  And you would agree with me, wouldn't you, that to the
14    degree there is a reduction in usage as a result of
15    cost-sharing, some of that reduction could be reduced
16    overutilization, which can have adverse health effects
17    on the patients?
18  A.  It could have -- it could address overutilization of
19    those adverse things.
20        Just to clarify, though, the Dartmouth
21    Atlas isn't as focused on drug overuse as medical
22    procedures.
23        But on the other hand, cost-sharing, as in
24    this last sentence you read, clearly if someone
25    doesn't seek the appropriate care, it can result in

34  (Pages 130 to 133)

SUZANNE DANIELS, PH.D. - 1/10/2014

## Page 134

1  greater costs and increased hospitalizations. And
2  that's the point she is making. And which continues,
3  the adverse effects of cost-sharing, onto the next
4  page in her findings.
5  Q.  But let's stay on this point for a second.
6      As I understand what she's saying in that
7  last sentence on page 11, she is saying that there
8  could be some reduction of necessary beneficial care
9  with adverse health outcomes, but there may also be
10  some reduction of unnecessary care which would have
11  had an adverse health effect; and she, further
12  suggests, those two effects might have a tendency to
13  balance each other out.
14      Is that not the way you read it?
15  A.  Balancing it out in terms of measuring in terms of
16  saying inappropriate and appropriate doesn't balance
17  it out for the individual involved.
18  Q.  Let me just ask this question:  What -- is there -- am
19  I correct that other than Dr. Swartz' survey of the
20  literature, Exhibit 26, none of the reports that
21  you have submitted in this case cite any authority on
22  the issue of health effects of cost-sharing?
23  A.  That is not correct.
24  Q.  What other sources do you cite for adverse effects of
25  cost-sharing?

## Page 135

1  A.  Page 9.
2  Q.  You're on Exhibit 6?
3  A.  Yes.  A and B.
4  Q.  And I see what you're pointing to, Dr. Daniels, but as
5  I read those paragraphs, and I think I scanned those
6  studies, my recollection is that they talked about the
7  use -- patient's use of medications because of costs
8  in paragraph A, but they did not evaluate the health
9  outcomes as a result of that use -- of that reduced
10  use of medications. Do you read it differently?
11  A.  There's a difference between short-term and long-term
12  health outcomes.
13  Q.  I understand.
14      But do you understand those -- the study
15  cited there in footnote 12, the JAMA study, do you
16  recall that that study addressed either short- or
17  long-term health consequences --
18  A.  I believe it did.
19  Q.  -- of the...
20  A.  Sorry.
21  Q.  Okay.  You believe it did?
22  A.  My recollection is that it did.
23  Q.  Okay.  And do you recall, as you sit here, what the
24  quantification of those adverse health outcomes was?
25  A.  I don't recall the quantification.

## Page 136

1  Q.  And same issue with regard to paragraph B.  The New
2  England Journal of Medicine study suggested that
3  copayments resulted in foregoing necessary outpatient
4  care, leading to increased use of hospital care, but
5  it doesn't -- that doesn't seem to me to address a
6  health outcome.
7  A.  When you think about something that could have been
8  treated on an outpatient basis, the individual ends up
9  not seeking the care due to costs, they end up in the
10  hospital, it's a higher level intensity of service,
11  means that they're not as well-off health-wise.
12      Does it go to the end point, based on this
13  extract here, of did they die?  In some cases, maybe;
14  some cases, maybe not.
15      But it is an issue -- I mean, it is true
16  with -- that, when you move to a higher intensity of
17  care, it's because of your health needs being greater.
18  So there is an adverse effect on ones health.
19  Q.  Do you know if the -- if the New England Journal of
20  Medicine study and the JAMA study were reviewed in
21  Dr. Swartz' article?
22  A.  I'd have to go back and cross-match it, but she had
23  similar findings that she reported in her study, as I
24  noted in my report.
25  Q.  Okay.  If you look at Daniels Exhibit 26, on page 33

## Page 137

1  is the citation of the sources.  Source number 127
2  seems to be, does it not, The Journal of the American
3  Medical Association piece by Tseng, CW Tseng?
4  A.  Yes.
5  Q.  T-s-e-n-g?
6  A.  Yes.
7  Q.  Do you understand my question?  My question is --
8  A.  I said, I believe so.
9  Q.  Thank you.  I did not hear your answer.
10      And then the study referred to in
11  subparagraph B, is that entry number 125 in
12  Dr. Swartz' appendix?
13  A.  I would need to confirm that with my files.
14      We did provide you all the actual -- we can
15  pull that and double-check it.
16  Q.  Um-hum.  Okay.  Let me ask you to look at the
17  Swartz -- in the Swartz article, Daniels Exhibit
18  Number 26, first at page -- on page 9 just above the
19  last bold heading, and the sentence right above that
20  heading says, The newly-released rules for health
21  insurance plans created by the PPACA eliminate
22  cost-sharing for four sets of preventive services, and
23  Medicare also will no longer face cost-sharing for
24  most preventive services as of January 2011.
25      Do you see that?

35 (Pages 134 to 137)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 138

1  A. No.
2  Q. I'm on page -- actually I'm on page 18. I'm sorry. I
3     was looking at the footnote number. I apologize.
4  A. Okay.
5  Q. It's the -- I'm having a hard time reading these
6     numbers. Maybe it's 16. It's the page with footnote
7     nine at the bottom, whatever that is.
8        MR. CANZANO: Yeah.
9  BY MR. BURCHFIELD:
10 Q. Okay. Are you with me?
11 A. Now, yes.
12 Q. It says -- at the last sentence before the bottom
13    heading, says, The newly-released rules for health
14    insurance plans created by the PPACA eliminate
15    cost-sharing for four sets of preventive services, and
16    Medicare also will no longer face cost-sharing for
17    most preventive services as of January 2011.
18       Do you see that?
19 A. I do.
20 Q. Is that accurate, so far as you know?
21 A. Yes.
22 Q. And then over on page 21, under the heading Findings,
23    and this refers to -- let me just read the entire
24    paragraph. It says, Schneeweiss and Zhang
25    specifically examined the effect of Medicare Part D

Page 139

1     coverage gap on the use and out-of-pocket spending of
2     beneficiaries who reached the coverage gap.
3        And, Dr. Daniels, you understand that to
4     mean the doughnut hole?
5  A. Yes.
6  Q. Okay. Using different data sets, both studies found
7     that people who reached the coverage gap reduced their
8     use of drugs in the months after they were affected by
9     the gap. Zhang, et al, estimated such beneficiaries
10    reduced their drug use by 14 percent, 0.7
11    prescriptions per month, and Schneeweiss estimated
12    that their use of drugs in four drug classes of the
13    study declined at the rate of 4.8 percent to 6.3
14    percent per month after they reached the gap. Zhang,
15    et al, also had data on people who had coverage for
16    generic drugs in the coverage gap. Some of these
17    people switched from brand name to generic drugs, but
18    in general these people reduced the number of their
19    prescriptions by only 0.14 prescriptions per month.
20       Do you see that?
21 A. I do.
22 Q. And do you know, Dr. Daniels, whether in the CNH plan
23    the so-called doughnut hole is reduced as a result of
24    the out-of-pocket annual maximums?
25 A. I'm not following you as far as the -- a doughnut hole

Page 140

1     in the CNH plan.
2  Q. Under Medicare Part D which the CNH -- which the
3     retirees in this case would be able to avail
4     themselves under the proposed plan, do you know if
5     there is doughnut hole protection, if you will, as a
6     result of the limit on out-of-pocket spending per
7     year?
8  A. Typically not.
9  Q. Do you know in this plan one way or the other?
10 A. It would not -- under this plan the drug benefit is no
11    longer part of the medical plan benefit. Its
12    individuals are being, under the proposed plan, asked
13    to go to the private marketplace if they want drug
14    coverage. There's no integration done of the out of
15    pockets.
16 Q. Let me ask you to look at the -- at the heading -- the
17    last heading there on page 21, the last finding. It
18    says, Long-term health effects of reduced use of
19    essential drugs, especially for people with chronic
20    health conditions, are unknown.
21 A. I would -- it's stated there, yes.
22 Q. Pardon me?
23 A. Yes.
24 Q. Okay. Are you aware of any -- of any studies to the
25    contrary?

Page 141

1  A. Actually, Swartz on page 12 discusses other studies
2     with other results relating to cost-sharing of
3     prescription drugs.
4  Q. I understand.
5  A. And page 12 would show an adverse effect, the last
6     sentence -- last two sentences on that page in
7     particular.
8        And arguably the Goldman study as well.
9  Q. Okay. But having discussed all the literature, her
10    finding is that: Long-term health effects of reduced
11    use of essential drugs, especially for people with
12    chronic health conditions, are unknown.
13       Do you agree that's her finding on page 21?
14 A. I would refer back and would suggest that it's her
15    conclusions that are critical. And she has findings
16    in two sections, so I don't know how one can determine
17    that findings are findings. They're not findings.
18       MR. BURCHFIELD: Okay. Why don't we take
19    about maybe five minutes. Let me review my notes. I
20    think I'm pretty close to being done.
21       MR. CANZANO: Okay.
22       (Recess taken at 2:42 p.m.)
23       (Back on the record at 2:51 p.m.)
24 BY MR. BURCHFIELD:
25 Q. Dr. Daniels, can we turn to your -- to Daniels Exhibit

36 (Pages 138 to 141)

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 142

1  6, your September report? And I'm on page 7,
2  paragraph 9.
3  A.  Yes.
4  Q.  In paragraph 9 you say that, In my experience, and
5  based on published research, retirees who are
6  generally on fixed incomes are not able to afford even
7  small increases in their expenses without hardship.
8       And it continues, and then -- and then you
9  get to the next paragraph, says, A recent published
10  study asked retirees about their ability to pay for a
11  $2,000 unanticipated expense should it occur in the
12  next month. The study found that only 50 percent of
13  workers and 52 percent of retirees surveyed stated
14  that they would definitely have $2,000 to cover the
15  expense.
16       And then it says, Another published study
17  found that 40 percent of retiree households had
18  expenses that exceed their income, and over 14 percent
19  of retiree households had spending that exceeded 75
20  percent of their income.
21       You followed all that?
22  A.  I did.
23  Q.  The study cited there in footnote 6, that's a survey,
24  right?
25  A.  That is correct.

Page 143

1  Q.  And do you know, Dr. Daniels, what the income
2  distribution of the persons surveyed in that study
3  was?
4  A.  I don't recall.
5  Q.  Do you -- do you know if that study -- and I thought I
6  had it here, but I don't.
7       Do you recall whether that study reported
8  the questions that were asked?
9  A.  My recollection is that the questions are not
10  reported, typical for a study. The questions are not
11  reported publicly.
12  Q.  Do you distinguish between a study and a survey?
13  A.  No.
14  Q.  And then it says, Another published study found that
15  40 percent of retiree households had expenses that
16  exceed their income, and over 14 percent of retiree
17  households had spending that exceeded 75 percent of
18  their income.
19       Do you recall whether that was a survey or
20  an analysis of the actual finances of the respondents?
21  A.  If I recall correctly, it is a survey as well.
22  Q.  Okay. And again, do you know the income -- the income
23  distribution of the respondents to that survey?
24  A.  I don't recall today.
25  Q.  Would you agree with me that at least conceptually a

Page 144

1  higher-income group would be less susceptible to
2  the -- to small increases in expenses?
3  A.  I take exception. I disagree, given the terminology
4  you used, income, because income does not take into
5  account ones debts, or ones liabilities, in other
6  words, so it's disposable income. The difference
7  between, as you know, income and your debts, that is
8  of relevance.
9  Q.  Point taken.
10       But wouldn't you expect that people, as the
11  income increases, the ability of individuals to
12  withstand an increase in their expenses increases?
13  A.  Again I go back to saying: It's based on disposable
14  income.
15  Q.  And we just don't have any data on this class of
16  retirees to know what their average disposable income
17  is, do we?
18  A.  I am not aware of any such data. I was not provided
19  that information if it's available. I don't know.
20       MR. BURCHFIELD: Okay. That's all I have.
21  Thank you very much for your patience.
22       Counsel, any questions?
23       MR. CANZANO: Just let me take a couple
24  minutes. I don't think I have anything.
25       MR. BURCHFIELD: Okay.

Page 145

1       (Recess taken at 2:56 p.m.)
2       (Back on the record at 2:59 p.m.)
3       MR. CANZANO: We're going to reserve the
4  right to read and sign.
5       (Deposition concluded at 2:59 p.m.
6  Signature of the witness was requested.)

37 (Pages 142 to 145)

Page 146

1  JACK REESE, FRANCES ELAINE
2  PIDDE, JAMES CICHANOFSKY,
3  ROGER MILLER, and GEORGE
4  NOWLIN,
5          Plaintiffs,
6  vs.        Case No. 2:04-cv-70592-PJD-PJK
7                Hon. Patrick J. Duggan, U.S.D.J.
8                Hon. Paul J. Komives, U.S. Mag. J.
9  CNH GLOBAL N.V. and CNH
10 AMERICA LLC,
11         Defendants.
12
13
14          VERIFICATION OF DEPONENT
15
16          I, having read the foregoing deposition
17  consisting of my testimony at the aforementioned time
18  and place, do hereby attest to the correctness and
19  truthfulness of the transcript.
20
21
22          _____
23          SUZANNE MARIE DANIELS, Ph.D.
24          Dated:
25

Page 147

1          ERRATA SHEET
2
3  PAGE LINE READS          PAGE LINE SHOULD READ
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23          _____
24          SUZANNE MARIE DANIELS, Ph.D.
25          Dated:

Page 148

1                 CERTIFICATE
2  STATE OF MICHIGAN
3  COUNTY OF OAKLAND
4
5          I, Mary Jo Power, a Notary Public in and
6  for the above county and state, do hereby certify that
7  this deposition was taken before me at the time and
8  place hereinbefore set forth; that the witness was by
9  me first duly sworn to testify to the truth; that this
10 is a true, full and correct transcript of my
11 stenographic notes so taken; and that I am not
12 related, nor of counsel to either party, nor
13 interested in the event of this cause.
14
15
16
17
18
19
20          _____
21          Mary Jo Power, CSR-1404
22          Notary Public
23          Oakland County, Michigan
24          My commission expires:  December 12, 2018
25