# EXHIBIT C

# In The Matter of:

*REESE, ET AL.*

*vs.*

*CNH GLOBAL N.V. and CNH AMERICA, LLC*

*THEO FRANCIS*
*January 16, 2014*

**MERRILL LAD**
1325 G Street NW, Suite 200, Washington, DC
Phone: 800.292.4789   Fax: 202.861.3425

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

----------------------------------+

JACK REESE, FRANCES ELAINE,        +

PIDDE, JAMES CICHANOFSKY,          +

ROGER MILLER, and                  + Case No.

GEORGE NOWLIN,                     + 2:04-cv-70592-PJD-PJK

          Plaintiffs,     +

          v.                          +

CNH GLOBAL N.V. and                +

CNH AMERICA LLC,                   +

          Defendants.     +

----------------------------------+

Deposition of THEO FRANCIS

Washington, D.C.

Thursday, January 16, 2014

1:08 P.M.

Job No.: 1-243485

Pages 1 - 62

Reported by: Denice Z. Lombard, CSR

Page 2

1  Deposition of THEO FRANCIS held at the
2  offices of:
3
4  McDERMOTT WILL & EMERY, LLP
5  500 North Capitol Street, Northwest
6  Washington, D.C. 20001
7
8
9
10
11
12
13
14
15
16
17
18
19
20  Pursuant to agreement, before Denice Z.
21  Lombard, Certified Shorthand Reporter and Notary Public
22  in the District of Columbia.

Page 3

1       APPEARANCES
2
3  ON BEHALF OF PLAINTIFFS:
4     JOHN R. CANZANO, ESQUIRE
5     McKNIGHT, McCLOW, CANZANO, SMITH & RADTKE, P.C.
6     400 Galleria Officentre, Suite 117
7     Southfield, Michigan 48034-8460
8     (248) 354-9650
9
10 ON BEHALF OF DEFENDANTS:
11    LAURA J. CAPOTOSTO, ESQUIRE
12    McDERMOTT WILL & EMERY, LLP
13    500 North Capitol Street, Northwest
14    Washington, D.C. 20001
15    (202) 756-8000
16
17
18
19
20
21
22

Page 4

1           CONTENTS
2  EXAMINATION OF THEO FRANCIS              PAGE
3     By Ms. Capotosto                         6
4
5           EXHIBITS
6     (Attached to the transcript.)
7  FRANCIS DEPOSITION EXHIBIT               PAGE
8  Exhibit 1 Subpoena To Produce Documents, Information,
9     Or Objects Or To Permit Inspection of Premises
10    In A Civil Action served 12-16-13        7
11 Exhibit 2 Subpoena To Produce Documents, Information,
12    Or Objects Or To Permit Inspection of Premises
13    In A Civil Action served 1-6-14         10
14 Exhibit 3 Subpoena To Testify At A Deposition In A
15    Civil Action, served 12-16-03           12
16 Exhibit 4 Plaintiffs' Expert Report by the witness
17    dated 9-26-13                           28
18 Exhibit 5 Employee Insurance Plan for Hourly Employees
19    of Case Corporation, United Auto Workers,
20    Summary Plan Description May 1998-May 2004,
21    Bates CNHA029383-29505                  32
22

Page 5

1       EXHIBITS, continued
2  FRANCIS DEPOSITION EXHIBIT               PAGE
3  Exhibit 6 Employee Group Insurance Plan for Hourly
4     Employees of Case New Holland Inc., United
5     Auto Workers, Summary Plan Description,
6     March 21, 2005 to April 30, 2011,
7     Bates MLL000365-504                     32
8  Exhibit 7 Employee Group Insurance Plan for Hourly
9     Employees of CNH America LLC Who Retired
10    After July 1, 1994 and Before May 1, 2005,
11    United Auto Workers, Summary Plan
12    Description                             33
13
14
15
16
17
18
19
20
21
22

Page 6

1  PROCEEDINGS
2  THEO FRANCIS
3  having been duly sworn, testified as follows:
4  EXAMINATION BY COUNSEL FOR DEFENDANTS
5  BY MS. CAPOTOSTO:
6  Q  Good afternoon, Mr. Francis. How are you
7  today?
8  A  I'm good. How are you.
9  Q  Good thanks. Are you feeling well?
10  A  I have a bit of a cold.
11  Q  Sorry to hear that. Have you taken any
12  prescription medication in the last 24 hours?
13  A  Yes.
14  Q  What prescription medications have you taken
15  in the last 24 hours?
16  A  It's a -- I'm trying to remember the name of
17  it. It's a proton pump inhibitor. I don't remember
18  which one it is.
19  Q  Does that medication --
20  A  Actually, now that I think about it, I'm
21  sorry, I'm wrong. I had switched from a prescription
22  to an over-the-counter, so no. It's an

Page 7

1  over-the-counter medicine.
2  Q  Okay. So that's an over-the-counter medicine.
3  Would that medication affect your memory?
4  A  No.
5  Q  Any other prescription medications?
6  A  No.
7  Q  Any other over-the-counter medications in the
8  last 24 hours?
9  A  Yes.
10  Q  What would that be?
11  A  Allegra-D.
12  Q  Does that affect your memory?
13  A  Not that I'm aware of.
14  Q  Any other non-prescription medications in the
15  last 24 hours?
16  A  No.
17  (Whereupon, Defendants' Exhibit 1 was marked
18  for identification and attached to the transcript.)
19  BY MS. CAPOTOSTO:
20  Q  The court reporter just handed you what is
21  marked Exhibit 1 which is a subpoena for documents
22  dated December 13th, 2013.

Page 8

1  Do you recognize this document, Mr. Francis?
2  A  I believe I've seen one like it anyway.
3  MR. CANZANO: Look through the whole thing,
4  actually the last page.
5  (Witness reviews document.)
6  THE WITNESS: I don't recall if I've seen one
7  exactly like this, no.
8  BY MS. CAPOTOSTO:
9  Q  So let's go to the second page, there's an
10  Affidavit of Service. Do you see that?
11  A  Yeah, I see it, yeah.
12  Q  Were you served on December 16th, 2013 at
13  6:58 p.m. at 314 Carroll Street, Northwest, No. 417,
14  Washington, D.C. 20012 as this signed affidavit
15  indicates?
16  A  I don't recall the exact date that I was
17  served with a subpoena, no.
18  Q  There is an attachment with a series of
19  document requests. I believe it's the last page.
20  Do you see those?
21  A  Yes, I do.
22  Q  You did not provide any documents in response

Page 9

1  to this subpoena, correct?
2  A  Again, I don't know that this was the subpoena
3  that I received, so I don't know whether I provided
4  documents responsive to this request.
5  MR. CANZANO: I could just -- if I could just
6  interject here. We provided documents in response to a
7  prior subpoena. There is no rebuttal report. And I
8  believe we did -- we responded to -- there was a
9  response from counsel to this subpoena which I believe
10  said there are no documents. There may have been an
11  objection included, but there's no rebuttal report.
12  And so anything about a rebuttal report would not --
13  there is nothing.
14  MS. CAPOTOSTO: Understood.
15  Q  So you're not producing documents because
16  you're not submitting a rebuttal report; is that
17  correct?
18  A  It is correct that I did not produce a
19  rebuttal report, yes.
20  Q  And you are not planning to produce a rebuttal
21  report; is that correct?
22  A  I have no plans to produce a rebuttal report,

3 (Pages 6 to 9)

Page 10

1  correct.
2  Q  Thanks
3      (Whereupon, Defendants' Exhibit 2 was marked
4  for identification and attached to the transcript.)
5  BY MS. CAPOTOSTO:
6  Q  Mr. Francis, the court reporter just handed
7  you what's been marked as Exhibit 2 which is a subpoena
8  for documents dated December 30th, 2013.
9      Do you recognize this document?
10 A  I'm sorry. When you say "this document," do
11 you mean this precise document, or do you mean the
12 contents of the document?
13 Q  Have you seen a copy of this document?
14 A  Okay. Because I haven't seen this document
15 before, meaning this piece of paper.
16     Again, I don't recall precisely what was in
17 the document that I received, but this language on this
18 last page does strike me as similar or the same as one
19 of the subpoenas I received.
20 Q  Let's go to page 2 of Exhibit 2, please. That
21 page is an Affidavit of Service; do you see that?
22 A  I see the affidavit, yeah.

Page 11

1  Q  Were you served on January 6, 2014 at
2  8:36 p.m. at 314 Carroll Street, Northwest, No. 417
3  Washington, D.C. 20012 as this signed affidavit
4  indicates?
5  A  I don't remember if that was the precise date
6  that I was served.
7  Q  There is an attachment with a document
8  request. Do you see that? It's the last page of the
9  exhibit.
10 A  I do, yes.
11 Q  You did not provide any documents in response
12 to this subpoena, correct?
13 A  That's correct.
14 Q  Do you plan on producing documents responsive
15 to this?
16     MR. CANZANO: I'm going to object. Just to
17 note that there has been an objection filed in response
18 to this document request, and I believe it's -- there
19 is an ongoing dispute about that. I'm not sure if
20 there was a motion filed on that particular one or not.
21     But it has been objected, so there's no reason
22 to ask about whether there's documents being produced,

Page 12

1  because we've told you we're not producing documents
2  pursuant to the objection.
3      MS. CAPOTOSTO: My question for Counsel then
4  is do plaintiffs plan to withdraw the request for these
5  same documents to CNH's expert witness Scott Macey?
6      MR. CANZANO: No, we do not.
7      (Whereupon, Defendants' Exhibit 3 was marked
8  for identification and attached to the transcript.)
9  BY MS. CAPOTOSTO:
10 Q  Mr. Francis, the court reporter just handed
11 you what has been marked as Exhibit 3 which is a
12 subpoena for testimony dated December 13th, 2013.
13     Do you recognize this document?
14 A  I'm not sure whether I've seen a copy of it
15 before.
16 Q  Again, please go to the second page of the
17 exhibit which is an Affidavit of Service.
18     Do you see that?
19 A  Um-hm, yes, I do see it.
20 Q  Were you served on December 16th, 2013 at
21 6:58 p.m. at 314 Carroll Street, Northwest, No. 417,
22 Washington, D.C. 20012 as this signed affidavit

Page 13

1  indicates?
2  A  I may have been. I don't recall the precise
3  date and time that it was served.
4  Q  Do you understand that you were required to be
5  present here on January 17th, 2014 at 3:00 p.m. to
6  answer questions under oath?
7  A  Yes, I do.
8  Q  Do you further understand that you agreed to
9  appear here today on January 16th at 1:00 p.m. instead
10 of then?
11 A  Yes.
12 Q  Because your testimony is being recorded, you
13 should not interrupt or try to speak over myself or
14 your counsel. Do you understand?
15 A  Yes.
16 Q  For similar reasons, you must provide verbal
17 responses. Nodding or shaking your head or saying
18 uh-huh or uh-uh won't do. Do you understand?
19 A  Yes.
20 Q  If you want a break, let me know. But I will
21 ask that you answer any question that is pending before
22 breaking. Do you understand?

Page 14

1  A  Yes.
2  Q  Finally, if you do not understand a question,
3  let me know. Do you understand?
4  A  Yes.
5  Q  Have you been deposed before, Mr. Francis?
6  A  No.
7  Q  Have you served as an expert witness in any
8  case before?
9  A  No.
10 Q  What is your full name?
11 A  Theodore Jeremy Francis.
12 Q  Where do you live?
13 A  I live at 314 Carroll Street, Northwest,
14 Apartment 417, Washington, D.C. 20012.
15 Q  And for how long have you lived there?
16 A  Since October 2008.
17 Q  And where did you live before that?
18 A  I lived in a rented sublet on Capitol Hill. I
19 don't know the precise address.
20 Q  And how long did you live there?
21 A  A few weeks.
22 Q  And where did you live before that?

Page 15

1  A  I lived -- then it gets complicated. I lived
2  briefly with my aunt in Connecticut, in Old Greenwich,
3  Connecticut.
4  Q  Do you recall the address?
5  A  9 Meadow Place. I don't recall the ZIP code.
6  Q  And what was the period where you lived with
7  your aunt?
8  A  Approximately six months, six to seven months.
9  Q  So what years?
10 A  Oh, I'm sorry, six to seven months during
11 2008, until about August 2008.
12 Q  And before that?
13 A  Before that I lived in Tallahassee, Florida.
14 Q  Do you recall the address?
15 A  I believe it was 1418 Terrace Hollow Court.
16 There may have been a suffix like B, but I don't
17 remember for sure, in Tallahassee, Florida.
18 Q  And how long did you live there?
19 A  Since approximately spring 2006 -- from
20 approximately spring 2006 until approximately December
21 2007.
22 Q  Then how about before that?

Page 16

1  A  Before that I lived in Tampa, Florida.
2  Q  And how long did you live in Tampa?
3  A  I lived in Tampa approximately nine months.
4  Q  And before that?
5  A  Before that I lived in Brooksville, Florida.
6  Q  And how long did you live there?
7  A  I lived in Brooksville, Florida approximately
8  nine or 10 months.
9  Q  So what does that take us back to year-wise?
10 A  Approximately October 2004.
11 Q  Okay. And where were you born, Mr. Francis?
12 A  I was born in Illinois.
13 Q  Where in Illinois?
14 A  Urbana, Illinois.
15 Q  And when were you born?
16 A  April 30th, 1973.
17 Q  Where did you attend high school?
18 A  I attended University Laboratory High School
19 in Urbana, Illinois.
20 Q  And when did you complete high school?
21 A  In 1990.
22 Q  And you went on to college after high school?

Page 17

1  A  I did.
2  Q  Where did you go?
3  A  I went to the University of Illinois at
4  Urbana-Champaign.
5  Q  And what year did you graduate from the
6  University of Illinois?
7  A  1994.
8  Q  And in what field was your degree?
9  A  It was in journalism.
10 Q  Did you go on to graduate school after
11 college?
12 A  Not immediately.
13 Q  What did you do after college?
14 A  I spent three months in Germany.
15 Q  Doing what?
16 A  Living with friends of the family and
17 seeing -- I took German language lessons as well.
18 Q  And then did you go on to graduate school from
19 there?
20 A  Immediately?
21 Q  Yes.
22 A  No.

Page 18

1  Q  What did you do next?
2  A  I went to an internship in Washington, D.C.
3  Q  And what was that internship?
4  A  It was an internship through the Washington
5  Center for Politics and Journalism which has since
6  changed its name.
7  Q  And what years were you in that internship?
8  A  I was in that internship in the fall of 1994.
9  Q  And what did you do next?
10  A  I went to work at a weekly newspaper in
11  southeast Alaska.
12  Q  Do you remember the name of the newspaper?
13  A  It was called the Pilot.
14  Q  And what were you doing there? What kind of
15  reporting?
16  A  I was a general reporter. I covered
17  everything from business to the local fishing industry,
18  logging, environmental issues, local schools, local
19  courts, municipal government; anything and everything
20  that happened in the town.
21  Q  And what next?
22  A  From there I returned to my hometown and

Page 19

1  worked at a pre-press publication house that I believe
2  is no longer in business.
3  Q  And what were you doing in that job?
4  A  I built and maintained databases primarily. I
5  also did some proofreading.
6  Q  And what did you do next career-wise or
7  education-wise?
8  A  After that I attended Columbia University
9  Graduate At School of Journalism.
10  Q  What years were you in attendance at Columbia?
11  A  I was there from late summer, early fall of
12  1996 until graduation in 1997.
13  Q  And what degree did you receive at Columbia?
14  A  I received a master's degree in journalism.
15  Q  And what was your next employment after
16  completing your education at Columbia?
17  A  I worked for a daily newspaper in Morris
18  County, New Jersey called The Daily Record.
19  Q  And what were your duties in that job?
20  A  I was a municipal reporter, I covered schools,
21  city government for various towns in the county. I
22  covered police, courts, a variety of local news issues.

Page 20

1  I did some business reporting as well.
2  Q  And how long were you with that paper?
3  A  I was there from early summer 1997 until late
4  summer, early fall 1998.
5  Q  And what did you do next?
6  A  I went to work on the business desk of the
7  Arkansas Democrat-Gazette in Little Rock, Arkansas.
8  Q  And what were your duties in that job?
9  A  I covered business generally as well as some
10  specific areas that were my responsibility.
11  Q  What were those specific areas?
12  A  They included nursing home neglect and abuse,
13  they included agriculture as well as labor relations
14  and workplace issues, health care.
15  Q  What specifically with health care?
16  A  There was a local hospital that was unionized,
17  and I covered that. I wrote about health maintenance
18  organizations, which were at that time quite prevalent,
19  and the market for health maintenance organizations in
20  Arkansas was in flux.
21  Q  And how long were you with that Arkansas
22  paper?

Page 21

1  A  I was there until August or September of 2000.
2  Q  And what did you do next?
3  A  I went to work for the Wall Street Journal in
4  Dallas, Texas.
5  Q  And what were your duties at the Wall Street
6  Journal?
7  A  I covered stocks. Specifically I covered
8  Texas stocks.
9  Q  Anything else?
10  A  I wrote a few other stories that were germane
11  to the publication within the Wall Street Journal that
12  I was working for.
13  Q  And what did you do next?
14  A  I covered mutual funds for the Wall Street
15  Journal out of New York City.
16  Q  So what year did you make the move from Texas
17  to New York?
18  A  The job in Texas ended December 31st, 2000,
19  and the job in New York began January 1st or 2nd of
20  2000 (sic).
21  Q  And how long were you with the Wall Street
22  Journal in New York?

6 (Pages 18 to 21)

Page 22

1  A  I was with the Wall Street Journal New York
2  office through August of 2008.
3  Q  And what were your duties in that job?
4  A  I had multiple jobs while at the Wall Street
5  Journal during that period. Do you want me to --
6  Q  Sure.
7  A  Okay. I'm sorry, how do you want me to
8  describe them?
9  Q  Oh, just go in chronological order. That
10 would be fine. Thank you.
11 A  Initially I covered mutual funds and
12 investing. I continued to cover some retirement issues
13 as an outgrowth of that, including 401(k) investing.
14    My formal -- next formal job title was as an
15 insurance reporter. I covered the property, casualty
16 and life insurance business, including annuities.
17    My next title was as a health care reporter
18 where I covered hospitals.
19    But throughout that time period I also wrote
20 about topics other than my primary responsibilities.
21 Q  Did you ever write about retiree health care
22 benefits?

Page 23

1  A  Yes, I did.
2  Q  What kinds of articles did you write?
3  A  I wrote front-page articles, I wrote personal
4  finance articles, I wrote corporate news articles.
5  Q  And what was the topic of some of these
6  articles?
7  A  Well, the ones about retiree health care were
8  about retiree health care benefits.
9  Q  What specifically about retiree health care
10 benefits?
11 A  Often changes in retiree health care benefits
12 that companies were implementing, the effects of
13 changes in retiree health care benefits on employees,
14 accounting issues, policy issues, disclosure issues.
15 Q  And how long were you with the Wall Street
16 Journal again? I think you said 2008?
17 A  Through August -- I believe August of 2008.
18 Q  And why did you leave?
19 A  I left to take a job with Business Week in
20 Washington, D.C.
21 Q  And what were your duties at that job?
22 A  At Business Week I was part of the Washington,

Page 24

1  D.C. Bureau, and I covered business and policy and
2  government in the nation's Capitol.
3  Q  Any health care retiree benefits at that
4  point?
5  A  I very likely wrote at least a few articles
6  about retiree issues at the time, yes.
7  Q  And how long were you there?
8  A  I was at Business Week until its sale to
9  Bloomberg LP on December 1, 2009.
10 Q  And then did you start working at Bloomberg?
11 A  Yes.
12 Q  And how long were you with Bloomberg?
13 A  I was with Bloomberg until early March 2010.
14 Q  And why did you leave then?
15 A  I left Bloomberg to take a job with
16 Morningstar, Inc. It's all one word.
17 Q  What were you doing with Morningstar,
18 Incorporated?
19 A  I worked for a division it had acquired called
20 footnoted.
21 Q  What were you doing with footnoted?
22 A  I read SEC filings and analyzed them and wrote

Page 25

1  about them.
2  Q  What kinds of things did you write about them?
3  A  Many things. Everything from analyzing what
4  the disclosures would tell investors about corporate
5  health, about companies' operations, about a company's
6  accounting, about a company's disclosures, about a
7  company's practices or performance.
8  Q  And how long were you with footnoted?
9  A  I was with footnoted for approximately two and
10 a half years until September 2012.
11 Q  And what did you do then in September 2012?
12 A  I left footnoted and I founded Disclosure
13 Matters LLC.
14 Q  Is that your current employer?
15 A  No.
16 Q  Who's your current employer?
17 A  My current employer is Dow Jones & Company.
18 Q  And when did you join Dow Jones & Company?
19 A  I joined Dow Jones & Company in early November
20 2013.
21 Q  So you were with Disclosure Matters from what
22 date to what date?

7 (Pages 22 to 25)

Page 26

1  A  From September 19th, 2012 when I organized the
2  LLC until I joined the Wall Street Journal.
3  Q  Does the LLC Disclosure Matters still exist?
4  A  Yes, the LLC does still exist.
5  Q  But you're not working there?
6  A  I'm not working there on any kind of a regular
7  basis, no.
8  Q  And what were you doing when you were with
9  Disclosure Matters?
10 A  Freelance reporting, writing, research.
11 Q  What kinds of topics?
12 A  All manner of business topics. I wrote about
13 and researched executive compensation, employee benefit
14 plans, board dynamics, corporate governance, mergers
15 and acquisitions; a wide range of business and
16 financial topics.
17 Q  Why did you decide to leave Morningstar and
18 start doing that?
19 A  I left Morningstar because Morningstar and the
20 footnoted unit that it had acquired parted company.
21 Q  And so you said you're now with Dow Jones?
22 A  I'm now with Dow Jones & Company, yes.

Page 27

1  Q  And what are you doing with them?
2  A  I'm a reporter for the Wall Street Journal.
3  Q  Again.
4  A  Again.
5  Q  And what kinds of stories are you covering?
6  A  A wide range of corporate news stories,
7  everything from -- a variety of topics. I don't have a
8  specific area of responsibility beyond corporate news.
9  Q  Anything in the retiree health care area,
10 retiree benefits area?
11 A  Not so far, no.
12 Q  And that is I think your complete employment
13 history?
14 A  Other than some jobs in college, yes.
15 Q  Thank you.
16 A  There was one omission. During the summer of
17 2012 I spent approximately a month working as a
18 temporary blogger for National Public Radio.
19 Q  And what kind of topics were you covering?
20 A  I covered economic issues.
21 Q  Anything in particular?
22 A  A wide range of things from economic

Page 28

1  indicators to some stories drawn from corporate filings
2  to bank financial statements to stories drawn from
3  radio segments that other employees of National Public
4  Radio produced.
5  Q  Have you attended any other classes since
6  graduating from Columbia?
7  A  What do you mean by classes?
8  Q  Any continuing education?
9  A  Yes, I have.
10 Q  What?
11 A  I took a course in programming, and I've also
12 taken a number of informal online or -- online classes
13 or webinars or seminars.
14 Q  On what topics?
15 A  A range of topics from identifying corporate
16 fraud to executive compensation practices to
17 programming, computer programming.
18 Q  Anything else?
19 A  That's all I can think of.
20    (Whereupon, Defendants' Exhibit 4 was marked
21 for identification and attached to the transcript.)
22 BY MS. CAPOTOSTO:

Page 29

1  Q  Mr. Francis, the court reporter just handed
2  you what has been marked Exhibit 4 which is Plaintiffs'
3  Expert Report, Theo Francis, dated September 26th,
4  2013. Do you recognize this document?
5  A  I believe so, but I'm not positive.
6  Q  Can you identify that document?
7  A  It appears very similar if not the same as the
8  expert report that I submitted.
9  Q  This remains your report as of today; is that
10 right?
11 A  Assuming it's the report that I submitted,
12 yes, it does.
13 Q  Please look through it. If you notice any
14 differences, let us know.
15 A  As I said, it appears to be similar without
16 reading every word and comparing it with the copy I
17 kept. I have no reason to think that it's not, but I
18 can't be certain unless I compare it line for line.
19 Q  And you have no further modifications to your
20 report; is that correct?
21 A  None that I'm aware of.
22 Q  Is your report a complete statement?

8 (Pages 26 to 29)

Page 30

1   A   What do you mean by complete statement?
2   Q   Do you have any modifications to your report?
3   A   None that I'm aware of.
4   Q   So is it a complete statement of your report?
5   Or is it a complete statement?
6   A   Well, I'm not sure I understand what you mean
7   by a complete statement.
8   Q   Let's turn to Section IV of your report. You
9   called that "Description of My Review of the Financial
10  Documents." Do you see that?
11  A   I'm sorry?
12  Q   You called it "Description of My Review of the
13  Financial Documents." Do you see that?
14  A   Yes, I do.
15  Q   And it says:
16  "My report is based primarily on my review of
17  CNH Global's financial records and public
18  disclosures, most of them filed with the
19  United States Security and Exchange
20  Commission. I also reviewed documents filed
21  by entities related to CNH Global, including
22  wholly owned subsidiary CNH Capital America

Page 31

1   LLC and FI CBM Holdings N.V., the entity into
2   which Fiat Industrial and CNH Global intend
3   to merge. FI CBM Holdings is also referred
4   to as 'DutchCo,' and is to renamed CNH
5   Industrial N.V. after the merger. A list of
6   documents I reviewed in the preparation of
7   this Report is attached as Exhibit 1."
8   Did you write that?
9   A   Yes, I did.
10  Q   So let's go to Exhibit 1 which I believe is
11  near the end of your report. Do you see Exhibit 1?
12  A   I do, yes.
13  Q   These are all the materials you reviewed; is
14  that correct?
15  A   This appears to be the list that I prepared of
16  all the materials that I reviewed, yes.
17  Q   So there aren't any documents that you
18  reviewed that are not listed here, correct?
19  A   It's correct that there are not any documents
20  that I reviewed that I didn't include in the report to
21  the best of my knowledge, yes.
22  Q   So you did not review any of the court's

Page 32

1   opinions in this case did you?
2   A   I did not.
3   (Whereupon, Defendants' Exhibit 5 was marked
4   for identification and attached to the transcript.)
5   BY MS. CAPOTOSTO:
6   Q   Mr. Francis, the court reporter just handed
7   you what has been marked as Exhibit 5. And I represent
8   to you that it is a Summary Plan Description
9   summarizing the 1998 group benefit plan under which
10  plaintiffs currently receive their health care
11  benefits. Are you familiar with this document?
12  A   I believe it is what you described it as, but
13  I'm not familiar with it.
14  Q   Have you ever seen this document before?
15  A   I have not.
16  Q   So you did not look at this document in
17  preparing your report, right?
18  A   I did not.
19  (Whereupon, Defendants' Exhibit 6 was marked
20  for identification and attached to the transcript.)
21  BY MS. CAPOTOSTO:
22  Q   Mr. Francis, the court reporter just handed

Page 33

1   you what has been marked Exhibit 6. And I represent to
2   you that it is a Summary Plan Description summarizing
3   the 2005 group benefit plan. Plaintiffs do not receive
4   their health care benefits under this plan, but the
5   plan design is substantially similar, if not identical,
6   to the plan CNH has proposed in this case.
7   Are you familiar with this document?
8   A   I am not.
9   Q   So you did not look at this document in
10  preparing your report, right?
11  A   I was not asked to review the company's
12  Summary Plan Description.
13  Q   And you did not do so, correct?
14  A   I did not do so.
15  (Whereupon, Defendants' Exhibit 7 was marked
16  for identification and attached to the transcript.)
17  BY MS. CAPOTOSTO:
18  Q   Mr. Francis, the court reporter just handed
19  you what has been marked Exhibit 7. And I represent to
20  you that Exhibit 7 is a Summary Plan Description
21  summarizing what CNH would like to do to the
22  plaintiffs' health care benefits in this case.

Page 34

1    Are you familiar with this document?
2    MR. CANZANO: I'm going to place an objection
3    to the form of this question. And I'm not trying to be
4    obstructionist, but understanding that you're making
5    certain representations about what the document is.
6    And the objection is that those facts are not in
7    evidence. So with that I'll end my objection.
8    BY MS. CAPOTOSTO:
9    Q    Are you familiar with this document,
10   Mr. Francis?
11   A    I don't believe I've ever seen it before, no.
12   Q    So you did not look at this document in
13   preparing your report, correct?
14   A    That is correct.
15   Q    Mr. Francis, Section I of your report is
16   called "Introduction and Scope of Review."
17       Do you see that?
18   A    Exhibit 4?
19   Q    Yes.
20   A    Section I?
21   Q    Yes.
22   A    I do see that.

Page 35

1    Q    And in that section you say:
2        "I was retained by the law firm of McKnight,
3        McClow, Canzano, Smith & Radtke, P.C. in the
4        lawsuit entitled Jack Reese versus CNH
5        America LLC to review the financial
6        statements of CNH Global N.V., it's
7        subsidiaries and affiliates, including its
8        majority shareholder, Fiat Industrial SpA. I
9        was asked to examine the financial status of
10       CNH Global and to review information on CNH
11       Global's benefit plans and executive
12       compensation."
13       Did you write that?
14   A    Yes, I did.
15   Q    And does that paragraph accurately set forth
16   what plaintiffs' counsel asked you to do?
17   A    I believe so, yes.
18   Q    Mr. Francis, you were not asked whether the
19   benefits in Exhibit 7 were reasonably commensurate with
20   the benefits in Exhibit 5 were you?
21   A    I was not.
22   Q    And you were not asked whether the terms of

Page 36

1    Exhibit 7 were reasonable in light of changes in health
2    care were you?
3    A    I was not.
4    Q    And you were not asked whether Exhibit 7 was
5    roughly consistent with any other benefit plan were
6    you?
7    A    I was asked nothing about Exhibit 7.
8    Q    And in fact you have nothing to say on any of
9    those subjects do you?
10   A    I don't know what you mean by nothing to say.
11   On which subjects? I'm not sure what you mean.
12   Q    On the comparison of CNH benefits, CNH health
13   care benefits.
14   A    When you say I have nothing to say --
15   Q    In your report do you say anything about
16   whether --
17   A    In my report I don't say anything about that,
18   no.
19   Q    In the second paragraph of Section I of your
20   report you wrote:
21       "I understand that the retirees covered by
22       this litigation are hourly retirees who

Page 37

1        retired after July 1st, 1994 and on or before
2        May 1st, 2005, their surviving spouses and
3        dependent spouses and children. I understand
4        that there are approximately 4000 living
5        retirees and spouses covered by the
6        litigation. I also understand that CNH
7        America LLC has proposed reductions to the
8        health care benefits provided to these
9        retirees, spouses and dependents."
10       Did you write that?
11   A    I did.
12   Q    Now, were there any other facts or data that
13   plaintiffs' counsel provided to you and that you
14   considered in preparing your report?
15   A    I don't believe so.
16   Q    Were there any other assumptions that
17   plaintiffs' counsel provided to you and that you relied
18   on in preparing your report?
19   A    I don't believe so.
20   Q    Mr. Francis, you understand that you have been
21   disclosed by plaintiffs as an expert witness in this
22   case, correct?

Page 38

1  A  I'm sorry, that I've been --
2  Q  Disclosed by plaintiffs as an expert witness
3  in this case, correct?
4  A  I don't know what you mean by disclosed in
5  this context.
6  Q  Are you serving as an expert witness in this
7  case?
8  A  Yes, I am.
9  Q  And in fact you plan to provide expert
10 testimony in this case, don't you.
11 A  I haven't discussed providing testimony beyond
12 this deposition.
13 Q  And you understand that in order to do that,
14 you had to provide a report, right?
15 A  Yes, that I do understand.
16 Q  And you provided a report, right?
17 A  I did, yes.
18 Q  It is Exhibit 4, correct?
19 A  I believe so, yes.
20 Q  And you know that this report is required to
21 have all the facts or data that you considered, right?
22 A  That's my understanding, yes.

Page 39

1  Q  And you would agree that your report contains
2  a lot of facts and data wouldn't you?
3  A  I agree that it contains facts and data, yes.
4  Q  And you know that your report should have any
5  exhibits that you are going to use to summarize your
6  testimony, right?
7  A  I'm not sure what you mean by exhibits to be
8  used to summarize testimony.
9  Q  Under the Federal Rules of Civil Procedure, if
10 you're going to use any exhibits, you need to include
11 them in your report just so you know.
12    And your report doesn't have any exhibits,
13 right?
14    MR. CANZANO: I'm going to object to lack of
15 foundation or calling for knowledge of the Rules of
16 Civil Procedure. There are many documents listed in
17 the report that have been provided and that we all
18 have.
19 BY MS. CAPOTOSTO:
20 Q  Mr. Francis, your report does not have any
21 exhibits, right?
22 A  I believe my report does have multiple

Page 40

1  exhibits. Exhibit 1 is a list of documents reviewed
2  and Exhibit 2 is my resume.
3  Q  Let me be more precise. I apologize.
4     Any exhibits that summarize your testimony.
5  A  As I said, I hadn't discussed or contemplated
6  providing testimony on any kind of specific terms
7  beyond doing a deposition.
8  Q  So right now you don't plan to use any
9  exhibits to the summarize your testimony, correct?
10 A  By "testimony," do you mean this deposition?
11 Q  I mean your current testimony, yes.
12 A  You mean the report. I don't plan --
13    MR. CANZANO: I'm going to object, because I'm
14 not sure what you mean by summarize testimony.
15    MS. CAPOTOSTO: Referring to Rule 26 of the
16 Federal Rules of Civil Procedure.
17 Q  And you know your report has to set forth your
18 qualifications including your publications, right?
19 A  I'm sorry, set forth --
20 Q  Your qualifications including your
21 publications, right?
22 A  Yes.

Page 41

1  Q  And your report does that in Section II and
2  Section III, right?
3  A  Yes.
4  Q  It does it also in Exhibit 2, right?
5  A  Yes.
6  Q  And you may understand that your report must
7  contain a list of all the other cases in the previous
8  four years in which you testified as an expert at trial
9  or by deposition.
10    MR. CANZANO: I'm going to object to lack of
11 foundation.
12    MS. CAPOTOSTO: I will represent to you that
13 based on the Rules of Civil Procedure that you would
14 need to do that.
15 Q  And I take it you have not done that, you have
16 not testified as an expert at trial or by deposition in
17 the last four years; is that correct?
18 A  That I said in one of your first questions,
19 I've never been an expert witness before, no.
20 Q  And your report must contain a statement of
21 the compensation to be paid for your study and
22 testimony in this case; is that correct?

Page 42

1  A  That's my understanding, yes.
2  Q  And you provided that information near the end
3  of your report in a section called "Compensation,"
4  correct?
5  A  Yes.
6  Q  You know that your report is also required to
7  set out your opinions in this case, right?
8  A  That's my understanding.
9  Q  There's not a section in your report that
10 clearly sets out your opinions is there?
11 A  I am not sure how you are using the word
12 "opinions" in this case.
13 Q  Is there a section in this report that clearly
14 sets out your opinions?
15 A  When you say "opinion," do you mean judgments
16 or do you mean -- what do you mean by opinion in this
17 context?
18 Q  I mean by the opinions that you are venturing
19 to deliver in this case.
20 A  I understand you're using the word "opinion."
21 I'm not quite sure I know what you mean by opinion.
22 This is -- the full substance of the report is my

Page 43

1  report, and it contains the information I developed and
2  the questions produced in the report. I'm not sure
3  what section you're thinking of.
4  Q  So is there no section in your report where
5  your opinions are set out? Is that correct?
6  A  Again, if by opinion you mean my expert
7  testimony, then entire report sets that out.
8  Q  So Mr. Francis, are there opinions in your
9  report?
10 A  Again, I don't know what you mean by the word
11 "opinion" in this context.
12 Q  You were retained by plaintiffs' counsel to
13 deliver opinions in this case; is that correct? As an
14 expert witness.
15 A  I was retained by my client to provide a
16 report on the subject outlined in Part I.
17 Q  So you didn't render any opinions?
18    MR. CANZANO: I'm going to object to lack of
19 foundation and calling for a legal conclusion or
20 calling for specialized knowledge about a term of art
21 as to what is an opinion in the context of the Federal
22 Rules of Evidence which there's been no reason or

Page 44

1  foundation that this witness would understand any
2  technical definition of that term.
3  BY MS. CAPOTOSTO:
4  Q  You're an investigative journalist, right?
5  A  I am, yes.
6  Q  And what an investigative journalist does is
7  they gather facts and they draw conclusions based on
8  those facts; is that right?
9  A  We gather facts and we report what's going on
10 in the world, yes.
11 Q  So is that what you did here? You gathered
12 facts. Did you draw any conclusions from those facts?
13 A  I gathered facts, and I presented my findings
14 based on those facts as laid out in the report, yes.
15 Q  So can you please point out to me in the
16 report where there are opinions, or your opinions.
17    MR. CANZANO: Same objection.
18    THE WITNESS: Again, I'm not sure what you
19 mean by opinions. If you mean where I say I like or
20 dislike something, no, I don't in any place say that I
21 like or dislike something.
22 BY MS. CAPOTOSTO:

Page 45

1  Q  So it seems to me that your report is largely
2  facts that you have mined from CNH public disclosures;
3  is that correct?
4  A  Quite a bit of it is. I don't know what
5  proportion of it is, yes.
6  Q  Okay. So to the extent that it's not facts
7  and that it's opinions or conclusions that you have
8  drawn based on those facts, I would like you to point
9  those out to me in your opinion.
10    MR. CANZANO: Could I have the question
11 repeated?
12    (Record was read by the reporter as follows:
13    "Question: Okay. So to the extent that it's
14    not facts and that it's opinions or
15    conclusions that you have drawn based on
16    those facts, I would like you to point those
17    out to me in your opinion.")
18    MS. CAPOTOSTO: And that should be report,
19 sorry. I correct that. It should be "... in your
20 report."
21    THE WITNESS: Let me go through it from the
22 beginning.

12 (Pages 42 to 45)

Page 46

1 Specifically based on the material that I list
2 in Exhibit 1 or --
3 BY MS. CAPOTOSTO:
4 Q Yes, I'm looking for you to point out --
5 A -- or do you also want me to look at my
6 professional credentials and so on?
7 Q Any opinions in your report.
8 MR. CANZANO: That's not what the question
9 said. Let's be clear what we're asking the witness to
10 do.
11 BY MS. CAPOTOSTO:
12 Q I'm asking the witness, if there are any
13 opinions in your report, to identify them for me,
14 please.
15 A I understand. I've already made clear that
16 I'm not sure what you mean by opinions. I've already
17 told you that I do not express like or dislike for
18 anything in here if that's what you mean by opinions.
19 Q Do you draw any conclusions?
20 A And you mean in the entire report.
21 Q Yes.
22 A Okay. So in Part II under Education,

Page 47

1 Professional Background and Experience, for example, I
2 conclude that I am a financial journalist because I've
3 covered financial issues.
4 MR. CANZANO: I don't mean to be obstruction
5 here. I just want to kind of keep this moving, and
6 I'll just make a suggestion that we ask the witness in
7 this portion we were asking him did he draw any
8 conclusions, to start with the part that isn't about
9 his history or his qualifications.
10 BY MS. CAPOTOSTO:
11 Q Sure. Why don't we start with your --
12 wherever you would like, Summary of Findings.
13 A Perhaps you can tell me if this is the kind of
14 thing that you're talking about.
15 MR. CANZANO: Summary of Findings is below --
16 THE WITNESS: Oh, Summary of Findings. Okay.
17 In Part V.A2 where I say that "CNH America LLC is a
18 wholly owned subsidiary of CNH Global N.V.," I drew
19 that conclusion from looking at -- in this case I
20 believe it was CNH Global N.V.'s list of subsidiaries.
21 So it was a conclusion on my part that CNH Global was
22 accurately disclosing it's subsidiaries.

Page 48

1 BY MS. CAPOTOSTO:
2 Q So that was your opinion?
3 A That's a conclusion.
4 Q Explain the difference between an opinion and
5 a conclusion in your mind.
6 A Well, as I said, I don't say that I like or
7 dislike anything in this report. That's my
8 understanding of what you mean by opinion. So this
9 would be a conclusion because I'm concluding -- this
10 sentence states flatly that "CNH America LLC is a
11 wholly owned subsidiary of CNH Global N.V."
12 Q So that's not a fact.
13 A Well, the fact is that CNH Global N.V.
14 discloses in its list of subsidiaries that CNH America
15 LLC is among the subsidiaries. My conclusion is that
16 that is accurate and that therefore in stating this I'm
17 stating a fact. But that takes a conclusion on my part
18 that CNH Global N.V. accurately listed its
19 subsidiaries.
20 Q As a journalist, sometimes people write
21 opinion pieces. You probably have done that, right?
22 A I have not, not since college.

Page 49

1 Q But you're familiar with the concept.
2 A I am familiar, yes.
3 Q And they're not necessarily whether you like
4 or dislike things. You're making statements about
5 things and drawing conclusions and things like that.
6 You don't consider that to be an opinion?
7 A Making statements about things is not
8 necessarily an opinion, no.
9 Q So in your mind just stating like or dislike
10 is the only opinion.
11 A In the context of journalism, when you're
12 talking about an opinion piece it is usually an opinion
13 piece because it makes value judgments about what is
14 good or bad or desirable or undesirable.
15 Q And do you make any such value judgments in
16 this paper?
17 A I did not.
18 Q Let's go to Section V of your report.
19 A Um-hm.
20 Q Specifically let's go to Section F. I believe
21 it's paragraphs 27 through 31.
22 A 27 through --

Page 50

1  Q  31.
2  A  Um-hm, yes.
3  Q  And in this section of your report you say
4  Rich Tobin made $2.21 million in 2012, right?
5  A  In which paragraph?
6  Q  I believe that's in paragraph 28.
7  A  I'm sorry, can you repeat the question?
8  Q  You say that Rich Tobin made $2.21 million in
9  2012, right?
10  A  Yes, I do.
11  Q  Then it looks like in the next paragraph you
12  say that Harold Boyanovsky -- and that's
13  B-o-y-a-n-o-v-s-k-y -- made $3.92 million in 2011,
14  right?
15  A  Yes.
16  Q  And that's a lot of money, right?
17  A  Depends what your frame of reference is.
18  Q  Do you think it's a lot of money?
19  A  Depends on the context.
20  Q  Do you think it's a lot of money in your
21  opinion?
22  A  Again, it depends on the context. To somebody

Page 51

1  like Bill Gates it's not very much money.
2  Q  Is it a lot of money to you?
3  A  It's more than I've made in a year, yes.
4  Q  And these individuals have management
5  responsibilities for a global manufacturing company,
6  correct?
7  A  That's my understanding.
8  Q  They have tremendous responsibility, right?
9  A  I don't know what you mean by tremendous. I
10  suppose so.
11  Q  And you're not suggesting that they should
12  have the same benefits as the company's hourly
13  employees are you?
14  A  In my report?
15  Q  Yes.
16  A  I do not make that suggestion, no.
17  Q  You're not aware of any global companies where
18  senior executives get the same benefits as hourly
19  employees are you?
20  A  I believe I have run across that on occasion,
21  but I don't know that I could name the company offhand.
22  Q  So Mr. Francis, why are these facts in your

Page 52

1  report?
2  A  Which facts?
3  Q  The facts in Section V.F.
4  A  They're in the report because they're
5  responsive to the request that was made to me in my
6  capacity as an expert for my client.
7  Q  Please remind me what that request was.
8  A  Sure.
9      "I was asked to examine the financial status
10     of CNH Global and to review information on
11     CNH Global's benefit plans and executive
12     compensation."
13  Q  These facts don't have anything to do with
14  health care do they?
15  A  When you say "anything to do with," are you
16  speaking broadly or --
17  Q  Does that section of your report have anything
18  to do with health care?
19  A  Except insofar as individuals can use their
20  compensation to purchase health care. Not directly,
21  no.
22  Q  It has nothing to do with whether the benefits

Page 53

1  in Exhibit 7 are reasonably commensurate with the
2  benefits in Exhibit 5 does it?
3      MR. CANZANO: I'm going to object to that
4  because it calls for this witness to make a legal
5  conclusion that's beyond the scope of what he was
6  retained to do.
7  BY MS. CAPOTOSTO:
8  Q  He can answer the question.
9  A  I wasn't familiar with Exhibit 7 until coming
10  here today.
11  Q  So the answer is it does not; is that right?
12  A  I'm sorry, can you repeat the question?
13  Q  The facts in this section have nothing to do
14  with whether the benefits in Exhibit 7 are reasonably
15  commensurate with the benefits set out in Exhibit 5
16  does it?
17      MR. CANZANO: I'm going object. It's been
18  asked and answered.
19  BY MS. CAPOTOSTO:
20  Q  Go ahead.
21  A  Again, I wasn't familiar with Exhibit 7, so I
22  don't know that I could answer that. I haven't had a

Page 54

1 chance even to review Exhibit 7 except in a very
2 cursory way.
3    Q    The facts in this section have nothing to do
4 with whether Exhibit 7 is reasonable in light of
5 changes to health care, right?
6    A    I couldn't possibly know whether it has
7 anything to do with that without being more familiar
8 with Exhibit 7.
9        MR. CANZANO: Was it Exhibit 6 was the
10 question?
11       MS. CAPOTOSTO: Sorry, Exhibit 7.
12       THE WITNESS: Again, without being more
13 familiar with Exhibit 7, I couldn't possibly know
14 whether the items in Part F are relevant.
15 BY MS. CAPOTOSTO:
16    Q    And so does information about the executive
17 compensation of CNH's senior executives have anything
18 to do with whether the benefits set out in Exhibit 7,
19 which have been proposed for the plaintiffs in this
20 case, the retiree health benefits that have been
21 proposed for the plaintiffs in this case, whether that
22 is roughly consistent with the benefits provided for

Page 55

1 other employees or retirees?
2        MR. CANZANO: Objection; lack of foundation
3 and assumes facts not in evidence.
4        THE WITNESS: I'm not familiar with what is
5 laid out in Exhibit 7, so I can't speak to whether
6 material that I produced has any relationship to it one
7 way or another.
8 BY MS. CAPOTOSTO:
9    Q    How would executive -- senior executive
10 compensation, what would that have to do with the
11 benefits being offered to hourly employees, the
12 plaintiffs in this case?
13    A    Are the compensation for senior executives in
14 this hypothetical situation being paid for by the same
15 company as the employee benefits?
16    Q    I'm talking about the section in your report.
17    A    But you were asking me about the section in
18 the report in relation to a document I have not
19 reviewed.
20       MR. CANZANO: I don't know that that was the
21 question. Maybe let's get the last question.
22       (Record was read by the reporter as follows:

Page 56

1        "Question: How would senior executive
2        compensation, what would that have to do with
3        the benefits being offered to hourly
4        employees, the plaintiffs in this case?"
5        THE WITNESS: Both are paid for by the same
6 company out of the same assets, reserves, cash flow.
7 BY MS. CAPOTOSTO:
8    Q    Let's go to Section E of your report. It's
9 called "Retiree HealthCare Obligations."
10       Do you see that?
11   A    Um-hm.
12   Q    In paragraph 23 you write that:
13       "CNH reported retiree healthcare and life
14       insurance obligations of $1.2 billion at the
15       end of 2012, up from $1.17 billion at the end
16       of 2011 and $1.16 billion at the end of 2010.
17       In other words, between 2010 and 2012 CNH's
18       total retiree healthcare and life insurance
19       obligation grew by just 4 percent or
20       $47 million."
21       Did you write that?
22   A    I did.

Page 57

1    Q    Do you know how much the company's benefit
2 obligation grew with respect to the plaintiffs' class,
3 the Reese class, during that time period?
4    A    I do not. I don't believe I do, no.
5    Q    And how much that benefit obligation grew,
6 that has nothing to do with whether the benefits set
7 out in Exhibit 7 that have been proposed for the
8 plaintiffs in this case are reasonably commensurate
9 with the benefits they are receiving now which are set
10 out in Exhibit 5 does it?
11       MR. CANZANO: Same objection that I made
12 before about lack of foundation and calling for this
13 witness to make a legal conclusion for which he has
14 no -- he's not stating he's an expert in the law and
15 what you're describing as reasonably commensurate.
16       THE WITNESS: I'm sorry, should I answer
17 anyway? What is the question? I'm sorry.
18       MS. CAPOTOSTO: Read it back.
19       (Record was read by the reporter as follows:
20       "Question: And how much that benefit
21       obligation grew, that has nothing to do with
22       whether the benefits set out in Exhibit 7

15 (Pages 54 to 57)

Page 58

1  that have been proposed for the plaintiffs in
2  this case are reasonably commensurate with
3  the benefits they are receiving now which are
4  set out in Exhibit 5 does it?")
5      THE WITNESS: I'm not familiar enough with
6  Exhibit 7 to offer any sort of statement on what my
7  report might or might not have to do with it.
8  BY MS. CAPOTOSTO:
9    Q  And does this section have anything to do with
10 whether the benefits set out in Exhibit 7 are
11 reasonable in light of changes to health care?
12     MR. CANZANO: Same objection.
13     THE WITNESS: I'm not familiar enough with
14 Exhibit 7 to offer any sort of a statement on that.
15 BY MS. CAPOTOSTO:
16   Q  And it has nothing to do with whether the
17 benefits in Exhibit 7 are roughly consistent with
18 benefits provided to other hourly employees and
19 retirees, right?
20     MR. CANZANO: Same objection.
21     THE WITNESS: In that question what do you
22 mean by "it"?

Page 59

1  BY MS. CAPOTOSTO:
2    Q  Does the information you set out in
3  paragraph 23, does that have — that has nothing to do
4  with whether the benefits set out in Exhibit 7 is
5  roughly consistent to the benefits provided to other
6  hourly employees and retirees does it?
7    A  Again, I'm not familiar enough with Exhibit 7
8  to know how my report or any part of my report relates
9  to it.
10     MS. CAPOTOSTO: Let's go off the record.
11     (Signature having not been waived, the
12 deposition of THEO FRANCIS was concluded at 2:11 p.m.)

Page 60

1         ACKNOWLEDGMENT OF DEPONENT
2     I, THEO FRANCIS, do hereby acknowledge that I
3  have read and examined the foregoing testimony, and the
4  same is a true, correct and complete transcription of
5  the testimony given by me, and any corrections appear
6  on the attached errata sheet signed by me.
7
8  _____    _____
9
10    (Date)              (Signature)

Page 61

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Denice Zelma Lombard, Certified Shorthand
3  Reporter, the officer before whom the foregoing
4  proceedings were taken, do hereby certify that the
5  foregoing transcript is a true and correct record of
6  the proceedings; that said proceedings were taken by me
7  stenographically and thereafter reduced to typewriting
8  by me; and that I am neither counsel for, related to,
9  nor employed by any of the parties to this case and
10 have no interest, financial or otherwise, in its
11 outcome.
12     IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 21st day of
14 January 2014.
15
16 My commission expires June 14, 2018.
17
18 _____
19 NOTARY PUBLIC IN AND FOR
20 THE DISTRICT OF COLUMBIA