# EXHIBIT D

# In The Matter of:

*REESE, ET AL.*
*vs.*
*CNH GLOBAL N.V. and CNH AMERICA, LLC*

---

*MARK L. LYNNE*
*January 17, 2014*

---

**MERRILL LAD**
1325 G Street NW, Suite 200, Washington, DC
Phone: 800.292.4789   Fax: 202.861.3425

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


- - - - - - - - - - - - -X

JACK REESE, et al.,            :

      Plaintiffs,      : Case No.

vs.                            : 2:04-cv-70592-PJD-PJK

CNH GLOBAL N.V. and CNH        :

AMERICA LLC,                   :

      Defendant.       :

- - - - - - - - - - - - -X



Deposition of MARK L. LYNNE

Baltimore, Maryland

Friday, January 17, 2014

9:39 a.m.


Job No.   1-243549

Pages:    1 - 197

Reported by:  Dana C. Ryan, RPR, CRR

Page 2

1       Deposition of MARK L. LYNNE, held at the
2   offices of:
3
4       Bolton Partners, Inc.
5       100 Light Street
6       9th Floor
7       Baltimore, Maryland 21202
8       (800) 394-0263
9
10
11
12
13
14
15
16
17       Pursuant to agreement, before Dana C.
18   Ryan, Registered Professional Reporter, Certified
19   Realtime Reporter and Notary Public in and for the
20   State of Maryland.
21
22

Page 4

1       C O N T E N T S
2   EXAMINATION OF MARK L. LYNNE:        PAGE:
3   By Mr. Rogaczewski            10
4
5
6
7       E X H I B I T S
8       (Attached to the Transcript)
9   LYNNE DEPOSITION             PAGE:
10  Exhibit 1   December 13, 2013 Subpoena      11
11      To Testify
12  Exhibit 2   December 13, 2013 Subpoena      15
13      To Produce Documents,
14      Information, Or Objects Or
15      To Permit Inspection Of
16      Premises In A Civil Action
17  Exhibit 3   December 30, 2013 Subpoena      18
18      To Produce Documents,
19      Information, Or Objects Or
20      To Permit Inspection Of
21      Premises In A Civil Action
22

Page 3

1       A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFFS:
4       DARCIE R. BRAULT, Esquire
5       McKnight, McClow, Canzano,
6           Smith & Radtke, P.C.
7       400 Galleria Officentre
8       Suite 117
9       Southfield, Michigan 48034
10      Telephone: (248) 354-9650
11      Email: dbrault@michworklaw.com
12
13
14  ON BEHALF OF THE DEFENDANT:
15      JOSHUA DAVID ROGACZEWSKI, Esquire
16      McDermott Will & Emery
17      500 North Capitol Street, Northwest
18      Washington, D.C. 20001
19      Telephone: (202) 756-8000
20      Email: jrogaczewski@mwe.com
21
22

Page 5

1       E X H I B I T S   C O N T I N U E D
2       (Attached to the Transcript)
3   LYNNE DEPOSITION             PAGE:
4   Exhibit 4   September 24, 2013 Expert      44
5       Report Of Mark Lynne
6   Exhibit 5   June 3, 2013 Expert Report     54
7       Of Mark Lynne
8   Exhibit 6   December 2011 CBO Article      63
9       Titled Spending Patterns
10      For Prescription Drugs Under
11      Medicare Part D
12  Exhibit 7   Document Titled Estimated      66
13      Total Participants
14  Exhibit 8   January 23, 2013 Draft         84
15      Document Titled Fiat
16      International Employee Group
17      Insurance Plan For Hourly
18      Employees Of CNH America LLC
19      Who Retired After July 1,
20      1994 And Before May 1, 2005,
21      UAW, Summary Plan
22      Description

MARK L. LYNNE – 1/17/2014

Page 6

1    E X H I B I T S   C O N T I N U E D
2        (Attached to the Transcript)
3    LYNNE DEPOSITION                    PAGE:
4    Exhibit 9    June 3, 2013 Document Titled    92
5            Methodology For Calculating
6            Estimated Out-Of-Pocket
7            Costs For Highest-Using
8            Participants (Section IV,
9            Summary Of Findings And
10           Conclusions, Number 28)
11   Exhibit 10   Spreadsheet, Bates Stamped    112
12           MLL000921
13   Exhibit 11   Electronic Document Produced    117
14           On A Flash Drive A Microsoft
15           Excel Workbook Titled IPO --
16           Pension Data -- 130812 - On
17           CNH_slist.xlsx
18   Exhibit 12   Plaintiff Reese's Responses    121
19           To CNH's Second Set Of
20           Interrogatories To Plaintiffs
21
22

Page 7

1    E X H I B I T S   C O N T I N U E D
2        (Attached to the Transcript)
3    LYNNE DEPOSITION                    PAGE:
4    Exhibit 13   Plaintiff Cichanofsky's    127
5            Responses To CNH's Second
6            Set Of Interrogatories To
7            Plaintiffs
8    Exhibit 14   Plaintiff Miller's Responses    131
9            To CNH's Second Set Of
10           Interrogatories To Plaintiffs
11   Exhibit 15   Plaintiff Nowlin's Responses    132
12           To CNH's Second Set Of
13           Interrogatories To Plaintiffs
14   Exhibit 16   January 15, 2014 Expert    136
15           Rebuttal Report Of Mark Lynne
16   Exhibit 17   April 25, 1988 American    144
17           Academy Of Actuaries
18           Valuation Of Accident And
19           Health Plans Under Section 89
20           Of The Internal Revenue Code,
21           Proposed Methodology
22

Page 8

1    E X H I B I T S   C O N T I N U E D
2        (Attached to the Transcript)
3    LYNNE DEPOSITION                    PAGE:
4    Exhibit 18   Highlighter Of A 2012    161
5            Agreement Between
6            Steelworkers And U.S. Steel
7    Exhibit 19   Errata Order Re: Decision    166
8            On Debtors' Motion For
9            Approval Of (1) Sale Of
10           Assets To Vehicle Acquisition
11           Holdings LLC; (2) Assumption
12           And Assignment Of Related
13           Executory Contracts; (3)
14           Entry Into UAW Retiree
15           Settlement Agreement In
16           General Motors Corp.,
17           Et Al., Bankruptcy Case
18   Exhibit 20   Web-based Lexis Printout Of    168
19           A 2007 Court of Appeals
20           Decision In The International
21           Union (UAW) Versus Ford Motor
22           Company

Page 9

1    E X H I B I T S   C O N T I N U E D
2        (Attached to the Transcript)
3    LYNNE DEPOSITION                    PAGE:
4    Exhibit 21   February 22, 2008 Document    179
5            Titled UAW, Union Retirees
6            File Proposed Settlement
7            Establishing VEBA Trust
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

MERRILL LAD
800-292-4789                    www.merrillcorp.com/law

MARK L. LYNNE - 1/17/2014

Page 10

1        P R O C E E D I N G S
2            MARK L. LYNNE,
3  having been duly sworn, testified as follows:
4  EXAMINATION BY COUNSEL FOR THE DEFENDANT
5  BY MR. ROGACZEWSKI:
6      Q    Good morning. Can you state and spell
7  your name for the record?
8      A    Mark, M-A-R-K, Lynne, L-Y-N-N-E.
9      Q    Mr. Lynne, do you have a middle name?
10     A    Lanterman, L-A-N-T-E-R-M-A-N.
11     Q    Are you feeling well today, Mr. Lynne?
12     A    Well, my voice isn't up to scratch,
13  but . . .
14     Q    Are you taking any medication for
15  what's bothering your throat?
16     A    I did take DayQuil this morning.
17     Q    Do you believe taking DayQuil will
18  affect your ability to give testimony today?
19     A    No.
20     Q    Have you taken any prescription
21  medication in the last 24 hours?
22     A    No.

Page 11

1      Q    Have you taken any other
2  nonprescription medication in the last 24 hours?
3      A    Other than that, no.
4          (Lynne Deposition Exhibit 1 was marked
5  for identification and attached to the
6  transcript.)
7  BY MR. ROGACZEWSKI:
8      Q    Mr. Lynne, you've been handed what's
9  been marked as Exhibit 1. It is called a subpoena
10  to testify at a deposition in a civil action,
11  dated December 13, 2013.
12         Do you recognize this document?
13     A    Yes.
14     Q    Have you seen it before?
15     A    Yes.
16     Q    What is this document?
17     A    It's a subpoena that I was served.
18     Q    And do you understand that you were
19  required to be present at my office at 8:00 a.m.
20  this morning to answer questions under oath?
21     A    Yes.
22     Q    And do you further understand that you

Page 12

1  agreed to appear at your office instead at
2  9:30 this morning?
3      A    Yes.
4      Q    And you understand that you're
5  answering questions today under oath?
6      A    Yes.
7      Q    Because your testimony is being
8  recorded, you should not interrupt or try to speak
9  over myself or -- or Ms. Brault.
10         Do you understand?
11     A    Yes.
12     Q    And I will try not to do the same.
13         For similar reasons, you must provide
14  verbal responses; nodding your head, shaking your
15  led or saying things like uh-huh or huh-uh won't
16  do.
17         Do you understand?
18     A    Yes.
19     Q    If you want a break, please let me
20  know. The only thing I ask is that if there is a
21  question pending that you answer it before
22  breaking.

Page 13

1          Do you understand?
2      A    Yes.
3      Q    And, finally, if you do not understand
4  a question, please let me know, and I'll do my
5  best to give you a question that is more
6  comprehensible to you. It's important for me to
7  have a clear record.
8          Do you understand?
9      A    Yes.
10     Q    Have you been deposed before?
11     A    No.
12     Q    Have you testified at a hearing or
13  trial before?
14     A    I've testified in an arbitration.
15     Q    Have you testified at any other
16  hearings or trials?
17     A    No.
18     Q    At how many arbitrations have you
19  testified?
20     A    One.
21     Q    What was the subject matter of the
22  arbitration in which you were deposed -- I'm

4 (Pages 10 to 13)

MARK L. LYNNE - 1/17/2014

Page 14

1   sorry, in which you testified?
2        A   My client, the Howard County, Maryland,
3   School System had a contract with a -- a dental
4   provider for their employee benefits, and there
5   was a dispute as to when they could terminate that
6   contract.
7        Q   Did you testify as a fact witness in
8   the arbitration?
9        A   Yes.
10       Q   You didn't testify as an expert witness
11  in the arbitration?
12       A   I honestly don't recall whether it was
13  fact or expert.  This was some years ago.
14       Q   How long ago was it?
15       A   I believe it was seven or eight years
16  ago.
17       Q   Do you recall providing an expert
18  report like you did in this case in that
19  arbitration?
20       A   No.
21       Q   Was the UAW involved in that
22  arbitration matter?

Page 15

1        A   No.
2        Q   Was Case Corporation involved in that
3   matter?
4        A   No.
5        Q   Was Case, LLC involved in that matter?
6        A   No.
7        Q   Was CNH America, LLC involved in that
8   matter?
9        A   No.
10       Q   Was Fiat involved in that matter?
11       A   No.
12       Q   Was CNH Global N.V. involved in that
13  matter?
14       A   No.
15       Q   Did the matter involve anyone who is a
16  plaintiff in this case?
17       A   No.
18       Q   Did the matter involve retiree health
19  benefits?
20       A   No.
21           (Lynne Deposition Exhibit 2 was marked
22  for identification and attached to the

Page 16

1   transcript.)
2        BY MR. ROGACZEWSKI:
3        Q   Mr. Lynne, you've been handed what's
4   been marked as Exhibit 2.  It is a subpoena to
5   produce documents, information or objects or
6   permit inspection at the premises in a civil
7   action.  It's dated December 13th, 2013.
8            Do you recognize this document?
9        A   Yes.
10       Q   Have you seen this before?
11       A   Yes.
12       Q   What is this document?
13       A   It is a subpoena I received.
14       Q   How did you receive it?
15       A   I was served here in this office.
16       Q   If I could direct you to page 2, the
17  affidavit of service is -- you were severed on
18  December 17th personally in these offices;
19  correct?
20       A   That sounds like the right date.
21       Q   You don't disagree with --
22       A   No.

Page 17

1        Q   You don't disagree -- you don't
2   actively disagree with it?
3        A   No.
4        Q   There is an attachment with a series of
5   document requests.  Do you see those?
6        A   Are you referring to pages 3 and 4?
7        Q   Of the attachment, correct.
8        A   Yes.  Yes, I see them.
9        Q   Do you understand that this subpoena
10  required you to produce documents that satisfied
11  or were responsive to those requests?
12       A   Yes.
13       Q   Did you, in fact, produce documents
14  responsive to these requests?
15       MS. BRAULT:  I'm just going to state
16  for the record we did produce documents responsive
17  to this request and also that we submitted
18  objections to some of the requests, but I believe
19  all the documents were produced.
20       BY MR. ROGACZEWSKI:
21       Q   I'll take the answer.
22       A   Yes.

5 (Pages 14 to 17)

MARK L. LYNNE - 1/17/2014

Page 18

1    Q    Thank you.
2         What documents were produced?
3    A    I produced a rebuttal expert report and
4  other documents that I relied upon for that report
5  and other documents that I received but may not
6  have relied upon.
7    Q    What do you mean by that?
8    A    There were -- there were some documents
9  that I opened, reviewed briefly but did not -- did
10 not factor into my report.
11   Q    To your knowledge, are you withholding
12 any documents that were responsive --
13   A    No.
14   Q    -- to the request?
15   A    No.
16        (Lynne Deposition Exhibit 3 was marked
17 for identification and attached to the
18 transcript.)
19 BY MR. ROGACZEWSKI:
20   Q    Mr. Lynne, you've been handed what's
21 been marked as Exhibit 3. It's another subpoena
22 to produce documents, information or objects or to

Page 19

1  permit inspection at the premises in a civil
2  action. This one is dated December 30, 2013.
3         Do you recognize this document?
4    A    Yes.
5    Q    Have you seen it before?
6    A    Yes.
7    Q    What is this document?
8    A    It's a subpoena that was served to me.
9    Q    Okay. And there is an attachment with
10 the document request. Do you see that?
11   A    Yes.
12   Q    You understand this subpoena required
13 you to produce documents that satisfied the
14 request?
15   A    Yes.
16        MS. BRAULT: I'm going to just state
17 for the record that we also filed an objection to
18 this subpoena as untimely and overly broad. I
19 don't think that Mr. Lynne actively participated
20 in any of the response to that -- to this
21 subpoena.
22        BY MR. ROGACZEWSKI:

Page 20

1    Q    Did you, in fact, produce documents
2  responsive to the request?
3    A    No.
4    Q    Are you withholding any documents that
5  are responsive to the request?
6    A    (Witness reviews document.)
7         MS. BRAULT: I'm going to just state
8  again that we did file objections, so to the
9  extent that asserting an objection is -- your term
10 was "withholding" documents, then to the extent
11 that any documents are being withheld they're
12 being withheld by counsel subject to the
13 objection, not the witness.
14      BY MR. ROGACZEWSKI:
15   Q    I'll take the answer.
16   A    I would agree with that.
17   Q    Are there documents responsive to the
18 request?
19   A    Yes.
20        MR. ROGACZEWSKI: Let me ask,
21 Ms. Brault, are plaintiffs planning to withdraw
22 the analogous request to CNH's experts.

Page 21

1         MS. BRAULT: No. Mr. Lynne is not a
2  registered lobbyist.
3      BY MR. ROGACZEWSKI:
4    Q    Mr. Lynne, where do you live?
5    A    I live in Monkton, Maryland.
6    Q    What is your address there?
7    A    2097 Corbett, C-O-R-B-E-T-T, Road.
8    Q    And could you spell the name of the
9  city again?
10   A    M-O-N-K-T-O-N.
11   Q    And that's in Maryland?
12   A    Yes.
13   Q    How long have you lived there?
14   A    Since 1989.
15   Q    And when were you born, Mr. Lynne?
16   A    March 30, 1958.
17   Q    And where were you born?
18   A    Baltimore, Maryland.
19   Q    Have you lived in Baltimore your entire
20 life?
21   A    In -- in the area, yes.
22   Q    Where did you attend secondary school?

6 (Pages 18 to 21)

MARK L. LYNNE - 1/17/2014

Page 22

1      A    Towson High School.
2      Q    And when did you complete your
3   education at Towson High School?
4      A    1976.
5      Q    And you graduated from Loyola College
6   in 1980 as a bachelor of arts in economics;
7   correct?
8      A    Correct.
9      Q    When did you enroll in Loyola?
10      A    Fall of 1976.
11      Q    Did you attend any colleges other than
12   Loyola?
13      A    No.
14      Q    Have you attended any other classes
15   since completing your education at Loyola?
16      A    I completed the designation called the
17   Certified Employee Benefits Specialist, which
18   required taking ten courses and passing tests, and
19   then also completed a follow-on designation called
20   a Fellow of the Certified Employee Benefits
21   Specialist program.
22      Q    What additional requirements did you

Page 23

1   have to fill to be a fellow?
2      It was in 1995; correct?
3      A    Yes.  It was taking an additional
4   course and a test.
5      Q    One additional course?
6      A    Yes.
7      Q    Now, CEBS allows you to have a
8   specialization in addition to being a certified
9   employee benefits specialist; correct?
10      A    It -- it's the primary designation for
11   consultants in this field.
12      Q    Can you have an additional designation
13   within -- within the field of employee benefits
14   such as -- or -- or are you simply a CEBS?
15      A    I'm a CEBS.
16      Q    Okay.  Any coursework besides from what
17   you've done in connection with becoming a CEBS or
18   a -- and a fellow?
19      A    No.
20      Q    Were any of the classes that you took
21   for the -- well, let me ask it this way.  What
22   were the courses that you had to take to become a

Page 24

1   CEBS?
2      A    I don't remember all of them, but they
3   were -- they had to do with different kinds of
4   employee benefits, health insurance, life,
5   disability, different retirement plans,
6   administration of employee benefits, human
7   resources.
8      Q    Any of the classes touch on labor law?
9      A    I don't recall that there was one that
10   was specifically on labor law, but -- I don't
11   recall the extent to which they -- they would have
12   done that.
13      Q    What about the course that you
14   completed to become a fellow?  What was that
15   course?
16      A    It was additional -- additional study
17   in the employee benefits field and updated current
18   information for what was happening in the benefits
19   field.
20      Q    Does your field have any continuing
21   education requirements?
22      A    It does to be a -- to be an insurance

Page 25

1   broker, which I am, also.
2      Q    What sort of things do you have to do
3   on a regular basis to be an insurance broker?
4      A    You have to take 16 credits every --
5   within a two-year period.
6      Q    Do those credits have to be in any
7   particular areas?
8      A    There are -- there are certain courses
9   that are -- that are sanctioned by the Maryland
10   Insurance Administration that you can take.
11      Q    Just as an example, what is the last
12   course that you took -- or the last three courses
13   that you've taken in connection with your
14   insurance brokers license?
15      A    One was about fraud in -- in benefit
16   plans; one was about requirements for privacy,
17   HIPAA.
18      Q    Then the third?
19      A    I don't recall the third.
20      Q    Okay.  You said fraud in benefit plans,
21   and fraud by whom in connection with benefit
22   plans?

7 (Pages 22 to 25)

Page 26

1    A    Could be fraud by policyholder, by --
2    by company.
3    Q    So either side of the insurance
4    relationship?
5    A    Right.
6    Q    Have any of your insurance broker
7    courses addressed issues associated with labor
8    law?
9    A    I don't recall that they did.
10   Q    You work currently at Bolton Partners;
11   correct?
12   A    Yes.
13   Q    And you've worked here since 1993;
14   correct?
15   A    Yes.
16   Q    Your second stint --
17   A    Yes.
18   Q    -- at Bolton Partners?
19        You concentrate on health care clients
20   and governmental entities; correct?
21   A    Governmental entities and jointly
22   trusteed multi-employer plans.

Page 27

1    Q    And I'm not asking for an identity of
2    your clients.  How would you describe your clients
3    generally?
4    A    They are -- they range in size from,
5    say, 300 participants to I think 60,000
6    participants.  They are typically self-insured
7    health plans.  They have other benefits besides
8    health: life, disability, dental, vision.
9    Q    Are your clients the plans or the plan
10   sponsors?
11   A    With the multi-employer plans, they are
12   the -- the plans, and they're operated by a board
13   of trustees.  With the governmental entities, they
14   are the employer.
15   Q    Are there any nongovernmental employers
16   that number among your clients?
17   A    We have a small number of
18   private-sector employers.
19   Q    Are any of them manufacturing firms?
20   A    No.
21   Q    Are any of them global in scope?
22   A    There are regional but not -- can I ask

Page 28

1    if -- when you say "global," do you mean
2    operations overseas?
3    Q    That's the intent of the question, yes.
4    A    No.
5    Q    One of your clients is the Middletown
6    Works Hourly and Salaried Union Retiree Health
7    Fund; correct?
8    A    Correct.
9    Q    And that's a VEBA fund; right?
10   A    Correct.
11   Q    How many health plans are paid for out
12   of the Middletown Works fund?
13   A    I -- I don't --
14   Q    That's fair.  You work in this field.
15   I don't.
16   A    Right.
17   Q    VEBA funds are not the same as the
18   health benefit plan; correct?
19   A    No, they're -- they have a different
20   structure -- different structure, management
21   structure.
22   Q    I mean, the VEBA fund might, by trust

Page 29

1    agreement, be allowed to pay for benefits under
2    one or more health plans; correct?
3    A    Yes.
4    Q    But it's -- it's distinguishable from
5    the plan itself; right?
6    A    The VEBA trust?
7    Q    Correct.  The -- the --
8    A    Yes.
9    Q    -- VEBA fund itself.
10   A    Yes.
11   Q    Okay.  So with a fund like the
12   Middletown Works fund, how many health plans is it
13   allowed to provide -- under how many health plans
14   is that fund allowed to provide to pay for
15   benefits?
16   A    I'm not aware that there's a limit.
17   Q    Okay.  But -- but as -- factually, how
18   many?
19   A    They have -- they have one health plan
20   for pre-Medicare retirees; they have one for
21   Medicare retirees.  They have a life insurance
22   plan.  They just added dental and investigation

Page 30

1   plans.
2        Q      So it has a different plan for
3   pre-Medicare and Medicare --
4        A   It does.
5        Q   -- retirees?
6            When were each of those plans enacted?
7        A   March of 1980 -- 1998.
8            I'm sorry.  I'm sorry.
9        Q   Okay.
10       A   March of 2008.
11       Q   And that's both of them --
12       A   Yes.
13       Q   -- both the Medicare and the --
14       A   Yes.
15       Q   -- pre-Medicare?
16           Okay.  When were the benefits under the
17   pre-Medicare plan last modified?
18       A   They were -- there have been some --
19   some what I would call minor changes to
20   utilization management programs, for instance, in
21   the prescription plan, to -- one was to make
22   the -- the plan mandatory generic; one was to add

Page 31

1   some new modules to the step therapy program.
2            In terms of the copays, the -- there's
3   a very small change to the prescription copays in
4   2011, I believe it was, where the formulary brand
5   was reduced by a dollar and nonformulary was
6   increased by $2.
7        Q   The Medicare beneficiaries plan, when
8   was the last time those benefits were modified?
9        A   Well, they -- they have the same
10   prescription.  They all have the same prescription
11   program, so those changes were made the same for
12   pre-Medicare and Medicare.
13       Q   And those changes were in 2011?
14       A   Yes.
15       Q   Your clients also include the Baltimore
16   County public entities; correct?
17       A   Yes.
18       Q   I recognize that's actually several
19   distinct clients; correct?
20       A   Yes.
21       Q   How many health plans are operated by
22   those clients?

Page 32

1        A   They have -- let's see.  They have
2   three for active employees and pre-Medicare
3   retirees, and two for Medicare retirees.
4        Q   You say three for actives and
5   pre-Medicares.  Do you mean that there are three
6   plan --
7        A   There are three options that they --
8        Q   That --
9        A   -- can choose from.
10       Q   That actives in pre-Medicare -- that
11   participants can choose from?
12       A   Yes.
13       Q   And two plans that are different from
14   those three that the Medicare participants can
15   choose from?
16       A   Yes.
17       Q   So the actives have the same choices as
18   the pre-Medicare retirees?
19       A   Yes.
20       Q   When were those plans enacted?
21       A   Well, it was a --
22       Q   When -- okay.

Page 33

1        A   Decades ago.
2        Q   Each of those?
3        A   Yeah.
4        Q   Each --
5        A   Yeah.
6        Q   -- each of those five plans have been
7   around for decades?
8        A   Probably since the -- at least the
9   1960s.
10       Q   The actives and pre-Medicare options,
11   when was the last time those plans were modified?
12       A   They have -- there were three different
13   entities.  There's the community college -- which
14   I don't -- I don't believe they have made any
15   modifications in a couple of years -- that the
16   school system increased their emergency room
17   copay.  I believe it was for 20 -- for 2013.
18           The county government negotiated with
19   their unions to make some changes to prescription
20   copays in future years.  I don't recall exactly
21   what those changes were.  I think they were --
22   they were modest increases to the copays.

9 (Pages 30 to 33)

MARK L. LYNNE - 1/17/2014

Page 34

1    Q    So the community college hasn't made
2  modifications in a couple of years.  Do you mean,
3  though, that they -- prior to a couple of years
4  ago they did make changes?
5    A    Their changes have been -- have been
6  very small that I recall.
7    Q    But they have changed; correct?
8    A    Yes.
9    Q    What about the two plan options for the
10  Medicare participants?  When was the last time
11  those plans were modified?
12    A    I -- I think it's been a couple of
13  years.
14    Q    Okay.
15    A    Maybe three or four years.
16    Q    But those plans have also been modified
17  at some point since their enactment?
18    A    Yes.
19    Q    Another of your clients is the Truck
20  Drivers and Helpers Local 355 Health and Welfare
21  Fund; correct?
22    A    Yes.

Page 35

1    Q    And that's a multi-employer health and
2  welfare fund; correct?
3    A    Yes.
4    Q    Even though it's a multi-employer fund,
5  how many health plans does the fund pay for their
6  benefits?
7    A    There are six.
8    Q    And do the plans -- are the plans
9  different from each other because they respond or
10  they have participants from different employer
11  groups?
12    A    The -- each employer can choose from --
13  from three different plans that they want to put
14  their -- that they put their employees in.
15    Q    Are the plans the same for active
16  employees and retirees?
17    A    The -- the only group -- there's one --
18  there's one employer that has retiree benefits.
19    Q    Only one?
20    A    (Witness nods head.)
21    Q    How many other employers are there in
22  the multi-employer group -- how many employers

Page 36

1  does the multi-employer fund correlate with?
2    A    I estimate 20.
3    Q    And only one provides retiree health
4  care benefits?
5    A    Correct.
6    Q    For the one that does provide retiree
7  health care benefits, does it offer one plan, two?
8  How many plans are available for its -- to its
9  retirees?
10    A    One -- one pre-Medicare, and it's
11  essentially the same plan Medicare except that
12  it -- it complements Medicare.  The medical piece
13  complements -- fills out the gaps in Medicare.
14    Q    What about the nonmedical piece of it?
15    A    It's the same.
16    Q    When was the last time that employer's
17  plan for retirees was modified -- were modified,
18  sorry?
19    A    They were just modified this year to
20  remove some annual maximums because of health care
21  reform.
22    Q    What about prior to that?

Page 37

1    A    It's about a -- it's been a number of
2  years.  I don't recall.
3    Q    Mr. Lynne, you were engaged to opine on
4  how CNH's proposed plan would affect plaintiffs;
5  correct?
6    A    Yes.
7    Q    How did you come to be engaged in this
8  project?
9    A    I was contacted by Roger McClow.
10    Q    Did Mr. McClow ask you any specific
11  questions in which he wanted opinions?
12        MS. BRAULT:  I'm going to place an
13  objection.  I think you're going into
14  communications that are outside the scope of Rule
15  26.
16  BY MR. ROGACZEWSKI:
17    Q    Let me try and ask it a different way.
18  How did Mr. McClow describe the scope of the
19  engagement?
20        MS. BRAULT:  Well, again, I think that
21  you're going into communications.  I think that
22  his report indicates what the engagement was.

10 (Pages 34 to 37)

Page 38

1    BY MR. ROGACZEWSKI:
2    Q    I'll take the answer.
3    A    I was asked to review the proposed
4  changes and their impact.
5    Q    Did Mr. McClow define for you what
6  "impact" meant?
7    A    Well, what the -- what the changes
8  would mean in terms of out-of-pocket costs for the
9  retirees.
10   Q    What facts, if any, did Mr. McClow
11  provide you with?
12   A    He -- well, he provided me with a
13  number of documents for the -- the current and
14  proposed plan.
15   Q    Were there any documents that you asked
16  him for?
17   A    I -- I believe the documents that he
18  provided seemed -- seemed comprehensive in terms
19  of allowing me to -- to do the analysis I wanted
20  to do.
21   Q    Over the course of the engagement, have
22  you requested specific information from -- from

Page 39

1  plaintiffs' counsel?
2    A    I -- I did ask for some additional
3  information about some of the cases that Mr. Macey
4  had discussed.
5    Q    And what did you ask for about those
6  cases?
7    A    Information that would -- would give me
8  more insight into what happened with -- with those
9  cases, communications about benefits or court
10  cases.
11   Q    Did you conduct any independent
12  research in connection with those cases?
13   A    I believe I did go on the -- the UAW
14  VEBA Web site.
15   Q    Is it fair to say, then, besides going
16  on the UAW VEBA Web site, what you know about
17  those cases comes to you from plaintiffs' counsel?
18   A    Yes.
19   Q    What did -- what have -- throughout the
20  course of the engagement, what have plaintiffs'
21  counsel told you about the rulings of the Sixth
22  Circuit in this case?

Page 40

1    MS. BRAULT: I'm going to place an
2  objection. I don't think that's within the
3  scope of 25, and I think it's going to
4  communications that are work product and
5  attorney-client privileged, so I'm going to
6  instruct him not to answer.
7    BY MR. ROGACZEWSKI:
8    Q    Are you going to follow the
9  instruction?
10   A    Yes.
11   Q    Okay. What assumptions have you been
12  asked to make for this engagement?
13   A    I haven't been asked to make
14  assumptions. I've been asked to review the --
15  review the records and perform analysis.
16   Q    Okay. Do you have an understanding
17  regarding the rulings of the Sixth Circuit in this
18  case?
19   A    I mean, as best as I -- as I think I
20  can reading the court opinion.
21   Q    And is that the source of your
22  understanding about the rulings of the Sixth

Page 41

1  Circuit in this case?
2    A    Yes.
3    Q    And what is your understanding of the
4  rulings of the Sixth Circuit in this case?
5    A    That -- that the benefits are
6  considered vested but that the Sixth Circuit
7  opined that it felt there could be changes made
8  provided they were -- I believe I remember the
9  phrase -- reasonably commensurate with current
10  benefits.
11   Q    Anything else about the Sixth Circuit
12  opinions?
13   A    I mean, I think they did mention
14  reviewing what had happened with -- with other --
15  with other cases or other employers.
16   Q    Anything else?
17   A    That's what I recall.
18   Q    Now, you've mentioned before that you
19  did request certain -- or you -- you made general
20  requests for information about situations referred
21  to by Mr. Macey, and you asked plaintiffs' counsel
22  for further information about those cases.

11 (Pages 38 to 41)

MARK L. LYNNE - 1/17/2014

Page 42

1    Am I remembering that correctly?
2    A    Yes.
3    Q    Have you asked plaintiffs' counsel for
4 any other types of information throughout the
5 engagement?
6    A    I think that we asked for -- although
7 it could have just been provided by plaintiffs'
8 counsel -- for some information on what pension
9 benefits retirees were getting currently.
10    Q    Is there any information for which
11 you've asked but were not provided?
12    A    I don't recall that.
13    Q    Regarding pension benefits, have you
14 reviewed any pension plan documents?
15    A    Are you asking about a summary plan
16 description?
17    Q    Let me ask it in -- let me ask two
18 different questions.
19    Over the course of the engagement, have
20 you reviewed any pension agreements between CNH
21 and the UAW?
22    A    I don't recall that.

Page 43

1    Q    Have you reviewed any summary plan
2 descriptions of the pension agreements?
3    A    I don't recall that.
4    Q    So what you know about pension benefits
5 comes from plaintiffs' counsel?
6    A    I believe there were some -- some
7 documents that showed individual pensions, and
8 then there was a -- a file that was compiled that
9 had a number of retirees and the pensions they
10 were receiving.
11    Q    What documents do you recall showed
12 individual pensions?
13    A    If I'm remembering correctly, they
14 were -- just names and amounts, but I -- I may be
15 thinking of another case here. Mainly it was
16 the -- a file that had a range of pensions that
17 retirees were getting.
18    MS. BRAULT: If it helps you to refresh
19 your recollection, you can look at Exhibit 1 to
20 your report.
21    MR. ROGACZEWSKI: It actually hasn't
22 been marked yet, but --

Page 44

1    MS. BRAULT: He has it in front of him
2 for the purpose of refreshing his recollection.
3 I'm only suggesting it might make it quicker.
4    THE WITNESS: Oh, the Excel data.
5    I received an Excel database.
6    (Lynne Deposition Exhibit 4 was marked
7 for identification and attached to the
8 transcript.)
9    BY MR. ROGACZEWSKI:
10    Q    Okay. Mr. Lynne, you've been handed
11 what's been marked as Exhibit 4. It is labeled
12 Plaintiffs' Expert Report authored by you. It's
13 dated September 24, 2013.
14    Do you recognize this document?
15    A    Yes.
16    Q    Have you seen it before?
17    A    Yes.
18    Q    And what is this document?
19    A    It's the expert report I prepared.
20    Q    And is this the document that you were
21 just using to refresh your recollection?
22    A    (Witness reviews document.) This does

Page 45

1 refer to an Excel database, yes.
2    Q    All right. Is it -- but my question is
3 a little different. Is it the document you were
4 using to refresh your recollection?
5    A    The one I was looking at here was
6 June 3rd.
7    Q    All right. What is the difference
8 between the document that you used to refresh your
9 recollection and Exhibit 4?
10    A    The -- the main difference was we had
11 additional information with Towers Perrin
12 projections -- Towers Perrin projections beyond
13 their initial ten-year period, and we updated this
14 report to reflect that. They were -- okay.
15    Q    No, you -- I didn't want to cut you
16 off.
17    A    No, I'm done.
18    Q    You initially reviewed Towers Watson's
19 projections through 2022; correct?
20    A    Yes.
21    Q    And then in your June report, you went
22 ten years further, correct, to 2032?

12  (Pages 42 to 45)

Page 46

1    A    No, I believe it was in the September
2  report that we went ten years further. Oh, I'm
3  sorry. I'm sorry. Yes, we -- I misunderstood the
4  question. We -- in the June report, we had the
5  data from Towers and we made our own estimates for
6  another ten years.
7    Q    Why did you run it out another ten
8  years?
9    A    Just to -- you know, because the bulk
10 of the retirees would still be -- there would
11 still be a large retiree group alive for more than
12 ten years, and we wanted to see what the impact of
13 the proposed changes would be going out another
14 ten years, see the increasing impact.
15   Q    Within your industry, is there a period
16 of time beyond which actuarial projections become
17 unrealistic?
18   A    I mean, we have to make our best
19 estimates. I think we're always making estimates
20 for calculating retiree liabilities, and they go
21 out until the last one is expected to be around.
22 I think -- I think we have a -- a pretty good

Page 47

1  model for taking the projections out a number of
2  years.
3    Q    I'm not suggesting that you've done
4  anything incorrectly, by the way. I'm just -- I'm
5  asking a slightly different question, which is,
6  projecting something out 20 years, lots of things
7  can change between now and then; correct?
8    A    It could.
9    Q    At what point in the project did you
10 decide to project out to 2032 instead of perhaps
11 some earlier point?
12   A    It was -- we had gotten the data from
13 Towers going out ten years, and as we were
14 preparing this initial report, we -- we thought it
15 would be good to look even further out to estimate
16 the impact.
17   Q    Do you know why Towers only went out
18 ten years initially?
19   A    I don't.
20   Q    Okay. To the best of your
21 recollection, was it always your intention in the
22 engagement to run it out to 2032?

Page 48

1    A    We -- as we were doing our analysis, we
2  were deciding how far we wanted to look out to see
3  the impact, so when you say "always," I mean, from
4  the first day of the engagement, we didn't have an
5  idea. But as we were doing the analysis, we
6  decided it would be -- we thought it would be
7  useful to take it out a further period of time
8  because, again, the retirees -- there would still
9  be a large number of retirees around even in 2032.
10   Q    Now, you also calculated a maximum
11 out-of-pocket liability using participants with
12 the highest usage of services; correct?
13   A    Yes.
14   Q    Whose idea was it to do that?
15   MS. BRAULT: I'm going to place an
16 objection. I -- I guess I'm -- I would like some
17 clarification. Are you asking him if it was an
18 instruction by counsel to do that? And, if so, I
19 object as it exceeds the scope of 26.
20   BY MR. ROGACZEWSKI:
21   Q    I'll take the answer.
22   MS. BRAULT: Well, I would like to know

Page 49

1  if the question is intending to breach
2  attorney-client communications.
3    MR. ROGACZEWSKI: Well, I'm trying to
4  find out what questions Mr. Lynne was asked. And
5  if Mr. Lynne was asked to identify what the
6  maximum out-of-pocket liability is using the
7  highest number of users, I think that does fall
8  within the scope of what he's allowed to testify
9  to.
10   MS. BRAULT: You should indicate before
11 you answer the question whether you're going to
12 answer with respect to what attorneys may have
13 said to you or people in your team may have said
14 to you.
15   THE WITNESS: Looking at the maximum
16 exposure for any person in a group with a plan
17 change is something that we would normally do
18 anyway, so I believe that we -- this is part of --
19 an assignment like this would be to look at sort
20 of the worst-case scenario for anyone impacted by
21 a plan change.
22   BY MR. ROGACZEWSKI:

13 (Pages 46 to 49)

MARK L. LYNNE - 1/17/2014

Page 50

1    Q    Is this something that you do in your
2  client engagements?
3    A    Yes.
4    Q    Is this something that you do in all
5  your client engagements?
6    A    Well, if -- if we're looking at plan
7  changes, it's a very typical part of it because --
8  especially with the multi-employer plans.
9  There's -- there's always concern about taking
10 care of the membership and see what -- you know,
11 what the -- they -- they want to know what the
12 worst-case scenario would be for their
13 participants --
14   Q    What about --
15   A    -- so --
16   Q    What about your plan sponsor clients?
17   A    We certainly do that there as well,
18 maybe not as much, but -- but, again, a number of
19 those situations are -- do involve negotiations or
20 discussions with unions, so it's good to be
21 prepared with that information.
22   Q    You used pension data provided to you

Page 51

1  by plaintiffs' counsel; correct?
2    A    Yes.
3    Q    Did you do anything to verify that
4  data?
5    A    No.
6    Q    You also reviewed the so-called
7  indemnity plan from 1990 between Case Corporation
8  and the UAW; correct?
9    A    Yes.
10   Q    How about that relate to your
11 engagement?
12   A    We just wanted to understand sort of
13 the history of -- of the plan, and there were
14 discussions about managed care -- introducing
15 managed care plans, and there was -- there was an
16 assertion by -- I believe it was Mr. Macey -- that
17 the introduction of the 1998 plan, the network
18 managed plan, was -- contained some takeaways.
19        And, so, what we wanted to do was to
20 look at the benefits that we're providing under
21 the 1990 plan and compare them to the 1998 plan to
22 see what in -- in totality that -- that plan did:

Page 52

1  was it a better plan; was it a worse plan.
2    Q    You looked at the 1990 plan before you
3  saw Mr. Macey's expert report in this case;
4  correct?
5    A    I think his initial report talked about
6  that if I recall correctly.
7    Q    His report from 2006?
8    A    Yeah.
9    Q    That's your recollection?
10   A    That's my recollection.
11   Q    Okay.  Did you ask to review the 1990
12 indemnity plan?
13   A    Yeah.  I mean, when we're looking at
14 the progression of -- of plan changes, it made
15 sense to look at changes that were made -- that
16 were negotiated and then -- and see how those
17 changes compare to what was proposed.
18   Q    You didn't look at the 1995 plan,
19 though; correct?
20   A    I don't recall that.
21   Q    Were you -- are you aware that there is
22 an intervening plan between the 1990 and the 1998

Page 53

1  plan?
2    A    I don't recall.
3    Q    Did you ask for all prior plans?
4    A    That was my intent, yeah.
5    Q    But you -- you were not given the 1995
6  plan?
7    A    There were a lot of documents.  I . . .
8    Q    But it's your recollection that you
9  asked to review the 1990 plan?
10   A    It was my recollection that that was
11 the plan that preceded the 1998 plan.
12   Q    Looking at the Exhibit 4, page 7,
13 paragraph 1, it says, Charts showing projected
14 costs under the current plan are attached as
15 Exhibit 3.
16        Do you see that?
17   A    You're talking about --
18   Q    In paragraph -- numbered paragraph 1.
19   A    Yep.
20   Q    Do you see that?
21   A    Yes.
22   Q    Are there charts attached to Exhibit 4?

14 (Pages 50 to 53)

Page 54

1    A    (Witness reviews document.) I don't
2  see them in this document.
3    Q    Do you know why there are no charts in
4  Exhibit 4?
5    A    (Witness reviews document.) No, I
6  don't.
7    Q    Did you review Exhibit 4 before you
8  signed it?
9    A    Yes.
10         (Lynne Deposition Exhibit 5 was marked
11  for identification and attached to the
12  transcript.)
13       BY MR. ROGACZEWSKI:
14    Q    All right. Mr. Lynne, you have in
15  front of you what's been marked as Exhibit 5,
16  which is also titled Plaintiffs' Expert Report
17  authored by you. This one is dated June 3rd,
18  2013.
19         Have you seen this document before?
20    A    Yes.
21    Q    What is this document?
22    A    This is the first expert report that I

Page 55

1  prepared.
2    Q    Okay. Now, looking at the same -- on
3  page 7, numbered paragraph number 1, this also
4  says, Charts showing projected costs under the
5  current plan are attached as Exhibit 3; correct?
6    A    Yes.
7    Q    Does Exhibit 5 have charts attached to
8  it?
9    A    Yes.
10    Q    Was it your intent that the charts that
11  are attached to Exhibit 5 would be in Exhibit 4?
12    A    Yes, they were -- yes.
13    Q    Do you recall making any changes to
14  Exhibits 3 and Exhibits 4 to Exhibit 5, your June
15  expert report, between June 3rd and
16  September 24th?
17    A    No.
18    Q    So if we look at the charts attached to
19  the initial expert report and use them in
20  combination with the September expert report,
21  would that be fair?
22    A    Yes.

Page 56

1    Q    Okay. Let's look back at Exhibit 4.
2  It's the more current one. Let's look at
3  paragraph 5.
4    A    What page is that?
5    Q    That's on page 8. I apologize.
6    A    Okay.
7    Q    Now, you project that a
8  Medicare-eligible retiree will have to pay $2,138
9  out-of-pocket in 2013 under the proposed plan
10  instead of 130 under the current plan; correct?
11    A    2,176 compared to 138, I believe.
12    Q    Okay. I apologize for misreading the
13  number. It was not intentional.
14         That projection is still less than $200
15  a month, isn't it?
16    A    Yes.
17    Q    Now, you say that the 2022 projection
18  of 3,735 is 26 times that of the current plan;
19  right?
20    A    2,607 percent, yes.
21    Q    That's comparing the projection for the
22  proposed plan under 2022 with the current plan,

Page 57

1  2013; right?
2    A    (Witness reviews document.) Yes.
3    Q    If you were to compare it, though, to
4  the 2013 projection for the proposed plan, it's
5  only about a 70 percent increase; isn't that
6  correct?
7    A    Do I get to use a calculator?
8    Q    I don't mind. I'm certainly not
9  pretending you're a computer.
10    A    So you are comparing in Section 5 the
11  3,735 to the 2,176?
12    Q    Correct.
13    A    Seventy-three percent.
14    Q    And that's about the same -- and the
15  2032 projection, $7,143, is about 228 percent of
16  the 2013 projection under the -- under the
17  proposed plan; correct?
18    A    Well, it's 3.3 times as much, yeah.
19    Q    Aren't those about the same levels of
20  increase under the current plan?
21    A    Well, they're three times higher in the
22  current plan versus 3.8 but off a very different

Page 58

1  base.
2      Q    But aside from the first-year increase,
3  you would agree that the -- for Medicare eligible
4  participants, the rate of out-of-pocket increase
5  is roughly the same under the current and proposed
6  plan year to year?
7      A    It's higher in the proposed plan.
8      Q    Even after the first year?
9      A    Well, comparing 2032 to 2013, the one
10  is a factor of 3.8 and the other is a factor of
11  3.0, so that's significant to me.
12      Q    Okay.  For the Medicare eligibles, a
13  large portion of the increased cost is the use of
14  Part D for prescription drugs; correct?
15      A    Correct.
16      Q    Now, you talk in your report about the
17  relative value of the plans, and that -- and you
18  calculate that by looking at the plan share of the
19  cost divided by combination of the cost that --
20  that the plan -- the participants pay; correct?
21      A    Yes.
22      Q    And for part -- for -- for prescription

Page 59

1  drug plan cost or for plan cost for Medicare
2  eligibles, you're not factoring in the amount of
3  the benefit costs that are paid for by the
4  government; correct?
5      A    No.
6      Q    You would agree that if you were to
7  put -- if you were to factor in them to the total
8  spending amount, the relative value numbers would
9  be different; correct?
10      A    But the relative value I'm looking at
11  is what the employer is providing, so I don't
12  understand how that's relevant.
13      Q    Well, the current plan there's two --
14  there's two -- there's two -- there are three
15  payors; right?
16          There's the plan for the -- well,
17  there's other payors, whether it's another
18  insurance provider or Medicare, the government,
19  and the participants; correct?
20      A    For the current plan?
21      Q    Yeah.
22      A    You're talking about for the medical

Page 60

1  piece that Medicare pays something?
2      Q    Well, in the case of the medical
3  benefits, yes.
4          In the case of the prescription drug
5  benefits, there's two payors; right?
6      A    Currently.
7      Q    Right.  And that represents the total
8  amount that the benefits cost to all payors;
9  right?
10      A    Yes.
11      Q    And under the proposed plan, a portion
12  of those benefit costs are going to be paid by
13  neither the company nor the participants; correct?
14      A    I mean, there is some federal subsidy,
15  but we don't know what it is.
16      Q    But it would -- you know, if you were
17  to factor that in, wouldn't it reduce the
18  amount -- the percentages by the company and the
19  participant that are paying for the benefits?
20      A    I would never look at it that way.
21      Q    Why not?
22      A    Because I'm looking at what the -- the

Page 61

1  company is providing for its retirees, and
2  that's -- I mean, they're not facing any cost for
3  that.
4      Q    So you don't think it's misleading to
5  say that the participants are picking up X percent
6  of the -- of the cost of their benefit when that
7  ratio doesn't account for the amount that the
8  government is paying?
9      A    No, because we're looking here at how
10  much is in the -- the agreement between the
11  employer and the employee and who's paying what.
12  I mean, we don't look at the -- the current plan
13  now, we don't look at what the federal government
14  might be paying for Medicare and factor that in.
15  I mean, that's -- that's -- it's irrelevant to
16  what the cost is between these two parties.
17      Q    It may be -- it may be, but it is
18  relevant in calculating their share of the total
19  cost of the benefits, isn't it?
20      A    I wouldn't agree.
21      Q    You would agree, though, that if you
22  were to factor it in, the percentage of the

16 (Pages 58 to 61)

MARK L. LYNNE - 1/17/2014

Page 62

1  participant's share would go down, wouldn't it?
2      A   If you were to factor it in.
3      Q   Now, there are changes in the Part D
4  program that will further mitigate the
5  participants' out-of-pocket cost under Part D;
6  correct?
7      A   Yes.
8      Q   Have those been factored into your
9  analysis?
10     A   Well, we -- as I think I mentioned, we
11 had used Towers Watson's projections for the first
12 ten years, so it -- it is our understanding that
13 they -- that that was factored in, the -- the
14 decreasing of the doughnut hole.
15     Q   All right.  So you're factoring in that
16 by 2020 participants will be responsible for only
17 25 percent of the coverage gap?
18         MS. BRAULT:  Can I just ask that there
19 be a clarification when you ask questions about
20 Medicare-eligible retirees and whether you're
21 talking about the medical benefit versus the
22 prescription drugs, because I think that the

Page 63

1  record has gotten quite confused on that issue?
2  BY MR. ROGACZEWSKI:
3      Q   I'll take the answer.
4      A   Can you repeat the question?
5      Q   It's your understanding that your
6  projections are accounting for the fact that by
7  2020 the prescription drug coverage gap under
8  Medicare Part D will be mitigated such that
9  participants are responsible for 25 percent of
10 those costs?
11     A   That is my understanding.
12     Q   What's the basis of that understanding?
13     A   (Witness reviews document.)  My
14 recollection of what the notes were on the Towers
15 Watson's projection spreadsheets, of what they
16 accounted for.
17         (Lynne Deposition Exhibit 6 was marked
18 for identification and attached to the
19 transcript.)
20 BY MR. ROGACZEWSKI:
21     Q   Mr. Lynne, you have in front of you
22 what's been marked as Exhibit 6, which is a CBO

Page 64

1  article called Spending Patterns For Prescription
2  Drugs Under Medicare Part D.  It was produced by
3  you at pages 30 through 36 -- 30 -- I'm sorry, 30
4  through 41.
5          This is an article that you -- that you
6  reviewed; correct?
7      A   Yes.
8      Q   All right.  And you would agree that as
9  far as the CBO was concerned in analyzing spending
10 under Medicare Part D, it looks at what's called
11 total spending; correct?
12     A   That's my understanding.
13     Q   And total spending refers to the drug
14 spending by all payors; correct?
15     A   (Witness reviews document.)  Yes.
16     Q   And, so, I mean, at least one other --
17 I mean, the CBO is looking at things it's
18 important to look at, not just the -- what the
19 plan is paying and what the participant is paying,
20 but the share that's being picked up by the
21 government?
22     A   Well, I would think if anybody would

Page 65

1  the CBO would because they're looking at their own
2  spending.
3      Q   But you don't think it's important?
4          MS. BRAULT:  I'm going to place an
5  objection; that's argumentative.  And he has
6  already answered the questions as to why he did
7  not factor in the percentage that CNH is shifting
8  to the government in their proposed plan.
9  BY MR. ROGACZEWSKI:
10     Q   I'll take the answer.
11     A   Yeah.
12     Q   Going back to Exhibit 4, let's look at
13 paragraph 7 on page 8.  You're projecting that a
14 non-Medicare eligible retiree will have to pay
15 $1,587 out-of-pocket in 2013 instead of the $227
16 that's being projected under the current plan; is
17 that correct?
18     A   Yes.
19     Q   And that's still less than $140 a
20 month, isn't it?
21     A   You're making me get the calculator out
22 again.

17 (Pages 62 to 65)

MARK L. LYNNE - 1/17/2014

Page 66

1        Yes.
2        Q    And in -- and you can feel free to look
3   at charts in Exhibit 5 for this purpose, but in
4   2014 you're projecting about $200 a month;
5   correct?
6        A    Yes.
7        Q    And in 2015, the projection is about
8   $275 a month; correct?
9        A    Yes.
10       Q    Jumping forward to 2019, the projection
11  is about $600 a month?
12       A    Yes.
13       Q    Now, in 2019, though, the projection is
14  that only 10 percent of the participants will be
15  not eligible for Medicare; is that correct?
16       A    I don't know the exact number, but that
17  sounds correct. You're going to . . .
18       Q    I try to ask first and then refresh.
19           (Lynne Deposition Exhibit 7 was marked
20  for identification and attached to the
21  transcript.)
22       BY MR. ROGACZEWSKI:

Page 67

1        Q    You've been handed what's been marked
2   as Exhibit 7. It has the case name at the top and
3   then it has a title Estimated Total Participants.
4   It's dated June 3rd, 2013. It was produced by you
5   at page 913.
6        Do you recognize this document?
7        A    Yes.
8        Q    And what is this document?
9        A    It was our estimate for how many
10  retirees would be in the plan -- how many
11  participants would be in the plan through 2032
12  split by pre- and post-Medicare.
13       Q    Would you agree in 2019 you're
14  projecting about 90 percent of the participants
15  would be Medicare eligible?
16       A    Yes.
17       Q    So for those participants, they're
18  paying only $315 a month in 2019; is that correct?
19       A    (Witness reviews document.) I'm sorry.
20  How much did you say?
21       Q    315.
22       A    In 2019?

Page 68

1        Q    Correct.
2        A    Yes, compared to less than 20 a month
3   in the current plan, but, yes.
4        Q    By the way, this -- Exhibit 7 projects
5   that there will still be 13 participants that are
6   not Medicare eligible in 2032.
7        Do you have an opinion as to what
8   accounts for that?
9        A    CNH retirees either marrying young
10  spouses or having children.
11       Q    And the children --
12       A    Probably young spouses.
13       Q    Have you looked at the demographics
14  currently to see if anyone would actually fit
15  within that?
16       A    Not -- not recently.
17       Q    Is Exhibit 7 created by starting with
18  what you know to be true currently and then using
19  actuarial -- recognize actuarial estimates to
20  project forward?
21       A    Yes.
22       Q    Now, for pre-Medicare eligibles, the

Page 69

1   premium is a large share of the out-of-pocket
2   costs; correct?
3        A    I would say that's reasonable to state
4   that.
5        Q    The premiums are tied to plan cost
6   increases year over year; correct?
7        A    Yes.
8        Q    So if the plan cost increases are not
9   that great in the future, the premiums would be
10  less than what they're projected; correct?
11       A    Yes.
12       Q    And under the proposed plan, both
13  participants and the plan have an incentive to
14  keep costs down; correct?
15       MS. BRAULT: I'm sorry. Could you
16  repeat that question?
17       BY MR. ROGACZEWSKI:
18       Q    Under the proposed plan, both
19  participants and the plan have incentives to keep
20  total plan costs down?
21       A    I'm -- I'm not sure I saw any
22  incentives built into the plan design that

18 (Pages 66 to 69)

Page 70

1   would -- that would reflect that statement.
2       Q    Well, they both share in the cost of
3   the premium -- of -- of the premium increases;
4   correct?
5       A    They do.
6       Q    And the plan's responsible for
7   40 percent of the plan increases and the
8   participants are responsible for 60 percent;
9   correct?
10      A    Yes.
11      Q    So they both have a stake in keeping
12  the plan cost down?
13      A    I guess that's correct.
14      Q    Under the current plan, however, the
15  participants have little incentive to keep the
16  plan costs down; correct?
17      A    (Witness reviews document.)  They do
18  bear out-of-pocket -- some out-of-pocket expenses
19  if they -- if they use significant plan resources,
20  so there is still some incentive.
21      Q    But their incentive is dwarfed by the
22  incentive of the plan to keep the cost down?

Page 71

1       MS. BRAULT:  Object to the use of the
2   term "dwarfed."
3       THE WITNESS:  Well, it's certainly true
4   they would pay a significantly higher amount in
5   the new plan.
6   BY MR. ROGACZEWSKI:
7       Q    And under the proposed plan, a larger
8   share of the increases year over year are borne by
9   the company; correct?
10      A    By the company?
11      Q    (Indicated affirmative.)
12      A    No.
13      Q    Under the current plan.
14      A    Oh, the current plan.  Yes, the company
15  picks up a larger share.
16      Q    A much larger share than the
17  participants; correct?
18      MS. BRAULT:  I'm just going to place an
19  objection.  I think that's argumentative.  The
20  numbers say what the numbers say.  Are you asking
21  him to quantify in some way other than the numbers
22  what the -- what the relative shares are?

Page 72

1   BY MR. ROGACZEWSKI:
2       Q    I'll take the answer.
3       A    The numbers show that the company picks
4   up more of the cost.
5       Q    But you're not willing to say
6   significantly more?
7       A    It's -- it's more.
8       Q    Okay.  Are you uncomfortable with the
9   word "significant"?
10      A    Not always.
11      MS. BRAULT:  Objection: argumentative.
12  Next question.
13  BY MR. ROGACZEWSKI:
14      Q    I'll take the answer.
15      MS. BRAULT:  You don't have to give an
16  answer if you don't want to.
17      MR. ROGACZEWSKI:  I disagree, and I
18  would encourage Ms. Brault not to make speaking
19  objections.  It's inappropriate.
20      THE WITNESS:  I sometimes use the word
21  "significant."
22  BY MR. ROGACZEWSKI:

Page 73

1       Q    You do?
2       A    (Witness nods head.)
3       Q    Why are you unwilling to use it in this
4   instance?
5       A    (Witness reviews document.)  I'm not
6   sure I can answer that.
7       Q    Your opinion is that the relative share
8   of cost under the current plan is constant,
9   correct, for pre-Medicare and Medicare eligible
10  retirees?
11      A    Yes, and so the -- the percentage stays
12  the same, and they each pick up proportionately
13  the same as they are now.
14      Q    Right.  And, so, does that mean -- that
15  means the percentage is about 98 percent, I think
16  you -- that the plan is picking up?
17      A    Yes.
18      Q    So that means that as the plan costs
19  increase, the plan is picking up 98 percent of the
20  cost increase; right?
21      A    That's correct.
22      Q    And the participants are picking up

19 (Pages 70 to 73)

Page 74

1   maybe 2 percent?
2       A    Yes.
3       Q    And 98 is not significantly more than
4   2?
5       A    Well . . . (witness reviews document.)
6           Just as 31 is significantly less than
7   98.
8       Q    I'm sorry.  Could I get an answer to
9   the question?  My question was a little different.
10          Is 98 significantly more than 2?
11      A    Yes.
12      Q    Thank you.
13          Let's talk about the 1990 plan.  You
14  calculated the relative value of the 1990 plan to
15  be 93; correct?
16      A    Yes.
17      Q    You understand that the 1990 plan was
18  in fact negotiated away in 1998; correct?
19      A    Yes.
20      Q    And that it's neither the current plan
21  nor the proposed plan; correct?
22      A    Correct.

Page 75

1       Q    So the 1990 plan really has nothing to
2   do with whether the current plan is reasonably
3   commensurate with the proposed plan, is it?
4           MS. BRAULT:  I'm going to place an
5   objection to form and foundation.
6           THE WITNESS:  What I was attempting to
7   discuss was -- is that Mr. Macey was -- was
8   stating that the '98 plan required significant
9   concessions or give-backs by the union because it
10  was a network managed plan.  And my point was
11  that, first of all, there were -- there were very
12  few changes from what I could see in the numbers
13  of providers, so people were not forced to change
14  providers.  And the plan was a better plan.
15          So I was simply responding to that --
16  to that statement.
17  BY MR. ROGACZEWSKI:
18      Q    Do you have an understanding as to what
19  the Sixth Circuit has said about this issue?
20      A    About managed plans?
21      Q    About the switch to managed care in
22  1998.

Page 76

1       A    I don't recall what they said.
2       Q    Okay.  You don't know if the Sixth
3   Circuit agrees with you or disagrees with you?
4       A    I don't remember what they said about
5   that, but I know what we saw in terms of the --
6   the provider networks painted a very different
7   picture.
8       Q    And how is the 1990 plan relevant to
9   whether the benefits provided under the proposed
10  plan were reasonably commensurate with what are in
11  the current plan?
12          MS. BRAULT:  Same objection, and he
13  answered your question.
14          MR. ROGACZEWSKI:  I disagree, and I'll
15  take the answer.
16          THE WITNESS:  Well, looking at a change
17  that was negotiated by the parties as an
18  improvement, I certainly didn't see the proposed
19  plan as anything like an improvement at all.
20  BY MR. ROGACZEWSKI:
21      Q    So it's your understanding that only
22  improvements are permissible under the Sixth

Page 77

1   Circuit's ruling?
2           MS. BRAULT:  I'm going to place an
3   objection to form, and it exceeds the scope of his
4   retention.
5       BY MR. ROGACZEWSKI:
6       Q    I'll take the answer.
7       A    As I understood their opinion,
8   reasonable changes.  The 1990 to '98 looked
9   reasonable to me.  Comparing that change to the
10  proposed change, those things look very different.
11      Q    Just because one change might be
12  considered reasonable doesn't mean that another
13  change isn't; correct?
14      A    You have to look at each one
15  separately.
16      Q    And you understand that the issue
17  before the court is between the current and the
18  proposed plan; correct?
19      A    I do, but I think an historical
20  perspective is important.
21      Q    And the 1990 plan has nothing to do
22  with whether any changes in the proposed plan are

20  (Pages 74 to 77)

MARK L. LYNNE - 1/17/2014

Page 78

1  reasonable in light of changes in health care, is
2  it?
3      A   I don't understand the question.
4      Q   Let me ask it a different way.  How was
5  the 1990 plan relevant to whether changes in the
6  proposed plan -- to the current plan are
7  reasonable in light of changes in health care?
8      A   I think it shows how plans can be
9  modified as the health care climate changes.  1990
10 to '98 responded to the predominance of these
11 network or managed plans, and so that was -- that
12 became the new plan then.  And what I thought was
13 relevant about that change was that it was -- it
14 appeared to me to be a plan that benefited both
15 parties.  You got -- you got a managed plan in
16 place, a network plan that had some advantages for
17 discounts with providers, but you also got some
18 benefit improvements.
19     Q   So only plans that benefit both sides
20 are -- satisfy the Reese standard?
21     A   I'm not sure I can comment on exactly
22 what the Sixth Circuit is looking for here.

Page 79

1      Q   You just said, though, that it was
2  relevant to you that the plan provided benefits to
3  both sides; correct?
4      A   Yes.
5      Q   And I'm asking you if it's your belief,
6  if it's your opinion that only plans that satisfy
7  that criteria satisfy Reese?
8          MS. BRAULT:  Let me place an objection.
9  I think it exceeds the scope of his retention and
10 is therefore an improper question.
11     BY MR. ROGACZEWSKI:
12     Q   I'll take the answer.
13     A   I mean, I think that should be the
14 objective of -- of any reasonable plan change.
15     Q   That it benefits both sides?
16     A   That there's give and take.
17     Q   And that if it doesn't, it doesn't
18 satisfy the reasonable standard?
19     A   I -- I think --
20         MS. BRAULT:  Objection to form.
21     BY MR. ROGACZEWSKI:
22     Q   I'll take the answer.

Page 80

1      A   I mean, looking at the proposed plan,
2  there appear to be no benefits at all for the
3  plaintiffs, and I don't think that satisfies the
4  reasonableness standard.
5      Q   So it would have to provide some
6  benefits to the participants in order to be
7  reasonable?
8      A   Well, I don't know exactly the
9  magnitude, but I would think that all -- all take
10 and no give is not reasonable.
11     Q   And the 1990 plan would obviously have
12 nothing to do with whether the proposed plan is
13 roughly consistent with what CNH is providing its
14 current employees; correct?
15         MS. BRAULT:  I'm going to place an
16 objection.  I think you're asking him for a legal
17 conclusion about what may or may not be relevant
18 to a legal standard, and it exceeds the scope of
19 his report.
20     BY MR. ROGACZEWSKI:
21     Q   I'll take the answer.
22         MR. ROGACZEWSKI:  And I'll again ask

Page 81

1  Ms. Brault not to make speaking objections.
2          THE WITNESS:  I think it's important to
3  look at, you know, the history of changes that
4  have been made in the past, so I -- again, I think
5  from an historical perspective it's important to
6  look at that plan.
7      BY MR. ROGACZEWSKI:
8      Q   That's important to whether it's -- the
9  proposed plan's roughly consistent with what's
10 being offered currently?
11     A   Again, I think it's important to look
12 at all the history.
13     Q   Even when you're comparing to what's
14 being offered now?
15     A   Well, it's -- it's -- the health care
16 field changes, but, yes, I think the -- looking at
17 history's important.
18     Q   You concluded that the proposed plan
19 has different relative value for the pre-Medicare
20 participants and the Medicare participants;
21 correct?
22     A   Yes.

21 (Pages 78 to 81)

MARK L. LYNNE - 1/17/2014

Page 82

1    Q    And you concluded that that wasn't the
2  case in both the current plan and the 1990 plan;
3  correct?
4    A    I don't believe I came up with exact
5  relative values.
6         (Court reporter asks for
7  clarification.)
8         THE WITNESS:  I don't believe I came up
9  with relative value numbers for the -- other
10  than -- than the cost exhibits here.
11  BY MR. ROGACZEWSKI:
12    Q    So it's not your recollection that you
13  concluded that the relative values for the 1990
14  plan and the current plan were not different for
15  pre-Medicare and Medicare-eligible participants?
16    A    It's my understanding that the pre- and
17  post-Medicare participants had the same benefits
18  with the exception of Medicare paying first on the
19  medical.
20    Q    It's not your opinion, though, that
21  plans can't provide different benefits for
22  pre-Medicare eligibles and Medicare-eligible

Page 83

1  participants; correct?
2    A    Correct.
3    Q    And to the extent the proposed plan has
4  different relative values, it's because of Part D;
5  correct?
6    A    Well, that's -- that's part of it.
7    Q    In the case of the Medicare eligibles;
8  correct?
9    A    But there's also a different medical
10  plan.
11    Q    And you're not suggesting, though, that
12  movement to a plan that treats Medicare
13  participants and pre-Medicare participants make
14  this unreasonable as a conceptual matter?
15    A    I'm sorry.  Can you state that again?
16    Q    That's fair.  It was a bad question.
17         You're not suggesting that it is
18  unreasonable to propose a plan that conceptually
19  treats Medicare-eligible participants and
20  pre-Medicare participants differently?
21    A    I mean, certainly there are plans out
22  there that do that.  There are others that simply

Page 84

1  say you get the same benefit, but on the medical
2  side we pay after Medicare pays and go up to the
3  same place.
4    Q    But neither one is conceptually
5  unreasonable; correct?
6    A    No.
7    Q    You agree, by the way, that there is no
8  difference in quality of care between the current
9  and proposed plan; correct?
10    A    Can you define "quality of care"?
11    Q    Well, let me ask you to look at
12  paragraph 26 of -- of Exhibit 4, where you say,
13  quote, There is no difference in the quality of
14  care that will be provided under the proposed plan
15  compared to the current plan, unquote.
16         Do you still agree with that statement?
17    A    I do.
18         (Lynne Deposition Exhibit 8 was marked
19  for identification and attached to the
20  transcript.)
21  BY MR. ROGACZEWSKI:
22    Q    Now, you say that the proposed plan

Page 85

1  has, quote, more restrictions and exclusions on
2  coverage than the current plan, unquote; right?
3    A    (Witness nods head.)
4    Q    Can you identify those restrictions to
5  me?
6         And while you're -- since you're
7  looking at it, you've been handed what's been
8  marked as Exhibit 8.  It was produced by you at
9  pages 111 through 200.  What is your understanding
10  as to what this document is?
11    A    My understanding is this was the -- the
12  plan that CNH wishes the -- this plaintiff group
13  to go into.
14         One of the restrictions that I saw can
15  be found on page B-25.  I did not see the
16  life-style prescription limitation in the previous
17  plan.  These things are not written for easy
18  finding.  Can you bear with me?
19    Q    I can.  I'm not trying to rush you,
20  believe me.
21    A    And then on page B-18, when I was
22  comparing expenses not covered between the current

22 (Pages 82 to 85)

Page 86

1    plan and this plan, I did not see the one at the
2    very bottom of B-18. It begins, Any treatment of
3    teeth, gums or any oral surgery. I did not see
4    that in the current plan.
5           And -- and then on page B-20, it's the
6    sixth bullet under, In addition. It starts with,
7    Resulting from the treatment of weak, strained or
8    flat feet.
9           Those are the ones that I recall.
10   Q    Okay. Any others?
11   A    Not that I can recall.
12   Q    Okay. Well, your report doesn't
13   specify them. That's why I'm asking.
14   A    Right, right.
15   Q    Okay. And, so, that's why I'm asking
16   for you to identify.
17          Now, you aren't contending that a $200
18   deductible is significant, are you?
19          MS. BRAULT: I'm sorry. Can -- I
20   object to form.
21          BY MR. ROGACZEWSKI:
22   Q    I'll take the answer.

Page 87

1    A    I think when you compare it to zero, I
2    think that's a significant change.
3    Q    You think the increase is significant;
4    correct?
5    A    I think the increase is significant.
6    Q    My question was a little different.
7    Are you contending that a $200 deductible is
8    significant?
9           MS. BRAULT: Objection to form: overly
10   broad.
11          THE WITNESS: In the context of what is
12   supposed to be vested benefits, I think that's
13   significant. And I think you can't just look at
14   one piece of a plan and say is that significant or
15   not. I mean, one -- when I look at it, I think
16   you have to look at all of the increases in cost
17   sharing, and that's just one piece of it.
18          BY MR. ROGACZEWSKI:
19   Q    Standing alone, is it -- compared to
20   the plans that you work with in your business, is
21   a $200 deductible significant?
22          MS. BRAULT: Objection to form: asked

Page 88

1    and answered.
2           THE WITNESS: I think I've answered
3    that.
4           BY MR. ROGACZEWSKI:
5    Q    I'll take the answer.
6    A    It -- it will be significant for some
7    of my plans. I mean, there's -- there's a wide
8    variety of plans out there.
9    Q    Okay. It -- it is not conceptually
10   unreasonable to have a $200 deductible, is it?
11          MS. BRAULT: Objection to relevance.
12   I'm not sure if "conceptually unreasonable" is
13   within the scope of what could be relevant to this
14   case.
15          THE WITNESS: I mean, what we're
16   looking at is what is an overall change here and
17   is this reasonable. I think you can't just look
18   at one piece.
19          BY MR. ROGACZEWSKI:
20   Q    Okay. A 15 percent co-insurance
21   requirement, is that unreasonable?
22          MS. BRAULT: Same objection.

Page 89

1           THE WITNESS: I would not want that
2    in -- in my plans that I consult for.
3           BY MR. ROGACZEWSKI:
4    Q    Do any of your plans have higher
5    co-insurance rates that 15 percent?
6    A    Oh, 15. I thought you said 50.
7    Q    No, one five. I'm sorry. I apologize.
8    A    Most of my multi-employer plans have
9    lower co-insurance rates than that.
10   Q    What about your other -- what about
11   your other plans?
12   A    It -- it depends on what they've
13   bargained.
14   Q    I mean, you would agree, right, no one
15   wants to pay more than they're currently paying;
16   correct?
17   A    Correct.
18   Q    I mean, the plaintiffs don't want to
19   pay more than they're currently paying; CNH
20   doesn't want to pay more than it's currently
21   paying?
22          MS. BRAULT: I'm going to place an

23 (Pages 86 to 89)

Page 90

1  objection to foundation. That's argumentative.
2      THE WITNESS: Are you still waiting for
3  me to answer something?
4  BY MR. ROGACZEWSKI:
5      Q   I am.
6      A   And can you ask that again?
7      Q   I'll just ask a different question.
8          On prescription drugs, a $10 copay for
9  generics is not unreasonable, is it?
10     A   I mean, I -- I have plans with $10
11 co-pays on generic drugs, yes.
12     Q   Or double that for a three-month supply
13 of $20?
14     MS. BRAULT: Objection to the term
15 "unreasonable" which you're using. It's overly
16 broad and irrelevant.
17     THE WITNESS: Not -- you know, I -- I
18 have plans that are -- that could be, you know,
19 like that, better than that, worse than that.
20 BY MR. ROGACZEWSKI:
21     Q   Now, you don't disagree with John --
22 you reviewed John Stahl's expert report; correct?

Page 91

1      A   Yes.
2      Q   You don't disagree with him that
3  participants are likely to choose generics more
4  often under the current plan -- under the proposed
5  plan than the current plan; correct?
6      A   I would not disagree with that.
7      Q   In fact, I think you said about one of
8  the plans that you worked for, that was one of the
9  design goals in one of the recent changes?
10     A   Yes, although better ways to achieve
11 it, I think.
12     Q   I think -- well, the way you said it,
13 it was to force people to use generics; correct?
14     A   Generic equivalents I don't have a
15 problem with.
16     Q   The proposed plans gives participants
17 the ability to choose, whether they want to pay
18 more for a brand or less for a generic; correct?
19     A   Well, so would -- so would that other
20 alternative.
21     Q   I'm sorry. How is it the same to make
22 generics mandatory and to use a cost structure to

Page 92

1  incent people to choose generics?
2      A   Because with the cost structure that's
3  being proposed, you're forcing people who can only
4  get a drug that is brand named to pay a much
5  higher copay. What I'm saying is there's --
6  there's a better way to achieve savings by keeping
7  co-pays where they are and telling people that if
8  there's a generic equivalent they should get it.
9          (Lynne Deposition Exhibit 9 was marked
10 for identification and attached to the
11 transcript.)
12 BY MR. ROGACZEWSKI:
13     Q   Mr. Lynne, you have in front of you
14 what's been marked as Exhibit 9 which has the case
15 name at the top, and it's titled Methodology for
16 Calculating Estimated Out-of-pocket Costs for
17 Highest-Using Participants. It was produced by
18 you at page 922.
19         Do you recognize this document?
20     A   Yes.
21     Q   And what is this document?
22     A   This is what we produced to show what

Page 93

1  we felt was a worst-case scenario for participant
2  cost sharing comparing the two plans.
3      Q   This is not based on any individual
4  participant; correct?
5      A   Yeah. I mean, we got detailed claim
6  files.
7      Q   But it's not based on a single
8  participant; correct?
9      A   Well, it's based on individual
10 participant data and -- and finding the person who
11 had the highest utilization of medical claims and
12 prescription claims.
13     Q   Is that the same person?
14     A   Not necessarily.
15     Q   So you constructed a hypothetical
16 person that had the worst-case scenario on the
17 medical side and the prescription drug side?
18     A   I was simply trying to show what the
19 worst-case scenario could be for medical and
20 prescription.
21     Q   So this doesn't represent the
22 experience of a single member of the plaintiff

24 (Pages 90 to 93)

MARK L. LYNNE - 1/17/2014

Page 94

1  class; correct?
2      A    Not that I know of.
3      Q    All right. No --
4      A    I don't think we got data to identify a
5  person, but we were looking for the highest
6  utilization.
7      Q    So, as far as you know, no participant
8  actually has the total usage that you use for your
9  baseline; right?
10     MS. BRAULT: You mean for the
11  non-Medicare and the Medicare combined?
12     MR. ROGACZEWSKI: Correct.
13     THE WITNESS: I mean, I don't -- I
14  don't know if it's one person or not for the two
15  things together, but that -- based on the data,
16  that -- that would be the, you know, highest
17  possible number we saw.
18     BY MR. ROGACZEWSKI:
19     Q    But you're not aware that any
20  participant actually experienced this total amount
21  between the drugs and the medical benefits;
22  correct?

Page 95

1      A    Correct.
2      Q    And, statistically speaking, by
3  selecting the maximum, you're selecting an outlier
4  to begin with, aren't you?
5      A    As I mentioned before, we -- in -- in
6  this kind of situation where a significant plan
7  change is being proposed, we want to see what --
8  what the worst-case scenario would be because
9  it's -- it's going to impact somebody this way.
10     Q    Did you perform a statistical analysis
11  to identify where on the spectrum these data
12  points were relative to the mean, the median?
13     A    They're the -- they were the highest
14  utilizing person we could find.
15     Q    Did you identify bands of utilization,
16  top 5 percent, meaning -- where --
17     A    This would be the top of the band.
18     Q    And how many participants have similar
19  exposures --
20     A    I don't remember how many were close to
21  these numbers.
22     Q    You just -- you just looked for the

Page 96

1  highest one?
2      A    We were looking at the -- at the
3  worst-case scenario.
4      Q    You didn't factor in whether the next
5  person had 10 percent less or 25 percent less or
6  2 percent less?
7      A    No, but it would surprise me if there
8  was a big difference between the top one and the
9  next one.
10     Q    But you didn't perform a statistical
11  analysis or anything like that, did you, to -- to
12  indicate that?
13     A    No. We had done other analyses that
14  had showed averages. We were just trying to get
15  to the worst-case scenario to see what that would
16  be because these people are on fixed incomes.
17     Q    There's nothing in your report that
18  shows the distribution of --
19     A    No.
20     Q    -- of exposures; right?
21     A    No.
22     Q    Under the drug -- under the drug

Page 97

1  portion you say that you modeled the distribution
2  between generic and brand and mail and retail.
3  What does that mean?
4      A    The data was not specific enough to
5  identify -- it did not identify generic, brand,
6  retail, mail. We just estimated what it was
7  because we could see that the total copay was and
8  how many prescriptions there was. So we just --
9  we looked at what the copay was per prescription
10  depending on whether it was brand, generic,
11  retail, mail and -- and -- and made our best
12  estimate.
13     Q    And how did you make those estimates?
14     A    Just based on what we see with retiree
15  groups in general and their -- how often they use
16  generic versus brand and retail versus mail.
17     Q    Did you look at the actual -- did --
18  did you consider the usage patterns of this
19  particular class of retirees?
20     A    I mean, we -- we had overall data, so I
21  believe we did -- we factored that in.
22     Q    You looked at their past usage?

25 (Pages 94 to 97)

Page 98

1    A    There were some reports from Express
2  Scripts that -- that we had access to.
3    Q    That had data about -- that broke out
4  their actual usage, not projections, but actual
5  usage under the -- under the current plan?
6    A    Overall, yeah.
7    Q    Did you factor in to your model whether
8  they would use more generics under the proposed
9  plan than the current plan?
10   A    I don't think we assumed any shift
11  because we wanted the -- the numbers to be a
12  consistent assumption, so I don't --
13   Q    Even though --
14   A    -- I don't --
15   Q    (Indicating).
16   A    I don't believe we did.
17   Q    Did you consider the impact of the
18  Affordable Care Act on users' drug costs?
19   A    Well, we -- we model it on the --
20  the current Part D benefit, the standard benefit.
21   Q    Okay.  You would agree that both of
22  those issues would lower the number if you had

Page 99

1  factored them in, wouldn't it?
2    A    Are you saying if they used more
3  generic drugs --
4    Q    As one --
5    A    -- would it lower the cost?
6    Q    Correct.
7    A    If they did, it would.
8    Q    And you said before you didn't disagree
9  they're likely to use more generics under the
10  proposed plan than the current plan; correct?
11   A    That's true.
12   Q    And the Affordable Care Act would also
13  reduce the cost in the future; correct?
14   A    It does; although, it reduces the --
15  the brand a little more quickly than generics, so
16  I'm not sure that's -- in the near future, I'm not
17  sure that would really have that much of an
18  impact.
19   Q    Looking at the medical experience of
20  the person that you selected, you found that
21  out-of-pocket costs were $665; correct?
22   A    Yes.

Page 100

1    Q    Now, under the current plan, those
2  would have been co-pays exclusively; correct?
3    A    Right.
4    Q    You assumed all services were done in
5  network; right?
6    A    I -- yeah, I did because that was --
7  that seemed to be what the -- the file was telling
8  us.
9    Q    Yeah.  I'm not questioning that.  I'm
10  just --
11   A    Yeah.
12   Q    -- confirming that.
13        So this person utilized approximately
14  65 instances of medical benefits under the current
15  plan; correct?
16   A    Right.
17   Q    And do you have any -- have you
18  performed any analysis on the claims data to
19  identify whether -- how typical that level of --
20  that utilization is?
21   A    We were not trying to find a typical
22  person.  We were trying to find the person who

Page 101

1  used the most health care to see how bad it would
2  get for them.
3    Q    You didn't consider the person -- you
4  didn't consider the lowest user; right?
5    A    Well, that wouldn't give us the
6  worst-case scenario, so, no, I didn't.
7    Q    No.  But it would give you the
8  best-case scenario, wouldn't it?
9    A    Yes.
10   Q    You doubled the amount because the
11  co-pay doubles, right --
12   A    Right.
13   Q    -- to get to 1330?
14        And what did you do -- did you do any
15  analysis to figure out the other part of it,
16  degree of co-insurance as well as the satisfaction
17  of the deductible?
18   A    Well, since we were assuming the
19  worst-case scenario, we -- we took the
20  out-of-pocket maximum.
21   Q    Okay.  You just assumed that?
22   A    Well, if somebody is going to the

26 (Pages 98 to 101)

MARK L. LYNNE - 1/17/2014

Page 102

1 doctor or a professional 66 times, it's likely
2 they have a lot of other expenses.
3    Q   Okay.
4    A   So I think that's a reasonable
5 assumption.
6    Q   Let's talk about placing Medicare
7 eligibles into the non-network plan.
8        Do you understand what I'm referring to
9 when I say that?
10   A   Uh-huh.
11   Q   Okay.  You say that that creates
12 additional cost shifting under the proposed plan
13 than exists under the current plan; correct?
14   A   Yes.
15   Q   Is it your opinion that that amount of
16 cost shifting is significant?
17   A   Well, I think -- I think it is because
18 they are -- they're in the network plan now which
19 just has co-pays.  They would go to a plan that
20 requires a $250 deductible and then 20 percent
21 co-insurance, so to me that's a significant
22 increase.

Page 103

1    Q   Even in 2022, ten years from now, a
2 Medicare-eligible participant is projected to pay
3 less than $100 per month for their medical
4 benefits and their premiums; correct?
5    A   By what year?
6    Q   2022.
7        MS. BRAULT:  You're just asking about
8 premiums now?
9        MR. ROGACZEWSKI:  And out-of-pocket,
10 but not for drugs because we're talking about the
11 comparison of the network to the non-network.
12       THE WITNESS:  I would agree with that.
13 BY MR. ROGACZEWSKI:
14   Q   Is that a significant amount?
15       MS. BRAULT:  Same objection.
16       THE WITNESS:  (Reviews document.)  I
17 don't -- I don't see how you can look at that in
18 isolation.  I mean, the -- you have to look at
19 what they would be paying in total for medical and
20 prescription because that's what they have now, so
21 it's -- and that was -- it may be less than a
22 hundred dollars a month for medical, but that's

Page 104

1 not all they have in terms of cost.
2 BY MR. ROGACZEWSKI:
3    Q   No, but your opinion, though, is that
4 moving them from the network plan to the
5 non-network plan for medical benefits is --
6 creates additional cost shifting, and I'm trying
7 to understand whether or not it's your opinion
8 that that's a significant amount of cost shifting
9 or not.
10   A   Well, to go from under $10 a month to
11 close to 100 a month is significant.
12   Q   Over a ten-year period?
13   A   Well, I think we have to compare it to
14 where they otherwise would have been, and that's
15 the whole point.
16   Q   What about comparing them to the
17 network plan under the proposed plan?  Did you --
18 did you do that comparison?
19   A   But the Medicare people are not going
20 to be in the proposed -- in the network plan.
21   Q   No, I understand that.
22       Your opinion is that moving them from

Page 105

1 the network plan to the non-network plan creates
2 additional cost shifting, and I'm trying to
3 understand whether or not you were looking at the
4 comparison of the current network plan to the
5 proposed non-network --
6    A   Yes.
7    Q   -- plan, or if you looked at the
8 comparison of the proposed network plan to the
9 proposed non-network plan.
10   A   I was looking at what they would
11 experience, which is the current network plan
12 compared to the proposed non-network plan, because
13 that's what's going to happen to the Medicare
14 population.
15   Q   You identify in your report a number of
16 alternatives that CNH could have pursued on the
17 prescription drug side for Medicare eligibles;
18 correct?
19   A   Well, some -- some were for all
20 participants and some were specifically for
21 Medicare eligible.
22   Q   Could you point to me the ones that are

27 (Pages 102 to 105)

Page 106

1  not --
2     A    Well, the -- EGWP would only be for
3  Medicare eligible.
4        (The Reporter asks for clarification.)
5        THE WITNESS: Employer Group Waiver
6  Plan. The acronym is EGWP.
7     BY MR. ROGACZEWSKI:
8     Q    So paragraph 31 says -- just tell me if
9  I'm reading this incorrectly -- the proposed plan
10 for Medicare eligible retirees would require the
11 retiree to purchase an individual Part D
12 prescription drug plan at a significant cost,
13 while completely eliminating the cost to CNH;
14 correct?
15       That's your opinion; right?
16    A    Yes.
17    Q    An alternative would to be consider a
18 number of programs and plan revisions that would
19 significantly reduce the cost to CNH while
20 continuing to maintain comparable benefits for
21 retirees.
22       And that's also your opinion; correct?

Page 107

1     A    Yes.
2     Q    And that's an alternative to what the
3  proposed plan is for Medicare eligibles on
4  prescription drugs; correct?
5     A    You mean the proposed nonplan.
6     Q    I'm using the proposed plan.
7     A    There is no plan.
8     Q    Well, there is a plan.
9     A    There's not a plan.
10       MS. BRAULT: The proposed plan does not
11 cover prescription drugs.
12       THE WITNESS: The proposed plan is no
13 plan provided by the employer, but what -- I mean,
14 what I'm saying is that there were alternatives
15 that could have been pursued to provide some
16 savings instead of completely doing away with the
17 plan.
18    BY MR. ROGACZEWSKI:
19    Q    Those are A, B, C and D; correct?
20    A    Correct.
21    Q    And those are alternatives for
22 Medicare-eligible retirees and prescription drugs;

Page 108

1  correct?
2     A    The first three, A, B and C, could also
3  be implemented for pre-Medicare. I was focusing
4  on the Medicare because that was the big -- to me
5  that was the big change proposed by CNH. But you
6  could do A, B and C, also, for the pre-Medicare
7  group. D is only some -- D is the only one you
8  can do for the Medicare group.
9     Q    Would it be fair to read your report as
10 suggesting that the alternatives in A through D
11 would satisfy the Reese standard?
12       MS. BRAULT: You're just talking about
13 the prescription drug piece of it?
14       MR. ROGACZEWSKI: I'm saying any of the
15 alternatives that Mr. --
16       MS. BRAULT: I'm going to --
17       MR. ROGACZEWSKI: -- Lynne sets forth.
18       MS. BRAULT: I'm going to make an
19 objection. I think you're asking him questions
20 that are beyond his request for opinions.
21       THE WITNESS: I could not bear to
22 imagine what would satisfy Judge Sutton.

Page 109

1     BY MR. ROGACZEWSKI:
2     Q    These are alternatives, however, that
3  you suggested; correct?
4     A    Yes.
5     Q    You wouldn't suggest an alternative
6  that would not be permissible, would you?
7        MS. BRAULT: Well, I'm going to just
8  object by what you mean "permissible."
9        THE WITNESS: Yeah. They would be --
10 permissible, how do you mean permissible?
11    BY MR. ROGACZEWSKI:
12    Q    Well, the issue in the case right now,
13 as you understand it, is what changes CNH is
14 allowed to make; correct?
15    A    Yes.
16    Q    And it's your opinion that CNH could
17 have considered the alternatives outlined in
18 paragraph 31; correct?
19    A    I think they could have, yes.
20    Q    All right. So it's not -- it -- it --
21 it is not fair to consider in your opinion that
22 those are -- those are reasonable changes to the

28 (Pages 106 to 109)

MARK L. LYNNE - 1/17/2014

Page 110

1  benefits?
2      A    I think they are reasonable changes.
3      Q    Are those the outer bound of what is
4  permissible or reasonable?
5      MS. BRAULT: Same objection.
6      THE WITNESS: I -- I -- I don't know
7  what -- what the court -- how the court will
8  think.
9      BY MR. ROGACZEWSKI:
10     Q    I mean, these --
11     A    I'm -- I'm just coming up with what I
12  think would have been reasonable alternatives.
13     Q    But this is not obviously an exclusive
14  list of what would be reasonable changes; correct?
15     A    I mean, I think at some point you have
16  to look at a -- a -- and I don't know -- if you
17  did all of these and other things, I think you
18  might start going beyond what was reasonable.
19     MR. ROGACZEWSKI: Now would actually be
20  a good time for a break.
21     (Recess -- 11:45 a.m.)
22     (After recess -- 12:02 p.m.)

Page 111

1      BY MR. ROGACZEWSKI:
2      Q    Mr. Lynne, you mentioned earlier that
3  you considered the pensions that class members
4  received; is that correct?
5      A    Yes.
6      Q    And that's the only form of income that
7  you considered in evaluating the participant's
8  ability to pay for health care; correct?
9      A    It is.
10     Q    You didn't consider social security or
11  disability income; correct?
12     A    I didn't have that information, but I
13  did not consider it.
14     Q    You didn't consider if they had income
15  from other employment; correct?
16     A    No.
17     Q    You didn't consider any other assets
18  they might have?
19     A    No.
20     Q    You didn't consider if they had other
21  spending that could be shifted to cover health
22  care benefits; correct?

Page 112

1      A    Correct.
2      (Lynne Deposition Exhibit 10 was marked
3  for identification and attached to the
4  transcript.)
5      BY MR. ROGACZEWSKI:
6      Q    Mr. Lynne, you have in front of you
7  what's been marked as Exhibit 10. It has the case
8  name at the top. It doesn't have a title. It's
9  a -- it appears to be a spreadsheet. It was
10  produced by you at 921.
11     Do you recognize this document?
12     A    Yes.
13     Q    And what is this document?
14     A    It is the end product of analysis that
15  I had my associate Bill Hudec do to sort through
16  the pension data file we got and put -- put the
17  pensioners in different categories and see how
18  many there were and -- and -- excuse me -- and
19  what the -- what the median was -- median pension.
20     Q    And I think you said earlier that you
21  received a file from plaintiffs' counsel that had
22  pension data on it. Am I remembering that

Page 113

1  correctly?
2      A    Yes.
3      Q    Is that the data that Mr. Hudec used --
4      A    Yes.
5      Q    -- to create Exhibit 10?
6      A    Yes.
7      Q    You see in the upper left-hand corner
8  it says, Redacted, and there's a dark strip. Do
9  you see that?
10     A    Uh-huh.
11     Q    Do you -- do you know what is behind
12  the redaction?
13     A    No.
14     Q    Did you redact something from this
15  document?
16     A    I don't recall doing that.
17     Q    Do you remember what would be there if
18  it wasn't redacted?
19     A    No, I -- but it was -- it was a
20  heading -- I mean, it would have been a heading
21  that had the -- the group split out without
22  reference to whether they were disabled. And --

29  (Pages 110 to 113)

MARK L. LYNNE - 1/17/2014

Page 114

1  and the bottom is -- is all -- it's all the same
2  group of people but splitting out the disabled
3  population separately, whereas, here they're just
4  in each of those categories as they would fall,
5  you know, age.
6      Q    So it's your understanding that a
7  heading similar to the one halfway down, quote,
8  Additional Split for Disabled Retirees, open
9  paren, 5/24/2013, close paren, is behind the
10  redaction?
11     A    To the best of my recollection, yes.
12     Q    When you produced documents in response
13  to CNH's subpoena, what was the logistical process
14  that you went through to produce them?
15     A    I'm not sure what you mean.
16     Q    Okay.  How did the documents get from
17  you to me?
18     A    They went through counsel.
19     Q    Okay.  Did you instruct counsel to
20  redact anything from the documents that you were
21  providing for production?
22     A    No.  Again, not that I recall.

Page 115

1      Q    Were you responsible for transmitting
2  the documents to counsel?
3      A    Well, my -- I think technically I had
4  Bill, who was my, you know, technical person, put
5  them all in a -- in a PDF file.  I mean, I
6  instructed him which files to -- to put in and
7  then they were -- they were sent to counsel.
8          MR. ROGACZEWSKI:  I'll ask -- I'd ask
9  Ms. Brault if she knows --
10         MS. BRAULT:  Do you have WiFi?
11         THE WITNESS:  Yes.
12         MS. BRAULT:  You know, maybe as you
13  ask, I'll see if I can -- I don't know the answer
14  off the top of my head, but maybe I'll be able to
15  provide it as we go on.
16         MR. ROGACZEWSKI:  Thank you.
17  BY MR. ROGACZEWSKI:
18     Q    Mr. Lynne, do you have any
19  relationships with any members of the plaintiff
20  class in this case?
21     A    No.
22     Q    Does Mr. Hudec?

Page 116

1      A    No.
2      Q    What about Ms. Calzetta?
3      A    No.
4      Q    Okay.  So Mr. Hudec is not related to
5  an Alfred Hudec?
6      A    I just noticed -- but that's Hudec.
7      Q    Okay.
8      A    Bill is Hudak (sic).
9      Q    Ah, very good.
10         Any other source for the data in
11  Exhibit 10 besides what was provided by
12  plaintiffs' counsel?
13     A    No.
14     Q    All right.  I'm going to show you what
15  I've -- what's being marked as Exhibit 11, which
16  is an electronic file that was produced by you.
17         MS. BRAULT:  Can we -- go ahead.
18  Before you turn his attention to that, can we go
19  off the record for one second?
20         MR. ROGACZEWSKI:  Sure.
21         (Discussion off the Record.)
22         (Recess -- 12:08 p.m.)

Page 117

1      (After recess -- 12:10 p.m.)
2      (Lynne Deposition Exhibit 11 was marked
3  for identification and attached to the
4  transcript.)
5  BY MR. ROGACZEWSKI:
6      Q    So, Mr. Lynne, up on the screen is
7  what's marked as Deposition Exhibit 11.  It is a
8  Microsoft Excel workbook titled IPO -- Pension
9  Data -- 130812 - on CNH_slist.xlsx.
10         And I'll represent that it was produced
11  by you in response to the subpoena.
12         MR. ROGACZEWSKI:  And I'll also state
13  on the record that the only thing I have done to
14  this file is I have extracted it from the disk on
15  which it was provided, loaded it onto my laptop,
16  and I have added to the document title Lynne
17  Deposition Exhibit 11.
18         And I also have thumb drives on which I
19  will provide the exhibit to the court reporter and
20  to Ms. Brault.
21  BY MR. ROGACZEWSKI:
22     Q    And using a digital exhibit often

30 (Pages 114 to 117)

Page 118

1    requires a lot more cooperation between the --
2    between the witness and the questioner, as well as
3    opposing counsel.  So if you want me to navigate
4    any place in particular, direct me to do so, and I
5    will do so.  If you want me to zoom it in, I'm
6    happy to zoom it in.  I did want to at least open
7    it up, though, as -- as it opened as we received
8    it.
9          Looking at Exhibit 11, Mr. Lynne, do
10   you recognize this document?
11   A    Yes.
12   Q    And what is this document?
13   A    It's an Excel file of pensioners with
14   their pension -- CNH pensioners with their pension
15   amounts.
16   Q    And how did you acquire this document?
17   A    I received it from counsel.
18   Q    You didn't create this document;
19   correct?
20   A    No.
21   Q    And, in fact, if you go over to the
22   file tab.  In the properties you see that Roger

Page 119

1    McClow authored it; correct?
2    A    I received it from Roger.
3    Q    How many times have you met Mr. McClow?
4    A    Well, we -- he is one of the trustees
5    on Middletown Works VEBA, so I'm not sure how many
6    times that makes, but we have quarterly meetings
7    for the last four or five years.
8    Q    Is that how you met Mr. McClow?
9    A    Yes.
10   Q    Going over to column N, which has a
11   heading that's in cell N1 that says, Bates Number,
12   do you see that?
13   A    Yes.
14   Q    In that column there are a series of
15   numbers that begin with the prefix CNHA.
16        Do you see that?
17   A    Yes.
18   Q    Do you know what those numbers
19   represent?
20   A    No.
21   Q    Did you do anything to audit the data
22   in this spreadsheet?

Page 120

1    A    No.
2    Q    Did you ask any questions about the
3    spreadsheet?
4    A    Well, we just -- we wanted to make sure
5    we understood what the -- what the amount --
6    amounts were and when the pension amount changed.
7    You can see that, you know, there's a -- an amount
8    to age 62, and then the basic pension we wanted to
9    make sure we understood that -- that the pension
10   age 62 is what they -- they got when they were
11   first retired if they were under 62 and got that
12   to age 62 and then the basic pension after -- at
13   age 60 -- starting at age 62.
14   Q    So just so the record is clear, you're
15   referring to column L of the worksheet, which
16   is -- has a heading of Pension To Age 62 in cell
17   L1, that you understand -- you understood that to
18   be the pension that a class member would receive
19   from retirement until age 62; is that my -- am I
20   summarizing what you just said correctly?
21   A    Yeah.  Can you -- can you go to
22   further -- are there further columns on the right?

Page 121

1    Q    Yes.  (Indicating).
2    A    Okay.
3    Q    Any particular column?
4    A    No.
5    Q    Okay.  And then in the amount -- in the
6    column that's headed K with the title in K1 of
7    Basic Pension, you understood that to be the
8    pension that a class member would receive when --
9    after they turn what age?
10   A    Sixty-two.
11   Q    Okay.  And did you ask any other
12   questions about Exhibit 11?
13   A    I don't recall asking the other
14   question.
15   Q    But then you -- you used the data in
16   Exhibit 11 to perform your analysis in coming to
17   your opinions; correct?
18   A    To compare costs with pension.
19        (Lynne Deposition Exhibit 12 was marked
20   for identification and attached to the
21   transcript.)
22   BY MR. ROGACZEWSKI:

MARK L. LYNNE - 1/17/2014

Page 122

1    Q    So you have in front of you, Mr. Lynne,
2  what's been marked as Exhibit 12. It's a document
3  entitled Plaintiff Reese's Responses To CNH's
4  Second Set Of Interrogatories To Plaintiffs.
5        Have you seen this document before?
6    A    I -- I honestly I may have, but it's
7  not coming back to me.
8    Q    Have you met Mr. Reese?
9    A    No.
10   Q    Do you understand he's the lead
11  plaintiff in this case?
12   A    Yes.
13   Q    Okay. So I'm going to navigate the
14  workbook to find Mr. Reese who is in row 836 on
15  Exhibit 11.
16       Now, Mr. Reese is over age 65; correct?
17   A    Is F date of birth?
18   Q    Yes, the data in cell F, 836, appears
19  to be Mr. Reese' date of birth.
20   A    4/3/1948?
21   Q    Correct.
22   A    Okay. So he turned 65 last April.

Page 123

1    Q    And according to Exhibit 11 -- and I'm
2  going over to cell K, 36, you assumed he had a
3  pension of about $14,775; correct?
4    A    You're going to make me do this again.
5        It would be about 14,800.
6    Q    Now, I'll ask you to look at page 3 of
7  Exhibit 12. In Mr. Reese's response to
8  interrogatory 14, it asks about his -- his income.
9  And according to Mr. Reese, his pension in 2012 is
10  about $2,000 greater than what you estimated;
11  correct?
12   A    Greater than what we were provided,
13  yes.
14   Q    I understand. Greater than the amount
15  that you would have considered his pension to be;
16  correct?
17   A    Yes.
18   Q    And he also has an additional pension
19  of over $25,000?
20       MS. BRAULT: I'm just going to place an
21  objection to the extent that you're having him
22  refer to the answers to interrogatories, which he

Page 124

1  said he did not see, and asking him to make
2  comparisons now. I think that that's
3  argumentative.
4        THE WITNESS: I see that it says that,
5  yes.
6  BY MR. ROGACZEWSKI:
7    Q    You would agree that Mr. Reese also has
8  as of, at least, 2012, over $30,000 of SSDI;
9  correct?
10   A    According to this, yes.
11   Q    And annuity income of over $15,000;
12  correct?
13   A    That's what it says here.
14   Q    Do you have any reason to doubt
15  Mr. Reese's answers to the interrogatory?
16   A    No.
17       MS. BRAULT: I just want to place an
18  objection. I think you said SSDI, and the
19  question was for social security or disability
20  income, just to be clear. I don't think that
21  Mr. Reese was disabled.
22       MR. ROGACZEWSKI: I was not

Page 125

1  suggesting -- I apologize --
2        MS. BRAULT: No, no, just wanted to
3  make sure we were clear.
4        MR. ROGACZEWSKI: I didn't mean to
5  suggest that.
6  BY MR. ROGACZEWSKI:
7    Q    Each of these additional sources of
8  income would factor into Mr. Reese's ability to
9  pay for health care, wouldn't they?
10   A    They would along with all other
11  expenses.
12   Q    Sure. But you didn't consider any of
13  these other sources of income; correct?
14   A    I did not because I didn't have them.
15   Q    If you had them, would you have used
16  them?
17   A    We were -- we were just trying to
18  compare over time what would happen with expenses
19  of the benefit they got from CNH with the pension
20  they got from CNH. I thought that was a
21  reasonable comparison to look at the impact over
22  time of -- of the potential change. I mean, I --

MERRILL LAD

Page 126

1  people are going to have, you know, different
2  other situations in their lives, but this is what
3  we had to compare.
4      Q    But you would not disagree, though,
5  that these other sources of income can provide
6  Mr. Reese with a greater ability to pay for health
7  care than his pension from CNH?
8          MS. BRAULT:  Objection: argumentative.
9          THE WITNESS:  Well, the additional
10 income would certainly be there to pay for the
11 expenses, but I would have no idea whether he was
12 a special case or -- no pun intended -- or
13 whether, you know, all the other folks would have
14 these other sources of income.
15     BY MR. ROGACZEWSKI:
16     Q    You're not saying it's irrelevant,
17 though?
18     A    For one person that income would factor
19 into affording anything, yes.
20     Q    Do you understand this to be a class
21 action, Mr. Lynne?
22     A    Yes.

Page 127

1      Q    And do you understand that Mr. Reese is
2  a class representative?
3      A    Yes.
4      Q    Do you have an understanding as to what
5  that means?
6      A    That he is a member of the class.
7      Q    Your understanding isn't that he's
8  representative of the class in any particular way?
9      A    Well, for instance, I don't know
10 whether other members of the class would have all
11 of these other -- would have other sources like he
12 would other than the Reese pension?
13     Q    All right.  You would agree, though,
14 that Reese's CNH pension -- his income is greater
15 than his CNH pension?
16     A    Reading this, yes.
17         (Lynne Deposition Exhibit 13 was marked
18 for identification and attached to the
19 transcript.)
20     BY MR. ROGACZEWSKI:
21     Q    All right.  You have in front of you
22 what's been marked as Exhibit 13, which is a

Page 128

1  document entitled Plaintiff Cichanofsky's
2  Responses To CNH's Second Set Of Interrogatories
3  To Plaintiffs.
4          Have you seen this before?
5      A    I don't recall seeing it.
6      Q    If you had reviewed it, it would be
7  listed in your expert report; correct?
8      A    I -- I can't remember everything that I
9  have -- like every document I had in there.
10     Q    But if you relied upon it -- I think
11 you even said if you had reviewed something and
12 you didn't rely on it, you would have provided it
13 in discovery; right?
14     A    I mean, if we received a document, it
15 would be listed there, but --
16     Q    Okay.
17     A    -- I -- I mean, I can't claim to have
18 read every word of every document.
19     Q    But if you had received it, it would be
20 listed in your expert report in Exhibit 1;
21 correct?
22         MS. BRAULT:  Excuse me.  I think what

Page 129

1  he said was if he relied upon it, it was listed in
2  his expert report; and if he reviewed it, it was
3  produced pursuant to the subpoena.  There's not an
4  exact match there, so mischaracterization of the
5  testimony.
6      BY MR. ROGACZEWSKI:
7      Q    Is that --
8      A    Yes, that's correct.
9      Q    Okay.  Have you met Mr. Cichanofsky?
10     A    No.
11     Q    Do you understand him to be a plaintiff
12 in the case?
13     A    I mean, before now, I -- I don't -- I
14 would not have known the name.
15     Q    Okay.  You're not aware he's also a
16 class representative?
17     A    I mean, honestly, I just knew the name
18 Reese.  I don't -- I didn't realize all the other
19 names.
20     Q    Okay.  I have navigated to row 864 of
21 Exhibit 11 which is the data for Mr. Cichanofsky.
22 Mr. Cichanofsky is -- is what age?

Page 130

1    A    Fifty-eight.
2    Q    So he's under 62; correct?
3    A    Right.
4    Q    So you would have presumed his pension
5  was $28,560; correct?
6         MS. BRAULT:  You may want to scroll
7  across the . . .
8         THE WITNESS:  Yes.  That's -- and
9  that's the pre-62 column, column L.
10 BY MR. ROGACZEWSKI:
11   Q    Column L, right.  Unfortunately,
12 whoever did this spreadsheet didn't have the
13 header row.
14   A    Yeah.  28,560.
15   Q    Now I'm going to ask you to look at
16 page 3 of Exhibit 13.  And, in fact, that is
17 Mr. Cichanofsky's pension, isn't it?
18   A    Yes.
19   Q    Mr. Cichanofsky also had an additional
20 $10,000 in income from another job; correct?
21   A    That's what it says here, yes.
22   Q    And like Mr. Reese, that -- that income

Page 131

1  demonstrates that he has greater income than
2  simply his pension; correct?
3    A    Yes.
4         (Lynne Deposition Exhibit 14 was marked
5  for identification and attached to the
6  transcript.)
7  BY MR. ROGACZEWSKI:
8    Q    You have in front of you what's been
9  marked as Exhibit 14.  It's a document entitled
10 Plaintiff Miller's Response To CNH's Second Set Of
11 Interrogatories To Plaintiffs.
12        Have you seen this document before,
13 Mr. Lynne?
14   A    I don't recall if I have.
15   Q    Have you met Mr. Miller?
16   A    No, I have not.
17   Q    Do you understand that he is another
18 plaintiff in this case?
19   A    Yes.
20   Q    Do you understand he is another class
21 representative in this case?
22   A    Yes, based on the title up here.

Page 132

1    Q    On Exhibit 11, Mr. Miller, who is in
2  row 1917 -- Mr. Miller is over age 65; correct?
3    A    Yes.
4    Q    And, so, according to this chart, you
5  would have predicted his pension to be about $975
6  a month; correct?
7    A    Yes.
8    Q    Now, looking at page 3 of Mr. Miller's
9  interrogatory responses, you see his pension is
10 actually a little higher than that; correct?
11   A    Yes.
12   Q    About $125 greater per month?
13   A    Yes.
14   Q    And he also has social security or
15 disability income that is twice as much as his
16 pension; right?
17   A    That's what it says here.
18   Q    And that's income that you didn't
19 consider; correct?
20   A    For our comparison, that's correct.
21        (Lynne Deposition Exhibit 15 was marked
22 for identification and attached to the

Page 133

1  transcript.)
2         BY MR. ROGACZEWSKI:
3    Q    You have in front of you what's been
4  marked as Exhibit 15 which is a document entitled
5  Plaintiff Nowlin's Responses To CNH's Second Set
6  Of Interrogatories To Plaintiffs.
7         Do you recall seeing this document
8  before?
9    A    I don't recall that I have.
10   Q    Have you met Mr. Nowlin?
11   A    No.
12   Q    Do you understand he is the fourth and
13 final plaintiff in this case?
14   A    Yes.
15   Q    And that he's also a class
16 representative?
17   A    Yes.
18   Q    Going to Exhibit 11, he's at row 721.
19 Mr. Nowlin is over age 65; correct?
20   A    Yes.
21   Q    And you would have predicted his
22 pension to be about $310 a month; correct?

MARK L. LYNNE - 1/17/2014

Page 134

1    A   Yes.
2    Q   Looking at page 3 of Exhibit 15,
3  Mr. Nowlin's pension is actually about $50 higher
4  than that; correct?
5    A   Yes.
6    Q   And he has two additional pensions,
7  albeit small, but two additional pensions that
8  total about 250 a month; correct?
9    A   Yes.
10   Q   And he has social security or
11 disability income of approximately $1,900 a month;
12 correct?
13   A   Yes.
14   Q   And other employment that at least
15 earned him $30,000 -- almost $30,000 over the
16 course of 2012; correct?
17   A   Yes.
18   Q   And that's -- none of those sources of
19 income were considered by you in your analysis;
20 correct?
21   A   No.
22   Q   Exhibit 11, is this the most up-to-date

Page 135

1  pension information that you've received from
2  plaintiffs' counsel?
3    A   Yes, I believe we only received one
4  file.
5    Q   So this is the pension data -- does --
6  is my -- would I understand correctly that this is
7  pension data of approximately August 13 -- I'm
8  sorry, August 12th, 2013?
9    A   I -- I don't -- I don't recall when I
10 got them exactly.
11   Q   You didn't name this file, I take it?
12       MS. BRAULT:  I'm just going to object
13 to -- to foundation.  I --
14       MR. ROGACZEWSKI:  He either knows or he
15 doesn't.
16       THE WITNESS:  I don't know.
17       MS. BRAULT:  That's not an obvious
18 indication of when the file was created or
19 transferred to him just because there's a date
20 code in the title, and I'm just going to object to
21 the implication.
22       THE WITNESS:  I don't know.

Page 136

1  BY MR. ROGACZEWSKI:
2    Q   Okay.  And you're not aware of any more
3  recent pension data; correct?
4    A   No.
5    Q   Okay.  And this is pension data that's
6  used in your September 24th report; correct?
7    A   Yes.
8    Q   Okay.
9        (Lynne Deposition Exhibit 16 was marked
10 for identification and attached to the
11 transcript.)
12       BY MR. ROGACZEWSKI:
13   Q   Before I move to this exhibit,
14 Mr. Lynne, I want to go back to Exhibits 4 and 5.
15 And if you could turn to page 24 of Exhibit 4, and
16 the third to last page of Exhibit 5.  It's not
17 numbered in the -- it's not numbered in Exhibit 5.
18       The compensation payable for the
19 preparation of your initial expert report
20 increased by approximately $4,500 between June 3rd
21 and September 24th; is that correct?
22   A   Yes.

Page 137

1    Q   How many additional hours were spent by
2  the -- by the individuals who worked on it?
3    A   Well, the hours are the same, and I --
4  I -- all I can -- all I can figure is that I
5  changed the number at the bottom and neglected to
6  change the number of hours.
7    Q   Well, that's what I gathered and that's
8  why I'm asking.  But, no, I'm just -- I'm asking
9  what -- what -- you know, for an update of the
10 hours.
11   A   That's what happened when you work from
12 a document and don't update on it.
13   Q   Believe me, I understand.
14   A   Hold on, please.  Looks like about 19
15 hours.
16   Q   Do you know how it broke out between
17 Mr. -- Mr. Hudec, Ms. Calzetta and yourself?
18   A   I believe it was predominantly my time,
19 but I don't know the breakout.
20   Q   Are you the author of any articles in
21 the last ten years?
22   A   I -- I don't believe so.

35  (Pages 134 to 137)

MARK L. LYNNE - 1/17/2014

Page 138

1    Q    When were you asked to prepare a
2  rebuttal report in this case?
3    A    To the best of my recollection, it was
4  around the -- the first of December. I -- I
5  don't -- I don't remember exactly.
6    Q    And just as we talked earlier about the
7  scope of your engagement for your principal expert
8  report, what was the scope of the assignment for
9  the rebuttal expert report?
10    A    To review the -- the October reports of
11  Mr. Macey and Mr. Stahl and to make rebuttal to
12  some of their claims, statements, opinions.
13    Q    Were you given any direction to focus
14  on specific parts of either Mr. Macey's or
15  Mr. Stahl's reports?
16    A    No. I was given their reports, and I
17  went through it and looked at some things that I
18  thought I could object to, and that's -- that's
19  what guided this -- this rebuttal report.
20    Q    And I think you said earlier that you
21  asked for materials about some of the
22  circumstances that Mr. Macey described in his

Page 139

1  report; is that correct?
2    A    Yes.
3    Q    Did you do that when you first got the
4  engagement, or was it in the middle of the
5  engagement?
6    A    In the middle of the rebuttal
7  engagement?
8    Q    Correct.
9    A    I mean, it was -- it was sort of
10  throughout the rebuttal engagement as I was going
11  through piece by piece of -- of what Mr. Macey and
12  Mr. Stahl said. There were different points where
13  I was collecting information.
14    Q    So how would you describe the process
15  that you went through in creating your rebuttal
16  report?
17    A    I -- I went through their statements,
18  looked at things that I wanted to comment on.
19  Some of it I just was able to use information
20  that -- you know, that I already had or from my
21  own experience, and then I had discussions with --
22  with counsel about --

Page 140

1    MS. BRAULT: I'm going to caution you
2  not to -- not to talk about discussions with
3  counsel to the extent that they are work product.
4    THE WITNESS: Well, there -- there was
5  information that I felt perhaps could be more
6  easily obtained referencing these other cases.
7  BY MR. ROGACZEWSKI:
8    Q    Did plaintiffs' counsel disclose any
9  facts to you about the situations that you were
10  asking about?
11    A    You mean other than the -- the
12  documents provided?
13    Q    Correct.
14    MS. BRAULT: That you relied upon.
15    You're only allowed to ask about facts
16  that he relied upon.
17    THE WITNESS: Not -- not that I recall.
18  I was given the name of someone to -- to talk to
19  regarding one of these cases, but I believe it
20  was -- it was primarily from -- from --
21  BY MR. ROGACZEWSKI:
22    Q    You don't --

Page 141

1    A    (Witness reviews document.) I mean,
2  I'm not sure I can point to any specific thing.
3    Q    Okay. So you have in front of you --
4  in fact, you're looking at it right now -- what's
5  been marked as Exhibit 16, which is titled
6  Plaintiffs' Expert Rebuttal Report. It's authored
7  by you, and it's dated January 15th, 2014.
8    Have you seen this document before?
9    A    Yes.
10    Q    What is this document?
11    A    It's the report that I recently
12  prepared.
13    Q    Okay. Now, you say in this rebuttal
14  report that none of your clients have ever made
15  changes as drastic as those proposed by CNH;
16  correct?
17    A    Yes.
18    Q    And CNH is not one of your clients;
19  correct?
20    A    Correct.
21    Q    And you understand that CNH made the
22  changes in the proposed plan with agreement of the

MERRILL LAD

MARK L. LYNNE - 1/17/2014

Page 142

1  UAW in 2005; correct?
2      MS. BRAULT: I'm going to place an
3  objection. I object to the use of your term
4  "change" because I think it's overly broad.
5      THE WITNESS: It -- it is my
6  understanding that the proposed plan was put in
7  place for certain CNH employees and retirees, but
8  that there was -- there were additional items that
9  were provided to them as a result of that
10 implementation.
11     BY MR. ROGACZEWSKI:
12     Q    In terms of the health plan design and
13 the health plan provisions, what CNH is proposing
14 here has, in fact, already been done for other
15 retirees at CNH, hasn't it?
16     A    That's my understanding, yes.
17     Q    You also say it's difficult to make
18 comparisons between different situations that
19 arise out of different industries and
20 circumstances and that every situation has its own
21 fact pattern.
22     Have I stated that opinion correctly?

Page 143

1      A    Yes.
2      Q    Isn't that what someone in your field
3  does, compare benefit plans across industries?
4      A    Yes.
5      Q    So why is it difficult?
6      A    Because there are different situations
7  with different employers, things might be
8  bargaining, not bargaining. There are other --
9  other than just looking at the benefit plans, in
10 some of these instances there were -- there were
11 other things agreed to outside of the health
12 benefit plans that were part of -- as I understood
13 it, part of the negotiations or a settlement.
14     So, I mean, you have to look at many
15 different things other than just comparing benefit
16 plans.
17     Q    Are you -- are you a member of the
18 American Academy of Actuaries?
19     A    No.
20     Q    Okay. Do you -- do you subscribe to
21 the academy's methodologies?
22     A    Generally.

Page 144

1      (Lynne Deposition Exhibit 17 was marked
2  for identification and attached to the
3  transcript.)
4      BY MR. ROGACZEWSKI:
5      Q    You have in front of you what's been
6  marked as Exhibit 17 which is a 1988 methodology
7  for valuation of accident and health plans under
8  Section 89 of the Internal Revenue Code. You
9  produced it at numbers 861 through 899.
10     Are you familiar with this document?
11     A    Yes.
12     Q    In fact, I think you used this document
13 or its methodology to calculate the relative value
14 of the 1990 plan; correct?
15     A    This was used as part of that, yes.
16     Q    All right. On page 1 it says that,
17 quote, The value for a specific plan is based
18 entirely on its provisions, unquote.
19     Do you agree with that?
20     MS. BRAULT: That that's how the -- a
21 valuation is done under this protocol?
22     BY MR. ROGACZEWSKI:

Page 145

1      Q    That's a statement in the methodology:
2  The value for a specific plan is based entirely on
3  its provisions.
4      Is that -- do you agree with that?
5      MS. BRAULT: I'm trying to understand
6  your question. Are you asking if in a normative
7  way a valuation is supposed to include that, or
8  are you just saying that that's what it says in
9  this document?
10     MR. ROGACZEWSKI: I think my question
11 was sufficiently clear.
12     BY MR. ROGACZEWSKI:
13     Q    I'll take the answer.
14     A    I mean, when we are simply looking at
15 Health Plan A versus Health Plan B, then, you
16 know -- and -- and in just determining not the
17 cost of the plan based on usage or anything else
18 but just on the benefits provided in one plan
19 versus another, that's what this is used for.
20     Q    And then it goes on, The value is
21 independent of the geographic location and
22 demographic characteristics of employees.

37 (Pages 142 to 145)

Page 146

1        Do you agree with that?
2        MS. BRAULT: I -- I'm -- I'm sorry.  I
3    have to object to form.  I really don't understand
4    your question.  Are you asking if this methodology
5    is -- is stating that as the boundaries of the
6    methodology, or are you asking him if all
7    valuations --
8        BY MR. ROGACZEWSKI:
9        Q    I'll take the answer.
10       MS. BRAULT: I don't understand the
11   question.
12       BY MR. ROGACZEWSKI:
13       Q    I'll take the answer.
14       MS. BRAULT: I would like to understand
15   the question, please.
16       BY MR. ROGACZEWSKI:
17       Q    I'll take the answer.
18       MS. BRAULT: Do you understand the
19   question?
20       THE WITNESS: I'm kind of confused by
21   the question.
22       BY MR. ROGACZEWSKI:

Page 147

1        Q    There's a statement, The value of a
2    plan is independent of the geographic location and
3    demographic characteristics of employees, the
4    actual health care utilization by plan
5    participants and the type of plan under which the
6    benefits are provided.
7        Do you agree with that statement?
8        MS. BRAULT: That that's what it says
9    here?
10       BY MR. ROGACZEWSKI:
11       Q    Do you agree with that statement?
12       A    If you're just comparing one plan to
13   another and that's all you're looking at, yes.
14       Q    And isn't that what we're doing in this
15   case?
16       A    Well, we're -- in the context of
17   comparing what CNH is proposing to -- to put in
18   for -- for this plaintiff class versus what it has
19   already done for others, there are other things --
20   there are other benefits outside of the plan that
21   were provided.
22       If you're going to compare those two

Page 148

1    things, I think you can't ignore that there were
2    pension improvements, improvements to Medicare
3    Part B reimbursement.  There was a -- a savings
4    account that was set up.  I mean, all of those
5    things -- what -- what I'm saying is there might
6    be other things besides one plan versus another.
7        Q    Does the valuation methodology in
8    Exhibit 17 take those things into account?
9        A    I -- when I use this, I looked at the
10   plan design.
11       Q    The terms of the health care plan?
12       A    Just comparing the -- the '90 and the
13   '98, in that narrow focus, I used this comparing
14   the plan provisions.
15       Q    And you could do the same comparison
16   between the current plan and the proposed plan;
17   correct?
18       A    I could.
19       Q    And the valuation would be the same,
20   wouldn't it?
21       A    The same as what?
22       Q    Between the current and the proposed

Page 149

1    plan.
2        A    It would be a different value.
3        Q    How? I'm sorry.  The proposed plan and
4    the 2005 plan, you could compare those two plans,
5    couldn't you?
6        A    Yes.
7        Q    And the valuation would be the same,
8    wouldn't it?
9        A    For the -- the -- for the medical plan
10   or the drug plan, yes.
11       Q    Which is what Exhibit 17 is all about,
12   the plan value; correct?
13       MS. BRAULT: I'm going to place an
14   objection.
15       THE WITNESS: It's part of -- it's part
16   of looking at it.  It's not the whole thing.
17   There are other benefits besides what this values.
18   This is just valuing the medical or the
19   prescription benefits.
20       BY MR. ROGACZEWSKI:
21       Q    And when the court -- if the court is
22   asking us to compare the -- whether or not the

Page 150

1  medical benefits are roughly consistent or
2  reasonably commensurate --
3      A    With --
4      Q    -- why isn't --
5          MS. BRAULT:  Wait.
6          THE WITNESS:  With --
7  BY MR. ROGACZEWSKI:
8      Q    -- why isn't --
9          MS. BRAULT:  Wait.
10 BY MR. ROGACZEWSKI:
11     Q    -- this sufficient?
12         MS. BRAULT:  I'm going to place an
13 objection. It's argumentative, and it's certainly
14 not what the court asked us to look at, and I
15 object.
16 BY MR. ROGACZEWSKI:
17     Q    I'll take the answer.
18         MS. BRAULT:  Form and foundation.
19 BY MR. ROGACZEWSKI:
20     Q    I'll take the answer.
21     A    As I understand it, the court is
22 looking at the comparison between the plan that

Page 151

1  this class of retirees has now, which is not the
2  2005 plan, comparing that to the proposed plan.
3  Those are very different plans, so I'm --
4      Q    You don't --
5      A    -- confused about what you're asking.
6      Q    You don't understand that one of the
7  factors is whether or not the proposed plan is
8  roughly consistent to what's provided to CNH's
9  current employees?
10     A    Is -- would the class of plaintiffs
11 here get everything that was provided to those
12 people? No.
13         So it's not consistent. They were
14 given other things that were part of a
15 negotiation, as I understand it.
16     Q    That are not health benefits?
17     A    Right.
18         MS. BRAULT:  Well --
19 BY MR. ROGACZEWSKI:
20     Q    Okay. Let's talk about AT&T --
21         MS. BRAULT:  I'm going to place an
22 objection to the last question to the extent it's

Page 152

1  overly broad and undefined.
2  BY MR. ROGACZEWSKI:
3      Q    How did you acquire information about
4  AT&T and Lucent's plans?
5      A    I received documents from counsel.
6      Q    Okay. What did you ask for to -- that
7  resulted in getting these documents?
8      A    Information that would -- that would
9  provide me some -- some insight into what happened
10 with those companies and their negotiations or --
11 or results from court proceedings that -- that
12 might shed a different light than what Mr. Macey
13 was saying.
14     Q    You don't identify anything Mr. Macey
15 says about AT&T or Lucent that is factually
16 incorrect; right?
17     A    I don't think so, but I think he left
18 some things out.
19     Q    I understand that, but I want to be
20 clear that you're not identifying anything that he
21 said that was factually incorrect.
22     A    (Witness reviews document.) I -- I

Page 153

1  don't think so.
2      Q    Now, AT&T is a cap situation; correct?
3      A    Yeah, as I -- as I understand it, there
4  were caps in place for many years.
5      Q    And the caps impose, once the cap is
6  reached, 100 percent of the increased cost on
7  participants; correct?
8      A    That's my understanding.
9      Q    That's more severe than what the
10 proposed plan does, isn't it?
11     A    It is, but those caps were agreed upon
12 by the parties. And, as I understand it, once
13 there were issues with reaching the cap, some
14 additional money, significant money was put into a
15 VEBA to help offset that.
16     Q    My question was a little different, and
17 it's really whether or not a plan that imposes
18 100 percent of the costs, by its terms, on
19 participants is less severe than a plan that
20 imposes only 60 percent of the increased costs?
21         MS. BRAULT:  Only 60 percent of the
22 increased costs?

MARK L. LYNNE - 1/17/2014

Page 154

1    THE WITNESS: Well, again, you can't
2  just look at that piece as if that's the only
3  thing that happened. I mean, I don't see how you
4  can ignore the VEBA money which helps take it from
5  100 percent to something different.
6    BY MR. ROGACZEWSKI:
7    Q    VEBA is not a health benefit, though,
8  is it?
9    A    No, but it was put there precisely
10  because it was becoming hard for these folks to --
11  to afford the amount over the cap. I mean,
12  that's -- that's my understanding. So it seems
13  like they should be taken together. They're
14  not -- they're not completely disconnected events,
15  in my opinion.
16    Q    Let's talk about Goodyear. How did you
17  acquire information about the Goodyear plans?
18    A    Again, I -- I asked counsel for
19  documents they had that would -- that would relate
20  to what happened with their retiree health care.
21    Q    When you got the documents about AT&T
22  and Lucent, did you after reviewing them ask for

Page 155

1  additional information about AT&T and Lucent?
2    A    I honestly don't recall whether it came
3  in pieces.
4    Q    What about with -- so what you know
5  about AT&T and Lucent comes entirely from
6  information provided by plaintiffs' counsel?
7    A    Yes.
8    Q    You didn't conduct any independent
9  research?
10    A    The information I got seemed pretty
11  clear about what happened.
12    Q    You didn't ask any questions about it?
13    A    I don't recall.
14    Q    Okay. And with Goodyear, the
15  information that you know about Goodyear also
16  comes just from plaintiffs' counsel?
17    MS. BRAULT: Could I just place just
18  the objection and as a clarification that when you
19  talk about, quote, the information that came from
20  plaintiffs' counsel, end quote, you're talking
21  about documents that came from plaintiffs' counsel
22  which have been produced?

Page 156

1    BY MR. ROGACZEWSKI:
2    Q    I'll take the answer.
3    A    Yes, it was the documents from
4  plaintiffs' counsel.
5    Q    And did you ask any questions after
6  receiving those documents?
7    A    I mean, I had conversations with
8  counsel.
9    Q    I'm not -- I'm not --
10    A    Okay.
11    Q    -- I'm not trying to ask about those
12  conversations. I'm just merely trying to
13  understand the degree to which you accepted the
14  information without question.
15    A    Well, I accepted the documents were --
16  were correct. I mean, there may have been
17  conversations we had where I was attempting to get
18  clarification to the extent that, you know,
19  counsel was able to provide. I don't remember
20  specific questions.
21    Q    And as with AT&T and Lucent, you're not
22  saying Mr. Macey is factually wrong about what

Page 157

1  happened with Goodyear; correct?
2    A    I -- I don't believe that I saw
3  anything factually wrong.
4    Q    And you didn't conduct any independent
5  research about Goodyear; correct?
6    A    I -- I think the documents seemed to --
7  to provide me what I need.
8    Q    Okay. Goodyear is another cap
9  situation; correct?
10    A    Yes.
11    Q    And in the absence in -- in the absence
12  of a funding vehicle, the caps would have resulted
13  in significant premiums; correct?
14    A    Yes.
15    Q    And in both Goodyear and AT&T and
16  Lucent, the timing is such that the caps were
17  agreed to and then subsequently the VEBA was
18  agreed to; correct?
19    A    That's my understanding.
20    Q    So the caps were agreed to without a
21  funding vehicle in place; correct?
22    A    It's my understanding that -- yes, but

40 (Pages 154 to 157)

MARK L. LYNNE - 1/17/2014

Page 158

1  then when there were issues with exceeding the
2  caps, then -- then that led to a funding vehicle
3  to -- to fix the situation.
4      Q   Right.  You don't disagree that the
5  caps were agreed to in the absence of a funding
6  vehicle?
7      A   No, I don't disagree.
8      Q   Okay.  Let's talk about U.S. Steel.
9  How did you acquire information about the U.S.
10 Steel agreements?
11     A   It was -- it's the same answer as the
12 others.  I -- I received documents from
13 plaintiffs' counsel.
14     Q   Okay.  Did you ask for additional
15 information after receiving the documents?
16     A   I don't recall that I did.
17     Q   Did you conduct any independent
18 research about U.S. Steel?
19     A   (Witness reviews document.)  I do not
20 believe I did.
21     Q   You don't identify anything that
22 Mr. Macey says that is wrong about the U.S. Steel

Page 159

1  situation -- that is factually incorrect; correct?
2      MS. BRAULT:  The record should reflect
3  that we're not looking at Mr. Macey's report.
4      THE WITNESS:  Yeah, I -- I don't --
5      MR. ROGACZEWSKI:  No, we're looking at
6  Mr. Lynne's rebuttal report.
7      THE WITNESS:  No, I don't think there
8  was any -- anything factually incorrect that I
9  found, but, again, it's the same issue of leaving
10 the sort of selective analysis.
11     BY MR. ROGACZEWSKI:
12     Q   At the bottom of page 4, there's a
13 quote from the 1975 agreement about pensioners and
14 receiving a -- an individual receiving a surviving
15 spouse's benefits.
16     Do you see that?
17     A   Yes.
18     Q   How did you come across that language?
19     A   It was in a document provided by
20 counsel.
21     Q   Now, that provision standing alone has
22 nothing to do with health care benefits; correct?

Page 160

1      A   Well, it talks about how changes can be
2  made to health care benefits.
3      Q   And you understand that there is no
4  similar provision in the CNH provision; correct?
5      A   Well, I think that's sort of the point.
6      Q   And you understand that the Sixth
7  Circuit has held that changes can be made
8  unilaterally by the company; correct?
9      MS. BRAULT:  Well, let me place an
10 objection to that's overly broad and ambiguous.
11     THE WITNESS:  Not just willy-nilly,
12 they can't.
13     BY MR. ROGACZEWSKI:
14     Q   What do you mean?
15     A   Well, they can't make any change they
16 want.
17     Q   Right.  As long as it satisfies the
18 Reese standard; correct?
19     A   Right.
20     Q   So the fact that an agreement had a
21 limitation that CNH's doesn't have isn't really
22 relevant, is it?

Page 161

1      A   Well, what I was trying to do here was
2  to say that Mr. Macey uses some of these
3  comparisons, but in each case there's some things
4  that are different about these other situations,
5  namely, that caps -- caps are in place in -- in a
6  number of these.
7      With CNH, my understanding was the caps
8  were negotiated out.  And, you know, other --
9  other of these situations, there were agreements
10 reached, and in this case there's been no
11 agreement reached.
12     So I thought that his examples -- you
13 know, there were things that were different, and
14 it would -- couldn't just say that because of
15 this, then that.
16     Q   Aren't there always going to be
17 differences when comparing situation A to
18 situation B?
19     A   Yeah, but these are pretty big
20 differences.
21     (Lynne Deposition Exhibit 18 was marked
22 for identification and attached to the

41 (Pages 158 to 161)

MARK L. LYNNE - 1/17/2014

Page 162

1  transcript.)
2      BY MR. ROGACZEWSKI:
3      Q    You have in front of you what's been
4  marked as Exhibit 18, which appears to me to be
5  the equivalent of what the UAW would call a
6  highlighter of a -- of a 2012 agreement between
7  the steelworkers and U.S. Steel.
8          I'll represent to you that this was
9  produced by you. The documents as we got them
10 didn't have production numbers. I -- I -- I --
11 that -- but I -- I'm not complaining, but that's
12 why it doesn't have one, but I wanted to represent
13 that you did -- it's my belief that you produced
14 this document.
15     A    Yes.
16     Q    Do you recall reviewing this document?
17     A    Yes.
18     Q    Actually, look at page 10 where it has
19 the participant premium. It looks to me like the
20 premiums were going to be $150 a month for
21 pre-Medicare eligible and 75 a month for Medicare
22 eligible.

Page 163

1          Do you agree with that?
2      A    Yes.
3      Q    And CNH's proposed plan starts at 57
4  for pre-Medicare and 5 for Medicare; correct?
5      A    Sounds correct.
6      Q    Both of those are less than what's in
7  the U.S. Steel plan; correct?
8      A    Yes.
9      Q    And let's look at a couple of pages
10 earlier, on page 8, at the plan design. The
11 in-network co-insurance rate is also higher under
12 the CNH proposed plan, isn't it?
13     A    Eighty-five.
14     Q    And the out-of-pocket maximum of the
15 proposed plan provides a greater degree of
16 protection for participants than the U.S. Steel
17 plan; correct?
18     A    I believe it has a lower out-of-pocket,
19 yes.
20     Q    Let's talk about Ford. And I -- let me
21 go back and ask this before. Have you conducted
22 any independent research about U.S. Steel?

Page 164

1      A    No.
2      Q    How did you acquire the information
3  that's in the rebuttal report about Ford?
4      A    They were reports that I received from
5  counsel.
6      Q    Did you --
7      A    Or documents I received.
8      Q    Did you do any independent research
9  about Ford?
10     A    No.
11     Q    Did you react or -- after reviewing the
12 documents provided by plaintiffs' counsel, did you
13 ask for additional information?
14     A    I may have gotten Francis' report after
15 reviewing the initial information.
16     Q    Did you ask for Francis' report?
17 You're talking about Theo Francis; correct?
18     A    Yes.
19     Q    Did you ask for Mr. Francis' report?
20     A    Yes.
21     Q    Specifically?
22     A    Well, about the financial condition of

Page 165

1  one versus the other.
2      Q    When did you become aware that
3  Mr. Francis was one of plaintiffs' experts?
4      A    I don't recall.
5      Q    And did you know Mr. Francis was an
6  expert when you asked for his report?
7      A    Well, I didn't know Mr. Francis.
8      Q    So you asked --
9      A    I was --
10     Q    I'm trying --
11     A    I was asking for information about --
12 because Mr. Macey was trying to compare the
13 automobile companies, which basically were
14 bankrupt. They were on it as comparisons. So I
15 wanted to understand what I could about CNH's
16 financial position.
17     Q    Now -- and what you got in response to
18 that was Mr. Francis' report?
19     A    Yes.
20     Q    Now, again, you're not identifying
21 anything factually incorrect in Mr. Macey's report
22 about Ford; right?

42 (Pages 162 to 165)

MARK L. LYNNE - 1/17/2014

Page 166

1    A   No, just leaving out.
2    Q   In fact, both Ford and GM agreed with
3  UAW to reduce retiree health benefits; right?
4    A   It's my understanding they did. I'm
5  not sure what choice they had.
6    Q   They -- but they -- they agreed to
7  them; correct?
8    A   In a bankruptcy situation.
9    Q   It's your understanding that they -- as
10  part of the bankruptcy, that's when the reductions
11  occurred?
12    A   I'm sure there were many instances of
13  negotiations as -- as these companies were having
14  trouble.
15    Q   GM's bankruptcy was in 2009; correct?
16    A   I don't see that I have the date in
17  here.
18    Q   Okay. Do you know when GM's bankruptcy
19  occurred?
20    A   I don't know the exact date.
21        (Lynne Deposition Exhibit 19 was marked
22  for identification and attached to the

Page 167

1  transcript.)
2    BY MR. ROGACZEWSKI:
3    Q   All right. You have in front of you,
4  Mr. Lynne, a filing made in a court case called,
5  In re: General Motors Corp., pending in the United
6  States Bankruptcy Court for the Southern District
7  of New York, Case Number 09-50026.
8        I'll represent this was also produced
9  by you.
10       Do you recall reviewing this document?
11    A   (Witness reviews document.) I don't
12  recall -- recall receiving this; I don't recall
13  that I relied on it.
14    Q   Okay. Do you recall reviewing it?
15    A   If I did, it was fairly cursory.
16    Q   I can't imagine why. It's mind
17  numbing, having read it.
18       Does it refresh your recollection
19  regarding when the GM bankruptcy occurred?
20    A   Looks like '09, yes.
21    Q   And do you have an understanding as to
22  when GM and Ford first agreed to reductions in

Page 168

1  retiree health care benefits with the UAW?
2    A   No.
3        (Lynne Deposition Exhibit 20 was marked
4  for identification and attached to the
5  transcript.)
6    BY MR. ROGACZEWSKI:
7    Q   You have in front of you what's been
8  marked as Exhibit 20 which is a -- a Lexis
9  printout, a Web-based Lexis printout of a Court of
10  Appeals decision, International Union (UAW) versus
11  Ford Motor Company, from 2007.
12       And I'll represent this was also
13  produced by you.
14       Do you recall reviewing this document?
15    A   I don't recall reviewing it in detail.
16    Q   Do you have a Lexis subscription,
17  Mr. Lynne?
18    A   Not to my knowledge.
19    Q   Have you used Lexis before?
20    A   No.
21    Q   I'll direct you to the top of the
22  fourth page of the document where the Court of

Page 169

1  Appeals says, quote, Ford also announced in early
2  2005 that an intended -- it intended to cut
3  retiree health care benefits. The UAW started
4  negotiations with Ford, and Ford disclosed its
5  confidential financial projections to the UAW.
6  After the UAW's financial consultant concluded
7  that Ford's prospects were at least as dire as the
8  company insisted, UAW presented Ford with a
9  package of proposed modest cuts to retiree health
10  benefits, a package consistent with the framework
11  it had negotiated with GM.
12       Do you see that?
13    A   Yes.
14       MS. BRAULT: Can you show it to me,
15  just point it --
16       MR. ROGACZEWSKI: It's the first full
17  paragraph.
18       MS. BRAULT: Oh, okay. All right.
19       MR. ROGACZEWSKI: I apologize. I
20  wasn't trying to --
21       MS. BRAULT: I got it.
22       BY MR. ROGACZEWSKI:

43 (Pages 166 to 169)

MARK L. LYNNE - 1/17/2014

Page 170

1    Q    Is that consistent with your
2  understanding as to the timing of events here?
3    A    I was aware that as these companies
4  were, you know, getting into significant trouble,
5  that there were -- there were agreements along the
6  way, but they're agreements between parties with
7  companies that are in very bad financial shape.
8  I'm not sure where the relevance is to CNH.
9    Q    Now, we were talking about valuing
10 plans before.  The financial condition of the
11 company doesn't go into the value of the plan, the
12 calculation of the plan value; correct?
13   A    It doesn't go into that narrow plan
14 calculation, no.
15   Q    And it's -- I mean, in -- but you
16 consider it a relevant consideration; correct?
17   A    Well, I -- it's hard to ignore that --
18 that those situations with Ford, GM and Chrysler
19 are -- that that had something to do with it.
20   Q    And -- and how -- and -- and -- now,
21 Ford eventually negotiated a VEBA with the UAW;
22 correct?

Page 171

1    A    That's my understanding.
2    Q    Do you have an understanding as to when
3  the VEBA came in time relative to the initial
4  changes in 2005?
5    A    No.
6    Q    CNH's financial state has nothing to do
7  with whether the proposed plan is reasonably
8  commensurate with the current plan, does it?
9        MS. BRAULT:  I'll place an objection to
10 form.
11       THE WITNESS:  I think in totality --
12 if -- if you're trying to compare the auto
13 companies to CNH, I'm saying it's a very different
14 situation that produced the reductions at the auto
15 companies from what's happening at CNH.
16 BY MR. ROGACZEWSKI:
17   Q    My question was a little different.
18 I'm asking how -- whether it's relevant to whether
19 the -- the terms of the proposed plan are really
20 commensurate with the current plan.  I'm not
21 talking about the auto companies' plan.
22       MS. BRAULT:  I object to the form of

Page 172

1  the question that it exceeds the scope of what he
2  was asked to do.
3        But go ahead.
4        THE WITNESS:  I'm not sure I understand
5  why a company in this kind of financial situation
6  would need to make such drastic cuts.
7  BY MR. ROGACZEWSKI:
8    Q    That wasn't my question.  My question
9  was in comparing the terms of the current plan and
10 the proposed plan, whether they're reasonably
11 commensurate, how is the financial state of the
12 company relevant to that?
13       MS. BRAULT:  I'm going to place an
14 objection.  I think we already agreed the
15 definition of reasonably commensurate is a legal
16 question, and I object to the extent you're asking
17 him to form a legal conclusion.
18       THE WITNESS:  I'm not sure I can answer
19 that.
20 BY MR. ROGACZEWSKI:
21   Q    You would agree, wouldn't you,
22 Mr. Lynne, you could compare the plan terms pretty

Page 173

1  easily without considering the financial state of
2  the companies; right?
3    A    Yes, and we have done that.
4    Q    Right.  In fact, you could take the
5  benefit plan, redact the company's name on it and
6  not even know it and compare the plan terms;
7  right?
8    A    Yes.
9    Q    And you could identify them as being
10 reasonably commensurate with each other or not;
11 correct?
12       MS. BRAULT:  I'm going to pose an
13 objection again to the legal conclusion of the
14 comparison being reasonably commensurate of just
15 on terms.
16       THE WITNESS:  What I was trying to do
17 was rebut an argument that Macey was making trying
18 to compare the CNH situation with these other
19 companies, and I don't think that's an appropriate
20 comparison.
21 BY MR. ROGACZEWSKI:
22   Q    Do you think that -- so it's your

MERRILL LAD

Page 174

1 understanding that that goes to whether they're
2 reasonably commensurate or not?
3     A   I guess so, yes.
4     Q   Okay. And whether the changes in the
5 proposed plan are reasonable in light of changes
6 in health care, that has nothing to do with
7 whether or not CNH is in good or poor financial
8 condition; correct?
9         MS. BRAULT: I'm going to place an
10 objection. Again, I think you're asking him to
11 comment on the court's standard and not
12 necessarily what he was asked to review in this
13 case.
14        THE WITNESS: Can you restate?
15 BY MR. ROGACZEWSKI:
16    Q   You would agree, wouldn't you, that in
17 looking at the changes that CNH is proposing and
18 evaluating whether they're reasonable in light of
19 the changes in health care, that the financial
20 condition of the company has nothing to do with
21 that?
22        MS. BRAULT: I object.

Page 175

1         THE WITNESS: You know, when I work
2 with my clients, the things that they need to do
3 are certainly dictated at some point by financial
4 conditions.
5 BY MR. ROGACZEWSKI:
6     Q   That wasn't an answer to my question.
7 How -- I'll ask it -- I'll ask it in a nonleading
8 way.
9         How is the financial condition of CNH
10 relevant to whether the changes that one wants to
11 make are reasonable in light of changes in health
12 care?
13    A   I wasn't trying to make that
14 comparison.
15    Q   Okay.
16    A   Macey was when comparing CNH to these
17 other companies.
18    Q   That's what you under- --
19    A   I was simply trying to rebut that part
20 of his argument.
21    Q   And that's what you understood
22 Mr. Macey to be doing in that part of his report?

Page 176

1     A   Trying to say that what happened at
2 these auto companies is something that could --
3 could happen at CNH, and that it was a good
4 comparison, which I disagree with.
5     Q   How about GM? How did you acquire the
6 information in your rebuttal report regarding GM?
7     A   (Witness reviews document.) That was a
8 combination of documents received from counsel,
9 and I believe that was where I looked -- looked up
10 the composition of the VEBA on the UAW Web site.
11    Q   The UAW VEBA trust breakdown -- work
12 chart; right?
13    A   Right.
14    Q   And aside from that, did you do any
15 independent research into the GM situation?
16    A   No.
17    Q   And aside from the conflation of the
18 UAW VEBA trust with the UAW, did you identify
19 anything incorrect in Mr. Macey's report?
20    A   Mr. Macey wasn't -- I don't believe he
21 was clear as to which of the auto companies he was
22 referring to, but he did say that -- he was

Page 177

1 attempting to say that the UAW made changes to
2 benefits; and, in fact, it was -- the trustees or
3 the administrators of the VEBA, which is
4 different.
5     Q   I said aside from that.
6     A   Oh, I'm sorry.
7     Q   Aside from that.
8     A   No.
9     Q   But Mr. Macey isn't wrong about the
10 terms that the UAW retirees are -- that -- that --
11 the terms of their benefits under the UAW VEBA as
12 set by the UAW VEBA trust; correct?
13    A   No, no.
14    Q   And, so, with the exception of the
15 research, you did everything that's in your --
16 everything you understand about GM came from
17 plaintiffs' counsel; correct?
18        MS. BRAULT: You mean in documents from
19 plaintiffs' counsel?
20        THE WITNESS: Yes.
21 BY MR. ROGACZEWSKI:
22    Q   And the same thing I'm saying would be

45 (Pages 174 to 177)

Page 178

1  true for Ford; correct?
2    A   Yes.
3    Q   Now, you make a -- a big point about
4  the connection of the Ford and the GM changes to
5  bankruptcy; correct?
6    A   I think it makes the comparison. Not a
7  very good one, yeah.
8    Q   GM's changes were made four years
9  before it went into bankruptcy; correct?
10   A   It was all part of their -- I viewed it
11 as a -- as all a part of the agreements that were
12 made as the company was going down hill.
13   Q   So you look at -- you take together the
14 '05 agreement, the '07 agreement and the
15 bankruptcy and put them all together?
16   A   Yes.
17   Q   You understand, correct, that the VEBA
18 that GM agreed to was not part of the original
19 agreement; right?  That -- that came second in
20 time?
21     MS. BRAULT:  I'm going to place an
22 objection: form.

Page 179

1      THE WITNESS:  I mean, I'm not sure that
2  to me the timing was as important as the fact that
3  these things were done with companies that were in
4  such dire financial straits.
5  BY MR. ROGACZEWSKI:
6    Q   Well, I understand your -- your -- I
7  understand your opinion on that. Now I'm thinking
8  about it -- this question is focusing on something
9  different, which is the connection of the funding
10 vehicle to the benefit changes. And I think you
11 said before that it was important that the funding
12 vehicle -- although it's not a health benefit --
13 was negotiated as -- as -- or changed at the same
14 time as the health care change; is that correct?
15   A   That's my understanding.
16   Q   And in GM that wasn't the case;
17 correct?
18   A   I'm not sure.
19     (Lynne Deposition Exhibit 21 was marked
20 for identification and attached to the
21 transcript.)
22 BY MR. ROGACZEWSKI:

Page 180

1    Q   You have in front of you what has been
2  marked as Exhibit 21 which is a -- a -- I don't
3  know if it's an article or a press release, but
4  it's from the UAW's Web site. It's entitled, UAW,
5  union retirees found proposed settlements
6  establishing VEBA trust.
7      Since it doesn't have a Bates number,
8  I'll make sure the record is clear you did not
9  produce this document.
10     The first paragraph says, The UAW,
11 along with UAW retirees, has filed a proposed
12 settlement of health care claims against --
13 against GM. If approved by the U.S. District
14 Court, the settlement will establish an
15 independent VEBA trust which will pay health
16 benefits for current and future UAW GM retirees.
17     Did I read that correctly?
18   A   Yes.
19   Q   Is that consistent with your
20 understanding as to when the UAW GM VEBA was
21 negotiated and then established?
22   A   Yes.

Page 181

1    Q   Four paragraphs down the article says,
2  A similar case was filed in 2005, and the UAW and
3  GM agreed to modify health care benefits for
4  retirees.
5      Did I read that correctly?
6    A   Yes.
7    Q   Is that consistent with your
8  understanding that the first agreement reduced
9  changes -- reduced health care benefits and then
10 two years later a subsequent agreement established
11 the funding mechanism?
12   A   Yes.
13   Q   In the case of GM, the -- the funding
14 mechanism was not part of the agreement that
15 changed their health care benefits; correct?
16     MS. BRAULT:  I'm just going to place an
17 objection to the extent that you're conflating
18 events, and -- and I object to the form to the
19 extent that you're assuming facts not in evidence,
20 that -- that something occurs at -- at a specific
21 point in time rather than over time.
22     THE WITNESS:  Again, the point I was

46 (Pages 178 to 181)

MARK L. LYNNE - 1/17/2014

Page 182

1  trying to make, Macey brings up these examples,
2  and these examples are -- in these other examples
3  there were agreements made or there was bankruptcy
4  or there were preexisting caps. With CNH, there
5  was no bankruptcy. There was no agreement. Caps
6  were negotiated out.
7        I'm just trying to say that I don't
8  think these comparisons -- he left out some things
9  in his comparisons that make them not good
10  comparisons.
11        We're trying to look at what the court
12  says needs to be done comparing it to other
13  situations. It's not a good comparison.
14  BY MR. ROGACZEWSKI:
15     Q   The court -- and we've talked about
16  already two of the three Reese factors. The third
17  one is whether the proposed plan is roughly
18  consistent with other plans.
19        Why -- how is the financial condition
20  of CNH relevant -- or the financial condition of
21  GM relevant to whether the terms or the benefit
22  plans are roughly consistent with each other?

Page 183

1     A   I -- I don't see how you can ignore a
2  company being bankrupt -- how you can ignore that
3  situation when you look at what had to be done
4  with the benefits.
5     Q   You can't compare the terms of Benefit
6  Plan A and Benefit Plan B without looking at the
7  financial condition of the companies?
8     A   If the financial condition is
9  relatively the same, you don't have to, but the
10  financial condition with these other companies had
11  a lot to do with what happened. I don't see how
12  that can be ignored.
13     Q   But all the things that you looked at
14  in your initial report -- participant's ability to
15  pay, the relative value of the plan, the costs
16  that are borne by the relative payors -- none of
17  those have anything to do with the financial
18  condition of the company, do they?
19     A   No, they don't.
20     Q   It wasn't something that you considered
21  in doing your initial expert report; correct?
22     A   No, but when the expert on the other

Page 184

1  side tries to make an argument for something, I'm
2  trying to understand whether that argument makes
3  sense and rebut it if it didn't make sense.
4     Q   You were able to fill the scope of your
5  engagement without reference to the finances of
6  the company; correct?
7     A   The initial scope, I suppose.
8     Q   Which was to evaluate the proposed plan
9  against -- against the standard for the court;
10  correct?
11        MS. BRAULT: Let me place an objection.
12  I think that mischaracterizes previous testimony
13  about the scope of his report.
14        THE WITNESS: We analyzed the proposed
15  plan, and even without considering those other
16  things, it's pretty clear how bad it is.
17  BY MR. ROGACZEWSKI:
18     Q   You don't dispute that CNH and UAW
19  agreed to a health benefit plan in 2005 that is
20  designed like the proposed plan; correct?
21     A   Correct.
22     Q   You don't dispute that CNH and UAW

Page 185

1  agree to a premium structure in an escalator
2  clause that is similar to what is in the proposed
3  plan; correct?
4     A   Correct.
5     Q   You say it matters in your rebuttal
6  report that the benefit was vested; right?
7     A   That's what the court said.
8     Q   But you understand that the Sixth
9  Circuit has held in this case that, even though
10  it's vested, changes can be made; right?
11     A   I understand that.
12        MS. BRAULT: Let me just place an
13  objection to the extent you mischaracterized the
14  previous testimony, and it's not just -- I think
15  his response was willy-nilly changes.
16  BY MR. ROGACZEWSKI:
17     Q   I'm just focusing on the fact the
18  rebuttal report makes the point the benefits were
19  vested. If the court says the benefits can be
20  changed even if they're vested, why does it matter
21  whether the benefits were vested in these other
22  cases or not?

MERRILL LAD

Page 186

1    MS. BRAULT: I'm going to place an
2  objection. I think you're mischaracterizing the
3  decision of the court which is indicative of a
4  question that's really asking for a legal
5  conclusion, and I don't think that Mr. Lynne's
6  prepared to talk about what reasonable means and
7  what kind of changes can be made and whether or
8  not vesting as a legal definition is encompassing
9  the kind of changes that you're asking about in an
10  ambiguous kind of way.
11    Having said that --
12    MR. ROGACZEWSKI:  And I'll -- I'll ask
13  Ms. Brault to refrain from speaking objections.
14    MS. BRAULT:  Having said that, I think
15  that his answer can be taken with an understanding
16  that he's answering the -- the question
17  (inaudible) with no position on the definitions.
18  BY MR. ROGACZEWSKI:
19    Q    I'll take the answer.
20    A    Can you restate the answer?
21    Q    If a court has held that CNH can make
22  changes even though the benefits are vested, why

Page 187

1  does it matter, as you say it does in your
2  rebuttal report, that the benefits are vested in
3  this case and not in those other cases?
4    A    Well, again, I was not a legal expert;
5  I was not hired to be a legal expert. But it
6  seems to me that if the court -- courts have made
7  a point that these benefits are vested, that --
8  that you need to take much more care in making any
9  changes to these than you would with benefits that
10  are not vested; that you have much less leeway to
11  make changes if they're vested.
12    Q    Do you have an understanding as to
13  whether the parties in these other circumstances
14  that you describe and got your information
15  entirely from plaintiffs' counsel -- as to
16  whether -- what the positions of the parties were
17  in those cases on whether the benefits were vested
18  or not?
19    MS. BRAULT: Objection to form. Also
20  again the correction that information from
21  plaintiffs' counsel included documents only that
22  were provided to him.

Page 188

1    THE WITNESS: I don't know.
2  BY MR. ROGACZEWSKI:
3    Q    So you don't know if one side in those
4  cases thought the benefits were vested or not, do
5  you?
6    A    I don't know about either side, but
7  it's my understanding that no court has said those
8  benefits were vested for any of those other
9  situations.
10    Q    Would it matter if in each of those
11  cases the employer thought the benefits were not
12  vested and the representatives of the employees
13  thought they were?
14    A    Probably not because the court hadn't
15  made a decision on that.
16    Q    Even though that's the position of the
17  parties in this case; correct?
18    MS. BRAULT:  Well, I'm sorry.  There
19  has been a court decision indicating that the --
20    MR. ROGACZEWSKI:  I didn't say that.  I
21  said the positions of the parties.
22    MS. BRAULT:  Well, the -- go ahead.

Page 189

1    THE WITNESS:  I would imagine those
2  would always be the positions of the parties, but
3  in this case a court has said something more.
4  BY MR. ROGACZEWSKI:
5    Q    But you don't -- okay.
6    You also state that the UAW refused to
7  discuss these changes with CNH; correct?
8    A    That is my understanding.
9    Q    But the UAW not only discussed the
10  changes; in fact, agreed to them for future
11  retirees; correct?
12    A    Not for the plaintiff class.  That's
13  what I'm referring to.
14    Q    Right.  But it did discuss them and
15  agree to them for future retirees; correct?
16    A    There's a lot of other things thrown
17  in.
18    Q    And agreed to these health benefits;
19  correct?
20    A    There are a lot of other things thrown
21  in.
22    Q    Things that weren't health benefits;

Page 190

1  correct?
2       MS. BRAULT: I'm going to place an
3  objection to your definition of health benefits.
4       THE WITNESS: Well, you don't think a
5  Medicare Part B or D increased reimbursement is a
6  health benefit?
7  BY MR. ROGACZEWSKI:
8       Q   Are you aware as to in what agreement
9  that amount is required to be paid?
10      A   In the 2005 agreement.
11      Q   Do you know what specifically in that
12 agreement?
13      A   I'm not -- between --
14      Q   Is it in the group benefit plan?
15      MS. BRAULT: You should let him finish
16 his answers before you start a question.
17      THE WITNESS: I had a copy of what I
18 took to be an agreement between the parties and it
19 had that in there.
20 BY MR. ROGACZEWSKI:
21      Q   Do you have an understanding as to
22 whether it's in the pension plan or not?

Page 191

1       A   No, I don't.
2       Q   You understand, regardless, the Sixth
3  Circuit has said that CNH can make changes
4  irrespective of the UAW's agreement; correct?
5       A   I think you're twisting my words, but
6  the -- what I'm saying is how can you compare an
7  agreement -- how can you say that an agreement
8  that was made with these benefits but with a
9  number of other things thrown in as sweeteners,
10 I'll call it -- how can you say that is the same
11 as trying to force down the throat those benefits
12 of those people without the sweeteners? It's not
13 the same.
14      Q   The plan valuation is the same;
15 correct?
16      A   Gees. You can't just look at the plan
17 valuation. There were other things involved. You
18 can't just, like, isolate little pieces, in my
19 opinion, without looking at all they got.
20      Q   I can't isolate the health care plan?
21      A   Not when you're trying to determine
22 whether they're -- they're reasonably the same.

Page 192

1       Q   Not when determining whether or not the
2  health benefits are roughly consistent?
3       A   Because other things were negotiated as
4  part of it, and the health benefits, if it had
5  just been that, there's no way they would have
6  agreed to those things without these other things.
7  You can't look at them --
8       Q   How do you --
9       A   -- in a vacuum.
10      Q   -- know that?
11      A   Well, they didn't agree to it without
12 those other things in there, so why would they
13 have done it without them.
14      Q   But if you're just looking at the
15 health benefits, they're the same, aren't they?
16      MS. BRAULT: I'm going to place an
17 objection to your continued use of the word
18 "health benefits" because I think you're using a
19 narrower definition than is common practice.
20      THE WITNESS: You could say that some
21 of the other things that were provided in the 2005
22 agreement were health benefits: Part B

Page 193

1  reimbursement, the reimbursement account. And the
2  plaintiff class, that's not part of what they're
3  being offered, so those things are different.
4  BY MR. ROGACZEWSKI:
5       Q   Thank you.
6       MR. ROGACZEWSKI: Could I take five
7  minutes?
8       MS. BRAULT: Sure.
9       (Recess -- 1:44 p.m.)
10      (After recess -- 1:58 p.m.)
11      MR. ROGACZEWSKI: I have concluded what
12 I came prepared to do.
13      MS. BRAULT: Okay. I do not have any
14 questions, so we're done.
15      THE COURT REPORTER: Read and sign?
16      MR. ROGACZEWSKI: Yes.
17
18
19      (Signature having not been waived, the
20 Deposition of MARK L. LYNNE ended at 1:58 p.m.)
21
22

Page 194

1    ACKNOWLEDGMENT OF DEPONENT
2      I, Mark L. Lynne, do hereby acknowledge
3    that I have read and examined the foregoing
4    testimony, and the same is a true, correct and
5    complete transcription of the testimony given by
6    me and any corrections appear on the attached
7    Errata sheet signed by me.
8
9
10
11    _____
12    (DATE)              (SIGNATURE)
13
14
15      CERTIFICATE OF NOTARY PUBLIC
16    Sworn and subscribed to before me this
17    _____ day of _____,
18
19
20    _____
21    NOTARY PUBLIC        MY COMMISSION EXPIRES
22

Page 195

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Dana C. Ryan, Registered Professional
3    Reporter, Certified Realtime Reporter, the officer
4    before whom the foregoing proceedings were taken
5    do hereby certify that the foregoing transcript is
6    a true and correct record to the best of my
7    ability of the proceedings; that said proceedings
8    were taken by me stenographically and thereafter
9    reduced to typewriting under my supervision; and
10    that I am neither counsel for, related to, nor
11    employed by any of the parties to this case and
12    have no interest, financial or otherwise, in its
13    outcome.
14      IN WITNESS WHEREOF, I have hereunto set
15    my hand and affixed my notarial seal this 24th day
16    of January 2014.
17    My Commission expires:
18    May 17, 2017
19
20    _____
21    NOTARY PUBLIC IN AND FOR THE
22    STATE OF MARYLAND

Page 196

1        E R R A T A  S H E E T
2    IN RE: JACK REESE, et al. v. CNH GLOBAL N.V. AND
3    CNH AMERICA LLC
4    RETURN BY: _____
5    PAGE LINE        CORRECTION AND REASON
6    ____ ____        _____
7    ____ ____        _____
8    ____ ____        _____
9    ____ ____        _____
10    ____ ____        _____
11    ____ ____        _____
12    ____ ____        _____
13    ____ ____        _____
14    ____ ____        _____
15    ____ ____        _____
16    ____ ____        _____
17    ____ ____        _____
18    ____ ____        _____
19    ____ ____        _____
20    ____ ____        _____
21    ____ ____        _____
22    (DATE)          (SIGNATURE)

Page 197

1        E R R A T A  S H E E T
2    IN RE: JACK REESE, et al. v. CNH GLOBAL N.V. AND
3    CNH AMERICA LLC
4    RETURN BY: _____
5    PAGE LINE        CORRECTION AND REASON
6    ____ ____        _____
7    ____ ____        _____
8    ____ ____        _____
9    ____ ____        _____
10    ____ ____        _____
11    ____ ____        _____
12    ____ ____        _____
13    ____ ____        _____
14    ____ ____        _____
15    ____ ____        _____
16    ____ ____        _____
17    ____ ____        _____
18    ____ ____        _____
19    ____ ____        _____
20    ____ ____        _____
21    ____ ____        _____
22    (DATE)          (SIGNATURE)