UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK REESE, JAMES
CICHANOFSKY, ROGER MILLER,
and GEORGE NOWLIN on                             Hon. Patrick J. Duggan
behalf of themselves and
a similarly situated class,                      Case No. 04-70592
    Plaintiffs,
v.                                               **Class Action**

CNH INDUSTRIAL N.V. and
CNH INDUSTRIAL AMERICA LLC,

    Defendants.
_____/

# EXHIBIT C

## To

## PLAINTIFFS' RESPONSE
## TO CNH'S MOTION FOR SUMMARY JUDGMENT

**Mark Lynne Expert Rebuttal Report**

**January 15, 2014**

JACK REESE, et al

V.

CNH AMERICA LLC, et al.

PLAINTIFFS' EXPERT REBUTTAL REPORT

Mark Lynne, CEBS
Bolton Partners, Inc.
100 Light Street, 9th Floor
Baltimore, MD  21202
mlynne@boltonpartners.com

January 15, 2014

## I. Introduction and Scope of Review

I was asked by the law firm of McKnight, McClow, Canzano, Smith & Radtke, P.C. in the lawsuit entitled Reese, et al. v. CNH America LLC, et al. to review the expert reports of Scott Macey and John Stahl dated October 17, 2013. My comments are as follows:

## II. Summary of Findings and Conclusions.

1. Mr. Macey states, on page four of his report, that employee paid premiums rose 159% between 1999 and 2010 (based on a GAO study); CNH is proposing (based on Towers Watson's analysis) that premiums alone will rise 1077% for pre-Medicare retirees from 2014 to 2022 (from $687 to $6,714) and 1053% for Medicare retirees (from $60 to $572).

2. Mr. Macey states, on page nine of his report, that employers are "demanding that [Medicare-eligible] retirees coordinate their . . . drug benefits with [Medicare] Part D." While it is true that virtually all plans I am familiar with (and consult with) coordinate their medical benefits with Medicare Parts A and B, none has changed their prescription benefits as proposed by CNH. When plans coordinate with Medicare Parts A and B (for medical benefits), in the typical case, Medicare is the primary payer and the company plan is secondary, filling out the gaps in Medicare coverage and providing benefits not paid by Medicare Parts A and B up to the plan's coverage limits. What CNH is proposing is the total elimination of an employer-provided benefit for prescription drugs, and requiring plan participants to purchase a Medicare Part D prescription drug plan. Medicare Parts A and B are a single payer system administered by the Federal Government; Part D benefits, while approved by the Federal Government, are provided by multiple private insurance companies. The benefits under Medicare Parts A and B are a single set of benefits provided to all Medicare beneficiaries, while Medicare Part D benefits vary greatly in terms of coverage, premiums, deductibles, copayment, coverage during the so-called "donut hole," etc. On page twenty-one of his report, Mr. Macey states that this change is reasonable as the "proposed benefits are reasonably commensurate with those provided under the current plan." This might have been true had the Proposed Plan actually coordinated with Part D; instead, it completely eliminates prescription benefits for Medicare eligible participants, who make up an increasing majority of the plan participants. CNH attempts to justify the elimination of prescription benefits for Medicare-eligible members by the fact that Part D exists, but the Proposed Plan makes no provision for coordination of CNH provided benefits with Part D, nor does it provide any subsidy for the premium payments for a Part D plan nor any reimbursement account for out of pocket expenses. A true coordination approach could have been achieved with the implementation of an Employer Group Waiver Plan (EGWP), which takes advantage of provisions of the Affordable Care Act with respect to Medicare Part D, thereby maintaining participant benefits while generating significant savings on plan costs to the plan sponsor. The proposed elimination of a company provided prescription drug benefit and its replacement with Medicare Part D is the

2

primary reason the participant share of plan costs by Medicare-eligible participants is projected to grow from 2.7% under the Current Plan to 62.6% in 2013; 69.0% in 2022 and 74.9% in 2032 under the Proposed Plan (based on Towers Watson's analysis). Based on Towers Watson's analysis, the participant projected out-of-pocket costs for Medicare Prescription coverage under the Current Plan is $107 in 2013, $186 in 2022, and $324 in 2032; for the Proposed Plan, those costs are $1,925 in 2013, $2,728 in 2022, and $4,681 in 2032. For a couple, the projected out-of-pocket costs for Medicare Prescription coverage are $5,456 in 2022 for the Proposed Plan compared to $372 for the Current Plan; in 2032 those numbers are $9,362 and $648 respectively. In my opinion, these widely disparate costs show that the Proposed Plan cannot possibly be considered "reasonably commensurate" to the benefits provided under the Current Plan.

3. Mr. Macey cites a number of situations where changes were made to other plans in an attempt to compare these plans to what CNH is proposing. I would not normally attempt to explore the factual basis of court cases and/or negotiations with which I was not involved, but since Mr. Macey has cited these situations in support of CNH's claim that they are relevant to whether it should be allowed to impose the Proposed Plan in place of the Current Plan, Plaintiff's counsel has asked me to review documents relative to these cases and provide my comments. At the outset, I believe it is difficult if not impossible to make such comparisons since the examples Mr. Macey cites arose out of different industries and quite different circumstances, and every situation has its own unique fact pattern. My firm works with many clients, from single employer to large public sector to multiemployer plans as well as a retiree-only plan provided under a Voluntary Employee Beneficiary Association (VEBA) Trust, and none has ever made changes to their retiree health care plans as drastic as those proposed by CNH.

   a. <u>ATT/Lucent</u>: Mr. Macey states, on page sixteen of his report, that Lucent made certain changes to its retiree healthcare plan. The changes proposed by CNH are much more punitive to retirees than the changes Lucent made. Mr. Macey discusses other changes made by Lucent on pages thirteen through sixteen. It is my understanding, based on an IBEW letter to retirees dated November 9, 2012, that the union and ATT had negotiated limitations on ATT's obligation for retiree health care beginning in the late 1980's, that caps applied only to prospective retirees, that these caps were in place for Lucent retirees after Lucent broke off from ATT and that the subsequent changes to retiree health care at ATT and Lucent were negotiated between the company and the union to ameliorate the impact of the previously negotiated caps on the employer's obligation. It is also my understanding that, in 2004, Lucent and its unions negotiated a VEBA for retired employees funded in part by a $400 million contribution by Lucent and that any subsequent changes to retiree health care benefits were determined by the VEBA trustees. The language in the 2004/CWA/IBEW/Lucent National Memorandum of Understanding, in the Postretirement Medical and Dental Benefits section, letter G (1) Establishment of Welfare Benefits Trust, states: "The parties recognize that the actual cost of the postretirement healthcare

benefits to be made available to Eligible Participants through the Retiree Medical Plan and the Retiree Dental Plan exceeds the level established by the Retiree Healthcare Caps and that the excess cost would, in the absence of further funding, have to be met by premium (or other) payments by Eligible Participants. The parties further recognize that the additional costs that the Eligible Participants would have to absorb may make further participation in the retiree healthcare program prohibitive for many."

b. <u>Goodyear:</u> Goodyear and the United Steelworkers Union (USW) negotiated caps on health care coverage beginning in 1991. The parties disputed whether those caps applied to pre-existing retirees. In 2003, when the costs first exceeded the caps, the USW and Goodyear agreed to plan design changes. In 2006, Goodyear announced that, effective January 2007, implementation of the caps would cause significant increases in the premiums charged to USW retirees. The union and retirees sued Goodyear in July 2007. The result was that the parties, including the representatives of the retiree Class, entered into a settlement agreement establishing a VEBA to provide retiree healthcare benefits. The court that approved the settlement specifically determined that the "[b]enefits in place for USW retirees as of the time of their retirement were more limited than both the benefits currently provided and benefits to be provided under the settlement." (Paragraph 16 of August 22, 2008 Order.)

c. <u>U.S. Steel:</u> In 2003, U.S. Steel and the USW entered into a five-year agreement, limiting the company's contribution for retiree health care to the amount it would pay for those benefits in 2006. Subsequent negotiations have resulted in modifications to that agreement, which offset the impact of the caps, including the use of $70 million from a Flat Premium Adjustment Account. Retired employees and surviving spouses also received lump sum payments, depending on the level of their pension, to be used to offset the rising cost of healthcare. U.S. Steel sought, in the 2012 negotiations, to eliminate Medicare retiree benefits and force those retirees into the individual market (including Medicare Part D for prescription benefits). The union was able to negotiate the continuation of the current prescription benefits with modest changes encouraging the use of mail order for maintenance drugs and increased cost sharing for specialty medications. The medical benefits for Medicare-eligible retirees were changed to a Medicare Advantage program, which, like the current CNH PPO plan, takes advantage of network provider discounts. Another very significant distinction between U. S. Steel and CNH is that, since 1975, the agreement between U. S. Steel and the USW has contained the following language: "Any pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by the Program established by this Agreement shall not have such coverage terminated or reduced (except as provided in this Program) so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of this Agreement, except as the Company and the Union may agree otherwise." Unlike any agreement between the UAW and CNH, this agreement always contained

4

language that allowed for negotiations that would change benefits, including for pre-existing retirees.

d. <u>Ford</u>: The Ford VEBA resulted from the settlement of class action litigation between Ford and the UAW and a Class of Ford retirees. The active Ford membership narrowly ratified an agreement that was essential to fund the VEBA. The class action settlement was approved by the district court after notice to the retirees. The district court's decision was affirmed on appeal. These actions occurred at a time when Ford was faced with the real possibility of bankruptcy. In light of that, the fact that the UAW and retirees were able to obtain VEBA funding worth billions of dollars, even if it replaced 60% to 70% of the cost of the prior plan, cannot be seen as a relinquishment of benefits. Compared to CNH's proposed plan for Medicare retirees where it assumes only 37% (in 2013) to 25% of the cost (by 2032; both based on Towers' estimates) this looks quite generous, especially since CNH, unlike Ford at the time of the VEBA negotiations, is not in danger of bankruptcy. In fact, according to the Plaintiff's Expert Report of Theo Francis, dated September 26, 2013, "CNH Global is a profitable, financially healthy company, with good financial performance and a reasonably strong balance sheet." Mr. Francis notes that CNH's revenues, over the last five years, have increased and " . . . its net income is rising faster than its revenues . . ."

e. <u>GM/Chrysler</u>: GM and Chrysler's bankruptcies were different than typical Chapter 11 proceedings and were expedited under Section 363 of the Bankruptcy Code because neither company had any cash other than that provided by the Federal Government, and neither could afford a long drawn-out Chapter 11 proceeding. The level of VEBA funding was the product of a series of negotiations, settlements, notices to retirees in both federal courts and bankruptcy courts, and finally, approvals by those courts in a situation where the companies would have otherwise been liquidated and retirees would have lost any opportunity for continuing benefits. In terms of all three automakers and the VEBAs established, Mr. Macey states, on page ten of his report, that the UAW has made changes to its retiree healthcare benefits that have increased out of pocket costs to retirees. This is incorrect – any changes made before the VEBAs were established were made subject to the approval of either the district or bankruptcy courts; and changes made after the VEBAs were in operation were made by the Committee established to run the VEBA, not by the UAW. The Committee is comprised of eleven members: six independent members and five UAW officers, all of whom have a fiduciary duty to plan participants. Any changes to benefits after the implementation of the VEBA have been or will be made by the Committee according to provisions of the Trust, to make certain the Trust stays solvent and can provide continuing benefits to all participants. As I have noted in my biography, I am consultant to the Middletown Works Hourly and Salaried Union Retiree Health Fund, which is a VEBA Trust. Our firm performs annual actuarial valuations assessing the long-term health of the Fund, and recommendations are made to the Trustees for actions necessary for its

5

long-term survival. Actions made by the Trustees cover a wide spectrum from investment management to benefit and vendor changes. In the five years since I first became the Fund's consultant, only very modest changes have been made to plan benefits and retiree contributions.

    f. <u>CNH:</u>
   i. Caps were negotiated by Case (CNH) and the UAW in November 1993 and continued under the 1995 CBA. They were **eliminated** in 1998 by agreement of the UAW and CNH. Given that negotiated caps were in place at AT&T, Lucent, Goodyear, and U.S. Steel, how the companies and the unions addressed modifications of retiree healthcare benefits in light of those caps can hardly be used for comparison purposes here.
   ii. Unlike any of the other situations Mr. Macey refers to, the district court and the Sixth Circuit have determined that retiree healthcare benefits for pre-2005 (CNH) retirees are vested.
   iii. At AT&T, Lucent, Goodyear, and U.S. Steel, changes to retiree health care benefits, including the caps and modifications of benefits to address the caps, were negotiated with the unions. Here, the UAW refused to discuss the very changes CNH seeks to impose on retirees.
   iv. At U.S. Steel, USW negotiated lump sum payments to ameliorate the impact of the increased contributions and out of pocket costs that resulted from costs that exceed the negotiated caps; no such offsetting payments have been proposed by CNH.
   v. In the 2005 CNH CBA, which resulted in the changes to post-2005 retirees, CNH provided additional benefits/funding to offset the impact of those changes (see #12 below). The Proposed Plan contains no similar benefits for pre-2005 retirees.

    g. It is my opinion that the above points show that what happened in these other situations (and at CNH subsequent to 2005) cannot be compared to what CNH is proposing to impose on its pre-2005 retirees, since each situation is different with different fact patterns and history.

4. Mr. Macey states, on page ten of his report that retired employees in jointly administered multi-employer health plans have been subjected to significant cutbacks. I am consultant to ten of such plans, and none have made significant cutbacks in benefits.

5. On page eighteen of his report, Mr. Macey states that the 1998 move from an Indemnity Plan to a Network Plan resulted in a loss of free choice and that loss is considered a significant value. This is not borne out by my experience generally or by the specific facts in this case. Usage of network providers is universally above 95% in any plan I consult for, and as noted in my previous report, was 99% for CNH retirees in 2008 (the earliest year data was provided). In fact, as cited in the District Court's opinion dated March 2011 (page 20), "the UAW was presented with information from Case reflecting that, in 1997, close to 100% of the providers who had treated Case employees were participants in the network and 100% of the hospitals in the area were within the

6

network." Provider networks are so extensive that it is no hardship finding and utilizing network providers. Not only was the requirement to use network providers in order to get the best benefit not a hardship, the change to a network plan entailed significant benefit improvements, such as the ability to receive certain benefits at 100% and the elimination of a lifetime maximum for certain benefits. The Network Plan also provided a significant benefit by eliminating, for "in network benefits", the usual and customary (U&C) limitation in the claim payment process. Under the Indemnity Plan, the plan payment was determined using the U&C allowance for any procedure, and applying the plan cost sharing parameters to that. This could result in additional member out of pocket costs due to balance billing when the provider's fee exceeded the U&C allowance. With the Network Plan, network providers are obligated to accept the negotiated fee as payment in full, eliminating the balance billing problem. Our analysis of the relative plan values of the Indemnity Plan and Network Plan indicated that the Network Plan had a relative value of 98% compared to the Indemnity plan, which had a value of 93%, meaning that, in addition to the improvement due to the elimination of the U&C issue, CNH increased the value of the benefits it provided under the Network Plan (and its share of the cost) by 5%.

6. On page twenty-one of his report, Mr. Macey states that Medicare-eligible participants will move to a "non-network based model, restoring the freedom of choice eliminated in 1998." In fact, the Current Plan for Medicare-eligible retirees is administered in such a way that virtually all participants are considered in-network. The plan coordinates with Medicare, and always pays as if the member went to a network provider. My analysis of the participant cost sharing bears this out. For the period January through November 2012, the average plan cost per participant was $2,510; the average member cost was $14. Clearly, the miniscule out-of-pocket cost was no deterrent to the retirees seeking care from any provider they chose.

7. On pages twenty-two through twenty-four of his report, Mr. Macey appears to make the argument that advances in medical technology are increasing costs considerably and that this justifies implementation of the Proposed Plan. There are two problems with this argument. First, the assertion is made that "28.9% of medical procedures paid for by the plan used procedure codes that did not exist in 1998." This overly simplistic look at procedure codes completely ignores the fact that most of the "new" codes are re-characterizations or reclassifications of existing codes; they are not brand new procedures. The same is true with the "new" prescriptions, which are: a) new generic versions of previously existing brand-name drugs; (b) new (and more effective) brand-name alternatives to existing brand-name drugs; or (c) new drugs to treat previously untreatable illnesses (such as Hepatitis C and Multiple Sclerosis), which are generally thought of as replacing medical costs. Certainly these should be applauded as cost saving measures and not blamed for rising costs. The second problem with the argument is that the Proposed Plan does virtually nothing to address the issue of technological advances by limiting new procedures (with the exception of limiting certain "lifestyle" drugs). Medical technology is constantly changing, and all health plans

7

allow for such changes by broadly defining what services are covered, so long as they are medically necessary. This is true of both the Current Plan and the Proposed Plan. Such technological advances were occurring long before the 1998 negotiations between CNH and the Union when CNH agreed to the elimination of the cap letter, which, while limiting the company's obligation, would have placed the burden of future healthcare inflation on the participants, regardless of its source: whether from advances in medical technology; defensive medical practice; normal price inflation; increased wages and benefits for healthcare workers; administrative costs; drug and other company profit margins. It should also be pointed out that, although there is general agreement that such improvements in and increased use of medical technology have a significant impact on costs, the magnitude of that influence is difficult to determine.

8. Plaintiff's counsel asked me to provide an analysis of the most recent medical claim data available (calendar 2012 through November) and the procedures performed on behalf of retirees for that year. I used the files cited below (in Documents Reviewed, #3), sorted them by procedure code, and produced a file that ranked procedure codes by frequency and paid amount. I was also asked to determine the frequency and amounts paid for certain codes for that period of 2012: 29827, 49083, 64483, 74176, 74177, 74178, 80053, 93306, 93458 and 96413. That information is:

| Code | Frequency | Amount Paid |
| --- | --- | --- |
| 29827 | 55 | $67,265.56 |
| 49083 | 79 | $63,918.17 |
| 64483 | 175 | $67,937.94 |
| 74176 | 206 | $57,686.39 |
| 74177 | 450 | $180,465.86 |
| 74178 | 204 | $122,418.57 |
| 80053 | 3,213 | $99,711.20 |
| 93306 | 595 | $128,151.40 |
| 93458 | 200 | $156,953.21 |
| 96413 | 517 | $52,256.90 |

9. On page twenty-four of his report, Mr. Macey discusses changes made to plans in response to rising healthcare costs. He mentions "new plan design and administrative provisions known as network/managed care plans." These types of plans were new in the late 1980's and early 1990's and implemented by agreement of CNH and the UAW in 1998. The Proposed Plan does not implement any new plan design or administration

provisions. Except for shifting costs to retirees from CNH, and the exclusion of certain "life style" drugs, the Current Plan and the Proposed Plan are essentially identical in plan design and administrative provisions. In my expert report, I discussed a number of potential changes that we have worked with our clients to implement that actually are new provisions (see #31 on page 13). These changes would significantly reduce plan costs with very little impact to the participants. Although technology is changing healthcare and in some instances increasing costs, there are reasonable ways to respond to these changes that keep benefits largely intact but introduce reviews of procedures to make sure they are both clinically appropriate and cost effective. The current response to new technology for medical plans includes a combination of old and new school approaches. The new school component uses data to identify: gaps in care (e.g., diabetics not following their recommended treatment regimen); healthcare usage that is not being appropriately managed (e.g., participants seeing many different specialists); and participants who have not gotten recommended preventive care procedures (physicals; mammograms; colonoscopies). The old school component is to provide this data (and other technology support) to primary care physicians and provide incentives for them to fulfill their role as care managers. It can also include steering participants to providers that demonstrate best outcomes at an appropriate price. For the prescription benefit, it includes closely reviewing the generally new and expensive specialty medications, implementing utilization management programs such as step therapy, quantity limits, and prior authorization to make sure usage is clinically appropriate; it does not include the complete elimination of the plans.

10. Mr. Macey includes a chart on page twenty-eight of his report (comparing pre-Medicare costs) that he is apparently using to suggest that the significantly higher cost sharing required under the Proposed Plan will not reduce the retirees' use of the plan and its benefits. What it does clearly demonstrate, however, is that cost increases over the period 2008 to 2012 were significantly higher in the Proposed Plan. For pre-Medicare medical, the increase in cost for the Proposed Plan is 74% from 2008-2012; for the Current Plan it is 14%. For prescription drugs, costs for the Proposed Plan went up 52% where the costs of the Current Plan actually went down. I do not view this as a compelling argument for the ability of the Proposed Plan to control healthcare cost advances. On this same issue, on page twenty-seven of his report, Mr. Macey states: "Indeed, although costs of participants for (sic) the plan will increase, one would not expect patient outcomes to be materially impacted by the increased costs. As long as participants make their premium payments, they will have access to the same care they have access to currently." This is not true. The pre-2005 retiree population covered by the will increasingly become Medicare-eligible (in fact, eventually all who do not die prior to age 65 will be covered by Medicare) and by far the most valuable benefit for these participants is prescription drug coverage, coverage which does not exist under the Proposed Plan. As noted in #2 above, under the Proposed Plan, due to the elimination of the benefit, the cost to retirees for prescriptions alone is expected to increase to just under $5,000 on average per person per year.

9

11. On pages twenty-nine and thirty of his report, Mr. Macey appears to take issue with our projections of long-term healthcare trends. In fact, the numbers we used assume a decreasing medical trend for the very reasons Mr. Macey lays out. We certainly would agree it is difficult to predict healthcare costs more than a few years into the future, but it's necessary to make long term planning and for calculation of long-term liabilities (which is, in fact, exactly what Towers Watson did in its long-term projections). We use a method approved by the Society of Actuaries (and a method one of our actuaries helped developed) that takes into account a number of variables, including "regular" inflation, real wage growth, increases due to new technology and a ceiling for healthcare costs as a % of GNP. Towers Watson initially provided projections through 2022; our projections would have been very close to theirs. We then extended the projected costs to 2032, and Towers Watson subsequently did the same. There is virtually no difference between our two numbers in terms of overall costs for the Medicare-eligible group (which is about all that will be left by then); the difference in the pre-Medicare costs appears to stem from Towers Watson's application of the Excise Tax, which increases our assumption of costs by about 1.25% per year. It's interesting to note that Mr. Macey mentions a "significant reduction in the cost escalation of the nation's health costs." If this is the case, it argues against making dramatic changes like those proposed by CNH. This statement also contradicts the argument Mr. Macey makes about technology increasing costs that I reference in #8 above. The real point, however, is that healthcare costs will continue to go up, and at a rate greater than general inflation, the compounding effect of which will be significant. And with retirees being forced to pick up 60% of such increases, they will increasingly be unable to afford the premium cost, and will lose all healthcare coverage at that point.

12. On page thirty-one of his report, Mr. Macey states that the Affordable Care Act "will offer members . . . an alternative to the Plan if it becomes too expensive . . ." by providing "retirees with substantial government subsidies." These subsidies, however, are not available at all for Medicare-eligible retirees and would only be available to pre-Medicare retirees if CNH eliminated the plan altogether or if the CNH plan became unaffordable. Mr. Macey appears to be conceding that at some point the CNH Proposed Plan will become so expensive that it will be unaffordable. This seems to be to be in direct contrast to his statement (on page twenty-one) that "the proposed benefits are reasonably commensurate with those provided under the current plan."

13. Beginning on page thirty-two of his report, Mr. Macey attempts to make the point that the Proposed Plan is identical "to the plan agreed to by the UAW and the plan providing benefits to more recent CNH America retirees." This statement ignores the fact that the UAW refused to bargain with CNH about the benefits for pre-2005 retirees and negotiated a number of benefits in the 2005 CBA to help future retirees pay for the increased out-of-pocket costs associated with the benefit reductions and elimination of prescription drug benefits for Medicare-eligible retires, including:

    a. A Retiree Medical Savings Account to help pay for increased member out of pocket costs. CNH's contributions consist of several components including a $7,500 initial payment; an amount equal to the value of the final year of vacation at retirement; and up to $1,500 (with thirty years of service) a year during the 2005 CBA beginning at Medicare eligibility.

    b. Significantly increased pension payments: the basic benefit was increased by 11.5% over the six-year term of the agreement from what it had been at the end of the 1998 CBA; the supplemental benefit was increased 21% from what it had been at the end of the 1998 CBA.

    c. A Part B premium reimbursement which became a combined Part B/Part D reimbursement, increasing from $65.50/month under the 1998 CBA to $100/month in 2007 under the 2005 CBA.

14. In addition, the reality is that those employees retiring after the 2005 CBA knew the negotiated changes were coming and could choose to extend their working years to make up for the reduced benefits.

15. On page thirty-five of his report, Mr. Macey discusses the UAW retiree VEBAs and asserts that the "agreements . . . provided funding sufficient for **only** approximately 60% to 70% of the expected future costs of providing benefits [my emphasis] . . " Regardless of the accuracy of that assessment, that level of funding, especially given the financial condition of GM, Ford and Chrysler at the time the VEBAs were established, looks generous compared to what CNH is proposing in the absence of any similar financial problems, namely that the plan would only cover 65% of pre-Medicare costs and 31% of Medicare costs by 2022 with those numbers reducing further to 51% and 25% respectively by 2032.

16. On page thirty-six of his report, Mr. Macey discusses agreements made between the UAW and Caterpillar and Deere that he says are similar to those proposed by CNH in the Proposed Plan. Mr. Macey's description of the Deere plan is factually incorrect. Based on the conversation I had on January 8, 2014 with James Hecker, who is a Deere retiree and was the International Representative responsible for negotiating the agreements between both active employees and retirees and Deere from September 1978 through October 2010, the Deere plan for retirees requires **no** participant premium sharing. In addition, the member cost sharing Mr. Macey mentions (a deductible and out of pocket maximum) applies only to out-of-network benefits. The in-network benefits are covered at 100% with no deductible or coinsurance required – only copayments for services such as office visits and use of the emergency room. Not mentioned by Mr. Macey is that their prescription plan requires only very modest copayments of $5 for generic drugs and $20 for brand-name drugs. The agreement between Deere and the UAW, reached in 2009 for the period 2009-2015 included very modest increases in copayments for brand-name drugs (from $15 to $20) and office visits (from $10 to $15 for primary care and from $10 to $25 for specialists); but this was more than made up for by the fact that it also included annual increases to the Medicare Part B reimbursement for current

11

retirees, annual lump-sum payments for current retirees of between $250 and $750 (depending on years of credited service) and for current surviving spouses of between $137.50 and $412.50, and pension increases for current retirees.

17. Regarding Caterpillar, in 1992 the company notified the union that, in its opinion, negotiations were at an impasse. Caterpillar unilaterally imposed caps on the amount if would pay for health care costs starting in 2000 and unilaterally modified the plan of benefits. Caterpillar did not apply the caps, however, to pre-1992 retirees. In March 1998, the UAW and Caterpillar reached an agreement to formally implement the benefit modifications and unilateral caps effective in 1999 for post-1992 retirees, but they also agreed to set up a VEBA that Caterpillar funded. As noted in the district court's decision in Winnett v. Caterpillar v. UAW, " . . . the actual financial impact of all of this was tempered by the VEBA agreement." The VEBA paid costs above the cap through 2004. In 2005 negotiations, Caterpillar agreed to pay 40% of the above cap costs. This differs from what CNH is proposing because what happened at Caterpillar, after Caterpillar unilaterally implemented the caps in 1992 was the result of negotiations. Caterpillar is also very different and not comparable to the situation here because, in 1998, CNH and the UAW negotiated the elimination of the existing caps; in Caterpillar the UAW was subsequently only able to negotiate a VEBA and then company payments above the unilateral caps. Finally, there is a significant difference between the Caterpillar example and CNH since Caterpillar did not change benefits for the existing (pre-1992) retiree group as CNH is proposing to do.

18. On page forty-two of his report, Mr. Macey states that "[t]he proposed plan also compares favorably with Medicare." Employer-sponsored plans for Medicare-eligible participants are not intended to be compared to Medicare – they are intended to supplement Medicare. Mr. Macey also attempts to compare the initial year $5/month retiree contribution (which by the way grows to $48 in ten years) to the Medicare Part B premium of $104.90. He fails to note, however, that the participant would still be required to pay the Medicare Part B premium **in addition to** the new, required contribution for the CNH Proposed Plan. Mr. Macey is correct in saying that the prescription coverage for Medicare participants compares favorably to Medicare, since in fact that will be their only available coverage; the Proposed Plan contains no employer-provided prescription coverage, which is the most draconian part of the Proposed Plan.

19. On page one of Mr. Stahl's report, he states that "[t]he medical plan provisions of the proposed pre-65 plan compare favorably to plan designs reflected in survey data collected for large employers for 2011 through 2013." This comparison is of no use, since it makes no attempt to narrow the comparison group to employer plans by industry, by salary or hourly, by bargaining or non-bargaining groups, by geographic area, or by size. In addition, there is only a comparison of benefit provisions, and no mention of whether and what premium cost sharing which will be required under the Proposed Plan. Also, there is no comparison of other factors such as whether the plan

participants receive other compensating benefits such as retiree medical savings accounts, Medicare reimbursements or other lump sum or additional pension payments to help finance their out of pocket costs.

20. My comments about Mr. Stahl's assertion that "new" procedure codes justify the proposed changes are the same as made in #7 and #8 above. In almost all cases, the medical codes added since 1998 further clarify existing codes or make them more specific to a procedure; they are not new procedures. The new prescriptions are variations of existing drugs or, if brand new, are effective in controlling costs since they replace medical costs.

21. Mr. Stahl's comments about increased cost-sharing leading to more cost effective plan usage (page 1) ignore the more commonly used technique of requiring participants to get the generic equivalent when available, or paying the difference in cost. This is the preferred way to accomplish more cost effective plan usage as it does not penalize participants who must get a brand name drug that has no generic substitute.

22. Mr. Stahl fails to compare the Proposed Plan to the benchmark data for prescription drug benefits for Medicare-eligible retirees. I can only assume that is because the Proposed Plan provides **no benefit** for prescription drugs for Medicare participants, and this would compare unfavorably to the benchmark data.

23. Mr. Stahl's comparison of the prescription benefits under the Proposed Plan for pre-Medicare participants indicates that it is below the average of the benchmark group. Under the Proposed Plan, copayments for brand name drugs would increase from $5 to either $40 or $60 for a one-month supply; for a three-month supply, the copayments for brand name drugs would increase from $5 to either $80 or $120. The prescription drug benefits under the Proposed Plan are far from being commensurate with the Current Plan; and, according to Mr. Stahl, they are also not even "average" when compared to Towers Watson's benchmark group.

24. Both Mr. Macey and Mr. Stahl talk about how changing technology requires new approaches by health plans to manage costs. Mr. Macey mentions managed care plans as new (although they were new in the last 1980s and early 1990s), and yet CNH has proposed moving a significant percentage of participants back to an old style indemnity plan (which was last prevalent in the '80s and early '90s) and away from the managed healthcare plan they are currently in.

13

_____

Mark Lynne, CEBS                                           January 15, 2014
Bolton Partners, Inc.

# EXHIBIT 1

**Documents Reviewed**

1. Expert Report of Scott Macey – October 17, 2013

2. Expert Report of John Stahl – October 17, 2013

3. CNH medical claims data for the period January 2012 through November 2012 (CNHA059047 and CNHA059053)

4. CNH Express Scripts top 25 prescription drug claims for UAW Retirees and Grandfathered Over and Under 65 for the period January 2012 through November 2012 by Total Rx and by Total Plan Cost (STAHL00013C_3945 UAW Grandfathered Top 25 YTD 2012)

5. CNH – Retiree Rate projections [Compatibility Mode] (Excel)(CNHA059043)

6. IBEW Local 21 AT&T Retiree Benefit Update Posted On: Nov. 9, 2012 16:22:23

7. 2004/CWA/IBEW/Lucent National Memorandum of Understanding

8. Reddington V. Goodyear, Case No. 5:07CV1999, Findings of Fact and Conclusions of Law; August 22, 2008

9. U.S. Steel Master Agreement Settlement Summary, September 2012

10. Case Corporation/UAW Tentative Agreement (Subject to Ratification) April 23, 1998

11. CNH America, LLC and UAW and Its Locals 152, 180, 763, and 807 Proposed Settlement Agreement, March 16, 2005

12. Winnett V. Caterpillar V. UAW, Case No. 3:06-0235 in the U.S. District Court for the Middle District of Tennessee Nashville Division

13. Jack Reese V. CNH America LLC, Plaintiffs' Expert Report of Theo Francis; September 26, 2013

14. Robert M. Fishman and Gordon E. Gouveia, *What's Driving Section 363 Sales after Chrysler and General Motors?*, Norton Journal of Bankruptcy Law and Practice, Volume 19, Number 4, 2010, 351.

15. Elliott S. Fisher, Julie P. Bynum, and Jonathan S. Skinner, *Slowing the Growth of Health Care Costs – Lessons from Regional Variation,* New England Journal of Medicine, 360:9, February 26, 2009

16. Daniel Callahan, *Health Care Costs and Medical Technology,* in From Birth to Death and Bench to Clinic: The Hastings Center Bioethics Briefing Book for Journalists, Policy makers, and Campaigns, ed. Mary Crowley (Garrison, NY: The Hastings Center, 2008), 79-82

17. Jonathan S. Skinner, *The Costly Paradox of Health-Care Technology,* MIT Technology Review, September 5, 2013

18. The Henry J. Kaiser Family Foundation, *How Changes in Medical Technology Affect Health Care Costs,* May 2, 2007

19. Draft Summary Plan Description, Employee Group Insurance Plan, for Hourly Employees of CNH America LLC, Who Retired after July 1, 1994 and Before May 1, 2005

20. Reese (E.D. Mich) _Supp_I Interr. Resp. Ex. A

21. Reese (E.D. Mich) _Supp_I Interr. Resp. Ex. B

22. Sporleder – Tennie re: Candido email April 29, 1997

23. Winnett Candido letter May 27, 1997

24. Bowen statement 130913

25. Reese V. CNH, Exhibit 8 to the Declaration of Jack Reese

26. Insurance Agreements between United States Steel Corporation and the United Steelworkers of America

27. Reese V. CNH District Court Opinion 3-3-11

28. UAW-Deere and Company, Highlights of Proposed New Agreement, 2009-2015

29. Summary of UAW-Caterpillar Tentative Agreement, December 15, 2004

30. Procedure Code Analysis – PH.xlsx

31. UAW Retiree Medical Benefits Trust (VEBA): Leadership Structure (uawtrust.org)

32. Benchmarking data provided by Towers Watson (STAHL0000052C) (Marked confidential and proprietary)

## COMPENSATION

My name is Mark Lynne. I am President of the Health Plan Consulting Division of Bolton Partners, Inc. The fee for my services and others within Bolton Partners who have assisted me is based on an agreed upon blended hourly billing rate of $230 per hour for myself and those who have helped me on this report. I have spent approximately 52.5 hours on this Report to date. Michael Jayner, Senior Benefits Consultant with Bolton Partners, has spent 3.5 hours working with me on this Report. Bill Hudec, Benefits Consultant with Bolton Partners, has spent 15.5 hours working with me on this Report; and Paul Huh, Benefits Consultant with Bolton Partners has spent 0.5 hours working with me on this Report. As of today, the approximate amount of compensation payable for preparation of this Report is $16,560.