UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK REESE, JAMES
CICHANOFSKY, ROGER MILLER,
and GEORGE NOWLIN on                                    Hon. Patrick J. Duggan
behalf of themselves and
a similarly situated class,                             Case No. 04-70592
     Plaintiffs,
v.                                                      **Class Action**

CNH INDUSTRIAL N.V. and
CNH INDUSTRIAL AMERICA LLC,

     Defendants.
_____/

## EXHIBIT S

## To

## PLAINTIFFS' RESPONSE
## TO CNH'S MOTION FOR SUMMARY JUDGMENT


**Declaration of Daniel Sherrick**

**May 14, 2014**

DECLARATION OF DANIEL SHERRICK

Daniel Sherrick states as follows

1.      The statements in this Declaration are made on personal knowledge. I

would be competent to testify to them if called as a witness

2.      I was employed as an attorney in the UAW Legal Department from

1984 through 2010.  I served as Associate General Counsel from 1984

through 1998 and as General Counsel from 1998 through 2010.  Since 2010, I

have been employed as the "UAW Liaison" to the Voluntary Employee

Beneficiary Association (VEBA) which provides health care benefits to UAW

retirees of General Motors, Ford and Chrysler ("Auto Companies").

3.      While UAW General Counsel, I was deeply involved in advising the

UAW President and other elected UAW officials in connection with retiree

healthcare issues, including bargaining with the Auto Companies regarding

establishment and funding of the various VEBAs described below.

4.      Prior to 2005, the Auto Companies on many occasions had sought the

UAW's agreement to reduce retiree medical benefits.  The UAW consistently

resisted those efforts, and refused to agree to reductions in retiree medical

benefits.  As a result, as of 2005, UAW retirees from GM, Ford and Chrysler

had medical coverage with virtually no cost-sharing (zero deductible, zero

co-pay and zero monthly contribution requirements).

5.      By 2005, Ford and GM were experiencing severe financial difficulties.

The cost of retiree medical benefits was a significant cause of those

difficulties, in large part because the sheer number of retirees was a vestige

of a time when the Auto Companies were much, much larger and was therefore out of proportion to the companies' active workforce, as well as their ability to continue to provide those benefits from current cash flow. As found by the Sixth Circuit, "[b]y the end of 2004, GM's accumulated [retiree medical] obligations amounted to almost seven times its market value; by the end of 2005, Ford's [retiree medical] obligations amounted to almost three times its market value." *UAW v. General Motors Corp.*, 497F.2d 615, 621 (6th Cir. 2007).). As the Sixth Circuit also noted, "in early 2005, both companies' credit ratings declined to non-investment grade status ('junk' status) in part due to GM's 'burdensome postretirement benefit obligations,' and Ford's 'massive unfunded retiree medical liability'." 497 F.2d at 621. (internal record citations omitted).

6.          Prior to entering into the 2005/2006 agreements described below, the UAW retained Lazard, a leading national investment banking firm, to conduct an independent and comprehensive analysis of the financial condition of the Auto Companies. The UAW concluded (as later confirmed by the Sixth Circuit) that -- without reduction in retiree medical liabilities -- the very survival of the Auto Companies was at stake. The UAW also concluded that, if the Auto Companies did not survive, retirees would likely lose their medical benefits completely, since these benefits were largely unfunded. Against that background, the UAW agreed to support reductions in retiree medical costs, and a restructuring of the method of delivery of certain retiree benefits, in order to protect the long-term viability of the Auto Companies,

and thereby help avoid the possibility that the insolvency of those companies would result in the complete elimination of these important retiree benefits.

7.          For these reasons, in 2005 and 2006, the UAW supported a series of changes to retiree medical benefits for UAW GM and Ford retirees, including imposing modest deductible, co-payment, and monthly contribution requirements, and modifying the delivery mechanism for dental benefits, and to make certain other administrative changes in the retiree medical benefit programs.  Other than these changes in dental coverage and modest cost-shifting features, the 2005 and 2006 agreements left GM and Ford responsible for providing on-going retiree medical benefits.  Those changes also required GM and Ford to establish and fund an independent VEBA to pay for the costs shifted to retirees (called the "Mitigation VEBA" or the "Dental VEBA").  Although in his Declaration, Mr. Macey attempts to disparage the role and significance of the Mitigation/Dental VEBA, that VEBA was funded with $3 billion in the case of General Motors, as well as on-going contributions of over $1.00 per hour for every hour worked by active UAW members at Ford and GM.  That VEBA would provide payments that largely offset the new cost shifting features incorporated into the company-sponsored plans, and would provide on-going dental benefits at the same level as prior to the agreement.  The net impact of this arrangement was that retirees experienced no change in their dental benefits, and only modest cost-shifting changes in their medical plan, summarized as follows:

➢   monthly contribution requirements of $10 (single) and $21 (family);

> annual deductible of $150 (single) and $300 (family); and

> co-payment feature, with an out of pocket maximum (including the
deductible) of $250 (single) and $500 (family).

8. Under applicable law, once a union-represented employee retires, the union
no longer serves as that individual's "exclusive representative" under the
National Labor Relations Act, and therefore the union cannot legally bargain
for reductions in benefits to which that individual is entitled under applicable
collective bargaining agreements. See *Chemical Workers v. Pittsburgh Plate
Glass Co.*, 404U.S. 157, 180 n. 20(1971). In order to respect the teachings of
*Pittsburgh Plate Glass*, the process for obtaining the necessary approvals of
the changes described above was as follows:

> With respect to the post-retirement benefits for still-active employees,
the union does serve as the "exclusive representative." Therefore, elected
UAW leadership entered into bargaining with the companies on those
issues, ultimately agreeing to support the package of benefit
modifications and funding requirements for the VEBA's summarized
above.

> That tentative agreement was then submitted to the impacted active
UAW membership for a ratification vote (since it would impact their post-
retirement benefits.). Those agreements were ratified by the active UAW
membership at both GM and Ford.

> Once the tentative agreements were ratified by the active UAW
membership at Ford and GM, the UAW and individual retirees sued

General Motors and Ford in separate actions for a declaratory judgment that UAW retirees had vested, lifetime healthcare benefits under Ford and GM collective bargaining agreements. The individual retiree Plaintiffs, represented in both cases by prominent retiree lawyer William Payne, sued as the representatives for classes of GM and Ford retirees. The classes of GM and Ford retirees were thereafter certified by the federal district courts. The package of proposed benefit changes was incorporated into a proposed class action settlement agreement, with the class defined to include already-retired UAW members who would be impacted by the proposed changes. The agreements entered into by the UAW were always clear that no changes could be made to the benefits of already-retired individuals unless and until the package of changes was approved by a final order of the appropriate federal court in a class action proceeding that included all impacted retirees as class members. The UAW actively participated in those class actions proceedings in full support of court approval, but the existing retirees in the certified classes were represented by Class Counsel.

➤ Court approval of the 2005 agreements was achieved, with District Court decisions in 2006. The Sixth Circuit affirmed the District Court approval in 2007. 435 F.3d 571.

9.      No similar agreements were reached with Chrysler in 2005/2006 because Chrysler's financial condition was stronger than GM and Ford at that

time.  Chrysler retirees therefore continued to receive unaltered retiree

medical benefits from Chrysler.

10.          National bargaining with the auto companies next occurred in the fall

of 2007.  By that time, the financial condition of the Auto Companies had

deteriorated even further and those companies sought further restructuring

of their retiree medical obligations in order to address more broadly their

economic decline.  Again, the UAW retained Lazard to provide expert

financial advice on the condition of the Auto Companies.  Again, the UAW

concluded that the situation, even after the 2005/2006 changes, was dire and

that the survival of the Auto Companies was in jeopardy if their retiree

medical liabilities were not addressed more broadly.  In discussions during

2007, the Auto Companies also stressed their belief that the collective

bargaining agreement did not provide benefits on a lifetime basis and

therefore upon expiration of the contracts in the fall of 2007 the companies

would be free to modify, or even terminate, retiree medical benefits.  While

the UAW strongly believed that the collective bargaining agreements would

support a finding that the Auto Companies had an obligation to provide

vested retiree medical benefits that continued for the life of the retirees, the

UAW also understood that there is always value in avoiding litigation risk

and did not want to put the retirees in the position where a court might rule

that the Auto Companies could terminate the benefits completely.

11.          For the reasons described in the preceding paragraph, the UAW

agreed during 2007 national bargaining with all three Auto Companies to

support creation and funding of an independent VEBA Trust that would take

responsibility for providing all retiree medical benefits.  As with the prior

agreements, the 2007 agreements were contingent on court approval in a

class action proceeding covering already-retired individuals.  Under the

agreements, this new VEBA Trust would launch in 2010, and would absorb

the assets and liabilities of the much smaller Mitigation/Dental VEBA's

established for the GM and Ford retirees  pursuant to the 2005/2006

negotiations and court approval.  The 2007 agreement provided that the

companies would provide billions of dollars of funding for the new VEBA

Trust, consisting of immediate up-front cash as well as a series of

complicated financial instruments.  The total funding package was designed

to support the then-existing level of medical benefits on a lifetime basis,

based on a series of mutually-agreed projections, including life expectancy,

medical inflation, discount rate, retirement patterns, etc.  The funding was

such that, if those projections turned out to be accurate, the fund would

continue to provide the then-existing level of benefits on a lifetime basis

without any reduction in benefits.

12.        Following ratification of the 2007 tentative agreements in the fall of

2007, the UAW, the Auto Companies and the retiree Class returned to court

for class action approval in the same manner as 2005/2006.  Those class

action settlement agreements were approved by the district courts in early

2008.  As with the earlier settlements, the district courts reviewed all aspects

of the settlement agreements and the quality of the representation of the

Class by Class Counsel, as well as the funding of the VEBA Trust, the assumptions on mortality, medical inflation, discount rate, etc. The district courts then approved the class action settlement agreements, which included the VEBA Trust, the funding and the VEBA Trust Agreement, as fair and reasonable to the Class of retirees given all of the relevant circumstances, and in particular, in light of the precarious financial status of the Auto Companies and the risk to the retirees of losing their benefits entirely through 1) an adverse legal determination that their benefits were not vested; or 2) the financial collapse of the Auto Companies.

13.    In late 2008 and 2009, the United States economy experienced a sudden and dramatic catastrophe. Auto sales fell precipitously as credit markets seized up. The Auto Companies burned through billions of dollars in cash reserves and required emergency federal financial assistance in December 2008, in order to avert an immediate and uncontrolled liquidation. That emergency financial relief briefly stabilized the companies, but both GM and Chrysler filed for bankruptcy in the summer of 2009. Stockholders of GM and Chrysler were completely wiped out. Ford engaged in a comprehensive out-of-court financial restructuring in order to dramatically modify the payment terms for its bondholders. As part of these bankruptcies and out-of-court financial restructurings, the VEBA funding obligations undertaken by the companies under the 2007/2008 agreements were modified, with the VEBA receiving some of the required funding in the form of company stock of uncertain value, as is common for financial creditors in

bankruptcy and restructuring scenarios.  In the GM and Chrysler

bankruptcies, the bankruptcy court also approved restructuring of the

retiree benefits, including elimination of dental and vision benefits as well as

other changes, pursuant to the procedures established by Section 1114 of the

Bankruptcy Code.  These changes, the bankruptcy court determined, would

provide immediate cash-flow relief for GM and Chrysler during the

bankruptcy proceeding and during the period prior to the launch of the VEBA

Trust scheduled for 2010.

14.      Dental and vision benefits were not modified for Ford retirees, since

Ford did not seek bankruptcy protection, and Ford retirees continue to

receive unaltered dental and vision benefits, now provided by the VEBA

Trust, under class action settlement agreements approved by the district

court.

15.      The 2009 changes to the VEBA Trust funding parameters for all three

Auto Companies forced the Trust to rely more heavily on company stock,

because those companies were insolvent and unable to meet their financial

obligations to creditors.  Creditors of all types were forced to accept "pennies

on the dollar" recoveries, as is typical in corporate bankruptcies and

restructurings.  As is also common, other creditors (such as lenders,

bondholders and the United States Treasury) were also required to accept

stock in the post-bankruptcy entity, in place of fixed cash obligations

resulting from pre-bankruptcy claims.

16.     The Trust began providing retiree health care benefits on January 1, 2010. In accordance with the court-approved Trust Agreement, the Trust is governed by an 11 member committee, which does not include any representatives of the auto companies. Five of the 11 members of that governing body are appointed by the UAW. The 6 member majority of that body consists of independent members, approved in the court-approval process, who bring expertize in health care design and delivery, institutional investment and other relevant disciplines. That Committee is required to monitor the assets and liabilities of the Trust and make benefit adjustments as appropriate, taking into account changes in asset levels, benefit costs and other dynamic factors.

17.     Since its launch in 2010, the Trust has found many ways to reduce costs without reducing benefits or shifting costs to retirees. Co-pays and deductibles have been adjusted annually, roughly to keep pace with inflation. Other benefits have been improved dramatically since the Trust's launch. For example, coverage has been expanded to include primary care physician office visits, which were previously not a covered benefit. Coverage for urgent care facilities (often an alternative to emergency room visits) was added in 2011. Preventative dental coverage, along with coverage for vision exams, was added for GM and Chrysler retirees in 2012. Ford retirees continue to receive comprehensive and unaltered dental and vision coverage. Other programs, such as diabetes education and cardiac rehabilitation, have also been added. These benefit adjustments since 2010 have been made by

Trust, pursuant to the Trust Agreement, and not by the UAW.   Full details of

these changes are described in communications to retirees from the Trust,

which are reproduced on the Trust website, uawtrust.org.


I declare under penalty of perjury that the above statements are correct


May 14, 2014

Daniel Sherrick