Exhibit 1

**Case Nos. 11-1359**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**JACK REESE, FRANCES ELAINE PIDDE, JAMES CICHANOFSKY,
ROGER MILLER and GEORGE NOWLIN,**

Plaintiffs/Appellees

v.

**CNH AMERICA LLC (f/k/a Case Corporation) and
CNH GLOBAL N.V.,**

Defendants/Appellants

On Appeal From the United States District Court
Eastern District of Michigan

**PRINCIPAL BRIEF OF PLAINTIFFS**

**ROGER J. McCLOW (P27170)
KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.
400 Galleria Officentre, Suite 117
Southfield, MI 48034
(248) 354-9650**

*Attorneys for Plaintiffs*

**Oral Argument Requested**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: _____      Case Name: _____

Name of counsel: _____

Pursuant to 6th Cir. R. 26.1, _____
*Name of Party*
makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

---

CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/_____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF REASONS FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . vi

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

COUNTER-STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

COUNTER-STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. THE INDEMNITY PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B. THE 1995 NEGOTIATIONS AND THE 1995 CASE MANAGED CARE PLAN . . . . 7

C. EVENTS PRECEDING THE 1998 NEGOTIATIONS . . . . . . . . . . . . . . . . . . . . . . . 8

D. THE 1998 NEGOTIATIONS AND THE 1998 PPO PLAN . . . . . . . . . . . . . . . . . . 8

    1. The 1998 Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    2. Negotiated Improvements Over the Indemnity Plan . . . . . . . . . . . 10

E. CNH'S ADMISSIONS THAT HEALTH CARE BENEFITS WERE
IMPROVED DURING THE 1998 NEGOTIATIONS . . . . . . . . . . . . . . . . . . . . . . . 12

F. THE 2002 EAST MOLINE PLANT SHUTDOWN AGREEMENT . . . . . . . . . . . . . 13

G. CNH AND THE UAW DID NOT AGREE TO MODIFY PLAINTIFFS'
BENEFITS IN 2005 OR 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.  THE DISTRICT COURT CORRECTLY HELD THAT
    PLAINTIFFS' VESTED BENEFITS ARE IRREDUCIBLE . . . . . . . . . . 16

    A.  STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.  FACT FINDING IS THE RESPONSIBILITY OF DISTRICT COURTS . . . . . . 16

    C.  IN REESE, THIS COURT DID NOT FIND FACTS; IT REMANDED
        FOR THE DISTRICT COURT TO MAKE FINDINGS OF FACT  . . . . . . . . 17

    D.  THE 1998 NEGOTIATIONS IMPROVED (AND DID NOT DIMINISH)
        THE BENEFIT PACKAGE  PROVIDED TO EXISTING RETIREES  . . . . . . . 18

    E.  THE UAW MUST AGREE BEFORE PLAINTIFFS' VESTED
        RETIREE BENEFITS CAN BE MODIFIED  . . . . . . . . . . . . . . . . . . . . . . 25

    F.  CNH'S DEFENSES, SOME RAISED FOR THE
        FIRST TIME ON APPEAL, ARE MERITLESS  . . . . . . . . . . . . . . . . . . . . 31

        1.  As in 1998, The UAW Always Upgraded Benefits
            For Existing Retirees In Prior Contracts  . . . . . . . . . . . . . . . . 31

        2.  The 1998 Letter of Understanding Relating To
            Optional Managed Care Plans Does Not Permit
            CNH to Charge a Premium for the 1998 PPO Plan  . . . . . . . . 33

        3.  The National and State Health Insurance
            Initiatives Letter Does Not Permit CNH To
            Escape Its Contractual Obligations . . . . . . . . . . . . . . . . . . . . . 38

        4.  The Sixth Circuit's Recent Decision in Winnett Has
            No Relevance to Issues Presented On Appeal Here  . . . . . . . 42

II. CNH HAS NOT SHOWN ENTITLEMENT TO ANY RELIEF
    UNDER ZIELINSKI OR ANY OTHER STANDARD . . . . . . . . . . . . . . . 46

    A.  THE ZIELINSKI STANDARD IS INAPPLICABLE TO THIS DISPUTE . . . . . 46

B. CNH's Proposed Changes Are Not Reasonably
Commensurate With Plaintiffs' Vested Benefits . . . . . . . . . . 48

C. CNH's Proposed Changes Are Not Reasonable
in Light of Changes in Health Care . . . . . . . . . . . . . . . . . . . . . . . 50

D. What Benefits CNH Provides Active Employees
or Other Employers Provide Retirees Is Irrelevant . . . . . . . 51

III. THE EAST MOLINE PLANT SHUTDOWN AGREEMENT
PROVIDED FOR IRREDUCIBLE BENEFITS . . . . . . . . . . . . . . . . . . . . . . 53

IV. *REESE* IS A DEPARTURE FROM PRIOR,
BINDING SIXTH CIRCUIT PRECEDENT . . . . . . . . . . . . . . . . . . . . . . . 56

V. PLAINTIFFS ARE ENTITLED TO ATTORNEY FEES . . . . . . . . . . . . . 58

VI. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

PLAINTIFFS' DESIGNATION OF RELEVANT DOCUMENTS . . . . . . . . . . . xii

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

# TABLE OF AUTHORITIES

## CASES

*Armstrong v. City of Melvindale*,
 432 F.3d 695 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Benitez v. Humana, Inc.*,
 No. 3:08CV-211-H, 2009 WL 3166651 *1 (W.D. Ky. Sept. 30, 2009) . . . . . . . 40

*Chemical Workers v. Pittsburgh Plate Glass Co.*,
 404 U.S. 157, 92 S.Ct. 383 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Curtis v. Alcoa, Inc.,
 No. 3:06-448, 2011 WL 850410 (E.D. Tenn., Mar. 9, 2011) . . . . . . . . . . . . . . . 44

*Fox v. Massey-Ferguson, Inc.*,
 172 F.R.D. 653 (E.D. Mich. 1995),
 *aff'd* , 91 F.3d 143 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Golden v. Kelsey-Hayes Co.*,
 845 F. Supp. 410 (E.D. Mich. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Hardt v. Reliance Standard Life Ins. Co.,
 ___ U.S. ___, 130 S. Ct. 2149 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Harris v. Metropolitan Nashville & Davidson County*,
 594 F.3d 476 (6th Cir.2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Kusens v. Pascal Co.,
 448 F.3d 349 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Price v. Board of Trustees of Indiana Laborer's Pension Fund*,
 632 F.3d 288 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Maurer v. Joy Technologies, Inc.*,
 212 F.3d 907 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

*Noe v. PolyOne Corp.*,

520 F.3d 548 (6th Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 58

*Pullman-Standard v. Swint,*
456 U.S. 273, 102 S.Ct. 1781 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Reese v. CNH America LLC,*
583 F.3d 315 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*UAW v. Yard-Man, Inc.,*
716 F.2d 1476 (6th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 37

*Weimer v. Kurz-Kasch, Inc.,*
773 F.2d 669 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Winnett v. Caterpillar, Inc.,*
609 F.3d 404 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

*Winnett v. Caterpillar, Inc.,*
703 F. Supp.2d 745 (M.D. Tenn. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Wood v. Detroit Diesel Corp.,*
607 F.3d 427 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43n

*Wood v. Detroit Diesel, Inc.,*
213 Fed. Appx. 463(6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Yolton v. El Paso Tennessee Pipeline Co.,*
435 F.3d 571 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## OTHER SOURCES

Publications of CMS (Center for Medicare and Medicaid Services),

*Medicare & You 2011* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Cost Threshold and Cost Limit Amounts for Plan Years Ending
in 2012, 5/26/11* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## STATEMENT OF REASONS FOR ORAL ARGUMENT

Plaintiffs request oral argument so that they may answer any of the questions the Court may have concerning the various issues raised by CNH in its appeal.

# ISSUES PRESENTED FOR REVIEW

I.   Did The District Court Correctly Conclude That Plaintiffs Are Entitled to Judgment As a Matter of Law Because There Is No Evidence That, in the 1998 Negotiations, the UAW and Case Negotiated Any Reductions in Benefits For Existing Retirees?

II.  Did The District Court Correctly Conclude that Plaintiffs Are Entitled to Judgment As a Matter of Law Because CNH and the UAW Have Not Agreed to Modify Retiree Benefits Since the 1998 Negotiations?

III. Did The District Court Correctly Conclude that Class Members Who Retired Under the 2002 East Moline Shutdown Agreement Are Entitled to Summary Judgment Because That Agreement Provides That Their Benefits "shall not be altered by any subsequent agreements in any future  negotiations?

IV.  Did The District Court Properly Exercise Its Discretion in Reinstating Plaintiffs' Attorney Fee Award?

## COUNTER-STATEMENT OF THE CASE

On August 29, 2007, the district court granted Plaintiffs' motion for summary judgment, concluding that "Plaintiffs are entitled to vested lifetime benefits as provided in the labor agreements in effect at the time of their or their deceased spouses' retirement." (R.214, Opinion at 24).

On June 20, 2008, the district court granted Plaintiffs' motion for attorney fees. (R.242).

On July 27, 2009, the Sixth Circuit affirmed the district court's decision that Plaintiffs' retiree health care benefits had vested for life. *Reese v. CNH America LLC*, 574 F.3d 315, 327 (6th Cir. 2009)("*Reese*"). But, focusing on the 1998 negotiations where CNH and the UAW agreed to replace the existing Indemnity Plan with a managed care plan for active employees and existing retirees, the Court asked "[w]hat does vesting mean in this context?" The Court then cited factual "clues" that, seen in a light most favorable to CNH, *could* support an interpretation the vested benefits of retirees could be "change[d] from CBA to CBA." 574 F.3d at 325. According to the Court, any such modifications from "CBA to CBA" must be "reasonably commensurate" with the benefits provided in the 1998 CBA, "reasonable in light of change in health care" and "roughly consistent with the kinds of benefits provided to current employees." *Id*. at 326.

The Court remanded to the district court to "decide how and in what circumstances CNH may alter such benefits - and to decide whether it is a matter amenable to judgment as a matter of law or not." *Id*. at 327.

The Court rejected CNH's objections to the attorney fee award, but vacated the award. Because part of the rationale of the fee award "may no longer be sound," the Court instructed the district court to determine "in the first instance what fee award is appropriate in the context of its final decision." *Id*. at 328.

Plaintiffs moved for reconsideration, arguing that the Court had addressed an issue that CNH had not raised either before the district court or on appeal. Plaintiffs also challenged what appeared to be the Court's factual determination that there had been "material alterations" to retiree health benefits during the 1998 negotiations.

On September 24, 2009, the panel denied the motion for reconsideration. Judge Sutton, the author of *Reese*, filed a published concurrence. 583 F.3d 955 (6th Cir. 2009). As to Plaintiffs' protest that the Court made findings of fact, Judge Sutton said Plaintiffs "overlooks the posture of the case - summary judgment - in which all inferences run in favor of the party that lost below: CNH." *Id*. at 956. The parties were free on remand to develop evidence that would show either 1) that "plaintiffs should win as a matter of law because the prior retirees either approved of the changes or they did not diminish the nature of the benefit package that existed upon retirement;" or 2) "that CNH should be allowed to make reasonable modifications to

the health-care benefits of retirees, consistent with the way the parties have interpreted and implemented prior CBAs containing similar language." *Id*.

On July 10, 2010, CNH moved for approval of changes to Plaintiffs' benefits. (R.271).

On July 16, 2010, Plaintiffs moved for summary judgment, asserting that they should "win as a matter of law" because the 1998 negotiations had *improved* retiree benefits. (R.273). Plaintiffs also argued that, regardless, CNH and the UAW must first agree to future alterations to Plaintiffs' benefits.

On September 7, 2010, Plaintiffs filed a second motion for summary judgment as to Plaintiffs who retired under the terms of the 2002 East Moline Plant Shutdown Agreement. (R.290).

On March 3, 2011, the district court granted Plaintiffs' motions. (R.304, Opinion). It concluded that the extensive factual record contained "no evidence that the UAW and CNH (or Case previously) ever negotiated a *reduction* of those benefits." (*Id*. at 23) (emphasis in Opinion). The court also concluded that, even if CNH could make future changes to Plaintiffs' benefits, "it is only through an agreement with the UAW." (*Id*. at 22).

The district court also concluded that the 2002 East Moline Shutdown Agreement – which stated that the benefits it conferred "shall not be altered by any

subsequent agreements in any future negotiations" -- meant that Plaintiffs who retired under that Agreement had unalterable benefits. (*Id*. at 23)

Based on its decision, the district court reinstated the attorney fee award. (*Id*.).

On March 16, 2011, CNH appealed. (R.309).

On May 10, 2011, the district court entered its Final Judgment. (R.316).

## COUNTER-STATEMENT OF FACTS

### A.  THE INDEMNITY PLAN

1.  From 1974 until 1998, the basic health care plan for Case hourly employees and retirees was the Indemnity Plan.

2.  Until 1998, the Indemnity Plan remained relatively unchanged. (R.273, Plaintiffs' Summary Judgment Motion, Ex. A, Reese Decl.; *compare* Ex. 1 at 9-15 with Ex. 7 at 16-23).[1]

3.  The Indemnity Plan had four types of benefits, Types A, B, C and D. (*Id*.).

4.  Type A or "Covered Hospital Expenses" were paid at "100% of the reasonable and customary charges," and covered hospital room and board, emergency care, outpatient surgical services, radiation and chemotherapy. (*Id*., Ex. 2 at 15-16; Ex. 7 at 17-18).

---

[1] The 1974 Group Insurance Plan and the 1990 and 1995 Group Benefit Plans are Exhibits 1, 2 and 7 to the Reese Declaration.

5.     Type B benefits, "Physicians' Charges for Surgery, In-Patient and Select Medical Care Procedures," covered "100% of reasonable and customary charges" for surgery, in hospital doctor visits, anesthesia, physician charges for diagnostic services, radiation therapy and emergency treatment and up to $100.00 per trip for an ambulance. (*Id.*, Ex. 2 at 16-19).  By 1990, Type B benefits included durable medical equipment, physical therapy, pap smears and mammograms. (*Id.*, Ex. 7 at 18-21).

6.     Type B benefits were limited to a "maximum of $25,000 for any one accident or sickness for each covered individual," an amount last increased in 1975. (*Id.*, Ex. 1 at 10; Ex. 2 at 16; Ex. 3 at 18).

7.     Type B benefits for heart, heart/lung, lung and liver transplants were capped at $25,000.00. (*Id.*, Ex. 2 at 17; Ex. 7 at 20).

8.      Type C benefits, "Other Covered Medical Expenses," covered doctor and specialist services not covered under Type B or after Type B benefits were exhausted; other services not covered under Type A or B, such as x-ray and diagnostic laboratory procedures; radium treatments; oxygen; in home kidney machines; IV antibiotic treatments; and the remainder of local ambulance service. (*Id.*, Ex. 2 at 19-20; Ex. 7 at 21-22).

9.     Type C benefits covered MRIs, CT Scans and skilled nursing care. (*Id.*, Ex. 2 at 19; Ex. 3 at 21; Ex. 8, Kelsey 3/8/89 Memo at 2-3; Ex. 24).

10.     Type C benefits, payable at 80% of reasonable and customary costs after a $50.00 per person deductible, were subject to a lifetime maximum of $50,000.00 per person, an amount last increased in 1975. (*Id.*, Ex. 1 at 12; Ex. 2 at 19; Ex. 7 at 21, 33).

11.     Type D benefits covered services for outpatient substance abuse and mental health treatment up to $2,000.00 a year. (*Id.*, Ex. 2 at 20-21; Ex. 7 at 22-23).

12.     The Indemnity Plan had a "hold harmless" provision protecting patients from charges over the "reasonable and customary" limit if the patient had not made a payment or entered into a fee agreement. (*Id.*, Ex. 2 at 22; Ex. 7 at 24).

13.     Disputes about "reasonable and customary" fees and the "hold harmless" clause were common prior to the 1998 negotiations. (*Id.*, Ex. 8).

14.     The 1990 Group Benefits Plan was effective through October 2, 1993. (*Id.*, Ex. 3 at 1, 80).

15.     The 1993 Extension Agreement extended the 1990 Central Agreement through February 5, 1995. (*Id.*, Ex. 4 at 2).

**B.     THE 1995 NEGOTIATIONS AND THE 1995 CASE MANAGED CARE PLAN**

16.     In 1995, Case proposed a managed health care plan to replace the Indemnity Plan for both active employees and current retirees. (*Id.*, Ex. 9, 10).

17.     The UAW and Case agreed to maintain the Indemnity Plan for active employees and current retirees with no changes.[2]  The Case Managed Care Network Plan ("1995 Network Plan") became mandatory for newly hired employees. (*Id*., Ex. 11 at 4, and Att. H at 3).

## C.     EVENTS PRECEDING THE 1998 NEGOTIATIONS

18.     On May 6, 1997, Julie Tennie, Case's Employee Benefit Manager, informed hourly retiree Christopher C. of the managed care plans Case offered as options to the Indemnity Plan and that he could enroll in one of those plans the following January. (*Id*., Ex. B).

19.     On May 27, 1997, CIGNA explained to Mr. C. that his dependent child Crystal had exhausted the "Class B" maximum of $25,000.00 for her respiratory illness; $19,473.60 of the Type B maximum for Crystal's spina bifida condition and her entire "Class C" lifetime maximum of $50,000.00. (*Id.*, Ex. D).

## D.     THE 1998 NEGOTIATIONS AND THE 1998 PPO PLAN

### 1.     The 1998 Negotiations

20.     Negotiations for the 1998 Central Agreement opened in early February 1998. (*Id.*, Ex. A, Reese Decl. at ¶25; Ex. 46).

---

2 The parties agreed to vision, dental and prescription drug improvements.  (*Id.*, Ex. 11, Att. H, Ex. 5, 6 and 7).

21.     From February 3, 1998 through April 23, 1998, Case presented several proposals and charts relating to health care benefits. (*Id.*, Exs. 14-21, 24-26).

22.     Case proposed to replace the Indemnity Plan with a managed care plan for employees and retirees. (*Id.*, Ex. 14 at 2; Ex.15 at 2; Ex. 16 at 1; Ex. 19 at 1; Ex. 20 at 1; Ex. 21 at 1).

23.     Case produced an "Analysis of Network Availability" showing that every Case hourly employee and retiree lived within an area covered by one Case's network plans.  Case stated: "All active and retired members can be covered by high quality, high value network-based medical coverage." (*Id.*,  Ex. 28).

24.     During negotiations, Case provided detailed information about the proposed network plan. (*Id.*, Ex. 22, 23, 40-41).

25.     Case proposed to substitute a Blue Cross Blue Shield of Iowa HMO ("BCBS") for the Quad Cities Heritage HMO Plan for Burlington and East Moline. (*Id.*, Ex. 29-32).

26.     BCBS produced a "Case Corporation Disruption Analysis," showing that 94.2% of the providers who had treated Case employees were members of the BCBS networks.  BCBS also provided information on individual doctors who were not in its networks and promised to approach these doctors about joining. (*Id.*, Ex. 33-35).

27.    Case produced a chart showing that 100% of hospitals in the Burlington and Quad Cities areas were in BCBS networks and provided additional information about the extent of the BCBS physician networks. (*Id.*, Ex. 36, 42-43).

28.    On April 23, 1998, the UAW's Case Council voted to accept a Tentative Agreement. (*Id.*, Reese Decl. at ¶54).

29.    The Tentative Agreement, containing the "Benefit Detail" as Attachment "E," was initialed on April 26, 1998 (*Id.*, Reese Declaration, Ex. 46).

30.    The Benefit Detail of the Tentative Agreement provided:

> • The Managed Health Care Network Plan provides full coverage (after modest co pays) for many improvements sought by the Union, including:
>   - MRI and CAT scans
>   - Emergency care
>   - Ambulance charges
>   - Sleep Apnia equipment (if medically necessary)
>   - Transfusion charges
>   - Organ transplants if medically necessary per network specifications
>   - Preventative care in network and non-network, such as PSA tests for men over age 40 and mammograms for women over age 40. Annual routine physicals are a covered benefit in the Managed Network Plan.
>   - Coverage in network without reasonable and customary limitations (no need for Hold Harmless).
>   - Hospice care in an approved facility (*Id.*).

## 2.    Negotiated Improvements Over the Indemnity Plan

31.    Under the 1998 PPO Plan, the Type B $25,000.00 maximum benefit limits and the Type C $50,000.00 lifetime maximum were eliminated. (*Id.*, Ex. 50 at 18, 22).

32.    For the first time Under the 1998 PPO Plan, retirees who went to a network doctor or specialist received had those services paid at 100% and without any "reasonable and customary" limitations.  Participants treated by non network doctors paid the same 20% co insurance they had under the Indemnity Plan. Co insurance payments were, for the first time, limited to $1,000.00 a year and subject to a $500,000.00, rather than a $50,000.00, lifetime maximum. (*Id*., Ex. 50 at 18, 22).

33.    For the first time, network skilled nursing care as well as network outpatient x-rays, MRIs, CT Scans and similar procedures were paid at 100% with no co payment, (*Id*. at 20-21), rather than at 80% and subject to the $50,000.00 Type C lifetime maximum. (*Id.*, at 21).

34.    For the first time, sleep apnea equipment, annual physical exams, routine immunizations and PSA tests for men were covered benefits. (*Id*., Ex. 22 at 1; Ex. 50 at 21).

35.    For the first time, outpatient hospice care was covered as a network benefit, paid at 100% with no co payment. (*Id*., Ex. 50 at 20).

36.    For the first time, network organ transplants were covered at 100% (*Id*., Ex. 20 at 1), not capped at $25,000.00 as under the Indemnity Plan. (*Id.*, Ex. 7 at 20).

37.    The age for mammograms was reduced to 35. (*Id*., Ex. 7 at 21; Ex. 50 at 20).

38.     The Type B limit of $100.00 on ambulance service payments was replaced by a single $10.00 co pay per trip. (*Id*., Ex. 7 at 19; Ex. 50 at 19).

39.     For the first time, chiropractic treatment was unlimited, (*Id*., Ex. 50 at 18), not limited to 30 visits a year as under the Indemnity Plan. (*Id*., Ex. 7 at 24),.

40.     For the first time, inpatient mental health and substance abuse benefits were not limited, (*Id*., Ex. 50 at 34), unlike the Indemnity Plan limits of inpatient mental health and substance abuse treatment to 120 and 31 days per year respectively. (*Id*., Ex. 7 at 18).

41.     For the first time, retirees could obtain network services at 100% with no reasonable and customary limits, (*Id*., Ex. 50 at 22), unlike the Indemnity Plan, where all benefits were limited to the reasonable and customary charge.

### E.     CNH'S ADMISSIONS THAT HEALTH CARE BENEFITS WERE IMPROVED DURING THE 1998 NEGOTIATIONS

42.     Before the implementation of the 1998 PPO Plan, Case sent retirees a series of newsletters.  In the first, dated July 1998, Case announced "Important Improvements to Your Health Care."  Case stated that "union negotiators and Case management have worked together to advance your health care benefits." The newsletter "focuse[d] on improvements to your health care benefits" and described the "improved managed care system" beginning September 1, 1998. (*Id.*, Ex. F).

43.    In subsequent newsletters, Case informed retirees of the improvements to their health care and of "other benefit improvements ." (*Id.*, Ex. G, H).

## F.    THE 2002 EAST MOLINE PLANT SHUTDOWN AGREEMENT

44.    In January 2002, CNH and the UAW executed the East Moline Shutdown Agreement that  provided for certain "Closing Benefits and Options" for "[e]ligible, affected employees" terminated as a result of the closing of the plant. (R.290, Ex. 1 at 14).

45.    The Closing Benefits included four special early options, all of which included "retiree medical" that began "at retirement." (*Id*. Ex. 1 at 49).  Under two options, an employee could "grow into" retirement at age 55 -- up to five years *after* the plant closed -- and begin to receive a pension "plus Retiree medical beginning at age 55." (*Id*. at 50, 51).

46.    The Shutdown Agreement provided, under "Finality of This Agreement," that: "The economic closedown benefits and the eligibility rules established and set forth in this Shutdown Agreement shall not be altered by any subsequent agreements in any future negotiations." (*Id*. at 19).

## G.    CNH AND THE UAW DID NOT AGREE TO MODIFY PLAINTIFFS' BENEFITS IN 2005 OR 2010

47.    In March 2005, CNH and the UAW reached a new Central Agreement effective through April 30, 2011 which was " not applicable to . . . any retiree who has

-13-

retired . . . prior to December 1, 2004. (R.273, Plaintiffs' Summary Judgment Motion, Ex. N at 78).

48.     In March 2010, Case and the UAW reached a mid-term agreement which terminated the 2005 Agreement. (*Id.*, Ex. O).

49.     The Medical Insurance provisions of the 2010 CBA apply only to retirees "who retire after November 1, 2004." (*Id.*, Ex. P at 42).

## SUMMARY OF ARGUMENT

The district court correctly concluded that, while language in *Reese* suggests that the Court had determined facts relevant to the scope of Plaintiffs' benefits, Judge Sutton's concurrence "remove[d] any doubt" as to what *Reese* intended the district court to do on remand. (R.304, Opinion at 14).  In *Reese*, the Court simply viewed selected factual "clues" in a light most favorable to CNH and remanded for the district court to consider the evidence presented in light of the legal issues the Court identified.

After assessing the record evidence and addressing each of CNH's defenses, the district court correctly concluded that the record contained "no evidence that the UAW and CNH (or Case previously) ever negotiated a *reduction* of those benefits." (R.304, Opinion at 23).  Because the changes in 1998 "did not diminish the nature of the benefits package that existed upon retirement," the district court correctly

concluded that Plaintiffs, in Judge Sutton's words, should "win as a matter of law." 583 F.3d at 956.

The district court was also correct that, to the extent CNH could alter retiree health care benefits, "it is only through an agreement with the UAW." (Opinion at 22). If, as *Reese* posited, it was in the contemplation of CNH and the UAW that retiree benefits could be reset "from CBA to CBA," 574 F.3d at 325-26, any subsequent changes also required the agreement of the UAW and CNH. Because the UAW and CNH have not reached such an agreement, Plaintiffs were entitled to summary judgment.

The district court correctly entered judgment for those Class Members who retired under the 2002 East Moline Shutdown Agreement. That Agreement expressly provided that "benefits and the eligibility rules established and set forth in this Shutdown Agreement shall not be altered by any subsequent agreements in any future negotiations." (R.304, Opinion at 22).

Given its decision on the merits, the district court properly reinstated the attorney fee award. Regardless of the outcome on this appeal, Plaintiffs are entitled to an attorney fee award because they prevailed on the major issue in this litigation – that Plaintiffs have vested lifetime health care benefits.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' VESTED BENEFITS ARE IRREDUCIBLE

### A. STANDARD OF REVIEW

On appeal, a district court's grant of summary judgment is reviewed *de novo*. *Price v. Board of Trustees of Indiana Laborer's Pension Fund*, 632 F.3d 288 (6th Cir. 2011); *Noe v. PolyOne Corp.*, 520 F.3d 548, 551 (6th Cir. 2008). "Summary judgment is proper when, viewing the facts and drawing all inferences in the light most favorable to the nonmoving party, there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law." *Harris v. Metropolitan Nashville & Davidson County*, 594 F.3d 476, 482 (6th Cir. 2010); *Reese v. CNH America LLC*, 583 F.3d 315, 321 (6th Cir. 2009).

### B. FACT FINDING IS THE RESPONSIBILITY OF DISTRICT COURTS

In *Pullman-Standard v. Swint*, 456 U.S. 273, 291-92, 102 S.Ct. 1781 (1982), the Court stated:

> When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings:
>
> "[F]actfinding is the basic responsibility of district courts, rather that appellate courts, and . . . the Court of Appeals should not have resolved in the first instance this factual dispute which had not been considered by the District Court." *DeMarco v. United States*, 415 U.S.

-16-

449, 450, n., 94 S.Ct. 1185, 1186, n., 39 L.Ed.2d 501 (1974). (footnote omitted).

### C.    IN *REESE*, THIS COURT DID NOT FIND FACTS; IT REMANDED FOR THE DISTRICT COURT TO MAKE FINDINGS OF FACT

As the district court noted, there *is* language in *Reese* that suggests that the panel was "analyzing in the first instance the facts relevant to the scope of Plaintiffs' benefits, and ruling, based on its determination of those facts, that Plaintiffs' healthcare benefits are alterable." (R.304, Opinion at 14). This same language prompted Plaintiffs to seek a panel rehearing.

In response to Plaintiffs' concern, Judge Sutton stated Plaintiffs "overlook[ed] the posture of this case – summary judgment – in which the inferences run in favor to the party that lost below: CNH." 583 F.3d at 956. Judge Sutton continued that, on remand, the parties were free to develop evidence on the point of whether the 1998 negotiations helped prior retirees "overall." If so, Judge Sutton said: "plaintiffs should win as a matter of law." *Id.*

CNH's argument that *Reese* is "law of the case" also "overlooks the posture" of *Reese*. In *Reese*, the Court was "draw[ing] all factual inferences in favor of the party opposing summary judgment: CNH." 574 F.3d at 321. To take a contrary position here, CNH necessarily ignores the basic, governing legal principle that fact finding is the responsibility of *district* courts and the unequivocal statements of Judge Sutton on the very issue presented here.

Plaintiffs, and the district court, take Judge Sutton at his word -- that *Reese* did *not* exceeding its authority by predetermining the facts, but was simply giving CNH the benefit of every doubt because it lost below. 583 F.3d 956.

### D.    THE 1998 NEGOTIATIONS IMPROVED (AND DID NOT DIMINISH) THE BENEFIT PACKAGE PROVIDED TO EXISTING RETIREES

In *Reese*, the Court remanded this matter to the district court to consider evidence and find facts. Judge Sutton stated in his concurrence that Plaintiffs "should win as a matter of law [if] . . . the changes [made in the 1998 negotiations] . . . did not diminish the nature of the benefits packet that existed upon retirement." 583 F.3d at 956.

On remand, Plaintiffs presented overwhelming, uncontroverted evidence that their benefits had been improved (and not diminished) in the 1998 negotiations. After carefully reviewing the evidence in a light most favorable to CNH, the district court agreed: "there is no evidence that the UAW and CNH (or Case previously) ever negotiated a *reduction* in those benefits." (R. 304, Opinion at 23).

In 1998, *Case* knew that the overall "nature of the package of benefits" for existing retirees had been "diminished." In its proposals to the UAW, the last of which was incorporated into the Tentative Agreement, Case listed the "many improvements sought by the union" in the 1998 PPO Plan. (R. 273, Plaintiffs' Motion, Ex. A, Reese Decl., Ex. 46 at 16). Immediately *after* the 1998 negotiations, Case

informed retirees that the 1998 negotiations had resulted in "Important Improvements to Your Health Care" and that "union negotiators and Case management have worked together to advance your health care benefits." (*Id.*, Ex. F). In subsequent newsletters, Case characterized the changes only as "improvements." (*Id.*, Ex. G, H).

CNH now finds it necessary to divorce itself from its contemporaneous characterization of the 1998 negotiations. But, even then, the most CNH could claim is that Plaintiffs had "overstated" the improvements made in 1998. The facts are undisputed and unequivocal. Case's contemporaneous admissions coincide with the actual facts. CNH's self-serving disavowals cannot alter those facts.

Prior to 1998, the Indemnity Plan contained many serious limitations that had increasingly reduced its value over the years. The Type B limitation of $25,000.00 for a single illness or accident and the Type C lifetime maximum of $50,000.00 were serious limitations that had been in existence for a quarter of a century. Once these limits were reached, the Indemnity paid nothing for the relevant services.

This is exactly what happened to Crystal, the dependent child of retiree Christopher C. By May 1997, Crystal had reached the Type B maximum for her respiratory illness and the Type C maximum of $50,000.00. For her separate spina bifida condition, the Indemnity Plan had paid $19,473.60 of the $25,000.00 limit. (*Id.*, Ex. B, D). Crystal no longer had any coverage for her respiratory condition under Type B; she had no coverage for *any* Type C services; she was fast exhausting

coverage for her spina bifida condition. The 1998 PPO Plan *eliminated* the possibility that this kind of personal financial catastrophe could recur - for *every* retiree, *every* spouse and *every* dependent.

The 1998 PPO Plan provided, for the first time ever, 100% payment for network doctors' and specialists' visits, outpatient x-rays, MRIs, CT Scans, other diagnostic laboratory services, allergy treatment, I.V. antibiotic treatments and skilled nursing home care. This was the *first time* that *any* retiree, spouse or covered dependent could obtain these services at 100%. Under the Indemnity Plan, retirees always had to pay 20% for these Type C services - until the Indemnity Plan paid $50,000.00, at which time retirees paid 100% of entire cost.

Contrary to the inference in *Reese*, 574 F.3d at 325, there is *no evidence* that the 1998 PPO Plan reduced any retiree's choice or caused any retiree to suffer a financial penalty. Here, as elsewhere, the Court was discussing managed care plans in general and postulating what the facts might show based on those generalizations. The Court never compared the Indemnity Plan to the 1998 PPO Plan. It assumed, for CNH's benefit, that, under the Indemnity Plan, all benefits were free. But, the Court remanded for a determination of what the evidence *actually was in this particular case*.

And, the evidence showed that benefits under the Indemnity Plan were never free. *Every* covered participant had *always* paid the Type C 20% co insurance payment *each and every time* they saw a doctor or a specialist on an outpatient basis; *each and*

-20-

*every time* they had an MRI or CT Scan; and *for each and every day* they spent in a skilled nursing facility.  Type C benefits covered the basic services that most often involve personal choice -- an individual's family doctor or specialist.  As to these important kinds of benefits, the 1998 PPO Plan represented an unqualified *improvement* in benefits to retirees.

There was no "financial penalty" if a retiree chose a doctor out of the network.  To the contrary, the 1998 PPO Plan, for the first time, provided a financial *benefit* for *choosing a network doctor*.  If a participant's doctor was in the network, all visits would be paid at 100% rather than 80%.

If the doctor was one of the few not in the network, a retiree paid the *same* 20% co insurance as for Type C services under the Indemnity Plan.  But, even here, the 1998 PPO Plan was a *vast* improvement for each and every retiree.  Unlike the Indemnity Plan, the 1998 PPO Plan placed a *limit* on the most a participant could pay for *non* network doctors -- $1,000.00 a year.  Under the Indemnity Plan, retirees never stopped paying 20% Type C co insurance payment – at least not until they exhausted $50,000.00 lifetime maximum.  At that point, the Indemnity Plan paid nothing.

CNH contends that the 1998 PPO Plan required a 20% co insurance payment for "big ticket" services like hospital services and surgery that had been Type A and B expenses under the Indemnity Plan. (Appeal Brief at 31).  But, CNH does not assert, nor can it, that there *were* any "non-network" hospitals or surgeons that the retirees

-21-

could "choose" even if they desired to do so.  There is no such evidence.  C a s e provided the UAW with a "disruption analysis" that showed that 94.2% of the providers who had treated Case employees and dependents were already in the proposed PPO network. (*Id*., Ex. 29).  The UAW requested and obtained information on the few individual doctors who had treated employees who were not in the PPO network. (*Id*., Ex. 33, 34).  Of the two doctors who had the most contacts, one had retired and the other belonged to an affiliated network; and BCBS agreed to approach that doctor about joining its network. (*Id.*, Ex. 35).  Case provided the UAW with lists of PPO providers in the Burlington area. The directories for the Quad Cities area were *too large* to produce. (*Id.*, Ex. 42). Case confirmed that *100% of the hospitals* in the Burlington and Quad Cities area and 87% of the doctors *in the entire state of Iowa* were within the PPO networks. (*Id*., Ex. 36, 43).

There is a reason why CNH could not produce a shred of actual evidence that any retiree suffered a loss as a result of the 1998 changes.  Under the 1998 PPO Plan, the *most* that a retiree could pay in a year for any kind of *non*-network services was capped is $1,000.00.  Even if a retiree could find a hospital or surgeon that was not in the 1998 PPO network, after the retiree paid $1,000.00 out of pocket, the 1998 PPO Plan paid for every service, in or out of network,  *including all of the former Type C expenses*, all doctors' visits, all x-rays, all MRIs and CT Scans, all skilled nursing, all home health care -- at 100%.  Under the Indemnity Plan a retiree paid 20% of Type

C expenses *without limit and forever* – at least until the Indemnity Plan paid $50,000.00 -- then the retiree paid 100% of every Type C expenses and the Indemnity Plan paid nothing.

The UAW made certain, *before* it agreed to the 1998 PPO Plan, that there would be no "reduction in effective choices" for retirees and that *all* retirees would have ready access to network services where, *for the first time ever*, *all* benefits were paid at 100%. This is conclusive evidence that "overall," the 1998 PPO Plan, in fact, "favored all retirees." 574 F.3d at 325; 586 F.3d at 956.

As the district court noted, all benefits under the Indemnity Plan were limited by the "reasonable and customary" clause. (R.304, Opinion at 19). By definition, *no* benefits under the Indemnity Plan were guaranteed at 100%, a problem that was eliminated under the 1998 PPO Plan because all of the doctors and hospitals in the PPO network accepted the Plan's payment as payment in full.

The Indemnity Plan's "reasonable and customary" limitation had always been a practical limitation on a participant's choice of doctors. If a doctor demanded to payment above the Indemnity Plan's "reasonable and customary" limit, the retiree had to pay the excess fee or choose another doctor. After 1998, every participant knew beforehand whether the doctor will accept the 1998 PPO Plan as payment in full.

In drawing inferences in CNH's favor, the Court in *Reese* cited a law review article on managed care plans, noting that those plans have coverage limitations

"against which insureds often rebel." 574 F.3d at 325.  Here, thirteen years after the 1998 negotiations, and after seven years of litigation, there is *no* evidence that *any* retiree "rebelled" at the implementation of the 1998 PPO Plan.  CNH has possession of all the retirees' benefit files and hundreds of thousands of pages of documents have been produced during discovery.  Surely, if retirees had suffered a reduction of choice under the 1998 PPO Plan, CNH could point to some supporting evidence of "rebellion."  But, CNH has not and cannot point to any such evidence.  The reason is obvious: there was nothing to rebel against.  As Case stated at the time, the 1998 PPO Plan provided "important improvements" to every retirees' benefits and freed them from the increasingly onerous limitations of the Indemnity Plan.

The 1998 PPO Plan also provided the kinds of additional and improved benefits that elderly retirees particularly need -- fully paid X-rays, MRIs and CT Scans, routine immunizations, annual physicals, PSA tests for men, improved mammogram benefits for women, skilled nursing care, home health care, hearing aids, vision benefits, dental benefits and outpatient hospice care.  These benefits alone are sufficient to demonstrate that the 1998 negotiations improved (and did not diminish) the package of health care benefits for all existing retirees.  In the absence of any evidence that CNH and the UAW ever agreed to *diminish* retiree benefits, the district court was unquestionably right to enter judgment for Plaintiffs.

### E. THE UAW MUST AGREE BEFORE PLAINTIFFS' VESTED RETIREE BENEFITS CAN BE MODIFIED

In *Reese*, the Court remanded for the district court to "decide how and in what circumstances CNH may alter such benefits." 574 F.3d. at 327. As the district court concluded, the answer is inherent in *Reese* itself. *Before* Plaintiffs' vested benefits can be altered, the UAW must agree to any proposed changes.

*Reese* compels this conclusion. The critical factor in *Reese* was the possibility that UAW and Case had "reset" benefits for existing retirees under the 1998 CBA. *Id.* at 324. According to *Reese*, parties to a CBA could agree to vest benefits while, at the same time, contemplating future changes to those benefits "*from CBA to CBA*." *Id* at 325. Of course, the *only* way that retiree benefits can be "reset" "from CBA to CBA" is through the mutual agreement of the parties who "reset" the benefits in the first place -- Case and the UAW.

In his concurrence, Judge Sutton stated that, on remand, the evidence might show "that CNH should be allowed to make reasonable modifications to the health-care benefits of retirees, consistent with the way the parties have interpreted and implemented prior CBAs containing similar language." 583 F.3d at 956. Of course, the only way Case and the UAW have "implemented prior CBAs" is through *mutual* agreement. CNH and the UAW have reached no agreement to adjust Plaintiffs' benefits since the 1998 CBA.

CNH asserts that it should not be required to obtain the agreement of the UAW to future changes because the UAW can refuse to bargain for existing retirees and requiring such an agreement would be a "useless act." (Appeal Brief at 51). But, CNH's claim that vested benefits can be reduced in the future is *premised* on the 1998 CBA where, according to CNH, the UAW agreed to "reset" benefits for existing retirees.

In 1998, the UAW did not have to bargain with CNH over retiree benefits. Nevertheless, CNH obtained something very useful to it – a managed care health delivery system that saved it money while giving something that benefitted retirees – "important improvements" to their health care benefits and the elimination of the many, increasingly severe limitations of the Indemnity Plan. CNH's "futility" argument ignores a very fundamental point – the Case and the UAW came to an agreement in 1998, when neither was required to bargain, and that is the explicit "context" of *Reese*.

Even though the 1998 negotiations established the context for future changes, CNH now claims that it is now free of the constraints that existed in 1998 – an agreement with the UAW. CNH could never have obtained what it *now* seeks – drastically reduced health care benefits and the elimination of the prescription drug benefits for Medicare-eligible retirees – in the 1990, 1995 or 1998 negotiations with the UAW. If what the UAW and CNH contemplated during the 1998 negotiations is

the benchmark for any future alterations to vested benefits, or if, as *Reese* says, "past is prologue," then CNH must necessarily propose changes that the UAW will accept – changes that involve the carefully considered give and take of negotiations leading to an agreement, like its predecessor in 1998, where benefits were improved in a manner that saved CNH money.

CNH cites *Winnett v. Caterpillar, Inc.*, 703 F. Supp.2d 745 (M.D. Tenn. 2010), as interpreting *Reese* as permitting changes in benefits without the union's agreement. (Appeal Brief at 50). To the contrary, the benefit changes in the *Winnett* litigation were those the UAW had *negotiated* in 2004.[3] In 2004, as in 1998, Caterpillar refused to agree to eliminate the unilaterally imposed 1992 dollar cap on benefits. Instead, in 2004, Caterpillar agreed in bargaining with the UAW to pay 40% of the "above cap" cost. The UAW and Caterpillar also agreed to other changes to address the impact of the 1992 cap on retirees, such as deductibles and increased co-pays, and premium contributions. *Id*. at 753. Judge Trauger made it clear that the changes that post-1992 retirees challenged were made "pursuant to the 2004 CLA" or "under the 2004 CLA."

---

3    The VEBA that the UAW negotiated with Caterpillar in 1998 *protected* post-1992 retirees from the full effect of the cost cap Caterpillar unilaterally implemented in 1992. The 2004 changes *mitigated* the effects of that preexisting cap by requiring Caterpillar to assume 40% of any increase in the cost of benefits above the cap.

*Id*. Judge Trauger later stated that vested benefits were subject to "reasonable adjustments, as part of the *give-and-take of labor negotiations*." *Id*. 768.[4]

Even then, Judge Trauger *rejected* certain of the negotiated terms of the 2004 CLA: "Even if reasonable adjustments *through continued collective bargaining* resulted in other acceptable incidental medical costs, the imposition of monthly premium charges . . . goes too far." *Id*. at 763 (emphasis added).

CNH's argument -- that *Winnett* relies on *Reese* for the proposition that an employer can make unilateral changes to vested benefits -- is undermined by *Winnett's* unambiguous holding. Under *Winnett*, the agreement of the parties to a CBA is a necessary precondition to changes that "reset" vested benefits.

CNH argues for a judicially imposed rule that would allow CNH to make periodic unilateral changes throughout the lifetime of the retirees - subject to litigation to determine whether each such change meets the vague *Zielinski* "reasonableness" standards set forth in *Reese*. Such a rule is clearly not what the UAW intended in 1998. And, it would result in costly, recurring, and disruptive litigation, as employers make unilateral changes every few years.

---

4    Judge Trager does appear to ignore the context of the *Reese* decision, an appeal from a grant of summary judgment for Plaintiffs, 574 F.3d at 321, and does not cite Judge Sutton's concurrence, 586 F.3d 955. The district court below did not repeat this error.

Federal courts, thrown in the middle of these recurring disputes, will necessarily become interest arbitrators and benefit plan architects. At best, the "unilateral change" rule CNH champions would result in a flood of retiree health care litigation that would last for decades, disrupt labor management relations, and visit economic harm and uncertainty on retirees and employers. In the recurring litigation nightmare envisioned by CNH, federal courts would be forced to make decisions that are obviously better left to the give and take of collective bargaining between the parties who vested the benefits in the first place.

In CNH's litigation scenario, employers will hire "experts" like Scott Macey, who bills hundreds of dollars an hour for his "expertise," to swear under penalty of perjury, on the one hand, that the 1998 PPO Plan resulted in "a significant loss of value" to participants *and*, on the other hand, that the same 1998 PPO Plan has a "relative value" of 98% for participants.[5] (R.271, Motion for Approval, Ex. 1, Macey Decl. ¶¶ 9, 27.c). Federal courts will be left with the task of ferreting out the actual facts when an employer, like CNH here, failed to mention that CNH proposal is to *eliminate prescription drug benefits for Medicare-eligible retirees* while assuring the court that "Plaintiffs. . . will receive substantially the same (if not identical) health care benefits under the 2005 Group Benefit Plan." (*Id.*, Brief at 12).

---

5 This means, according to Mr. Macey, that CNH pays 98% of the 1998 PPO Plan's usage costs and 100% of premium costs.

CNH has offered no proof that. in 1998, the UAW or CNH comprehended that CNH could subsequently bypass the UAW and seek judicial approval of unilateral changes.  Such a notion is, of course, absurd.  But, unless the intent of the parties to the CBAs at issue is irrelevant, CNH must prove that this is exactly what the UAW and CNH intended in 1998.  Absent proof of such mutual intent, CNH must resort to what is, after all, the "context" of its claim that retiree benefits are "alterable" in the future -- negotiations with the UAW to modify benefits for existing retirees.  Until CNH obtains the UAW's agreement to further changes in Plainitffs''' benefits, CNH cannot seek relief here.

The district court's decision  is entirely consistent with and, indeed, mandated by *Reese*.  Viewing the evidence most favorably to *CNH*, the Court discussed "clues" that might support a finding that the UAW and CNH contemplated future modifications to the vested benefits of current retirees "from CBA to CBA." 574 F.3d at 325-26.  In his concurrence, Judge Sutton stated that the evidence "may show" that benefits could be altered "consistent with the way the parties have interpreted and implemented prior CBAs containing similar language." 583 F.3d at 956. Obviously, under this approach, any future alterations must be agreed upon in the same way the prior changes were implemented -- through a negotiated agreement with the UAW.

**F.    CNH'S DEFENSES, SOME RAISED FOR THE FIRST TIME ON APPEAL, ARE MERITLESS**

**1.    As in 1998, The UAW Always Upgraded Benefits For Existing Retirees In Prior Contracts**

CNH's initial argument is that, until 2005, retirees historically received the benefits described in the current CBA, not the agreement under which they retired. Therefore, according to CNH, the UAW and Case and the retirees all understood that retiree benefits were not "locked in." (Appeal Brief at 24-25). This Court has already rejected that argument.

As Judge Sutton stated in *Reese*, "the resetting of health care benefits for previously retired employees might not concern anyone if each change *upgraded* the existing package of benefits." 574 F.3d at 324. (emphasis in original). Here, the UAW actively sought to improve retiree benefits in each round of negotiations. The fact that the UAW was successful in upgrading retiree benefits over the years does not mean that the UAW had to agree to *reductions*, much less that the UAW or the retirees understood that retiree benefits could be reduced in subsequent CBAs. It certainly does not mean that CNH can insist on benefit reductions in the face of the UAW refusal to negotiate. The benefits in place at the time of retirement *were* locked in. They could be improved by the agreement of the UAW and CNH but not reduced absent the consent of the retirees.

This is the essence of *Pittsburgh Plate Glass*. Negotiations over the benefits of existing retirees is a *permissive* subject of bargaining. 404 U.S. at 181-82; *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983). In any negotiation, CNH could have refused to negotiate over benefits improvements for existing retirees. The UAW could have refused to negotiate over benefit reductions. As the Supreme Court stated in *Pittsburgh Plate Glass*, an employer and union are free to negotiate over the benefits of existing retirees, but "this does not mean that . . . the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent." 404 U.S. at 181 n.20.

In *Reese*, the Court noted that the *upgrading* of benefits in prior negotiations "would not break any promises to provide irreducible benefits." 574 F.3d at 325. Evidence that retiree benefits were upgraded in prior negotiations by agreement is, at most, evidence that the agreement of the UAW and CNH is a necessary precondition to future changes. Because all prior agreements have resulted in benefit "upgrades," *if* the UAW and CNH ever agree to reductions in benefits in the future *without* Plaintiffs' consent, Plaintiffs will have an action for breach of contract under Section 301. *Pittsburgh Plate Glass*, 404 U.S. at 181 n.20.

2.    **The 1998 Letter of Understanding Relating To Optional Managed Care Plans Does Not Permit CNH to Charge a Premium for the 1998 PPO Plan**

CNH's second argument is based on the 1998 Letter of Understanding entitled "Cost of Healthcare Coverage." CNH argues that, in *Reese*, the Court conclusively interpreted this letter as giving it the right to modify benefits. (Appeal Brief at 26). To the contrary, the Court, in drawing all inferences in CNH's favor, discussed the Letter as a "clue" that "points in the . . . direction" of an "interpretation" that benefits could "change from CBA to CBA." 574 F.3d at 325

On remand, the evidence showed conclusively that the Letter of Understanding does *not* point in the direction suggested by *Reese*.   The Letter of Understanding addresses managed care plans (HMOs, PPOs and other plans) that CNH had historically offered as *options* to the basic Indemnity Plan, and after 1998, as options to the 1998 PPO Plan.

For years prior to 1998, Case had provided optional managed care plans to employees and retirees as options to the Indemnity Plan.  At various times, these optional plans included Heritage (Quad Cities) HMO, Compcare HMO, Met HMO, Humana HMO, Community HMO and HMO Illinois. (R.273, Ex. A, Reese Decl., Ex. 27; Ex. C).  As of January 1, 1998, there were more employees and retirees enrolled in these optional HMO plans (1521) than in the Indemnity Plan (1447).[6] *(Id.*, Reese

---

6 The remaining employees (564) were in the 1995 Network Plan. (*Id.*)

-33-

Decl., Ex. 27). In prior Letters of Understanding, Case agreed to pay the premiums for employees and retirees enrolled in these optional plans *unless* the cost exceeded the cost of the Indemnity Plan. (*Id*, Ex. A, Reese Decl. Ex. 2 at 58, 65; Ex. 7, 94, 99). In that event, the employee or retiree would pay the difference in cost as a premium contribution. This was the situation in 1998, when Case proposed to replace the Indemnity Plan with what became the 1998 PPO Plan.

In 1998, when Case proposed what became the 1998 PPO Plan, it also proposed that the 1998 PPO Plan would become the "base" plan for the cost comparison with the optional HMO plans. Because the 1998 PPO Plan was less costly than the Indemnity Plan, CNH's proposal necessarily meant that employees enrolled in an optional managed care plan would be more likely to be charged a premium for that optional coverage. The 1998 "Cost of Healthcare Coverage" Letter addressed this issue. By the Letter's plain terms, CNH agreed that, over the term of the 1998 CBA, it would not charge a premium to employees and retirees enrolled in an optional "HMO, PPO or other plan" *even if* the cost of that plans exceeded the cost of the 1998 PPO Plan.

In its initial decision, the district court got it right:

> The plain language of the 1998 Letter of Understanding simply provides that, during the term of the 1998 Central Agreement, the cost for health insurance coverage for retirees electing a non-Network option (i.e. an "HMO, PPO, or other plan") will not be greater than the cost (if any) for the Network option. . . . It does not provide that contributions

-34-

can be sought from retirees and surviving spouses for Network coverage once the 1998 Cental Agreement expires. (R. 214, Opinion at 17).

Because *Reese* had drawn inferences in CNH's favor as to the Letter, Plaintiffs presented extensive evidence on remand to confirm the district court's reading of the Letter. Because CNH makes this Letter a cornerstone of its appeal, Plaintiffs will highlight that evidence here.

- Case and the UAW had traditionally agreed that Case could provide optional managed care plans as long as they were approved by the UAW. In the 1990 and 1995 Plans, there was a Letter of Understanding relating to the "Quad Cities Health Maintenance Organization - Heritage" and one Letter of Understanding relating to "HMO" coverage in general. (R. 273, Ex. A, Reese Decl. Ex. 2 at 58, 65; Ex. 7 at 94, 99).

- The "Quad Cities Health Maintenance Organization - Heritage" letter provided that Case would "pay the premiums to the Heritage HMO for such programs, provided that the Company's cost will not be increased. Any additional premium for HMO programs will be paid by the participating employees." (*Id.*, Ex. 7 at 94).

- In the HMO letter, Case agreed to provide optional managed care plans "at a cost to the Company not to exceed the cost at that time to provide these benefits in the standard indemnity plans." (*Id.*, Ex. 7 at 99).

- On October 3, 1997, Tim Haas, Case's Benefits Director, wrote to Jack Reese, the UAW's Ag-Imp Assistant Director, informing him that the 1998 premiums for the Quad Cities HMO exceeded the costs of the Indemnity Plan at both Burlington and East Moline and that Case intended to charge a contribution to employees who opted to remain in that HMO. (*Id.*, Ex. Q).

- In its initial proposal during the 1998 negotiations, Case proposed that the "Managed Health Care Network Plan is the 'base' plan when considering cost of HMOs when compared to base plan cost." (*Id.*, Reese Decl., Ex. 15).

- On April 9, 1998, Case proposed the following language for a "Cost of HMO Coverage" Letter of Understanding:

  > During the 1998 contract negotiations, the Company and the Union agreed that over the term of the 1998 labor agreement employees and retirees who are enrolled in a Company offered HMO will not have to pay any additional employee contributions above those which may be required for enrollment in the Case Managed Network Plan (if any). (*Id.*, Ex. R).

- The final version of the Letter of Understanding, entitled "Cost of Healthcare Coverage," has as its first paragraph:

  > During the 1998 contract negotiations, the Company and the Union agreed that over the term of the 1998 labor agreement employees and retirees who are enrolled in a Company offered HMO, PPO or other plan will not have to pay any additional employee contributions above those which may be required for enrollment in the Case Managed Network Plan (if any). (*Id.*, Reese Decl., Ex. 50 at 79).

During the 1998 negotiations, Case abandoned its proposal to charge employees who enrolled in optional HMO/PPO plans any "employee contributions" above the cost of the 1998 PPO Plan. Case agreed that, unlike in earlier CBAs, Case would *not* to charge a premium to employees enrolled in optional HMO/PPO Plans -- even when the cost for those optional plans exceeded the cost of the Case Network Plan (the 1998 PPO Plan). But, Case agreed to forego its historical right to charge premiums for optional HMO/PPO plans only "over the term of the 1998 labor agreement."

As the evidence shows, the 1998 Cost of Health Care Coverage Letter does not address Case's contractual obligation to pay for the 1998 PPO Plan. That obligation is found in the retiree section of the 1998 Group Benefits Plan, where Case agreed

that, without any durational limitation, "No contributions are required for the Health Care Plans, Dental Plan, Vision Plan and Hearing Plan." (*Id*., Ex. 50 at 64).

In the second paragraph of the Letter of Understanding, Case agreed to "be responsible for the retention of HMOs, PPOs and other health care delivery systems during the term of this agreement." Again, the reference here is *not* to the base 1998 PPO Plan but to *optional* managed care plans that CNH traditionally provided to employees and retirees if the UAW approved them. Again, Case's obligation to provide the 1998 PPO Plan for retirees is found in the body of the 1998 GBP itself.

CNH argues that the words "or other plan" at the end of the phrase "Company offered HMO, PPO or other plan" "sweeps in" the 1998 PPO Plan and therefore contemplates changes to premiums charged for the 1998 PPO Plan. (Appeal Brief at 27). The Letter would then read: "employees and retirees who are enrolled in [the Case Managed Network Plan] will not have to pay any additional employee contributions above those which may be required for enrollment in the Case Managed Network Plan (if any)," which would render it meaningless. *See Yard-Man*, 716 F.2d at 1480 (terms of CBA "must be construed so as to render none nugatory"). The Letter of Understanding makes sense only if "or other plan" is read *ejusdem generis* with "Company offered HMO, PPO," that is, the plans CNH offers as *options* to the base Case Managed Network Plan, the 1998 PPO Plan.

### 3. The National and State Health Insurance Initiatives Letter Does Not Permit CNH To Escape Its Contractual Obligations

CNH's third principal argument is based on another Letter of Understanding, entitled "National and State Health Insurance Initiatives." (Appeal Brief at 28-29). This Letter allows CNH to take advantage of benefits provided by federal or state governments that "duplicate or may be integrated with the benefits of the Group Benefit Plan." CNH argues that this Letter permits CNH to eliminate prescription drug benefits for Medicare-eligible retirees because the federal government passed legislation authorizing Medicare Part D prescription drug plans.

CNH makes this argument for the first time in its *second* appeal to this Court. For this reason alone, this Court should reject it. *Kusens v. Pascal Co.*, 448 F.3d 349, 368 (6th Cir. 2006); *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006)(appellate court "function is to review the case presented to the district court, rather than a better case fashioned after a[n] . . . unfavorable order."). Nevertheless, the Letter has no bearing on any issue in this case, as any factual analysis in the district court would have readily disclosed.

Medicare Part D plans are not provided by the federal government and do not "duplicate" the prescription drug benefits under the 1998 PPO Plan. As the Center for Medicare and Medicaid Services ("CMS") states, "To get Medicare prescription drug coverage, you must join a plan run by an insurance company or other private company

-38-

approved by Medicare. Each plan can vary in costs and drugs covered"[7]  Part D plans

vary greatly in cost and the benefits provided.  According to CMS, a standard Part D

Plan 1) requires a premium (the national base average is $32.34); 2) has a $310.00

deductible; 2) has co pays; and 4) has a coverage gap that ends when an insured has

spent $4,550.00 in out of pocket costs – not including the monthly premium.[8] *See*

*Benitez v. Humana, Inc.*, No. 3:08CV-211-H, 2009 WL 3166651 *1 (W.D. Ky. Sept.

30, 2009)(Appendix at 000012).

By the time a retiree has paid premiums and reached the end of the coverage

gap, out of pocket costs are nearly $5,000.00 ($4,550 plus $408 in annual premiums)

-- nearly $10,000 for a retiree and spouse -- an amount that this Court has recognized

would constitute irreparable harm to a retiree absent an injunction. *Yolton v. El Paso*

*Tennessee Pipeline Co.*,  435 F.3d 571, 584 (6th Cir. 2006); *Wood v. Detroit Diesel,*

*Inc.*, 213 Fed. Appx. 463, 472 (6th Cir. 2007).  CNH's assertion that Medicare Part

D somehow "duplicates" the prescription drug benefits of the 1998 PPO Plan cannot

be taken seriously either in the context of the Letter or in the context of CNH's

assertion that the *elimination* of prescription drugs for Medicare-eligible retirees meets

the *Zielinski* "reasonably commensurate" standard.

CNH omits the following sentence of the Letter, one that defeats  its argument:

---

7    "Medicare & You 2011" at page 72 (Appendix at 000002).

8    "Medicare & You 2011" at pages 75-79 (Appendix at 000005).

This understanding is conditioned on the Company obtaining and maintaining such governmental approvals as may be required to permit the integration of the benefits under the Group Benefits Plan with the benefits provided by any such law.

In other words, the Letter explicitly contemplates that CNH will affirmatively take the steps to *integrate* any statutory benefits with 1998 PPO Plan and *maintain* the Group Benefit Plan thereafter. It *precludes* CNH from *abandoning* its obligations to provide prescription drug benefits under the 1998 Group Benefit Plan.

In *Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034, 1041 (E.D. Mich. 1994), the employer relied on a similar "statutory benefits" provision. The court concluded that the clause merely "relieved of its obligation of providing health benefits when a government program *gives retirees those same benefits*." (emphasis added). According to the court, these provisions "merely protect the defendant from having to give its retirees duplicate benefits already provided by the government. . . . [T]he burden placed upon defendant is merely lessened where the retiree receives federal benefits." *Id*. at 1042. *Accord Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 677-78 (E.D. Mich. 1995), *aff'd*, 91 F.3d 143 (6th Cir. 1996).

CNH is not seeking to have its burden lessened by integrating Part D benefits with the 1998 PPO Plan. It is seeking to *eliminate* its obligation to provide any prescription drugs benefits for Medicare-eligible retirees.

In *Hinckley*, the district court noted that, in *Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410 (E.D. Mich. 1994), Kelsey-Hayes had not raised the federal statutory provision as a defense. 866 F. Supp. 1042 n.6.

> The court is confident that defendant's failure to use those "key" provisions in *Golden* stemmed not from oversight, but rather a recognition that the provisions do not give the defendant the right to terminate or modify, at will, retiree benefits for Medicare-eligible retirees.

*Hinckley* was decided less than eight months after *Golden*. Here, CNH waited more than seven years.

CNH *has* greatly benefitted from the Medicare Part D reimbursement program. CNH is eligible to receive a 28% subsidy from the federal government for its drug payments between $320 and $6,500 per covered retiree (2012 threshold and limit).[9] But, CNH has no contractual right to eliminate *vested* prescription drugs for Medicare-eligible retirees simply because retirees can purchase private Medicare Part D drug plans; it certainly does not have that right under the "National and State Health Insurance Initiatives" Letter of Understanding.

---

9    *See* "Cost Threshold and Cost Limit Amounts for Plan Years Ending in 2012," dated May 26, 2011, at *rds.cms.hhs.gov/news/announcements/costthreshold12.htm* (Appendix at 000010).

### 4.   The Sixth Circuit's Recent Decision in *Winnett* Has No Relevance to Issues Presented On Appeal Here

CNH asserts that *Reese* should be construed as a conclusive determination that the 1998 PPO Plan was a "material alteration" because, in *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 406 (6th Cir. 2010), *Reese* was cited to support the holding that Caterpillar's imposition of a managed care plan was *one* of the events that started the running of the statute of limitations.

Judge Sutton, in his concurrence in *Reese,* rejected any notion that the implementation of the 1998 PPO Plan necessarily constituted a reduction in benefits by stating that Plaintiffs "should win as a matter of law" if the evidence reveals that the 1998 changes did not diminish the nature of the existing package of retiree benefits.

The district court rejected CNH's argument as well.  The court correctly concluded that any court must consider the facts "of the particular case before it, comparing the specifics of the managed care plan imposed and the plan it is replacing." (R.304, Opinion at 21).  The district court analyzed those facts in great detail on remand and concluded that, as CNH informed retirees in 1998, the 1998 PPO Plan was an important improvement over the Indemnity Plan it replaced.

In *Winnett*, the 1988 Plan had provided "cost-free" health care benefits for retirees and surviving spouses." 609 F.3d at 406, 407.  The 1998 Caterpillar managed

care plan that replaced it required 30% co insurance for non network services. The 1998 Caterpillar Plan also 1) increased prescription drug co pays; and 2) placed a limit on new dependents; 3) added new limits to vision and dental care; and 4) imposed a dollar cap on Caterpillar's future obligation. Further, in 1998, Caterpillar announced an unfettered right "to terminate the plan" where before, any such right had been subject to the applicable CBA. *Id*. at 409.

Here, the Indemnity Plan never provided "cost-free" health benefits. There was always a 20% co insurance payment on Type C services. The Indemnity Plan had various lifetime limits on Type B and Type C benefits. In fact, it was under the 1998 PPO Plan, that all retirees had access to "cost-free" Type C benefits *for the first time*.

There are other differences. In 1998, *Caterpillar* limited vision and dental benefits. In 1998, *CNH* agreed to increase vision, dental and hearing aid benefits.

In 1998, *Caterpillar* announced a dollar cap on its future obligation to retirees. In 1998, *CNH* agreed to the elimination of the 1995 FAS Letter, foreclosing any legitimate argument that its obligation to retirees *was,* or in the future could be, limited.[10]

---

10    In a footnote, CNH cites *Wood v. Detroit Diesel Corp.*, 607 F.3d 427 (6th Cir. 2010). (Appeal Brief at 13 n.5). CNH can get no comfort from *Wood*. If the FAS 106 Letter had "capped" CNH's cost of retiree health care benefits *while* it existed (an argument the district court rejected), the *elimination* of the FAS 106 letter in 1998 foreclosed any future limits on Plaintiffs' vested benefits. This fact is simply additional, compelling evidence that the 1998 negotiations *improved* (and did not diminish) the nature of the existing benefit package.

CNH cites *Curtis v. Alcoa, Inc.*, No. 3:06-448, 2011 WL 850410, (E.D. Tenn., Mar. 9, 2011), to support its argument that *Reese* held that a switch to managed care is a benefit reduction as a matter of law. (Appeal Brief at 31 n.10). Unsurprisingly, *Curtis* addresses the facts specific to that case, not the facts of *this* case. In *Curtis*, the court held that plaintiffs' benefits had vested, but were limited by a preexisting cap. Alcoa and the Steelworkers *agreed* to modify benefits in 2006 to allow Alcoa to soften the impact of the cap, including a managed care plan that cost Alcoa less. Plaintiffs sued. Slip Opinion at *53.

The court quoted from *Reese,* 574 F.3d at 325, that managed care "represented a reduction in the effective choices of coverage available" because: "[u]nlike the prior plan, under which they could choose any doctor without suffering a financial penalty, they generally had to pay more for choosing an out-of-plan doctor." *Id.* *40.

Of course, in his concurrence (not cited in *Curtis*), Judge Sutton disavowed any intent to prejudge *every* managed care plan regardless of the facts. Instead, "plaintiffs should win as a matter of law," despite the negotiated implementation of managed care, if the evidence showed that existing benefits had improved in 1998. 583 F.3d at 956. On remand, the undisputed facts showed that, under the 1998 PPO Plan, Plaintiffs could, for the first time, by their *choice* of a doctor, obtain 100% coverage, "unlike the prior [Indemnity] plan," where Plaintiffs paid 20% regardless of their

choice. There is *no* evidence that *any* retiree saw their "coverage downgraded" in *any* respect under the 1998 PPO Plan.

The district court in *Curtis* did not blindly follow the generalizations in *Reese.* Fulfilling its role as fact finder, the court carefully analyzed the facts and made conclusions of law (*296* findings and conclusions over a 55-page opinion), arriving at the ultimate conclusion that "to the extent that the plan design *negotiated by Alcoa and the Union in 2006* differs from the 2001 cap agreement, those variations are clearly reasonable under *Reese* . . . ." Slip Opinion at *53 (emphasis added).[11]

Both *Winnett* and *Curtis* rest on their unique facts. As the district court understood below, no change, negotiated or imposed, is made or can be considered in a vacuum, but depends on the facts of the particular case, not on speculation or generalizations. (R.304, Opinion at 21). The district court correctly held that all of the evidence in *this* case showed conclusively that the 1998 PPO Plan improved benefits from the Indemnity Plan it replaced. Given that conclusion, Plaintiffs were and are entitled to summary judgment.

---

11 The district courts in *Winnett* and *Curtis* reviewed *negotiated* changes to retiree benefits. There is no "intra-circuit split." CNH Appeal Brief at viii. Here, there has been no negotiated change. And, here, CNH agreed to *eliminate* the FAS 106 Letter in 1998, completely undermining CNH's argument that Plaintiffs' benefits could be limited, even by a subsequent *negotiated* change.

## II. CNH HAS NOT SHOWN ENTITLEMENT TO ANY RELIEF UNDER *ZIELINSKI* OR ANY OTHER STANDARD

The district court denied CNH's motion for approval of changes because it held that *Plaintiffs* were entitled to summary judgment. In its Brief, CNH reiterates the agreements it made below: 1) that *Reese* means what Judge Sutton says it does not mean; and 2) that CNH has provided uncontested proof that its proposed changes to Plaintiffs' benefits satisfy the *Zielinski* standards. Neither is correct.

As Judge Sutton stated unequivocally in his concurrence, *Reese* does *not* hold as a matter of law, that Plaintiffs' vested benefits can be changed. But, even if it had, CNH would not be entitled to any relief. As Plaintiffs demonstrated in their response to CNH's motion below, CNH utterly failed to satisfy the *Zielinski* standards. (R. 278, Plaintiffs' Response at 6-20).

In the unlikely event that this Court finds that the district court erred in entering judgment for Plaintiffs, this matter must be remanded for a determination in the first instance "when and how" changes can be made to Plaintiffs' vested benefits. At this point, Plaintiffs will only briefly address CNH's argument on the *Zielinski* factors.

### A. THE *ZIELINSKI* STANDARD IS INAPPLICABLE TO THIS DISPUTE

Plaintiffs have never had an opportunity to address the propriety of the *Zielinski* standards in the context of this litigation. After focusing on the "context"

concept, *Reese*, *sua sponte*, incorporated a "reasonableness" test from *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615, 619, 620 (7th Cir. 2006). 574 F.3d at 326.

As the district court noted, the *Zielinski* test was not devised for a situation like the instant case. (R.304, Opinion at 15-16). In *Zielinski*, the Seventh Circuit addressed a 35-year-old Shutdown Agreement where there was no existing bargaining relationship and where the underlying benefit agreements had been lost. As a result, the Seventh Circuit concluded that there were "gaps" to fill, a "standard activity of courts in contract cases." 463 F.3d at 619-20. The court reversed entry of summary judgment for Pabst and remanded with instructions for the district court to adjust the benefits "to the extent possible without wild conjecture – for changes to which the parties to the agreement would have agreed had they focused at the outset on the duration of the commitment made by the employers." *Id*. at 621. (emphasis added). In *Zielinski*, the court reaffirmed the primacy of the agreement of the "parties to the [CBA]." In *Zielinski*, the court had to fill "gaps" only because the parties' underlying agreement was *lost*.

Here, the agreement of the "parties to the agreement" is not lost; there are no gaps to fill. This Court knows exactly what agreements the UAW and CNH have made since the early 1970's through 2010 and precisely what they say. In 1998, the UAW and CNH negotiated, in CNH's words, "important improvements" to the benefit package of existing retirees. In 2005 and 2010, the UAW refused to agree to

-47-

any changes in Plaintiffs' vested benefits. The *Zielinski* factors are entirely inapplicable in the context of this litigation.

### B. CNH'S PROPOSED CHANGES ARE NOT REASONABLY COMMENSURATE WITH PLAINTIFFS' VESTED BENEFITS

The first factor of the *Zielinski* test is whether the proposed benefit changes are "reasonably commensurate" with what the retirees had at retirement. 574 F.3d at 326.

CNH seeks approval for reductions similar to those that, CNH claims, the UAW and CNH negotiated for active employees in 2005. In 2005, the UAW *refused* to agree to *any* changes in benefits for existing retirees. In other words, CNH seeks from the Court what CNH failed to obtain from the UAW. The district court correctly saw the absurdity of CNH's position. (R. 304, Opinion at 22).

Before the district court, CNH asserted that "[t]he 2005 Group Benefit Plan is 'reasonably commensurate' with the 1998 Group Benefits Plan;" and that "Plaintiffs will not experience a disruption in their benefits if they move from the 1998 Group Benefit Plan, because the specific benefits provided under both plans are remarkably similar . . . . Both plans provide prescription drug coverage. . . . Thus, Plaintiffs -- all of whom receive benefits under the 1998 Group Benefit Plan [] -- will receive substantially the same (if not identical) health care benefits under the 2005 Group Benefit Plan."(R. 271, CNH Brief at 12).

Incredibly, CNH did *not* mention that, under the 2005 CBA, prescription drug benefits *had been eliminated* for Medicare-eligible retirees effective January 7, 2007. (R.278, Plaintiffs' Response, Ex. A at 44). CNH did not overlook this fact. Instead, CNH was trying to mask the magnitude of the changes it sought to impose on Plaintiffs. The proposed elimination of prescription drug benefits for Medicare-eligible retirees absolutely precludes a finding that the benefits CNH seeks to impose are "reasonably commensurate" with the benefits provided under the 1998 PPO Plan.

CNH asserts now, as it did when confronted with its chicanery below, that there was no reason to disclose its plan to eliminate prescription drug benefits because Medicare-eligible retirees had access to Medicare Part D benefits. (R.287, CNH Reply at 1). As described above, Medicare Part D plans certainly do not make the prescription benefits provided under the 1998 PPO Plan "superfluous" as CNH asked the district court to believe. (*Id*.). Retirees who purchase a Part D plan can pay up to almost $5,000.00 a person ($10,000 for a couple) in out of pocket costs every year. It was a travesty for CNH to assert that "Plaintiffs . . . will receive substantially the same (if not identical) health care benefits under the 2005 Group Benefit Plan."

As Plaintiffs explained below, the 2005 Group Benefit Plan is not remotely "commensurate" with the 1998 PPO Plan in many other ways as well. (R.278,

Plaintiffs' Response at 7-13). To the extent necessary, Plaintiffs direct the Court to the evidence Plaintiffs cite there.

### C. CNH'S PROPOSED CHANGES ARE NOT REASONABLE IN LIGHT OF CHANGES IN HEALTH CARE

CNH's proposed changes have nothing to do with changes in the way health care is delivered. They do not reflect or take into account new medical technologies. Other than the elimination of the prescription drug plan for Medicare-eligible retirees, the *structure* of the 2005 Plan is similar to the 1998 PPO. CNH simply wants to shift a vast portion of *CNH's* cost burden to Plaintiffs through the imposition of premium contributions, higher deductibles and higher co insurance payments. Of course, the very concept of vested benefits is intended to protect retirees against just these kinds of changes regardless of whether they are imposed or negotiated.

Especially here, health care inflation cannot provide a rationale for these kinds of massive benefit cuts. It was in the 1998 negotiations, after all, that the CNH agreed to eliminate the "FAS 106 Out-Year Cost Limiters" Letter, which CNH contended "capped" its exposure to future health care inflation. By the changes it seeks, CNH is seeking to re-impose limits on its exposure to medical inflation, a claimed right that CNH explicitly gave up in 1998.

### D. WHAT BENEFITS CNH PROVIDES ACTIVE EMPLOYEES OR OTHER EMPLOYERS PROVIDE RETIREES IS IRRELEVANT

The third *Zielinski* factor is that any proposed changes be "roughly consistent with the kinds of benefits provided to current employees." 574 F.3d at 326.  In *Zielinski*, unlike here, there was no current bargaining relationship, so it is difficult to conceive how that factor could apply here.  And here, the UAW *refused* to agree to apply the 2005 benefit reductions to Plaintiffs.  A literal application of *Zielinski* in the context of this case would render the UAW's role "from CBA to CBA" meaningless.  A literal application of the third *Zielinski* factor would eliminate the only real protections afforded to retirees with vested benefits.

Possibly recognizing the absurdity of its argument, CNH submitted the declaration of Scott Macey, arguing that the UAW had *agreed* to the reduction in retiree benefits with *other* employers.   Plaintiffs responded that CNH had never identified Mr. Macey as a potential expert on the topics of his Declaration. Mr. Macey had never been qualified as an "expert" by the district court.  His declaration was based almost entirely on hearsay and was otherwise inadmissible under the Federal Rules of Civil Procedure.  Plaintiffs also pointed out many glaring errors, among the most grievous  of which were his assertions that the UAW had *agreed* to reductions in benefits with other employers, when, in fact, any reductions in had been the result of class action settlements or bankruptcy settlements - or both.

The district court did not address Mr. Macey's declaration, although it did note that, "CNH points out that the UAW *has agreed to* the same changes in other cases. . . . Here, however, CNH is seeking to unilaterally impose those changes." (R.304, Opinion at 22)(emphasis in original). The district court, noting that CNH sought to accomplish through litigation what it could *not* accomplish through collective bargaining, held: "to the extent CNH can [alter Plaintiffs' benefits], it is only through an agreement with the UAW." (*Id*.).

What the UAW did or did not do, in other situations, under different pressures, with different employers, in negotiations involving active employees in different bargaining units with different concerns, is irrelevant here. *Reese* cannot mean that district court can look at what the UAW did elsewhere to justify the imposition of a benefit proposal the UAW *rejected* in 2005.

In any event, CNH's motion was based almost entirely on Mr. Macey's Declaration. Because Mr. Macey's Declaration was inadmissible and incompetent for the reasons described in detail by Plaintiffs below, (R.278, Response at 15-20), CNH could not have prevailed under any standard.

The most that CNH proved, by its submission of self-serving and inadmissible declarations, is that the resolution of these kinds of disputes should remain the domain of the give and take of bargaining "from CBA to CBA."

### III.  THE EAST MOLINE PLANT SHUTDOWN AGREEMENT PROVIDED FOR IRREDUCIBLE BENEFITS

The East Moline Shutdown Agreement, negotiated in January 2002, has a section entitled "*Finality of This Agreement*." It provides: "***The economic closedown benefits and the eligibility rules established and set forth in this Shutdown Agreement shall not be altered by any subsequent agreements in any future negotiations***." (R.290, Plaintiffs' Motion, Ex. 1 at 19).  This Court can only enforce CNH's agreement by affirming the district court's summary judgment as to the Plaintiffs whose benefits are governed by the Shutdown Agreement.

CNH and the UAW carefully negotiated the enhanced benefit packages for employees who retired under the Shutdown Agreement, *including in particular* the right to receive "Retiree Insurances" *after* the termination of the 1998 Central Agreement at East Moline.  In fact, under two of the special early retirement packages, employees who qualified at age 50 would not *begin* to receive both pension benefits *and* retiree health insurance until age 55, up to five years *after* the 1998 CBA and their employment at CNH terminated.

CNH and the UAW also agreed that the 1998 Group Benefit Plans would continue to govern the "rights and benefits" of these separated employees.  Upon the final closing of the East Moline facility, CNH and the UAW agreed that 1998 Central Agreement "shall terminate and be of no further effect ***provided, however, that this***

-53-

*Shutdown Agreement and the benefit plans and agreements related thereto shall not terminate and continue to apply to the extent they govern and provide rights and benefits to separated employees." (Id.* at 20) (emphasis added).

For the hundreds of employees who retirement is governed by the 2002 East Moline Shutdown Agreement, there is an explicit agreement between CNH and the UAW, ratified by the employees who then retired under the terms of the Shutdown Agreement, that *their* benefits could *not* be "reset" "from CBA to CBA."

In the Shutdown Agreement, CNH and the UAW expressed their intent that "Retiree Insurances" -- together with other benefits bestowed by that Agreement: 1) "shall not be altered by any subsequent agreements" between CNH and the UAW; and 2) the 1998 Group Benefit Plans would continue to govern benefits despite the termination of the 1998 Central Agreement. In other words, CNH acknowledged, not only that retiree insurance benefits were "vested" for life, but exactly "*what vesting means*" in the context of the Shutdown Agreement.

As the district court stated, this Court did not address the East Moline Shutdown Agreement; it considered only the 1998 CBA. (R.304 at 22). CNH claims, however, that Plaintiffs made this argument in its last appeal and this Court rejected it. (Appeal Brief at 35). To the contrary, in the last appeal, Plaintiffs merely argued (briefly) that CNH had continued to provide benefits for retirees from closed plants after the CBAs terminated at those locations and that this was an indicia that benefits

-54-

were vested.  Plaintiffs cited plant closings in 1987, 1993 *and* 2002. (Plaintiffs'
6/12/08 Appeal Brief at 50).  Because the district court had ruled in favor of the entire
Class, Plaintiffs had no occasion, on appeal, to argue that the language of the 2002
Agreement itself  provided for vested benefits.  Because the issue was never raised,
this Court did not reject the claim in *Reese*.

"Under the doctrine of law of the case – and the specific application of that
doctrine, the rule of mandate, at issue here – the trial court is free to consider any
issues not decided 'expressly or impliedly by the appellate court.'" *Kavorkian v. CSX
Transportation, Inc.*, 117 F.3d 953, 958-59 (6th Cir. 1997)(*quoting Jones v. Lewis*,
957 F.2d 260, 262 (6th Cir. 1992)).  In *Reese*, the only *final* determination was that
retiree benefits were vested for life. *Reese*, 574 F.3d at 322-24.  The Court remanded
for a determination of "[w]hat does vesting mean" in the context of the 1998
negotiations. *Id.* at 324.  The Court never mentioned, much less decided, any issue
relating to the 2002 East Moline Shutdown Agreement.

Employees who accepted one of the special early retirement packages
relinquished their right to further employment with Case and to other benefits
(relocation allowance; retraining tuition reimbursement; outplacement benefits and
continuing seniority) and a $10,000 Severance Option.  They gave up these rights
with the understanding and assurance from CNH that their benefit package would
"not be altered by any subsequent agreements in any future negotiations."

Under the Shutdown Agreement, CNH was assured that the UAW would not seek to improve either the pension or health care benefits for these employees. The UAW obtained a guarantee that CNH would not seek to reduce their benefits in subsequent negotiations. Both parties understood that the benefits and benefit levels in the 1998 Group Benefits Plan would *always* "continue to apply to the extent they govern and provide rights and benefits to separated employees" and could "not be altered" by any subsequent CBA.

## IV. *REESE* IS A DEPARTURE FROM BINDING SIXTH CIRCUIT PRECEDENT

CNH *begins* its Brief by saying that, before the district court, Plaintiffs "boldly contended that 'the *Reese* panel has it entirely wrong,'" (CNH Appeal Brief at 1). CNH apparently thinks it can convince this Court that Plaintiffs relied principally on an argument that began on page 18 of their 20 page brief, rather than on their arguments in the 17 preceding pages. As troubling is CNH's failure to note what else Plaintiffs said on page 18: "*Although it is irrelevant to the task presently before this Court*, Plaintiffs will note here that they too preserve their right to challenge, at the appropriate time, the very foundation of the *Reese* panel decision." (R.273, Plaintiffs' Summary Judgment Motion, Brief at 18)(emphasis added). CNH knows that, to have a chance of prevailing here, CNH must distort Plaintiffs' arguments at every opportunity.

It is no surprise that Plaintiffs disagreed with the formulation in *Reese* of the question of "what does vesting mean in this context." Plaintiffs have always contended that Plaintiffs' benefits vested at retirement and cannot be changed thereafter without their consent. That is the protection afforded retirees in *Chemical Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n.20, 92 S.Ct. 383 (1971). *Accord Weimer v. Kurz-Kasch, Inc.*, 773 F.2d 669, 676 n.7 (6th Cir. 1985), one that was reiterated in *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 918 (6th Cir. 2000), as follows: "If benefits have vested, then retirees must agree before the benefits can be modified, even in a subsequent CBA between the employer and active employees."

In *Reese*, however, the Court postulated that the UAW and CNH *could* agree to modify the vested benefits of existing retirees in a subsequent CBA, even if the retirees did *not* consent. And, the evidence the Court cited to support this concept is that the UAW and CNH modified the benefits of existing retirees without their consent *after* they retired: "We know that the contracting parties viewed the 1995 CBA's benefits as subject to some change because they changed them [in 1998]." 574 F.3d at 326.

Under *Pittsburgh Plate Glass* and *Maurer*, a subsequent CBA between a union and employer *cannot* impact vested benefits unless the retiree consents. If, as *Reese* discussed, a union's actions in subsequent negotiations is evidence of whether vested

-57-

retiree benefits can be changed then, contrary to *Pittsburgh Plate Glass*, a retiree has *no* protection if the union and the former employer decide to bargain over their benefits. Had *Reese* applied the governing principle of *Maurer* and *Pittsburgh Plate Glass*, rather than adopting the "context" concept from the dissent in *Noe v. PolyOne Corp.*, 520 F.3d 548, 566-67 (6th Cir. 2008), the district court's initial decision would have been affirmed.

## V.    PLAINTIFFS ARE ENTITLED TO ATTORNEY FEES

In *Reese*, the Court recognized that Plaintiffs were entitled to attorney fees because they had prevailed on the fundamental issue – they were entitled to vested benefits. Because the Court concluded that "at least part of the rationale for the fee award may no longer be sound," the Court remanded "to allow the district court to decide in the first instance what award is appropriate in the context of its final decision." 574 F.3d at 328.

On remand, the district court ruled in Plaintiffs' favor and reinstated the attorney fee award. Because the district court was correct on the merits, the reinstatement of the fee award was correct as well.

CNH argues that, if it prevails on appeal, the fee award should be vacated. (Appeal Brief at 53). Even if CNH prevails on appeal, Plaintiffs are entitled to attorney fees because they *prevailed* on the fundamental issue – that Plaintiffs have vested, lifetime benefits. *See Hardt v. Reliance Standard Life Ins. Co.*, ___ U.S. ___,

130 S. Ct. 2149 (2010)(plaintiff need not be the prevailing party, but must show some degree of success, to justify ERISA fee award). The issue would be, once again, for "the district court to decide in the first instance what award is appropriate in the context of its final decision."

## VI. CONCLUSION

For the reasons stated, Plaintiffs ask this Honorable Court to affirm the Judgment of the District Court in all respects.

Respectfully submitted,

KLIMIST, McKNIGHT, SALE
McCLOW & CANZANO, P.C.

By:   /s/ Roger J. McClow
   ROGER J. McCLOW (P27170)
   Attorneys for Plaintiffs/Appellees
   400 Galleria Officentre, Suite 117
   Southfield, MI 48034
   248-354-9650
   rmcclow@kmsmc.com

Dated: June 20, 2011

# CERTIFICATE OF COMPLIANCE

Pursuant to FRAP 32(a)(7)(C), the undersigned certifies this brief complies with the type-volume limitations of FRAP 32(a)(7)(B)(i).

1. Exclusive of the exempted portions in FRAP 32(a)(7)(B)(iii), the brief contains 13995 words.

2. The Brief has been prepared in proportional spaced typeface using Word Perfect Version 12 Times New Roman at 14-point.

3. The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in FRAP 32(a)(7), may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

   /s/ Roger J. McClow
ROGER J. McCLOW

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2011, I electronically filed Plaintiffs' Principal

Brief with the Clerk of the Court using the ECF system which will provide electronic

notification of the filing of the Brief to all registered ECF participants.

KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.

By:  /s/ Roger J. McClow
Roger J. McClow (P27170)
Attorneys for Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI 48034
(248) 354-9650     Fax: (248) 354-9656
Email: rmcclow@kmsmc.com

Dated: June 20, 2011

# PLAINTIFFS' DESIGNATION OF RELEVANT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(b), Plaintiffs designate the following documents as relevant:

| DESCRIPTION OF ENTRY | DATE | RECORD ENTRY NO. |
|---|---|---|
| Opinion and Order - Summary Judgment | Aug. 29, 2007 | R.214 |
| Opinion and Order - Attorney Fees | June 20, 2008 | R.242 |
| CNH Motion for Approval of Changes, with Exhibits 1 and 2 | July 10. 2010 | R.271 |
| Plaintiffs' Motion for Summary Judgment, with Exhibits A (Reese Decl. with Exhibits 1-4, 7-11, 14-46 and 50-53) and Exhibits B-D, F-H and N-P | July 16, 2010 | R.273 |
| Plaintiffs' Response to CNH Motion (R.271) | July 26, 2010 | R.278 |
| CNH Reply in Support of Motion (R.271) |  | R.287 |
| Plaintiffs' Second Motion for Summary Judgment, with Ex. 1 | Sept. 7, 2010 | R.290 |
| Opinion and Order | March 3, 2011 | R.304 |
| Notice of Appeal | March 16, 2011 | R.309 |
| Judgment | May 11, 2011 | R.316 |

# APPENDIX

CENTERS FOR MEDICARE & MEDICAID SERVICES

# Medicare & You



# 2011

**This is the official U.S. government Medicare handbook with important information about the following:**

★ What's new

★ Medicare costs

★ What Medicare covers

★ Health and prescription drug plans

★ Your Medicare rights

★ Signing up to get future handbooks electronically



000001



## Medicare Prescription Drug Coverage (Part D)

Medicare offers prescription drug coverage to everyone with Medicare. Even if you don't take a lot of prescriptions now, you should still consider joining a Medicare drug plan. To get Medicare prescription drug coverage, you must join a plan run by an insurance company or other private company approved by Medicare. Each plan can vary in cost and drugs covered. If you decide not to join a Medicare drug plan when you're first eligible, and you don't have other creditable prescription drug coverage, you will likely pay a late enrollment penalty. See pages 78–79.



There are two ways to get Medicare prescription drug coverage:

1. **Medicare Prescription Drug Plans.** These plans (sometimes called "PDPs") add drug coverage to Original Medicare, some Medicare Cost Plans, some Medicare Private Fee-for-Service (PFFS) Plans, and Medicare Medical Savings Account (MSA) Plans.

2. **Medicare Advantage Plans (like an HMO or PPO) or other Medicare health plans that offer Medicare prescription drug coverage.** You get all of your Part A and Part B coverage, and prescription drug coverage (Part D), through these plans. Medicare Advantage Plans with prescription drug coverage are sometimes called "MA-PDs."

**Both types of plans are called "Medicare drug plans" in this section.**

## Who Can Get Medicare Drug Coverage?

To join a Medicare Prescription Drug Plan, you must have Medicare Part A **or** Part B. To join a Medicare Advantage Plan, you must have Part A **and** Part B. You must also live in the service area of the Medicare drug plan you want to join.



If you have employer or union coverage, call your benefits administrator before you make any changes, or before you sign up for any other coverage. If you drop your employer or union coverage, you may not be able to get it back. You also may not be able to drop your employer or union **drug** coverage without also dropping your employer or union **health** (doctor and hospital) coverage. If you drop coverage for yourself, you may also have to drop coverage for your spouse and dependants. If you want to know how Medicare prescription drug coverage works with other drug coverage you may have, see pages 82–83.



## Join, Switch, or Drop a Medicare Drug Plan

You can join, switch, or drop a Medicare drug plan at these times:

- When you're first eligible for Medicare (the 7-month period that begins 3 months before the month you turn 65, includes the month you turn 65, and ends 3 months after the month you turn 65).

- If you get Medicare due to a disability, you can join during the 3 months before to 3 months after your 25th month of disability. You will have another chance to join 3 months before the month you turn 65 to 3 months after the month you turn 65.

- **NEW**—Between October 15–December 7 in 2011. Your coverage will begin on January 1, 2012, as long as the plan gets your enrollment request by December 7.

- Anytime, if you qualify for Extra Help.

In most cases, you must stay enrolled for that calendar year starting the date your coverage begins. However, in certain situations, you may be able to join, switch, or drop Medicare drug plans at other times. Some of these situations include the following:

- If you move out of your plan's service area
- If you lose other creditable prescription drug coverage
- If you live in an institution (like a nursing home)

If you want to join a plan or switch plans, do so as soon as possible so you will have your membership card when your coverage begins, and you can get your prescriptions filled without delay.

Call your State Health Insurance Assistance Program (SHIP) for more information. See pages 123–126 for the telephone number. You can also call 1-800-MEDICARE (1-800-633-4227). TTY users should call 1-877-486-2048.

If you have limited income and resources, you may qualify for Extra Help to pay for Medicare prescription drug coverage. You may also be able to get help from your state. See pages 86–91.

Blue **words**
**in the text**
**are defined**
**on pages**
**127–130.**

2:04-Case-05092-PJHD-PDKcuDoen# 426-2109ilec2D05/14fb4: (Pg276201 95  PPgeD755612



## How Do You Join?

Once you choose a Medicare drug plan, you may be able to join by completing a paper application, calling the plan, or enrolling on the plan's Web site or on www.medicare.gov. You can also enroll by calling 1-800-MEDICARE (1-800-633-4227). TTY users should call 1-877-486-2048. When you join a Medicare drug plan, you will have to provide your Medicare number and the date your Part A and/or Part B coverage started. This information is on your Medicare card. **Note: Medicare drug plans aren't allowed to call you to enroll you in a plan. Call 1-800-MEDICARE to report a plan that does this.**

## How Do You Switch?



You can switch to a new Medicare drug plan simply by joining another drug plan during one of the times listed on page 73. **You don't need to cancel your old Medicare drug plan or send them anything.** Your old Medicare drug plan coverage will end when your new drug plan begins. You should get a letter from your new Medicare drug plan telling you when your coverage begins.

If you want to drop your Medicare drug plan and don't want to join a new plan, you can do so during one of the times listed on page 73. You can disenroll by calling 1-800-MEDICARE. You can also send a letter to the plan to tell them you want to disenroll. If you drop your plan and want to join another Medicare drug plan later, you have to wait for an enrollment period. You may have to pay a late enrollment penalty. See pages 78–79.



**If your Medicare Advantage Plan includes prescription drug coverage and you join a Medicare Prescription Drug Plan, you will be disenrolled from your Medicare Advantage Plan and returned to Original Medicare.**

For more information on joining, dropping, and switching plans, read the fact sheet "Understanding Medicare Enrollment Periods" by visiting http://go.usa.gov/lsi. You can also call 1-800-MEDICARE to see if a copy can be mailed to you.



# What You Pay

Below and continued on the next page are descriptions of the payments you make throughout the year in a Medicare drug plan. **Your actual drug plan costs will vary** depending on the prescriptions you use, the plan you choose, whether you go to a pharmacy in your plan's network, whether your drugs are on your plan's formulary (drug list), and whether you get Extra Help paying your Part D costs.

### Monthly premium

Most drug plans charge a monthly fee that varies by plan. You pay this in addition to the Part B premium. If you belong to a Medicare Advantage Plan (like an HMO or PPO) or a Medicare Cost Plan that includes Medicare prescription drug coverage, the monthly premium you pay to your plan may include an amount for prescription drug coverage.

**Note:** Contact your drug plan (not Social Security) if you want your premium deducted from your monthly Social Security payment. Your first deduction will usually take 3 months to start, and 3 months of premiums will likely be deducted at once. After that, only one premium will be deducted each month. You may also see a delay in premiums being withheld if you switch plans.

**NEW**—Your Part D monthly premium could be higher based on your income. This includes Part D coverage you get from a Medicare Prescription Drug Plan, or a Medicare Advantage Plan or Medicare Cost Plan that includes Medicare prescription drug coverage. If your modified adjusted gross income as reported on your IRS tax return from 2 years ago (the most recent tax return information provided to Social Security by the IRS) is above a certain amount, you will pay a higher monthly premium. See page 134 for more information.

### Yearly deductible

The amount you must pay before your drug plan begins to pay its share of your covered drugs. Some drug plans don't have a deductible.

### Copayments or coinsurance

Amounts you pay at the pharmacy for your covered prescriptions after the deductible (if the plan has one). You pay your share, and your drug plan pays its share for covered drugs.

Blue **words** in the text are defined on pages 127–130.

000005



## What You Pay (continued)

### Coverage gap

Most Medicare drug plans have a coverage gap (also called the "donut hole"). This means that after you and your drug plan have spent a certain amount of money for covered drugs, you have to pay all costs out-of-pocket for your prescriptions up to a yearly limit. Not everyone will reach the coverage gap. Your yearly deductible, your coinsurance or copayments, and what you pay in the coverage gap all count toward this out-of-pocket limit. The limit doesn't include the drug plan premium you pay or what you pay for drugs that aren't covered.

There are plans that offer some coverage during the gap, like for generic drugs. However, plans with gap coverage may charge a higher monthly premium. Check with the drug plan first to see if your drugs would be covered during the gap. For more information, visit http://go.usa.gov/IoF to view the fact sheet "Bridging the Coverage Gap." You can also call 1-800-MEDICARE (1-800-633-4227) to see if a copy can be mailed to you. TTY users should call 1-877-486-2048.

**NEW**—If you reached the coverage gap in **2010**, (and you weren't already getting Extra Help), you may have received a one-time $250 rebate check to help you with your drug costs.

If you reach the coverage gap in 2011, you will get a 50% discount on covered brand-name prescription drugs at the time you buy them. There will be additional savings for you in the coverage gap each year through 2020 when you will have full coverage in the gap. Talk to your doctor or other health care provider to make sure that you're taking the lowest cost drug available that works for you. For more information, visit http://go.usa.gov/1np to view the publication, "Closing the Coverage Gap—Medicare Prescription Drugs Are Becoming More Affordable."

### Catastrophic coverage

Once you reach your plan's out-of-pocket limit, you automatically get "catastrophic coverage." Catastrophic coverage assures that once you have spent up to your plan's out-of-pocket limit for covered drugs, you only pay a small coinsurance amount or copayment for the drug for the rest of the year.

**Note:** If you get Extra Help paying your drug costs, you won't have a coverage gap and will pay only a small or no copayment once you reach catastrophic coverage. See pages 86–89.

Blue **words in the text are defined on pages 127–130.**

000006



## What You Pay (continued)

The example below shows costs for covered drugs in 2011 for a plan that has a coverage gap.

**Ms. Smith joins the ABC Prescription Drug Plan. Her coverage begins on January 1, 2011. She doesn't get Extra Help and uses her Medicare drug plan membership card when she buys prescriptions.**



| Monthly Premium—Ms. Smith pays a monthly premium throughout the year. | | | |
|---|---|---|---|
| **1. Yearly Deductible** | **2. Copayment or Coinsurance (What you pay at the pharmacy)** | **3. Coverage Gap** | **4. Catastrophic Coverage** |
| Ms. Smith pays the first $310 of her drug costs before her plan starts to pay its share. | Ms. Smith pays a copayment, and her plan pays its share for each covered drug until their **combined** amount (plus the deductible) reaches $2,840. | Once Ms. Smith and her plan have spent $2,840 for covered drugs, she is in the coverage gap. In 2011, she gets a 50% discount on covered brand-name prescription drugs that counts as out-of-pocket spending, and helps her get out of the coverage gap. | Once Ms. Smith has spent $4,550 out-of-pocket for the year, her coverage gap ends. Now she only pays a small copayment for each drug until the end of the year. |



Call the plans you're interested in to get more details. You can visit www.medicare.gov/find-a-plan, or call 1-800-MEDICARE (1-800-633-4227) to compare the cost of plans in your area. TTY users should call 1-877-486-2048. For help comparing plan costs, contact your State Health Insurance Assistance Program (SHIP). See pages 123–126 for the telephone number.



## What is the Part D Late Enrollment Penalty?

The late enrollment penalty is an amount that is added to your Part D premium. You may owe a late enrollment penalty if one of the following is true:

- You didn't join a Medicare drug plan when you were first eligible for Medicare, and you didn't have other creditable prescription drug coverage.
- You didn't have Medicare prescription drug coverage or other creditable prescription drug coverage for 63 days or more in a row.

**Note:** If you get Extra Help, you don't pay a late enrollment penalty.



Blue **words** in the text are defined on pages 127–130.

Here are a few ways to avoid paying a penalty:

- **Join a Medicare drug plan when you're first eligible.** You won't have to pay a penalty, even if you've never had prescription drug coverage before.

- **Don't go 63 days or more in a row without a Medicare drug plan or other creditable coverage.** Creditable prescription drug coverage could include drug coverage from a current or former employer or union, TRICARE, Indian Health Service, Department of Veterans Affairs, or health insurance coverage. Your plan will tell you each year if your drug coverage is creditable coverage. This information may be sent to you in a letter or included in a newsletter from the plan. Keep this information, because you may need it if you join a Medicare drug plan later.



- **Tell your plan about any drug coverage you had if they ask about it.** When you join a plan, and they believe you went at least 63 days in a row without other creditable prescription drug coverage, they will send you a letter. The letter will include a form asking about any drug coverage you had. Complete the form. If you don't tell the plan about your creditable coverage, you may have to pay a penalty.



## How Much More Will You Pay?

The cost of the late enrollment penalty depends on how long you didn't have creditable prescription drug coverage. Currently, the late enrollment penalty is calculated by multiplying 1% of the "national base beneficiary premium" ($32.34 in 2011) times the number of full, uncovered months that you were eligible but didn't join a Medicare drug plan and went without other creditable prescription drug coverage. The final amount is rounded to the nearest $.10 and added to your monthly premium. Since the "national base beneficiary premium" may increase each year, the penalty amount may also increase every year. You may have to pay this penalty for as long as you have a Medicare drug plan.

> **Example:** Mrs. Jones didn't join when she was first eligible—by May 15, 2007. She joined a Medicare drug plan between November 15—December 31, 2010, for an effective date of January 1, 2011. Since Mrs. Jones didn't join when she was first eligible and went without other creditable drug coverage for 43 months (June 2007–December 2010), she will be charged a monthly penalty of $13.90 in 2011 ($32.34 x.01 = $.3234 x 43 = $13.90) in addition to her plan's monthly premium.

When you join a Medicare drug plan, the plan will tell you if you owe a penalty, and what your premium will be.

## If You Don't Agree With Your Penalty

If you don't agree with your late enrollment penalty, you may be able to ask Medicare for a review or reconsideration. You will need to fill out a reconsideration request form (that your Medicare drug plan will send you), and you will have the chance to provide proof that supports your case such as information about previous prescription drug coverage. If you need help, call your Medicare drug plan.

000009

# RDS Retiree Drug Subsidy Program

## Announcement

### 05/26/2011

**Cost Threshold and Cost Limit Amounts for Plan Years Ending in 2012, and the Parameters for Medicare Part D Plans in 2012**

On Monday, April 4, 2011, the Centers for Medicare & Medicaid Services (CMS) announced the Cost Threshold and Cost Limit amounts that apply to Plan Sponsors participating in CMS' Retiree Drug Subsidy (RDS) Program, with qualified prescription drug years that end in 2012, as well as the parameters for Medicare Part D plans in 2012.

The amounts for RDS plan years ending in 2012 changed from the amounts for RDS plan years ending in 2011. The Cost Threshold and Cost Limit amounts are $320 and $6,500, respectively. The originally announced Cost Thresholds and Costs Limits for RDS Plan Years ending in 2006, 2007, 2008, 2009, 2010, and 2011 continue to apply for those RDS Plan Years.

For detailed information about the Cost Threshold and Cost Limit amounts for specific Plan Years, go to: Cost Threshold And Cost Limit By Plan Year.

CMS also announced on April 4, 2011 that the Medicare Part D benefit parameters for 2012 (for example, initial coverage limit) have been adjusted.

**Impact of Adjustments**

The year in which a Plan Sponsor's RDS Plan Year ends, as specified in the Plan Sponsor's Application, determines the applicable Cost Threshold and Cost Limit amounts for that Application. This principle applies to both calendar year plans and non-calendar year plans. The newly announced Cost Threshold and Cost Limit amounts are used in determining the amount of subsidy payments for RDS Plan Years ending in 2012. Thus, for each such plan, subsidy payments to a Plan Sponsor for each Qualifying Covered Retiree will generally equal 28 percent of Allowable Retiree Costs, attributable to Gross Retiree Costs between $320 and $6,500.

Plan Sponsors of RDS plans ending in 2012 that were using the 2011 Cost Threshold and Cost Limit as a basis for submitting costs to CMS' RDS Center, should adjust their interim cost data in their next cost submission to reflect the new 2012 Cost Threshold and Cost Limit amounts.

Please keep in mind that Final Cost Reports, whether submitted for purposes of reconciling interim payments or submitted by Plan Sponsors that had selected an annual payment frequency, must reflect the applicable Cost Threshold and Cost Limit amounts that correspond to the Application plan year end date.

In addition, revised RDS regulations that took effect June 9, 2008, state that the valuation of defined standard prescription drug coverage for a given plan year is based on the initial coverage limit, cost-sharing, and out-of-pocket threshold for defined standard prescription drug coverage under Medicare Part D at the start of such plan year or that is announced for the upcoming calendar year. More specifically, under the revised regulations, any actuarial attestation submitted to CMS' RDS Center within 60 days after the publication of the adjusted amounts can be based on either the adjusted amounts, or the previous year's amounts. Any actuarial attestation submitted more than 60 days after the publication of the adjusted amounts must apply the adjusted amounts.

000010

For more detailed information on the Cost Threshold and Cost Limit amounts for 2012, and the Medicare Part D benefit parameters, select the following link to the CMS announcement.

2:04-Cv-70592-PJD-PDK Doc # 426-21 Filed 05/14/14 Pg 83 of 95 Pg ID 25619

The 2012 RDS Cost Threshold and Cost Limit amounts and the Medicare Part D benefit parameters appear on page 49 of this document.

If you need more information, contact CMS' RDS Center Help Line.

Page last updated: May 26, 2011

Westlaw.

Slip Copy, 2009 WL 3166651 (W.D.Ky.), 47 Employee Benefits Cas. 2441
**(Cite as: 2009 WL 3166651 (W.D.Ky.))**

▷

United States District Court, W.D. Kentucky,
at Louisiville.
Maria BENITEZ, et al, Plaintiffs
v.
HUMANA, INC., et al, Defendants.

Civil Action No. 3:08CV-211-H.
Sept. 30, 2009.

West KeySummary**Labor and Employment 231H**
🔑**649**

231H Labor and Employment
   231HVII Pension and Benefit Plans
      231HVII(K) Actions
         231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties
            231Hk649 k. Pleading. Most Cited Cases

Participants in a retirement savings plan failed to state an ERISA claim that the plan's administrators breached their fiduciary duties. The participants failed to sufficiently allege that the administrators knew of software or internal controls problems that led to errors in calculating assets and projected earnings. The participants did not articulate how or why any administrator knew of the problems, but only made conclusory statements that they knew or should have known about the problems. Employee Retirement Income Security Act of 1974, § 2, 29 U.S.C.A. § 1001.

Thomas J. McKenna, Gainey & McKenna, New York, NY, J. Guthrie True, Johnson, True & Guarnieri, LLP, Frankfort, KY, for Maria Benitez, Lucretia Hocker, Michael J. Rose, Connie Riggs.

Jennifer K. Hirsh, Robert I. Harwood, Samuel K. Rosen, Tanya Korkhov, Harwood Feffer, LLP, New York, NY, for Michael J. Rose.

Matthew B. Borden, Ronald S. Kravitz, Liner Yankelevitz Sunshine & Regenstreif, LLP, San Francisco, CA, Robert E. Rickey, Cook Portune & Logothetis, Cincinnati, OH, for Connie Riggs.

Elysia M. Solomon, Gary S. Tell, Robert N. Eccles, O'Melveny & Myers LLP, Washington, DC, J. Bruce Miller, Michael J. Kitchen, J. Bruce Miller Law Group, Louisville, KY, for Humana, Inc., for Defendants.

**MEMORANDUM OPINION**

JOHN G. HEYBURN II, District Judge.

**\*1** Plaintiffs Maria Benitez, Lucretia Hocker, Michael J. Rose, and Connie Riggs (collectively "Plaintiffs") are participants in the Humana Retirement Savings Plan and the Humana Puerto Rico 1165(e) Retirement Plan (collectively the "Plan"). Plaintiffs allege that Humana, Inc. ("Humana"), various of its officers and several of its corporate committees (collectively, "Defendants") [FN1] breached their fiduciary duties as administrators and managers of the Plan in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et. seq.* Each of the individual Defendants is an officer and/or director of Humana.

> FN1. The actual named Defendants, in addition to Humana, include Michael B. McCallister ("McCallister"), James H. Bloem ("Bloem"), James E. Murray ("Murray"), Bonnie C. Hathcock ("Hathcock"), Deborah M. Triplett ("Triplett"), David A. Jones, Jr. ("Jones"), Frank A. D'Amelio ("D'Amelio"), W. Roy Dunbar ("Dunbar"), Kurt J. Hilzinger ("Hilzinger"), William J. McDonald ("McDonald"), James J. O'Brien ("O'Brien"), Ann Reynolds ("Reynolds"), unnamed John Does, the Compensation Committee, the Investment Committee, and the Plan Committee.

Defendants have moved to dismiss on the grounds that the Complaint does not state a viable claim for relief under ERISA. After a careful re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3166651 (W.D.Ky.), 47 Employee Benefits Cas. 2441
**(Cite as: 2009 WL 3166651 (W.D.Ky.))**

view, including a conference to discuss the issues, the Court concludes that the complaint does not state allegations which can support the causes of action against Defendants. No amount of discovery will change this conclusion.

**I.**

The facts relevant to the case concern the methods Humana devised to price its insurance products and who might be responsible for any mistakes.

Humana's core business function is providing supplemental health care plans to beneficiaries of government benefit programs, including Medicare. Medicare coverage is broken into four categories, one of which concerns prescription drugs. Private insurance companies offer Prescription Drug Plans ("PDPs") to cover the costs of these drugs. Terms of the PDPs vary, but generally participants pay a monthly premium and have a yearly deductible. Once the deductible is met, participants pay part of the cost of the prescription, a co-payment, and the insurance company covers the rest of the cost of the drug until the participants reach the initial coverage limit. After that point, the participants pay 100 percent of the cost of drugs up to a second limit. This period of time is called the " **coverage gap**." Once participants reach the **coverage gap** limit, the insurance company provides catastrophic coverage, which requires a very small co-payment.

Starting in 2006, Humana began offering stand-alone PDPs. The Centers for Medicare & Medicaid Services ("CMS"), a federal government agency, regulates and limits the out-of-pocket costs PDPs may require individuals to pay. Using actuarial equivalence tests, CMS evaluates each insurance company's PDP to determine whether each one qualifies as an approved PDP provider. To so qualify, an insurance company must devise a PDP so that plan members are not responsible for more than 33% of the costs of drugs before the **coverage gap**. Companies that provide PDPs attempt to meet the 33% costs exactly when setting their premiums. Failure to qualify would mean that the PDP cannot be marketed.

**A.**

Insurance companies, such as Humana, set premiums a year in advance based on actuarial assumptions and other information. When Humana set its 2008 fiscal year premiums, it did so based on actuarial data that projected an increase in the use of prescription drugs that carry high co-payments (known as "tier III" drugs). Humana estimated that the use of these tier III drugs would increase from 6% to 15%. Based on that projected increase, Humana concluded it must lower the costumer co-payments for these drugs so that personal costs for PDP members would not exceed the 33% limit. Given Humana's projections, had it not lowered its co-payments, the Humana PDPs would not have received CMS approval.

**\*2** The process of making projections and setting prices is a complex one. Humana uses a variety of projections and actuarial data to determine the amount of co-payment for each drug tier. Its Pharmacy Business Unit (the "PB Unit") negotiated prescription prices with pharmacy chains. That PB Unit gathered the relevant actuarial data through their claims-processing software. The PB Unit then sent its data to Argus Health Systems ("Argus"), which is an independent company that acted as the middle-man between Humana and the pharmacies filling prescriptions for PDP enrollees. Argus used the Humana data to determine the appropriate price for each category of prescriptions.

Plaintiffs allege that the PB Unit software was outdated and failed to properly organize and track claims data. Based on flawed information, Argus set inconsistent prescription prices. That information then factored into the calculation of the PDP premiums. There is undoubtedly some element of truth to Plaintiffs assertion that "[t]he failure to organize and coordinate information concerning prescription pricing, input by Humana's employees at the Pharmacy Business Unit, caused by the outdated claims processing software, resulted in flawed information being transmitted to Argus, which in turn led to inconsistent prescription pri-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3166651 (W.D.Ky.), 47 Employee Benefits Cas. 2441
**(Cite as: 2009 WL 3166651 (W.D.Ky.))**

cing ..." Ultimately, pricing required judgments about future consumer conduct which, by their nature, cannot be predicted without absolute certainty.

In September 2007, Humana issued its guidance for the 2008 fiscal year. Humana projected an earnings per share between $5.30 and $5.50. The SEC filing attributed Humana's strong financial performance to "the company's Commercial operations and stand-alone **Medicare Prescription** Drug **Plans,**" projecting that both would positively impact the next fiscal year. From September 2007 until March 2008, Humana made repeated public statements in its SEC filings, in press releases, and at meetings and conferences with investors and analysts that its earnings per share would be between $5.30 and $5.55 for FY 2008. It repeatedly attributed Humana's performance to the improvements in commercial operations and the PDPs.

In January 2008, Humana re-affirmed its 2008 earnings guidance, but admitted that PDPs' gross sales were "somewhat ahead of expectations." In February, Humana raised its earnings projections by $.05, reflecting a lower tax rate than previously anticipated. At that time, Humana admitted that "the composition of our 2008 PDP membership [ ... ] has changed from last year." Humana expected the composition of the PDP membership to have an impact on quarterly patterns, but not the full year, and thus did not adjust its earnings projections at that time. In February, Humana's Chief Operating Officer, Murray, said that statistics tracking the PDPs meant things were "pretty predictable" and led Murray to say, "Nothing has surprised us this year."

On March 12, 2008, Humana announced that it had mis-estimated its earnings per share and that the year's earnings were now projected to be between $4.00 and $4.25 per share. The change was announced in a press release and in a conference call with analysts. Humana explained that the incorrect tier III drug use projections contributed to the incorrect earnings projections. McCallister and

Bloem stated that they had difficulty deciding on the co-payment for PDPs, eventually deciding to lower the co-pay. At that time, Murray also stated: "In hindsight, we should have assumed that members would likely change their behavior and substitute lower tier drugs rather than lowering our co-pays."

**\*3** Following the announcement, Humana's stock immediately dropped about 14 percent. The incorrect projections also resulted in a direct loss to the company of over $300 million represented by the shift of drug costs to Humana, new higher-cost members who joined the Humana plan to take advantage of the lowered co-pays, and the ratio of low income customers to low cost costumers. Neither the earnings restatement nor the direct financial loss underlying the restatement appears to have threatened Humana's long term viability or profitability.

Plaintiffs allege that due to material weaknesses in its internal controls Humana's financial reporting lacked a reasonable basis at all relevant times. Because of those weaknesses, Humana improperly calculated the prescription drug usage based upon the pricing and discounts for members in the PDPs. No doubt some such internal weakness or some mistakes contributed to Humana's improper calculation of the mix shift of high and low cost members in the PDPs. These problems caused the assumptions underlying Humana's earnings guidance to be flawed and inaccurate. Plaintiffs assert that "Defendants either knew or should have known that they could not accurately gauge the level of tier III drug usage or were reckless in basing such an important decision as the pricing of co-payments for PDPs on such a drastically incorrect estimation." Thus, Plaintiffs suggest that Defendants caused the earnings guidance to be incorrect, thereby artificially inflating the stock price.

**B.**

Humana provides its employees benefits, including an individual account employee pension benefit plan. The Plan offers employees nine invest-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3166651 (W.D.Ky.), 47 Employee Benefits Cas. 2441
**(Cite as: 2009 WL 3166651 (W.D.Ky.))**

ment fund options and provides matching contributions by Humana. One investment fund is the Humana Unitized Stock Fund ("HSF"). The HSF invests in Humana common stock. The fund itself contains Humana common stock, owned by the Plan and not the participants themselves, and a small portion (approximately 2%) cash or cash equivalents to meet the cash needs for the fund's daily transactions. The Summary Plan Description ("SPD") states that the Charles Schwab Trust Company manages HSF and "ensure[s] that approximately 98% of the fund is invested in Humana common stock." Plan participants select which funds to invest in for their individual accounts. All matching contributions, however, are invested in Humana common stock. Humana common stock represents about 30% of the Plan's total investments. The Plan also incorporates by reference all SEC documents that Humana has filed.

When Humana's stock declined, the Plan lost some of its value. Plaintiffs, as Plan participants, claim Defendants are responsible for that loss due to Defendants' positions at Humana and fiduciary responsibilities to the Plan. Defendants ARE individuals with various positions at Humana and entities involved in the Plan management and administration. The Company, Humana, is the named Plan administrator and Plan Sponsor. It acts through its officers, directors, and employees. The Directors are members of the Board (collectively "Director Defendants") and include: McCallister (President, CEO, Director), Jones (Chairman of the Board), D'Amelio (Director), Dunbar (Director), Hilzinger (Director), McDonald (Director), O'Brien (Director), and Reynolds (Director). The Director Defendants have primary fiduciary oversight of the Plan including its management and administration, management and disposition of assets, and appointing, monitoring, and removing fiduciaries. The Director Defendants have access to non-public Company financial information, corporate documents, etc. They participate in the issuance of statements including press releases and SEC filings. The Humana Officers include Bloem and Murray (collectively "Officer Defendants"). The Officer Defendants are privy to confidential information concerning Humana, participate in day-to-day management of the Company, participate in preparing public statements, and communicate with Plan participants. They have authority with respect to management and administration of the Plan and its assets.

**\*4** The Director Defendants appointed several committees to administer and manage the Plan. The Compensation Committee, including Hilzinger (Chairman), Dunbar, and McDonald (collectively "Compensation Committee Defendants"), administers the programs, reviews management development planning status and policies, and monitors compensation actions by management. The Investment Committee, including Dunbar (Chairman), D'Amelia, and O'Brien (collectively "Investment Committee Defendants"), assists the Board in establishing investment objectives and policies for employee benefit plans and reports to the full Board on Committee actions. The Plan Committee, including Hathcock (Senior VP, Chief HR Officer), Triplett (Director of Associate Benefit Programs and Policy), and John Does (committee members) (collectively "Plan Committee Defendants"), is responsible for making all policy decisions under the plan and reviews and rules on any claims that may have been appealed. It also is responsible for day-to-day administration and management of the Plan.

## II.

Plaintiffs brought this action on behalf of the Plan and as individuals, as a class action. The complaint alleges four separate counts, all of which arise from the common circumstances detailed above. When Humana restated its earnings projections for FY 2008 on March 12, 2008, the price of Humana shares declined precipitously, causing the value of many Humana employee pension plans to decline as well. Though stated in four separate counts, the main thrusts of Plaintiffs' grievances are that the individual Defendants should have been suspicious about the earnings projection; should

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

have investigated the accuracy of those projections; and in doing so would have discovered that the new pricing would lead to different conduct by both non-plan members and plan members than projected.

Count I alleges a breach of fiduciary duties of loyalty and prudence. Plaintiffs claim that Defendants knew or should have known that Humana stock was not an appropriate investment due to the inaccurate reporting of information which caused the incorrect earnings projections; that Defendants did not protect the Plan from losses arising from the non-disclosed problems; and that Defendants fostered a positive attitude toward Company stock by not disclosing negative material information. Plaintiffs also claim that Defendants prevented Plan participants from knowing the true risks of the Humana stock investment. Plaintiffs generally assert three grievances: (1) that Humana should not have continued matching contributions entirely in Humana common stock, (2) that the Plan participants' investments in the HSF should not have been left 98% in Humana common stock, and (3) that Plan participants should have been discouraged or told not to continue their investments in HSF.

Counts II and IV allege claims integral to those in Count I. Count II asserts a breach of fiduciary duties for failing to provide complete and accurate information to Plan participants. Plaintiffs allege that Defendants conveyed inaccurate information about the soundness of Humana stock and the prudence of investing in it, and failed to inform the Plan participants about Humana's internal control problems. Count IV asserts a breach of duty to adequately monitor other appointed fiduciaries who actually made the mistaken earning projections.

*5 Count III is slightly different, alleging a breach of individual Defendants' duty to avoid conflicts of interest. In support of that assertion, Plaintiffs cite Bloem, Jones, McCallister, and Murray's sales of their personal Humana stock in November, December, and January. Plaintiffs also claim that Defendants placed the Company's interests over the Plan by failing to investigate the investment decisions; continuing to offer Humana stock as an investment option; and maintaining the Plan investment in Humana stock.

Plaintiffs seek their lost profits from investing in Humana stock instead of other funds available within the Plan at the same time. They also seek to recover their losses incurred by investing their retirement funds in Humana stock when the stock price was artificially inflated as well as those losses incurred when Humana stock declined once the earnings projections were adjusted. Finally, Plaintiffs seek a constructive trust over all amounts by which the Defendants benefitted as a result of their breaches.

**III.**

A court should dismiss a complaint pursuant to Fed.R.Civ.P. 12(b)(6) "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *H. J., Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 249-50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (citation and quotation omitted). While the Court must "view the complaint in the light most favorable to the plaintiff [and] treat all well-pleaded allegations therein as true," *Amini v. Oberlin College,* 259 F.3d 493, 497 (6th Cir.2001), it is not required to accept as true "unwarranted legal conclusions and/or factual allegations." *Harvey v. Great Seneca Fin. Corp.,* 453 F.3d 324, 327 (6th Cir.2006). As the Supreme Court recently held, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citation omitted) (alteration in original); *see also Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009) (applying *Twombly* to all civil matters).

The strongest argument against dismissal is that discovery will lead to evidence supporting the claims. The Court will bear this argument in mind

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

as it analyzes each claim.

### IV.

Count I of the complaint alleges that Defendants breached their fiduciary duty of prudence and loyalty by (1) failing to liquidate or diversify the existing individual and matching fund investments in Humana stock; (2) failing to advise or discourage Plaintiffs from continuing to invest in Humana stock; and (3) continuing to invest matching funds in Humana stock.

### A.

ERISA "imposes far-reaching standards governing the operation of [employee pension and welfare benefit] plans, including a set of 'standards of conduct, responsibility, and obligation for fiduciaries' entrusted with management of the plans." *Corley v. Hecht Co.,* 530 F.Supp. 1155, 1160 (U.S.D.C.1982) (citations omitted). Fiduciaries who exercise discretionary management and administrative authority must meet a "prudent man" standard of care. 29 U.S.C. § 1104. That standard itself has three components. *Kuper v. Iovenko,* 66 F.3d 1447, 1458 (6th Cir.1995). "The first element is a 'duty of loyalty' pursuant to which 'all decisions regarding an ERISA plan 'must be made with an eye single to the interests of the participants and beneficiaries.' " *Id.* at 1458 (quoting *Berlin v. Mich. Bell Tel. Co.,* 858 F.2d 1154, 1162 (6th Cir.1988)) (internal citations omitted). Second, ERISA imposes a "prudent man" obligation, which is " 'an unwavering duty' to act both 'as a prudent person would act in a similar situation' and 'with single-minded devotion' to those same plan participants and beneficiaries." *Id.* (quoting *Berlin,* 858 F.2d at 1162). Third, ERISA fiduciaries must avoid conflicts of interest, as they "must act for the exclusive purpose of providing benefits to plan beneficiaries." *Id.* (quoting *Berlin,* 858 F.2d at 1162) (internal quotations and citation omitted).

**\*6** When applied to eligible individual account plans ("EIAPs") and employee stock ownership plans ("ESOPs"), however, these duties are modified. 29 U.S.C. § 1104(a)(2). These plans are ex-

empt from any requirement to diversify plan investments and the prudence requirement, when the plan invests in qualifying employer securities. *Id.* Congress specifically exempted both plans to encourage investment in employer stock. *Kuper,* 66 F.3d at 1458 (quoting *Donovan v. Cunningham,* 716 F.3d 1455, 1466 (5th Cir.1983)); *See also Edgar v. Avaya, Inc.,* 503 F.3d 340, 347 (3d Cir.2007). Nevertheless, a plan may not "completely prohibit diversification of [EIAP] assets," because doing so would "override ERISA"s goal of ensuring the proper management and soundness of employee benefit plans." *Id.* at 1457.

Accordingly, a strict standard of review does not apply to EIAP fiduciary investment decisions. *Id.* at 1459; *See also Moench v. Robertson,* 62 F.3d 553, 570 (3d Cir.1995) (stating that strict scrutiny review would render the diversification exception essentially meaningless). Instead, EIAP fiduciary decisions are reviewed for abuse of discretion. *Kuper,* 66 F.3d at 1459. [FN2] Under that standard, the Court "presume[s] that a fiduciary's decision to remain invested in employer securities was reasonable." *Id.* Reasonableness is presumed whether the claim is failure to diversify or failure to liquidate. *Id.* at 1457, 1459. A fiduciary still has a duty to investigate whether an investment decision is appropriate. *Id.* at 1459. But a failure to investigate is only actionable if "an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Id.* at 1460.

> FN2. Although the plan in *Kuper* was an ESOP, the Sixth Circuit based its holding on the statutory provision that excepts both ESOPs and EIAPs from the diversification requirement. *Kuper,* 66 F.3d at 1459. The statutory provision makes no distinction between the two plans. 29 U.S.C. § 1104(a)(2). The Court finds no reason to distinguish between ESOPs and EIAPs for purposes of determining whether a fiduciary's actions were impermissible. Furthermore, the Sixth Circuit developed its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3166651 (W.D.Ky.), 47 Employee Benefits Cas. 2441
**(Cite as: 2009 WL 3166651 (W.D.Ky.))**

standard of review from the Third Circuit standard outlined in *Moench,* 62 F.3d 553 . *Kuper,* 66 F.3d at 1458-59. In a subsequent opinion, the Third Circuit explicitly stated that the abuse of discretion standard applied to both ESOPs and EIAPS. *Edgar v. Avaya, Inc.,* 503 F.3d 340, 347-48 (3d Cir.2007).

The " *Kuper* " presumption of prudence thus "requires fiduciaries to divest their plans of company stock only when holding it becomes so risky-that is, so imprudent-that the problem could not be fixed by diversifying into other assets." *In re Ford Motor Co. ERISA Lit.,* 590 F.Supp.2d 883, 892-93 (E.D.Mich.2008). The Sixth Circuit has held that the fiduciaries' decision to hold company stock while aware of events that would continue to cause the stock to decline in value was reasonable. *See Kuper,* 66 F.3d at 1460 (stating that the plaintiffs' allegations were insufficient to rebut the presumption). The stock price in *Kuper* declined from more than $50 per share to approximately $10 per share. *Id.*

As an example, in *DiFelice v. U.S. Airways, Inc.,* U.S. Airways employees brought a class action challenging the fiduciaries' investments in company stock. 497 F.3d 410, 414 (4th Cir.2007). The fiduciaries included high-ranking company officers. During the class period, U.S. Airways faced serious financial hurdles, calling its viability into doubt. U.S. Airways even began considering filing for bankruptcy, but believed that it could successfully restructure voluntarily. The Fourth Circuit concluded that even a showing that the company offered company stock during a time of grave uncertainty for the company was insufficient to overcome the presumption. *Id.* at 425. Other circuits have reached similar conclusions. The Ninth Circuit stated that "[m]ere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence" to rebut the *Kuper* presumption. *Wright v. Or. Metallurgical Corp.,* 360 F.3d 1090, 1099 (9th Cir.2004) (holding

that fiduciaries are not required to diversify EIAPs "upon each subsequent rise in share value attributed to a merger or ... any other major corporate development"). The Fifth Circuit concluded that where "[t]here is no indication that [the company's] viability as a going concern was ever threatened, nor that [the company's] stock was in danger of becoming essentially worthless," the plaintiffs had not overcome the presumption. *Kirschbaum v. Reliant Energy, Inc.,* 526 F.3d 243, 255 (5th Cir.2008).

**\*7** This standard of "presumed reasonableness" and its application in the above circumstances seem to set an appropriately high barrier for moving forward in cases of this kind.

**B.**

Plaintiffs first claim that Defendants breached their fiduciary duties by miscalculating the PDPs and projected earnings for FY 2008 and that Defendants failed to investigate those mistakes. However, Plaintiffs do not allege that Defendants themselves actually made the mistakes. They blame the mistakes on "internal control problems" and "old software." If Defendants did not make the mistakes, the mere fact that the mistakes were made cannot, by itself, be sufficient to allege a breach of Defendants' fiduciary duties. Plaintiffs must show that a reasonable fiduciary would have investigated and discovered the mistakes.

Plaintiffs provide no facts suggesting that Defendants actually knew of the problems leading to the errors in the PDPs pricing or the errors in the projected earnings. No where in the Complaint does Plaintiff articulate how any Defendant knew of the problems or why any Defendant would have known about the software problems. Plaintiffs only identify each Defendant's position with the Company [FN3] and assert that Defendants knew or should have known about the internal control problems and the old software. Although the Court accepts all factual allegations in the Complaint as true at this stage, it is not called to accept a conclusory and speculative inferences. There must be more than a formulaic recital of the elements of a claim. The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3166651 (W.D.Ky.), 47 Employee Benefits Cas. 2441
**(Cite as: 2009 WL 3166651 (W.D.Ky.))**

fact of the mistakes alone, in these circumstances, is not enough to suggest Defendant's knowledge of them or their duty to have discovered them.

> FN3. These positions, over the years, include director, senior vice president, chief financial officer (full-time and interim), treasurer, chief operating officer, market and segment operations, service operations, health plan division, chief human resources officer, and director of associate benefit programs and policy.

Still, Plaintiffs contend that the necessary inference could arise from the known facts. Plaintiffs make much of the discrepancy between the actual 6% utilization and the projected 15% utilization of tier III drugs used to set the PDP premiums. Plaintiffs contend that such a discrepancy is questionable on its face and was sufficient to put Defendants on alert that an investigation was needed. This argument is undercut by the fact that the discrepancy involved a mere projection of human behavior rather than a known and quantifiable set of data. In other words, the employees making the estimates were not dealing with known behaviors, but rather projections of it. Thus, it's likely that a reasonable fiduciary would not have known there was a problem based solely on the discrepancy.

Moreover, the Court notes that Humana had only been offering stand-alone PDPs for two years when it set its 2008 premiums. During that time, CMS was also phasing in new assessment criteria. [FN4] This also indicates that changes in projections may have been expected. Of course, Defendants did not calculate the projections themselves, but rather relied upon independent persons (independent from the fiduciaries) to do so which indicates that Defendants would likely have been able to reasonably rely on the information produced by these professionals and would not have been alerted to a need to investigate. In fact, Plaintiffs allege no facts showing that a similarly situated fiduciary would have investigated based on the discrepancy in the utilization projections.

> FN4. Although Defendants are sophisticated and educated players in the health care benefits market, two years of specifically relevant information provides scant basis for questioning the projections. Adding to the confusion, between 2005 and 2007 CMS transitioned its reimbursement model to use new factors.

**\*8** Even if Plaintiffs did allege sufficient grounds to suggest Defendants should have further investigated the EPS guidance or the underlying utilization projections, Plaintiffs must also allege that an investigation would yield different results; i.e. an investigation would have shown the fiduciaries their error. Therefore, the Complaint must contain either facts supporting that the projections were obvious miscalculations or that the data used was clearly inaccurate. While in hindsight the projections may have been inaccurate, there is nothing to show that they were miscalculated in their original form. Plaintiffs do allege that the computer software used to make the projection was old and, thus, caused the variations in pricing. However, there is nothing in the complaint to indicate that Defendants should have known that the old software would produce such mistaken results. There is simply no indication that Defendants would have found the problems even if they had looked.[FN5]

> FN5. The Court also notes that a multitude of factors invariably goes in to making projections for PDP premiums. The projections are an effort to predict human behavior or in the future. Therefore, it is even less likely that if an investigation had been conducted, the fiduciaries, who reasonably rely on the work of others in calculating the premiums, would have discovered that there was an error in the calculations.

Without facts to support the conclusory allegations that a fiduciary would have discovered the problems with the PDP premiums and the projected earnings, Plaintiffs cannot maintain their claim for breach of fiduciary duty. No doubt, in hindsight,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the calculations were erroneous. The Plaintiffs may even be able to prove that some employees made mistakes. However, that does not mean that Defendants, who relied on third parties, should have recognized these mistakes. The Complaint fails to sufficiently allege any facts suggesting that Defendants knew or should have known of the software problems or any other internal control problems that would give rise to errors in the calculations.

### C.

As noted, the law has properly provided fiduciaries with significant leeway when holding their own company stock. That means that even if Defendants had a duty to investigate, and even if they had discovered the alleged errors in the calculations earlier, to continue holding Humana stock is presumed to be prudent. Because Plaintiffs damages are based on Defendants failure to divest the Plan's holdings in Humana stock and the notion that it was imprudent to continue to invest in Humana stock, Plaintiffs must allege sufficient facts that overcomes the high presumption of prudence in maintaining and investing in Humana stock. The Court's review concludes, as a matter of law, that the continued investment in Humana shares was not improvident.

The Court looks to the complaint for allegations that could rebut the presumption. The decline in Humana's stock price is an insufficient rebuttal. Here, the mistaken original earnings guidance would not have led a reasonable fiduciary to conclude that the investment itself was so risky as to be improvident because it did not disguise an underlying weakness in the business or its future viability. The Court takes judicial notice that events subsequent to March, 2008, have shown that an investment in Humana stock is not so risky that it would be an abuse of discretion for the fiduciaries to continue it.

**\*9** Additionally, had Defendants divested the Plans of Humana stock at any time prior to the March 12 announcement, they would have faced potential liability under securities laws for insider

trading. *See Edgar v. Avaya, Inc.,* 503 F.3d 340, 350 (3d Cir.2007) (stating same). Fiduciaries cannot be required to subject themselves to securities liabilities in order to avoid breaches of fiducial duties. This is one of the underlying policy reasons for the presumption itself.

Finally, once the mistake was made, which as discussed above was not a breach of Defendants' fiduciary duties, continuing to invest in the stock could not have caused the claimed injury. Given the efficient market hypothesis, the stock market price would have decreased whenever the information about Humana's errors in its earnings guidance was released. Waiting until March 12 did not exacerbate or prevent any losses as the market accurately reflected the true effect of the information that the earnings guidance was wrong. Therefore, as *Kuper* supports, this Court should presume that Defendants acted prudently.

For the foregoing reasons, the Court finds that the allegations contained in Count I of the Complaint are insufficient to state a claim upon which relief can be granted and must be dismissed.

### V.

Count II alleges a breach of the fiduciary duty ERISA imposes to convey complete and accurate information to plan participants. *James v. Pirelli Armstrong Tire Corp.,* 305 F.3d 439, 452 (6th Cir.2002). This is actually a negative duty not to misinform and an affirmative duty to provide information when silence might be harmful. *Id.* ERISA specifically delineates the disclosure duties. 29 U.S.C. §§ 1021-26. Fiduciaries, need only to disclose the specific information the statute delineates. *Sprague v. GMC,* 133 F.3d 388, 405 (6th Cir.1998) (stating that "ERISA's fiduciary standards [cannot] be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed."). Material information must be communicated but not misrepresented. *James,* 305 F.3d at 452. Even negligent material misrepresentations to plan participants can breach ERISA fiduciary duties. *Pfahler v. Nat'l*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3166651 (W.D.Ky.), 47 Employee Benefits Cas. 2441
**(Cite as: 2009 WL 3166651 (W.D.Ky.))**

*Latex Products Co.*, 517 F.3d 816, 830 (6th Cir.2007). "A misrepresentation is material 'if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision.' " *Pfahler*, 517 F.3d at 831 (citing *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir.2002)).

Courts have not generally attach ERISA fiduciary duties to confidential business details like internal controls or pricing decisions. *See, e.g., Banks v. Healthways, Inc.*, 2009 WL 211137, at *3 (M.D.Tenn.2009) (stating that there is no affirmative duty to disclose non-public information regarding the company's financial condition); *In re Goodyear Tire & Rubber Co. ERISA Litig. .*, 438 F.Supp.2d 783, 794 (N.D.Ohio 2006) (concluding that business decisions do not constitute fiduciary actions); *In re Ferro Corp. ERISA Lit.*, 422 F.Supp.2d 850, 864 (N.D.Ohio 2006) (holding that defendants did not have a duty to disclose non-public information about alleged accounting irregularities). *But cf. Brieger v. Tellabs, Inc.*, 2009 WL 1565203, * 15 (N.D.Ill.2009) (stating that a fiduciary can avoid tension between ERISA fiduciary duties and security responsibilities by simultaneously disclosing business information to plan participants and the general public). In *Edgar v. Avaya*, the plaintiffs alleged, as Plaintiffs do here, that the employer had made public statements and forecasts that misled plan participants about the company's future earnings prospects. 2006 WL 1084087, *2 (D.N.J.2006). The New Jersey District Court dismissed the claim, concluding that the plaintiffs offered "nothing more than a hindsight view of the Company's prior statements to support conclusory allegations that these prior statements were inaccurate and misleading at the time they were made ." *Id.* at *26-27. The Court concludes that this reasonable approach applies here.

**\*10** As a consequence, for instance, the Third Circuit has concluded that plan fiduciaries did not breach their duty of disclosure by informing plan participants of several adverse corporate develop-

ments in the company earnings announcements and not earlier. *Edgar v. Avaya, Inc.*, 503 F.3d 340, 350-51 (3d Cir.2007).[FN6] Moreover, the duty not to make material misrepresentations does not impose a "duty of clairvoyance." *Swinney v. Gen. Motors Corp.*, 46 F.3d 512, 520 (6th Cir.1995) (quoting *Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1163-64 (6th Cir.1988)). Thus, the Plans were not entitled to know about the earnings restatements before everyone else in the market.

> FN6. It follows that the preparation of SEC filings is not a fiduciary act for purposes of ERISA, even if the SEC filings are incorporated by reference into ERISA documents. *See Kirschbaum v. Reliant Energy. Inc.*, 526 F.3d 243, 257 (5th Cir.2008) (stating that statements made by fiduciaries in securities filings are not generally made in a fiduciary capacity); *Shirk v. Fifth Third Bancorp*, 2009 WL 692124, * 16 (S.D.Ohio 2009); *Crowley v. Corning. Inc.*, 234 F.Supp.2d 222, 228 (W.D.N.Y.2002); *Mellot v. ChoicePoint. Inc.*, 561 F.Supp.2d 1305, 1317 (N.D.Ga.2007); *But cf. Varity Corp. v. Howe.* 516 U.S. 489, 504, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (stating that SEC statements are actionable under ERISA only to the extent that they are specifically tied to plan benefits); *In re Ferro Corp. ERISA Litig.*, 422 F.Supp.2d at 865 (stating that incorporating allegedly false SEC filings into plan documents does create a cause of action). This means simply that including incorrect statements in an SEC filing does not create a cause of action here.

Thus, the responsibility here is two-fold: one, the fiduciaries must ensure that any statements they do make are truthful and two, the fiduciaries must make complete statements. Of course, to make a claim of omission, Plaintiffs must identify the additional information that was required to be dis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3166651 (W.D.Ky.), 47 Employee Benefits Cas. 2441
**(Cite as: 2009 WL 3166651 (W.D.Ky.))**

closed. *In re Huntington Bancshares Inc. ERISA Litig.,* 2009 WL 330308, *11 (S.D.Ohio 2009) (citing *Twombly,* 127 S.Ct. at 1965-66).

The law does not require that fiduciaries share every piece of information they know with the beneficiary, particularly where that information is not known to be relevant or material. Plaintiffs claim that Defendants omitted information about the old and malfunctioning data processing software. Such information cannot properly be considered material. The day to day mechanics of the business, although they may impact material information, are themselves to a large extent mundane. Although the fiduciary relationship imposes important duties, the requirement of disclosure of mechanical and managerial details goes too far. Material information includes the earnings projections, prospective gains, and prospective losses, not each piece of raw data or formula underlying those conclusions. Knowing how the claims processing software worked would not have a substantial likelihood of helping a reasonable employee make an informed investment decision. The connection between the processing software and the financial health of the company is a complicated chain of connections. Defendants do not have a duty to disclose every link in that chain. Since the state of the data processing software is not material, Defendants had no duty to disclose it.

Defendants could only have failed in their duty to disclose accurate material information by disclosing flawed earnings guidance published in Humana's SEC filings, and then repeatedly publicizing it. Since Defendants did eventually disclose the error, the claim must be that the information should have been disclosed earlier. The Court must look, therefore, at the moment the disclosure was originally made to assess whether Defendants breached that duty. The allegation is initially suspect because it is not clear that the company made SEC filings and other publications that could be considered fiduciary statements. Even assuming that the statements are fiduciary statements does not end the analysis.

*11 The Court has thoroughly examined what Plaintiffs allege Defendants knew or should have known at the time of the disclosure in Section IV of this opinion. Having found Plaintiffs provided no basis to support that Defendants did or should have known of the errors, the Court finds no information that Defendants needed to disclose as fiduciaries.

**VI.**

Count IV is entirely encompassed by Counts I and II. It alleges a breach of Defendants' duty to monitor other fiduciaries and those appointed to manage and administer the plan. *See* 29 U.S.C. § 1105(a) (providing that one fiduciary may be liable for another fiduciary's breaches). Fiduciaries cannot breach that duty to monitor if the monitored fiduciaries did not breach a duty. *Pedraza v. Coca-Cola Co.,* 456 F.Supp.2d 1262, 1278 (N.D.Ga.2006) (stating that there must be a primary breach to create a cause of action).

It is appropriate to dismiss a failure to monitor claim when Plaintiffs fail to adequately allege any breaches of fiduciary duty. *Ward v. Avaya Inc.,* 299 Fed. Appx. 196, 202 (3d Cir.2008); *Edgar,* 503 F.3d at 349 n. 15; *Brieger v. Tellabs, Inc.,* 2009 WL 1565203, *18 (N.D.Ill.2009); *In re Huntington Bancshares Inc. ERISA Litig.,* 2009 WL 330308, *11 (S.D.Ohio 2009). Plaintiffs failed to sufficiently allege any underlying breach of fiduciary duty. Thus, no primary breach by a monitored fiduciary exists. Without a primary breach, the supervisory fiduciaries cannot be liable for a failure to monitor.

**VII.**

Count III of the complaint alleges Defendants failed to resolve two conflicts: (1) Plaintiffs allege that Defendants protected their own personal interests and the Company's interests because they artificially maintained a high price for Humana stock by not selling the Plan's stock when it was imprudent to hold it; and (2) Plaintiffs allege that Defendants sold their own stock as Company insiders (profiting by $26M).

Being both a plan fiduciary and a corporate of-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ficer causes the fiduciary to wear two hats. *Pegram v. Herdrich*, 530 U.S. 211, 225, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). Those hats, however, must only be worn one at a time. *Id.* A corporate officer who is a plan fiduciary, therefore, often confronts potential conflicts of interest resulting from their duty of loyalty. High company officials who sell personally-owned company stock while using the company fund to purchase more shares or who use the Plan for the purpose of propping up the stock price in the market suggest a breach of the duty of loyalty. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 422 (4th Cir.2007).

Having already concluded it was prudent for the Plan to continue to hold Humana stock, the Court cannot find a conflict of interest for continuing to invest in the same stock. For the Plan to invest in Humana stock did not artificially protect the Defendants' personal interests or the Company's interests by somehow maintaining a high price for the stock. Defendants had no duty to sell the Plan's stock, and in fact may have breached their duty to follow the terms of the plan had they divested.[FN7] Nothing Defendants did could be construed to have subverted the Plan's interests.

> FN7. The Court recognizes that Plaintiffs allege in the Complaint that the Plan terms allow the fiduciary to divest any investment in Humana Stock. (Compl.¶ 34). That plan document contradicts the SPD, and the Court has been informed that the plan language Plaintiffs cite was adopted after the time at issue.

**\*12** Defendants were following the Plan's explicit terms, as stated in the SPD, by investing Plan assets in Humana stock. Even though Directors sold some of their own stock, there is no allegation of suspicious activity apart from Plaintiffs' allegations that those sales occurred during the time that the stock price was allegedly inflated. To make such an accusation necessitates the fiduciaries played an active and intentional role in inflating the stock price; but the stock price was not artificially in-

flated. The allegations do not suggest anything more than poor judgment on the part of the fiduciaries who relied on well-reasoned and researched advice in determining the earnings projections. To the extent that Plaintiffs' allegations contend that the Directors were trading on insider information, such a claim should sound in securities law.

Having found the allegations insufficient to support an action for breach of fiduciary duty, the Court need not address whether this action was properly raised under § 502(a)(3) and § 502(a)(2). The Court will dismiss all claims regardless of how they were alleged.

The Court will issue an order consistent with this Memorandum Opinion.

W.D.Ky.,2009.
Benitez v. Humana, Inc.
Slip Copy, 2009 WL 3166651 (W.D.Ky.), 47 Employee Benefits Cas. 2441

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.