Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


- - - - - - - - - - - - - -X

JACK REESE, et al.,            :

        Plaintiffs,    : Case No.

vs.                           : 2:04-cv-70592-PJD-PJK

CNH GLOBAL N.V. and CNH       :

AMERICA LLC,                  :

        Defendant.    :

- - - - - - - - - - - - - -X



Deposition of MARK L. LYNNE

Baltimore, Maryland

Friday, January 17, 2014

9:39 a.m.


Job No.   1-243549

Pages:    1 - 197

Reported by:  Dana C. Ryan, RPR, CRR

1    prepared.

2        Q    Okay.  Now, looking at the same -- on

3    page 7, numbered paragraph number 1, this also

4    says, Charts showing projected costs under the

5    current plan are attached as Exhibit 3; correct?

6        A    Yes.

7        Q    Does Exhibit 5 have charts attached to

8    it?

9        A    Yes.

10       Q    Was it your intent that the charts that

11   are attached to Exhibit 5 would be in Exhibit 4?

12       A    Yes, they were -- yes.

13       Q    Do you recall making any changes to

14   Exhibits 3 and Exhibits 4 to Exhibit 5, your June

15   expert report, between June 3rd and

16   September 24th?

17       A    No.

18       Q    So if we look at the charts attached to

19   the initial expert report and use them in

20   combination with the September expert report,

21   would that be fair?

22       A    Yes.

1        Q      Okay.  Let's look back at Exhibit 4.

2     It's the more current one.  Let's look at

3     paragraph 5.

4        A      What page is that?

5        Q      That's on page 8.  I apologize.

6        A      Okay.

7        Q      Now, you project that a

8     Medicare-eligible retiree will have to pay $2,138

9     out-of-pocket in 2013 under the proposed plan

10    instead of 130 under the current plan; correct?

11       A      2,176 compared to 138, I believe.

12       Q      Okay.  I apologize for misreading the

13    number.  It was not intentional.

14              That projection is still less than $200

15    a month, isn't it?

16       A      Yes.

17       Q      Now, you say that the 2022 projection

18    of 3,735 is 26 times that of the current plan;

19    right?

20       A      2,607 percent, yes.

21       Q      That's comparing the projection for the

22    proposed plan under 2022 with the current plan,

1    2013; right?

2         A     (Witness reviews document.)  Yes.

3         Q     If you were to compare it, though, to

4    the 2013 projection for the proposed plan, it's

5    only about a 70 percent increase; isn't that

6    correct?

7         A     Do I get to use a calculator?

8         Q     I don't mind.  I'm certainly not

9    pretending you're a computer.

10        A     So you are comparing in Section 5 the

11   3,735 to the 2,176?

12        Q     Correct.

13        A     Seventy-three percent.

14        Q     And that's about the same -- and the

15   2032 projection, $7,143, is about 228 percent of

16   the 2013 projection under the -- under the

17   proposed plan; correct?

18        A     Well, it's 3.3 times as much, yeah.

19        Q     Aren't those about the same levels of

20   increase under the current plan?

21        A     Well, they're three times higher in the

22   current plan versus 3.8 but off a very different

MARK L. LYNNE - 1/17/2014

1    base.

2        Q    But aside from the first-year increase,

3    you would agree that the -- for Medicare eligible

4    participants, the rate of out-of-pocket increase

5    is roughly the same under the current and proposed

6    plan year to year?

7        A    It's higher in the proposed plan.

8        Q    Even after the first year?

9        A    Well, comparing 2032 to 2013, the one

10   is a factor of 3.8 and the other is a factor of

11   3.0, so that's significant to me.

12       Q    Okay.  For the Medicare eligibles, a

13   large portion of the increased cost is the use of

14   Part D for prescription drugs; correct?

15       A    Correct.

16       Q    Now, you talk in your report about the

17   relative value of the plans, and that -- and you

18   calculate that by looking at the plan share of the

19   cost divided by combination of the cost that --

20   that the plan -- the participants pay; correct?

21       A    Yes.

22       Q    And for part -- for -- for prescription

MARK L. LYNNE - 1/17/2014

```
 1    drug plan cost or for plan cost for Medicare

 2    eligibles, you're not factoring in the amount of

 3    the benefit costs that are paid for by the

 4    government; correct?

 5         A    No.

 6         Q    You would agree that if you were to

 7    put -- if you were to factor in them to the total

 8    spending amount, the relative value numbers would

 9    be different; correct?

10         A    But the relative value I'm looking at

11    is what the employer is providing, so I don't

12    understand how that's relevant.

13         Q    Well, the current plan there's two --

14    there's two -- there's two -- there are three

15    payors; right?

16              There's the plan for the -- well,

17    there's other payors, whether it's another

18    insurance provider or Medicare, the government,

19    and the participants; correct?

20         A    For the current plan?

21         Q    Yeah.

22         A    You're talking about for the medical
```

MARK L. LYNNE - 1/17/2014

```
 1   piece that Medicare pays something?

 2        Q    Well, in the case of the medical

 3   benefits, yes.

 4             In the case of the prescription drug

 5   benefits, there's two payors; right?

 6        A    Currently.

 7        Q    Right.  And that represents the total

 8   amount that the benefits cost to all payors;

 9   right?

10        A    Yes.

11        Q    And under the proposed plan, a portion

12   of those benefit costs are going to be paid by

13   neither the company nor the participants; correct?

14        A    I mean, there is some federal subsidy,

15   but we don't know what it is.

16        Q    But it would -- you know, if you were

17   to factor that in, wouldn't it reduce the

18   amount -- the percentages by the company and the

19   participant that are paying for the benefits?

20        A    I would never look at it that way.

21        Q    Why not?

22        A    Because I'm looking at what the -- the
```

MARK L. LYNNE - 1/17/2014

```
 1    company is providing for its retirees, and

 2    that's -- I mean, they're not facing any cost for

 3    that.

 4         Q    So you don't think it's misleading to

 5    say that the participants are picking up X percent

 6    of the -- of the cost of their benefit when that

 7    ratio doesn't account for the amount that the

 8    government is paying?

 9         A    No, because we're looking here at how

10    much is in the -- the agreement between the

11    employer and the employee and who's paying what.

12    I mean, we don't look at the -- the current plan

13    now, we don't look at what the federal government

14    might be paying for Medicare and factor that in.

15    I mean, that's -- that's -- it's irrelevant to

16    what the cost is between these two parties.

17         Q    It may be -- it may be, but it is

18    relevant in calculating their share of the total

19    cost of the benefits, isn't it?

20         A    I wouldn't agree.

21         Q    You would agree, though, that if you

22    were to factor it in, the percentage of the
```

MARK L. LYNNE - 1/17/2014

```
 1    participant's share would go down, wouldn't it?

 2        A     If you were to factor it in.

 3        Q     Now, there are changes in the Part D

 4    program that will further mitigate the

 5    participants' out-of-pocket cost under Part D;

 6    correct?

 7        A     Yes.

 8        Q     Have those been factored into your

 9    analysis?

10        A     Well, we -- as I think I mentioned, we

11    had used Towers Watson's projections for the first

12    ten years, so it -- it is our understanding that

13    they -- that that was factored in, the -- the

14    decreasing of the doughnut hole.

15        Q     All right.  So you're factoring in that

16    by 2020 participants will be responsible for only

17    25 percent of the coverage gap?

18            MS. BRAULT:  Can I just ask that there

19    be a clarification when you ask questions about

20    Medicare-eligible retirees and whether you're

21    talking about the medical benefit versus the

22    prescription drugs, because I think that the
```

MARK L. LYNNE - 1/17/2014

```
 1    record has gotten quite confused on that issue?

 2         BY MR. ROGACZEWSKI:

 3         Q     I'll take the answer.

 4         A     Can you repeat the question?

 5         Q     It's your understanding that your

 6    projections are accounting for the fact that by

 7    2020 the prescription drug coverage gap under

 8    Medicare Part D will be mitigated such that

 9    participants are responsible for 25 percent of

10    those costs?

11         A     That is my understanding.

12         Q     What's the basis of that understanding?

13         A     (Witness reviews document.)  My

14    recollection of what the notes were on the Towers

15    Watson's projection spreadsheets, of what they

16    accounted for.

17               (Lynne Deposition Exhibit 6 was marked

18    for identification and attached to the

19    transcript.)

20         BY MR. ROGACZEWSKI:

21         Q     Mr. Lynne, you have in front of you

22    what's been marked as Exhibit 6, which is a CBO
```

```
1                Yes.

2        Q     And in -- and you can feel free to look

3    at charts in Exhibit 5 for this purpose, but in

4    2014 you're projecting about $200 a month;

5    correct?

6        A     Yes.

7        Q     And in 2015, the projection is about

8    $275 a month; correct?

9        A     Yes.

10       Q     Jumping forward to 2019, the projection

11   is about $600 a month?

12       A     Yes.

13       Q     Now, in 2019, though, the projection is

14   that only 10 percent of the participants will be

15   not eligible for Medicare; is that correct?

16       A     I don't know the exact number, but that

17   sounds correct.  You're going to . . .

18       Q     I try to ask first and then refresh.

19             (Lynne Deposition Exhibit 7 was marked

20   for identification and attached to the

21   transcript.)

22             BY MR. ROGACZEWSKI:
```

MARK L. LYNNE - 1/17/2014

```
 1          Q      You've been handed what's been marked

 2     as Exhibit 7.  It has the case name at the top and

 3     then it has a title Estimated Total Participants.

 4     It's dated June 3rd, 2013.  It was produced by you

 5     at page 913.

 6                 Do you recognize this document?

 7          A      Yes.

 8          Q      And what is this document?

 9          A      It was our estimate for how many

10     retirees would be in the plan -- how many

11     participants would be in the plan through 2032

12     split by pre- and post-Medicare.

13          Q      Would you agree in 2019 you're

14     projecting about 90 percent of the participants

15     would be Medicare eligible?

16          A      Yes.

17          Q      So for those participants, they're

18     paying only $315 a month in 2019; is that correct?

19          A      (Witness reviews document.)  I'm sorry.

20     How much did you say?

21          Q      315.

22          A      In 2019?
```

```
 1        Q     Correct.

 2        A     Yes, compared to less than 20 a month

 3   in the current plan, but, yes.

 4        Q     By the way, this -- Exhibit 7 projects

 5   that there will still be 13 participants that are

 6   not Medicare eligible in 2032.

 7              Do you have an opinion as to what

 8   accounts for that?

 9        A     CNH retirees either marrying young

10   spouses or having children.

11        Q     And the children --

12        A     Probably young spouses.

13        Q     Have you looked at the demographics

14   currently to see if anyone would actually fit

15   within that?

16        A     Not -- not recently.

17        Q     Is Exhibit 7 created by starting with

18   what you know to be true currently and then using

19   actuarial -- recognize actuarial estimates to

20   project forward?

21        A     Yes.

22        Q     Now, for pre-Medicare eligibles, the
```

MARK L. LYNNE - 1/17/2014

Page 69

```
1    premium is a large share of the out-of-pocket

2    costs; correct?

3         A     I would say that's reasonable to state

4    that.

5         Q     The premiums are tied to plan cost

6    increases year over year; correct?

7         A     Yes.

8         Q     So if the plan cost increases are not

9    that great in the future, the premiums would be

10   less than what they're projected; correct?

11        A     Yes.

12        Q     And under the proposed plan, both

13   participants and the plan have an incentive to

14   keep costs down; correct?

15             MS. BRAULT:  I'm sorry.  Could you

16   repeat that question?

17        BY MR. ROGACZEWSKI:

18        Q     Under the proposed plan, both

19   participants and the plan have incentives to keep

20   total plan costs down?

21        A     I'm -- I'm not sure I saw any

22   incentives built into the plan design that
```

MARK L. LYNNE - 1/17/2014

```
 1    participants; correct?

 2         A      Correct.

 3         Q      And to the extent the proposed plan has

 4    different relative values, it's because of Part D;

 5    correct?

 6         A      Well, that's -- that's part of it.

 7         Q      In the case of the Medicare eligibles;

 8    correct?

 9         A      But there's also a different medical

10    plan.

11         Q      And you're not suggesting, though, that

12    movement to a plan that treats Medicare

13    participants and pre-Medicare participants make

14    this unreasonable as a conceptual matter?

15         A      I'm sorry.  Can you state that again?

16         Q      That's fair.  It was a bad question.

17                You're not suggesting that it is

18    unreasonable to propose a plan that conceptually

19    treats Medicare-eligible participants and

20    pre-Medicare participants differently?

21         A      I mean, certainly there are plans out

22    there that do that.  There are others that simply
```

MARK L. LYNNE - 1/17/2014

Page 84

1    say you get the same benefit, but on the medical

2    side we pay after Medicare pays and go up to the

3    same place.

4        Q    But neither one is conceptually

5    unreasonable; correct?

6        A    No.

7        Q    You agree, by the way, that there is no

8    difference in quality of care between the current

9    and proposed plan; correct?

10       A    Can you define "quality of care"?

11       Q    Well, let me ask you to look at

12   paragraph 26 of -- of Exhibit 4, where you say,

13   quote, There is no difference in the quality of

14   care that will be provided under the proposed plan

15   compared to the current plan, unquote.

16            Do you still agree with that statement?

17       A    I do.

18            (Lynne Deposition Exhibit 8 was marked

19   for identification and attached to the

20   transcript.)

21       BY MR. ROGACZEWSKI:

22       Q    Now, you say that the proposed plan

MARK L. LYNNE - 1/17/2014

```
 1    has, quote, more restrictions and exclusions on

 2    coverage than the current plan, unquote; right?

 3         A     (Witness nods head.)

 4         Q     Can you identify those restrictions to

 5    me?

 6              And while you're -- since you're

 7    looking at it, you've been handed what's been

 8    marked as Exhibit 8.  It was produced by you at

 9    pages 111 through 200.  What is your understanding

10    as to what this document is?

11         A    My understanding is this was the -- the

12    plan that CNH wishes the -- this plaintiff group

13    to go into.

14              One of the restrictions that I saw can

15    be found on page B-25.  I did not see the

16    life-style prescription limitation in the previous

17    plan.  These things are not written for easy

18    finding.  Can you bear with me?

19         Q     I can.  I'm not trying to rush you,

20    believe me.

21         A     And then on page B-18, when I was

22    comparing expenses not covered between the current
```

MARK L. LYNNE - 1/17/2014

1    plan and this plan, I did not see the one at the

2    very bottom of B-18.  It begins, Any treatment of

3    teeth, gums or any oral surgery.  I did not see

4    that in the current plan.

5              And -- and then on page B-20, it's the

6    sixth bullet under, In addition.  It starts with,

7    Resulting from the treatment of weak, strained or

8    flat feet.

9              Those are the ones that I recall.

10      Q     Okay.  Any others?

11      A     Not that I can recall.

12      Q     Okay.  Well, your report doesn't

13   specify them.  That's why I'm asking.

14      A     Right, right.

15      Q     Okay.  And, so, that's why I'm asking

16   for you to identify.

17              Now, you aren't contending that a $200

18   deductible is significant, are you?

19              MS. BRAULT:  I'm sorry.  Can -- I

20   object to form.

21      BY MR. ROGACZEWSKI:

22      Q     I'll take the answer.

MARK L. LYNNE - 1/17/2014

Page 87

```
 1        A     I think when you compare it to zero, I
 2    think that's a significant change.
 3        Q     You think the increase is significant;
 4    correct?
 5        A     I think the increase is significant.
 6        Q     My question was a little different.
 7    Are you contending that a $200 deductible is
 8    significant?
 9              MS. BRAULT:  Objection to form: overly
10    broad.
11              THE WITNESS:  In the context of what is
12    supposed to be vested benefits, I think that's
13    significant.  And I think you can't just look at
14    one piece of a plan and say is that significant or
15    not.  I mean, one -- when I look at it, I think
16    you have to look at all of the increases in cost
17    sharing, and that's just one piece of it.
18    BY MR. ROGACZEWSKI:
19        Q     Standing alone, is it -- compared to
20    the plans that you work with in your business, is
21    a $200 deductible significant?
22              MS. BRAULT:  Objection to form: asked
```

MARK L. LYNNE - 1/17/2014

```
 1       A      Yes.

 2       Q      You don't disagree with him the

 3   participants are likely to choose generics more

 4   often under the current plan -- under the proposed

 5   plan than the current plan; correct?

 6       A      I would not disagree with that.

 7       Q      In fact, I think you said about one of

 8   the plans that you worked for, that was one of the

 9   design goals in one of the recent changes?

10       A      Yes, although better ways to achieve

11   it, I think.

12       Q      I think -- well, the way you said it,

13   it was to force people to use generics; correct?

14       A      Generic equivalents I don't have a

15   problem with.

16       Q      The proposed plans gives participants

17   the ability to choose, whether they want to pay

18   more for a brand or less for a generic; correct?

19       A      Well, so would -- so would that other

20   alternative.

21       Q      I'm sorry.  How is it the same to make

22   generics mandatory and to use a cost structure to
```

MARK L. LYNNE - 1/17/2014

Page 92

```
 1   incent people to choose generics?

 2       A     Because with the cost structure that's

 3   being proposed, you're forcing people who can only

 4   get a drug that is brand named to pay a much

 5   higher copay.  What I'm saying is there's --

 6   there's a better way to achieve savings by keeping

 7   co-pays where they are and telling people that if

 8   there's a generic equivalent they should get it.

 9             (Lynne Deposition Exhibit 9 was marked

10   for identification and attached to the

11   transcript.)

12       BY MR. ROGACZEWSKI:

13       Q     Mr. Lynne, you have in front of you

14   what's been marked as Exhibit 9 which has the case

15   name at the top, and it's titled Methodology for

16   Calculating Estimated Out-of-pocket Costs for

17   Highest-Using Participants.  It was produced by

18   you at page 922.

19             Do you recognize this document?

20       A     Yes.

21       Q     And what is this document?

22       A     This is what we produced to show what
```

MARK L. LYNNE - 1/17/2014

1    we felt was a worst-case scenario for participant

2    cost sharing comparing the two plans.

3        Q      This is not based on any individual

4    participant; correct?

5        A      Yeah.  I mean, we got detailed claim

6    files.

7        Q      But it's not based on a single

8    participant; correct?

9        A      Well, it's based on individual

10   participant data and -- and finding the person who

11   had the highest utilization of medical claims and

12   prescription claims.

13       Q      Is that the same person?

14       A      Not necessarily.

15       Q      So you constructed a hypothetical

16   person that had the worst-case scenario on the

17   medical side and the prescription drug side?

18       A      I was simply trying to show what the

19   worst-case scenario could be for medical and

20   prescription.

21       Q      So this doesn't represent the

22   experience of a single member of the plaintiff

MARK L. LYNNE - 1/17/2014

```
 1    class; correct?

 2        A    Not that I know of.

 3        Q    All right.  No --

 4        A    I don't think we got data to identify a

 5    person, but we were looking for the highest

 6    utilization.

 7        Q    So, as far as you know, no participant

 8    actually has the total usage that you use for your

 9    baseline; right?

10            MS. BRAULT:  You mean for the

11    non-Medicare and the Medicare combined?

12            MR. ROGACZEWSKI:  Correct.

13            THE WITNESS:  I mean, I don't -- I

14    don't know if it's one person or not for the two

15    things together, but that -- based on the data,

16    that -- that would be the, you know, highest

17    possible number we saw.

18        BY MR. ROGACZEWSKI:

19        Q    But you're not aware that any

20    participant actually experienced this total amount

21    between the drugs and the medical benefits;

22    correct?
```

MARK L. LYNNE - 1/17/2014

1        A        Correct.

2        Q        And, statistically speaking, by

3    selecting the maximum, you're selecting an outlier

4    to begin with, aren't you?

5        A        As I mentioned before, we -- in -- in

6    this kind of situation where a significant plan

7    change is being proposed, we want to see what --

8    what the worst-case scenario would be because

9    it's -- it's going to impact somebody this way.

10        Q        Did you perform a statistical analysis

11    to identify where on the spectrum these data

12    points were relative to the mean, the median?

13        A        They're the -- they were the highest

14    utilizing person we could find.

15        Q        Did you identify bands of utilization,

16    top 5 percent, meaning -- where --

17        A        This would be the top of the band.

18        Q        And how many participants have similar

19    exposures --

20        A        I don't remember how many were close to

21    these numbers.

22        Q        You just -- you just looked for the

MARK L. LYNNE - 1/17/2014

1   highest one?

2       A     We were looking at the -- at the

3   worst-case scenario.

4       Q     You didn't factor in whether the next

5   person had 10 percent less or 25 percent less or

6   2 percent less?

7       A     No, but it would surprise me if there

8   was a big difference between the top one and the

9   next one.

10      Q     But you didn't perform a statistical

11  analysis or anything like that, did you, to -- to

12  indicate that?

13      A     No.  We had done other analyses that

14  had showed averages.  We were just trying to get

15  to the worst-case scenario to see what that would

16  be because these people are on fixed incomes.

17      Q     There's nothing in your report that

18  shows the distribution of --

19      A     No.

20      Q     -- of exposures; right?

21      A     No.

22      Q     Under the drug -- under the drug

MARK L. LYNNE - 1/17/2014

```
 1    portion you say that you modeled the distribution

 2    between generic and brand and mail and retail.

 3                What does that mean?

 4        A    The data was not specific enough to

 5    identify -- it did not identify generic, brand,

 6    retail, mail.  We just estimated what it was

 7    because we could see what the total copay was and

 8    how many prescriptions there was.  So we just --

 9    we looked at what the copay was per prescription

10    depending on whether it was brand, generic,

11    retail, mail and -- and -- and made our best

12    estimate.

13        Q    And how did you make those estimates?

14        A    Just based on what we see with retiree

15    groups in general and their -- how often they use

16    generic versus brand and retail versus mail.

17        Q    Did you look at the actual -- did --

18    did you consider the usage patterns of this

19    particular class of retirees?

20        A    I mean, we -- we had overall data, so I

21    believe we did -- we factored that in.

22        Q    You looked at their past usage?
```

1    things, I think you can't ignore that there were

2    pension improvements, improvements to Medicare

3    Part B reimbursement.  There was a -- a savings

4    account that was set up.  I mean, all of those

5    things -- what -- what I'm saying is there might

6    be other things besides one plan versus another.

7          Q     Does the valuation methodology in

8    Exhibit 17 take those things into account?

9          A     I -- when I use this, I looked at the

10   plan design.

11         Q     The terms of the health care plan?

12         A     Just comparing the -- the '90 and the

13   '98, in that narrow focus, I used this comparing

14   the plan provisions.

15         Q     And you could do the same comparison

16   between the current plan and the proposed plan;

17   correct?

18         A     I could.

19         Q     And the valuation would be the same,

20   wouldn't it?

21         A     The same as what?

22         Q     Between the current and the proposed

MARK L. LYNNE - 1/17/2014

Page 149

```
 1   plan.

 2        A     It would be a different value.

 3        Q     How?  I'm sorry.  The proposed plan and

 4   the 2005 plan, you could compare those two plans,

 5   couldn't you?

 6        A     Yes.

 7        Q     And the valuation would be the same,

 8   wouldn't it?

 9        A     For the -- the -- for the medical plan

10   or the drug plan, yes.

11        Q     Which is what Exhibit 17 is all about,

12   the plan value; correct?

13             MS. BRAULT:  I'm going to place an

14   objection.

15             THE WITNESS:  It's part of -- it's part

16   of looking at it.  It's not the whole thing.

17   There are other benefits besides what this values.

18   This is just valuing the medical or the

19   prescription benefits.

20        BY MR. ROGACZEWSKI:

21        Q     And when the court -- if the court is

22   asking us to compare the -- whether or not the
```

MARK L. LYNNE - 1/17/2014

```
 1   medical benefits are roughly consistent or

 2   reasonably commensurate --

 3        A    With --

 4        Q    -- why isn't --

 5             MS. BRAULT:  Wait.

 6             THE WITNESS:  With --

 7        BY MR. ROGACZEWSKI:

 8        Q    -- why isn't --

 9             MS. BRAULT:  Wait.

10        BY MR. ROGACZEWSKI:

11        Q    -- this sufficient?

12             MS. BRAULT:  I'm going to place an

13   objection.  It's argumentative, and it's certainly

14   not what the court asked us to look at, and I

15   object.

16        BY MR. ROGACZEWSKI:

17        Q    I'll take the answer.

18             MS. BRAULT:  Form and foundation.

19        BY MR. ROGACZEWSKI:

20        Q    I'll take the answer.

21        A    As I understand it, the court is

22   looking at the comparison between the plan that
```

MARK L. LYNNE - 1/17/2014

```
 1   this class of retirees has now, which is not the

 2   2005 plan, comparing that to the proposed plan.

 3   Those are very different plans, so I'm --

 4       Q     You don't --

 5       A     -- confused about what you're asking.

 6       Q     You don't understand that one of the

 7   factors is whether or not the proposed plan is

 8   roughly consistent to what's provided to CNH's

 9   current employees?

10       A     Is -- would the class of plaintiffs

11   here get everything that was provided to those

12   people?  No.

13             So it's not consistent.  They were

14   given other things that were part of a

15   negotiation, as I understand it.

16       Q     That are not health benefits?

17       A     Right.

18             MS. BRAULT:  Well --

19   BY MR. ROGACZEWSKI:

20       Q     Okay.  Let's talk about AT&T --

21             MS. BRAULT:  I'm going to place an

22   objection to the last question to the extent it's
```

MARK L. LYNNE - 1/17/2014

Page 152

```
 1    overly broad and undefined.

 2         BY MR. ROGACZEWSKI:

 3         Q     How did you acquire information about

 4    AT&T and Lucent's plans?

 5         A     I received documents from counsel.

 6         Q     Okay.  What did you ask for to -- that

 7    resulted in getting these documents?

 8         A     Information that would -- that would

 9    provide me some -- some insight into what happened

10    with those companies and their negotiations or --

11    or results from court proceedings that -- that

12    might shed a different light than what Mr. Macey

13    was saying.

14         Q     You don't identify anything Mr. Macey

15    says about AT&T or Lucent that is factually

16    incorrect; right?

17         A     I don't think so, but I think he left

18    some things out.

19         Q     I understand that, but I want to be

20    clear that you're not identifying anything that he

21    said that was factually incorrect.

22         A     (Witness reviews document.)  I -- I
```

```
1              ACKNOWLEDGMENT OF DEPONENT
2                 I, Mark L. Lynne, do hereby acknowledge
3      that I have read and examined the foregoing
4      testimony, and the same is a true, correct and
5      complete transcription of the testimony given by
6      me and any corrections appear on the attached
7      Errata sheet signed by me.
8
9
10
11     _____        _____
12     (DATE)                       (SIGNATURE)
13
14
15              CERTIFICATE OF NOTARY PUBLIC
16     Sworn and subscribed to before me this
17     _____ day of _____, _____
18
19
20     _____        _____
21     NOTARY PUBLIC                MY COMMISSION EXPIRES
22
```

```
 1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2           I, Dana C. Ryan, Registered Professional

 3    Reporter, Certified Realtime Reporter, the officer

 4    before whom the foregoing proceedings were taken

 5    do hereby certify that the foregoing transcript is

 6    a true and correct record to the best of my

 7    ability of the proceedings; that said proceedings

 8    were taken by me stenographically and thereafter

 9    reduced to typewriting under my supervision; and

10    that I am neither counsel for, related to, nor

11    employed by any of the parties to this case and

12    have no interest, financial or otherwise, in its

13    outcome.

14           IN WITNESS WHEREOF, I have hereunto set

15    my hand and affixed my notarial seal this 24th day

16    of January 2014.

17    My Commission expires:

18    May 17, 2017

19

20    _____

21    NOTARY PUBLIC IN AND FOR THE

22    STATE OF MARYLAND
```

```
 1                 E R R A T A   S H E E T

 2     IN RE:  JACK REESE, et al. v. CNH GLOBAL N.V. AND

 3     CNH AMERICA LLC

 4     RETURN BY: _____

 5     PAGE  LINE              CORRECTION AND REASON

 6     _____ _____        _____

 7     _____ _____        _____

 8     _____ _____        _____

 9     _____ _____        _____

10     _____ _____        _____

11     _____ _____        _____

12     _____ _____        _____

13     _____ _____        _____

14     _____ _____        _____

15     _____ _____        _____

16     _____ _____        _____

17     _____ _____        _____

18     _____ _____        _____

19     _____ _____        _____

20     _____ _____        _____

21     _____        _____

22       (DATE)                    (SIGNATURE)
```

```
 1              E R R A T A   S H E E T

 2    IN RE:  JACK REESE, et al. v. CNH GLOBAL N.V. AND

 3    CNH AMERICA LLC

 4    RETURN BY: _____

 5    PAGE   LINE              CORRECTION AND REASON

 6    _____ _____           _____

 7    _____ _____           _____

 8    _____ _____           _____

 9    _____ _____           _____

10    _____ _____           _____

11    _____ _____           _____

12    _____ _____           _____

13    _____ _____           _____

14    _____ _____           _____

15    _____ _____           _____

16    _____ _____           _____

17    _____ _____           _____

18    _____ _____           _____

19    _____ _____           _____

20    _____ _____           _____

21    _____     _____

22       (DATE)                    (SIGNATURE)
```