Exhibit 5

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

JACK REESE, FRANCES ELAINE

PIDDE, JAMES CICHANOFSKY,

ROGER MILLER, and GEORGE

NOWLIN,

                Plaintiffs,

     vs.               Case No. 2:04-cv-70592-PJD-PJK

                        Hon. Patrick J. Duggan, U.S.D.J.

                        Hon. Paul J. Komives, U.S. Mag. J.

CNH GLOBAL N.V. and CNH

AMERICA LLC,

                Defendants.

_____

The Deposition of SUZANNE MARIE DANIELS, Ph.D.

Taken at 400 Galleria Officentre, Suite 117

Southfield, Michigan

Commencing at 9:28 a.m.

Friday, January 10, 2014

Before Mary Jo Power, CSR-1404, RPR, RMR, CRR

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1    A.    That's not what I was asked to look at.

 2    Q.    So you don't have an opinion on that?

 3    A.    I don't.

 4    Q.    Okay.  This -- we've been going for about -- how long?

 5          Let's go for a little bit longer.  We can get a little

 6          bit more done, I think.  I'm eager to get you out of

 7          here with appropriate dispatch.

 8                And as with the other benefit plans, you

 9          weren't asked to form an opinion as to whether the

10          Dana Corp plan was more generous, less generous, or

11          about the same as the CNH proposal here, were you?

12    A.    I was not asked to form an opinion.

13    Q.    And you don't have an opinion?

14    A.    I was not asked to form an opinion.

15    Q.    I take it --

16    A.    Beyond the scope of my work.

17    Q.    And so I take it that means you don't have an opinion.

18    A.    That is correct.

19    Q.    Thank you.

20                Dr. Daniels, your work in the health care

21          area has -- I assume that you have followed the issues

22          of some of the major entities in the Detroit area with

23          regard to their retiree health care liabilities; is

24          that right?

25    A.    Could you be more specific?
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1   Q.   Sure.

 2   A.   -- as to the entities?

 3   Q.   Sure.

 4                   You know that both business and

 5        governmental entities in the greater Detroit area have

 6        had -- have struggled with their retiree health care

 7        liabilities in recent years, right?

 8   A.   There are some entities that have struggled in recent

 9        years.

10   Q.   In fact, the former treasurer of the state of Michigan

11        opined in court just a couple of weeks ago that the

12        principal reason Detroit went into bankruptcy was

13        retiree health care benefits.

14                   Didn't you -- did you read that?

15   A.   I read that.

16   Q.   And do you disagree with that assessment?

17   A.   Detroit is far more complex than just retiree health

18        care as it relates to the bankruptcy.

19   Q.   But you would agree that the retiree health care

20        obligations of Detroit are at least a material

21        contributing factor to Detroit's decision to go into

22        bankruptcy?

23   A.   They are a factor.  I have not personally reviewed the

24        numbers to say whether or not they are material --

25        it's a material reason.
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1                    MR. BURCHFIELD:  Let me ask the reporter to
 2          mark as Daniels Exhibit 12 an article from the Detroit
 3          Free Press dated November 5, 2013, entitled Dillon:
 4          Retiree Health Care, Not Pension Shortfall, a Core
 5          Reason for Detroit Bankruptcy.
 6                    MARKED BY THE REPORTER:
 7                    DEPOSITION EXHIBIT 12
 8                    10:48 a.m.
 9  BY MR. BURCHFIELD:
10  Q.  Dr. Daniels, do you have in front of you Daniels
11      Exhibit 12?
12  A.  I do.
13  Q.  And do you see there in the first paragraph it says,
14      Former Michigan Treasurer Andy Dillon said Tuesday
15      that Detroit's retiree health care commitment was a
16      core reason why the city filed for bankruptcy and that
17      the city's pension shortfall wasn't the driving
18      factor, unquote?
19  A.  I see that language.
20  Q.  And that -- and you saw the news reports of that
21      testimony, I assume?
22  A.  I did not see this one.
23  Q.  Dr. Daniels, would you agree with me that every day
24      CNH's ability to implement the changes that it's
25      proposing in retiree health care benefits are delayed,
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1          the retirees receive a financial benefit?
 2    A.    I don't think I can answer with a simple yes or no.
 3    Q.    And what about the question do you find difficult?
 4    A.    "Every day."
 5    Q.    Well, let's say every month.  Would you agree that
 6          every month the changes that CNH is proposing are
 7          delayed that the class of retirees in this case
 8          receive a financial benefit?
 9                   MR. CANZANO:  I --
10                   THE WITNESS:  No.
11                   MR. CANZANO:  I'm going to object because
12          it assumes -- it assumes that there is a right to make
13          that change.
14                   MR. BURCHFIELD:  I don't -- I don't -- if
15          that's the way you understood the question, let me
16          make sure that that assumption is not reflected in the
17          question.
18    BY MR. BURCHFIELD:
19    Q.    In the event CNH were to have a right to make the
20          changes, every month that those changes are delayed
21          the retirees receive a financial benefit, correct?
22    A.    Retirees who access services will pay less than under
23          the proposed plan.
24    Q.    And that's a benefit to them?
25    A.    Correct.
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1   A.   It was -- yeah, 4300, because they had paid the
 2        retainer.
 3   Q.   Okay.  I'm looking at the $8,000 figure in your
 4        report, but they're current on the invoices you've
 5        tendered?
 6   A.   Yes, they are.
 7   Q.   All right.  Now let me look at -- let's look at
 8        attachment 2, which is on page 22 of Daniels Exhibit
 9        6, and can you just confirm for the record that this
10        is the list of materials that you have relied upon in
11        connection -- in preparing your report, plus any
12        additional materials cited in the footnotes of your
13        report?
14   A.   Yes, I believe this encompasses everything.
15   Q.   Okay.  Did you -- could you describe what if any
16        literature search you did in preparing your report?
17   A.   I did an extensive literature review in order to
18        address the focus that I was asked to look at, and
19        that would be the impact of changes in plan on the
20        retirees.  So I researched the current literature
21        that's published and peer reviewed to find information
22        in that area.
23   Q.   And about how many hours did you spend on that
24        extensive review?
25   A.   It's listed in here.  Three, four, five, roughly.
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1    Q.   So March 31 and June 1 I see literature review entries
 2         totaling four hours.  Is that it?
 3    A.   That's about right, yep.
 4    Q.   Okay.  And you were satisfied that your literature
 5         review in that four hours was sufficient to render the
 6         opinions that you've rendered in this case?
 7    A.   Yes.
 8    Q.   Okay.
 9    A.   I have reviewed the literature in this area before.
10    Q.   So obviously you relied upon your extensive experience
11         as an economist in the health care area, you relied on
12         your literature review you just described, you relied
13         on the documents that are listed in attachment 2 of
14         your report, and you relied upon letters submitted by
15         the individual retirees.
16              Is there anything else that you have relied
17         upon to form your opinions in this case?
18    A.   I did not rely upon the letters from the retirees in
19         the formation of my opinion.
20    Q.   Okay.  You cite them in your report.  What -- how
21         would you describe what you did with them, if you
22         don't call that reliance?
23    A.   Earlier on we talked about the report that was
24         submitted in June --
25    Q.   Um-hum.
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1   A.   -- that mirrors this report.  The difference really
 2        between the two is -- are the citations from the
 3        retiree letters, which served to provide real world
 4        examples of the cited research and my opinion.
 5   Q.   Okay.  You wouldn't say that your report rises and
 6        falls on those retiree letters, would you?
 7   A.   As I just said, they were to provide real world
 8        examples, but my opinion was based on my experience
 9        and the literature.
10   Q.   Did you find the retiree letters credible?
11   A.   Found that the retiree letters were consistent with
12        the literature, in my opinion.
13   Q.   Yeah.  We'll look at some of that in a minute.
14             Okay.  So in terms of what you relied on
15        for your opinion, your experience, the review of the
16        literature, the review of the documents listed in
17        attachment 2 to your report, anything else that you
18        relied upon for purposes of forming your opinions in
19        this case?
20   A.   I do not believe so.
21   Q.   Okay.  You did not do any field work, I assume?
22   A.   What do you mean by, "field work"?
23   Q.   You didn't go out and personally interview any of the
24        retirees?
25   A.   No.
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1    Q.   Did you find that credible?

 2    A.   Yes.

 3    Q.   Okay.  Let's look at footnote 21, which cites to a

 4         letter from a, I think, Mr. Michael Darin.  Davis, you

 5         had.  It appears to me like it might be Darin, but it

 6         does say Davis.

 7              Are you on page 12, footnote 21?

 8    A.   I am.

 9    Q.   And there the quotation is in the second paragraph.

10         It says, A plan participant writes, Any new expense

11         will completely ruin me.  If it comes down to that

12         point, I plan to stop taking my medications and let

13         nature take its course, unquote.

14              Do you see that?

15    A.   I do.

16    Q.   Does it sound to you a little suspicious that two

17         independent retirees used that same terminology?

18    A.   It's a -- no.  It's a common term of saying, I'll just

19         let nature take its course.

20    Q.   I'll stop taking my medications and let nature take

21         its course.  That didn't strike you as a suspicious

22         turn of phrase?

23    A.   No, it didn't.  It's not that atypical for people to

24         say those types of things.

25    Q.   Would you entertain a hypothesis that use of that
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1          terminology was as a result of a leading question or a
 2          comment that they might have heard?
 3    A.    I wouldn't know.
 4    Q.    Would it surprise you, or did you notice as you went
 5          through these letters, that there were a number of
 6          repetitive uses of particular phraseology in the 58
 7          letters?
 8    A.    It did not strike me.  I did not notice similar
 9          phraseology going through them, no.
10    Q.    Would that be a concern to you, if it turned out to be
11          the case, and if you had noticed it?
12    A.    Not -- it would not be a concern if it's commonly-used
13          phraseology.
14    Q.    Do you recall any of the 58 letters providing complete
15          financial information on the retiree's family?
16    A.    Would you explain a little what -- you mean, like,
17          their total income and assets and --
18    Q.    Total pension income, total social security income,
19          other income, assets.
20    A.    I don't recall letters containing that type of
21          information.
22    Q.    Would that be relevant in evaluating the credibility
23          of a retiree who is claiming that the increased cost
24          would have a devastating impact and might lead them to
25          discontinue all their prescriptions?
```

```
 1    A.    I wasn't asked to evaluate.  I didn't have income
 2          data.
 3    Q.    Well, but my question -- but I'm asking you now, and
 4          that is:  Would you find it -- and maybe you wouldn't.
 5          Would you not find total income and total asset
 6          information about a person claiming that a particular
 7          event was going to have a devastating financial impact
 8          relevant to evaluating the credibility of that person?
 9    A.    In order to -- the information that would be required
10          would be extensive; not just assets, liabilities.  It
11          also would be subjective, because what is devastating
12          to that individual might not be devastating to you or
13          I.
14    Q.    But it would at least be relevant data to determine if
15          someone's claim of complete ruin as a result of an
16          increased health care cost was credible or not?
17    A.    I don't think that it's totally true, because again,
18          it's subjective.  We may say it's not complete ruin;
19          but if they view it that way, and they're not willing
20          to continue to take their meds because they feel it's
21          financially ruinsome (sic), and they may have
22          obligations that don't show up on their own personal
23          financial statements, they're either taking care of
24          their -- like, a disabled child or grandchild or
25          something -- I don't know that we can pass that
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1       judgment.

 2   Q.  We need more information than we've got from these

 3       letters to pass that judgment, don't we?

 4   A.  I don't know why you would want to pass that judgment.

 5   Q.  Well, to the degree it is relevant that the financial

 6       impact of these changes is devastating, don't we have

 7       to address that judgment?

 8   A.  Demonstrate it with the report prior to the letters

 9       that the retirees would be adversely impacted a number

10       of different ways by the proposed changes.

11               MR. BURCHFIELD:  I ask the reporter to mark

12       as Daniels Exhibit 16 a copy of the decision of the

13       United States Court of Appeals for the Sixth Circuit

14       in Reese versus CNH America dated June 5 -- well,

15       actually dated September 13, 2011.

16               MARKED BY THE REPORTER:

17               DEPOSITION EXHIBIT 16

18               12:19 p.m.

19   BY MR. BURCHFIELD:

20   Q.  Dr. Daniels, have you read this -- have you read this

21       decision before?

22   A.  Yes.

23   Q.  And it's listed as one of the documents you rely upon

24       in attachment 2 of your expert report, item number 4,

25       correct?
```

SUZANNE DANIELS, PH.D. - 1/10/2014

1        impacted differently?

2   A.   But they're going to be impacted regardless of their

3        means.  But the extent of that impact is a

4        point-in-time observation.  You could look today and

5        say someone looks like they're all set, they're in

6        good shape.  That could change tomorrow for them.

7   Q.   So would you or would you not agree that a prudent

8        person making a determination of whether the

9        plaintiffs individually are being -- are being

10       seriously impacted by the proposed changes would look

11       at their financial background?

12                  Or if you don't think that would be

13       pertinent information for a prudent person to look at,

14       you may say so.

15  A.   I don't -- there are impacts beyond just looking at

16       cost of the change in the plan.  If the network

17       changes, providers change.  So you could look at it

18       from a financial point of view, yes, that's one piece

19       of it, but there's other pieces to the change.

20  Q.   Let's focus on the financial impact, because as I read

21       the 56 letters -- 58 letters -- that's what they were

22       focusing on, and that's what your report focuses on to

23       a large degree, financial --

24  A.   I disagree.

25  Q.   Let's focus on financial impact.  We'll talk about

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1          health care outcomes after lunch.
 2               Wouldn't you agree that, in order to
 3          evaluate the financial impact on the individuals of
 4          the class, it would be prudent to look at their
 5          financial situations?
 6     A.   If one felt that the financial aspect was critical,
 7          you could look at their financial status at a point in
 8          time, but knowing that is only a point-in-time
 9          assessment.
10     Q.   We may all die tomorrow.
11     A.   That's right.
12     Q.   But you would consider -- you would consider it
13          prudent to look at the financial information?
14     A.   No.  I said that you could look at it if what your
15          focus is -- if your focus is on assessing a potential
16          financial impact.
17     Q.   That's the question.  If we're interested in assessing
18          the financial impact on the retirees, shouldn't we
19          look at their financial information?
20     A.   If you want to look at it individually, then yes.
21     Q.   Okay.  That's all I wanted to know.  Thank you.
22               MR. BURCHFIELD:  I tell you what, why don't
23          we -- we're at probably a pretty good breaking point.
24          Let me just ask -- let me just ask a couple questions,
25          then we'll take a break for lunch, if that's okay.
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1   BY MR. BURCHFIELD:

 2   Q.   On Daniels Exhibit 19 -- do you see that?  This is the

 3        interrogatory responses by George Nowlin.  And do you

 4        see, Dr. Daniels, his income information on page 3,

 5        down at the bottom of the page?

 6   A.   Yes.

 7   Q.   Okay.  And just so you know, if you look at the first

 8        page of Exhibit 19, the caption of the case, just to

 9        confirm, Jack Reese is the lead plaintiff in this

10        case.  Do you see that?

11   A.   I see that.

12   Q.   And you see George Nowlin is also one of the named

13        class representatives in the case?

14   A.   I see that.

15               MR. BURCHFIELD:  Okay.  All right.  Let's

16        take -- let's take, you know -- do you want to take --

17        I'll take as much as you want, but I could probably do

18        30 minutes if we can get through the cafeteria in that

19        period of time.

20               MR. CANZANO:  Actually, 30 minutes is fine.

21               MR. BURCHFIELD:  Okay.  We'll do our best

22        to get through the line in the cafeteria in that

23        period of time and be back, you know, quarter after

24        one or so.

25               MR. CANZANO:  Okay.
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1           wouldn't you, that there have been at least two

 2           noteworthy changes in federal health care programs,

 3           Medicare Part D and the Affordable Care Act?

 4     A.    Could you repeat the beginning of your sentence?

 5     Q.    Sure.  You would agree with me that since 1998 there

 6           have been two noteworthy changes in federal health

 7           programs, Medicare Part D, and the Affordable Care

 8           Act?

 9     A.    I would agree that those are two of -- noteworthy

10           changes.

11     Q.    Any others you can think of?

12     A.    Those are the most major ones.

13     Q.    Any minor ones you can think of?

14     A.    No, because they're mainly tweaks.  We had Medicare

15           part C for a while if you go back, things that didn't

16           work out so well.

17     Q.    Having now looked at this letter, does it have any

18           effect one way or the other on the opinions you have

19           ventured in this case?

20     A.    No, it does not.

21     Q.    I'm going to ask you to look at -- would you look at

22           your report, Daniels Exhibit 6, note 2?

23     A.    Page?

24     Q.    And the text -- the text begins on paragraph 6,

25           carries over to paragraph 7.
```

SUZANNE DANIELS, PH.D. - 1/10/2014

1    A.    What page are you at?

2    Q.    Page 6 of your report, Exhibit 6, the September

3          report.  And let me just read it into the record.

4                   Access to health insurance plays a key role

5          in retirement decisions.  A study found that 54

6          percent of those surveyed indicated that access to

7          retiree health insurance was, quote, extremely

8          important, unquote, and another 28 percent reported

9          that it was, quote, very important, unquote.  And then

10         footnote 2.

11                   Do you see that?

12   A.    Yes, I do.

13   Q.    And in footnote 2 you cited -- there you go -- high

14         employment cite -- you cited a document from the

15         Employee Benefits Research Institute in January 2013;

16         is that correct?

17   A.    That's correct.

18                   MR. BURCHFIELD:  Let me ask the reporter to

19         mark that document as Daniels Exhibit 22.

20                   MARKED BY THE REPORTER:

21                   DEPOSITION EXHIBIT 22

22                   1:41 p.m.

23   BY MR. BURCHFIELD:

24   Q.    Dr. Daniels, after you've had a chance to look at

25         this, would you please let me know if this is, in

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1            fact, the survey that you cited in footnote 2 of your
 2            report?
 3     A.     Yes, this is the document.
 4     Q.     Now, this is a -- this is a survey, correct?
 5     A.     That is correct.
 6     Q.     They asked a number of people about what -- about, in
 7            figure 5, the impact of health insurance on their
 8            decision to retire.
 9                       Do you see that?
10     A.     Correct, I see that.
11     Q.     In looking at this document I did not see the actual
12            questions that were asked.  Did you happen to notice
13            those?
14     A.     No.  This is a survey, though, that they routinely do
15            on an annual basis, EBRI, and the methodology is
16            telephone based.  It's described on page 4.
17     Q.     It says at the bottom of page 4, The HCS, the health
18            confidence survey, was conducted between June 28 and
19            July 20, 2012, through telephone interviews with 800
20            individuals ages 21 and older.
21                       Do you see that?
22     A.     Yes, I do.
23     Q.     And given that we are -- given that the survey is
24            asking questions about the relevance of various
25            factors to a retirement decision, would it be
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1          pertinent to you to know what portion of the survey

 2          respondents were in their 20s as opposed to in their

 3          50s?

 4   A.     Well, it's a statistically-valid survey with results,

 5          so they don't -- they're not asking -- it's not a

 6          survey of just those nearing retirement age.

 7   Q.     So it wouldn't be relevant to you to know that?

 8                  MR. CANZANO:  Could you repeat the

 9          question?

10                  THE WITNESS:  Yeah, repeat the question.

11   BY MR. BURCHFIELD:

12   Q.     It wouldn't be relevant to you, I take it, to know

13          what percentage of the survey respondents were in

14          their 20s as opposed to their 50s?

15   A.     It would be.

16                  And the survey, though, the document -- and

17          without rereading the entire study, though -- they are

18          people that have worked a number of years, as

19          indicated by they've worked longer than they had

20          expected.  So this isn't someone in their 20s, if

21          you're -- referring back to the tables.

22   Q.     I'm not sure -- I'm not sure we're -- maybe we're

23          talking past each other.

24                  My question for you is:  If there were an

25          even distribution of people in their 20s, 30s, 40s,
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1         50s, and 60s, and the questions related to factors
 2         going into a retirement decision, would it bear on the
 3         credibility you've placed on the study to know that
 4         close to half of the survey respondents were 20 or
 5         more years away from retirement?
 6    A.   Well, if we refer back, this is focused on people that
 7         are closer to retirement, in my interpretation of this
 8         quickly, without going back.
 9    Q.   Where are you reading?
10    A.   If we go back to figure 1.
11    Q.   Right.
12    A.   Let's see.
13    Q.   Figure 1 is --
14    A.   I'm sorry.  I'm sorry.
15    Q.   Figure 1 is sourced to something other than the survey
16         on which you've relied.
17    A.   I need to go back and refresh my memory, but the HCS
18         is a survey that's focused on older workers and
19         savings for retirement in general as well as this
20         health care section.  So it's not 20-year-olds.
21    Q.   Well, you would agree that's not what it says.  It
22         says, The HCS was conducted between June 28 and July
23         20, 2012, through telephone interviews with 800
24         individuals, ages 21 and older.
25                   MR. CANZANO:  He's reading from right
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1          there.

 2                    THE  WITNESS:   Yeah.   But you're correct.

 3     BY MR. BURCHFIELD:

 4     Q.   And it doesn't give a margin of error for the survey

 5          that I saw.

 6     A.   No, it doesn't report that out.

 7     Q.   And it doesn't give a breakdown of what the

 8          demographic distribution of the survey respondents is

 9          that I saw.

10                    MR. CANZANO:   I'm going to object to that

11          as mischaracterizing the document.

12     BY MR. BURCHFIELD:

13     Q.   Do you see a demographic distribution of the survey

14          respondents?

15     A.   They didn't do a survey that was aimed at identifying

16          differences by demographics.

17     Q.   So I take it the answer to my question is:  No, there

18          is no demographic distribution of the 800 survey

19          respondents here?

20     A.   I can't assume that.

21                    MR. CANZANO:   I'm going to object to that.

22          Mischaracterizing the document.

23     BY MR. BURCHFIELD:

24     Q.   Okay.  Let me ask you that.

25                    Can you point me anywhere in this document
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1          that you cited in your report where it provides a

 2          demographic breakdown of the 800 people, ages 21 and

 3          older, that it surveyed from June 28 through July 20,

 4          2012?

 5     A.   I do not see it in this document.

 6     Q.   So no margin of error stated, right?

 7     A.   Not in this report --

 8     Q.   Okay.  No --

 9     A.   -- paper.

10     Q.   No demographic breakdown, right?

11     A.   Correct.

12     Q.   No --

13     A.   Based on this -- this is in a notes document and not

14          necessarily the entire research brief.

15     Q.   And no reiteration of the questions that were asked,

16          right?

17     A.   They are not contained in this document.

18     Q.   Okay.  You say, Not in this document.

19               Did you look at something other than this

20          document?

21     A.   No, I did not.

22     Q.   So as you sit here today, you don't know whether that

23          information is publicly available or not, right?

24     A.   Which information?

25     Q.   Margin of error, demographic distribution of the
```

1           sample, or -- or the questions?

2    A.    The information is likely available.  Whether it's

3           publicly available depends, because some of EBRI's

4           work, the more detailed work, is provided to their

5           member organizations and not all of it to the public.

6    Q.    But you haven't seen it?

7    A.    No.  I did not review it as part of this work.

8    Q.    Now, you know that there are empirical behavioral

9           studies that try to address the issue of health

10          insurance benefits and their effect on retirement.

11          You know that, don't you?

12   A.    I'm not familiar with behavioral studies.

13   Q.    You haven't -- are you not aware of studies that --

14   A.    I don't know what you mean by "behavioral."

15   Q.    That -- let me rephrase the question.

16                    Are you aware of any studies that, using

17          actual human behavior reacting to changes in health

18          care structures, evaluate the greater or lesser

19          likelihood of retirement?

20   A.    Not that come to mind.  It's the ones I've cited in

21          this paper.

22   Q.    You're not familiar with the Gustman and Steinmeier

23          study with the National Bureau of Economics Research

24          in March 1993?

25   A.    Quite candidly, when I did my literature review,

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1            documents, studies going back that far, are very

 2            dated.

 3    Q.     Okay.  How about --

 4    A.     I try to find things more relev -- more current.

 5    Q.     How about David Blau and Donna Gilleskie, December of

 6            2005, Health Insurance and Retirement of Married

 7            Couples, University of North Carolina Chapel Hill?

 8    A.     I don't believe that's one that I reviewed you were

 9            provided.

10    Q.     How about Coe, Khan, and Rutledge, May 2013, Center

11            for Retirement Research at Boston College?

12    A.     I don't even know if these documents -- these are

13            relevant to my work.

14    Q.     But in any event, you didn't consider any of them?

15    A.     No.

16    Q.     The only source that you relied upon for your

17            conclusion that health insurance -- that access to

18            health insurance plays a key role in retirement

19            decisions, the only external source you cite for that

20            paragraph, is the EBRI survey that we talked about?

21    A.     That and my experience.

22    Q.     Okay.  Let's talk about your experience.

23                   What -- have you done any empirical

24            analysis -- let me start more basically.

25                   Have you done any published work on the
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1          effect of health care -- of access to health care
 2          insurance on retirement outcomes?
 3    A.    No.
 4    Q.    Have you done any -- have you done any empirical
 5          research on that, which is to say, comparison of the
 6          actual retirement decisions of people under one health
 7          care regime versus another health care regime?
 8    A.    I have not.
 9    Q.    Have you done any methodical surveys of persons within
10          the range of retirement decision-making on that issue?
11    A.    No.
12    Q.    Have you conducted methodical meetings with potential
13          retirees who are considering retirement?
14    A.    From a research perspective?
15    Q.    Yes.
16    A.    No.
17    Q.    What is your experience in this area, Dr. Daniels?
18    A.    It ranges from work at the UAW, attending retiree
19          meetings, pre-retiree meetings, continued work after
20          the UAW at the Greater Detroit Area Health Council,
21          which also then involved trust funds and others, and
22          as health care costs continue to rise, there's much
23          written about individuals wanting to continue to work
24          because of the health care benefits, as well as to
25          date we see it.
```

SUZANNE DANIELS, PH.D. - 1/10/2014

 1    Q.    And others have studied those issues, but you haven't

 2          in a methodical way?

 3    A.    That's correct.

 4    Q.    Okay.  By the way, Dr. Daniels, with regard to Daniels

 5          Exhibit 22, the EBRI survey, looking back at figure 5

 6          on page 6, you would agree with me, wouldn't you,

 7          that, as that chart is constructed, it doesn't shed

 8          much light on whether the survey respondents were

 9          addressing a binary system, full health insurance, or

10          no health insurance; or whether they were addressing

11          the gradations of health insurance?

12    A.    This uses the term health insurance as a single term.

13    Q.    So that could be retire with health insurance or

14          retire without health insurance, right?

15    A.    That is correct.

16    Q.    And here we know that the changes that are being made

17          in the health program are not eliminating health

18          insurance; they are simply increasing the

19          cost-sharing, correct?

20    A.    I disagree.

21    Q.    How do you disagree?

22    A.    You're eliminate -- the prescription drug benefit is

23          eliminated under the proposed plan for the Medicare

24          eligibles.

25    Q.    But Medicare eligibles do have prescription drug

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1          coverage available to them through Medicare Part D,

 2          don't they?

 3    A.    Only if they elect to purchase such coverage.

 4    Q.    But it's available, right?

 5    A.    Well, certainly it's available, but it's eliminated.

 6    Q.    And you would agree with me that this survey, the

 7          survey results reported in table 5 of Exhibit 22,

 8          don't distinguish as to whether it's -- whether the

 9          retirees would pay for the program themselves or

10          whether they would have it provided to them?

11    A.    I don't think I'd go to that conclusion.  I disagree.

12    Q.    What --

13    A.    It says they worked longer because they wanted to

14          continue to have health care insurance through their

15          employer.

16    Q.    Based on that chart, do you draw conclusions about

17          whether the persons being surveyed there were taking

18          into account the potential availability of Medicare

19          Part D?

20    A.    I can't draw a conclusion such as that.  There's not

21          sufficient detail.

22               MR. BURCHFIELD:  Let me ask the reporter to

23          mark as Daniels Exhibit 23 a document entitled A

24          Preliminary Expert Report of Suzanne Paran --

25               THE WITNESS:  Paranjpe.
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1                    MR. BURCHFIELD:  -- Paranjpe, dated June
 2         27, 2011.
 3                    MARKED BY THE REPORTER:
 4                    DEPOSITION EXHIBIT 23
 5                    2:00 p.m.
 6    BY MR. BURCHFIELD:
 7    Q.   Dr. Daniels, do you recognize Exhibit 23 as an expert
 8         report that you submitted in the case of Thomas Temme
 9         and Shirley Temme, individually and as representative
10         of a class, versus Bemis Company, on or about June 27,
11         2011?
12    A.   Yes.
13    Q.   And is the -- is that your signature on the last page,
14         page 4 of the document?
15    A.   Yes.
16    Q.   And at that point this -- the Suzanne Par --
17    A.   Paranjpe.
18    Q.   -- Paranjpe, Ph.D., is the person we now know as
19         Dr. Suzanne M. Daniels, Ph.D., correct?
20    A.   That is correct.
21    Q.   Okay.  Great.  Just to be clear.
22                    Let me ask you to look, please, on page 3
23         of that document.  Just above The Facts Considered
24         there's a paragraph that says, It is my opinion that
25         an appropriate, alternative approach is to adjust the
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1        who were Medicare eligible?
 2   A.   That is my recollection.
 3   Q.   Okay.
 4   A.   Yes, for Daniels 25, yes for both.
 5   Q.   And are these -- both of these -- are both of these
 6        opinions, 24 and 25, from the same case, or are they
 7        different cases?
 8   A.   Just think for one second.
 9             They're separate legal actions against TRW.
10        They're different groups.
11   Q.   Okay.  And if you don't recall, just say so, but do
12        you remember what the distinguishing characteristics
13        of the two groups are in one case versus the other?
14   A.   I don't -- there's some var -- I don't exactly
15        remember, but there was some variation in benefits and
16        contributions.  But I don't recall with this one.
17   Q.   Okay.  Let's now turn back to Daniels Exhibit 7, which
18        is your rebuttal report or your addendum, if we could.
19             Do you have that in front of you?
20   A.   I do.
21   Q.   And in that report you are responding to Mr. Macey's
22        report to the degree it relies upon a Robert Wood
23        Johnson report by Katherine Swartz entitled
24        Cost-sharing:  Effects on Spending and Outcomes; is
25        that correct?
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1   A.   I -- this is in response to his section 2B3 of his

 2        report.

 3   Q.   Okay.  And you discuss in here, don't you, Dr. Swartz'

 4        paper?

 5   A.   I do.

 6   Q.   Well, I see it, I just can't get it out of the box.

 7             MR. BURCHFIELD:  Let me ask the reporter to

 8        mark that paper as Daniels Exhibit 26.

 9             MARKED BY THE REPORTER:

10             DEPOSITION EXHIBIT 26

11             2:13 p.m.

12   BY MR. BURCHFIELD:

13   Q.   Dr. Daniels, do you recognize Daniels Exhibit 26 as

14        the -- as the Cost-sharing:  Effects on Spending and

15        Outcomes paper by Dr. Katherine Swartz that you

16        discussed in your rebuttal report, Daniels Exhibit 7?

17   A.   Yes.

18   Q.   And did you -- I take it that the only source that you

19        have relied upon -- or let me start again.

20             The only source you have cited in your

21        December 16, 2013, report, Daniels Exhibit 7, is the

22        Swartz paper.

23   A.   That is correct.

24   Q.   Okay.  Now, am I correct that Dr. Swartz relied in

25        some measure on the Rand Health Insurance Experiment,
```

1        which was designed between 1970 and 1974, and

2        conducted between 1975 and 1978?

3    A.  This work by Swartz is a survey of the literature, in

4        essence, and not a study that would you cite something

5        to rely on, but rather to really summarize the

6        landscape of work that's been done in the field.

7    Q.  Okay.  I'll try to find it.

8              Let me ask you to look at the page of

9        Daniels Exhibit 26 which has the last three digits at

10       the bottom, right-hand corner 923 -- oh, I'm sorry,

11       it's the page with the heading Methodology Overview.

12             Are you with me?

13   A.  I am.

14   Q.  And it says -- it is page 7.  I see that now.  It's --

15       in the first paragraph there it says, The rapid

16       changes in medical care, along with changes in health

17       insurance cost-sharing provisions, make studies done

18       before 1990 less relevant for this review.  Because it

19       is so expensive to conduct a large, randomized

20       experiment such as the Rand -- that's R-a-n-d --

21       Health Insurance Experiment, no experiments with

22       variations in health insurance design have been

23       conducted since the HIE, the health insurance

24       experiment.

25             Do you agree with that statement?

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1    A.    That -- I agree that experiments have not been

 2          conducted, and the key word is experiments.

 3    Q.    Okay.  And then she goes on to talk about some of the

 4          studies and says, in the second paragraph,

 5          Unfortunately, many of the empirical studies of the

 6          effects of patient cost-sharing are based on

 7          cross-sectional data, which are collected at only one

 8          point in time.  The problem with using cross-sectional

 9          data to analyze the effects of cost-sharing is that

10          individuals often have some choice about the type of

11          health insurance they have, and the choice of

12          cost-sharing requirements could be driven in part by

13          how healthy a person is or how much care the person

14          expects to use.  In this case, it is hard to

15          disentangle the effect of cost-sharing from the effect

16          of, say, the individual's health.

17                    Do you see that?

18    A.    Yes.

19    Q.    And do you agree with her statement there?

20    A.    It's difficult.  Does not mean impossible.

21    Q.    Okay.  Would you look at page 10, please, under the

22          heading Findings?  And in the first bolded finding

23          there it says, Reductions in patient-initiated care in

24          response to increases in cost-sharing are likely to

25          come predominantly from the half of the population who
```

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 132

```
 1          have low medical expenses, people who most likely are
 2          healthy.
 3                    Do you see that?
 4     A.   Yes.
 5     Q.   And do you agree with that?
 6     A.   Yes.  In the context of the population that she's
 7          looking at for this report, yes.
 8     Q.   And what is your understanding of the population she's
 9          looking at here?
10     A.   Her focus of this work is on the -- those under -- the
11          non-Medicare eligibles that are covered under Health
12          Care Reform under the ACA.  That's her stated purpose
13          in the introduction.
14     Q.   Let me ask you to look at the bottom of page 11, and
15          the bolded heading says, What of the effects of
16          increased cost-sharing on health outcomes.
17                    And it says, There has not been a study on
18          the effects of increased cost-sharing on the health of
19          a general population since the Rand HIE.
20                    Do you agree with that?
21     A.   Yes.
22     Q.   And then she goes on to say -- at the end of that
23          paragraph she says, As noted above, however, the HIE
24          found that people with higher cost-sharing reduced
25          their use of both appropriate and inappropriate health
```

1        care services about equally.  One hypothesis from this

2        finding is that any negative effects due to reducing

3        appropriate health care were matched by reducing

4        inappropriate care that sometimes causes adverse

5        health effects leading to hospitalizations.

6                  Do you see that?

7   A.   Yes.

8   Q.   And I take it you mention -- you mentioned earlier the

9        Dartmouth Atlas study which talked about

10       overprescription and overutilization.  Do you remember

11       that?

12  A.   Variations in care.

13  Q.   And you would agree with me, wouldn't you, that to the

14       degree there is a reduction in usage as a result of

15       cost-sharing, some of that reduction could be reduced

16       overutilization, which can have adverse health effects

17       on the patients?

18  A.   It could have -- it could address overutilization of

19       those adverse things.

20                 Just to clarify, though, the Dartmouth

21       Atlas isn't as focused on drug overuse as medical

22       procedures.

23                 But on the other hand, cost-sharing, as in

24       this last sentence you read, clearly if someone

25       doesn't seek the appropriate care, it can result in

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1              greater costs and increased hospitalizations.  And

 2              that's the point she is making.  And which continues,

 3              the adverse effects of cost-sharing, onto the next

 4              page in her findings.

 5     Q.       But let's stay on this point for a second.

 6                       As I understand what she's saying in that

 7              last sentence on page 11, she is saying that there

 8              could be some reduction of necessary beneficial care

 9              with adverse health outcomes, but there may also be

10              some reduction of unnecessary care which would have

11              had an adverse health effect; and, she further

12              suggests, those two effects might have a tendency to

13              balance each other out.

14                       Is that not the way you read it?

15     A.       Balancing it out in terms of measuring in terms of

16              saying inappropriate and appropriate doesn't balance

17              it out for the individual involved.

18     Q.       Let me just ask this question:  What -- is there -- am

19              I correct that other than Dr. Swartz' survey of the

20              literature here, Exhibit 26, none of the reports that

21              you have submitted in this case cite any authority on

22              the issue of health effects of cost-sharing?

23     A.       That is not correct.

24     Q.       What other sources do you cite for adverse effects of

25              cost-sharing?
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
1   A.   Page 9.

2   Q.   You're on Exhibit 6?

3   A.   Yes.  A and B.

4   Q.   And I see what you're pointing to, Dr. Daniels, but as

5        I read those paragraphs, and I think I scanned those

6        studies, my recollection is that they talked about the

7        use -- patient's use of medications because of costs

8        in paragraph A, but they did not evaluate the health

9        outcomes as a result of that use -- of that reduced

10       use of medications.  Do you read it differently?

11  A.   There's a difference between short-term and long-term

12       health outcomes.

13  Q.   I understand.

14            But do you understand those -- the study

15       cited there in footnote 12, the JAMA study, do you

16       recall that that study addressed either short- or

17       long-term health consequences --

18  A.   I believe it did.

19  Q.   -- of the...

20  A.   Sorry.

21  Q.   Okay.  You believe it did?

22  A.   My recollection is that it did.

23  Q.   Okay.  And do you recall, as you sit here, what the

24       quantification of those adverse health outcomes was?

25  A.   I don't recall the quantification.
```

1    Q.    And same issue with regard to paragraph B.  The New

2          England Journal of Medicine study suggested that

3          copayments resulted in foregoing necessary outpatient

4          care, leading to increased use of hospital care, but

5          it doesn't -- that doesn't seem to me to address a

6          health outcome.

7    A.    When you think about something that could have been

8          treated on an outpatient basis, the individual ends up

9          not seeking the care due to costs, they end up in the

10         hospital, it's a higher level intensity of service,

11         means that they're not as well-off health-wise.

12                     Does it go to the end point, based on this

13         extract here, of did they die?  In some cases, maybe;

14         some cases, maybe not.

15                     But it is an issue -- I mean, it is true

16         with -- that, when you move to a higher intensity of

17         care, it's because of your health needs being greater.

18         So there is an adverse effect on ones health.

19   Q.    Do you know if the -- if the New England Journal of

20         Medicine study and the JAMA study were reviewed in

21         Dr. Swartz' article?

22   A.    I'd have to go back and cross-match it, but she had

23         similar findings that she reported in her study, as I

24         noted in my report.

25   Q.    Okay.  If you look at Daniels Exhibit 26, on page 33

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 137

```
 1          is the citation of the sources.  Source number 127

 2          seems to be, does it not, The Journal of the American

 3          Medical Association piece by Tseng, CW Tseng?

 4    A.    Yes.

 5    Q.    T-s-e-n-g?

 6    A.    Yes.

 7    Q.    Do you understand my question?  My question is --

 8    A.    I said, I believe so.

 9    Q.    Thank you.  I did not hear your answer.

10                And then the study referred to in

11          subparagraph B, is that entry number 125 in

12          Dr. Swartz' appendix?

13    A.    I would need to confirm that with my files.

14                We did provide you all the actual -- we can

15          pull that and double-check it.

16    Q.    Um-hum.  Okay.  Let me ask you to look at the

17          Swartz -- in the Swartz article, Daniels Exhibit

18          Number 26, first at page -- on page 9 just above the

19          last bold heading, and the sentence right above that

20          heading says, The newly-released rules for health

21          insurance plans created by the PPACA eliminate

22          cost-sharing for four sets of preventive services, and

23          Medicare also will no longer face cost-sharing for

24          most preventive services as of January 2011.

25                Do you see that?
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1    A.    No.

 2    Q.    I'm on page -- actually I'm on page 18.  I'm sorry.  I

 3          was looking at the footnote number.  I apologize.

 4    A.    Okay.

 5    Q.    It's the -- I'm having a hard time reading these

 6          numbers.  Maybe it's 16.  It's the page with footnote

 7          nine at the bottom, whatever that is.

 8                    MR. CANZANO:  Yeah.

 9    BY MR. BURCHFIELD:

10    Q.    Okay.  Are you with me?

11    A.    Now, yes.

12    Q.    It says -- at the last sentence before the bottom

13          heading, says, The newly-released rules for health

14          insurance plans created by the PPACA eliminate

15          cost-sharing for four sets of preventive services, and

16          Medicare also will no longer face cost-sharing for

17          most preventive services as of January 2011.

18                    Do you see that?

19    A.    I do.

20    Q.    Is that accurate, so far as you know?

21    A.    Yes.

22    Q.    And then over on page 21, under the heading Findings,

23          and this refers to -- let me just read the entire

24          paragraph.  It says, Schneeweiss and Zhang

25          specifically examined the effect of Medicare Part D
```

SUZANNE DANIELS, PH.D. - 1/10/2014

1          coverage gap on the use and out-of-pocket spending of

2          beneficiaries who reached the coverage gap.

3                    And, Dr. Daniels, you understand that to

4          mean the doughnut hole?

5     A.   Yes.

6     Q.   Okay.  Using different data sets, both studies found

7          that people who reached the coverage gap reduced their

8          use of drugs in the months after they were affected by

9          the gap.  Zhang, et al, estimated such beneficiaries

10         reduced their drug use by 14 percent, 0.7

11         prescriptions per month, and Schneeweiss estimated

12         that their use of drugs in four drug classes of the

13         study declined at the rate of 4.8 percent to 6.3

14         percent per month after they reached the gap.  Zhang,

15         et al, also had data on people who had coverage for

16         generic drugs in the coverage gap.  Some of these

17         people switched from brand name to generic drugs, but

18         in general these people reduced the number of their

19         prescriptions by only 0.14 prescriptions per month.

20                    Do you see that?

21    A.   I do.

22    Q.   And do you know, Dr. Daniels, whether in the CNH plan

23         the so-called doughnut hole is reduced as a result of

24         the out-of-pocket annual maximums?

25    A.   I'm not following you as far as the -- a doughnut hole

SUZANNE DANIELS, PH.D. - 1/10/2014

1          in the CNH plan.

2    Q.    Under Medicare Part D which the CNH -- which the

3          retirees in this case would be able to avail

4          themselves under the proposed plan, do you know if

5          there is doughnut hole protection, if you will, as a

6          result of the limit on out-of-pocket spending per

7          year?

8    A.    Typically not.

9    Q.    Do you know in this plan one way or the other?

10   A.    It would not -- under this plan the drug benefit is no

11         longer part of the medical plan benefit.  Its

12         individuals are being, under the proposed plan, asked

13         to go to the private marketplace if they want drug

14         coverage.  There's no integration done of the out of

15         pockets.

16   Q.    Let me ask you to look at the -- at the heading -- the

17         last heading there on page 21, the last finding.  It

18         says, Long-term health effects of reduced use of

19         essential drugs, especially for people with chronic

20         health conditions, are unknown.

21   A.    I would -- it's stated there, yes.

22   Q.    Pardon me?

23   A.    Yes.

24   Q.    Okay.  Are you aware of any -- of any studies to the

25         contrary?

1   A.   Actually, Swartz on page 12 discusses other studies

2        with other results relating to cost-sharing of

3        prescription drugs.

4   Q.   I understand.

5   A.   And page 12 would show an adverse effect, the last

6        sentence -- last two sentences on that page in

7        particular.

8             And arguably the Goldman study as well.

9   Q.   Okay.  But having discussed all the literature, her

10       finding is that:  Long-term health effects of reduced

11       use of essential drugs, especially for people with

12       chronic health conditions, are unknown.

13            Do you agree that's her finding on page 21?

14  A.   I would refer back and would suggest that it's her

15       conclusions that are critical.  And she has findings

16       in two sections, so I don't know how one can determine

17       that findings are findings.  They're not findings.

18            MR. BURCHFIELD:  Okay.  Why don't we take

19       about maybe five minutes.  Let me review my notes.  I

20       think I'm pretty close to being done.

21            MR. CANZANO:  Okay.

22            (Recess taken at 2:42 p.m.)

23            (Back on the record at 2:51 p.m.)

24  BY MR. BURCHFIELD:

25  Q.   Dr. Daniels, can we turn to your -- to Daniels Exhibit

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1          6, your September report?  And I'm on page 7,

 2          paragraph 9.

 3    A.    Yes.

 4    Q.    In paragraph 9 you say that, In my experience, and

 5          based on published research, retirees who are

 6          generally on fixed incomes are not able to afford even

 7          small increases in their expenses without hardship.

 8                   And it continues, and then -- and then you

 9          get to the next paragraph, says, A recent published

10          study asked retirees about their ability to pay for a

11          $2,000 unanticipated expense should it occur in the

12          next month.  The study found that only 50 percent of

13          workers and 52 percent of retirees surveyed stated

14          that they would definitely have $2,000 to cover the

15          expense.

16                   And then it says, Another published study

17          found that 40 percent of retiree households had

18          expenses that exceed their income, and over 14 percent

19          of retiree households had spending that exceeded 75

20          percent of their income.

21                   You followed all that?

22    A.    I did.

23    Q.    The study cited there in footnote 6, that's a survey,

24          right?

25    A.    That is correct.
```

```
 1    JACK REESE, FRANCES ELAINE

 2    PIDDE, JAMES CICHANOFSKY,

 3    ROGER MILLER, and GEORGE

 4    NOWLIN,

 5                    Plaintiffs,

 6      vs.              Case No. 2:04-cv-70592-PJD-PJK

 7                        Hon. Patrick J. Duggan, U.S.D.J.

 8                        Hon. Paul J. Komives, U.S. Mag. J.

 9    CNH GLOBAL N.V. and CNH

10    AMERICA LLC,

11                    Defendants.

12    _____

13

14            VERIFICATION OF DEPONENT

15

16            I, having read the foregoing deposition

17      consisting of my testimony at the aforementioned time

18      and place, do hereby attest to the correctness and

19      truthfulness of the transcript.

20

21

22            _____

23            SUZANNE MARIE DANIELS, Ph.D.

24            Dated:

25
```

SUZANNE DANIELS, PH.D. - 1/10/2014

```
 1                              ERRATA SHEET

 2

 3    PAGE  LINE  READS              PAGE   LINE  SHOULD READ

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                   _____

24                   SUZANNE MARIE DANIELS, Ph.D.

25                   Dated:
```

SUZANNE DANIELS, PH.D. - 1/10/2014

Page 148

```
 1                          CERTIFICATE

 2    STATE OF MICHIGAN

 3    COUNTY OF OAKLAND

 4

 5              I, Mary Jo Power, a Notary Public in and

 6        for the above county and state, do hereby certify that

 7        this deposition was taken before me at the time and

 8        place hereinbefore set forth; that the witness was by

 9        me first duly sworn to testify to the truth; that this

10        is a true, full and correct transcript of my

11        stenographic notes so taken; and that I am not

12        related, nor of counsel to either party, nor

13        interested in the event of this cause.

14

15

16

17

18

19

20        _____

21            Mary Jo Power, CSR-1404

22            Notary Public

23            Oakland County, Michigan

24            My commission expires:  December 12, 2018

25
```