# EXHIBIT B

# REESE, ET AL v. CNH GLOBAL N.V., ET AL

# JOHN F. STAHL

## January 14, 2014

*Prepared for you by*



## BIENENSTOCK
### NATIONWIDE COURT REPORTING & VIDEO

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

JOHN F. STAHL
January 14, 2014

---

Page 9

1    Q.  And who are they?  When you say
2  "colleagues," are they partners with you at Towers
3  Watson or colleagues?
4    A.  We don't have partners, but they are --
5  Peter is one of the senior actuaries in the
6  retirement practice who had done some of the
7  projections and the OPEB valuation that we used in
8  Exhibits 1 through 6, maybe more specifically 5 and
9  6 that are in the expert testimony report.
10       And Rebecca is also an actuary in the
11  retirement practice who worked with him in that
12  regard.  I believe she also handled some of the
13  billing, and Nick Rosales is an analyst in the
14  health care practice who did some of the work and
15  helped produce the exhibits.
16    Q.  So these are all people who worked -- are
17  they all employees of Towers Watson?
18    A.  Yes, correct.
19    Q.  And they're people that assisted you in
20  the work you did in your expert report?
21    A.  That's correct.
22    Q.  Was anybody else involved in assisting you
23  in the work that went into your expert report?
24    A.  There was one additional associate, Rob
25  DiMartino, who did some of the work in assembling

---

Page 10

1  -- some of the work on a prescription drug data,
2  and he worked briefly with one of our prescription
3  drug experts, Katie Asch, Asch.
4    Q.  I'm sorry.  Katie, you said?
5    A.  Yes.
6    Q.  A-s-c-h?
7    A.  Correct, in putting together some of the
8  prescription drug exhibits.
9    Q.  Anyone else that assisted you in the work
10  that went into your report?
11    A.  To my knowledge, no, but it's possible
12  that there were some other analysts that Nick
13  directed to pull some exhibits together, but
14  I don't believe there was a significant role that
15  they played.
16    Q.  Did you read any transcripts from any of
17  the depositions that have already occurred in this
18  case?
19    A.  No.
20    Q.  You said that you looked at your report
21  and the documents that were produced pursuant to
22  the subpoena?
23    A.  Correct.
24    Q.  Anything else that you looked at?
25    A.  To my knowledge, no.  No, I can't think of

---

Page 11

1  anything.
2       MS. BRAULT:  I am going to have this marked as
3  Exhibit No. 1.
4            (Whereupon, STAHL Deposition
5            Exhibit 1 was marked for
6            identification.)
7  BY MS. BRAULT:
8    Q.  This was the notice of deposition.
9       Now, looking at Exhibit No. 1, have you
10  seen this notice before?
11    A.  Yes, I believe I have.
12    Q.  The original notice we have, we were going
13  to take your deposition at, I think, McCorkle Court
14  Reporters, and there was a change in the location
15  which was reflected in the re-notice, which is
16  Exhibit No. 2.
17            (Whereupon, STAHL Deposition
18            Exhibit 2 was marked for
19            identification.)
20       THE WITNESS:  Okay.
21  BY MS. BRAULT:
22    Q.  But, otherwise, the notice with respect to
23  documents you were required to produce are the
24  same; would you agree?
25    A.  Yes.

---

Page 12

1    Q.  And did you bring any documents?
2    A.  I did.
3    Q.  Okay.  So you just handed me two pieces of
4  paper.  Was there anything else that you brought
5  with you?
6    A.  No.
7    Q.  Okay.  And what are these two pieces of
8  paper that you handed to me?
9    A.  They are time records indicating time
10  spent by myself or assistants as a retained expert
11  in the matter and other billing records related to
12  the expert testimony or expert report.
13    Q.  What does "WIP to bill" mean?
14    A.  Work in progress.  So there is work where
15  there has been hours billed to it, but they haven't
16  actually been billed to the client yet.
17    Q.  Does this indicate the dates on which the
18  work was done?
19    A.  I don't have it in front of me.
20       Could I see?
21       I apologize for the small print.  I can't
22  read it either.
23       This particular exhibit does not.  We
24  could produce such an exhibit, but this is a
25  summary exhibit.

---



JOHN F. STAHL
January 14, 2014

---

Page 13

1    MS. BRAULT:  How many copies do we have of
2  this?
3    MS. CAPOTOSTO:  Two.
4    MS. BRAULT:  Can I keep one and have one
5  marked?
6    MS. CAPOTOSTO:  Sure.
7    MS. BRAULT:  We might want to staple them
8  together.
9        (Whereupon, STAHL Deposition
10        Exhibit 3 was marked for
11        identification.)
12  BY MS. BRAULT:
13    Q.  So maybe you can help me understand this
14  from the second page.  This is a spreadsheet?
15    A.  Uh-huh.
16    Q.  Do you know -- I'm looking at the path
17  name for this document.  It looks like it was part
18  of a "U" drive file that's under 50412.  Do you
19  know what that is?  50412.
20    A.  It's the client code.
21    Q.  Who is the client?
22    A.  CNH.
23    Q.  And then the next thing it says is 13.  Is
24  that the year 2013?
25    A.  Yes, correct.

---

Page 14

1    Q.  And then bills would be?
2    A.  It's where billing records are stored.
3    Q.  And then the part of the billing records
4  that this would fall under would be under
5  retirement and then under Reese?
6    A.  That's correct.
7    Q.  Fair to say that you have other billing
8  that you would sent to CNH under retirement?
9    A.  I would say if I do -- I personally am
10  almost never involved in sending bills directly to
11  the client but as a company, yes.
12    Q.  You do more work for them than just --
13    A.  Correct.
14    Q.  -- what expert consulting entails,
15  correct?
16    A.  Correct.  Sorry.
17    Q.  That's okay.  Everybody talks
18  conversationally, and sometimes it doesn't work.
19        So this shows, if I am looking at it
20  correctly, a project number.  Is the project number
21  the Reese case?
22    A.  No, I believe that is a more general
23  billing code, and the way we would identify whether
24  it's a Reese case or Reese group cost would have
25  been in the associate's comment field.

---

Page 15

1    Q.  So like Q467 or T882?
2    A.  No.
3        Do you see in the associate comments?
4        Each one of those comments say Reese Group
5  or has the word Reese in there at some point.  So
6  that's how the bill preparer would have known that
7  these were costs allocated to this particular
8  project.
9    Q.  Okay.  And this indicates what the hours
10  were that they spent?
11    A.  Yes.
12    Q.  But not when they spent it?
13    A.  Correct.
14        There is another report that could be
15  produced that shows that level of detail.
16    Q.  So it says "Project LOB" at the very end.
17  What is that?
18    A.  LOB stands for line of business.  So that
19  indicates to me that this is being consolidated up
20  through the retirement practice as opposed to one
21  of our other practices.
22    Q.  Okay.  And your time is not on here,
23  correct?
24    A.  That is correct.
25    Q.  Where is your time reflected?

---

Page 16

1    A.  I believe this time -- and I could be
2  wrong -- but I believe -- no, looking at the
3  comments, it's fairly clear that this has to do
4  with providing -- the document was prepared towards
5  the end of 2013, towards the very end of 2013, that
6  went through all of the documents that were
7  prepared electronically and provided a written
8  description of the documents and what questions
9  they were intended to be responsive to in terms of
10  the document request that we received, and this
11  document is only taking into account time that's
12  gone through a certain part in our system.  I was
13  out of the office at that time, and I didn't end up
14  reviewing that until January 2.  So I believe there
15  may be another maybe two hours of my time.
16    Q.  Well, where is your time reflected at all?
17    A.  This particular time in this particular
18  summary, it's -- I didn't have any time in the
19  period of time covered by this, this summary.
20    Q.  Okay.  Did you -- okay.  So the document
21  request asks for time records indicating the time
22  spent by Mr. Stahl or his assistants as a retained
23  expert in this matter, any and all billing records
24  indicating the total consideration for work as an
25  expert in this matter.

---



JOHN F. STAHL
January 14, 2014

Page 21

1     MS. BRAULT:  No, I am going to reference it by
2   the Bates stamp number that I was given in the
3   case.  It's too large to print out and enter as an
4   exhibit.  Each particular document may not be.  I'm
5   identifying it by the Bates number that it was
6   given to me by.
7     MS. CAPOTOSTO:  CNH objects to asking the
8   witness about documents to the extent that they are
9   not entered as exhibits.  We feel they need to be
10  entered into the record so that they can travel
11  with the transcript.  In the future to the extent
12  you are going to continue to do this throughout the
13  deposition, CNH has a standing objection.
14    MS. BRAULT:  I'll give you a standing
15  objection.  Like I said, if you want to burn a copy
16  and add it to the transcript, I don't really have a
17  problem with that except I don't want to have to
18  pay for copies of thousands of documents that might
19  get printed out as a result of that.  So that's up
20  to you.
21  BY MS. BRAULT:
22    Q.  Okay.  So looking at this, this looks like
23  it's billing records.  Can you tell when those
24  billing -- when these are from?  When the time was
25  spent?

Page 22

1     A.  No.
2     Q.  And it looks like there was a lot of time
3   spent by your associates as well as yourself?
4     A.  Yes.
5     Q.  Who is C. Alton Smith?
6     A.  He's an administrative assistant.
7     Q.  This would clear up the spelling of
8   Gasiewski.
9     A.  Yes.
10    Q.  G-a-s-i-e-w-s-k-i.
11       Besides this document and the document you
12  gave me today, are you aware of any other billing
13  records that we haven't been provided that reflects
14  work on this case?
15    A.  I'm not aware of them but that is not
16  indicative of anything other than the fact that I
17  don't do -- I'm not really responsible for billing.
18    Q.  Tell me if I'm wrong, but it looks like
19  the total amount of the billing was $19,827.50 some
20  cents?
21    A.  That's what the exhibit shows.
22    Q.  And that there has been some amount of
23  that paid?
24    A.  That's what it appears to be showing.  If
25  you could scroll over a little to the left, I could

Page 23

1   see what the wording is.  It appears there is a
2   write-off is what that line is indicating.
3     Q.  What's a write-off?
4     A.  In some cases there may be time entered
5   into the system that for one reason or another we
6   don't think should be or could be billed to the
7   client.
8     Q.  It was adjusted?
9     A.  It was adjusted downwards.
10    Q.  So the total was adjusted by some $3,300,
11  and then the total, it looks like, that's owed
12  under this bill was 18,488?
13    A.  Yes.
14    Q.  And this doesn't reflect what was paid,
15  correct?
16    A.  It does not.
17    Q.  Do you know if you're paid?
18    A.  I do not know.
19    Q.  So when I received this data, it came on a
20  disc, I believe, and so the first document is
21  entitled STAHL00001C_2010_2013_Utilization_Analyzed, and then
22  it looks like the sub-files after that, which are
23  marked 2, 3, 4, and 5, were all the individual
24  years that made up that summary of the 2010-2013
25  data?

Page 24

1     A.  That's what it looks like, I agree.
2     Q.  And then after that there is a Section 6,
3   7, 8, 9, 10, 11, 12 and 13 all deal with
4   prescription drug benefits including the top 25; is
5   that right?
6     A.  I can't really see.
7     Q.  I don't know if that's -- let me --
8     A.  I believe they are prescription drug
9   benefit files, the over and under age 65 report and
10  the ESI report.
11    Q.  What do you mean by "ESI"?
12    A.  Express Script International.  They handle
13  the prescription drug benefit for CNH.
14    Q.  I am going to open what's been marked as
15  STAHL00006C _3945_UAW Grandfathered Over & Under 65
16  report, hopefully.
17       So when you open the file, the first thing
18  that comes up is the cost summary, correct?
19    A.  Correct.
20    Q.  And there is a cover, which is showing
21  that it's an Express Scripts report?
22    A.  Correct.
23    Q.  So did they prepare the cost summary?
24    A.  No, I believe the cost summary would have
25  been something that we added to the report.



JOHN F. STAHL
January 14, 2014

Page 29

1  analysis, but in some cases they may wish to
2  identify which of those are Medicare Part D covered
3  claims or not.
4      Q.  Well, are they all prescription drug
5  claims?
6      A.  They are all prescription drug claims.
7  There are some drugs that Medicare Part D doesn't
8  cover.
9      Q.  So they isolated those drugs that Medicare
10 Part D does not cover?
11     A.  Right.
12     Q.  So you would acknowledge that there are
13 claims that are covered under the current over 65
14 or Medicare-eligible current plan retirees that
15 would not be covered by Medicare Part D?
16     A.  Yes.
17     Q.  So Medicare Part D provides less coverage
18 than the current coverage for over 65 for
19 Medicare-eligible retirees in the current plan?
20     A.  It does not appear to cover all of the
21 drugs.
22     Q.  Then the same sort of analysis, it looks
23 like, was done in the under 65 group, correct?
24     A.  Correct.
25     Q.  And do you know if there was any

Page 30

1  difference in terms of data that was collected for
2  those groups, in other words, differences in the
3  columns?
4      A.  No, I don't.
5      Q.  It looks like there is no discussion of
6  the Medicare Part D, presumably, because these
7  folks wouldn't be eligible?
8      A.  Correct.
9      Q.  But we don't know if some of the drugs
10 covered by the pre-65 would not be covered under
11 Medicare Part D in the future?
12     A.  That's correct.
13     Q.  And then this is the summary.  There is a
14 lot of -- I'm sure that there is a technical word
15 for what happens when these cells are too small to
16 put the numbers in, but I don't know what the term
17 is.
18     A.  Well, field overflow probably but you
19 could expand that.  If you expand the columns,
20 double click there, they should appear.
21         There you go.
22     Q.  And is this summary different from the
23 first summary?
24         The first summary may have been -- I guess
25 it's called the Cost Summary versus -- do you know

Page 31

1  why this particular summary that's under the Cost
2  Summary tab of STAHL 6 is there?
3      A.  It likely was something we did to check
4  the data to see if it matched what's in the Summary
5  tab.  I mean when we use the data, we would
6  probably do a summing up of the numbers as opposed
7  to using their summation.
8      Q.  And when you say -- so it would make
9  sense, since under the current plan, whether you
10 are over or under 65, you are still in the same
11 drug plan.  So it would be a very similar
12 percentage of plan cost, correct?
13     A.  That would make sense, yes.
14     Q.  Okay.  And is this -- so this amount for
15 the under 65 group, 38,451,331, is that the amount
16 that CNH paid?
17     A.  Yes, that would have been the amount that
18 CNH paid.
19     Q.  And the same would be true for the over 65
20 that CNH paid 22,811,662?
21     A.  Yes.
22     Q.  I wanted to ask you about this pivot
23 table.  That's something that you use to mine the
24 data from the Express Scripts report?
25     A.  That's correct.

Page 32

1      Q.  So what you've done is all of the numbers
2  or what your people, at least, have done is all of
3  the numbers that were extracted came out of the
4  data?
5      A.  Correct.
6      Q.  And the data is indirectly from Express
7  Scripts, not you?
8      A.  Correct.
9      Q.  And then correct me if I'm wrong but
10 I think the next few of these Excel spreadsheets,
11 which are marked as 7, 8 and 9, and using that as a
12 STAHL00007, 8, and 9 in the consecutive Bates
13 stamped documents.  So it looks like these are, for
14 example, from 2009, and the next one would be 2010,
15 and then the next one would be 2011.  Does that
16 make sense?
17     A.  Yes.
18     Q.  I just want to make sure I understand
19 what's in this -- on this disc.
20         So now we are down to the Power Point
21 slides that have the top 25 prescription drugs?
22     A.  Yes.
23     MS. CAPOTOSTO:  This is STAHL 10?
24     MS. BRAULT:  If you just look up here at the
25 very top, it's STAHL00010C_3945, and there is three



JOHN F. STAHL
January 14, 2014

|  | Page 33 |
|---|---|

1  Power Point slides in a row -- I am sorry -- four
2  Power Point slides in a row and they are 10, 11, 12
3  and 13.
4  BY MS. BRAULT:
5      Q.  Do you know what the difference is between
6  each of these?
7      **A.  Aside from the -- I believe the difference**
8  **is just the year, the period of time covered by**
9  **each.**
10     Q.  So No. 11, for example, is the year 2010,
11 it looks like?
12     **A.  Yes.**
13     Q.  And then so this one should be 2012,
14 right?
15     MS. CAPOTOSTO:  STAHL000013.
16     MS. BRAULT:  This is 13.
17 BY MS. BRAULT:
18     Q.  And that is 2012?
19     **A.  Correct.**
20     Q.  And this is a slide from that you
21 didn't prepare, correct?
22     **A.  Correct.  It's prepared by Express**
23 **Scripts.**
24     Q.  Did you put that data into any other form?
25     **A.  Yes, I believe there is another Excel file**

|  | Page 34 |
|---|---|

1  that has that data entered into it.
2      Q.  Okay.  The next document, it's 00014, is
3  another report, and this is over and under 65.  Do
4  you know what kind of report this is?
5      **A.  I believe that is a report that's very**
6  **similar to the reports you saw earlier.  The main**
7  **difference is these reports would be for the**
8  **non-grandfathered group.**
9      Q.  And this one -- how do you know when it's
10 the non-grandfathered group?
11     **A.  One easy way to tell in this case is if**
12 **you look at the over -- first of all, the numbers**
13 **are a lot smaller, so much smaller group.  In this**
14 **case I also know that the newer group does not have**
15 **drug coverage after age 65.  You could see at the**
16 **top there the over age 65.  I couldn't answer why**
17 **there are any claims in that group, but there is a**
18 **very small number of claims in that group.**
19     Q.  That was to be one of my questions is why
20 would there be claims in that group?
21     **A.  I honestly couldn't tell you why there**
22 **would be any claims in that group.  If there was**
23 **any substantial amount of claims, we probably would**
24 **have questioned it, but given the small number,**
25 **didn't seem to be a significant item.**

|  | Page 35 |
|---|---|

1      Q.  It looks like that was for 2009.  That was
2  No. 00014.
3          This one should be for 2010 for that
4  group?
5      MS. CAPOTOSTO:  STAHL00015?
6  BY MS. BRAULT:
7      Q.  This says over and under 65 report, and it
8  gives from 2010 -- well, January to December
9  of 2010.  So this would be the same report but for
10 the next year.  We are looking at Exhibit STAHL 15
11 at this point?
12     **A.  Correct.**
13     Q.  You didn't prepare this, correct?  You
14 just received this from Express Scripts?
15     **A.  Correct.  Those are the raw data reports**
16 **received from Express Scripts.**
17     Q.  So if we are correct -- this is 00011.
18 This is 00012.  This would be 2013, and I'm looking
19 at STAHL00018.
20         No, it's not.
21         It looks like it was 2009 to current.
22     **A.  Correct.  So that would have been**
23 **equivalent to all of the data lumped together into**
24 **one overall report.**
25     Q.  And this is just on prescription drug cost

|  | Page 36 |
|---|---|

1  for pre-65, correct?
2      **A.  Correct.**
3      Q.  So it shows for that period of time the
4  percent the plan paid was 79.58 percent?
5      **A.  Correct.**
6      Q.  So it was significantly lower than the
7  grandfathered group that was pre-65 prescription
8  cost in terms of percentage?
9      **A.  In terms of percentage, it is 97 percent**
10 **versus 80 percent rounding.**
11     Q.  Would you agree that that's significantly
12 lower?
13     **A.  I would agree it's lower.**
14     Q.  Now, the next item here is --
15     **A.  It's a big file.**
16     Q.  I might even just crash the whole system.
17 I'm not going to do it.  I'll go there last when we
18 can afford to crash.
19         Let me just ask you, so STAHL00019 and
20 00020C are very large Excel spreadsheets that
21 include documents, at least the clue from the
22 title, is from Anthem, which would be Blue
23 Cross/Blue Shield, correct?
24     **A.  Correct.**
25     Q.  What's your understanding of what's



JOHN F. STAHL
January 14, 2014

## Page 37

1  contained in those files?
2      **A.  That would be what you might refer to as**
3  **the claim database where we have taken -- there are**
4  **a number of files, if you go further on, that have**
5  **a suffix of text, dot txt, that are basically raw**
6  **data files, by which I mean they are not Excel.**
7  **They are not Power Point.  They haven't been**
8  **processed at all.  They are just files of numbers**
9  **and letters.**
10      **Those were processed into a form, which we**
11  **could summarize into an Excel file and then analyze**
12  **that data.  So those -- these would be sort of the**
13  **databases that we looked at when we were looking at**
14  **the claims data.**
15      Q.   And I'm going to scroll up so that that
16  one is at the top of this list here and ask you --
17  so the text files would be STAHL00031, 32, 33, 34,
18  35, 36, 37, 38 and 39?
19      **A.   Correct.**
20      Q.   And those text files, I am going to pull
21  one up just so that we can put on the record what
22  it looks like.
23      Just for the record this computer file is
24  in notepad --
25      MS. CAPOTOSTO:  It is STAHL00039.

## Page 38

1  BY MS. BRAULT:
2      Q.   So this doesn't even have labels, correct,
3  on the data?
4      **A.   That's correct.  There should be another**
5  **file on here that gives you a file layout.**
6      Q.   Like a key?
7      **A.   Correct.**
8      Q.   And this was data that was provided to
9  you?
10      **A.   Correct.**
11      Q.   And that was from Anthem?
12      **A.   Yes.**
13      Q.   Just for the record, STAHL00031 through 39
14  are the Anthem files that were provided to you at
15  it looks like more or less six-month intervals
16  probably because of the size of the data?
17      **A.   That's exactly right.**
18      Q.   The next document, 40, is a summary of UAW
19  medical and prescription claims?
20      **A.   Correct.**
21      Q.   And that part is just the summary,
22  correct?
23      **A.   Correct.**
24      Q.   And this would have been what -- these
25  numbers -- I am just going to go click on one --

## Page 39

1  indicate in the formula field that the numbers came
2  from the Anthem summary, correct?
3      **A.   Correct.**
4      MS. CAPOTOSTO:  You are clicking on D7 in the
5  summary?
6      MS. BRAULT:  Yes.
7  BY MS. BRAULT:
8      Q.   But I guess my question is is there any
9  number in this summary that doesn't come from
10  either a formula or the Anthem data?
11      **A.   To my knowledge, we did our best to try --**
12  **if we had a code on something like this, we would**
13  **have tried to provide every file that fed into it.**
14  **So I don't believe so.**
15      Q.   And the cost of benefit is something you
16  could tell from the Anthem data, correct?
17      **A.   That's correct.**
18      **It's not -- that COB in that context**
19  **doesn't stand for cost of benefit.  It stands for**
20  **other coverage that they might be receiving.**
21      Q.   Okay.  And then so the patient paid number
22  is what came out of cost for the patient?
23      **A.   That's what they paid out of pocket, their**
24  **deductibles, co-insurance, copay.**
25      Q.   And then the amount that the plan paid

## Page 40

1  came directly from the Anthem data?
2      **A.   Correct.**
3      **In fact, all the data on that file should**
4  **have been from the Anthem file.**
5      Q.   Without going through each one, I mean
6  just sort of randomly picking them, but that's your
7  understanding, there isn't anything that doesn't
8  come from the Anthem file?
9      **A.   Anthem or the prescription drug would have**
10  **been ESI, a claim summary from them.**
11      Q.   The Express Scripts?
12      **A.   Correct.**
13      Q.   And then the rest would come through a
14  formula?
15      **A.   Correct.**
16      Q.   And just come back to this later but these
17  were your calculations in the summary of what the
18  plan paid percentage-wise and what the
19  participant -- I'm just going to hide these for now
20  so we can look at these.
21      So we've got the grandfathered,
22  non-grandfathered and then we have, for 2008, the
23  amounts that were paid, and we can compare them,
24  right?
25      **A.   Correct.**



JOHN F. STAHL
January 14, 2014

Page 41

1      MS. CAPOTOSTO:  Row 33?
2      MS. BRAULT:  35, I think.
3   BY MS. BRAULT:
4      Q.  Well, 35 is 2008 and then it goes up to
5   2012, correct?
6      A.  Correct.
7      Q.  Are these the numbers you use for your
8   comparison in your report?
9      A.  I believe those numbers appear --
10  I couldn't recall off the top of my head which
11  exhibit, but I believe those might be in Exhibits 1
12  through 4 that are in the report.
13     Q.  I'm now opening 41C and this looks like it
14  was Exhibit 1.
15     A.  Yes.
16     Q.  So this would be the UAW retirees pre-65
17  medical and prescription costs in the aggregate and
18  then per adult member?
19     A.  Correct.
20     Q.  And it's split between the grandfathered
21  and the non-grandfathered?
22     A.  Yes.
23     Q.  So this would have been something that you
24  would have made by reference to the previous
25  exhibit?

Page 42

1      A.  Correct.
2      Q.  Okay.  And this is all work that you
3   prepared?
4      A.  Not that I prepared it myself, Nick or
5   someone working for me prepared it, and I reviewed
6   it.
7      Q.  Can you tell me what this document is?
8      This is Exhibit 42.
9      A.  I believe it's a document that we prepared
10  in order to try and be responsive and provide all
11  the documents that we looked at when we were doing
12  the report or the projections.  This doesn't
13  directly find its way into the report.
14     Q.  What is it?
15     A.  It is a projection of -- it's a document
16  that tries to calculate what CNH's potential
17  liability is under the excise tax that is a part of
18  Health Care Reform.  It's also referred to
19  generically as a Cadillac tax on high-cost plans.
20     Q.  And were you able to determine what the
21  tax would be?
22     A.  We did make a determination of a number to
23  include in their OPEB report.  To be honest, I'm
24  not sure if that appears in this particular
25  document or not.

Page 43

1      Q.  Does it make much of a difference in terms
2   of your calculation?
3      A.  It did appear in the -- I believe in the
4   projections in five and six, there may be a line
5   there that shows what the excise tax is.  I'm
6   not --
7      Q.  Do you have a copy of your report in front
8   of you?
9      A.  I do.
10     Q.  Maybe you could tell me if it does appear
11  there.
12     A.  I can look and see.
13         (Whereupon, STAHL Deposition
14         Exhibit 6 was marked for
15         identification.)
16  BY MS. BRAULT:
17     Q.  That's Exhibit 6.
18     A.  It's not separately identified in here as
19  appearing in here, but I believe it is identified
20  as having been included.
21     Q.  How is it included?
22     A.  It would have been included in the --
23  either in the pre-65 or post -- in the medical --
24  I'm presuming it was included in the medical plan
25  cost as opposed to the prescription drug plan cost

Page 44

1   line.
2      Q.  And cost to whom?
3      A.  Cost to CNH, not as an out-of-pocket cost.
4      Q.  And do you know how it's labeled as a cost
5   or is it just entered as a cost?
6      A.  It would have been just included in the
7   total cost.  It's not specifically called out.
8      Q.  And do you know who calculated this?
9      A.  Those would have been calculated by Peter
10  and Rebecca locally.
11     Q.  Do you know how they went about that?
12     A.  Sure.
13         They would use the calculation -- do you
14  see the last eight tabs or so are output from our
15  valuation projection program.  They show total cash
16  payments and total counts of retirees and covered
17  spouses.
18     MS. CAPOTOSTO:  You are now looking at
19  STAHL00042.
20     MS. BRAULT:  Yes.
21  BY MS. BRAULT:
22     Q.  There are a lot of tabs, though, correct?
23     A.  Correct.
24         They are segregated into costs for what we
25  call beneficiaries, which would be the BENY there



JOHN F. STAHL
January 14, 2014

**Page 49**

1    case means a covered group.  This is an employee
2    and spouse are both covered.  They are both alive,
3    and they are both covered.
4        And single, that would mean there was a
5    single retiree covered, and a spouse in this case
6    would mean a surviving spouse is covered.
7    Q.  And the total would be the total of all
8    three?
9    A.  Correct.
10   Q.  Okay.  So based upon your numbers in 2032,
11   which is the last year that we sort of went and did
12   the projections of cost to the plan, there would be
13   approximately 15 -- well, 1589.2 people or
14   contracts?
15   A.  Contracts, correct, and that would be --
16   although there may well be, if you scroll down
17   to -- and this is the post-65.  I don't know that
18   there would be in pre-65.  There might be a very
19   few pre-65 people covered.
20   Q.  And if I want to know that, I can move
21   this way?
22       So pre-65 are in what?
23   A.  On the base one tab would be the pre-65.
24   Q.  Okay.  And in 2032 it's showing maybe 17
25   people?

**Page 50**

1    A.  Correct.
2    Q.  Okay.  So by far and away, the majority of
3    the plan participants are going to be post-65 by
4    2032?
5    A.  Correct.  And it's a closed group.
6        Now, just for completeness, if you tab
7    down to base 11, there are also individuals who are
8    identified as surviving spouses at the beginning of
9    the valuation, and they appear on these tabs.  So
10   there is a few more people that have to be added in
11   if you wanted to get a complete count.
12   Q.  But this is -- by 2029 that's the end of
13   them?
14   A.  That's the end of the pre-65 group there,
15   and if you tab down to the next tab --
16   Q.  What would the next tab be?
17   A.  I think it's base 13.
18       And then you'll see there is some more
19   that are still -- depending on your point of view,
20   a handful or a number of, hundred over 65 at that
21   point in time.
22   Q.  The next exhibit is STAHL00043C, which is
23   another Excel spreadsheet.  Just, for the record, I
24   can see who the authors are here by looking at
25   the -- there is a ribbon.  It just reads the data

**Page 51**

1    when you pull it up.
2        So this would be something that Robert
3    DiMartino would have authored?
4    A.  Correct.
5    Q.  Would this be correct that he would have
6    made that on January 17, 2013, do you think?
7    A.  It might have been the year it was saved
8    in the -- we consolidated all of these together.
9    I guess it's possible.  I'm sorry.  I had the year
10   wrong.  I was originally thinking it says 2014,
11   which would be possible, but it's possible that
12   that would have been the date he saved it.
13   Q.  You don't know, though, because you
14   weren't the one who authored it?
15   A.  I didn't author this particular document.
16   I would have reviewed the exhibits that were
17   created by this document.
18   Q.  And then the tabs here show plan costs for
19   certain drugs?
20   A.  Correct.
21   Q.  Do you know where the data came from for
22   the plan cost?
23   A.  Those came from those Power Point exhibits
24   that are up -- were produced by Express Scripts.
25   Q.  So somebody just took and typed in those?

**Page 52**

1    A.  Correct.
2    Q.  And that was true for 2010, 2011 and 2012?
3    A.  Correct.
4    Q.  And then they are just added up basically
5    in the summary?
6    A.  Correct, and then consolidated up in the
7    exhibit here.
8    Q.  Now, did you look at any of the actual
9    claims data?
10   A.  When you say "actual claims data," I'm not
11   sure what you are referring to.
12   Q.  This shows how much the plan paid for
13   claims for drugs.  Did you see the specific data
14   that showed the drug and the cost?
15   A.  Those would have been in the Power Point
16   exhibits.
17   Q.  And I think you said those came directly
18   from --
19   A.  Those came directly from Express Scripts.
20   They were transferred by me into this exhibit.
21   Q.  And this, again, is exhibit Bates stamped
22   43.
23       This is the field descriptions.  Looking
24   at 44, this is that key for the documents that are
25   expressed in Notebook?



JOHN F. STAHL
January 14, 2014

Page 53

1   A.  Correct, yes.
2   Q.  And some Anthem files?
3   A.  Yes, I think this is the Anthem one.  I am
4   not sure if there was one that was produced for
5   Express Scripts too, but my guess would be this is
6   the Anthem one.
7   Q.  Here is a document that's called
8   Historical Comparison Data?
9   A.  Correct.
10   Q.  Which is marked as 45.
11   What is this document?
12   A.  In the expert report, we -- as you go
13   through the process that we use to sort of validate
14   the data, one of the things we did to sort of test
15   the integrity of the data with the detailed claim
16   files that we got from Anthem for this analysis,
17   was to test them against other data that we
18   previously received from Anthem that we used for
19   different purposes.  So we went back and looked at
20   the claims we got from them previously, and we made
21   reference to testing them in the report and the
22   document request asked for that document, and this
23   is in reference to that.
24   Q.  Were you satisfied with the way that the
25   data meshed?

Page 54

1   A.  Yes.
2   Q.  Was there a margin of error?
3   A.  Well, there is always -- you are never
4   going to be exactly the same, and one of the
5   reasons is we are looking at incurred claims versus
6   paid claims.  Incurred claims has to do with all
7   claims -- for example, if I look at a claim that
8   was incurred in 2010, that means the services were
9   rendered in 2010, and it will take a number of --
10   can take several years before all of those claims
11   are actually, ultimately, paid out.  So there can
12   be different estimates of what those claim amounts,
13   ultimately, will be, but they were all close enough
14   that we felt that the data -- that there wasn't any
15   significant data missing from what we got from
16   Anthem.  It tied pretty well with what we had
17   previously.
18   Q.  This one, the Claims Input Sample 2011
19   Rate, has a number of columns that actually have
20   blanks in them; do you know why?
21   A.  I do not know why other than -- no, off
22   the top of my head, I don't know why.
23   Q.  And you didn't produce this document?
24   A.  This is the -- well, we ultimately, we
25   produced it in a prior year.

Page 55

1   Q.  Do you know who, I mean, authored it?
2   A.  I do not know off the top of my head.
3   Q.  What is IBNR model?
4   A.  IBNR stands for incurred but not reported.
5   In other words, we might think ultimately -- it's a
6   way of getting at what we think the ultimate claims
7   that will be incurred in a period are before
8   those claims are completely paid out.
9   Would you like more explanation on the
10   exhibit itself?
11   Q.  Yes, please.
12   A.  Sure.
13   If you look at -- if you scroll over so
14   you can see Column B as well.
15   MS. CAPOTOSTO:  This is STAHL00046, for the
16   record?
17   MS. BRAULT:  Yes.
18   THE WITNESS:  Going in Column B you can look at
19   total incurred and paid through November 30, 2012,
20   and those -- that's the data we got from Anthem.
21   It looked at claims that were incurred and paid
22   through 2012.
23   We know it takes a period of time to ultimately
24   pay out all the claims for services, for example,
25   rendered in November of 2012.  We look at the

Page 56

1   historical length of time that it takes to pay out
2   those claims.  We can make an estimate of what that
3   amount will ultimately become.
4   So if you look at the Column B, which is the
5   total incurred and paid through November, you will
6   see that we make an estimate in Column H of the
7   amount that's still remaining.  That's the
8   incurred, in other words, the services that have
9   been rendered but they haven't actually been paid
10   out for whatever reason.  Either they haven't been
11   submitted for payment or they are still being
12   adjudicated or any number of reasons it could be.
13   BY MS. BRAULT:
14   Q.  This would have been data that you used to
15   make your future calculations?
16   A.  Correct.  We got paid claims through the
17   November 30.  We, what I would refer to as
18   completed those claims.  In other words, made an
19   estimate of what the amounts ultimately will be
20   paid out on those claims, and that's what we will use
21   for analysis of the estimated incurred claims.
22   Q.  Do you know what the difference is then
23   between the IBNR model -- this is post-65 that's
24   included in 46 and pre-65 in 47?
25   A.  Correct.



JOHN F. STAHL
January 14, 2014

Page 57

1    Q.  Okay.  Is there a big difference between
2  incurred but not paid costs?
3    A.  Sure.
4    If you want to -- I think the easiest
5  thing to do is to see that -- do you mean between
6  pre-65 and post-65 or do you mean just -- the
7  biggest difference --
8    Q.  Two different charts.
9    A.  Yes.
10    The main difference is that because
11  post-65 has Medicare involved and so to adjudicate
12  the claims, you sort of have to know what Medicare
13  has paid.  It takes longer.  So there is usually a
14  longer period of time over which it will take to
15  ultimately adjudicate those.  So if you wanted to
16  open it, I can show you what I'm talking about.
17    Q.  That's okay.
18    Liability summary is STAHL00048.  This is
19  something -- is this something that you prepared?
20    A.  This is -- this would have been prepared
21  by Peter and Rebecca, and this looks to be the cash
22  flow and summaries that were in Exhibits 5 and 6.
23    Q.  Let me ask you about that.  Do you know
24  where the data is that they got this from?
25    A.  The ultimate -- the original data would

Page 58

1  have been -- I think you're -- I think that's what
2  you're in right now, those data tabs, pre-65
3  medical and post-65 medical.  They would have been
4  from our valuation software.
5    Q.  Okay.  It doesn't really tell me from the
6  formula line where those came from?
7    A.  Correct.  I think -- well, those would
8  have been taken from the valuation run, software
9  run, and then essentially, I think, cut and pasted
10  into that document.
11    Q.  Okay.  And then I think that we already
12  looked at 49C earlier.  This is the cost or the
13  billing statement.
14    And then STAHL00050_rbrvs is -- what is
15  this?
16    A.  That was the --
17    Q.  CPT codes?
18    A.  -- CPT codes to classify claims into
19  whether they were procedure codes that existed in
20  1998 or not.
21    Q.  Have you performed this analysis in other
22  cases or is this something you undertook for the
23  purposes of this case?
24    A.  I know -- this was a specific something
25  someone else did for me.  So this wasn't me

Page 59

1  personally performing this analysis.
2    I don't believe that we've done this
3  specific type of analysis before.
4    Q.  Who did it for you?
5    A.  It was an individual in our Minneapolis
6  office.  I can't recall his name off the top of my
7  head.
8    Q.  Would it tell me if I go to --
9    A.  It very well may be that he's shown as the
10  creator of the document.
11    Q.  Laura Laudenberger?
12    A.  She did not do that particular portion of
13  the analysis.  She was the individual in our
14  research area that supplied the data for the
15  analysis.
16    Q.  Do you know who did this analysis?
17    A.  Again, off the top of my head, I don't
18  know.  I could find out and follow up with that.
19    Q.  How do you know if it's reliable?
20    A.  How do I know --
21    Q.  Yeah, if that particular analysis is
22  reliable.
23    A.  Other than telling you that it's an
24  individual that we contract with to do analyses,
25  and this is not a particularly complex analysis,

Page 60

1  I trust that the individual did the analysis
2  correctly.
3    Q.  Can you tell me what the method was that
4  was used?
5    A.  Yes.
6    Similar codes, procedure codes exist on
7  the Anthem files, and there are software programs
8  that enable us to match up those codes that are on
9  this file and sort of separate the claims that are
10  in the Anthem files essentially into three groups:
11  One where the codes matched, ones where the codes
12  didn't match and claims on the Anthem file where
13  there was no code.
14    Q.  Now, so if a code did not match, what did
15  that mean?
16    A.  It was just sort of put off to the side in
17  a separate bucket, and then I think if you look at
18  the exhibit that this relates to -- maybe it's
19  Exhibit 7.  I can't remember off the top of my
20  head --
21    Q.  Your report is right there, if you want to
22  look.
23    A.  It is Exhibit 8.  There are essentially
24  three -- there is three buckets.  There is total
25  claims with codes, in this case that's referred to

JOHN F. STAHL
January 14, 2014

Page 61

1   as total CPT/HTPC claims.
2       THE COURT REPORTER:  Total...
3   BY MS. BRAULT:
4       Q.  CPT/HTPC claims is what he said.  It's an
5   acronym.
6       A.  Then there are codes for CPT/HTPCs that
7   did not exist in 1998, and there is also a group of
8   claims for which there was no coding on the Anthem
9   file.
10      Q.  Now, why did you pick 1998?
11      A.  That was the year of the contract, the
12  year of the group in question.
13      Q.  Did you understand that context
14  specifying what the benefits were was in effect at
15  least until 2006, correct?
16      A.  My understanding, I thought, was that the
17  last --
18      Q.  2004.  I am sorry.  It was at least a
19  six-year contract.
20      A.  Correct, I did understand that.
21      Q.  The reason that you used 1998 -- and did
22  you understand that when the agreement was made in
23  1998 that CNH was agreeing to cover drugs that
24  might come into existence at least during the
25  contract term, correct?

Page 62

1       A.  Correct.
2       Q.  Is it a new thing that new medical
3   procedures occur?
4       A.  No, it's not.
5       Q.  Is that something in 1998, when they
6   bargained their contract, they would know that
7   there might be things that would be developed later
8   that would be covered?
9       MS. CAPOTOSTO:  Object to form.
10      THE WITNESS:  Correct.
11  BY MS. BRAULT:
12      Q.  Now, looking at all of the things in here,
13  are there things that you provided to us that you
14  didn't rely upon in coming to your opinion?
15      MS. CAPOTOSTO:  You say "looking at things in
16  here."
17      MS. BRAULT:  The documents that we've gone
18  through now, STAHL Exhibit 1 and we're currently
19  looking at 51C.
20  BY MS. BRAULT:
21      Q.  So STAHL Bates Stamp 1 through 51 -- let's
22  identify 51 for the record.  It claims it is a
23  retiree census.  Do you know what that is?
24      A.  Yes.
25      Q.  What is that?

Page 63

1       A.  That is a file, historical retiree census
2   file, that we relied upon to get the counts of
3   covered individuals historically.
4       Q.  So this has the basic demographic data for
5   the retiree?
6       A.  Correct, at various points in time.
7       Q.  And there is another document that we'll
8   get to, 52, but STAHL 1 through 51, were they all
9   documents that you relied upon in your report or
10  used?
11      A.  This, to my knowledge, there is only one
12  that I don't believe we used directly in the
13  report.
14      Q.  And which one was that?
15      A.  That would be -- there was one document,
16  which is what I would call a continuous table.  It
17  would show how many claims were at various levels
18  of cost, X number of claims between $100,000 and
19  200,000.  I don't believe we directly used that in
20  anything, but there was -- was a document that we
21  used in the course of this, so, therefore, we
22  included it.
23      MS. CAPOTOSTO:  When it's a good time for you,
24  I'd like to take a break.
25      MS. BRAULT:  I think this is a good time.  We

Page 64

1   can stop now, if you want.
2       (A short break was taken.)
3   BY MS. BRAULT:
4       Q.  I am looking now at what was sent to me in
5   a separate file.  It's the benchmarking file, and
6   it was Bates Bates stamped STAHL 52, and this is just a
7   summary tab that I have on the screen right now.
8       Do you recognize this document?
9       A.  I do.
10      Q.  Okay.  Did you compile this document?
11      A.  I did not compile it personally, another
12  individual.
13      Q.  Again, there are many tabs here.  One is
14  Retirees All Fields and then Actives All Fields,
15  and then there is a Sheet 1 with -- I am not even
16  sure what that is supposed to be -- the number of
17  employees; is that right?
18      A.  Correct.
19      Q.  And then lookups, do you know what lookups
20  are?
21      A.  Looking through the spreadsheet, I believe
22  that was a way of making sure all the data was in a
23  consistent format so that it could be more easily
24  summarized.
25      Q.  So somebody put these numbers in?

JOHN F. STAHL
January 14, 2014

Page 65

1    A.  Correct.
2    Q.  Somebody typed in all of the numbers that
3  are in here?
4    A.  I'm not a hundred percent sure how the
5  numbers got in there, whether they were typed in or
6  whether they were originally created on a pivot
7  table.
8    Q.  So why would -- why did -- do you have any
9  idea what this does or how it assisted?
10   A.  I believe it was used in order to get the
11  data that -- the raw data in a consistent format
12  for when it was ultimately summarized into the
13  exhibit.
14   Q.  So the raw data that this relies upon is
15  where?
16   A.  I believe that would be in the active all
17  fields of retirees, all fields.
18   Q.  Okay.  I am just going to go from the top
19  for the first one here.  The organization name is
20  listed as A.O. Smith Corporation for the first
21  group which is under Row 2?
22   MS. CAPOTOSTO:  For the record you are on the
23  Active All Fields tab?
24   MS. BRAULT:  Yes.
25

Page 66

1  BY MS. BRAULT:
2    Q.  Where did you get this data?  Where did
3  this come from?
4    A.  We send out -- we either send out or we
5  may fill out ourselves.  There is a portion of our
6  organization that does survey information.  We
7  would send out a request for an organization to
8  participate.  They may fill this information out
9  themselves, fill a questionnaire out or to the
10  extent they are an existing client or a, whether or
11  not an existing client, that we have the
12  information out.  We may have someone in our
13  organization fill out the data.
14   Q.  So I am going to Retirees All Fields now.
15  It says A.O. Smith, and then the first thing it
16  says under column about retiree medical plans, it
17  says no.  So is it fair to say that that company
18  doesn't provide retirees any medical plans?
19   A.  It's not clear from this what the question
20  is being asked.  It may mean that they don't
21  provide any retiree medical plans.  It may also
22  mean they don't provide retiree medical to new
23  hires, and they may have groups of existing
24  grandfather retirees that have retiree medical
25  benefits.

Page 67

1    Q.  Did they mine the data for those plans?
2    A.  Typically, when we do these types of
3  surveys -- that's why I'm saying I'm not sure --
4  we, typically, will look at the benefits that it
5  provides to new hires.
6    Q.  Okay.  So when you undertook this
7  particular analysis, did you look to see if A.O.
8  Smith Corporation had current retiree health care
9  benefits available to any class of retired
10  employees?
11   A.  We did not.
12   Q.  So by limiting it to what they offered to
13  current employees, you would be limiting it to more
14  recent plans or more recently adopted plans?
15   A.  We may be.  Again, I don't know
16  specifically what was put into this database.
17   Q.  And who put that in, did you say, out of
18  your group?
19   A.  There is -- no, this is an existing
20  database.  It wasn't specifically created for this
21  assignment.  This is a database we have for a
22  number of purposes.
23   Q.  And there is -- it looks like many columns
24  of information, participation requirements, some
25  are in network.  There is family maximums,

Page 68

1  deductibles.  What's the difference between
2  Column G, where it says Annual Deductible Before 65
3  Out of Network, Individual -- H is the family
4  maximum?
5    A.  Correct.
6    Q.  In some of these where it says none,
7  apparently don't have an annual deductible before
8  65 in network individual.  Is that what it means
9  when it says none?
10   A.  That's the way I read that.
11   Q.  Some of them have no out-of-pocket maximum
12  or no out-of-network coverage?
13   A.  That's what that is saying, yes.
14   Q.  Did you choose the data points for
15  comparison?
16   A.  We -- when we did our comparison, we chose
17  the data for employers that offer PPO plans since
18  that's the plan we were comparing against.
19   Q.  Was there any other limitation that you
20  put on the data?
21   MS. CAPOTOSTO:  Object to form.
22   THE WITNESS:  I'm not aware of any.  We looked
23  at the active data and stripped out the PPO.  So we
24  were just looking at the PPO plans and compared
25  those.



JOHN F. STAHL
January 14, 2014

---

Page 73

1  turn the projector off just for a little bit so
2  that it doesn't overheat and ask you some other
3  kinds of questions.
4        I'm sorry.  I should be able to tell this
5  from the exhibit but I'm not sure I noticed.
6        What is your billing rate?
7     **A.  I have to look it up myself.  I think
8  it's -- well, let me look it up.**
9     Q.  It's shown as 655 an hour in Attachment A
10  here?
11     **A.  Okay.**
12     Q.  Is that right?
13     **A.  I believe so.**
14     Q.  And as of October 17 it indicates that
15  there is $18,488 expended toward this report; is
16  that right?
17     **A.  Yes.**
18     Q.  And then what you gave me for November
19  includes -- is that an additional 15,858?
20     **A.  That's my understanding.**
21     Q.  And there is some additional as well?
22     **A.  Yes.**
23     Q.  Do you know how much there is additional
24  since then?
25     **A.  I don't believe -- I don't know.**

---

Page 74

1     Q.  And does this billing just go through your
2  regular client account for CNH?
3     **A.  I am not sure how it gets billed.  When
4  you say "regular client account," I'm not sure what
5  you mean.**
6     Q.  Well, you do work for CNH as an actuary,
7  correct?
8     **A.  Correct.**
9     Q.  Okay.  Is it just billed through whatever
10  code you have for CNH in the Towers Watson billing
11  system?
12     **A.  Yes.**
13     Q.  Just a separate, I don't know, I guess,
14  matter?
15     **A.  I believe, looking at the other exhibit,
16  it appeared to be going through not a specifically
17  Reese group code.  It was just a generic, general
18  code that we identified by comment as to whether --
19  what the specific work product was.**
20     Q.  That's under the general topic of
21  retirement for CNH?
22     **A.  It was billed through the retirement line
23  of business.**
24     Q.  Is that the line of business that you're
25  in?

---

Page 75

1     **A.  No, I work in the health and group
2  benefits.**
3     Q.  And I think I asked you if you had ever
4  testified before, and you said no, not in a
5  deposition anyway.  Have you testified in any other
6  forum?
7     **A.  I believe at one point, many years ago,
8  I was -- I testified in a -- I'm not sure of the
9  right word.  Mediation or --**
10     Q.  Were you in court?
11     **A.  I was not in court.  It was something like
12  this.**
13     Q.  Was it an arbitration?
14     **A.  Arbitration.  That's the word for it.
15  Sorry.**
16     Q.  That's all right.
17        Who were you testifying for?
18     **A.  I believe it was the state of Illinois.**
19     Q.  And why were you testifying?
20     **A.  There was a very narrow question as to
21  whether a rate increase could be positive or
22  negative or whether it could only be an increase.**
23     Q.  And do you know if you were an expert
24  witness in that case?
25     **A.  I don't know.**

---

Page 76

1     Q.  Do you know if you've ever been qualified
2  as an expert witness before or an expert?
3     **A.  When you say "qualified," does that refer
4  to --**
5     Q.  Where a court has determined that you are
6  qualified to provide expert witness testimony.
7     **A.  To the best of my -- I wouldn't have
8  thought so.  I am not aware of it.**
9     Q.  Okay.  Have you ever prepared expert
10  witness reports for anyone in the past?
11     **A.  No.**
12     Q.  So this would be your first experience
13  with the idea of providing expert witness
14  testimony?
15     **A.  Correct.**
16     Q.  And your educational background, where did
17  you go to college?
18     **A.  University of Michigan.**
19     Q.  And you graduated in 1983; is that
20  correct?
21     **A.  Yes.**
22     Q.  And that was with a mathematics degree?
23     **A.  Yes.**
24     Q.  Is that a bachelor of science?
25     **A.  Yes, bachelor of science.**

---

JOHN F. STAHL
January 14, 2014

Page 77

1    Q.   And then --
2    A.   I'm sorry.  It was a bachelor of arts.
3    Either choice.  I chose bachelor of arts.  It was
4    bachelor of arts.  I made a conscious decision not
5    to take bachelor of science.
6    Q.   You could do either one, correct?
7    A.   You could do either one, and there was no
8    course difference between the two.  So just choose
9    what you want.
10   Q.   You graduated in 1983; is that correct?
11   A.   That's correct.
12   Q.   And then did you have additional education
13   after that?
14   A.   No education directly, but in order to get
15   an FSA, you have to take a series of exams
16   sponsored by the Society of Actuaries.
17   Q.   Are you a fellow?
18   A.   I am.
19   Q.   And were you a fellow before or after they
20   changed the coursework requirements?
21   A.   I got my fellowship in 1987.  So they
22   changed it continuously.
23   Q.   Have you had to take any more coursework
24   after 1987 or exams after 1987?
25   A.   No exams.  There is an education

Page 78

1    requirement that I fulfill annually, but there is
2    no direct exam per se.
3    Q.   Who did you work for starting in 1983?
4    A.   I started work for Banker's Life and
5    Casualty in Chicago.
6    Q.   How long did you work for them?
7    A.   I worked there until 1986.
8    Q.   And then where did you go?
9    A.   I went to CNA Chicago.
10   Q.   CNA?
11   A.   CNA Insurance Company.
12   Q.   How long were you there?
13   A.   I was there until 1989.
14   Q.   And then where?
15   A.   Then to the Wyatt Company.
16   Q.   Which became Towers Watson eventually?
17   A.   Correct.
18   Q.   So you have been with the same company,
19   some different iterations of it, since 1989?
20   A.   Correct.
21              (Whereupon, STAHL Deposition
22              Exhibit 7 was marked for
23              identification.)
24   BY MS. BRAULT:
25   Q.   I am going to show you what's been marked

Page 79

1    as Exhibit No. 7.  Take a moment to look at this
2    and tell me if you've ever seen this document
3    before.
4    A.   I believe I may have seen the document
5    without the answers in it.
6    Q.   Without the answers.
7    A.   Oh, I'm sorry.  Now that I see Tom
8    Coogan's name at the bottom, I don't believe I've
9    ever seen the document before.
10   Q.   Do you recognize Exhibit A or B as being
11   documents that you provided to CNH or for CNH?
12   A.   Yes, those are documents that we provided.
13   Q.   Okay.
14   A.   They appear to be.
15   Q.   If you look at exhibit -- I'm sorry --
16   it's No. 2, Interrogatory No. 2, which is on page 3
17   of the document, it says that CNH incorporated by
18   reference its objections, and then it says that it
19   consulted with and relied upon Towers Watson & Co.,
20   which provides CNH with benefits-related services
21   in the ordinary course of business for information
22   used to answer 10 through 31 and 51.
23              Do you know who at Towers Watson was
24   consulted?
25   A.   Without looking at what 10 through 31 and

Page 80

1    51, those specific answers, no, I don't know.
2    Q.   Okay.  Well, 10 through 31 were questions
3    about -- you can look at them -- the actual cost
4    for benefits between 2008 and 2012 broken down into
5    several categories and then projected costs from
6    out to 2022 over several different categories, and
7    then 51 is about the rate of the growth of
8    out-of-pocket costs.
9    A.   It would be the same group of people that
10   were involved in putting together the exhibits that
11   are incorporated in the expert report; that is to
12   say, principally, myself, Nick Rosales, Peter
13   Gasiewski and Rebecca Petersen.
14   Q.   And so when you say -- are those all
15   people who report to you or that you have a work
16   relationship with?
17   A.   None of them report to me directly.  They
18   are all people I have a working relationship with.
19   Q.   Is your -- do you work regularly on CNH's
20   account?
21   A.   Yes.
22   Q.   And are you their principal actuary at
23   Towers Watson?
24   A.   I'd be the principal health care actuary,
25   yes.



JOHN F. STAHL
January 14, 2014

Page 81

1    Q.  How long have they been your client?
2    A.  I don't know the exact date, but I believe
3    I've worked with them since 2008.
4    Q.  Did you work with them in a less direct
5    role before that?
6    A.  I don't believe so.
7    Q.  Did you replace someone that had been
8    working with them as their principal health care
9    actuary before then?
10   A.  That's my understanding.
11   Q.  Do you know who that was?
12   A.  I believe the prior actuary was Towers
13   Perrin, TP.
14   Q.  And this was back in 2008.  What was the
15   iteration of your employer at that time?
16   A.  At that time that was -- we were Watson
17   Wyatt.
18   Q.  So when it merged, you got the work?
19   A.  No.
20   Q.  When Towers Perrin and Watson Wyatt
21   merged?
22   A.  No, I believe that was prior to the
23   merger.  I don't believe the merger actually took
24   place until 2010.
25   Q.  So who do you think was on the account

Page 82

1    before you from Towers Perrin?
2    A.  I not a hundred percent sure.  It would
3    have been someone out of our Milwaukee office.
4    Q.  And you don't know who it is?
5    A.  I don't know for sure who was on the
6    account at that time.
7    Q.  And who do you work with from CNH?  Who is
8    your liaison?
9    A.  Primarily, Don Pooley (phonetic) is my
10   principal liaison.
11   Q.  And what is the scope of the work that you
12   do for CNH?
13   A.  We do active health care consulting,
14   pricing, premium in the employee contribution
15   setting, system and plan design.  We do similar --
16   similar type work for retirees -- rate setting,
17   cost setting, retiree contribution, calculations.
18   I also work in conjunction with the retirement
19   practice.
20   Q.  I'm sorry.  What was the last thing you
21   said?
22   A.  I work in conjunction with our retirement
23   practice to assist in putting together retiree
24   medical evaluations that are used for accounting
25   purposes and also disability evaluations that are

Page 83

1    also used for accounting purposes.
2    Q.  Anything else?
3    A.  There may be other types of projects that
4    we take on from time to time, but those are the
5    principal ongoing activities.
6    Q.  And how much do -- how much does Towers
7    Watson bill to CNH for your work in a typical year;
8    do you know?
9    A.  I don't know.
10   Q.  How many clients like CNH do you have that
11   you are their principal health care actuary?
12   A.  I have to think.
13       Do you want an exact number?
14   Q.  Well, I can take an estimate.
15   A.  I'd say between eight and ten.
16   Q.  Well, is there some other type of work you
17   provide as an actuary to some other type of client
18   or is your work at Towers Watson primarily as
19   principal health care actuary for eight to ten
20   clients?
21   A.  It's primarily that, but I do do other
22   types of projects throughout the year.  And I also
23   review work of other -- for other clients who I'm
24   not the principal actuary, but I may be called in
25   to just review work other people have done.

Page 84

1    Q.  Do you know what percentage of your work
2    at Towers Watson is spent doing work for CNH as
3    opposed to all the other kind of work that you do?
4    A.  I don't know.
5    Q.  Would you say that it's -- the work that
6    you do for CNH is more or less time consuming than
7    the other clients that you have?
8    A.  I have bigger clients, and I have smaller
9    clients.  I'm not sure.  They are not the biggest
10   client I have.  They are not the smallest.
11   Q.  Are they the second or third biggest?
12   A.  They are a bigger client.
13   Q.  So would you say that they are like the
14   top third?
15   A.  The reason I'm not 100 percent sure is
16   because from a health care perspective, they are
17   a -- they are a good-sized client.  I'd say they
18   are in the top third.
19   Q.  And then the -- I take it you are paid
20   directly by Towers Watson.  You get paid a salary,
21   correct?
22   A.  Yes.
23   Q.  What do you get paid by Towers Watson?
24   A.  Salary?
25   Q.  Yes.



JOHN F. STAHL
January 14, 2014

**Page 85**

1  A. I believe it's 220,000 a year.
2  Q. And on top of it you receive variable pay?
3  A. I have an annual bonus too.
4  Q. And is that dependent upon your
5  receivables or some other factor?
6  A. Not receivables directly. There are a
7  number of different items that factor into it.
8  Q. And what -- obviously, the satisfaction of
9  one of your top 30 percent clients is going to be
10  an important factor?
11  A. That would be fair to say.
12  Q. What is the relationship between, if any,
13  the bonus and your salary? Sometimes people have a
14  percentage bonus.
15  A. Yes.
16  Q. What typically is your bonus, if you make
17  the whole thing?
18  A. The target percent is 30 percent. It
19  could go up or down depending on a number of items,
20  how well I met various target goals and probably,
21  most importantly, how profitable the company was as
22  a whole.
23  Q. So both of those things are factored in?
24  A. Correct.
25  Q. And the target, are they per client

**Page 86**

1  targets or are they -- I mean your personal
2  targets, are they per client targets or do they
3  have like annual billable ranges or goals?
4  A. They are not per client. The target
5  percentage tends to be -- it's related to your
6  grade, what pay band you are at. So I'm a Band 40
7  employee. Everyone in 40 has a 30 percent target.
8  Q. And so whether or not you meet the target,
9  though, is based upon the total profitability of
10  the company and also some of at least your numbers?
11  A. Correct.
12  Q. Okay. And performance is factored in as
13  well, subject to performance or no?
14  A. It is. There are objective measures,
15  billable hours, new business sales and then there
16  are other less objective, more subjective criteria.
17  Q. And have you been meeting your target
18  since 2008?
19  A. I have.
20  Q. Now, the plan that covers the class, is
21  that what you would refer to as a funded or
22  unfunded plan?
23  A. From a retiree medical perspective, it
24  would be an unfunded plan.
25  Q. Are all of the medical plans unfunded?

**Page 87**

1  A. Not all.
2  When you say "all," do you mean if I look
3  at the universe of employers?
4  Q. No, I mean all of CNH's medical plans.
5  A. CNH? I believe there is a plan that is
6  funded.
7  Q. Which one is that?
8  A. I know them as FANA, and I believe that is
9  at least partially funded. I believe there are
10  some assets to the tune of, perhaps, $40 million
11  that underlie that plan, that particular plan.
12  Q. And who is the -- who does that apply to,
13  the FANA plan?
14  A. It's a closed group of retired union
15  employees. I believe former steelworkers, but
16  again, I'm not --
17  Q. Not sure?
18  A. -- not sure.
19  Q. You do the FASB reporting for CNH,
20  correct?
21  A. Our company does, yes, and I am involved
22  in helping to put together the report, yes.
23  Q. And you signed it in the last few years,
24  correct?
25  A. Yes, I have.

**Page 88**

1          (Whereupon, STAHL Deposition
2           Exhibit 8 was marked for
3           identification.)
4  BY MS. BRAULT:
5  Q. I will show you what's been marked as
6  Exhibit No. 8. This would be the valuation that
7  Towers Watson prepared in -- is it April 2013 that
8  it was prepared?
9  A. Yes.
10  Q. And it is to cover the year ending
11  December 31, 2012, and the 2013 benefit cost?
12  A. This was -- yes, that's correct, and
13  that's -- if I go back, it appears this report was
14  issued in April 2013, just knowing when this type
15  of information would have had to be available to
16  the accountants and financial statements, but when
17  you say prepared, the bulk of the work would have
18  had to have been done prior to that.
19  Q. Okay. Looking at what's been -- if you
20  look at the very bottom right-hand corner of each
21  document, there is a number that starts out CNHA
22  and then it has numbers 059. Can you look at the
23  one that ends in 841?
24  A. Okay.
25  Q. And it says that this report documents the



JOHN F. STAHL
January 14, 2014

Page 125

1    MS. CAPOTOSTO:  I am going to object and
2  instruct not to answer on the basis of the
3  work-product doctrine.
4  BY MS. BRAULT:
5    Q.  Do you know who made the decision to
6  change the benefits?
7    MS. CAPOTOSTO:  I am going to object and
8  instruct not to answer on the basis of the
9  work-product doctrine.
10  BY MS. BRAULT:
11    Q.  Do you know when the decision was made to
12  propose the precise plan that's currently being
13  proposed?
14    MS. CAPOTOSTO:  I will object and instruct not
15  to answer on the basis of the work-product
16  doctrine.
17  BY MS. BRAULT:
18    Q.  Do you know who at CNH was responsible for
19  determining whether or not the proposed plan was a
20  reasonable plan?
21    MS. CAPOTOSTO:  I am going to object and
22  instruct not to answer on the basis of the
23  work-product doctrine.
24  BY MS. BRAULT:
25    Q.  Did you?  Were you the person responsible?

Page 126

1    A.  No, I was not.
2    Q.  Have you made a determination of whether
3  or not you believe that the -- or are you of the
4  opinion that the proposed plan is a reasonable one?
5    A.  That's a pretty broad question.  It
6  depends on how you define reasonable.  I don't know
7  that there is any objective criteria that I could
8  say it is reasonable.  It would depend on how you
9  are defining reasonability.
10    Q.  Did you attempt to answer that question at
11  all in your report?
12    A.  I did look at the plan provisions in the
13  one exhibit where there is benchmarking and tried
14  to determine whether -- with respect to the pre-65
15  benefits, are those the kind of provisions
16  comparable to the benefits offered by other
17  employers, not necessarily to retirees but to
18  active employees.
19    Q.  Do you know if any new prescription drugs,
20  medical procedures, new economics of care or
21  advances in medical technology that you are
22  claiming, support the idea that the changes in the
23  proposed plan are reasonable?
24    MS. CAPOTOSTO:  Object to form.
25    THE WITNESS:  Do I know if any?

Page 127

1  BY MS. BRAULT:
2    Q.  Can you identify any prescription drugs,
3  for example, or any medical procedures, new
4  economies of care, advances in medical technology,
5  any of those things, can you identify --
6    A.  Them by name, is that what you're --
7    Q.  Yes.
8    A.  Sure.
9    Prescription drugs, I would say Nexium is
10  a new prescription drug.
11    Q.  Anything else?
12    A.  Off the top of my head --
13    Q.  Was that the focus of your task when you
14  started out your report?
15    A.  One of the aspects of report were to try
16  and determine to what extent new procedures or new
17  drugs impacted cost or contributed to cost.  It
18  wasn't specifically to identify which procedures
19  those were but really more focused on what
20  percentage of costs were related to the new
21  procedures or new prescription drugs.
22    Q.  And did you look at any particular
23  procedure?
24    A.  No, we did not.  It was a broader net.
25    Q.  When you say "we," you mean the people on

Page 128

1  your team?
2    A.  Correct, or our firm.
3    Q.  So neither you nor the person on your
4  team -- I can't remember the name of that person.
5    A.  Skoog, Derek Skoog.
6    Q.  As far as you know, he didn't look at any
7  particular specific procedure either.  He used
8  codes?
9    A.  Derek, actually, wasn't involved.  He was
10  involved in the benchmarking study, and I can't
11  remember the name of the person in the Minneapolis
12  office that was involved in the procedures of that
13  study.  But it was not -- we didn't investigate any
14  particular code.
15    Q.  Was there any new economics of care that
16  you relied upon in coming to this conclusion that
17  the proposed changes are reasonable?
18    MS. CAPOTOSTO:  Object to form.
19    THE WITNESS:  No, I don't believe that
20  I actually really --
21  BY MS. BRAULT:
22    Q.  I'm sorry.  I should probably look at the
23  report.  So you say in your report --
24    Let's go to Exhibit 6.  In your report you
25  have four opinions that are first summarized under

JOHN F. STAHL
January 14, 2014

Page 129

1  opinions and then you have your bases for the
2  opinions?
3      **A. Uh-huh.**
4      Q. Yes?
5      **A. Yes.**
6      Q. Did you author this document?
7      **A. Yes.**
8      Q. Looking at exhibit -- I'm sorry -- Opinion
9  No. 1, to the extent that this is an opinion, I am
10  not sure I quite understand it. I mean what you're
11  saying is that you prepared an exhibit or your
12  team prepared exhibits that show what the
13  historical experience of claims were, and you
14  projected them out through 2032, right?
15      **A. Correct.**
16      Q. And you're not saying anything substantive
17  or -- I shouldn't say that. You are not saying
18  anything normative about that. You are just saying
19  that this is what it is?
20      MS. CAPOTOSTO: Object to form.
21      THE WITNESS: We're saying it's -- in our
22  opinion it's our best estimate to the extent
23  that -- the projections are not factual. They are
24  a projection. They involve some subjective
25  determination that in our opinion the assumptions

Page 130

1  used to do that are reasonable.
2  BY MS. BRAULT:
3      Q. And the assumptions that you used to do
4  that are essentially actuarial assumptions?
5      **A. That's correct.**
6      Q. And the methodology that you applied would
7  be accounting methodology and actuarial
8  assumptions?
9      **A. I'd say I would consider it an actuarial**
10  **methodology. It happens to line up with the same**
11  **basis that we use for the accounting, but the cash**
12  **flows themselves or the projected cash flows are**
13  **not -- there is nothing inherently -- there is no**
14  **accounting, anything inherently accounting about**
15  **this.**
16      Q. So as I understand it, you took raw
17  data -- raw, I guess as it comes from Express
18  Scripts or Anthem -- and you migrated it into a
19  software program that you can use, like Excel, and
20  you determined what the total costs were per year
21  and the per claim cost and broke those down into
22  the categories that are indicated.
23      Other than the assumptions that you made,
24  that you indicate in the back of your report here,
25  are there any other assumptions that you used?

Page 131

1      MS. CAPOTOSTO: Object to form.
2      THE WITNESS: There are also other assumptions
3  that we also outlined on the bottom of Exhibit 5
4  and 6 that show how we broke up various components
5  of the cost.
6  BY MS. BRAULT:
7      Q. Are there any assumptions that you made
8  that aren't contained somewhere in the body of the
9  brief or the exhibits?
10      **A. To my knowledge, no.**
11      Q. Are any of the assumptions outside of the
12  norm in actuarial science?
13      **A. No.**
14      **In fact, to the extent they are the same**
15  **as we use for valuation purposes, they have to be**
16  **our best estimate of future experience.**
17      Q. Did you look at anything that JOHN F.
18  STAHL prepared? I am sorry. You are JOHN F.
19  STAHL.
20      Did you look at anything Mark Lin prepared
21  in this case?
22      **A. I may have.**
23      **Is Mark Lin the underwriter who reviewed**
24  **the -- I'm not sure who Mark Lin was.**
25      Q. I am not sure underwriter is the correct

Page 132

1  word. He's an actuary, and he looked at the
2  numbers similar to the way you did in your Opinion
3  No. 1.
4      **A. He's an expert, the expert witness or did**
5  **the expert report for the plaintiffs?**
6      Q. Yes.
7      **A. I believe I reviewed that report, yes.**
8      Q. Did you see anything in his report that
9  differed from your report in terms of the estimate
10  of the cost or that you disagreed with in terms of
11  the estimate of the cost?
12      MS. CAPOTOSTO: Object to form.
13      THE WITNESS: I didn't see that he made any
14  independent estimates of the cost, and it looked,
15  from what I can recall from reading it, that he
16  sort of reviewed the numbers we put together and
17  commented on those numbers. I don't recall him --
18  I don't recall independent projections.
19  BY MS. BRAULT:
20      Q. Did you take issue with anything that he
21  said in that report that you can recall?
22      MS. CAPOTOSTO: Object to form.
23      THE WITNESS: I can't recall that I did.
24  BY MS. BRAULT:
25      Q. And then the second opinion that you have

JOHN F. STAHL
January 14, 2014

---

Page 133

1  here is No. 2, "The Medical plan provisions of the
2  proposed" -- well, strike that.
3       Before we get to that, on Exhibit No. 1,
4  is there anything that you relied upon that is not
5  contained in either the report, the exhibits or the
6  files that were provided to us on discs that we
7  looked through?  STAHL 1 through 52.
8     A.  No.
9     Q.  Okay.  And then looking at No. 6, "The
10  Medical plan provisions of the proposed pre-65 plan
11  compare favorably to plan designs reflected in
12  survey data collected for large employers for 2011
13  through 2013."
14       This is the benchmarking, correct?
15     A.  Correct.
16     Q.  Okay.  And unlike the earlier opinion,
17  this opinion does -- it does have a normative raise
18  compared favorably?
19     A.  Correct.
20     Q.  And can you tell me what you did to
21  compare these -- I take it you compared the
22  proposed plan to the benchmark data, correct?
23     A.  That's correct.
24     Q.  Did you compare the current plan to that
25  benchmark data?

---

Page 134

1     A.  I did not.
2     Q.  Tell me what your method -- what the
3  methodology was that you employed for this Opinion
4  No. 2.
5     A.  In Exhibit 7.
6     Q.  You are referencing an exhibit to tell me
7  what the methodology was?
8     A.  Yes.
9       We compared the principal plan provisions
10  against the -- on an individual basis against the
11  principal plan provisions for PPO plans, which were
12  the predominant plans offered for plans in the
13  database for active employees, and then determined
14  whether those fell above or below the average or
15  above or below the first quartile.
16     Q.  Any other methodology that you used to
17  reach your opinion in No. 2?
18     A.  No.
19     Q.  Is there any document or thing that you
20  relied upon that was not provided to us to reach
21  your Opinion No. 2 in the exhibit that we looked
22  at, that we had in this document that was Bates
23  stamped STAHL 52?
24     A.  No.
25     Q.  In reaching Opinion No. 3, can you tell me

---

Page 135

1  what methodology you employed?
2     A.  With respect to the medical costs, we
3  looked at the procedure codes that were contained
4  on the current -- on the Anthem file for claims
5  incurred from 2008 to 2012 November 30.  We
6  determined which of those were associated with
7  procedures that did not exist until 1998.  We
8  looked at what percentage of costs were associated
9  with those codes.  Similarly, we looked at not all
10  prescription drugs but those that were in the top
11  25 and looked at which prescription drugs those
12  were, which were drugs that had been introduced
13  since 1998, and determined what percentage of cost
14  of the top 25 drugs were due to drugs that were
15  introduced since 1998, and I looked at trends that
16  were occurring in those items.
17     Q.  When you say the "top 25," you are talking
18  about the top 25 in what sense?
19     A.  Cost, top 25 drugs with the highest annual
20  cost for each year.
21     Q.  Out of the data of claims?
22     A.  Out of the data of prescription drug
23  claims, yes.
24     Q.  And you didn't actually do that.  That's
25  something that Express Scripts did for you?

---

Page 136

1     A.  Express Scripts has a standard report that
2  they put together that they provided to us.
3     Q.  And you used the data from the Express
4  Scripts standard report?
5     A.  Correct.
6     Q.  Did you use it or did somebody else use
7  it?
8     A.  Somebody else took that report,
9  transferred the actual dollar numbers into an Excel
10  spreadsheet and then looked up each drug in an FDA
11  database to see when that drug was introduced so it
12  could be categorized by the year it was introduced.
13     Q.  You didn't do that, looking it up --
14     A.  I didn't do it personally, no.
15     Q.  So you just took what they did, and you
16  looked at it?
17     A.  That's correct.
18     Q.  You didn't actually do any of the
19  analysis?  They provided it to you?
20     MS. CAPOTOSTO:  Object to form.
21     THE WITNESS:  I believe the actual process
22  would have been Rob.  Rob put together the
23  analysis.  Nick checked it from a technical
24  perspective, and I reviewed it.
25

---

JOHN F. STAHL
January 14, 2014

Page 137

1    BY MS. BRAULT:
2        Q.  By the time you got it for review, all of
3    the calculations had been completed?
4        A.  That's correct.
5        Q.  Was there anything else that you relied
6    upon to reach the conclusion, the opinion that
7    you've listed as No. 3 in your report that you
8    haven't provided to us either in the body of the
9    report, the exhibits or in the documents marked
10   STAHL Exhibit 1 through 52?
11       A.  No.
12       Q.  With respect to Opinion No. 4, it says,
13   "Increased participants' cost sharing leads to more
14   cost-effective plan usage.  Specifically, increases
15   in cost sharing for brand-name drugs under the
16   proposed plan have led to higher utilization of
17   generic drugs and lower overall cost per
18   prescription."
19            That's your opinion?
20       A.  It is.
21       Q.  What is the methodology you used to reach
22   that opinion?
23       A.  We were provided prescription drug claim
24   data and number of prescriptions for the pre-65
25   plans for both the grandfathered and

Page 138

1    non-grandfathered group on a year-by-year basis,
2    I believe, 2009 through 2013 -- I'm sorry -- 2010
3    through the first half of 2013.  We examined the
4    two groups to see what portion of claims and costs
5    fell -- cost per prescription fell into basically
6    six categories:  Generic, brand formulary, brand
7    non-formulary and then also retail and mail.  And
8    we compared the costs in the utilization by
9    category between the grandfathered and
10   non-grandfathered groups.
11   BY MS. BRAULT:
12       Q.  When you say "we," did you actually do
13   that or did you get it after it had already been
14   calculated?
15       A.  I got it after it had already been
16   calculated, and I, again, reviewed the
17   calculations.
18       Q.  Is there anything that you relied upon in
19   reaching a conclusion or your opinion in No. 4 that
20   isn't contained in your report, the exhibit or in
21   STAHL 1 through 52?
22       A.  No.
23       Q.  Is it your intention to rely upon anything
24   else in any future proceeding to support these
25   opinions?

Page 139

1        MS. CAPOTOSTO:  Object to form.
2        THE WITNESS:  To the best of my knowledge, no.
3    BY MS. BRAULT:
4        Q.  Do you intend to do any further analysis
5    in support of any of these opinions?
6        A.  To the best of my knowledge, no.
7        Q.  The opinions that are included in one
8    through four, these are your opinions, correct?
9        A.  Correct.
10       Q.  Do you intend to develop any further
11   opinions with respect to this case?
12       MS. CAPOTOSTO:  Object to form.
13       THE WITNESS:  No.
14   BY MS. BRAULT:
15       Q.  Do you know what, in bargaining, the 2005
16   retirees or those employees who were under the 2005
17   plan originally, do you know what they got in
18   bargaining that the class did not?
19       A.  When you say 2005, do you mean the
20   non-grandfathered?  The newer group?
21       Q.  Yes.
22            Do you know what the non-grandfathered
23   people got in bargaining that the grandfathered did
24   not?
25       MS. CAPOTOSTO:  Object to form.

Page 140

1        THE WITNESS:  I don't.
2    BY MS. BRAULT:
3        Q.  So when you are looking at a comparison of
4    the plan, you are just looking at the plan elements
5    of each of the plans, correct?
6        MS. CAPOTOSTO:  Object to form.
7        THE WITNESS:  I'm specifically looking with
8    respect to the medical plans, is that --
9    BY MS. BRAULT:
10       Q.  Right.
11            When you are talking about cost, you are
12   looking at what the costs are based upon the
13   specific benefit elements?
14       A.  Correct.
15       Q.  Okay.  So, for example, if people in the
16   proposed plan received RMSAs of $7,500 in their
17   notional account, that's not something that you
18   looked at in terms of a plan comparison?
19       A.  That's correct.
20       Q.  And you didn't look at whether or not they
21   received any kind of additional lump sum payment,
22   special 65 lump sum payment for premium, to offset
23   premium, correct?
24       A.  That's correct.
25       Q.  And you didn't look at anything that they



JOHN F. STAHL
January 14, 2014

Page 141

1  would have received by way of increased pension
2  benefits in that contract, correct?
3      A. That's correct.
4      Q. Or the step increases that they may have
5  received over the course of their contract,
6  correct?
7      A. Correct.
8      Q. So in terms of comparing the value of the
9  proposed plan and the current plan, at least your
10  evaluation of the differences does not include
11  whatever benefits the 2005 retirees might have
12  received that are considered either contractual or
13  pension benefits but not specific to the retiree
14  health care plan, correct?
15      MS. CAPOTOSTO: Objection. Form.
16      THE WITNESS: It does not.
17  BY MS. BRAULT:
18      Q. Does the fact of the Medicare Part D
19  program factor into your comparisons in any way?
20      A. Yes, it does.
21      Q. Tell me how.
22      A. It's reflected when we try and figure out
23  what the out-of-pocket cost would be for retirees,
24  Medicare retirees, when the post-65 drug program
25  has been eliminated, in terms of determining what

Page 142

1  their out-of-pocket cost will be, the assumption is
2  made that they will purchase a Part D plan and then
3  will receive benefits, basic Part D benefits under
4  that plan, and that the balance of their
5  out-of-pocket costs would be basically what isn't
6  covered through a Part D plan.
7      Q. Okay. I am going to ask you -- I am going
8  to go back to that, but I want to ask you, did the
9  Affordable Care Act factor into your comparisons in
10  any way?
11      A. Only to the extent it exacted an excise
12  tax. There was some consideration of the excise
13  tax. There was no -- that's where it came into
14  and, I guess, also to the extent that affected the
15  benefits offered under the Part D plan itself. For
16  example, they are closing the donut hole by 2020.
17  So that was an effect of the Affordable Care Act
18  that was reflected in the projections.
19      Q. Okay. And so the specific data that would
20  reflect the out-of-pocket cost to the retiree, can
21  you tell me which of these data files I would find
22  that?
23      A. Historical actual out-of-pocket costs are
24  you referring to?
25      Q. The one you said you considered the

Page 143

1  Medicare Part D program.
2      A. It would be -- I'm not sure. Whichever
3  the one that has the projections that went into
4  Exhibits 5 and 6. I am not sure which document
5  that was. I think it was towards the end. The one
6  that says liabilities, liability summary.
7      Q. This one here.
8      A. I believe that's the one.
9      Q. Is this the one you're talking about?
10      A. Yes.
11      Q. You are saying the out-of-pocket cost to
12  the post-65 prescription drug group is modified in
13  some way -- oh, I see your formula now.
14      Did you write that formula?
15      A. I would have assisted Peter and Rebecca in
16  developing that formula.
17      Q. So what you're doing is you're taking the
18  prescription drug cost from the current plan and
19  doing what to that formula?
20      A. We are essentially -- what we are
21  attempting to do is take the total prescription
22  drug covered cost under the old plan for a post-65
23  retiree. We are subtracting off the percentage of
24  the cost that would be paid by that one minus the
25  Part D premium number there, that's basically, it

Page 144

1  would be saying that it would vary by year.
2      It might, in the first year, be 60 percent
3  of the cost. 60 percent of the drug costs are
4  expected to be covered under the Part D plan. So
5  it's subtracting that off the percentage and saying
6  the balance of that would be an out-of-pocket cost,
7  and then it's also including, as an out-of-pocket
8  cost, the Part D premium.
9      Q. How are you determining what the premium
10  would be?
11      A. If you tab down to the Part D tab there
12  is -- do you see the base beneficiary premium
13  projected forward?
14      Q. Hold on. So is Part D premium projection
15  an actuarial value there?
16      A. Right.
17      Q. Okay. So for 2013 you've got base
18  beneficiary premium. Do you think that that's --
19  what is the base beneficiary premium?
20      A. That is the average premium for
21  participants in Part D, for basic Part D premium
22  average in the U.S.
23      Q. Did you look at it by geography?
24      A. Did not. I don't believe it varies
25  significantly by geography.

JOHN F. STAHL
January 14, 2014

Page 145

1    Q.  Well, the plans do, don't they?  You could
2  get a Part D plan that costs $15 a month, and you
3  could get a Part D plan that costs $150 a month.
4    **A.  There are -- this is base beneficiary**
5  **premium.  It's the plan for the basic Part D plan,**
6  **not for an enhanced version.  So it's the standard**
7  **set of benefits.**
8    Q.  Why does it have an actuarial value of
9  63.4 percent?  I'm not understanding that.
10    **A.  That's the estimated percentage of cost**
11  **that would be covered under the Part D plan in**
12  **2013.**
13    Q.  What is this other box?
14    **A.  I believe that's a transposition of the**
15  **other values in such a way that they could line up**
16  **better with the other exhibits.**
17    Q.  Who is Shawn Maloney?
18    **A.  Shawn Maloney is another actuary in our**
19  **practice that specialized in retired medical and,**
20  **specifically, the prescription drug portion of the**
21  **benefits.**
22    Q.  What does Shawn Maloney have to do with
23  the ---
24    **A.  He helped us determine what was an**
25  **appropriate actuarial value to include as the**

Page 146

1  **prescription drug under the Affordable Care Act.**
2  **He referred to it as the donut hole is filled in,**
3  **and the benefit, Part D basic benefit, increases in**
4  **value to a maximum in 2020.**
5    Q.  Did you do a math model for EGWP?
6    **A.  As part of this analysis?**
7    Q.  As part of any analysis.
8    MS. CAPOTOSTO:  Object and instruct not to
9  answer.
10    THE WITNESS:  Have I ever done an analysis?
11  BY MS. BRAULT:
12    Q.  For this plan.
13    **A.  We have looked at that particular funding**
14  **method.**
15    MS. CAPOTOSTO:  I am going to object and
16  instruct you not to answer based on the
17  work-product doctrine.
18  BY MS. BRAULT:
19    Q.  Well, there are lots of ways to manage
20  costs in a plan, right?
21    **A.  Correct.**
22    Q.  And there are lots of different ways that
23  a plan could compare favorably to another plan,
24  correct?
25    **A.  Correct.**

Page 147

1    Q.  And so one of the things that you said in
2  your opinions was that the medical plan provisions
3  of the proposed pre-65 plan compare favorably to
4  plan designs reflected in survey data, and it goes
5  on.
6    Did you compare the proposed plan to plans
7  with EGWPs for post-65 prescription drug coverage?
8    **A.  I did not.**
9    Q.  Why not?
10    **A.  We don't have -- the databases that we**
11  **have for retiree medical plans do not, I don't**
12  **believe, indicate whether they have EGWP or not as**
13  **part of the design.**
14    Q.  So several hundred or so employers, you
15  can't tell, but you don't think any of them have
16  EGWP?
17    **A.  I don't know how many may or may not have**
18  **EGWPs.  It's not possible to determine from the**
19  **data.**
20    Q.  So the data is somewhat limited in terms
21  of making comparisons?
22    MS. CAPOTOSTO:  Object to form.
23    THE WITNESS:  It is limited for retiree plans.
24  The data -- you notice when you look at the data,
25  many plans have no plan whatsoever listed.  So it's

Page 148

1  much more difficult to draw conclusions from the
2  data that's there for the retirees.
3  BY MS. BRAULT:
4    Q.  So that, indeed, limits your opinion in
5  two.  Your comparison is to mostly active
6  employees, right?
7    **A.  The comparison of benefits?**
8    Q.  Yes.
9    **A.  Entirely active employees.**
10    Q.  So it's not to retirees on any level?
11    **A.  That's correct.**
12    Q.  Okay.  Did you try to do any kind of
13  comparison to retiree plans?
14    **A.  It would have been, A, difficult to do**
15  **because of the way the data is, but also the**
16  **comparison, the database would show a significant**
17  **proportion of employers don't provide any retiree**
18  **medical benefits.  So that would, right off the**
19  **bat, make the plan, any comparison of any plan that**
20  **provides benefits look better right off the bat.**
21  **So it didn't seem to be necessarily the best**
22  **comparison to use.**
23    Q.  Do you know of any benefit that the
24  retirees would receive from -- that switched from
25  the current plan to the proposed plan?



JOHN F. STAHL
January 14, 2014

Page 205

1   did you collect data for only the years 2011
2   through 2013?
3       A.  It wasn't a decision to limit it to that.
4   That's just the data that we have in this database
5   that's continually updated, and it happens at this
6   point in time the plan provisions are in there for
7   those particular years.
8       Q.  And you were comparing, I think we've
9   already talked about that.  You were comparing the
10  retiree plan to active plan?
11      A.  Comparing the --
12      Q.  Pre-65?
13      A.  Pre-65.
14      Q.  And only the medical, right?
15      A.  Medical prescription drug plans were
16  compared as well, but, yes, the medical was an
17  active database compared against the CNH or the
18  proposed plan.
19      Q.  But you didn't compare the current plan?
20      A.  I did not compare the current plan.
21      Q.  Wouldn't it have been a more -- if you
22  had, wouldn't it tell you something more about the
23  difference between the current plan and the
24  proposed plan if you compared both to the benchmark
25  data?

Page 206

1       MS. CAPOTOSTO:  Object to form.
2       THE WITNESS:  I am not sure if that would tell
3   us more or not.  I know that if we compared the --
4   just based on what we were showing the percentiles
5   for the plans that are out there in the database,
6   comparing the current plan against that would
7   likely be maybe in the top 1 or 2 percent of plans.
8   So I don't know that that would provide -- be
9   particularly new information.
10  BY MS. BRAULT:
11      Q.  Maybe I'm wrong here, but the way that you
12  phrased your conclusion on page 1 of your opinion,
13  you say, "The Medical plan provisions of the
14  proposed pre-65 plan compare favorably" --
15      A.  Can you tell me what page you are on?
16      Q.  Page 1.
17      You say the "medical plan provision."  Did
18  you mean to include prescription?
19      A.  I was not intending to be -- to restrict
20  it to the medical plan provision.  I was using it
21  broad.  Quite common -- I was not intending to be
22  limited to the medical.  I was -- should say
23  medical and drug plan provisions.
24      Q.  But it is only for the pre-65 plan,
25  correct?

Page 207

1       A.  That's correct.
2       Q.  You said that you used large employers,
3   correct?
4       A.  Correct.
5       Q.  What are large employers?
6       A.  I am not aware of the exact definition.
7   You see that in terms of the average size of the
8   groups, there was the average was 19,000 employees
9   with a median of 5,000.
10      Q.  Now, is that of total employees or covered
11  employees?
12      A.  I believe that's total employees.
13      Q.  Do you know how many of the total
14  employees are covered?
15      A.  I don't.  I don't know.
16      Q.  So in looking at the benchmark data, we
17  don't really know whether or not the groups are
18  near the same size as our group?
19      MS. CAPOTOSTO:  Object to form.
20      THE WITNESS:  In terms of covered employees, we
21  don't know.
22  BY MS. BRAULT:
23      Q.  And as far as the -- how many employees
24  does CNH have?
25      A.  In round numbers, if I look at salaried

Page 208

1   and nonunion and hourly and the UAW group, which
2   tend to be the groups I look at, it's in the 9,000
3   range, 10,000 range, I believe.
4       Q.  I'm sorry.  9 to 10,000?
5       A.  I believe, yes.
6       Q.  Okay.  Now, going to the -- would it be
7   fair to say you kind of split the proposed plan
8   into two pieces that would apply to the pre-65 and
9   that would apply to the post-65, and then you are
10  only comparing the pre-65; is that fair?
11      A.  That's what we're doing.
12      Q.  Looking at the basis of your opinion
13  comparison against the benchmark data -- I think
14  we've already talked about this -- what you did or
15  what your staff did was to look at specific benefit
16  provisions, not a constellation of benefit
17  provisions?
18      A.  That's correct.
19      Q.  And there isn't, as far as I could tell,
20  any data or comparison that would reflect what a
21  premium cost sharing would be for the benchmark
22  plans against the current plan?
23      A.  That's correct.
24      Q.  So just bear with me for a second.  So one
25  of these benchmark companies may have a lower copay

JOHN F. STAHL
January 14, 2014

**Page 217**

1  looking for that item in an active because that's
2  very, very rare in an active plan.
3     Q.  You didn't compare -- even though you have
4  all of this data for retirees out there, that's not
5  what you compared, correct?
6     A.  We didn't compare it against the retiree
7  data.  That's correct.
8     Q.  That was because it was too small?
9     A.  It's because there are so many plans that
10 provide no benefit at all.
11    Q.  How many plans do provide benefits under
12 this retiree field?
13    A.  I didn't look.  We could figure it out
14 but...
15    Q.  Is that the separate database that you
16 were talking about or is that even a different one
17 that deals with collective bargaining agreements?
18    A.  I believe this is the same.
19    Q.  It's the same employers and then it
20 depends on whether or not they provide --
21    A.  When you say the separate database...
22    Q.  Look at the screen where it says active --
23 and this is STAHL 52 again.  It says Actives All
24 Fields and Retiree All Fields, and then on A, we
25 have got names of employers.  These are the same

**Page 218**

1  employers for active and retirees, right?
2     A.  Right.
3     Q.  Okay.  That's what I was asking.
4     A.  Yes, we would ask for data on both their
5  active and retiree plans.
6     Q.  Okay.  Is there any indication here
7  whether or not the benefits are found to have been
8  vested?
9     MS. CAPOTOSTO:  Object to form.
10    THE WITNESS:  I don't know.
11 BY MS. BRAULT:
12    Q.  Do you know if there is any indication in
13 here whether or not there is a valid reservation of
14 rights clause in this contract?
15    A.  I don't know.
16    Q.  Do you know if there is a data point in
17 STAHL 52, the benchmarking data, that would
18 indicate whether or not there was a promise that
19 the benefit would be provided to the retiree at no
20 cost or the active at no cost?
21    A.  I don't know.
22    Q.  Is there an indication whether or not the
23 benefit is subjected to any kind of pending legal
24 challenge or had been subjected to the legal
25 challenge or anything like that?

**Page 219**

1     A.  Almost certainly not but I don't know.
2     Q.  Okay.  Can you tell from looking at the
3  benchmark data how many of those companies have
4  eliminated pos-Medicare prescription drugs in their
5  entirety?
6     MS. CAPOTOSTO:  Object to form.
7     THE WITNESS:  How many have --
8  BY MR. BRAULT:
9     Q.  Who have eliminated post-Medicare
10 prescription drugs in its entirety?  In other
11 words, they provided it before Part D and then they
12 just eliminated it.
13    MS. CAPOTOSTO:  Object to form.
14    THE WITNESS:  You can't tell.
15 BY MS. BRAULT:
16    Q.  I'm sorry.  You can't tell?
17    A.  You can't tell.
18    Q.  You, obviously, have many benefit plans
19 that you provide services for, correct?
20    MS. CAPOTOSTO:  Object to form.
21 BY MR. BRAULT:
22    Q.  Between your eight to ten clients and all
23 of their various plans, right?
24    A.  Correct.
25    Q.  And then some special project and things

**Page 220**

1  like that?
2     A.  Yes.
3     Q.  How many benefit plans do you provide
4  services for that made a decision to eliminate
5  Part D coverage when Part D was introduced?
6     A.  Eliminate prescription drug coverage?
7     Q.  Yes.
8     A.  I can't give you an exact number, but
9  there was at least one that eliminated it
10 immediately.  There has been at least several
11 others that have eliminated it subsequently, and
12 then there has been many others that are -- not
13 many -- but others beyond that that have changed
14 their benefit so that it's not a defined benefit
15 plan or it doesn't define the medical benefits or
16 the prescription drug benefit.  It provides a
17 defined dollar subsidy that the retiree can take to
18 the market and buy whatever plan they want.
19    Q.  Do you know if CNH, for the 2005 group,
20 instituted a defined subsidy for them so that they
21 could go out and buy the Part D coverage on the
22 market?
23    A.  Do I know if they did?
24    Q.  Yes.
25    A.  To my knowledge -- well, I don't know that

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

Page 225

1    are not in here as far as I could find them.  They
2    are not in here under Case.  Maybe CNH?  No.
3           Let's talk about the "Covered Services and
4    Prescription Drugs."  I don't want to repeat what
5    we already did on this.  You say, "A high
6    percentage of the actual cost for medical and
7    prescription drugs for the current plan over the
8    period 2008 through 2012 involved procedure codes
9    or drugs that did not exist in 1998."
10          And then you have a conclusion sentence,
11   "As a result, the proposed changes are reasonable
12   in the light of continuing changes in the cost and
13   delivery of health care," correct?
14      A.  Correct.
15      Q.  Is your statement, "As a result, the
16   proposed changes are reasonable in light of
17   continuing changes in the cost and delivery of
18   health care," dependent upon your premise here
19   relating to the high percentage of actual cost of
20   medical and prescription drug cost not existing in
21   1998?
22      MS. CAPOTOSTO:  Object to form.
23      THE WITNESS:  The premise is that additional --
24   all medical plans are worded in such a way that
25   they pick up those costs automatically.  So they

Page 226

1    are, of necessity, covering services that were not
2    originally available in any given base year and
3    that they are covered as long as they are medically
4    necessary in the future.
5    BY MS. BRAULT:
6       Q.  So would you agree with me that your
7    conclusion is dependent upon the proposition in
8    your first sentence that if the procedure code or
9    drug didn't exist in 1998, then it's a change --
10   well, let me strike that.
11          Other than the code not existing or the
12   drug not existing in 1998, is there any other
13   reason or basis for your conclusion that that
14   medical procedure or prescription drug did not
15   exist?
16      MS. CAPOTOSTO:  Object to form.
17      THE WITNESS:  No.
18   BY MS. BRAULT:
19      Q.  So if we were to show that it's not true
20   that a code change always represents a
21   technological advance in medicine, then to the
22   extent we can show that, it would not support your
23   conclusion, correct?
24      MS. CAPOTOSTO:  Object to form.
25      THE WITNESS:  I think that if you could show

Page 227

1    that it never happens, then, perhaps, that would
2    undercut it entirely, I believe, but to the extent
3    that you could show that there are certain codes
4    that don't represent increases, then that would
5    certainly lessen the impact of the new procedures.
6    BY MS. BRAULT:
7       Q.  Okay.  We'll talk about that.  In the
8    basis for your opinion you talk about medical
9    procedures since 1998, right?
10      A.  Yes.
11      Q.  You say that Exhibit 8 shows medical
12   expenses for 2009 through 2012 broken down between
13   services for codes that existed and services for
14   codes which did not.  That all came out of Anthem?
15      A.  That came out of the codes themselves that
16   were contained on the Anthem database and that we
17   have separate -- RBRVS filed it and the codes from
18   1998.
19      Q.  And those were the -- we were looking at
20   those two files that were too big to open, and
21   without really causing problems, the note files,
22   that's in sort of the raw data form?
23      A.  To be honest, I am not sure that those
24   were even summarized in the two files that are too
25   big to open.  They were in the Notepad files.

Page 228

1       Q.  They are in the Notepad files?
2       A.  Yes, it would be in the Notepad files.
3       Q.  The Anthem summaries are in 19 and 20, and
4    they are 47,000 and 46,000 kilobytes each.  And
5    every time we try to open them, it crashes
6    everything.
7          It may take a little while, but we are
8    currently trying to open STAHL 39C.  There we go.
9    So 39C is a Notepad document that has a bunch of
10   sort of raw data.  Do you know which one of these
11   is the code information?
12      A.  I don't know off the top of my head.
13      Q.  You never tried to match a particular code
14   to any particular procedure, correct?
15      A.  I did not personally.
16      Q.  Okay.  Are you familiar with the CPTs or
17   the coding system that are used?  Is that something
18   that's familiar to you?
19      A.  Not particularly.
20      Q.  Do you know what they use them for?
21      A.  To -- not specifically.
22      Q.  You report that approximately 24 percent
23   of the records did not have a code and costs for
24   those claims are shown separately?
25      A.  Correct.

JOHN F. STAHL
January 14, 2014

Page 229

1    Q.  Okay.  So the logic here is that if the
2  procedure code didn't exist in 1998, then that
3  procedure or service didn't exist.  So the fact
4  that it exists now represents a technological
5  advance and a benefit that or a service that could
6  not have been provided under the original contract
7  because it didn't exist, right?
8    A.  Yes.  That's the general logic, yes.
9    Q.  Do you know how new codes are initiated?
10  Do you know how new codes come into use?
11    A.  No.
12    Q.  Do you know if some new codes are
13  reclassifications of existing codes rather than new
14  procedures?
15    A.  No.
16    Q.  Do you know who develops and publishes the
17  codes?
18    A.  I don't know the organization myself, no.
19    Q.  Do you know why codes get changed?
20    A.  No.
21    Q.  Do you know how often a change in code is
22  just a re-definition of an existing code?
23    A.  No.
24    Q.  Do you know how much of the 25 percent
25  or -- well, do you know how many of the codes that

Page 230

1  you tracked as being not in existence in 1998 had
2  maybe a bundled code prior to 1998 that then was
3  unbundled after 1998 to include many different
4  codes?
5    A.  I don't know.
6    Q.  One of the codes that you reported on was
7  a Code 29827.  Exhibit 8.
8        Do you know that there was a code for
9  example, sutures, for puncture wounds before 1998?
10    A.  No.
11    Q.  Do you know that after 1998 they revised
12  the codes to include codes that would capture
13  sutures for puncture wounds, one puncture and
14  another code for sutures for puncture wounds, two
15  punctures and another code for suture wounds, three
16  punctures?  Are you aware of some of the changes in
17  the code being based upon that kind of unbundling?
18    MS. CAPOTOSTO:  Object to form.
19    THE WITNESS:  I'm not aware of that.
20  BY MS. BRAULT:
21    Q.  That's not part of what you studied here?
22    A.  Correct.
23    Q.  Would you agree with me that if you had
24  different codes to separate out number of puncture
25  wounds you were suturing isn't an indication that

Page 231

1  suturing of puncture wounds is a new technology or
2  a new service that wasn't available to the patient
3  prior to the unbundling of the code; would you
4  agree with me?
5    A.  I would agree.
6    Q.  Do you know what a comprehensive metabolic
7  panel is?
8    A.  I do not.
9    Q.  Let's talk a little bit about prescription
10  drugs.  In your report you talk about prescription
11  drugs that were not available in 1998?
12    A.  Yes.
13    Q.  Did you do any studies to determine
14  whether or not the prescription drugs that were
15  determined to be not available in 1998 existed in a
16  brand name form prior to 1998 as opposed to a
17  generic form?
18    MS. CAPOTOSTO:  Object to form.
19    THE WITNESS:  I did not.
20  BY MS. BRAULT:
21    Q.  Are the drugs listed and analyzed by the
22  drug name?
23    A.  I don't know.
24    Q.  I think you gave me the example of Nexium?
25    A.  I don't know what was on the Power Point

Page 232

1  file, if there was actual drug code or just a name.
2    Q.  Because you didn't do that work?
3    A.  I didn't -- I didn't directly do that work
4  myself.  I can't recall.  I believe they used the
5  name.
6    Q.  Can we look at it?
7    A.  Sure.
8    Q.  Where would I look; do you know?
9    A.  Scroll up until you see the Power Point.
10    Q.  This one maybe?
11    A.  Sure.
12    Q.  We are looking at STAHL 10.
13    A.  This one use the slider at the bottom.
14    Q.  So it look like it's by drug name,
15  correct?
16    A.  Correct.
17    Q.  And it indicates whether it's formulary or
18  not?
19    A.  Yes.
20    Q.  What is formulary?
21    A.  It is a group of drugs established by the,
22  in this case, ESI where they obtain favorable
23  pricing on those particular drugs.  There are lower
24  copays for those drugs as opposed to a
25  non-formulary drug.



JOHN F. STAHL
January 14, 2014

---

Page 233

1      Q.   Do you know when Viagra was released on
2  the market?
3      A.   I do not know that.
4      Q.   Do you know if any of these were drugs
5  that were created before 2004 when the -- or 2005
6  when the contract expired?
7      A.   No, I don't.
8      Q.   So do you know what the time limitation is
9  for a patent for a drug?
10     A.   No, I don't.
11     Q.   Do you know that drug patents only last
12 for 15 years?
13     A.   No.
14     Q.   If I told you that, would that affect your
15 analysis of this in any way?
16     A.   No.
17     Q.   Do you know if sometimes what happens is
18 in the industry that there are variations made to
19 patented drugs under different names so that the
20 patent can be increased but the drug basically does
21 the same thing?
22     A.   No.
23     Q.   Would you say that it's true that some new
24 drugs are generic versions of previously existing
25 drugs?

---

Page 234

1      MS. CAPOTOSTO:  Object to form.
2      THE WITNESS:  I wouldn't have any knowledge of
3  that.
4  BY MS. BRAULT:
5      Q.   Okay.  And some new brand name
6  alternatives are alternatives to brand name
7  existing drugs?
8      MS. CAPOTOSTO:  Object to form.
9      THE WITNESS:  I don't.  I don't know.
10 BY MS. BRAULT:
11     Q.   That wasn't something that you looked at
12 either?
13     A.   (Witness nodding head.)
14     Q.   Would you agree that some new drugs treat
15 previously untreatable illnesses so they would
16 replace medical costs?
17     A.   I would agree certainly that some new
18 drugs treat previously untreatable illnesses.
19     Q.   Isn't it true that there were new drugs
20 coming out -- I mean there have been new drugs
21 coming out all the time for decades, really; would
22 you agree?
23     A.   I would agree.
24     Q.   And that's something that people were
25 certainly contemplating when they came up with a

---

Page 235

1  plan for prescription drugs, wouldn't you agree?
2      MS. CAPOTOSTO:  Object to form.
3  BY MS. BRAULT:
4      Q.   Wouldn't you agree it's likely people
5  would be thinking about the fact that there would
6  be new drugs that would be covered by a
7  prescription drug plan in the future?
8      A.   All medical and drug plans are inherently
9  written that they cover medically necessary drugs.
10 So they sort of inherently expand their coverage to
11 cover new treatments and drugs.
12     Q.   So you could write a plan that said we are
13 only going to cover drugs that are available now,
14 right?
15     A.   I've never seen one written that way.  So
16 I'm not sure if it could be done.
17     Q.   I mean it would probably be more expensive
18 over time, right, if you made a comprehensive list
19 of the drugs that could be used and then set it and
20 said there couldn't be any changes?
21     MS. CAPOTOSTO:  Object to form.
22     THE WITNESS:  I don't have any view as to
23 whether that would be more expensive or less
24 expensive.
25

---

Page 236

1  BY MS. BRAULT:
2      Q.   Okay.  I am going get to your last part of
3  this.
4      MS. CAPOTOSTO:  Would it be a good time for us
5  to take a very brief break.
6      MS. BRAULT:  Can we do very brief because I'm
7  not going to be much longer.  I don't want to say
8  I'm not going to be much longer.  I'd like to get
9  done as quickly as I can, obviously, for everyone's
10 sake.
11          (A short break was taken.)
12 BY MS. BRAULT:
13     Q.   Would you agree that a preferred way to
14 accomplish more cost effective Medicare -- I'm
15 sorry -- prescription drug usage is to provide a
16 voluntary choice as opposed to schedule that
17 doesn't allow you to minimize the cost effect?
18     MS. CAPOTOSTO:  Object to form.
19     MS. BRAULT:  Bad question.  I'll try again.
20 BY MS. BRAULT:
21     Q.   We talked earlier about the different ways
22 that you can modify a prescription drug plan to
23 encourage better or more cost effective consumer
24 behavior, right?
25     A.   Yes.

---

