# EXHIBIT C

# REESE, ET AL v. CNH GLOBAL N.V., ET AL

# SCOTT MACEY

January 15, 2014

*Prepared for you by*



NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

Page 242

1  Q   Where did you work prior to ERIC?
2  A   My immediate prior employer was the law firm
3  of Covington & Burling here in Washington, D.C.
4  Q   And how long did you work for Covington &
5  Burling?
6  A   A little over two years.
7  Q   My recollection is when I took your
8  deposition in another retiree health care case called
9  Sloan V. BorgWarner, you were working at Covington
10 Burling; is that correct?
11 A   Yeah. Do you recall what -- I forget when
12 you took -- when that other deposition was. But...
13 Q   I believe it was in 2012.
14 A   Okay. I worked at Covington & Burling until
15 the end of May 2012.
16 Q   It was before May of 2012?
17 A   Okay. So that would be correct.
18 Q   You recall that deposition from the Sloan
19 case?
20 A   Well, none of the details at this point.
21 Q   Did you -- prior to coming in here today,
22 did you review the transcript in that case of your
23 deposition?
24 A   No.
25 Q   During that case we spent some time going

Page 243

1  through your background, your educational background,
2  and other places that you had worked in the past.
3         I know at one point you reviewed the
4  deposition transcript to make sure that it was
5  accurate; is that true?
6  A   I -- I probably -- I don't specifically
7  recall doing it, but I -- I believe that I did it,
8  because I think I -- any time I've testified, which
9  hasn't been too many times, I always got to look at
10 the transcript and offer corrections if something
11 wasn't right.
12 Q   So if there were corrections that were to be
13 made to that Sloan case deposition, you would have --
14 you would have made those corrections?
15 A   I believe that's the case, yes.
16 Q   Do you recall anything that was -- that you
17 testified in the Sloan case as it relates to your
18 educational background or your employment history that
19 was incorrect?
20 A   I -- I don't recall, because I don't recall
21 what I actually testified and what I actually said.
22 But I assume that I properly stated my background, and
23 that if there was some incorrect transcription error,
24 I would have caught it.
25 Q   Okay. So what I'm trying to avoid is, as

Page 244

1  interesting as your educational background is --
2  A   Boring.
3  Q   -- and your employment background is, I'd
4  like to not -- I'd like to skip over that, and based
5  on those assurances that you reviewed the transcript
6  and if you would have seen an error you would have
7  corrected it, then I'm going to skip over that so that
8  we can get to maybe more relevant information as it
9  relates to this, since you already had that in the
10 record at a deposition under oath at least once as it
11 relates to your background.
12       Okay. As the President and CEO of ERIC,
13 what are your job responsibilities?
14 A   I'm charged with managing and overseeing the
15 general activities of the organization. I'm
16 responsible for its budget and finances and managing
17 the staff. I, you know, have communications and
18 interactions with the member representatives,
19 different employees from different companies that
20 are -- that are members, and, you know, at least
21 playing a role in the overall policy directions of the
22 organization. It's ultimately controlled by a Board
23 of Directors.
24 Q   And what is ERIC?
25     MR. ROGACZEWSKI: Objection to form.

Page 245

1  A   ERIC is a nonprofit trade association
2  focused on benefit and ERISA matters, primarily on
3  behalf of major plan sponsors.
4  Q   Is that major employers? Or is it beyond
5  employers?
6     MR. ROGACZEWSKI: Objection to form.
7  A   Major employers.
8  Q   Do you have -- are there any labor unions
9  that are members of ERIC?
10 A   No.
11 Q   On behalf of ERIC, what are its general
12 activities?
13 A   Keeping members well informed of issues and
14 developments regarding ERISA and employee benefits;
15 interacting with the Federal agencies that regulate
16 employee benefits on matters of importance, things
17 that they ask us about, and on their proposals
18 regarding regulations and guidance and things like
19 that; from time to time developing and filing amicus
20 briefs in cases of importance to the -- to the
21 members; monitoring interacting with Congress on major
22 or sometimes technical, substantive legislative
23 developments regarding benefits, ERISA, in some cases
24 the tax code and related laws.
25       I think that's probably at a high level what

Page 246

1  we do.
2      Q   And with respect to -- I think you used the
3  word "members."  Could you describe what a member is,
4  how that's defined?
5      A   Yeah.  A member is a -- is a plan sponsor
6  that has a significant number of employees that
7  sponsors benefit programs, retirement programs,
8  pensions, 401(k) plans, health plans, life insurance
9  and things like that, that has determined to join our
10 organization and assigns one or more people to be --
11 to interact with the organization, either to receive
12 our communications, to be on our conference calls, and
13 to come to meetings.
14     Q   And do they pay a fee to become a member?
15     A   They pay annual dues.
16     Q   With respect to policy direction, who sets
17 the policy for ERIC?
18     A   Ultimately the members, either directly
19 if -- if they're asked, or sometimes we will go out
20 with a mailing to members in general, should we be
21 concerned, are you concerned about this or not; if so,
22 let us know how.  Sometimes the Board of Directors.
23 You know, rarely would staff, including me, alone
24 enunciate some policy position.
25     Q   Who's on the Board of Directors?

Page 247

1      A   20 to 25 company representatives.
2      Q   Is CNH a member of ERIC?
3      A   No.
4      Q   Are any of CNH's affiliated or entities a
5  member of ERIC?
6      A   Well, I don't know who that would be, but I
7  understand that CNH is somehow associated with Fiat,
8  and, to my knowledge, I know Fiat is not a member,
9  but, to my knowledge, no other company associated with
10 Fiat is a member.
11     Q   Does ERIC engage in lobbying activity?
12     A   Yes.
13     Q   Do you personally engage in lobbying
14 activity?
15     A   Not much.
16     Q   Has ERIC ever taken a position or advocated
17 a position as it relates to retiree health care
18 benefits?
19         MR. ROGACZEWSKI:  Objection to form.
20     A   I guess, could you be more explicit on that,
21 when you say retiree health care, taking a position
22 regarding retiree health care?
23     Q   Has ERIC ever advocated in front of Congress
24 or regulatory agencies on issues that relate to
25 retiree health care benefits?

Page 248

1      A   Well, first, has it ever, perhaps.  The
2  organization was formed in, I want to say around 1976,
3  probably, '76, '70 -- around 1976.  So, you know, it's
4  a long history.
5          During my tenure as CEO, there's been only
6  one issue regarding retiree health that we spent any
7  time or addressed at all.
8      Q   And what was that issue?
9      A   That was whether or not the Affordable Care
10 Act, the market reform provisions, applied to a
11 retiree-only plan, a plan that had only retirees in
12 it.
13     Q   And what was the position of ERIC as it
14 relates to that issue?
15     A   We didn't think it should, and the
16 Government agreed.
17     Q   Have you, even before your time at ERIC,
18 ever been an advocate or a lobbyist for issues related
19 to retiree health care?
20         MR. ROGACZEWSKI:  Object to form.
21     A   My recollection would be yes, in some --
22 some fashion.
23     Q   Okay.  And for whom were you working at that
24 time?
25     A   I believe that I was probably working for

Page 249

1  AT&T.
2      Q   Okay.  And what was the position of AT&T?
3          MR. ROGACZEWSKI:  Objection to form.
4      A   I don't recall -- I don't recall the
5  specific issues, but there was a hearing before a
6  congressional committee and the hearing involved
7  some - this is a number of years ago, so I -- you
8  know, I can't recall all this stuff in detail -
9  something to do with the vesting or not or -- of
10 retiree health.  And the reason I can recall something
11 about it is the person who was testifying right before
12 or right after me, I think right before, and on the
13 same panel, was a retiree from Bethlehem Steel.  And I
14 spoke with him some, and he had a, you know, a tough
15 story to tell, and, you know, I talked to him about
16 it.  So I remember that.  So -- but I don't remember
17 the specific issue before Congress or what our
18 specific -- what my specific testimony was.
19     Q   Do you recall whether you were advocating
20 for or against vested retiree health care benefits?
21     A   You know, I --
22         MR. ROGACZEWSKI:  Objection to form.
23     A   I don't argue -- I've never argued for or
24 against vesting retiree health benefits.  The position
25 that I have personally and that I've represented, you



Page 334

1  Q   So I guess what -- I think what I'm taking
2  from your answer there is that with respect to the
3  unions at AT&T, Lucent, the UAW, General Motors and
4  Ford, and possibly the steelworkers, that the unions
5  viewed the benefits as vested, but I guess I didn't
6  hear whether you thought the employers thought they
7  were vested.
8      A   The companies all thought they weren't
9  vested.
10     Q   Okay.  And in none of those cases was there
11 a finding, that you're aware of, that the benefits
12 were vested?
13     A   I believe that's correct.  I'm not sure
14 about -- they might have been in the GM Case, when the
15 UAW VEBA, they might have -- I think the court, if I
16 recall - and I haven't read it lately - kind of
17 skirted the issue and didn't get into too much of
18 that, just that in the end it's in the best interest
19 of everybody, all the parties.
20     Q   And with respect to AT&T and Lucent, there
21 were caps that were negotiated by the parties with
22 respect to retiree health care?
23     A   That's correct.  Yes.
24     Q   And with respect to any of the other
25 bargaining relationships that you described in your

Page 335

1  report, were there caps that were part of the formula
2  for retiree health care?
3      A   I think the -- the ones -- forget the UAW
4  auto company ones.  I think Goodyear and U.S. Steel,
5  there weren't caps on the group of the people
6  affected, and it just got to where I think the parties
7  came to an agreement that this was -- you know, the
8  companies were saying this is too burdensome for what
9  we feel we're able to cover, or, you know, we think we
10 need to make changes consistent with what other
11 companies are doing, and ultimately they came to an
12 agreement.  I don't think there were -- if there were
13 caps, there wasn't caps that affected all the people
14 involved.
15     Q   Okay.  And you mentioned that at least with
16 respect to General Motors, there was a bankruptcy that
17 was involved with that.
18     A   Ultimately there was a bankruptcy.
19     Q   And with respect to some of the other
20 companies, I believe, at least with respect to Ford,
21 there was a potential for bankruptcy?
22     A   Yeah.  I mean, they were never in the
23 extremis situation that GM and Chrysler was, but I
24 assume they -- you know, were running through cash at
25 that point in time.

Page 336

1  Q   I'm going to just backtrack a little bit.
2      With respect to the lobbying activity that
3  you've engaged in during your career, have you ever
4  lobbied on behalf of a labor union?
5      A   No.
6      Q   Okay.  And I think -- and I know you said
7  previously that ERIC doesn't have any labor union
8  members, correct?
9      A   Correct.
10     Q   With respect to the members, that's a
11 voluntary membership group for ERIC?
12     A   Yes.
13     Q   And they pay voluntary dues?
14     A   Yes.
15     Q   Okay.  And your pay is out of the dues that
16 are received by ERIC?
17     A   Well, out of the total budget, and the
18 budget is primarily dues.
19     Q   Okay.  Are there -- what other methods of --
20     A   Oh, there might be a few payments for events
21 or, you know, monies collected on events.  You know,
22 we collect money for amicus briefs and then, you know,
23 pay a law firm to prepare the brief, and it might not
24 match total exactly, dollar for dollar, of what we
25 collect, you know.  But there's a lot of internal

Page 337

1  staff time put into all of that, so part of it will go
2  to defer those expenses.  But the bulk of the
3  revenues, I'd say 95 percent, probably come from dues.
4      Q   With respect to the positions that ERIC
5  takes, it's advocating on behalf of its members'
6  interests; is that accurate?
7      A   I would -- yeah, I think that's a good
8  characterization.
9      Q   And in advocating on behalf of its members'
10 interests, who are mostly large corporations,
11 sometimes those interests are in opposition to the
12 interests of retirees; is that accurate?
13         MR. ROGACZEWSKI:  Object to the form.
14     A   I guess that's just how -- it depends on how
15 you look at it.  I think, you know, that -- I could
16 see there might be situations where either a union
17 representing employees or some employees or former
18 employees/retirees would consider that, but I don't --
19 you know, I don't inherently see that tension.  A lot
20 of the -- an awful lot of what ERIC does is technical
21 stuff, technical substantive stuff, you know:  How --
22 what does the Internal Revenue Code or ERISA require
23 regarding the design of plan; does state law or
24 Federal law apply to a -- a particular issue;
25 should -- should the Government mandate the provision



Page 338

1  of some type of requirement benefit.
2       And the reason I can say that that wouldn't
3  have an effect on our members' employees is because
4  they -- our members might take a position on that
5  because they don't like -- generally, they don't like
6  mandates from the Government on the design of
7  particular aspects of plans or the maintenance of
8  those plans. But they all have plans.
9       So if there was a mandate put in, they
10 wouldn't be affected by it. There are some bills over
11 the last few years that have been in there that looks
12 like, oh, every plan, every sponsor, every company has
13 to either have a plan or provide payroll withholding
14 to send money to some outside agency or a financial
15 company on behalf of employees. Our members wouldn't
16 be affected by that. That's our determination. But
17 they might say, well, you know, if we're asked, we
18 don't like that because we don't believe in mandates.
19 It might not be that we do a lot of lobbying on it,
20 but we're doing some lobbying on something else and
21 asked about that.
22      So, you know, I don't think -- is it
23 possible to have some tension between the ERIC
24 position and what the common sense says may be what
25 the union or employees might feel? Yeah, I guess it's

Page 339

1  possible. I don't think that's the -- just the normal
2  issue. I don't think there's an inherent tension.
3     Q   If there is a tension, ERIC is going to
4  advocate on behalf of its members over the interests
5  of anyone who isn't a member, correct?
6     A   Oh, that's true. There are times where we
7  stand down, where we say, well, let's -- you know,
8  let's stand by, let's not get involved in this issue.
9     Q   Well, what I'm asking is a little different
10 than that.
11      What I'm asking is, if there is an issue
12 that could negatively impact employees or retirees
13 that ERIC's members want to see happen, that ERIC will
14 advocate on behalf of what its members want?
15    A   Not --
16        MR. ROGACZEWSKI: Object to form.
17    A   Not automatically. If -- you know, we have
18 a -- an Executive Committee, we have a Board of
19 Directors, we have influential members, and, you know,
20 there could be situations where, you know, we don't
21 want to do something on behalf of some members that
22 might aggravate another set of members, either because
23 of sensitivity to the issues or, even though it might
24 benefit some companies, they don't think it's a good
25 position to take, or something like that. So

Page 340

1  sometimes we just stand down from issues.
2     Q   I understand that.
3         But I'm talking when there is no conflict
4  among ERIC's members, if there -- if ERIC takes a
5  position, it's on behalf of its members, and if that
6  position is antithetical to employees or retirees,
7  then that would -- that wouldn't matter to ERIC.
8     A   It matters because we do the following, at
9  least, you know, we try to understand what the -- if
10 there is opposition - and it's not unusual in our, you
11 know, adversarial political and policy environment,
12 that there's opposition - then what is the opposition,
13 and why do they feel the way they feel. Now, it might
14 be obvious in some situations why they feel the way
15 they feel. In other situations it might be more
16 subtle, you know. We try to reach out to AARP,
17 Pension Rights Center, unions on occasion, and say,
18 you know -- I've had AARP and the Pension Rights
19 Center and other retiree organizations call me and ask
20 for a meeting about a particular issue, and I'll say
21 yeah, come on in; I'll say I don't know if we're going
22 to end up, you know, on the -- feeling the same way
23 about this, but, yeah, come on in.
24      And so we care about it, but, yeah, if it
25 came down between a choice that the members all felt

Page 341

1  strongly about and what a union or AARP or Pension
2  Rights Center or something felt strongly about and
3  there was a tension between them and we weren't going
4  to stand down, yeah, we'll take the position of our
5  members. We don't go looking for fights, though, and
6  if there are ways to avoid it, you know, before
7  Congress or the agency or something like that, we're
8  always happy to explore it.
9     Q   Okay. I may have asked you this previously.
10        But you -- during your time -- at any time
11 in your career, you've never represented CNH or been a
12 consultant to CNH, have you?
13    A   I've had no contact with them whatsoever.
14    Q   Are you intending to file any additional
15 documentation or supplement your expert report in any
16 way?
17    A   I guess I don't -- I don't know. I guess it
18 depends on -- you know, I would probably take my cue
19 in that regard in whether counsel felt it was helpful.
20    Q   But right now you're not, you have no
21 intention --
22    A   I don't have a specific intent to do so,
23 but, you know, there -- it could come up.
24    Q   Okay.
25        MR. ROGACZEWSKI: We're mindful of our

Page 362

1  insurance provider provide Part D coverage for all of
2  its retirees --
3       MR. ROGACZEWSKI: Objection to form.
4  Q   -- who are Medicare-eligible?
5  A   I -- I don't recall. It seems to ring a
6  bell, that concept, but I don't recall specifically.
7  Q   Okay. On Page 23 you state that advances in
8  medical technology have increased costs and
9  justified -- and justify the plan changes.
10      Could you explain how you reached that
11 conclusion, or what you used to reach that conclusion?
12 A   Where exactly did I say that here? Page 23?
13 What -- in the first full paragraph or that second
14 paragraph in the middle of the page?
15 Q   It kind of starts with the first full
16 paragraph.
17 A   (Reviewing.)
18      I don't see where you are. I'm sorry.
19 Q   Where it starts, "The cost of health care
20 product -- the costs of health care have risen
21 significantly due to the --
22 A   Yes.
23 Q   -- increases in drug technology.
24 A   I see that.
25 Q   I'm not quoting you verbatim, but the first

Page 363

1  paragraph relates to technological changes as being a
2  driver of increased health care costs.
3  A   And so give me your question.
4  Q   And my question is, how did you reach that
5  conclusion, that medical technology has been a driver
6  of increased medical costs?
7  A   Oh. Just the -- there are Government and
8  other reports from consultants in the health care
9  industry, such as Kaiser and Rand & Company, and all
10 associations like that. There's a lot of literature
11 on it. You know, the -- some of the primary drivers
12 of increased health care costs, obviously some is the
13 demographics of the aging, you know, the population is
14 aging more, baby boomers are getting older, that big
15 bubble of people.
16      But the -- the new drugs, the new
17 treatments, and all of the new technologies, and I
18 think that -- on the bottom of the page, you know, my
19 references to the Tower study and Stahl's report bears
20 all that out, that all the -- the -- either the new
21 drugs that -- that are now a cost of the plan, that
22 people are using, the cost of the plan, or the
23 procedure codes under the medical aspects of the plan
24 have changed significantly between '98 and whenever
25 the report was, 2012 or something.

Page 364

1  Q   Are you -- do you have any expertise in
2  medical codes, technological codes, or --
3  A   Not really, no.
4  Q   So a code could change, for example, for a
5  prescription drug because it became generic, correct?
6  A   I -- I honestly don't know that. I -- you
7  know, and so I -- I don't know, you know, how they
8  applied the -- that aspect of their study.
9  Q   Okay. And one thing that has happened in
10 the medical field over the last, say, 15 years or so
11 is the increased use of generics as an alternative and
12 a cost saver for employers; is that correct?
13 A   Well, because a lot of drugs -- yes, it is
14 correct. Because a lot of drugs, significantly used
15 drugs for some chronic conditions, such as high
16 cholesterol as an example, have come off patent
17 protection and moved into being generic.
18 Q   And that's a trend that has increased over
19 time; is that correct?
20 A   I think it's -- I don't know -- I think it
21 has, but, you know, part of it is that there's --
22 there was a number of very significant widely-used
23 drugs that came off patent protection that certainly
24 helped that trend along.
25      MR. RADTKE: Okay. Could you give me about

Page 365

1  10, maybe 5 or 10 minutes, and I'll see if I have any
2  additional questions.
3       THE WITNESS: Sure. Absolutely.
4       (Break taken at 1:32 p.m.)
5       (Back on the record at 1:48 p.m.)
6       MR. ROGACZEWSKI: We will exercise our right
7  to read and sign.
8       (Signature having not been waived, the
9  examination of Scott Macey, Esquire, was concluded at
10 1:48 p.m.)