# EXHIBIT F

## DECLARATION OF JAMES E. HECKER

James E. Hecker states as follows:

1.　　I am competent to testify in this matter if called as a witness. The following statements are based on my personal knowledge.

2.　　I started working for John Deere and Company on September 2, 1965. I served as a steward, a member of the executive board and as president of UAW Local 434. As President of Local 434, I participated in the negotiations for the 1973 and 1976 collective bargaining agreements between the UAW and John Deere.

3.　　In 1978, I was placed on staff by the International UAW as an International Representative. Throughout my employment as a UAW International Representative, I was assigned to administer the collective bargaining agreements between the UAW and John Deere. I participated in collective bargaining negotiations between the UAW and John Deere beginning with the 1979 collective bargaining agreement and ending with the 2009 collective bargaining agreement. The 2009 CBA is in effect through October 2015.

4.　　In mid-1999, I was assigned to administer the CNH Global collective bargaining agreement. At the time, there was a collective bargaining agreement in place for the period 1998 through 2004. I participated in the negotiation of the 2004 negotiations which ended with a collective bargaining agreement in April 2005.

5.      I retired effective October 1, 2010 as a John Deere hourly retiree.  I receive retiree health benefits set forth in the 2009 UAW/John Deere collective bargaining agreement.  My current health care plan is the John Deer Premier Plan administered by United Health Care.

6.      I pay no premiums for my John Deere retiree health care coverage.

7.      Other than a $15 co pay for primary doctor visits, a $25 co pay for specialist office visits and a $40 co pay for emergency room visits, medical and surgical benefits are paid at 100% for in network services.

8.      Under the 2009 John Deere health care plan, benefits for out of network services are called "point of service" benefits and are paid at 80%, subject to a deductible of $250 per person, $500 per family and an out of pocket maximum of $1,000 per person, $2,000 per family.

9      The prescription drug plan has a co pay of $5.00 for generic and a $20 co pay for brand name drugs.

10.     I read the Declaration of Scott Macy dated April 9, 2014.  I do not know who Mr. Macey is.  I do know that he never participated in negotiations at John Deere between 1973 and the time I retired.

11.     Mr. Macey clearly does not have any idea what medical benefits John Deere hourly retirees like me currently enjoy.  John Deere hourly retirees do not pay premium contributions.  The "point of service benefits" he refers to are not the

2

primary benefits retirees receive. As I state above, "point of service" benefits are the out of network benefits. As a John Deere retiree, I pay 20% of the cost of medical services only if I choose not to go to a network provider. If I go to in network providers, the benefits are paid at 100% with no deductible and no co insurance payments other than the office visit and emergency room co pays noted above.

12.    Mr. Macey states, in paragraph 52 of his Declaration, that: "The UAW has agreed that companies such as Caterpillar and Deere may transfer some or all of a plan's funding and other requirements from the company to a VEBA." That is absolutely untrue as it applies to Deere. Sometime during the 2003 CBA, Deere notified me that it intended to establish a VEBA on its own. Deere did not ask the UAW to agree to the VEBA and the UAW did not participate in any way in the establishment of a VEBA at Deere. As I understand it, Deere unilaterally established the VEBA internally as a funding mechanism for retiree health care benefits. The UAW has nothing to do with the Deere VEBA and the VEBA at Deere has nothing to do with Deere's obligation to provide retiree health care benefits. The Deere VEBA was not discussed during the 2009 negotiations.

13.    A copy of the 2009 UAW/John Deere Benefit Plans, the insurance supplement to the 2009 collective bargaining agreement is attached as Exhibit A.

14.    When I assumed responsibility for the CNH Global collective bargaining agreement in 1999, there was a Letter of Understanding entitled Cost of Healthcare

3

Coverage attached to the 1998 Group Benefit Plan. A copy of that Letter of Understanding is attached as Exhibit B. This letter addressed the cost of alternate plans, such as alternate HMOs, PPOs, etc. that Case Corporation had traditionally offered in addition to the contractual health care plan which was referred to in the 1998 Group Benefit Plans as the Case Network PPO Plan. This letter of understanding had nothing to do with premium contributions for coverage under the Case Network PPO Plan. It only had to do with premiums that could be charged for these alternate plans. As I understood it, if the cost of providing these alternate plans exceeded the cost of what it cost CNH to provide the Case Network Plan, CNH had agreed to pay the excess costs for the duration of the 1998 CBA rather than charging the employee for the excess cost.

15.    When I first assumed responsibility for the CNH Global CBA, CNH Global was offering several alternative plans, including Community Health Plan and Humana HMO for the Racine area; the HMO Illinois for the Burr Ridge, Illinois area; and the Alliance Select PPO for the Burlington and East Moline areas.

16.    At some point in time, Paul Christ, CNH Global's labor relations director, approached me about terminating the alternate health care plans CNH offered to employees and retirees in the Racine and Burr Ridge areas. The UAW agreed to Mr. Christ's request on the condition that CNH Global agree to certain improvements in the Case Network Plan, including eliminating the co pay for mail order drugs and

4

reducing the co pay for doctor's office visits from $10 to $5 and specialist's visits from $25 to $15.   As a result, the Cost of Healthcare Coverage Letter of Understanding was modified and superceded by the agreement Mr. Christ and I signed on September 20, 2000, a copy of which is attached as Exhibit C.

17.   In the 2004-2005 negotiations between the UAW and CNH, CNH initially demanded that the UAW agree to reductions in health care benefits for existing retirees.   The UAW refused to discuss any reductions or caps on health care benefits for existing retirees.   The UAW indicated a willingness to discuss benefit improvements for current retirees, but CNH only wanted benefit reductions.   In response to the UAW's refusal to negotiate reductions for current retirees, CNH revised its proposals to delete any demands relating to current retirees and thereafter CNH's health care proposals dealt only with active employees and future retirees.

18.   The final agreement reached in March 2005 resulted in massive reductions in health care benefits, changes that shifted costs to active employees and future retirees.   These changes included the elimination of prescription drug benefits for Medicare-eligible retirees after January 1, 2006 and greatly increased prescription drug co pays for pre-Medicare retirees.   Other major changes included employee and retiree premium contributions for coverage the first time that would increase at the rate of 60% of the annual  increased costs of the benefits.   Also, costs were shifted to active employees and future retirees though the institution of deductibles and co

5

insurance for in network benefits and increased deductibles and co insurance for non network benefits.

19.     The UAW agreed to these massive health care cuts for several reasons. These reasons included the fact that the UAW's membership had been greatly reduced because of the closing of the East Moline plant in August 2004. As a result, and as a result of the work force reductions at other plants, there were about a quarter of the number of active employees in 2004 as there had been when I was assigned to CNH in 1999. Also, the UAW had gone on strike on November 3, 2004. The strike had been unsuccessful. After the UAW made an unconditional offer to return to work on November 22, 2004, CNH refused to let the employees return to work and locked them out beginning November 23, 2004. By mid-March 2005, when the UAW and CNH reached a new CBA, active employees had been out of work for almost four months.

20.     Despite the UAW's compromised position during the 2004-2005 negotiations, the UAW was able to negotiate at least three benefits that greatly reduced the impact of the health benefit cuts on future retirees. First, CNH agreed to greatly increased pension benefits for active employees who retired after the effective date of the 2005 CBA. Second, CNH agreed to establish and fund Retiree Medical Savings Accounts for employees which were specifically intended to be used after retirement to pay for the increased out of pocket costs post-2005 retirees would be

6

required to pay in premium contributions, deductibles, co insurance and other costs imposed under the reduced 2005 health care plan. Third, CNH agreed to increase the Medicare Part B reimbursement benefit from the then current level of $65.50 a month to $100.00 a month. This benefit was renamed the Part B and Part D reimbursement benefit to reflect the fact that it was intended to reimburse Medicare-eligible retirees and spouses for the cost of both Part B (medical) and Part D (prescription drug) premiums.

21.    It is impossible to separate the details of the reduced health care plan from the increased pension benefits, the RMSA accounts and the Part B and Part D reimbursement benefits, that were negotiated in 2005 at CNH. The increased benefits were intended to offset the impact the cost shifting provisions in the health care plan. The UAW would not have agreed to the massive reductions in benefits under the health care plan unless the retirees had additional sources of income and the RMSA accounts to help pay for the increased out of pocket costs under the health care plan implemented for active employees and post-2004 retirees.

22.    John Deere, like CNH, has its manufacturing facilities in the Midwest, including plants in Moline and East Moline, Illinois, Davenport, Des Moines, Dubuque, Ottumwa, and Waterloo, Iowa and Coffeyville, Kansas. Deere, like CNH, manufactures tractors and agricultural implements as well as smaller construction equipment, such as back hoes.

I swear under penalty of perjury that the above statements are true.

Dated: May 12, 2014                          Signed: *James E. Hecker*
                                                     James E. Hecker

8

Exhibit A

**BENEFIT PLANS
DEERE & COMPANY**

**JOHN DEERE DAVENPORT WORKS**
Davenport, Iowa

**JOHN DEERE DES MOINES WORKS**
Des Moines, Iowa

**JOHN DEERE DUBUQUE WORKS**
Dubuque, Iowa

**JOHN DEERE HARVESTER WORKS–EAST MOLINE**
East Moline, Illinois

**JOHN DEERE
NORTH AMERICAN PARTS DISTRIBUTION CENTER**
Milan, Illinois

**JOHN DEERE OTTUMWA WORKS**
Ottumwa, Iowa

**JOHN DEERE SEEDING GROUP/CYLINDER DIVISION**
Moline, Illinois

**JOHN DEERE ENGINE WORKS
JOHN DEERE WATERLOO WORKS
JOHN DEERE WATERLOO WORKS–
TRACTOR and CAB ASSEMBLY OPERATIONS
JOHN DEERE WATERLOO FOUNDRY**
Waterloo, Iowa

**JOHN DEERE COFFEYVILLE WORKS**
Coffeyville, Kansas

**JOHN DEERE COMPANY**
Atlanta, Georgia

**JOHN DEERE COMPANY**
Denver, Colorado

and the

**INTERNATIONAL UNION
UNITED AUTOMOBILE
AEROSPACE and
AGRICULTURAL
IMPLEMENT WORKERS
OF AMERICA**

and its

**LOCALS**
281, 450, 94, 865, 74, 79, 434, 838, 472, 186, and 2366

**EXPIRES 1 OCTOBER 2015**



TABLE OF CONTENTS

# TABLE OF CONTENTS

APPENDIX "1"
BENEFIT PLANS DEERE & COMPANY ............................. 1

ARTICLE I    PREAMBLE ............................. 1

ARTICLE II   JOINT COMPANY-UNION CENTRAL
             PENSION BOARD
  Section 1. Members ............................. 2
  Section 2. Authority and Jurisdiction ............................. 2
  Section 3. Chairman ............................. 3
  Section 4. Procedures ............................. 5

ARTICLE III  JOINT COMPANY-UNION LOCAL
             PENSION BOARD ............................. 6
  Section 1. Members ............................. 6
  Section 2. Secretary ............................. 7
  Section 3. Authority and Jurisdiction ............................. 8
  Section 4. Procedure ............................. 10
  Section 5. Request for Review ............................. 11
  Section 6. Reports to the Board ............................. 13

ARTICLE IV   WAIVER ............................. 15

ARTICLE V    UNION OFFICIALS ............................. 16
  Section 1. Service Credit ............................. 16
  Section 2. Pension Benefits ............................. 16
  Section 3. Life Insurance ............................. 17

ARTICLE VI   RETIREE UNION DUES ............................. 18
  Section 1. Authorization of Union Dues ............................. 18
  Section 2. Indemnification ............................. 18

ARTICLE VII  APPEAL BOARD PROCEDURE
             APPLICABLE TO APPENDICES
             "B," "C," "E," "I," "J," "J-1,"
             "L" AND "L-1"
  Section 1. Purpose ............................. 21
  Section 2. Procedure ............................. 21

i

# TABLE OF CONTENTS

APPENDIX "A"
JOHN DEERE PENSION PLAN
FOR WAGE EMPLOYEES ......24

ARTICLE I  ESTABLISHMENT OF PLAN ......24
Section 1.  Purpose......24
Section 2.  Effective Date(s)......24
Section 3.  Cost of Benefits......24
Section 3.5  Expenses......24
Section 4.  The Trust Fund and the Trustee......25
Section 5.  Payments to the Trust Fund......25
Section 5.5  Adjustment for Mistaken or Nondeductible Contributions......26
Section 6.  Federal Tax Laws......26
Section 7.  Administration, Fiduciary Responsibilities, and Termination......26
Section 8.  Service Credit......31
Section 9.  Vesting......31
Section 10.  Nonencumbrance of Benefits......33
Section 11.  Application......34
Section 12.  Limitations of Benefits......39
Section 13.  Denial of Benefits......39
Section 14.  Actuarial Equivalence......39

ARTICLE II  PLAN FOR COMPUTING AND MAINTAINING EMPLOYEES' SERVICE CREDIT ......42
Section 1.  Company Defined......42
Section 2.  Starting Date......42
Section 3.  Service Credit Records......42
Section 4.  Service Credit Defined......42
Section 5.  Time of Crediting......46
Section 6.  Partial Year's Service Credit......46
Section 7.  Occupational Injury......46
Section 8.  Nonoccupational Injury or Illness......48
Section 9.  Layoff......48
Section 10.  Optional Leave......49
Section 11.  Uniformed Services Employment and Reemployment Rights......49

ii

# TABLE OF CONTENTS

Section 12.  Accumulation in any Unit......49
Section 13.  Transfer......50
Section 14.  Crediting Time Spent at Other Units ......50
Section 15.  Termination of Continuous Employment and Service Credit......50
Section 16.  Reestablishment of Service Credit......51
Section 17.  Original Unit Defined......52
Section 18.  Additional Foundry Service Credit......52

ARTICLE III  ELIGIBILITY FOR RETIREMENTS AND AMOUNT OF PENSIONS......54
Section 1.  Normal Retirement......54
Section 2.  Early Retirement......56
Section 2.1  Employment Security Pension Program......60
Section 2.2  John Deere Facility Closing Pension Program......62
Section 3.  Total and Permanent Disability Retirement......63
Section 4.  Postponed Retirement......68
Section 5.  Deferred Vested Pension......68
Section 6.  Commencement and Termination of Pension Benefits......73
Section 7.  Suspension of Benefits During Reemployment......76

ARTICLE IV  SURVIVOR BENEFITS......79
Section 1.  Survivor Benefits for Retired Employees......79
Section 2.  Survivor Benefits for Employees and Disability Retired Employees......80
Section 3.  Commencement and Termination of Survivor Benefits......81
Section 4.  Preretirement Surviving Spouse Benefit for Former Employees......82

ARTICLE V  SUPPLEMENTAL ALLOWANCE......85
Section 1.  Eligibility for Supplemental Allowance......85
Section 2.  Amount of Supplemental Allowance......85

iii

TABLE OF CONTENTS

Section 3.    Assumptions and Adjustments in Computing Amount of Supplemental Allowance ....86
Section 4.    Payment of Allowance and Forfeiture Provision ....87
Section 5.    Discharged Employees ....88

ARTICLE VI    RETIRED EMPLOYEES ....89
Section 1.    Early and Normal Retirement Benefits....89
Section 2.    Formula Pensions ....91
Section 2.1   Mutual Early Retirement Benefits....92
Section 3.    Disability, Special Early, Employment Security, Foundry Closing Pensioners, Minneapolis Depot Closing Pensioners, and John Deere Facility Closing Pensioners ....93
Section 4.    Restoration of Pension Benefits After Death of Retired Employee's Spouse ....96
Section 5.    Election of Pension Benefit Increase in the Event of Divorce ....97
Section 6.    Survivor Benefit Election After Retirement ....97
Section 7.    Supplemental Allowance of Retired Employees ....98
Section 8.    Lump Sum Payments ....99

ARTICLE VII   QUALIFIED DOMESTIC RELATIONS ORDERS TOP-HEAVY PLAN PROVISIONS ....101
Section 1.    Qualified Domestic Relations Orders ....101
Section 2.    Top-Heavy Plan Provisions ....103

ARTICLE VIII  PAYMENT OF POST-RETIREMENT MEDICAL COSTS ....108
Section 1.    Purpose and Scope....108
Section 2.    Special Definitions....108
Section 3.    Eligibility Determined Under Medical Plan....110
Section 4.    Amount of Payments for Medical Costs....110
Section 5.    Manner of Payment of Medical Costs ....111

iv

TABLE OF CONTENTS

Section 6.    Funding For Payment of Medical Costs....111
Section 7.    Separate Account - Record Keeping.....112
Section 8.    Expenses ....112
Section 9.    Non-diversion of Separate Account Assets ....113
Section 10.   Forfeitures ....113
Section 11.   Effective Date ....114

APPENDIX IX   Provisions for John Deere Coffeyville Work Transition ....115

APPENDIX "B"
THE HEALTH BENEFIT PLAN FOR WAGE EMPLOYEES ....116

ARTICLE I     GENERAL PROVISIONS....116
Section 1.    Preamble....116
Section 2.    Supplemental Medical Benefits - Occupational....116
Section 3.    Claims Covered Under New Plan....117
Section 4.    Effective Dates of Coverage ....117
Section 5.    Termination....118
Section 6.    Cost of Benefits ....119
Section 7.    Named Fiduciary and Plan Administrator....119
Section 8.    Amendment, Modification, and Termination....119
Section 9.    Funding....120
Section 10.   Claim for Benefits....120
Section 11.   Denial of Benefits....120
Section 12.   Managed Care Organizations ....121
Section 13.   Nonassignability of Benefits ....121
Section 14.   Provider Exclusion....121
Section 15.   John Deere Traditional Option ....121
Section 16.   Dependents Residing in Other Areas....123
Section 17.   Health Benefit Plan....123

ARTICLE II    CONTINUATION OF HEALTH COVERAGE ....126
Section 1.    Leave of Absence for Employees Hired Prior to 1 October 1997 ....126

v

TABLE OF CONTENTS

Section 2.   Union Leave of Absence for Employees Hired on or after 1 October 1997 ... 126
Section 3.   Layoff ... 127
Section 4.   Notice of Termination to Laid Off Employees ... 128
Section 5.   Work Stoppages ... 128
Section 6.   Illness or Accident ... 128
Section 7.   Employees Hired Prior to 1 October 1997 Receiving Life Insurance in Monthly Installments ... 129
Section 8.   Retirement for Employees Hired Prior to 1 October 1997 ... 129
Section 9.   Surviving Spouse of an Employee Hired Prior to 1 October 1997 ... 129
Section 10.  Special Continuation Provisions ... 130

ARTICLE III   PREMIUM RATES ... 133

ARTICLE IV   SPONSORED DEPENDENTS ... 134
Section 1.   Eligibility ... 134
Section 2.   Premium Rate ... 135
Section 3.   Termination of Coverage ... 135

ARTICLE V   PRIVILEGE OF OBTAINING INDIVIDUAL INSURANCE ... 136

ARTICLE VI
Section 1.   DEFINITIONS ... 137
Section 2.   Hospital ... 137
Section 3.   Medicare ... 137
Section 4.   Room and Board Charges ... 138
Section 5.   Dependent ... 138
Section 6.   Permanently and Totally Disabled ... 139
Section 7.   Mental or Nervous Disorder ... 139
Section 8.   Psychiatric Services ... 139
Section 9.   Psychiatrist ... 140
Section 10.  Psychologist ... 140
Section 11.  Medical Doctor ... 140
Section 12.  Outpatient Psychiatric Clinic ... 140
Section 13.  Day Care Center ... 141
Section 14.  Night Care Center ... 141

vi

TABLE OF CONTENTS

Section 14.  Community Mental Health Center ... 142
Section 15.  Qualified Nursing Home ... 142
Section 16.  Other Group Plan ... 143
Section 17.  Allowable Expense ... 143
Section 18.  Claims Determination Period ... 143
Section 19.  Ophthalmologist ... 144
Section 20.  Optometrist ... 144
Section 21.  Optician ... 144
Section 22.  Lenses ... 144
Section 23.  Contact Lenses ... 144
Section 24.  Frame ... 144
Section 25.  Otologist or Otolaryngologist ... 145
Section 26.  Audiologist ... 145
Section 27.  Dealer ... 145
Section 28.  Hearing Aid ... 145
Section 29.  Ear Mold ... 146
Section 30.  Audiometric Examination ... 146
Section 31.  Hearing Aid Evaluation Test ... 146
Section 32.  Primary Care Physician ... 146
Section 33.  Specialist Physician ... 146
Section 34.  Maximum Allowable Benefit ... 147

ARTICLE VII   HOSPITAL EXPENSE BENEFITS EMPLOYEES AND THEIR DEPENDENTS ... 148
Section 1.   For Daily Room and Board Expense ... 148
Section 2.   For Additional Fees ... 150
Section 3.   For Maternity Expense ... 152
Section 4.   Organ or Tissue Transplants ... 153
Section 5.   Jejunoileostomy and Incidental Lipectomy ... 153
Section 6.   For Outpatient Expense ... 153
Section 7.   Free-Standing Surgical Centers ... 154
Section 8.   Observation Rooms ... 164
Section 9.   Exclusions and Limitations ... 164
Section 10.  Restoration of Benefits ... 165

ARTICLE VIII   SURGICAL PROCEDURE EXPENSE BENEFITS EMPLOYEES AND THEIR DEPENDENTS
Section 1.   Surgical Procedures Other Than Obstetrical Procedures ... 166

vii

TABLE OF CONTENTS

Section 2. Obstetrical Procedures....166
Section 3. Organ or Tissue Transplants....168
Section 4. Jejunoileostomy and Incidental Lipectomy....168

ARTICLE IX BENEFITS FOR EXPENSE OF PHYSICIAN'S NONSURGICAL SERVICES....169
Section 1. Physician's Visits – Employees and Dependents....169
Section 2. Emergency Care - Employees and Dependents....170
Section 3. Radiation Therapy - Employees and Dependents....177
Section 4. Pap Smears – Employees and Dependents....177
Section 5. Chemotherapy – Employees and Dependents....177
Section 6. Allergy Testing - Employees and Dependents....178
Section 7. Second Opinion Surgery....178
Section 8. Observation Rooms....180

ARTICLE X DIAGNOSTIC LABORATORY AND X-RAY EXAMINATION EXPENSE BENEFITS EMPLOYEES AND THEIR DEPENDENTS....181
Section 1. Laboratory or X-Ray Examination....181
Section 2. Pap Smears....181
Section 3. Allergy Testing and Allergy Injections....181
Section 4. Mammograms....181
Section 5. Exclusions....182

ARTICLE XI HEMODIALYSIS OTHER THAN HOSPITAL ADMINISTERED EMPLOYEES AND THEIR DEPENDENTS....183

ARTICLE XII PRESCRIPTION DRUG EXPENSE BENEFITS EMPLOYEES AND AND THEIR DEPENDENTS....188
Section 1. Eligibility....188
Section 2. Amount of Benefit....188

viii

TABLE OF CONTENTS

Section 2. Exclusions....189
Section 3. Definitions....191

ARTICLE XIII DENTAL EXPENSE BENEFITS EMPLOYEES AND THEIR DEPENDENTS....194
Section 1. Effective Date....194
Section 2. Hospital Expenses....194
Section 3. Indemnity Limit....194
Section 4. Covered Dental Expenses....195
Section 5. Predetermination of Benefits....199
Section 6. Limitations....200
Section 7. Exclusions....202
Section 8. Definitions....203
Section 9. Coordination With Other Dental Expense Benefits....204

ARTICLE XIV PSYCHIATRIC SERVICES EXPENSE BENEFITS EMPLOYEES AND THEIR DEPENDENTS....205
Section 1. Inpatient Expense....205
Section 2. Psychiatric Services (Institutional)....205
Section 3. Psychiatric Services (Medical Doctor)....206
Section 4. Psychological Examination....207
Section 5. Family Counseling....207
Section 6. Exclusions and Limitations....207

ARTICLE XV PROSTHETIC DEVICE AND DURABLE MEDICAL EQUIPMENT EXPENSE BENEFITS EMPLOYEES AND DEPENDENTS....210
Section 1. Prosthetic Device Benefits....210
Section 2. Durable Medical Equipment....211

ARTICLE XVI OUTPATIENT PHYSICAL THERAPY BENEFITS EMPLOYEES AND DEPENDENTS....214
Other Than a Hospital....214

ix

TABLE OF CONTENTS

ARTICLE XVII   QUALIFIED NURSING HOME EXPENSE BENEFITS EMPLOYEES AND THEIR DEPENDENTS......216
Section 1.   Injury or Sickness (Other Than Mental or Nervous Disorder)......216
Section 2.   Mental or Nervous Disorder......217
Section 3.   Restoration of Benefits......218
Section 4.   Exclusions and Limitations......219

ARTICLE XVIII   VISION CARE EXPENSE BENEFITS EMPLOYEES AND THEIR DEPENDENTS......220
Section 1.   Eligibility......220
Section 2.   Covered Vision Care Benefits......220
Section 3.   Preferred Provider Arrangement (Where Available)......221
Section 4.   Indemnity Limits......222
Section 5.   Exclusions......223
Section 6.   Contract Providers......224

ARTICLE XIX   ADDITIONAL PROVISION AS A CONSEQUENCE OF MEDICARE FOR EMPLOYEES HIRED PRIOR TO 1 OCTOBER 1997 AND THEIR DEPENDENTS......225
Section 1.   Persons Subject to This Provision......225
Section 2.   Amount of Benefit......225
Section 3.   Payment of Benefits......225
Section 4.   Premium Reimbursement......225
Section 5.   Lifetime Reserve......226

ARTICLE XX   ALCOHOLISM AND/OR DRUG DEPENDENCY EXPENSE BENEFITS EMPLOYEES AND DEPENDENTS......227
Section 1.   Inpatient Expense......227
Section 2.   Outpatient Expense......228
Section 3.   Certification for Treatment......229
Section 4.   Exclusions and Limitations......230

x

TABLE OF CONTENTS

ARTICLE XXI   HEARING AID EXPENSE BENEFITS EMPLOYEES AND THEIR DEPENDENTS......231
Section 1.   Eligibility......231
Section 2.   Covered Hearing Aid Benefits......231
Section 3.   Preferred Provider Arrangement (Where Available)......232
Section 4.   Indemnity Limits......233
Section 5.   Exclusions......233
Section 6.   Contract Provider......235

ARTICLE XXII   CATASTROPHIC MEDICAL EXPENSE BENEFITS......236
Section 1.   Eligibility......236
Section 2.   Covered Catastrophic Medical Expense......236
Section 3.   Indemnity Limits......237
Section 4.   Exclusions and Limitations......237

ARTICLE XXIII   SPEECH THERAPY......238
Section 1.   Covered Speech Therapy......238
Section 2.   Exclusions and Limitations......238

ARTICLE XXIV   EXCLUSIONS AND LIMITATIONS APPLICABLE TO ALL ARTICLES OF THE PLAN......240
Section 1.   Nonduplication of Benefits......240
Section 2.   Coordination of Benefits......241
Section 3.   Utilization Review......241
Section 4.   Subrogation......245
Section 5.   ......246

PROCEDURES ON MAYO CLINIC AND UNIVERSITY OF IOWA HOSPITAL CLAIMS FOR DEERE & COMPANY......247

APPENDIX "C" THE DISABILITY BENEFIT PLAN FOR WAGE EMPLOYEES

ARTICLE I   ESTABLISHMENT OF PLAN......250
Section 1.   Preamble......250

xi

# TABLE OF CONTENTS

Section 2. Claims Covered Under New Plan....250
Section 3. Effective Date of Coverage ....250
Section 4. Physical Examinations ....251
Section 5. Termination....251
Section 6. Cost of Benefits....251
Section 7. Named Fiduciary and Plan Administrator....251
Section 8. Amendment, Modification, and Termination....251
Section 9. Funding....252
Section 10. Application for Benefits....252
Section 11. Denial of Benefits....262

ARTICLE II CONTINUATION OF INSURANCE....253
Section 1. Leave of Absence....253
Section 2. Layoff....253
Section 3. Work Stoppages....254

ARTICLE III AMOUNT OF BENEFIT....255
Section 1. Determination of Earnings Bracket....255
Section 2. Benefit Amount....256

ARTICLE IV COMMENCEMENT AND DURATION OF BENEFITS....259
Section 1. Weekly Indemnity - Nonoccupational....259
Section 2. Supplemental Weekly Indemnity - Occupational....262
Section 3. Layoff Disability Benefits....263
Section 4. Long-Term Disability Benefits - Occupational and Nonoccupational....264

ARTICLE V EXCLUSIONS AND LIMITATIONS....271
Section 1. Exclusions....271
Section 2. Nonduplication of Benefits....271

APPENDIX "D" SUPPLEMENTAL UNEMPLOYMENT BENEFIT PLAN ...273

ARTICLE I GENERAL PROVISIONS AND ELIGIBILITY FOR BENEFITS....273
Section 1. Purpose of Plan....273

xii

# TABLE OF CONTENTS

Section 2. Eligibility for Benefits....273
Section 3. Amount and Duration of Benefits....273

ARTICLE II ADMINISTRATION OF THE PLAN....277
Section 1. General....277
Section 2. To Whom Benefits are Payable in Certain Conditions....281
Section 3. Benefit Overpayments....281

ARTICLE III MISCELLANEOUS....283
Section 1. Filing of Application....283
Section 2. Receipt of Benefits....283
Section 3. No Vested Interest....283
Section 4. Powers and Authority of the Company...284
Section 5. Non-alienation of Benefits....284
Section 6. Amendment and Termination of the Plan....284

ARTICLE IV DEFINITIONS....286

ARTICLE V TRANSITIONAL ASSISTANCE PROGRAM....288

APPENDIX "E" THE LEGAL SERVICES PLAN FOR WAGE EMPLOYEES....289

ARTICLE I ADMINISTRATION....289
Section 1. Establishment of Plan....289
Section 2. Effective Date(s)....289
Section 3. Named Fiduciary and Plan Administrator....289
Section 4. Complaint Procedure....289

ARTICLE II ELIGIBILITY AND BENEFITS....290
Section 1. Eligibility for Benefits....290
Section 2. Covered Benefits....291
Section 3. Excluded Benefits....295

xiii

TABLE OF CONTENTS

APPENDIX "F"
FACTORY CLOSING PLAN....298

Section 1. Notice....298
Section 2. Eligibility....298
Section 3. Factory Closing Services....298
Section 4. Implementation of Complete Plant Closing Decisions....299
Section 5. Supplemental Unemployment Benefits....300
Section 6. Additional Health Insurance....300
Section 7. John Deere Pension Plan for Wage Employees....300
Section 8. Implementation of Discontinuance of a Major Function Decision....300
Section 9. Chain-Wide Seniority....301

APPENDIX "G"
RELOCATION ALLOWANCE PLAN....302

Section 1. Eligibility for Relocation Allowance....302
Section 2. Amount of Relocation Allowance....302
Section 3. Eligibility for Supplemental Income Allowance....303
Section 4. Federal or State Legislation....304

APPENDIX "H"
TUITION REFUND PLAN....305

Section 1. Purpose....305
Section 2. Eligibility....305
Section 3. Approved Schools and Courses....306
Section 4. Application for Approval....306
Section 5. Amount of Tuition Aid....306

APPENDIX "I"
JOHN DEERE GROUP LIFE AND DISABILITY INSURANCE PLAN FOR WAGE EMPLOYEES....308

ARTICLE I
ESTABLISHMENT OF PLAN....308
Section 1. Preamble....308

xiv

TABLE OF CONTENTS

Section 2. Cost of Benefits....308
Section 3. Nonencumbrance of Benefits....308
Section 4. Named Fiduciary and Plan Administrator....308
Section 5. Amendment, Modification, and Termination....309
Section 6. Funding....309
Section 7. Application for Benefits....310
Section 8. Denial of Benefits....310

ARTICLE II ELIGIBILITY AND AMOUNT OF BENEFIT....311
Section 1. Eligibility of Employees and Commencement of Insurance....311
Section 2. Amount of Benefit....311
Section 3. Accidental Death and Dismemberment Insurance....313
Section 4. Total and Permanent Disability....315
Section 5. Transition Survivor Income Benefit and Bridge Survivor Income Benefit for Employees Hired Prior to 1 October 1997....316
Section 6. Continuance of Insurance for Employees Hired Prior to 1 October 1997....320
Section 7. Termination of Insurance....321
Section 8. Exclusions....323
Section 9. Designation of Beneficiary....323
Section 10. Privilege of Obtaining Individual Insurance....324
Section 11. Physical Examinations....324

APPENDIX "J"
GENERAL PROVISIONS OF THE PROFIT SHARING PLAN....325

Section 1. ....325
Section 2. ....325
Section 3. ....325
Section 4. ....327
Section 5. ....328

xv

TABLE OF CONTENTS

Section 6. ............................................... 328
Section 7. ............................................... 329
Section 8. ............................................... 331

APPENDIX "J-1"
PROFIT SHARING PLAN ............................ 332

Section 1.  Type of Plan and Purpose .......... 332
Section 2.  Definitions ................................. 332
Section 3.  Eligibility and Participation ......... 334
Section 4.  Amount of Benefit ...................... 335
Section 5.  Payment of Benefit ..................... 339
Section 6.  Miscellaneous ............................ 339

APPENDIX "L"
GENERAL PROVISIONS OF THE JOHN DEERE
TAX DEFERRED SAVINGS PLAN .................. 342

Section 1.  Definitions ................................. 342
Section 2.  Establishment of Plan ................. 342
Section 3.  Limitations ................................. 343
Section 4.  Information to Union ................... 345
Section 5.  Claim Procedure ........................ 345
Section 6.  Termination of the Collective
            Bargaining Agreement ................. 346
Section 7.  Compensation ............................ 346

APPENDIX "L-1"
JOHN DEERE TAX DEFERRED SAVINGS PLAN
FOR WAGE EMPLOYEES ........................... 347

ARTICLE I  ESTABLISHMENT OF PLAN ........ 347
Section 1.1  Establishment of Plan .............. 347
Section 1.2  Purpose .................................. 347
Section 1.3  Trust ...................................... 347
Section 1.4  Trustee ................................... 348
Section 1.5  Plan Administrator .................... 348
Section 1.6  Impossibility of Diversion .......... 348

xvi

TABLE OF CONTENTS

ARTICLE II  DEFINITIONS ........................... 350
Section 2.1  Definitions .............................. 350
Section 2.2  Gender and Number .................. 357

ARTICLE III  ELIGIBILITY AND PARTICIPATION ... 358
Section 3.1  Eligibility ................................ 358
Section 3.2  Participation ............................ 358
Section 3.3  Change of Status ..................... 359
Section 3.4  Reemployment ......................... 359
Section 3.5  Continued Participation ............. 359
Section 3.6  Uniformed Services Employment and
            Reemployment Rights Act of 1994 ... 360
Section 3.7  Effect of Layoff or Leave of Absence ... 360

ARTICLE IV  CONTRIBUTIONS ...................... 361
Section 4.1  Election and Amount of Contributions ... 361
Section 4.2  Suspension of
            Authorized Contributions ............. 361
Section 4.3  Employer Payment of Authorized
            Contributions ............................ 362
Section 4.4  Maximum Limitation on Contributions ... 362
Section 4.5  Form of Contributions ............... 362
Section 4.6  Tax Deferred Agreements .......... 362
Section 4.7  Rollover Contributions .............. 364
Section 4.8  Section 402 Limit on Contributions ... 365
Section 4.9  Section 401(k) Limit on Wage
            Deferral Contributions ................ 367
Section 4.10  Section 401(m) Limit on
            Matching Contributions ............... 371

ARTICLE V  PARTICIPANTS' ACCOUNTS ......... 375
Section 5.1  Accounts ................................. 375
Section 5.2  Accounting Adjustments ............ 376
Section 5.3  Allocation of Contributions ........ 376
Section 5.4  Limitation on Allocations to
            Participants' Accounts ................ 377
Section 5.5  Non-Vested Participant Accounts ... 379
Section 5.6  Participant Statements .............. 379

xvii

TABLE OF CONTENTS

ARTICLE VI    INVESTMENT FUNDS.....380
Section 6.1   Trust Fund.....380
Section 6.2   Investment Funds.....380
Section 6.3   Loan Fund.....385
Section 6.4   Investment Elections.....386
Section 6.5   Voting Rights.....386
Section 6.6   Dividend Rights and Election.....387
Section 6.7   Company Deduction.....388
Section 6.8   Other ESOP Requirements.....388

ARTICLE VII   VESTING, DISTRIBUTIONS, WITHDRAWALS, AND LOANS.....390
Section 7.1   Vesting.....390
Section 7.2   Entitlement to Distributions.....390
Section 7.3   Time and Manner of Distribution.....391
Section 7.4   Withdrawals Before Termination of Employment.....396
Section 7.5   Loans to Eligible Participants.....400
Section 7.6   Distribution to Person Under Legal Disability.....403
Section 7.7   Beneficiaries.....404
Section 7.8   Benefits of Persons Who Cannot Be Located.....405
Section 7.9   Required Minimum Distributions.....406

ARTICLE VIII  AMENDMENT AND TERMINATION.....408
Section 8.1   Amendment or Modification.....408
Section 8.2   Suspension or Termination.....409
Section 8.3   Merger or Consolidation of Plan or Transfer of Plan Assets.....410
Section 8.4   Distribution on Termination or Partial Termination.....410

ARTICLE IX    PLAN ADMINISTRATION.....412
Section 9.1   Rights, Powers, and Duties.....412
Section 9.2   Application of Rules.....412
Section 9.3   Exercise of Plan Administrator's Duties.....413
Section 9.4   Claims and Review of Denial of Claims.....413
Section 9.5   Qualified Domestic Relations Orders.....414

xviii

TABLE OF CONTENTS

ARTICLE X     ADOPTION BY SUBSIDIARIES.....417
Section 10.1  Adoption by Subsidiaries.....417
Section 10.2  Delegation of Authority.....417

ARTICLE XI    MISCELLANEOUS.....419
Section 11.1  Benefits May Not Be Assigned or Alienated.....419
Section 11.2  No Guarantee of Benefits.....419
Section 11.3  No Guarantee of Employment.....419
Section 11.4  Governing Laws.....419
Section 11.5  Top-Heavy Plan Provisions.....420

ARTICLE XII   COMPANY CONTRIBUTIONS FOR EMPLOYEES.....424
Section 12.1  Background.....424
Section 12.2  Matching Contributions.....424
Section 12.3  Employer Payment of Authorized and Matching Contributions.....424
Section 12.4  Maximum Limit on Employer's Contributions.....424
Section 12.5  Form of Contributions.....424
Section 12.6  Other Provisions of Article IV of the Plan.....425
Section 12.7  Vesting.....425

ARTICLE XIII  ROTH CONTRIBUTIONS.....426
Section 13.1  General Application.....426
Section 13.2  Separate Accounting.....426
Section 13.3  Direct Rollovers.....427
Section 13.4  Correction of Excess Contributions.....428
Section 13.5  Definition.....428

LETTERS
Possible Health Care Legislation.....430
Defense Against Excessive Dental Charges.....432
Joint Committee on Health Care.....434
National Health.....436

xix

APPENDIX "1" – ARTICLE I

# APPENDIX "1"
## BENEFIT PLANS DEERE & COMPANY

### ARTICLE I
### PREAMBLE

During the term of this Collective Bargaining Agreement the Company agrees to carry out and the Union agrees to accept, subject to the specific provisions of this Appendix "1", amended Benefit Plan(s) hereinafter referred to as the Plan attached hereto and marked for identification as follows:

1. John Deere Pension Plan for Wage Employees - Appendix "A";

2. John Deere Health Benefit Plan for Wage Employees - Appendix "B";

3. John Deere Disability Benefit Plan for Wage Employees - Appendix "C";

4. John Deere Group Life and Disability Insurance Plan for Wage Employees - Appendix "I";

5. John Deere Profit Sharing Plan - Appendices "J" and "J-1"; and

6. John Deere Tax Deferred Savings Plan for Wage Employees - Appendices "L" and "L-1".

It is further agreed that in the event of any conflict between the provisions of the Plans identified above and the provisions of this Appendix "1", the provisions of this Appendix "1" will control.

1

TABLE OF CONTENTS

Work Hardening .......................................... 437

Social Security Deductions ....................... 439

Work Therapy .......................................... 443

Continued Recognition of the UAW ........ 445

Factory Closing Services Office ............... 446

Tax Deferred Savings Plan ...................... 448

Provider Network(s) ................................. 449

Impact On State Unemployment Eligibility Requirements ... 451

TDSP Eligible Earnings ........................... 452

Definition of Employees Hired Prior to 1 October 1997 ... 453

Legal Services Provider ........................... 455

Retirement Recognition Award – Employees Hired Prior to 1 October 1997 ............ 456

xx

APPENDIX "A" – ARTICLE VIII

## ARTICLE VIII
## PAYMENT OF POST-RETIREMENT MEDICAL COSTS

**Section 1. Purpose and Scope**

This Article constitutes part of the John Deere Pension Plan for Wage Employees (hereinafter referred to as the "Plan") that has been adopted by Deere & Company (the "Company") and sets forth the terms and conditions under which Eligible Retirees, their dependents, and their Eligible Spouses will either receive payments on their behalf from this plan or the Company, as set forth below, for the Medical Costs that are described in more detail further below. All other payments, will be made directly by the Company or from such other funding source as the Company may establish. This Article VIII will not change any of the benefit levels set forth in the Medical Plan. This retiree medical program is intended to comply with the requirements of Section 401(h) of the Internal Revenue Code and shall be interpreted and administered accordingly. Unless the context indicates to the contrary, or the provisions of this Article provide otherwise, all provisions and definitions contained elsewhere in the Plan apply to this Article.

**Section 2. Special Definitions**

For purposes of this Article, the following terms shall have the meaning set forth below and, while not changing any similar terms used in the body of the Plan, shall supersede any similar terms that appear in the body of the Plan.

A. "Eligible Retiree" means each employee who is a participant in the Plan and who, upon retirement under the Plan, meets any additional eligibility requirements set forth from time to time under, and therefore participates in, the Medical Plan whose premiums or other costs are to be paid in whole or in part by this Plan on behalf of such participant or such participant's dependent or Eligible Spouse, provided, however, that no retired participant or

108

APPENDIX "A" – ARTICLE VIII

other participant who is or was a Key Employee shall be treated as a present or a future Eligible Retiree for purposes of contributions that fund a liability of the Plan to pay Medical Costs on behalf of such participant or the Eligible Spouse of such participant, and no retired participant who is or was a Key Employee and no Eligible Spouse of such a retired participant shall be eligible to receive payment for Medical Costs from the Plan on his or her behalf.

B. "Eligible Spouse" means a spouse who is married to an Eligible Retiree, or a spouse who was married at the time of the Eligible Retiree's death, provided that any such spouse must also meet any additional eligibility requirements set forth from time to time under the Medical Plan in order to be an Eligible Spouse.

C. "Maximum Amount" means the limit on monthly payments for Medical Costs payable from this Plan, as determined in accordance with Section 4 of this Article.

D. "Medical Costs" means the payments of premiums or other costs of coverage under a Medical Plan on behalf of an Eligible Retiree, their dependent, and/or an Eligible Spouse in accordance with the terms of this Plan. Payments for Medical Costs will only constitute those benefits that are set forth in Section 213(d) of the Code.

E. "Medical Plan" means the John Deere Health Benefit Plan for Wage Employees, and such other plans under which the Company provides payments for Medical Costs in the form of some or all of the premiums or other costs on behalf of Eligible Retirees, their dependents, and Eligible Spouses, provided that the foregoing lists shall be expanded, contracted, or otherwise changed from time to time to reflect the current lists of health care plans for which the Company pays Medical Costs in the form of some or all of the premiums or other costs on behalf of Eligible Retirees, their dependents, and Eligible Spouses.

109



APPENDIX "A" – ARTICLE VIII

## Section 3.   Eligibility Determined Under Medical Plan

Subject to specified limits, this Plan shall make payments toward the premiums or other costs of coverage under the Medical Plan and the costs of any claims paid by the Company under such Medical Plans in which an Eligible Retiree and/or an Eligible Spouse chooses to participate. The terms and any amendment of the terms of a Medical Plan affecting its cost, conditions of eligibility, or other matters relating to the provisions of this Plan shall automatically be incorporated in this Plan. Moreover, the ability of the Company or any participating Subsidiary to amend or terminate a Medical Plan at any time shall be determined under the provisions of the Medical Plan and any Collective Bargaining Agreements and is not limited in any way under the provisions of this Plan.

## Section 4.   Amount of Payments for Medical Costs

Effective 1 November 2005 all assets in this 401(h) Account shall be used to pay all monthly Medical Costs until such time as this 401(h) Account is deemed to be exhausted or is actually exhausted. The assets in the 401(h) account are deemed to be exhausted when such assets are no longer adequate to make ongoing benefit payments; provided, however, that the Company may retain an ongoing reserve balance in this 401(h) Account of an amount not to exceed $250,000 and the assets in this 401(h) Account will be deemed to be exhausted even if such an ongoing reserve balance is retained. Any ongoing reserve balance will be used to finance Employer-provided benefits for Participants starting November 1, 2020 until such reserve is actually exhausted.

The monthly Medical Costs payable from this Plan on behalf of each Eligible Retiree, their dependents, and each Eligible Spouse is limited to reimbursing up to one hundred percent (100%) of annual premium or other cost of such participant under the Medical Plan but never more than the amount restricted by the Subordination of Benefits Test described in Section 401(h) of the Code. All other payments will be made from such other funding source as the Company may

110

APPENDIX "A" – ARTICLE VIII

establish or directly by the Company. This Article VIII will not change any of the benefit levels set forth in the Medical Plan.

## Section 5.   Manner of Payment of Medical Costs

Payment of Medical Costs shall be made directly from this Plan to the insurance carrier, trustee, or other proper party under the funding vehicle for the Medical Plan that covers the Eligible Retiree, their dependents or an Eligible Spouse on whose behalf the Medical Costs are being paid. If a self-insured Medical Plan of the Company or a participating Subsidiary has no trust or other funding vehicle, payments from this Plan may be made directly to the Company or participating Subsidiary that sponsors such Medical Plan, provided that the payments are then used promptly for the payment of health care benefits owed by such Medical Plan in a manner that satisfies the conditions of the Employee Retirement Income Security Act of 1974 for an exemption from the trust requirement imposed by Part 4 of Title I of such Act. No payment of monthly Medical Costs shall be made under this Plan to the extent that such payment would duplicate any similar payment for the same coverage.

## Section 6.   Funding For Payment of Medical Costs

Effective as provided in Section 11, and subject to the right reserved by the Company (and by the Pension Plan Investment Committee to the extent provided in Article I, Section 4) to amend or terminate the Plan (including this Article) in whole or in part (which action may cause the payment of Medical Cost obligations under this Plan to become obligations of the Company and participating Subsidiaries on behalf of the Eligible Retirees and Eligible Spouses who receive coverage under a Medical Plan), the Company and each participating Subsidiary shall make actuarially determined contributions to fund the payment for Medical Costs provided hereunder, such contributions to be reasonable and ascertainable. Except as may otherwise be required by any minimum funding requirement that may be applicable to the payment of Medical Costs provided pursuant to this Article, the contributions for each year need not be

111

APPENDIX "A" – ARTICLE VIII

made until the due date (including extensions) for filing the Company's Federal income tax return for such year. Such contributions are not intended to exceed the amount that is currently deductible under Internal Revenue Code Section 404, and are conditioned on such deductibility and subject to being returned to the employer to the full extent permitted by applicable law in the event that the intended deduction is disallowed. The payment for Medical Costs shall be subordinate to the retirement benefits provided by the Plan. In this regard, contributions shall be deemed subordinate if the aggregate contributions credited to the separate account described in Section 7 below, when added to the contributions for any life insurance protection provided under the Plan (other than any legally required spousal survivor annuity protection), do not, for all Plan Years beginning on or after 1 November 1988, exceed 25% of the aggregate actual contributions to the Plan (other than contributions to fund past service credit) for all such Plan Years. In no event will the contribution exceed the maximum contribution allowable under the Code that enables the payment of Medical Costs to remain subordinate to the retirement benefits provided under the Plan.

**Section 7.   Separate Account - Record Keeping**

All contributions for the payment of Medical Costs shall be credited to a separate account which shall be maintained under the Trust Fund solely for record keeping purposes. At the time of any contribution to the Plan, the Pension Plan Investment Committee shall designate the portion of such contribution allocable to the funding of the payment of Medical Costs. In addition, the separate account shall be charged with any payment of Medical Costs under the terms of this Article. However, all funds accounted for in the separate account may, but need not be, invested together with all funds held by the Trustee under the Plan. Annual reports regarding contributions and total assets contained in this 401(h) fund will be provided to the appropriate bargaining agent.

112

APPENDIX "A" – ARTICLE VIII

**Section 8.   Expenses**

All reasonable expenses of administering the separate account, including but not limited to reasonable expenses and compensation of the Trustee, the Plan's actuary, attorneys, auditors, investment advisors, investment managers, and other consultants shall be charged to the separate account established pursuant to Section 7 at the discretion of the Pension Plan Investment Committee, unless the amount of such compensation and expenses shall be separately paid by the Company and/or participating Subsidiaries.

**Section 9.   Non-diversion of Separate Account Assets**

Trust assets allocated to the separate account for payment of Medical Costs may not be used for, or diverted to, any other purpose (including payment of pension benefits) prior to the satisfaction of all liabilities of the Plan to provide for the payment of such Medical Costs. In this regard, if (i) this Plan is terminated, (ii) the requirement that payment of Medical Costs be provided by this Plan is eliminated by amendment, or (iii) the Medical Plan is terminated, the Plan shall only be responsible for the payment of Medical Costs incurred prior to such termination or amendment. Any amounts remaining in the separate account after the satisfaction of all liabilities for Medical Costs shall be returned to the Company.

**Section 10.   Forfeitures**

In the event the interest of Eligible Retirees or Eligible Spouses in the separate account is forfeited prior to termination of the Plan, an amount equal to the amount of the forfeiture shall be applied to reduce future contributions by the Company and participating Subsidiaries to fund such payment for Medical Costs.



113

APPENDIX "A" – ARTICLE VIII

## Section 11.    Effective Date

This Article is effective as of 1 November 1988, provided however that such Article is contingent upon the receipt of a favorable Determination Letter from the Internal Revenue Service that such Article does not adversely affect the tax qualified status of the Plan, and in the event such Letter cannot be obtained, this Article will be null and void.

114

APPENDIX "A" – ARTICLE IX

## ARTICLE IX

## Provisions for John Deere Coffeyville Works Transition

Effective 1 January 2008, the Union and the Company agreed to merge the John Deere Coffeyville Works Pension Plan for Wage Employees into the John Deere Pension Plan for Wage Employees.

As part of the 2008 John Deere Coffeyville Works Agreement, specific provisions relative to the incorporation of John Deere Coffeyville Works employees into the John Deere Pension Plan for Wage Employees were set forth.    The pension provisions for individuals hired prior to 1 January 1996 relative to the rates, step-ups, and lump sums bargained under the John Deere Coffeyville Works agreement will apply to the employees, retirees, and surviving spouses of the John Deere Coffeyville Works.

For the John Deere Coffeyville pension provisions in effect during the term of the agreement for employees hired prior to 1 January 1996, refer to the John Deere Coffeyville Works Pension Plan for Wage Employees, supplements to the John Deere Pension Plan for Wage Employees.

115



APPENDIX "B" – ARTICLE I

## APPENDIX "B"
## THE HEALTH BENEFIT PLAN FOR WAGE EMPLOYEES

### ARTICLE I
### GENERAL PROVISIONS

**Section 1.    Preamble**

Deere & Company and its various U.S. subsidiaries and affiliates hereinafter designated the Company, will provide the Health Benefit Plan for Wage Employees (hereinafter referred to as the Plan). The Plan shall make available Group Hospital, Surgical, Medical, Prescription Drug Expense, Dental Expense, Vision Care Expense, and Hearing Aid Expense coverage as hereinafter set forth.

**Section 2.    Supplemental Medical Benefits – Occupational**

A. If an employee shall be entitled to any medical care or treatment from the Company under Workers' Compensation, such medical care or treatment will be supplemented to equal benefits under the Health Benefit Plan for Wage Employees.

B. Where there is a dispute as to whether or not an injury suffered by an employee grew out of his employment with the Company, the following procedure will be followed:

With regard to medical services, the Company physicians, at their discretion, may either treat the employee, refer him to an outside physician, or permit him to go to a physician of his choice.

C. The employee will be required to sign a reimbursement form which will provide that any Workers' Compensation judgment in favor of the employee which duplicates a payment previously made by the Company will be returned to the Company by the employee, or deducted from any final settlement the Company may be required to make.

116



APPENDIX "B" – ARTICLE I

D. It is understood that any of the above actions taken while the dispute is pending will in no way impair the rights of the employee or the Company nor be used to prejudice the position of either.

**Section 3.    Claims Covered Under New Plan**

The benefits provided in this Plan shall be payable with respect to any claims initially incurred on or after 1 January 2010. With respect to claims initially incurred prior to 1 January 2010, benefits will be payable as provided in the prior Agreement.

**Section 4.    Effective Dates of Coverage**

A. Employees shall have coverage effective the first day of the month following the date of the employee's establishment of seniority except that benefits provided under the dental, vision, and hearing provisions shall be effective on the first day of the month following attainment of one (1) year of seniority.

B. Employees shall notify the Company within thirty (30) days of the date their dependency status changes (unless prevented from doing so because of reasons satisfactory to the Company). Upon such proper notification, coverage shall be deemed effective from the date the employee acquired the dependent. Coverage shall be effective on the date of notification if such notification occurs after 30 days.

C. Part-time or temporary employees are not eligible for the coverage under this Plan until they become full-time employees. (This does not apply to factory bargaining units.)

D. Special Enrollment/Disenrollment Period – Children's Health Insurance Program (CHIP) and Medicaid

Effective 1 April 2009, employees and eligible dependents are provided a special enrollment or disenrollment period of 60 days from the date of the Medicaid or CHIP eligibility

117

APPENDIX "B" – ARTICLE I

change to request enrollment or disenrollment in Deere group health plan who:

- Lose Medicaid or CHIP coverage because they are no longer eligible, or
- Become eligible for a state's premium assistance program under Medicaid or CHIP.

**Section 5.   Termination**

A. Employee coverage referred to in Section 1 of this Article will terminate when the employee's employment terminates subject to the provisions of this Plan.

B. Coverage on any dependent will cease automatically:

(1) The date the dependent becomes covered as an employee of the Company, or

(2) if the dependent is a spouse, on the date of divorce, or

(3) if the dependent is a child when any such child fails to meet the definition of dependents as set forth in Article VI, or

(4) on the date of termination of employee coverage.

C. An employee who

(1) loses seniority through discharge, absence from work without notifying the Company as required by applicable Collective Bargaining Agreements or plant rules, or failure to return to work when called; and

(2) is seeking to have his or her seniority reinstated through the grievance procedure,

may continue the coverage referred to in Section 1 of this Article during the period the grievance is pending and the employee contribution for such continuing coverage shall be at the appropriate rate provided that if the employee is reinstated the Company will reimburse him or her for all the

APPENDIX "B" – ARTICLE I

contributions in respect to coverage under this Plan which the Company would have made if the employee had remained on the active payroll.

**Section 6.   Cost of Benefits**

Except as otherwise specifically provided, the cost of providing benefits under this Plan will be borne by the Company and no contribution to the Plan shall be made by any employee, retired employee or beneficiary.

**Section 7.   Named Fiduciary and Plan Administrator**

Deere & Company is the Named Fiduciary and the Plan Administrator and shall administer this Plan, except as otherwise specifically provided.

**Section 8.   Amendment, Modification, and Termination**

A. Except as otherwise specifically provided, the Board of Directors of Deere & Company, or, to the extent so authorized by resolution of the Board of Directors, the Deere & Company Compensation Committee, may at any time amend, or modify the Plan. The procedure for amendment or modification of the Plan by either the Board of Directors or the Deere & Company Compensation Committee, as the case may be, shall consist of: the lawful adoption of a written amendment or modification to the Plan by majority vote at a validly held meeting or by unanimous written consent, followed by the filing of such duly adopted amendment or modification by the Secretary with the official records of the Company. However, no change shall reduce the amount of any benefit to which an employee, retired employee, or beneficiary shall be entitled in respect to claims incurred prior to the effective date of such change.

APPENDIX "B" – ARTICLE I

## B.   Suspension or Termination

Except as otherwise specifically provided, the Board of Directors of Deere & Company may at any time suspend or terminate the Plan. However, no change shall reduce the amount of any benefit to which an employee, retired employee, or beneficiary shall be entitled in respect to claims incurred prior to the effective date of such change.

## Section 9.   Funding

Except as otherwise specifically provided, benefits shall be provided through an insurance company selected by Deere & Company, a fund established by Deere & Company, or from the general assets of Deere & Company.

## Section 10.   Claim for Benefits

An employee, retiree or beneficiary will not need to file a claim for benefits if services are received from a participating provider. No claim for benefits must be filed if services are received from participating providers. Network physicians, hospitals, pharmacies, and other health care providers will bill the Plan directly. However, in order for any employee, retiree, or beneficiary to receive benefits for services rendered by a non-participating provider, a claim for benefits must be filed. A claim for benefits must also be filed for dental services. The process for claiming benefits is described in the Summary Plan Description.

## Section 11.   Denial of Benefits

A.   When a claim for benefits is denied in whole or in part, the claimant will receive a written notice of the reason or reasons for such denial, as described in the Summary Plan Description.

B.   The Plan provides an appeal process for claims that have been denied in whole or in part. The claims appeal process is described in the Summary Plan Description.

APPENDIX "B" – ARTICLE I

## Section 12.   Managed Care Organizations

A Managed Care Organization (MCO) which is authorized to deliver comprehensive health maintenance and treatment services to enrolled participants and which is approved by the Company, may be offered as an alternative to the benefits provided under this Plan.

During prescribed enrollment periods, an employee may elect to continue as a participant in this Plan or may elect to become a participant in an approved MCO, provided the employee resides in the geographic area in which the MCO provides services.

## Section 13.   Nonassignability of Benefits

An employee, retired employee, or covered dependent may authorize that payment of benefits otherwise payable to the employee or retiree, may be made directly to the provider. However, in so authorizing direct payment to the provider, an employee or retiree shall not transfer the right to appeal, representation, or any other rights conferred by this plan, to the provider.

## Section 14.   Provider Exclusion

In providing health benefits, the Company's objective is to obtain high quality medical care on a cost effective basis for employees, retirees and dependents.  With that objective in mind, the Company may exclude any provider.  Exclusion means that the Company will not pay a provider and/or will not reimburse employees, retirees and dependents for services and supplies provided by an excluded provider.

## Section 15.   John Deere Traditional Option

A.   The John Deere Traditional option of this Health Benefit Plan for Wage Employees will be available for eligible employees, eligible retirees, eligible surviving spouses and their dependents who have established a primary residence in the United States that fails to meet the provider access



## APPENDIX "B" – ARTICLE I

and quality standards of the National Committee for Quality Assurance (NCQA) as set forth in the letter on PROVIDER NETWORK(S):

B. All provisions as outlined in Appendix "B" will apply to the John Deere Traditional option except as follows:

(1) Office visits with applicable copayments are not covered.

(2) Emergency room copayment will not apply. Benefits will be paid at 100% of allowed covered charge.

(3) Allergy injections are not covered.

(4) Maternity and obstetrical services for dependents, other than a spouse, are not covered.

(5) Covered preventive care will be limited to pap smears and mammograms.

(6) Reasonable and customary provisions will apply to all covered services. Reasonable and customary is defined as the portion of any charge which is not in excess of the charge made for similar services and supplied to individuals of similar age, sex, circumstances and medical condition in the locality concerned. The provisions of the letter on DEFENSE AGAINST EXCESSIVE DENTAL CHARGES shall apply to medical charges incurred under the John Deere Traditional Option.

(7) Network restrictions do not apply to covered benefits except for mental health/substance abuse and organ transplants.

(8) In addition to pharmacy copayments for Covered Prescription Drugs through a participating retail pharmacy or mail order provider, pharmacy copayments will apply to a 34-day supply of Covered Prescription Drugs filled through any non-participating pharmacy.

## APPENDIX "B" – ARTICLE I

(9) The special exception for treatment at Mayo Clinic (Rochester) and University of Iowa hospitals will require a referral letter from the patient's physician.

### Section 16.    Dependents Residing in Other Areas

Dependents of employees and retirees who do not reside in the same service area as the employee or retiree, and who permanently reside in an area that does not have the health benefit option available in which the employee or refiree is enrolled, shall be allowed to enroll in health benefit option(s) that are available in the area where the dependent resides.

### Section 17.    Health Benefit Plan

The following health benefits are available to employees and to their dependents:

A. Hospital, Surgical, Medical, and Prescription Drugs through a quality, cost effective network(s) as determined by the Company for each service area:

(1) In-Network

a. After $15 copayment for a primary care office visit or $25 copayment for a specialist office visit, 100% paid for covered in-network office visit.

b. 100% paid for other covered in-network medical plan services.

(2) Emergency Room Services

After $40 copayment for an emergency room visit, 100% paid for covered emergency room services.

(3) Point of Service

a. Based on 80% of Maximum Allowable Benefit with 20% coinsurance paid by the employee after satisfying a $250 per individual deductible or $500 per family deductible per calendar year.

APPENDIX "B" – ARTICLE I

Employee coinsurance and deductible payments will not exceed $1,000 for an individual or $2,000 for a family per calendar year.

b. Benefits not covered under Point of Service are Preventive Care, Durable Medical Equipment, Prosthetic Devices, Hospice, and Organ Transplants.

(4) In-Network Covered Prescription Drugs

After $5 copayment for in-network generic prescriptions or $20 copayment for in-network brand prescriptions, 100% paid for Covered Prescription Drugs.

B. Dental:

(1) 100% coverage for preventive services.

(2) 100% coverage for basic services such as fillings, inlays, crowns, extractions, and oral surgery.

(3) 50% coverage for the major services of dentures, orthodontia, and bridgework.

(4) Benefit payable subject to Article XIII, Section 3, Indemnity Limit.

C. Vision:

(1) A Preferred Provider Arrangement (where available)

After $5 copayment for examination by an ophthalmologist or optometrist, 100% paid for covered examinations. After $10 copayment for single vision lens, bifocal vision lens, trifocal vision lens, and lenticular vision lens, 100% paid for covered lenses. After $50 copayment for contact lenses, 100% paid for covered contact lenses.

APPENDIX "B" – ARTICLE I

After $10 copayment for frames, 100% paid for covered frames; or

(2) Scheduled Benefits

Scheduled benefits providing $45.70 for examination by an ophthalmologist, $45.70 for examination by an optometrist, $27.80 for frames, $20.50 per lens for single vision, $29.25 per lens for bifocal, $38.00 per lens for trifocal, $46.70 per lens for lenticular, and $29.25 per lens for contact lens.

(3) Benefits provided once every 24-month period (12 months for examination and lenses for dependents under age 17).

D. Hearing:

(1) A Preferred Provider Arrangement (where available)

100% paid for covered audiometric exam, covered hearing aid evaluation, pre-determined hearing aids (single and binaural), and dispensing fees, or

(2) Scheduled Benefits

Scheduled benefits providing $30.00 for audiometric exam, $40.00 for hearing aid evaluation, $225.00 for a hearing aid, $125.00 for a hearing aid dispensing fee, $450.00 for binaural hearing aids, and $190.00 for binaural hearing aid dispensing fee.

(3) Benefits provided every 36 months.

APPENDIX "B" – ARTICLE II

# ARTICLE II
## CONTINUATION OF HEALTH COVERAGE

**Section 1.   Leave of Absence for Employees Hired Prior to 1 October 1997**

A. An employee not actively at work due to leave of absence may continue coverage for a maximum of twelve (12) months on the following basis:

(1) During the first six (6) months of such leave, the employee will pay fifty (50) percent of the premium and the Company will pay the remaining fifty (50) percent of the premium. During the subsequent six (6) months of the leave, the employee will be required to pay the full premium.

(2) Employees not actively at work due to leave of absence for Local Union business may continue coverage beyond twelve (12) months for the duration of the leave of absence by paying the full premium.

B. If an employee is granted a leave of absence due to a clinically anticipated disability based on the natural course of the employee's diagnosed condition and if such employee continues coverage during such approved leave of absence as provided in Paragraph A-(1) of this Section, upon medical certification satisfactory to the Company from the employee's attending physician that the employee is totally disabled, coverage for the employee will be continued as provided in Section 6 of this Article.

**Section 2.   Union Leave of Absence for Employees Hired on or after 1 October 1997**

Employees not actively at work due to leave of absence for Local Union business will have coverage on the following basis:

(1) During the first six (6) months of such leave, the employee will pay fifty (50) percent of the premium and the Company will pay the remaining fifty (50)

126

---

APPENDIX "B" – ARTICLE II

percent of the premium. During the subsequent six (6) months of the leave, the employee will be required to pay the full premium.

(2) Employees not actively at work due to leave of absence for Local Union business may continue coverage beyond twelve (12) months for the duration of the leave of absence by paying the full premium.

**Section 3.   Layoff**

A. An employee with seniority but not actively at work due to layoff will have coverage subject to nonduplication of benefits continued for a period of time which will be determined by the number of weeks the employee is eligible for Supplemental Unemployment Benefits (SUB) at the date of layoff, in accordance with the provisions of the Supplemental Unemployment Benefit Plan, but in no event will such period be less than six (6) months or exceed eighteen (18) months from the date of layoff.

B. An employee who is employed under the provisions of Article XIV, Section 9 or 10 of the Agreement and who:

(1) has been employed at a secondary unit for twelve (12) months or more, and

(2) has an employment relationship with an original (home) unit, and

(3) is subsequently terminated from the secondary unit,

will have coverage continued as provided for in Paragraph A above.

C. Following the expiration of the period of time coverage was continued under A or B above, the employee may continue coverage for a period of twelve (12) additional months by payment of the full premium.

127

APPENDIX "B" – ARTICLE II

## Section 4.  Notice of Termination to Laid Off Employees

Notice will be given to employees at least sixty (60) days prior to termination of their coverage notifying them of the date coverage will terminate and of the provisions for continuation of coverage as provided.

## Section 5.  Work Stoppages

A. In the event of a work stoppage, an employee involved in such work stoppage will be required to contribute the full premium for coverage if such work stoppage continues beyond ten (10) consecutive workdays from the date the work stoppage commenced. Coverage provided in this Plan will then terminate unless the employee contributes the full premium in advance to the Company. In the event that the employee returns to work prior to the end of the month for which he or she has contributed the full premium, the Company will reimburse, on a daily prorated basis, the unused portion of the full premium. An employee who does not contribute, as required, to continue coverage in effect will be eligible for coverage upon return to work.

B. The employee contributions for the premium charge in A above may be paid by the Union.

## Section 6.  Illness or Accident

The coverage of an employee not actively at work because of illness or accident will be continued at no cost to the employee during such illness or accident or for a period of time equal to the employee's continuous employment, whichever is lesser, but in any event not less than fifty-two (52) weeks. An employee or a retired employee will have coverage continued while eligible to receive long-term disability benefits as set forth in the John Deere Disability Benefit Plan for Wage Employees.

APPENDIX "B" – ARTICLE II

## Section 7.  Employees Hired Prior to 1 October 1997 Receiving Life Insurance in Monthly Installments

An employee receiving Life Insurance in monthly installments under the John Deere Group Life and Disability Insurance Plan for Wage Employees will have the benefits outlined in this Plan continued by the Company without cost to the employee. While such benefits are in effect for such employee, they will be continued for the employee's eligible dependents.

## Section 8.  Retirement for Employees Hired Prior to 1 October 1997

An employee who is retired or retires under the John Deere Pension Plan for Wage Employees except under Article III, Section 5 will have the benefits outlined in this Plan continued by the Company without cost to the employee. While such benefits are in effect for the retired employee they will be continued for the employee's dependents without cost.

## Section 9.  Surviving Spouse of an Employee Hired Prior to 1 October 1997

A. The surviving spouse of an employee not eligible to retire under the John Deere Pension Plan for Wage Employees at the time of death and who is receiving a Transition Survivor Income Benefit and not eligible for a Bridge Survivor Income Benefit may continue coverage for two years upon payment of the full monthly group rate.

B. The surviving spouse of an employee not at work on or after 1 October 1994 and not eligible to retire under the John Deere Pension Plan for Wage Employees at the time of death which occurs on or after 22 October 1979 and who is eligible to receive both a Transition and Bridge Survivor Income Benefit will have the coverage continued by the Company without cost for a period of six (6) months. Thereafter, the surviving spouse may continue coverage to age 62, even though temporarily ineligible for a Bridge Survivor Income Benefit because she is eligible for

APPENDIX "B" – ARTICLE II

Mother's Insurance Benefits under the Federal Social Security Act, upon payment of the full monthly group rate. For the surviving spouse of an employee who is at work on or after 1 October 1994, health benefits will be continued without cost for a period of twelve (12) months.

C. The surviving spouse of a retired employee, who has been married to the retiree for one year or more immediately prior to the death of the retiree, or the surviving spouse of an employee who was eligible to retire under the John Deere Pension Plan for Wage Employees at the time of death will have the benefits outlined in this Plan continued by the Company without cost provided such spouse was covered under the Health Benefit Plan. While such benefits are in effect for the surviving spouse, they will be continued for such spouse's dependents.

D. If an employee dies as a result of a work incurred accident or illness, the surviving spouse not eligible under Paragraph C above, will have the benefits outlined in this Plan continued by the Company without cost. Such benefits will cease on the first to occur of the surviving spouse's remarriage, attainment of an age when such surviving spouse is eligible for Medicare, or death.

E. If an employee dies as a result of a work incurred accident or illness and there is no surviving spouse, the legal guardian of the employee's eligible dependent children may continue the benefits outlined in this Plan for such dependents by payment of the full monthly premium.

F. For the purpose of A, B, C, and D above, coverage will apply to the surviving spouse and the employee's or retiree's eligible dependents as defined in Article VI. No benefit will be payable with respect to a pregnancy commencing after the death of the employee.

Section 10.    Special Continuation Provisions

A. Notwithstanding other continuation provisions of this Plan, effective with events described in B and C below that occur on or after 1 November 1986 if an employee or an

130

APPENDIX "B" – ARTICLE II

employee's dependent loses coverage under this Plan, such employee or dependent may be eligible for additional continuation of coverage under this Plan by payment of up to 102% of the full monthly premium. The minimum continuation provisions provided under this Section are not in addition to the continuation provisions otherwise provided by this Plan.

B. A minimum continuation period of eighteen (18) months will be provided for an employee and an employee's dependents whose coverage would otherwise have terminated as a result of

(1)  termination of the employee for reasons other than gross misconduct; or

(2)  layoff.

C. A minimum continuation period of thirty-six (36) months will be provided for an employee's dependents whose coverage would otherwise have terminated as a result of

(1)  the death of an employee;

(2)  the divorce from an employee;

(3)  ceasing to meet the definition of an eligible dependent.

D. The continuation privilege provided in this Section may be terminated before the expiration of the eighteen (18) or thirty-six (36) month continuation period if

(1)  the Company ceases to provide coverage to its employees;

(2)  the covered person fails to make timely premium payments;

(3)  the covered person becomes a participant in another group health plan;

131

APPENDIX "B" – ARTICLE III

## ARTICLE III
## PREMIUM RATES

When an employee is required to make premium payments to continue health benefits, such payments must be made prior to the first of the month for which it is paid. Rates will be determined annually and become effective 1 January of each year.

133



APPENDIX "B" – ARTICLE II

(4)  the covered person becomes eligible for Medicare; or

(5)  a spouse remarries and becomes covered under another group health plan.

132

APPENDIX "B" – ARTICLE IV

## ARTICLE IV
## SPONSORED DEPENDENTS

### Section 1.   Eligibility

A.  Dependent coverage as provided in this Plan other than maternity benefits shall be available to employees for their sponsored dependents. A sponsored dependent means any person, other than a dependent as defined in Article VI of this Plan, who is a member of the employee's household and who is dependent on the employee for more than one-half of his support as defined by the Internal Revenue Code of the United States and who either qualifies in the current year for dependency tax status or who has been reported by the employee as such on his most recent Federal Income Tax Return.  An employee must request coverage for each sponsored dependent (1) at the time the employee becomes insured, or (2) within thirty-one (31) days of acquiring a sponsored dependent and certify that the person he is enrolling is his dependent under the above definition.  If an employee does not request coverage for sponsored dependents within the time limits above, he may obtain coverage only upon presentation of evidence of good health of the sponsored dependent which is satisfactory to the Company.

B.  Retired employees shall be deemed employees for the purpose of Paragraph A above.

C.  Coverage for a sponsored dependent enrolled at the time of an employee's or retired employee's death may be continued at the option of the surviving spouse while such spouse is enrolled for coverage by paying the required premium.

D.  The Company may require from time to time that the employee furnish proof of the continued dependency of any sponsored dependent.

134

APPENDIX "B" – ARTICLE IV

### Section 2.   Premium Rate

A.  The employee will be required to pay the full cost of the dependent coverage for his sponsored dependents. The monthly contribution will be deducted from the employee's pay.  For any month in which such deduction cannot be made from the employee's pay, the employee must pay the premium in advance.

B.  The retired employee or surviving spouse will be required to pay the premium in advance for the dependent coverage for the sponsored dependents.

C.  Coverage for sponsored dependents will begin on the first day of the month following the first deduction or payment of the required monthly premium.

### Section 3.   Termination of Coverage

Sponsored dependents' coverage shall terminate on the earliest of the following:

A.  The end of the month in which the employee, retired employee or surviving spouse files a request to cancel such coverage.

B.  The end of the last month for which contribution was paid.

C.  The date the employee's coverage terminates.

D.  The date the sponsored dependent ceases to meet the dependency requirement.

E.  The first of the month in which the sponsored dependent becomes eligible for coverage under Medicare as defined in this Plan.

135



APPENDIX "B" – ARTICLE V

## ARTICLE V
## PRIVILEGE OF OBTAINING
## INDIVIDUAL INSURANCE

An individual policy may be obtained without further evidence of insurability upon termination of coverage under this Plan.

A. due to termination of the employee's employment in the classes eligible for coverage hereunder, or

B. due to the death of the employee while the employee is covered for dependents coverage hereunder, or

C. with respect to a child of the employee, due to such child's ceasing to be dependent, as defined herein provided the applicant qualifies, makes application and pays the premium for such individual policy within thirty-one (31) days after such termination of coverage.

Information as to the coverage available and premium rates can be obtained from the Company when coverage terminates.

---

APPENDIX "B" – ARTICLE VI

## ARTICLE VI
## DEFINITIONS

**Section 1.   Hospital**

The term "hospital" as used herein means

A. An institution which meets all of the following tests:

(1) It is engaged primarily in providing medical care and treatment of sick and injured persons on an inpatient basis at the patient's expense and maintains diagnostic and therapeutic facilities for surgical and medical diagnosis and treatment of such persons by or under the supervision of a staff of duly qualified physicians;

(2) It continuously provides twenty-four (24) hour a day nursing service by or under the supervision of registered graduate nurses and is operated continuously with organized facilities for operative surgery; and

(3) It is not, other than incidentally, a place of rest, a place for the aged, a place for drug addicts, a place for alcoholics, or a nursing home.

B. A hospital, other than a psychiatric hospital or a tuberculosis hospital as those terms are defined in Medicare, which is qualified to participate and eligible to receive payments under and in accordance with the provisions of Medicare.

**Section 2.   Medicare**

The term "Medicare" as used herein means the Health Insurance for the Aged Program under Title XVIII of the Social Security Act as such program is currently constituted and as it may be later amended.

APPENDIX "B" – ARTICLE VI

## Section 3.   Room and Board Charges

"Room and board charges" as used herein mean all charges for room, board, general duty nursing, intensive care in an intensive care unit, and any other charges by whatever name such charges are called, which are made by the hospital at a daily or weekly rate, or which are regularly made by the hospital as a condition of occupancy of the class of accommodations occupied but not including charges for professional services of physicians nor charges for private duty or special nursing services rendered outside of an intensive care unit.

## Section 4.   Dependent

A. The term "dependent" as used herein is limited to

(1) the spouse of an employee;

(2) the employee's unmarried children under nineteen (19) years of age;

(3) the employee's unmarried children legally residing with and dependent upon the employee for more than one-half of their support as defined by the Internal Revenue Code of the United States of America, who qualify in the current year for dependency tax status or as a dependent on the employee's most recent Income Tax Return; and

a. who are nineteen (19) years of age or over but under twenty-five (25) years of age; or

b. who are permanently and totally disabled regardless of age.

B. The term "unmarried children" shall include natural born, legally adopted, those for whom legal adoption proceedings have been initiated, and stepchildren. Unmarried children shall also include children under nineteen (19) years of age, dependent on the employee for more than one-half of their support as defined by the Internal Revenue Code of

APPENDIX "B" – ARTICLE VI

the United States of America, who either qualify in the current year for dependency tax status or who have been reported as such by the employee on his most recent Federal Income Tax Return, who reside in the household of which the employee is the head, and who are related by blood or marriage to the employee, or are under such employee's legal guardianship.

C. For employees hired on or after 1 October 1997 a dependent shall not include a person who otherwise has coverage under this plan, i.e., a person who is covered as an employee or a person who is a dependent of another employee.

## Section 5.   Permanently and Totally Disabled

The term "permanently and totally disabled" as used herein means any medically determinable physical or mental condition which prevents the dependent, age twenty-five (25) or over, from engaging in substantial gainful activity and which can be expected to result in death or to be of long continued or indefinite duration.

## Section 6.   Mental or Nervous Disorder

The term "mental or nervous disorder" as used herein means neurosis, psychoneurosis, psychopathy, psychosis, or mental or emotional disease or disorder of any kind as set forth in the International Classification of Diseases of the U. S. Department of Health, Education and Welfare (V, Mental Psychoneurotic, and Personality Disorders, 300-329 as amended).

## Section 7.   Psychiatric Services

The term "psychiatric services" as used herein shall be deemed to include all accepted forms of diagnosis, evaluation and/or treatment of mental and nervous disorders.

APPENDIX "B" – ARTICLE VI

## Section 8.    Psychiatrist

The term "psychiatrist" as used herein means

A.  a medical doctor who is qualified and, licensed to practice medicine and surgery and who is certified or eligible for certification in psychiatry by the American Board of Psychiatry and Neurology, or

B.  a medical doctor who has completed an approved residency training program in psychiatry.

## Section 9.    Psychologist

The term "psychologist" as used herein means an individual

A.  who is licensed or certified as a psychologist by the appropriate governmental authority having jurisdiction over such licensing or certification, as the case may be, in the jurisdiction where such individual renders service, or

B.  who is a Member or Fellow of the American Psychological Association or who is identified as a qualified clinical psychologist by the American Board of Examiners in Professional Psychology, if there is no licensing or certification in the jurisdiction where such person renders service.

## Section 10.    Medical Doctor

The term "medical doctor" as used herein is limited to an individual who holds a Doctor of Medicine degree and is entitled to use the abbreviation (M.D.), and practices medicine within the scope of his license.

## Section 11.    Outpatient Psychiatric Clinic

The term "outpatient psychiatric clinic" as used herein means an institution or a distinct part of an institution, public or private, other than the office of a physician, which

140

APPENDIX "B" – ARTICLE VI

A.  provides outpatient services for persons with mental or nervous disorders,

B.  is serviced by a psychiatrist who has regularly scheduled hours in such clinic and who assumes medical responsibility for all patients, and

C.  meets the minimum standards established by the American Psychiatric Association in its Standards for Psychiatric Hospitals and Clinics.

## Section 12.    Day Care Center

The term "day care center" as used herein means an institution or distinct part of an institution which meets all of the following tests:

A.  It is engaged primarily in providing care and treatment of persons with mental or nervous disorders through a planned therapeutic program and maintains diagnostic and therapeutic facilities for the diagnosis and treatment of such persons.

B.  It is operated under the supervision of a psychiatrist who has regularly scheduled hours at such center or under the direction of a psychiatrist who acts as consultant to the staff of the center on a regularly scheduled basis and which has other qualified mental health professionals necessary for adequate psychiatric care.

C.  It is not other than incidentally a school, a place for custodial care, a recreation or training center.

D.  When separate from a hospital, it is approved by the state health and/or mental hygiene department.

## Section 13.    Night Care Center

The term "night care center" as used herein is limited to a distinct part of a hospital which provides for the diagnosis, care and treatment of persons with mental or nervous disorders, during the evening or night hours.

141

APPENDIX "B" – ARTICLE VI

### Section 14.   Community Mental Health Center

The term "community mental health center" as used herein means an institution or distinct part of an institution as defined by the federal government in the Community Mental Health Centers Act of 1963.

### Section 15.   Qualified Nursing Home

The term "qualified nursing home" as used herein means

A. Only an institution or distinct part of an institution which meets fully every one of the following tests:

(1) It is operated in accordance with the applicable laws of the jurisdiction in which it is located;

(2) It is under the supervision of a duly qualified physician, or registered graduate nurse (R.N.), who is devoting full time to such supervision;

(3) It is regularly engaged in providing room and board and continuously provides twenty-four (24) hour a day nursing care for sick and injured persons at the patient's expense;

(4) It maintains a daily medical record of each patient who is under the care of a duly qualified physician;

(5) It is authorized to administer medication to patients on the order of duly qualified physician;

(6) It is not, other than incidentally, a place of rest, a home for the aged, the blind or the deaf, a hotel, a domiciliary care home, a maternity home, or a home for alcoholics, drug addicts, the mentally ill or tubercular patients;

(7) It is accredited by the Joint Commission on Accreditation of Hospitals; and

142

APPENDIX "B" – ARTICLE VI

(8) It has a transfer agreement in effect with one or more hospitals; or

B. An institution or distinct part of an institution which is qualified to participate and eligible to receive payments as an Extended Care Facility under and in accordance with the provisions of Medicare.

### Section 16.   Other Group Plan

The term "Other Group Plan," as used herein, means any plan of another employer providing benefits or services for or by reason of medical care or treatment which benefits or services are provided on an insured or uninsured basis in connection with an employee's or an employee's dependent's employment, occupation or profession.

In the case where both the husband and wife are employees of the Company, the phrase "other group plan" shall include any health benefit plan of the Company.

### Section 17.   Allowable Expense

The term "Allowable Expense," as used herein, means any reasonable and customary charge which the employee or dependent is legally required to pay for an item of medical expense at least a portion of which is covered under either this Plan or any other Group Plan of another employer covering the person for whom claim is made. If benefits are provided in the form of services rather than cash payments, the reasonable cash value of each service rendered shall be considered both an Allowable Expense and a benefit paid.

### Section 18.   Claims Determination Period

The term "Claims Determination Period," means a calendar year or that portion of a calendar year during which the person for whom claim is made has been insured under this Plan.

143

APPENDIX "B" – ARTICLE VI

Section 19.    Ophthalmologist

The term "Ophthalmologist" as used herein means any licensed doctor of medicine or osteopathy legally qualified to practice medicine, including the diagnosis, treatment, and prescribing of lenses related to conditions of the eye.

Section 20.    Optometrist

The term "Optometrist" as used herein means any person legally licensed to practice optometry as defined by the laws of the state in which the service is rendered.

Section 21.    Optician

The term "Optician" as used herein means any person who makes or sells eyeglasses prescribed by an Ophthalmologist or Optometrist to cure or correct defects in the eyes, and grinds lenses or has lenses ground according to prescription.

Section 22.    Lenses

The term "Lenses" as used herein means ophthalmic corrective lenses ground as prescribed by an Ophthalmologist or Optometrist, to be fitted into a frame.

Section 23.    Contact Lenses

The term "Contact Lenses" as used herein means ophthalmic corrective lenses ground as prescribed by an Ophthalmologist or Optometrist, to be fitted directly to the patient's eyes.

Section 24.    Frame

The term "Frame" as used herein means a standard eyeglass frame into which two lenses are fitted.

144

---

APPENDIX "B" – ARTICLE VI

Section 25.    Otologist or Otolaryngologist

The term "otologist or otolaryngologist" as used herein means any person who is board certified or eligible for certification in his specialty in compliance with standards established by his doctor of medicine or osteopathy legally qualified to practice medicine and who, within the scope of his license, performs a medical examination of the ear and determines whether the patient has a loss of hearing acuity and whether the loss can be compensated for by a hearing aid.

Section 26.    Audiologist

The term "audiologist" as used herein means any person who (1) possesses a master's or doctorate degree in audiology or speech pathology from an accredited university, (2) possesses a Certificate of Clinical Competence in Audiology from the American Speech and Hearing Association, and (3) is qualified in the state in which the service is provided to conduct an audiometric examination and hearing aid evaluation test for the purposes of measuring hearing acuity and determining the prescribing the type of hearing aid that would best improve the covered person's loss of hearing acuity. Where an otologist or otolaryngologist performs the foregoing services, he shall be deemed an audiologist for the purposes of this Plan.

Section 27.    Dealer

The term "dealer" as used in Article XXI means any person or organization that sells hearing aids prescribed by an otologist, otolaryngologist or audiologist to improve hearing acuity in compliance with the laws or regulations governing such sales, if any, of the state in which the hearing aids are sold.

Section 28.    Hearing Aid

The term "hearing aid" as used herein means an electronic device worn on the person for the purpose of amplifying sound and assisting the physiologic process of hearing, and includes an ear mold, if necessary.

145



APPENDIX "B" – ARTICLE VI

## Section 29.   Ear Mold

The term "ear mold" as used herein means a device of soft rubber, plastic or a non-allergenic material which may be vented or nonvented that individually is fitted to the external auditory canal and pinna of the patient.

## Section 30.   Audiometric Examination

The term "audiometric examination" as used herein means a procedure for measuring hearing acuity that includes tests relating to air conduction, bone conduction, speech reception threshold and speech discrimination.

## Section 31.   Hearing Aid Evaluation Test

The term "hearing aid evaluation test" as used herein means a series of subjective and objective tests by which an otologist, otolaryngologist or audiologist determines which make and model of hearing aid will best compensate for the covered person's loss of hearing acuity and which make and model will therefore be prescribed, and shall include one visit by the covered person subsequent to obtaining the hearing aid for an evaluation of its performance and a determination of its conformity to the prescription.

## Section 32.   Primary Care Physician

The term "primary care physician" as used herein means a licensed physician (M.D., D.O.) (1) whose declared practice is internal medicine, family/general practice, or pediatrics; (2) who practices within the scope of his license; and (3) who is not a Specialist Physician.

## Section 33.   Specialist Physician

The term "specialist physician" as used herein means a licensed physician (M.D., D.O.) (1) whose declared practice is limited to treating a specific disease, specific parts of the body, or specific procedures; (2) who practices within the scope of his license; and (3) who is not a Primary Care Physician.

APPENDIX "B" – ARTICLE VI

## Section 34.   Maximum Allowable Benefit

The term "maximum allowable benefit" as used herein means the plan benefit payment accepted by in-network providers in the patient's region for similar covered services and supplied to individuals of similar age, sex, circumstances and medical condition.



APPENDIX "B" – ARTICLE VII

# ARTICLE VII
## HOSPITAL EXPENSE BENEFITS
## EMPLOYEES AND THEIR DEPENDENTS

**Section 1.  For Daily Room and Board Expense**

A. Benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services if an insured employee or an insured employee's dependent shall be confined upon the recommendation of a physician as a resident patient in a hospital on account of accidental bodily injury or sickness not hereinafter excepted and such confinement shall begin:

(1) While such person is covered under this Article, or

(2) Within three (3) months from the date such person ceases to be covered under this Article provided such person shall have been totally disabled by bodily injury or sickness at the date he shall have ceased to be covered under this Article, and shall have been continuously so disabled to the date of commencement of such confinement.

B. The benefits will be paid for room and board of such person up to the maximum daily benefit hereinafter specified for each of the first three hundred sixty-five (365) days of such confinement during any one (1) period of disability.

C. The number of days for which benefits are provided under B above will be reduced by the number of days for which benefits were paid during the same period of disability under Article XIV hereof.

D. The maximum daily benefit shall be:

(1) For any day that private accommodations, intensive care unit accommodations, or isolation facilities are not occupied, an amount equal to the hospitals regular daily rate for the accommodations occupied.

148

APPENDIX "B" – ARTICLE VII

(2) For any day that private accommodations are occupied, an amount equal to the hospital's most frequent charge for semiprivate accommodations. If it is certified in writing by the Admitting Office of the hospital that semiprivate accommodations were not available at the time of admission, then for the day or days that semiprivate accommodations were not available, an amount equal to the hospital's regular daily rate for the lowest priced private accommodation available.

(3) For any day that intensive care unit accommodations or isolation facilities are required, an amount equal to the hospital's regular daily rate for such accommodations.

The benefits will be paid for isolation facilities when such facilities are required by either the hospital and/or the attending physician. The isolation facilities will be considered "as required" until such time as a definitive diagnosis is made by either the hospital or the attending physician that isolation is no longer required.

To illustrate, suppose an employee is hospitalized with a suspected infectious condition and is placed in isolation. The benefits will be paid for the isolation facilities until the end of the day during which the definitive diagnosis is reached that the infectious condition requiring isolation no longer exists.

Another illustration would be the situation where an employee is hospitalized with a broken leg, and during the course of his confinement develops an infectious condition requiring isolation. Again, the benefits will be paid for the isolation facilities beginning at the time they are required and until such time as the definitive diagnosis is made stating that the infectious condition no longer exists.

149

APPENDIX "B" – ARTICLE VII

(4) For any day that intensive care unit accommodations are required in a hospital that does not have intensive care facilities, an amount equal to the hospital's regular daily rate for the accommodations occupied. This requirement must be certified by the attending physician.

## Section 2.   For Additional Fees

### A.   Miscellaneous Fees

If an insured employee or an insured employee's dependent on any day of hospital confinement for which benefits are payable under Section 1 of this Article shall necessarily receive medical care and treatment, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services subject to the provisions hereinafter contained, for:

(1) the charges made by the hospital for such care and treatment of such person (except charges for room and board, nursing care and attendance by a physician) including, but without limitation thereto, charges for blood transfusions, blood plasma, blood serums, and X-rays;

(2) charges for anesthesia administered during such hospital confinement;

(3) charges for screening X-rays and public health test where required by the hospital; and

(4) charges by radiologists, pathologists, and other hospital based physicians to the extent such charges are not hospital charges.

150

APPENDIX "B" – ARTICLE VII

### B.   Ambulance Service

If an insured employee or an insured employee's dependent shall necessarily require a professional ambulance service (including an ambulance operated by a hospital), benefits will be paid 100% for covered services when:

(1) a person is taken to a hospital and is confined, or from hospital to hospital if the services required are not available at the first hospital;

(2) there is emergency medical care and treatment on account of bodily injury suffered in an accident;

(3) there is medical care and treatment within 72 hours of and in connection with a surgical operation;

(4) there is medical care and treatment secured immediately after the onset of a (nonsurgical) Medical Emergency;

(5) a person is taken to a hospital and is dead on arrival (DOA);

(6) a person is taken from hospital to home or nursing home when it is deemed medically necessary - such as but not limited to, being in a full body cast; and

(7) a person is taken by air ambulance to a hospital for any of the reasons stated in (1) through (6) above, and

a. such method of transportation is medically required by the attending physician, i.e., because of the individual's medical condition land transportation cannot be used, and

b. such method of transportation is in fact an ambulance service and not a charter service.

151

APPENDIX "B" – ARTICLE VII

In no event shall the benefit paid exceed the charge by the professional ambulance service for conveyance to the nearest facility equipped and staffed to provide the necessary emergency, surgical, or rehabilitative treatment nor shall any benefit be payable with respect to any such charges incurred after the first 365 days of hospital confinement during any one continuous period of disability.

C.   Inpatient Hemodialysis

If an insured employee or an insured employee's dependent shall necessarily receive Hemodialysis Treatment, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

The benefit includes the use of the machine and other required physical equipment, such as all consumable and expendable supplies, solutions, drugs and laboratory tests; trained staff, and other hospital services as may be required, except the physician's professional services which shall be provided under the provisions of Section 1 of Article IX, including the diagnostic and supportive studies and treatment prior to kidney transplant.

Section 3.   For Maternity Expense

Benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services, subject to the provisions hereinafter contained as specified in Sections 1 and 2 of this Article, if an insured employee or an insured employee's dependent shall be as a resident patient in a hospital on account of pregnancy, childbirth or miscarriage, and such confinement shall begin:

A.   While such person is covered under this Article; or

APPENDIX "B" – ARTICLE VII

B.   Within nine (9) months from the date such person ceases to be covered under this Article, provided such confinement results from pregnancy which existed at such date and which pregnancy commenced while such person was covered under this Article, as evidenced by a written statement of the attending physician.

Section 4.   Organ or Tissue Transplants

If an insured employee or insured employee's dependent shall be confined upon the recommendation of a physician as a resident patient in a hospital for the purpose of being a donor for an organ or tissue transplant surgical procedure or if any other person shall be so confined for the purpose of being a donor for an insured employee or an insured employee's dependent, the benefits provided in Sections 1 and 2 of this Article shall be payable provided the donor is not otherwise eligible for hospital insurance benefits under the Company's plan, the plan of any other company or otherwise. If an insured employee or an insured employee's dependent shall be confined as set out above for the purpose of being a donor, the benefits provided in Sections 1 and 2 of this Article will not be paid if the donee has hospital insurance which will cover the donor.

Section 5.   Jejunoileostomy and Incidental Lipectomy

If an insured employee or an insured employee's dependent shall incur hospital charges for jejunoileostomy and incidental lipectomy the benefits provided in Sections 1 and 2 of this Article will be paid for patients where all of the following criteria have been met:

A.   Massive obesity - preferably a body weight over 100 lbs. over optimal weight.

B.   Medical complications secondary to the obesity such as hypertension, diabetes, serious venous stasis, hyperlipidemia, etc.

It is understood that the operation is not performed for cosmetic reasons.

APPENDIX "B" – ARTICLE VII

## Section 6.  For Outpatient Expense

### A.  Emergency Room

Benefits as set forth below will be paid 100% for covered services after $40 emergency room visit copayment if an insured employee or an insured employee's dependent shall necessarily receive in a hospital:

(1)  Emergency medical care and treatment on account of bodily injury not hereinafter excepted suffered by such person in an accident.

(2)  Medical care and treatment within seventy-two (72) hours of and in connection with a surgical operation.

(3)  Medical care and treatment secured immediately after the onset of a (nonsurgical) medical emergency or as soon thereafter as the care can be made available.

A "Medical Emergency" is the sudden and unexpected onset of conditions that could reasonably be expected by a prudent layperson to result in serious jeopardy to the mental or physical health of the individual and for which the claimant secures medical care immediately after the onset or as soon thereafter as the care can be made available. "Medical Emergencies" include heart attacks, cardiovascular accidents, poisoning, loss of consciousness or respiration, and such other acute conditions which meet the criteria set forth below.

### a.  CRITERIA

The criteria which will be utilized in determining the existence of a medical emergency condition as set forth in Section 6-A-(3) above and whether benefits will be payable are as follows:

154

APPENDIX "B" – ARTICLE VII

i.  The condition must be of such nature that failure to render care and/or treatment at the time required could reasonably result in deterioration to the point of placing the patient's life in jeopardy and/or cause serious impairment to bodily functions of the patient.

ii.  Severe symptoms must occur suddenly and unexpectedly. The symptoms must be sufficiently severe to cause a person to seek immediate medical assistance regardless of the hour of the day or night. A chronic condition in which symptoms have existed over a period of time would not qualify for medical emergency consideration. However, if symptoms become acute enough to require immediate medical assistance, it might at that point so qualify.

iii.  Immediate care must be secured. A medical emergency will not be considered to exist if medical care is not secured immediately after the onset of the condition. A telephone call to a doctor would not fulfill this requirement if examination and treatment by the physician is deferred until the next day. As a general rule the date of onset of symptoms and the date of treatment as reported on the claim form should be the same.

iv.  The illness or condition as finally diagnosed or as indicated by its symptoms was one which would require immediate medical care.

b.  The following are examples of medical emergencies:

i.  FOREIGN BODY IN AIRWAY WITH ACUTE OBSTRUCTION

The blocking of the normal flow of oxygen and carbon dioxide.

155

APPENDIX "B" – ARTICLE VII

ii. ACUTE LARYNGEAL EDEMA

Swelling of the vocal cords and related structures with impairment of the airway.

iii. ACUTE PULMONARY EDEMA

Fluid in the airways and tissue of the lungs.

iv. ASPHYXIA

Lack of oxygen.

v. TENSION PNEUMOTHORAX

Collapsed lung.

vi. CARDIAC

Impairment of the normal blood flow in the coronary vascular system, e.g., apparent heart attack, angina.

vii. ADAMS STOKES SYNDROME

Sudden attack of unconsciousness caused by cardiac arrhythmia.

viii. MASSIVE PULMONARY EMBOLISM

Blood clot in the pulmonary vascular system which interferes with respiration.

ix. CARDIAC ARREST

The sudden cessation of heart contractions.

x. CARDIAC TAMPONADE

Blood in the sac covering the heart.

156

APPENDIX "B" – ARTICLE VII

xi. CONVULSIVE DISORDERS

Sudden loss of consciousness with muscular contractions of the body with impairment of the respiratory process due to muscular spasm of the jaws interfering with flow of air to the patient.

xii. CEREBROVASCULAR ACCIDENT

Sudden occlusion of the blood supply to the brain with loss of function of the brain supplied by that particular blood vessel.

xiii. INFECTION

Infection of the covering membrane of the brain.

xiv. ECLAMPSIA

Absorption of toxic products of conception by the mother with changes in cerebral, renal and cardiac functions.

xv. GASTROINTESTINAL

Acute loss of blood by reason of ulceration or erosion of blood vessels in the abdominal cavity.

xvi. PERFORATION OF VISCUS

Traumatic loss of continuity of intra-abdominal viscera (stomach, intestine, bladder, etc.).

xvii. UREMIC COMA

Failure of kidney function with increase in retained metabolites.

157

APPENDIX "B" -- ARTICLE VII

xviii.   ACUTE OBSTRUCTION OF URINARY TRACT

Stone or tumor interfering with normal drainage of the excretory mechanism of the kidney, ureter, bladder or urethra.

xix.   ANURIA-LOWER NEPHRON NECROSIS

Failure of urine secretion by the kidney due to infection, toxic substances ingested, etc.

xx.   DIABETIC COMA

Failure of the body to effectively utilize glucose with increase in fat combustion leading to acidosis from excessive hydrogen ion formation.

xxi.   PARATHYROID TETANY

Impairment of calcium metabolism with change in serum calcium and secondary nerve function malfunction with muscle spasms (tetany).

xxii.   ADDISON DISEASE WITH CRISIS

Loss of adrenal gland hormone.

xxiii.   HYPERCALCEMIA

Increase in serum calcium blood level with resultant cerebral and renal changes.

xxiv.   INSULIN REACTION

Incorrect dose of drug, or failure to take or ingest prescribed diet, with the correct dose of insulin.

xxv.   THYROID STORM

Over or excessive secretion or liberation of thyroid hormone.

158

APPENDIX "B" -- ARTICLE VII

xxvi.   HEAT STROKE

Failure of the heat regulatory function of the body.

xxvii.   TEMPERATURE ELEVATION

Acute high fever (for) infants less than three years of age.

xxviii.   ACUTE GLAUCOMA

Sudden increase in intra ocular pressure.

xxix.   SYMPATHETIC OPHTHALMIA

Infection and edematous changes occurring in the nonaffected eye.

xxx.   CAVERNOUS SINUS THROMBOSIS

Complication of middle ear disease with erosion of mastoid bone and spreading infection to the cavernous sinus in the brain.

xxxi.   ACUTE ABDOMEN

Acute appendicitis
Acute cholecystitis
Acute pancreatitis

xxxii.   SHOCK

Infection
Hemorrhage - traumatic
Cardiac - Heart attack

159

APPENDIX "B" – ARTICLE VII

xxxiii.   LOSS OF CONSCIOUSNESS

Diabetic coma
Epilepsy - seizure
Overdose of drugs
Alcoholism

xxxiv.   HIGH TEMPERATURE – ADULT

104° or higher as recorded at the emergency room.

The benefits will be paid, subject to the provisions above, for charges made by the hospital for such care and treatment of such person, except charges for nursing care and attendance by a physician.

The benefits will be paid provided that no benefit shall be payable under any other Section of this Article on account of injuries received in such accident, or on account of such operation or expense incurred in connection therewith.

B.   Hemodialysis

If an insured employee or an insured employee's dependent shall necessarily receive hemodialysis treatment through the use of an artificial kidney machine in a hospital outpatient department, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services for certain items of expense resulting from such treatment.

Benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services for repetitive dialysis and related services on an ambulatory basis for an acute or chronic kidney disease causing functional impairment of the kidney. The benefit includes hospital charges for required physical equipment such as the treatment room related supplies, solutions, drugs and laboratory tests and the use of hemodialysis machines. Benefits include payment for the

APPENDIX "B" – ARTICLE VII

services of nurses and trained staff of the outpatient facility when charged by the facility.

Utilization of services for outpatient hemodialysis is not dependent on prior hospital confinement nor will such utilization affect benefits provided for hospital confinement.

C.   Physical Therapy Benefits - Employees and Dependents

(1)   Outpatient physical therapy benefits will be payable 100% for in-network covered services or subject to point of service benefits for out-of-network covered services performed for a period of 60 treatment days per calendar year when prescribed by a physician for a specified condition resulting from disease or injury or prescribed immediately following surgery related to the condition and when the physical therapy is performed in the outpatient department of a hospital. Such services must be performed by a physician or a qualified physical therapist according to prescription from a physician concerning the nature, frequency and duration of treatment.

(2)   Consultation services of a physician who is a specialist in rehabilitation or physical medicine when requested by the physician in charge of the case where special skill or knowledge for proper diagnosis and treatment is required, will be provided once during or preceding a course of physical therapy treatment whether charged by the physician or charged by the institution where the service is rendered.

(3)   A "qualified physical therapist" is a graduate of a program of physical therapy approved by the Council on Medical Education of the American Medical Association in collaboration with the American Physical Therapy Association or its equivalent, and, where applicable, is licensed by the state.

APPENDIX "B" – ARTICLE VII

(4) Physical therapy shall include functional occupational therapy to the extent that such therapy is performed to regain use of the upper extremities. Occupational therapy shall not include vocational therapy or vocational rehabilitation nor educational or recreational therapy.

(5) Physical therapy limitations shall not include cardiac rehabilitation for post myocardial infarction and post cardiac surgery in an approved hospital outpatient facility.

(6) Payment will be made at 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

D. Radiation Therapy

The benefits as set forth below will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services if an insured employee or an insured employee's dependent shall receive on account of accidental bodily injury or sickness not herein excluded, X-ray, radon, radium or radioactive isotope treatments administered in the outpatient department of a hospital

(1) while such person is covered under this Article, or

(2) within three (3) months from the date such person ceases to be covered under this Article, provided such person shall have been totally disabled by accidental bodily injury or sickness at the date he shall have ceased to be covered under this Article, and shall have been continuously so disabled to the date of such treatment.

162

APPENDIX "B" – ARTICLE VII

E. Chemotherapy

If an insured employee or an insured employee's dependent shall incur charges by the outpatient department of a hospital for treatment by a physician for malignancies using medically acceptable chemotherapy and such charges are incurred while such person is covered under this Program, and are not covered by any other provision of this Program, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

F. Preadmission Hospital Tests

(1) If an insured employee or an insured employee's dependent shall incur charges either by a hospital or by a physician's office for required tests prior to a scheduled admission to the hospital, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

(2) Such required tests must be

a. Related to the patient's condition or diagnosis, and

b. Ordered by the physician in charge or required by the hospital, and

c. Performed within 14 days of the date of the scheduled admission to the hospital.

(3) In the event the scheduled admission to the hospital is canceled by the physician in charge, benefits will be paid. However, if the scheduled admission is canceled by the employee or the employee's dependent, then no benefits are payable.

163

APPENDIX "B" – ARTICLE VII

## Section 10.    Restoration of Benefits

A.  Successive periods of confinement in a hospital shall be considered as having occurred during one period of disability, except that a new period of disability will be established if the employee or dependent, as the case may be, shall have completely recovered from the injury or sickness causing the earlier confinement before the later confinement; or

(1)  In the case of the employee only, if the employee shall have returned to active work with the employer for at least one (1) full working day before commencement of the later confinement; or

(2)  in the case of the dependent only, if the later confinement is due to an injury or sickness entirely unrelated to the cause of the earlier confinement, or if a period of sixty (60) consecutive days shall have elapsed during which the dependent is not confined as a resident inpatient in a hospital.

B.  If any of the benefits herein set out become exhausted with respect to an employee or a dependent, they will be reinstated one (1) year from the date of the last claim for which payment was made.

165



APPENDIX "B" – ARTICLE VII

## Section 7.    Free-Standing Surgical Centers

A.  If an insured employee or an insured employee's dependent shall incur surgical charges for a surgical procedure performed in a free-standing surgical center, the charges by the free-standing surgical center will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services if such facility is licensed as a surgical center in accordance with the requirements of the jurisdiction in which it is located.

B.  It is understood that the surgical procedures normally performed in a free-standing surgical center will be those the outpatient department of a hospital or on an inpatient basis.

## Section 8.    Observation Rooms

If an employee or an employee's dependent shall incur charges by a hospital for an observation room, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services. Coverage will be provided on the basis that admittance to an observation room is in lieu of an acute care hospital admission. The Company reserves the right to utilize the services of an organization such as the Iowa Foundation for Medical Care to pre-certify and/or monitor the stay in an observation room. Such services may also be utilized to monitor the practices of hospitals that charge for observation rooms to ensure that observation rooms are not used to circumvent criteria established under Section 6 of this Article.

## Section 9.    Exclusions and Limitations

The insurance under this Article shall not cover any confinement or medical care and treatment which is not recommended by a duly qualified physician.

164

APPENDIX "B" – ARTICLE VIII

## ARTICLE VIII
## SURGICAL PROCEDURE
## EXPENSE BENEFITS
## EMPLOYEES AND THEIR DEPENDENTS

**Section 1.  Surgical Procedures Other Than Obstetrical Procedures**

A.   Benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services rendered by a surgeon, and an assistant surgeon where required if a surgical procedure, other than an obstetrical procedure, as herein defined, shall be necessarily performed by a duly qualified surgeon and assistant surgeon on an insured employee or an insured employee's dependent on account of accidental bodily injury or sickness not hereinafter excepted.

(1)   While such person is covered under this Article, or

(2)   Within three (3) months from the date such person ceases to be covered under this Article provided such person shall have been totally disabled by bodily injury or sickness at the date he shall have ceased to be covered under this Article, and shall have been continuously so disabled to the date of commencement of such confinement.

B.   The benefit for the surgical procedure shall include the charge for surgery and the surgeon's charges for necessary postoperative hospital and office visits.

**Section 2.  Obstetrical Procedures**

A.   Benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services to a duly qualified physician or surgeon, and an assistant surgeon if medically necessary if an obstetrical procedure, as herein defined, shall be necessarily performed on an insured employee or an insured employee's dependent

APPENDIX "B" – ARTICLE VIII

(1)   while such person is covered under this Article; or

(2)   within nine (9) months from the date such person ceases to be covered under this Article, provided the operation is performed as a result of pregnancy which existed at such date and which pregnancy commenced while such person was covered under this Article, as evidenced by a written statement of the attending physician or surgeon.

B.   In addition to the amount payable for an obstetrical procedure, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services to a duly qualified physician for prenatal and postnatal care and treatment.

C.   Where it is necessary to determine how much of the total expense is for obstetrical procedure and how much is for prenatal and postnatal care and treatment, such determination shall be made on the basis of sixty (60) percent of the total expenses being for the obstetrical procedure and forty (40) percent being for prenatal and postnatal care and treatment.

D.   The term "obstetrical procedure" as used herein is limited to:

(1)   Delivery of child or children;

(2)   cesarean section, including delivery;

(3)   an abdominal operation for extrauterine or ectopic pregnancy;

(4)   miscarriage;

(5)   false labor; and

(6)   threatened abortion.

APPENDIX "B" – ARTICLE VIII

## Section 3.   Organ or Tissue Transplants

If an insured employee or an insured employee's dependents shall incur surgical charges as a donor for an organ or tissue transplant surgical procedure or if any other person incurs such an insured employee's dependents, the benefits provided in Section 1 of this Article shall be payable provided the donor is not otherwise eligible for surgical insurance benefits under the an insured employee or an insured employee's dependent shall incur surgical charges as set out above as a donor, the benefits provided in Section 1 of this Article will not be paid to the extent that the donee has surgical insurance which will cover the donor.

## Section 4.   Jejunoileostomy and Incidental Lipectomy

If an insured employee or an insured employee's dependent shall incur surgical charges for jejunoileostomy and incidental lipectomy the benefits provided in Section 1 of this Article will be paid for patients where all of the following criteria have been met:

A. Massive obesity – preferably a body weight over 100 lbs. over optimal weight.

B. Medical complications secondary to the obesity such as hypertension, diabetes, serious venous stasis, hyperlipidemia, etc.

It is understood that the operation is not performed for cosmetic reasons.

168

APPENDIX "B" – ARTICLE IX

# ARTICLE IX
# BENEFITS FOR EXPENSE OF
# PHYSICIAN'S NONSURGICAL SERVICES

## Section 1.   Physician's Visits - Employees and Dependents

A. Hospital and Qualified Nursing Home Visits

Benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services to a duly qualified physician for hospital and qualified nursing home visits, if an insured employee shall be necessarily treated on account of accidental bodily injury or sickness not hereinafter excepted,

(1) while such person is covered under this Section; or

(2) within three (3) months from the date such person ceases to be covered under this Section provided such person shall have been totally disabled by accidental bodily injury or sickness at the date he shall have ceased to be covered under this Article, and shall have been continuously so disabled to the date of such visit for treatment.

B. Organ or Tissue Transplants

If an insured employee shall be confined upon the recommendation of a physician as a resident patient in a hospital for the purpose of being a donor for an organ or tissue transplant surgical procedure, or if any other person shall be so confined for the purpose of being a donor for an insured employee, the benefits provided in A of this Section shall be payable provided the donor is not otherwise eligible for insurance benefits under the Company's Plan, the plan of any other company, or otherwise. If an insured employee shall be confined asset out above for the purpose of being a donor, the benefits provided in A of this Section will not be paid if the donee has medical insurance which will cover the donor.

169

APPENDIX "B" – ARTICLE IX

C.  Exclusions and Limitations

No payment shall be made under this Section for any charge for any visit

(1) for treatment in connection with any dental work or procedure except that benefits will be payable for hospital admission charges by a physician; or

(2) for eye examination for the fitting of glasses.

D.  Restoration of Benefits

(1) Successive periods of confinement in a hospital and/or qualified nursing home shall be considered as having occurred during one (1) period of disability, except that a new period of disability will be established if the employee shall have completely recovered from the injury or sickness causing the earlier confinement before the later confinement, or

a.  If the employee shall not have been confined as a resident inpatient in a hospital or qualified nursing home for at least two (2) consecutive weeks, or

b.  If the employee shall have returned to active work with the employer for at least one (1) full working day before the commencement of the later confinement.

(2) If any of the benefits herein set out become exhausted with respect to an employee or a dependent, they will be reinstated one (1) year from the date of the last claim for which payment was made.

Section 2.  Emergency Care – Employees and Dependents

A.  Benefits will be paid 100% for covered services after $40 emergency room visit copayment for necessary initial medical care and treatment, except charges for nursing care, received by the employee or employee's dependent on account of

170

APPENDIX "B" – ARTICLE IX

(1) bodily injury not hereinafter excepted; or

(2) the onset of a medical emergency provided such medical care and treatment is rendered immediately or as soon thereafter as care can be made available.

A "Medical Emergency" is the sudden and unexpected onset of conditions that could reasonably be expected by a prudent layperson to result in serious jeopardy to the mental or physical health of the individual and for which the claimant secures medical care immediately after the onset or as soon thereafter as the care can be made available. "Medical Emergencies" include heart attacks, cardiovascular accidents, poisoning, loss of consciousness or respiration, and such other acute conditions which meet the criteria set forth below.

a.  CRITERIA

The criteria which will be utilized in determining the existence of a medical emergency condition as set forth in Section 2-A-(2) above and whether benefits will be payable are as follows:

i.  The condition must be of such nature that failure to render care and/or treatment at the time required could reasonably result in deterioration to the point of placing the patient's life in jeopardy and/or cause serious impairment to bodily functions of the patient.

ii. Severe symptoms must occur suddenly and unexpectedly. The symptoms must be sufficiently severe to cause a person to seek immediate medical assistance regardless of the hour of the day or night. A chronic condition in which symptoms have existed over a period of time would not qualify for medical emergency consideration. However, if symptoms become acute enough to require immediate medical assistance, it might at that point so qualify.

171

APPENDIX "B" – ARTICLE IX

iii. Immediate care must be secured. A medical emergency will not be considered to exist if medical care is not secured immediately after the onset of the condition. A telephone call to a doctor would not fulfill this requirement if examination and treatment by the physician is deferred until the next day. As a general rule the date of onset of symptoms and the date of treatment as reported on the claim form should be the same.

iv. The illness or condition as finally diagnosed or as indicated by its symptoms was one which would require immediate medical care.

b. The following are examples of medical emergencies;

i. FOREIGN BODY IN AIRWAY WITH ACUTE OBSTRUCTION

The blocking of the normal flow of oxygen and carbon dioxide.

ii. ACUTE LARYNGEAL EDEMA

Swelling of the vocal cords and related structures with impairment of the airway.

iii. ACUTE PULMONARY EDEMA

Fluid in the airways and tissue of the lungs.

iv. ASPHYXIA

Lack of oxygen.

v. TENSION PNEUMOTHORAX

Collapsed lung.

172

APPENDIX "B" – ARTICLE IX

vi. CARDIAC

Impairment of the normal blood flow in the coronary vascular system, e.g. apparent heart attack, angina.

vii. ADAMS-STOKES SYNDROME

Sudden attack of unconsciousness caused by cardiac arrhythmia.

viii. MASSIVE PULMONARY EMBOLISM

Blood clot in the pulmonary vascular system which interferes with respiration.

ix. CARDIAC ARREST

The sudden cessation of heart contractions.

x. CARDIAC TAMPONADE

Blood in the sac covering the heart.

xi. CONVULSIVE DISORDERS

Sudden loss of consciousness with muscular contractions of the body with impairment of the respiratory process due to muscular spasm of the jaws interfering with flow of air to the patient.

xii. CEREBROVASCULAR ACCIDENT

Sudden occlusion of the blood supply to the brain with loss of function of the brain supplied by that particular blood vessel.

xiii. INFECTION

Infection of the covering membrane of the brain.

173

APPENDIX "B" – ARTICLE IX

xiv.  ECLAMPSIA

Absorption of toxic products of conception by the mother with changes in cerebral, renal and cardiac functions.

xv.  GASTROINTESTINAL

Acute loss of blood by reason of ulceration or erosion of blood vessels in the abdominal cavity.

xvi.  PERFORATION OF VISCUS

Traumatic loss of continuity of intra-abdominal viscera (stomach, intestine, bladder, etc.).

xvii.  UREMIC COMA

Failure of kidney function with increase in retained metabolites.

xviii.  ACUTE OBSTRUCTION OF URINARY TRACT

Stone or tumor interfering with normal drainage of the excretory mechanism of the kidney, ureter, bladder or urethra.

xix.  ANURIA–LOWER NEPHRON NECROSIS

Failure of urine secretion by the kidney due to infection, toxic substances ingested, etc.

xx.  DIABETIC COMA

Failure of the body to effectively utilize glucose with increase in fat combustion leading to acidosis from excessive hydrogen ion formation.

174

APPENDIX "B" – ARTICLE IX

xxi.  PARATHYROID TETANY

Impairment of calcium metabolism with change in serum calcium and secondary nerve function malfunction with muscle spasms (tetany).

xxii.  ADDISON DISEASE WITH CRISIS

Loss of adrenal gland hormone.

xxiii.  HYPERCALCEMIA

Increase in serum calcium blood level with resultant cerebral and renal changes.

xxiv.  INSULIN REACTION

Incorrect dose of drug, or failure to take or ingest prescribed diet, with the correct dose of insulin.

xxv.  THYROID STORM

Over or excessive secretion or liberation of thyroid hormone.

xxvi.  HEAT STROKE

Failure of the heat regulatory function of the body.

xxvii.  TEMPERATURE ELEVATION

Acute high fever (for) infants less than three years of age.

xxviii.  ACUTE GLAUCOMA

Sudden increase in intra ocular pressure.

175



APPENDIX "B" -- ARTICLE IX

xxix.   SYMPATHETIC OPHTHALMIA

Infection and edematous changes occurring in the nonaffected eye.

xxx.   CAVERNOUS SINUS THROMBOSIS

Complication of middle ear disease with erosion of mastoid bone and spreading infection to the cavernous sinus in the brain.

xxxi.   ACUTE ABDOMEN

Acute appendicitis
Acute cholecystitis
Acute pancreatitis

xxxii.   SHOCK

Infection
Hemorrhage - traumatic
Cardiac - Heart attack

xxxiii.   LOSS OF CONSCIOUSNESS

Diabetic coma
Epilepsy - seizure
Overdose of drugs
Alcoholism

xxxiv.   HIGH TEMPERATURE - ADULT

104° or higher as recorded at the emergency room or at the physician's office.

B.   Exclusions

No payment shall be made under this Section for any charge for any such care and treatment:

176

---

APPENDIX "B" -- ARTICLE IX

(1)   which is not acute and does not demand treatment on an emergency basis as would be expected by a prudent layperson.

(2)   for which the employee is entitled to benefits under any other Article of the program; or

(3)   in connection with any dental work or procedure.

Section 3.   Radiation Therapy - Employees and Dependents

The benefits as set forth below will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services if an insured employee or an insured employee's dependent shall receive on account of accidental bodily injury or sickness not herein excluded, X-ray, radon, radium or radioactive isotope treatments administered and charged for by a duly qualified physician.

Section 4.   Pap Smears - Employees and Dependents

If an insured employee or an insured employee's dependent shall incur expense for a routine pap smear test made by a duly qualified physician and such expense shall be incurred while such person is covered under this Program, benefits will be paid 100% for in-network covered services.

Section 5.   Chemotherapy - Employees and Dependents

If an insured employee or an insured employee's dependent shall incur charges by a physician for malignancies using medically acceptable chemotherapy and such charges are incurred while such person is covered under this Program, and are not covered by any other provision of this Program, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

177

APPENDIX "B" – ARTICLE IX

Section 6.   Allergy Testing and Allergy Injections - Employees and Dependents

If an insured employee or an insured employee's dependent shall incur such expense for allergy testing and/or allergy injections made by a duly qualified physician, and such expense shall be incurred while such person is covered under this Program, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

Section 7.   Second Opinion Surgery

A. If an employee or an employee's dependent undergoes a surgical consultation performed by a consulting surgeon to determine the need for major elective (nonemergency) surgery which has been recommended by another surgeon and which will require treatment in a hospital or in a free-standing surgical center, second surgical opinion benefits will be payable.

B. Payment will be made at 100% for in-network covered services after the applicable office visit copayment or subject to the point of service benefits for out-of-network opinions to determine the need for surgery.

C. If the second surgical opinion does not confirm the need for surgery, a third opinion consultation will be covered on the same basis as a second opinion.

D. For the purpose of this Section, "consulting surgeon" means a physician who is Board qualified or a Board Certified member of his surgical specialty, and "major elective (nonemergency) surgical procedure" includes:

Adenoidectomy and/or Tonsillectomy
Hysterectomy
Cholecystectomy
Inguinal hernia repair
Laminectomy
Coronary artery bypass surgery

178

APPENDIX "B" – ARTICLE IX

Hemorrhoidectomy
Bunionectomy
Knee surgery
Mastectomy
Varicose vein ligation and/or stripping
Myringotomy with insertion of drainage tubes
Submucous Resection
Thyroidectomy
Cataract removal
Colonoscopy
Gastroscopy
Foot Surgery (when the total surgical fee for all recommended procedures exceeds $200)

E. Additional procedures may be added to this list of major elective (nonemergency) surgical procedures if mutually agreed to by the Company and the Union.

F. The employee or employee's dependent may select a consulting surgeon of their choice, however, at the request of the employee or employee's dependent the Company will provide a list of available consulting surgeons known to them.

G. It is understood that the final decision to elect surgery is entirely that of the employee or employee's dependent and by electing to use this provision the employee or employee's dependent is not required to follow the recommendations of the consulting surgeon.

H. Benefits under this Section are not payable for:

(1) Charges for which benefits are otherwise provided under this Plan.

(2) Charges for the failure to keep a scheduled appointment with a consulting surgeon.

179

APPENDIX "B" – ARTICLE IX

**Section 8.   Observation Rooms**

If an employee or an employee's dependent shall incur charges by a physician while admitted to an observation room for which benefits are payable under Section 8, Article VII, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services for one visit per stay.

180

APPENDIX "B" – ARTICLE X

**ARTICLE X**
**DIAGNOSTIC LABORATORY**
**AND X-RAY EXAMINATION EXPENSE BENEFITS**
**EMPLOYEES AND THEIR DEPENDENTS**

**Section 1.   Laboratory or X-Ray Examination**

If an insured employee or an insured employee's dependent shall incur expense for any laboratory or X-Ray examination not hereinafter excepted made by, or at the request of, a duly qualified physician or a chiropractor in the course of treatment of such person on account of accidental bodily injury or sickness, and such expense shall be incurred while such person is covered under this Article, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

**Section 2.   Pap Smears**

If an insured employee or an insured employee's dependent shall incur expense for laboratory analysis of a pap smear made by a duly qualified physician and such expense shall be incurred while such person is covered under this Program, benefits will be paid 100% for in-network covered services.

**Section 3.   Allergy Testing and Allergy Injections**

If an insured employee or an insured employee's dependent shall incur expense for allergy testing and/or allergy injections made by or at the request of a duly qualified physician, and such expense shall be incurred while such person is covered under this Program, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

**Section 4.   Mammograms**

If an employee or an employee's dependent shall incur expenses for routine mammograms benefits will be paid 100% for in-network covered services per the following minimum schedule:

181



APPENDIX "B" – ARTICLE X

Women age 35 through 39 - One baseline mammogram
Women age 40 through 49 - One mammogram every two years
Women age 50 and older - One mammogram annually

**Section 5.    Exclusions**

No payment shall be made under this Article in any event with respect to:

A.  Any examination in connection with any dental work or procedure except as may be required on account of accidental injury to natural teeth.

B.  Any examination for which the employee is entitled to benefits under Article VII hereof, or made during a period of confinement for which the employee is entitled to benefits under said Article.



APPENDIX "B" – ARTICLE XI

## ARTICLE XI
## HEMODIALYSIS
## OTHER THAN HOSPITAL ADMINISTERED
## EMPLOYEES AND THEIR DEPENDENTS

In addition to the benefits described in Article VII, Section 2-C and 6-B, the Company will provide hemodialysis benefits for employees and their dependents for certain items of expense resulting from the use of an artificial kidney machine in the employee's or dependent's home.

Hemodialysis is the supportive use of an artificial kidney machine for a severely damaged or malfunctioning kidney. The following provisions establish the scope of benefits for this treatment:

**APPROVED HEMODIALYSIS CENTER**

Benefits will be paid 100% for in-network covered services or subject to point-of-service benefits for out-of-network covered services for repetitive dialysis and related services in an approved hemodialysis center on an ambulatory basis for an acute or chronic kidney disease causing functional impairment of the kidney.  The benefit includes facility charges for required physical equipment such as the treatment room related supplies, solutions, drugs and laboratory tests and the use of hemodialysis machines.   Benefits include payment for the services of nurses and trained staff of the facility when charged by the facility.

Utilization of services for hemodialysis is not dependent on prior hospital confinement nor will such utilization affect benefits provided for hospital confinement.

**HOME HEMODIALYSIS**

Hemodialysis will be considered a benefit in the patient's home when the treatment is repetitive, for chronic irreversible kidney disease, and when such treatment is arranged under an approved treatment program through:

APPENDIX "B" – ARTICLE XI

(1) The physician director of an approved hospital hemodialysis training program; or

(2) A committee of staff physicians of an approved hospital hemodialysis training program; and

(3) The physician attending the patient during the establishment of his treatment program.

A. Benefit

(1) Benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services for the purchase, rental or lease of a hemodialysis machine placed in the home.

(2) The benefit includes payment for essential installation costs, and the subsequent maintenance or repair of such equipment, when the patient's place of residence is deemed to be the most convenient and desirable setting for such treatment. The owner of the patient's place of residence must give written permission in advance of the installation of such equipment.

(3) The benefit includes the hospital's expenses incurred or resulting from the training of the patient, family members or any other individual who of necessity will be assisting the patient in the home in the operation of the dialyzer.

(4) Expenses for related laboratory tests and for consumable and expendable supplies, such as the dialysis membrane, the dialysis solution, tubing and drugs required during dialysis are provided as benefits when purchased through and billed by the hospital.

(5) The cost of removing the hemodialysis equipment from the patient's home following discontinuance of the patient's need for such equipment.

184

APPENDIX "B" – ARTICLE XI

B. Administration

(1) Prior hospitalization is not required for patients on home hemodialysis. Normally, however, the patient will have been hospitalized or will have received treatment at an outpatient facility until his treatment program is established and stabilized and either the patient, a family member or another individual is trained in the appropriate techniques to assist in dialysis.

(2) Benefits shall be payable only to participating hospitals as defined in Article VI, Section 1.

(3) The physician director, or a committee of staff doctors, in conjunction with the attending physician will assume full responsibility for appropriate case selection, training of the patient and family members in full detail of the procedure, and the prescribing of a suitable dialysis machine which is acceptable to the Company.

(4) Utilization of services for home hemodialysis will not be charged against any portion of the insured employee's or dependent's remaining hospital inpatient benefits. Exhaustion of the insured employee's or dependent's remaining hospital inpatient benefits will not disqualify him for home hemodialysis benefits.

(5) The full cost of treatment drugs required during dialysis, supplies, solutions, or other consumable and/or expendable items purchased under the stipulation of the program will be reimbursed when purchased through and billed by an approved hospital.

(6) The patient's place of residence must have access to electrical power, an approved water supply and sanitary waste disposal prior to the installation of the dialyzer. Benefits are payable for attaching the dialyzer to existing power, water and disposal systems but are not payable for the cost of obtaining such systems.

185

APPENDIX "B" – ARTICLE XI

C. Exclusions

(1) Neither the Company nor the hospital organization shall pass on to anyone an ownership right or interest in a hemodialysis machine which is placed under this program in an insured employee's or dependent's residence.

(2) Benefits are not payable for expenses which are not billed by a participating hospital.

(3) Family members or other individuals trained and assisting in the dialysis procedure will not be reimbursed.

(4) Training of individuals by other than staff members or by other individuals with whom the hospital hemodialysis training center has contracted for such training purposes is not covered.

(5) Charges for electricity or water used in the operation or maintenance of the dialyzer are not reimbursable. The cost of the installation of electrical power, an approved water supply and/or sanitary waste disposal system in conjunction with the installation of a hemodialysis machine is excluded.

(6) Physician's services are not covered by the Plan except for a proration of an amount for administration and overall supervision of the program by a physician reimbursed by the hospital, as opposed to payment for direct patient care services.

(7) Expenses which are not payable due to the application of the Coordination of Benefits provision are excluded.

(8) Expenses incurred prior to the effective date of the home hemodialysis program or, if later, the effective date of the member's coverage are excluded.

APPENDIX "B" – ARTICLE XI

(9) After the initial installation, any subsequent costs incurred in moving the dialyzer to another location within the patient's place of residence are excluded.

(10) Expenses incurred in the installation of a dialysis machine which are not essential to its operation are excluded.

APPENDIX "B" – ARTICLE XII

## ARTICLE XII
## PRESCRIPTION DRUG EXPENSE BENEFITS
## EMPLOYEES AND THEIR DEPENDENTS

### Section 1. Eligibility

Benefits as set out herein will be payable if an insured employee or an insured employee's dependents incur expenses for Covered Prescription Drugs as a result of an injury not entitling him to benefits under Workers' Compensation or occupational disease law, or of sickness not entitling him to benefits under any such law, and for conditions of pregnancy and obesity, and such prescription drugs are provided, upon the written order of a physician, by a walk-in pharmacy (including a hospital pharmacy) or a mail-order pharmacy or a physician.

### Section 2. Amount of Benefit

A. For all Covered Prescription Drugs dispensed by all Participating Providers, payment shall be made for such drugs after a drug copayment for each prescription and refill of a prescription as follows:

(1) The drug copayment will be the responsibility of the employee and will be paid to the provider.

(2) Reimbursement by the Company will be made directly to the provider and will be one hundred (100) percent of the payable charge.

B. For all Covered Prescription Drugs dispensed by Non-Participating Providers payment shall be made for such drugs after a drug coinsurance for each prescription and refill of a prescription as follows:

(1) The cost of the entire prescription will be the responsibility of the employee and will be paid to the provider upon delivery of the prescription.

188

APPENDIX "B" – ARTICLE XII

(2) Reimbursement by the Company will, except as provided below, be made to the employee and will be seventy-five (75) percent of the payable charge. However, reimbursement by the Company will not exceed the benefit available through Participating Providers.

C. The drug copayment referenced in this Article shall be as follows:

(1) A drug copayment of five dollars ($5.00) will be assessed for all generic Covered Prescription Drugs which meet either of the following conditions:

a. An up to a 34-day supply of generic Covered Prescription Drugs at a retail Participating Provider; or

b. An up to a 100-day supply of generic Covered Prescription Drugs on the approved 100-day supply list dispensed from a mail order Participating Provider.

(2) A drug copayment of twenty dollars ($20.00) will be assessed for all brand Covered Prescription Drugs which meet either of the following conditions:

a. An up to a 34-day supply of brand Covered Prescription Drugs at a retail Participating Provider; or

b. An up to a 100-day supply of brand Covered Prescription Drugs on the approved 100-day supply list dispensed from a mail order Participating Provider.

### Section 3. Exclusions

Benefits under this Article shall not be payable for:

A. Charges for which benefits are otherwise payable under this program.

189

APPENDIX "B" – ARTICLE XII

B.    Charges for the administration of prescription drugs.

C.    Charges for contraceptive devices and other birth control products not listed on the Plan's Formulary.

D.    Charges for therapeutic devices and appliances; bandages and other similar supplies; support garments and other non-medicinal substances.

E.    Charges for more than a thirty-four (34) day supply of any prescription drug except maintenance drugs and covered allergenic extracts.

F.    Charges for more than a one hundred (100) day supply of maintenance drugs.

G.    Charges for more than a twelve (12) month supply of covered allergenic extracts.

H.    Charges for any prescription refill in excess of the number specified by the physician or any refill dispensed in excess of the time allotted or number of refills allowed by State or Federal laws and regulations.

I.    Charges for medications furnished on an inpatient or outpatient basis and covered under the terms of any other group prepayment plan, whether such plan is on a service or an indemnity basis.

J.    Charges for any drugs and medicines received by any person covered by Medicare if, as the result of any amendment adopted on or after 1 January 1971, drugs or medicines are added as an item of covered expense under Medicare.

K.    Charges for syringes and needles, except for disposable syringes and needles necessary to inject a covered supply of insulin.

L.    Charges for drugs that are not Covered Prescription Drugs.

190

---

APPENDIX "B" – ARTICLE XII

Section 4.    Definitions

A.    "Prescription drugs" for purposes of this Article, mean:

(1)    Legend drugs (any medicinal substance the label of which under the federal food, drug and cosmetic act is required to bear the legend "Caution: Federal law prohibits dispensing without a prescription").

(2)    Drugs which do not meet the legend drug definition, but are designated by the Federal Drug Enforcement Agency (D.E.A.) as Class V drugs (controlled sale by pharmacy only) and where state law has added to federal statute thereby prohibiting dispensing without a prescription in that state.

(3)    Non-legend glucose test tablets, strips, reagents and stylets in connection with a chronic diabetic condition.

(4)    Injectable insulin and/or glucagon with or without a prescription provided such is legal in the state where dispensed and the need is verified by the dispensing pharmacist.

(5)    Disposable syringes and needles necessary to inject a covered supply of insulin with or without a prescription provided such is legal in the state where dispensed and the need is verified by the dispensing pharmacist.

B.    "Payable charge" as used in this Article is the allowable ingredient charge plus the dispensing fee plus applicable sales tax less the drug copayment or coinsurance.

C.    "Allowable ingredient charge" as used in this Article is:

(1)    For Non-Participating Providers the actual ingredient charge.

(2)    For Participating Providers an allowable price determined by schedule, method or formula and agreed upon by the Company and the Participating Providers.

191



APPENDIX "B" – ARTICLE XII

D. "Dispensing fee", as used in this Article is a fee paid to the pharmacist for dispensing drugs as provided for in this program and:

(1) For Non-Participating Providers is a fee for the dispensing of each prescription or each refill which will be determined on the basis of the general level of fees for such dispensing within the area in which the prescription is secured.

(2) For Participating Providers is an allowable fee determined by schedule, method or formula and agreed upon by the Company and the Participating Providers.

E. "Participating Provider" means any walk-in pharmacy (including a hospital pharmacy) or mail-order pharmacy or physician legally licensed to dispense drugs which has entered into an agreement with the Company to provide prescription drugs under this Article at prices and dispensing fees as provided for by schedule, method or formula in the agreement with the Participating Provider.

F. "Average wholesale price" is a generally recognized per-unit price for drug products which provides a common pricing basis which both the drug industry and third-party payers recognize. The prices are updated monthly by survey of drug manufacturers and wholesale houses by an independent data service and supplied by the data service to the Company for a fee.

G. "Physician", for purposes of this Article, shall be limited to:

(1) A doctor of medicine (MD)

(2) A doctor of dental surgery (DDS)

(3) A doctor of dental medicine (DMD)

APPENDIX "B" – ARTICLE XII

(4) A doctor of osteopathy (DO)

(5) A doctor of podiatric medicine (DPM)

(6) A doctor of optometry (OD) in states where license to prescribe drugs is granted.

H. "Maintenance Drug", for the purposes of this Article, means a prescription drug, contained on the current maintenance list, which is available in up to 100 day supplies. Drugs on the maintenance list are periodically reviewed and changed after evaluation by health care professionals.

I. "Covered Prescription Drugs" shall be selected by the Plan's pharmacy formulary committee based upon clinical effectiveness and cost. These drugs may be subject to quantity limitations and prior authorization as deemed appropriate by the Plan's pharmacy formulary committee. The formulary list is subject to periodic review and modification. The formulary will give providers an adequate range of choices to treat a given condition.

APPENDIX "B" -- ARTICLE XIII

## ARTICLE XIII
## DENTAL EXPENSE BENEFITS
## EMPLOYEES AND THEIR DEPENDENTS

### Section 1.   Effective Date

Benefits will be paid to an employee if an insured employee or an insured employee's dependent incurs dental treatment expense as hereinafter provided and such expenses are incurred on or after the effective date of coverage.

### Section 2.   Hospital Expenses

If an insured employee or an insured employee's dependent is confined as a resident patient in a hospital for necessary treatment in connection with injuries or disease of a dental nature, the daily room and board and miscellaneous fee expenses incurred during such confinement will be payable under the provisions of Article VII.

### Section 3.   Indemnity Limit

A.   The maximum benefit payable in any one (1) calendar year for benefits under this Article, except benefits described in Section 4-A-(2) through (25) and C-(4), will be one thousand six hundred and fifty dollars ($1,650).

B.   The maximum benefit payable in connection with orthodontic treatment will be one thousand eight hundred and fifty dollars ($1,850) for treatment programs commencing on or after 1 January 2010 for all such expenses incurred during the lifetime of the insured.

C.   The maximum benefits payable in Paragraphs A and B above will apply separately to each insured employee and to each insured employee's dependent.

194

APPENDIX "B" -- ARTICLE XIII

### Section 4.   Covered Dental Expenses

Benefits will be paid to the employee subject to the limitations and provisions hereinafter contained in an amount equal to the actual expense to the employee of the reasonable and customary charge of a dentist for the dental services and supplies received by an insured employee or an insured employee's dependent for the necessary treatment as hereinafter listed.

A.   One hundred percent (100%) of the reasonable and customary charge for:

(1)   Oral examinations including prophylaxis (scaling and cleaning of teeth), but not more than two (2) examinations in any calendar year. In addition benefits will be provided for up to a maximum of four (4) visits for scaling and cleaning during the twelve (12) months following periodontal surgery or definitive periodontal treatment.

(2)   The excision of partially or completely unerupted or impacted teeth.

(3)   Surgical removal of an erupted tooth (must require incision of tissue).

(4)   Gingivectomy procedures, if performed in connection with the treatment of diseased gums.

(5)   Initial emergency care and treatment as a result of an accident.

(6)   Alveolectomy, but not the extraction of teeth preceding such alveolectomy at one sitting.

(7)   Apicoectomy or apicoectomy combined with single stage nerve extirpation and canal filling.

(8)   Incision and drainage of abscess.

195

APPENDIX "B" – ARTICLE XIII

(9) Removal of retained or residual roots totally covered by bone.

(10) Removal of cysts and neoplasms.

(11) Frenectomy.

(12) Biopsy.

(13) Excision of hypertrophied or hyperplastic tissue.

(14) Tooth transplantation or implantation or reimplantation.

(15) Sulcoplasty.

(16) Oral antral fistula closure and/or antral root recovery.

(17) Exostosis.

(18) Osteoplasty or Ostectomy or Osteotomy.

(19) X-rays required for treatment or diagnosis of accidental injury.

(20) Fracture of facial bones.

(21) Neurectomy - not associated with root canal therapy.

(22) Sialolithotomy and associated diagnostic procedures.

(23) General anesthesia administered as an outpatient which renders a patient totally unconscious in connection with the removal of impacted teeth. General anesthesia shall include intravenous sedation when administered in connection with covered oral surgery.

(24) Surgical exposure of impacted or unerupted teeth for orthodontic treatment.

APPENDIX "B" – ARTICLE XIII

(25) Complete blood count, urinalysis and blood sugar laboratory tests necessary prior to performing ambulatory oral surgical procedures under this Section 4-A.

B. One hundred percent (100%) of the reasonable and customary charge for:

(1) Topical application of sodium or stannous fluoride.

(2) Dental X-rays, but not more than one (1) full mouth X-ray in any period of thirty-six (36) consecutive months; and supplementary bitewing X-rays but not more than twice during each calendar year; and such other dental X-rays as are required in connection with the diagnosis of a specific condition requiring treatment.

(3) Routine extractions (removal of teeth uncomplicated).

(4) Restorations – other than restorations used for retaining prosthetic devices.

(5) Treatment of periodontal and other diseases of gums and tissues of the mouth but not surgical procedures covered in A above. (Bridgework required in connection with such treatment is subject to the fifty percent (50%) rate of payments).

(6) Injection of medication, other than local anesthetic by the attending dentist.

(7) Repair or recementing of crowns, inlays, bridgework or dentures, or relining of dentures.

(8) Space maintainers.

(9) Inlays, gold fillings, crowns (including precision attachments for dentures).

(10) Root canal therapy - without an apicoectomy.

APPENDIX "B" – ARTICLE XIII

(11) Oral surgery procedures not included in A above.

(12) General anesthesia administered as an outpatient which renders a patient totally unconscious in connection with a covered dental service other than as specified in A-(23). General anesthesia shall include intravenous sedation when administered in connection with covered oral surgery.

(13) Cosmetic bonding for cosmetic restorations, including fillings or veneers (bonding), as a result of tetracycline staining, severe fluorosis, opalescent dentin or amelogenesis imperfecta, but excluding cosmetic treatment as a result of cigarette or coffee staining, staining after orthodontic treatment or malshaped or malpositioned teeth.

(14) Dental sealants for individuals age five (5) through sixteen (16) for permanent adult teeth numbers two (2), three (3), fourteen (14), fifteen (15), eighteen (18), nineteen (19), thirty (30), and thirty-one (31) as identified by the American Dental Association. Not to exceed one (1) application per tooth every three (3) years through age sixteen (16).

C. Fifty percent (50%) of the reasonable and customary charge for:

(1) Initial installation of fixed bridgework (including inlays and crowns to form abutments).

(2) Initial installation (including adjustments during the six (6) month period following installation) of partial or full removable dentures.

(3) Replacement of existing partial or full removable denture or fixed bridgework by a new denture or by new bridgework, or the addition of teeth to an existing partial removable denture or to bridgework, but only if satisfactory evidence is presented that:

APPENDIX "B" – ARTICLE XIII

a. the replacement or addition of teeth is required to replace one (1) or more teeth extracted after the existing denture or bridgework was installed; or

b. the existing denture or bridgework was installed at least five (5) years prior to its replacement and the existing denture or bridgework cannot be made serviceable; or

c. the existing denture is an immediate temporary denture which cannot be made permanent and replacement by a permanent denture takes place within twelve (12) months from the date of installation of the immediate temporary denture.

Normally, dentures will be replaced by dentures, but if achieving a professionally acceptable course of treatment requires bridgework, such bridgework will be a Covered Dental Expense.

(4) Orthodontic treatment, appliance therapy, and functional/myofunctional therapy. However, general anesthesia and X-rays required in connection with orthodontic treatment shall be covered under Paragraph B of this Section. Extractions which are required for and which are a part of the orthodontic treatment plan will be payable under this provision.

Section 5.   Predetermination of Benefits

A. If a course of treatment can reasonably be expected to involve Covered Dental Expenses of more than one hundred twenty-five dollars ($125), a description of the procedures to be performed and an estimate of the dentist's charges must be filed with the Company prior to the commencement of the course of treatment. The Company will notify the employee and the dentist of the benefits payable based upon such course of treatment and of the expenses not covered. The expenses to be paid will be certified by the Company as payable under this Article.

APPENDIX "B" – ARTICLE XIII

B.  In determining the amount of benefits payable, professional consideration will be given to procedures, services, or courses of treatment that are customarily provided by the dental profession in conformity with good professional practices and standards that may be performed for the dental condition concerned.  The amount included as and customary charge determined in accordance with the Certified Covered Dental Expenses will be the reasonable limitations set forth below.  In the event alternate procedures or services are to be certified, no certification will be issued until the dentist has been contacted and requested to provide an explanation for the procedures or services in question.

C.  If a description of procedures to be performed and an estimate of the dentist's charges are not submitted in advance, the Company reserves the right to make a determination of benefits payable under this Article taking into account procedures, services or courses of treatment which will provide a professionally adequate result.

D.  This predetermination requirement will not apply to courses of treatment under one hundred twenty-five dollars ($125) or to emergency treatment, oral examinations, X-rays or prophylaxis.  A course of treatment is one (1) or more treatments in a planned series resulting from a dental examination.

**Section 6.   Limitations**

A.  Restorative:

(1)  Gold, baked porcelain restorations, crowns and jackets.

If a tooth can be restored with a material such as amalgam, appropriate payment for that procedure will be made toward the charge for another type of restoration selected by the patient and the dentist. The balance of the treatment charge will remain the responsibility of the patient.

200

---

APPENDIX "B" – ARTICLE XIII

(2)  Reconstruction.

Appropriate payment will be made toward the cost of procedures necessary to eliminate oral disease and to replace missing teeth.  Appliances or restorations necessary to increase vertical dimension or restore the occlusion will be considered optional and their cost will remain the responsibility of the patient.

B.  Prosthodontics:

(1)  Partial Dentures.

If a cast chrome or acrylic partial denture will restore the dental arch satisfactorily, Dental Expense Benefits will cover the applicable percentage of the cost of such procedure toward a more elaborate or precision appliance that patient and dentist may choose to use, and the balance of the cost will remain the responsibility of the patient.

(2)  Complete Dentures.

If, in the provision of complete denture services, the patient and dentist decide on personalized restorations or specialized techniques as opposed to standard procedures, Dental Expense Benefits will be allowed for the appropriate amount for the standard denture service toward such treatment and the balance of the cost will remain the responsibility of the patient.

(3)  Replacement of Existing Dentures.

An existing denture will be replaced only if it is unsatisfactory and cannot be made satisfactory. Services which are necessary to render such appliances satisfactory will be provided in accordance with the Agreement.  Prosthodontic appliances will be replaced only after five (5) years have elapsed following any prior provision of such appliances by any group program.

201

APPENDIX "B" – ARTICLE XIII

C. Orthodontics:

(1) If orthodontic treatment is terminated for any reason before completion, the obligation to pay benefits will cease with payment to the date of termination.

(2) The monthly benefit payment obligation under the orthodontic benefits provision shall cease on the termination date of this Agreement unless renewed or extended.

Section 7.   Exclusions

Covered, Dental Expenses do not include and no benefits are payable for:

A. Charges for which benefits are otherwise provided under this Health Benefit Plan.

B. Charges for treatment by other than a dentist, except that scaling or cleaning of teeth may be performed by a licensed dental hygienist if the treatment is rendered under the supervision and guidance of the dentist.

C. Charges for services and supplies that are solely cosmetic in nature, including charges for personalization or characterization of dentures.

D. Charges for prosthetic devices (including bridges and crowns) and the fitting thereof which were ordered while the individual was not insured for Dental Expense Benefits or which were ordered while the individual was insured for Dental Expense Benefits but are finally installed or delivered to such individual more than sixty (60) days after termination of insurance.

E. Charges for the replacement of a lost, missing or stolen prosthetic device.

202

APPENDIX "B" – ARTICLE XIII

F. Charges set forth in "Exclusions" applicable to all Articles.

G. Charges for failure to keep a scheduled visit with the dentist.

H. Charges for replacement or repair of a broken orthodontic appliance.

I. Services provided by dental laboratories or expanded dental auxiliaries unless such dental laboratories or dental auxiliaries are licensed in accordance with the requirements of the jurisdiction in which it is located.

Section 8.   Definitions

A. The term "Dentist" means a legally licensed dentist practicing within the scope of his license. For the purposes of this Article, the term "Dentist" also includes a legally licensed physician authorized by his license to perform the particular dental services he has rendered.

B. The term "Reasonable and Customary Charge" means the actual charge of a dentist for services rendered or supplies furnished to the extent the fee is reasonable and does not exceed his usual charge for such service or supply, and does not exceed the customary fee for comparable services and supplies charged by dentists in the area with training, experience and professional standing similar to that of the dentist who renders the services or furnishes the supplies.

C. The term "Orthodontic Treatment" means the preventative and corrective treatment of all those dental irregularities which result from the anomalous growth and development of dentition and its related anatomic structures or as a result of accidental injury and which require repositioning of teeth to establish normal occlusion.

203

APPENDIX "B" – ARTICLE XIII

### Section 9. Coordination With Other Dental Expense Benefits

The Company shall follow the same procedures with respect to the Dental Expense Benefits concerning coordination of benefits as is set forth for Hospital, Surgical and Medical Benefits, except that only other dental expense benefits provided either by a group Dental Benefit Plan to which an employer contributes at least fifty percent (50%) of the cost, or a comprehensive medical plan providing dental benefits which meets the same qualifications will be considered.




204

APPENDIX "B" – ARTICLE XIV

### ARTICLE XIV
### PSYCHIATRIC SERVICES
### EXPENSE BENEFITS
### EMPLOYEES AND THEIR DEPENDENTS

### Section 1. Inpatient Expense

If an insured employee or an insured employee's dependent shall be necessarily confined as a resident inpatient in a hospital (as defined in this Article) or Night Care Center, other than a hospital as defined in the Article entitled "Definitions," on account of a mental or nervous disorder and such confinement shall begin while such person is covered under this Article, benefits will be paid 100% for in-network covered services, or subject to point of service benefits for out-of network covered services..

### Section 2. Psychiatric Services (Institutional)

A.   The benefits set forth below will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services if an insured employee or an insured employee's dependent shall receive necessary psychiatric services under the supervision of a psychiatrist on account of a mental or nervous disorder while such person is covered under this Article, and such service is rendered and billed for as regular institutional care

(1)   by a hospital (as defined in this Article);

(2)   by a Community Mental Health Center;

(3)   by a Day Care Center;

(4)   by a Night Care Center, or

(5)   by an Out-patient Psychiatric Clinic.

205



APPENDIX "B" – ARTICLE XIV

B. Benefits will be paid, subject to the provisions hereinafter contained, for

(1) professional and other staff services and other ancillary services including electroshock therapy, anesthetic for electroshock therapy, psychological testing and family counseling; and

(2) prescribed drugs and medications dispensed by the facility rendering treatment including such drugs and medications consumed by the patient outside the treatment facility.

Section 3.  Psychiatric Services (Medical Doctor)

A. If an insured employee or an insured employee's dependent shall necessarily receive psychiatric services rendered by a psychiatrist or other medical doctor on account of a mental or nervous disorder while such person is covered under this Article, and such service is rendered

(1) in a psychiatrist's or other medical doctor's office benefits will be paid at 100% for in-network covered services after the $25 office visit copayment or subject to point of service benefits for out-of-network covered services;

(2) in a hospital, Community Mental Health Center, Day Care Center, Night Care Center or an Outpatient Psychiatric Clinic benefits will be paid at 100% for in-network covered services or subject to point of service benefits for out-of-network covered services; or

(3) in such person's home benefits will be paid at 100% for in-network covered services or subject to point of service benefits for out-of-network covered services;

and if the charges for such service exceed the benefits payable under any other Article of this program, benefits will be paid as indicated, subject to the Benefit Limits hereinafter contained.

206

APPENDIX "B" – ARTICLE XIV

B. Benefit Limits

Benefits shall not be paid for more than one (1) visit on any day.

Section 4.  Psychological Examination

If an insured employee shall incur expense on account of himself or his dependent for psychological testing other than testing covered under Section 2 of this Article by a psychologist, made at the request of a medical doctor in the course of treatment of such person on account of a mental or nervous disorder and such expense is incurred while such person is covered under this Article, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

Section 5.  Family Counseling

If an insured employee shall incur expense on account of himself or his dependent for visits made to the office of a medical doctor by the family of such person for counseling services in connection with a mental or nervous disorder of the employee or dependent, as the case may be, and such expense is incurred while such person is covered under this Article, benefits will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

Section 6.  Exclusions and Limitations

A. The term "hospital" as used herein means:

(1) An institution which meets all of the following tests:

a. It is duly licensed as a hospital in accordance with the requirements of the jurisdiction in which it is located.

207

APPENDIX "B" – ARTICLE XIV

b. It is engaged primarily in providing twenty-four (24) hour a day medical care and treatment of sick and injured persons on an inpatient basis at the patient's expense and maintains diagnostic and therapeutic facilities on the premises for medical diagnosis and treatment of such persons by or under the supervision of a staff of duly qualified physicians, one (1) or more of whom are on duty on the premises at all times.

c. It maintains a daily medical record of such patient.

d. It continuously provides twenty-four (24) hour a day nursing service by professional nurses who have the right to use the title "Registered Nurse" and the abbreviation "R.N."

e. It is not, other than incidentally, a place of rest, a place for the aged, a place for custodial care, a nursing home, a convalescent home, a place for drug addicts, or a place for alcoholics.

(2) A hospital, other than a tuberculosis hospital, as such term is defined in Medicare, which is qualified to participate and eligible to receive payments under and in accordance with the provisions of Medicare.

B. Exclusions and Limitations

No payment will be made under this Article

(1) for any day of confinement, service rendered or examination made which is not recommended by a duly qualified physician;

(2) for charges made by a physician who is not a medical doctor (M.D.);

(3) for charges incurred on account of services, other than diagnostic services, for mental deficiency or retardation; or

208



APPENDIX "B" – ARTICLE XIV

(4) for charges incurred on account of treatment of a mental or nervous disorder which is not amenable to favorable modification by accepted psychiatric treatment.

209

APPENDIX "B" – ARTICLE XV

# ARTICLE XV
## PROSTHETIC DEVICE AND DURABLE MEDICAL EQUIPMENT EXPENSE BENEFITS EMPLOYEES AND DEPENDENTS

### Section 1. Prosthetic Device Benefits

A. Eligibility

Prosthetic device benefits will be payable if a prosthetic device is received by an insured employee or an insured employee's dependent as a result of accidental bodily injury or sickness on the order of a physician when payment for such device is not otherwise covered under the Program. Payment will be made for such device at 100% for in-network covered services.. Payment may be made directly to the provider or supplier of such device.

B. Definition

(1) "Prosthetic Device" means a Centers of Medicare and Medicaid Services (CMS)/Medicare approved device which replaces all or part of a body organ (including contiguous tissue) or a diseased, malformed, or injured portion of the body or replaces all or part of the function of a permanently inoperative or malfunctioning bodily organ, or portion of the body, including, but not limited to, leg, arm, back and neck braces, trusses and artificial legs, arms, and eyes, and terminal devices such as hand hooks furnished on the order of a physician. Replacements of unusable prosthetic devices or repairs of these devices when furnished on a physician's order, and supplies and equipment not having any use other than in connection with the use of the prosthetic device and which are necessary for the effective use of the prosthetic device will also be covered.

APPENDIX "B" – ARTICLE XV

(2) The term "Prosthetic Device" includes post-surgical lenses customarily used during convalescence from eye surgery in which the lens of the eye was removed, or used to replace a congenitally absent lens of the eye. In addition, combinations of prosthetic lenses are covered when determined to be medically necessary by a physician to restore essentially the vision provided by the crystallin lens of the eye. This benefit shall include coverage for such lenses when provided by an optometrist if the lenses were prescribed by an ophthalmologist.

(3) "Prosthetic Device" shall include colostomy and ureterostomy supplies such as bags, belts, tubing, and stoma adhesive except for colostomy and ureterostomy supplies not having any use other than in connection with the use of the prosthetic device.

(4) "Prosthetic Device" shall include a tracheostomy speaking valve, an apparatus that aids tracheotomy patients in speaking.

C. Exclusions

Dentures, other dental appliances, hearing aids and glasses and contact lens prescribed to correct visual defects are excluded. Also excluded are nondurable items such as support garments, special shoes, (unless an integral part of a leg brace), and elastic support bandages.

### Section 2. Durable Medical Equipment

A. Eligibility

Durable Medical Equipment Benefits will be payable if durable medical equipment is received by an insured employee or an insured employee's dependent as a result of accidental bodily injury or sickness on the order of a physician for use, when not confined as an inpatient in a hospital, nursing home, or any other institution for the treatment of such accidental bodily injury or sickness, or to



APPENDIX "B" – ARTICLE XV

improve the functioning of a malformed body member when payment for such equipment is not otherwise provided for under the Program.

B. Payment

Payment will be made for rental of such equipment at 100% for in-network covered services. Payment may be made directly to the provider or supplier of the equipment. The company may approve purchase of such equipment if it can reasonably be assumed that the duration of need is such that the rental price would exceed the purchase price, or said items cannot be made available on a rental basis.

C. Definition

"Durable Medical Equipment" means CMS/Medicare approved medical equipment which (1) can withstand repeated use, (2) is primarily and customarily used to serve a medical purpose, (3) generally is not useful to a person in the absence of illness or injury, and (4) is appropriate for medical treatment in the home and includes, but is not limited to, such items used for treatment as an iron lung, oxygen tents, hospital-type beds and equipment, wheelchairs, crutches, canes, walkers, inhalators, traction equipment, nebulizers and suction machines, toilet aids, circulatory aids, neuromuscular stimulants, and glucose monitors for insulin-dependent type I diabetes where there is documentation by the physician of poor control (i.e., widely fluctuating blood sugar before mealtime, frequent episodes of insulin reactions, evidence of frequent ketosis) or dependent type I diabetes mellitus complicated by pregnancy. "Durable Medical Equipment" shall include the rental of continuous passive motion devices prescribed within three (3) days of surgery for use during a period not to exceed thirty (30) days unless extended by written order of the prescribing physician. In addition to coverage for pressure gradient supports (also known as burn pressure garments), when prescribed to enhance healing and prevent scarring of burn patients, coverage will be provided when prescribed for circulatory insufficiency conditions to

212

APPENDIX "B" – ARTICLE XV

promote and restore normal fluid circulation in the extremity (up to four times annually for chronic conditions unless there is a change in physical conditions such as gain or loss of weight of the patient). "Durable Medical Equipment" shall include phototherapy (a light with photometer) when used to treat jaundice in newborns and bead seats when prescribed by a physician to be used to prevent ulcers for a child bound to a wheelchair. Transtracheal catheters for administering oxygen will be covered subject to review on a case by case basis to ensure proper use and training in the use of the equipment. Coverage will be provided for jaw motion rehabilitation systems, including cushions - and replacement measuring scales, used to strengthen the range of motion for persons who have limited motion range, weakness of the muscles for mastication or speech but excluding such devices used to treat conditions of temporomandibular joint dysfunction. Coverage will be provided for persons requiring therapeutic shoes purchased due to severe diabetes. Benefits will not be paid for special features or equipment such as motor drive beds and wheelchairs requested by the patient for personal comfort or convenience unless medically necessary.

D. Exclusions

"Durable Medical Equipment" does not include dentures; hearing aids; eyeglasses; contact lens or equipment which is primarily and customarily used for nonmedical purposes such as heat lamps; air conditioners and other devices and equipment used for environmental control or to enhance the environmental setting in which the patient is placed such as room heaters, humidifiers, dehumidifiers and other equipment which basically serve comfort or convenience; special pad or mattress to prevent decubitus ulcers, (except in case of advanced neurological disorders) and bed bath types of equipment which basically are utilized for hygienic purposes; prosthetic devices; any other item or device which does not stand repeated use such as elastic stockings, face mask, irrigating kits, ace bandages, orthopedic shoes, (or other devices that do not serve a meaningful and necessary therapeutic purpose) in the care and treatment of the patient.

213

APPENDIX "B" – ARTICLE XVI

## ARTICLE XVI
## OUTPATIENT PHYSICAL THERAPY BENEFITS
## EMPLOYEES AND DEPENDENTS

**Other Than a Hospital**

A. Outpatient physical therapy benefits will be payable for services performed for a period of 60 treatment days per calendar year when prescribed by a physician for a specified condition resulting from disease or injury or prescribed immediately following surgery related to the condition and when the physical therapy is performed in an approved comprehensive physical therapy facility. Only a facility that has been approved by the Company can be an approved comprehensive physical therapy facility.

Nursing homes and rehabilitation centers may be approved as a comprehensive physical therapy facility. However, the offices of medical doctors, chiropractors, osteopathic physicians and the offices of other similar providers may not, under any circumstances, be approved as a comprehensive physical therapy facility.

Such services must be performed by a physician or a qualified physical therapist. There must be a prescription from a physician concerning the nature, frequency and duration of treatment if the services are performed by a qualified physical therapist.

B. Consultation services of a physician who is a specialist in rehabilitation or physical medicine when requested by the physician in charge of the case where special skill or knowledge for proper diagnosis and treatment is required, will be provided once during or preceding a course of physical therapy treatment whether charged by the physician or charged by the institution where the service is rendered.



214

APPENDIX "B" – ARTICLE XVI

C. A "qualified physical therapist" is a graduate of a program of physical therapy approved by the Council on Medical Education of the American Medical Association in collaboration with the American Physical Therapy Association or its equivalent, and, where applicable, is licensed by the state.

D. Physical therapy shall include functional occupational therapy to the extent that such therapy is performed to regain use of the upper extremities and such therapy is performed in a facility otherwise approved for physical therapy. Occupational therapy shall not include vocational therapy or vocational rehabilitation nor educational or recreational therapy.

E. Payment will be made at 100% for in-network covered services or subject to the point of service benefits for out-of-network covered services.

215

APPENDIX "B" – ARTICLE XVII

## ARTICLE XVII
## QUALIFIED NURSING HOME EXPENSE BENEFITS EMPLOYEES AND THEIR DEPENDENTS

### Section 1.   Injury or Sickness
(Other Than Mental or Nervous Disorder)

A.   Benefits as set forth below will be paid 100% for in-network covered services or subject to point of service benefits for out-of-network covered services if an insured employee or an insured employee's dependent shall be necessarily confined, on orders of a duly qualified physician, as a resident inpatient in a qualified nursing home, on account of an accidental bodily injury or sickness not hereinafter excepted, other than a mental or nervous disorder, and if a duly qualified physician renders therapeutic treatment to such person, and such person shall

(1)   be admitted directly from his residence; or

(2)   have been a resident inpatient in a hospital and shall have been transferred to such qualified nursing home immediately after termination of his hospital confinement.

B.   Such confinement as described in A must begin

(1)   While such person is covered under this Article, or

(2)   Within three (3) months from the date such person ceases to be covered under this Article provided such person shall have been totally disabled by bodily injury or sickness at the date he shall have ceased to be covered under this Article, and shall have been continuously so disabled to the date of commencement of such confinement.

C.   Benefits will be paid, subject to the provisions hereinafter contained, in an amount equal to the rate for a semi-private room made by the qualified nursing home for room and

216

APPENDIX "B" – ARTICLE XVII

board and necessary medical care and treatment for the first seven hundred thirty (730) days of such confinement during any one (1) period of disability, subject to restoration of benefits as stated in Section 3 of this Article.

D.   The number of days for which benefits are provided under C above will be reduced by the number of days for which benefits were paid during the same period of disability under Article VII or Article XIV hereof multiplied by two.

E.   Such confinement as described in A above must be certified as necessary, by a duly qualified physician, on the fourteenth (14th) day and every thirty (30) days thereafter during the same period of disability.

### Section 2.   Mental or Nervous Disorder

A.   The benefits as set forth below will be paid 100% for in-network covered services, or subject to point of service benefits for out-of-network covered services, if an insured employee or an insured employee's dependent shall have been necessarily confined upon the recommendation of a physician as a resident inpatient in a hospital on account of a mental or nervous disorder and shall have been transferred, on orders of a duly qualified physician, to a qualified nursing home on account of the same mental or nervous disorder immediately after termination of such confinement and provided such confinement in a hospital shall begin

(1)   While such person is covered under this Article, or

(2)   Within three (3) months from the date such person ceases to be covered under this Article provided such person shall have been totally disabled by bodily injury or sickness at the date he shall have ceased to be covered under this Article, and shall have been continuously so disabled to the date of commencement of such confinement.

217

APPENDIX "B" – ARTICLE XVII

B. Benefits will be paid, subject to the provisions hereinafter contained, in an amount equal to the rate for a semi-private room made by the qualified nursing home for room and board and necessary medical care and treatment for the first seven hundred thirty (730) days of such confinement during any one (1) period of disability, subject to restoration of benefits as stated in Section 3 of this Article.

C. The number of days for which benefits are provided under B above will be reduced by the number of days for which benefits were paid during the same period of disability under Article VII or Article XIV hereof multiplied by two.

D. Such confinement must be certified as necessary, by a duly qualified physician, on the fourteenth (14th) day and every thirty (30) days thereafter during the same period of disability.

E. A duly qualified physician must continue to render therapeutic treatment to such person while necessarily confined in such qualified nursing home.

Section 3.  Restoration of Benefits

A. If an employee or his dependent covered hereunder shall become entitled to the maximum number of days of confinement provided under this Article, the amount of his benefits hereunder may be restored upon receipt by the Company of evidence that

(1) the employee shall not have been confined as a resident inpatient in a hospital, qualified nursing home or other institution for at least two (2) consecutive weeks; or

(2) the dependent shall not have been confined as a resident inpatient in a hospital, qualified nursing home or other institution for at least sixty (60) consecutive days; or

218

APPENDIX "B" – ARTICLE XVII

(3) if the later confinement is due to an injury or sickness entirely unrelated to the cause of the earlier confinement.

B. If any of the benefits herein set out become exhausted with respect to an employee or a dependent, they will be reinstated one (1) year from the date of the last claim for which payment was made.

Section 4.  Exclusions and Limitations

No payment shall be made under this Article in any event with respect to

A. charges incurred in connection with confinement which is not recommended and approved by a duly qualified physician;

B. charges incurred in connection with injury or sickness for which benefits are payable under Article VII and Article XIV;

C. charges that the employee would not be required to pay if there were no insurance;

D. charges for any medication not prescribed by a duly qualified physician;

E. charges incurred in connection with drug addiction, chronic brain syndromes, alcoholism and senile deterioration; except charges incurred where there coexists a definable medical condition which requires treatment; or

F. charges incurred in connection with confinement which is primarily domiciliary or custodial in nature.

219

APPENDIX "B" – ARTICLE XVIII

## ARTICLE XVIII
## VISION CARE EXPENSE BENEFITS
## EMPLOYEES AND THEIR DEPENDENTS

### Section 1.   Eligibility

Benefits will be paid to an employee if an insured employee or an insured employee's dependent incurs Vision Care Expense as hereinafter provided and such expenses are incurred on or after the effective date of coverage for such insured employee.

### Section 2.   Covered Vision Care Benefits

Benefits will be paid to the employee subject to the limitations and provisions hereinafter contained for charges by an Ophthalmologist, Optometrist or Optician as follows:

A.   Vision examination but not more than one (1) in any period of 24 consecutive months from the latest examination for employees and for dependents over age 16, 12 consecutive months from the latest examination for dependents age 16 and under, except as provided below. A vision examination (including history, testing visual acuity, external examination of the eye, binocular measure, ophthalmoscopic examination, tonometry when indicated, medication for dilating the pupils and desensitizing the eyes for tonometry, if applicable, and summary and findings) shall be for the purpose of determining the need for correction of visual acuity, prescribing lenses, if needed, and confirming the appropriateness of eyeglasses obtained under the prescription.

Benefits will be provided for an additional visual examination (as defined above) performed by an ophthalmologist, upon referral in writing by an optometrist, within 60 days of a vision examination by the optometrist.

220

APPENDIX "B" – ARTICLE XVIII

B.   Necessary materials and professional services to order, prepare, fit and adjust single vision, bifocal, trifocal, lenticular or contact prescription lenses once during any period of 24 consecutive months for employees and for dependents over age 16, 12 consecutive months for dependents age 16 and under.

C.   Frames once in any period of 24 consecutive months from the last receipt of frames, and then only if new lenses are prescribed.

D.   Determination of the 12- and 24-consecutive-month periods for lenses and frames will be based on the date of examination.

### Section 3.   Preferred   Provider   Arrangement
### (Where Available)

A.   The benefit payable in any period of 12 or 24 consecutive months for vision examination as provided in Section 2-A shall be 100% for covered exam after $5 copayment.

B.   The benefit payable in any period of 12 or 24 consecutive months for materials and professional services as provided in Section 2-B shall be as follows:

(1)   Single Vision Lenses      100% for covered lenses after $10 copayment

(2)   Bifocal Vision Lenses     100% for covered lenses after $10 copayment

(3)   Trifocal Vision Lenses    100% for covered lenses after $10 copayment

(4)   Lenticular Vision Lenses  100% for covered lenses after $10 copayment

(5)   Contact Lenses            100% for covered lenses after $50 copayment

221

APPENDIX "B" – ARTICLE XVIII

C. The benefit payable in any period of 24 consecutive months for frames shall be 100% for covered frames after $10 copayment.

D. The limitations provided in this Section shall apply whether or not a claim for benefits is for replacement of lost, stolen or broken lenses, contact lenses or frames.

Section 4. Indemnity Limits

A. The maximum benefit payable in any period of 12 or 24 consecutive months for vision examination as provided in Section 2-A shall be the actual charge but in no event more than:



| Examination By: | |
| --- | --- |
| Opthalmologist | $45.70 |
| Optometrist | 45.70 |

B. The maximum benefit payable in any period of 12 or 24 consecutive months for materials and professional services as provided in Section 2-B shall be the actual charge for two (2) lenses but not more than:

| | |
| --- | --- |
| (1) Single Vision- per lens | $20.50 |
| (2) Bifocal- per lens | 29.25 |
| (3) Trifocal- per lens | 38.00 |
| (4) Lenticular- per lens | 46.70 |
| (5) Contact- per lens | 29.25 |

APPENDIX "B" – ARTICLE XVIII

C. The maximum benefit payable in any period of 24 consecutive months for frames as provided in Section 2-C shall be:

| For Expenses Incurred For | |
| --- | --- |
| Frames | $27.80 |

D. The limitations provided in this Section shall apply whether or not a claim for benefits are for replacement of lost, stolen or broken lenses, contact lenses or frames.

Section 5. Exclusions

Covered Vision Care Expenses do not include and no benefits are payable for:

A. Lenses which do not require a prescription.

B. Charges for which benefits are otherwise provided under this Health Benefit Plan.

C. Procedure determined to be special or unusual, such as, but not limited to, orthoptics, vision training, subnormal vision aids and aniseikonic lenses.

D. Vision examinations or materials furnished for any condition, disease, ailment, or injury arising out of and in the course of employment.

E. Services rendered and materials ordered:

(1) before the employee became eligible for this benefit.

(2) after termination of the insured employee's employment; except for materials ordered while covered by this Plan and delivered within thirty (30) days after the date of termination.

APPENDIX "B" -- ARTICLE XVIII

(3) for which the employee is not charged or is not obligated to pay.

F.   Charges for failure to keep a scheduled visit with the Ophthalmologist, Optometrist or Optician.

### Section 6.   Contract Providers

The Company will attempt to establish provider contracts with suppliers of the materials and services provided in Sections 2-B and 2-C of this Article, in certain areas in which the Company has employees. The establishment of such contracts shall provide a predetermined selection of prescription lenses and eye glass frames without cost except the employee will bear a portion of the cost for contact lenses. The selection of lenses and frames other than the predetermined variety offered, or of contact lenses, shall result in payment by the employee of an amount equivalent to the amount that the employee would have paid in the absence of such contracts.

---

APPENDIX "B" -- ARTICLE XIX

### ARTICLE XIX
### ADDITIONAL PROVISION AS A
### CONSEQUENCE OF MEDICARE FOR
### RETIRED OR DISABLED EMPLOYEES
### HIRED PRIOR TO 1 OCTOBER 1997
### AND THEIR DEPENDENTS

### Section 1.   Persons Subject to This Provision

Each retired or disabled employee and his qualified dependents, or the surviving spouse of an active employee or retired employee and the deceased employee's/retiree's qualified dependents, who are covered under this Plan and for whom Medicare would be the primary payor for health care benefits, shall be subject to this provision.

### Section 2.   Amount of Benefit

Benefits will be paid under this Plan for charges that are not payable by Medicare but that would have been payable under this Plan in the absence of Medicare.

In addition, benefits are payable for any charges not otherwise payable under the John Deere Traditional Option but which are used to satisfy any Medicare deductible or coinsurance.

### Section 3.   Payment of Benefits

If a person subject to this provision is enrolled in a Managed Care Organization (MCO) which has contracted with Medicare to provide a comprehensive health benefit for Medicare eligible beneficiaries, such person is required to enroll in the MCO's Medicare product.

### Section 4.   Premium Reimbursement

When persons subject to this provision become eligible for Medicare, the Company will reimburse the employee or surviving spouse for Part B of Medicare based on the following schedule. Reimbursement shall not exceed the actual charge.

APPENDIX "B" – ARTICLE XIX

A dependent will not be eligible for the reimbursement if they are eligible to receive a Medicare reimbursement from another employer. Upon proof of enrollment in Medicare Part B, reimbursement will be as follows:

PREMIUM REIMBURSEMENT PER PERSON

| | |
|---|---|
| 1 Jan 2010 | $ 98.90 |
| 1 Jan 2011 | $104.89 |
| 1 Jan 2012 | $111.24 |
| 1 Jan 2013 | $117.97 |
| 1 Jan 2014 | $125.12 |
| 1 Jan 2015 | $132.69 |

**Section 5.  Lifetime Reserve**

A person eligible for Medicare and who has exhausted the maximum 90 days of hospital benefits during a benefit period under Medicare shall be required to use the 60 days of hospital lifetime reserve benefits to which such person is entitled under Medicare. The lifetime reserve must be used before the 365-day benefit provided under this Plan is applied. In such cases 60 days will be added to the 365 days provided in Article VII of this Plan. The Company will be responsible for initiating procedures for the person to make appropriate application to use this lifetime reserve.



APPENDIX "B" – ARTICLE XX

## ARTICLE XX
## ALCOHOLISM AND/OR DRUG DEPENDENCY
## EXPENSE BENEFITS
## EMPLOYEES AND DEPENDENTS

**Section 1.  Inpatient Expense**

A. Benefits will be payable as hereinafter provided, if an insured employee or an insured employee's dependent is necessarily confined as a patient in an Approved Residential Facility for the treatment of alcoholism and/or drug dependency. Payment will be made at 100% for in-network covered services or subject to point of service benefits for out-of-network covered services which are received in such facility.

B. Benefits will be paid for the following covered services:

(1) Room and board, including nursing services, including aftercare visits as specified in the treatment plan, during any covered period of treatment

(2) Laboratory tests related to treatment received at the facility.

(3) Drugs, biologicals and solutions dispensed by the facility for use during confinement.

(4) Supplies and use of equipment required for detoxification and/or rehabilitation (other than recreational, hobby or craft) which conform to the treatment plan established by the physician for the patient.

APPENDIX "B" – ARTICLE XX

(5) Professional and other trained staff and other ancillary services provided in the facility required for the care and treatment of the patient. Ancillary services include all special institutional services and supplies charged by the facility except services and supplies not related or not necessary to the medical care and treatment of the patient.

(6) Individual and group therapy for the patient; individual counseling for the patient; and counseling for other members of the family of the patient undergoing treatment to the extent that such counseling is necessary and related to the treatment of the patient.

(7) Fixed charges for patient participation in an approved aftercare program which follows release from treatment in an Approved Inpatient Facility. Such program shall not exceed a period of 12 consecutive months following the first day of commencement in the program. Charges shall be paid only when the program certifies that the patient is continuously participating in the program.

Section 2.  Outpatient Expense

A.  Benefits will be payable as hereinafter provided, if an insured employee or an insured employee's dependent receives treatment as a patient in an Approved Outpatient Facility on account of alcoholism and/or drug dependency. Payment will be made at 100% for in-network covered services or subject to point of service benefits for out-of-network covered services to any such facility.

B.  Benefits will be paid for the following covered services:

(1)  Professional and other trained staff and ancillary services provided in the facility, necessary for the care and treatment of the ambulatory patient. Ancillary services include all special institutional services and supplies charged by the facility except services and supplies not related or not necessary to the medical care and treatment of the patient.

228

APPENDIX "B" – ARTICLE XX

(2)  Individual and group therapy for the patient; individual counseling for the patient; and counseling for other members of the family of the patient undergoing treatment to the extent that such counseling is necessary and related to the treatment of the patient.

(3)  Laboratory tests related to the treatment received at the facility.

(4)  Drugs, biologicals, solutions and supplies dispensed at the facility in connection with treatment received including take-home drugs.

(5)  Fixed charges for patient participation in an approved aftercare program which follows release from treatment in an Approved Outpatient Facility. Such program shall not exceed a period of 12 consecutive months following the first day of commencement in the program. Charges shall be paid only when the program certifies that the patient is continuously participating in the program.

Section 3.  Certification for Treatment

A.  Before benefits are available for services in Approved Residential and Outpatient Facilities, a physician must examine the patient and assign a diagnosis of alcoholism and/or drug dependency as classified in categories 303.0-304.7 of the Eighth Revision, International Classification of Diseases, Adopted for Use in the United States, U.S. Department of Health, Education and Welfare. Treatment in any such facility must be rendered under the supervision and management of a physician.

B.  An Approved Residential or Outpatient Facility means a facility which provides detoxification and rehabilitation services and which has been approved by the Company.

229

APPENDIX "B" – ARTICLE XX

C. An "Approved Residential Facility" shall be deemed to be a hospital for the purpose of determining benefits payable in accordance with the Disability Benefit Plan. Benefits shall not be payable under the Disability Benefit Plan in connection with treatment in an "Approved Outpatient Facility."

## Section 4. Exclusions and Limitations

Benefits are not payable for:

A. Charges for services for which benefits are otherwise provided under any health benefit program provided through the Company to employees and their dependents.

B. Charges for personal and convenience items such as telephone, television, personal care items and personal services.

C. Charges for diversional activities such as recreational, hobby or craft equipment or fees.

D. Charges for dispensing of methadone and/or taking urine specimens without individual or group therapy, individual counseling or psychological testing.

E. Charges for services rendered primarily in connection with disorders other than alcoholism and/or drug dependence.

F. Except as provided in Section 1-B-(1), charges for treatment incurred unless, in the case of an employee, he or she has returned to full-time work after the end of a prior period of treatment for at least 60 consecutive days before commencing a succeeding period of treatment, or in the case of a dependent, such dependent had resumed normal activity after the end of a prior period of treatment for a continuous period of at least three months before commencing a succeeding period of treatment.

G. Charges for services rendered to a person not insured for benefits under any health benefit program provided through the Company to employees and their dependents.

230

---

APPENDIX "B" – ARTICLE XXi

# ARTICLE XXI
# HEARING AID EXPENSE BENEFITS
# EMPLOYEES AND THEIR DEPENDENTS

## Section 1. Eligibility

Benefits will be paid to an employee if an insured employee or an insured employee's dependent incurs Hearing Aid Expense as hereinafter provided and such expenses are incurred on or after the effective date of coverage for such insured employee. Payment may be made directly to the provider or dealer.

## Section 2. Covered Hearing Aid Benefits

Benefits will be paid to the employee subject to the limitations and provisions hereinafter contained for charges as follows:

A. Audiometric examination performed by an otologist, otolaryngologist or audiologist.

B. Hearing aid evaluation test performed by otologist, otolaryngologist or audiologist, which may include the trial and testing of various makes and models of hearing aids to determine which make and model will best compensate for the loss of hearing acuity but only when indicated by the most recent audiometric examination.

C. Hearing aids of the following functional design: in-the-ear, behind-the-ear (including air conduction and bone conduction types) and on-the-body, but only if (a) the hearing aid is prescribed based upon the most recent audiometric examination and most recent hearing aid evaluation examination, and (b) the hearing aid provided by the dealer is the make and model prescribed by the otologist, otolaryngologist or audiologist and is certified as such by the otologist, otolaryngologist or audiologist. Benefits will be payable for binaural hearing aids for persons with a hearing loss in both ears.

231

APPENDIX "B" – ARTICLE XXI

**Section 3. Preferred Provider Arrangement (Where Available)**

A. Benefits will be payable for no more than one (1) audiometric examination, hearing aid evaluation test or hearing aid received in any period of 36 consecutive months after receipt of the most recent previous audiometric examination, hearing aid evaluation test and hearing aid, respectively, for which benefits were payable under this Plan.

B. The benefit payable in any period of 36 consecutive months for an audiometric examination, hearing aid evaluation test or hearing aid shall be:

(1) audiometric examination   100% for covered audiometric examination

(2) hearing aid evaluation   100% for covered hearing aid examination

(3) hearing aid   100% for covered hearing aid

(4) binaural hearing aid   100% for covered binaural hearing aid

(5) dispensing fee   100% for covered dispensing fee

C. If the employee or the employee's dependent shall request unusual services from an otologist, otolaryngologist, audiologist or dealer, such person shall pay the full additional charge therefore.

232

APPENDIX "B" – ARTICLE XXI

**Section 4. Indemnity Limits**

A. Benefits will be payable for no more than one (1) audiometric examination, hearing aid evaluation test or hearing aid received in any period of 36 consecutive months after receipt of the most recent previous audiometric examination, hearing aid evaluation test and hearing aid, respectively, for which benefits were payable under this Plan.

B. The maximum benefit payable in any period of 36 consecutive months for an audiometric examination, hearing aid evaluation test or hearing aid shall be the actual charge but in no event more than:

(1) audiometric examination - $30.00

(2) hearing aid evaluation test - $40.00

(3) hearing aid - $225 plus a dispensing fee of $125

(4) binaural hearing aid - $450 plus a dispensing fee of $190

C. If the employee or the employee's dependent shall request unusual services from an otologist, otolaryngologist, audiologist or dealer, such person shall pay the full additional charge therefore.

**Section 5. Exclusions**

Covered Hearing Aid Expenses do not include and no benefits are payable for:

A. Medical or surgical treatment.

B. Drugs or other medication.

C. Audiometric examinations, hearing aid evaluation tests and hearing aids provided under any applicable Worker's Compensation law.

233



APPENDIX "B" – ARTICLE XXI

D. Audiometric examinations and hearing aid evaluation tests performed, and hearing aids ordered:

(1) Before the covered person became eligible for coverage.

(2) After termination of coverage.

E. Hearing aids ordered while covered but delivered more than 60 days after termination of coverage.

F. Charges for audiometric examinations, hearing aid evaluation tests and hearing aids for which no charge is made to the covered person or for which no charge would be made in the absence of Hearing Aid Expense Benefits Coverage.

G. Charges for audiometric examinations, hearing aid evaluation tests and hearing aids which are not necessary, according to professionally accepted standards of practice.

H. Charges for audiometric examinations, hearing aid evaluation tests and hearing aids that do not meet professionally accepted standards of practice, including charges for any such services or supplies that are experimental in nature.

I. Charges for audiometric examinations, hearing aid evaluation tests and hearing aids, received as a result of ear disease, defect or injury due to an act of war, declared or undeclared.

J. Charges for audiometric examinations, hearing aid evaluation tests and hearing aids provided by any governmental agency that are obtained by the covered person without cost by compliance with laws or regulations enacted by any federal, state, municipal or other governmental body.

APPENDIX "B" – ARTICLE XXI

K. Charges for any audiometric examinations, hearing aid evaluation tests and hearing aids to the extent benefits therefore are payable under any health care program supported in whole or in part by funds of the federal government or any state or political subdivision thereof.

L. Replacement of hearing aids that are lost or broken unless at the time of such replacement the covered person is otherwise eligible under the indemnity limits set forth in Section 3-A of this Article.

M. Charges for the completion of any insurance forms.

N. Replacement parts for and repairs of hearing aids.

O. Eyeglass-type hearing aids, to the extent the charge for such hearing aid exceeds the covered hearing aid expense for one hearing aid under Section 3-B.

P. Charges for failure to keep a scheduled visit with an otologist, otolaryngologist or audiologist.

**Section 6. Contract Provider**

The Company will attempt to establish provider contracts with dealers of hearing aids as defined in Section 2 of this Article, in certain areas in which the Company has employees. The establishment of such contracts shall provide audiometric examination, hearing aid evaluation tests, and predetermined selection of hearing aids without cost to the employee provided all such services and devices are received through a contract provider.

APPENDIX "B" – ARTICLE XXII

# ARTICLE XXII
# CATASTROPHIC MEDICAL EXPENSE BENEFITS

## Section 1.   Eligibility

Benefits will be paid if an insured employee or an insured employee's dependent incurs Catastrophic Medical Expense as hereinafter provided.

## Section 2.   Covered Catastrophic Medical Expense

A. Subject to the limitations and provisions hereinafter contained, if an insured employee or an insured employee's dependent shall be necessarily confined as a resident patient of a hospital after exhaustion of the benefits under Article VII, Section 1-B of this Plan, benefits will be paid for the following necessary health care services in respect to such continuing disability on account of accidental bodily injury or sickness:

(1) Hospital charges as provided in Article VII, without limitation of 365 days.

(2) Nonsurgical physician's charges as provided in Article IX without the Indemnity Limits set forth in Section 1-A-(2)of that Article.

B. If an insured employee or an insured employee's dependent necessarily receives services of a graduate registered nurse, subject to the limitations and provisions hereinafter contained, benefits will be paid to the extent that such charges are not rendered by a member of the employee's family, and the first $100 of such charges in a calendar year are paid by the employee.



APPENDIX "B" – ARTICLE XXII

## Section 3.   Indemnity Limits

Payment for charges for health care services described in Section 3 shall be 80% of the first $10,000 of such charges in respect of any one (1) disability, and 100% of such charges in excess of $10,000, subject to a maximum total benefit under this Article of $50,000 for any person for his or her lifetime.

## Section 4.   Exclusions and Limitations

No payment shall be made under this Article in respect to charges for services for which benefits are otherwise provided under any health benefit program provided through the Company to employees and their dependents.

APPENDIX "B" – ARTICLE XXIII

## ARTICLE XXIII
## SPEECH THERAPY

### Section 1.   Covered Speech Therapy

Outpatient speech therapy benefits will be payable for services performed for a period of 60 treatment days per calendar year when:

A.   Prescribed by a physician for an employee or an employee's dependent for a residual speech impairment resulting from:

(1)   a cerebral vascular accident or

(2)   accidental injury to the head or neck or

(3)   surgery to the head or neck or

(4)   for children under age 6, congenital and severe developmental speech disorders, and where therapy is not available through public agencies (e.g., state, school), and

B.   The speech therapy is performed in the outpatient department of a hospital or in a nursing home as defined under Article VI of this Plan, or in other facilities (such as speech rehabilitation centers as a part of a university speech program) having comprehensive speech therapy facilities which are approved by the Company.

### Section 2.   Exclusions and Limitations

No benefits shall be payable for long-standing, chronic conditions or inherited speech abnormalities. Services must be performed by a qualified speech therapist according to a prescription from a physician concerning the nature, frequency and duration of treatment. A "qualified speech therapist" is an audiologist who (1) possesses a Master's or Doctorate Degree

238

APPENDIX "B" – ARTICLE XXIII

in Audiology and Speech Pathology from an accredited university, (2) possesses a Certificate of Clinical Competence in Audiology from the American Speech and Hearing Association and (3) where applicable, is licensed by the state. Payment will be made for such therapy at 100% for in-network covered services or subject to point of service benefits for out-of-network covered services.

239





APPENDIX "B" – ARTICLE XXIV

## ARTICLE XXIV
## EXCLUSIONS AND LIMITATIONS APPLICABLE TO ALL ARTICLES OF THE PLAN

**Section 1.**

No payment shall be made under the Plan in any event with respect to:

A. Charges incurred in connection with injury or sickness for which benefits are payable by any employer in accordance with the provisions of any Workers' Compensation or similar law. This exclusion covering disabilities growing out of employment with any employer will not apply when the other employer is not required under applicable state law to be a covered employer under the Workers' Compensation Laws.

B. Charges incurred while the employee or dependent, as the case may be, is confined in a hospital operated by the United States of America or an agency thereof, or charges which the employee himself would not be legally required to pay except charges for health care services supported in whole or part by funds of the Federal Government under Title XIX of the Social Security Amendments of 1965 (Public Law 89-97, 88th Congress, First Session).

C. Charges incurred on account of a dependent in connection with any hospital confinement or surgical operation or medical care and treatment for which the dependent is entitled to benefits under the program as an employee or former employee of the employer.

D. Charges incurred on account of a dependent in connection with any hospital confinement which shall have commenced, or any operation performed or medical care and treatment rendered during a period of hospital confinement which shall have commenced, prior to the date the dependent shall have become covered under the program.

240

APPENDIX "B" – ARTICLE XXIV

E. Except as set forth in Article XIX of this Plan charges incurred by employees, dependents of employees, retirees, dependents of retirees, and surviving spouses for which benefits are provided under any governmental programs.

**Section 2.   Nonduplication of Benefits**

A. This provision shall apply to an employee whose insurance is continued during a period of layoff provided he is entitled to benefits as an insured employee of another employer.

B. If any benefit shall be provided under any other group insurance policy, or any other group plan by whatever name called, on account of hospital, surgical and medical expenses covered under this Plan and in connection with any injury, sickness or pregnancy an amount equal to the sum of (1) the total benefits provided through such policy or plan and (2) the total cash value computed on an equitable basis of all services and supplies furnished through such policy or plan under provisions thereof which provide for the furnishing of services and supplies rather than payment in cash shall be deducted from the amount which otherwise would be payable under this Plan on account of such injury, sickness or pregnancy.

C. If any benefit shall be provided under any other group insurance policy or any other group plan by whatever name called to which the employee is required as a condition of employment to make premium contributions, such benefits that are attributable to the employee's contribution shall not be deducted under Paragraph B above.

**Section 3.   Coordination of Benefits**

A. Coordination

(1) Notwithstanding any provision of this Plan to the contrary, benefits for covered expenses shall be coordinated as set out below with "other group plans" as defined.

241

APPENDIX "B" – ARTICLE XXIV

(2) When benefits payable under any other group plans are also payable under this Plan, the benefits otherwise payable during any "claims determination period," as defined, under this Plan in the absence of this Coordination provision are subject to reduction to the extent necessary to make such benefits, together with the benefits payable or the value of the services available under all such other group plans, equal to the total amount of "allowable expenses" as defined.

(3) Upon receipt of satisfactory evidence that an individual covered under this Plan contributed, with respect to the month in which expense for covered services was incurred, fifty percent (50%) or more of the monthly premium or subscription charge for coverage under another group plan, the benefits of such other group plans will not be considered for the purposes of determining the benefits under this Plan.

(4) When the total amount of benefits provided by this Plan and other group plans exceeds one hundred percent (100%) of the allowable expenses incurred during a claim determination period and, as a result of this provision, a portion of benefits otherwise payable under this Plan is not paid, a benefit credit in the amount of such portion will be established. The benefit credit may be used to pay up to one hundred percent (100%) of allowable expenses when another claim (or claims) for a service which is covered under this Plan is incurred in the same claim determination period during which the benefit credit was established. Any benefit credit established during a claim determination period will be canceled at the end of that calendar year.

(5) Any benefit limits set forth in this Plan will be applicable only to the benefits actually paid under this Plan, exclusive of any amount paid out of an established benefit credit.

APPENDIX "B" – ARTICLE XXIV

B. Effect on Benefits

(1) The benefits of another group plan will be ignored for the purposes of determining the benefits under this Plan if the Coordination provision of the other group plan requires such other group plan to determine its benefits after the benefits of this Plan, and the rules set forth in Paragraph C below would require this Plan to determine its benefits before such other group plan.

(2) The benefits of another group plan will be considered for the purposes of determining the benefits under this Plan for dependent spouses even though such spouse has not enrolled in such group plan and such group plan is available at no cost. Group plans available at no cost shall include group plans available as an option without contribution under another employer's flexible benefit program or similar program. If more than one group plan is available as an option, the option providing the highest level of benefits without contribution will be considered. Such dependent spouses will be given the opportunity to enroll for the benefits of another group plan before this provision is applied.

(3) The benefits of another group plan will be considered for the purposes of determining the benefits under this Plan for dependent children age nineteen (19) through twenty-four (24) working full time even though such child has not enrolled in such group plan and such group plan is available at no cost. Such dependent child will be given the opportunity to enroll for the benefits of another group plan before this provision is applied.

C. Order of Priority of Payments

(1) If the other group plan does not contain a Coordination of Benefits provision, such plan shall be considered primary.

APPENDIX "B" – ARTICLE XXIV

(2) If the other group plan contains a Coordination of Benefits provision:

a. The plan of the employer of the covered person on whose behalf the expenses were incurred shall be primary.

b. In the case of a covered dependent, if "a" above does not establish which plan is primary, the plan under which he or she is a dependent of a male employee shall be primary; except that in the case of a person for whom claim is made as a dependent child:

i. If the parents are separated or divorced, the employer plan of the unmarried parent having custody of the child will be primary; and the employer plan of the parent not having custody of the child will be secondary; or

ii. If the parents are divorced and the parent having custody of the child has remarried, the employer plan of the parent having custody of the child shall be primary; the employer plan of the step-parent of the child will be secondary; and the employer plan of the parent not having custody of the child will be tertiary.

iii. For claims incurred on or after 2 February 1987 or as soon thereafter as is administratively feasible, and in cases where (i.), (ii.) and a court decree as described below do not apply, the benefits of the plan which covers the child as a dependent of the parent whose birthday in any year occurs before the birthday in such year of the other parent will be determined before the benefits of the plan which covers the child as a dependent of such other parent.

APPENDIX "B" – ARTICLE XXIV

Notwithstanding (i.) and (ii.) above, if there is a court decree which would otherwise establish financial responsibility for the health care expenses with respect to the child, the benefits of a plan which covers the child as a dependent of the parent with such financial responsibility shall be determined before the benefits of any other plan which covers the child as a dependent child.

c. When "a" and "b" above do not establish which plan is primary, the plan which has covered the person on whose behalf the expenses were incurred for the longer period of time shall be primary.

D. Right of Recovery

Whenever benefit payments have been made under this Plan and by the other group plan which are in excess of the amount of allowable expenses, the Company shall have the right to recover such overpayments. Recovery of overpayment, if any, may be made at a later date from any person to, for or with respect to whom such payments were made, any insurance companies and any other organizations.

E. Release of Information

Any person claiming benefits under this Plan must authorize the release of such information as may be necessary to implement this Section 3.

Section 4.    Utilization Review

As always, the attending physician or other health care practitioner is responsible for determining the necessity of hospital preadmission/admission and for determining necessary service, duration of hospital stay, and other procedures.

APPENDIX "B" – ARTICLE XXIV

Such service, duration of hospital stay, and other procedures shall be subject to review for medical/dental appropriateness and for level of care setting in which provided. Such review will be accomplished by provider utilization review committees, Foundations for Medical Care, and/or Professional Standards Review Organizations. Such review may include preadmission/ admission certification and concurrent stay review consistent with utilization review medical/dental guidelines for patient review.

It is the intention of the Company to support the employee on any claim by a provider for charges incurred after a notice of determination by a utilization review body that preadmission/admission, service, duration of hospital stay, or other procedures are not appropriate. The Company's support shall include any costs connected with the claim. If it is determined that such charges must be paid, the employee will be held harmless and the charges will be paid by the Company.

**Section 5.   Subrogation**

In the event of any payment of benefits under this Plan for which an insured employee or an insured employee's dependent may have a claim or cause of action against any person or organization (except a claim or cause of action against an Employer and except against insurers of policies of insurance issued to, and in the name of, an insured employee or an insured employee's dependent) the Company shall be subrogated to all right of recovery of the insured employee or the insured employee's dependent with respect to any expenses included in any judgment or settlement. If an insured employee or an insured employee's dependent incurs attorney's fees in connection with the successful prosecution or settlement of any claim or cause of action which includes such benefits, the Company shall reduce its right of subrogation of a pro rata share of such attorney's fees based on the ratio of the amount of any such benefits paid under this Plan to the total amount recovered by settlement or judgment. The insured employee or the insured employee's dependent shall, at the request of the Company, execute and deliver such instruments and papers as may be required and to take such other reasonable steps necessary to secure the subrogation rights.

246

APPENDIX "B"

PROCEDURES ON MAYO CLINIC AND UNIVERSITY OF IOWA HOSPITAL CLAIMS FOR DEERE & COMPANY

A. A special exception is made in regard to treatment at Mayo Clinic (Rochester) and University of Iowa hospitals under our insurance plan. In some Mayo cases, the patient is confined to one of the local hospitals which operates in conjunction with but is not a part of Mayo Clinic. When there is hospital confinement, our insurance provisions apply. In many cases, however, patients may not be hospitalized or may receive treatment partly in Clinic and partly in hospital. It is these cases where the exceptions to our limitations are made.

B. All Mayo Clinic and University of Iowa Hospital (both herein referred to as "Clinic") claims must have a preauthorized referral from the Plan to be paid at in-network benefits.

C. Room and board.

For all preauthorized Clinic referrals, room and board will be reimbursable if substantiated by receipts. Room payment will be made for motel, hotel or trailer parking space for the time confined in the Clinic and for the night before. For example, if the Clinic bill shows dates of 10 August to 12 August, payment can be made for 9, 10 and 11 August when receipts are furnished. If the room bill is for more than one person, then the single rate is payable. Board is payable only on the days for which room charges are payable. It is payable for up to four (4) meals a day, considering one (1) a light snack. Grocery receipts are not allowable as food bills. Total board and room charges are not limited to the most frequent board and room rates charged by the Rochester or Iowa City area hotels.

247

APPENDIX "B"

D. In-hospital services and in-clinic services.

The following charges are payable:

X-rays
Laboratory
Administration of anesthesia
Electrocardiogram
Electroencephalogram
Surgical pathology
Physical therapy treatments
Electromyogram
Renogram
Radiation therapy
Mammogram
Blood bank service
Blood tests
Blood donor fees (payable only if there is some evidence in the file that the blood was not replaced and employee was not reimbursed for charges)

The following charges are not payable (unless directly related to the diagnosis for which the employee or dependent is being treated):

Ear, nose and throat service
Dermatologic service
Ophthalmoscopy
Tuberculin test
Dental X-rays
Audiogram
Hearing tests
Refraction
Gynecology-Pelvic examination
External eye examination
Chiropody
Perimetry
Urology catheterization service
Prescriptions purchased by patient

248

APPENDIX "B"

E. Medical.

The amount payable per day during Clinic confinements shall be the actual expense not to exceed twenty dollars ($20).

The following are examples of charges to which this medical reimbursement can be applied:

Pulmonary clinic consultations
Medical history and examination by physician in internal medicine
Plastic and laryngology examination and consultation
General medical examination and consultation
Neurology
Physical therapy consultation
Orthopedic examination and consultation
Consultation by surgeon
Speech therapy
Diet instruction
Psychiatric examination

F. Surgical.

Under surgery, the following are payable:

Proctoscopic and sigmoidoscopic examination
Administration of transfusion
Spinal tap
Cystoscopic examination
All scheduled surgical procedures

249

EXHIBIT B

Case Corporation                                                                          79
Group Insurance Plan
Effective 1998


## LETTER OF UNDERSTANDING


**Re: Cost of Healthcare Coverage**


During the 1998 contract negotiations the Company and the Union agreed that over the term of the 1998 labor agreement employees and retirees who are enrolled in a Company offered HMO, PPO or other plan will not have to pay any additional employee contributions above those which may be required for enrollment in the Case Network Plan (if any).

The Company will be responsible for the retention of HMOs, PPOs and other health care delivery mechanisms during the term of this agreement. In the event that any offered HMO or PPO does not continue to provide access and high quality, cost effective care on a sustaining basis to Case UAW members, the Company may exercise its right to terminate that provider, provided that a replacement plan is instituted that meets the requirements described below. The Company will give the Union at least ninety (90) days notice of its desire to replace a provider and the Company and Union will work together in the selection of the replacement plan. Any replacement plan will provide comparable benefits and access to the type of plan it replaces. If the replacement plan is an HMO or PPO it will satisfy the UAW's standards regarding access and quality for that type of plan.

The same principles will govern the selection of additional (as opposed to replacement) HMOs, PPOs or POS plans to be made available to Case UAW members.



International Union, UAW                          Case Corporation

EXHIBIT C

## LETTER OF UNDERSTANDING

Re:     Modification of Letter of Understanding on Cost of Health Care Coverage

During the 1998 contract negotiations the Company and the union reached agreement on certain principles governing the retention and replacement of HMOs and PPOs during the term of that agreement. Those principles are set forth in a Letter of Understanding on Cost of Health Care Coverage ("1998 Letter").

The Company and the Union have determined that certain modifications in the 1998 Letter are appropriate beginning in calendar year 2001. The Company and the Union agree that effective December 31, 2000, Community Health Plan HMO and Humana HMO will cease to provide services under the Company's Group Benefit Plan in the Racine, Wisconsin area and HMO Illinois will cease to provide services under the Company's Group Benefit Plan in the Burr Ridge, Illinois area. The existing CIGNA PPO, as modified in the manner provided below, will constitute the replacement plan for purposes of satisfying the requirements of the 1998 Letter.

Effective as of January 1, 2001 the CIGNA PPO Plan will be modified as follows with respect to claims incurred on or after January 1, 2001 by Company employees or their dependents, and by Company retirees or surviving spouses or their dependents, wherever the CIGNA PPO Plan applies under the 1998 Letter to such individuals:

A.    The co-pay for in-network office visits will be reduced to $5.00 per visit;

B.    The co-pay for outpatient office visits for in-network mental health or substance abuse treatment will be reduced to $15.00 per visit; and

C.    The co-pay for mail-order prescription drugs (currently $5.00 for a 90-day supply) will be eliminated.

The Company and the Union agree to review this matter on an annual basis to determine if there is an acceptable HMO Plan available. In the event that a new or replacement HMO, or other managed care plan, is implemented for Company employees, retirees or their spouses or other dependents within any area served by the CIGNA PPO Plan, the Company reserves and shall have the right to change the CIGNA PPO Plan to revert prospectively in all service areas to the co-pay levels in effect for in-network office visits, in-network mental health or substance abuse outpatient office visits and mail-order prescription drugs immediately prior to 2001.

During the term of the 1998 agreement the Company will not, absent further agreement with the Union or legal mandate, offer a competing HMO or other managed care plan in any area served by the CIGNA PPO Plan while the modified CIGNA PPO is in effect.

To the extent that the provisions of this Letter of Understanding vary from those in the 1998 Letter, the 1998 Letter is modified and superseded by the Letter.

James E. Hecker

INTERNATIONAL UNION, UAW                      CNH GLOBAL N.V.

Signed this, the _20th_ day of _September_____, 2000

CNHA029512