# EXHIBIT H

## DECLARATION OF WES HOGSETT

Wes Hogsett states as follows:

1.     I am competent to testify in this matter if called as a witness. The statements in this Declaration are based on my personal knowledge.

2.     I started working for Caterpillar at the Mossville, Illinois plant in 1978. I was a member of UAW 974.

3.     While I was employed at the Mossville plant, I served as a Local 974 steward and chief steward. I was elected as a Committeeman and as Chair of the East Peoria Grievance Committee. From June 2008 through July 2010, I served as the Bargaining Chair for Local 974.

4.     In July 2010, I went on the staff of the International UAW as an International Representative. As an International Representative, I serviced various Caterpillar Locals. In August 2012, I was assigned to service the collective bargaining agreements at CNH.

5.     In 1991, during the labor dispute between Caterpillar and the UAW, Caterpillar unilaterally implemented changes to retiree health care benefits, including a cap on what it would pay for retiree health care, the cap to be effective in 2000 based on Caterpillar's cost of providing retiree health care in 1999. These changes only applied to employees retiring after January 1, 1992 (post-1991 retirees). Employees

who had already retired (pre-1992 retirees) were not affected by Caterpillar's unilateral changes.

6.     It is my understanding that, in 1998 agreement that settled the labor dispute, the UAW could not obtain Caterpillar's agreement to eliminate the cap for post-1991 retirees, but Caterpillar did agree to  a Voluntary Employee Benefit Association (VEBA) fund that would pay  for costs in excess of the cap after it became effective in 2000.  The VEBA paid for these above cap costs for post-1991 retirees through August 2004.  Caterpillar also agreed to the payment of retirement bonuses for employees retiring during the term of the 1998 CBA, in amounts ranging from from $3,952 to $5,008, depending on labor grade.

7.     I participated in the 2004 negotiations between Caterpillar and the UAW in my capacity of Chair of the East Peoria Grievance Committee.  In the 2004 negotiations, Caterpillar refused to eliminate the existing health care cost cap or to fund the VEBA for post-1991 retirees and spouses.  Caterpillar did agree to fix premiums for post-1991retirees at for the first three years of the 2004 CBA (2005 through 2007) at contribution rates far below those that would have been implemented under the imposed cap proposal and agreed to pay 40% of the annual increases in above cap costs for the last three years of the 2004 CBA (2008 through 2010). Caterpillar and the UAW also agreed to health care plan design changes that would reduce the cost of the health care plan and, therefore, the amount the retirees would

have to pay in premiums under the 40/60 premium increase share agreement. The prescription drug plan under the 2004 CBA had three tiers for future retirees with co pays of $5/$20/$35 effective January 1, 2005 through January 1, 2008, co pays that increased to $6/$25/$45, with a $100 co pay for prescriptions costing more than $1,000, beginning January 1, 2008. The co pays for post-1991 retirees, those retiring before January 10, 2005 remained the same as they were, $5/$15. In 2004, the UAW negotiated substantial pension increases for future retirees. These increases, over the term of the 2004 CBA, totaled ($420 a month in monthly supplemental allowances and $4.10 per month per year of credited service in basic pension benefits. The UAW also obtained an increase in the Part B premium reimbursement benefit to $99.50 per month. The UAW again negotiated cash bonuses for employees retiring after the effective date of the 2004 CBA in the same amounts as under the 1998 CBA. The UAW also negotiated three annual lump sum payments of up to $750 (a total of up to $2,250) for current retirees, those who retired before February 1, 2005, and three lump sum payments of up to $412.50 (a total of $1,237.50) for surviving spouses of those retirees. A copy of he 2004 Insurance Plan Agreement between the UAW and Caterpillar is attached as Exhibit A.

8.    I participated in the 2011 negotiations between the UAW and Caterpillar as an International Representative.    During the 2011 negotiations, Caterpillar refused to bargain over the benefits of post-1991 retirees, that is, those employees who

had retired prior to March 7, 2011. In the end, the only improvements the UAW was able to obtain for those retirees were two lump sum payments of $300, one in the first and one in the third year of the 2011 CBA. As to active employees and future (post-March 7, 2011 retirees), Caterpillar again refused to eliminate the health care cost cap it had unilaterally imposed in 1992. As to these future retirees, the UAW and Caterpillar agreed to fixed premium payments for health care coverage for 2012 and 2013. Caterpillar and agreed to subsidize premiums in 2014, 2015 and 2016 by paying 15% of the retiree's 60% share of health care inflation over the implemented 1992 retiree cost cap. Caterpillar also again agreed to provide employees retiring during the terms of the 2011 CBA with a retirement bonus in the same amounts as under the 1998 and 2004 CBAs. The prescription drug plan for employees and post-March 7, 2011 retirees included an additional tier, Tier 0, where generic drugs have a $0 co pay at the Select (Wal-Mart) or Preferred Network (Walgreens) Pharmacy. Tier 1 drugs have a $0 co pay at the Select or $5 co pay at the Preferred Network Pharmacy. Tier 2 drugs and Tier 3 drugs have a $20 and $35 co pay respectively at either the Select of Preferred Network Pharmacy. The co pay for high cost drugs, those costing more than $1,000 is still $100. The health care plan covering post-March 7, 2011 retirees currently has deductibles of $650 per person/ $1,300 per family with 20% co insurance paid by participants up to an annual out of pocket maximum of $1,875 per person/$3,750 per family. In 2015 through the end of the

CBA, the deductibles will be $700/$1,400 and the out of pocket maximum will be $2,000/$4,000.

9.    At the present time, there are several different health care plans covering hourly Caterpillar retirees, depending on the date of retirement. Pre-1992 retirees continue to have the hospital, medical and surgical benefit plans they had prior to January 1, 1992.   Pre-1992 retirees have covered hospital, medical and surgical benefits that are generally paid at 100% with no premium contributions. Post-1991 retirees have the benefits that Caterpillar unilaterally implemented in 1992, with the improvements and other changes that were negotiated in the 1998 and 2004 CBAs, with Caterpillar paying 40% of the increased plan costs over the unilaterally imposed 1992 retiree cost cap. Post-1991 retirees who retired before March 16, 1998, the date of the 1998 CBA, have a 10% co insurance payment after a $300/$600 deductible with an annual out of pocket maximum of $750/$1,500; employees who retired between March 16, 1998 and before January 10, 2005 have a 20% co insurance payment with a $300/$600 deductible with an annual out of pocket maximum of $1,000/$2,000 out of maximum; employees who retired on and after January 1, 2010 and before March 7, 2011 have a 20% co insurance after a $500/$1,000 deductible up to an annual out of pocket maximum of $1,500/$3,000.  Post-March 7, 2011 retirees and spouses have the benefit plan negotiated for future retirees during the 2011 negotiations and described above.

10.    It is my understanding that the amount of premium contributions over the 1992 cost cap are determined separately for post-1991 and post-March 7, 2011 retirees.   The retiree share of the above cap premiums for post-1991 retirees is determined on the basis of the cost experience of the pool of post-1991 retirees and dependents.  The retiree share of the above cap costs for post-March 7, 2011 retirees is based on the cost experience for active employees and post-March 7, 2011 retirees and their dependents.  Because different cost pools are used to determine above cap costs, the rate of premium increases differ for the post-1991 and the post-March 7, 2011 retiree groups.

I swear under penalty of perjury that the above statements are true.


Dated: May 12, 2014                              Signed: ___*Wes Hogsett*___
                                                          Wes Hogsett

EXHIBIT A

GROUP INSURANCE PLAN
TABLE OF CONTENTS

Page

INSURANCE PLAN AGREEMENT..........................................................................1
    Section 1.    Definitions...........................................................................1
    Section 2.    Applicability to Group Insurance Plan ...........................................2
    Section 3.    Amendments to Group Insurance Plan ............................................2
    Section 4.    Modifications Necessary to Maintain Approval from Governmental
        Insurance Department ...................................................................2
    Section 5.    Complete Agreement Not Subject to Strike........................................2
    Section 6.    Exclusive Plan...............................................................................2
    Section 7.    Conformance of Plan with State or Federal Legislation............................2
    Section 8.    Procedure for Review of Disputed Claims ......................................3
    Section 9.    Term of Agreement; Notice to Modify or Terminate ...............................4
    Section 10.    Special Coverage in the Event of Plant Closing .........................................5

MEMORANDUM OF AGREEMENT RELATING TO IMPLEMENTATION OF GROUP
    INSURANCE PLAN ...........................................................................................9

MEMORANDUM OF AGREEMENT RELATING TO CERTAIN EMPLOYEES UNDER THE
    GROUP INSURANCE PLAN..............................................................................10

GROUP INSURANCE PLAN..................................................................................11

SECTION I  DEFINITIONS ......................................................................................11
    1.1.    "Basic Agreement"..........................................................................11
    1.2.    "Central Agreement"........................................................................11
    1.3.    "Claims Administrator" ....................................................................11
    1.4.    "Continuous Service".......................................................................11
    1.5.    "Cosmetic" ....................................................................................11
    1.6.    "Covered Medical Expenses" ..........................................................11
    1.7.    "Days"11
    1.8.    "Dependent"...................................................................................11
    1.9.    "Dependents' Coverage" ..................................................................12
    1.10.    "Employee"...................................................................................12
    1.11.    "Experimental or Investigational" ..................................................13
    1.12.    "Insurance Carrier" ........................................................................13
    1.13.    "Medical Emergency".....................................................................13
    1.14.    "Office Call"..................................................................................13
    1.15.    "Participant" ..................................................................................13
    1.16.    "Personal Coverage" ......................................................................13
    1.17.    "Physician" ...................................................................................13
    1.18.    "Plan" 13
    1.19.    "Retiree" .......................................................................................14
    1.20.    "Usual and Customary" ..................................................................14

SECTION II  AVAILABILITY OF PLAN TO EMPLOYEES AND RETIREES......................14

SECTION III  ELIGIBILITY FOR AND EFFECTIVE DATE OF COVERAGE......................15
    3.1.    Eligibility and Effective Date of Coverage...............................................15
    3.2.    Additional Life Insurance Coverage ........................................................17
    3.3.    Reinstatement of Additional Life Insurance Coverage..............................17
    3.4.    Enrollment and Effective Date of Dependents' Coverage.......................17
    3.5.    Reemployment ........................................................................................19
    3.6.    Effect of Total and Permanent Disability ................................................19
    3.7.    Reinstatement from Military Leave .........................................................19
    3.8.    Preferential Hire ......................................................................................19

SECTION IV  LIFE INSURANCE, LONG TERM DISABILITY BENEFITS, ACCIDENTAL
    DEATH AND DISMEMBERMENT BENEFITS, ACCIDENT AND SICKNESS
    BENEFITS AND SURVIVOR INCOME BENEFITS ........................................19
    4.1.    Contribution and Schedule of Benefits ...................................................19
    4.2.    Increase or Decrease in Amount of Coverage .........................................21
    4.3.    Long Term Disability Benefits ................................................................21
    4.4.    Accidental Death or Dismemberment Benefits ........................................24
    4.5.    Weekly Accident and Sickness Benefits..................................................25
    4.6.    Survivor Income Benefits ........................................................................28
    4.7.    Life Insurance Benefits for Retirees .......................................................30

SECTION V  MEDICAL EXPENSE BENEFITS ..........................................................30
    5.1.    General....................................................................................................30
    5.2.    Hospital Expense Benefits .......................................................................31
    5.3.    Nursing Home Benefits............................................................................32
    5.4.    Surgical Operation Benefits.....................................................................34
    5.5.    Physicians' Attendance Benefits...............................................................37
    5.6.    Diagnostic X-ray and Laboratory Examination Benefits............................37
    5.7.    Emergency First Aid Benefits...................................................................38
    5.8.    Anesthesia Benefits..................................................................................38
    5.9.    Psychiatric Benefits .................................................................................39
    5.10.   Radiation Therapy Benefits .....................................................................40
    5.11.   Prescription Drug Benefits.......................................................................40
    5.12.   Physicians Consultation Benefits.............................................................45
    5.13.   Radiology Benefits..................................................................................46
    5.14.   Transplanted Organ or Tissue Benefits....................................................46
    5.15.   Benefits Under Federal Law Including Medicare ....................................46
    5.16.   Coordination of Benefits.........................................................................47
    5.17.   Hemodialysis Benefits ............................................................................50
    5.18.   Outpatient Physical or Speech Therapy Benefits......................................50
    5.19.   Prosthetic Device Benefits.......................................................................52
    5.20.   Durable Medical Equipment Benefits.......................................................52
    5.21.   Alcoholism and Drug Abuse Benefits ......................................................53
    5.22.   Chemotherapy Benefits............................................................................56
    5.23.   Dental Expense Benefits..........................................................................56

5.24.   Vision Care Benefits ............................................................62
5.25.   Maximum Benefits Payable to Participants ............................64
5.26.   Network Benefits ...............................................................64
5.27.   Home Health Care Benefits .................................................64
5.28.   Hospice Benefit.................................................................67
5.29.   Ambulance Benefits............................................................68
5.30.   Contributions for Medical Coverage .....................................69
5.31.   Deductible Amount ...........................................................72
5.32.   Co-Insurance ...................................................................73
5.33.   Charges in Excess of Usual and Customary and Professional Review ...............75

SECTION VI  TERMINATION OF COVERAGE AND CONVERSION PRIVILEGE.............76
6.1.    Termination of Coverage ....................................................76
6.2.    Conversion and Continuation Coverage ...............................80
6.3.    Continuation of Medical Benefits under COBRA ....................81
6.4.    Life Insurance During Eligibility Period for Conversion ............84
6.5.    Continuation of Group Life Insurance for Retirees ..................84
6.6.    Discontinuance of Coverage ...............................................85

SECTION VII  ENROLLMENT AND CONTRIBUTIONS .........................................85
7.1.    Contributions....................................................................85
7.2.    Refund of Overpayment .....................................................85
7.3.    Request for Enrollment ......................................................85
7.4.    Failure to Make Contributions .............................................85

SECTION VIII  SPONSORED DEPENDENTS .....................................................86
8.1.    Eligibility .........................................................................86

SECTION IX  GENERAL PROVISIONS ............................................................86
9.1.    Insurance Policy ...............................................................86
9.2.    Subrogation .....................................................................86
9.3.    Administration Of The Plan .................................................86
9.4.    Limitation for Filing Claims .................................................87
9.5.    Health Information Privacy...................................................87
9.6.    Participating Provider Contracts ..........................................93

SECTION X  SCHEDULE OF SURGICAL OPERATIONS....................................93

## INSURANCE PLAN AGREEMENT

THIS AGREEMENT, entered into as of December 15, 2004, between CATERPILLAR INC. and INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW) and its affiliated locals 145, 751, 786, 974, 1415, 1989 and 2096 (hereinafter collectively referred to as the "Union"),

### WITNESSETH THAT:

Section 1.  Definitions.  When used herein:

(a)  "Bargaining Unit" means the respective units for collective bargaining purposes to which the Group Insurance Plan applies pursuant to this Agreement.

(b)  "Basic Agreement" as applied to a Bargaining Unit means those provisions of the Central Agreement which apply to such Bargaining Unit, together with the provisions of the Local Agreement covering such Bargaining Unit.

(c)  "Central Agreement" means the agreement between the Employers and the Union covering terms and conditions of employment of Employees (other than terms and conditions which are the subject of special supplemental agreements such as pensions, group insurance and supplemental unemployment benefits and other than terms and conditions which are covered by a Local Agreement).

(d)  "Collective Bargaining Representative" means with respect to a Bargaining Unit, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) and a Local thereof to which recognition is extended by an Employer for that Bargaining Unit.

(e)  "Company" means Caterpillar Inc.

(f)  "Employee" means any person who is in a Bargaining Unit covered by this Agreement who is a regular full-time employee and actively employed by an Employer, or who is on the Seniority List for such Bargaining Unit, on or after the Effective Date specified in Section 9 hereof.

(g)  "Employers" means Caterpillar Inc. and any of its subsidiaries that adopt the Group Insurance Plan, each of which may also be referred to as an "Employer."

(h)  "Group Insurance Plan" means the group insurance plan as set forth in Exhibit I attached hereto and made a part hereof.

(i)  "Insurance Carrier" means a legal reserve life insurance company selected by the Company to issue a policy or policies of group insurance pursuant hereto.

(j)  "Local Agreement" means an agreement between an Employer and a Collective Bargaining Representative covering terms and conditions of employment of Employees (other than terms and conditions which are the subject of special

supplemental agreements such as pensions, group insurance and supplemental unemployment benefits and other terms and conditions which are governed by the Central Agreement).

(k)    "Seniority List" means the seniority list provided for in the Basic Agreement.

Section 2.  Applicability to Group Insurance Plan.  Subject to the succeeding provisions of this Agreement, the Employers agree to continue to maintain for eligible Employees the Group Insurance Plan which was in effect on the day preceding the date of this Agreement.

Section 3.  Amendments to Group Insurance Plan.  Effective as of January 10, 2005, said Group Insurance Plan shall be amended to read as set forth in Exhibit I attached to this Agreement.

Section 4.  Modifications Necessary to Maintain Approval from Governmental Insurance Department.  In the event that any revisions of the Group Insurance Plan (as heretofore in effect or as amended herein) are necessary in order to obtain or maintain such approval as may be necessary from any state department of insurance or from any similar or other official body, or in order to satisfy the requirements of the Insurance Carrier as to the minimum number of participants, the Employers may make such revisions with the agreement of the Union insofar as Employees in the Bargaining Units are concerned, adhering as closely as possible to the intent of the parties as expressed in this Agreement (including the Group Insurance Plan).

Section 5.  Complete Agreement Not Subject to Strike.  During the term of this Agreement neither the Union nor any of its officers, agents, or representatives, nor any of the Employees or their agents or representatives, shall engage or continue to engage in or in any manner sanction or encourage any strike, work stoppage, slowdown, or other interruption or impeding of work, or engage or continue to engage in any other use of economic force, for the purpose of securing any modification, change, or termination of this Agreement or of the Group Insurance Plan, or for the purpose of securing the establishment of any new, different or additional plan for insurance or other benefits for death, sickness, accident, hospitalization or surgical or other medical services, or other welfare plans for the benefit of Employees or retired Employees, or the Dependents of either. During the term of this Agreement, the Employers shall have no obligation to negotiate or bargain with the Union, any Collective Bargaining Representative, or with the Employees or any other representative of the Employees with respect to any of the subject matters of this Agreement (except as otherwise expressly provided herein), the right to bargain with respect to any such matters being expressly waived.

Section 6.  Exclusive Plan.  The Group Insurance Plan shall be the exclusive plan for insurance or other benefits for death, sickness, accident, hospitalization or surgical or other medical services, or other welfare benefits for Employees and retired Employees, and the Dependents of either, to be provided by the Employers, in whole or in part, except such pension or other welfare benefits as may be provided for in other agreements between the Employers and the Union.

Section 7.  Conformance of Plan with State or Federal Legislation.  In the event that there is hereafter enacted any law providing benefits for Employees who are disabled by sickness or accident (except benefits for occupational disabilities under workers' compensation and occupational disease laws and benefits for total and permanent disability under the Federal

INSURANCE                                  2

Social Security Act), the Employers and the Union will negotiate with respect to the changes, if any, that should be made in the Group Insurance Plan in the light of such law.

Section 8.  Procedure for Review of Disputed Claims. To afford Employees a means by which they can seek review and possible reconsideration of a disputed disability, medical, dental, vision, catastrophic medical expense, or a hearing aid claim, or a life insurance, accidental death or dismemberment, or survivor income benefit claim which is denied the following procedure will apply:

Step 1.  Should the Employee, following receipt of the notification letter which advises him that all or a portion of his claim for benefits has been denied, be unable to secure a satisfactory explanation from his Employer or the Insurance Carrier (or such other organization as shall be responsible for providing the benefit in dispute) of the reason for such denial, the Employee may then request the designated local union insurance representative to review the reasons for denial with the designated management representative.

Step 2. The management representative will review the Employee's claim with the local union insurance representative. If needed, more details with respect to the reasons for denial will be obtained by the management representative. If appropriate, he will advise the local union insurance representative what type of additional information is needed to support a claim for payment of benefits. Copies of all available material pertinent to the claim, including the denial letter, will also be furnished upon request.

Step 3.  If, after discussion with the management representative, the local union insurance representative feels that the claim was improperly denied, he may notify in writing the International Union, UAW, Agricultural Implement Department, and the management representative that he would like the claim further reviewed by the International Union and the designated representative of the Company. The management representative will then direct a memorandum describing the discussions which have taken place (a copy of which will be sent to the local union insurance representative and to the UAW Agricultural Implement Department) to the Company representative and will also forward the entire claim file to the representative. Thereupon, the International Union should contact the Company representative to arrange for a meeting at a mutually convenient time for the purpose of further discussion of the claim.

Step 4.  If, after discussion between the representative of the International Union and the designated representative of the Company, the parties cannot resolve the claim in dispute and the representative of the International Union continues to feel that the claim was improperly denied, such representatives shall appoint an impartial person to review the claim in dispute and to determine whether or not denial was proper. In the event of the inability of the parties to agree upon such an impartial person within a period of thirty days after it is determined that such an impartial person should be appointed, the parties shall ask the American Arbitration Association to furnish a suggested list of names of five persons, from which list the parties shall select one person to serve. Such selection shall be by agreement, if possible; otherwise, by the International Union and the Company alternately eliminating names from said list. After each party has eliminated the names of two persons from said list, the remaining one shall be appointed to act.

There shall be no appeal from any ruling by the impartial person so designated. Each such ruling shall be final and binding on the collective bargaining representatives, on the Employee, retired Employee or dependent involved, any other persons claiming benefits under the Plan and the Employers; and shall be based solely on the written facts submitted relating to the case in dispute and such ruling shall apply solely to the case in dispute and shall not be used as a precedent for future cases. No ruling in any one case nor any initial determination in any one case shall create a basis for retroactive adjustments in any other cases. The collective bargaining representatives will discourage any attempt of their respective members and any other persons and will not encourage or cooperate with any of its members and any other persons, in any appeal to any court or administrative board or agency from a ruling of such impartial person.

The fees and expenses of such impartial person, and any clerical or stenographic expense mutually agreed to, shall be borne equally by the Company and the International Union.

Section 9.  Term of Agreement; Notice to Modify or Terminate.

(a)     Subject to subparagraph (b), this Agreement shall be effective January 10, 2005 and shall remain in force through February 28, 2011, and thereafter from March 1 of one year through the last day of February of the next succeeding year, unless at least 60 (but not more than 90) days prior to March 1, 2011, or at least 60 (but not more than 90) days prior to March 1 of any succeeding year, any party gives written notice to the other that it desires a modification or termination. In the event that any negotiations following such notice do not result in an agreement for renewal, with or without modification, prior to the March 1 next succeeding such notice, this Agreement shall terminate at the end of any term (including any one-year extension in accordance with the foregoing) unless further extended by mutual agreement. Termination of this Agreement shall not have the effect of automatically terminating the Group Insurance Plan. Nothing in this Agreement shall change or modify the bargaining units to which the recognition of the International and the respective Local Unions has been extended by an Employer as set forth in the Central Bargaining Agreement.

(b)     If at any time any of the approvals referred to in Section 4 (regarding governmental approval) ceases to be in effect, or there is a failure to satisfy the requirements of the Insurance Carrier and the Claims Administrator as to the minimum number of participants, the Employers (unless revisions made pursuant to Section 4 result in the complete reinstatement of such approval or satisfaction of said requirements) may terminate this Agreement by giving at least sixty (60) (but not more than 90) days' written notice thereof to the Union (which notice shall specify the effective date of the termination). In the event that any such notice of termination is given, the parties shall meet for the purpose of negotiating regarding the matters covered hereby within not less than thirty (30) nor more than sixty (60) days prior to the termination date specified in such notice.

(c)     Any notice under this Section shall be in writing and shall be sufficient, if to the International Union and any of its above-described affiliated locals, if sent by mail addressed to Caterpillar Department, International Union, United

INSURANCE                                    4

Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Detroit, Michigan, with copies to the appropriate affiliated unions at the last address furnished to the Company by such local unions; and if to an Employer, to Caterpillar Inc., Attention: Corporate Labor Relations, 100 N.E. Adams Street, Peoria, Illinois 61629-4185, or to such other address as the Company shall furnish to the Union in writing.

Section 10.  Special Coverage in the Event of Plant Closing.

(a)   Notwithstanding anything contained in the Group Insurance Plan (the "Plan") to the contrary, the provisions of this Section 10 shall be applicable to any Employee who is placed on permanent layoff from a facility or part of a facility which closes as a result of a Plant Closing at that facility

(i)   on or after the date it is announced that such Plant Closing will occur and

(ii)   on or after the Effective Date of this Agreement

and who on the date of such permanent layoff has at least 10 years of seniority and any such Employee shall be eligible to have a portion of his group insurance coverage continued while on layoff and not retired under the Non-Contributory Pension Plan from his facility for an additional 12 months following the expiration of the 12 month period for which coverage was continued under paragraph 6.1(a)(i) of the Plan; provided that with respect to any coverage in accordance with Section IV thereof, such Employee continues to make the required contributions for coverage under Section IV during such 12 month period, and provided further that such Employee has not refused recall to the Bargaining Unit from which he was laid off.  As used in this Section 10, the term "Plant Closing" means a "Complete Plant Closing" as that term is defined in the Central Agreement.

(b)   Under this Section 10, there shall be continued an Employee's

(i)   Medical Expense Benefits coverage under paragraphs 5.1 through 5.33 of the Group Insurance Plan, and

(ii)   Basic Life Insurance, Additional Life Insurance, Accidental Death and Dismemberment Insurance, and Survivor Income Benefits coverage under the Group Insurance Plan provided such Employee continues to contribute monthly for the full cost of such coverage.

(c)   In the event an Employee is reemployed at a facility at which a Plant Closing has occurred during the period that coverage is continued under this Section 10 and he is subsequently again laid off, such Employee will not be entitled to a new additional 12 months of coverage under this Section 10 but that portion of his additional 12 months of coverage under this Section 10 which remained when rehired shall again be resumed after the Employee has exhausted any coverage

which is continued pursuant to paragraph 6.1(a)(i) of the Plan because of such subsequent layoff.

(d)    For the purpose of paragraph 5.16 of the Group Insurance Plan (Coordination of Benefits) during the additional 12 month period that coverage is continued under this Section 10, the order of benefits determination shall be as follows:

      (i)    notwithstanding anything contained in paragraph 5.16(4) of the Group Insurance Plan to the contrary, where an Employee is employed by another employer and is covered by an "Other Plan" as an employee not on layoff from that employer, the benefits of the "Other Plan" shall be determined before the benefits of the "Plan", or

      (ii)    where an Employee is covered by an "Other Plan" as an employee on layoff from an employer, the order of benefit determination in paragraph 5.16(4) shall apply.

(e)    In the event any such Employee commences employment at a second Employer location (i.e., a facility at which a Plant Closing did not occur) of an Employer in accordance with the provisions of Section 16.10 of the Central Agreement, the following shall apply:

      (i)    Coverage under Section IV and Section V will take effect, as of the first day the Employee is actively at work at such second location and any coverage under Section IV and Section V which has been continued while on layoff under the provisions of paragraph 6.1 of the Plan and this Section 10 shall terminate on the day preceding such first day of active work with no interruption of coverage.

      (ii)    For the purpose of determining the maximum period of payments under paragraphs 4.3 (Long Term Disability Benefits) and 4.5 (Weekly Accident and Sickness Benefits) of the Plan, an Employee shall have his seniority when first disabled determined by adding any seniority attained at the facility which incurred a Plant Closing to any seniority attained at such second location.

      (iii)    The Employee's base annual earnings at such second location as defined in paragraph 4.1(b) of the Plan shall be used for the purpose of determining the amount of insurance pursuant to the Schedule of Benefits contained in such paragraph 4.1(b).

      (iv)    For the purpose of determining the maximum amount or duration of benefits payable under the Plan, all payments made prior to the Employee's first day of active work at such second location shall be applied against any payments due the Employee on or after such first day of active work.

      (v)    For the purpose of determining the amount of, or eligibility for, retired life insurance under paragraph 4.7 of the Plan, an Employee's Credited Service shall, subject to the provisions of paragraph (f) below, include any Credited Service granted to him by the provisions of the Supplemental Agreement Relating to Non-Contributory Pension Plan for past Credited Service at the facility which incurred a Plant Closing.

(f)    Notwithstanding the provisions of paragraphs 3.1, 4.3, 4.5, 4.6, and 4.7 of the Plan to the contrary, an Employee who has retired or is eligible for a pension under Section 13 of the Supplemental Agreement Relating to Non-Contributory Pension Plan, and who is subsequently rehired by an Employer, shall be provided coverage under the Plan as a rehired Employee except that:

      (i)    Such Employee's retirement life insurance pursuant to paragraph 4.7 of the Plan shall be continued; and such Employee shall be eligible for supplemental basic life insurance and accidental death and dismemberment insurance coverage under this paragraph (f) in an amount equal to the amount of Basic Life Insurance and Accidental Death and Dismemberment Insurance coverage which would otherwise be provided under the Plan based upon his rate of pay while so employed less the amount of any such retirement life insurance so continued.

      (ii)    Survivor Income Benefits Insurance provided under paragraph 4.6 of the Plan shall be payable in the event of an Employee's death regardless of the Employee's prior retirement.

      (iii)    Weekly Accident and Sickness Benefits provided under paragraph 4.5 of the Plan, and Long Term Disability Benefits under paragraph 4.3 of the Plan, shall be payable in the event an Employee becomes disabled, regardless of the Employee's prior retirement.

      (iv)    During the period of active employment the Employee's coverage under Section V of the Plan as a retiree shall be suspended and coverage as an active Employee shall be fully in effect. In the event the Employee subsequently has coverage under Section IV and V of the Plan terminated due to the provisions of Section VI of the Plan, said coverage as a retiree shall be resumed on the day following the date of termination of coverage as determined in Section VI of the Plan.

      (v)    Upon the subsequent retirement of any such Employee following his period of reemployment, his retirement medical coverage under Section V of the Plan shall be resumed and his retirement life insurance amount referred to in subparagraph (i) above shall continue to be determined based upon his number of years of Credited Service at his retirement from the facility at which a Plant Closing occurred; except that if an Employee's Credited Service and age at the time he again retires is sufficient to make him eligible to retire pursuant to the provisions of the

Non-Contributory Pension Plan then in effect, then such Employee shall be eligible for an additional amount of retirement life insurance under this paragraph (f) based solely upon the amount of supplemental basic life insurance and accidental death and dismemberment coverage determined under subparagraph (i) above, and upon attainment of age 65 years such supplemental accidental death and dismemberment insurance shall be cancelled and such supplemental life insurance shall be reduced at the rate prescribed by paragraph 4.7 of the Plan.

Agreed and subscribed to as of the day and year first above written.

MEMORANDUM OF AGREEMENT RELATING TO
IMPLEMENTATION OF GROUP INSURANCE PLAN

The Company and the Union agree that the following modifications to the Insurance Plan Agreement effective January 10, 2005 (the "Agreement") and the Company's Group Insurance Plan (the "Plan") that is an Exhibit to the Agreement are necessary to accomplish the transition of eligible employees and retirees, and their dependents, to the Plan.  Any capitalized term that is not defined shall have the same meaning as in the Plan.

Notwithstanding any provision of the Agreement or the Plan:

1.      Prior to January 1, 2006, the Plan shall apply to all of the following groups (subject to modifications described herein, in the Plan, the Agreement, the Group Insurance Plan 2004 or the Insurance Plan Agreement to which it is an Exhibit, or in any other Agreement or Understanding related to any of the foregoing).

      a.      Any person with a hire date prior to January 10, 2005 who is not classified by the Company as (i) a "supplemental employee" as defined in the Central Agreement or (ii) a Caterpillar Logistics Services employee who was hired or recalled from layoff to labor grades 1 or 2 (A) on or after April 6, 1992 at Denver, Colorado (Local 1415) or York, Pennsylvania (Local 786); or (B) on or after March 23, 1998 at Morton, Illinois (Local 974) or Memphis, Tennessee (Local 1989).  A "hire date" is the last date of rehire if it follows a break in continuity of service.

      b.      Any person who is a regular full-time employee and actively employed in a Bargaining Unit covered by the Insurance Plan Agreement to which the Company's Group Insurance Plan 2004 is an Exhibit, or an employee who is hired or transferred into a Bargaining Unit after January 9, 2005, other than an individual with coverage in effect under the 1998 Group Insurance Plan (the "Prior Plan") that is an Exhibit to the Insurance Plan Agreement dated as of the 16th day of March, 1998, or an individual described in subparagraph a.(i) or (ii), above, except that an individual described in subparagraph a.(ii), above, shall remain covered by the Prior Plan, to the extent provided in the Memorandum of Agreement Relating to Benefits Agreements for Parts and Service Support Facilities thereto, through May 31, 2005 and such an individual with less than three (3) years of Continuous Service as of June 1, 2005, shall remain so covered thereafter.

      c.      Any person who is either (a) a former employee who retired prior to January 10, 2005 and was covered under the Prior Plan on January 9, 2005 or (b) an Employee who retires from an Employer after January 9, 2005 and at the time of his retirement has accrued at least 10 years of credited service (5 years if hired after age 60) under the Company's Non-Contributory Pension Plan after the earlier of age 45 or the date he has accrued 20 years of credited service under the Company's Non-Contributory Pension Plan and at his retirement is eligible for the immediate commencement of a monthly pension under the Company's Non-

INSURANCE                 9

Contributory Pension Plan or would be eligible for such immediate commencement but for his election to defer commencement of his pension.

The provisions of this Memorandum of Agreement shall also apply to the Dependents of the foregoing persons who were participating in the Prior Plan on January 9, 2005 or who become eligible to participate in the Plan after January 9, 2005.

2.  On or after January 1, 2006, the Plan shall only be effective for persons described in subparagraphs 1.a. and c., above, and will be effective only for such individuals.

3.  With respect to all persons described in subparagraph 1.a.(ii), above:

    a.  Subsections 4.1, and 4.2 of the Company's Group Insurance Plan 2004, as applied by Letter of Agreement No. 3 thereto shall be effective on June 1, 2005, in lieu of the corresponding provisions of the Prior Plan.

    b.  Subsection 4.5 of the Company's Group Insurance Plan 2004, as applied by Letter of Agreement No. 3 thereto shall be effective as of the date of ratification of the Central Agreement, in lieu of the corresponding provisions of the Prior Plan.

    c.  Subsection 5.15 of the Plan shall not apply.

4.  [RESERVED]

5.  The Company and the Union further agree and acknowledge that this Memorandum of Agreement will expire upon its terms and have no further force and effect as of January 1, 2006.

MEMORANDUM OF AGREEMENT RELATING TO CERTAIN EMPLOYEES UNDER THE GROUP INSURANCE PLAN

The Company and the Union agree to the following modification to the Insurance Plan Agreement effective January 10, 2005 (the "Agreement") and the Company's Group Insurance Plan that is an Exhibit to the Agreement. For Caterpillar Logistics Services Business Units, the Agreement shall remain in effect until the sixtieth day following the effective date of the Central Agreement and all Local Agreements covered by the Central Agreement to succeed those expiring on February 28, 2011.

EXHIBIT I
GROUP INSURANCE PLAN

SECTION I
DEFINITIONS

When used herein, the terms defined below shall have the meanings so indicated:

1.1.    "Basic Agreement" shall have the meaning defined in the agreement to which this Plan is an exhibit.

1.2.    "Central Agreement" shall have the meaning defined in the agreement to which this Plan is an exhibit.

1.3.    "Claims Administrator" means the Company, or its designee, that provides certain claim administration services for the Plan.

1.4.    "Continuous Service" means the time elapsed since the last date of hiring or rehiring following a break in continuity of service. Continuity of service shall be broken by the occurrence of any event (regardless of when such event occurred or occurs) which breaks continuity of service for the purpose of determining seniority under the Basic Agreement in force at the time of such occurrence, or, with respect to any period during which no such agreement is in force, under the last such agreement in force prior to such period.

1.5.    "Cosmetic" means procedures or services that change or improve appearance without significantly improving physiological function.

1.6.    "Covered Medical Expenses" means the Usual and Customary charges for the types of medical services and supplies provided under Section V of this Plan.

1.7.    "Days" means calendar days.

1.8.    "Dependent" means (1) an Employee's or Retiree's spouse; or (2) an unmarried Child of an Employee or a Retiree, provided, however, that if the Employee or Retiree and his spouse are both Employees or Retirees of the Employer or any subsidiary of the Employer only one Employee may enroll the Child as a Dependent pursuant to subsection 3.4. To the extent that the Plan provides for coverage of a surviving Dependent of a deceased Employee or former Employee, the term "Dependent" shall include such survivor. A Child is an eligible Dependent only if the following requirements are met:

(a)    Minor Child - such Child is under 19 years of age, or

(b)    Student - such Child is 19 years of age or more but under 25 years of age, and

(i)    prior to January 1, 2006, (A) legally resides with the Employee or Retiree and (B) receives from the Employee or Retiree more than one-half of his or her support; or

      (ii)     on and after January 1, 2006, (A) is not in the armed forces of any country, and (B) is a full-time student in a high school, college or trade school; students who work between semesters, trimesters or quarters shall be considered full-time students for the purpose of this subsection 1.8; or

   (c)    Disabled Child - such Child is 19 years of age or more, and

      (i)     is incapable of sustaining employment by reason of mental or physical disability, excluding in any case, any Child on account of whom such Employee or Retiree has not furnished evidence satisfactory to the Company or its designee of the disability and the residence and support described in (ii) and (iii) below, and

      (ii)     legally resides with such Employee or Retiree (or legally resides in a licensed special care home or facility which specializes in the treatment of physical or mental disabilities), and

      (iii)    receives from the Employee or Retiree more than one-half (1/2) of his or her support.

Support, for purposes of subparagraphs (b)(i) and (c)(iii) above, is calculated by the following: The total family expenses for lodging, food and utilities (but not real estate taxes, mortgage interest and insurance) will be divided by the number of persons living in the home.

This quotient, plus the cost of such Child's clothing, education, medical care (which is not covered by insurance), and travel shall be compared to the total income of the Child, and if the income exceeds one-half (1/2) the expenses determined by the above calculation, the Child will not be a Dependent.

A Child who is a Dependent by reason of this paragraph (c) shall continue to be a Dependent until he fails to satisfy this paragraph (c).

"Child" (or "Children") means any (i) natural child, (ii) legally adopted child, or (iii) stepchild who resides in the covered Employee's or Retiree's household. For the purposes hereof, an unmarried child shall be deemed to be under 19 or 25 years of age until the end of the month in which falls his or her 19th or 25th birthday.

1.9.    "Dependents' Coverage" means coverage in accordance with Section V providing benefits with respect to an illness or injury suffered by a Dependent of an Employee or Retiree.

1.10.   "Employee" means any person with coverage in effect under the group insurance plan in effect under the 1998 Insurance Plan Agreement who is not classified by the Company as (i) a "supplemental employee" as defined in the Central Agreement or (ii) a Caterpillar Logistics Services employee who was hired or recalled from layoff to labor grades 1 or 2 (1) on or after April 6, 1992 at Denver, Colorado (Local 1415) or York, Pennsylvania

(Local 786); or (2) on or after March 23, 1998 at Morton, Illinois (Local 974) or Memphis, Tennessee (Local 1989).

1.11.    "Experimental or Investigational" means medical, surgical, diagnostic, psychiatric, substance abuse or other health care services, technologies, supplies, treatments, procedures, drug therapies or devices that, at the time determination is made regarding coverage in a particular case, are determined to be any of the following:

    (1)    not approved by the U.S. Food and Drug Administration (FDA) to be lawfully marketed for the proposed use and not identified in the American Hospital Formulary Service or the United States Pharmacopoeia Dispensing Information as appropriate for the proposed use.

    (2)    subject to review and approval by any institutional review board for the proposed use.

    (3)    the subject of an ongoing clinical trial that meets the definition of a Phase 1, 2 or 3 clinical trial set forth in the FDA regulations, regardless of whether the trial is actually subject to FDA oversight.

1.12.    "Insurance Carrier" means a legal reserve life insurance company selected by the Company.

1.13.    "Medical Emergency" means a serious medical condition or symptom resulting from injury, sickness or mental illness that is both of the following:

    (a)    arises suddenly; and

    (b)    in the judgment of a reasonable person, requires immediate care and treatment, generally received within 24 hours of onset, to avoid jeopardy to life or health.

1.14.    "Office Call" means a visit with a Physician for the purpose of examination or consultation or the administration of a test or medication, other than one for which reimbursement is specifically provided hereunder.

1.15.    "Participant" means an Employee or a Retiree, Dependent, or sponsored dependent (as described in Section VIII) who is covered under the Plan pursuant to subsection 3.1.

1.16.    "Personal Coverage" means coverage in accordance with Section V providing benefits with respect to an illness or injury suffered by an Employee.

1.17.    "Physician" means any doctor of medicine, doctor of osteopathy, podiatrist, dentist, psychologist, chiropractor, optometrist or other provider who is properly licensed and qualified by law and acts within the scope of his license.

1.18.    "Plan" means, for the purposes of this document, this Group Insurance Plan.

1.19.   "Retiree" means either (a) a former Employee who retired from an Employer prior to January 10, 2005 and was covered under the group insurance plan in effect under the 1998 Insurance Plan Agreement or (b) an Employee who retires from an Employer after January 9, 2005 and at the time of his retirement has accrued at least 10 years of credited service (5 years if hired after age 60) under the Non-Contributory Pension Plan after the earlier of age 45 or the date he has accrued 20 years of credited service under the Non-Contributory Pension Plan and at his retirement is eligible for the immediate commencement of a monthly pension under the Non-Contributory Pension Plan or would be eligible for such immediate commencement but for his election to defer commencement of his pension.

1.20.   "Usual and Customary" means the lesser of: (i) the Physician's usual charge for furnishing the service or supply or (ii) the charge the Claims Administrator determines in its discretion to be reasonable for such service or supply.  Such determination shall take into account the prevailing range of fees in the local geographic area of providers of similar training or experience for like services or supplies.  The Claims Administrator will utilize an independent national company to determine these prevailing ranges, and shall establish from time to time a percentile measure (or different measures for different types of charges) that shall constitute the highest Usual and Customary charge.  In the case of a network provider, as described in subsection 5.26, when there is a negotiated network charge for the service or supply, Usual and Customary for all purposes means that negotiated network charge.

SECTION II
AVAILABILITY OF PLAN TO EMPLOYEES AND RETIREES

2.1.   Subject to the provisions of any document of which this may be a part and the succeeding provisions hereof, the Employers will maintain the Plan herein described either through a group policy or policies issued by an Insurance Carrier, through a self-insured plan which may or may not be funded by a trust either wholly or in part, or through a combination of either of the aforementioned means. The Employers may use a trust fund of the type described in Section 501(c)(9) of the Internal Revenue Code to fund post-retirement liabilities. The Employers will pay such part of the cost thereof as is not provided by Employee contributions and shall retain any dividends payable thereunder.  Provided that it does not affect the amount of the Participants' contribution described in paragraph 5.30 or the benefits available under Section V of the Plan, the Employers may attribute one or more classes of benefits described in Section V of the Plan to their payments, to Participant contributions, or to some combination thereof.  Except to the extent that a benefit may be payable to him therefrom, no individual shall have any other interest in or right to the assets of any trust fund established as a part of the Plan.

2.2.   Benefits for Retirees who retired prior to January 1, 1992 shall be governed by the group insurance plan in effect under the 1998 Insurance Plan Agreement, except that prescription drug benefits as described in Letter of Agreement 8 attached to this Plan shall apply to those Retirees.

Benefits for Retirees who retired on or after January 1, 1992 but prior to January 10, 2005 shall be governed by this Plan, except that such Retiree's basic life insurance shall be governed by the group insurance plan in effect under the 1998 Insurance Plan Agreement.

## SECTION III
## ELIGIBILITY FOR AND EFFECTIVE DATE OF COVERAGE

3.1.  Eligibility and Effective Date of Coverage.  Participants covered under the group insurance plan in effect under the 1998 Insurance Plan Agreement on January 9, 2005 shall be covered under this Plan effective January 10, 2005; provided that Bargaining Unit Employees excluded from the definition of "Employee" in subsection 1.10 and such employees' dependents shall not be covered under this Plan.  Prior to April 1, 2005, coverage in accordance with Section IV, except Additional Life Insurance, and coverage in accordance with Section V, except dental, vision and hearing aid expense coverage, will take effect on the day following the completion of: a) for Employees who are scheduled to work five eight-hour days, 60 Days of work, b) for Employees who are scheduled to work three twelve-hour shifts, 40 Days of work, c) for Employees who are scheduled to work four ten-hour shifts, 48 Days of work, or d) for Employees who are scheduled to work a combination of different workweeks, 60 Days of work which shall be calculated by adding all Days worked using the following formula: each eight-hour shift shall equal one Day, each ten-hour shift shall equal one and one-quarter Day, and each twelve-hour shift shall equal one and one-half Day. This waiting period calculation applies to all provisions of paragraph 3.2 (Additional Life Insurance Coverage). Dental, vision and hearing aid expense coverage will take effect on the day following an Employee's completion of 365 Days of Continuous Service with the Employers if such Employee is actively at work on his 365th Day of Continuous Service.

An Employee must elect coverage by enrolling in accordance with the procedures established by the Company or its designee. In the event that any Employee does not elect coverage under Section V within 30 days of first becoming eligible therefor and later elects to enroll for coverage, that coverage will be subject to an 18-month Pre-existing Condition exclusion period instead of the 12-month period described in the last paragraph of this subsection 3.1.  An Employee's Dependent who was not covered under the group insurance plan in effect under the 1998 Insurance Plan Agreement will be eligible for coverage as described in subsection 3.4 below.

A Retiree who was covered under the Plan as an Employee on the day preceding his retirement shall be eligible to continue Medical Expense Benefit coverage as described in Section V.  If the Retiree did not have Personal Coverage under the Plan on the day preceding his retirement, he shall not be eligible to enroll for such coverage after retirement.  Coverage shall continue with respect to the covered Retiree and any Dependents covered with respect to him on the day preceding his retirement unless the Retiree waives such coverage in accordance with procedures established by the Company or its designee.

A Retiree who retires on or after January 10, 2005 and who is eligible for, but does not elect to enroll for, benefits under the Plan at the time of his retirement may enroll in the

Plan for Medical Expense Benefit coverage during any one annual enrollment period following his retirement, in accordance with the procedures established by the Company or its designee, upon showing, in a form satisfactory to the Company or its designee, that he (and his Dependents, if applicable) was covered under an employer-sponsored group health plan or comparable private insurance (including COBRA coverage under the Plan) for the previous twelve (12) months, or for the entire period since his retirement if less than twelve (12) months. Such election shall be effective on the first day of the applicable Plan year.

A Retiree who retired prior to January 10, 2005 and who had Medical Expense Benefit coverage as a Retiree under the group insurance plan in effect under the 1998 Insurance Plan Agreement may elect (for himself and his Dependents, if applicable), during any one annual enrollment period to cease being covered under the Plan. Such election shall be effective on the first day of the applicable Plan year. Any such Retiree who elects to cease coverage may re-enroll in the Plan for Medical Expense Benefit coverage during any one annual enrollment period following cessation of coverage, in accordance with procedures established by the Company or its designee, upon showing, in a form satisfactory to the Company or its designee, that he (and his Dependents, if applicable) was covered under an employer-sponsored group health plan or comparable private insurance (including COBRA coverage) for the previous twelve (12) months. Such election shall be effective on the first day of the applicable Plan year.

A Retiree's Dependent who was not covered under the Group Insurance Plan on the day preceding the Retiree's retirement will be eligible for coverage only as described in subsection 3.4(ii), (iii), (iv) or (v) below.

Notwithstanding anything in this Section 3.1 to the contrary, Medical Expense Benefits under Section V will not be payable for expenses related to the treatment of a Pre-existing Condition that existed within six months prior to the Participant's enrollment date. For an Employee who was subject to the 60-day waiting period in effect prior to April 1, 2005, and who enrolled or enrolls within 30 days of becoming eligible for coverage, and any eligible Dependent with respect to such Employee, the Employee's and each such Dependent's enrollment date is the Employee's hire date. For any other Employee or Dependent, the enrollment date is the Employee's or Dependent's first date of coverage under Section V. "Pre-existing Conditions" are conditions for which medical advice or treatment was recommended by a Physician or received from a Physician (including, for Employees, in the course of an employment physical) within the six-month period preceding the Participant's enrollment date. Pre-existing Conditions do not include conditions for which medical advice or treatment was recommended by a Physician in connection with pregnancy or, in cases involving newborn children or newly adopted children. Any medical expenses covered under Section V incurred on or after the end of a period of three consecutive months after the effective date of benefits for that Participant, during which time that person has not received medical treatment for that condition, or was not advised to receive medical treatment for that condition, shall not be subject to this limitation. The maximum period that such Pre-existing Conditions will not be covered is 12 months after the Participant's enrollment date. This 12-month maximum limitation shall be reduced by one month for each month of prior creditable

coverage as long as the Participant did not incur a break in coverage exceeding 63 days (excluding any waiting period applicable).  Creditable coverage includes coverage under any employer-sponsored health plan (including COBRA coverage), an individual health policy, Medicare, Medicaid, or a governmental plan for which the Participant has a certification acceptable to the Company or its designee from the employer-sponsored health plan, individual health insurer, Medicare, Medicaid, or governmental plan.

3.2.   Additional Life Insurance Coverage. Additional Life Insurance in accordance with Section IV will be made available to any Employee who files with his Employer a proper request therefor (subject to the 60-day waiting period described in subsection 3.1 for Plan years beginning prior to January 1, 2006).  In the case of an Employee requesting Additional Life Insurance after the expiration of his first 60 Days of work (for those subject to the 60-day waiting period), or of an Employee requesting reinstatement of any such insurance terminated, pursuant to paragraphs 6.6 (Discontinuance of Coverage) or 7.4 (Failure to Make Contributions), the requested insurance shall take effect only if evidence of insurability satisfactory to the Insurance Carrier or the Company is furnished with respect to such Employee.  In any such case, requested insurance shall take effect on the first day on which the Employee is actively at work coinciding with or following the date on which the Insurance Carrier or the Company accepts as satisfactory the evidence of his insurability.  No Additional Life Insurance will be provided after the first day of the month following the calendar month in which the Employee attains age 65 years.

3.3.   Reinstatement of Additional Life Insurance Coverage.  In the case of an Employee whose Additional Life Insurance has terminated pursuant to item (i), (ii), or (iii) of subparagraph 6.1 (a) (Termination of Coverage) and who thereafter requests reinstatement of such insurance, his Additional Life Insurance shall become effective on the date request therefor is filed with his Employer, provided such request is filed within the first thirty Days he is actively at work subsequent to such termination.  If such request is not filed with his Employer within said thirty Days, the requested Additional Life Insurance shall take effect upon the receipt of acceptable evidence of insurability pursuant to the rules of paragraph 3.2.

3.4.   Enrollment and Effective Date of Dependents' Coverage.  An Employee may enroll an eligible Dependent for coverage under Section V when such Employee becomes eligible for coverage pursuant to subsection 3.1 above or during any subsequent annual (or other open) enrollment period.  A Retiree may enroll an eligible Dependent for coverage under Section V when such Retiree acquires a new Dependent.  Notwithstanding any contrary provision, if an Employee or a Retiree and his spouse are both Employees or Retirees of the Employer or any subsidiary of the Employer only one such spouse may enroll any Child as a Dependent.  To enroll a Dependent, the Employee or Retiree must make written application on a form and in a manner prescribed by the Company or its designee. A Dependent for whom an Employee or Retiree makes written application for Dependent Coverage under Section V shall, subject to the payment of monthly costs and the additional provisions of this paragraph, become covered as follows:

(i)   If an Employee makes such written request within the 30-day period immediately following the first day of such Employee's eligibility,

Dependent coverage shall be effective on the date Employee coverage is effective.

(ii)   If the Employee applies for Dependent Coverage during an annual or other open enrollment period, such Dependent Coverage shall become effective on the enrollment date as established by the Company or its designee. An Employee's or a Retiree's newborn Child will be covered from the moment of birth, provided the Employee or Retiree has coverage in effect under the Plan that provides for the participation of one or more Child. If coverage described in the preceding sentence is not in effect at the time of birth, the Child will only be covered prior to a subsequent annual enrollment period if the Employee or Retiree applies for Dependents' Coverage within 30 days of the birth, which coverage shall be retroactive to the date of birth.

(iii)   A Child adopted by the Employee or Retiree, or placed with the Employee or Retiree for adoption, will be covered from the date the Employee or Retiree has custody of the Child, provided the Employee or Retiree has coverage in effect under the Plan that provides for the participation of one or more Child. For this purpose, "custody" means the Child has been placed with the Employee or Retiree for adoption and the Employee or Retiree is legally responsible for medical expenses incurred by the Child. If coverage described in the preceding sentence is not in effect on the date the Employee or Retiree acquires custody, the Child will only be covered prior to a subsequent annual enrollment period if the Employee or Retiree applies for Dependents' Coverage within 30 days of such custody date, which coverage will be retroactive to the custody date.

(iv)   If a Dependent is acquired other than at the time of his birth due to a court order or decree or marriage, coverage for the new Dependent will be effective on the date of such court order or decree or marriage, provided the Employee or Retiree has coverage in effect under the Plan that provides for the participation of one or more Child. If coverage described in the preceding sentence is not in effect on the date of the court order or decree or marriage, and the Employee or Retiree applies for Dependents' Coverage within 30 days of such court order or decree or marriage, such Dependents' Coverage will be effective on the first day of the month coincident with or next following the date of the court order or decree or marriage.

(v)   If a Retiree's Dependent is covered under the Plan, and such Dependent (A) enters the armed forces of the United States and (B) upon discharge from the armed forces, still satisfies the requirements of subsection 1.8, such Retiree may apply for Dependents' Coverage with respect to such Dependent within 30 days of such discharge, which coverage shall be retroactive to the date of discharge.

INSURANCE                                18

Notwithstanding anything in this Plan to the contrary, the Plan shall provide medical expense benefit coverage in accordance with a qualified medical child support order. Subject to any continuation rights provided hereunder, Dependents' Coverage will end when the related Employee's or Retiree's coverage ends.

3.5.   Reemployment. An Employee who suffers a break in continuity of service and who is subsequently reemployed shall be treated as a new Employee in the same manner as though he had never previously been employed.

3.6.   Effect of Total and Permanent Disability. For the purpose of this Plan, an Employee who is totally and permanently disabled and receiving disability benefits under the Non-Contributory Pension Plan shall not be considered a retired Employee until the first of the month following attainment of age 65 years except as it pertains to survivor medical continuation as provided in paragraph 6.2(b)(ii).

3.7.   Reinstatement from Military Leave. For the purpose of this Plan, if an Employee reports for reinstatement to his job with an Employer in accordance with the terms of a military leave of absence and is immediately placed on layoff, he will be deemed to have been actively at work on the day he so reported.

3.8.   Preferential Hire. Notwithstanding any provision under the Plan to the contrary, if an Employee commences employment at a different plant of an Employer in accordance with the provisions of Section 12.15 of the Central Agreement, any Continuous Service at his prior plant shall be counted for both eligibility for coverage and his duration of benefits under the Plan.

## SECTION IV
## LIFE INSURANCE, LONG TERM DISABILITY BENEFITS, ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS, ACCIDENT AND SICKNESS BENEFITS AND SURVIVOR INCOME BENEFITS

4.1.   Contribution and Schedule of Benefits.

(a)   The amount of Basic Life Insurance, long term disability benefits, accidental death and dismemberment benefits, and weekly accident and sickness benefits in accordance with this Section will be provided by the Employers without cost to Employees, except as otherwise provided in paragraph 6.1 (Termination of Coverage). The Employee shall contribute for Additional Life Insurance at the full cost of the coverage in effect for such Employee, as determined by the Insurance Carrier, on a schedule determined by the Company.

(b)   Prior to February 1, 2005, the amounts of insurance coverages, other than additional life insurance coverage, are as set forth in the Schedule of Benefits in the group insurance plan in effect under the 1998 Insurance Plan Agreement. Prior to May 30, 2005, the amounts of additional life insurance coverages are as set forth in the Schedule of Benefits in the group insurance plan in effect under the 1998 Insurance Plan Agreement. On and after February 1, 2005, the amounts of basic life insurance and accidental death and dismemberment coverages shall

INSURANCE                          19

be as set forth below in the Schedule of Benefits.  On and after May 30, 2005, the amounts of additional life insurance coverage shall be as set forth below in the Schedule of Benefits.  On and after February 1, 2005, the amounts of long term disability and weekly accident and sickness benefits shall be as set forth in subsections 4.3 and 4.5 of this Plan.  The amount of an Employee's insurance coverage set forth below in the Schedule of Benefits, other than survivor income benefits, shall be determined by his base annual earnings.  An Employee's base annual earnings shall be determined under the formula:  straight-time hourly rate (excluding any cost-of-living allowance or night shift or other premium), multiplied by 40 hours, multiplied by 4.33 weeks, multiplied by 12 months.

(c)     Notwithstanding any provision herein to the contrary, any increase in benefits under subsections 4.1 — 4.5 shall only apply to an individual from and after the first day he is actively at work on or after the Monday following ratification of the Central Agreement.

SCHEDULE OF BENEFITS

| | |
|---|---|
| Basic Life Insurance | 100% of base annual earnings up to maximum benefit of $75,000 |
| Additional Life Insurance | 100% or 200% of base annual earnings up to a maximum benefit of $150,000 |
| Accidental Death & Dismemberment Insurance | |
| One Member | 50% of base annual earnings up to maximum benefit of $37,500 |
| Two Members or Death | 100% of base annual earnings up to maximum benefit of $75,000 |

(d)     On the first of the month following an active Employee's attainment of age 70 years, the amount of Basic Life and Accidental Death and Dismemberment benefits shall reduce to 50% of such amounts in effect at age 70.  If such Employee continues to be actively at work, subsequent reductions shall take place based upon the following schedule:

(i)     on the first of the month following attainment of age 75, 35% of the Basic Life Insurance and Accidental Death and Dismemberment coverage in effect at age 70 shall remain in force;

(ii)    on the first of the month following attainment of age 80, 25% of the Basic Life and Accidental Death and Dismemberment coverage in effect at age 70 shall remain in force;

    (iii)    on the first of the month following attainment of age 85, 20% of the Basic Life and Accidental Death and Dismemberment coverage in effect at age 70 shall remain in force; and

    (iv)    on the first of the month following attainment of age 90, 15% of the Basic Life and Accidental Death and Dismemberment coverage in effect at age 70 shall remain in force.

4.2.    Increase or Decrease in Amount of Coverage.

Each Employee insured in accordance with this Section shall be insured for the exact amounts of insurance applicable to him.  In the event of an increase or decrease in a covered Employee's hourly rate of pay, which changes his base annual earnings, the amounts of his insurance shall be automatically increased or decreased (without change, however, in the type of life insurance coverage -- Basic or Basic and Additional -- theretofore applicable to him), such increase or decrease in the amounts of insurance to become effective on the first day on which he is actively at work coinciding with or following the date of such increase or decrease in his hourly rate of pay; provided, however, during the period that an Employee, while at work, is receiving payments under any workers' compensation or occupational disease law for loss of pay occasioned by his being assigned to a lower rated job as a result of an occupational disability, his insurance shall not be decreased as aforesaid but shall be based upon his hourly rate of pay at the time of the compensable injury unless, at his option, he files a written request during such period (on a form provided by his Employer) for reduction in the amounts of his insurance to the amounts provided for the Class in which his rate decrease places him.

4.3.    Long Term Disability Benefits.

    (a)    Long Term Disability benefits will be payable if an Employee, while coverage in accordance with this Section is in effect with respect to him, becomes and remains totally disabled and files a claim for benefits under this subsection 4.3, supported by medical evidence acceptable to the Company or Insurance Carrier within 30 days of the date of eligibility for such benefits.  An Employee will be considered totally disabled if he is not engaged in regular employment or occupation for remuneration or profit (excluding employment or occupation which is determined to be for purposes of rehabilitation) and if it is determined on the basis of medical evidence satisfactory to the Company or Insurance Carrier that such Employee is totally disabled by bodily injury or disease so as to be prevented thereby from engaging in any regular occupation or employment with his Employer. Long Term Disability benefits will be payable only upon receipt by the Company or Insurance Carrier of such notice and such due proof, as shall be from time to time required, of such disability. Benefits will not be payable for any period of disability during which the Employee is retired pursuant to a pension plan of the Employers and is receiving a pension payment thereunder except where such pension payment is a disability pension benefit under the Non-Contributory Pension Plan.  Benefits payable in accordance with this subsection 4.3 shall not be payable for any disability directly or indirectly caused by:

      (i)      insurrection, rebellion, terrorist act, or war, whether declared or undeclared, or an act of war;

      (ii)     active participation in a riot;

      (iii)    intentionally self-inflicted injury;

      (iv)    attempted suicide; or

      (v)     commission of or attempt to commit a felony.

The amount of monthly benefits payable under this paragraph 4.3 shall be 55% of the Employee's base annual earnings as defined in subsection 4.1(b) divided by 12.

(b)    The first payment shall be made after receipt of due proof of such disability, and after payment, by reason of such disability, of weekly accident and sickness benefits pursuant to paragraph 4.5 (Weekly Accident and Sickness Benefits) has terminated because benefits for the maximum number of weeks have been paid thereunder. Payments pursuant to this paragraph shall continue while such disability continues until the earliest to occur of

      (i)     the termination of the period of such disability,

      (ii)    the date the Employee fails to furnish due proof of continuance of total disability upon 30 days following the Company's or Insurance Carrier's written request,

      (iii)   for an Employee with one or more years of seniority at the date his disability commences, the expiration of a period (including within such period the 52-week period during which weekly accident and sickness benefits were paid) equivalent to the greater of (1) the Employee's seniority when first disabled or (2) two years,

      (iv)   for an Employee with less than one year of seniority at the date his disability commences, the expiration of a one-year period,

      (v)    for an Employee who has not attained age 60 years at the date his disability commences, the end of the month in which the disabled Employee attains age 65 years,

      (vi)   for an Employee who has attained age 60 but who has not attained age 63 at the date his disability commences, the end of a period of 60 months (including in such period the 52-week period for which Weekly Accident and Sickness Benefits were paid), and

(vii)   for an Employee who has attained age 63 at the date his disability commences, the maximum benefits shall be determined by the following schedule:

| Employee's Age at Commencement of Disability | Maximum Duration of Long-Term Disability Benefits |
|---|---|
| 63 and 0 mos. but less than 68 and 1 mo. | 12 months |
| 68 and 1 mo. but less than 68 and 2 mos. | 11 months |
| 68 and 2 mos. but less than 68 and 3 mos. | 10 months |
| 68 and 3 mos. but less than 68 and 4 mos. | 9 months |
| 68 and 4 mos. but less than 68 and 5 mos. | 8 months |
| 68 and 5 mos. but less than 68 and 6 mos. | 7 months |
| 68 and 6 mos. and over | 6 months |

(c)   The amount of each monthly benefit (in accordance with the Schedule of Benefits) shall be reduced by

(i)   primary benefits paid or payable under the Federal Social Security Act,

(ii)   disability benefits under any state or other governmental program (other than benefits under any law designed to compensate veterans of the military, naval, or merchant marine services of the United States for service-connected disability),

(iii)   disability pension benefits under the Non-Contributory Pension Plan,

(iv)   benefits (other than hospitalization or medical benefits) under any other Employer-sponsored plan which are paid or payable for any period of disability occurring within the same month for which a benefit is payable under this subsection 4.3, and

(v)   benefits under any workers' compensation, occupational disease or similar law which are paid or payable for any period of disability occurring within the same month for which a benefit is payable under this subsection 4.3, except payments under such law for (1) the loss of, or permanent and complete loss of use of, or the permanent partial loss of use of any bodily member or permanent partial disability payments for a work-related disability unrelated to the disability for which benefits under this subsection 4.3 are payable, (2) hospitalization or medical expense, or (3) disfigurements.

For the purpose of determining the amount of any of the reductions for governmental benefits specified in items (i), (ii), and (v) above, and any pension benefits specified in (iii) above, any such amount shall be determined as of the first day for which Long Term Disability benefits are payable for each period of

INSURANCE                                              23

disability under this paragraph 4.3 (or as of the first day on which the amount of each one of such governmental or pension benefits for which such a reduction is made is initially determined, if later) and thereafter any such amount of governmental or pension benefits for each period of disability shall not be changed because of changes of law or pension plan amendments or scheduled increases in pension amounts which are enacted and approved or made after such first day and any changes in amount as a result of such change of law or pension plan amendments or scheduled increases (whether prospectively or retroactively) shall be disregarded, but all or any portion of any increase in pension amounts which represents a recalculation or adjustment of the number of years of credited service upon which pension benefits are calculated shall not be disregarded.

(d) Unless an Employee has returned to work for a period of active full-time work of not less than 45 calendar days during which the Employee works all normally scheduled days of work as described in Section 7.16 of the Central Agreement, a succeeding period of disability due to the same or related cause or causes shall be considered a continuation of the previous period of disability. An absence on any such normally scheduled day of work on which the Employee would have worked except that he was excused by the Company and compensated for such absence under the provisions of Sections 9.2 (Vacation), 14.11 (Union Call-Outs; up to a maximum of 15 days), 15.3 (Jury Duty and Witness Service), 15.4 (Temporary Military Service) or 15.5 (Bereavement) of the Central Agreement shall be deemed to be days of work for purposes of this paragraph 4.3(d).

(e) Any benefits due for periods other than a whole calendar month shall be such proportion of the monthly benefit as the number of workdays that the Employee is disabled in such calendar month bears to the entire number of workdays in that calendar month. "Workdays" as used in the preceding sentence shall include any holidays falling within an Employee's regular workweek.

4.4. Accidental Death or Dismemberment Benefits. Benefits for accidental death or accidental dismemberment will be payable if an Employee, while such insurance in accordance with this Section is in effect with respect to him, sustains bodily injuries through violent, external and accidental means (subject to the limitations customarily contained in such policies issued by the Insurance Carrier), and within three hundred and sixty-five days thereafter suffers, as a direct result of such bodily injuries, independently of all other causes, the loss of a hand by severance at or above the wrist joint, the loss of a foot by severance at or above the ankle joint, the total and irrecoverable loss of the sight of an eye, or loss of life, to the extent provided in the insurance policy. This insurance does not cover losses caused wholly or partly by disease or bodily or mental infirmity, or by medical or surgical treatment or diagnosis thereof, by ptomaine or by bacterial infection (except only septic infection of and through a visible wound sustained solely through violent, external and accidental means); by hernia (no matter how or when sustained); by insurrection, war or any act of war; or by or resulting from intentional self-destruction or intentionally self-inflicted injury, while sane or insane.

4.5.    Weekly Accident and Sickness Benefits. Weekly accident and sickness benefits will be payable if an Employee, while such coverage in accordance with this Section is in effect with respect to him, becomes wholly and continuously disabled, so as to be prevented from performing any and every duty of his occupation, by an injury or by sickness, provided that during the period of such disability he is under treatment therefor by a Physician and the claim is filed with supporting medical evidence acceptable to the Company within thirty calendar days of the first day of disability.  Weekly benefits will be payable in an amount equal to 66.67% of the Employee's straight time hourly rate excluding any cost-of-living allowance or night shift or other premium multiplied by 40.  Such benefits will be payable only while the Employee is so disabled and under such treatment, beginning on the earliest of -

    (i)     the first day he is confined as a patient in a legally constituted hospital upon the order of a Physician,

    (ii)    the first day during the period of disability on which he is under treatment by a Physician if (1) the disability is the result of (aa) a non-occupational injury directly caused by accidental means (i.e., an injury will be recognized as having occurred accidentally if the Employee furnishes a satisfactory history of an unexpected event of such a nature as to cause disability, and sprains, strains, wrenches and the like will be so recognized where visible evidence is lacking but there is satisfactory medical evidence to establish the existence of disability), or (bb) an occupational injury occurring as a result of employment with an Employer and (2) the Employee is wholly and continuously disabled so as to be prevented from performing any and every duty of his occupation from the time the injury occurs,

    (iii)   the first day he undergoes a surgical operation listed in the schedule contained under Section X (Surgical Schedule) for which maximum payments of $25 or more are listed,

    (iv)    the eighth day of disability caused by any other sickness or injury, or

    (v)     the first day he is confined as a patient in an Approved Residential Facility as defined in paragraph 5.21 (Alcohol and Drug Abuse Benefits) upon the order of a Physician.

For purposes of this paragraph 4.5 any day an Employee works four hours or more will not be considered as a day of disability.  In the case of an Employee who is scheduled for workweeks of three twelve-hour workdays or four ten-hour workdays, benefits shall be paid for days of absence during that work schedule on the basis of a three-day workweek or four-day workweek, as determined by the work schedule assigned by the Employer.  In the case of any other Employee, benefits shall be paid on the basis of a five-day workweek, Monday through Friday, provided that if one of such days is not included in an Employee's regular workweek, Saturday shall be substituted for that day and if two of

INSURANCE                                    25

such days are not included in the Employee's regular workweek, Saturday and Sunday shall be substituted for such two days.

Weekly Accident and Sickness Benefit payments shall be payable for any subsequent period of absence to any Employee who (i) has been disabled and on a disability leave of absence, (ii) has returned to work from that disability leave of absence (his "original period of absence") on a special job which has been established by an Employer for the sole purpose of rehabilitation of disabled Employees, (iii) ceases to be actively at work due to layoff (other than on a temporary layoff) from such special job because such special job is subsequently eliminated or because the Employee's seniority will no longer permit him to hold that special job, and (iv) is, and continues to be, wholly disabled so as to be prevented from performing any regular employment with the Employers. For purposes of determining the maximum benefit period described below, any subsequent period of absence while so disabled following a cessation of work on such special job due to the same or related cause or causes of his original period of absence shall be considered a part of the same one continuous period of disability unless the Employee has returned to work for a period of active full-time work not less than 45 calendar days during which the Employee works all regularly scheduled hours he was scheduled to work. (Any absence on any such day of work on which the Employee would have worked except that he was excused by the Company and compensated for such absence under the provisions of Sections 9.2 (Vacation), 14.11 (Union Call-Outs; up to a maximum of 15 days), 15.3 (Jury Duty and Witness Service), 15.4 (Temporary Military Service) or 15.5 (Bereavement) of the Central Agreement shall be deemed to be days of work for purposes of this paragraph 4.5.)

The benefits will not be payable for more than the lesser of

     (i)    52 weeks, or

     (ii)   a period equal to the Employee's seniority as of the day he first becomes disabled,

for any one continuous period of disability (whether for one or more causes) or for successive periods of disability due to the same or related cause or causes unless the succeeding period of disability commences after the Employee has returned to work for a period of active full-time work of not less than 45 calendar days during which the Employee works all regularly scheduled hours he was scheduled to work (any absence on any such day of work on which the Employee would have worked except that he was excused by the Company and compensated for such absence under the provisions of Sections 9.2 (Vacation), 14.11 (Union Call-Outs; up to a maximum of 15 days), 15.3 (Jury Duty and Witness Service), 15.4 (Temporary Military Service) or 15.5 (Bereavement) of the Central Agreement shall be deemed to be days of work for purposes of this paragraph 4.5); provided, however, if an Employee is confined as a registered bed patient in a legally constituted hospital or an Approved Residential Facility upon the order of a Physician, or if statutory benefits are payable to the Employee for the same disability under any workers' compensation, occupational disease, or similar law because of employment with his Employer at the date of expiration of the maximum period for

which he is entitled to receive benefits pursuant to item (ii) above, benefits shall continue to be payable while such Employee continues to be so confined or continues to be eligible for such statutory benefits, but in no case beyond the end of the applicable 52 weeks' period specified in item (i) above. In addition, benefits will not be payable for any period of disability during which the Employee is retired pursuant to a pension plan of the Employers and receiving a pension payment thereunder.

Benefits payable in accordance with this paragraph 4.5 during any Period of Disability will be reduced by the amount, if any, of benefits paid or payable to the Employee during the same Period of Disability under any workers' compensation, occupational disease, or similar law (except payments under such law for (i) the loss of, or the permanent and complete loss of use of, any bodily member or permanent partial disability payments for a work-related disability unrelated to the disability for which benefits under this paragraph 4.5 are payable; (ii) hospitalization or medical expense; (iii) disfigurements), and for the purposes of this sentence, a Period of Disability means a period commencing on Monday and ending on the next following Sunday. Benefits otherwise payable for any period of disability shall be reduced by the weekly equivalent of any Disability Insurance Benefits or Old-Age Insurance Benefits (primary insurance amount only) to which the Employee is entitled for the same period under the Federal Social Security Act or any future legislation providing similar benefits, except old-age benefits reduced because of the age at which received. For purposes of such reduction, the weekly equivalent of benefits paid on a monthly basis is computed by dividing the monthly benefit rate by 4.33. Benefits payable in accordance with this paragraph 4.5 to an Employee on layoff shall be reduced by the amount of any disability benefit which such Employee is entitled to receive (or could become entitled to receive by making a proper application therefor) for the same week of disability or any portion thereof under a plan financed in whole or in part by any other employer.

Benefits payable in accordance with this paragraph 4.5 shall not be payable for any day of disability for which the Employee receives holiday pay for the same day of disability; however, such day(s) shall be counted as waiting period day(s) for the purposes of item (iv) above.

Benefits payable in accordance with this paragraph 4.5 shall not be payable for any day of disability that the Employee receives pay from an Employer for the same day of disability if such Employee was injured while at work and receives pay for the balance of the day on account of such injury.

Benefits payable in accordance with this subsection 4.5 shall not be payable for any disability directly or indirectly caused by:

> (i)   insurrection, rebellion, terrorist act, or war, whether declared or undeclared, or an act of war;
>
> (ii)   active participation in a riot;
>
> (iii)   intentionally self-inflicted injury;

(iv)     attempted suicide; or

(v)     commission of or attempt to commit a felony.

4.6.    Survivor Income Benefits.

(a)    Eligible survivors, as defined herein, of an Employee who dies before retiring under the Non-Contributory Pension Plan and while insured for accidental death and dismemberment insurance under this Section shall be paid a monthly survivor income benefit. For purposes of this paragraph 4.6, the survivors of an Employee receiving a disability pension under the Non-Contributory Pension Plan who dies on or after the first of the month following his sixty-fifth birthday shall not be eligible for a monthly survivor income benefit.

(b)    (i)     Commencing on the first day of the month following the Employee's death, a Transition Survivor Income Benefit shall be payable for a period of not more than 24 months and shall equal $400 for each month there is no eligible survivor in the class entitled to receive a Transition Survivor Income Benefit who is eligible for an unreduced old-age benefit, a survivor's benefit not reduced because of age, or a disability benefit under the Federal Social Security Act, and $225 for any other month; an eligible survivor shall be deemed eligible for an unreduced survivor's benefit under the Federal Social Security Act when age 62 is attained.

(ii)     If the Employee is survived by a Class A Survivor, the monthly benefit shall be payable to such survivor. If the Employee is not survived by a Class A Survivor, the monthly benefit shall be payable in equal shares to the Employee's Class B Survivors, but if such Employee is not survived by a Class B Survivor, in equal shares to the Employee's Class C Survivors. Eligibility shall be determined as of the first day of the month following the Employee's death and as of the first day of each succeeding month. If on the first day of any such month the Employee is not survived by an eligible survivor, no benefit is payable for that month or any subsequent month.

(iii)     If a survivor receiving benefits hereunder dies or ceases to be eligible, any benefit still payable shall be paid to remaining eligible survivors in that Class, and, if none, to the next succeeding class of eligible survivors. If such next succeeding Class consists of one or more Class B Survivors and all of them die or cease to be eligible, any benefits still payable shall be paid to Class C Survivors. In no event will any such benefit be paid to a Class B or Class C Survivor for any month subsequent to 24 calendar months after the date of death of the Employee.

(c)    Following the payment of 24 monthly Transition Survivor Income Benefits, a Class A Survivor who was at the death of the Employee (i) at least 45 years of age, (ii) under 45 years of age and severely disabled, or (iii) under 45 years of age

INSURANCE                          28

and whose years of age (computed to the nearest 1/12 year) when combined with the deceased Employee's number of years of credited service under the Non-Contributory Pension Plan equal a total of 55 or more, shall receive a Bridge Survivor Income Benefit of $400 per month until the earliest to occur of

    (aa)    her or his remarriage,

    (bb)    her or his attainment of age 62, age 62 and one month, if such survivor receives an initial Social Security Old-Age Insurance Benefit which is paid during the second month following the survivor's 62nd birthday, or such lower age as full Widow's or Widower's Insurance Benefits become payable under the Federal Social Security Act as it may be amended, or

    (cc)    the date of her or his recovery from such disability in the case of a survivor described in (ii) above;

provided, however, that no benefit shall be payable to a Class A Survivor for any month for which she or he is eligible because of the care of a child to receive Mother's Insurance Benefits or a comparable benefit for a father, whether or not such benefit is called a Father's Insurance Benefit, under the Federal Social Security Act as now in effect or as hereafter amended.

For the purpose of this subparagraph 4.6(c), a Class A Survivor shall be deemed to be severely disabled if, at the date of death of the Employee and on the date any Bridge Survivor Income Benefits become payable, she or he is suffering from a chronic disease, impairment, or deformity which wholly prevents her or him from performing normal home responsibilities or any gainful work.

(d)    Payment to any survivor or survivors in any of the above Classes shall forever release and discharge the Employers from any further liability or obligation under this paragraph 4.6 to the extent of such payment unless the Employer, at the time of making such payment, had knowledge from its records or from written notification received by it that another person or persons was entitled thereto. No Survivor Income Benefit payable hereunder shall be subject in any manner to assignment, pledge, attachment, or encumbrance of any kind, nor subject to the debts or liability of any eligible survivor except as required by applicable law and except as permitted by paragraph 6.2(c) (Continuation of Medical Benefits by Dependents).

(e)    For the purposes of this paragraph an eligible survivor shall mean only the following:

    (i)    A "Class A Survivor" means the widow or widower of a deceased Employee, but only if he or she was married to the deceased Employee for at least one year immediately prior to the Employee's death;

INSURANCE           29

      (ii)     A "Class B Survivor" means any natural or legally adopted child of the deceased Employee who, at the Employee's death and at the time a Survivor Income Benefit first becomes payable to such child, is both unmarried and under 21 years of age, but such child shall cease to be a Class B Survivor upon marrying or reaching his or her twenty-first birthday; or

      (iii)     A "Class C Survivor" means a parent of the deceased Employee for whom the Employee had, during the calendar year preceding the Employee's death, provided at least 50% of the parent's support.

    (f)     The monthly payments otherwise payable under this Section to a surviving spouse shall be reduced by the monthly amount of any Survivor's Benefits which are payable for the same month under the Non-Contributory Pension Plan.

4.7.    Life Insurance Benefits for Retirees.  Basic life insurance benefits will be provided by the Employer for each Retiree for a period following retirement.  The amount of basic life insurance coverage for each Retiree is equal to the amount of Company provided basic life insurance coverage in effect for the Employee on the day preceding his retirement date.  Such coverage shall be continued until the day preceding the first anniversary of the Retiree's retirement date.  On the first anniversary of his retirement date, the amount of the Retiree's basic life insurance shall be reduced to 50% of the amount in effect on the day he retired.  Such reduced amount of coverage shall continue in effect during the two-year period ending on the day preceding the third anniversary of his retirement date.  On the third anniversary of the Retiree's retirement date, his basic life insurance coverage shall be discontinued unless continued pursuant to section 6.5.

SECTION V
MEDICAL EXPENSE BENEFITS

5.1.    General.  A benefit shall be provided in accordance with this Section only for an Employee or Retiree, while coverage for such benefit is in effect with respect to him, or a Dependent, while Dependents' Coverage for such benefit is in effect with respect to the Employee or Retiree.  Benefits in accordance with this Section will be provided to such eligible Participants for the duration of any Agreement to which this Plan is a part.  Each covered Dependent must be registered by the Employee or Retiree on a form or similar documentation as required by the Company or its designee prior to payment of any claim with respect to such Dependent.  Medical expense benefits not specifically provided under this Section V are excluded from coverage.  Prior to January 1, 2006, the provisions of section 5.29 of the group insurance plan in effect under the 1998 Insurance Plan Agreement (regarding catastrophic medical expense benefits) shall continue to apply and other provisions of such plan will apply only to the extent specified in this Section V.  No benefit shall be payable in accordance with this Section V as a result of an injury or sickness entitling a Participant to benefits under any workers' compensation or occupational disease law.  No benefits shall be paid for services deemed Cosmetic or Experimental or Investigational, as determined by the Claims Administrator in its discretion.  Payment will be made for the most cost effective services under this Plan.

Benefits may be paid directly to the provider of the service. A Participant may authorize that benefits (otherwise payable to the Participant) be paid directly to the provider of the service through completion of a claim form or other method approved by the Employer. However, in no event may a Participant transfer or assign to the provider the right of appeal, representation, or any other rights conferred by this Plan. Notwithstanding any other provision hereof to the contrary, no benefits will be payable pursuant to this Section V for services which are or may be obtained without cost to the Participant. If a charge is made to such Participant which he is legally required to pay, any benefits hereunder will be computed in accordance with the provisions of this Section, taking into account only such charge.

5.2.   Hospital Expense Benefits. Hospital expense benefits will be payable if a Participant becomes and remains necessarily confined as a patient in a legally constituted hospital upon the order of a Physician as a result of an injury or sickness. In determining whether a confinement which is primarily diagnostic in nature meets the requirement that such confinement be necessary and as a result of injury or sickness, the performance during such confinement of a diagnostic procedure meeting one or more of the criteria set forth below will be considered as meeting such requirement --

    (i)    those procedures where confinement is mandatory,

    (ii)    those procedures where advance preparation of the patient could be done only as an inpatient,

    (iii)    those procedures that require hospitalization for the safety of the patient or success of the test, or

    (iv)    those procedures where there is a concurrent medical hazard and as a result the patient could not have the test performed as an outpatient.

No benefits will be payable unless during such confinement the Participant is admitted as a bed patient in accordance with the hospital's rules and regulations regarding admission or undergoes a surgical operation in the hospital, or receives emergency care in the hospital on account of, and not later than the day following, an accidental injury or the onset of a Medical Emergency; or the Participant undergoes x-ray or laboratory examinations, as part of a pre-admission testing program approved by the Claims Administrator in its discretion, for performance of a covered surgical operation. For purposes of this paragraph, in the case of a child who is born in such hospital, the hospital confinement shall be deemed to commence on the date of birth. If the Participant receives ward or semiprivate room accommodations, payment will be made for the actual amount charged by the hospital for room and board; or if the Participant receives private room accommodations, payment will be made for the actual amount charged up to the hospital's most common semiprivate room rate (or up to the charge for the lowest priced private room accommodation available when initially so confined for any period of confinement the hospital certifies that the requested semiprivate room accommodations were not available); or if the Participant is confined in an isolation room required by infectious diseases requiring routine or reverse isolation such as infectious hepatitis, or

spinal meningitis, or required for the treatment of severe burns where a germ-free environment is mandatory, payment will be made for the actual amount charged by the hospital for the room and board; for each day of confinement. For confinements due to alcoholism and drug abuse, refer to subsection 5.21 (Alcoholism and Drug Abuse Benefits). Payment will also be made for the actual amounts charged for Special Hospital Services received during the days of hospital confinement for which payment for room and board charges will be made in accordance with this paragraph. The term "Special Hospital Services" means anesthetics (and the administration thereof by an employee of the hospital) received during such confinements, chest x-rays (screening), and all other special hospital services and supplies charged for by the hospital except services and supplies not related or not necessary to the medical care and treatment of the person confined and except the services of physicians, surgeons, or special nurses other than nursing services provided by the special nursing units generally referred to as Intensive Care Units operated as a part of the hospital's progressive care program. Hospital expense benefits may be paid directly to the hospital. On and after January 1, 2006, for emergency room benefits, a co-payment of (i) for Employees and their Dependents, $75; or (ii) for Retirees and their Dependents, $50, will be applied, unless the Participant is admitted to a hospital from the emergency room.

No more than 140 days of confinement shall be payable during the lifetime of a Participant for confinements primarily due to alcohol or drug abuse including in such maximum all Hospital and Approved Residential Facility days for which the Participant receives benefits under this paragraph or paragraph 5.21 (Alcoholism and Drug Abuse Benefits).

Benefits under this paragraph 5.2 shall be payable when a Covered Organ Transplant is performed in an Approved Organ Transplant Center as provided for in paragraph 5.4(b) (Human Organ Transplants). Benefits under this paragraph 5.2 shall be payable for 50% of the charge when a Covered Organ Transplant is performed in a hospital or facility which is not an Approved Organ Transplant Center under paragraph 5.4(b) (Human Organ Transplants).

5.3.    Nursing Home Benefits.

(a)    Nursing Home benefits will be payable if a Participant becomes and remains necessarily confined in a Nursing Home (as defined herein) for the skilled treatment of an injury or sickness as determined by the Claims Administrator in its discretion. Confinements in the Nursing Home must be ordered by a Physician for the purpose of convalescing from an acute illness or injury that requires an intensity of care or a combination of skilled nursing, rehabilitation, and facility services which are less than those of a general acute Hospital but greater than those available in the home setting. For benefits to be available, skilled nursing and/or skilled rehabilitation services must be needed on a daily basis, and the covered person must be expected to improve to a predictable level of recovery, and the Participant must continue to be under active medical supervision during the confinement in the Nursing Home, and such Physician must certify to the Claims Administrator that continuing Nursing Home care is essential.

Notification to the Claims Administrator is required prior to the commencement of treatment. On and after January 1, 2006, non-notification to the Claims Administrator prior to the commencement of treatment will result in a non-notification reduction of $100 for otherwise covered expenses under the Plan.

(b)    Covered Nursing Home services shall include room and board in a semi-private room (a room with two or more beds) and those procedures prescribed by the Physician and employed in caring for the sick which require technical nursing skill beyond that which the ordinary untrained person can adequately administer. Such services may be provided by either professional or practical nursing personnel, so long as they extend beyond routine personal care.

(c)    Benefits shall be payable for the actual amount charged for the services described under the preceding paragraph (b) up to the Usual and Customary amount.

(d)    Benefits under this paragraph 5.3 shall not be payable for:

(i)    Periods of confinement when the Participant is not under the active care and treatment by a Physician.

(ii)   Care in homes which exist primarily for care of tuberculosis, alcoholics, drug addicts, mental or nervous disorders, the blind, the deaf, or the mentally deficient.

(iii)  Care which is primarily custodial, domiciliary, maintenance, personal care, or due to senility. For the purpose of this paragraph 5.3(d), on and after January 1, 2006 "custodial, domiciliary or maintenance care" is care that may be provided by persons without special skill or training. It may include, but is not limited to, help in getting in and out of bed, walking, bathing, dressing, eating, and taking medication, as well as ostomy care, hygiene or incontinence care, and checking of routine vital signs. For the purpose of this paragraph 5.3(d) "senility" means senile deterioration without a concurrent medical condition which requires confinement in a nursing home.

(iv)   Care in governmental or public financed or operated homes or institutions, or care in homes financed by charitable funds where no charge is customarily or traditionally made to the patient.

(v)    Care in homes providing purely custodial care, including Shelter Care Homes and Homes for the Aged.

(vi)   Care in homes wherein the skilled care is part of an agreement with the patient to provide lifetime care in consideration of a transfer of assets or a similar arrangement with no additional cost to the patient.

(vii)  When skilled nursing and/or rehabilitation services are required intermittently (such as physical therapy three times a week).

(viii)   Periods of confinement for which the primary carrier would have paid had the primary carrier's qualifying conditions been met. For example, an Employee has Medicare as the primary carrier. Medicare requires a qualifying hospital stay prior to admission to a skilled nursing facility. If the Employee is admitted to the skilled nursing facility without first having the qualifying hospital stay, the Claims Administrator in its discretion will estimate what Medicare would have paid, and then would pay as secondary.

(e)   For the purposes of this paragraph the term "Nursing Home" means only an institution (or ward or wing thereof) that is operated solely to provide convalescent and long-term illness care and which (i) meets every one of the requirements for registration and continuing recognition as an Extended Care Facility by the Joint Commission on Accreditation of Hospitals, and (ii) is recognized under the Health Insurance for the Aged Act of the United States (Medicare) as an Extended Care Facility.

5.4.   Surgical Operation Benefits.

(a)   Surgical operation benefits will be payable if a Participant undergoes a covered surgical operation as a result of an injury or sickness, provided that such operation was ordered and performed by a Physician.

Payment will be made for

(i)   the actual surgical fee charged by the operating Physician, and

(ii)   the actual surgical fee charged by an assistant operating Physician if such assistant operating Physician actively assisted the operating Physician in performing a major surgical procedure recognized as a covered surgical operation under the Plan on a hospital in-patient basis, and if such operating Physician certifies that such assistance was necessary and that the services of interns, residents or house Physicians were not available

for those procedures defined by the Claims Administrator in its discretion to the extent that such total fee for such surgery, pre-operative care and post-operative care does not exceed the Usual and Customary charge for the surgical procedure performed. Pre-operative care means care in the hospital prior to surgery; and post-operative care means care in the hospital following surgery and any follow-up office visits, including the replacement of post-surgical casts.

Surgical operation benefits will also be payable for the actual fee charged by another Physician, in lieu of the operating Physician, providing post-operative care following a major surgical procedure for which surgical operation benefits are payable to the extent that the total charge by the operating Physician and Physician providing such post-operative care does not exceed the Usual and Customary charge for the surgical procedure performed.

INSURANCE                                     34

If a Participant undergoes a covered surgical operation in an ambulatory surgical care facility legally licensed as a surgical center in the state in which such facility is located, special hospital services under paragraph 5.2 (Hospital Expense Benefits) will be paid; provided, however, the charges for which such special hospital services are payable shall not exceed the Usual and Customary charge of the legally constituted hospitals in the area for the same or similar services. If a Participant undergoes a covered surgical operation in a physician's office, surgical operation benefits shall be payable for necessary equipment and supply charges to the extent such charges are Usual and Customary.

Payment for obstetrical procedures shall include pre- and post-natal care. "Pre- and post-natal care" means all pre-natal office calls and generally accepted routine laboratory services as determined by the Claims Administrator in its discretion in connection with maternity care, hospital visits during confinement and the normal post-natal examination.

Surgical expense benefits may be paid directly to the operating or assistant operating Physician.

(b)     Second Opinion Surgery.

Prior to June 1, 2005, Second Surgical Opinion Benefits will be payable if an Employee or Dependent undergoes a surgical consultation performed by a Consulting Surgeon to determine the need for Major Elective (non-emergency) Surgery which has been recommended by another surgeon and which will require treatment in a hospital or in an Ambulatory Surgical Center.

Payment will be made for the actual fee charged by the Consulting Surgeon for an office examination to determine the need for surgery to the extent such fee is Usual and Customary.

If the second surgical opinion does not confirm the need for surgery, a third opinion consultation will be covered on the same basis as a second opinion.

For the purpose of this paragraph, "Consulting Surgeon" means a Physician who is Board qualified or a Board Certified member of his surgical specialty, and "Major Elective (non-emergency) Surgical Procedure" includes:

(i)     Adenoidectomy and/or Tonsillectomy

(ii)    Hysterectomy

(iii)   Cholecystectomy

(iv)    Inguinal hernia repair

(v)     Laminectomy

| | |
|---|---|
| (vi) | Coronary artery bypass surgery |
| (vii) | Hemorrhoidectomy |
| (viii) | Bunionectomy |
| (ix) | Knee surgery |
| (x) | Mastectomy |
| (xi) | Varicose vein ligation and/or stripping |
| (xii) | Myringotomy with insertion of drainage tubes |
| (xiii) | Submucous Resection |
| (xiv) | Thyroidectomy |
| (xv) | Cataract removal |
| (xvi) | Colonoscopy |
| (xvii) | Gastroscopy |
| (xviii) | Foot Surgery (when the total surgical fee for all recommended procedures exceeds $200) |

Additional procedures may be added to this list of Major Elective (non-emergency) Surgical Procedures if mutually agreed to by the Company and the Union.

The Employee or Dependent may select a Consulting Surgeon of their choice, however, at the request of the Employee or Dependent the Company or Insurance Carrier will provide a list of available Consulting Surgeons known to them.

It is understood that the final decision to elect surgery is entirely that of the Employee or Dependent and by electing to use this provision the Employee or Dependent is not required to follow the recommendations of the Consulting Surgeon.

Benefits under this paragraph are not payable for:

| | |
|---|---|
| (1) | Charges for which benefits are otherwise provided under this Plan. |
| (2) | Charges for consultation in connection with a surgical procedure not defined as a Major Elective (non-emergency) Surgical Procedure above. |
| (3) | Charges for the failure to keep a scheduled appointment with a Consulting Surgeon. |

(4)    Charges for consultation with any Physician other than a Consulting Surgeon.

(5)    Charges for medical care and treatment.

(6)    Charges by a Consulting Surgeon who subsequently performs the surgical procedure in question.

No benefits shall be payable under this subsection 5.4(b) after May 31, 2005.

(c)    Human Organ Transplants

Surgical Operation Benefits shall be payable if a Participant undergoes a Covered Organ Transplant in an Approved Organ Transplant Center.

"Covered Organ Transplant" means transplantation of only procedures pre-approved by the Claims Administrator in its discretion and shall not include any transplantation of any non-human organs, or artificial devices.

"Approved Organ Transplant Center" means only those medical centers which have been approved by the Claims Administrator in its discretion for organ transplantation benefits under this Agreement.

5.5.    Physicians' Attendance Benefits.  Except as otherwise provided below, if hospital expense benefits are payable to or for the account of a Participant in accordance with paragraph 5.2 (Hospital Expense Benefits), in-hospital physicians' attendance benefits will be payable for professional visits made by the Physician in charge of the case to the Participant on account of whose confinement such hospital expense benefits are payable; provided that in-hospital physicians' attendance benefits will be payable only for professional visits made during the period of hospital confinement for which such hospital expense benefits are payable.  In-hospital physicians' attendance benefits will not be payable for any visits during a hospital confinement of a Participant which is primarily due to surgery except that benefits will be payable for any visit during such confinement for the treatment of a separate condition which is unrelated to such surgery. No payment shall be made for routine care of a newborn child, except for the initial examination of said child, when provided and billed by a Physician other than the delivering Physician or the Physician who administered the anesthesia during the delivery. Payment will be made for the actual fee charged to the extent that such charge is Usual and Customary. Benefits may be paid directly to the Physician.

5.6.    Diagnostic X-ray and Laboratory Examination Benefits.  Diagnostic x-ray and laboratory examination benefits, but not Office Call benefits, will be payable (a) if a Participant undergoes a diagnostic x-ray or laboratory examination (including sonography and fetal monitoring) as a result of any injury or sickness, provided that such examination is upon the order of a Physician, or (b) if a Participant undergoes a diagnostic X-ray or laboratory examination, as part of a non-hospital based preadmission testing program approved by the Claims Administrator in its discretion and which meet the requirements for admission to a hospital or outpatient surgical facility for the performance of a covered surgical

procedure. (Criteria for approval of a non-hospital based preadmission testing program shall include utilization of a State licensed laboratory and/or X-ray equipment, agreement by the admitting hospital or surgical facility to accept, without duplication, test results submitted by the physician, and an acceptable price schedule.) Such benefits may be paid directly to the person or organization performing such service. Payment will be made for the actual amount charged to the extent that such charge is Usual and Customary. No benefit shall be payable under this paragraph 5.6 for any of the following examinations: examinations in connection with dental work, procedure or treatment; examinations and tests in connection with routine or periodic physical, premarital, or similar examinations or tests not required in and directly related to diagnosis of illness or injury (other than routine papanicolaou test, i.e., pap smears); and examinations for which benefits are payable under paragraph 5.2 (Hospital Expense Benefits) of this Section; nor shall benefits be payable for more than the number of examinations which are generally accepted by the Claims Administrator in the exercise of its discretion to be sufficient to diagnose the condition involved. Benefits will be payable for routine papanicolaou tests, i.e., pap smears, provided that, on and after June 1, 2005, benefits shall be payable only for laboratory analysis of pap smears and not for administration of the papanicolaou test in an Office Call. Routine screening mammograms will be covered under the following schedule: one mammogram between the ages of 35 and 39 and one mammogram every year for those age 40 and over.

5.7.   Emergency First Aid Benefits.  Emergency first-aid benefits will be payable if a Participant sustains an accidental injury and receives initial emergency first-aid services rendered by a Physician on account of such injury when payment for such services is not otherwise provided for under this Plan. Payment will be made for the actual fee of the Physician to the extent such fee is Usual and Customary. In addition emergency first-aid benefits will include initial emergency first-aid services rendered by a Physician for a medical emergency when payment for such services is not otherwise provided for under this Plan. Payment will be made for the actual fee of the Physician to the extent such fee is Usual and Customary. Initial emergency first-aid services shall not include any follow-up services. Benefits may be provided to more than one Physician for the initial examination and treatment if the Participant is referred from one Physician to a second Physician because of the Participant's condition and the second Physician's specialization, in which case payment will be made for the actual fee of each Physician to the extent such fee is Usual and Customary. Such benefits may be paid directly to the Physician.

5.8.   Anesthesia Benefits.  If hospital expense benefits are payable to or for the account of a Participant in accordance with paragraph 5.2 (Hospital Expense Benefits), anesthesia benefits will be payable for services rendered in connection with the administration of general anesthesia in a hospital by a Physician, or by a duly qualified registered nurse, when required by, and rendered in relation to surgical, obstetrical, or in-hospital services for which benefits are payable under the Plan. Payment will be made for the actual amount charged for such services to the extent such amount is Usual and Customary. No benefits shall be payable under this paragraph for services rendered by the operating Physician or by an employee of a hospital. Payment may be made directly to the person rendering such services.

5.9.   Psychiatric Benefits.

(a)   Psychiatric benefits will be payable for Psychotherapeutic Services rendered to a Participant in connection with the treatment of any nervous or mental disorder (other than mental deficiency or retardation) as a result of an injury or sickness when payment is not otherwise provided by this Plan.  Payment may be made directly to the person or institution rendering such services under the following circumstances:

   (i)   by a Physician when performed in such Physician's office, or

   (ii)   in the outpatient department of a legally constituted hospital, or

   (iii)   in the community mental health center facility.

(b)   Payment shall be made for such services under the following conditions for the actual fee or charge, except as otherwise provided herein, to the extent the fee or charge for such services is Usual and Customary:

   (1)   Payment will be made for all hospital, professional and other ancillary services (other than those described in subparagraph (6) below) received by an ambulatory Participant when such treatment is provided through such hospital's outpatient or Day Care Program.

   (2)   Payment will be made for all prescribed drugs and medications dispensed and charged for by such hospital outpatient department or Community Mental Health Center Facility rendering such treatments as a part of regular institutional care programs.

   (3)   Payment will be made for the fee charged for electroshock therapy (including the charge made by a Physician for the rendering of such therapy) and anesthesia for electroshock therapy when received in such hospital outpatient department or Community Mental Health Center Facility.

   (4)   Payment will be made for the fee charged for visits to the Physician's office during any calendar year by the Participant for the professional services rendered by such Physician.

   (5)   If a Participant is receiving treatment for which benefits are payable under the preceding subparagraph (4), payment will be made for the fee charged for visits to a Physician's office for counseling during any calendar year by other members of the family of the Participant undergoing treatment to the extent such visits are deemed necessary and related to the treatment of the Participant and are for the professional services of the Physician.

   (6)   Payment will be made for the fee charged for necessary group psychotherapeutic treatments

    (i)    in the Physician's office, or

    (ii)   as a part of an approved outpatient program or Day Care Program of a hospital or Community Mental Health Center Facility if such program is approved by the Claims Administrator in its discretion.

(7)    Payment will be made for 100% of the fee charged for psychological testing by a legally licensed psychologist upon the order of a Physician when deemed necessary and related to the treatment of the mental and nervous disorder for which benefits are otherwise payable under this paragraph; provided, however, that the maximum amount payable under this subparagraph (7) for such psychological testing received prior to June 1, 2005, shall be $100 in any calendar year , and on and after June 1, 2005, shall be $200 in any calendar year.

(c)    For the purposes of this paragraph, "Psychotherapeutic Services" means the treatment of mental illness (as defined by the American Psychiatric Association's current publication of the "Diagnostic and Statistical Manual of Mental Disorders, DSM – IV") and identified and treated as such by a Physician. "Community Mental Health Center Facility" means an institution providing treatment for mental illness which is associated with and is a part of a defined statewide community mental health program. "Day Care Program" means an approved therapeutic facility in a legally constituted hospital for patients with mental illness who spend part of a day in a planned treatment program in the facility.

(d)    On and after January 1, 2006, a maximum of 40 visits per Participant per calendar year will be paid under this subsection 5.9.

5.10.   Radiation Therapy Benefits.

Radiation therapy benefits will be payable if a Participant undergoes treatment of malignancies; tumors of bones, brain or spinal cord; hemangiomas; vascular nevi; lymphomas; leukemia; and thyroid disease utilizing generally accepted radiation therapy as defined by the Claims Administrator in its discretion, as a result of any injury or sickness when payment for such treatment is not otherwise provided for under this Plan. Payment will be made for radiation therapy which is administered and charged for by a Physician or administered in the outpatient department of a legally constituted hospital by a Physician and charged for by the hospital for the actual amount charged to the extent such charge is Usual and Customary. Payment may be made directly to the Physician or hospital.

5.11.   Prescription Drug Benefits. Prior to February 1, 2005, the provisions of section 5.11 of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply. On and after February 1, 2005, the following provisions shall apply to Prescription Drug Benefits except as specifically provided:

(a)    Prescription Drug expense benefits will be payable if a Participant, as a result of an injury or sickness, incurs expenses for covered Prescription Drugs and such

Prescription Drugs are provided, upon the written order of a Physician or his or her legally licensed agent, by any pharmacy, Physician or any other person or organization legally licensed to dispense drugs within the United States.

(b)   Payment for such Prescription Drug Products will be made for each prescription and refill of a prescription to the extent it is a Legend Drug. The amount of payment is subject to the formulary classification of the prescription, its corresponding co-payment provisions, and other limitations of this subsection 5.11. Payment may be made directly to the person or organization dispensing the prescription or to the Participant.

(c)   Co-payments for Participating Provider Prescription Drug Products. The Participant is responsible for a co-payment for each prescription drug purchased from a Participating Provider on and after February 1, 2005. In the case of an Employee, or a Retiree who retires from the Company on or after January 10, 2005, or their Dependents, the co-payment amounts shall be as follows:

(i)   Generic Drug Prescriptions. The Participant must pay $5 for each one-month supply of a generic prescription drug.

(ii)   Formulary Preferred and Compounded Medications. The Participant must pay $20 for each one-month supply of a formulary preferred prescription drug or compounded prescription drug.

(iii)   Formulary Non-Preferred. The Participant must pay $35 for each one-month supply of a formulary non-preferred prescription drug.

A mail-order prescription drug program is available to the Participants described above. The Plan will provide up to a 90-day supply of an eligible prescription drug after payment of the following: (i) one $5 co-payment for a generic prescription drug; (ii) two $20 co-payments for a formulary preferred prescription drug or a compounded prescription drug; and (iii) three $35 co-payments for a formulary non-preferred prescription drug or brand-name prescription drug for which a generic drug is available.

One or more of the co-payment amounts described above in this paragraph (c) may be adjusted by the Company to an amount not in excess of (A) as of January 1, 2008, the lesser of (i) $6, under subparagraph (c)(i) above; $25, under subparagraph (c)(ii), above; or $45, under subparagraph (c)(iii), above; or (ii) in each case, the amount that results if the amount in subparagraph (c)(i), (ii), or (iii) is increased by the unadjusted percent change in the Medical Care Component of the Consumer Price Index for all Urban Consumers, U.S. City Average, as compared January 1, 2004; and (B) as of January 1 every three (3) years thereafter, the amounts that result if the amounts in effect are increased by the unadjusted percent change of the Medical Care Component of the Consumer Price Index for all Urban Consumers, U.S. City Average, as compared to the January 1, three (3) years earlier. Such Consumer Price Index data may relate to an

equivalent earlier period (e.g., using the preceding October 1 instead of January 1 for the beginning and end dates), if necessary to administer this subsection. The same adjustment shall be applied to the dollar co-payment amounts for mail-order described in the preceding paragraph, which will continue to be subject to the multiples described in that paragraph. Notwithstanding the foregoing, the co-payment amounts will not be adjusted for Retirees or their Dependents during the term of the Central Agreement.

Notwithstanding the foregoing, the co-payment amounts for Retirees who retired from the Company prior to January 10, 2005, or their Dependents shall be as follows:

 (A) Generic Drug Prescriptions. The Participant must pay $5 for each one-month supply of a generic drug.

 (B) Brand-Name Drug Prescriptions. The Participant must pay $15 for each one-month supply of a brand-name drug.

A mail-order prescription drug program is available to Retirees and their Dependents. The Plan will provide up to a 90-day supply of an eligible prescription drug after payment of the following: (i) one $5 co-payment for a generic prescription drug, and (ii) two $15 co-payments for a brand-name prescription drug. These co-payment amounts also will not be adjusted for Retirees and their Dependents during the term of the Central Agreement.

 (d) Non-Participating Provider. The Participant is responsible for co-insurance for each prescription drug purchased from a non-Participating Provider as follows:

  (i) If the Participant purchases a prescription from a non-Participating Provider in the network service area in which he resides or is employed, then the Participant shall be responsible for 50% of the actual medication and dispensing charge for each one-month supply.

  (ii) If the Participant is traveling outside the defined network service area where he resides or works, the co-payment provisions of paragraph (c) above shall apply to prescriptions purchased from any non-Participating Provider.

 (e) Notwithstanding any provision to the contrary, benefits under this subsection 5.11 shall be limited as follows:

  (i) Prescription drugs must meet approved indications established by the FDA or by the Claims Administrator.

  (ii) Prescription drugs must be prescribed by a Physician or his or her legally licensed agent covered under the Plan who is acting within the scope of his or her license.

(iii)    The Claims Administrator has the discretion to limit quantities for dosage optimization.

(iv)    The Claims Administrator has the discretion to limit quantities as determined by the FDA or by the Claims Administrator.

(v)    Certain Prescription Drug Products require prior authorization to determine benefit coverage.

(vi)    The Claims Administrator has the discretion to require, as a condition to reimbursement, that a Participant obtain all or a defined group of drugs or services from a single participating provider or pharmaceutical vendor.

(vii)    Multiple prescription drugs, when packaged as a unit, will require a co-payment (or co-insurance payment, if purchased from a non-Participating Provider in the network service area) for each prescription drug.

(viii)    The following brand name medications will be covered at the applicable formulary co-payment: Coumadin, Dilantin, Lanoxin, Tegretol, and Synthroid.

(ix)    Prescription drugs will be limited to a one-month supply except when the mail-order option is utilized.

(x)    Coverage of Non-Legend drugs is limited to insulin, needles and syringes. Insulin is subject to the formulary co-payment provision in paragraph 5.11(c). Needles and syringes are subject to the generic co-payment provision in paragraph 5.11(c)(i).

(xi)    Drugs purchased outside of the United States will be payable only if the Participant's primary residence is outside of the United States; provided that, the Claims Administrator also has the discretion to approve payment of prescription drugs purchased outside of the United States when a Participant is traveling outside the United States. The formulary co-payment provision in paragraph 5.11(c)(ii) will apply to approved purchases.

(xii)    On and after January 1, 2008, (A) if the Pharmacy Payment Rate of a prescription drug purchased from a Participating Provider exceeds $1,000, the Plan shall only reimburse the amount by which the Pharmacy Payment Rate exceeds $100; and (B) if a prescription drug that is available by mail-order has a Pharmacy Payment Rate of more than $3,000 for a 90-day supply, the Plan will only reimburse mail-order prescriptions for the amount by which the Pharmacy Payment Rate exceeds $300 for a 90-day supply of such prescription drug.

(f)    Benefits under this subsection 5.11 shall not be payable for:

(i)     Any items limited or excluded by the medical plan, except where specifically provided.

(ii)    Charges for vitamins; dietary drugs; immunizing agents; cosmetics or other health and beauty aids; fertility drugs; therapeutic devices and appliances; bandages, and similar supplies; support garments; and other non-medicinal substances.

(iii)   Fluoride preparations.

(iv)   Smoking cessation aids or deterrents.

(v)    Non-Legend Drugs, Over-the-counter medications and Over-the-counter equivalents.

(vi)   Drugs purchased as replacement prescriptions resulting from loss, theft, or breakage.

(vii)  Any drugs or items in excess of the specific limits described in this subsection 5.11.

(viii) Charges for the administration of Prescription Drugs.

(ix)   Charges for Prescription Drugs incurred prior to the date coverage under this paragraph became effective.

(x)    Charges for any prescription refill of covered prescription drugs in excess of the number specified by the Physician or any refill dispensed after one year from the date of the Physician's latest order.

(xi)   Charges for any prescription drugs for which the cost of the prescription is less than the co-payment amount.

(xii)  Charges for which benefits are otherwise provided under this Plan.

For purposes of this paragraph:

(i)     "Brand-Name Drug" means a prescription drug product that is (1) manufactured and marketed under a trademark or name by a specific drug manufacturer, and (2) recognized as a brand-name product by the Claims Administrator in its discretion.

(ii)    "Compounded Drug" means a mixture of two or more medications, one of which must be a prescription drug, to treat a diagnosis. Over the counter drugs are not covered by the Plan.

(iii)   "Generic Drug" means a prescription drug product that is (1) chemically equivalent to a Brand-Name Drug, and (2) recognized as a Generic product by the Claims Administrator in its discretion.

(iv)   "Non-Preferred Drug" means any Brand-Name Drug that is not on the Claims Administrator's Preferred Drug List.

(v)   "Over-the-counter" drug means any drug or related medical remedy that is available without a prescription, including a drug which is prescribed in an equal, a lesser, or a higher dosage.

(vi)   "Over-the-counter Equivalent" drugs means a drug or related medical remedy that is substantially equivalent to an over-the-counter drug or remedy.

(vii)   "Participating Provider" means any Physician, pharmacy or other organization legally licensed to dispense drugs which has entered into an agreement to provide Prescription Drugs under this Plan at their Pharmacy Payment Rate to be agreed upon between said Participating Provider and the Claims Administrator or such other organization as shall be responsible for providing the benefit; provided, however, that in no event will the amount agreed upon exceed the Usual and Customary charge of the Participating Provider.

(viii)   "Pharmacy Payment Rate" means the payment a Participating Provider is entitled to receive, including any dispensing fee and any sales tax, for a particular Prescription Drug product dispensed to a Participant according to the terms of the applicable pharmacy provider contract.

(ix)   "Preferred Drug" means a Brand-Name Drug on the Claims Administrator's Preferred Drug List.

(x)   "Preferred Drug List" identifies those Brand-Name Drugs preferred by the Claims Administrator in its discretion and is reviewed and modified periodically by the Claims Administrator in its discretion.

(xi)   "Prescription Drugs" and "Legend Drugs" mean any medical substance, the label of which under the Federal Food, Drug and Cosmetic Act, is required to bear the legend: "Caution: Federal Law prohibits dispensing without prescription."

5.12.   Physicians Consultation Benefits.  If hospital or nursing home expense benefits are payable to or for the account of an Employee in accordance with paragraphs 5.2 (Hospital Expense Benefits) or 5.3 (Nursing Home Benefits), physicians' consultation benefits will be payable for the consultation services (other than staff consultations required by the hospital or nursing home's rules or regulations) rendered by a Physician, to the Physician in charge of the case, during the hospital or nursing home confinement for which hospital or nursing home expense benefits are payable for a condition requiring the assistance of a

consulting Physician with the special skill and experience needed in the treatment of such condition. Payment will be made for the consulting Physician's actual charge to the extent Usual and Customary. Such benefits may be paid directly to the Physician rendering the consultation services.

5.13.   Radiology Benefits. If hospital expense benefits are payable to or for the account of a Participant in accordance with paragraph 5.2 (Hospital Expense Benefits), radiology benefits will be payable for services rendered in connection with the use of x-rays and other radioactive substances in a hospital by a Physician specializing in radiology including Magnetic Resonance Imaging, when required by, and rendered in relation to, services for which benefits are payable under the Plan. Payment will be made for the actual amount charged for such services to the extent such amount is Usual and Customary and to the extent not otherwise covered under the Plan. No benefits shall be payable under this paragraph for services rendered by an employee of a hospital. Payment may be made directly to the Physician rendering such services.

5.14.   Transplanted Organ or Tissue Benefits. If benefits are payable pursuant to this Section V of the Plan to or for the account of a Participant, the initial medical expenses of a donor providing a transplanted organ or tissue to a Participant will also be considered as expenses for which medical expense benefits will be payable under this Section V of the Plan (subject to appropriate plan limits) to the extent not otherwise covered under this Plan or any other plan providing similar benefits.

5.15.   Benefits Under Federal Law Including Medicare.

(a)     The provisions of this Section V shall not be applicable to Participants who are or may become eligible for hospital, surgical or other medical expense benefits under any federal law providing such benefits for the public at large. Compliance by the Employers with such laws shall be deemed full compliance with the provisions of this Section V with respect to Participants eligible for benefits under such laws. If, as a result of such laws, the level of benefits provided for any group of Employees or their Dependents is generally lower than the corresponding level of benefits under this Section V, the Employers may, at their option and to the extent they find it practicable, provide a plan of benefits supplementary to the federal benefits to the extent necessary to make total benefits as nearly comparable as practicable to the benefits provided under Section V.

(b)     In accordance with the right the Employers have, pursuant to the preceding paragraph 5.15(a), to provide a plan of benefits supplemental to federal benefits, this Plan shall supplement benefits provided by the Health Insurance for the Aged Act, "Title XVIII", of the Social Security Act (Medicare) in the following manner.

Benefits otherwise provided on account of medical expenses covered under this Section V of the Plan shall be reduced by any "benefits available" on account of such medical expenses under such Act as enacted and thereafter amended. "Benefits available" shall mean (i) all benefits to which a person is entitled under

Part A of said Act including, in the case of a person not enrolled under Part A of said Act, any benefits to which he would be entitled under Part A of said Act if he were enrolled for such coverage, and (ii) all benefits for which a person is actually covered under Part B of said Act by reason of enrollment for coverage under Part B of said Act; provided, however, following the first eligibility date for coverage under Part B of said Act of a person described in the following sentence, it shall be assumed that such person is enrolled for coverage under Part B of said Act, and any benefits to which he would be entitled under Part B of said Act if he were enrolled for such coverage shall be included as "benefits available." The Company will reimburse a Participant for his Medicare Part B premiums in an amount up to $99.50 per month during the term of the Central Agreement.

(c)    If a Participant elects to participate in a Medicare+Choice program, including but not limited to private contracting with a Physician, other practitioner or provider, the Plan will only pay the amount for which it would have been liable had the Participant remained in the traditional Part A and/or B program(s).

(d)    Notwithstanding any other provision to the contrary, in no case will this Plan, under the rules establishing the order of benefit determination, make payment in an amount which, when added to the amount paid in accordance with benefits available, would exceed the amount that would be payable by this Plan if it were the only plan providing such benefits.

(e)    The provisions of paragraph 5.15(a) above to the contrary notwithstanding, the Employers may, if federal laws permit, substitute a plan of benefits for the benefits provided by the federal laws referred to above, and modify the provisions of the Plan to the extent and in the respects necessary to secure the approval of such substitution from the appropriate governmental authority.

5.16.   Coordination of Benefits.  Prior to June 1, 2005, the provisions of section 5.18 of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply.  On and after June 1, 2005, the following provisions shall apply regarding Coordination of Benefits:

1.    Benefits Subject To This Provision

All of the benefits provided under this Section V of the Plan are subject to this provision.

2.    Definitions.

(a)    "Other Plan" means any plan providing benefits for, or services in the form of, or by reason of, hospital care, or treatment, or treatments by Physicians or services or supplies provided by other providers which benefits or services are provided by group, blanket, or franchise insurance coverage, group practice, individual practice and other prepayment coverage on a group basis, including Blue Cross-Blue Shield, coverage

under a labor management trustee plan, union welfare plan, employer organization plan, or employee benefit organization plan.

The term "Other Plan" shall be construed separately with respect to each policy, contract or other arrangement for benefits or services and separately with respect to that portion of any such policy, contract, or other arrangement which reserves the right to take the benefits or services of other plans into consideration in determining its benefits and that portion which does not.

(b)    "Covered Services" means any necessary, reasonable and customary item of expense for service covered in whole or in part under this Plan or any Other Plan in which the individual covered under this Plan is enrolled. When any Other Plan provides benefits in the form of services, the reasonable cash value of each service rendered shall be deemed to be a benefit paid.

3.    Payment of Covered Services

Notwithstanding the provisions of this Plan, in no case will this Plan, under the rules establishing the order of benefit determination, as described in subparagraph 4 of this paragraph 5.16, make payment of an amount which, when added to the amount paid by the Other Plan, exceeds the amount that would be reimbursed by this Plan if it were the only plan providing such benefits.

4.    Effect on Benefits

(a)    For the purposes of subparagraph 3 of this paragraph 5.16, the rules establishing the order of benefit determination are:

(1)    The benefits of the Plan or Other Plan which covers the person on whose Covered Services claim is based other than as a dependent shall be determined before the benefit of the Plan or Other Plan which covers such person as a dependent;

(2)    The benefits of the Plan or Other Plan which covers the child as a dependent of the parent whose birthday in any year occurs before the birthday in such year of the other parent will be determined before the benefits of the Plan or Other Plan which covers the child as a dependent of such other parent; except that:

(aa)    when the parents are separated or divorced and the parent with custody of the child has not remarried, the benefits of the Plan or Other Plan which covers the child as a dependent of the parent with custody of the child will be determined before the benefits of the Plan or Other Plan which covers the child as a dependent of the parent without custody;

INSURANCE         48

(bb)   when the parents are divorced and the parent with custody of the child has remarried, the benefits of the Plan or Other Plan which covers the child as a dependent of the parent with custody shall be determined before the benefits of the Plan or Other Plan which covers that child as a dependent of the stepparent, and the benefits of the Plan or Other Plan which covers that child as a dependent of the stepparent will be determined before the benefits of the Plan or Other Plan which covers that child as a dependent of the parent without custody;

notwithstanding the above, if there is a court decree which would otherwise establish financial responsibility for the medical, dental, or other health care expenses with respect to the child, the benefits of a plan which covers the child as a dependent of the parent with such financial responsibility shall be determined before the benefits of any other plan which covers the child as a dependent child;

(3)   When rules (1) and (2) do not establish an order of benefit determination, the benefits of the Plan or Other Plan which has covered the person on whose Covered Services claim is based for the longer period of time shall be determined before the benefits of the Plan or Other Plan which has covered such person the shorter period of time.

(b)   If the individual covered under this Plan is also covered under any Other Plan, which is a group contract underwritten by the Insurance Carrier, other than a contract which provides cash benefits to the individual, the rules set forth in subparagraph 4(a) of this paragraph 5.16 establishing the order of benefit determination shall be applicable whether or not such other group contract contains a provision coordinating its benefits with those of this Plan.

(c)   Upon receipt of evidence satisfactory to the Claims Administrator in its discretion that an individual covered under this Plan contributed, with respect to the month in which expense for covered services was incurred, 50% or more of the monthly premium or subscription charge for coverage under any Other Plan, the benefits payable under such Other Plan will be disregarded for the purposes of determining the benefits payable under this Plan.

5.   Right to Receive and Release Necessary Information.

For the purposes of determining the applicability of and implementing the terms of this provision of this Plan or any provision of similar purpose of any Other Plan, the Claims Administrator or an Employer may, without the consent of or notice to any person, release to or obtain from any insurance company or other

organization or person any information, with respect to any individual covered under this Plan, which it deems to be necessary for such purposes. Any individual claiming benefits under this Plan shall furnish to the Claims Administrator or the Employer such information as may be necessary to implement this provision.

6.    Facility of Payment.

Whenever payments which should have been made under this Plan in accordance with this provision have been made under any Other Plan, the Claims Administrator or the Employer shall have the right in its discretion to pay over to any organizations making such other payments any amounts it shall determine to be warranted in order to satisfy the intent of this provision and amounts so paid shall be deemed to be benefits paid under this Plan and to the extent of such payments for Covered Services the Claims Administrator or the Employer shall be fully discharged from liability under this Plan.

7.    Right of Recovery.

(a)    Whenever payments have been made by the Claims Administrator or the Employer with respect to Covered Services in a total amount, at any time, in excess of the maximum amount of payment necessary at that time to satisfy the intent of this provision, the Claims Administrator or the Employer, irrespective of to whom paid, shall have the right to recover such payments, to the extent of such excess, from among one or more of the following as it shall determine: any persons to or for or with respect to whom such payments were made, any insurance companies, any other organizations.

(b)    The Employee, for him or herself and on behalf of his or her Dependents, shall, upon request, execute and deliver such instruments and papers as may be required and do whatever else is necessary to secure such rights to the Claims Administrator or the Employer.

5.17.    Hemodialysis Benefits. Prior to June 1, 2005, the provisions of section 5.19 of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply. On and after June 1, 2005, the following provisions shall apply to Hemodialysis Benefits: Hemodialysis benefits will be payable if a Participant receives the use of an artificial kidney machine for hemodialysis upon the order of a Physician while confined in a hospital, in the hospital outpatient department, or in the Participant's home. Payment will be made for the actual amount charged, to the extent such amount is Usual and Customary.

5.18.    Outpatient Physical or Speech Therapy Benefits.

(a)    Outpatient physical therapy, occupational therapy, and cardiac rehabilitation benefits will be payable for services prescribed by a Physician for a Participant for a specified condition resulting from disease or injury or prescribed immediately following surgery related to the condition and when the physical

INSURANCE         50

therapy is performed in the outpatient department of a Hospital, in a Nursing Home as defined under paragraph 5.3 (Nursing Home Benefits) of the Plan, or other facilities such as Rehabilitation Centers having comprehensive physical therapy facilities and approved by the Claims Administrator in its discretion. Prior to January 1, 2006, the Plan will pay for a maximum period of 60 treatment days of all such services combined.  On and after January 1, 2006, the Plan will pay a maximum benefit of $10,000 per calendar year for all such services combined.  Such services must be performed by a Physician or a qualified physical therapist according to prescription from a Physician concerning the nature, frequency and duration of treatment.  A "qualified physical therapist" is a graduate of a program of physical therapy approved by the Council on Medical Education of the American Medical Association in collaboration with the American Physical Therapy Association or its equivalent, and, where applicable, is licensed by the state. Payment will be made for the actual charge for such therapy or consultation to the extent such charge is Usual and Customary.

(b)   Outpatient speech therapy benefits will be payable when:  (1) prescribed by a Physician for a Participant for a residual speech impairment resulting from (i) a cerebral vascular accident or (ii) accidental injury to the head or neck or (iii) surgery to the head or neck or (iv) for children under age 6 (benefits will be paid after attainment of age 6 for continuous treatment which began before age 6), congenital and severe developmental speech disorders, and where therapy is not available through public agencies (e.g., state, school), and (2) the speech therapy is performed in the outpatient department of a Hospital, in a Nursing Home as defined under paragraph 5.3 (Nursing Home Benefits) of the Plan, or in other facilities (such as speech rehabilitation centers as a part of a university speech program) having comprehensive speech therapy facilities which are approved by the Claims Administrator in its discretion.

Prior to January 1, 2006, the Plan will pay for a maximum period of 60 treatment days of such speech therapy services.  On and after January 1, 2006, the Plan will pay a maximum benefit of $3,000 per calendar year for such services.  No benefits shall be payable for long standing, chronic conditions or inherited speech abnormalities. Such services must be performed by a qualified speech therapist according to a prescription from a Physician concerning the nature, frequency and duration of treatment. The 60 treatment day limit (applicable prior to January 1, 2006) will be renewed in the event of additional unrelated surgery to the head or neck and the resulting condition is such as to require speech therapy, or in the event of an unrelated covered condition requiring speech therapy, or annually from the last date a course of speech therapy treatment commenced. A "qualified speech therapist" is an audiologist who (i) possesses a Master's or Doctorate Degree in Audiology and Speech Pathology from an accredited university, (ii) possesses a Certificate of Clinical Competence in Audiology from the American Speech and Hearing Association and (iii) where applicable, is licensed by the state. Payment will be made for the actual charge for such therapy to the extent such charge is Usual and Customary.

5.19.   Prosthetic Device Benefits.  Prior to June 1, 2005, the provisions of sections 5.22 and 5.28 of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply.  On and after June 1, 2005, the following provisions shall apply to Prosthetic Device Benefits:  Prosthetic Device benefits will be payable if a prosthetic device is received as a result of an injury or sickness by a Participant on the order of a Physician when payment for such device is not otherwise covered under the Plan. Payment will be made for the actual amount charged for such device to the extent such charge is Usual and Customary. Payment may be made directly to the provider or supplier of such device.

"Prosthetic Device" means a device which replaces all or part of a body organ (including contiguous tissue) or a diseased, malformed, or injured portion of the body or replaces all or part of the function of a permanently inoperative or malfunctioning body organ, or portion of the body furnished on the order of a Physician.  Hearing aid benefits will be payable up to a maximum of $500 for any such subsequent audiometric examination, hearing aid evaluation test or hearing aid only if received more than 36 months after receipt of the most recent previous audiometric examination, hearing aid evaluation test or hearing aid, respectively, for which benefits were payable under the Plan. Replacements of unusable prosthetic devices or repairs or modifications of these devices, when furnished on a Physician's order, and supplies and equipment not having any use other than in connection with the use of the prosthetic device and which are necessary for the effective use of the prosthetic device will also be covered.  The term "Prosthetic Device" includes post-surgical lenses customarily used during convalescence from eye surgery in which the lens of the eye was removed, or used to replace a congenitally absent lens of the eye.  In addition, combinations of prosthetic lenses are covered when determined to be medically necessary by a Physician to restore essentially the vision provided by the crystallin lens of the eye.  Devices such as dentures, other dental appliances (except for Mandibular Advancement Devices used to treat sleep apnea), and glasses and contact lens prescribed to correct visual defects are excluded. Also excluded are duplicates and replacement of stolen prosthetic devices, non-durable items such as support garments, special shoes (unless an integral part of a leg brace), and elastic support bandages.

5.20.   Durable Medical Equipment Benefits.  Prior to June 1, 2005, the provisions of section 5.23 of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply.  On and after June 1, 2005, the following provisions shall apply to Durable Medical Equipment Benefits:  Durable Medical Equipment benefits will be payable if Durable Medical Equipment is received by a Participant on the order of a Physician for use, when used in an outpatient setting, for the treatment of injury or sickness or to improve the functioning of a malformed body member when payment for such equipment is not otherwise provided for under this Plan. Payment will be made of the actual amounts charged for the rental of such equipment to the extent such charges are Usual and Customary and do not exceed the purchase price. Payment may be made directly to the provider or supplier of the equipment. The Claims Administrator in its discretion may approve the purchase of such equipment if it can reasonably be assumed that the duration of need is such that the rental price would exceed the purchase price, or said item cannot be made available on a rental basis.

"Durable Medical Equipment" means medical equipment which (1) can withstand repeated use, (2) is primarily and customarily used to serve a medical purpose, (3) generally is not useful to a person in the absence of illness or injury, and (4) is appropriate for medical treatment in the home.

Benefits will not be paid for special features or equipment requested by the patient for personal comfort or convenience unless medically necessary. "Durable Medical Equipment" does not include, for example, dentures; hearing aids; eyeglasses; contact lenses; equipment which is primarily and customarily used for non-medical purposes; devices and equipment used for environmental control or to enhance the environmental setting in which the patient is placed; equipment which basically serves comfort or convenience; equipment which basically is utilized for hygienic purposes; prosthetic devices; and any other item or device which does not stand repeated use or which does not serve a meaningful and necessary therapeutic purpose in the care and treatment of the patient. The Claims Administrator shall have discretion to make the final determination as to whether equipment is medically necessary.

5.21.   Alcoholism and Drug Abuse Benefits.  Prior to June 1, 2005, the provisions of section 5.24 of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply.  On and after June 1, 2005, the following provisions shall apply to Alcoholism and Drug Abuse Benefits:

(a)   Alcoholism and drug abuse benefits will be payable if a Participant becomes and remains necessarily confined as a patient in an Approved Residential Facility or receives treatment in an Approved Outpatient Facility as a result of alcoholism or drug dependency when payment is not otherwise provided by this Plan. Payment will be made for the actual fee or charge for covered services which are received in such a facility to the extent the fee or charge for such services is Usual and Customary.

(b)   Payment will be made for the following covered services in an Approved Residential Facility:

1.   Room and board, including nursing services.

2.   Laboratory examinations related to the treatment received at the facility.

3.   Drugs, biologicals and solutions dispensed by the facility for use during confinement.

4.   Supplies and use of equipment required for detoxification and/or rehabilitation (other than recreational, hobby, or craft) which conform to the treatment plan established by the Physician for the Participant.

5.   Professional and other trained staff and other ancillary services provided in the facility required for the care and treatment of the Participant. Ancillary services include all special institutional services and supplies

charged by the facility except services and supplies not related or not necessary to the medical care and treatment of the Participant.

6.    Individual and group therapy for the Participant; individual counseling for the Participant; and counseling for other members of the family of the Participant undergoing treatment to the extent that such counseling is necessary and related to the treatment of the Participant.

7.    Psychological testing of the Participant by a person legally qualified to administer and interpret such tests. Where there are no applicable licensure laws, such individual must be certified by the appropriate professional body for psychological testing.

(c)    Payment will be made for the following covered services in an approved Outpatient Facility:

1.    Professional and other trained staff and other ancillary services provided in the facility required for the care and treatment of the Participant. Ancillary services include all special institutional services and supplies charged by the facility except services and supplies not related or not necessary to the medical care and treatment of the Participant.

2.    Individual and group therapy for the Participant; individual counseling for the Participant; and counseling for other members of the family of the Participant undergoing treatment to the extent that such counseling is necessary and related to the treatment of the Participant. Each visit by one or more members of the Participant's family will be deducted from the 45 calendar year, or 140 lifetime, maximum number of visits specified in paragraph (d) below.

3.    Laboratory examinations related to the treatment received at the facility.

4.    Drugs, biologicals, solutions and supplies dispensed at the facility which are related to the treatment received including take home drugs.

5.    Psychological testing of the Participant by a person legally qualified to administer and interpret such tests. Where there are no applicable licensure laws, such individual must be certified by the appropriate professional body for psychological testing.

(d)    Benefits for covered services received in an Approved Residential Facility shall not be payable for more than 45 days during any covered period of treatment; except that one day shall be deducted from such 45 days for each one day that a Participant receives hospital expense benefits and for each two days that a Participant receives nursing home benefits for room and board pursuant to paragraphs 5.2 (Hospital Expense Benefits) and 5.3 (Nursing Home Benefits) for confinements due to alcoholism, drug dependency, or nervous or mental conditions which are related to the treatment in the Approved Residential Facility

and which occurred during the same covered period of treatment. A "covered period of treatment" means a period of treatment in an Approved Residential Facility, hospital and/or nursing home commencing with the date of the first admission therein and ending with the date of last discharge therefrom. Successive periods of treatment in an Approved Residential Facility, hospital or nursing home shall be considered as a part of the same period of treatment unless, in the case of an Employee, he or she returns to active full-time work after the end of the prior period of treatment for at least 60 consecutive days of work with the Employers before beginning the succeeding period of treatment, or in the case of a Dependent, such Dependent had resumed normal activity for a continuous period of at least three months before beginning the succeeding period of treatment. No more than one-hundred forty (140) days of confinement shall be payable during the lifetime of a Participant including in such maximum all hospital days primarily due to alcohol or drug abuse for which the Participant receives Hospital Benefits under paragraph 5.2.

Benefits for covered services received during visits to an Approved Outpatient Facility shall not be payable for more than 45 visits in a calendar year or for more than 140 visits during the lifetime of each Participant. For the purpose of this paragraph 5.21 a visit is considered to have occurred only if patient counseling, family counseling or psychological testing of the patient has been provided and paid for by the Plan.

Benefits will not be paid for treatment in an Approved Residential or Outpatient Facility unless a Participant has been examined by a Physician and has been diagnosed by such Physician to have alcoholism or other drug dependency as classified in categories 303.0 – 305.0 and 305.2 – 305.93 of the Ninth Revision, International Classification of Diseases, Adopted for Use by the United States Department of Health and Human Services and unless treatment in such facility is rendered under the supervision and management of a Physician.

(e)    "Covered services" do not include and no benefits are payable for:

1.    Charges for services for which benefits are otherwise provided under this Plan.

2.    Charges for personal and convenience items such as telephone, television, personal care items, and personal services.

3.    Charges for diversional activities such as recreational, hobby or craft equipment or fees.

4.    Charges for dispensing of Methadone and/or taking of urine specimen without individual or group therapy, individual counseling or psychological testing.

5.    Charges for services rendered primarily in connection with disorders other than alcoholism or drug dependence.

      (f)     For purposes of this paragraph 5.21 an "Approved Residential or Outpatient Facility" means a facility providing detoxification and rehabilitation services approved by the Claims Administrator in its discretion. In no event will the term "Approved Residential or Outpatient Facility" include an institution or a part thereof which is used primarily as a rest home, a home for the aged, a nursing home, a sheltered care facility, or a place for the treatment of mental disease.

5.22.    Chemotherapy Benefits.  Chemotherapy benefits will be payable if a Participant undergoes treatment of malignancies using Chemotherapy as a result of an injury or sickness when payment for such treatment is not otherwise provided for under this Plan. Payment will be made for Chemotherapy which is administered and charged for by a Physician or administered in the outpatient department of a legally constituted hospital by a Physician and charged for by a hospital for the actual amount charged to the extent such charge is Usual and Customary. Payment may be made directly to the Physician or Hospital.

5.23.    Dental Expense Benefits.  Prior to January 1, 2006, the provisions of section 5.26 of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply.  On and after January 1, 2006, the following provisions shall apply to Dental Expense Benefits: Dental expense benefits will be payable, subject to the conditions herein, if a covered Participant, while dental expense coverage is in effect with respect to such Participant, incurs Covered Dental Expenses.  Covered Dental Expenses shall not include any service received prior to the date coverage takes effect with respect to a Participant.

      (a)     The maximum amount payable for all Covered Dental Expenses under this subsection 5.23 in any calendar year (except those expenses for orthodontic treatment) shall be $1,500 for each Participant.  The maximum amount payable under this subsection 5.23 for covered orthodontic treatment under item (c)(iii)(4) below shall be $1,500 for each Participant for all such expenses incurred during the lifetime of each such Participant.

      (b)     A separate calendar year deductible amount of $50 will be applied to Covered Dental Expenses under this paragraph 5.23, except for Covered Dental Expenses as provided under subparagraphs (c)(i)(1), (c)(i)(2), (c)(i)(3), (c)(i)(5), (c)(i)(6) and (c)(iii)(4).

           The deductible amount will apply to each Participant, except that it will not apply to Covered Dental Expenses after: (i) at least two covered family members incur Covered Dental Expenses; and (ii) those expenses when applied to the deductible amount equal two times the deductible amount; however, in any event, no one family member may have more than $50 applied toward such deductible amount. If an Employee or Retiree and his spouse both are Employees or former Employees and are both covered under a plan sponsored by the Employer, the deductible amount will apply to each spouse separately.

INSURANCE                        56

(c)     "Covered Dental Expenses" are the Usual and Customary charges of a Physician which an Employee is required to pay for the following dental services and supplies received, while coverage is in effect, for the necessary dental treatment: (The amount of payment for dental expenses shall be governed by professional consideration of the procedures, services, or courses of treatment that are customarily provided by the dental profession consistent with sound professional standards for the dental condition concerned.) Only Necessary Dental Services are covered under the Plan. The fact that a Dentist has performed or prescribed a procedure or treatment or the fact that it may be the only available treatment for a dental disease does not mean that the procedure or treatment is covered under the Plan.

    (i)     Payment shall be made for 100% of the fee charged (to the extent Usual and Customary) for the following services:

       (1)     Oral examinations including prophylaxis (scaling and cleaning of teeth), but not more than two examinations or more than two prophylaxes in any calendar year.

       (2)     Topical application of fluoride; except that benefits will not be payable for the application of fluoride to a Participant age 20 or more unless such application is necessary for hypersensitive teeth.

       (3)     Space maintainers that replace prematurely lost teeth for a Dependent Child under 19 years of age.

       (4)     Emergency palliative treatment.

       (5)     Sealants – Limited to covered persons under the age of 16 years and once per first or second permanent molar, every five years.

       (6)     Dental x-rays, but not more than one full mouth x-ray in any period of 60 consecutive months; and supplementary bitewing x-rays but not more than once in any calendar year; and such other dental x-rays as are required in connection with the diagnosis of a specific condition requiring treatment.

    (ii)     Payment shall be made for 80% of the fee charged (to the extent Usual and Customary) for the following services:

       (1)     Extractions.

       (2)     Oral surgery (except for implant surgery under item (c)(iii)(5) below).

       (3)     Fillings.

(4)     General anesthetics administered in connection with oral surgery or other covered dental services.

(5)     Treatment of periodontal and other diseases of the gums and tissues of the mouth. (Payment shall be made for 50% of bridgework required in connection with such treatment.)  Only one of the following procedures will be covered per quadrant or site per 36 month period: crown lengthening, gingivectomy, osseous graft, osseous surgery.

(6)     Endodontic treatment, including root canal therapy.

(7)     Injection of antibiotic drugs by the attending Physician.

(8)     Cosmetic bonding of eight (8) front teeth (teeth 5 through 12 on the upper dental arch and teeth 21 to 28 on the lower dental arch) for children 8 through 19 years of age if required because of severe tetracycline staining, severe fluorosis, hereditary opalescent dentin, or ameleogenesis imperfecta, but not more frequently than once in any period of 3 consecutive calendar years. Charges for such services shall be payable only if such services have been preauthorized prior to the commencement of such services.

(iii)   Payment shall be made for 50% of the fee charged (to the extent Usual and Customary) for the following services:

(1)     Initial installation of fixed bridgework (including inlays and crowns to form abutments).

(2)     Initial installation (including adjustments during the six-month period following installation) of partial or full removable dentures.

(3)     Replacement of existing partial or full removable denture or fixed bridgework by a new denture or by new bridgework, or the addition of teeth to an existing partial removable denture or to bridgework, but only if satisfactory evidence is presented that:

(aa)    The replacement or addition of teeth is required to replace one or more teeth extracted after the existing denture or bridgework was installed; or

(bb)    The existing denture or bridgework was installed at least five years prior to its replacement (however, this five-year rule does not apply to dentures or bridgework for which no benefit was paid under the Plan) and the existing denture or bridgework cannot be made serviceable; or

INSURANCE                                        58

                (cc)    The existing denture is an immediate temporary denture which cannot be made permanent and replacement by a permanent denture takes place within twelve months from the date of installation of the immediate temporary denture.

Normally dentures will be replaced by dentures but if achieving a professionally acceptable course of treatment requires bridgework, such bridgework will be a Covered Dental Expense.

        (4)    Orthodontic treatment consisting of appliance therapy and functional/myofunctional therapy; except that benefits will not be payable for such treatment for a Participant age 22 or older. Dental x-rays and surgical therapy (including extractions) are covered under separate items as listed above.

        (5)    Initial installation of implants.

        (6)    Repair or recementing of crowns, inlays, bridgework or dentures, or relining of dentures (limited to relining done more than 6 months after the initial insertions).

        (7)    Inlays; gold fillings; crowns (including precision attachments for dentures) limited to one per tooth every 60 months.

    (iv)    Hospital Board and Room Expenses, and the charges of a hospital for necessary hospital services and supplies, in connection with injuries or diseases of a dental nature, are included under hospital expense benefits and not under Dental Expense Benefits.

(d)    Pre-Determination of Benefits.

If a course of treatment can reasonably be expected to involve Covered Dental Expenses of more than $200, a description of the procedures to be performed and an estimate of the Physician's charges must be filed with the Claims Administrator prior to the commencement of the course of treatment. The Claims Administrator will notify the Employee and the Physician of the benefits payable based upon such course of treatment and of the expenses not covered. The expenses to be paid will be certified by the Claims Administrator as payable under this subsection 5.23. The Claims Administrator will determine the amount of benefit payable in its discretion.

If a description of the procedures to be performed and an estimate of the Physician's charges are not submitted in advance, the Claims Administrator shall, in its discretion, make a determination of benefits payable under this subsection 5.23.

This pre-determination requirement will not apply to courses of treatment under $200 or to emergency treatment, oral examinations, x-rays, or prophylaxis. A

course of treatment is one or more treatments in a planned series resulting from a dental examination.

(e)   Limitations.

A.   Restorative:

(1)   Gold, baked porcelain restorations, crowns and jackets. If a tooth can be restored with a material such as amalgam, appropriate payment for that procedure will be made toward the charge for another type of restoration selected by the patient and the Physician. The balance of the treatment charge will not be payable under the Plan.

(2)   Reconstruction. Appropriate payment will be made toward the cost of procedures necessary to eliminate oral diseases and to replace missing teeth. Appliances or restorations necessary to increase vertical dimension or restore the occlusion will be considered optional and their cost will not be payable under the Plan.

B.   Prosthodontics:

(1)   Partial Dentures. If a cast chrome or acrylic partial denture will restore the dental arch satisfactorily, Dental Expense Benefits will cover the applicable percentage of the cost of such procedure toward a more elaborate or precision appliance that the patient and Physician may choose to use, and the balance of the cost will not be payable under the Plan.

(2)   Complete Dentures. If, in the provision of complete denture services, the patient and the Physician decide on personalized restorations or specialized techniques as opposed to standard procedures, Dental Expense Benefits will be allowed for the appropriate amount for the standard denture service toward such treatment, and the balance of the cost will not be payable under the Plan.

(3)   Replacement of Existing Dentures. An existing denture will be replaced only if it is unsatisfactory and cannot be made satisfactory. Services which are necessary to render such appliances satisfactory will be provided in accordance with the Plan.

Prosthodontic appliances will be replaced only after five (5) years have elapsed following any prior provision of such appliances under the Plan. (This five-year limitation applies only to appliances

provided under the Plan. It does not apply to any such appliances for which no benefit was paid under the Plan.)

C.    Orthodontics:

    (1)    If orthodontic treatment is terminated for any reason before completion, the obligation to pay benefits will cease with payment to the date of termination.

    (2)    The monthly benefit payment obligation under the orthodontic benefits provision shall cease on the Termination Date of the Insurance Plan Agreement, unless renewed or extended.

(f)    Exclusions.  Covered Dental Expenses do not include and no benefits are payable for:

    (1)    Charges for which benefits are otherwise provided under this Plan.

    (2)    Charges for treatment by other than a Physician except that scaling or cleaning of teeth may be performed by a licensed dental hygienist if the treatment is rendered under the supervision and guidance of the Physician.

    (3)    Charges for services and supplies that are solely cosmetic in nature, including charge for personalization or characterization of dentures.

    (4)    Charges for prosthetic devices (including bridges and crowns) and the fitting thereof which were ordered while the individual was not covered for Dental Expense Benefits or which were ordered while the individual was covered for Dental Expense Benefits but are finally installed or delivered to such individual more than sixty days after termination of coverage.

    (5)    Charges for the replacement of a lost, missing or stolen prosthetic device.

    (6)    Charges set forth as "exclusions" in any other Sections of the Plan.

    (7)    Charges for failure to keep a scheduled visit with the Physician.

    (8)    Charges for replacement or repair of a broken orthodontic appliance.

    (9)    Charges for facility usage.  For purposes of this paragraph, the term "Facility" means a health care facility that is not a hospital.

(g)    Definition of Orthodontic Treatment.  The term "Orthodontic Treatment" means the preventative and corrective treatment of all those dental irregularities which result from the anomalous growth and development of dentition and its related anatomic structures or as a result of accidental injury and which require repositioning of teeth to establish normal occlusion.

INSURANCE            61

(h)    Coordination with other Dental Expense Benefits. The Claims Administrator shall follow the same procedures with respect to Dental Expense Benefits concerning coordination of benefits as are set forth in paragraph 5.16.

(i)    For the purposes of this paragraph 5.23, the term "Physician" means a legally licensed Dentist or Doctor of Dental Surgery practicing within the scope of his license. For the purposes of this paragraph, the term "Physician" also includes a legally licensed physician authorized by his license to perform the particular dental services he has rendered.

(j)    Claims Review. The Claims Administrator reserves the right to require verification of any alleged fact or assertion pertaining to any claim for Covered Dental Expenses.

(k)    Participating Provider Contracts. The Claims Administrator may attempt to establish direct or indirect participating provider contracts with Physicians, as defined under (i) above, or other providers or facilities, or may enter into agreements with a network administrator in areas where the Employer has Employees.

5.24.  Vision Care Benefits. Prior to January 1, 2006, the provisions of section 5.27 of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply. On and after January 1, 2006, the following provisions shall apply to Vision Care Benefits:

(a)    Vision care benefits will be payable, subject to the conditions herein, if a Participant incurs expenses for covered vision care services of an Ophthalmologist, Optometrist or Optician while vision care benefit coverage is in effect with respect to such Participant. Covered vision care services shall not include any services rendered or materials ordered prior to the date coverage takes effect with respect to a Participant.

(b)    Payment will be made for the Usual and Customary charge for any of the following necessary covered vision care services to the extent that the combined charges for all services do not exceed a maximum amount of $150 payable once every other calendar year:

(i)     One lens or set of lenses

(ii)    Frames

(iii)   Examination

(c)    Exclusions -- Payment will not be made for the following:

(i)     Lenses not requiring a prescription, except a plano lens when prescribed in conjunction with a prescription corrective lens in the same frame (a single

INSURANCE                                   62

vision lens benefit will be payable for the plano lens); and frames not furnished for covered lenses.

(ii)    Medical or surgical treatment of the eye.

(iii)   Drugs or any other medication; and eyeglass cases and contact lens solutions.

(iv)    Procedures or services determined by the Claims Administrator in its discretion to be special or unusual such as but not limited to orthoptics, vision training, subnormal vision aids, aniseikonic lenses, and tonography.

(v)     Services rendered or materials ordered after the date the Participant ceases to be covered for vision care except for lenses and frames prescribed prior to such cessation of coverage and delivered within 30 days of the date prescribed.

(vi)    Frames, lenses, or other materials necessitated by, or furnished as a condition of, employment with the Employers or the cost of examinations otherwise paid by the Employers.

(vii)   Sunglass lenses, photosensitive lenses or anti-reflective lenses.

(viii)  Charges for services for which benefits are otherwise provided under the Plan.

(ix)    Charges for failure to keep a scheduled visit with the Ophthalmologist, Optometrist or Optician.

(x)     Charges for vision testing examinations, lenses or frames which are not necessary, according to accepted standards of ophthalmic practice, or which are not ordered or prescribed by the attending Ophthalmologist or Optometrist.

(xi)    Charges for vision testing examinations, lenses or frames which do not meet accepted standards of ophthalmic practice including charges for any such services or supplies which are experimental in nature.

(xii)   Replacement of lenses or frames which are lost or broken.

(d)     Coordination with other Vision Care Benefits.

The Claims Administrator shall follow the same procedures with respect to Vision Care Benefits concerning coordination of benefits as is set forth in paragraph 5.16 (Coordination of Benefits).

(e)     Participating Provider Contracts.

The Claims Administrator may attempt to establish direct or indirect participating provider contracts with suppliers of lenses and frames or other providers or facilities, or may enter into agreements with a network administrator in areas where the Employer has Employees.

5.25.   Maximum Benefits Payable to Participants.  Effective January 1, 2006, for each Participant, all benefits payable under this Section V shall not exceed a lifetime maximum of $3,500,000.

5.26.   Network Benefits.  Medical expense benefits under Section V shall be modified in the following manner:

    (i)    Benefits shall be provided through selected medical providers (including, but not limited to physicians, dentists, hospitals and pharmacies) with whom exclusive contracts shall be executed between the Company and such providers or the Claims Administrator and their providers.  As such arrangements become available, the Company will designate the benefits under the Plan.

    (ii)    Any such medical provider may also be the Company, a subsidiary of the Company, or be employed by the Company or a subsidiary of the Company.

    (iii)    With respect to any particular benefit or groups of benefits, a particular provider may be selected and such selections may differ depending on the location of the facility where Employees work and as defined by the Participant's residential zip code.

    (iv)    When a provider or providers have been selected for a particular location and benefit and the Participant's residential zip code places him within a defined network service area, the Participant shall have the choice of (a) obtaining service from such provider(s) with benefits payable under the terms of the Plan at the negotiated network charge or (b) obtaining the service from a non-selected provider, in which case the medical expense benefit payable shall be reduced to 50% of the amount that otherwise would be payable pursuant to the provisions of Section V (excluding the provisions of subsection 5.31).

    (v)    When a provider or providers have not been selected for a particular location and the Participant's residential zip code places him outside of a defined network service area, the Participant shall have the choice of seeking services from any provider or providers without a reduction in benefits pursuant to the provisions of Section V of the Plan.

5.27.   Home Health Care Benefits.  Prior to June 1, 2005, the provisions of section 5.31 of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply.  On and after June 1, 2005, the following provisions shall apply to Home Health Care Benefits:

(a)     Home Health Care benefits will be payable for services rendered to a Participant in his home or other non-institutional setting or residence by an authorized Home Health Care Agency (where "authorized" means an agency approved by Medicare and licensed by the state in which care is delivered to provide the full array of covered services; which agency may be affiliated with a hospital or nursing home) in accordance with a planned course of treatment ordered by a Physician which 1.) begins immediately following a period of covered hospital confinement for which benefits were payable under subsection 5.2 (Hospital Expense Benefits) or a period of covered nursing home confinement for which benefits were payable under subsection 5.3 (Nursing Home Benefits) and is for the continued treatment of the injury or sickness which caused such confinement; or 2.) the treatment of an injury or sickness which the Physician certifies requires the skilled services provided by a Home Health Care Agency and the patient is homebound for medical reasons and physically unable to obtain the necessary medical services on an outpatient basis and, in either case, the planned course of treatment must be accepted by the patient and immediate care givers and approved by the Claims Administrator in its discretion.  During such period of treatment, the Participant must continue to be under active medical supervision, and, the Physician must certify to the Claims Administrator that continuing Home Health Care services are medically necessary for the proper treatment of the Participant's specific condition, and that the lack of such treatment would require covered medically necessary confinement in a hospital or nursing home if not provided by a Home Health Care Agency.

Benefits will only be payable, unless otherwise covered under the Plan, when the treatment plan and level of skill of those providing the treatment and care have been approved by the Claims Administrator prior to commencement of the treatment plan in the non-institutional setting.  Non-notification to the Claims Administrator in its discretion prior to the commencement of treatment will reduce the amount of benefits otherwise payable by $100.

In general, the treatment plan and services will be approved in accordance with the following:

(i)     The medical condition at the time the proposed treatment plan is submitted for approval is such that it would otherwise require a medically necessary covered confinement in a hospital or nursing home, and

(ii)    the proposed treatment plan's projected costs do not exceed the costs of hospital or nursing home confinement that otherwise would have been covered by the Group Insurance Plan, and

(iii)   the duration of the Home Health Care services does not exceed the normal period to obtain the desired medical objective, not taking into account complications, and

(iv)    the therapies ordered are consistent with the planned rehabilitative goals.

INSURANCE                                            65

(b)     Benefits shall be payable for the Home Health Care services listed below for the actual amount charged for such services, to the extent such charge is Usual and Customary.

     (i)     part-time or intermittent nursing care by a Registered Nurse (RN),

     (ii)    part-time or intermittent therapy services by a Registered Physical Therapist (RPT) or "qualified speech therapist" as defined in paragraph 5.18 (Outpatient Physical or Speech Therapy Benefits),

     (iii)   part-time or intermittent nursing care by a Licensed Practical Nurse (LPN) under the supervision of an RN,

     (iv)    part-time or intermittent home health aide services, occupational therapy and nutritional guidance provided by the Home Health Agency under the supervision of a RN or RPT and in conjunction with approved RN or RPT services and these services are required for the patient to remain non-institutionalized, and

     (v)     medical supplies and solutions related to the skilled need for which the Participant qualifies for coverage.

(c)     Such benefits shall not be payable for more than 100 home care visits per calendar year. A home care visit consists of each visit to the patient's home by any member of the Home Health Care Agency (if two or more visits are made by one member in a day, each visit is counted as a separate visit; if two or more members make a visit in a day each visit by each member is counted as one visit) for the purpose of providing necessary covered Home Health Care services and a Home Health Care visit will be counted even though the patient is not seen if the visit is made in good faith, i.e., the agency is not notified prior to the visit that the patient is not available.

(d)     Expenses are not covered for:

     (i)     Services of a person who ordinarily resides in the home or non-institutional place of residence of the Participant or is a member of the Participant's family,

     (ii)    services and supplies not related to medical care or treatment (including housekeeping services),

     (iii)   services rendered in any period during which the Participant is not under the active care and treatment of a Physician,

     (iv)    custodial care and transportation services,

     (v)     benefits or services otherwise provided under the Plan,

(vi)  hyperalimentation nutrients taken orally or by tube or used as a feeding modality to repair or prevent nutritional deficiencies or to boost protein-caloric intake, or nutrients delivered to the Participant's residence but unused,

(vii)  services not approved by the Claims Administrator in its discretion, or

(viii)  services provided by a non-authorized agency.

5.28.  Hospice Benefit.  This section 5.28 shall be effective on and after June 1, 2005.

(a)  Hospice benefits will be payable for service rendered to a Participant in such person's home or other non-institutional place or residence by an authorized Hospice Agency (authorized means an Agency approved by Medicare and licensed by the state to provide hospice related services) when the Participant has been certified by the Physician as being Hospice appropriate.

Benefits will only be payable, unless otherwise covered under the Plan, when the treatment plan and level of skill of those providing the treatment and care have been approved by the Claims Administrator prior to commencement of the treatment plan in the non-institutional setting.  Non-notification to the Claims Administrator prior to the commencement of treatment will result in a non-notification reduction of $100 for covered expenses under the Plan.

Coverage will be approved in accordance with the guidelines of the Claims Administrator.

(b)  Benefits shall be payable for the Hospice Services provided in the person's home or other non-institutional place of residence listed below for the actual amount charged for such services, to the extent such charge is Usual and Customary. Additionally, benefits are not payable for the services listed below which exceed the costs of room and board in a skilled nursing facility which are payable under (c) below.

(i)  Part-time or intermittent nursing care by a Hospice Registered Nurse,

(ii)  part-time or intermittent nursing care by a Hospice Licensed Practical Nurse (LPN) under the supervision of an RN,

(iii)  intermittent Medical Social Worker visits,

(iv)  part-time or intermittent home health aide services which are  1.) in conjunction with approved RN services, and 2.)  required for the patient to remain non-institutionalized, and

(v)  medical supplies and solutions related to the Hospice care.

(c)     In lieu of the services listed in (b) above, the Claims Administrator may determine that the patient would qualify for coverage of room and board in a skilled nursing facility. The Claims Administrator must be contacted prior to hospice placement in the skilled nursing facility. At no time will coverage of room and board in a skilled nursing facility be available simultaneously with the services listed in (b) above.

(d)     Expenses are not covered for:

      (i)     services of a person who ordinarily resides in the home or non-institutional place of residence of the Employee or is a member of the Family of the Employee or the Employee's spouse,

      (ii)     services and supplies not related to medical care or treatment (including housekeeping services),

      (iii)     custodial care (except when rendered in conjunction with approved RN hospice services, and when required for the patient to remain non-institutionalized),

      (iv)     transportation services,

      (v)     benefits or services otherwise provided under the Plan,

      (vi)     hyperalimentation nutrients taken orally or by tube or used as a feeding modality to repair or prevent nutritional deficiencies or to boost protein-caloric intake, or nutrients delivered to the Participant's residence but not used

      (vii)     services not approved by the Claims Administrator in its discretion, or

      (viii)     services provided by a non-authorized agency.

5.29.    Ambulance Benefits. Prior to June 1, 2005, the provisions of section 5.32 of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply. On and after June 1, 2005, the following provisions shall apply to Ambulance Benefits: Expenses for local ambulance services will be paid if medically necessary (as determined by the Claims Administrator in its discretion) and the Participant (a) is transported by ambulance from the place where injured or stricken by illness to the nearest facility where necessary medical treatment can be rendered; or (b) is transported from a hospital where medically required services are not available to the nearest hospital where such services are available; or (c) with respect to air ambulance, is transported to a hospital because of the reason stated in (b) and such method of transportation is medically required by the attending Physician (i.e., because of the individual's medical condition, and ground transportation cannot be used) and is in fact an ambulance service and not a charter flight service.

5.30.   Contributions for Medical Coverage.

    (a)   Employee Contributions.  Effective June 1, 2005, Employees will contribute toward the cost for the benefits described in this Section V by authorizing withholdings from compensation in the amounts shown below.  An Employee who does not receive any compensation from the Company shall be required to contribute to the cost of coverage by making monthly payments in accordance with the rules established by the Company.

        (1)   For each month or portion of a month that coverage is in effect during 2005, contributions will be made on the following basis (subject to the adjustments described in (6) below, if applicable):

|  | Employee Only | Employee & Spouse | Employee & Child(ren) | Family |
|---|---|---|---|---|
| Premium | $21 | $41 | $33 | $66 |

        (2)   For each month or portion of a month that coverage is in effect during 2006, contributions will be made on the following basis (subject to the adjustments described in (5) and (6) below, if applicable):

|  | Employee Only | Employee & Spouse | Employee & Child(ren) | Family |
|---|---|---|---|---|
| Premium | $22 | $44 | $35 | $71 |

        (3)   For each month or portion of a month that coverage is in effect during 2007, contributions will be made on the following basis (subject to the adjustments described in (5) and (6) below, if applicable):

|  | Employee Only | Employee & Spouse | Employee & Child(ren) | Family |
|---|---|---|---|---|
| Premium | $24 | $48 | $38 | $77 |

        (4)   The Employee Only contributions toward coverage in any given month will be equal to one-twelfth of ten percent (10%) of the Total Annual Cost Per Employee for 2008 and each subsequent year.  The Total Annual Cost Per Employee will be calculated for each calendar year commencing with 2008 and will be based on the Total Annual Participant Cost Per Employee, which shall equal the quotient of (i) the sum of (A) the total

claims and administration costs for covered Employees and covered Dependents of Employees in this Plan, and (B) the total claims and administration costs for persons who satisfy the definition of covered "Employee" or covered "Dependent" under the Company's Group Insurance Plan 2004, divided by (ii) the sum of (A) the total number of covered Employees in this Plan, and (B) the total number of persons who satisfy the definition of covered "Employee" under the Company's Group Insurance Plan 2004, in the second prior year (2006 for 2008 contributions, for example) projected forward two years.  Once the Total Annual Participant Cost Per Employee is calculated, it shall be used to develop the Total Annual Cost Per Employee by multiplying it by a factor determined by the Company's actuary, using commonly applied methodology to take into account the demographics of this Plan and the Company's Group Insurance Plan 2004, and coverage category relative values.  The projection shall be based on an annual inflation factor which will be the unadjusted percent change of the Medical Care Component of the Consumer Price Index for all Urban Consumers, U.S. City Average as compared to the previous year, plus 4%, and adjusted for any changes in benefit provisions.  Once Employee Only contributions are determined, the Company will use coverage category relative values consistent with those utilized in (1), (2), and (3) to determine the contribution amounts for other coverage categories.

(5)     On and after January 1, 2006, in the event that an Employee's covered spouse (A) is not employed by an Employer and (B) either (i) has other group health coverage available and has not elected such other coverage; or (ii) has elected other group health coverage, but, under the coordination of benefits rules of such other coverage and the Plan, the reimbursements from the Plan are more than they would be if such other coverage were primary and Plan benefits were secondary, the contribution amount for the Employee & Spouse coverage category shall be 3.8 times the amount for the Employee Only coverage category and the amount for the Family coverage category shall be 5.0 times the amount for the Employee Only coverage category.

(6)     The monthly contribution amounts described above reflect the reduced applicable contribution amount if an Employee and/or spouse Dependent is participating in a wellness program approved by the Company.  If an Employee and/or spouse Dependent is not participating in a wellness program approved by the Company, the applicable monthly contribution amount described above shall be increased by $75 for each one of them who is covered by the Plan and not participating in such program.  (For purposes of this paragraph (6), participation in a wellness program sanctioned by the Company means completing two health assessments under such program per year).

(b)   Retiree Contributions.  The Employers and Retirees shall share the cost of Retiree Medical Expense Benefit coverage as described in this Section V as follows:

(i)   Company's Annual Base Contribution.  The Company's annual base contribution for Retirees' (and Dependents') benefits described in this Section V is:

(1)   $4,451 per Participant for Participants who are pre-age 65, and

(2)   $3,119 per Participant for Participants who are post-age 64.

(ii)   Retiree Contribution.  Effective February 1, 2005, Retirees (and Dependents of Retirees) will contribute toward coverage for the benefits described in this Section V.  A Participant shall contribute the Per Participant Retiree Contribution amount described below (pre-age 65 or post-age 64, as applicable to the specific Retiree or Dependent) for the Retiree and each of his Dependents covered hereunder; provided that the maximum contribution for a Retiree and all of his covered Dependents shall be the two (2) highest contribution amounts that the Retiree and his Dependents would otherwise be required to pay.

(1)   For each month or portion of a month that coverage is in effect during 2005, the Per Participant Retiree Contribution amount is $59 (pre-age 65) and $62 (post-age 64).  Notwithstanding the foregoing, the Company, in its discretion, may increase, to not more than $134, the pre-age 65 Per Participant Retiree Contribution amount for Retirees or spouse Dependents of Retirees who do not participate in a wellness program sanctioned by the Company.

(2)   For each month or portion of a month that coverage is in effect during 2006, the Per Participant Retiree Contribution amount is $87 (pre-age 65) and $83 (post-age 64).  Notwithstanding the foregoing, the Company, in its discretion, may increase, to not more than $162, the pre-age 65 Per Participant Retiree Contribution amount for Retirees or spouse Dependents of Retirees who do not participate in a wellness program sanctioned by the Company.

(3)   For each month or portion of a month that coverage is in effect during 2007, the Per Participant Retiree Contribution amount is $111 (pre-age 65) and $101 (post-age 64).  Notwithstanding the foregoing, the Company, in its discretion, may increase, to not more than $186, the pre-age 65 Per Participant Retiree Contribution amount for Retirees or spouse Dependents of Retirees who do not participate in a wellness program sanctioned by the Company.

(4)    For each month or portion of a month that coverage is in effect during 2008 and subsequent years, the Per Participant Retiree Contribution amounts (pre-age 65 and post-age 64) will be equal to one-twelfth (1/12th) of (A) the Total Annual Cost Per Retiree Participant; minus (B) the sum of (I) the Company's annual base contribution set forth in (i) above, plus (II) 40 percent of the amount by which the Total Annual Cost Per Retiree Participant exceeds the Company's annual base contribution set forth in (i) above. Notwithstanding the foregoing, the Company, in its discretion, may increase, by not more than $75, the pre-age 65 Per Participant Retiree Contribution amount for Retirees or spouse Dependents of Retirees who do not participate in a wellness program sanctioned by the Company. The Total Annual Cost Per Retiree Participant will be calculated for each calendar year commencing with 2008 and is the average claims and administration costs per covered Retiree and Dependent of a Retiree (calculated separately for pre-age 65 and post-age 64 Participants and with the costs with respect to Participants who are Retirees who retired prior to January 1, 1992 or their Dependents multiplied by a factor of 0.92) in the second prior year (2006 for 2008 contributions, for example) projected forward two years. The projection forward for each year, as determined by the Company's actuary, shall increase the cost per covered Retiree and Dependent by an annual inflation factor which will be the unadjusted percent change of the Medical Care Component of the Consumer Price Index for all Urban Consumers, U.S. City Average as compared to the previous year, plus 4%, and shall adjust for any changes in benefit provisions.

(For purposes of this paragraph (ii), participation in a wellness program sanctioned by the Company means completing two health assessments under such program per year).

5.31.    **Deductible Amount.** The provisions of this subsection 5.31 shall be effective on and after January 1, 2006. Notwithstanding any provision of the Plan to the contrary, for each Participant described below, the separate calendar year deductible amounts will be applied to Covered Medical Expenses under this Section V, except for medical expense benefits under subsections 5.11 (Prescription Drug Benefits), 5.23 (Dental Expense Benefits), and 5.24 (Vision Care Benefits).

(a)    Employees and their Dependents will be subject to the deductible amounts described in this paragraph (a). Prior to January 1, 2008, a separate calendar year deductible amount of $300 per person and $600 per family will be applied to Covered Medical Expenses. After December 31, 2007, the deductible amount shall be $500 per person and $1,000 per family.

INSURANCE               72

(b)     Retirees who retired on or after January 1, 1992 but prior to March 16, 1998 and their Dependents will be subject to the deductible amounts described in this paragraph (b). A separate calendar year deductible amount of $300 per person and $600 per family will be applied to Covered Medical Expenses.

(c)     Retirees who retired on or after March 16, 1998 but prior to January 10, 2005 and their Dependents will be subject to the deductible amounts described in this paragraph (c). A separate calendar year deductible amount of $300 per person and $600 per family will be applied to Covered Medical Expenses.

(d)     Retirees who retire on or after January 10, 2005 and their Dependents will be subject to the deductible amounts described in this paragraph (d). Prior to January 1, 2008, a separate calendar year deductible amount of $300 per person and $600 per family will be applied to Covered Medical Expenses. After December 31, 2007, the deductible amount shall be $500 per person and $1,000 per family.

The deductible amounts described in this subsection 5.31 shall not include any co-payments paid by a Participant, and no co-payments shall be reduced as a result of a Participant or a Participant and his family having reached the applicable deductible amount.

The deductible amount will apply to each Participant, except that the deductible amount will not apply to Covered Medical Expenses after two or more covered family members have incurred Covered Medical Expenses that, in the aggregate, equal the per family deductible; however, in any event no one covered family member may have more than the per person deductible applied to the per family deductible. If an Employee or a Retiree and his spouse are both Employees or former Employees and are both covered under a group insurance plan sponsored by the Employer, the deductible amount will apply to each spouse separately.

5.32.   Co-Insurance. The provisions of this subsection 5.32 shall be effective on and after January 1, 2006.

(a)     Notwithstanding any provision of the Plan to the contrary (but subject to subsection 5.26(iv)), for each Participant described below, the Plan will pay the amount for Covered Medical Expenses under this Section V after the deductible amount under subsection 5.31 is met, except for medical expense benefits under subsections 5.11 (Prescription Drug Benefits), 5.23 (Dental Expense Benefits), and 5.24 (Vision Care Benefits).

(i)     For Employees and their Dependents, the Plan will pay the amount described in this subparagraph (i). Prior to January 1, 2008, the Plan will pay 90% of Covered Medical Expenses. After December 31, 2007, the Plan will pay 80% of Covered Medical Expenses.

(ii)    For Retirees who retired on or after January 1, 1992 but prior to March 16, 1998 and their Dependents, the Plan will pay the amount described in this subparagraph (ii). The Plan will pay 90% of Covered Medical Expenses.

INSURANCE                                    73

(iii)    For Retirees who retired on or after March 16, 1998 but prior to January 10, 2005 and their Dependents, the Plan will pay the amount described in this subparagraph (iii). Prior to January 1, 2008, the Plan will pay 90% of Covered Medical Expenses. After December 31, 2007, the Plan will pay 80% of Covered Medical Expenses.

(iv)    For Retirees who retire on or after January 10, 2005 and their Dependents, the Plan will pay the amount described in this subparagraph (iv). Prior to January 1, 2008, the Plan will pay 90% of Covered Medical Expenses. After December 31, 2007, the Plan will pay 80% of Covered Medical Expenses.

The Participant is responsible to the provider for the amount remaining.

(b)    The term "co-insurance amount" under this subsection 5.32 means the amount of Covered Medical Expenses which is not payable in a calendar year solely due to the percentage limitation described in paragraph (a) above. The co-insurance amounts apply to each Participant, except that each Participant described below will not be responsible for paying a co-insurance amount once the sum of the co-insurance and deductible amounts paid by the Participant for the year equals the amount described below.

(i)    The amount described in this subparagraph (i) will apply to Employees and their Dependents. A Participant will not be responsible for paying a co-insurance amount once the sum of the co-insurance and deductible amounts paid by the Participant for the year equals (A) $1,000 prior to January 1, 2008 and (B) $1,500 after December 31, 2007. In addition, if the Employee has one or more covered Dependents, none of them will be responsible for paying a co-insurance amount once the sum of their co-insurance and deductible amounts paid for the year equals (AA) $2,000 prior to January 1, 2008 and (BB) $3,000 after December 31, 2007.

(ii)    The amount described in this subparagraph (ii) will apply to Retirees who retired on or after January 1, 1992 but prior to March 16, 1998 and their Dependents. A Participant will not be responsible for paying a co-insurance amount once the sum of the co-insurance and deductible amounts paid by the Participant for the year equals $750. In addition, if the Retiree has one or more covered Dependents, none of them will be responsible for paying a co-insurance amount once the sum of their co-insurance and deductible amounts paid for the year equals $1,500.

(iii)    The amount described in this subparagraph (iii) will apply to Retirees who retired on or after March 16, 1998 but prior to January 10, 2005 and their Dependents. A Participant will not be responsible for paying a co-insurance amount once the sum of the co-insurance and deductible amounts paid by the Participant for the year equals $1,000. In addition, if the Retiree has one or more covered Dependents, none of them will be

responsible for paying a co-insurance amount once the sum of their co-insurance and deductible amounts paid for the year equals $2,000.

(iv)     The amount described in this subparagraph (iv) will apply to Retirees who retire on or after January 10, 2005 and their Dependents.  A Participant will not be responsible for paying a co-insurance amount once the sum of the co-insurance and deductible amounts paid by the Participant for the year equals (A) $1,000 prior to January 1, 2008 and (B) $1,500 after December 31, 2007.  In addition, if the Retiree has one or more covered Dependents, none of them will be responsible for paying a co-insurance amount once the sum of their co-insurance and deductible amounts paid for the year equals (AA) $2,000 prior to January 1, 2008 and (BB) $3,000 after December 31, 2007.

Notwithstanding any contrary provision, (i) the 50% co-insurance amount described in subsection 5.26(iv) shall not be included for purposes of calculating the maximum amounts described in this subsection 5.32; and (ii) the 50% co-insurance amount described in subsection 5.26(iv) shall continue to apply after such maximum amounts have been met.

5.33.   Charges in Excess of Usual and Customary and Professional Review.

(a)     In the event that a Physician's charge for a covered medical or dental expense under this Section V of the Plan exceeds the Usual and Customary charge for the services performed, and it is clearly established that the Employee or Dependent has neither agreed to nor ratified such Physician's charge, the Company or the Insurance Carrier will take every reasonable action to resolve the difference between the actual amount charged and the Usual and Customary charge so that there is no residual payment due by the Employee or Dependent. In the event that legal action is brought by the Physician for such excess amount, the Company or the Insurance Carrier will undertake to provide the defense of such action, will pay the expenses of providing such defense, and will pay any resulting judgment entered against the Employee or Dependent. It is understood that in order to be relieved of his obligation for any amount in excess of the Usual and Customary charge, the person involved in such action will be obligated to testify, submit to examination, release information and to furnish any evidence in his possession upon request.

(b)     If a review committee or medical foundation, with whom the Company or the Insurance Carrier has an agreement for the continuing review of

(i)      the necessity of services received in a hospital, nursing home or any other facility, and/or

(ii)     the necessity of confinement in a hospital, nursing home or any other facility,

determines that any such services or any day or days of confinement are not necessary, then the Company or the Insurance Carrier will take every reasonable action to resolve the charges for the unnecessary services or day or days of confinement so that there is no residual payment due by the Employee or Dependent for such services, or any day of confinement, determined to be unnecessary by such review committee or medical foundation. The provisions of this subparagraph 5.33(b) will apply if it is clearly established that the Employee or Dependent neither agreed to nor ratified the charges for days of confinement or services determined to be unnecessary. In the event that legal action is brought by the hospital or nursing home or any other facility for such charges, the Company or the Insurance Carrier will undertake to provide the defense of such action, will pay the expenses of providing such defense, and will pay any resulting judgment entered against the Employee or Dependent. It is understood that in order to be relieved of any obligation for any amount of such charges, the person involved in such action will be obligated to testify, submit to examination, release information and to furnish any evidence in his possession upon request.

SECTION VI
TERMINATION OF COVERAGE AND CONVERSION PRIVILEGE

6.1.   Termination of Coverage.

(a)   Termination of Employee's Coverage.  An Employee's coverage under Sections IV and V (including Dependents' Coverage and sponsored dependents' coverage if any such coverage is in effect with respect to the Employee) shall terminate on the last day of the calendar month in which such Employee ceases to be actively at work unless he returns to active work with his Employer during the same calendar month.  Provided that, subject to payment of the applicable premium:

(i)   such coverage on account of an Employee on layoff will be continued for a period of 12 months following the last day of the calendar month in which the Employee ceases to be actively at work (or in the case of an Employee reporting for reinstatement to his job with an Employer in accordance with the terms of a military leave of absence who is immediately placed on layoff, the last day in the calendar month in which the Employee is placed on layoff); provided, however, that coverage in accordance with Section IV (other than weekly accident and sickness benefits) shall be continued beyond the last day of the calendar month in which such Employee completes thirty days of such layoff only if, during the thirty days preceding such last day of the month, he files a request for continuance of such coverage under Section IV on a form to be obtained from his Employer and thereafter contributes monthly for such coverage the applicable premium for life insurance (Basic or Basic and Additional); at the end of 12 months of coverage, an Employee on layoff shall be permitted to continue coverage under Section V for a period of six additional months by filing a request therefor and contributing monthly for

such coverage 102% of the applicable premium (as defined in and pursuant to paragraph 6.3).

(ii)    such coverage on account of an Employee on disability leave of absence shall be continued (A) in the case of an Employee who becomes disabled prior to his attainment of age 60 years, until the earlier of (1) the last day of the month in which he ceases to be on such disability leave of absence without returning to active work during the same calendar month, or (2) the last day of the month in which he attains age 65 years; provided that in no event shall coverage in accordance with Section IV be terminated prior to the last day of the month in which he attains age 65 years if he is receiving disability pension benefits under the Non-Contributory Pension Plan; and provided, further, that such Employee shall make the required contribution for Additional Life Insurance until the later of (a) the end of the first twelve months of such disability leave of absence; and (B) in the case of an Employee who becomes disabled on or after attainment of age 60 years, until the earlier of (1) the last day of the month in which he ceases to be on such disability leave of absence without returning to active work during the same calendar month, or (2) the expiration of the period for which weekly accident and sickness benefits are paid to him under the Plan;

(iii)    such coverage (other than weekly accident and sickness benefits) on account of an Employee who loses his seniority through discharge or separation and is appealing such discharge or separation may be continued for up to 12 months if within thirty days following such discharge or separation he files a request for continuance of coverage under Section IV and/or Section V while such appeal is pending on a form to be obtained from his Employer and agrees to contribute monthly on and after the date coverage would otherwise terminate:

(1)    the full cost of such insurance as determined by the Insurance Carrier (Basic or Basic and Additional) for coverage in accordance with Section IV, and/or

(2)    for coverage in accordance with Section V, the applicable full group rate based upon the coverage in effect, and

(3)    in accordance with paragraph 6.3, an eligible Employee may elect to continue coverage under Section V for an additional 6 months by filing a request therefor and contributing monthly for such coverage 102% of the applicable premium (as defined in and pursuant to paragraph 6.3).

If the Employee is reinstated, his Employer will reimburse him for all contributions with respect to coverage under Section IV and/or V for up to the first 12 months of coverage which would not have been payable if the

Employee had not suffered a break in continuity of service as a result of such discharge.

(iv)    such coverage on account of an Employee on family leave of absence will be continued for a period of up to 12 weeks following the last day of the calendar month in which the Employee ceases to be actively at work; provided, however, that coverage in accordance with Section IV shall be continued beyond the last day of the calendar month in which such Employee completes thirty days of such leave of absence only if, during the thirty days preceding such last day of the month, he files a request for continuance of such coverage under Section IV on a form to be obtained from his Employer and agrees to thereafter contribute monthly for such coverage the sum of -

    (1)    the full cost of such insurance as determined by the Insurance Carrier (Basic or Basic and Additional), and

    (2)    $36 per month for weekly accident and sickness coverage.

(v)    such coverage under Section V on account of an Employee entitled to protection under the Uniformed Services Employment and Reemployment Rights Act ("USERRA") will be continued as follows:

    (1)    If the Employee takes a leave of absence from his employment to perform uniformed service for a period of 30 Days or less, the Employee shall be treated as being actively at work during such leave of absence for all purposes under the Plan.

    (2)    If the Employee takes a leave of absence from his employment to perform uniformed service for a period of 31 Days or more, the Employee shall have the right to elect to continue coverage under the Plan for himself and each of his covered Dependents. The duration of continued coverage under USERRA shall extend from the effective date of the Employee's leave of absence to perform Uniformed Service until the earliest of the following dates:

        (a)    the last day of the 18-month period beginning on the effective date of the Employee's leave of absence;

        (b)    the date the Employee fails to make a required USERRA premium payment; and

        (c)    the date the Employee's reemployment rights under USERRA expire.

"Uniformed service" means the performance of duty on a voluntary or involuntary basis under competent authority and includes active duty, inactive duty for training, initial active duty for training, inactive duty

training, full-time National Guard duty and a period during which an Employee is absent from employment with the Employer for the purpose of an examination to determine the fitness of the Employee to perform any such duty in the Armed Forces, the Army National Guard and the Air National Guard when engaged in active duty for training, inactive duty training or full-time National Guard duty, the commissioned corps of the Public Health Service and any other category of person designated by the President in time of war or emergency.

An Employee who elects continued coverage while on uniformed service leave shall be required to pay the total amount of the cost of the coverage provided under the Plan during the period of such leave for the Employee and his Dependents, as determined by the Company, plus 2%.

Notwithstanding any contrary provision contained herein, coverage on account of an Employee on leave for uniformed service covered under USERRA shall continue and shall be subject to reinstatement only to the extent required under such Act.

(vi)   such coverage on account of an Employee who is on leave of absence granted in writing (pursuant to a collective bargaining agreement between his Employer and the Union) to him because of his election or appointment to a position with the Union may be continued until the last day of the month in which he ceases to be on such leave of absence without returning to active work during the same calendar month; provided, however, that

(1)   coverage in accordance with Section IV shall be continued beyond the last day of the calendar month in which such Employee completes 30 days of such leave of absences only if, during the 30 days preceding such last day of the month, he files a request for continuance of such coverage under Section IV on a form to be obtained from his Employer and he agrees to thereafter contribute monthly for such coverage the sum of

(a)   the full cost of such insurance as determined by the Insurance Carrier (Basic or Basic and Additional), and

(b)   $36 per month for weekly accident and sickness coverage; and

(2)   coverage in accordance with Section V will be continued beyond the last day of the calendar month in which such Employee completes 12 months of such leave of absence only if, during the 30 days preceding such last day of the month, he files a request for continuance of such coverage under Section V on a form to be obtained from his Employer and agrees to

INSURANCE                                            79

thereafter contribute monthly the applicable full group rate based upon the coverage then in effect.

Notwithstanding anything above in this Section 6.1 to the contrary, such coverage will terminate on the day an Employee ceases to be actively at work in the event of discharge, strike or quit.

(b)     Termination of Retiree's Coverage.  A Retiree's coverage (including Dependents' Coverage and sponsored dependent coverage if any such coverage is in effect with respect to the Retiree) under the Plan shall terminate if the Participant fails to make the applicable contribution.

6.2.    Conversion and Continuation Coverage.

(a)     Conversion of Life Insurance.  In the event that an Employee's life insurance in accordance with Section IV involuntarily terminates solely by reason of the provisions of paragraph 6.1 or a Retiree's life insurance terminates or is reduced, the Employee or Retiree shall be entitled to have issued to him by the Insurance Carrier without evidence of insurability an individual policy of life insurance only (without disability benefits or accidental means death benefit) in any of the forms then customarily issued by the Insurance Carrier (except term insurance); provided he makes proper written application to the Insurance Carrier within thirty-one days after the last day of the month in which his life insurance is initially terminated or reduced, and pays the premium for such individual policy applicable to the class of risk to which he belongs and to the form and amount of the individual policy at his attained age at the effective date of such individual policy.

(b)     Continuation of Medical Benefits By Dependents After the Death of an Employee or Retiree.

Dependents' Coverage will terminate on the death of the Employee or Retiree. Thereafter the Employer shall permit the surviving spouse (or Dependent child or children) of a deceased Employee or Retiree to elect to continue the same Dependents' Coverage (covering only those Dependents who were covered under such Dependents' Coverage at the time of the Employee's or Retiree's death) under the Plan as if the Employee or Retiree were then living so long as, with respect to a survivor of an Employee,

(i)     survivors benefits are payable under the Non-Contributory Pension Plan (including for this purpose a surviving spouse who would receive such benefits except for the receipt of a survivor income benefit under paragraph 4.6 of this Plan), but, in any event, excluding any person who receives qualified preretirement survivor annuity ("QPSA") benefits under the Non-Contributory Pension Plan or by reason of a qualified domestic relations order ("QDRO") pursuant to the Non-Contributory Pension Plan, or

INSURANCE                                     80

    (ii)    such Dependent continues to survive in the event of the death of an Employee who is receiving a Disability Pension under the Non-Contributory Pension Plan and the Employee was (a) eligible for the immediate commencement of a monthly pension (other than a Disability Pension under the Non-Contributory Pension Plan) at the time the Disability Pension commenced, or (b) at the time of the Employee's death;

        1.    the Employee was age 55 or more,

        2.    coverage under Section V of the Plan was in effect, and

        3.    the spouse was eligible for the immediate commencement of a surviving spouse's benefit or would have been eligible had the Employee not waived the surviving spouse's benefit as provided in subsection 6.4 of such plan.

Dependents' Coverage for any such Dependent , as in effect as of the Employee's or Retiree's death, will continue in effect so long as the Dependent elects to continue coverage and to pay the applicable contribution in accordance with subsection 5.30(b). Dependents' Coverage may not be continued beyond the end of the month in which a surviving spouse's remarriage occurs.

6.3.    Continuation of Medical Benefits under COBRA.

    (a)    The requirements of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") apply to the Plan. If coverage under Article V of the Plan is discontinued because of any of the qualifying events described below, eligible Participants may elect continuation coverage under the Plan according to the COBRA rules.

An Employee has the right to choose this continuation coverage if such Employee loses group health coverage because of a reduction in such Employee's hours of employment or the termination of such Employee's employment (for reasons other than gross misconduct).

The spouse of an Employee or Retiree covered by the Plan has the right to choose continuation coverage if such spouse loses group health coverage under the Plan for any of the following reasons:

    (i)    The death of the covered Employee;

    (ii)    The termination of the covered Employee's employment (for reasons other than gross misconduct) or reduction in the covered Employee's hours of employment;

    (iii)    Divorce or legal separation from the covered Employee or Retiree;

    (iv)    The covered Employee or Retiree becomes entitled to Medicare; or

(v)     A proceeding in a case under Title 11, United States Code, with respect to the Employer from whose employment the covered Employee retired.

In the case of a Dependent Child covered by the Plan, the Dependent Child has the right to continuation coverage if group health coverage under the Plan is lost for any of the following reasons:

(i)     The death of the covered Employee or Retiree;

(ii)    The termination of the covered Employee's employment (for reasons other than gross misconduct) or reduction in the covered Employee's hours of employment with the Employer;

(iii)   The covered Employee's or Retiree's divorce or legal separation;

(iv)    The covered Employee or Retiree becomes entitled to Medicare;

(v)     The Child ceases to be a "Dependent" as defined under the Plan; or

(vi)    A proceeding in a case under Title 11, United States Code, with respect to the Employer from whose employment the covered Employee retired.

(b)     Notice Requirements. Under the law, the Employee, Retiree or an eligible Dependent has the responsibility to inform the Company of a divorce, legal separation or a Child losing dependent status under the Plan within 60 days of the date the event occurs.  The Employer has the responsibility to notify the Company of the Employee's or Retiree's death or Medicare entitlement or the Employee's termination or reduction in hours of employment.

When the Company is notified that one of these events has happened, the Company will ensure that the affected Participants are notified within 14 days of the right to choose continuation coverage.  Under the law, the affected Participants have 60 days from the later of the date the Participants would lose coverage because of one of the events described above or the date the Participants are advised by the Company of the right to continue coverage to inform the Company that the Employee or Retiree and/or the eligible covered Dependents want continuation coverage.

Notice to the Employee's or Retiree's eligible covered spouse of the right to elect continuation coverage under the Plan will be deemed notice to any eligible covered Dependent Child residing with the Employee's or Retiree's spouse.  If the Employee, Retiree, or eligible covered Dependent(s) do not elect continuation coverage within this election period, then the right to continuation coverage based on COBRA rules will be lost.

An eligible Employee may elect COBRA continuation coverage for an eligible Child who is born to, adopted by, or placed for adoption with such Employee while the Employee's COBRA continuation coverage (or right to elect COBRA

continuation coverage) is effective, provided that the Employee has notified the Company in writing within 30 Days of the Child's birth, adoption or placement for adoption.

(c)     Payment for Continuation Coverage. The Participant will be required to pay for the cost of continuation coverage in an amount equal to the cost of Plan coverage, plus 2%.

Contribution amounts and benefits for continuation coverage are subject to change. The Employee or Retiree will be notified of any changes in contribution amounts or benefits available under the Plan.

If the Participant elects continuation coverage after the qualifying event, then the Participant will have 45 days from the date of the election to make the required initial contribution. That initial contribution must cover the entire period from the date of the qualifying event to the date of the payment. There is no grace period for the initial contribution. Each other contribution payment is due within 30 days after the first day of each month of continuation coverage.

Covered individuals will not be billed for any contribution payments for continuation coverage. If any contribution payment for continuation coverage is postmarked after the date that payment is due, continuation coverage under the Plan will terminate and will not be reinstated.

(d)     Length of Continuation Coverage. If the Employee and/or his eligible covered Dependents elect to continue Plan coverage, the maximum continuation period following a qualifying event involving termination of employment or reduced work hours is 18 months.

If the Participant is found by the Social Security Administration ("SSA") to be eligible for Social Security disability benefits because of a disability that existed at any time during the first 60 days of this COBRA continuation coverage, then the disabled person and his family members will be eligible to continue Plan coverage for up to 29 months (an additional 11 months). To be eligible for that additional time to continue Plan coverage, the disabled person must remain disabled and must notify the Company: Within 60 days after receiving the disability determination from Social Security, and before the original 18-month period to continue Plan coverage ends.

An increased cost of up to 150% of the cost of Plan coverage may be required for those 11 extra months of continuation coverage. The disabled person must promptly notify the Company of any SSA finding that he or she is no longer disabled.

If a second qualifying event occurs within the applicable 18- or 29-month period, the period to continue Plan coverage under COBRA may be extended for up to 36 months from the first qualifying event. For all other qualifying events, the maximum period to continue Plan coverage is 36 months.

(e) Termination of Continuation Coverage.  COBRA continuation coverage will end on the date that the first of the following occurs:

   (i) The Employer no longer provides group health coverage to any of its Employees;

   (ii) The contribution for this continuation coverage is not paid on time;

   (iii) The Participant become covered under another group health plan that does not contain any exclusion or limitation with respect to any preexisting condition such individuals may have or contains a pre-existing condition exclusion that does not apply to such individuals because of the requirements of the Health Insurance Portability and Accountability Act of 1996;

   (iv) The Participant become entitled to Medicare; or

   (v) The Participant elected to extend coverage for up to 29 months due to disability and there has been a final determination by the SSA that such individual is no longer disabled.

   The Participant must inform the Company within 30 days of the date of any final determination by the SSA that the person is no longer disabled.

(f) General Information About Continuation Coverage. Continuation coverage is provided subject to eligibility under the law.  The Company reserves the right to terminate continuation coverage retroactively if the Participant is determined to be ineligible for continuation coverage.  The Company intends to provide continuation coverage only to the extent required by law and will administer continuation coverage according to those requirements.

6.4.   Life Insurance During Eligibility Period for Conversion.  In the event that an Employee's life insurance in accordance with Section IV involuntarily terminates solely by reason of the provisions of paragraph 6.1 (Termination of Coverage) and he dies during the thirty-one day period during which application for an individual policy may be made in accordance with paragraph 6.2(a) (Conversion of Life Insurance), there will be paid to his beneficiary of record the maximum amount of life insurance for which an individual policy could have been issued in accordance with paragraph 6.2 (whether or not he shall have applied for such individual policy).

6.5.   Continuation of Group Life Insurance for Retirees.  A Retiree may apply, at the time of his retirement to purchase group life insurance that will extend life insurance coverage when basic life insurance coverage terminates pursuant to paragraph 4.7.  The amount of such coverage shall be the amount in effect on the day preceding termination of basic life coverage.  The Retiree will be required to file an application provided by the Company or its designee.  The Company may require the Retiree to submit evidence of insurability.  If the Retiree's application is approved by the Company, such coverage shall commence on

INSURANCE                                        84

the third anniversary of the Retiree's retirement date. Upon commencement of coverage, the Retiree shall pay the full group rate for such coverage as determined by the Company.

6.6.   Discontinuance of Coverage. In the event that a covered Employee gives written notice on a form provided by his Employer that he desires to discontinue all coverage hereunder, or a portion thereof, the coverage specified in such notice shall terminate on the last day of the calendar month in which such notice is received by his Employer. If an Employee who has declined coverage for himself or any Dependent under Section V of this Agreement, elects to re-enroll for such coverage, paragraph 3.1 in regard to pre-existing conditions shall be applicable for the Employee and his Dependents. Coverage will commence effective the first of the month following acceptance and approval of such re-enrollment application by the Company or its designee.

SECTION VII
ENROLLMENT AND CONTRIBUTIONS

7.1.   Contributions. A covered Participant shall contribute in the applicable amount or amounts as determined by the Company for each calendar month with respect to coverage in force with respect to him on the first day of such month. All contributions required shall be made through automatic payroll deductions or, if applicable, from any pension or survivor income benefits due survivors, unless such coverage has been declined on a form provided by the Company or its designee, and except that where necessary by reason of lack of earnings they shall be made by direct payment to the Company or its designee.

7.2.   Refund of Overpayment. If it is determined that any benefits paid to a Participant under any Section of the Plan should not have been paid or should have been paid in a lesser amount, written notice thereof shall be given to such Participant and he shall repay the amount of the overpayment to the Company.

If the Participant fails to repay such amount of overpayment promptly, the Claims Administrator shall arrange to recover the amount of the overpayment by making an appropriate deduction or deductions from any future benefit payment or payments payable to the Participant under the Plan or the Company may make appropriate deduction or deductions from future compensation payable to the Employee and may also make such deduction or deductions upon the request of the Claims Administrator.

7.3.   Request for Enrollment. Each request for enrollment under Section IV and a request for Dependents' Coverage under Section V shall be on forms provided by the Company or its designee, shall contain an authorization for the Employer to deduct from the Employee's pay the amount of his contributions hereunder, and shall be duly executed by the Employee.

7.4.   Failure to Make Contributions. If a person required to make contributions fails to pay the applicable contributions for any month, the appropriate Employer or its designee shall notify such person of such failure to pay contributions, such notice to be mailed to such person's last known address as shown by such Employer's records. If such person then

fails to pay such contributions within thirty days after the mailing of such notice, all coverage (except any for which no contribution is required under the preceding provisions of this Plan) shall automatically terminate on the last day of the last month for which he made contribution.

SECTION VIII
SPONSORED DEPENDENTS

8.1.   Eligibility.  Except as otherwise provided in this subsection 8.1, prior to June 1, 2005, the provisions of Section VIII of the group insurance plan in effect under the 1998 Insurance Plan Agreement shall continue to apply.  On and after June 1, 2005, the Employee or Retiree with respect to whom each sponsored dependent is covered shall be responsible for paying the full group rate for such coverage.  No Employee or Retiree is permitted to add any person to sponsored dependent coverage after January 31, 2005.  Participants who were covered under Section V of the Group Insurance Plan as "sponsored dependents" prior to February 1, 2005 shall continue to be covered as sponsored dependents under the Group Insurance Plan thereafter until coverage terminates pursuant to subsection 6.1, 6.6 or 7.4, or coverage would have terminated under the provisions of Section VIII of the group insurance plan in effect under the 1998 Insurance Plan Agreement.

SECTION IX
GENERAL PROVISIONS

9.1.   Insurance Policy.  Except to the extent necessary to produce conformity with the preceding provisions, any policy or policies issued by an Insurance Carrier shall contain the provisions customarily contained in policies of group insurance issued by such Insurance Carrier for similar insurance coverages.

9.2.   Subrogation.  In the event of any payment of benefits under Section V for which a Participant may have a claim or cause of action against any person or organization (except a claim or cause of action against an Employer and except against insurers of policies of insurance issued to, and in the name of, the Participant), the Employer or the Insurance Carrier shall be subrogated to all right of recovery of the Participant with respect to any expenses included in any judgment or settlement. If such Participant incurs attorney's fees in connection with the successful prosecution or settlement of any claim or cause of action which includes such benefits, the Employer or Insurance Carrier, as the case may be, shall reduce its right of subrogation by a pro rata share of such attorney's fees based on the ratio of the amount of any such benefits paid under Section V to the total amount recovered by settlement or judgment. The Participant shall, at the request of the Company or the Insurance Carrier, execute and deliver such instruments and papers as may be required and to take such other reasonable steps necessary to secure the subrogation rights.

9.3.   Administration Of The Plan.  Except to the extent otherwise expressly provided in an applicable collective bargaining agreement, the Plan shall be administered by the Company or its designee; provided, however, that the Company by resolution of its

Board of Directors may designate any person, committee, board or similar body to act as named fiduciary or fiduciaries under the Plan and allocate any and all of its duties and responsibilities under the Plan to such named fiduciary or fiduciaries. If the Board of Directors allocates any of its duties and responsibilities under the Plan to a named fiduciary, such named fiduciary shall be substituted for the Company wherever such term appears under the Plan with respect to any duties and responsibilities so allocated. Any such named fiduciary or its delegates shall have discretionary authority to interpret the terms of the Plan, to determine eligibility for and entitlement to Plan benefits and shall have the discretion to take any other action with respect to the Plan in accordance with such resolution. Any interpretation, determination or action pursuant to such authority shall be given full force and effect and shall not be given "de novo" review if challenged in any proceeding in any court, agency or other forum. Prior exercise of such authority shall not create a precedent or obligate such named fiduciary or delegates to exercise their authority in the same or similar fashion thereafter.

9.4.    Limitation for Filing Claims. All claims under Section V of this Plan must be filed no later than one calendar year following the calendar year in which the expenses were incurred for all expenses incurred on or after January 10, 2005. Claims for expenses incurred prior to January 10, 2005 must be filed by December 31, 2005. For this purpose, expenses are incurred on the date the related service is rendered. Claims for expenses filed after these deadlines will not be paid. Participants shall comply with the requirements governing claims and appeals as set forth in the Department of Labor Regulations Section 2560.503-1.

9.5.    Health Information Privacy.

(a)    General. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the privacy regulations issued thereunder ("Privacy Rule") require the Company to ensure that certain health information is adequately protected and used or disclosed only for limited purposes. The Plan is a "hybrid entity" within the meaning of the "Privacy Rule" which means only the Plan's Health Care Components are covered under HIPAA while the other benefit components are not covered under HIPAA. The Health Care Components of the Plan are identified below and are subject to this provision and must comply with the standards for privacy of individually identifiable health information as set forth in the Privacy Rule.

(b)    Definitions. The following words and phrases, with the initial letter of each word capitalized, have the meanings indicated below for purposes of this subsection 9.5.

(i)    "Health Care Component" means the Plan's benefit components which provide medical, dental, vision, prescription drug, behavioral health, and health care reimbursement benefits. Such benefit components are covered under HIPAA.

INSURANCE                                      87

(ii) "Health Care Operations" means any of the following activities to the extent that they are related to a Health Care Component's covered functions:

(A) Conducting quality assessment and improvement activities; population-based activities related to health improvement, reduction of health care costs, case management and care coordination; contacting health care providers and patients regarding treatment alternatives; and related functions that do not include treatment;

(B) Reviewing competence or qualifications of health care professionals and evaluating provider and Health Care Component performance;

(C) Underwriting and other activities that relate to the creation, renewal, or replacement of a contract of health insurance or health benefits, and ceding, securing or placing a contract for reinsurance of risk relating to claims for health care (including stop-loss insurance);

(D) Conducting or arranging for medical review, legal services, and auditing functions, including fraud and abuse detection and compliance programs;

(E) Business planning and development, such as cost-management and planning-related analysis related to managing and operating a Health Care Component, and development or improvement of coverage policies; and

(F) Business management and general administrative activities, including, but not limited to: (A) management activities related to implementation of and compliance with the requirements of the Privacy Rule; (B) customer service, including the provision of data analyses for an Employer, provided that PHI is not disclosed to the Employer; (C) resolution of internal grievances; (D) due diligence related to the sale, transfer, merger, or consolidation of all or part of a Health Care Component with another entity directly regulated under the Privacy Rule, or an entity that, following such activity, will be subject to the Privacy Rule; and (E) consistent with applicable requirements of the Privacy Rule, creating de-identified information or a limited data set, both as defined in the Privacy Rule.

(iii) "Individual" means a Participant who is or was covered under one or more Health Care Components and who is the subject of Protected Health Information.

(iv)   "Payment" means activities undertaken by a Health Care Component to obtain contributions or to determine or fulfill its responsibility for coverage and provision of benefits, or to obtain or provide reimbursement for the provision of health care. Such activities include, but are not limited to:

     (A)   Determinations of eligibility or coverage (including coordination of benefits or the determination of cost sharing amounts), and adjudication or subrogation of health benefit claims;

     (B)   Risk adjusting amounts due based on enrollee health status and demographic characteristics;

     (C)   Billing, claims management, collection activities, obtaining payment under a contract for reinsurance (including stop-loss insurance and excess of loss insurance), and related health care data processing;

     (D)   Review of health care services with respect to medical necessity, coverage under a Health Care Component, appropriateness of care, or justification of charges;

     (E)   Utilization review activities, including precertification and preauthorization of services, and concurrent and retrospective review of services; and

     (F)   Disclosure to consumer reporting agencies of necessary information relating to collection of premiums or reimbursement.

(v)   "Privacy Policy" means the Caterpillar Inc. and Subsidiaries Health Plan HIPAA Privacy Policy.

(vi)   "Protected Health Information" or "PHI" means individually identifiable health information that (1) relates to the past, present, or future physical or mental condition of an Individual, provision of health care to an Individual, or payment for such health care; (2) can either identify the Individual, or there is a reasonable basis to believe the information can be used to identify the Individual; and (3) is received or created by or on behalf of a Health Care Component.

(vii)   "Responsible Employee" means an employee (including a contract, temporary, or leased employee) of an Employer whose duties (1) require that the employee have access to PHI for purposes of Payment or Health Care Operations, or (2) make it likely that he or she will receive or have access to PHI. Responsible Employee also includes any other employee (other than a designated Responsible Employee) who creates or receives PHI on behalf of a Health Care Component, even though his or her duties do not (or are not expected to) include creating or receiving PHI.

Responsible Employees are within the Health Care Component's HIPAA firewall when they perform Health Care Component functions.

(c)     Responsible Employees.  Only Responsible Employees are permitted to use, disclose, create, receive, access, maintain, or transmit PHI on behalf of a Health Care Component.  The use or disclosure of PHI by Responsible Employees shall be restricted to the Health Care Component administration functions that an Employer performs on behalf of a Health Care Component.

Employees of an Employer who perform the following functions on behalf of one or more Health Care Components are Responsible Employees:

(i)      claims determination and processing functions;

(ii)     vendor relations functions;

(iii)    benefits education and information functions;

(iv)    legal activities;

(v)     information systems support activities;

(vi)    internal audit functions; and

(vii)   human resources functions, including payroll.

In addition to those individuals described above, the HIPAA privacy officer, and Company employees to whom the HIPAA privacy officer has delegated any of the following responsibilities shall also be Responsible Employees:

(i)      implementation, interpretation, and amendment of the Privacy Policy;

(ii)     Privacy Rule training for Responsible Employees;

(iii)    investigation of and response to complaints by Individuals and/or employees;

(iv)    preparation, maintenance, and distribution of the privacy notice;

(v)     response to requests by Individuals to inspect or copy PHI;

(vi)    response to requests by Individuals to restrict the use or disclosure of their PHI;

(vii)   response to requests by Individuals to receive communications of their PHI by alternate means or in an alternate manner;

(viii)  amendment and response to requests to amend Individuals' PHI;

INSURANCE                                    90

    (ix)    response to requests by Individuals for an accounting of disclosures of their PHI;

    (x)    response to requests for information by the Department of Health and Human Services;

    (xi)    approval of disclosures to law enforcement or to the military for government purposes;

    (xii)    maintenance of records and other documentation required by the Privacy Rule;

    (xiii)    negotiation of Privacy Rule provisions and/or reasonable security provisions into contracts with third party service providers;

    (xiv)    maintenance of Health Care Component PHI security documentation; or

    (xv)    approval of access to PHI stored in electronic form.

(d)    Permitted Uses and Disclosures.  Responsible Employees may access, request, receive, use, disclose, create, and/or transmit PHI only to perform certain permitted and required functions on behalf of Health Care Components, consistent with the Privacy Policy.  This includes:

    (i)    uses and disclosures for Payment and Health Care Operations functions of a Health Care Component, another HIPAA covered entity, or a health care provider;

    (ii)    disclosures to a health care provider for the health care provider's treatment activities;

    (iii)    disclosures to an Employer (1) of summary health information for purposes of obtaining health insurance coverage or premium bids for the Health Care Components or for making decisions to modify, amend, or terminate the Health Care Components, or (2) of enrollment or disenrollment information;

    (iv)    disclosures of an Individual's PHI to the Individual or his or her personal representative, as defined in the Privacy Rule;

    (v)    disclosures to an Individual's family members or friends involved in the Individual's health care or payment for the Individual's health care, or to notify an Individual's family in the event of an emergency or disaster relief situation;

    (vi)    uses and disclosures to comply with workers' compensation laws;

(vii)    uses and disclosures for legal and law enforcement purposes, such as to comply with a court order;

(viii)    disclosures to the Secretary of Health and Human Services to demonstrate the Health Care Components' compliance with the Privacy Rule;

(ix)    uses and disclosures for other governmental purposes, such as for national security purposes;

(x)    uses and disclosures for certain health and safety purposes, such as to prevent or lessen a threat to public health, to report suspected cases of abuse, neglect, or domestic violence, or relating to a claim for public benefits or services;

(xi)    uses and disclosures to identify a decedent or cause of death, or for tissue donation purposes;

(xii)    uses and disclosures required by other applicable laws; and

(xiii)    uses and disclosures pursuant to an Individual's authorization that satisfies the requirements of the Privacy Rule.

(e)    Certification Requirement. The Company may permit an Employer's Responsible Employees to access PHI only upon receipt of a certification by the Employer that the Employer agrees:

(i)    not to use or further disclose PHI other than as permitted or required by this Section and the Privacy Policy or as required by law;

(ii)    to take reasonable steps to ensure that any agents, including subcontractors, to whom the Employer provides PHI received from the Health Care Components agree to the same restrictions and conditions that apply to the Employer with respect to such PHI;

(iii)    not to use or disclose PHI for employment-related actions and decisions or in connection with any other employee benefit plan of the Employer other than another Health Care Component or health plan;

(iv)    to report to the Company any use or disclosure of PHI that is inconsistent with the permitted uses or disclosures described above of which the Employer becomes aware;

(v)    to make available PHI for the Individual's inspection and copying in accordance with the Privacy Rule;

(vi)    to make available PHI for the Individual's amendment, and to incorporate any amendments to PHI in accordance with the Privacy Rule;

(vii)   to make available PHI required to provide the Individual with an accounting of disclosures in accordance with the Privacy Rule;

(viii)  to make its internal practices, books, and records relating to the use and disclosure of PHI received on behalf of the Health Care Components available to the Secretary of Health and Human Services for purposes of determining compliance with the Privacy Rule;

(ix)    if feasible, to return or destroy all PHI received from the Health Care Components that the Employer still maintains in any form and retain no copies of such PHI when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of PHI infeasible; and

(x)     to take reasonable steps to ensure that there is adequate separation between Health Care Component administration functions and the Employer's other activities.

(f)     Mitigation.  In the event of non-compliance with any of the provisions set forth in this Section, the HIPAA privacy officer shall address any complaint or report of non-compliance promptly and confidentially.  The HIPAA privacy officer first will investigate the complaint or report and document his or her investigation efforts and findings.  If PHI has been used or disclosed in violation of the Privacy Policy or inconsistent with this Section, the HIPAA privacy officer shall take immediate steps to mitigate any harm caused by the violation and to minimize the possibility that such a violation will recur.  If a Responsible Employee or other employee of the Company is found to have violated the Privacy Policy, such employee shall be subject to disciplinary action up to and including termination of employment.

9.6.    Participating Provider Contracts.  Where the Claims Administrator enters into direct or indirect participating provider contracts with Physicians or other providers or facilities, or agreements with a network administrator, in areas where the Employer has Employees, the standard rules of the network administrator shall govern the benefits provided hereunder.

## SECTION X
## SCHEDULE OF SURGICAL OPERATIONS

The following schedule of surgical operations are included for the sole purpose of application of Paragraph 4.5 of the Plan.

Maximum
Payment

ABDOMEN
        Resection of stomach or large intestine (including rectum) .............................$250

Choledochoplasty plastic repair or reconstruction of bile ducts ..........................250
Pancreatectomy local, partial or subtotal ..........................................................250
Removal, or other operation on gall bladder or liver ..........................................200
Gastroenterostomy, gastrostomy ......................................................................200
Intestines, small, resection or anastomosis .......................................................200
Pyloroplasty ...................................................................................................200
Subdiaphragmatic or subphrenic abscess ..........................................................200
Peptic Ulcer, perforated, closure of .................................................................175
Exploratory Laparotomy ..................................................................................175
Appendectomy .................................................................................................125
Cutting into abdominal cavity for diagnosis or treatment of organs therein (unless
    otherwise specified in this schedule) ...........................................................175

AMPUTATIONS
Upper Extremity
    Interscapulo-thoracic ................................................................................250
    Disarticulation of shoulder ........................................................................150
    Arms through humerus ...............................................................................100
    Forearm, through radius and ulna ...............................................................100
    Band through metacarpal bones ...................................................................60
    Finger, one at any joint or phalanx ..............................................................40
        each additional finger ...........................................................................15
Lower Extremity
    Hind-quarter (hemipelvectomy) ..................................................................250
    Disarticulation of hip ................................................................................175
    Thigh: through femur, supracondylar ..........................................................125
        through condyles of femur ....................................................................175
    Leg: through tibia and fibula ......................................................................125
    Foot, transmetatarsal ...................................................................................75
    Toe, one at any joint or phalanx ..................................................................40
        each additional toe ...............................................................................15

BONES
Osteoplasty (shortening or lengthening of bone) ...............................................200
Diseased bone removal (alveolar processes excepted)
    Metacarpal, Metatarsal, or Phalanges ...........................................................50
    All others ................................................................................................150
Drilling of cortex for osteomyelitis or bone abscess or incision of periosteum (alveolar
    processes excepted) ....................................................................................50
Cutting operation for removal of material used for internal fixation ....................50
Osteotomy for correction of congenital or acquired deformities;
    Major long bones ........................................................................................75
Fingers or toes .................................................................................................50
Epiphyseal arrest by drilling, grafting or stapling. ..............................................50
Exostosis, one or more, removal of ...................................................................50

BREAST
    Abscesses ....................................................................................35
    Benign tumors, or partial amputation ....................................................50
    Mastectomy
        Simple ................................................................................100
        Radical ...............................................................................250

CARDIOVASCULAR SYSTEM
    Heart and Pericardium:
        Cardiotomy, pericardiotomy or pericardiectomy...........................250
    Arteries:
        Arteriotomy, with exploration or removal of embolus:
            intrathoracic ...............................................................250
            intra-abdominal ...........................................................175
            neck or extremities .........................................................50
            excision of arterial or arteriovenous aneurysm........................150
        Angiography:
            Catheterization of heart chambers ................................50
            Cerebral angiogram, with vessel exposure ................30
    Veins:
        Varicose veins:
            injection treatment, each treatment (not more than 5) ...............10
            cutting operation ...........................................................75
            Phlebotomy, with exploration or removal of thrombus:
                intrathoracic ...............................................................250
                intra-abdominal ...........................................................175
                neck or extremities .........................................................50
    Transfusion of Blood:
        Recipient each transfusion (not more than 8) ................................25

CHEST
    Cutting into thoracic cavity for diagnosis or treatment of organs therein (unless otherwise
        specified in this schedule)...........................................................250
    Lobectomy ...................................................................................250
    Pneumolysis .................................................................................150
    Thoracotomy for drainage...............................................................75
    Pneumothorax, artificial: induction of ...............................................30
        each refill ............................................................................10
    Thoracentesis:  puncture of pleural cavity for aspiration.......................15

DISLOCATIONS, REDUCTION OF:
    Unless otherwise specified, the maximum payment shown is the payment for closed
        reduction or treatment.
    Maximum payment for open reduction or operation for treatment of compound
        dislocations is twice the amount shown for closed reduction unless otherwise
        specified in the schedule.
    Temporomandibular..........................................................................15

Clavicle, sternoclavicular, or acromioclavicular ............................................50
Shoulder (humerus)  closed reduction .........................................................40
    open reduction..........................................................................................175
Elbow ..............................................................................................................50
Metacarpal or carpal .....................................................................................50
Finger ..............................................................................................................10
Thumb:  closed...............................................................................................10
    open ........................................................................................................50
Hip (femur) ...................................................................................................100
Knee (tibia) .....................................................................................................75
Patella:  Closed reduction .............................................................................40
    Open reduction.......................................................................................100
Semilunar cartilage (meniscus):  closed .......................................................15
    open ......................................................................................................125
Ankle or Astragalar-tarsal..............................................................................50
Other tarsal or Metatarsal...............................................................................60
Toe ...................................................................................................................10

EAR, NOSE OR THROAT
Labyrinthotomy.............................................................................................250
Labyrinthectomy ...........................................................................................250
Fenestration of semicircular canals...............................................................250
Mastoidectomy .............................................................................................150
Myringotomy:  tympanotomy:  plicotomy........................................................15
Tonsillectomy
    Removal of tonsils or tonsils and adenoids:
        Employee ..........................................................................................50
        Wife or child 12 years of age and over .............................................50
        Child under 12 years of age ..............................................................30
    Nasal septum, submucous resection with or without
      rhinoplasty............................................................................................100
    Rhinoplasty with or without submucous resection:
      including grafts .....................................................................................150
      without grafts ........................................................................................100
    Maxillary sinusotomy, simple: antrum window operation:
      Unilateral................................................................................................50
    Maxillary sinusotomy, radical (Caldwell-Luc):
      Unilateral..............................................................................................100
      Bilateral.................................................................................................150
    Sphenoid or ethmoid sinusotomy.....................................................................50
    Frontal sinusotomy, external, radical...............................................................150
    Combined external, frontal, ethmoid and sphenoid sinusotomy
      Unilateral..............................................................................................150
      Bilateral.................................................................................................200
    Removal of nasal polyps or turbinate (one or more) ...........................................25
    Tracheotomy ....................................................................................................75
    Laryngectomy .................................................................................................250

ENDOSCOPIC PROCEDURES
>
> Thoracoscopy, Peritoneoscopy, or Culdoscopy:
>> With surgical operation ....................................................................150
>> Without surgical operation ...............................................................60
>
> Bronchoscopy, esophagoscopy, or gastroscopy
>> With surgical operation ....................................................................100
>> Without surgical operation ...............................................................60
>
> Laryngoscopy, direct:
>> With surgical operation.....................................................................75
>> Without surgical operation................................................................25
>
> Cystoscopy:
>> With surgical operation (not otherwise classified) ...........................50
>> Without surgical operation................................................................25
>
> Proctoscopy – Sigmoidoscopy - See Rectum

EYE
>
> Detached retina, repair of.........................................................................200
> Cataract, extraction ..................................................................................150
> "  needling..................................................................................................75
> Enucleation or evisceration......................................................................125
> "  "  with implantation .............................................................................150
> Cutting operation on eye muscles, one or more muscles ....................125
> Glaucoma, operation for  .........................................................................125
> Removal of intraocular foreign body  .....................................................125
> Iridectomy or Keratectomy .....................................................................100
> Plastic repair of eyelid .............................................................................100
> Pterygium...................................................................................................50
> Operative removal of foreign body imbedded in cornea or sclera .......................15

FRACTURES, TREATMENT OF
>
> Unless otherwise specified the maximum payment is the payment for closed reduction or treatment.
>
> Maximum payment for open reduction or operation for treatment of compound fractures is twice the amount shown for closed reduction unless otherwise specified in the schedule but not exceeding $250.
>
> Epiphyseal separations are considered fractures of the bone involved.
>
> Skull
>> Depressed:
>>> Requiring dural repair........................................................................250
>>> Not requiring dural repair ................................................................125
>> Non-operative treatment ...................................................................50
>
> Facial Bones
>> Nose ........................................................................................................25
>> Mandible, or Maxilla  ...........................................................................50
>>> "  "  - open or closed reduction
>>> with wiring of teeth or application of skeletal fixation............................150

Facial bones (not otherwise classified) ............................................25
Spine and Trunk
    Vertebra, body of:
        closed treatment (one or more) ............................................100
        laminectomy or spine fusion for  ........................................250
    Vertebral process, one or more ................................................25
    Sacrum ....................................................................................50
    Coccyx ....................................................................................25
    Ribs, one ................................................................................20
        each additional ..............................................................5
    Sternum ..................................................................................25
    Sternum, depressed-open reduction ........................................100
    Clavicle ..................................................................................40
    Scapula ....................................................................................50
    Pelvis
        Closed reduction ..........................................................75
        with fracture and protrusion of the acetabulum ..............125
        Open operation including repair of pelvic contents ........250
Upper Extremity
    Humerus ..................................................................................100
    Elbow, fracture into ..............................................................100
    Radius and/or ulna ................................................................100
    Wrist:  Carpal Bones - one or more  ......................................75
    Metacarpal - one or more ........................................................50
    Finger or Thumb:  one ............................................................30
        each additional  ............................................................10
Lower Extremity
    Femur ....................................................................................175
    Tibia and/or fibula................................................................125
    Patella....................................................................................65
    Ankle, bimalleolar or trimalleolar........................................125
    Antragalus and/or Os Calcis ................................................100
    Other Tarsal and/or Metatarsal bones ....................................50
    Toes, one ................................................................................30
        each additional ............................................................10

GENITAL SYSTEM
    Female (Gynecology)
    Radical hysterectomy for malignant tumor................................250
    Hysterectomy, including total or subtotal supracervical or
        panhysterectomy (with or without, dilation and curettage, surgery
        on tubes, ovaries, ligaments or pelvic floor repair) ................175
    Excision of fibroid tumor of uterus............................................125
    Uterine suspension or fixation ................................................125
        With interposition, with or without pelvic floor repair............150
    Amputation of Cervix ..............................................................50
    Local excision of lesion of cervix, conization,

Cauterization or any combination thereof................................................25
Dilation and curettage (non-puerperal)..............................................35
Dilation and curettage (non-puerperal) with local excision of lesion of
    cervix, conization or cauterization..............................................50
Cystocele and/or rectocele, repair of ...............................................75
Perineorrhaphy, perineoplasty, colpoplasty, other gyneclogical plastic,
    or any combination thereof.......................................................75
Any operation on the ovaries and/or fallopian tubes ....................125
Bartholin's and Skene's glands, or urethral carbuncle:
Excision..................................................................................................35
Incision...................................................................................................15
Male
Prostate, removal for malignant tumor ........................................250
Prostate removal............................................................................200
Prostate, external drainage of abscess..........................................50
Orchiectomy or epididymectomy ................................................75
Excision of:
    Hydrocele...............................................................................75
Varicocele:
    Unilateral...............................................................................50
    Bilateral.................................................................................75
Vasectomy for disease .................................................................40
Incision into testis or epididymis ................................................35
Circumcision:
Of Employee or Dependent 12 years of age and over ...................30
Of Dependent under 12 years of age............................................20

## HERNIA
Hernioplasty: herniorrhaphy: herniotomy:
    Single .......................................................................................100
    Multiple....................................................................................150
Hiatus or diaphragmatic...............................................................250
Ventral, incisional .......................................................................175
Ventral, incisional with fascial or artificial implant ............................200

## JOINTS
Arthroplasty
    Shoulder, elbow, hip, knee......................................................250
    Wrist or ankle.........................................................................125
    Any other joint........................................................................60
Arthrodesis - fusion or fixation
    Hip or shoulder.......................................................................175
    Knee or ankle..........................................................................150
    Elbow or wrist........................................................................125
    Spine fusion - see Spine
    Intervertebral disc - see Spine

Arthrotomy
    Shoulder, elbow, hip or knee ............................................................150
    Wrist or ankle.................................................................................125
    Any other joint ................................................................................50
Capsulotomy and/or capsuloplasty
    Shoulder, elbow, hip and knee .......................................................100
    Any other joint ................................................................................50
Capsulorrhaphy: suture or repair of joint capsule...............................75
Bursa - Excision of or incision into ......................................................75
    Needling of......................................................................................20

## MUSCLES - CUTTING, REPAIR, SUTURING AND TRANSPLANTATION

Single ....................................................................................................50
Each additional......................................................................................25
Division of scalenus anticus..................................................................75
Division of sternocleidomastoid for torticollis ....................................100

## NERVES

Gasserian Ganglionectomy .................................................................250
Sympathectomy....................................................................................200
Retrogasserian neurotomy: transection of
    sensory root of trigeminal nerve ...................................................175
    Transection of vestibular branch of acoustic nerve .......................100
Peripheral nerve trunk surgery..............................................................75
Transection of phrenic nerves................................................................75
Injection of alcohol ...............................................................................25
Diagnostic and therapeutic blocks:
    Sympathetic block (lumbar, dorsal, or cervical), initial .................25
    Paravertebral block, initial .............................................................25

## OBSTETRICAL PROCEDURES

Delivery of child or children.................................................................75
Caesarean section, including delivery..................................................125
Abdominal operation for extrauterine pregnancy ...............................125
Miscarriage ...........................................................................................35

## PARACENTESIS ....................................................................................15

## RECTUM AND ANUS

Proctoplasty, perineal, for stricture or prolapse.................................100
Cutting operation or injection treatment for
radical cure of hemorrhoids (complete procedure):
Other than external................................................................................75
External only..........................................................................................25
Cutting operation for fistula in ano.......................................................75
Proctorrhaphy for stenosis ....................................................................75
Cutting operation for fissure .................................................................30

Cryptectomy, single or multiple ........................................................10
Enucleation of external thrombotic hemorrhoid ...............................10
Biopsy, not otherwise classified ......................................................15
Other cutting operations..................................................................25
Proctoscopy....................................................................................10
Proctoscopy, with removal of papillomas or polyps.........................25
Sigmoidoscopy................................................................................25
Sigmoidoscopy, with removal of papillomas or polyps.....................35
If more than one operation is performed at any one time on the rectum or
anus, the maximum payment shall not exceed $125.

## SKIN AND SUBCUTANEOUS AREOLAR TISSUE

Excision of pilonidal cyst or sinus....................................................100
Wide excision of lesion, with graft or plastic closure .......................100
Wide excision of lesion, without graft or plastic closure....................50
Drainage of furuncle, small subcutaneous abscess or sebaceous cyst.................10
Drainage of onychia or paronychia, with or
without complete or partial avulsion of nail ......................................10
Drainage of lymph node abscess or lymphadenitis.............................10
Incision and removal of foreign body ...............................................10
Biopsy of skin, subcutaneous tissue, or lymph node .........................10
Local excision of small benign neoplastic, cicatricial, inflammatory or congenital lesion
........................................................................................................15

Excision of nail, nail bed, or nail fold:
partial .............................................................................................10
complete..........................................................................................25
Excision of lymph node for diagnosis...............................................25
Simple excision of lymph nodes for tuberculosis .............................50
Excision of carbuncle......................................................................25
Drainage of carbuncle .....................................................................15
Lacerations, surgical repair of:
    Single .......................................................................................15
    Each additional...........................................................................10
    All types, maximum ...................................................................75
Burns, surgical treatment of:
    Third degree ..............................................................................35
    Second degree ...........................................................................20

## SKULL

Craniotomy, with plastic repair, bone graft, metal or plastic plate.....................250
Trephination (or burr holes) exploratory:
    Unilateral...................................................................................50
    Bilateral.....................................................................................75

Ventriculography ...........................................................................50

SPINE
     Intervertebral disc, operation for .......................................................................250
     Laminectomy ....................................................................................................250
     Spine fusion .....................................................................................................250
     Pneumoencephalography ...................................................................................25
     Spinal puncture (lumbar puncture) ...................................................................15

SPRAINS
     Application of Plaster Cast
     Wrist or Ankle ..................................................................................................10
     Elbow or Knee ..................................................................................................15

TENDONS
     Cutting, Repair, Suturing, and Transplantation:
          Single ..........................................................................................................50
          Each additional ...........................................................................................25
     Fasciectomy for Dupuytren's contracture .......................................................100

THYROIDECTOMY ...............................................................................................225

TUMORS
     Removal of; by cutting operation:
          Malignant tumors (except those of face, lip, or skin) ...................250
          Malignant tumors, face, lip, or skin ..........................................................100

URINARY SYSTEM
     Removal of kidney ..........................................................................................200
     Cutting operation into kidney, ureter, or bladder ............................................175
     Cystostomy (for drainage) ..............................................................................100
     Cutting into urethra .........................................................................................100
     Litholapaxy or crushing of stone ....................................................................100

The Company reserves the right to establish the value of additional procedures, for purposes of benefits payable under Section 4.5. Such determination may be delegated by the Company to an Insurance Carrier or other third party.

## LETTERS OF AGREEMENT

LETTER OF AGREEMENT NO. 1
RE: Health Maintenance Organization Plans

This will confirm our understanding that in the event a Health Maintenance Organization plan were to be developed in one or more communities where our plants are located, it would be desirable to offer the employees and retirees, and their dependents, who are located in such communities, the option to enroll in such a plan as an alternative to enrollment under the health program outlined in Section V of our current Insurance Plan Agreement.  Eligibility for participation will be based on the applicable zip code service area as defined and established by the Company or its designee for such communities.

On and after January 1, 2006, when employees and their dependents are enrolled in a Health Maintenance Organization plan, their benefits, rights and obligations shall be governed by the terms, rules, and procedures of the Health Maintenance Organization plan as in effect from time to time, including any changes thereto, and benefits not covered by such plan will not be covered under Section V of the current Group Insurance Plan.

In this regard, please be advised that the undersigned is prepared to investigate any such alternative plan in the event that one or more are formed, and if it is found, by mutual agreement between the undersigned and the Union (regardless of whether the plan is approved by the United States Department of Health and Human Services under the Health Maintenance Organization Act of 1973) that such a plan or plans is of high quality and provides at least the level of benefits specified in Section V of our Insurance Agreement, at a cost to the undersigned that does not exceed its cost at that time to provide these benefits under such Section V, then steps will be taken by the undersigned within a reasonable period of time following such investigation but before the termination of such Insurance Plan Agreement to permit employees and their dependents, an option, annually, to enroll in such a plan.

LETTER OF AGREEMENT NO. 2
RE: Rehabilitative Jobs

During 1982 negotiations, the Company and Union agreed that Employees who are returned from disability leave of absence to special jobs created for rehabilitation purposes and who are subsequently laid off under the circumstances described in paragraph 4.5 shall be eligible for Weekly Accident and Sickness Benefits.

This confirms the understanding between the parties that the specially created jobs in the Restricted Employee Placement Center of the Track Type Tractor Business Unit shall be included in the administration of this provision and that when an Employee is returned to work on such a specially created job other than in the Restricted Employee Placement Center, the Company will notify the Local Union of the nature, location and description of such special job and of the Employee assigned to that job.

LETTER OF AGREEMENT NO. 3
RE: Retirement Insurance in Event of Plant Closing

This will confirm our understanding of the application of retirement insurance coverage for employees who are placed on layoff as a result of plant closing.

Employees who are eligible to retire, either under the Special Early Retirement or under the regular retirement provisions, will have coverage as follows:

Employees who are at least age 50 with at least 10 years of credited service when SUB ends will have retirement life and medical insurance placed in effect at the expiration of their 12 (or 24) month continuation as provided in paragraph 6.1 of the Group Insurance Plan or Section 10 of the Insurance Plan Agreement whether or not the employee is then retired and receiving a pension benefit at that time.

LETTER OF AGREEMENT NO. 4
RE:  Joint Committee on Health Care

During negotiations, the Company and Union discussed the desirability of establishing a Joint Committee on Health Care to study various cost containment and quality assurance measures and alternate delivery systems that are of mutual interest. The parties agreed that a Joint Committee on Health Care would be formed as soon as practical to address the following mutual concerns:

1.    Review and approval of Health Maintenance Organization's requests for inclusion in dual choice offerings to employees, including dental HMO's. Study the feasibility of joint assessment of quality of medical care provided by HMO's.

2.    Study and implement, if possible, a pilot "Early Discharge Maternity Incentive Program" in any or all plant locations.

3.    Study and implement alternative cost containment programs in the area of foot surgery.

4.    Study and implement cost effective programs to assure the necessity and quality of dental implant surgery, TMJ surgery, gingivectomies, replacement crowns and orthodontic care.

5.    Study abuses in the laboratory test and X-ray area and implement programs which will reduce abuses.

6.    Review effectiveness of Preferred Provider Plan.

   a)    Ongoing review for specific operation problems.

   b)    Review data for overutilization.

   c)    Review data for quality of care issues.

INSURANCE                                         2

d)      Update list of procedures and diagnoses which require precertification.

e)      Determination if additional penalties are required to discourage utilization of certain Non-Preferred Providers.

f)      Implement hold harmless provisions in certain situations.

7.     Study and implement guidelines for dental implants.

8.     Study incidence of Cesarean section claims and claims for premature infants to determine if an early pregnancy education program will reduce the incidence of claims for these high cost conditions.

9.     Study mental health costs and determine if case management techniques are available to reduce costs and improve quality of care.

10.    Study methods available to provide assurance that physicians who perform services are qualified to provide them.

11.    Assess the need for and implement a precertification process for expensive inpatient and outpatient laboratory tests and x-rays (such as, but not limited to, MRI's, PETS, etc.) as well as expensive surgical procedures and provide a mechanism whereby specific medical providers can be identified and after sufficient notification to employees, any charges for those specific procedures or any expenses of a specific provider will not be considered as medical expense benefits covered under Article V.

12.    Review the development of long term care plans and plan features that provide appropriate benefit levels, utilization review and the cost aspects of such plans including the effect of any legislative efforts to provide such care.

13.    Other mutually agreed-to topics of a cost containment or quality assurance nature.

14.    Review and approval of any changes to the existing criteria used to approve Organ Transplant Centers.

15.    Review and approval of any changes to the existing criteria used to approve Office Surgery programs.

16.    Study and evaluate the various alternatives available in order to provide an impartial review of the quality of services and/or providers available within the healthcare networks developed by the Company.

The Committee shall be made up of the following individuals:

For the Company, its:

1.     Employee Benefits Manager

INSURANCE                                    3

2.    Group Insurance Manager

3.    Medical Director of Group Insurance

4.    Head Dental Advisor, and

5.    Cost Containment Supervisor

6.    One or more Representatives from Corporate Labor Relations.

For the Union, its:

1.    Social Security Department Technician

2.    International Union Representative from the Caterpillar Department

3.    An Insurance Representative from the separate locals.

The parties are free to call upon specialists within their organizations to participate on an as needed basis.

The Joint Committee will meet, at least once each quarter, in Peoria, IL unless by mutual agreement the time and place is changed.

In the instance that the Insurance Representative from a local plant is not a full time employee of the Union, the representative shall attend meetings of the Joint Committee, and accompany Company members of the Joint Committee to medical community meetings in regard to the Preferred Provider Agreement without loss of pay for regularly scheduled hours.

LETTER OF AGREEMENT NO. 5

The following guidelines will be used by the Company for reducing Accident and Sickness Benefits by Social Security Disability Insurance Benefits:

(a)    As early as the thirteenth but no later than the twentieth week of disability, depending upon the initial prognosis on the claim, an Employee will be notified of the eligibility requirements and advised to apply for Social Security Disability Insurance Benefits (DIB). The Employee will be advised that, effective with the payment for the twenty-sixth week of disability, Accident and Sickness (and Long Term Disability) benefit computations will presume eligibility for DIB except that if, prior to such twenty-sixth week, the Employee files for DIB and completes a reimbursement agreement and an authorization form allowing the Social Security Administration to advise the Company or Insurance Carrier of its determination, he shall receive unreduced Accident and Sickness (or Long Term Disability) benefit payments while he is otherwise eligible. Further, the Employee will be instructed that, if his physician anticipates that the Employee's disability will not extend beyond twelve months, his physician should complete a statement indicating such a prognosis. Where such a statement is provided, a reduction of

Accident and Sickness (or Long Term Disability) benefits, based on presumed eligibility for DIB, will not be instituted in the twenty-sixth week of disability. If during the ensuing period of disability it becomes apparent that either 1) through deterioration of the Employee's condition, or 2) a prolongation of the recovery period, that he will not return to work for a prolonged period, he will be requested to file for DIB and complete reimbursement and authorization forms.

(b)     In the twenty-fourth week of disability, any Employee whose physician has not completed the statement referenced in (a) above, will be again advised to apply for DIB if he has not done so and instructed to complete a reimbursement agreement and an authorization form allowing the Social Security Administration to advise the Company or Insurance Carrier of its determination. Failure to 1) apply for DIB, 2) complete a reimbursement agreement, or 3) complete the authorization form will result in the suspension of an amount of Accident and Sickness (or Long Term Disability) benefits equal to the presumed amount of DIB (commencing at the 26th week) until the Employee provides satisfactory proof that he has applied for DIB, completed a reimbursement agreement and an authorization form. The Employee also will be advised that he may authorize release of information in the Accident and Sickness (and Long Term Disability) benefit claim files to the Social Security Administration.  In the event the Company institutes a program to assist Employees in the DIB application process, the Employee is required to cooperate in that process.  Failure to comply with the process will result in the suspension of an amount of Accident and Sickness (or Long Term Disability) benefits equal to the presumed amount of DIB until such time as the Employee cooperates with that process.

(c)     Upon receipt of an initial determination of disallowance of DIB, a notice will be sent instructing the Employee to 1) file a request for reconsideration, within two weeks of the date of the notice, and 2) complete an authorization form allowing the Social Security Administration to advise the Company or Insurance Carrier of its determination. Failure to either 1) request such reconsideration within such time period, or 2) complete the authorization form will result in the suspension of an amount of Accident and Sickness (or Long Term Disability) benefit payments equal to the presumed amount of DIB until the Employee provides satisfactory proof that such request has been filed and the authorization form has been completed.

(d)     Upon receipt of a reconsideration determination of disallowance, the Employee will be encouraged to file for a hearing before an administrative law judge of the Social Security

Administration. If the Employee files for such a hearing, he will be requested to complete another authorization form as referenced in (c) above.

(e)     In the event of a reconsideration determination denying DIB, and provided any subsequent review does not reverse such decision, the Employee will not be required to repay any Accident and Sickness (or Long Term Disability) benefits

otherwise payable, unless such denial of DIB resulted from the Employee's refusal to accept vocational rehabilitation. Where such denial occurs, the Employee is obligated to repay Accident and Sickness (and Long Term Disability) benefits in an amount equal to the amount of DIB to which he would otherwise have been entitled for the same period or periods of disability.

(f)    Upon receipt of a notice of award of DIB, any overpayment of Accident and Sickness (or Long Term Disability) benefits caused by the retroactive award of DIB is to be repaid. The amount of the overpayment will be based on the actual amount of such award.

(g)    In the event of a DIB award resulting from a reconsideration or hearing before an administrative law judge, the amount of Accident and Sickness (and Long Term Disability) benefits overpayment will be reduced by an amount equal to any attorney fees associated with the award, provided that 1) the Employee makes such repayment within 30 days of the date the Employee is notified of the amount to be repaid, and 2) such reduction applies only to attorney fees associated with a successful appeal of a denial of DIB and includes only that portion of the attorney's fee associated with the period of time the Employee was entitled to receive Accident and Sickness (and Long Term Disability) benefits, and 3) such reduction for such attorney fees may not exceed 25 percent of the overpayment. Attorney fees for services prior to denial of the initial application for DIB will not reduce the amount of overpayment.  Failure to repay the full amount of the overpayment within one year of the date of notification of such overpayment shall result in the Employee being separated from the Company unless such one-year period is extended by mutual agreement of the Company and the Union.

(h)    An Employee age 65 or older may be entitled to Old-Age Benefits as early as the first day of total disability. No reduction of Accident and Sickness benefits shall be made until the Employee provides evidence that he is receiving Old-Age Benefits (through authorization of information disclosure by the Social Security Administration or otherwise). If requested, such evidence shall be provided by such an Employee.

(i)    In the event an Employee receives an initial determination of disallowance of DIB, all amounts of Accident and Sickness Benefits withheld will be paid to the Employee unless the Employee was denied DIB for failure to accept vocational rehabilitation or for not filing for DIB within the period of time specified by the Social Security Administration as necessary for DIB to commence at the first of the sixth month of disability.

(j)    When the Company mails the initial notice to the Employee requesting that the Employee apply for DIB, a copy of such initial notice will be mailed to the Union's Local Insurance Representative, if any, of the facility at which the Employee works.

(k)     Upon receipt of the final determination of disallowance of DIB the Employee shall reapply for a new initial determination under the rules as outlined in this Letter of Agreement 5 within thirty days of notification by the Company to reapply for DIB.

LETTER OF AGREEMENT NO. 6
Re: Flexible Spending Account Plan

Pursuant to the terms of Caterpillar's Flexible Spending Account Plan, which is qualified under Section 125 of the Internal Revenue Code, active Employees will be eligible to participate in the plan for payment of health care expenses and/or dependent care expenses on a pre-tax basis as of January 1, 2006.

LETTER OF AGREEMENT NO. 7
RE: Medical Premium Payment Plan

Pursuant to the terms of Caterpillar's Medical Premium Payment Plan, which is also qualified under Section 125 of the Internal Revenue Code, active employees will be able to pay required premiums under Section V of the Plan on a pre-tax basis on and after February 1, 2005, provided that, in order to permit the pre-tax treatment of such contributions, the eligibility, coverage and cancellation of coverage provisions of such Medical Premium Payment Plan will be applied to the Group Insurance Plan.

LETTER OF AGREEMENT NO. 8
RE: Prescription Drug Benefits for Certain Retirees

This confirms our understanding that the prescription drug benefits described in subsection 5.11 shall apply to Retirees who retired from the Company prior to January 1, 1992 (and any Dependent or sponsored dependent covered with respect to such Retiree) except that the limitations described in paragraph 5.11(e)(xii) shall not apply, and the following co-payment amounts shall be substituted for the co-payment amounts set forth in paragraph 5.11(c):

(i)     Generic Drug Prescriptions.  The Participant must pay $5 for each one-month supply of a generic drug.

(ii)    Brand-Name Drug Prescriptions.  The Participant must pay $15 for each one-month supply of a brand-name drug.

A mail-order prescription drug program is available to Retirees who retired from the Company prior to January 1, 1992 (and any Dependent or sponsored dependent covered with respect to such Retiree).  The Plan will provide up to a 90-day supply of an eligible prescription drug after payment of the following: (i) one $5 co-payment for a generic prescription drug, and (ii) two $15 co-payments for a brand-name prescription drug.

The above co-payment amounts will not be subject to the adjustments described in paragraph 5.11(c).

INSURANCE                                     7

LETTER OF AGREEMENT NO. 9
RE: Health Insurance Legislation

This confirms our understanding that, if during the term of our current Insurance Plan Agreement any federal or state law (other than a Workers' Compensation or Occupational Disease law) is enacted or amended (other than a Workers' Compensation or Occupational Disease law) regarding hospital, surgical, medical, dental, vision, or prescription drug benefits for employees, retirees, or their dependents, which may duplicate or may be integrated with the benefits under Section V of the Group Insurance Plan, then the Company may modify the benefits described in Section V, but only if, with respect to each modification, (i) the modification increases, or does not reduce, a benefit available under Section V or reduces, or does not increase, the amount payable by a Participant under Section V with respect to a benefit; (ii) the modified benefit is available on an optional basis to Participants; or (iii) the modification eliminates a benefit available under Section V that would duplicate a benefit available as a result of such law.

In the event any such federal or state law is enacted, the Company will meet with the International Union to discuss the modification of the benefits under Section V that may be affected by such law in the manner described above.  No such modification shall be made without the Union's agreement.