2:04-cv-70592-PJD-PJK   Doc # 428-12   Filed 05/21/14   Pg 1 of 19   Pg ID 16196

**EXHIBIT K**

## DECLARATION OF JAMES RICHARD ATWOOD

I, James Richard Atwood, declare as follows:

1.      I am competent to testify in this matter if I am called as a witness. The statements in my declaration are based on my personal knowledge or records available to me.

2.      I was employed by the UAW International since I began my employment at the UAW International in 1985 until I retired on June 30, 2010.   During that entire time, I was assigned to the International's Agricultural Implement Department.

3.      Before I came on staff with the International UAW, I was employed as an hourly employee at Allis-Chalmers in Springfield, Illinois beginning in September 1970.  In 1974, Allis-Chalmers became known as Fiat Allis.  While working for Fiat Allis, I had several positions with UAW Local 1027, the Local representing hourly employees at the Springfield plant, including steward, chief steward, Bargaining Committee member, Chair of the Bargaining Committee and President, the position I held when I went to the International in 1985.

4.      The UAW International Agricultural Implement (Ag Imp) Department is located at Solidarity House, the UAW International headquarters in Detroit.  The Ag Imp Department is responsible for bargaining collective bargaining agreements with Caterpillar, Deere & Co. and CNH Global.  The UAW Director of the Ag Imp

Department has the principal authority and responsibility for negotiation and administration of collective bargaining agreements for these employers.

5. From September 1985 until November 1992, I was an International Representative in the UAW International Agricultural Implement ("Ag Imp") Department at Solidarity House in Detroit.

6. From November 1992 until January 1993, I was the Assistant Director of the Ag Imp Department at Solidarity House in Detroit.

7. From 1993 through June 1995, I was the Administrative Assistant to Bill Casstevens with respect to all matters relating to Caterpillar negotiations and contract administration. At that time, Mr. Casstevens was UAW International Secretary-Treasurer and the Director of the Ag Imp Department.

8. From June 1995 until June 2002, I was the Administrative Assistant to Richard Shoemaker with respect to all matters relating to Caterpillar negotiations and contract administration. At that time, Mr. Shoemaker was a UAW International Vice President and Director of the Ag Imp Department.

9. From June 2002 to June 2006, I was the Administrative Assistant to UAW International Vice President and Director of the Ag Imp Department Cal Rapson.

10. From June 2006 until I retired, I was the Administrative Assistant to UAW International Vice President and Director of the Ag Imp Department Jimmy

Settles with respect to all matters relating to Caterpillar negotiations and contract administration.

11. I participated in the negotiations with Caterpillar on behalf of the International UAW beginning with the 1986 collective bargaining agreement (CBA). I participated in negotiations with Caterpillar for every CBA thereafter until I retired, including the 2004 CBA.

12. Under the 1988 CBA, as under prior CBAs, retirees received health care benefits with no premium contribution.

13. In 1991, Caterpillar and the UAW met to negotiate a successor contract to their 1988 CBA, which was set to expire on September 30, 1991. Negotiations were unsuccessful and, on November 3, 1991, the UAW cancelled the extension of the 1988 contract and the UAW-represented employees voted to strike.

14. The UAW and Caterpillar continued to negotiate during the strike. However, in March 1992, Caterpillar declared impasse in the negotiations. On March 31, 1992, Caterpillar sent letters to the UAW, advising the UAW that, effective April 6, 1992, Caterpillar would implement portions of its final contract offer.

15. In April 1992, the UAW ended its strike and striking employees returned to work.

16. In November 1992, Caterpillar announced that, effective December 1, 1992, it was implementing additional terms of its final contract offer.

17. One of the terms that Caterpillar implemented in December 1992 was a potential "cap" on the cost to Caterpillar for retiree health care benefits. Under the implemented "cap" proposal, Caterpillar bargaining unit employees who retired after January 1, 1992 would, starting in 2000, be potentially responsible for any costs of retiree health care coverage over the costs to Caterpillar of providing those benefits in 1999.

18. The UAW and Caterpillar refer to the six and a half year period from the expiration of the 1988 CBA on November 3, 1991 until the parties signed and ratified a new labor agreement in March 1998 as the "Labor Dispute."

19. During the Labor Dispute, the UAW filed thousands of grievances and about 1500 unfair labor practice charges with and more than 400 complaints issued by the National Labor Relations Board, including several that proceeded to litigation, relating to Caterpillar's conduct during the Labor Dispute. Caterpillar filed lawsuits against the UAW as well during this period. During the Labor Dispute, employees were on strike for a total of about 21 months, including 11 different unfair labor practice stirkes.

20. The UAW and Caterpillar negotiated off and on during the Labor Dispute. During the course of these negotiations, the UAW demanded that the 1992 unilaterally implemented cap on retiree health care costs be eliminated. Caterpillar refused to eliminate the cap.

21. In 1998, because Caterpillar refused to eliminate the unilaterally implemented retiree health care cap, the UAW proposed, and Caterpillar agreed, that the parties create a Voluntary Employee Beneficiary Association (VEBA) to cover the retirees' share of any above-cap costs after the cost cap became effective in 2000 under Caterpillar's 1992 unilaterally implemented proposal. The UAW's goal was for the VEBA funds to ensure that retirees would not have to pay any above-cap premiums during the term of the 1998 agreement, thus allowing the UAW and Caterpillar to defer the time when any retirees would be impacted by Caterpillar's unilaterally implemented cap on retiree health care costs.

22. The 1998 Caterpillar CBA had an expiration date in April 2004, and the funds in the VEBA lasted through August 2004.

23. In 2003, Caterpillar and the UAW began meeting to negotiate a successor labor agreement. These negotiations lasted throughout 2004. Caterpillar employees rejected two of Caterpillar's proposals, one in April 2004 and one in August 2004. During these negotiations, Caterpillar again refused to eliminate the retiree health care cost cap that it had unilaterally implemented in 1992.

24. In light of the Caterpillar's refusal of Caterpillar to eliminate the cap and the fact that the VEBA's funds would soon be exhausted, the UAW again sought alternative means to address the impact that the cost cap could have on current and future retirees. As a result of those negotiations, which concluded with a ratification

vote in early 2005, the UAW was able to secure Caterpillar's agreement to vastly improve benefits for the retirees and their dependents. In particular, Caterpillar agreed to fixed retiree contributions for the first three years of the 2004 CBA (2005, 2006 and 2007) which were much lower than they would have been under the 1992 cost cap. For example, the retiree contribution under the implemented cap proposal for 2005 would have been $177 a month for pre-65 retirees and $165 a month for post-64 retirees. Under the 2004 CBA, the agreed upon contributions were $59 a month for pre-65 retirees and $62 a month for post-64 retirees. For the last three years of the 2004 CBA (2008, 2009 and 2010), Caterpillar agreed to pay forty percent of the annual increases in retiree health care costs above Caterpillar's 1992 unilaterally implemented cost caps. The 2004 CBAs also contained some medical benefit plan design changes that were intended to reduce the overall cost of the medical benefit plan provided by Caterpillar, and consequently decrease the amount of the above-cap premiums paid by retirees.

25. In the 2004 CBA, the UAW was able to obtain other benefit improvements for all existing retirees, including three lumps sum payments of up to $750 each for retirees and $412.50 for surviving spouses. For future retirees, the UAW was able to obtain an increase in the supplemental pension (paid to age 62) of $420 a month by the end of the 2004 CBA (from $2,380 a month to $2,800 a month) and an increase in the basic benefit of $4.10 per year of credited service, meaning that

an employee with 30 years of service would receive an additional $123 a month for life.

26. I have reviewed a copy of the Declaration of Scott J. Macey dated April 9, 2014. I do not know who Mr. Macey is. He never participated in any of negotiations at Caterpillar or at Case in which I was involved. He never discussed the Caterpillar negotiations with me.

27. In paragraph 53 of his Declaration, Mr. Macey states: "Although there is a long history of animosity between the UAW and Caterpillar in their collective-bargaining negotiations and related matters, the company and the UAW agreed to resolve many of those difficulties in 1998 by implementing a cap on the amount of costs that the company would be liable for under the retiree health plan."

28. Mr. Macey's statement quoted above about the implementation of the cap is not true. The UAW never agreed to the implementation of a cost cap for any Caterpillar retirees. Caterpillar unilaterally implemented its retiree cost cap proposal in 1992 and the UAW was unable to obtain Caterpillar's agreement to eliminate the cost cap in either 1998 or 2004. In a very difficult situation, where there had been a Labor Dispute for six and a half years, where there was massive litigation and there had been a total of 21 months of strikes, the UAW was nevertheless able to improve the benefit plan for post-1991 retirees through the VEBA which would pay for costs above the unilaterally implemented caps and to agree to some plan design changes that

would reduce premium cost increases under the unilaterally implemented cap proposal. In 2004, with the VEBA running out of funds, the UAW got Caterpillar to agree to much lower, fixed premium contributions for the first three years of the CBA and to assume 40% of the above cap cost increases for the last three years of the CBA.

29. During the 1998 and 2004 negotiations, the UAW also obtained many other benefit improvements for retirees, including increased pension benefits, lump sum payments to existing retirees and surviving spouses, retirement bonuses for employees retiring during the term of the CBAs and increased monthly Medicare part B premium reimbursements. These improved benefits helped offset the retirees' out of pocket premiums and medical costs.

30. Caterpillar did not apply its unilaterally implemented cost cap of 1992 to its hourly retirees who had retired prior to January 1, 1992. At the time I retired in 2010, those retirees had benefits that were substantially unchanged since January 1, 1992, including hospital, surgical, medical and psychiatric health care benefits paid at 100% of reasonable and customary levels at no premium cost. I understand that Caterpillar is still providing those benefits to pre-1992 retirees at no cost to them.

31. As an Administrative Assistant to the Director of the Ag Imp Department, I participated in the 1998 and 2004/2005 negotiations between Case Corporation (later CNH) and the UAW.

8

32. Just before the 1998 negotiations began, El Paso, the company then responsible for providing health care benefits to retirees who had retired prior to the July 1, 1994 Case Corporation initial public offering (IPO), announced that it intended to implement what it called a "cost sharing" agreement between Case and the UAW and to start charging pre-IPO retirees for costs above the amounts initially set forth in a 1993 FAS 106 Letter.

33. Because the FAS 106 Letter was never intended to be a substantive cap on Case Corporation's obligation to Case hourly retirees, the UAW demanded in the 1998 negotiations that Case Corporation eliminate the FAS 106 Letter. Case Corporation finally agreed to the elimination of FAS 106 Letter. Case Corporation also agreed to establish and fund a VEBA to pay for any contributions that El Paso charged pre-IPO retirees.

34. During the 1998 negotiations, the UAW also negotiated greatly improved health care benefits for existing post-IPO retirees and future Case retirees through the Case Network PPO Plan as the replacement for the existing Indemnity Plan.

35. Under the Case Network PPO Plan, retirees could receive, for the first time, out patient medical and diagnostic benefits paid at 100% with no deductible and no lifetime maximum limitation. Under the Indemnity Plan, most out patient benefits were paid as Type C benefits, under which Case only paid 80% of the reasonable and customary costs of the services, after a $50 annual deductible, and subject to a lifetime

9

maximum of $50,000.00 in benefit payments. Many Type C benefits, such as EKGs, MRIs and other diagnostic tests were expensive, meaning that retirees had to pay significant amounts out of their pocket for the 20% co insurance. Further, Case's share of the cost was deducted from the $50,000 lifetime maximum. This meant that, once the lifetime maximum was reached, Case no longer had any obligation to the retiree for Type C expenses and the retiree would be responsible for the entire costs of those expenses.

36. Under the Indemnity Plan, most of the benefits were subject to a "reasonable and customary" payment, meaning that Case's obligation was limited to what it determined was the "reasonable and customary" charge for the services. Leading up to the 1998 negotiations, the UAW had experienced many disputes relating to the "reasonable and customary" provisions of the Indemnity Plan. Although the CBA contained a "hold harmless" clause that protected employees and retirees from paying amounts over the "reasonable and customary" amounts, that clause excluded situations where, for example, the employee or retiree paid or agreed to pay the provider for the excess charges. More and more doctors refused to provide treatment unless the patient agreed to the full cost of services. In those situations, Case refused to pay any more than its "reasonable and customary" amount so more and more retirees and employees were being balanced billed by providers.

37. Another huge problem with the Indemnity Plan were lifetime maximums that had not been increased for years for both Type B ($25,000 for any accident or illness) and Type C ($50,000 in total payments) benefits. Once these limits were reached, the Indemnity Plan paid nothing for the lifetime of the retiree.

38. In the 1998 negotiations, Case was not interested in and refused to discuss improvements to the Indemnity Plan. But, Case proposed the managed care preferred provider organization (PPO) plan that, Case assured the UAW, would provide improved benefits as well as improved quality of benefits for active employees and retirees. During the 1998 Case negotiations, the UAW spent several months and a great deal of effort to make certain that the benefits for retirees were actually improved. Much of that effort revolved around making certain that the networks included broad access to providers and to quality medical care. The UAW confirmed that the PPO plan's network would include all of the hospitals and a vast majority of providers in the area where the retirees lived. My recollection is that more than 90% of providers who had seen employees and retirees prior to the 1998 negotiations were in the networks covered by the Case Network PPO Plan.

39. Under the Case Network PPO, in network benefits were paid at 100% with no deductible and no lifetime limitation. The fact that the Case Network Plan required a 20% co insurance payment for out of network services did not represent a reduction in benefits from the Indemnity Plan. To the contrary, under the Indemnity

11

Plan, Type C benefits required a 20% co insurance payment. Further, the Type C 20% co insurance had no annual out of pocket maximum, which meant that there was no limit on the amount paid for the 20% co insurance charged to participants. Under the Case Network PPO, the most a retiree could pay for out of network services, or the out of pocket maximum, was $1,000.00 per person per year. This was a significant improvement over the Indemnity Plan where the participants' 20% co insurance payments were not limited by an out of pocket maximum.

40. The UAW negotiated many specific and overall improvements in the health care plan for retirees in the 1998 negotiations. The UAW never agreed to reduce benefits for existing retirees in 1998.

41. In the 2004/2005 negotiations at CNH, CNH initially demanded massive reductions in health care benefits for both employees and current retirees. The UAW informed CNH that the UAW would discuss benefit improvements for current retirees, but would not discuss any benefit reductions for current post-IPO retirees. CNH then deleted any demands for reductions to health care benefits for current retirees.

42. In the final 2005 CBA, having been on strike or lockout for several months, the UAW finally agreed to cost shifting provisions in the health care benefit plan that covered active employees and future retirees. These provisions included premium contributions, deductibles and co insurance up to an out of pocket maximum for in network benefits, increased deductibles and increased co insurance up to an

increased out of pocket maximum for out of network benefits, increased prescription drug co pays and, effective January 1, 2006, the elimination of prescription drug benefits for Medicare-eligible retirees and spouses.

43. In the 2004/2005 negotiations, the UAW proposed and CNH agreed to several benefits and benefit improvements to help future retirees pay for the costs shifted to them under the health care plan. Among these benefit improvements were greatly increased pension benefits, a Retiree Medical Savings Accounts (RMSAs) funded by CNH and an increased monthly Medicare premium reimbursement. The pension increases included a $500.00 increase over the term of the 2005 CBA in the monthly supplemental pension benefit paid to age 62 and an increase in basic monthly pension benefit of $4.85 per year of credited service. The RMSAs provided for several CNH contributions, including a initial contribution of $7,500 immediately after the CBA was ratified and a contribution of an amount equal to the last year's vacation pay at retirement. There were other annual contributions for retirees who were age 65 and older. The RMSAs also provided for interest to accrue on CNH's contributions to the RMSA. The Medicare Part B premium reimbursement was increased from $65.50 a month to $100.00 a month beginning January 1, 2006 to reflect the premiums that retirees would have to pay if they enrolled in a private Medicare Part D plan beginning with the termination of the prescription drug plan.

13

44    Under the 2005 CNH CBA, only employees who retired after December 1, 2004 were entitled to the pension increases, the RMSA and the increased Part B and Part D premium reimbursement benefit. These improvements were part of the overall package that post-2004 retirees received. All three of these benefit enhancements, the pension increases, the RMSA and the Part B and Part D benefit increase, were intended to help the post-2004 retirees pay for the costs shifted to them under the 2005 CBA. It is impossible to separate the cost shifting changes to the 2005 health care plan from the benefit improvements that were intended to reduce the impact of those changes.

45.    In his Declaration, Mr. Macey attempts to compare the benefits that other UAW represented retirees receive from other employers with the benefits CNH retirees receive. For example, Mr. Macey refers to the benefits that General Motors, Chrysler and Dana retirees receive under VEBAs. There can be no valid comparison for more reasons than I can describe here. As can be seen from the limited description of the negotiations at Caterpillar and CNH, the negotiations and the results of negotiations at every employer is very different. In every situation, the UAW is representing different groups of employees, who vote on the contract, who have varying degrees of economic leverage, and is negotiating with employers who are in different financial condition and have different interests and demands. For obvious

reasons, the concept of "pattern bargaining" in the Ag Imp Department had no viability after the Caterpillar Labor Dispute started in 1992.

46. What happened at Caterpillar since 1992 to the present is entirely dissimilar to what happened at Case during the same time period. This is illustrated by the description of events above. This is also illustrated by what happened with respect to the health care "cost caps."

47. At Caterpillar, the retiree health care cost caps were unilaterally implemented by Caterpillar in 1992. When the UAW entered negotiations with Caterpillar in 1998, the UAW was faced with the fact that those unilaterally implemented cost cap from 1992 were in place. At the time, the UAW was six and a half years into the Labor Dispute and the UAW could not force Caterpillar to eliminate the existing caps. In order to end the Labor Dispute and for active employees to return to work, the UAW obtained Caterpillar's agreement to the VEBA to address the above cap cost issue for post-1991 retirees. The UAW again had to address the issue of above cap costs in the 2004 negotiations, as discussed above.

48. At Case, the UAW agreed to a FAS 106 letter in 1993 which contained caps on Case's obligation for retiree health care that were intended to address Case's FAS 106 accounting issue. This letter was extended in the 1995 negotiations. However, in late 1997, when El Paso claimed that this FAS 106 Letter was a "cost sharing" agreement and announced it would require pre-IPO retirees to pay premium

15

contributions, the UAW demanded that Case eliminate the FAS 106 Letter which Case agreed to do during the 1998 negotiations. Case's agreement to eliminate the FAS 106 Letter meant, and can only mean, that Case knowingly assumed the burden of all future retiree health care inflation over the caps set forth in the FAS 106 Letter. In the 2004/2005 negotiations, the UAW refused to discuss any CNH proposals that would shift health care costs to the post-IPO retirees and limited its discussions to changes in health care to active employees and future retirees.

49. Given the historical facts, partially set forth above, there can be no valid comparison between Caterpillar and CNH with respect to retiree health care benefits. Given the historical facts at CNH, there can be no valid comparison between the retiree health benefits provided to post-IPO and post-2004 CNH retirees.

50. In paragraph 57 of his Declaration, Mr. Macey refers to Honeywell. In 2003 and 2007, I participated in master collective bargaining negotiations on behalf of the UAW with Honeywell relating to employees at several Honeywell factories. Mr. Macey was not involved in those negotiations. The situation at Honeywell, like all collective bargaining relationships with which I have been involved, is unique and far more complex than can be summarized in a sentence or two. I understand that, since 2011, the UAW and Honeywell hourly retirees are engaged in litigation with Honeywell about Honeywell's obligation to provide retiree health care and about the extent of that obligation.

51. In the 1998 CBA, there was a Letter of Understanding called the Cost of Healthcare Coverage. That letter addressed the situation where Case offered alternate HMOs and PPOs to the contractual Case Network PPO Plan. Case had offered alternate HMOs and managed care plans, including the John Deere Heritage Plan, to employees and retirees for years prior to 1998. In prior CBAs, if the cost of these alternative plans cost Case more than the Indemnity Plan, the employee would have to pay any excess cost over the Indemnity Plan. In 1998, this concept was revised. Because the Case Network PPO Plan was expected to cost Case less that the Indemnity Plan – and that is the main reason Case wanted the Network PPO Plan – that meant that it was more likely that employees choosing alternative managed care plans would have to pay premiums to remain in those plans. In fact, Case specifically demanded that the cost of the Case Network PPO Plan be the standard for determining excess premium payments for employees choosing alternate plans. In the end, Case agreed to pay any additional employee contributions over the cost of the Case Network PPO Plan during the term of the 1998 CBA. The 1998 Cost of Healthcare Letter did not give CNH any right to charge employees or retirees for premium contributions for coverage under the Case Network PPO.

52. Under the 1998 CBA at Case, as under prior CBAs. the contributions for employees and retirees were set forth in the Group Benefit Plan document. Under the 1998 CBA, employees actively at work and retirees received health care benefits with

17

no premium contribution. However, certain groups of employees and dependents were required to pay premiums to maintain their coverage. For example, employees on maternity leave and union leave of absence could continue health care coverage by paying the full cost of that coverage. Also, certain employees, spouses and dependents who lose company paid coverage could continue group coverage for specified periods of time under the COBRA provisions of the 1998 CBA by "paying the applicable premium rate." Under the 1998 Cost of Healthcare Letter, these groups of employees could not be charged any more than the cost of their contribution to the Case Network PPO Plan, even if they were enrolled in an alternative manage care plan that cost more than the Network PPO Plan.

I declare under penalty of perjury that the above statements are true.

Dated: May 12, 2014          Signed: /s/ James Richard Atwood
                                     James Richard Atwood