EXHIBIT G

MARK L. LYNNE - 1/17/2014

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

- - - - - - - - - - - - - -X

JACK REESE, et al.,            :

            Plaintiffs,    : Case No.

vs.                           : 2:04-cv-70592-PJD-PJK

CNH GLOBAL N.V. and CNH       :

AMERICA LLC,                  :

            Defendant.     :

- - - - - - - - - - - - - -X


Deposition of MARK L. LYNNE

Baltimore, Maryland

Friday, January 17, 2014

9:39 a.m.


Job No.   1-243549

Pages:    1 - 197

Reported by:  Dana C. Ryan, RPR, CRR

MARK L. LYNNE - 1/17/2014

```
 1    this class of retirees has now, which is not the

 2    2005 plan, comparing that to the proposed plan.

 3    Those are very different plans, so I'm --

 4         Q     You don't --

 5         A     -- confused about what you're asking.

 6         Q     You don't understand that one of the

 7    factors is whether or not the proposed plan is

 8    roughly consistent to what's provided to CNH's

 9    current employees?

10         A     Is -- would the class of plaintiffs

11    here get everything that was provided to those

12    people?  No.

13              So it's not consistent.  They were

14    given other things that were part of a

15    negotiation, as I understand it.

16         Q     That are not health benefits?

17         A     Right.

18              MS. BRAULT:  Well --

19    BY MR. ROGACZEWSKI:

20         Q     Okay.  Let's talk about AT&T --

21              MS. BRAULT:  I'm going to place an

22    objection to the last question to the extent it's
```

MARK L. LYNNE - 1/17/2014

1    overly broad and undefined.

2         BY MR. ROGACZEWSKI:

3         Q     How did you acquire information about

4    AT&T and Lucent's plans?

5         A     I received documents from counsel.

6         Q     Okay.  What did you ask for to -- that

7    resulted in getting these documents?

8         A     Information that would -- that would

9    provide me some -- some insight into what happened

10   with those companies and their negotiations or --

11   or results from court proceedings that -- that

12   might shed a different light than what Mr. Macey

13   was saying.

14        Q     You don't identify anything Mr. Macey

15   says about AT&T or Lucent that is factually

16   incorrect; right?

17        A     I don't think so, but I think he left

18   some things out.

19        Q     I understand that, but I want to be

20   clear that you're not identifying anything that he

21   said that was factually incorrect.

22        A     (Witness reviews document.)  I -- I

MARK L. LYNNE - 1/17/2014

1    don't think so.

2         Q     Now, AT&T is a cap situation; correct?

3         A     Yeah, as I -- as I understand it, there

4    were caps in place for many years.

5         Q     And the caps impose, once the cap is

6    reached, 100 percent of the increased cost on

7    participants; correct?

8         A     That's my understanding.

9         Q     That's more severe than what the

10   proposed plan does, isn't it?

11        A     It is, but those caps were agreed upon

12   by the parties.  And, as I understand it, once

13   there were issues with reaching the cap, some

14   additional money, significant money was put into a

15   VEBA to help offset that.

16        Q     My question was a little different, and

17   it's really whether or not a plan that imposes

18   100 percent of the costs, by its terms, on

19   participants is less severe than a plan that

20   imposes only 60 percent of the increased costs?

21             MS. BRAULT:  Only 60 percent of the

22   increased costs?

MARK L. LYNNE - 1/17/2014

Page 154

```
 1            THE WITNESS:  Well, again, you can't

 2    just look at that piece as if that's the only

 3    thing that happened.  I mean, I don't see how you

 4    can ignore the VEBA money which helps take it from

 5    100 percent to something different.

 6         BY MR. ROGACZEWSKI:

 7         Q     VEBA is not a health benefit, though,

 8    is it?

 9         A     No, but it was put there precisely

10    because it was becoming hard for these folks to --

11    to afford the amount over the cap.  I mean,

12    that's -- that's my understanding.  So it seems

13    like they should be taken together.  They're

14    not -- they're not completely disconnected events,

15    in my opinion.

16         Q     Let's talk about Goodyear.  How did you

17    acquire information about the Goodyear plans?

18         A     Again, I -- I asked counsel for

19    documents they had that would -- that would relate

20    to what happened with their retiree health care.

21         Q     When you got the documents about AT&T

22    and Lucent, did you after reviewing them ask for
```

MARK L. LYNNE - 1/17/2014

```
 1   additional information about AT&T and Lucent?

 2        A     I honestly don't recall whether it came

 3   in pieces.

 4        Q     What about with -- so what you know

 5   about AT&T and Lucent comes entirely from

 6   information provided by plaintiffs' counsel?

 7        A     Yes.

 8        Q     You didn't conduct any independent

 9   research?

10        A     The information I got seemed pretty

11   clear about what happened.

12        Q     You didn't ask any questions about it?

13        A     I don't recall.

14        Q     Okay.  And with Goodyear, the

15   information that you know about Goodyear also

16   comes just from plaintiffs' counsel?

17             MS. BRAULT:  Could I just place just

18   the objection and as a clarification that when you

19   talk about, quote, the information that came from

20   plaintiffs' counsel, end quote, you're talking

21   about documents that came from plaintiffs' counsel

22   which have been produced?
```

MARK L. LYNNE - 1/17/2014

Page 156

```
 1        BY MR. ROGACZEWSKI:

 2        Q     I'll take the answer.

 3        A     Yes, it was the documents from

 4   plaintiffs' counsel.

 5        Q     And did you ask any questions after

 6   receiving those documents?

 7        A     I mean, I had conversations with

 8   counsel.

 9        Q     I'm not -- I'm not --

10        A     Okay.

11        Q     -- I'm not trying to ask about those

12   conversations.  I'm just merely trying to

13   understand the degree to which you accepted the

14   information without question.

15        A     Well, I accepted the documents were --

16   were correct.  I mean, there may have been

17   conversations we had where I was attempting to get

18   clarification to the extent that, you know,

19   counsel was able to provide.  I don't remember

20   specific questions.

21        Q     And as with AT&T and Lucent, you're not

22   saying Mr. Macey is factually wrong about what
```

MARK L. LYNNE - 1/17/2014

```
 1   happened with Goodyear; correct?

 2       A    I -- I don't believe that I saw

 3   anything factually wrong.

 4       Q    And you didn't conduct any independent

 5   research about Goodyear; correct?

 6       A    I -- I think the documents seemed to --

 7   to provide me what I need.

 8       Q    Okay.  Goodyear is another cap

 9   situation; correct?

10       A    Yes.

11       Q    And in the absence in -- in the absence

12   of a funding vehicle, the caps would have resulted

13   in significant premiums; correct?

14       A    Yes.

15       Q    And in both Goodyear and AT&T and

16   Lucent, the timing is such that the caps were

17   agreed to and then subsequently the VEBA was

18   agreed to; correct?

19       A    That's my understanding.

20       Q    So the caps were agreed to without a

21   funding vehicle in place; correct?

22       A    It's my understanding that -- yes, but
```

1    then when there were issues with exceeding the

2    caps, then -- then that led to a funding vehicle

3    to -- to fix the situation.

4         Q    Right.  You don't disagree that the

5    caps were agreed to in the absence of a funding

6    vehicle?

7         A    No, I don't disagree.

8         Q    Okay.  Let's talk about U.S. Steel.

9    How did you acquire information about the U.S.

10   Steel agreements?

11        A    It was -- it's the same answer as the

12   others.  I -- I received documents from

13   plaintiffs' counsel.

14        Q    Okay.  Did you ask for additional

15   information after receiving the documents?

16        A    I don't recall that I did.

17        Q    Did you conduct any independent

18   research about U.S. Steel?

19        A    (Witness reviews document.)  I do not

20   believe I did.

21        Q    You don't identify anything that

22   Mr. Macey says that is wrong about the U.S. Steel

MARK L. LYNNE - 1/17/2014

```
 1   situation -- that is factually incorrect; correct?

 2             MS. BRAULT:  The record should reflect

 3   that we're not looking at Mr. Macey's report.

 4             THE WITNESS:  Yeah, I -- I don't --

 5             MR. ROGACZEWSKI:  No, we're looking at

 6   Mr. Lynne's rebuttal report.

 7             THE WITNESS:  No, I don't think there

 8   was any -- anything factually incorrect that I

 9   found, but, again, it's the same issue of leaving

10   the sort of selective analysis.

11        BY MR. ROGACZEWSKI:

12        Q    At the bottom of page 4, there's a

13   quote from the 1975 agreement about pensioners and

14   receiving a -- an individual receiving a surviving

15   spouse's benefits.

16             Do you see that?

17        A    Yes.

18        Q    How did you come across that language?

19        A    It was in a document provided by

20   counsel.

21        Q    Now, that provision standing alone has

22   nothing to do with health care benefits; correct?
```

MARK L. LYNNE - 1/17/2014

```
 1      A     Well, it talks about how changes can be

 2   made to health care benefits.

 3      Q     And you understand that there is no

 4   similar provision in the CNH provision; correct?

 5      A     Well, I think that's sort of the point.

 6      Q     And you understand that the Sixth

 7   Circuit has held that changes can be made

 8   unilaterally by the company; correct?

 9            MS. BRAULT:  Well, let me place an

10   objection to that's overly broad and ambiguous.

11            THE WITNESS:  Not just willy-nilly,

12   they can't.

13      BY MR. ROGACZEWSKI:

14      Q     What do you mean?

15      A     Well, they can't make any change they

16   want.

17      Q     Right.  As long as it satisfies the

18   Reese standard; correct?

19      A     Right.

20      Q     So the fact that an agreement had a

21   limitation that CNH's doesn't have isn't really

22   relevant, is it?
```

MARK L. LYNNE - 1/17/2014

Page 164

```
 1        A      No.

 2        Q      How did you acquire the information

 3   that's in the rebuttal report about Ford?

 4        A      They were reports that I received from

 5   counsel.

 6        Q      Did you --

 7        A      Or documents I received.

 8        Q      Did you do any independent research

 9   about Ford?

10        A      No.

11        Q      Did you react or -- after reviewing the

12   documents provided by plaintiffs' counsel, did you

13   ask for additional information?

14        A      I may have gotten Francis' report after

15   reviewing the initial information.

16        Q      Did you ask for Francis' report?

17   You're talking about Theo Francis; correct?

18        A      Yes.

19        Q      Did you ask for Mr. Francis' report?

20        A      Yes.

21        Q      Specifically?

22        A      Well, about the financial condition of
```

MARK L. LYNNE - 1/17/2014

Page 165

1    one versus the other.

2        Q    When did you become aware that

3    Mr. Francis was one of plaintiffs' experts?

4        A    I don't recall.

5        Q    And did you know Mr. Francis was an

6    expert when you asked for his report?

7        A    Well, I didn't know Mr. Francis.

8        Q    So you asked --

9        A    I was --

10       Q    I'm trying --

11       A    I was asking for information about --

12   because Mr. Macey was trying to compare the

13   automobile companies, which basically were

14   bankrupt.  They were on it as comparisons.  So I

15   wanted to understand what I could about CNH's

16   financial position.

17       Q    Now -- and what you got in response to

18   that was Mr. Francis' report?

19       A    Yes.

20       Q    Now, again, you're not identifying

21   anything factually incorrect in Mr. Macey's report

22   about Ford; right?

MARK L. LYNNE - 1/17/2014

```
 1        A      No, just leaving out.

 2        Q      In fact, both Ford and GM agreed with

 3   UAW to reduce retiree health benefits; right?

 4        A      It's my understanding they did.  I'm

 5   not sure what choice they had.

 6        Q      They -- but they -- they agreed to

 7   them; correct?

 8        A      In a bankruptcy situation.

 9        Q      It's your understanding that they -- as

10   part of the bankruptcy, that's when the reductions

11   occurred?

12        A      I'm sure there were many instances of

13   negotiations as -- as these companies were having

14   trouble.

15        Q      GM's bankruptcy was in 2009; correct?

16        A      I don't see that I have the date in

17   here.

18        Q      Okay.  Do you know when GM's bankruptcy

19   occurred?

20        A      I don't know the exact date.

21               (Lynne Deposition Exhibit 19 was marked

22    for identification and attached to the
```

MARK L. LYNNE - 1/17/2014

1    transcript.)

2        BY MR. ROGACZEWSKI:

3        Q    All right.  You have in front of you,

4    Mr. Lynne, a filing made in a court case called,

5    In re: General Motors Corp., pending in the United

6    States Bankruptcy Court for the Southern District

7    of New York, Case Number 09-50026.

8             I'll represent this was also produced

9    by you.

10            Do you recall reviewing this document?

11       A    (Witness reviews document.)  I don't

12   recall -- recall receiving this; I don't recall

13   that I relied on it.

14       Q    Okay.  Do you recall reviewing it?

15       A    If I did, it was fairly cursory.

16       Q    I can't imagine why.  It's mind

17   numbing, having read it.

18            Does it refresh your recollection

19   regarding when the GM bankruptcy occurred?

20       A    Looks like '09, yes.

21       Q    And do you have an understanding as to

22   when GM and Ford first agreed to reductions in

MARK L. LYNNE - 1/17/2014

```
 1              THE WITNESS:  You know, when I work
 2    with my clients, the things that they need to do
 3    are certainly dictated at some point by financial
 4    conditions.
 5         BY MR. ROGACZEWSKI:
 6         Q    That wasn't an answer to my question.
 7    How -- I'll ask it -- I'll ask it in a nonleading
 8    way.
 9              How is the financial condition of CNH
10    relevant to whether the changes that one wants to
11    make are reasonable in light of changes in health
12    care?
13         A    I wasn't trying to make that
14    comparison.
15         Q    Okay.
16         A    Macey was when comparing CNH to these
17    other companies.
18         Q    That's what you under- --
19         A    I was simply trying to rebut that part
20    of his argument.
21         Q    And that's what you understood
22    Mr. Macey to be doing in that part of his report?
```

MARK L. LYNNE - 1/17/2014

Page 176

```
 1      A     Trying to say that what happened at

 2   these auto companies is something that could --

 3   could happen at CNH, and that it was a good

 4   comparison, which I disagree with.

 5      Q     How about GM?  How did you acquire the

 6   information in your rebuttal report regarding GM?

 7      A     (Witness reviews document.)  That was a

 8   combination of documents received from counsel,

 9   and I believe that was where I looked -- looked up

10   the composition of the VEBA on the UAW Web site.

11      Q     The UAW VEBA trust breakdown -- work

12   chart; right?

13      A     Right.

14      Q     And aside from that, did you do any

15   independent research into the GM situation?

16      A     No.

17      Q     And aside from the conflation of the

18   UAW VEBA trust with the UAW, did you identify

19   anything incorrect in Mr. Macey's report?

20      A     Mr. Macey wasn't -- I don't believe he

21   was clear as to which of the auto companies he was

22   referring to, but he did say that -- he was
```

MARK L. LYNNE - 1/17/2014

Page 177

```
 1   attempting to say that the UAW made changes to

 2   benefits; and, in fact, it was -- the trustees or

 3   the administrators of the VEBA, which is

 4   different.

 5        Q     I said aside from that.

 6        A     Oh, I'm sorry.

 7        Q     Aside from that.

 8        A     No.

 9        Q     But Mr. Macey isn't wrong about the

10   terms that the UAW retirees are -- that -- that --

11   the terms of their benefits under the UAW VEBA as

12   set by the UAW VEBA trust; correct?

13        A     No, no.

14        Q     And, so, with the exception of the

15   research, you did everything that's in your --

16   everything you understand about GM came from

17   plaintiffs' counsel; correct?

18             MS. BRAULT:  You mean in documents from

19   plaintiffs' counsel?

20             THE WITNESS:  Yes.

21        BY MR. ROGACZEWSKI:

22        Q     And the same thing I'm saying would be
```

MARK L. LYNNE - 1/17/2014

Page 178

1    true for Ford; correct?

2         A     Yes.

3         Q     Now, you make a -- a big point about

4    the connection of the Ford and the GM changes to

5    bankruptcy; correct?

6         A     I think it makes the comparison.  Not a

7    very good one, yeah.

8         Q     GM's changes were made four years

9    before it went into bankruptcy; correct?

10        A     It was all part of their -- I viewed it

11   as a -- as all a part of the agreements that were

12   made as the company was going down hill.

13        Q     So you look at -- you take together the

14   '05 agreement, the '07 agreement and the

15   bankruptcy and put them all together?

16        A     Yes.

17        Q     You understand, correct, that the VEBA

18   that GM agreed to was not part of the original

19   agreement; right?  That -- that came second in

20   time?

21              MS. BRAULT:  I'm going to place an

22   objection: form.

MARK L. LYNNE - 1/17/2014

```
 1              THE WITNESS:  I mean, I'm not sure that

 2     to me the timing was as important as the fact that

 3     these things were done with companies that were in

 4     such dire financial straits.

 5          BY MR. ROGACZEWSKI:

 6          Q     Well, I understand your -- your -- I

 7     understand your opinion on that.  Now I'm thinking

 8     about it -- this question is focusing on something

 9     different, which is the connection of the funding

10     vehicle to the benefit changes.  And I think you

11     said before that it was important that the funding

12     vehicle -- although it's not a health benefit --

13     was negotiated as -- as -- or changed at the same

14     time as the health care change; is that correct?

15          A     That's my understanding.

16          Q     And in GM that wasn't the case;

17     correct?

18          A     I'm not sure.

19              (Lynne Deposition Exhibit 21 was marked

20     for identification and attached to the

21     transcript.)

22          BY MR. ROGACZEWSKI:
```

MARK L. LYNNE - 1/17/2014

```
1        Q     You have in front of you what has been

2    marked as Exhibit 21 which is a -- a -- I don't

3    know if it's an article or a press release, but

4    it's from the UAW's Web site.  It's entitled, UAW,

5    union retirees found proposed settlements

6    establishing VEBA trust.

7              Since it doesn't have a Bates number,

8    I'll make sure the record is clear you did not

9    produce this document.

10             The first paragraph says, The UAW,

11   along with UAW retirees, has filed a proposed

12   settlement of health care claims against --

13   against GM.  If approved by the U.S. District

14   Court, the settlement will establish an

15   independent VEBA trust which will pay health

16   benefits for current and future UAW GM retirees.

17             Did I read that correctly?

18        A     Yes.

19        Q     Is that consistent with your

20   understanding as to when the UAW GM VEBA was

21   negotiated and then established?

22        A     Yes.
```

MARK L. LYNNE - 1/17/2014

1          Q      Four paragraphs down the article says,

2     A similar case was filed in 2005, and the UAW and

3     GM agreed to modify health care benefits for

4     retirees.

5                Did I read that correctly?

6          A      Yes.

7          Q      Is that consistent with your

8     understanding that the first agreement reduced

9     changes -- reduced health care benefits and then

10    two years later a subsequent agreement established

11    the funding mechanism?

12         A      Yes.

13         Q      In the case of GM, the -- the funding

14    mechanism was not part of the agreement that

15    changed their health care benefits; correct?

16               MS. BRAULT:  I'm just going to place an

17    objection to the extent that you're conflating

18    events, and -- and I object to the form to the

19    extent that you're assuming facts not in evidence,

20    that -- that something occurs at -- at a specific

21    point in time rather than over time.

22               THE WITNESS:  Again, the point I was

 1    trying to make, Macey brings up these examples,

 2    and these examples are -- in these other examples

 3    there were agreements made or there was bankruptcy

 4    or there were preexisting caps.  With CNH, there

 5    was no bankruptcy.  There was no agreement.  Caps

 6    were negotiated out.

 7             I'm just trying to say that I don't

 8    think these comparisons -- he left out some things

 9    in his comparisons that make them not good

10    comparisons.

11             We're trying to look at what the court

12    says needs to be done comparing it to other

13    situations.  It's not a good comparison.

14        BY MR. ROGACZEWSKI:

15        Q    The court -- and we've talked about

16    already two of the three Reese factors.  The third

17    one is whether the proposed plan is roughly

18    consistent with other plans.

19             Why -- how is the financial condition

20    of CNH relevant -- or the financial condition of

21    GM relevant to whether the terms or the benefit

22    plans are roughly consistent with each other?

MARK L. LYNNE - 1/17/2014

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2                  I, Mark L. Lynne, do hereby acknowledge

 3       that I have read and examined the foregoing

 4       testimony, and the same is a true, correct and

 5       complete transcription of the testimony given by

 6       me and any corrections appear on the attached

 7       Errata sheet signed by me.

 8

 9

10

11       _____        _____

12       (DATE)                       (SIGNATURE)

13

14

15                  CERTIFICATE OF NOTARY PUBLIC

16       Sworn and subscribed to before me this

17       _____ day of _____, _____

18

19

20       _____        _____

21       NOTARY PUBLIC                MY COMMISSION EXPIRES

22
```

```
 1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2         I, Dana C. Ryan, Registered Professional

 3    Reporter, Certified Realtime Reporter, the officer

 4    before whom the foregoing proceedings were taken

 5    do hereby certify that the foregoing transcript is

 6    a true and correct record to the best of my

 7    ability of the proceedings; that said proceedings

 8    were taken by me stenographically and thereafter

 9    reduced to typewriting under my supervision; and

10    that I am neither counsel for, related to, nor

11    employed by any of the parties to this case and

12    have no interest, financial or otherwise, in its

13    outcome.

14         IN WITNESS WHEREOF, I have hereunto set

15    my hand and affixed my notarial seal this 24th day

16    of January 2014.

17    My Commission expires:

18    May 17, 2017

19

20    _____

21    NOTARY PUBLIC IN AND FOR THE

22    STATE OF MARYLAND
```