EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

\- - - - - - - - - - - - - - -X

JACK REESE, et al., :

Plaintiffs, : Case No.

vs. : 2:04-cv-70592-PJD-PJK

CNH GLOBAL N.V. and CNH :

AMERICA LLC, :

Defendant. :

\- - - - - - - - - - - - - - -X

Deposition of MARK L. LYNNE

Baltimore, Maryland

Friday, January 17, 2014

9:39 a.m.

Job No. 1-243549

Pages: 1 - 197

Reported by: Dana C. Ryan, RPR, CRR

A It's about a -- it's been a number of years. I don't recall.

Q Mr. Lynne, you were engaged to opine on how CNH's proposed plan would affect plaintiffs; correct?

A Yes.

Q How did you come to be engaged in this project?

A I was contacted by Roger McClow.

Q Did Mr. McClow ask you any specific questions in which he wanted opinions?

MS. BRAULT: I'm going to place an objection. I think you're going into communications that are outside the scope of Rule 26.

BY MR. ROGACZEWSKI:

Q Let me try and ask it a different way. How did Mr. McClow describe the scope of the engagement?

MS. BRAULT: Well, again, I think that you're going into communications. I think that his report indicates what the engagement was.

BY MR. ROGACZEWSKI:

Q I'll take the answer.

A I was asked to review the proposed changes and their impact.

Q Did Mr. McClow define for you what "impact" meant?

A Well, what the -- what the changes would mean in terms of out-of-pocket costs for the retirees.

Q What facts, if any, did Mr. McClow provide you with?

A He -- well, he provided me with a number of documents for the -- the current and proposed plan.

Q Were there any documents that you asked him for?

A I -- I believe the documents that he provided seemed -- seemed comprehensive in terms of allowing me to -- to do the analysis I wanted to do.

Q Over the course of the engagement, have you requested specific information from -- from

plaintiffs' counsel?

A I -- I did ask for some additional information about some of the cases that Mr. Macey had discussed.

Q And what did you ask for about those cases?

A Information that would -- would give me more insight into what happened with -- with those cases, communications about benefits or court cases.

Q Did you conduct any independent research in connection with those cases?

A I believe I did go on the -- the UAW VEBA Web site.

Q Is it fair to say, then, besides going on the UAW VEBA Web site, what you know about those cases comes to you from plaintiffs' counsel?

A Yes.

Q What did -- what have -- throughout the course of the engagement, what have plaintiffs' counsel told you about the rulings of the Sixth Circuit in this case?

BY MR. ROGACZEWSKI:

Q Mr. Lynne, you mentioned earlier that you considered the pensions that class members received; is that correct?

A Yes.

Q And that's the only form of income that you considered in evaluating the participant's ability to pay for health care; correct?

A It is.

Q You didn't consider social security or disability income; correct?

A I didn't have that information, but I did not consider it.

Q You didn't consider if they had income from other employment; correct?

A No.

Q You didn't consider any other assets they might have?

A No.

Q You didn't consider if they had other spending that could be shifted to cover health care benefits; correct?

A Correct.

(Lynne Deposition Exhibit 10 was marked for identification and attached to the transcript.)

BY MR. ROGACZEWSKI:

Q Mr. Lynne, you have in front of you what's been marked as Exhibit 10. It has the case name at the top. It doesn't have a title. It's a -- it appears to be a spreadsheet. It was produced by you at 921.

Do you recognize this document?

A Yes.

Q And what is this document?

A It is the end product of analysis that I had my associate Bill Hudec do to sort through the pension data file we got and put -- put the pensioners in different categories and see how many there were and -- and -- excuse me -- and what the -- what the median was -- median pension.

Q And I think you said earlier that you received a file from plaintiffs' counsel that had pension data on it. Am I remembering that

correctly?

A Yes.

Q Is that the data that Mr. Hudec used --

A Yes.

Q -- to create Exhibit 10?

A Yes.

Q You see in the upper left-hand corner it says, Redacted, and there's a dark strip. Do you see that?

A Uh-huh.

Q Do you -- do you know what is behind the redaction?

A No.

Q Did you redact something from this document?

A I don't recall doing that.

Q Do you remember what would be there if it wasn't redacted?

A No, I -- but it was -- it was a heading -- I mean, it would have been a heading that had the -- the group split out without reference to whether they were disabled. And --

and the bottom is -- is all -- it's all the same group of people but splitting out the disabled population separately, whereas, here they're just in each of those categories as they would fall, you know, age.

Q So it's your understanding that a heading similar to the one halfway down, quote, Additional Split for Disabled Retirees, open paren, 5/24/2013, close paren, is behind the redaction?

A To the best of my recollection, yes.

Q When you produced documents in response to CNH's subpoena, what was the logistical process that you went through to produce them?

A I'm not sure what you mean.

Q Okay. How did the documents get from you to me?

A They went through counsel.

Q Okay. Did you instruct counsel to redact anything from the documents that you were providing for production?

A No. Again, not that I recall.

(After recess -- 12:10 p.m.)

(Lynne Deposition Exhibit 11 was marked for identification and attached to the transcript.)

BY MR. ROGACZEWSKI:

Q So, Mr. Lynne, up on the screen is what's marked as Deposition Exhibit 11. It is a Microsoft Excel workbook titled IPO -- Pension Data -- 130812 - on CNH_slist.xlsx.

And I'll represent that it was produced by you in response to the subpoena.

MR. ROGACZEWSKI: And I'll also state on the record that the only thing I have done to this file is I have extracted it from the disk on which it was provided, loaded it onto my laptop, and I have added to the document title Lynne Deposition Exhibit 11.

And I also have thumb drives on which I will provide the exhibit to the court reporter and to Ms. Brault.

BY MR. ROGACZEWSKI:

Q And using a digital exhibit often

requires a lot more cooperation between the -- between the witness and the questioner, as well as opposing counsel. So if you want me to navigate any place in particular, direct me to do so, and I will do so. If you want me to zoom it in, I'm happy to zoom it in. I did want to at least open it up, though, as -- as it opened as we received it.

Looking at Exhibit 11, Mr. Lynne, do you recognize this document?

A Yes.

Q And what is this document?

A It's an Excel file of pensioners with their pension -- CNH pensioners with their pension amounts.

Q And how did you acquire this document?

A I received it from counsel.

Q You didn't create this document; correct?

A No.

Q And, in fact, if you go over to the file tab. In the properties you see that Roger

McClow authored it; correct?

A I received it from Roger.

Q How many times have you met Mr. McClow?

A Well, we -- he is one of the trustees on Middletown Works VEBA, so I'm not sure how many times that makes, but we have quarterly meetings for the last four or five years.

Q Is that how you met Mr. McClow?

A Yes.

Q Going over to column N, which has a heading that's in cell N1 that says, Bates Number, do you see that?

A Yes.

Q In that column there are a series of numbers that begin with the prefix CNHA.

Do you see that?

A Yes.

Q Do you know what those numbers represent?

A No.

Q Did you do anything to audit the data in this spreadsheet?

A No.

Q Did you ask any questions about the spreadsheet?

A Well, we just -- we wanted to make sure we understood what the -- what the amount -- amounts were and when the pension amount changed. You can see that, you know, there's a -- an amount to age 62, and then the basic pension we wanted to make sure we understood that -- that the pension age 62 is what they -- they got when they were first retired if they were under 62 and got that to age 62 and then the basic pension after -- at age 60 -- starting at age 62.

Q So just so the record is clear, you're referring to column L of the worksheet, which is -- has a heading of Pension To Age 62 in cell L1, that you understand -- you understood that to be the pension that a class member would receive from retirement until age 62; is that my -- am I summarizing what you just said correctly?

A Yeah. Can you -- can you go to further -- are there further columns on the right?

Q Yes. (Indicating).
A Okay.
Q Any particular column?
A No.
Q Okay. And then in the amount -- in the column that's headed K with the title in K1 of Basic Pension, you understood that to be the pension that a class member would receive when -- after they turn what age?
A Sixty-two.
Q Okay. And did you ask any other questions about Exhibit 11?
A I don't recall asking the other question.
Q But then you -- you used the data in Exhibit 11 to perform your analysis in coming to your opinions; correct?
A To compare costs with pension.
(Lynne Deposition Exhibit 12 was marked for identification and attached to the transcript.)
BY MR. ROGACZEWSKI:

Q So you have in front of you, Mr. Lynne, what's been marked as Exhibit 12. It's a document entitled Plaintiff Reese's Responses To CNH's Second Set Of Interrogatories To Plaintiffs.
Have you seen this document before?
A I -- I honestly I may have, but it's not coming back to me.
Q Have you met Mr. Reese?
A No.
Q Do you understand he's the lead plaintiff in this case?
A Yes.
Q Okay. So I'm going to navigate the workbook to find Mr. Reese who is in row 836 on Exhibit 11.
Now, Mr. Reese is over age 65; correct?
A Is F date of birth?
Q Yes, the data in cell F, 836, appears to be Mr. Reese' date of birth.
A 4/3/1948?
Q Correct.
A Okay. So he turned 65 last April.

Q And according to Exhibit 11 -- and I'm going over to cell K, 36, you assumed he had a pension of about $14,775; correct?

A You're going to make me do this again.

It would be about 14,800.

Q Now, I'll ask you to look at page 3 of Exhibit 12. In Mr. Reese's response to interrogatory 14, it asks about his -- his income. And according to Mr. Reese, his pension in 2012 is about $2,000 greater than what you estimated; correct?

A Greater than what we were provided, yes.

Q I understand. Greater than the amount that you would have considered his pension to be; correct?

A Yes.

Q And he also has an additional pension of over $25,000?

MS. BRAULT: I'm just going to place an objection to the extent that you're having him refer to the answers to interrogatories, which he

said he did not see, and asking him to make comparisons now. I think that that's argumentative.

THE WITNESS: I see that it says that, yes.

BY MR. ROGACZEWSKI:

Q You would agree that Mr. Reese also has as of, at least, 2012, over $30,000 of SSDI; correct?

A According to this, yes.

Q And annuity income of over $15,000; correct?

A That's what it says here.

Q Do you have any reason to doubt Mr. Reese's answers to the interrogatory?

A No.

MS. BRAULT: I just want to place an objection. I think you said SSDI, and the question was for social security or disability income, just to be clear. I don't think that Mr. Reese was disabled.

MR. ROGACZEWSKI: I was not

suggesting -- I apologize --

MS. BRAULT: No, no, just wanted to make sure we were clear.

MR. ROGACZEWSKI: I didn't mean to suggest that.

BY MR. ROGACZEWSKI:

Q Each of these additional sources of income would factor into Mr. Reese's ability to pay for health care, wouldn't they?

A They would along with all other expenses.

Q Sure. But you didn't consider any of these other sources of income; correct?

A I did not because I didn't have them.

Q If you had them, would you have used them?

A We were -- we were just trying to compare over time what would happen with expenses of the benefit they got from CNH with the pension they got from CNH. I thought that was a reasonable comparison to look at the impact over time of -- of the potential change. I mean, I --

people are going to have, you know, different other situations in their lives, but this is what we had to compare.

Q But you would not disagree, though, that these other sources of income can provide Mr. Reese with a greater ability to pay for health care than his pension from CNH?

MS. BRAULT: Objection: argumentative.

THE WITNESS: Well, the additional income would certainly be there to pay for the expenses, but I would have no idea whether he was a special case or -- no pun intended -- or whether, you know, all the other folks would have these other sources of income.

BY MR. ROGACZEWSKI:

Q You're not saying it's irrelevant, though?

A For one person that income would factor into affording anything, yes.

Q Do you understand this to be a class action, Mr. Lynne?

A Yes.

A Yes.

Q Isn't that what someone in your field does, compare benefit plans across industries?

A Yes.

Q So why is it difficult?

A Because there are different situations with different employers, things might be bargaining, not bargaining. There are other -- other than just looking at the benefit plans, in some of these instances there were -- there were other things agreed to outside of the health benefit plans that were part of -- as I understood it, part of the negotiations or a settlement.

So, I mean, you have to look at many different things other than just comparing benefit plans.

Q Are you -- are you a member of the American Academy of Actuaries?

A No.

Q Okay. Do you -- do you subscribe to the academy's methodologies?

A Generally.

(Lynne Deposition Exhibit 17 was marked for identification and attached to the transcript.)

BY MR. ROGACZEWSKI:

Q You have in front of you what's been marked as Exhibit 17 which is a 1988 methodology for valuation of accident and health plans under Section 89 of the Internal Revenue Code. You produced it at numbers 861 through 899.

Are you familiar with this document?

A Yes.

Q In fact, I think you used this document or its methodology to calculate the relative value of the 1990 plan; correct?

A This was used as part of that, yes.

Q All right. On page 1 it says that, quote, The value for a specific plan is based entirely on its provisions, unquote.

Do you agree with that?

MS. BRAULT: That that's how the -- a valuation is done under this protocol?

BY MR. ROGACZEWSKI:

Q That's a statement in the methodology: The value for a specific plan is based entirely on its provisions.

Is that -- do you agree with that?

MS. BRAULT: I'm trying to understand your question. Are you asking if in a normative way a valuation is supposed to include that, or are you just saying that that's what it says in this document?

MR. ROGACZEWSKI: I think my question was sufficiently clear.

BY MR. ROGACZEWSKI:

Q I'll take the answer.

A I mean, when we are simply looking at Health Plan A versus Health Plan B, then, you know -- and -- and in just determining not the cost of the plan based on usage or anything else but just on the benefits provided in one plan versus another, that's what this is used for.

Q And then it goes on, The value is independent of the geographic location and demographic characteristics of employees.

Do you agree with that?

MS. BRAULT: I -- I'm -- I'm sorry. I have to object to form. I really don't understand your question. Are you asking if this methodology is -- is stating that as the boundaries of the methodology, or are you asking him if all valuations --

BY MR. ROGACZEWSKI:

Q I'll take the answer.

MS. BRAULT: I don't understand the question.

BY MR. ROGACZEWSKI:

Q I'll take the answer.

MS. BRAULT: I would like to understand the question, please.

BY MR. ROGACZEWSKI:

Q I'll take the answer.

MS. BRAULT: Do you understand the question?

THE WITNESS: I'm kind of confused by the question.

BY MR. ROGACZEWSKI:

Q There's a statement, The value of a plan is independent of the geographic location and demographic characteristics of employees, the actual health care utilization by plan participants and the type of plan under which the benefits are provided.

Do you agree with that statement?

MS. BRAULT: That that's what it says here?

BY MR. ROGACZEWSKI:

Q Do you agree with that statement?

A If you're just comparing one plan to another and that's all you're looking at, yes.

Q And isn't that what we're doing in this case?

A Well, we're -- in the context of comparing what CNH is proposing to -- to put in for -- for this plaintiff class versus what it has already done for others, there are other things -- there are other benefits outside of the plan that were provided.

If you're going to compare those two

things, I think you can't ignore that there were pension improvements, improvements to Medicare Part B reimbursement. There was a -- a savings account that was set up. I mean, all of those things -- what -- what I'm saying is there might be other things besides one plan versus another.

Q Does the valuation methodology in Exhibit 17 take those things into account?

A I -- when I use this, I looked at the plan design.

Q The terms of the health care plan?

A Just comparing the -- the '90 and the '98, in that narrow focus, I used this comparing the plan provisions.

Q And you could do the same comparison between the current plan and the proposed plan; correct?

A I could.

Q And the valuation would be the same, wouldn't it?

A The same as what?

Q Between the current and the proposed

plan.

A It would be a different value.

Q How? I'm sorry. The proposed plan and the 2005 plan, you could compare those two plans, couldn't you?

A Yes.

Q And the valuation would be the same, wouldn't it?

A For the -- the -- for the medical plan or the drug plan, yes.

Q Which is what Exhibit 17 is all about, the plan value; correct?

MS. BRAULT: I'm going to place an objection.

THE WITNESS: It's part of -- it's part of looking at it. It's not the whole thing. There are other benefits besides what this values. This is just valuing the medical or the prescription benefits.

BY MR. ROGACZEWSKI:

Q And when the court -- if the court is asking us to compare the -- whether or not the

medical benefits are roughly consistent or reasonably commensurate --

A With --

Q -- why isn't --

MS. BRAULT: Wait.

THE WITNESS: With --

BY MR. ROGACZEWSKI:

Q -- why isn't --

MS. BRAULT: Wait.

BY MR. ROGACZEWSKI:

Q -- this sufficient?

MS. BRAULT: I'm going to place an objection. It's argumentative, and it's certainly not what the court asked us to look at, and I object.

BY MR. ROGACZEWSKI:

Q I'll take the answer.

MS. BRAULT: Form and foundation.

BY MR. ROGACZEWSKI:

Q I'll take the answer.

A As I understand it, the court is looking at the comparison between the plan that

this class of retirees has now, which is not the 2005 plan, comparing that to the proposed plan. Those are very different plans, so I'm --

Q You don't --

A -- confused about what you're asking.

Q You don't understand that one of the factors is whether or not the proposed plan is roughly consistent to what's provided to CNH's current employees?

A Is -- would the class of plaintiffs here get everything that was provided to those people? No.

So it's not consistent. They were given other things that were part of a negotiation, as I understand it.

Q That are not health benefits?

A Right.

MS. BRAULT: Well --

BY MR. ROGACZEWSKI:

Q Okay. Let's talk about AT&T --

MS. BRAULT: I'm going to place an objection to the last question to the extent it's

overly broad and undefined.

BY MR. ROGACZEWSKI:

Q How did you acquire information about AT&T and Lucent's plans?

A I received documents from counsel.

Q Okay. What did you ask for to -- that resulted in getting these documents?

A Information that would -- that would provide me some -- some insight into what happened with those companies and their negotiations or -- or results from court proceedings that -- that might shed a different light than what Mr. Macey was saying.

Q You don't identify anything Mr. Macey says about AT&T or Lucent that is factually incorrect; right?

A I don't think so, but I think he left some things out.

Q I understand that, but I want to be clear that you're not identifying anything that he said that was factually incorrect.

A (Witness reviews document.) I -- I

don't think so.

Q Now, AT&T is a cap situation; correct?

A Yeah, as I -- as I understand it, there were caps in place for many years.

Q And the caps impose, once the cap is reached, 100 percent of the increased cost on participants; correct?

A That's my understanding.

Q That's more severe than what the proposed plan does, isn't it?

A It is, but those caps were agreed upon by the parties. And, as I understand it, once there were issues with reaching the cap, some additional money, significant money was put into a VEBA to help offset that.

Q My question was a little different, and it's really whether or not a plan that imposes 100 percent of the costs, by its terms, on participants is less severe than a plan that imposes only 60 percent of the increased costs?

MS. BRAULT: Only 60 percent of the increased costs?

THE WITNESS: Well, again, you can't just look at that piece as if that's the only thing that happened. I mean, I don't see how you can ignore the VEBA money which helps take it from 100 percent to something different.

BY MR. ROGACZEWSKI:

Q VEBA is not a health benefit, though, is it?

A No, but it was put there precisely because it was becoming hard for these folks to -- to afford the amount over the cap. I mean, that's -- that's my understanding. So it seems like they should be taken together. They're not -- they're not completely disconnected events, in my opinion.

Q Let's talk about Goodyear. How did you acquire information about the Goodyear plans?

A Again, I -- I asked counsel for documents they had that would -- that would relate to what happened with their retiree health care.

Q When you got the documents about AT&T and Lucent, did you after reviewing them ask for

additional information about AT&T and Lucent?

A I honestly don't recall whether it came in pieces.

Q What about with -- so what you know about AT&T and Lucent comes entirely from information provided by plaintiffs' counsel?

A Yes.

Q You didn't conduct any independent research?

A The information I got seemed pretty clear about what happened.

Q You didn't ask any questions about it?

A I don't recall.

Q Okay. And with Goodyear, the information that you know about Goodyear also comes just from plaintiffs' counsel?

MS. BRAULT: Could I just place just the objection and as a clarification that when you talk about, quote, the information that came from plaintiffs' counsel, end quote, you're talking about documents that came from plaintiffs' counsel which have been produced?

BY MR. ROGACZEWSKI:
Q I'll take the answer.
A Yes, it was the documents from plaintiffs' counsel.
Q And did you ask any questions after receiving those documents?
A I mean, I had conversations with counsel.
Q I'm not -- I'm not --
A Okay.
Q -- I'm not trying to ask about those conversations. I'm just merely trying to understand the degree to which you accepted the information without question.
A Well, I accepted the documents were -- were correct. I mean, there may have been conversations we had where I was attempting to get clarification to the extent that, you know, counsel was able to provide. I don't remember specific questions.
Q And as with AT&T and Lucent, you're not saying Mr. Macey is factually wrong about what

happened with Goodyear; correct?

A I -- I don't believe that I saw anything factually wrong.

Q And you didn't conduct any independent research about Goodyear; correct?

A I -- I think the documents seemed to -- to provide me what I need.

Q Okay. Goodyear is another cap situation; correct?

A Yes.

Q And in the absence in -- in the absence of a funding vehicle, the caps would have resulted in significant premiums; correct?

A Yes.

Q And in both Goodyear and AT&T and Lucent, the timing is such that the caps were agreed to and then subsequently the VEBA was agreed to; correct?

A That's my understanding.

Q So the caps were agreed to without a funding vehicle in place; correct?

A It's my understanding that -- yes, but

then when there were issues with exceeding the caps, then -- then that led to a funding vehicle to -- to fix the situation.

Q Right. You don't disagree that the caps were agreed to in the absence of a funding vehicle?

A No, I don't disagree.

Q Okay. Let's talk about U.S. Steel. How did you acquire information about the U.S. Steel agreements?

A It was -- it's the same answer as the others. I -- I received documents from plaintiffs' counsel.

Q Okay. Did you ask for additional information after receiving the documents?

A I don't recall that I did.

Q Did you conduct any independent research about U.S. Steel?

A (Witness reviews document.) I do not believe I did.

Q You don't identify anything that Mr. Macey says that is wrong about the U.S. Steel

situation -- that is factually incorrect; correct?

MS. BRAULT: The record should reflect that we're not looking at Mr. Macey's report.

THE WITNESS: Yeah, I -- I don't --

MR. ROGACZEWSKI: No, we're looking at Mr. Lynne's rebuttal report.

THE WITNESS: No, I don't think there was any -- anything factually incorrect that I found, but, again, it's the same issue of leaving the sort of selective analysis.

BY MR. ROGACZEWSKI:

Q At the bottom of page 4, there's a quote from the 1975 agreement about pensioners and receiving a -- an individual receiving a surviving spouse's benefits.

Do you see that?

A Yes.

Q How did you come across that language?

A It was in a document provided by counsel.

Q Now, that provision standing alone has nothing to do with health care benefits; correct?

A Well, it talks about how changes can be made to health care benefits.

Q And you understand that there is no similar provision in the CNH provision; correct?

A Well, I think that's sort of the point.

Q And you understand that the Sixth Circuit has held that changes can be made unilaterally by the company; correct?

MS. BRAULT: Well, let me place an objection to that's overly broad and ambiguous.

THE WITNESS: Not just willy-nilly, they can't.

BY MR. ROGACZEWSKI:

Q What do you mean?

A Well, they can't make any change they want.

Q Right. As long as it satisfies the Reese standard; correct?

A Right.

Q So the fact that an agreement had a limitation that CNH's doesn't have isn't really relevant, is it?

Do you agree with that?
A Yes.
Q And CNH's proposed plan starts at 57 for pre-Medicare and 5 for Medicare; correct?
A Sounds correct.
Q Both of those are less than what's in the U.S. Steel plan; correct?
A Yes.
Q And let's look at a couple of pages earlier, on page 8, at the plan design. The in-network co-insurance rate is also higher under the CNH proposed plan, isn't it?
A Eighty-five.
Q And the out-of-pocket maximum of the proposed plan provides a greater degree of protection for participants than the U.S. Steel plan; correct?
A I believe it has a lower out-of-pocket, yes.
Q Let's talk about Ford. And I -- let me go back and ask this before. Have you conducted any independent research about U.S. Steel?

A No.

Q How did you acquire the information that's in the rebuttal report about Ford?

A They were reports that I received from counsel.

Q Did you --

A Or documents I received.

Q Did you do any independent research about Ford?

A No.

Q Did you react or -- after reviewing the documents provided by plaintiffs' counsel, did you ask for additional information?

A I may have gotten Francis' report after reviewing the initial information.

Q Did you ask for Francis' report? You're talking about Theo Francis; correct?

A Yes.

Q Did you ask for Mr. Francis' report?

A Yes.

Q Specifically?

A Well, about the financial condition of

one versus the other.

Q When did you become aware that Mr. Francis was one of plaintiffs' experts?

A I don't recall.

Q And did you know Mr. Francis was an expert when you asked for his report?

A Well, I didn't know Mr. Francis.

Q So you asked --

A I was --

Q I'm trying --

A I was asking for information about -- because Mr. Macey was trying to compare the automobile companies, which basically were bankrupt. They were on it as comparisons. So I wanted to understand what I could about CNH's financial position.

Q Now -- and what you got in response to that was Mr. Francis' report?

A Yes.

Q Now, again, you're not identifying anything factually incorrect in Mr. Macey's report about Ford; right?

A No, just leaving out.
Q In fact, both Ford and GM agreed with UAW to reduce retiree health benefits; right?
A It's my understanding they did. I'm not sure what choice they had.
Q They -- but they -- they agreed to them; correct?
A In a bankruptcy situation.
Q It's your understanding that they -- as part of the bankruptcy, that's when the reductions occurred?
A I'm sure there were many instances of negotiations as -- as these companies were having trouble.
Q GM's bankruptcy was in 2009; correct?
A I don't see that I have the date in here.
Q Okay. Do you know when GM's bankruptcy occurred?
A I don't know the exact date.
(Lynne Deposition Exhibit 19 was marked for identification and attached to the

transcript.)

BY MR. ROGACZEWSKI:

Q All right. You have in front of you, Mr. Lynne, a filing made in a court case called, In re: General Motors Corp., pending in the United States Bankruptcy Court for the Southern District of New York, Case Number 09-50026.

I'll represent this was also produced by you.

Do you recall reviewing this document?

A (Witness reviews document.) I don't recall -- recall receiving this; I don't recall that I relied on it.

Q Okay. Do you recall reviewing it?

A If I did, it was fairly cursory.

Q I can't imagine why. It's mind numbing, having read it.

Does it refresh your recollection regarding when the GM bankruptcy occurred?

A Looks like '09, yes.

Q And do you have an understanding as to when GM and Ford first agreed to reductions in

THE WITNESS: You know, when I work with my clients, the things that they need to do are certainly dictated at some point by financial conditions.

BY MR. ROGACZEWSKI:

Q That wasn't an answer to my question. How -- I'll ask it -- I'll ask it in a nonleading way.

How is the financial condition of CNH relevant to whether the changes that one wants to make are reasonable in light of changes in health care?

A I wasn't trying to make that comparison.

Q Okay.

A Macey was when comparing CNH to these other companies.

Q That's what you under- --

A I was simply trying to rebut that part of his argument.

Q And that's what you understood Mr. Macey to be doing in that part of his report?

A Trying to say that what happened at these auto companies is something that could -- could happen at CNH, and that it was a good comparison, which I disagree with.

Q How about GM? How did you acquire the information in your rebuttal report regarding GM?

A (Witness reviews document.) That was a combination of documents received from counsel, and I believe that was where I looked -- looked up the composition of the VEBA on the UAW Web site.

Q The UAW VEBA trust breakdown -- work chart; right?

A Right.

Q And aside from that, did you do any independent research into the GM situation?

A No.

Q And aside from the conflation of the UAW VEBA trust with the UAW, did you identify anything incorrect in Mr. Macey's report?

A Mr. Macey wasn't -- I don't believe he was clear as to which of the auto companies he was referring to, but he did say that -- he was

attempting to say that the UAW made changes to benefits; and, in fact, it was -- the trustees or the administrators of the VEBA, which is different.

Q I said aside from that.

A Oh, I'm sorry.

Q Aside from that.

A No.

Q But Mr. Macey isn't wrong about the terms that the UAW retirees are -- that -- that -- the terms of their benefits under the UAW VEBA as set by the UAW VEBA trust; correct?

A No, no.

Q And, so, with the exception of the research, you did everything that's in your -- everything you understand about GM came from plaintiffs' counsel; correct?

MS. BRAULT: You mean in documents from plaintiffs' counsel?

THE WITNESS: Yes.

BY MR. ROGACZEWSKI:

Q And the same thing I'm saying would be

true for Ford; correct?

A Yes.

Q Now, you make a -- a big point about the connection of the Ford and the GM changes to bankruptcy; correct?

A I think it makes the comparison. Not a very good one, yeah.

Q GM's changes were made four years before it went into bankruptcy; correct?

A It was all part of their -- I viewed it as a -- as all a part of the agreements that were made as the company was going down hill.

Q So you look at -- you take together the '05 agreement, the '07 agreement and the bankruptcy and put them all together?

A Yes.

Q You understand, correct, that the VEBA that GM agreed to was not part of the original agreement; right? That -- that came second in time?

MS. BRAULT: I'm going to place an objection: form.

ACKNOWLEDGMENT OF DEPONENT

I, Mark L. Lynne, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

_____________________ _____________________

(DATE) (SIGNATURE)

CERTIFICATE OF NOTARY PUBLIC

Sworn and subscribed to before me this

_______ day of _______________, _________

_____________________ _____________________

NOTARY PUBLIC MY COMMISSION EXPIRES

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter, the officer before whom the foregoing proceedings were taken do hereby certify that the foregoing transcript is a true and correct record to the best of my ability of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 24th day of January 2014.

My Commission expires:
May 17, 2017

Dana C. Ryan

NOTARY PUBLIC IN AND FOR THE
STATE OF MARYLAND