EXHIBIT 5

JOHN F. STAHL
January 14, 2014

Page 1

```
 1                   UNITED STATES DISTRICT COURT

 2                   EASTERN DISTRICT OF MICHIGAN

 3                        SOUTHERN DIVISION

 4     JACK REESE, JAMES            )

 5     CICHANOFSKY, ROGER           )

 6     MILLER and GEORGE NOWLIN     )

 7     on behalf of themselves      )

 8     and a similarly situated     )

 9     class,                       )

10              Plaintiffs,         )

11       vs.                        ) Case No. 04-70592

12     CNH GLOBAL N.V.,             )

13     formerly known as Case       )

14     Corporation and CNH          )

15     AMERICA LLC,                 )

16              Defendants.         )

17

18          The discovery deposition of JOHN F. STAHL,

19     taken in the above-entitled cause, before

20     Deanna Amore, a notary public of DuPage County,

21     Illinois, on January 14, 2014, commencing at the

22     time of 9:04 a.m. at 227 West Monroe Street,

23     Chicago, Illinois, pursuant to notice.

24     Reported by:  Deanna Amore, CSR, RPR

25     License No. 084-003999
```



JOHN F. STAHL
January 14, 2014

Page 136

```
1        A.    Express Scripts has a standard report that
2    they put together that they provided to us.
3        Q.    And you used the data from the Express
4    Scripts standard report?
5        A.    Correct.
6        Q.    Did you use it or did somebody else use
7    it?
8        A.    Somebody else took that report,
9    transferred the actual dollar numbers into an Excel
10   spreadsheet and then looked up each drug in an FDA
11   database to see when that drug was introduced so it
12   could be categorized by the year it was introduced.
13       Q.    You didn't do that, looking it up --
14       A.    I didn't do it personally, no.
15       Q.    So you just took what they did, and you
16   looked at it?
17       A.    That's correct.
18       Q.    You didn't actually do any of the
19   analysis?  They provided it to you?
20       MS. CAPOTOSTO:  Object to form.
21       THE WITNESS:  I believe the actual process
22   would have been Rob.  Rob put together the
23   analysis.  Nick checked it from a technical
24   perspective, and I reviewed it.
25
```



JOHN F. STAHL
January 14, 2014

1    BY MS. BRAULT:

2        Q.    By the time you got it for review, all of

3    the calculations had been completed?

4        A.    That's correct.

5        Q.    Was there anything else that you relied

6    upon to reach the conclusion, the opinion that

7    you've listed as No. 3 in your report that you

8    haven't provided to us either in the body of the

9    report, the exhibits or in the documents marked

10   STAHL Exhibit 1 through 52?

11       A.    No.

12       Q.    With respect to Opinion No. 4, it says,

13   "Increased participants' cost sharing leads to more

14   cost-effective plan usage. Specifically, increases

15   in cost sharing for brand-name drugs under the

16   proposed plan have led to higher utilization of

17   generic drugs and lower overall cost per

18   prescription."

19            That's your opinion?

20       A.    It is.

21       Q.    What is the methodology you used to reach

22   that opinion?

23       A.    We were provided prescription drug claim

24   data and number of prescriptions for the pre-65

25   plans for both the grandfathered and



JOHN F. STAHL
January 14, 2014

Page 138

1    non-grandfathered group on a year-by-year basis,

2    I believe, 2009 through 2013 -- I'm sorry -- 2010

3    through the first half of 2013.  We examined the

4    two groups to see what portion of claims and costs

5    fell -- cost per prescription fell into basically

6    six categories:  Generic, brand formulary, brand

7    non-formulary and then also retail and mail.  And

8    we compared the costs in the utilization by

9    category between the grandfathered and

10   non-grandfathered groups.

11   BY MS. BRAULT:

12       Q.   When you say "we," did you actually do

13   that or did you get it after it had already been

14   calculated?

15       A.   I got it after it had already been

16   calculated, and I, again, reviewed the

17   calculations.

18       Q.   Is there anything that you relied upon in

19   reaching a conclusion or your opinion in No. 4 that

20   isn't contained in your report, the exhibit or in

21   STAHL 1 through 52?

22       A.   No.

23       Q.   Is it your intention to rely upon anything

24   else in any future proceeding to support these

25   opinions?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

 1     would have received by way of increased pension

 2     benefits in that contract, correct?

 3         A.    That's correct.

 4         Q.    Or the step increases that they may have

 5     received over the course of their contract,

 6     correct?

 7         A.    Correct.

 8         Q.    So in terms of comparing the value of the

 9     proposed plan and the current plan, at least your

10     evaluation of the differences does not include

11     whatever benefits the 2005 retirees might have

12     received that are considered either contractual or

13     pension benefits but not specific to the retiree

14     health care plan, correct?

15         MS. CAPOTOSTO:  Objection.  Form.

16         THE WITNESS:  It does not.

17     BY MS. BRAULT:

18         Q.    Does the fact of the Medicare Part D

19     program factor into your comparisons in any way?

20         A.    Yes, it does.

21         Q.    Tell me how.

22         A.    It's reflected when we try and figure out

23     what the out-of-pocket cost would be for retirees,

24     Medicare retirees, when the post-65 drug program

25     has been eliminated, in terms of determining what



JOHN F. STAHL
January 14, 2014

Page 142

1   their out-of-pocket cost will be, the assumption is

2   made that they will purchase a Part D plan and then

3   will receive benefits, basic Part D benefits under

4   that plan, and that the balance of their

5   out-of-pocket costs would be basically what isn't

6   covered through a Part D plan.

7        Q.   Okay.  I am going to ask you -- I am going

8   to go back to that, but I want to ask you, did the

9   Affordable Care Act factor into your comparisons in

10  any way?

11       A.   Only to the extent it exacted an excise

12  tax.  There was some consideration of the excise

13  tax.  There was no -- that's where it came into

14  and, I guess, also to the extent that affected the

15  benefits offered under the Part D plan itself.  For

16  example, they are closing the donut hole by 2020.

17  So that was an effect of the Affordable Care Act

18  that was reflected in the projections.

19       Q.   Okay.  And so the specific data that would

20  reflect the out-of-pocket cost to the retiree, can

21  you tell me which of these data files I would find

22  that?

23       A.   Historical actual out-of-pocket costs are

24  you referring to?

25       Q.   The one you said you considered the



JOHN F. STAHL
January 14, 2014

Page 143

1   Medicare Part D program.

2       A.   It would be -- I'm not sure.   Whichever

3   the one that has the projections that went into

4   Exhibits 5 and 6.   I am not sure which document

5   that was.   I think it was towards the end.   The one

6   that says liabilities, liability summary.

7       Q.   This one here.

8       A.   I believe that's the one.

9       Q.   Is this the one you're talking about?

10      A.   Yes.

11      Q.   You are saying the out-of-pocket cost to

12  the post-65 prescription drug group is modified in

13  some way -- oh, I see your formula now.

14           Did you write that formula?

15      A.   I would have assisted Peter and Rebecca in

16  developing that formula.

17      Q.   So what you're doing is you're taking the

18  prescription drug cost from the current plan and

19  doing what to that formula?

20      A.   We are essentially -- what we are

21  attempting to do is take the total prescription

22  drug covered cost under the old plan for a post-65

23  retiree.   We are subtracting off the percentage of

24  the cost that would be paid by that one minus the

25  Part D premium number there, that's basically, it


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

1      Q.    And so one of the things that you said in

2   your opinions was that the medical plan provisions

3   of the proposed pre-65 plan compare favorably to

4   plan designs reflected in survey data, and it goes

5   on.

6           Did you compare the proposed plan to plans

7   with EGWPs for post-65 prescription drug coverage?

8      A.    I did not.

9      Q.    Why not?

10     A.    We don't have -- the databases that we

11  have for retiree medical plans do not, I don't

12  believe, indicate whether they have EGWP or not as

13  part of the design.

14     Q.    So several hundred or so employers, you

15  can't tell, but you don't think any of them have

16  EGWP?

17     A.    I don't know how many may or may not have

18  EGWPs.   It's not possible to determine from the

19  data.

20     Q.    So the data is somewhat limited in terms

21  of making comparisons?

22     MS. CAPOTOSTO:   Object to form.

23     THE WITNESS:   It is limited for retiree plans.

24  The data -- you notice when you look at the data,

25  many plans have no plan whatsoever listed.   So it's



JOHN F. STAHL
January 14, 2014

Page 148

1    much more difficult to draw conclusions from the

2    data that's there for the retirees.

3    BY MS. BRAULT:

4         Q.   So that, indeed, limits your opinion in

5    two.  Your comparison is to mostly active

6    employees, right?

7         A.   The comparison of benefits?

8         Q.   Yes.

9         A.   Entirely active employees.

10        Q.   So it's not to retirees on any level?

11        A.   That's correct.

12        Q.   Okay.  Did you try to do any kind of

13   comparison to retiree plans?

14        A.   It would have been, A, difficult to do

15   because of the way the data is, but also the

16   comparison, the database would show a significant

17   proportion of employers don't provide any retiree

18   medical benefits.  So that would, right off the

19   bat, make the plan, any comparison of any plan that

20   provides benefits look better right off the bat.

21   So it didn't seem to be necessarily the best

22   comparison to use.

23        Q.   Do you know of any benefit that the

24   retirees would receive from -- that switched from

25   the current plan to the proposed plan?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

1       MS. CAPOTOSTO:  Object to form.

2       THE WITNESS:  When you say benefit --

3   BY MS. BRAULT:

4       Q.   Is there anything about the plan that

5   would be a benefit for them?

6       A.   An improvement in benefits?

7       Q.   An improvement in their benefits or

8   financial situation or in any way benefit them.

9       MS. CAPOTOSTO:  Object to form.

10      THE WITNESS:  I'm not aware of any.

11  BY MS. BRAULT:

12      Q.   It's true that there is no good thing

13  that's in the proposed plan --

14      MS. CAPOTOSTO:  Object to form.

15  BY MS. BRAULT:

16      Q.   -- that's not in the current plan?

17      MS. CAPOTOSTO:  Object to form.

18      THE WITNESS:  When you say "there is no good

19  thing" that -- it's a subjective determination

20  whether it's a good thing.  That would be -- the

21  way I interpret that is there is nothing good about

22  the new plan.  I don't know that I believe that is

23  the case.

24  BY MS. BRAULT:

25      Q.   Well, they are already covered by the



JOHN F. STAHL
January 14, 2014

Page 197

1     A.   Correct.

2     Q.   Do you know how much -- what somebody on a

3   fixed income can typically afford to pay for an

4   insurance premium?

5     A.   I do not, no.

6     Q.   In the year 2032 what would the post-65

7   burden be?

8     A.   I am sorry.  2032?

9     Q.   Yeah, going down to the end.

10     A.   It would be, post-65, 1678, 758 and 4681,

11   7,017.

12     Q.   Is there a percentage of household income

13   or a percentage of household assets that you use as

14   a benchmark to determine whether or not someone is

15   likely to pay a premium and participate in a plan

16   or in the alternative forgo the plan and get

17   prescription or get health care benefits elsewhere?

18     MS. CAPOTOSTO:  Object to form.

19     THE WITNESS:  I have not seen it, the testing

20   done that way.  What I've typically seen is to

21   compare the cost of the plan against other

22   commercially available products.  So if you look at

23   what's available in the Medicare supplement or

24   Medicare advantage market.

25   BY MS BRAULT:



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

1       Q.   Do you know how these costs compare to

2   other product or projections for other products?

3       A.   I don't know how they would compare

4   against projected out to 2032.  I know on a

5   relative basis how they compare right now.

6       Q.   How do they compare right now on a

7   relative basis?  The premium in total

8   out-of-pocket.

9       A.   The answer is generally -- is that in 2013

10  the out-of-pocket cost would start out very low,

11  and they compare very favorably.  It's only over

12  time as the premium grows to 60 percent of the

13  increase, that that starts getting to be more

14  significant.

15      Q.   Can you tell when it becomes sort of a

16  more significant item in relation to other products

17  that might be available on the market?

18      MS. CAPOTOSTO:  Object to form.

19      THE WITNESS:  There is no way to tell.  It

20  would require this type of projecting what's

21  available on the market 10 and 20 years out, and

22  that market is just not -- is more volatile.

23  BY MS. BRAULT:

24      Q.   Do you know of any other premiums that are

25  part of a product that somebody purchases where the



JOHN F. STAHL
January 14, 2014

1    premiums go up each year based upon a formula like

2    this one?

3        A.   Well, I'm not sure, but I can say it's a

4    formula like this one.  But any health care

5    coverage, typically, will go up as your age

6    increases, certainly in a non-Medicare group will

7    go up as your age increases, and the cost

8    increases.

9        Q.   I am not talking necessarily about when

10   you first purchased the insurance, but as you are

11   covered under the insurance, 60 percent of the cost

12   of the plan seems to be a pretty steep incline as

13   you go up because you are going to, obviously, the

14   amount of increase is going to go up into the

15   future.

16       MS. CAPOTOSTO:  Object to form.

17       THE WITNESS:  With respect to coverages

18   available on the open market, no, I'm not aware of

19   any that would increase in that way, but it

20   wouldn't be able to because you would already be

21   paying a hundred percent.  It would just go up with

22   trend.

23       For other employer plans, it's not uncommon.

24   In fact, it's increasingly more likely for

25   employers to say we will pay the cost of the plan



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

Page 210

1      Q.    And there wasn't any particular logic to
2    the years 2011 to 2013?
3      A.    That's just what happens to be populating
4    the database right now.  It wasn't a conscious
5    decision to exclude any data.  The totality of the
6    data that's in there is from those years.
7      Q.    What is this database typically used for
8    in non-litigation practice?
9      A.    Many times when an employer looks at their
10   cost from year to year, they look at their plan
11   provisions to see if they are in line with what
12   other companies are doing.
13     Q.    So this is really designed to assist
14   employers in making plan design choices
15   prospectively?
16     A.    Correct.
17     Q.    You only need the last few years because
18   you are looking at what's in line with what's going
19   to be done in the future, not necessarily what's in
20   line with what's been done in the past?
21     A.    Right.
22           The idea is to have something that helps
23   project -- make a reasonable anticipation of what
24   will happen next year is what they are mostly used
25   for.


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

Page 211

1      Q.   Now, did you exclude any part of the

2   employer groups by industry?  In other words, did

3   you make any attempt to select employers that were

4   within the same type of industry as CNH?

5      A.   No, we didn't.

6      Q.   Did you make any attempt to distinguish

7   between plans that covered salaried versus hourly

8   employees?

9      A.   Virtually, all the data -- virtually, all

10   the companies would be covering salaried employees.

11   We have a limited number of data as it would apply

12   to bargained plans.

13      Q.   Limited data -- so you didn't then --

14   obviously, you didn't go through because there is a

15   difference between hourly and bargained hourly,

16   correct?

17      A.   That's correct.  I don't know, to the

18   extent -- to what extent these plans might be

19   covering non-bargained hourly employees or

20   salaried.

21      Q.   What about bargaining hourly?

22      A.   Generally speaking, these plans would not

23   be covering bargained hourly plans in the

24   comparison set.

25      Q.   And you are saying that because of your



JOHN F. STAHL
January 14, 2014

Page 212

1    familiarity with the group or because there is
2    actually a data point that you can look at and say
3    this number percentage is bargaining and this
4    number isn't?
5         A.    There is no data element on there that
6    says bargain versus non-bargain that I can see.
7    I believe we have a separate database that has
8    not -- has bargained plans in it.  It's would be a
9    much smaller and less well-populated database.
10        Q.    Do you know how many employers are in that
11   separate database?
12        A.    I don't know off the top of my head.
13        Q.    What would you guess?  Is it half the size
14   of this one?
15        A.    I guess it's even much less than that.
16        Q.    25 percent?
17        A.    If I had to guess, probably that amount or
18   lower.
19        Q.    So if it's like 900 in this one, 700, I
20   think I saw, 900, it says nearly 900 companies.  So
21   25 percent of that is?
22        A.    225.
23        Q.    Thank you.
24        A.    I don't know the exact number.  I just
25   know it's not as big of a data set.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

Page 213

1        Q.    Would it be fair to say that the benefits,

2    particularly health care benefits, that are

3    bargained for by a collective bargaining process

4    are generally richer benefits than those that are

5    not bargained for by a collective bargaining

6    process?

7        MS. CAPOTOSTO:  Object to form.

8        THE WITNESS:  I don't know that that's true.

9    Sometimes -- it just depends on the industry.  I've

10   seen some industries where the bargained benefits

11   are exactly the same as salaried or not as good.

12   It depends on the bargaining position of the union

13   and the industry.

14   BY MS. BRAULT:

15       Q.    And a lot of what happens in bargaining is

16   that they bargain over provisions, right?

17       MS. CAPOTOSTO:  Object to form.

18   BY MS. BRAULT:

19       Q.    Including health care provisions?

20       A.    Yes.

21       Q.    Have you been called upon to assist

22   clients while they are in bargaining to talk about

23   cost of the plans -- I'm sorry, not cost of plans

24   but cost of plan design elements or even plans,

25   I guess, altogether?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

Page 224

1    points?

2        A.    It would likely have the same data points.

3    It just would be just a much smaller group of

4    companies.

5        Q.    So if you have a separate database for

6    retirees that are covered under collective

7    bargaining agreements, plans that are covered by a

8    collective bargaining agreement, then it would make

9    sense that this one that you have actually excludes

10   bargaining groups, right?

11       MS. CAPOTOSTO:   Object to form.

12   BY MS. BRAULT:

13       Q.    Or is that a subpart of this one?

14       A.    It would make sense because I don't see

15   a -- without -- otherwise, there would be a column

16   saying bargain or non-bargain on it.  I don't see

17   that column.

18       Q.    So that means to you that they are all

19   non-bargaining, right?

20       A.    That's what it means to me.

21       Q.    And CNH is not in here; is that right?

22       A.    I don't know.

23       Q.    It's alphabetical, right?

24       A.    Yes.

25       Q.    Would it be under Case?  I looked.  They



JOHN F. STAHL
January 14, 2014

Page 225

1    are not in here as far as I could find them.  They

2    are not in here under Case.  Maybe CNH?  No.

3           Let's talk about the "Covered Services and

4    Prescription Drugs."  I don't want to repeat what

5    we already did on this.  You say, "A high

6    percentage of the actual cost for medical and

7    prescription drugs for the current plan over the

8    period 2008 through 2012 involved procedure codes

9    or drugs that did not exist in 1998."

10          And then you have a conclusion sentence,

11   "As a result, the proposed changes are reasonable

12   in the light of continuing changes in the cost and

13   delivery of health care," correct?

14   A.    Correct.

15   Q.    Is your statement, "As a result, the

16   proposed changes are reasonable in light of

17   continuing changes in the cost and delivery of

18   health care," dependent upon your premise here

19   relating to the high percentage of actual cost of

20   medical and prescription drug cost not existing in

21   1998?

22   MS. CAPOTOSTO:  Object to form.

23   THE WITNESS:  The premise is that additional --

24   all medical plans are worded in such a way that

25   they pick up those costs automatically.  So they



JOHN F. STAHL
January 14, 2014

1    are, of necessity, covering services that were not

2    originally available in any given base year and

3    that they are covered as long as they are medically

4    necessary in the future.

5    BY MS. BRAULT:

6        Q.    So would you agree with me that your

7    conclusion is dependent upon the proposition in

8    your first sentence that if the procedure code or

9    drug didn't exist in 1998, then it's a change --

10   well, let me strike that.

11           Other than the code not existing or the

12   drug not existing in 1998, is there any other

13   reason or basis for your conclusion that that

14   medical procedure or prescription drug did not

15   exist?

16       MS. CAPOTOSTO:  Object to form.

17       THE WITNESS:  No.

18   BY MS. BRAULT:

19       Q.    So if we were to show that it's not true

20   that a code change always represents a

21   technological advance in medicine, then to the

22   extent we can show that, it would not support your

23   conclusion, correct?

24       MS. CAPOTOSTO:  Object to form.

25       THE WITNESS:  I think that if you could show



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

Page 227

```
1    that it never happens, then, perhaps, that would
2    undercut it entirely, I believe, but to the extent
3    that you could show that there are certain codes
4    that don't represent increases, then that would
5    certainly lessen the impact of the new procedures.
6    BY MS. BRAULT:
7         Q.   Okay.  We'll talk about that.  In the
8    basis for your opinion you talk about medical
9    procedures since 1998, right?
10        A.   Yes.
11        Q.   You say that Exhibit 8 shows medical
12   expenses for 2009 through 2012 broken down between
13   services for codes that existed and services for
14   codes which did not.  That all came out of Anthem?
15        A.   That came out of the codes themselves that
16   were contained on the Anthem database and that we
17   have separate -- RBRVS filed it and the codes from
18   1998.
19        Q.   And those were the -- we were looking at
20   those two files that were too big to open, and
21   without really causing problems, the note files,
22   that's in sort of the raw data form?
23        A.   To be honest, I am not sure that those
24   were even summarized in the two files that are too
25   big to open.  They were in the Notepad files.
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

Page 228

1       Q.   They are in the Notepad files?

2       A.   Yes, it would be in the Notepad files.

3       Q.   The Anthem summaries are in 19 and 20, and

4    they are 47,000 and 46,000 kilobytes each.  And

5    every time we try to open them, it crashes

6    everything.

7            It may take a little while, but we are

8    currently trying to open STAHL 39C.  There we go.

9    So 39C is a Notepad document that has a bunch of

10   sort of raw data.  Do you know which one of these

11   is the code information?

12      A.   I don't know off the top of my head.

13      Q.   You never tried to match a particular code

14   to any particular procedure, correct?

15      A.   I did not personally.

16      Q.   Okay.  Are you familiar with the CPTs or

17   the coding system that are used?  Is that something

18   that's familiar to you?

19      A.   Not particularly.

20      Q.   Do you know what they use them for?

21      A.   To -- not specifically.

22      Q.   You report that approximately 24 percent

23   of the records did not have a code and costs for

24   those claims are shown separately?

25      A.   Correct.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

JOHN F. STAHL
January 14, 2014

Page 253

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4    JACK REESE, JAMES          )
      CICHANOFSKY, ROGER         )
 5    MILLER and GEORGE NOWLIN   )
      on behalf of themselves    )
 6    and a similarly situated   )
      class,                     )
 7              Plaintiffs,      )
         vs.                     ) Case No. 04-70592
 8    CNH GLOBAL N.V.,           )
      formerly known as Case     )
 9    Corporation and CNH        )
      AMERICA LLC,               )
10              Defendants.      )
11       This is to certify that I have read the
12    transcript of my deposition taken in the
13    above-entitled cause by Deanna Amore, Certified
14    Shorthand Reporter, on January 14, 2014, and that
15    the foregoing transcript accurately states the
16    questions asked and the answers given by me as they
17    now appear.
18    _____
                JOHN F. STAHL
19    SUBSCRIBED AND SWORN TO
20    before me this 21st day
21    of February 2014.
22    _____
23       Notary Public
24
25
```



JOHN F. STAHL
January 14, 2014

Page 254

```
 1    STATE OF ILLINOIS    )

 2                         )   SS:

 3    COUNTY OF DU PAGE    )

 4        I, Deanna Amore, a notary public within and for

 5    the County of DuPage County and State of Illinois,

 6    do hereby certify that heretofore, to-wit, on

 7    January 14, 2014, personally appeared before me, at

 8    227 West Monroe Street, Chicago, Illinois, JOHN F.

 9    STAHL, in a cause now pending and undetermined in

10    the United States District Court, Eastern District

11    of Michigan, Southern Division, wherein JACK REESE,

12    JAMES CICHANOFSKY, ROGER MILLER and GEORGE NOWLIN

13    on behalf of themselves and a similarly situated

14    class are the Plaintiffs, and CNH Global N.V.,

15    formerly known as Case Corporation and CNH AMERICA

16    LLC are the Defendants.

17        I further certify that the said witness was

18    first duly sworn to testify the truth, the whole

19    truth and nothing but the truth in the cause

20    aforesaid; that the testimony then given by said

21    witness was reported stenographically by me in the

22    presence of the said witness, and afterwards

23    reduced to typewriting by Computer-Aided

24    Transcription, and the foregoing is a true and

25    correct transcript of the testimony so given by
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

1   said witness as aforesaid.

2       I further certify that the signature to the

3   foregoing deposition was reserved by counsel for

4   the respective parties.

5       I further certify that the taking of this

6   deposition was pursuant to Notice, and that there

7   were present at the deposition the attorneys

8   hereinbefore mentioned.

9       I further certify that I am not counsel for nor

10  in any way related to the parties to this suit, nor

11  am I in any way interested in the outcome thereof.

12      IN TESTIMONY WHEREOF:  I have hereunto set my

13  hand and affixed my notarial seal this 19th day of

14  January, 2014.

15

16

17

18

19

_Dennis Amore_

20          NOTARY PUBLIC, DUPAGE COUNTY, ILLINOIS

21

22

23

24

25

                                                    255

**TOWERS WATSON** 

| Page | Line | Correction |
|------|------|------------|
| 44 | 10 | Delete "locally" |
| 45 | 15 | "per" should be "for" |
| 45 | 20 | "to a" should be "down" |
| 45 | 20 | Delete "dot" |
| 45 | 25 | "assumed — not even quite" should be "assumed to have died – not even quite" |
| 48 | 25 | "— referred to as a contract" should be "two-party contract" |
| 49 | 1 | "means a" should be "a two-party" |
| 49 | 1 | "this" should be "that" |
| 50 | 5 | "and" should be "since" |
| 50 | 10 | "is" should be "are" |
| 50 | 20 | "a number of, hundred" should be "a number of one hundred" |
| 50 | 20 | Delete "by me" |
| 60 | 24 | "is" should be "are" |
| 63 | 16 | "continuous" should be "continuance" |
| 63 | 20 | "there" should be "it" |
| 64 | 12 | "individual" should be "individual did" |
| 65 | 17 | "of" should be "and" |
| 66 | 4 | "—" should be "surveys" |
| 66 | 12 | "out" should be "on" |
| 68 | 23 | "PPO" should be "PPO plans" |
| 77 | 3 | "Either" should be "we had a" |
| 77 | 21 | "so they" should be "But they have" |
| 77 | 25 | "education" should be "continuing education" |
| 82 | 9 | "Don Pooley" should be "Tom Coogan" |
| 82 | 14 | "in the" should be "and" |
| 89 | 13-14 | "to provide" should be "provided to" |
| 89 | 15 | "are" should be "is" |
| 89 | 19 | "sometimes" should be "as it's sometimes" |
| 92 | 13 | "of" should be "on" |
| 92 | 22 | "planned" should be "plan" |
| 96 | 7 | "path" should be "data" |
| 98 | 3 | "plans" should be "plan" |
| 98 | 4 | "documented" should be "documents" |
| 110 | 2 | "is" should be "are" |

TOWERS WATSON 

Ms. Melissa Farah
February 21, 2014

| Page | Line | Correction |
|------|------|------------|
| 121 | 23 | "provided" should be "been provided" |
| 145 | 19 | "specialized" should be "specializes" |
| 146 | 2 | "referred to" should be "reviewed" |
| 167 | 16 | "typical, I'm not" should be "typically, it's not" |
| 168 | 2 | "of" should be "for" |
| 169 | 3 | "is" should be "are" |
| 169 | 22 | "won't" should be "will" |
| 182 | 5 | "it's not" should be "they've got" |
| 183 | 15 | "to the group" should be "to, is the group" |
| 185 | 16 | "combatted" should be "valued" |
| 189 | 15 | "that" should be "any" |
| 190 | 17 | "simple" should be "simplified" |
| 191 | 14 | "been" should be "not" |
| 205 | 15 | "Medical" should be "Well" |
| 205 | 17 | "or" should be "for" |
| 212 | 8 | "not" should be "got" |
| 216 | 12 | "company" should be "cap" |
| 216 | 13 | "121" should be "161" |
| 222 | 21 | "part" should be ""Part B" |
| 223 | 16 | "bargain" should be "bargained" |
| 227 | 17 | "filed it and" should be "file with" |
| 228 | 19 | "particularly" should be "specifically" |
| 232 | 1 | "was" should be "was an" |
| 241 | 5 | "what" should be "that" |