# Exhibit B Part 3

G.   Personal Protective Equipment

The protective safety equipment, which will be provided by the Company, is set forth below. All personal protective equipment provided by the Company will continue to be of safe design and construction. Employees must wear the personal protective equipment, and use the protective devices and other safety equipment designed to protect them from injury and illness.

Eye Protection Program.

The Company will provide prescription and/or non-prescription safety glasses to all employees starting their employment with the Company. All employees are required to wear ANSI-Z87.1 approved safety glasses in the course of their employment. When safety glasses are damaged in the course of an employee's work, they will be replaced at no cost to the employee by the Company. For prescription safety glasses, the employee will provide the Company with a copy of their prescription and assume the cost of such prescription. When a correction is required in the employee's prescription, the cost of replacement prescription safety glasses will be assumed by the Company. The replacement cost of prescription safety glasses lost or damaged by improper care by the employee will be at the expense of the employee, unless two years have elapsed from the date of the last issue of prescription safety glasses.

Foot Protection Program.

The Company will provide toe clips or guards to all employees starting employment with the Company. All employees are required to wear prescribed foot protection in the course of their employment. The Company will make ANSI-Z41.1 approved safety shoes available to the employee for purchase. A supplement of $25.00 will be paid toward the purchase of a pair of metatarsal-guarded shoes. Two (2) pair per year will be supplemented. When metatarsal-guarded shoes are required to comply with OSHA (such as the Racine Foundry), the Company will provide employees with metatarsal-guarded shoes from the Company approved suppliers or vendors in accordance with the requirements of OSHA. The employee must turn in the used pair of shoes and a receipt to receive reimbursement for the new pair of metatarsal-guarded shoes. Any employee removing a guard from a shoe is subject to normal disciplinary action. This provision is not intended to reduce the Company's responsibility, in any way, under the OSHA Standard 1910.136

Miscellaneous

Personal protective equipment, devices and clothing, which are required or are necessary for particular work assignments, shall be provided and furnished by the Company.    (Refer to Local Supplements for specific personal protective equipment.)

Personal protective equipment furnished employees except for prescription glasses, must be returned to the Company when terminating employment. The cost of such equipment not returned in usable condition will be deducted from the employee's last pay check, except for those items returned in unusable condition due to normal wear and tear.

Personal protective equipment that is damaged as a result of a workplace injury will be replaced at company expense.

H.   Lost Time Payment

An employee who receives an in-plant injury which requires a visit to a hospital or doctor in or out of the plant will be paid the appropriate wage schedule hourly rate as applicable for the time lost, or the balance of the shift, whichever is shorter, provided the employee returns to the job promptly if able to return to work.

I.   Health and Safety Dispute Resolution

Written grievances involving Safety that have been reviewed in the "second step" may be referred to the Local Safety Committee/Team. The remaining steps of the grievance procedure are also available for those grievances.

CNHA032119

It is the desire of the parties that problems and questions relating to Health and Safety should be resolved through the use of these Safety Committees/Team by the parties without referral to government agencies.

J.   Fall Prevention

The Company will continue to apply its comprehensive fall prevention program. Hazardous tasks will be prioritized and plans for control measures will be developed and implemented. The programs guidelines, which will constitute a base line, or benchmark, will be distributed to each facility. The Local Health and Safety Committee/Team will review the program and, based on that facility's operations, may make recommendations.

K.   No Hands in Die/Protection Program

The Company is committed to the Safety and Health of all employees, regarding power press and press brake safety. During this agreement the Company will strive to achieve a No Hands in Die application and where this is not feasible, it will ensure point of operation devices such as brake monitors, barrier guards, light guards, or simultaneous and concurrent activated two-handed controls are utilized and maintained in working condition.

For those operations which require employees to place their hands or arms into the die area, power presses will, where feasible, be additionally equipped with safety devices to prevent the press ram from cycling or falling, while the employees are loading and unloading into the die area.

Press brake operations will incorporate safety methods, procedures, tools, devices, or combination of these to achieve pinch point protection.

The parties agree to consult with recognized experts in the field of power press safeguarding to identify potential areas to improve employee protection.

L.   Abatement Programs

Noise

The Company will continue to develop and implement feasible engineering controls in an effort to eventually eliminate the use of hearing protection. Where feasible, the Company is committed to purchasing equipment or machinery that will further the noise reduction objective.   The Joint Local Health and Safety Committee/Team will receive copies of any noise surveys conducted in that facility that year and review the most recent noise abatement plan.   The Joint Local Health and Safety Committee/Team may make recommendations after reviewing this information.

Respirators

The Company will provide pulmonary function tests as deemed necessary by the Company Medical Director.

The Company will proceed with such pulmonary function tests for welders and foundry employees.

The Company will continue to experiment with new and innovative welding procedures and/or equipment.

The Company will review with the Local Safety Committee/Team the respirator abatement program currently in effect, and those it is planning to undertake.  The Company will supply this information to the Local Safety Committee/Team in writing with the understanding that the Local Safety Committee/Team will have an opportunity to discuss the respirator abatement program with the Company and make recommendations designed to improve upon it.

M.   Lockout Program

There shall be an effective lockout program in each plant, which shall include:

- machine specific lockout procedures

82

83

CNHA032120

- the dissemination of lockout procedure information (it is the Company's intent to post lockout procedures where written lockout procedures have been established pursuant to OSHA Standard 1910.147); the Joint Local Health and Safety Committee/Team will review written procedures and make recommendations where the information is incomplete.

- compliance inspections

  The Company will review with the Local Safety and Health Committee/Team the machinery and equipment lockout program currently in effect, as well as any modifications to the program when made.  The Company will supply this information in writing with the understanding that the Local Safety and Health Committee/Team will have an opportunity to discuss the program and make recommendations designed to improve upon it.

N.  Ergonomics

The Company has implemented and will maintain a comprehensive ergonomics program. The elements of the program and implementation timetable will be reviewed periodically with the Central Committee and each Joint Local Health and Safety Committee/Team.

Where feasible, engineering controls will be the primary method of reducing cumulative trauma risks and administrative controls will be used pending the installation of any feasible engineering controls.

O.  Hazardous Material Review and Reduction.

Effective control of hazardous materials protects the employees of Case as well as the environment in the surrounding communities. The Company will continue reducing its use of hazardous materials where feasible. This program will be reviewed periodically with the Joint Local Health and Safety Committees/Teams.  The Local Union Health and Safety Committee/Team Chairman will be provided with advance information on hazardous materials which affect the health and safety of UAW members and be given an opportunity to participate in the review and make recommendations.

P.  Contractor Safety Program.

The Company will establish a Contractor Safety Program at each facility, which will include guidelines on pre-qualification, site inspections and enforcement procedures. The draft program will be circulated among members of the various Plant Safety Committees/Teams for review and recommendations.

Q.  New and Modified Machinery and Plant Rearrangement

Where feasible, health and safety issues (such as ergonomics) should be considered at the early stages of process development or machinery acquisition.  Accordingly, engineers involved in such projects should be knowledgeable or receive training in ergonomics, health and safety hazard analysis and the Company's related specifications for machinery acquisition. Whenever possible, the Company will provide advance notice to the Joint Local Health and Safety Committee/Team of significant acquisitions of new equipment and machinery or layout changes which may adversely affect the health and safety of employees.

R.  Preventive Maintenance

The Company will establish and implement preventive maintenance programs in areas that affect employee health and safety.  The Joint Local Health and Safety Committee/Team will periodically monitor these programs.

S.  Industry Research Projects

Where feasible, the Company will continue its participation in relevant research projects conducted within industry for the prevention and elimination of work place hazards.

T.  (Local Supplement)

U.  The apprenticeship committee at each local plant will make provision for health and safety training for apprentices.

84

85

V.  Working Alone

The Company will continue to apply its working alone policy. This policy provides guidelines on the assignment of employees, highlight special hazards and recommend rules, procedures and safeguarding systems for the elimination or control of these hazards.

W.  Union Liability

The International Union, Local Unions, Union and Joint Local Health and Safety Committees and Union members of such Safety Committees/Teams and Union officials, employees and agents shall not be liable for any work-connected injuries, disabilities, diseases, deaths or loss resulting there from which may be incurred by employees of the Company or its subsidiaries or by third parties while on Company property. This is not intended to, and does not, increase the Company's liability in such cases beyond its' normal exposure, if any (i.e., Worker's Compensation).

## Section 4. Group Insurance and Pension.

A.  The group insurance plan agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this Agreement.

B.  Insurance Claim Review.

The Company recognizes the importance of resolving disputes involving Group Insurance Claims, and the importance of retaining the confidentiality of the information contained therein on behalf of the employee. Therefore, these cases would be treated apart from the grievance procedure in the following manner:

To resolve the disputes and maintain the confidentiality of the claim, the Local Plant Industrial Relations Manager, or his representative, will review the claim and related pertinent facts with the Joint Local Union Insurance Representative.

This review will be held monthly at a time mutually agreed upon. Five (5) days in advance of this same meeting the Company will provide the Local Union representative information relative to all claim denials, death benefit payments, and those employees who have received 48 weeks of accident and sickness benefits.

C.  The pension plan agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this agreement.

D.  All disputes or claims arising under or relating to the pension plan shall be processed pursuant to the provisions of the pension plan and shall not be subject to the grievance procedure set forth in Article VII.

## Section 5. Supplemental Unemployment Benefit Plan.

The Company and the Union agree in principle on the desirability of providing income protection for employees in periods of layoff through supplemental unemployment benefits. The supplemental unemployment benefit plan will provide protection for employees of the Company. It will be known as the "Supplemental Unemployment Benefit Plan", and is made a part of this Agreement and attached hereto as a Supplement.

## Section 6. Jury Service Pay.

Any employee who has completed his probationary period and who is summoned and reports for jury duty in a court of record (including coroner's juries) or who is required by law to appear and does appear for examination by a jury commission prior to such jury service will be reimbursed by the Company for each day on which he performs such jury duty and on which he would otherwise have been scheduled to work, in accordance with the succeeding provisions of this section:

CNHA032122

A. If he is absent for his entire shift because of such jury duty, he will be paid the difference between his jury duty and eight (8) hours of straight time pay at his regular straight time rate (excluding shift premium) for the pay period immediately prior to such jury service.

B. If he performs such jury duty and works on the same day, he will be paid the difference, if any, between his actual earnings for that day plus the jury pay received and eight (8) hours of straight time pay at his regular straight time rate (excluding shift premium) for the pay period immediately prior to such jury duty.

C. Time paid for but not worked will not be counted as hours worked for purposes of overtime. Reimbursement to an employee under this section shall be payable only if the employee (i) gives the Company prior notice of his summons for jury duty, (ii) presents evidence satisfactory to the Company that jury duty was performed on the day or days for which such reimbursement is claimed, and (iii) when released or excused from such duty returns to work promptly.

D. An employee who is subpoenaed for court appearance and is not the plaintiff or defendant, will be paid for such time lost in the same manner as outlined above for jury duty. If an employee is excused from jury service more than five (5) hours after the applicable start time of the first shift employee or less than three and one-half hours prior to the applicable start time of the second shift employee, he will not be required to return to work that day. A third shift employee will be excused from work on either the shift immediately preceding the start of his jury service, or the shift immediately following the completion of his jury service. This is at the option of the employee, however, he must notify his immediate supervisor prior to being absent, and it is not for both the day preceding jury service and the day following jury service.

## Section 7. Bereavement Pay.

A. When death occurs in an employee's immediate family: spouse, child, parent, step-parent, brother, sister, half brother, half sister, current spouse's parent, grandparent, current spouse's grandparent, grandchild, adopted child, step child, or a stillborn child, brother-in-law, sister-in-law, an employee on request will be excused for any three (3) normally scheduled days of work (or for such fewer days as the employee may be absent) during the three (3) days (excluding Saturdays and Sundays) immediately following the date of death, provided he attends the funeral. In the event of a memorial service or delayed funeral, the requested days off (for which an employee meets the qualifications under this Article) need not be consecutive but must not extend beyond the day following such memorial service or funeral. A Sunday funeral which is held at a distant location where travel may be required on Monday, will be treated the same as a delayed funeral an such Monday travel day will be considered as an excused day.

B. When death occurs to the following relatives of an employee: son-in-law or daughter-in-law, the employee, on request, will be excused from work during the day of the funeral, provided he attends the funeral.

C. After making written application, the employee shall receive pay for any scheduled days of work for which he is excused (excluding Saturdays and Sundays, or in the case of 7-day operations, the sixth and seventh days of the employee's scheduled workweek), provided he attends the funeral. Payment shall be made at the employees' regular straight-time rate (including shift premium). Time thus paid will not be counted as hours worked for purposes of overtime pay.

## Section 8. Unenforceable Provisions.

In the event that any of the provisions of this Agreement shall be or become invalid or unenforceable by reason of any federal or state law or regulations now existing or hereinafter enacted, such invalidity or unenforceability shall not affect the remainder of the provisions hereof.

CNHA032123

### Section 9. Scope of Agreement.

This Agreement disposes of any and all bargaining issues, whether or not presented during negotiations, except with respect to the processing of grievances as provided in Article VII, and shall remain in full force and affect without further change until the expiration thereof.

### Section 10. Mutual Interests.

For the purpose of promoting the mutual interest of both parties and with a view toward bringing about a better understanding with our people and more harmonious relations between the Company and the Union, the Company agrees that before instituting (implementing) any changes affecting the hours and working conditions of its employees, it will notify the Union (in writing where appropriate) except in those situations such as emergencies where time does not permit. In all cases, however, the Company will discuss and explain the reasons necessitating such changes. Nothing in this section is intended to add to or take away any of the rights that accrue to either party under the other sections of this Agreement.

## ARTICLE XV
## TERMINATION

This Agreement (including both Central and Local understandings) shall continue in full force and effect through May 2, 2004 and thereafter from year to year unless sixty (60) days prior to such date either party gives notice in writing of a desire to terminate this Agreement.

INTERNATIONAL UNION,
UNITED AUTOMOBILE,
AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA                    CASE CORPORATION

By:    Richard Shoemaker          By:    Marc Castor
       Paul Korman                       Paul Crist
       James Beardsley                   Tom Graham
       James R. Atwood                   Tim Haas
       Jack Reese                        Dan Hansen
       Dennis Williams                   Judy Lojeski
       Ray Gulley                        Todd Spratts
       Joseph Kiriaki                    Julie Tennie
       Bill Bowling                      Jim Grauwels
       John Collings
       Renee Turner-Bailey
       Ron Blum
       Joe Stackpoole
       Leonard Page
       John Snow
       Karl Mantyla
       Chuck James

LOCAL UNION NO. 1356T
(East Moline)                           EAST MOLINE
BY:    Tom Kale                    By:    Chip Nelson
       Jim Stribling                     Larry Hamm

CNHA032124

**Notes**

CNHA032125

Letter of
Understanding

CNHA032126

**CENTRAL LETTERS AND EXHIBITS** ........................................... 1
Agency Shop ............................................................................ 1
Employee and Pension List ..................................................... 2
Orientation Program ................................................................ 3
Future Government Controls .................................................... 4
Equal Employment Opportunity ............................................... 4
Tuition Refund ......................................................................... 6
Negotiations Meetings ............................................................. 6
Absenteeism, Alcoholism and Drug Addiction Committee ....... 7
Special Conditions for Reinstatement of Grievances ............... 9
Conducting Joint Sessions ...................................................... 11
New Technology ...................................................................... 11
Annual Insurance Meetings ..................................................... 12
Seniority Preference under Article IX,
    Section 12, as it applies to Members of the Local
    Union Executive Board ...................................................... 13
Equality of Sacrifice ................................................................ 14
Notification - Plant Closings ................................................... 15
Retraining & Placement .......................................................... 16
Plant Preferential Seniority Placement List ............................ 17
Deductions for Voluntary Political Contributions
    from Employee Paychecks (V-Cap) .................................. 20
Negotiation Pay for Locals ...................................................... 22
Vacation Assignments ............................................................. 22
Overtime Absenteeism ............................................................ 23
Personal Time ......................................................................... 24
Employee Involvement Process & Joint Commitments ........... 24
Employee Development and Training Program ....................... 30
Striker Replacement ................................................................ 31
Rapid Improvement Teams ...................................................... 32
New Product Launch & Other Related demand Periods .......... 33
4 Day – 10 Hour Schedules ..................................................... 34
3 Day – 12 Hour Schedules ..................................................... 40
Appendix –
    Competitive and Secure Employment (C.A.S.E.) Program ... 46
    Application of C.A.S.E. Program Resources Pool
        Assignments at East Moline Plant .............................. 58
    Impact of C.A.S.E. Program on Small Locals .................. 60
    Letter of Commitment .................................................... 61
Annual Lump Sum Bonus Payments ....................................... 64

i

CNHA032127

Alternative Pay Systems (APS) ............................................ 67
Tuition Refund .................................................................... 68
Time Clocks ...................................................................... 68
In House Office .................................................................. 68
Training ............................................................................. 69
Highly Skilled and Technical Position Placements .............. 70
Management Trainees ......................................................... 70
Professional Dues .............................................................. 70
Access to Personnel Records .............................................. 71
Classification Schedule ....................................................... 71
Optional Life Insurance ....................................................... 72
Non-Unit Employees and Contract Personnel ..................... 72
River City Project ................................................................ 73

WAGE SCHEDULES ............................................................. 74

**To: UAW – J I CASE DEPARTMENT**
**Re:  Agency Shop**

If the Union security provisions in this Agreement are hereafter deemed unlawful, the following provisions concerning Union security shall be in effect for the remainder of the term of this Agreement between J I Case Company and the Union dated July 1, 1994 provided they are consistent with applicable law:

Agency Shop.
Present employees who become members of the Union after the effective date of this Agreement and who thereafter fail to retain their membership in the Union, present employees who are not members of the Union, and each new employee who does not become a member of the Union beginning thirty (30) days following the beginning of such employment or the effective date of this Agreement, whichever is later, shall as a condition of employment pay to the Union each month a service charge as contribution toward the administration of this Agreement and as the representative of such employees. The service charge for the first month shall be in an amount equal to the Union's regular and usual initiation fee, and for each month thereafter, in an amount equal to the Union's regular and usual dues.

Checkoff.
Upon receipt of and pursuant to a lawful written authorization card from an employee, the Company will deduct from the earnings of the second pay period, which is paid the third week of the month, the amount of money (equalling periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership in the Union) equal to that paid by the other employees in the bargaining unit who are members of the Union. Such amount of money shall be designated in writing by the financial officer of the Union and in accordance with the Constitution and Bylaws of the Union. The Company will remit said deductions to the official designated for this purpose by the Union.

ii

1

CNHA032128

Indemnification.

The Union agrees to indemnify and save the Company harmless against any and all claims, demands, or other forms of liability whatever that shall arise out of or by reason of action taken or not taken in connection with this Agreement.

UAW - CASE DEPARTMENT                    CASE CORPORATION

Dated: May 1, 1998

## To: UAW - CASE DEPARTMENT
## Re: Employee and Pension List

During the life of this Agreement, at quarterly intervals, the Company agrees to furnish the International Union and Local Union with a list of all employees and pensioners covered by this Agreement together with their addresses as they appear on the Company's records. The Company will periodically make attempts to keep such information accurate. The International Union and Local Union shall retain such information in confidence and only disclose such information to Union officials whose duties require them to have such information.

UAW - CASE DEPARTMENT                    CASE CORPORATION

Dated: May 1, 1998

---

# LETTER OF UNDERSTANDING

## RE: Orientation Program

The Company and the Union are aware of the importance of improved understanding on the part of new employees joining the Company and the parties addressing themselves to this will undertake the development of a Joint Orientation Program.

This Program will afford the Union the opportunity to inform the new employee of the background of the Union, the role of the Union in providing representation under the current agreement and stress the process that is afforded the employee through the grievance procedure in such proper representation.

It is understood in the development of this Program on the part of both parties the need to stress job responsibility relating to quality, workmanship, attendance, and understanding of company rules and regulations.

In developing the program the Company and the Union will determine what subjects and sequence will be used and the manner in which the orientation program will be implemented.

It is the intent that the Local Plant management and the Local Union officials will jointly prepare a mechanical-type of presentation (such as video-tape) wherein the subjects of employee benefits, safety, responsibilities of the Company, the Union and the employees are addressed to enable prompt and effective employee relations.

The Joint Orientation Program will provide for the presence of the Local Union President or Chairman of the Bargaining Committee during the presentation.

The programs for all plants will be updated and completed for use in their new employee orientation programs.

Dated: May 1, 1998

2

3

CNHA032129

## LETTER OF UNDERSTANDING

### Re: Future Government Controls.

If a governmental agency having appropriate authority holds that any increase in rates of pay or benefits provided for by this Agreement or in any supplement thereto is disallowed or postponed, the Company will periodically, at or near the time the prescribed payments become due place in appropriate bank and/or escrow accounts, an amount of money equal to that necessary to provide the rates of pay and benefits so disallowed or postponed, if so doing is permissible under government regulations. The parties will negotiate means of making available to employees benefits equal in value to any money so deposited in a manner permissible under governmental regulations. All provisions of the collective bargaining agreement unaffected by the governmental rules shall remain in full force and effect.

Dated: May 1, 1998

## LETTER OF UNDERSTANDING

### Re:  Equal Employment Opportunity

The Company and the Union have through their past discussion recognized their responsibility and the desirability of providing individuals equal treatment and opportunity in their employment. During these negotiations the parties have agreed to further recognize their efforts in these areas. Therefore, the parties agree to establish a Joint Central EEO Committee composed of two (2) representatives appointed by the Director of the Union's Agricultural Implement Department and two (2) representatives of the Company to be appointed by the Company. Through this program of Equal Employment Opportunity at both Central and Local levels of operation, the concept of equal opportunity in all areas of employment and the use of the contractual grievance procedure will be further emphasized. The Joint Committee's efforts to achieve prompt analysis, avoidance of the multiplicity of litigation and resolution of those areas that could

be the basis for claims of discrimination is recognized to be beneficial to all employees. The Joint Central Committee will meet as required, as is mutually deemed desirable or necessary. The functions of this Committee will be as follows:

-- Explore Affirmative Action Programs and concepts that will enhance Equal Employment Opportunity.

-- Review and discuss ways and means of encouraging employees to use the grievance procedure as the exclusive method to resolve claims of denial of Equal Opportunity Rights.

-- Maintain liaison with appropriate Federal and State agencies in those circumstances where the parties agree that such liaison would be mutually beneficial.

-- Advise and counsel the Local EEO Committees.

Each plant will establish a local EEO Committee composed of two members from the Amalgamated Local Union 1356: the Chairman of the Civil Rights Committee and the President of the Amalgamated Local Union 1356, and in his absence the Chairman of the Local Bargaining Committee, and two members from the Plant Management. In those cases where the Chairman of the Civil Rights Committee is absent, and it is necessary to meet concerning an EEO problem, a member of the EEO  Committee may serve in his absence.

The EEO Committee will meet quarterly or as frequently as mutually desirable or necessary on a date and time mutually agreeable.

The Committee will work together and encourage employees to enter Apprenticeship and Training Programs for upgrading and utilization of skills.

The Committee will review copies of grievances involving discrimination and potential problems relating thereto and make recommendations regarding same.

The Secretary will keep minutes of the meeting with copies provided to the Company and Union representatives following each meeting.

4

5

The Company will pay the Union members of the Committee for Company called meetings.

The functions of the Joint Central EEO Committee and the Local EEO Committee shall be advisory, consultative, and cooperative. While the Company and the Union will welcome the recommendation of the Committees, the Committees may not commit either party to a specific course of action. However, the Union agrees that it will discourage its members from by-passing the grievance procedure with respect to any claim or complaint against the Company which may be made the subject of a grievance under the contract.

Dated: May 1, 1998

## LETTER OF UNDERSTANDING

### Re: Tuition Refund

The Company has an outstanding policy which provides for company reimbursement of 80% of the cost of tuition, etc., upon successful completion of the course of study provided company approval is obtained prior to enrollment and the course of training must relate directly to work performed in and by the bargaining unit. There are other details in this statement of policy, but the essential ingredient is the prior approval of the Company.

Dated: May 1, 1998

## LETTER OF UNDERSTANDING
### Re: Negotiations Meetings

It is understood by the Company that time spent by Union Officers and Committeemen in Local or Central Negotiations Meetings during the present negotiations will be counted as time worked for vacation, holiday, attendance bonus distribution of overtime penalty and bonus payment, and pension eligibility.

Dated: May 1, 1998

## LETTER OF UNDERSTANDING
### Re: Absenteeism, Alcoholism and Drug Addiction Committee

In our recent contract negotiation discussion, it was agreed to establish an Absenteeism, Alcoholism, and Drug Addiction Committee with membership consisting of two Company members and two Union members. The Union members will be:

> Chairman of the Bargaining Committee
>
> A second Local Union member who is knowledgeable and has had experience or training in the field.

The Committee will obtain information regarding programs and Community resources for treatment and release jointly such information to supervisors and Union Representatives. This committee will also be divided into three subcommittees, consisting of one member from the Company and one member from the Union, each subcommittee concentrating in one area either absenteeism, alcoholism, or drug addiction.

A Company supervisor or a Union Representative, Union committeeman or official may notify the Committee in writing that an employee has agreed to have his name submitted to the committee for their assistance with his addiction problem.

Should the employee concur that there is an addiction problem, he will be referred by the subcommittee to an appropriate agency for assistance.

Should the employee deny any addiction problem, his particular situation will no longer be a subject of the Committee.

Should the employee for whom assistance was arranged cease his participation in such assistance program, he will no longer be a subject of the Committee.

CNHA032131

No employee will be discharged for excessive absenteeism nor because of an alcohol or drug addiction problem without first notifying this committee and giving them the opportunity to review the problem.

Therefore, when an employee's conduct places him in jeopardy of discharge, the Company will schedule the employee to appear before the appropriate subcommittee. The subcommittee will meet jointly with the employee. Records, such as, prior warnings, absentee records, etc., will be made available by the Company so that the facts of the individual's problem can be established.

The subcommittee will offer to the employee an opportunity to explain his problem so that the subcommittee can offer assistance or direct the employee to an agency offering services relative to the employee's problem. Records of each subcommittee meeting will be maintained by the Company and will be available for the Committee review at each meeting.

As we discussed, most of the employees appear before the subcommittee because of excessive absenteeism. In order to establish a uniform procedure to deal with absenteeism, the Company has established the following corrective disciplinary action:

| First offense: | Verbal Warning |
| Second offense: | Written Warning |
| Third offense: | Three (3) day disciplinary suspension; Appearance before Subcommittee |
| Fourth offense: | Five (5) day disciplinary suspension |
| Fifth offense: | Discharge |

The appearance before the subcommittee after the third offense will be scheduled by the Company, usually during the week following the employee's three-day suspension unless circumstances make it impractical to do so. Any challenge to the employee's absentee records or disciplinary action would be handled through the grievance procedure and the subcommittee's discussion would deal with the employee problem and proposed solution. Also, any information

disclosed by the employee to the subcommittee will not subject the employee to disciplinary action by the Company.

If an employee's attendance is acceptable for a period of six (6) months or longer, he will be subject to a repeat of the last penalty, rather than progress to the next step. If his attendance is acceptable for a period of one year, he will be subject to a penalty one step lower than his previous penalty. If his attendance is acceptable for eighteen (18) months or longer, he will be subject to a penalty two (2) steps lower than his previous penalty. In the application of the above, periods of absence of fifteen (15) or more consecutive work days will not be counted in the six (6) month measurement period.

During the course of this contract a training meeting will be held for Supervisors and Union Representatives for the purpose of reviewing recognition and follow-up relating to the Alcohol and Drug program.

Dated: May 1, 1998

## LETTER OF UNDERSTANDING
### Re: Special Conditions for Reinstatement of Grievances

During the 1994 negotiations, the parties acknowledged the desirability of ensuring prompt, fair, and final resolution of employee grievances. The parties also recognized that maintenance of a stable, effective, and dependable grievance procedure is necessary to implement the foregoing principle. Accordingly, the parties view any attempt to reinstate a grievance properly disposed of as contrary to the purpose for which the grievance procedure was established and a violation of the fundamental principles of collective bargaining.

However, in those instances where the International Union, UAW, by either its Executive Board, Public Review Board, or Constitutional Convention Appeals Committee, has reviewed the disposition of a grievance and found that such disposition was improperly affected by the Union or Union representative involved, the UAW - Case Department will inform the Company's Director of Industrial Relations in writing that such grievance is reinstated in the grievance procedure at the step at which the original disposition of the grievance occurred.

8

9

CNHA032132

Should the Court or an agency (State or Federal) with appropriate authority find that the Union failed to fairly represent an employee, then the International Union and the Director of Industrial Relations will proceed to establish the procedure for the submission or reinstatement of the complaint or grievance to the grievance procedure.

It is agreed, however, that the Company will not be liable for any claims for damages, including back-pay claims arising out of the grievance either that are already barred under the provisions of the Agreement at the time of the reinstatement of the grievance or that relate to the period between the time of the original disposition and the time of the reinstatement as provided herein. It is further agreed that the reinstatement of any such grievance shall be conditioned upon the prior agreement of the Union and the employee or employees involved that none of them will thereafter pursue such claims for damages against the Company in the grievance procedure, or in any court or before any Federal, State, or Municipal Agency.

Notwithstanding the foregoing, a decision of an arbitrator shall continue to be final and binding on the Union and its members, the employee or employees involved, and the Company. Such grievances shall not be subject to reinstatement.

This letter is not to be construed as modifying in any way either the rights or obligations of the parties under the terms of this Agreement, except as specifically limited herein, and does not affect sections thereof that cancel financial liability or limit the payment or retroactivity of any claim, including claims for back wages or that provide for the final and binding nature of any decisions by an arbitrator or other grievance resolutions.

It is understood this letter and the parties' obligations to reinstate grievances as provided herein can be terminated by either party upon 30 days notice in writing to the other.

It is agreed that none of the above provisions will be applicable to any case settled prior to the effective date of this letter.

Dated: May 1, 1998

10

# LETTER OF UNDERSTANDING
## Re: Conducting Joint Sessions

During these negotiations, we discussed the possibility of conducting joint sessions designed for the mutual benefit of both the Company and the Union. The joint annual Safety and Health, Alcohol and Drug, EEO and CCICS sessions were identified as an example.

After these negotiations, it was agreed that further discussions would be held to identify other such joint efforts. Such discussions will also include the number and selection of participants, duration, location of the sessions and other related matters. Members of these committees will be compensated for lost straight time hours of work, travel and lodging expenses and reasonable meal expenses, provided a receipt is turned in. Further, the Company will pay tuition fees, if any, as provided to Employee Involvement participants in quality meetings.

May 1, 1998

# LETTER OF UNDERSTANDING
## Re: New Technology

During the course of negotiations the parties discussed the impact of technological progress on the relationship of the parties, the size of the work force, and the training required to equip bargaining unit employees to function effectively as new processes, methods and equipment become available.

It is agreed that a Joint Central Committee on Technology be established comprised of two (2) members of the Union, and two (2) members of Management. Within thirty (30) days of ratification of this Agreement each side shall notify the other of the identity of its Committee Members. Within sixty (60) days of ratification the Committee shall hold its first meeting and thereafter annually unless it is mutually agreed to meet at some earlier date.

The committee will review problem areas dealing with new machines, methods, procedures and training and endeavor to resolve existing controversies; study contemplated changes that may be forthcoming

11

and attempt to meet the problems that may arise in terms of work schedules, manpower, and training; deal with problems forwarded to the committee resulting from unresolved items at the various plants locations.

May 1, 1998

## LETTER OF UNDERSTANDING
### Re: Annual Insurance Meetings

During the term of this agreement the Company will schedule annual meetings at plant locations which will be attended by the Local Union President, Bargaining Committee Chairman, Local Union Insurance Representative and representatives of the Plant Industrial Relations and Insurance Office, and the Corporate Insurance Office to review insurance claim administration if disputes are unresolved. At the request of the Parties, a representative of the carrier will be in attendance at the meeting.

In addition, an annual meeting will be held at which one representative from the UAW Ag-Imp Department and one representative from the UAW Social Security Department and one insurance representative from each plant location will meet with the Company Benefits and Industrial Relations Directors or their representatives, and representatives of the insurance carrier to discuss insurance plan administration.

Dated: May 1, 19984                                Case Corporation

## LETTER OF UNDERSTANDING

### Re: Seniority Preference under Article IX, Section 12, as it applies to Members of the Local Union Executive Board.

In view of the recent decisions by the National Labor Relations Board dealing with superseniority, the UAW hereby gives notice that the Union will not seek enforcement of the Seniority Preference Clause in the current labor agreement for any Local Union executive board officer other than the President and Vice President, unless such other members of the Executive Board are responsible for grievance processing and/or on the job contract administration and be in the plant to accomplish their duties directly related to administering the contract.

However, should the NLRB rulings be overturned or modified on appeal, it is the understanding of the parties that, to the extent permitted by such appeal decision, "Seniority Preference" coverage will revert to the provisions currently contained in the respective Central and Local Agreements.

Dated: May 1, 1998

12

13

CNHA032134

## LETTER OF UNDERSTANDING

Mr. Richard Shoemaker
**Vice President & Director**
**International Union, UAW**
**8000 East Jefferson Avenue**
**Detroit, Mi 48214**

### Re: Equality of Sacrifice

During the current negotiations concerning the economic provisions of the new Agreement, the Union expressed concern that the employees not represented by the UAW contribute equally to those wage and benefit adjustments necessary to achieve mutual growth and job security.

The Company agrees with the position of the Union that all employees should share equitably in the contributions necessary to achieve that goal. The Company also pointed out that a number of reductions and suspensions in compensation and benefit programs have already been instituted for nonrepresented employees and, depending on business conditions may be restored and/or resumed.

At the same time, the Company assured the Union that, excluding such restorations and/or resumptions of the programs themselves or the monetary value thereof, should any additional paid holidays, paid time off, or general wage increases (excluding guaranteed sharing benefits, merit increases, and cost-of-living increases) be granted to employees not represented by the UAW during the term of the Agreement, any such additional paid holidays, paid time off, or general wage increases will automatically be applied to employees covered by the Agreement.

Dated: May 1, 1998

14

## LETTER OF UNDERSTANDING

### Re: Notification - Plant Closings

During these negotiations, the Union expressed concern over the possibility of plant closings. In view of this, when the Company plans for a complete closing of a facility where employees are represented by the UAW, the Company will give 6 months advance notice to the Local Union in the event of a full plant closing.

When requested by the Union, the parties will meet as soon as possible to review and discuss alternatives, if any, to a plant closing. The Company will furnish the Union with the reasons why consideration is being given to closing the plant and will give a projected closing date.

If, after reasonable period for the above discussions, the decision is made by the Company to close a plant, the parties will enter into negotiations to discuss the impact of this decision upon the employees.

However, in the event such 6 months notice would impair the Company's need for speed, flexibility and confidentiality, the Company will give such notice no less than 60 days prior to a full plant closing. Such notice will include the reasons for the closing or the discontinuance of a major function and a tentative date(s).

May 1, 1998

15

# LETTER OF UNDERSTANDING
## Re: Retraining & Placement

**Mr. Richard Shoemaker**
**Vice President & Director**
**UAW – AG IMPLEMENT DEPARTMENT**

The Company agrees to form a National Joint Committee on retraining and placement.

1. **Retraining**

   This Committee will be made up of three members from the Union as appointed by the Vice President UAW Agricultural Implement Department and three members from the Company as appointed by the Vice President Corporate Relations for the Company. This Committee will be charged with developing mutual initiatives in retraining, outplacement, and placement from within through the Plant Preferential Seniority Placement list during periods of full plant closings.

   The Company has agreed to provide a tuition reimbursement program for employees laid off due to a full Plant closing. This program will provide a maximum of $2,000/year for trade, or vocational school training which is job related. Employees will qualify for this tuition reimbursement based on the criteria established in the  Tuition Refund Letter of Understanding.

   In keeping with this program both parties will work toward securing Government funds which may be available to help defray the costs of retraining.

2. **Outplacement**

   Employees laid off due to a full plant closing will be offered assistance in seeking other job opportunities through a career transition service provided by the Company at no cost to the employees. This service will be provided at each of the major manufacturing operations identified by the National Joint

Committee on Retraining and Placement. The purpose of this service will be to provide employees with:

1. Information on employment opportunities in the local or nearby communities.

2. Counseling on the types of skills that are marketable in industry in the job market of today and the future.

3. Counseling on how to seek, apply for and acquire employment.

Paul H. Crist
Director, Labor Relations

Dated: May 1, 1998

# LETTER OF UNDERSTANDING
## Re: Plant Preferential Seniority Placement List

**Mr. Richard Shoemaker**
**Vice President & Director**
**UAW - Agricultural Implement Department**

**Dear Mr. Shoemaker**

A Plant Preferential Seniority Placement List will be developed to expand employment opportunities for employees on layoff due to a plant closing.

A. Inclusion on the Plant Preferential Seniority Placement List.

1. Eligibility

Employees who are placed on layoff due to a plant closing after the effective date of this contract.

16

17

CNHA032136

2. a) Each eligible employee laid off due to a full plant closing may make written application through their home plant Industrial Relations Department for placement at another location. Applications for employment must be made with the Company within 90 days following the last day worked.

   b) The Company will develop the Plant Preferential Seniority Placement List by plant location from applications received from eligible employees.

B. Placement of employees from the Plant Preferential Seniority Placement List will be accomplished in the following manner.

   1. a) When an eligible employee has been placed on the Plant Preferential Seniority Placement List, they will be offered the first open job they are eligible and qualified to perform at the applied for location.

      b) The determination of qualifications in a) above shall include consideration of all prior work experience, demonstrated skill and ability, physical fitness, and other normal hiring standards. Prescreening physicals may be required when necessary.

   2. The most senior qualified employee on either plant Preferential Seniority Placement List will be offered placement on open jobs at the location, after all qualified employees at that location have been recalled from layoff.

   3. Once an employee on the Plant Preferential Seniority Placement List, has been placed at the location on an open job, the employee will carry their Company service and previous bargaining unit seniority to the new bargaining unit. The employee's recall and seniority rights at the home location will be terminated.

4. An employee on the Plant Preferential Seniority Placement List as a result of a Plant Closing who has been transferred to a new location based on the procedures above, will be eligible for the relocation allowance.

C. Employees will be removed from the Plant Preferential Seniority Placement Lists as follows:

   1. When an employee receives a job placement at a UAW location as a result of the above procedures or is recalled to his/her home bargaining unit.

   2. If an employee refuses a job offer that resulted from the implementation of the procedures above, they will be stricken permanently from the Plant Preferential Seniority Placement List at the refused location. Such employee will remain on the Plant Preferential Seniority Placement List for other locations applied for and will retain his seniority rights in the bargaining unit from which he was placed on a layoff status.

D. General

   1. The Company will not consider any grievances on back-pay liability as a result of the implementation of the provisions of Preferential Hiring. If an employee identifies an error in placement, the Company will correct it in the next available job opening.

   2. Recognizing the potential delay inherent in the transfer and relocation of employees between operations and the critical time requirements of production schedule increases, the Company retains the right to fill job openings at plant locations by temporarily assigning employees. In no case will a grievance be considered by the Company as a result of this temporary assignment.

Paul H. Crist
Director, Labor Relations

Dated: May 1, 1998

18

19

CNHA032137

# LETTER OF UNDERSTANDING
Re: V-Cap

**Mr. Richard Shoemaker**
**Vice President & Director**
**UAW - Agricultural Implement Department**
**Solidarity House**
**8000 East Jefferson**
**Detroit, Michigan 48214**

Dear Mr. Shoemaker:

This letter describes our understanding reached during the 1983 negotiations concerning deductions for voluntary political contributions from employee paychecks.

The International Union will furnish the Company, for each employee for whom a deduction is to be made, an Authorization Card signed by the employee containing the following:

(a)     Name and Address

(b)     Plant

(c)     Department Number

(d)     Social Security Number

(e)     Local Union Number

(f)     Dollar/Cents amount to be deducted each period

Cards that cannot be processed will be returned to the International Union for correction.

The Company will make authorized deductions from checks for the third pay period ending in each  month, and continuing while the authorization is in effect.

A deduction not made will not be carried forward.

In the month following each deduction, the Company will issue one or more checks (one for each payroll processing unit in existence) payable to UAW V-CAP, in care of the International Union, for deductions made in the preceding month. Overpayment to the Union resulting from cancelled employee authorizations will be recovered in a subsequent month.

A computer-generated magnetic tape(s) listing will also be forwarded which will indicate the name, address, payroll location code, local Union number, department number, full social security number, and the amount deducted for employees whose deductions are included in the check. Year-to-date deduction totals will be included in the report.

The Company will pay the actual costs of additional setup and programming, of general administration, computer and machine time, and of processing new authorization changes or cancellations.

Employees who wish to cancel their authorizations for payroll deductions will sign a card supplied by the Union for that purpose. Refunds will be the responsibility of the Union.

The International Union will collect and forward as one transmittal all signed Authorization Cards and Cancellation Cards for the initial processing and for each quarter to Local Management.

An Authorization card that is not revoked by the employee shall continue in effect upon reinstatement to active status in the same bargaining unit provided the employee's record is still being maintained by that payroll department.

The Union will indemnify and hold harmless the Company from any and all liability or claims arising from administrative error resulting from the deductions provided for in this agreement.

Paul H. Crist
Director, Labor Relations

Dated: May 1, 1998

20

21

## LETTER OF UNDERSTANDING
### Re: Negotiation Pay for Locals

Local Bargaining Committee members will be paid for working time lost engaged in meetings with management or preparation for meetings with management in local negotiations up to the hours which have been agreed to under ARTICLE VI Section 4 -Union Paid Time Off.

Dated: May 1, 1998                                Case Corporation

## LETTER OF UNDERSTANDING
### Re: Vacation Assignments

Vacation assignments shall be arranged by the Company in a manner which will insure the orderly and efficient continuation of operations.

The primary method for employees selecting vacation time shall occur during the period of June 1 through the completion of vacation shutdown of each year. During this period, each employee, commencing in seniority order, will be permitted to identify the week(s) during which the employee desires vacation. Changes in the vacation dates selected, or changes after the completion of vacation shutdown, shall be on a first come basis and seniority shall not be used.

All vacation assignments by the Company shall be made within the period of June 1 through May 31 of each vacation year.

The Company agrees to give, whenever possible, the desired vacation time indicated by the employees in accordance with the above; provided however, that all vacations are subject to the Company's right to schedule a vacation shutdown.

Subject to vacation shutdown priority employees may schedule vacation on a daily basis subject to the following:

- vacation time to be scheduled in four hour blocks (e.g. either four or eight hours per day); and

- in advance of the day on which the four or eight hour vacation is to be taken, supervisory approval of the employee's vacation request is required.

## LETTER OF UNDERSTANDING
### Re: Overtime Absenteeism

In order to establish a uniform procedure to deal with overtime absenteeism, the Company has established the following corrective disciplinary action:

First Offense        Written Warning

Second Offense     One (1) day disciplinary suspension

Third Offense        Three (3) day disciplinary suspension

Fourth Offense      Discharge

If an employee's attendance is deemed acceptable for a period of six (6) months or longer, he will be subject to a repeat of the last penalty, rather than to progress to the next step. If his attendance is acceptable for a period of one year or longer, he will be subject to a penalty one step lower than his previous penalty.

If an employee's attendance is deemed acceptable for a period of eighteen (18) months or longer, he will be subject to a penalty two (2) steps lower than his previous penalty.

Dated: May 1, 1998

CNHA032139

## LETTER OF UNDERSTANDING
### Re: Personal Time

Due to the nature of the employees' work, employees shall not have a pre-scheduled, designated break period; rather, employees will be allowed a reasonable period of time during the course of the workday for personal matters (i.e., acquiring a beverage or going to the restroom). Such time shall be taken so as not to disrupt the workflow, nor shall employees abuse this privilege.

## LETTER OF UNDERSTANDING
### RE: EMPLOYEE INVOLVEMENT PROCESS & JOINT COMMITMENTS

During the 1994 Negotiations, the parties discussed the Company's continuing need to improve quality and satisfy customer orders in a timely manner and at an acceptable cost. In an attempt to get employees involved with these goals, the Company and the UAW agreed to establish a jointly administered Employee Involvement Process which shall increase, not diminish, the responsibilities and obligations of all parties.

The Employee Involvement Process will be based on the fundamental precept that given an opportunity, people have a great deal more to offer than just the strength of their physical labor. Employee involvement will allow individuals to discover their own potential, and put that potential to work in more creative ways. By creating a dedication to the work itself and to continuous improvement in every facet of that work, people will develop pride in workmanship, self-respect, self-reliance and a heightened sense of responsibility. It is the hope of the Company to discover new avenues for employee involvement almost daily.

In order to achieve these goals and vision for the Employee Involvement Process, the parties have chartered the following commitments, responsibilities and committees:

1.   Joint Commitment

The UAW is joining Case Corporation's commitment to this process because it recognizes the program as an integral part of the Union's continuing commitment to the concepts of operational excellence, flexible manning and production scheduling, optimum utilization of all resources, and manufacture of the highest quality products at the lowest possible cost.

The Company's primary objective and commitment is to grow and prosper. Since the catalyst for its progress is its employees, it recognizes the obligation to keep them employed and improve their wages and working conditions. It accepts Union organizing and collective bargaining as an essential and constructive force in our democratic society.

The Union's primary objective is to improve the quality of life for its members and their families by assuring that they will be treated with dignity and provided with economic security. In addition, it is essential to the Union's purpose to assure that workers are afforded the opportunity to master their work environment; to achieve not only improvement in their economic status but, of equal importance, to gain from their labors a greater measure of dignity, self-fulfillment and self worth.

To achieve the common goal of maintaining and improving the quality of life for employees and their families through company growth, the Parties are committed to:

- Maintain a prosperous business necessary to maintain fair wages and benefits that will assure a satisfactory standard of living and to provide secure jobs with the opportunity for advancement;

- Provide workers a voice in their own destiny in decisions that affect their lives before such decisions are made;

- Provide that the covered plants and facilities are operated under methods which will promote, to the fullest extent possible, economy of operation, quality and quantity of output, cleanliness and protection of property;

24

25

CNHA032140

- Work together as a team;

- Build the highest quality products in the world at the lowest possible cost to the consumer;

- Promote full communication over the established policies and procedures;

- Cooperate with established standards of conduct and promote fair and equitable treatment;

- Maintain a safe work place utilizing new and innovative programs that could be a model for use throughout the entire industry;

- Resolve employee concerns through procedures using problem solving and non-adversarial techniques that are based on consensus instead of confrontation;

- Recognize the full worth and dignity of all employees, both bargaining unit and non-bargaining unit, and to treat each other with respect;

- Constantly seek improvement in quality, efficiency and work environment through dedication to world class manufacturing principles, employee involvement programs, joint quality efforts and other similar efforts, and

- Recognize and respect each other's rights and perform all responsibilities sincerely.

2.   Management responsibility

For management, the task will be to reinforce its commitment to employee involvement within the corporate culture, particularly at the local level, and to remove obstacles in the path of this innovative approach to participatory management. This will include providing opportunities for individual growth of employees.

In carrying out its commitments, the Company has the exclusive responsibility, to plan, direct, and control Company operations, as specifically stated in Article IV of the Central Agreement. In performing these responsibilities, the Company will inform the Union about the following matters:

- The inauguration or retirement of top management;

- Annual Company objectives;

- Major organizational changes;

- Annual business plans;

- Company's long-range plans and policies;

- Establishment of production schedule (s) and changes;

- Contemplated insourcing or outsourcing decisions;

- Technological changes that will impact the bargaining unit; and

- Other major events.

Additionally, the Company will meet and confer and make its best efforts to reach a consensus with the Union prior to initiating or changing Company policies relating to terms and conditions of employment. The Company shall make no change in Company policies contrary to the terms of this Agreement except as by mutual agreement of the Parties.

3.   Union Responsibility

The Union has the exclusive responsibility of representing its membership regarding all terms and conditions of employment and to ensure that they are treated consistent with the term of this Agreement and that they receive fair and equitable wages and benefits.

CNHA032141

- Work togethe
- Build the hig possible cos
- Promote fu and procedi
- Cooperate promote fa
- Maintain programs entire ind
- Resolve problem based o
- Recogn bargain other w
- Const enviro manu joint c
- Recc resp

2. Managei

For mat employ: the loc innoval include emplo

The Union accepts the responsibility to promote the objectives and to cooperate with the Company in adm on a fair and equitable basis, standards of conc attendance plans; to promote constant improvements and productivity; and to cooperate with the Company i with government entities.

4. Employee Responsibilities

The Company and the Union recognize and acc responsibility to strive to create and maintain a posit environment. In order to accomplish that now and in th all employees are encouraged to fulfill the responsibilities:

- Support the performance of the total team and support other members of the team.

- Participate in the setting of and attaining of reasonab goals;

- Work within reasonable Company guideline philosophy;

- Respect the individual rights of others;

- Support and abide by reasonable standards of condu attendance policies;

- Promote and support a continuous improveme continually looking for opportunities to make the Co more efficient through a continuous review and modifi of work processes and procedures to conform to world manufacturing goals.

- Achieve quality goals and improve quality standards;

- Support the team concept; and

Assist the Company in meeting production goals and schedules.

Promote good housekeeping and maintain a safe work environment.

National Committee on Employee Involvement

The parties, to further these commitments and responsibilities, have formed a National Committee on Employee Involvement comprised of three (3) members from the International Union and three (3) members from the Company. The purpose of the Committee is to establish and maintain guidelines for the program and provide joint leadership. With mutual agreement this committee may augment its numbers with non-voting associate members from Dealer, Store, Customer or other related councils, as the Committee feels will benefit its goals. This committee will be responsible for:

- Establishing and ensuring strict adherence to policy, giving directions and setting goals for Employee Involvement Process activities on both a Local and/or Central basis, and ensuring that employees participate in such activities only on a voluntary basis.

- Encouraging cooperation in initiating and carrying out Local efforts and goals.

- Provide assistance, direction, and guidance to Local Employee Involvement Steering Committees.

- Initiating special programs of common interests.

- Resolving any conflict between the Employee Involvement Process and the grievance procedure or collective bargaining responsibilities.

- Monitoring the effectiveness of the Employee Involvement Process in attaining its goals.

29

29

CNHA032142

The Union accepts the responsibility to promote the common objectives and to cooperate with the Company in administering, on a fair and equitable basis, standards of conduct; and attendance plans; to promote constant improvements in quality and productivity; and to cooperate with the Company in dealing with government entities.

4. Employee Responsibilities

The Company and the Union recognize and accept their responsibility to strive to create and maintain a positive work environment. In order to accomplish that now and in the future, all employees are encouraged to fulfill the following responsibilities:

- Support the performance of the total team and actively support other members of the team.

- Participate in the setting of and attaining of reasonable team goals;

- Work within reasonable Company guidelines and philosophy;

- Respect the individual rights of others;

- Support and abide by reasonable standards of conduct and attendance policies;

- Promote and support a continuous improvement by continually looking for opportunities to make the Company more efficient through a continuous review and modification of work processes and procedures to conform to world class manufacturing goals.

- Achieve quality goals and improve quality standards;

- Support the team concept; and

- Assist the Company in meeting production goals and schedules.

- Promote good housekeeping and maintain a safe work environment.

5. National Committee on Employee Involvement

The parties, to further these commitments and responsibilities, have formed a National Committee on Employee Involvement comprised of three (3) members from the International Union and three (3) members from the Company. The purpose of the Committee is to establish and maintain guidelines for the program and provide joint leadership. With mutual agreement this committee may augment its numbers with non-voting associate members from Dealer, Store, Customer or other related councils, as the Committee feels will benefit its goals. This committee will be responsible for:

- Establishing and ensuring strict adherence to policy, giving directions and setting goals for Employee Involvement Process activities on both a Local and/or Central basis, and ensuring that employees participate in such activities only on a voluntary basis.

- Encouraging cooperation in initiating and carrying out Local efforts and goals.

- Provide assistance, direction, and guidance to Local Employee Involvement Steering Committees.

- Initiating special programs of common interests.

- Resolving any conflict between the Employee Involvement Process and the grievance procedure or collective bargaining responsibilities.

- Monitoring the effectiveness of the Employee Involvement Process in attaining its goals.

28

29

With the solid commitment and participation of both the Union and the Company, this Employee Involvement Process will make employees key participants in many facets of the decision-making process and will result in a team spirit that will make a significant contribution to improved product quality and productivity.

## LETTER OF UNDERSTANDING
### Re:   Employee Development and Training Program

During 1987 negotiations the International Union UAW and Case Corporation jointly recognized the need to promote training, retraining and personal development activities which would improve job skills and enhance job security for Case Corporation employees as well as contribute to the competitiveness and well-being of the Company. As a result, the National Joint Executive Committee on Union-Management Relationships (NJEC) will, during the life of this Agreement, develop a joint UAW-Case Corporation Employee Development and Training Program. The objectives of such a program will be:

.       to provide opportunities to both active and laid off employees to upgrade their job skills; and thereby

.       to improve the job placement and job retention rights of such employees relative to their seniority; and thereby

.       to contribute toward the goal of retaining senior employees at work.

It is intended that the development be completed and such Program be ready for implementation by 18 months following ratification of the 1987 Central Agreement.

Commencing May 18, 1998, 5¢ will be diverted and credited to the Joint Training Account from the previously diverted COLA. This credit will be intended to fund training endeavors developed under this program. The 5¢ will be multiplied by each compensated hour (including overtime premium) and added to the Joint Training Account.

Training programs developed under this Letter of Agreement and the allocation of funds from the Joint Training Account shall be administered jointly by Union and Company members of NJEC.

In the event that expenses of mutually agreed programs exceed amounts accumulated in the Joint Training Account, the Company will contribute additional funds as needed. In addition, the Union and Company will cooperate in attempts to obtain funding for training purposes from various governmental agencies.

Dated: May 14, 1998

## LETTER OF UNDERSTANDING
### Re:  Striker Replacement

Over the years, Case Corporation and the UAW have made a sincere effort to resolve issues through the negotiation process and the grievance procedure. In those instances where, unfortunately, strikes have occurred, Case Corporation has, in the interest of our long term relationship, elected to refrain from continuing production operations by hiring new employees as permanent replacements for striking workers. During those few instances in which a strike has occurred, the UAW recognizes that Case must continue to protect equipment, facilities and, most importantly, fulfill its commitments to customers by using salary employees as are available to continue critically necessary operations in an orderly manner.

This course of action by the Company has served the parties well. It has permitted us to address the issues without additional pressure and escalation of the tensions of the situations. Accordingly, it is Case Corporation's intent to continue this policy at this time.

CNHA032144

## LETTER OF UNDERSTANDING
### Re:   Rapid Improvement Teams

During the 1998 negotiations the parties agreed upon the implementation of the Case Production System (CPS). In doing so, they recognized that in order for CPS to be successful in creating the environment for a constantly improving workplace, Case, the UAW and all employees -- both salaried and hourly -- would have to develop and participate in an unprecedented cooperative partnership at all levels of their relationship.

Successful implementation of CPS requires that employees work together to recognize issues or problems, develop alternatives or solutions and then initiate and complete an action plan which addresses that issue or problem. This process is referred to as Rapid Improvement.

When a Rapid Improvement Event involves or directly affects an operation within the bargaining unit, the following procedure will apply:

(1)   The Company will provide written notice to the Local Union no later than three (3) days prior to the start of a Rapid Improvement Event.

(2)   The notice will describe:

    (a)   what the Rapid Improvement Event was created to study, review or analyze (e.g., area, process, function, layout);

    (b)   the expected duration of the Rapid Improvement Event; normally, a Rapid Improvement Event will not exceed five (5) work days;

    (c)   the size of the Rapid Improvement Team;

    (d)   the identity of bargaining unit and non represented employees on the team.

(3)   A Rapid Improvement Team will exist for each Rapid Improvement Event.

(4)   Absent agreement of the Union, each Rapid Improvement Team will be disbanded after the conclusion of that Rapid Improvement Event.

Recognizing that each Team Member has a unique set of skills, experience and knowledge, during a Rapid Improvement Event, each Team Member may be called upon to perform any number or variety of tasks, including those that are non-traditional. The parties recognize and agree that for Rapid Improvement Events to be successful it will be necessary for each Team Member to work as a part of the Team.

## LETTER OF UNDERSTANDING
### Re:   New Product Launch And Other Related Demand Periods

During the 1998 negotiations the parties discussed the unusual, but necessary, operational demands that exist when a facility prepares for and/or commences a product launch, development of prototype components or products, or the addition/elimination of a shift caused by such launch. In light of the operational issues accompanying such demand periods and the adverse effect which employee movement and insufficient manning would have on the success of that event, the parties have agreed to the following procedure.

The Company will notify both the International and affected Local Union, in writing, at least thirty (30) calendar days in advance of the date that the demand period would commence.

In this notice or related communication the Company will inform the Union of:

• the product/prototype component or product that is at issue;

• the expected duration of the launch/build cycle or prototype period

CNHA032145

- the contract/work rule/practices issues which could affect the timing, effectiveness, efficiency, cost, etc. (or related business reasons) of the launch/build cycle or prototype period; such issues may include, but not be limited to:

  - employee movement
  - overtime scheduling
  - overtime distribution/charging
  - duration of the modifications

Thereafter, the parties will meet for up to, but not more than, thirty (30) calendar days from the date of the notice to resolve these issues. The Union will make a good faith effort to address the issues raised by the Company and will not unreasonably withhold its agreement.

If the parties reach agreement, such agreement shall be in writing and signed by the parties.

## LETTER OF AGREEMENT
### Re:   4 Day - 10 Hour Schedules

During the 1998 negotiations, the parties discussed the Company's need for increased flexibility in scheduling employees. In recognition of these needs, and notwithstanding the provisions contained in Article XI, Sections 1-6 or any other contract language, side letter or practice to the contrary, the parties have agreed that the Company may schedule employees to work four (4) - ten (10) hour days in a workweek rather than five (5) - eight (8) hour days (or three (3) - twelve (12) hour days) in a workweek. The following guidelines will govern the application of this Agreement.

1. When the Company changes an employee's weekly work schedule, either to a 4-10 schedule or back to a 5-8 or 3-12 schedule, it will notify the Union and affected employees no later than the end of the employee's shift on the fifth workday prior to the date the new schedule will commence (e.g., for a Monday change in schedule, notification will occur on the prior Monday).

2. The 4-10 schedule may be implemented for an employee(s), a crew, a team, cost center, department or all of the unit employees in a plant, only after the parties have mutually agreed to implement this schedule for those affected employees.

3. The 4-10 schedule will be implemented so that individual employees working a 4-10 schedule will work four (4) consecutive days during the otherwise normal workweek (The 4-10 schedule will be either Monday through Thursday and/or Tuesday through Friday).

4. (a) When an employee is working a 4-10 schedule, the local rules governing daily overtime shall apply for daily overtime (i.e., if the local rules allow for one (1) hour of daily mandatory overtime, then one hour of overtime will be mandatory under this schedule) on the employee's regular work days (Monday through Thursday or Tuesday through Friday) and for work on the employee's designated fifth workday (e.g., Monday or Friday).   (i.e., if the local rule allows for a full shift of eight (8) hours on Saturday, then the employee may be scheduled for nine (9) hours under this schedule, with a proportional rule applying for less than eight (8) hours).   All hours in excess of these limits in any workday shall be voluntary.

   (b) An employee may be scheduled to work on the employee's designated fifth workday (Monday or Friday) in accordance with the local overtime rules at that location (e.g., the local rules governing Saturday work under a 5-8 schedule shall apply to the fifth workday).   For Monday work the employee will be notified no later than the end of the employee's shift on the prior Friday.   For Friday work the employee will be notified no later than the end of the employee's shift on the immediately preceding Wednesday.

   (c) An employee shall not be compelled to work on Saturday or Sunday (their sixth or seventh workday).

34

35

CNHA032146

(d) When an employee is working a 4-10 schedule, such employee will not be required to work overtime on holidays or on the Saturday or Sunday immediately following the Monday through Friday period in which the employee worked the 4-10 schedule. The employee may work any overtime offered to him on these days.

(e) When an employee is working a 4-10 schedule on a Tuesday through Friday workweek, Monday shall be considered as the fifth day in that workweek. An employee working a 4-10 schedule on a Monday through Thursday schedule shall have Friday designated as the fifth day in that workweek. Employees scheduled to work on the fifth day in their workweek (Monday or Friday) shall receive one and one-half times their straight time rate of pay for all hours worked on such fifth day.

(f) If an employee is offered and elects to work on Saturday (their sixth workday) they shall receive one and one-half times their straight time rate of pay for all hours worked on the sixth workday.

(g) If an employee is offered and elects to work on Sunday (their seventh workday), they shall receive two times their straight time rate of pay for all hours worked on the seventh workday.

5. Article XI, Section 4(1) shall be modified for employees working a 4-10 schedule. Employees on a 4-10 schedule will not receive overtime premium pay for hours worked in excess of eight (8) up to and including the tenth (10th) hour in the regularly scheduled workday. Hours worked in excess of ten (10) in any one workday will be paid at time and one-half.

6. (a) When work is performed on a designated holiday, the employee will be paid double time for the hours worked plus the applicable holiday pay if otherwise qualified.

(b) When a holiday falls on an employee's regularly scheduled workday (i.e., the four consecutive day schedule), the employee will be paid ten (10) hours of pay for the holiday at the appropriate straight time hourly rate of pay.

(c) When a holiday falls on one of the non-work days in the workweek (Saturday, Sunday and either Monday or Friday), the employee shall work his normal forty hour schedule at straight time pay and receive an additional eight (8) hours of pay for the holiday at the appropriate straight time hourly rate of pay.

(d) In the event the Company schedules a plant-wide vacation shutdown during a holiday week, an employee absent on vacation during such week will receive eight (8) hours of holiday pay, at the appropriate straight time rate of pay, if otherwise qualified, if the holiday falls on a "non-work day" or; if the holiday falls on a "workday" the employee, if otherwise qualified, will have the option of receiving holiday pay or an additional PAA day, as noted in Article XI, Section 10 of the Central Agreement.

(e) In the event the Company schedules an employee's vacation during a week in which a holiday falls, the employee will receive an additional eight (8) hours of holiday pay at the appropriate straight time rate, if otherwise qualified, if the holiday falls on a "non-workday", or if the holiday falls on a "workday" the employee, if otherwise qualified, will receive an additional day off with pay, as noted in Article XI, Section 10 of the Central Agreement.

7. Notwithstanding Article XII, Section 6, employees working a 4-10 schedule must use their PAA time in increments of five (5) or ten (10) hours; provided however, that if an employee took four (4) or eight (8) hours of PAA while working a 5-8 schedule or multiples of those, when the employee has less than ten (10) hours of PAA remaining, the employee will be allowed to take such lesser amount on a one-time basis. In addition, PAA hours will be paid off, at the employee's option, as follows:

36

37

CNHA032147

(a) Remaining hours over thirty (30) at the end of the last pay period in February.

(b) Remaining hours over twenty (20) at the end of the last pay period in March.

(c) Remaining hours over ten (10) at the end of the last pay period in April.

(d) At the end of the last pay period in May, the remaining hours, if any.

8. Notwithstanding Article XIV, Section 8, when a death occurs in the family of an employee working a 4-10 schedule, the following rules apply:

(a) If a death occurs to those relatives listed in Article XIV, Section 8, A, the employee will, upon request, be excused for the three calendar days (excluding Saturdays, Sundays and either Monday or Friday based on the employee's schedule) immediately following the date of death, provided he attends the funeral.

(b) If a death occurs to those relatives listed in Section 8, B, and the funeral occurs on one of the employee's four work days the employee, on request, will be excused from work the day of the funeral, provided he attends the funeral.

(c) All other rules, conditions, and limitations contained in Section 8 shall apply.

(d) If the employee working the 4-10 schedule is so qualified and eligible, the employee will receive ten (10) hours of pay for each scheduled day of work for which he is excused.

9. Notwithstanding Article XIV, Section 7, when an employee working a 4-10 schedule appears for jury duty on one of his regularly scheduled four working days, the following rules will apply:

(a) Except as is specifically stated herein, all other rules, conditions and limitations contained in Section 7 shall apply.

(b) When an employee is absent for his entire shift because of such jury duty, he will be paid the difference between the jury duty and ten (10) hours of straight time pay.

(c) If he performs work and jury duty on the same day, the employee will receive the difference, if any, between his actual earnings for the day plus jury pay received and ten (10) hours of straight time pay.

(d) Employees subpoenaed for court appearances and who are not a plaintiff or defendant will be paid for time lost in the same manner as for jury duty.

10. For purposes of qualifying for vacation pay under Article XII, Section 1, C, each ten (10) hour day worked by an employee pursuant to the 4-10 schedule will be counted as one-and-one quarter days worked. This calculation method will be used only for those ten (10) hour days worked while on a 4-10 schedule and will not apply for employees who work ten (10) hours in a day on another schedule.

11. If an employee working a 4-10 schedule becomes disabled within the meaning of the Accident & Sickness Benefit Plan, all rules, conditions and limitations contained in such plan shall continue to apply except that for each day of any portion of a disability period which would have been a regularly scheduled workday for that employee and which is less than a whole week, the amount of Weekly Benefit is obtained by dividing the Weekly Benefit contained in the Plan by four.

38

39

## LETTER OF AGREEMENT
### Re:   3 Day - 12 Hour Schedules

During the 1998 negotiations, the parties discussed the Company's need for flexibility in scheduling employees.  In recognition of this need, and notwithstanding the provisions contained in Article XI, Sections 1-6 or any other contract language, letter or practice to the contrary, the parties have agreed that the Company may schedule employees to work three (3) - twelve (12) hour days in a workweek rather than five (5) - eight (8) hour days or four (4) - ten (10) hour days in a workweek.  The following guidelines will govern the application of this agreement:

1. When the Company changes an employee's weekly work schedule under the Letter, either to a 3-12 schedule or back to a 5-8 or 4-10 schedule, it will notify the Union and affected employees no later than the end of the employee's shift on the fifth workday prior to the date the new schedule will commence (e.g., for a Monday change in schedule, notification will occur on the prior Monday).

2. The 3-12 schedule may be implemented for an employee(s), a crew, a team, cost center, department or all of the employees in a plant, only after the parties have mutually agreed to implement this schedule for those affected employees.

3. The 3-12 schedule will be utilized to provide six (6) day twenty-four (24) hour operations with four (4) complements of employees working fixed consecutive periods of work during the workweek as follows:

| Shift | Sun. | Mon. | Tues. | Wed. | Thurs. | Fri. | Sat. |
|-------|------|------|-------|------|--------|------|------|
| 1     |      | I    | I     | I    | III    | III  | III  |
| 2     |      | II   | II    | II   | IV     | IV   | IV   |

Employees scheduled to a 3-12 schedule will work either a Monday-Wednesday or Thursday-Saturday schedule.

Employees will elect among the four (4) work groups based upon seniority in the job classifications affected, except when it would result in an imbalance between experienced and inexperienced workers or other skill and ability requirements.

4. (a) The shift schedule will normally provide for a one-half (1/2) hour overlap:

Starting & Quitting Times
Shift 1                5:45 a.m. to 6:15 p.m.
Shift 2                5:45 p.m. to 6:15 a.m.

Dinner Period
Shift 1                11:30 a.m. to 12:00 noon
Shift 2                11:30 p.m. to 12:00 midnight

(b) Where the shifts are established as abutting, e.g.:

Shift 1                6:00 a.m. to 6:00 p.m.
Shift 2                6:00 p.m. to 6:00 a.m.

A twenty (20) minute paid lunch will be provided.  The Company may change the starting and quitting times set forth in this paragraph 4 with appropriate notice to the Union and affected employees as provided for in Paragraph 1 above.

5. Except as provided for in paragraph 8, employees on the 3-12 schedule will receive pay for forty (40) straight time hours during each workweek provided the full thirty-six (36) hour schedule is worked (or vacation, jury, bereavement or holiday payments are paid for the scheduled hours).  If fewer than the full thirty-six (36) hour schedule is worked (or paid as noted above), the employee will be paid only for those hours actually worked.

CNHA032149

6.  (a)  Except as provided for in paragraph 8, when an employee is working a 3-12 schedule, such employee may not be required to work more than the scheduled twelve (12) hours on the employee's normal workdays nor may the employee be required to work on any other day during the workweek.

    (b)  Except as provided for in paragraph 8, an employee may be offered and accept work on other than his regularly scheduled workdays or work in excess of twelve (12) hours on their regularly scheduled workdays. In such case, and provided that such employee has worked his full thirty-six (36) hour work schedule during the workweek, the first four (4) hours of such work shall be paid at straight time rates. Hours worked beyond twelve (12) on a regular workday or in excess of forty in the week will be paid at time-and-one-half (1-1/2) the straight time rate of pay. Except when it is part of the employee's regular shift hours (either extending into Sunday from Saturday or starting on Sunday as part of his Monday workday) or as stated in paragraph 8, hours worked on Sunday shall be paid at double time.

7.  Article XI, Section 4, shall be modified for employees working a 3-12 schedule. Employees on a 3-12 schedule will not receive premium pay for hours worked in excess of eight (8) up to and including the twelfth (12th) hour in the regularly schedule workday. Hours worked in excess of twelve (12) in any one workday will be paid at time and one-half (1/2). Employees working a 3-12 schedule will be paid straight time and will not receive premium pay for any hours worked on Saturday or Sunday when such hours are part of that employee's regular 12 hour shift on one of his three scheduled working days.

8.  The Company may decide that certain operations or areas must operate seven (7) days per week. In such cases the employees working the Monday-Wednesday or Thursday-Saturday 3-12 schedule will alternate in working Sundays to close in the workweek. In such case, the following conditions will apply:

    (a)  As set forth in paragraph 3, the 3-12 schedule will have four crews, identified as I, II, III and IV. On the seven day schedule, Crews I and II will work the first Sunday and Crews III and IV will work the second Sunday, with the crews alternating thereafter.

    (b)  Employees on a 3-12 schedule who are scheduled to work Sunday on the alternating 4-12 schedule will not receive forty (40) hours pay for thirty-six (36) hours work as stated in paragraph 5. Nor will the thirty-seventh (37th) through the fortieth (40th) hours of work be paid at straight time as provided for in paragraph 6(b). Rather, the employee will receive thirty-six (36) hours pay for his normal 3-12 schedule (i.e., Monday-Wednesday or Thursday-Saturday) and will be paid time-and-one-half for the twelve (12) hours worked on the alternating Sunday.

9.  (a)  When work is performed on a designated holiday, the employee will be paid double time for the hours worked plus the applicable holiday pay if otherwise qualified.

    (b)  When a holiday falls on an employee's regularly scheduled workday (i.e., one of the three consecutive twelve (12) hour workdays), the employee will be paid twelve (12) hours of pay for the holiday at the appropriate straight time hourly rate of pay.

    (c)  When a holiday falls on one of the non-workdays in the workweek, the employee shall work his normal thirty-six (36) hour schedule at straight time pay (and pay for forty (40) hours as provided under 5, above) and receive an additional eight (8) hours of pay for the holiday at the appropriate straight time hourly rate of pay if otherwise qualified.

    (d)  In the event the Company schedules a plant-wide vacation shutdown during a holiday week, an employee absent on vacation during such week will receive eight (8) hours of holiday pay, at the appropriate straight time rate of pay, if otherwise qualified, if the holiday falls on a "non-work day" or; if the holiday falls on a "workday" the employee, if

42

43

CNHA032150

otherwise qualified, will have the option of receiving holiday pay or an additional PAA day, as noted in Article XI, Section 10 of the Central Agreement.

(e)   In the event the Company schedules an employee's vacation during a week in which a holiday falls, the employee will receive an additional eight (8) hours of holiday pay at the appropriate straight time rate, if otherwise qualified, if the holiday falls on a "non-workday", or if the holiday falls on a "workday" the employee, if otherwise qualified, will receive an additional day off with pay, as noted in Article XI, Section 10 of the Central Agreement.

10.   Notwithstanding Article XII, Section 6, employees working a 3-12 schedule must use their PAA time in increments of six (6) or twelve (12) hours: provided however, that if an employee took PAA under the 5-8 or 4-10 schedule and has less than twelve (12) hours of PAA remaining, the employee will be allowed to take such lesser amount on a one-time basis.  PAA hours will be paid off, at the employee's option, in accordance with the payout table set forth in Article XII, Section 6, D.

11.   Notwithstanding Article XIV, Section 8, when a death occurs in the family of an employee working a 3-12 schedule, the following rules apply:

(a)   If a death occurs to those relatives listed in Article XIV, Section 8, A, the employee will, upon request, be excused for up to any three (3) normally scheduled days of work (or for such fewer days as the employee may be absent) during the three calendar (3) days (excluding Saturdays and Sundays unless Saturday is part of that employee's regular three day workweek) immediately following the date of death, provided he attends the funeral.

(b)   If a death occurs to those relatives listed in Section 8, B, and the funeral occurs on one of the employee's three work days, the employee, on request, will be excused from work the day of the funeral, provided he attends the funeral.

(c)   All other rules, conditions and limitations contained in Article XIV, Section 8, shall apply.

(d)   If the employee working the 3-12 schedule is so qualified and eligible, the employee will receive twelve (12) hours of pay for each scheduled day of work for which he is excused.

12.   Notwithstanding Article XIV, Section 7, when an employee working a 3-12 schedule appears for jury duty on one of his regularly scheduled three working days, the following rules will apply:

(a)   Except as is specifically stated herein, all other rules, conditions and limitations contained in Article XIV, Section 7, shall apply.

(b)   When an employee is absent for his entire shift because of such jury duty, he will be paid the difference between the jury duty and twelve (12) hours of straight time pay.

(c)   If he performs work and jury duty on the same day, the employee will receive the difference, if any, between his actual earnings for the day plus jury pay received and twelve (12) hours of straight time pay.

(d)   Employees subpoenaed for court appearances and who are not a plaintiff or defendant will be paid for time lost in the same manner as for jury duty.

13.   For purposes of qualifying for vacation pay under Article XII, Section 1, C, each twelve (12) hour day worked by an employee pursuant to the 3-12 schedule will be counted as one-and-one-half days worked.  This calculation method will be used only for those twelve (12) hour days worked while on a 3-12 schedule and will not apply for employees who work twelve (12) hours in a day on another schedule.

44

45

CNHA032151

14. If an employee working a 3-12 schedule becomes disabled within the meaning of the Accident & Sickness Benefit Plan, all rules, conditions and limitations contained in such plan shall continue to apply except that for each day of any portion of a period of disability which would have been a regularly scheduled workday for that employee and which is less than a whole week, the amount of Weekly Benefit is obtained by dividing the Weekly Benefit contained in the Plan by three.

# JOB SECURITY
## C.A.S.E.

## LETTER OF UNDERSTANDING

### Re:   GEL Administrative Issues

During the 1995 negotiations the parties reviewed several administrative/interpretation issues. Following ratification the National Job Security Committee will meet to review the updated C.A.S.E. Program and discuss these and other GEL application issues.

## COMPETITIVE AND SECURE
## EMPLOYMENT PROGRAM

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| I. | DEFINITIONS | | 47 |
| | A. | Bargaining Unit | 47 |
| | B. | Active Employees | 47 |
| | C. | Basic Benefit & Employment Protections | 48 |
| | D. | Job Security Protections | 48 |
| | E. | Layoff | 49 |
| | F. | Program Year | 50 |
| | G. | Loss of Job Security Protections | 50 |
| II. | EXCEPTIONS TO JOB SECURITY | | 51 |
| III. | RESOURCE POOL | | 53 |
| IV. | EMPLOYABILITY RIGHTS | | 56 |
| V. | ADMINISTRATION | | 56 |
| VI. | DURATION | | 58 |

## I.   DEFINITIONS

### A.   Bargaining Unit

The term "bargaining unit", as used in this C.A.S.E. Security Program, shall be defined as, and limited to, those employees covered by Article I of the Central Agreement and Article I of the Local Supplemental Agreements for the following locations and Local Unions:

| | |
|---|---|
| Burlington - | Local 807 |
| Burr Ridge - | Local 152 |
| East Moline - | Local 1304 |
| | Local 1306 |
| | Local 1356C |
| | Local 1356T |
| Racine - | Local 180 |
| St. Paul - | Local 763 |

### B.   Active Employees

For purposes of this program, "active employees" shall be defined to include employees actively at work and those employees not at work due to time off for vacation, PAA, bereavement, jury or witness, unexcused absences, short

CNHA032152

term illness including S & A, a CASE eligible employee on Workers' Compensation, short term military encampment leaves under Article X, Section 4 C, and short term Union leave of absence under Article X, Section 2, B and C, and excluding all employees on any other status including layoff or any other leaves of absence (e.g., LTD, a CASE ineligible employee on Workers' Compensation, Military, long term Union leave of absence under Article X, Section 2 A, etc.).

## C.  Basic Benefit and Employment Protections

On a seniority basis, all employees will have or earn the following layoff benefits and/or job security protections.

(1)  One Year Seniority

An employee with at least one (1) year of seniority but less than five (5) years of seniority at the time of layoff, will be entitled to Supplemental Unemployment Benefits while on layoff as provided for in the SUB Plan.

(2)  Five Years Seniority

An active employee with at least five (5) or more years of seniority at the time such employee is subject to layoff will be entitled to job security protection for each program Year as set forth in I. D of this Exhibit, and based on the employee's seniority (i.e., Five or ten years) at the time of layoff under II below, will be entitled to Supplemental Unemployment Benefits while on layoff as provided for in the SUB Plan.

## D.  Job Security Protections

(1)  Basic Protections of Program

The basic commitment of the Company is that during the time that an employee is eligible for job security protection, as defined in I, C (2) of this Exhibit, that

employee will no longer be subject to layoff beyond those conditions set forth in II. This commitment provides true employment security because the risk of long term layoff and loss of recall rights is virtually eliminated for a protected employee. The obligation to provide benefits to eligible employees under the job security provisions of this Program shall arise, with the exceptions set forth in II below, in the event of any Qualifying Action as defined in D, (2) below.

(2)  Qualifying Actions

(a)  A Qualifying Action hereunder is any event that would result in any actively working employee, who is eligible for and receiving the job security protection established in I, C (2) above, to be laid off, including but not limited to volume reductions, sourcing decisions, introduction of technology, productivity improvements, permanent plant closings, and the consolidation of operations, but excluding the actions or events specified in II below.

(b)  The obligation to provide benefits hereunder shall not arise unless one or more Qualifying Actions would otherwise result in the layoff of an eligible employee during the term of the CASE Program. Where applicable, the benefits provided under this Program can be generally defined as the opportunity for active work and/or the other constructive activities and assignments for forty (40) hours in each workweek unaffected by the Qualifying Actions set forth in D (2) (a) above.

## E.  Layoff

For all purposes under this Program "layoff" shall be defined as, and limited to, a situation when an employee is not provided with work, is removed from a facility and is placed on layoff status.

48

49

F.   Program Year

A program year shall run from the first Monday in April each year to the first Monday in April of the following year; provided however, that due to the seventy-three (73) month duration of the Agreement, and its expiration on May 2, 2004, the seventh program year shall commence on the First Monday in April 2004 and run through May 2, 2004.

G.   Loss of Job Security Protections

An employee who is otherwise eligible for job security benefits and/or protection under the provisions of I. C of this Exhibit, shall lose all of such rights, benefits and/or protection, including those provided for in I. D above under the following circumstances:

(1)   Discharged for "good cause";

(2)   Disciplinary suspension (for the period of the suspension);

(3)   Voluntary termination (including terminations under Article IX, Section 4, Sub-paragraphs (1) and (3) of the Central Agreement) or for any other reason whereby the employee ceases to be an active employee of the Company as defined in 1.B. above;

(4)   Retirement;

(5)   Death;

(6)   Refusing placement into Resource Pool;

(7)   Refusing assignment once in Resource Pool;

(8)   Failure to sign up for Master Recall List after Qualifying Action in the form of a plant closing has eliminated the employee's job (see I D (2) above);

(9)   Failure to accept an assignment from the Master Recall List under the conditions set forth under (8) above.

II.   EXCEPTIONS TO JOB SECURITY

A Qualifying Action shall not include any of the following actions or events or actions or events similar in nature thereto. Employees are not protected against the following non-qualifying actions which may result in a layoff or other reduction of the benefits provided under this program including a reduction in the forty (40) hours of available work in each workweek:

(1)   Reduction in the workforce occurring as a result of material shortages, equipment failures or power failures; or

(2)   Reductions in the workforce arising out of or resulting from Acts of God or other events beyond the Company's control; or

(3)   Reduction in the workforce occurring as a result of strikes, walkouts and other forms of labor disputes; or

(4)   A sale of the Company or any covered plant or facility shall eliminate the CASE Program and any of the benefits hereunder for all affected employees, as of the closing date of the sale; or

(5)   (a)   Reduction in the workforce of up to thirty-seven (37) workweeks over the term of this Agreement (i.e. March 30, 1998 through May 2, 2004) at each Bargaining Unit for the purpose of reducing or avoiding an increase in finished product inventories and/or model changeover, plant renovation or plant rearrangements. The thirty-seven (37) workweeks exception may be scheduled (in whole or in part) on a departmental basis in each covered Bargaining Unit and may be scheduled for different times and durations for different departments. The layoff and/or recall provisions of the Central and Local Agreements shall not be applicable to such shutdown periods. The thirty-seven (37) workweeks (or any portion thereof) may be consecutive or nonconsecutive, but must be scheduled for full workweek periods; up to two (2)

50

51

CNHA032154

weeks (i.e., ten (10) working days) may be taken in less than full workweeks each year for rolling shutdowns, startups and/or line threading. Individual employees shall not be adversely affected i.e., subject to more than thirty-seven (37) workweeks of shutdown during the term of this Agreement due to change of department and/or location and the Local CASE Committees shall be responsible for assuring this does not occur.

(b) During any Program Year up to ten (10) days of exception weeks entitlement may be scheduled on a day-by-day basis. Guaranteed SUB payments for scheduled day-at-a-time exception weeks will be $115 per day.

(6) Full or partial plant shutdowns during the inventory/vacation shutdown provided for in Article XII, Section 5 of the Central Agreement (not in excess of four (4) weeks in any Program year).

(7) In the event a Resource Pool created by volume reductions exists at a bargaining unit for a continuous period of three (3) months, the Company may place the number of volume-related Resource Pool employees assigned to the Resource Pool, or any other portion thereof, on additional special exception weeks for up to twenty-six (26) consecutive weeks subject to the following conditions:

(a) Affected employees will be entitled to full regular SUB benefits for full weeks of unemployment as provided for under the SUB Plan; provided however, that an employee who is entitled to job security protection as set forth in I, D of this Exhibit will remain entitled to full regular SUB benefits for full weeks of unemployment during this twenty-six (26) week period if the employee would have otherwise been ineligible due to his having been placed on the thirty-seven (37) exception weeks prior to the twenty-six (26) week volume reduction special exception weeks, and

(b) The Local parties have the option to mutually develop a procedure which would allow more senior employees to be laid off for the special additional exception weeks. This option may be exercised provided the procedure maintains the required skill and ability levels in the unit, and provided further that it is accomplished on a one-for-one direct replacement basis, resulting in no added bumping, bidding, shift preference, or other employee movement.

III.   RESOURCE POOL

A.   Purpose of Resource Pool

A Resource Pool may be maintained for each Bargaining Unit in order to provide continued employment opportunities to employees who would otherwise be subject to layoff. Such layoff and placement in the Resource Pool would be based on their seniority status under the seniority provisions of both the Central and Local Agreements.

B.   Assignment of Protected Employees in the Resource Pool

When an employee has job security protection pursuant to I, C (2) of this Program, the Company does not have a vacant work assignment for the individual due to a Qualifying Action, the Company will create a Resource Pool and those employees who would otherwise be laid off as a result of the Qualifying Action after application of the seniority provisions of the Central and applicable Local Agreement, shall instead be placed in the Resource Pool. The parties recognize that the scope of such protections requires flexibility with regard to the assignment by the Company of duties and activities to Resource Pool employees and the selection of Resource Pool employees for training. Therefore, the following special assignment rules may be utilized for protected employees who have been placed in the Resource Pool, and such employees in the Resource Pool may be:

(1)   placed in a training program; or

52                                               53

CNHA032155

(2)   used as a replacement to facilitate the training of another employee.

(3)   given a job assignment within or outside the bargaining unit which may involve non-traditional work (assignment to non-bargaining unit work shall not create any extension of the bargaining unit's jurisdiction nor shall it create any continuing right to perform such work); or

(4)   temporarily transferred to any other Company location in the United States for up to one hundred and twenty (120) work days in any Program year; provided however, that in such case the Company will reimburse the employee for travel and living expenses in accordance with Company policy; provided, however, that temporary assignments under this subparagraph (5) to covered Bargaining Units at other locations shall not be made if employees remain on the recall list at that location (or employees would be recalled to that location under the Master Recall List). Reasonable assignments between Bargaining Units at separate locations for training purposes will not be subject to this restriction; or

(5)   given any other assignment consistent with the purposes of this Program; or

(6)   With regard to employees in the Resource Pools, the Company's assignment of employees shall not be restricted by seniority rules or other practices. Employees assigned from the Resource Pools to temporary assignments in the Bargaining Unit will work the same schedules as the department and/or classification to which they are assigned including any required overtime. Such employees will be treated the same as any other employee with respect to any contractual notice requirements for such overtime unless it is impossible to do so. Any overtime worked by employees while on Resource Pool assignments will not be charged to any overtime unit or group. In the event that the Company assigns no duties to a Resource Pool employee, that employee shall remain available for

assignment upon reasonable notice in accordance with rules and procedures established by the Company for administration of the Resource Pools.

Employees, assigned to the Resource Pool, shall be removed from the Resource Pool in seniority order pursuant to the Central and Local Agreements, as vacant work assignments become available, provided they are qualified to perform the work required.

C.   The Company and the Union have agreed to the following guidelines to administer the Resource Pools:

(1)   The wage rate of an employee transferred to the Resource Pool shall be established as the regular, straight time hourly rate of the employee's last regular assignment prior to being placed into the Pool. This shall not include any Red Circle Pay Level, unless assigned to a CCICS application.

(2)   The wage rate of a Resource Pool employee who is temporarily assigned shall be the wage rate of the temporary assignment or the wage rate as established in paragraph (1) above, whichever is higher.

(3)   Resource Pool assignments will be considered temporary and not subject to provisions governing permanent filling of vacancies or the application of shift preference.

(4)   A regular employee who is replaced by a Pool employee so that the regular employee can receive training will be paid the employee's applicable regular straight time hourly rate of pay for the training period. Such employee will be returned to the same classification upon completion of the training assignment subject to the applicable Local Agreement. In the event the employee has insufficient seniority to return to the formerly held classification, the employee will be placed in accordance with the seniority provisions in the Central and applicable Local Agreement.

54

55

CNHA032156

(5) A training assignment will be voluntary on the part of an employee being replaced by a Pool employee, unless such training is to develop or improve technical skills relevant to the employee's current job assignment or anticipated future job needs.

(6) An employee may refuse the opportunity to be assigned to the Pool or, while in the Pool, decline an assignment. In such event, the employee will no longer be considered in the Resource Pool and will lose all I, C (2) protection. The refusing employee will be laid-off with a right of recall in accordance with his seniority only to a non-Pool position. In no case may the refusing employee then claim a violation of seniority rights of this Program because a less senior employee is working or is in the Pool regardless of the less senior employee's job assignment.

## IV. EMPLOYABILITY RIGHTS

Except as specifically set forth in this CASE Program, the negotiation of CASE shall not create any additional employment rights for covered employees and shall not in any way affect and/or modify the existing rules or regulations, including the "good cause" standard set forth in Article VIII of the Central Agreement, governing the discipline or discharge of covered employees.

## V. ADMINISTRATION

The Company and Union agree that:

A. At each bargaining unit listed in 1 A, a Local CASE Committee will be established.

B. The membership of the Committee will consist of an equal number of Management and Union Representatives at each covered location as follows:  Racine, Burlington and East Moline - 3 Management and 3 Union Representatives; Burr Ridge and St. Paul - 2 Management and 2 Union Representatives.   The Union Representatives shall be

determined by the Vice President, Director of the Case Department, UAW.

C. The duties of the Local Committee will be:

(1) Periodically review the size and makeup of the Resource Pool and review the impact of attritional openings as well as future manpower requirements.

(2) Monitor the placement of an employee who is assigned to a Resource Pool.

(3) Review the assignment of Pool employees to nontraditional work assignments where practicable, both within or outside the Bargaining Unit.

(4) Review any complaint regarding the administration of the C.A.S.E. Security Program. Refer unresolved complaints to the National Committee.  Only those matters governing the size of the Pool or governing the treatment of an employee assigned to or impacted by the Pool will be subject to the Grievance Procedure.

(5) Jointly develop and initiate proposals to improve operational effectiveness to secure existing jobs, and to attract customers and additional business thus providing additional job opportunities.

D. A National C.A.S.E. Security Committee will be established at the Company-International Union level consisting of three (3) representatives selected from the Company and three (3) representatives selected by the Vice President, Director of the Case Department, UAW.

E. The National Committee will meet periodically as required to:

(1) Monitor the efforts of the Local Committees.

(2) Approve Local Committee efforts to improve operational effectiveness and coordinate those actions when appropriate.

56

57

CNHA032157

F.   The National C.A.S.E. Security Committee is specifically empowered to periodically review and evaluate the operation of this C.A.S.E. Program and make mutually satisfactory adjustments to its provisions during the term of this C.A.S.E. Program.

VI   DURATION

The terms and commitments contained in this C.A.S.E. Program shall remain in full force and effect from March 30, 1998 through the stated duration of this Collective Bargaining Agreement. The C.A.S.E. Program shall automatically terminate, by its own terms, as of midnight, May 2, 2004, unless the Company and the UAW mutually agree, in writing, to either extend the terms of this contract and the C.A.S.E. Program or to continue the C.A.S.E. Program in the successor contract.

## LETTER OF UNDERSTANDING
Re:   **Application of C.A.S.E. Program Resource Pool Assignments at East Moline Plant**

During the 1995 Negotiations, the parties agreed that when an employee is placed within a Resource Pool, the employee may be assigned to non-traditional work.

The parties recognized the potential impact which this Resource Pool work assignment flexibility could have on historical lines of jurisdiction between Locals 1304, 1306, 1356C and 1356T.

In an attempt to resolve this and other related problems, the parties have agreed to the following amendments to the C.A.S.E. Program and exceptions to the inter-bargaining unit transfer principle which shall be applicable only at the East Moline plant.

1)   Notwithstanding the language contained in paragraph IV A (2) (C) of C.A.S.E., and the above stated principle, the parties will maintain the separate lines of jurisdictional demarcation (except as otherwise mutually agreed between the Company and the Local Union), and the Company will not transfer employees in a Resource Pool to available work in the other bargaining unit(s) unless there are no employees on layoff in the other bargaining unit and there are no eligible employees on the Master Recall List.

2)   There shall be no cross-unit transfers into or out of Local 1356C and/or 1356T.

3)   Notwithstanding the C.A.S.E. Program and paragraph 1), above, the Letter of Understanding dated February 24, 1987, between the Company and Local 1306 regarding experimental work shall remain in full force and effect.

4)   Notwithstanding the language contained in IV, A of the C.A.S.E. Program, when an employee in Local 1306 is reduced into the Local 1306 Resource Pool, that employee will be subject to displacement only by a more senior employee on layoff who has the present skill and ability to perform the work in that trade (i.e., tool maker, machine repair, experimental, oiler).

5)   Notwithstanding the language contained in IV, A of the C.A.S.E. Program and in the Letter of Understanding on "Recognition of Local IH Seniority Recall Lists" in the Central Agreements dated June 1, 1985 for Locals 1304 and 1306, a former IH employee covered by those Letters shall not have any right to displace a less senior employee in the Resource Pool unless and until that former IH employee has first been recalled by the Company and become a Company employee.

Dated: May 1, 1998

CNHA032158

March 31, 1998

Mr. Richard Shoemaker
Vice President & Director
UAW - Solidarity House
8000 E. Jefferson Avenue
Detroit, MI 48214

RE:   IMPACT OF C.A.S.E. PROGRAM ON LOCAL UNION NOS.
      763, 152, 1306, 1356C AND 1356T

Dear Dick:

During the 1998 negotiations the Union expressed its concern regarding the potential impact of the new C.A.S.E. Program on the Local 152, Local 763, Local 1306, Local 1356C and Local 1356T bargaining units. In response to this concern I assured you that the Company will not use the new C.A.S.E. program for the purpose of eliminating or significantly reducing the Local 763, Local 152, Local 1306, Local 1356C and Local 1356T bargaining units. Should a change in the present business conditions occur, which impacts the Company's requirements, I will notify you, at the earliest practical time, to discuss the situation and possible alternatives.

Sincerely,

Marc Castor
Vice President, Human Resources

## LETTER OF COMMITMENT

### INTRODUCTION

During the 1998 negotiations the parties discussed the negative impact of ever increasing pricing and competitive pressures and constantly changing market conditions on these covered operations. Both parties also recognized that continuous real improvement in manufacturing efficiencies and flexibilities, as well as employee participation and ownership in the process of constant cost reduction, are critical if these particular operations are to remain competitive and provide long-term employment opportunities, and agreed that if the Company is to survive in today's intensely competitive agricultural and construction machinery industries, the parties must cooperate in an unprecedented fashion in order to achieve the most efficient manufacturing operations. This Letter of Commitment is an integral step in the parties' joint effort to fully and completely implement demand flow technology and the Case Production System, as well as the initiation of programs designed to transfer, in part, the responsibility for cost reduction to all employees.

In response to these manufacturing and marketplace concerns the parties have, in prior negotiations, and in accordance with the C.A.S.E. Program, attempted to address the need for more efficient operations and increased flexibility by agreeing to work rule and labor contract language changes and understandings. While the Union pledged its continuing commitment to the concepts of flexible manning and production scheduling, optimum utilization of all resources and the manufacturing of the highest quality products at the lowest possible cost, and the Company pledged an equal commitment to these concepts, to provide the resources needed and to promote the modifications in management practices and attitudes necessary at all levels of the Company to bring about the desired results, both parties recognize that Case will not improve or even maintain its current competitive position without the Case Production System ("CPS") and continuous cost reduction.

60

61

CNHA032159

True employment security comes only from being more competitive in the marketplace by operating the most cost-effective factories with the most efficient, skilled employees. The parties understand that employees are more likely to direct their focus on continuous improvement of product quality and competitive costs and hence, to be more productive, if they have the opportunity to attain certain employment protections. However, the parties also recognize that the original C.A.S.E. program, while moderately successful in that it provided some measure of security for existing employees, may have actually hindered growth opportunities and did not generate growth. Consequently, the parties have agreed to a new C.A.S.E. employment security program, which applies a more realistic approach to job security -- one that arises from a healthy, profitable and competitive enterprise.

## CPS IMPLEMENTATION

Implementation of CPS will not only be revolutionary, but also evolutionary in nature. While the parties have attempted to address some of the work rule issues which must be modified to provide the Company with the flexibility necessary to successfully implement CPS in order to create a more efficient and productive manufacturing environment, the parties recognize and understand that during the term of this Agreement other work rule and contract modifications may be necessary. Thus, it is agreed that work rules and contract application issues may be continually reviewed and modified where necessary to facilitate and/or expedite the successful implementation of CPS. Every effort will be made so that any modifications will be jointly developed and approved, giving equal weight to operating efficiency, quality and job opportunities. The Union further agrees that in fulfilling its role in this process, its cooperation, approval and support for implementation of such proposed changes will not be unreasonably withheld.

## COST REDUCTION

An integral component to the Company's continued success and hence, its ability to provide true job security, is continuous cost reduction. In the global markets in which Case competes, intense pricing pressures will be the norm, demanding that Case improve its

product year after year and offer it at a competitive price. This lofty goal can only be achieved if all Case employees -- salaried and hourly -- take ownership of and responsibility for continuous cost reduction. The Union agrees with this need and pledges its support and cooperation for implementation of a process to accomplish this objective.

## INSOURCING OPPORTUNITY

The Company also agrees to continually review its work loads and schedules and, where appropriate, to insource work that is currently being produced elsewhere. The Union, in turn, recognizes that if the Company is expected to insource work, thereby providing a stronger commitment to employment security, it may be necessary to modify and/or eliminate then existing work rules and practices based on then existing conditions or circumstances in order to make the insourcing an economically justified and cost effective decision. Again, the Union agrees that its cooperation, approval and support for such proposed changes will not be unreasonably withheld.

## SUBCONTRACTING

Moreover, the Company intends to take advantage of its improved competitive position by reducing its use of subcontractors where its own employees can perform the work in a more economic, timely and efficient manner than can the subcontractor. As always, when making decisions regarding subcontracting, the Company will review such matters with an intention to maintaining, as far as practicable in relation to its needs, a fully utilized, stable workforce. The Company shall make such decisions with a view toward enhancing the long term stability and health of the enterprise as a whole.

## CONCLUSION

In this regard, the parties acknowledge that a central feature of the above commitments to CPS and secure and competitive employment is the Company's long range goal of fully utilizing the skills and abilities of its employees and in the process more efficiently utilizing the capacity and capabilities of its capital assets. The Union understands that the unprecedented job security commitments provided herein have effectively transformed bargaining unit employees from a variable cost to the Company to a fixed cost, making it more important than ever to have

62

63

a fully utilized and flexible workforce. To this end, and to reemphasize the above commitments, jointly developed work rule modifications will be considered on an ongoing basis in order to more fully utilize the workforce by insourcing new work and bringing back previously outsourced work to the extent practical.

On its part management recognizes that in order for employees to identify with and understand their important role in these operations, they should have an understanding of developments affecting their plants. Therefore an essential part of management's commitment in the CPS and C.A.S.E. programs will be to communicate with all employees, and to familiarize them with relevant manufacturing developments relating to manufacturing goals and objectives.

It is also recognized that employees possess unique experiences and knowledge pertaining to the operations of the business. To fully utilize this resource, the parties will cooperate to form Rapid Improvement Teams aimed at reducing costs, improving quality, and increasing efficiencies in all plants.

Dated: May 1, 1998

# WAGES AND BENEFIT APPLICATIONS

## LETTER OF AGREEMENT
Re:   Annual Lump Sum Bonus Payments

During the first, second, third, fourth, fifth and sixth years of this contract Eligible Employees (as defined below), shall receive lump sum bonus payments calculated as percentages of the total amount of "Qualified Earnings" (as defined below) received by such Eligible Employee during the applicable "Base Period" preceding an "Eligibility Date". The percentages shall be as follows: 1998 payment – three percent (3%); 1999 payment – three percent (3%); 2000 payment – three percent (3%); 2001 payment – three percent (3%); 2002 payment – three percent (3%); 2003 payment – three percent (3%). The lump sum bonus payment shall be a gross amount and will have subtracted from it the required statutory and contractual deductions.

64

A.   Eligible Employees shall be defined as those employees who possess seniority in a bargaining unit covered by the 1998 Central Agreement on the applicable Eligibility Date and who actually performed work for the Company during the applicable Base Period.

B.   Qualified Earnings shall be defined as income received by an Eligible Employee from the Company during the applicable Base Period from one of the following sources:

1)   Regular Hourly and/or Incentive Earnings and CCICS Performance Payments plus COLA (including shift premium and overtime premiums);
2)   Saturday, Sunday or Holiday premium payments;
3)   Holiday Pay;
4)   Paid Absence Allowance Payments;
5)   Vacation Pay;
6)   Bereavement Pay;
7)   Jury or Witness Duty Pay;
8)   Temporary Military Service Make-up Pay;
9)   Report-in or Call-back;
10)  Attendance Bonus

C.   Lump Sum Payment Schedule

| Base Period | Eligibility Date | Payment During First Full Pay Period Commencing on or After |
|---|---|---|
| December 23, 1996 Through December 21, 1997 | March 29, 1998 | Approximately one (1) month following ratification |
| December 22, 1997 Through December 27, 1998 | February 7, 1999 | March 1, 1999 |
| December 28, 1998 | February 6, 2000 | March 1, 2000 |

65

CNHA032161

Through
December 26, 1999

December 27, 1999     February 4, 2001     March 1, 2001
Through
December 24, 2000

December 25, 2000     February 3, 2002     March 1, 2002
through
December 23, 2001

December 24, 2001     February 2, 2003     March 1, 2003
Through
December 22, 2002

D.   An employee who retires during a Base Period and who, but for such retirement, would have been an Eligible Employee entitled to such lump sum bonus payment, shall receive a payment in accordance with the provisions of this Letter of Agreement.

E.   In the case of an employee who dies during a Base Period who otherwise would have been an Eligible Employee entitled to such lump sum bonus payment shall have a payment made, in accordance with the provisions of this Letter of Agreement, to the beneficiary or beneficiaries of his/her basic life insurance under the Group Insurance Plan.

Dated: May 1, 1998

---

# LETTER OF UNDERSTANDING
## Re: Alternative Pay Systems (APS)

In preparation for the transition from individual incentive standards to Alternative Pay Systems (APS), the parties have agreed to the development and implementation of mutually acceptable pilot programs for each UAW facility. The Company and the Union will establish and mutually agree to criteria which set forth the parties APS objectives prior to the Pilot Program development process described herein.

Development of Pilot Program

- Alternative Pay System Committees at each facility (maximum of eight employees; four Company and four Union members) will be immediately formed to develop and implement the APS pilot programs.

- A National APS Committee will be formed (two (2) members appointed by the Company and two (2) members appointed by the International Union); the National APS Committee will assist the facility committees and review APS pilot programs submitted for implementation. The Company and/or the Union may separately or by mutual agreement employ experts/consultants to help facilitate their work.

- Outside resources (e.g., gainsharing experts, etc.) will be made available, as requested by the facility APS Committees.

- Plans for pilot programs must be completed by March 1996 and submitted to the International Union and Case Corporate for review and approval.

- The months of May and June 1996 will be used by the Committee at each facility to develop forms, educational/explanatory materials, systems, etc., necessary to facilitate the launch of the new pilot programs effective January 1, 1997. July through October 1996 will be utilized for communication and training of affected employees prior to the January 1997 commencement of the pilot program.

CNHA032162

• By mutual agreement APS pilot programs may be installed for groups of employees prior to January 1, 1997.

Dated: May 1, 1996

## LETTER OF UNDERSTANDING
### Re:  Tuition Refund

The Company has an outstanding policy which provides for company reimbursement of 80% of the cost of tuition, etc., upon successful completion of the course of study provided company approval is obtained prior to enrollment and the course of training must relate directly to work performed in and by the bargaining unit. There are other details in this statement of policy, but the essential ingredient is the prior approval of the Company.

Dated: May 1, 1998

## Letter of Agreement
### Re:  Time Clocks

The Company and the Union also discussed the importance of both parties to work together in a team concept to insure that world class manufacturing goals are met.  To that end the Company agrees to explore alternatives to time clocks and/or the elimination of time clocks for all hourly technical employees in Local 1356.  If time clocks are eliminated, it would be on a trial basis subjective to periodic review. Either party can end this agreement with a two (2) week advance notice to the other party.

## Letter of Agreement
### Re:  In House Office

The Company agrees to provide Local 1356T with an in-house office supplied with a desk, file cabinet, phone and answering machine.  The Company will not unreasonably delay in providing the office, the location of which will be mutually agreed upon.

68

## Letter of Understanding
### Re:  Training

The Company and the Union recognize the desirability for it's employees to upgrade their job skills and knowledge.  As a result the parties have agreed to form a Plant Joint Training Committee.  The Committee will be comprised of the Presidents of the three (3) Local Unions and the Chairmen of the Bargaining Committees (or their designated representatives).  The Committee will also be comprised of the General Plant Manager (or his designated representative), the Manager, Human Resources and the Manager, Training.

The roles and responsibilities of the Committee are as follows:

1.  Identify training needs and provide for employees to receive the training.

2.  Monitor and evaluate all training activities.

3.  Communicate and coordinate the development of training programs with other UAW/Case IH training committees.

4.  Support and carry out the guidelines and objectives of the UAW/Case Corporation Employee Development and Training Program.

5.  Complete and submit project request forms for expenditures of joint training funds.

6.  Coordinate with the National Joint Training Committee.

7.  Other activities deemed appropriate by the Committee.

The Committee will meet no less than once every thirty (30) working days.  Programs shall be offered to employees during work hours, off-work hours or through the Tuition Reimbursement Program.

69

CNHA032163

## Letter of Agreement
### Re: Highly Skilled and Technical Position Placements

The parties also discussed the introduction of new employees to Local 1356T who are highly skilled and technically literate. Openings may occur and a bargaining unit employee may have requested to fill the position but does not have the skills and abilities to perform the position within a reasonable training period. The Company may hire a new employee(s) who is highly skilled and technically literate. Such employee will, of course, be represented by Local 1356T. Management will discuss the matter with the local Union in advance of hiring such employee, to determine if there is a significant skill differential between the presently employed and the potential new hire.

In the event the local Union does not agree with the Company's position to hire a new employee versus promoting or transferring a present employee, the Union may pursue the matter through the applicable provisions of the grievance procedure.

## LETTER OF UNDERSTANDING
### Re: Management Trainees

The Company may employ non-unit persons as management trainees. The purpose of the training is to prepare those individuals to occupy managerial positions. This training may involve work in job assignments whose incumbents are represented by UAW Local 1356-T. The performance of unit work by managerial employees shall not directly result in the reduction or layoff of any unit employee. Such assignment to 1356T work shall not exceed six (6) months of their training rotation.

## LETTER OF UNDERSTANDING
### Re: Professional Dues

The Company agrees to reimburse the Technical Unit employees for reasonable dues to Professional Associations related to their work. It is understood that no employee may be reimbursed for dues to more than one (1) association.

## LETTER OF UNDERSTANDING
### Re: Access to Personnel Records

During the 1994 negotiations, the Company committed that it would abide by federal and/or state statutes regarding an employee's access to that employee's personnel record.

## LETTER OF UNDERSTANDING
### Re: Classification Schedule

During the 1994 negotiations, the parties agreed to the following schedule of classifications:

> Industrial Engineer
> Process Engineer
> Facilities Engineer
> Engineer - Quality Control

This listing shall remain in effect until modified by the Company. If the Company elects to modify this classification schedule it will notify the Union in advance of the change. If the Union does not agree with the wage rate established by the Company, the Union may grieve the reasonableness of the rate.

The above-listed classification will apply to and cover the jurisdictional areas set forth in Article I.

Under the above-listed schedule, the metallurgist function comes within the Engineer-Quality Control classification; the Long Range Planning Engineer is part of the Facilities Engineer classification; and the Advance Planning Engineer is part of the Process Engineer classification.

CNHA032164

## LETTER OF AGREEMENT
### Re: Optional Life Insurance

During the 1994 negotiations the Company assured the Union that if other UAW represented Case employees were generally eligible to purchase additional optional life insurance, the same program will be available to 1356T members.

## LETTER OF UNDERSTANDING
### Re: Non-Unit Employees and Contract Personnel

During the 1994 negotiations, the parties discussed the Company's continued use of non-unit employees and contract personnel, neither of which are bargaining unit engineers and are not covered by the contract, to perform work which is covered by the contract and also performed by bargaining unit employees. While recognizing the Company's need to continue utilizing non-unit employees and contract personnel for purposes of flexibility, efficiency and productivity, the parties have agreed to the following.

Notwithstanding Article I and Article XIV, Section 1, the Company's use of non-unit employees to perform work, functions or responsibilities covered by the contract will continue, as it has in the past, but limited in scope to the engineering supervisors or management and representatives from Corporate manufacturing services.

The company's use of contract personnel shall be limited to a number equal to 25% of the 1356T seniority list. The resulting figure, if not a whole number, shall be rounded, down or up, to the nearest number (i.e., .50 and less rounded down; .51 and up rounded up). That whole number is the number of contract personnel that may be utilized by the Company to perform work that is also covered by the contract and performed by bargaining unit employees.

## LETTER OF UNDERSTANDING

**Subject: River City Project**

Case Corporation recognizes UAW Local 1304, 1306, 1356C and 1356T as the exclusive bargaining agent of the employees referred to below at the River City Facility under the following terms and conditions relating to the participation of members supporting the new product development project at River City. This Letter of Understanding specifically applies to the River City project only.

1. Employees for the project will be selected by the Company on a voluntary basis and will be required to sign a non-disclosure agreement.

2. Selection will be by classification and qualifications.

3. While assigned to the River City project, team members will be required to perform a variety of tasks that may include traditional and non-traditional bargaining unit work. Performance of such work shall not, in any way, expand the jurisdiction of that respective Local Union. Similarly, to maximize the timely and efficient completion of the project, lines of demarcation or jurisdiction between Local Unions shall not restrict or limit the assignment of work between and among members of the various Local Unions.

4. The signatures to this agreement recognize that the resources supporting the River City project will benefit from the skills and expertise ingrained in the men and women of Case Corporation East Moline Plant. To that end, issues that arise relating to the team members of River City project will be dealt with in an atmosphere of mutual respect in order to cooperatively develop solutions that support the timely completion of the project.

For the Company:　　　For the Union:
Paul H. Crist　　　　　Dean Prine, Local 1304
　　　　　　　　　　　Gaylord Vogler, Local 1306
　　　　　　　　　　　Wayne M. Hungerford, Local 1356C
　　　　　　　　　　　Jim Stribling, Local 1356T

Date: April 26, 1998

72

73

CNHA032165

## 2001

## 2002

## 2003

## 2004

Wage Schedule - 1356 T

| | Entry/Start | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | 1 Yr | 2 Yr | 3 Yr | 4 Yr | 5 Yr | 6 Yr | 7 Yr | 8 Yr | 9 Yr | 10 Yr | 11 Yr | 12 Yr | 13 Yr | 14 Yr | 15 Yr | 16 Yr |
| Associate | $13.00 | | | | | | | | | | | | | | | | | |
| Engineer I | | $15.19 | $15.66 | $16.15 | $16.65 | $17.16 | $17.70 | $17.89 | $18.09 | $18.29 | $18.49 | $18.69 | $18.90 | $19.10 | $19.31 | $19.53 | $19.77 | $20.02 |
| Engineer ID | | $15.68 | $16.17 | $16.67 | $17.18 | $17.72 | $18.27 | $18.47 | $18.67 | $18.88 | $19.08 | $19.29 | $19.51 | $19.72 | $19.94 | $20.16 | $20.27 | $20.52 |
| Engineer II | | $15.73 | $17.25 | $17.78 | $18.34 | $18.91 | $19.49 | $19.70 | $19.92 | $20.14 | $20.36 | $20.58 | $20.81 | $21.04 | $21.27 | $21.51 | $21.77 | $22.02 |
| Engineer IID | | $17.22 | $17.75 | $18.30 | $18.87 | $19.46 | $20.06 | $20.26 | $20.46 | $20.67 | $20.87 | $21.08 | $21.29 | $21.51 | $21.72 | $21.94 | $22.27 | $22.52 |

*Accumulated COLA is not included in this schedule, all accumulated and future COLA will be paid as an adder



E. Moline 1356T

1
9
9
8

2
0
0
4

Printed in the U.S.A.

CNHA032167