UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK REESE, JAMES CICHANOFSKY,
ROGER MILLER, and GEORGE NOWLIN          Hon. Patrick J. Duggan
on behalf of themselves and
a similarly situated class,               Case No. 04-70592

      Plaintiffs,

v.                                        **Class Action**

CNH INDUSTRIAL N.V. and
CNH INDUSTRIAL AMERICA, LLC,

      Defendants.

           /

## **<u>PLAINTIFFS' MOTION FOR RECONSIDERATION</u>**

Plaintiffs, by their attorneys McKnight, McClow, Canzano, Smith & Radtke, P.C., pursuant to E.D. Mich. LR 7.1(h)(3), move for reconsideration of the District Court's September 28, 2015 order granting Defendants' Motion for Summary Judgment.  In support of this motion, Plaintiffs state:

1.      On August 29, 2007, this District Court granted Plaintiffs' Motion for Summary Judgment, based on its conclusion that the "plain language of the relevant agreements, as further supported by the extrinsic evidence, demonstrates Case's and the UAW's intent to grant lifetime retiree health insurance coverage to retirees and surviving spouses of retirees who are eligible for or are receiving a pension." (R.214 at 22-23).

2.      In its recent decision, the District Court nevertheless entered summary judgment *against* Plaintiffs, relying on the intervening Supreme Court decision of *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015).

3.      In *Tackett*, the Supreme Court reaffirmed that the responsibility of courts is to "ascertain the intention of the parties" through the application of ordinary contract principles, 135 S. Ct. at 935 (emphasis in opinion).

4.      *Tackett* held that the extra-contractual inferences enunciated in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), because the use of an inference

2

favoring vesting of retiree benefits "distorts the attempt 'to ascertain the intention of the parties." *Id*. at 935.

5.      *Tackett* did not foreclose the production of evidence that supports the conclusions of the evidence.  But, *Tackett* held that such a conclusion must be drawn from facts, "shorn of presumptions."

6.      In reaching its recent decision, the District Court ignored substantial, undisputed record evidence that Case intended for retiree benefits to vest for life. This brief focuses on evidence relating to two critical, probative facts bearing on the intent of the parties.

7.      First, in 1971, shortly after the conclusion of the 1971 contract negotiations, Case's benefit director explained what Case's intent was when it agreed to the CBA language conferring health care benefits on retirees.  In a letter to hourly retirees, Case's benefit director informed them that Case had agreed to provide fully paid health benefits for them and for the "remainder of [a surviving spouse's] lifetime" after the retiree passed away.

8.      Second, in 1998, Case agreed to the elimination of the existing medical cost cap letter.  By so agreeing, Case knew that its obligation to provide retiree health care benefits extended, not only *beyond* the expiration of the 1998 CBA, but that its obligation was no longer limited by a future dollar cap thereafter.

9.   *Tackett* did not foreclose an inquiry into Case's actual intent when it agreed in 1971 to contract language tying pension benefits to receipt of a pension. As shown by the concurrence, *Tackett* simply held that such language was not determinative of the parties' intent.  As noted, Mr. Devine provided an authoritative description of what Case understood the contract language to mean.

10.   *Tackett*, in summarizing the traditional rules of contract interpretation, relied on Williston on Contracts, including a citation to a section in which Williston states that "unambiguous contract language . . . need not be interpreted in a vacuum; the underlying goal in interpreting a contract is to ascertain the intent of the parties, and the surrounding circumstances when the parties entered the contract, among other relevant considerations, may well shed light on that intent." II Williston on Contracts §30:6 (4th ed.).

11.   Here, the District Court committed manifest error by failing to consider the significance of the undisputed facts relating to "the surrounding circumstances when the parties entered the contract" in 1971 and in 1998.

12.   Even if the plain language of the CBA did not unambiguously provide for vested benefits, it is ambiguous because "a reasonable person would find it susceptible to different or inconsistent interpretations." *Cogent Solutions Group, LLC v. Hyalogic*, LLC, 712 F.3d 305, 310 (6th Cir. 2013).  In fact, as noted, the District

4

Court held in 2007 that the CBA language supported *Plaintiffs'* interpretation and, even in his recent decision, recognizes that *Plaintiffs'* position is plausible. Moreover, as the District Court and the Sixth Circuit have already held, substantial extrinsic evidence shows that Case understood, and voiced that understanding to retirees, that its obligation to provide retiree benefits lasted for the lifetimes of the retirees and surviving spouses.

13.     Given the undisputed facts, the District Court erred when it failed to "draw all factual inferences in favor of the party opposing summary judgment . . . ." *Reese v. CNH America LLC*, 574 F.3d 315, 321 (6th Cir. 2009).  One such factual inference is that, as the district court already *held*, the CBA language, including the tie between retiree health benefits and a pension, can be construed as providing benefits that survive the expiration of the CBA.

14.     Neither *Tackett* nor traditional contract principles required the district court to turn a blind eye to the undisputed evidence of Case's intent when it entered into the 1971 and 1998 CBAs.  To the contrary, *Tackett* instructed courts to "ascertain the intention of *the parties*."

15.     The District Court committed manifest error when it failed to consider all of the probative evidence that sheds light on the parties' intent.

5

16.     On October 13, 2015, Plaintiffs sought the concurrence of Defendants'

counsel in the relief requested, specifying the grounds on which the motion is based,

and concurrence was denied.

Respectfully submitted,

McKNIGHT, McCLOW, CANZANO,
SMITH & RADTKE, P.C.

By:  /s/Roger J. McClow
Roger J. McClow (P27170)
Darcie R. Brault (P43864)
Attorneys for Class Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI  48034
(248) 354-9650
dbrault@michworklaw.com

Dated: October 13, 2015

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK REESE, JAMES CICHANOFSKY,
ROGER MILLER, and GEORGE NOWLIN                 Hon. Patrick J. Duggan
on behalf of themselves and
a similarly situated class,                                    Case No. 04-70592

      Plaintiffs,

v.                                                                          Class Action

CNH INDUSTRIAL N.V. and
CNH INDUSTRIAL AMERICA, LLC,

      Defendants.

_____/

**BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR RECONSIDERATION**

# *TABLE OF CONTENTS*

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.     STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   STATEMENT OF PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.    THE PRIMARY PURPOSE OF CONTRACT INTERPRETATION IS TO
             ASCERTAIN THE INTENT OF THE CONTRACTING PARTIES. . . . . . . . . . . 6

       B.    CASE CORPORATION UNDERSTOOD FROM THE BEGINNING THAT
             RETIREE HEALTH BENEFITS WERE VESTED, LIFETIME BENEFITS. . . . 8

       C.    IN 1998, CASE AGREED TO PROVIDE "UNCAPPED" BENEFITS
             BEYOND THE EXPIRATION OF THE CBA. . . . . . . . . . . . . . . . . . . . . . . 13

       D.    CBA LANGUAGE TYING HEALTH BENEFITS TO LIFETIME
             PENSIONS IS RELEVANT EVIDENCE OF A LIFETIME OBLIGATION. . . . 19

V.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

### INDEX OF AUTHORITIES

**Cases**

*Alabama v. North Carolina,*
  560 U.S. 330 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bradley v. Washington, Alexandria & Georgetown Steam Packet Co.,*
  38 U.S. 89 (1839). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Brooklyn Life Ins. Co. v. Dutcher,*
  95 U.S. 269 (1877). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Carbon Fuel Co. v. United Mineworkers,*
  444 U.S. 212 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Chesapeake & Ohio Canal Co. v. Hill,*
  82 U.S. 94 (1872). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Cogent Solutions Group, LLC v. Hyalogic, LLC,*
  712 F.3d 305 (6th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cole v. ArvinMeritor, Inc.,*
  2006 U.S. Dist. LEXIS 61003 (E.D. Mich. 2006),
  *aff'd* 549 F.3d 1064 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Davison v. Von Lingen,*
  113 U.S. 40 (1885). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*George v. Tate,*
  102 U.S. 564 (1881). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Golden v. Kelsey Hayes Co.,*
  73 F.3d 648 (6th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Golden v. Kelsey-Hayes Co.,*
  845 F. Supp. 410 (E.D. Mich. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Litton Financial Printing Div. v. NLRB,*
  501 U.S. 190 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*Mastrobuono v. Shearson Lehman Hutton,*
  514 U.S. 52 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*M&G Polymers USA, LLC v. Tackett*,
  135 S. Ct. 926 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Noe v. PolyOne Corp.*,
  520 F.3d 548 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Old Colony Trust Co. v. City of Omaha*,
  230 U.S. 100 (1913). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ososki v. St. Paul Surplus Lines Ins. Co.*,
  162 F. Supp. 2d 714 (E.D. Mich. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*UAW v. Kelsey-Hayes*, Co.,
  No. 11-CV-14434, 2015 U.S. Dist. LEXIS 124411
  (E.D. Mich., Sept. 17, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*UAW v. Yard-Man, Inc.,*
  716 F.2d 1476 (6th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 20, 23

*Wonderland Shopping Center Venture LP v. CDC Mortgage Capital, Inc.*,
  274 F.3d 1085 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Yolton v. El Paso Tennessee Pipeline Co.*,
  CA 02-75164, 2008 U.S. Dist. LEXIS 17619
  (E.D. Mich., Mar. 7, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15n

*Yolton v. El Paso Tennessee Pipeline Co.*,
  318 F. Supp.2d 455 (E.D. Mich. 2003). . . . . . . . . . . . . . . . . . 4, 10, 13, 19, 20, 23

*Yolton v. El Paso Tennessee Pipeline Co.*,
  435 F.3d 571 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 14, 19, 20, 23

***Treatises***

II Williston on Contracts, §30:6 (4th ed.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 16

***Court Rules***

Local Rule 7.1(h)(3) (E.D. Mich.).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## I.   STANDARD OF REVIEW

Motions for reconsideration are governed by E.D. Mich. LR 7.1(h)(3), which

states in pertinent part:

> Generally, and without restricting the court's discretion, the court will
> not grant motions for rehearing or reconsideration that merely present
> the same issues ruled upon by the court, either expressly or by
> reasonable implication. The movant must not only demonstrate a
> palpable defect by which the court and the parties and other persons
> entitled to be heard on the motion have been misled but also show that
> correcting the defect will result in a different disposition of the case.

"A 'palpable defect' is a defect which is obvious, clear, unmistakable, manifest,

or plain." *Ososki v. St. Paul Surplus Lines Ins. Co.*, 162 F. Supp. 2d 714, 718 (E.D.

Mich. 2001).

The Court, in converting summary judgment for Plaintiffs into summary

judgment for Defendants, based on its reading of *M&G Polymers v. Tackett*, 135 S.

Ct. 926 (2015), has committed manifest error – by ignoring, rather than enforcing, the

clear intent of the parties to the collective bargaining agreements.  In this motion,

Plaintiffs address two specific and determinative contract facts that illustrate and

underscore that error.

## II.   INTRODUCTION

In its September 28 decision, the District Court reconsidered its earlier

decisions and reversed itself based on its view of the meaning of *M&G Polymers*

*USA, LLC v. Tackett*, 135 S. Ct. 926 (2015).  In *Tackett,* the Supreme Court addressed

and rejected the inferences set forth in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983). The Supreme Court remanded for reconsideration of whether retiree health care benefits vested in that case under traditional contractual principles – without reliance on any extra-contractual inferences. *Id.* at 937.

*Tackett* instructed courts to apply "ordinary principles of contract law" recognizing that when interpreting collective bargaining obligations, "as with any other contract, the parties' intentions control." *Id.* at 930, 933. The district court ignored this directive and failed to even consider the unmistakable manifestations of Case's intent, thus improperly granting summary judgment to Defendants.

Here, in its motion for summary judgment, Plaintiffs expressly disclaimed any reliance on the *Yard-Man* inference. (R.129 at 8, n.7). In its 2007 opinion for summary judgment for Plaintiffs, the district court never mentioned the *Yard-Man* inference, either in its recitation of "governing principles" or in its application of those principles. (R.214 at 12-13; 13-22). Applying traditional contract principles, the court concluded that the "plain language of the CBA" demonstrated Case's intent to vest health benefits for retirees. (*Id.* at 22). It noted that substantial extrinsic evidence confirmed this conclusion. (*Id.*).

In light of this, the District Court's recent entry of summary judgment *against* Plaintiffs based on its reading of *Tackett* is manifestly wrong. CBA language that "plainly" expresses the intent to *vest* benefits simply cannot be also read to *foreclose*

consideration of extrinsic evidence that conclusively supports the *initial* interpretation. The meaning of the operative contractual language, as consistently espoused by Case Corporation itself for a quarter century, did not change based on an intervening Supreme Court decision that addresses "inferences" that neither the District Court nor Plaintiffs employed.

In this motion, Plaintiffs focus on two specific contractual facts. First, immediately after the CBA language governing retiree health care benefits was negotiated in 1971, Case's director of benefits wrote to hourly retirees telling them that Case had agreed, in those negotiations, to provide fully paid health benefits for them and for the surviving spouse for "the remainder of her lifetime."

Second, in 1998 negotiations, Case agreed to *eliminate* the existing cost cap on its future, *post*-CBA obligation to provide retiree health care benefits, an agreement that would be illusory if those benefits were not intended to survive the existing CBA.

As the Supreme Court emphasized in *Tackett*, the only legitimate purpose of contract interpretation is to determine the intent of the parties. 135 S. Ct. at 935. The District Court, by ignoring Case's *actual* intent, committed manifest error requiring reversal and reinstatement of judgment for Plaintiffs. The entire contract, read as a whole, and in light of the surrounding circumstances at the time the parties entered into the CBAs, "plainly" vests benefits, as the district court and the Sixth Circuit previously held. At worst, the language is ambiguous and requires the consideration

3

of extrinsic evidence, evidence that overwhelmingly confirms that Case intended to vest retiree health care benefits.

## III.    STATEMENT OF PROCEEDINGS

This litigation is closely related to *Yolton v. El Paso Tennessee Pipeline Co.*, CA 02-75164 (E.D. Mich.). *Yolton* involves a class of retirees who retired from Case before an initial public offering (IPO) effective July 1, 1994.  The IPO was part of a Reorganization Agreement under which Case's former parent Tenneco assumed liability for pre-IPO retirees and Case retained liability for post-IPO retirees.

In *Yolton v. El Paso Tennessee Pipeline Co.*, 318 F. Supp.2d 455 (E.D. Mich. 2003), the district court entered a preliminary injunction in favor of pre-IPO retirees. It concluded that the express language of the 1990 CBA showed that Case and the UAW intended retiree health care benefits to vest. The court analyzed on CBA language that provided, *inter alia*, that "Employees Retired on Company Pension and Surviving Spouses Receiving Company Pension" would be eligible for company paid health benefits. *Id*. at 466-67. The court also compared other CBA provisions that, unlike the retiree health benefit provision, had specific durational limits, a contractual indication that "retiree benefits, not so specifically limited, were intended to survive" the expiration of the CBA. *Id*. Then, the court stated:

> Even if the parties' intent were not clear based on the express language of the various labor agreements, Plaintiffs present substantial extrinsic evidence to demonstrate that the UAW and Case intended to

4

provide retirees and surviving spouses fully funded, lifetime health insurance benefits.

*Id*. at 468.

The Sixth Circuit affirmed, *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 at 583 (6th Cir. 2006), approving the district court's contractual analysis, and stating:

> [W]hile the plain language of the CBAs requires us to conclude that the district court did not abuse its discretion by issuing the injunction, we also note that like the *Golden* case, "[d]efendant's conduct also indicates that plaintiffs'[s] benefits were vested" 845 F. Supp. at 415. The district court identified substantial evidence indicating an understanding that the health insurance benefits were lifetime benefits.

As the District Court concluded in its 2007 decision granting summary judgment to the *Reese* Plaintiffs, the operative language governing retiree health benefits remained "substantially identical" from the time it was negotiated through the 1998 CBA. (R.214 at 13).  It concluded:

> [T]he Court finds no genuine issue of material fact with respect to whether Plaintiffs are entitled to vested lifetime health insurance benefits.  The Court concludes that the plain language of the relevant agreements, as further supported by the extrinsic evidence, demonstrates Case's and the UAW's intent to grant lifetime retiree health insurance coverage to retirees and surviving spouses of retirees who are eligible for or are receiving a pension. (*Id*. at 22).

Neither the language of the CBAs nor the "substance" of the extrinsic evidence changed in the wake of *Tackett*.  In this motion, Plaintiffs focus on two simple, undisputed contractual facts that demonstrate Case's intent with respect to the

5

duration of its contractual promise to retirees and thereby also demonstrate the District Court's palpable error.

## IV.   ARGUMENT

### A.   THE PRIMARY PURPOSE OF CONTRACT INTERPRETATION IS TO ASCERTAIN THE INTENT OF THE CONTRACTING PARTIES

Since courts began enforcing private agreements, the "cardinal rule" of contract interpretation has been that a court must first ascertain and then enforce the intention of the contracting parties.  In *Bradley v. Washington, Alexandria & Georgetown Steam Packet Co.*, 38 U.S. 89, 97 (1839), the Court stated:

> It is a principle recognized and acted upon by all Courts of justice, as a cardinal rule in the construction of all contracts, that the intention of the parties is to be inquired into; and if not forbidden by law, is to be effectuated.

*Accord George v. Tate*, 102 U.S. 564, 570 (1881) ("intent of the parties is the contract, and whenever that is ascertained, however inartificially [sic] expressed, it is the duty of courts to give it effect"); *Wonderland Shopping Center Venture LP v. CDC Mortgage Capitol, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001)("court's primary responsibility" is to ascertain and enforce the parties' intent)(applying Michigan law).

As the Court wrote in *Chesapeake & Ohio Canal Co. v. Hill*, 82 U.S. 94, 99-100 (1872):

> We should look carefully to the substance of the original agreement . . . as contradistinguished from its mere form, in order that we may give it a fair and just construction, and ascertain the substantial intent of the

6

parties, which is the fundamental rule in the construction of all agreements.

Another basic principle is that contracts must be interpreted and enforced according to the parties' intent when the contract was made, irrespective of subsequent events. *Davison v. Von Lingen*, 113 U.S. 40, 50 (1885).

Judge, now Justice, Kennedy, concurring in *Williams v. Fenix & Scission, Inc.*, 608 F.2d 1205, 1210-11 (9th Cir. 1979), rejected the concept that judicial inquiry into the intent of contracting parties could be short-circuited by a so-called "plain meaning" approach:

> This approach to contractual interpretation has been rejected by the circuit and it is out of line with the better-reasoned contract law cases. It results in the exclusion of evidence clearly probative of the parties' understanding of their obligations. Examination of the circumstances which give rise to the agreement, of the subsequent acts and communications which bear on the parties' intent at the time of contracting, are relevant to show the intended meaning of a provision in a contract.

*Accord* II Williston on Contracts § 30:6 (4th ed.).

Recently, in *Russell v. Citigroup, Inc*., 748 F.3d 677 (6th Cir. 2014), the Sixth Circuit restated this traditional principle of contract interpretation as follows: "A court must interpret a provision in a contract not in isolation, but against the backdrop of 'the contract as a whole, . . . the situation of the parties and the conditions under which the contract was written.'" (*quoting* <u>Frear v. P.T.A. Industries, Inc.</u>, 103 S.W.3d 99, 106 (Ky. 2003).

These established concepts were not altered by *Tackett*. Indeed, the majority opinion held that the primary purpose of contract interpretation is to "ascertain the intention of *the parties*." 135 S. Ct. at 935 (emphasis in opinion).

### B.   CASE CORPORATION UNDERSTOOD FROM THE BEGINNING THAT RETIREE HEALTH BENEFITS WERE VESTED, LIFETIME BENEFITS

There is an undisputed fact in this case that is unique and one that sets it apart from all reported cases on collectively bargained retiree health care benefits. When Case first agreed to provide fully paid health benefits to hourly retirees in the 1971 negotiations, it announced precisely what it had agreed to do for retirees. Immediately following the 1971 negotiations, C.J. Divine, Case's Director of Benefits and Practices, told retirees that, after they passed away, their surviving spouses were entitled to medical insurance coverage "for the remainder of [their] lifetime."

Mr. Devine participated in the 1971 negotiations as one of three management representatives on Case's Benefit Subcommittee. (Plaintiffs motion for summary judgment, R.129, Ex. 44). After the conclusion of those negotiations, Mr. Devine wrote a letter to "Retirees of J. I. Case Company Retired Under the Hourly Employee Pension Plan" about the "details of the Group Medical Insurance you are eligible for January 1, 1972, as a J. I. Case Retiree or Surviving Spouse of a Retiree." (Plaintiffs' motion for summary judgment, R.129, Ex. 19, Lojeski Dep. Ex. 8).[1]

---

[1] Fuller details surrounding this correspondence are set forth in Plaintiffs' 2007 motion for summary judgment. (R.129 at 15-17).

Mr. Devine wrote the letter in a question and answer format because, he wrote, that would "be the most understandable and anticipating the questions most of you have in mind."  He added: "Because this letter contains considerable important information, please read it carefully and keep it for future reference."[2]

Question 3, posed by Mr. Devine, was "Will a Premium be Required?"  Case's "answer" was: "Retirees and Surviving Spouses, age 65 or older, are not required to pay a premium, either for themselves or any dependent.  Instead, the coverage shall be fully paid by the Company."

Question 9, posed by Mr. Devine was: "Will my spouse be able to keep this coverage if I pass away?"  Mr. Devine assured Case retirees: "If you have elected the Spouse's Optional Form of Pension and your spouse will receive a pension as a result, your spouse will be able to keep this coverage for the remainder of her lifetime."

A contracting party's understanding of its contractual obligations, revealed in word or deed, is a significant, if not controlling, indicator of intent and the meaning of the contractual words chosen. *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118 (1913) ("the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed

---

[2] Virginia Clark, the surviving spouse of retiree Merlin Clark, kept this letter for more than *thirty* years before she produced it during the *Yolton* litigation. Copies of Mr. Devine's letter and the envelope it came in, addressed to her deceased husband, are attached as Exhibit A.

of great, if not controlling, influence"); *Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269 (1877)("There is no surer way to find out what parties meant, than to see what they have done.").

Although so powerful as to be a sufficient indication of Case's intent, Mr. Devine's 1971 letter to retirees is simply the first of a multitude of similar expressions by Case of its intent spanning more than a quarter of a century. *See e.g., Reese*, R.214 at 21-22 (citing exhibits); *Yolton*, 318 F. Supp.2d at 469-70; 435 F.3d at 583.

Nearly 20 years after he unambiguously expressed Case's intent, Mr. Divine participated in the 1990 negotiations as Case's Benefit Manager. At the conclusion of the 1990 negotiations, Mr. Divine wrote to the surviving spouse of a disabled employee who had died at age 53, making her ineligible for a pension and therefore, ineligible for continuing health care benefits. He told the surviving spouse that, during the 1990 negotiations, the company had agreed to extend the same healthcare coverage to her as "those provided to other surviving spouses of deceased retirees . . . ." He added: "You will have these coverages for your lifetime." (Plaintiffs' Motion for Summary Judgment, R.129, Ex. 61, also attached as Ex. B).

As the court stated in its 2007 decision granting Plaintiffs' motion for summary judgment in *Reese*, the operative language remained "substantially identical" through the 1998 CBA. (R.214 at 13-14). The court also cited evidence that, for "almost a decade" *after* 1993, "Case's representatives understood that retirees and their

10

surviving spouses were entitled to lifetime medical insurance benefits and they conveyed this understanding to retirees and surviving spouses." (R.214 at 21-22).[3]

Nothing in *Tackett* required the district court to turn a blind eye to what it already knew to be undisputed, contemporaneous and consistent evidence of Case's actual intent. To the contrary, *Tackett* specifically instructs courts to apply "ordinary principles of contract law." 135 S. Ct. at 933, 935. *Tackett* relied heavily on Williston on Contracts for its recitation of these principles, including a citation to II Williston on Contracts §30:6, p. 108 (4th ed. 2012) addressing "clear and unambiguous" contract language. 135 S. Ct. at 933. In that section, Williston elaborated on the correct principle to be applied:

> While unambiguous contract language is generally interpreted without resort to extrinsic evidence, it need not be interpreted in a vacuum; the underlying goal in interpreting a contract is to ascertain the intent of the parties, and the surrounding circumstances when the parties entered the contract, among other relevant considerations, may well shed light on that intent.

II Williston on Contracts § 30:6 (4th ed.) (footnotes omitted).

The practical construction, or the parties' conduct under the agreement, is "highly significant" evidence of the parties' intent. *Alabama v. North Carolina,* 560 U.S. 330, 346 (2010). What Case said the CBA language meant in 1971 when it first agreed to that language, is part of the "surrounding circumstances that "sheds light"

---

[3]Plaintiffs summarized that evidence in its initial Motion for Summary Judgment. R.129, at 16-26.

on Case's intent.  It is "highly significant" of Case's intent precisely because it discloses exactly what Case understood its obligation to be at the time it negotiated the operative CBA language. If the underlying goal is to ascertain Case's intent, as *Tackett* requires, the District Court erred in not considering that evidence.

*Tackett* also allowed that a "court may look to known customs or usages in a particular industry to determine the meaning of a contract," but the "parties must prove those customs or usages using affirmative evidentiary support in a given case." 135 S. Ct. 935.  Indeed, *Tackett* left intact *Carbon Fuel Co. v. United Mineworkers*, 444 U.S. 212 (1979) where the Supreme Court directed that "special heed" should be given to the context of collective bargaining when interpreting CBAs. *Tackett* merely instructs that the "context" must be proved by record evidence, rather than through generalized inferences found in *Yard-Man*.[4]

In this case, Plaintiffs proved, by overwhelming affirmative evidentiary support, the actual "customs and usage" of the *contracting* parties – that Case understood and consistently represented to retirees and surviving spouses that retiree

---

[4] *Tackett's* criticism of *Yard-Man* was that its use of an inference favoring vesting of retiree benefits "distorts the attempt 'to ascertain the intention of the parties." *Id*. at 935.  *Tackett* did not foreclose the consideration of probative evidence that supports a conclusion that can be drawn from those facts, for example, that the parties intended, by tying benefits to pensions, to provide benefits for the period that a retiree receives a pension.  Such a conclusion must be drawn from affirmative facts, "shorn of presumptions." *Id*. at 937.

health benefits lasted for their "lifetime."[5] The meaning that a party attributes to an obligation assumed under a CBA, especially when it does continuously after the obligation is assumed, is more direct and probative of the contracting parties' intent than any evidence of the "custom or usage" in a particular industry.

The District Court's failure to consider Mr. Devine's 1971 letter, and the other probative evidence it earlier cited as supporting the "plain meaning" of the CBA, necessarily means that its September 28 decision is suffused with a "palpable defect."

### C.   IN 1998, CASE AGREED TO PROVIDE "UNCAPPED" BENEFITS BEYOND THE EXPIRATION OF THE CBA

The second contract fact that demonstrates a "palpable defect" in the court's September 28 decision is the elimination of the FAS 106 medical cap letter during the 1998 negotiations.[6]  The elimination of the medical cap letter is compelling evidence that Case understood and agreed that its obligation to provide fully paid retiree health care benefits indefinitely *beyond* the expiration of the 1998 CBA.

The background facts were recited by the district court in its prior decisions in

---

[5]It was a shared custom and usage. For example, after the 1990 negotiations, Mr. Devine sent Plaintiff Jack Reese, a UAW International Representation, a copy of his letter to Reba Williams, confirming that she, like other surviving spouses, was now entitled to "lifetime" medical insurance coverage. (See Exhibit B).

[6] In their initial Motion for Summary Judgment and throughout the litigation, the *Reese* Plaintiffs have asserted that the elimination of the FAS Medical Cap Letter in 1998 conclusively proved that Case was obligated to provide uncapped, lifetime benefits. (*See e.g.*, R.129 at 12-14; Reply Brief, R.192 at 3).

*Yolton* and *Reese*. On about November 5, 1993, Case and the UAW agreed to extend the 1990 CBA through February 5, 1995. (R.214 at 5). Section 9 of that Extension Agreement, entitled "FAS 106 Out-Year Cost Limiters," refers to a "Letter of Agreement" as Attachment B. That Letter of Agreement states in full:

> This will confirm our understanding that the average per capita annual cost to the Company of providing medical and related benefits under the Case Group Benefit Plan to retired employees and surviving spouses of deceased employees shall not exceed $2,750 for Medicare eligible individuals and $8,500 for those individuals who are not eligible for Medicare. Notwithstanding the foregoing, no covered person shall be required to pay a portion of any excess amount prior to April 1, 1998. (R.214 at 5-6).

Shortly after the 1993 negotiations, Tenneco (Case's parent) spun off Case through an initial public offering (IPO) that became effective July 1, 1994. Under the Reorganization Agreement between Tenneco and Case, Tenneco assumed liability for health benefits for pre-IPO Case retirees. Case was responsible for health benefits for employees retiring after July 1, 1994. *See generally, Yolton*, 435 F.3d at 575-76.

In the 1995 negotiations, the UAW and Case agreed to retain the FAS 106 Letter but extended the stated effective date of the dollar caps from to January 1, 1999, again beyond the expiration date of the new 1995 CBA. (R.214 at 6).

On October 27, 1997, El Paso (the successor to Tenneco) informed pre-IPO retirees that it intended to require contributions from them beginning April 1, 1998 pursuant to the "cost-sharing" provisions of the medical cap letter. *Yolton v. El Paso*

14

*Tennessee Pipeline Co.*, 2008 U.S. Dist. LEXIS 17619 (E.D. Mich., Mar. 7, 2008), slip opinion at 8. In other words, El Paso announced its intention to enforce the dollar caps set forth in the 1993 FAS Cap Letter on the date set forth in that Letter.

The UAW objected strenuously to El Paso's assertion that the FAS 106 Letter was a "cost sharing" agreement.[7] In the negotiations that followed shortly after El Paso's announcement, Case's initial proposals were that the medical cap letter be maintained. For example, on March 2, 1998, Case proposed to the UAW that the parties "maintain current letter." (R.273-20 at 12).[8] Case proposed to maintain the existing medical cap letter in proposals through at least March 28, 1998. (*See* R.273-22 at 2, 8; R.273-23 at 3).

Toward the end of negotiations, Case revised its position on the medical cap letter. On April 22, 1998, Case proposed that the effective date of the cost "caps" be suspended until July 1, 2004 -- more than six years in the future and after the expiration of the 1998 CBA. (R.273-25 at pages 5, 17). Case reiterated this proposal in its April 23, 1998 proposal to the UAW. (R.273-26, at 6, 17).

---

[7] See the district court's discussion of the UAW's response to El Paso's October 1998 announcement in its order granting the *Yolton* Plaintiffs' Motion for Summary Judgment. *Yolton*, 2008 U.S. Dist. LEXIS 17619, slip opinion at 21-22.

[8] This proposal and the ones cited in the following paragraphs, as well as the 1998 Tentative Agreement, are exhibits to the Declaration of Jack Reese, which in turn is filed at R.273- 2. Mr. Reese describes the 1998 negotiations pertaining to the elimination of the medical cap letter at paragraphs 38-41 and 46 of his Declaration.

The UAW and Case reached a Tentative Agreement later on April 23, 1998. (R.273-51).  Under the heading "Post IPO Retiree Benefits/Payments," that agreement provides: "Medical cap letter between the parties is eliminated." (*Id*. at 10).  Later on in the Tentative Agreement, in Attachment "E," the Benefit Detail section, the parties reiterated that agreement: "Post-IPO Retiree Medical Cap Letter - Delete." (*Id*. at 25).

These circumstances surrounding the 1998 negotiations are clearly relevant and probative, even assuming the language of the 1998 CBA were unambiguous. *See* II Williston on Contracts §30:6 (4th ed.); *Williams v. Fenix & Scission, Inc*., 608 F.2d 1205, 1210-11 (9th Cir. 1979)(Kennedy, J, concurring).  Case's proposal to extend the medical cap letter would have required Case to pay the full cost of retiree benefits through a date beyond the term of the 1998 CBA.  By definition, this is evidence that Case's obligation extended *beyond* the expiration of that agreement.  The elimination of the future medical cost cap is probative evidence of Case's agreement to pay the *full cost* of retiree benefits *beyond* the *post*-CBA effective date (July 1, 2004) of its proposed cap.  It is convincing, if not controlling, evidence that Case's continuing obligation for retiree benefits was unlimited both in duration *and* in cost.

In its 2007 Opinion, the district court recognized the significance of the FAS 106 medical cap letters.  It stated that those letters "only set forth caps on Case's future cost for benefits" and that, "[p]ursuant to the express terms of the letters, those cost-controlling caps were to take effect only after the expiration of the then current

16

Central Agreement." (R.214 at 19). The district court added that "[t]his supports Plaintiffs' claim that retiree health insurance benefits were intended to continue after the termination date of the [CBA]." (*Id.*). It undoubtedly does. And, because it supports that conclusion, judicial consideration of the significance of the medical cap letters and their negotiated elimination in 1998 is critical to determining the meaning of the 1998 CBA.

According to *Tackett*, the critical question is whether the parties intended retiree "benefits [to] continue after the agreement's expiration." *Tackett*, 135 S. Ct. at 937; *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 203 (1991). Negotiated cost caps that only become effective after the contract expires are evidence that Case's obligation to provide retiree benefits "continued after the [1998] agreement's expiration." By agreeing to the *elimination* of those *post*-CBA cost caps in 1998, Case understood that its continuing obligation to provide retiree benefits was *not* limited by any future, post-CBA dollar caps.

In *Cole v. ArvinMeritor, Inc.*, 2006 U.S. Dist. LEXIS 61003 (E.D. Mich. 2006), *aff'd* 549 F.3d 1064 (6th Cir. 2008), the court agreed with this analysis. The court addressed medical cost cap letters that had formulas for determining future company cost contributions for retiree health benefits. The court concluded that those letters evidenced an intent to vest benefits because "cost controlling caps are future oriented and govern retiree health care benefits for decades beyond the expiration of the

17

agreements in which they appear." *Id.* at 25.

The district court's recent decision -- that Case had no obligation to retirees after the 1998 CBA expired -- places Plaintiffs in a far worse position than if the UAW had *accepted* Case's last proposal to suspend the caps until July 1, 2004. If the UAW had accepted that proposal, the *worst* case scenario is that retirees would be entitled to fully paid benefits *beyond* the expiration of 1998 CBA and then, beginning July 1, 2004, capped benefits thereafter. Because the UAW *rejected* Case's proposal to limit its post-CBA obligation and Case agreed to eliminate the medical cap letter entirely, the parties intended Case's *post*-contract obligation to pay the full cost of retiree benefits indefinitely.

*Tackett* did not alter the significance of this contractual fact. Another "cardinal principle of contract construction [is] that a document should be read to give effect to all of its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton,* 514 U.S. 52, 63 (1995).

The negotiated elimination of the medical cap letter, twice memorialized in the Tentative Agreement, is an integral part of the 1998 CBA. It unambiguously discloses the intent of Case and the UAW concerning the duration of Case's contractual obligation to retirees. When Case abandoned its proposal for *post*-CBA cost cap and agreed to eliminate the medical cap letter, Case necessarily agreed to pay the full cost of retiree benefits -- not simply to a specific date beyond the term of the

18

1998 CBA, but indefinitely thereafter. Any other construction of the parties' agreement would render the UAW's demand for the elimination of the medical cap letter – and Case's agreement to that demand – meaningless.

In its recent decision, the district court did not refer to the circumstances surrounding the elimination of the FAS 106 medical cap letters or consider the significance of those undisputed facts. By failing to do so, the court could not possibly discern the actual intent of the parties.

### D. CBA LANGUAGE TYING HEALTH BENEFITS TO LIFETIME PENSIONS IS RELEVANT EVIDENCE OF A LIFETIME OBLIGATION

Given the undisputed facts discussed above, the Court's September 28 decision negates, rather than enforces, the intent of the parties. But, even if there were some ambiguity in the meaning of the CBA language, Plaintiffs are at least entitled to present their evidence at trial.

A contract is ambiguous, and extrinsic evidence admissible, if a reasonable person would find the contract susceptible to different or inconsistent interpretations. *Cogent Solutions Group, LLC v. Hyalogic*, *LLC*, 712 F.3d 305, 310 (6th Cir. 2013). Here, we have the remarkable situation where the same court, in separate decisions, holds that the *same* language conferring health care benefits on retirees has two entirely *contradictory* meanings.

In *Yolton*, 318 F. Supp. 2d 455 at 468, the district court held that the "parties'

19

intent" in the operative retiree language was "clear based on the express language of the various labor agreements."  In affirming, the Sixth Circuit held that "the plain language of the CBAs requires us to conclude that the district court did not abuse its discretion by issuing the injunction . . . ." 435 F.2d at 583.

As the Sixth Circuit held in *Yolton*, neither it nor the district court relied on the *Yard-Man* inference for their conclusion. Instead, those courts applied "basic rules of contract interpretation." *Id*.  As the Sixth Circuit stated: "the [district] court's analysis does not in any way rely on an inference.  Instead, the district court interpreted the language of the agreement and found evidence that the defendants intended to confer lifetime benefits upon the plaintiffs." *Id.*

In *Reese*, in its order granting Plaintiffs' motion for summary judgment, the District Court did not mention the *Yard-Man* inference, either in its recitation of the governing law (R.214 at 12-13) or in its application of the governing legal principles to the facts. (*Id*. at 13-23).  Instead, the district court relied on the "plain meaning of the relevant agreements, further supported by extrinsic evidence," as demonstrating Case's intent to grant lifetime health benefits to retirees and surviving spouses of retirees eligible for or are receiving a pension. (*Id*. at 22-23).

The district court and the Sixth Circuit *Yolton* both relied on the "tie" of health benefits to pension benefits in the CBAs as evidence that retiree health benefits were intended to last as long as pension benefits, that is, for life. *Yolton*, 318 F. Supp.2d

20

at 466; 435 F.3d at 580.  Both courts relied on *Golden v. Kelsey Hayes Co.*, 73 F.3d 648, at 656 (6th Cir. 1996), not *Yard-Man*, for that interpretive principle. *See Yolton*, 435 F.3d at 580. Although the District Court apparently believes that *Tackett* held otherwise, *Tackett* did not reject the "tied to pension" interpretive concept.

The majority opinion in *Tackett* did not hold that pension tying can never be evidence of an intent to vest benefits.  That majority's criticism of the Sixth Circuit's approach on this issue was limited to language in *Noe v. PolyOne Corp.*, 520 F.3d 548 (6th Cir. 2008), where the Sixth Circuit stated that CBA language that "ties eligibility for retirement-health benefits to eligibility for a pension . . . [leaves] little room for debate that retirees' health benefits ves[t] upon retirement." *Tackett*, 135 S. Ct. at 935 (*quoting Noe*, 520 F.3d at 558).

*Tackett's* criticism of *Noe* was its holding that pension-tying language is dispositive of the parties' intent.  While not conclusive, such language is certainly relevant and should be considered in connection with the entire record, which includes Mr. Divine's 1971 letter and the 1998 elimination of medical cost cap letter. A court can only truly determine the "intent of the parties" by weighing all of the probative evidence.

The continuing viability of the "tied to pension" concept is demonstrated by the *Tackett* concurrence.  The concurrence stated that, on remand, the lower court must determine whether the parties intended the benefits to vest without employing any

inferences favoring the retirees.  But, the concurrence stated, "[b]ecause the retirees have a vested, lifetime right to a monthly pension, . . . a provision stating that retirees 'will receive' health-care benefits if they are 'receiving a monthly pension' is relevant to this examination." [9]

In the post-*Tackett* decision of *UAW v. Kelsey-Hayes*, Case No. 11-CV-14434, 2015 U.S. Dist. LEXIS 124411 (E.D. Mich., Sept. 17, 2015), Judge Steeh concluded that language in a CBA similar to that in *Golden v. Kelsey-Hayes* conferred vested benefits on retirees.  Judge Steeh cited *Tackett* for the proposition that ordinary principles of contract interpretation must be applied to the interpretation of CBAs, without inferences favoring the retirees. (Slip opinion at 19).  Although Judge Steeh noted that promises to provide vested benefits must be clear, he also noted that *Tackett* recognized that a "CBA's general duration clause is not necessarily inconsistent with the 'express or implied' terms that may promise 'that certain benefits continue after the agreement's expiration.'" *Id.*, *quoting Tackett*, 135 S. Ct. at 937.  For this proposition, *Tackett* (and Judge Steeh) cited *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 203 (1991).  As Judge Steeh noted, "[a]ll

_____

[9] If the majority in *Tackett* had decided that CBA language tying retiree health benefits to pensions was insufficient to survive summary judgment, it would have simply reversed and entered judgment for the employer.  Instead, the majority remanded for reconsideration in light of its opinion.  In its recent decision, the district court closed a door on the retirees that *Tackett* left open.

collectively-bargained vested benefits are promised in limited-duration CBAs with general duration clauses." (*Id*. at 20-21).

Addressing the operative CBA language, Judge Steeh concluded that the retiree health benefits had vested and granted summary judgment to the plaintiffs. He based this conclusion on CBA language providing that the health care coverages an employee had "at the time of retirement shall be continued" *Id*. at 20, and that similar promises of continued benefits were made to surviving spouses. Judge Steeh found that these promises of "continuance" contrasted with other contract provisions in the same CBA that, unlike the retiree health provisions, had specific durational limits. According to Judge Steeh: "This shows that when the parties intended to make certain benefits of a limited duration, they expressly provided as much in the contract." *Id*.

In *Yolton*, the district court and the Sixth Circuit employed a similar contractual analysis, noting that, in the CBAs at issue here, there is no limitation on the duration of retiree health benefits, while there are durational limits on other benefits. 318 F. Supp.2d at 466-67; 435 F.3d at 582-83. Because the 1998 CBA contains substantially identical provisions with specific durational limits, the same analysis applies here. In its recent decision, the district court did not mention this salient contractual fact, one that, as Judge Steeh concluded, supports a finding that retiree health care benefits survive the expiration of the CBA.

As Judge Steeh concluded, *Tackett*, in rejecting the *Yard-Man* inference, did

23

not substitute a presumption in favor of employers. Collective bargaining agreements must be construed according to traditional rules of contract interpretation. Here, given the two contractual facts cited above, there is no question about what Case intended, from 1971 through 1998 and beyond. By ignoring those two critical undisputed facts, the District Court committed manifest error.

## V.   CONCLUSION

The District Court relied on *Tackett* to overturn his prior judgment that the plain language of the CBAs provided for vested benefits. But, *Tackett* does not address the actual, undisputed facts pertaining to the history of health benefits for hourly Case retirees, the language of the relevant CBAs, or the context of the relevant UAW/Case negotiations.

From the very beginning, Case understood that the CBA provided for lifetime health benefits. Contemporaneously with the agreement on the contract language, Case's Director of Benefits told retirees what the CBA language meant: "If you have elected the Spouse's Optional Form of Pension and your spouse will receive a pension as a result, your spouse will be able to keep this coverage for the remainder of her lifetime."

Here, when El Paso announced its decision to apply the cost caps, the UAW insisted that Case agree to the elimination of the post-CBA cost caps. By so agreeing, Case necessarily abandoned, as well, any argument that its continuing, *post*-CBA

obligation for retiree health care benefits was limited either in scope *or* duration in the future.

The district court misapplied the principles set forth in *Tackett*. By entering summary judgment in favor of Case, the District Court negated, rather than ascertained, the intent of the contracting parties. Based on the undisputed facts, even under the principles set forth in *Tackett*, Plaintiffs are still entitled to summary judgment. At the very least, they are entitled to a trial.

Respectfully submitted,

McKNIGHT, McCLOW, CANZANO,
SMITH & RADTKE, P.C.

By:  /s/Roger J. McClow
Roger J. McClow (P27170)
Darcie R. Brault (P43864)
Attorneys for Class Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI  48034
(248) 354-9650
dbrault@michworklaw.com

Dated: October 13, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2015, I electronically filed the foregoing document with the Clerk of the Court using the ECF system.

Respectfully Submitted,

McKNIGHT, McCLOW, CANZANO,
SMITH & RADTKE, P.C.

By:  /s /Roger J. McClow
Roger J. McClow (P27170)
Darcie R. Brault (P43864)
Attorneys for Class Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI  48034
(248) 354-9650
dbrault@michworklaw.com

Dated: October 13, 2015