UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK REESE, JAMES
CICHANOFSKY, ROGER MILLER,
and GEORGE NOWLIN on behalf of
themselves and a similarly situated
class,

                Plaintiffs,

v.                                                              Civil Case No. 04-70592
                                                                Honorable Patrick J. Duggan

CNH INDUSTRIAL N.V. and CNH
INDUSTRIAL AMERICA, LLC,

                Defendants.

_____/

**OPINION AND ORDER (1) GRANTING PLAINTIFFS' MOTION FOR
RECONSIDERATION [ECF NO. 447]; (2) VACATING THE COURT'S
SEPTEMBER 28, 2015 JUDGMENT [ECF NO. 446]; (3) DENYING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 423];
(4) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
[ECF NO. 419]; AND DENYING AS MOOT PLAINTIFFS' MOTION TO
STRIKE [ECF NO. 428]**

On September 28, 2015, this Court issued a decision holding that the

Supreme Court's decision in *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926

(2015), required the reversal of this Court's previous holding– affirmed by the

Sixth Circuit Court of Appeals– that Plaintiffs are entitled to lifetime vested retiree

health care benefits. *Reese v. CNH Industrial N.V.*, No. 04-70592, 2015 WL

5679827 (E.D. Mich. Sept. 28, 2015). The Court therefore entered a Judgment on

the same date, ruling in favor of Defendants and against Plaintiffs. (ECF No. 446.) Plaintiffs filed a motion for reconsideration pursuant to Eastern District of Michigan Local Rule 7.1 on October 13, 2015. (ECF No. 447.) At this Court's invitation, Defendants (hereinafter "CNH") filed a response to Plaintiffs' motion. (ECF No. 449.) The Court concludes that it in fact committed a palpable error in its September 28, 2015 decision, the correction of which results in a different disposition of the case. *See* E.D. Mich. LR 7.1(h)(3). As such, the Court is vacating the Judgment entered on the same date and proceeding to rule on the motions it found moot as a result of holding that Plaintiffs' retiree health insurance benefits did not vest.

## I.    Plaintiffs' Motion for Reconsideration

The Court's palpable error can be summarized as follows. In its most recent motion for summary judgment on the issue of vesting, CNH correctly asserted that this Court and the Sixth Circuit previously relied on inferences repudiated in *Tackett* when concluding that Plaintiffs are entitled to vested retiree health care benefits. CNH incorrectly asserted, however, that the only conclusion to be reached once those inferences are removed is that the parties intended Plaintiffs' retiree health insurance benefits to terminate with the 1998 Central Agreement. According to CNH, the Supreme Court in *Tackett* set forth "*new* rules of construction that now govern, in all circuits, the determination of whether retiree

health benefits are vested." (ECF No. 439 at Pg ID 11606, emphasis added.) In fact, *Tackett* did not create new rules for construing collective bargaining agreements. Instead, the Supreme Court in *Tackett* simply rejected the inferences set forth in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), and its progeny, and reaffirmed that collective bargaining agreements are interpreted "according to ordinary principles of contract law . . .." *Tackett*, 135 S. Ct at 933. CNH failed to apply those ordinary principles of contract law to the relevant agreements in its motion for summary judgment– a mistake this Court repeated in reaching its September 28, 2015 decision. Now applying those principles, this Court concludes that Plaintiffs are entitled to vested retiree health insurance benefits.

As the Supreme Court re-emphasized in *Tackett*, a court's objective when interpreting any contract, including a collective bargaining agreement, is to "give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010); *Tackett*, 135 S. Ct. at 933 (quoting *Stolt-Nielsen*, 559 U.S. at 682) (" 'In this endeavor, as with any other contract, the parties' intentions control.' "). " 'Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.' " *Tackett*, 559 U.S. at 682 (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)). The Court is confident that it

3

may rely on Justice Ruth Bader Ginsburg's elaboration of "ordinary contract principles" in her concurrence in *Tackett* (despite CNH's warning otherwise), particularly as Justice Ginsburg relies on the same treatise used by the majority as the source of these principles:

> Under the "cardinal principle" of contract interpretation, "the intention of the parties, to be gathered from the whole instrument, must prevail." 11 R. Lord, Williston on Contracts § 30:2, p. 27 (4th ed. 2012) (Williston). To determine what the contracting parties intended, a court must examine the entire agreement in light of relevant industry-specific "customs, practices, usages, and terminology." *Id*., § 30:4, at 55-58. When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further. *Id.*, § 30:6, at 98-104. But when the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties. *Id*., § 30:7, at 116-124.

135 S. Ct. at 937-38 (Ginsburg, J., concurring); *see also Brooklyn Life Ins. Co of New York v. Dutcher*, 95 U.S. 269, 273 (1877) ("There is no surer way to find out what parties meant than to see what they have done.").

Contrary to CNH's contention in its summary judgment motion, the absence of clear and express language vesting Plaintiffs' health insurance benefits in the relevant agreements does not necessarily compel the conclusion that the parties lacked the intent for those benefits to vest.  Imposing such a requirement on collective bargaining agreements in general, or ERISA welfare benefits in particular, strays from the ordinary contract principles that *Tackett* instructs courts to apply in construing those agreement.  As the Supreme Court has previously

4

stated, duties in a contract may arise from its express or *implied* terms.  *See Litton Fin. Printing Div., Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 203 (1991).

CNH overstates the significance of the *Tackett* Court's single reference to *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998).  The Court refers to the standard applied in *Sprague* only to "underscore[] *Yard-Man*'s deviation from ordinary principles of contract law."  *Tackett*, 135 S. Ct. at 937.  It is important to remember, as well, that *Sprague* did not involve bargained-for benefits; instead, the benefits at issue in that case were specifically characterized as unilaterally offered benefits.  *Sprague*, 133 F.3d at 393, 402-03.  Perhaps more importantly, if the *Tackett* Court intended to require clear and express vesting language to find the parties' intent to vest, why would it have not simply held that the Pension, Insurance, and Service Award Agreement at issue in the case before it- which lacked such express language- did not confer vested benefits?  Instead, the Supreme Court remanded the case to the court of appeals.  *Tackett*, 135 S. Ct. at 937.

This Court indicated in its September 28, 2015 decision that it "did not find a manifestation of intent to confer lifetime benefits in this case."  *Reese*, 2015 WL 5679827, at *10.  After tossing aside the *Yard-Man* inferences employed earlier by this Court and the Sixth Circuit in this case and in *Yolton v. El Paso Tennessee Pipeline Co.*, 318 F. Supp. 2d 455 (E.D. Mich. 2003), *aff'd* 435 F.3d 571 (6th Cir.

5

2006), this Court then concluded "that its prior determination that the parties

intended to confer lifetime healthcare benefits is no longer viable in light of the

Supreme Court's intervening decision in *Tackett*."  *Reese*, 2015 WL 5679827, at

*10.  The Court committed a palpable error by being too haste in reaching this

conclusion.  For the lack of a clear manifestation of the parties' intent in the

collective bargaining agreement did not negate the possibility that there was

ambiguity regarding their intent.  Yet, the Court neglected to consider this

possibility.[1]  And as Plaintiffs argue in their motion for reconsideration, if the

contract is ambiguous, the Court should have considered the "substantial extrinsic

evidence . . . demonstrat[ing] that the UAW and Case intended to provide retirees

and surviving spouses fully funded, lifetime health insurance benefits."[2]  (ECF No.

447, quoting *Yolton*, 318 F. Supp. 2d at 468); *see also Yolton*, 435 F.3d at 583.

---

[1] *Tackett* does advise "that courts should not construe ambiguous writings to create lifetime promises."  135 S. Ct. at 936 (citation omitted).  This Court erred in taking this direction to the opposite extreme: construing an ambiguous writing to create no lifetime promise.  As long-standing principles of contract interpretation instruct, where a contract is ambiguous, extrinsic evidence may resolve that ambiguity.
[2] CNH's motion for summary judgment on the issue of vesting did not go further than arguing that once the inferences established in *Yard-Man* and its progeny are set aside, the Court must conclude that the parties did not intend Plaintiffs' health insurance benefits to vest.  Because, in fact, the Court's inquiry should not end there, the Court could find that CNH has not established its entitlement to summary judgment based on its argument that *Tackett* requires a reversal of the prior conclusion that Plaintiffs are entitled to vested retiree health insurance benefits.

There are several reasons why this Court now finds an ambiguity in the relevant agreements.

As an initial matter, the Court erred in reading *Tackett* as "suggest[ing] that courts should not rely on language tying eligibility for contribution-free healthcare benefits to the receipt of pension benefits." *See Reese*, 2015 WL 5679827, at *9. All that *Tackett* holds or suggests is that a court may not *infer* from such tying language that the parties intended retiree health insurance benefits to vest. Such language does not lose all significance, however. In other words, *Tackett* does not hold that courts must ignore language that under *Yard-Man* and its progeny inferred an intent to vest. To the contrary, *Tackett* advises courts to apply "ordinary principles of contract law[,]" 135 S. Ct. at 933; and under those principles, " 'the intention of the parties' " is "gathered from the *whole instrument . . ..*" *Id*. at 937 (Ginsburg, J., concurring) (emphasis added).

When the relevant agreements were negotiated, the parties were aware that pension benefits vest for the life of the retiree. *See, e.g., Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 89 (1983) (citing 29 U.S.C. §§ 1051-1086) (explaining that ERISA "imposes participation, funding, and vesting requirements on pension plans). By tying eligibility for retiree health insurance benefits to eligibility for pension benefits, the parties may have been expressing their intent for health insurance benefits to survive for the same duration. In other words, so long as an

7

individual is eligible to receive a pension benefit, he or she continues to be eligible for the retiree health insurance benefits promised in the agreements.

Similarly, the absence of contract language specifically setting forth the duration of retiree health insurance benefits does not dictate automatically that the agreement's general durational clause applies to those benefits. Without doubt, the *Tackett* Court criticized the Sixth Circuit's expansion of *Yard-Man* in *Noe v. PolyOne Corp.*, 520 F.3d 548 (6th Cir. 2008), where the Sixth Circuit concluded that " '[a]bsent specific durational language referring to retiree benefits themselves,' a general durational clause *says nothing* about the vesting of retiree benefits." *Tackett*, 135 S. Ct. at 934 (quoting *Noe*, 520 F.2d at 555 ) (emphasis added in *Tackett*). Nevertheless, the *Tackett* Court did not hold that in the absence of specific durational language a general durational clause *says everything* about the vesting of retiree benefits. If this had been the meaning of the Court's holding– where the contract at issue lacked a specific durational clause for retiree health insurance benefits– why remand the case to the Sixth Circuit with instructions to apply ordinary rules of contract law to determine whether the parties intended those benefits to survive the contract's expiration? *Tackett*, 135 S. Ct. at 937.

It is true that generally " 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id*. (quoting *Litton*, 501 U.S. at 207). It is equally true, however, that the expiration of a contract does not

8

release the parties from obligations that are fixed under the contract, but have not been satisfied. *Litton*, 501 U.S. at 206 (explaining that "an expired contract has by its own terms released all its parties from their respective contractual obligations, *except* obligations already fixed under the contract but as yet unsatisfied.") (emphasis added).

Whether the parties intended certain obligations to survive the agreement's expiration is, again, determined by looking at the contract as a whole. Notably, here, the 1998 Central Agreement states that the group insurance plan *and the pension plan* "run concurrently with this Agreement . . .." (ECF No. 439-4 at Pg ID 16755.) Yet no one contends that the company's obligation to provide pension benefits ceased upon the expiration of the agreement. Further, under the heading "Provisions Applicable to Employees Retired on Company Pension and Surviving Spouses Receiving Company Pension", the 1998 Group Insurance Plan provides:

> Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for the Group benefits as described in the following paragraphs. *All other coverages cease coincident with the date of employment termination due to retirements . . ..*

(ECF No. 439-3 at Pg ID 16688, emphasis added.) Among the benefits "described in the following paragraphs" are group health insurance benefits for retirees, for which "[n]o contributions are required[.]" (*Id.* at Pg ID 16688-16690.) At the very least, these provisions create an ambiguity with respect to the parties' intent. The

inclusion of specific durational clauses for other benefits but not pension plan and retiree health insurance benefits further raises an ambiguity with respect to the parties' intent as to the duration of the latter benefit.

Other agreements between the parties further support a finding that the parties intended retiree health insurance benefits to vest. For example, in the Group Benefit Plan made effective with the 2005 negotiations between the parties and developed through the 2005 Central Agreement, retirees and surviving spouses of retirees *who retired on or after December 1, 2004*, were required to contribute towards their medical plans per a contribution schedule. (*See* ECF No. 125-18 at Pg ID 4530, 4557.) If the parties did not intend for retiree health care benefits to vest in the agreements preceding the 2005 agreement (i.e., if they intended for coverage to expire with the prior agreements), why limit contributions to post-December 1, 2004 retirees? The agreements this Court has referred to as "the 1993 Cap Letter", "the 1995 Cap Letter", and "the 1998 Letter of Understanding" offer further proof. (*See* ECF No. 125-6 at Pg ID 4438; ECF No. 125-8 at Pg ID 4650; ECF No. 125-11 at Pg ID 4306.) As this Court has previously found, these agreements reflect the parties' intent to vest retiree health care benefits which were provided in the 1998 collective bargaining agreement and preceding agreements. *See Reese v. CNH Global N.V.*, No. 04-70592, 2007 WL 2484989, at *7-9 (E.D. Mich. Aug. 29, 2007).

10

In short, as a result of the Supreme Court's decision in *Tackett*, courts may no longer rely on the inferences set forth in *Yard-Man* and its progeny when evaluating collective bargaining agreement to discern the intent of the parties with respect to the vesting of retiree health insurance benefits. This Court and the Sixth Circuit in fact relied on many– although not all– of those inferences when evaluating the agreements relevant to this case. Once those inferences are removed, however, *Tackett* instructs that courts still must employ "ordinary principles of contract law" to assess the parties' intentions-- which "control." *Tackett*, 135 S. Ct. at 933 (quotation marks and citation omitted). This Court committed a palpable error in its September 28, 2015 decision when it cast aside the now outlawed inferences from its previous analysis, but then failed to re-evaluate the relevant agreement according to those ordinary principles of contract law. Having done so now, the Court finds at least an ambiguity with respect to whether the parties intended Plaintiffs' health insurance benefits to vest. Accordingly, the Court may look to extrinsic evidence to ascertain their intent. As this Court has previously discussed and held, the extrinsic evidence supports a finding that the parties intended to grant Plaintiffs vested, lifetime retiree health insurance coverage. Therefore, the Court is granting Plaintiffs' motion for reconsideration and vacating its September 28, 2015 Judgment in favor of CNH.

11

Having reached this conclusion, the Court now must address the issue for which the Sixth Circuit remanded the matter: a determination of whether CNH may make the changes it proposes to those vested benefits.  *See Reese v. CNH Am. LLC*, 694 F.3d 681 (6th Cir. 2012) ("*Reese II*").

## II.    Cross-Motions for Summary Judgment on the Issue of Reasonableness

Following *Reese II*, CNH submitted a new plan proposing changes to Plaintiffs' health insurance benefits and the parties engaged in discovery relating to the factors the Sixth Circuit instructed this Court to consider on remand in assessing the plan's reasonableness.  In April 2014, after the conclusion of discovery, the parties filed cross-motions for summary judgment with respect to the reasonableness of CNH's proposed plan.  (ECF Nos. 419, 423.)  In addition, Plaintiffs filed a motion to strike the declarations of defense experts John F. Stahl and Scott J. Macey.  (ECF No. 428.)

The *Reese II* panel instructed this Court as follows regarding its task on remand– a task that the panel described as a "vexing one," *Reese II*, 694 F.3d at 686:

> To gauge whether CNH has proposed reasonable modifications to its healthcare benefits for retirees, the district court should consider whether the new plan provides benefits "reasonably commensurate" with the old plan, whether the changes are "reasonable in light of changes in health care" (including access to new medical procedures and prescriptions) and whether the benefits are "roughly consistent with the kinds of benefits provided to current employees." *Reese I*, 574 F.3d at 326.  In doing so, the district court should take evidence

12

on the following questions (and others it considers relevant to the reasonableness question):

- [1] What is the average annual total out-of-pocket cost to retirees for their healthcare under the old plan (the 1998 Group Benefit Plan)? What is the equivalent figure for the new plan (the 2005 Group Benefit Plan)?

- [2] What is the average per-beneficiary cost to CNH under the old plan? What is the equivalent figure for the new plan?

- [3] What premiums, deductibles and copayments must retirees pay under the old plan? What about under the new plan?

- [4] How fast are the retirees' out-of-pocket costs likely to grow under the old plan? What about under the new plan? How fast are CNH's per-beneficiary costs likely to grow under each?

- [5] What difference (if any) is there between the quality of care available under the old and new plans?

- [6] What difference (if any) is there between the new plan and the plans CNH makes available to current employees and people retiring today?

- [7] How does the new plan compare to plans available to retirees and workers at companies similar to CNH and with demographically similar employees?

*Id.* at 685-86. The first five considerations focus on whether CNH's proposed plan to change Plaintiffs' retiree health insurance benefits is "reasonably commensurate" with the current plan. The sixth consideration focuses on whether the benefits provided under the proposed plan are "roughly consistent with the kinds of benefits provided to current employees." Finally, the seventh

13

consideration focuses on whether the proposed changes are 'reasonable in light of changes in health care." The Court addresses these issues in turn.[3]

## A. Is the Proposed Plan "Reasonably Commensurate" with the Current Plan?

### 1. Analysis[4]

In considering whether CNH's proposed plan is "reasonably commensurate" with the current one, the Court is cognizant of the definition of "commensurate." One dictionary defines the word as "equal in measure or extent" and "corresponding in size, extent, amount, or degree." Webster's Ninth New Collegiate Dictionary 264 (1991). Synonyms for "commensurate" are:

---

[3] Before proceeding, the Court addresses Plaintiffs' motion to strike the declarations of defense experts John F. Stahl and Scott J. Macey. Plaintiffs argue that the declarations should be stricken because: (1) they exceed the scope of previously-submitted declarations; (2) they exceed the scope of, and are inconsistent with, Stahl's and Macey's deposition testimony; (3) statements made by Stahl and Macey in their declarations are not based on personal knowledge; and (4) the declarations otherwise do not meet the requirements of the Federal Rules of Evidence. CNH opposes each argument and urges the Court to deny Plaintiffs' motion. Because the Court ultimately is granting summary judgment in favor of Plaintiffs and against CNH, the Court construes the facts throughout this Opinion in the light most favorable to CNH. In doing so, the Court considers the declarations (with one exception specifically noted). As the declarations do not change the result, the Court is denying Plaintiffs' motion to strike as moot.

[4] All of the data discussed in this section of the Opinion is supplied by CNH's expert, John F. Stahl, a senior consulting actuary at Towers Watson. In construing the facts in the light most favorable to CNH, the Court assumes the accuracy of the data Stahl provides.

14

> Proportionate (she was not paid commensurate with her experience and ability).  Corresponding, compatible, in accord, fitting, on a proper scale, commensurable, parallel, appropriate, equivalent, in keeping with, relative, analogous, synchronous, coordinate, coterminous, adequate, equal, on a scale suitable, coextensive, balanced, symmetrical, congruous, matching, in agreement, comparable, consistent, due.

William Statsky, West's Legal Thesaurus Dictionary: Special Deluxe Ed. 151 (1986).

Considerations [1] and [4], above, require the Court to compare the average total out-of-pocket costs to retirees under both plans, now and in the future.  The average annual out-of-pocket cost to pre-Medicare participants under the current plan is $269 in 2015, $377 in 2022, and $596 in 2032.[5]  The average annual out-of-pocket cost to pre-Medicare participants under the proposed plan (including annual premium contributions) is estimated at $3,286 in 2015, $9,345 in 2022, and $21,615 in 2032.  Under the current plan, pre-Medicare participants would pay less than 1.5% of the plan costs, with CNH paying over 98.5% of the plan costs, every year from now until at least 2032.  Under the proposed plan, pre-Medicare participants would pay 19.2% of the costs of the plan in 2015, with CNH paying 80.8%.  In 2022, pre-Medicare participants would pay 34.9% of the plan costs, with CNH paying 65.1%; and in 2032, pre-Medicare participants would pay 46.8%

---

[5] Retirees make no premium contributions under the current plan.

of the costs of the plan, with CNH paying 53.2%.  The following chart and graph

illustrate the data discussed in this paragraph:

### Comparison of Out-of-Pocket Costs to Pre-Medicare Participants Under Current and Proposed Plans

|  | Current Plan | | Proposed Plan | |
|---|---|---|---|---|
|  | **Average Annual Out-of-Pocket Cost to Retiree** | **Share of Costs Paid by Retiree** | **Average Annual Out-of-Pocket Cost to Retiree** | **Share of Costs Paid by Retiree** |
| **2015** | $269 | 1.5% | $3,286 | 19.2% |
| **2022** | $377 | 1.5% | $9,345 | 34.9% |
| **2032** | $596 | 1.5% | $21,615 | 46.8% |



The average annual out-of-pocket cost to Medicare-eligible participants

under the current plan is $159 in 2015, $239 in 2022, and $417 in 2032.  The

average annual out-of-pocket cost to Medicare-eligible participants under the

proposed plan (including annual premium contributions) is estimated at $2,512 in 2015, $3,735 in 2022, and $7,017 in 2032.  Under the current plan, Medicare-eligible participants would pay less than 3% of the plan costs, with CNH paying over 97% of the plan costs, every year from now until at least 2032.  Under the proposed plan, Medicare-eligible participants would pay 64.5% of the costs of the plan in 2015, with CNH paying 35.5%.  In 2022, Medicare-eligible participants would pay 69% of the plan costs, with CNH paying 31%; and in 2032, Medicare-eligible participants would pay 74.9% of the costs of the plan, with CNH paying only 25.1%.  The following chart and graph illustrate the data discussed in this paragraph:

**Comparison of Out-of-Pocket Costs to Medicare-Eligible Participants Under Current and Proposed Plans**

| | Current Plan | | Proposed Plan | |
|---|---|---|---|---|
| | **Average Annual Out-of-Pocket Cost to Retiree** | **Share of Costs Paid by Retiree** | **Average Annual Out-of-Pocket Cost to Retiree** | **Share of Costs Paid by Retiree** |
| **2015** | $159 | 2.7% | $2,512 | 64.5% |
| **2022** | $239 | 2.7% | $3,735 | 69% |
| **2032** | $417 | 2.6% | $7,017 | 74.9% |



Considerations [2] and [4], above, require the Court to compare the average per-beneficiary cost to CNH under the current and proposed plans, now and in the future.  CNH's costs under the current plan for each pre-Medicare participant are projected to be $17,935 in 2015, $25,148 in 2022, and $39,749 in 2032.  Under the proposed plan, CNH's costs for each pre-Medicare participant are projected to drop to $13,871 in 2015, $17,407 in 2022, and $24,570 in 2032.  This data is illustrated in the following chart and graph:

**Average Annual Costs to CNH of Each Pre-Medicare Participant**

|  | Current Plan | Proposed Plan | Savings Per Participant |
|---|---|---|---|
| **2015** | $17,935 | $13,871 | $4,064 |
| **2022** | $25,148 | $17,407 | $7,741 |
| **2032** | $39,749 | $24,570 | $15,179 |



CNH's costs under the current plan for each Medicare-eligible participant are estimated to be $5,752 in 2015, $8,701 in 2022, and $15,322 in 2032. Under the proposed plan, CNH's costs for each Medicare-eligible participant drop dramatically to $1,380 in 2015, $1,681 in 2022, and $2,352 in 2032. This data is illustrated in the following chart and graph:

**Average Annual Costs to CNH of Each Medicare-Eligible Participant**

|  | **Current Plan** | **Proposed Plan** | **Savings Per Participant** |
|---|---|---|---|
| **2015** | $5,752 | $1,380 | $4,372 |
| **2022** | $8,701 | $1,681 | $7,020 |
| **2032** | $15,322 | $2,352 | $12,970 |



Consideration [3], above, requires the Court to compare the premiums, deductibles, and copayments that participants must pay under the current and proposed plans. The Court addresses the related concepts of coinsurance and out-of-pocket maxima, as well.

**Premiums**. Retirees make no premium payments under the current plan. The proposed plan imposes premium sharing under which participant premium payments grow each year. According to CNH's data, the proposed plan calls for premium contributions in 2015 of $1,410 per year for pre-Medicare retirees and $120 per year for Medicare-eligible retirees, compared to no premiums under the current plan. In subsequent years, premium contributions under the proposed plan increase by 60% of the total cost increase of retiree medical coverage from one year to the next. According to CNH's data, annual premium contributions for pre-

Medicare participants will be $6,714 in 2022 (compared to $0 under the current plan) and $17,458 in 2032 (again, compared to $0 under the current plan).  For Medicare-eligible participants, premium contributions will be $572 in 2022 (compared to $0 under the current plan) and $1,578 in 2032 (again, compared to $0 under the current plan).  The following chart illustrates this data:

**Annual Premium Requirements Under the Current and Proposed Plans**

|  | Current Plan | | Proposed Plan | |
|---|---|---|---|---|
|  | Pre-Medicare Retirees | Medicare-Eligible Retirees | Pre-Medicare Retirees | Medicare-Eligible Retirees |
| **2015** | $0 | $0 | $1,410 | $120 |
| **2022** | $0 | $0 | $6,714 | $572 |
| **2032** | $0 | $0 | $17,458 | $1,578 |

**Deductibles, Copayments, Coinsurance, and Out-of-Pocket Maxima**.

Under the current plan, there are no deductibles for in-network services, and either no copayment or a $5 copayment for almost all services, after which 100% of the cost of the service is covered.  For out-of-network services under the current plan, there is a $100 per person, $300 per family deductible, after which insurance pays for 80% of the reasonable and customary charges for almost all services.  The out-of-pocket maximum for out-of-network services is $1,000 per person and $2,000 per family.

21

Under the proposed plan, pre-Medicare participants would pay a $200 per person, $400 per family deductible for in-network services, after which insurance would pay 85% of the reasonable and customary charges for most services, except there is no coinsurance and a $20 copayment for routine office visits and preventive care (allergy treatments, chiropractic, gynecologic exams, mammograms, primary care, mental health treatment, etc.).  There is a $1,000 per person, $2,000 per family out-of-pocket maximum; copayments and deductibles do not count toward meeting the out-of-pocket maximum.

For out-of-network services for pre-Medicare participants under the proposed plan, there is a $500 per person, $1,000 per family deducible, after which insurance would pay 65% of the reasonable and customary charges for almost all services, including routine office visits and preventive care.  There is a $2,000 per person out-of-pocket maximum.

Medicare-eligible participants under the proposed plan would pay a $250 per person, $500 per family deducible, after which insurance would pay for 80% of the reasonable and customary charges for almost all services, including most routine office visits (routine physicals are not covered).  There is a $1,500 per person, $3,000 per family out-of-pocket maximum; deductibles count toward meeting the out-of-pocket maximum.

22

The following chart compares the deductibles, copayments, coinsurance, and out-of-pocket maxima under the current and proposed plans.

**Material Terms of Healthcare Coverage
Under Current and Proposed Plans**

|  | **Current Plan – All Retirees** | **Proposed Plan – Pre-Medicare Retirees** | **Proposed Plan – Medicare-Eligible Retirees** |
|---|---|---|---|
| **Annual Deductibles** | *In-network*: $0 *Out-of-network*: $100 individual and $300 family | *In-network*: $200 individual and $400 family *Out-of-network*: $500 individual and $1,000 family | $250 individual and $500 family |
| **Post-Deductible Coverage (Coinsurance)** | *In-network*: 100% *Out-of-network*: 80% | *In-network*: 85% *Out-of-network*: 65% | 80% |
| **Copayments** | $5 | $20 (office visits) | None |
| **Annual Out-of-Pocket Maxima** | *In-network*: N/A *Out-of-network*: $1,000 individual and $2,000 family | *In-network*: $1,000 individual and $2,000 family *Out-of-network*: $2,000 individual | $1,500 individual and $3,000 family |

**Prescription Drug Coverage**.  Regarding prescription drug coverage, under the current plan, there is a $5 co-pay for a short-term (30 days or less) supply of generic or brand drugs, and no co-pay for a 90-day supply through the mail.  Under the proposed plan, prescription drug coverage is entirely eliminated for Medicare-eligible participants.  Pre-Medicare participants under the proposed plan would pay a $10, $40, and $60 co-pay for a short-term supply (30 days or less) of generic, formulary, and non-formulary drugs, respectively, and a $20, $80, and $120 co-pay

23

for a long-term supply (30-90 days) of generic, formulary, and non-formulary drugs, respectively.  Prescription co-pays do not count toward meeting the plan deductible or out-of pocket maximum.  The following chart illustrates this data.

**Prescription Drug Coverage Under Current and Proposed Plans**

| Current Plan – All Retirees | Proposed Plan – Pre-Medicare Retirees | Proposed Plan – Medicare-Eligible Retirees |
|---|---|---|
| Generic and Branded: $5 short term $0 long term | Generic: $10 short term $20 long term Branded (formulary): $40 short term $80 long term Branded (non-formulary): $60 short term $120 long term | No Coverage |

According to the data supplied by CNH's expert, pre-Medicare participants under the proposed plan will pay average annual out-of-pocket costs for prescription medicine of $1,118 in 2015 (compared to $149 under the current plan), $1,568 in 2022 (compared to $209 under the current plan), and $2,478 in 2032 (compared to $331 under the current plan).  Medicare-eligible participants will have to look to other sources for prescription coverage, namely, the Medicare Prescription Drug Plan (Part D), and are estimated to pay $2,102 in 2015 (compared to $124 under the current plan), $2,728 in 2022 (compared to $186 under the current plan), and $4,681 in 2032 (compared to $324 under the current plan).

24

Consideration [5], above, requires the Court to compare the quality of care available under the current and proposed plans.  The parties agree that the quality of care is comparable under both plans, except that the quality of care for Medicare-eligible participants is reduced under the proposed plan due to the unavailability of prescription drug coverage for that class of participants through the plan.  Aside from this, the parties agree that both plans cover services that are "medically necessary" for the care of the participant and offer the same suite of benefits.[6]

## 2.  Summary

The Court's analysis of the first five considerations above, all of which bear on whether the proposed plan is "reasonably commensurate" to the current plan, reveals that the plan proposed by CNH bears little resemblance to the current plan from a cost-sharing perspective.  In sum, Plaintiffs are far worse off under the proposed plan and the cost-shift proposed by CNH is extreme.  In 2015, out-of-pocket costs under the proposed plan are expected to be more than twelve times higher for pre-Medicare retirees than they would be for the same year under the

---

[6] Plaintiffs argue that the quality of care under the proposed plan will deteriorate with each passing year as participant cost of coverage increases, because Plaintiffs will forego medical treatment as it becomes increasingly unaffordable.  However, consideration [5] of the *Reese* framework requires the Court to compare the quality of care "available" under both plans.  The affordability of those services (i.e., their *practical* availability) is the subject of considerations [1] through [4], discussed above.

25

current plan and almost sixteen times higher for Medicare-eligible retirees. By 2032, the numbers become even more staggering. Pre-Medicare retirees are expected to pay out-of-pocket costs under the proposed plan that are more than thirty-six times those which they would be paying in 2032 under the current plan, and Medicare-eligible retirees are expected to pay costs that are almost seventeen times higher than those they would be paying under the current plan.[7]

In allowing "reasonable" modifications to Plaintiffs' vested healthcare benefits, this Court does not believe the Sixth Circuit had in mind anything near the magnitude of the changes proposed here. "Reasonably commensurate" changes must mean, at a minimum, changes that are not drastic. Because the cost changes proposed here are drastic, the Court does not believe that such changes can even arguably qualify as "reasonably commensurate."

Therefore, the Court concludes that the proposed plan is far from "reasonably commensurate"– or "equal in measure or extent"– to the current plan. Because the issue is not a close one, as CNH has opted to propose a plan that

---

[7] The Court is cognizant that the number of pre-Medicare retirees will decrease over time, and that there are expected to be only a handful of retirees remaining in the Class by 2032. However, there is no dispute that there will still be some pre-Medicare retirees in 2032 – thirteen by the parties' estimate. The Court does not ignore these unlucky thirteen retirees in its reasonableness analysis. In 2032, these thirteen retirees are expected to pay shockingly high average annual out-of-pockets costs of $21,615 – $1,801.25 per month – for their healthcare under the Proposed Plan.

drastically increases retiree costs with no meaningful mitigating benefit, the Court does not believe that this case requires it expand the meaning of "reasonably commensurate," as the parties urge, beyond the dictionary definitions articulated above.

Before proceeding to the next element of the *Reese* framework, the Court notes that CNH's reliance on *Tackett v. M&G Polymers USA, LLC*, 733 F.3d 589 (6th Cir. 2013), *vacated and remanded on other grounds*, 135 S. Ct. 926 (2015), is misplaced. In that case, the Sixth Circuit held, with no analysis, that the district court did not clearly err in finding the following modifications to healthcare benefits reasonable under the standard set forth in *Reese*: An increase in the co-pay for generic drugs from $4 to $10, an increase in the annual prescription drug deductible from $175 to $250, and an increase in the out-of-pocket maximum from $500 to $4,000 per family. *Id.* at 601. This aspect of *Tackett*'s holding is not helpful to CNH because the changes proposed by CNH in the present case are, considered cumulatively, more extreme than the changes approved in *Tackett*. Moreover, CNH's reliance on the case overlooks both the deferential standard of review employed by the *Tackett* court and the court's failure to offer any meaningful analysis in support of its conclusory holding.

27

## B.  Are the Benefits Under the Proposed Plan "Roughly Consistent With the Kinds of Benefits Provided to Current Employees"?

### 1.  Analysis

Pursuant to consideration [6] of the framework set forth in *Reese*, above, this Court must compare the benefits provided to current CNH retirees with the benefits that would be provided to Plaintiffs under the proposed plan, and determine whether the latter benefits are "roughly consistent with the kinds of benefits provided to current employees."

Current CNH retirees receive their benefits under a CBA which became effective in 2010.  The 2010 CBA is materially identical to the parties' prior CBA, which became effective in 2005.  The parties seem to agree that the two plans – the proposed plan and the plan available to current CNH retirees– are roughly equivalent.[8]  Because the two plans are roughly equivalent, CNH argues that this consideration of the *Reese* framework militates in favor of approving the proposed plan.

_____

[8] CNH points out that the premiums Plaintiffs would pay under the proposed plan always will be less than the premiums paid under the 2005 and 2010 CBAs by current retirees, as the premiums paid by current retirees began increasing each year since 2005 under an escalating premium schedule (i.e., 60% of the total cost increase of retiree medical coverage from one year to the next) while the premiums that Plaintiffs would pay under the proposed plan would not begin increasing until the proposed plan takes effect.  In other words, the premiums paid by current retirees had a "head start" on escalating and thus will always be higher than the premiums paid by Plaintiffs under the proposed plan, which would not begin escalating until the proposed plan becomes effective, if at all.

However, Plaintiffs argue that, although the plans themselves are similar, current CNH retirees are better off in terms of their overall healthcare situation than Plaintiffs would be under the proposed plan.  Plaintiffs argue that current retirees obtained significant benefit improvements that were successfully bargained-for and awarded under the 2005 and 2010 CBAs– benefit improvements which were meant to offset the effect of the significant reduction in healthcare benefits to individuals retiring under those agreements, and which would not be available to Plaintiffs under the proposed plan.  Plaintiffs discuss three mitigating benefits that are available to current retirees but would not be available to Plaintiffs under the proposed plan, arguing that the availability of these improvements to only current retirees and not to Plaintiffs makes the former group of retirees better off than the latter group in terms of their overall healthcare picture.

First, CNH agreed to a pension increase for post-2005 retirees.  According to Plaintiffs, current retirees receive $6,000 per year in additional supplemental allowance pension payments until age sixty-two and retirees who have been employed for at least thirty years receive an annual increase in basic pension benefits of $1,746 per year starting at age sixty-two and continuing for life.  CNH does not dispute this, although it points out that pension amounts are a function of pension rates and years of service and thus a current retiree who has less years of service may receive a smaller pension than a retiree in Plaintiffs' Class.

29

Nevertheless, CNH does not dispute that pension rates are higher for current retirees than for Plaintiffs.

Second, CNH agreed to increase the monthly Medicare Part B reimbursement benefit by $34.50, from $65.50 per Medicare participant (the amount Plaintiffs now receive) to $100 (the amount current retirees receive). This benefit improvement provides current retirees with an additional $414 per year (or $818 for married couples) beginning at age sixty-five and continuing for life, in order to offset the loss of CNH-sponsored prescription drug coverage for Medicare-eligible retirees. CNH does not dispute this improvement.

Third, CNH agreed to establish and contribute to Retiree Medical Savings Accounts (RMSA). According to Plaintiffs, CNH contributed a median amount of more than $16,000 for each retiree who retired after May 1, 2005 for a period of six years (i.e., during the term of the 2005 CBA). CNH does not dispute this, but states that it is not obligated to make any future contributions to retiree RMSAs going forward. Plaintiffs do not appear to disagree.

CNH asks the Court to ignore the three improved benefits awarded to current retirees as irrelevant to the analysis required under *Reese* because *Reese* requires a comparison of only the plans, and the improved benefits are not part of the plan. The Court rejects this rigid reading of *Reese*. When directing this Court to compare the healthcare plan offered to current retirees with the proposed

30

healthcare plan, the *Reese* panels may not have contemplated that benefits impacting retiree healthcare affordability could be awarded outside the four corners of the healthcare plans themselves. To consider only the two plans while ignoring other benefits impacting retiree healthcare affordability would result in a distortion of the full retiree healthcare picture.

Plaintiffs argue that the above three benefit improvements, which are available to current retirees but would not be available to Plaintiffs under the proposed plan, place current retirees in a better position than Plaintiffs would be under the proposed plan. However, the exact extent to which current retirees are better off by virtue of the three improvements depends on factors unique to each retiree (years of service, lifespan, etc.) and is difficult to quantify. For example, the three benefit improvements discussed above could have a value of $135,000 over the lifetime of a current retiree with over thirty years of service who lives until the age of eighty-two. If the employee retired at age fifty, he or she would receive twelve years of supplemental allowance pension payments in the annual amount of $6,000 per year (for a total of $72,000 over twelve years), twenty years of basic pension benefits in the annual amount of $1,746 (for a total of $34,920 over twenty years), seventeen years of increased Medicare Part B reimbursements (for a total of $7,038 over seventeen years), and $16,000 in contributions to an RMSA account. The value of the three benefit improvements would be altogether

31

different for a retiree with a different number of years of service and a different lifespan.

Another complicating factor is that, while current retirees enjoy some degree of benefit improvements that would be not offered to Plaintiffs under the proposed plan, thereby making current retirees better off than Plaintiffs would be under the proposed plan, the extent to which current retirees are better off (which is already unknown, as it depends on the unique circumstances of the retiree) is reduced by virtue of the fact that current retirees pay more for their benefits, through more expensive premiums, than would Plaintiffs under the proposed plan.

### 2.  Summary

As mentioned, this Court's task is to compare the benefits provided to current CNH retirees with the benefits that would be provided to Plaintiffs under the proposed plan, and to determine whether the benefits that would be provided to Plaintiffs under the proposed plan are "roughly consistent with the kinds of benefits provided to current employees."  While there is little difference between the two healthcare plans, the Court cannot ignore the fact that current retirees were awarded improved benefits outside the context of their healthcare plan– benefits that render current retirees better off than Plaintiffs would be under the proposed plan.  At the same time, although current retirees are entitled to benefits that are better than those that would be awarded to Plaintiffs, current retirees also pay more

32

for their benefits because their premiums are higher, and will always be higher, than those Plaintiffs would pay under the proposed plan.

The record does not reflect, beyond the next few years, how much less Plaintiffs would pay in premiums under the proposed plan, compared to how much current retirees pay in premiums under the 2005 and 2010 CBAs. Therefore, it is not possible to put a dollar amount on how much Plaintiffs would save in premiums and compare that amount to the value of the improved benefits awarded to current retirees, in order to determine who comes out "on top"– current retirees, who would pay more in premiums but have better overall benefits, or Plaintiffs, who would pay less in premiums but have worse overall benefits.

Assuming that the lifetime value of the improved benefits enjoyed by current retirees is in the same ballpark as the lifetime premium savings that would be enjoyed by Plaintiffs under the proposed plan, and because the healthcare plan offered to current retirees is similar to the proposed plan, the benefits available to Plaintiffs under the proposed plan are "roughly consistent with the kinds of benefits provided to current employees."

### C. Are the Proposed Changes "Reasonable in Light of Changes to Health Care"?

### 1. Analysis

In determining whether the changes proposed by CNH are "reasonable in light of changes to health care," the Court is obligated to consider how the

proposed plan compares to plans "available to retirees and workers at companies similar to CNH and with demographically similar employees."[9]  Predictably, Plaintiffs argue that the proposed changes are not reasonable in light of changes to healthcare, while CNH takes the opposite position.  Also unsurprisingly, both sides have selected comparator plans that support their respective positions.  That is, Plaintiffs have selected a comparator plan– one offered by one of CNH's principal competitors, John Deere– which is very similar to the current plan and much less favorable to retirees than the proposed plan.  The plan selected by Plaintiffs has no premiums, full coverage for in-network services, higher rates of coinsurance and lower deductibles for out-of-network services, and low copayments for office visits and prescription drugs.  CNH has selected several comparator plans– one of which is a plan offered by another of CNH's principal competitors, Caterpillar– which are similar to, or more favorable to, retirees than the proposed plan.  The Caterpillar plan features participant premium contribution requirements, higher deductibles and copayments, and lower rates of coinsurance.

---

[9] Plaintiffs strenuously object to this inquiry, insisting that plans offered by other companies are irrelevant in assessing the reasonableness of the modifications proposed here: "It would be difficult to more completely divorce the reasonableness inquiry from the context of the intent of the parties during collective bargaining, than to introduce the 'other similar companies' comparison as an element of 'reasonableness.' "  (ECF No. 419 at Pg ID 14067).  The Court agrees with Plaintiffs, but the Sixth Circuit's instructions are clear.

CNH does not dispute that the comparator plan selected by Plaintiffs, the John Deere plan, is similar to the current plan.[10]  CNH also does not dispute that John Deere is a company that is similar to CNH, with demographically similar employees.  Therefore, the Court deems the John Deere plan an appropriate comparator and concludes that the plan supports Plaintiffs' position that the current plan remains reasonable in light of changes to healthcare.

Apparently conceding that the John Deere plan supports Plaintiffs' position, CNH argues that "*Reese* does not require CNH's proposed plan to match the one plan most favorable to retirees" and that the comparator plan on which they principally rely, the Caterpillar plan, "is consistent with the trend in the marketplace toward greater participant cost-sharing."  (ECF No. 426 at Pg ID 15530).  The problem with CNH's argument is that if *Reese* does not require that the proposed plan match a comparator plan that is *favorable* to retirees, it also cannot require that the proposed plan match comparator plans, such as the ones selected by CNH, that are *unfavorable* to retirees.  Herein lies a problem with consideration [7] of the *Reese* framework requiring a comparison of the proposed

---

[10] In his declaration, defense expert Scott Macey makes certain representations about the John Deere plan – representations that Plaintiffs believe make the plan look less favorable to retirees than it is, and representations that Plaintiffs argue are factually incorrect.  However, in the pertinent section of their brief opposing Plaintiffs' motion for summary judgment, CNH does not cite Macey's representations about the John Deere plan and do not argue that the John Deere plan is dissimilar to the current plan.

plan with plans offered by "companies similar to CNH and with demographically similar employees": There are all kinds of healthcare plans offered by employers– plans like the current plan that are favorable to retirees, and plans like the proposed plan that are not favorable to retirees.  Naturally, the proposed plan will compare favorably to some plans and not to others, and the parties will surely locate the plans that support their respective litigation-induced positions and select those plans as comparators.  For this reason, comparing the proposed plan to other plans that have been cherry-picked by the parties sheds little or no light on changes in the provision of employer-sponsored healthcare benefits.

As mentioned, CNH relies on a healthcare plan offered by Caterpillar as its principal comparator.  Plaintiffs do not dispute that Caterpillar is a company that is "similar to CNH and with demographically similar employees" and that the Caterpillar plan is less favorable to retirees than the proposed plan.  However, Plaintiffs argue that the Caterpillar plan is not an appropriate comparator because the unfavorable benefit levels conferred in the Caterpillar plan stem, not from trends in the area of employer healthcare plans, but rather from the unique and contentious bargaining atmosphere and protracted negotiations between the union and Caterpillar.

Plaintiffs submit the declaration of James Atwood, an administrative assistant with UAW who participated in the negotiations between the union and

36

Caterpillar during the relevant time period. (ECF No. 425-2 at Pg ID 15007-08, ¶¶ 7-11). Atwood states that under the union's 1988 CBA with Caterpillar (and under prior CBAs), retirees received healthcare benefits with no premium contribution requirement. (*Id.* at Pg ID 15008, ¶ 12.) However, beginning in 1991 when the parties began negotiating a successor CBA, the negotiations broke down, employees began to strike, and a lengthy labor dispute ensued, at the beginning of which Caterpillar unilaterally imposed a "cap" on the costs that it would pay for retiree healthcare benefits. (*Id.* at Pg ID 15008-15009, ¶¶ 13-18.)[11] Throughout the labor dispute, which was a particularly litigious period in the relationship between UAW and Caterpillar, Caterpillar refused to eliminate the cap, prompting the union to take steps to address the impact of the cap on current and future Caterpillar retirees. (*Id.* at Pg ID 15009-15010, ¶¶ 19-23.) According to Atwood, in 2005, "the UAW was able to secure Caterpillar's agreement to vastly improve

---

[11] CNH's expert, Scott Macey, suggests in his declaration that UAW and Caterpillar agreed to the cap. (*See* ECF No. 423-22 at Pg ID 14920-21, ¶ 53.) However, unlike Atwood, Macey did not personally participate in the negotiations between UAW and Caterpillar. Because declarations must be based on personal knowledge and nothing in Macey's declaration indicates that he has personal knowledge of what occurred during the negotiations between UAW and Caterpillar, the Court disregards that portion of Macey's declaration as unreliable. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge . . ."); *Duke v. Nationstar Mortg., LLC*, 893 F. Supp. 2d 1238, 1244 (N.D. Ala. 2012) ("An affidavit or declaration based on anything less than personal knowledge is insufficient. . . . Additionally, the affidavit or declaration must state the basis for such personal knowledge.").

benefits for retirees and their dependents," including increased pension benefits, lump sum payments to existing retirees and surviving spouses, retirement bonuses, and increased Medicare Part B premium reimbursements– all benefits that were meant to offset an increase in retiree out-of-pocket healthcare costs.  (*Id.* at Pg ID 15010-15013, ¶¶ 24-25, 28-29.)

In light of the turbulent and unique bargaining history between UAW and Caterpillar, Plaintiffs argue that the Caterpillar plan is not an appropriate comparator because the benefit levels offered under the plan are a function of the distinct bargaining factors and dynamics between Caterpillar and the union, and not healthcare plan trends among companies similar to CNH.  Plaintiffs' argument highlights two additional problems with consideration [7] of the *Reese* framework calling for a comparison between the proposed plan and plans offered by similar companies.  First, although the inquiry is whether the proposed modifications are "reasonable in light of changes to health care"– an inquiry that is meant to take into account the degree to which the proposed modifications are consistent with trends in the area of employer-sponsored healthcare benefits– the level of benefits awarded under a given plan may have less to do with the climate the inquiry is meant to consider than with other factors that do not reflect trends in healthcare.  Stated differently, it is difficult to determine the extent to which the benefit levels

in a plan reflect healthcare trends as opposed to other factors that are irrelevant to the task at hand.

Second, examining a healthcare plan in a vacuum may not paint an accurate and complete picture of how well-off retirees are in terms of their healthcare situation.  This is because benefits awarded outside the context of the plan factor into the calculus, as well, and those other benefits, assuming the Court may permissibly consider them under the nebulous *Reese* framework, may escape detection.  For example, a healthcare plan with high participant costs may not translate into overall high participant healthcare costs if the high costs called for under the plan are mitigated through other benefits awarded outside the plan.  And the opposite also is true: A healthcare plan calling for low participant costs may not mean participant healthcare costs are low if less generous benefits are awarded outside the plan.

The Caterpillar plan on which CNH relies seems to implicate all of these concerns, calling into question whether the plan reflects the reality of the present-day healthcare market.  Moreover, although the principal comparator plan on which CNH relies is the Caterpillar plan, they also discuss many other comparator plans, including plans offered by AT&T, Ford, General Motors, U.S. Steel, Goodyear, and the federal judiciary.  According to CNH, these entities have implemented a cost-sharing approach similar to the approach taken in the proposed

39

plan and the benefit levels under these plans are similar to, or less generous than, the benefit levels offered in the proposed plan.  In addition, CNH cites a study in which Towers Watson, CNH's benefit consultant, compared the proposed plan with data aggregated in its database of nearly 900 employers.  CNH states that the proposed plan is more favorable to retirees than the plans offered by at least 75% of the nearly 900 employers surveyed from the perspective of the participants.

In their response brief, Plaintiffs vigorously attack the utility of CNH's information.  Plaintiffs state that the comparator companies on which CNH relies are not companies that are "similar" to CNH and are thus not appropriate comparators.  Plaintiffs also argue that the Towers Watson comparison is "devoid of meaning" for many reasons, including the following: (1) the study purposefully excludes unionized employers with collectively bargained plans, despite the availability of a database compiling information on such plans; (2) the study includes only plans that are provided to active employees and not plans that are provided to retirees; and (3) the database was not designed to find companies in the same industry as CNH.  Plaintiffs are correct.

*Reese* instructed the parties and this Court to compare the proposed plan with plans offered at "companies similar to CNH and with demographically similar employees."  Accordingly, the Court deems irrelevant plans offered by companies that are not shown to be "similar" to CNH with "demographically similar

40

employees."   CNH does not explain how entities like AT&T, Ford, General Motors, U.S. Steel, Goodyear, and the federal judiciary are similar to CNH with demographically similar employees.   In addition, because the  Towers Watson study analyzes plans offered by nearly 900 employers and there has been no showing that all 900 companies included in the study are "similar to CNH" and have "demographically similar employees," the study is irrelevant.

## 2.  Summary

In sum, comparing the proposed plan to plans offered by "companies similar to CNH and with demographically similar employees" does not shed light on whether the modifications proposed by CNH are "reasonable in light of changes to health care."  Among the many plans offered by employers, the parties have merely selected plans that match their respective litigation positions.  Plaintiffs selected a plan that is similar to the current plan and CNH selected plans similar to the proposed plan.  Even putting aside the cherry-picking concern, the full participant benefit picture cannot be gleaned from an examination of the healthcare plans alone, as benefits bearing on retiree healthcare costs are sometimes conferred outside the context of the healthcare plan.  Moreover, the process by which employee benefits are negotiated is a give-and-take process under which the bargaining parties may agree to forego healthcare benefits in exchange for other types of benefits, or bolster healthcare benefits in exchange for benefit reductions

in other areas.  Given these practical bargaining realities, the level of healthcare

benefits on which the bargaining parties finally settle provides little insight on

healthcare trends.

### D.    Conclusion

The Court has considered whether the proposed plan provides benefits that

are "reasonably commensurate" with the current plan, whether the benefits are

"roughly consistent with the kinds of benefits provided to current employees," and

whether the proposed changes are "reasonable in light of changes in health care."

Regarding the first consideration, the proposed plan imposes a massive cost-shift

from CNH to the retirees and is far from "reasonably commensurate" with the

current plan.  If approval of CNH's plan modifications requires satisfaction of all

three elements of the *Reese* reasonableness framework, [12] the Court rejects CNH's

proposed changes based solely on CNH's failure to satisfy this first element.

However, even if this Court is wrong about the conjunctive nature of the

reasonableness framework and the *Reese* panels envisioned a balancing approach

---

[12] *Reese* "construed [the 1998 CBA] to permit modifications to benefits plans that
are 'reasonably commensurate' with the benefits provided in the 1998 CBA,
'reasonable in light of changes in health care' and roughly consistent with the
kinds of benefits provided to current employees."  *Reese I*, 574 F.3d at 326
(quoting *Zielinski*, 463 F.3d at 620); *see also Reese II*, 694 F.3d at 685.  Based on
the panel's use of conjunctive language to articulate the test, the Court believes
that the proposed modifications, to be approved, must satisfy all three elements
comprising the reasonableness framework and that failure to satisfy one of the
elements requires rejection of CNH's proposed modifications.

whereby failure to satisfy one element should not necessarily result in the rejection of CNH's proposed modifications, the Court still rejects CNH's proposed modifications.  The first element of *Reese*'s reasonableness framework weighs strongly in favor of rejecting the proposed changes, so much so that the Court believes a strong showing by CNH on the remaining elements of the *Reese* framework would be necessary to tilt the balance in favor of approving the proposed changes.  CNH has failed to make such a showing.

With regard to the second element, whether the proposed benefits are "roughly consistent with the kinds of benefits provided to current employees," it is impossible to discern precisely how much better or worse Plaintiffs would be under the proposed plan, as compared to current retirees under the 2005 and 2010 CBAs.  Nevertheless, it appears that the two classes of retirees are in roughly similar positions in terms of their healthcare situation.  Because the evidence does not support a finding that one class is significantly better or worse than the other, this element of the *Reese* framework does not weigh strongly in favor of approving or rejecting the proposed modifications.

Regarding the third element of *Reese*'s reasonableness framework, whether the proposed changes are "reasonable in light of changes in health care," the relevant inquiry mandated by *Reese*– a comparison between the proposed plan and "plans available to retirees and workers at companies similar to CNH and with

43

demographically similar employees"– is problematic as a practical matter for all the reasons explained above.  This inquiry does not shed light on whether the proposed changes are "reasonable in light of changes in health care."  In any event, putting aside the utility of this inquiry, CNH has not shown that the proposed modifications are consistent with plans offered by "companies similar to CNH and with demographically similar employees" any more than Plaintiffs have shown that the proposed modifications are inconsistent with plans offered by "companies similar to CNH and with demographically similar employees."  This element does not weigh strongly in support of either side.

For these reasons, the Court concludes that the modifications proposed by CNH are not reasonable under *Reese*'s reasonableness framework and rejects the modifications.  CNH argues that the Court should sever the proposed modifications it finds unreasonable and approve the remainder of the modifications.  Conversely, Plaintiffs argue that the Court should consider the proposed plan as a whole and not approve or reject it in parts.  Nothing in the *Reese* decisions informs the debate on this issue.

Even if CNH is correct that this Court has authority to consider each modification separately, approving the reasonable proposed changes and rejecting the unreasonable ones, CNH does not argue that the Court must do so, and the Court declines to adopt this approach.  As Plaintiffs correctly point out, the

piecemeal approach urged by CNH, if adopted, would encourage employers to request modifications that are unreasonable, knowing that they can rely on a court to separately examine each proposed modification and tweak it so that it falls just within the hazy category of "reasonable."  It is not the role of a court to write or rewrite a healthcare plan, and incentivizing employers to suggest reasonable modifications while believing them to be unreasonable arguably encourages bad faith conduct.  In addition, courts lack the expertise necessary to fashion the specifics of a healthcare plan.  The Court does not believe *Reese* requires, or even contemplates, judicial scrutiny into such minute, yet important, plan details.

For all of the reasons stated above,ok

**IT IS ORDERED** that Plaintiffs' Motion for Reconsideration (ECF No. 447) is **GRANTED** and the September 28, 2015 Judgment (ECF No. 446) is **VACATED**;

**IT IS FURTHER ORDERED** that CNH's Motion for Summary Judgment (ECF No. 423) is **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (ECF No. 419) is **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike (ECF No. 428) is **DENIED AS MOOT**.

45

Date:  November 9, 2015                    s/PATRICK J. DUGGAN
                                           UNITED STATES DISTRICT JUDGE

Copies to:
Counsel of Record