# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: April 20, 2017

Ms. Darcie R. Brault
McKnight, Canzano, Smith, Radtke & Brault
423 N. Main Street, Suite 200
Royal Oak, MI 48067

Mr. Bobby Roy Burchfield
King & Spalding
1700 Pennsylvania Avenue, N.W., Suite 200
Washington, DC 20006

Mr. Douglas A Darch
Baker & McKenzie
300 E. Randolph Street, Suite 5000
Chicago, IL 60601

Re: Case No. 15-2382, *Jack Reese, et al v. CNH Industrial N.V., et al*
Originating Case No. : 2:04-cv-70592

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0092p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

JACK REESE; FRANCES ELAINE PIDDE; JAMES
CICHANOFSKY; ROGER MILLER; GEORGE NOWLIN,

*Plaintiffs-Appellees*,

*v.*

CNH INDUSTRIAL N.V.; CNH INDUSTRIAL
AMERICA, LLC,

*Defendants-Appellants*.

No. 15-2382

---

Appeal from the United States District Court for
the Eastern District of Michigan at Detroit.
No. 2:04-cv-70592—Patrick J. Duggan, District Judge.

Argued: October 19, 2016

Decided and Filed: April 20, 2017

Before: GIBBONS, SUTTON, and DONALD, Circuit Judges.

---

### COUNSEL

**ARGUED:** Bobby R. Burchfield, KING & SPALDING LLP, Washington, D.C., for Appellants.
Darcie R. Brault, MCKKNIGHT, CANZANO, SMITH, RADTKE & BRAULT, P.C., Royal
Oak, Michigan, for Appellees. **ON BRIEF:** Bobby R. Burchfield, KING & SPALDING LLP,
Washington, D.C., for Appellants. Darcie R. Brault, MCKKNIGHT, CANZANO, SMITH,
RADTKE & BRAULT, P.C., Royal Oak, Michigan, for Appellees. Douglas A. Darch, BAKER
& MCKENZIE LLP, Chicago, Illinois, for Amicus Curiae.

GIBBONS, J., delivered the opinion of the court in which DONALD, J., joined in the
judgment. DONALD, J. (pg. 15), delivered a separate opinion concurring in the result.
SUTTON, J. (pp. 16–24), delivered a separate dissenting opinion.

No. 15-2382                  *Reese, et al. v. CNH Indus.*                  Page 2

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge.  Defendants-appellants CNH Industrial N.V. and CNH Industrial America LLC (collectively "CNH") appeal the district court's order granting plaintiffs' motion for reconsideration.  The trial court reversed its grant of summary judgment for CNH and instead granted summary judgment for plaintiffs.  In this appeal, CNH again asks this court to find that plaintiffs' right to lifetime healthcare benefits failed to vest.  If, however, we were to find that plaintiffs' right had vested, CNH believes the district court erred in finding that CNH's proposed changes were not "reasonably commensurate" with plaintiffs' current plan.

This matter is complicated by a change in the law since this long-running litigation began.  In light of *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), which abrogated this circuit's *Yard-Man* line of cases, the district court had to revisit the question of whether plaintiffs had a vested right to lifetime healthcare benefits.  The court ultimately found that they did.  Because we find that the CBA is ambiguous, and because the extrinsic evidence indicates that parties intended for the healthcare benefits to vest for life, we affirm the district court's vesting determination.  Remand to the district court is proper, however, because it failed to properly weigh the costs and the *benefits* of the proposed plan, as instructed by *Reese II*.

I.

This case's long and complicated factual and procedural history has been recounted several times by this court and by the district court.  Plaintiffs, former employees of CNH who retired between 1994 and 2004, filed suit in the Eastern District of Michigan in 2004, seeking a declaration that they were entitled to lifetime healthcare benefits, an injunction requiring CNH to "maintain the level of retiree health care benefits currently in effect," and damages for injuries the retirees might sustain if the benefits were terminated.  *Reese v. CNH Am. LLC*, 574 F.3d 315, 319 (6th Cir. 2009) (*Reese I*).  In 1971, CNH (then known as Case Corporation) and the United Automobile, Aerospace, and Agricultural Workers of America ("UAW") entered into a collective-bargaining agreement ("CBA"), in which CNH agreed "to provide health-care

insurance to its retired employees and their spouses who were receiving a [pension or a spouse's pension]" from the company.  *Id.* at 318.  "From 1974 through 1995, each CBA (in three- or four-year terms) renewed this commitment in 'substantially unchanged' form, and each CBA provided that employees did not have to pay premiums in order to receive coverage." *Id.* (internal citations omitted).

In 1998, CNH and UAW entered into the CBA that generated this lawsuit.  *Id.*  That CBA was in effect until May 2, 2004, and provided that:

> Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for the Group benefits as described in the following paragraphs.

*Id.*  The paragraphs that followed listed the "Medical" and "Prescription Drug" benefits available to all classes of covered retirees regardless of the duration of their service before retirement.  *Id.* "The CBA does not spell out what 'Medical' benefits are included; it just says that eligibility for specific coverage will be based on each plan's eligibility requirements, and goes on to note that no contributions . . . are required for the Health Care Plans . . . ."  *Id.* (internal quotations and citations omitted.)

Ultimately, the district court and the *Reese I* court faced two questions: "Did [CNH] in the 1998 CBA agree to provide health-care benefits to retirees and their spouses for life? And, if so, does the scope of this promise permit CNH to alter these benefits in the future?"  *Reese v. CNH Am. LLC*, 694 F.3d 681, 683 (6th Cir. 2012) (*Reese II*).  In *Reese I*, this court answered both questions in the affirmative, but remanded to the district court so that it could determine "how and in what circumstances CNH may alter [the healthcare benefits] . . . ."  *Reese I*, 574 F.3d at 327.  On remand, the district court failed to reach the reasonableness question and did not create a factual record upon which this court could rule.  *Reese II*, 694 F.3d at 683. Instead, it found that CNH could not unilaterally make changes to the scope of plaintiffs' healthcare benefits, which was in conflict with our commands in *Reese I*.  Thus, the case was remanded to the district court again, this time with a list of seven factors to consider when

making its reasonableness-of-the-proposed-plan determination and with clear instructions that CNH could make unilateral changes to the plan.[1]  *Reese II*, 694 F.3d at 685–86.

While on this second remand, another unexpected wrinkle was added to this case when the Supreme Court abrogated this circuit's *Yard-Man* decision and its progeny.  *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 930 (2015) (*Tackett*).  Because *Yard-Man* created an inference in favor of employees in collective-bargaining cases, *Reese I*, 574 F.3d at 321, the district court was required to reconsider whether plaintiffs had a vested right to lifetime healthcare benefits.  Initially, the district court found that they did not, noting that it was "[c]onstrained by the Supreme Court's decision" in *Tackett*.  (DE 445, Op. & Order, Page ID 16912.)  However, on plaintiffs' motion for reconsideration, the district reversed course and found not only that plaintiffs' rights were vested even after *Tackett*, but also that CNH's proposed changes were unreasonable.  Thereafter, CNH filed this timely appeal.

## II.

We review the district court's grant of summary judgment *de novo*.  *Domingo v. Kowalski*, 810 F.3d 403, 410 (6th Cir. 2016) (citing *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 542 (6th Cir. 2014)).  Construing the evidence in the light most favorable to the nonmovant, *id.* (citing *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)), summary

---

[1] The seven factors are:

[1]  What is the average annual total out-of-pocket cost to retirees for their healthcare under the old plan (the 1998 Group Benefit Plan)? What is the equivalent figure for the new plan (the 2005 Group Benefit Plan)?

[2]  What is the average per-beneficiary cost to CNH under the old plan? What is the equivalent figure for the new plan?

[3]  What premiums, deductibles and copayments must retirees pay under the old plan? What about under the new plan?

[4]  How fast are the retirees' out-of-pocket costs likely to grow under the old plan? What about under the new plan? How fast are CNH's per-beneficiary costs likely to grow under each?

[5]  What difference (if any) is there between the quality of care available under the old and new plans?

[6]  What difference (if any) is there between the new plan and the plans CNH makes available to current employees and people retiring today?

[7]  How does the new plan compare to plans available to retirees and workers at companies similar to CNH and with demographically similar employees?

*Reese v. CNH Am., LLC*, 694 F.3d 681, 685–86 (6th Cir. 2012) (*Reese II*).

judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.

Before the Supreme Court decided *Tackett*, the rights created by collective-bargaining agreements were reviewed with a thumb on the scale in favor of employees.  *Tackett*, 135 S. Ct. at 935.  This doctrine, known most commonly as the *Yard-Man* inference, was the law in this circuit for more than thirty years.  And it was the law in effect when this court and the district court initially reviewed the rights at issue in this case.  In *Tackett*, the Supreme Court abrogated the *Yard-Man* inference and instructed courts to apply "ordinary principles of contract law" when reviewing collective-bargaining agreements.  *Id*. at 937.  Thus, the Supreme Court found, despite *Yard-Man* and its progeny's claim to the contrary, that we had not been employing ordinary contract-interpretation principles.  What is hard to disentangle, however, is how many, if any, of the contract principles created by the *Yard-Man* line of cases survive *Tackett*.  Presumably, not every contract-interpretation principle found in those cases impermissibly relied on inferences in favor of employees.  But, *Tackett* required us to revisit those old rules to weed out impermissible assumptions and inferences.

On remand from the Supreme Court, we interpreted the high Court's instructions, and noted the following, non-exhaustive list of ordinary principles of contract law:

• [A]s with any other contract, the parties' intentions control.

• Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.

• Although a court may look to known customs or usages in a particular industry to determine the meaning of a contract, the parties must prove those customs or usages using affirmative evidentiary support in a given case.

• [T]he written agreement is presumed to encompass the whole agreement of the parties.

• Courts [should] avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract. . . . [A] promise that is "partly" illusory is by definition not illusory.

• [C]ourts should not construe ambiguous writings to create lifetime promises. . . . [C]ontracts that are silent as to their duration will ordinarily be treated not as "operative in perpetuity" but as "operative for a reasonable time."

• [T]raditional rules of contractual interpretation require a clear manifestation of intent before conferring a benefit or obligation.

• Contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.

• When a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life.

*Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208 (6th Cir. 2016) (*Tackett III*) (citing *Tackett*, 135 S. Ct. at 933–37). The *Tackett III* court went on to cite additional principles highlighted by Justice Ginsburg's concurrence:

• Under the cardinal principle of contract interpretation, the intention of the parties, to be gathered from the whole instrument, must prevail.

• [W]hen the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties. . . . [F]or example, the parties' bargaining history.

• No rule requires "clear and express" language in order to show that parties intended health-care benefits to vest.

• Constraints upon the employer after the expiration date of a collective-bargaining agreement . . . may be derived from the agreement's "explicit terms," but they may arise as well from implied terms of the expired agreement.

*Id.* at 208–09 (citing *Tackett*, 135 S. Ct. at 937–38 (Ginsburg, J., concurring)). "Importantly," *Tackett III* noted, "the Court rejected *Yard-Man*'s inferences in favor of retirees, but also declined to adopt an 'explicit language' requirement in favor of companies." *Id.* at 209 (citing *Tackett*, 135 S. Ct. at 937–38 (Ginsburg, J., concurring)); *see also Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 203, 207 (1991) ("[A] collective-bargaining agreement [may] provide[ ] in explicit terms that certain benefits continue after the agreement's expiration," but nevertheless, "constraints upon the employer after the expiration date of a collective-bargaining agreement . . . may arise as well from the express or implied terms of the expired agreement itself."). Thus, relying heavily on Justice Ginsburg's concurrence, *Tackett III* removed presumptions in favor of vesting, but also explicitly declined to shift that presumption to the employer.

The *Tackett III* court then proceeded to discuss what effect the absence of any durational language has on the vesting of rights.  It held that:

> [W]hile the Supreme Court's decision [in *Tackett*] prevents us from presuming that "absent specific durational language referring to retiree benefits themselves, a general durational clause *says nothing* about the vesting of retiree benefits," we also cannot presume that the *absence* of such specific language, by itself, evidences an intent *not* to vest benefits or that a general durational clause says *everything* about the intent to vest.

*Tackett III*, 811 F.3d at 209.  The *Tackett III* court highlighted that the retirees in that case acknowledged that the agreements at issue lacked clear and express language vesting benefits, but still remanded the case to the district court so that it could determine whether certain documents were part of the agreements or "may otherwise serve as extrinsic evidence."  *Id.* at 210 & n.3.

While, in some cases, the presence of a general-durational clause will cure any ambiguity as to the duration of benefits, *see Gallo v. Moen, Inc.*, 813 F.3d 265, 268 (6th Cir. 2016) (finding that, due to the lack of a specific end date, the CBA's healthcare benefits should be governed by agreement's general-durational clause), the general-durational clause here does not.  This is so because the parties in this case carved out certain benefits, such as life insurance and healthcare insurance, and stated that those coverages ceased at a time different than other provisions of the CBA.   True, this provision says only that healthcare coverage continues past the date of retirement and is silent on whether the benefits continue past the termination date of the agreement.  But, when read in conjunction with the whole instrument, as *Tackett III* commands, this silence, rather than resolving ambiguity, furthers it.  We cannot, and should not, presume that the general-durational clause here says everything about the parties' intentions.  *Tackett III*, 811 F.3d at 209.

To find ambiguity in this case, partially from the silence as to the parties' intentions, does not offend the Supreme Court's mandate from *Tackett* that we not infer vesting from silence.  There is surely a difference between finding ambiguity from silence and finding vesting from silence.  The latter is impermissible after *Tackett*; the former permits the court to turn to extrinsic evidence to determine the intent of the parties—precisely the goal in any contract dispute.

Further, just as the Supreme Court has commanded that we not infer vesting from silence, it has directed us not to infer vesting from the tying of benefits to achievement of pensioner status.  But, as with silence, it has not directed us to ignore tying's ability to create ambiguity.  Here, healthcare benefits were tied to pension eligibility.  This, by itself, says little about whether those healthcare benefits should vest for life.  It does, however, create an ambiguity about the parties' intentions.  Inferring vesting from tying alone violates *Tackett* and ordinary principles of contract interpretation.  Finding an ambiguity from tying allows a court to explore the extrinsic evidence to discover what the parties actually intended.  This, as with silence, does not offend any principle of contract interpretation.  Instead, it moves us closer to the ultimate goal in any contract dispute: discovering the parties' true intentions.  *See Tackett III*, 811 F.3d at 208 (holding that the "cardinal principle of contract interpretation" should govern: what were the parties' intentions?) (citing *Tackett*, 135 S. Ct. at 937–38 (Ginsburg, J., concurring)).

Silence as to the duration of retiree healthcare benefits, when combined with those benefits' coupling to pensioner status and their segregation from other entitlements in the CBA, overcomes any presumption that the general-durational clause should govern.  *See id*. (noting also our limitation on presuming that a general-durational clause, by itself, conclusively answers the question of vesting).  If these elements were not present, or if the CBA clearly stated that the general-durational clause was intended to govern healthcare benefits, the CBA would most likely be unambiguous.  But this is not the case, and *Tackett III* prohibits us from relying exclusively on the general-durational clause to resolve this matter.[2]  Here, presuming that the CBA's general-durational clause says everything about the parties' intentions ignores evidence, taken from the whole instrument, indicating that the parties may have intended the benefits to extend beyond the end of the CBA.  Giving dispositive weight to the general-durational clause here would move the thumb from the employees' side of the scale and place it on the side of employers.  *Tackett*, however, sought to create a level playing field, not to foster an equally

---

[2]To the extent that *Tackett III* and *Gallo* are in conflict—a dispute about which reasonable minds may differ—*Tackett III*, being first in time, must govern.  To so hold is not an endorsement of *Tackett III*'s reasoning nor is it an indictment of *Gallo*'s; rather, it simply demonstrates adherence to this court's precedent.  *Darrah v. City of Oak Park*, 255 F.3d 301, 309–10 (6th Cir. 2001) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)); *see also* 6th Cir. R. 32.1(b) ("Published panel opinions are binding on later panels. A published opinion is overruled only by the court en banc.").

inequitable one.  Accordingly, we reach the extrinsic evidence in this case to determine the parties' intent.

The district court previously reviewed the extrinsic evidence and found that the plaintiffs' rights had vested.  The record supports the district court's finding.  For example, in an accounting document, CNH calculated the costs of certain retirees' benefits, and when determining healthcare costs, based the figure on the employees' life span.  It is unlikely that an employer would base the future cost of supplying an employee with healthcare insurance on the employee's life span, as CNH did here, if that employer knows that its healthcare obligations expire at a fixed date.  Further, CNH representatives repeatedly told the company's employees that retirees would have healthcare coverage for their lifetimes.  For example, in a June 18, 1990 letter to Reba Williams, the spouse of a deceased retiree, CNH informed her she would have medical insurance "coverage[] for [her] lifetime."  (DE 153, Exh. 61.)  And CNH intended to provide group insurance coverage to the spouses of retirees "in a consistent manner" to the way it handled Williams's claim.  (DE 154, Exh. 62.)  These and other examples in the record indicate that CNH, the retirees, and the retirees' spouses, intended and expected that the healthcare benefits provided were vested for life.

However, unless a CBA says otherwise, the vesting of healthcare rights does not prevent reasonable modifications to those rights.  *Reese I*, 574 F.3d at 325.  Thus, we must consider whether CNH's proposed changes are reasonable.  In *Reese II*, we remanded this case to the district court so that it could consider, again, whether the proposed changes to plaintiffs' plans were reasonable.  *Reese II*, 694 F.3d at 683.  In so doing, we listed seven non-exhaustive factors that the district court should consider.  *Id.* at 685–86.  Those factors were:

> [1] What is the average annual total out-of-pocket cost to retirees for their healthcare under the old plan (the 1998 Group Benefit Plan)? What is the equivalent figure for the new plan (the 2005 Group Benefit Plan)?
>
> [2] What is the average per-beneficiary cost to CNH under the old plan? What is the equivalent figure for the new plan?
>
> [3] What premiums, deductibles and copayments must retirees pay under the old plan? What about under the new plan?

[4] How fast are the retirees' out-of-pocket costs likely to grow under the old plan? What about under the new plan? How fast are CNH's per-beneficiary costs likely to grow under each?

[5] What difference (if any) is there between the quality of care available under the old and new plans?

[6] What difference (if any) is there between the new plan and the plans CNH makes available to current employees and people retiring today?

[7] How does the new plan compare to plans available to retirees and workers at companies similar to CNH and with demographically similar employees?

*Id*. On remand, and after reconsidering whether plaintiffs' rights had vested, the district court proceeded to consider these factors. It grouped the first five together and stated that these factors all pertain to comparing the proposed plan to the current plan. The district court then considered the two remaining factors at the end of its analysis: a comparison of the proposed plan to the plans CNH offers current employees and retirees and a comparison of CNH's proposed plan to other similar companies' plans.

The district court ultimately concluded that CNH's proposed plan was not reasonably commensurate with the current plan, relying primarily, if not exclusively, on the first five factors—specifically, the increased costs to plaintiffs under the proposed plan. The district court found that plaintiffs and current employees and retirees "are in roughly similar positions in terms of their healthcare situation," but yet found that this factor did not weigh strongly in favor of either party. It also found the final factor—the comparison between CNH's proposed plan and the plans offered by similar companies—did not weigh in favor of either party, and in its reasoning questioned the utility of this factor.

The district court's analysis erred in several ways, and remand is necessary to address these mistakes. *Reese II* made clear that the district court was to consider not only any increased costs to plaintiffs, but also any additional benefits that inured to them. *Reese II*, 694 F.3d at 685. Specifically, we asked the district court to determine if "the retirees' benefits differ in material respects from those offered to current employees and people retiring today," and whether the proposed changes to the plan "are reasonable in light of changes in health care (including access to new medical procedures and prescriptions)." *Id*. (internal quotations and citations omitted). Thus, while the district court held that the two plans provide roughly the same "quality of care"

because both provide coverage for "medically necessary" procedures, this ignores that, before a procedure can be medically necessary, it must be medically possible. As we noted in *Reese II*, "[n]ew and better medical procedures arise while others become obsolete. And it is the rare medical innovation that costs *less* than the one it replaces." *Reese II*, 694 F.3d at 683. Thus, "[r]etirees, quite understandably, do not want lifetime eligibility for the medical-insurance plan in place on the day of retirement, even if that means they would pay no premiums for it." *Id.* at 683–84. Instead, "[t]hey want eligibility for up-to-date medical-insurance plans, all with access to up-to-date medical procedures and drugs." *Id.* at 684. The district court's failure to consider the increased benefits, along with the increased costs, necessitates remand.

The district court focused heavily on cost-shifting provided for in the proposed plan. It did so with good reason: many of the *Reese II* factors dealt with changes in costs for CNH and for plaintiffs. In considering those changes in costs, however, the district court made several mistakes. For those Medicare-eligible plaintiffs, the district court considered only the costs shifted away from CNH, and apparently presumed that plaintiffs would foot this entire bill. Of course this is not true; a substantial portion of the costs shifted to Medicare-eligible plaintiffs will be covered by the federal government. Thus, the true cost-shifting is less than that highlighted by the district court.

The district court also erred by focusing too heavily on the future increased costs to non-Medicare-eligible plaintiffs. No plaintiff-retiree, and very few plaintiff-spouses, will be ineligible for Medicare in 2032. Thus, the most dramatic cost-shifting under the proposed plan is more paper tiger than realistic expectation. There are, however, thirteen plaintiffs—very young spouses of retirees—who would be ineligible for Medicare in 2032. These unlucky thirteen would be subject to drastic increases in costs for their healthcare, and the district court refused to ignore them in its reasonableness analysis. Although it was right to acknowledge this small subset of the class, the district court placed an undue amount of weight on their costs. In any institutional setting, there will be certain members who are harmed by policy decisions. These thirteen spouses fall into that camp.

Because the proposed plan was materially similar to the plan offered to current employees and retirees, while being less expensive to plaintiffs, the district court further erred in

finding that this factor did not favor either side. First, the mere fact that the proposed plan was equal in substance to the plan offered to current employees and retirees weighs in favor of reasonableness. *Reese II* asked the district court "[w]hat difference (if any) is there between the new plan and the plans CNH makes available to current employees and people retiring today?" *Reese II*, 694 F.3d at 686. Thus, this reasonableness benchmark asked the district court to determine if the proposed plan was similar to the current plans being offered by CNH. The district court found that it was. Second, not only does the proposed plan place plaintiffs in substantially the same position in terms of healthcare benefits as current employees and retirees, but plaintiffs also pay less for these same benefits.

The district court was motivated to find this factor in equipoise by looking to benefits that post-2004 employees and retirees received outside the healthcare-benefit context. For example, while their premiums are higher than those under the proposed plan, current employees and retirees also receive higher pensions and a one-time contribution to a health-savings account. Requiring consideration of these benefits, subsequently bargained for by UAW and CNH, would essentially grandfather all past-retirees into the new CBA from which they were explicitly excluded. Requiring an equal increase in plaintiffs' healthcare benefits for every benefit or concession won by current CNH employees is not part of the *Reese II* framework. The proposed plan must offer healthcare benefits similar to those received by current employees and retirees. It does not have to exceed this requirement to compensate plaintiffs for benefits to which they are not entitled. To do so would be not only unfair to CNH but also could have adverse consequences on future collective-bargaining agreements.

Finally, the district court erred in determining whether the proposed plan was reasonable in light of changes to healthcare. This factor asked the district court to review plans offered by "companies similar to CNH and with demographically similar employees." *Reese II*, 694 F.3d at 686. The district court discounted the utility of this factor, noting that "[n]aturally, the proposed plan will compare favorably to some plans and not to others, and the parties will surely locate the plans that support their respective litigation-induced positions and select those plans as comparators." (DE 450, Op. & Order, Page ID 17031.) Yet, even though it acknowledged the inherent biases of the parties' "cherry-picked" plans, the district court still used plaintiffs'

comparator as the basis for its decision.  (*Id.* at 17030, 17031.)  It is true that the last factor is less than clear about what qualifies as a "similar company" or what exactly is meant by "demographically similar employees," but this does not warrant ignoring as irrelevant the aggregate data of 900 companies.  Many of these companies are large corporations (Ford, General Motors, AT&T, etc.) that are similar to CNH, and, while not perfect comparators, this aggregate data is worthy of consideration.

The district court also held that it could not consider the reasonableness of the proposed plan in piecemeal fashion.  CNH challenges this holding and urges us to remand so that the district court can examine the proposed plan in this way.  There is no law directly on point, and neither *Reese I* nor *Reese II* addresses this directly.  There is language in both cases, however, that suggests that the court could permit the district court to sever the proposed plan and address each part individually.  CNH claims *Reese I* supports its position that the terms of the proposed plan may be severed and examined individually.  Specifically, it says that *Reese I*'s direction to the district court "to decide how and in what circumstances" CNH may alter such benefits suggests that the court may sever the terms.  *See Reese I*, 574 F.3d at 327.  Although not cited by CNH, language in *Reese II* also suggests that the terms may be severed.  There, the court held that the reasonableness inquiry here "is a vexing one" and that "if the parties cannot resolve the [issues] on their own, we (and the district court) will do our best to resolve it for them."  *Reese II*, 694 F.3d at 686.  Thus, we see no reason why the district court cannot examine individual terms of the proposed plan for reasonableness.  And, allowing the district court to determine which terms are reasonable, and which are not, might facilitate the settlement process between the parties and could lead to a quicker resolution of this long-running litigation.

On remand, the district court should reconsider the factors presented in *Reese II*, with special attention on the increased benefits to plaintiffs—including those benefits created by progress in medical procedures and prescriptions.  The district court should also consider how much of the cost to Medicare-eligible retirees will be borne by the federal government or others.  And lastly, the district court should reconsider whether the proposed plan is reasonable in light of the plans offered at similar companies—*i.e.*, large manufacturing corporations with union

No. 15-2382          *Reese, et al. v. CNH Indus.*          Page 14

representation.[3]  It should also look to the individual terms proposed and determine, if not reasonable on the whole, whether individual pieces of the plan are reasonable.

IV.

For the reasons stated above, we affirm the district court's finding that plaintiffs' right to lifetime healthcare benefits vested.  Remand is necessary, however, so that the district court can reconsider the reasonableness of CNH's proposed plan in light of *Reese I*, *II*, and the instructions they provide.

---

[3]The "demographically similar employees" language from this *Reese II* factor must do some work, and we believe comparing collectively-bargained-for agreements to collectively-bargained-for agreements, coupled with limiting the inquiry to large manufacturing corporations, will help ensure that the comparators are similar to CNH.

No. 15-2382                    *Reese, et al. v. CNH Indus.*                    Page 15

---

### CONCURRENCE

---

BERNICE BOUIE DONALD, concurring.  I agree with the lead opinion as to affirming the district court's vesting determination and, so, concur in the judgment.  I write separately, however, to reassert my disagreement with this Court's previous determination that despite a lifetime vesting, CNH may unilaterally modify the scope of the retirees' healthcare benefits.

In *Reese I*, the Court held that "to the extent [the district court] suggests that these benefits must be maintained precisely at the level provided for in the 1998 CBA, it is not supported by the 1998 CBA, extrinsic evidence provided by the parties or common sense." *Reese I*, 574 F.3d at 327.  The converse, that CNH may "reasonably" alter these benefits, however, is not supported by this Court or Supreme Court precedent.  As I noted in my dissent in *Reese II*, "[s]everal decisions of this Court, as well as Supreme Court precedent, express the principle that, once a retiree's health care benefits have vested for life, an employer's unilateral modification of the scope of those benefits is a violation of the Labor Management Relations Act."  *Reese II*, 694 F.3d at 687 (citing *Allied Chemical & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chemical Division*, 404 U.S. 187, 181 n.20 (1971); *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006)).  My review of this issue and the relevant law, unchanged by the Supreme Court's decision in *Tackett*, causes me to continue in my belief that because we have found that the retirees' healthcare benefits vested for life, "the level of those benefits must be deemed vested in scope and *not* subject to unilateral modification by CNH."  *Reese II*, 694 F.3d at 688.

Considering, however, the well-established law-of-the-case doctrine, *see Caldwell v. City of Louisville*, 200 F. App'x 430, 432–33 (6th Cir. 2006) ("The law-of-the-case doctrine precludes reconsideration of issues decided at an earlier stage of the case"), I recognize the limitations—although not the impossibility—in reaching a result that is inconsistent with that reached at this Court's first review of this case.

———————————

**DISSENT**

———————————

SUTTON, Circuit Judge, dissenting.  In a 9–0 decision reversing our court in *M & G Polymers USA, LLC v. Tackett*, the Supreme Court asked us to do two things:  (1) to interpret collective bargaining agreements "according to ordinary principles of contract law," and (2) to stop using the extraordinary *Yard-Man* "inferences," which had "plac[ed] a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements."  135 S. Ct. 926, 933, 935 (2015).  With the unanimous overruling of *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), those twin directives became one:  apply normal rules of contract interpretation to promises with respect to healthcare benefits.

Because our court had long insisted that the *Yard-Man* inferences sprang from ordinary contract law, the Supreme Court proceeded to guide us about what counts as an ordinary contract principle and what does not.  The Court told us to respect "general durational clauses" in collective bargaining agreements, reminded us that "courts should not construe ambiguous writings to create lifetime promises," and directed us that, "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life."  *Id.* at 936–37.

These principles should make quick work of this case.  In this collective bargaining agreement, the company never promised to provide healthcare benefits for life, and the agreement contained a durational clause that limited *all* of the benefits and burdens of the contract (not otherwise extended or shortened) to the six-year term of the agreement.  In every other circuit in the country, that would end this case.  The durational clause would control, and the healthcare benefits would last as long as the durational clause said they would.

Not here.  The court concludes that the company made a lifetime commitment to provide healthcare benefits as a matter of law.  Is this the application of "ordinary principles of contract law"?  I am dubious.  I know of no other area of contract law in which an agreement's promises, subject to an uncontradicted durational clause, could be found ambiguous as to their duration—

and then interpreted to last for life. The court's approach to this contract is ordinary only in this circuit and only in ways that contradict the Supreme Court's unambiguous directives about how to interpret such contracts. I respectfully dissent.

Several ordinary contract principles tell us how to resolve this case. One says that the four corners of the collective bargaining agreement are a good place to start. "Because 'the written agreement is presumed to encompass the whole agreement of the parties,' and because Congress has placed special emphasis on the 'written terms' of retiree healthcare plans, we must enforce those terms as written." *Gallo v. Moen Inc.*, 813 F.3d 265, 270 (6th Cir. 2016) (quoting *Tackett*, 135 U.S. at 936, 933), *cert. denied*, 137 S. Ct. 375 (2016); *see also* 29 U.S.C. § 1102(a)(1). In this instance, the key is what the agreement does and does not say. It *never* promises lifetime healthcare benefits. What *is* written are two things: a specific promise of retiree healthcare benefits and a general durational clause that ends the entire agreement on "May 2, 2004." That means the benefit lasts as long as the commitment—until May 2, 2004.

Reinforcing that conclusion is another traditional principle. "[C]ontractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991); *see Tackett*, 135 S. Ct. at 937. This agreement does not contain any written terms saying that healthcare benefits are excepted from the durational clause. Just the opposite: The agreement says that the Group Benefit Plan "*will run concurrently* with this Agreement and is hereby made a part of this Agreement." R. 439-4 at 45 (emphasis added). The durational clause, and the absence of any provision setting a time frame for healthcare benefits, is all anyone needs to know to decide this case. The benefits do not last beyond May 2, 2004, because the agreement did not promise them beyond that date. Any other approach to the issue, *Tackett* explained, "distort[s] the text" of the agreement by "refus[ing] to apply general durational clauses to provisions governing retiree benefits." 135 S. Ct. at 936.

A third principle cements this conclusion. "[W]hen a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id.* at 937. In this case, the healthcare-benefits promise is silent as to the length of the commitment, and the agreement contains an expiration date of six years. That means the

promise ends on May 2, 2004, unless and until the parties agree to extend it in the next collectively bargained agreement (just as they had so often done in the past).

Last but not least is this: Even if there were no durational language, even in other words if there were no six-year limit to the agreement, we still could not construe this agreement's commitments as lifetime promises. "[T]he traditional principle," *Tackett* noted, is "that courts should not construe ambiguous writings to create lifetime promises." *Id.* at 936. "[C]ontracts that are silent as to their duration will ordinarily be treated not as 'operative in perpetuity' but as 'operative for a reasonable time.'" *Id.* (quoting 3 A. Corbin, *Corbin on Contracts* § 553, p. 216 (1960)).

These principles should resolve this case. And they would resolve this case in every other circuit in the country. Before *Tackett*, ours was the only circuit that applied a presumption in favor of treating healthcare benefits as promises for life. *See Noe v. PolyOne Corp.*, 520 F.3d 548, 568 (6th Cir. 2008) (Sutton, J., concurring in part and dissenting in part). The other circuits applied the just-mentioned rules of interpretation to contracts just like this one, confirming that these rules are indeed "ordinary," and thus respected the durational clauses in each of them. *See, e.g.*, *Senior v. NSTAR Elec. & Gas Corp.*, 449 F.3d 206, 218 (1st Cir. 2006); *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 134 (2d Cir. 1999); *UAW v. Skinner Engine Co.*, 188 F.3d 130, 140 (3d Cir. 1999); *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 543 (7th Cir. 2000); *see also* Raymond A. Franklin, Note, *Vesting Retirement Benefits: Revisiting* Yard-Man *and Its Unacknowledged Presumption*, 25 J. Civ. Rts. & Econ. Dev. 803, 821–22 (2011). After *Tackett*, unsurprisingly, the other courts of appeals continue to enforce general durational clauses in similar agreements—including a unanimous Fourth Circuit decision from just a few weeks ago. *See Barton v. Constellium Rolled Prods.-Ravenswood, LLC*, 851 F.3d 349, 354 (4th Cir. 2017); *see also Finley Hosp. v. NLRB*, 827 F.3d 720, 725 (8th Cir. 2016); *Michels Corp. v. Cent. States, Se., & Sw. Areas Pension Fund*, 800 F.3d 411, 421 (7th Cir. 2015).

There is one area, it's worth pointing out, in which *our circuit* has followed these traditional rules. Pre-*Tackett* and post-*Tackett*, we have honored these principles if the healthcare-benefits promise was contained in an employment agreement between an individual and the company, as opposed to a collectively bargained agreement. *See Sprague v. Gen. Motors*

*Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (en banc). That means we have applied a presumption in favor of lifetime vesting where it is needed least (company promises in which the employees were collectively represented by a union), not where it is needed most (company promises in which the employees have no representative). Notably, *Tackett* favorably cited Judge Nelson's decision in *Sprague*, suggesting we should apply the *same rules* in both settings. *Tackett*, 135 S. Ct. at 936–37.

I am hard pressed to understand our hesitance in following the path that the Supreme Court has set for us, that the other circuits have long followed, and that we have followed when it comes to non-collectively bargained agreements with respect to the *same* subject matter. In what area of contract law would we disregard a durational clause? I know of none. How, then, can this be the application of ordinary contract principles? I know not.

In abrading an inter-circuit split (and an intra-circuit split) that the Supreme Court just sutured shut, the court with respect makes too much of the silence in the healthcare-benefits provision about the length of the commitment and too little of the durational clause's express limitation of these benefits to "May 2, 2004." Contractual ambiguity, it may be true, gives courts a warrant to search the record for extrinsic evidence of contractual meaning. But that warrant requires a textual finding unfound here—that there are two competing interpretations, both of which are fairly plausible readings of the language. *See TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 582–83 (6th Cir. 2010); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 425 (2012). Put differently, if there is only one fair reading of the agreement, that is the end of the matter.

So it should end here. Everyone agrees on one fair reading: that retiree healthcare benefits would last, like the rest of the promises in the agreement, until the contract expired on May 2, 2004. The majority offers another: that the contract promised retiree benefits for life. But the contract principles that the Court spelled out in *Tackett* do not permit that reading.

Consider the court's efforts to identify ambiguity and to resolve it in favor of a lifetime promise. It points to a provision in the Group Benefit Plan that says pension-eligible retirees "who retire . . . after 7/1/94" and their spouses "shall be eligible for the Group benefits as

described in the following paragraphs [which include medical coverage].  All other coverages cease coincident with the date of employment termination due to retirement."  R. 439-3 at 28. But this provision says only that healthcare coverage continues past the date of *retirement*.  It does not say that benefits continue past the termination date of the agreement, much less that they continue for life.

Silence about the length of this commitment, the court adds, supports a finding of ambiguity.  In the court's words:  "when read in conjunction with the whole instrument, . . . this silence, rather than resolving ambiguity, furthers it."  Maj. Op. 7.  But that is true only if we ignore what "the whole instrument" says.  When read in conjunction with a durational clause that expressly limits all provisions of the agreement to six years, silence as to a benefits provision must submit to the durational clause, not override it.

Nor does this interpretation require us to "presume that [the] general durational clause says *everything* about the intent to vest."  *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 209 (6th Cir. 2016); *see* Maj. Op. 8.  That is a straw man.  The durational clause sets an end date, hardly a surprise in a collective bargaining agreement, and that end date applies when nothing in the agreement contradicts it.  No presumptions necessary.  And no ambiguity.  Silence on the duration of the retiree healthcare benefits means that the agreement's general durational clause is still the only provision specifying when those commitments terminate—May 2, 2004.  *See Gallo*, 813 F.3d at 269–70.  Any other approach is *Yard-Man* re-born, re-built, and re-purposed for new adventures.

The court is troubled that "[g]iving dispositive weight to the general-durational clause here would move the thumb from the employees' side of the scale and place it on the side of employers" and that "*Tackett* sought to create a level playing field, not to foster an equally inequitable one."  Maj. Op. 8–9.  No worries there.  As just shown, there is no risk in giving "dispositive weight" to an express general durational clause so long as courts honor express limits or extensions of promises in the agreement.  More fundamentally, *Tackett* did not direct courts to give employees and employers an equal shot in litigation regardless of what their contract said; it ensured that collective bargaining agreements would be interpreted by the same, ordinary principles as other contracts.  Equality between contracts, not between litigants faced

with different contractual commitments.  In any other area, we would say an uncontradicted general durational clause controls all of the promises in an agreement.  If that puts a thumb on any side of the scale, it's because the text of the collectively bargained agreement put it there. And silence cannot lift it.

How, one might ask, does the court sidestep the Supreme Court's command that, "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life"?  *Tackett*, 135 S. Ct. at 937.  Isn't that rule applicable here?  Don't the court's repeated references to "silence" about the duration of the healthcare-benefits commitment implicate the rule?  The majority demurs "because the parties in this case carved out certain benefits, such as life insurance and healthcare insurance, and stated that those coverages ceased at a time different than other provisions of the CBA."  Maj. Op. 7.  But that is a recycling of the point addressed above—that the agreement says that retiree healthcare benefits continue after the date of retirement, quite understandably, but not after the expiration date of the agreement.  All the court has to go on to extend the benefits past the end of the agreement, once again, is:  silence.  And under *Tackett*, we cannot infer vesting from silence.

The court next claims ambiguity about whether the healthcare benefits last a lifetime because eligibility for healthcare benefits is linked to pensions and because pensions are vested lifetime commitments.  But the tying language in this contract has nothing to do with the duration of the healthcare benefits.  The agreement says that pensioners "shall be eligible" for healthcare benefits *for as long as the agreement provides those benefits*—that is, until May 2, 2004—not for as long as retirees earn a pension.  The court admits that the tying of healthcare benefits to pensioner status "by itself, says little about whether those healthcare benefits should vest for life.  It does, however, create an ambiguity about the parties' intentions."  Maj. Op. 8.

But if tying says little about vesting, how does it create ambiguity about vesting?  I do not know.  *Tackett* at any rate "rejected this kind of 'tying' analysis as a relic of a misdirected frame of reference, calling it one of many *Yard-Man* inferences that was 'inconsistent with ordinary principles of contract law.'"  *Gallo*, 813 F.3d at 272 (quoting *Tackett*, 135 S. Ct. at 937). A forbidden inference cannot generate a plausible reading.  And without a plausible explanation for treating the healthcare benefits promise as a promise for life, the general durational clause

controls. We do not "expect to find lifetime commitments in time-limited agreements." *Gallo*, 813 F.3d at 269. To suppose that this agreement's tying language suggests lifetime vesting clearly enough to override an explicit durational clause is to find an elephant-sized commitment in a linguistic mousehole. *See id.*; *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). It doesn't fit, and it doesn't belong.

Because the retiree healthcare benefits expired on May 2, 2004, the extrinsic evidence invoked by the court is neither here nor there. Still, even setting aside the absence of a contractual ambiguity to resolve—even indeed setting aside the agreement's provision *precluding* use of parol evidence, R. 439-4 at 47—the extrinsic evidence does not support the court's position. Start with the parties' bargaining history. "The 1998 CBA not only set the rules for employees who retired during the next six years of that CBA; it also *reset* the rules for employees who retired after July 1, 1994, which is inconsistent with the notion that the 1990 and 1995 CBAs (using the same [retiree healthcare benefit] language as the 1998 CBA) created unalterable, irreducible health benefits." *Reese v. CNH Am. LLC*, 574 F.3d 315, 324 (6th Cir. 2009). After *Tackett*, that same logic shows a lack of vesting, which is exactly what we concluded in *Gallo*. That these benefits were reset (or "continued" as in *Gallo*) after prior agreements expired undermines a theory of vesting because it indicates that they would have to be reset again when this agreement expired. *See Gallo*, 813 F.3d at 270.

This bargaining history also casts a clarifying light on the accounting document that shows CNH planned to pay healthcare benefits for the life of the retiree. CNH and the union renewed retiree healthcare benefits in each successive agreement until this litigation began. All that the accounting document shows is that CNH expected that practice to continue and forecast its budget accordingly. We dealt with exactly this situation in *Gallo*: "That a company to its credit hopes to subsidize healthcare benefits for its retirees for as long as possible does not mean it has promised to do so." 813 F.3d at 274. Taken in context, the accounting document shows only that CNH hoped and planned to pay lifetime healthcare benefits, not that it was contractually bound to do so. *See Witmer v. Acument Glob. Techs., Inc.*, 694 F.3d 774, 777 (6th Cir. 2012).

Nor is the remaining extrinsic evidence helpful, as most of it predates the relevant time period. The plaintiffs consist of retirees from between July 1, 1994 and April 1, 2005, and this dispute concerns what the company promised to that group. No amount of parol evidence regarding prior agreements, including promises made to workers who retired in the 1970s and '80s, is probative of the meaning of a set of distinct promises made by a new corporate parent for the first time in 1995, and then in altered form in 1998. The 1993 and 1995 "cap letters" showed that CNH planned to provide coverage beyond the term of the 1995 agreement, but again a commendable and hope-filled plan does not entail a binding commitment. We should reject this argument for the same reason the Fourth Circuit just rejected it: "The Cap Letters both fall short of *Tackett*'s requirement for a clear signal that parties intend for benefits to vest and fail to negate the unambiguous durational language in [the agreement]." *Barton*, 851 F.3d at 356. The "Letter[s] of Understanding" that accompanied the 1998 agreement, moreover, reinforce the conclusion that the benefits were not vested. One letter provided that CNH could unilaterally alter benefits to reflect new healthcare laws, and the other limited its promise to keep retiree costs constant to "the term of the 1998 labor agreement," R. 439-3 at 42. Even if admissible, the documents do not establish a lifetime right to healthcare benefits.

* * *

The conundrum of today's decision is that *Tackett* tells us to apply ordinary contract principles to these agreements, and yet every other court in the country would handle this case differently. I could double the length of this opinion with applicable quotes from other circuits but will offer just a few to make the point. Here's one circuit: "[E]ntitlements established by collective bargaining agreements do not survive their expiration or modification. . . . The mere silence of Collective Bargaining Agreements and plan documents concerning the vestment of welfare benefits fails to give rise to an ambiguity." *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 816 (7th Cir. 1992) (quotation omitted). And another: "Contractual vesting is a narrow doctrine. To prevail, Plaintiffs must assert strong prohibitory or granting language; mere silence is not of itself abrogation [of the right to alter health coverage]." *Wise v. El Paso Nat. Gas Co.*, 986 F.2d 929, 938 (5th Cir. 1993). And another: "Promising to provide benefits for a certain period of time necessarily establishes that once that time period expires, the promise does

as well. . . .  Therefore, we conclude that this provision unambiguously establishes that once the CBAs expired, Multifoods was free to reduce retiree medical benefits." *Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976, 981 (2d Cir. 1997).  And another:  "The most natural reading of a contract that has defined endpoints of 1998 and 2001 is that terms in the contract apply to events between 1998 and 2001." *Des Moines Mailers Union, Teamsters Local No. 358 v. NLRB*, 381 F.3d 767, 770 (8th Cir. 2004).  And still another:  "Silence on duration . . . may not be interpreted as an agreement by the company to vest retiree benefits in perpetuity." *UAW v. Skinner Engine Co.*, 188 F.3d 130, 147 (3d Cir. 1999).  And yet another:  "The plain language of the CBA and SPD clearly indicates that the retiree health benefits did *not* vest [because the general durational clause] contains explicit durational language stating that the retiree health benefits continue 'for the term of' the governing CBA." *Barton*, 851 F.3d at 354.

Either our circuit or the rest of the country is not applying "ordinary principles of contract law" to these agreements.  *Tackett*, 135 S. Ct. at 937.  I fear that we, again, are out of step.

A last point, about the equities.  No one likes the thought of ending healthcare benefits for retirees who have worked for much of their lives and who may not be able to take on new jobs now.  But it is by no means clear that this is what would happen if we followed *Tackett* and ruled that the benefits did not vest.  The absence of a contractual right to lifetime healthcare does not mean that these retirees will not receive healthcare benefits.  Even aside from existing federal healthcare programs, there's no reason to think that the incentives that drove the company and the union to agree repeatedly on retiree healthcare benefits in the past will cease to drive the parties to make similar arrangements in the future.  During oral argument, CNH confirmed that it intended, if it prevailed on the vesting issue, to bring this class of retirees into a healthcare plan *that mirrors the one offered to current employees and more recent retirees*.  At stake, then, is the plaintiffs' desire for *better* healthcare benefits than current employees and recent retirees.  Whether that request is fair or not, equitable or not, it isn't what this collective bargaining agreement provides.

For these reasons, I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 15-2382

JACK REESE; FRANCES ELAINE PIDDE;
JAMES CICHANOFSKY; ROGER MILLER;
GEORGE NOWLIN,
      Plaintiffs - Appellees,

     v.

CNH INDUSTRIAL N.V.; CNH INDUSTRIAL
AMERICA, LLC,
      Defendants - Appellants.

```
┌─────────────────────────────┐
│            FILED            │
│         Apr 20, 2017        │
│    DEBORAH S. HUNT, Clerk   │
└─────────────────────────────┘
```

Before:  GIBBONS, SUTTON, and DONALD, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
  for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's vesting determination is AFFIRMED.  IT IS FURTHER ORDERED that the case is REMANDED to the district court with instructions to properly weigh the costs and the benefits of the proposed plan in accordance with *Reese II*.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk